O7C8STOA

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                           23 Cr. 430 (KPF)

 5    ROMAN STORM,

 6                    Defendant.             Argument

 7    ------------------------------x
                                             New York, N.Y.
 8                                           July 12, 2024
                                             10:00 a.m.
 9
      Before:
10
                      HON. KATHERINE POLK FAILLA,
11
                                             District Judge
12
                              APPEARANCES
13
      DAMIAN WILLIAMS
14         United States Attorney for the
           Southern District of New York
15    BY:  NATHAN M. REHN
           BEN ARAD
16         BENJAMIN A. GIANFORTI
           Assistant United States Attorneys
17
      KEVIN G. MOSLEY
18         Special Assistant United States Attorney

19    WAYMAKER LLP
           Attorneys for Defendant
20    BY:  BRIAN E. KLEIN
           KERI CURTIS AXEL
21         KEVIN M. CASEY

22    HECKER FINK LLP
           Attorneys for Defendant
23    BY:  DAVID E. PATTON

24

25
```

1         (In open court; case called)

2         THE DEPUTY CLERK:  Please state your name for the

3     record, beginning with the government.

4         MR. REHN:  Good morning, your Honor.  AUSA Thane Rehn,

5     appearing for the United States.  I am joined at counsel's

6     table by AUSAs Benjamin Gianforti and Ben Arad, and Special

7     AUSA Kevin Mosley.

8         THE COURT:  Good morning to each of you and thank you

9     very much.

10        Mr. Rehn, is it you to whom I should be directing my

11    questions this morning or someone else?

12        MR. REHN:  Primarily, your Honor.  I will be handling

13    the motions to dismiss and any scheduling issues.  Mr.

14    Gianforti will be addressing any questions you may have about

15    the motion to suppress.  And Mr. Arad will be addressing any

16    questions you may have about the motion to compel.

17        THE COURT:  Thank you.

18        My friends at the back.  Thank you very much.

19        Mr. Storm, good morning to you, sir.

20        THE DEFENDANT:  Good morning, your Honor.

21        THE COURT:  If you could let me know if there is a

22    division of labor with respect to oral argument today.

23        MR. KLEIN:  There is, your Honor.  Brian Klein

24    appearing for Mr. Storm, who is here.  With me is Keri Axel and

25    Kevin Casey.  And David Patton just joined; he filed a notice

O7C8STOA

```
1    of appearance yesterday.

2              THE COURT:  Mr. Patton, welcome.  Long time no see.

3              MR. KLEIN:  We are dividing it up in a slightly

4    different way than they are.

5         I am going to argue the motion to compel, the 1960

6    portion of the motion to dismiss, and discuss all of the

7    scheduling and other matters.  Ms. Axel is going to discuss the

8    motion to suppress, the money laundering and IEEPA counts.  And

9    just to be full employment on this side, Mr. Casey, if you have

10   any questions about due process or First Amendment on the

11   motion to dismiss.

12             THE COURT:  Okay.  Thank you.

13        For those of you who have not had an oral argument

14   before me, I will give you the advice I give to everyone.

15   Please listen carefully to my questions.  Don't read too much

16   into them.  They are not designed to signify anything other

17   than my interest in exploring these issues.  It is often the

18   case that I am kicking the tires of the parties' arguments, and

19   therefore may ask questions that suggest I have a view that I

20   don't in fact have.  Answer only the question that is asked,

21   please.

22        I do have questions for each side.  If it turns out

23   that you would like to answer a question that I have asked the

24   other side that I did not think to ask you, I will give you

25   that opportunity as well.
```

O7C8STOA

```
1              I want to just begin with two housekeeping matters.
2    The first is, it did not strike me that the parties disagreed
3    over the relevant standards for a motion to compel, a motion to
4    suppress, or a motion to dismiss.  So if and when I decide
5    these motions, they will very likely be done by oral decision,
6    and I probably won't spend a whole lot of time on the
7    standards, assuming that the parties agree with them.  If you
8    don't, you will let me know.  I appreciate there are very
9    different views about certain cases on certain specific legal
10   issues.  But in terms of what one has to do to suppress
11   evidence, or what is the standard for a motion to compel, I
12   think there is agreement on that.
13              There is as well, and I can do this now or I can do
14   this at the end -- I will do it at the end.  There is a dispute
15   over the trial date.  Let's talk about that at the end because
16   perhaps I will have greater clarity after I have heard the
17   arguments.
18              All right.  I begin then with questions regarding the
19   motion to compel.
20              So, Mr. Klein, that is you, sir.  You are welcome to
21   stay where you are or go to the podium, as you see fit.  I will
22   just ask each of you, because I have had this happen, to bring
23   the microphones closer to you because the acoustics in the
24   courtroom are suspect.  So let us deal with that.
25              Shall we begin, Mr. Klein?
```

O7C8STOA

1            MR. KLEIN:  Yes, your Honor.

2            THE COURT:  I will ask you to stand if you can.

3            MR. KLEIN:  Sorry, your Honor.

4            THE COURT:  My point was that you can stand here or

5     stand at the podium.  Whatever works for you.

6            MR. KLEIN:  I will go over here.

7            THE COURT:  Welcome to the podium, sir.  Thank you.

8            Sir, I want to begin with the argument that you and

9     your client need access to the communications regarding the

10    MLATs in this case, and I believe in particular the one with

11    the Netherlands.  For me, there's a bit of a tension, or maybe

12    there is just a gap between the argument that these MLAT

13    communications are material to the preparation of the defense,

14    and then the arguments for why, which to me are conditional,

15    perhaps speculative, perhaps attenuated.  I would have thought,

16    and I do actually think, that there has to be some threshold

17    showing beyond, these might be useful to us.  And so I would

18    like to talk to you about what that threshold showing should

19    be.

20            Of course, you have offered some theories as to how

21    there might be something useful there.  I think that can be

22    said in every case.  I would think that there would have to be

23    more than that.  So let me please understand the showing that

24    you believe you have made, and the showing that you believe you

25    need to make, in order to obtain the underlying communications

O7C8STOA

1    regarding the MLATs.

2           MR. KLEIN:  Yes, your Honor.

3           So, I think we would start with the standard we put

4    in, that I don't think there is a disagreement on, with the

5    *Stein* case and *Maniktala*──maybe I am mispronouncing that──but

6    both indicate you need to have a strong indication that they

7    might be helpful.  So I will just start there.  You don't have

8    to definitively know precisely how they are going to help you,

9    but you need to have a strong sense of it, and I think we do

10   have that here.

11          We, of course, couch our language a little bit in the

12   "may" or "might" because we haven't actually seen them and, I

13   don't want to oversell to the Court, without having seen the

14   documents, how exactly we may use them.  But we know, generally

15   speaking, and I was a former prosecutor, MLAT requests and the

16   communications, again, can often involve substantive facts

17   about the case.  So they often include affidavits where an

18   agent testifies, or in a form of a writing, to facts.  They

19   often include exhibits.

20          Now, having not actually seen them, it's hard to say,

21   and the government didn't indicate exactly the nature of these

22   MLAT requests or whether there are any communications where

23   they have substantive discussions about evidence, about

24   witnesses, about other things.  So we are hampered a little bit

25   there, but that's generally the case with a lot of discovery

O7C8STOA

```
1   requests, your Honor.  And I think the case law indicates

2   that's okay as long as we are communicating to you why we need

3   these.  And I think we were doing the best we could with some

4   limited information.

5       But I would think, your Honor, if we look back and

6   say, these are often like search warrant applications, or

7   search warrant affidavits, which are provided to us on a

8   regular basis in discovery.  And, of course, the defense

9   doesn't know before we get them what actually is in the

10  affidavit, what it might say, why it might say it, are there

11  exhibits attached, etc.  So I think starting from that point,

12  which is we need to have a strong indication or a strong sense

13  of things, which I believe we do, and also what generally an

14  MLAT request looks like.

15      Here, also I would say this case involves a lot of

16  foreign evidence.  So the government has produced to us what we

17  understand, and we would like clarity, all the documents they

18  received from the Dutch authorities.  So from seeing those

19  documents, we also know that they have requested things that

20  are super-relevant to our case and our defense.  So I would add

21  that to the equation, your Honor.

22      THE COURT:  I guess I am trying to understand what you

23  mean by that.  You have received foreign evidence from them.

24  You therefore intuit, based on the evidence you have received,

25  that what the government sought included materials that are
```

O7C8STOA

1    relevant to your defense.  Why then do you need the

2    communications with the Dutch authorities?

3          MR. KLEIN:  Well, we don't need all communications, to

4    be very clear.

5          So, if they are just e-mailing the Dutch authorities

6    and saying, hey, can you speak on the phone today or when are

7    we getting the MLAT requests, we are not asking for that.  We

8    are asking if there are substantive communications about

9    substantive facts in this case.

10          THE COURT:  Why would that matter?

11          MR. KLEIN:  For example, they might have said, Can you

12    give all of the things related to these, and they list five

13    witnesses.  And there might be witnesses we don't know about

14    from other things, and the Dutch authorities didn't provide

15    that because they don't have it, but the affidavit itself or

16    the MLAT would contain that information.  So that's an example

17    I can think of off the top of my head.  Or they might list

18    categories of things they want, we want these seven things from

19    you, and they got six, but one of those categories would be

20    very informative to us in developing our case.

21          And, again, Judge Kaplan in *Stein*, it's not just like

22    it has to be an actual exhibit that might come in trial.  It

23    would help us uncover admissible evidence.  So I think that's

24    one of our focuses here.  We believe these would help us

25    uncover admissible evidence.

O7C8STOA

          THE COURT:  Suffice it to say, I have years of

experience with the *Stein* case, if you go back in the docket of

that case.  So thank you.  I am familiar with it.

          I understand the argument, I suppose.  If they ask for

seven categories of information and the government received six

and there is not a category, what does that mean for you?

          MR. KLEIN:  I do think the witnesses is a better

analogy here.  If they say, give us all information on these

five people, and they get information on four, and we haven't

heard of the fifth person they're asking about, or they have

communicated about that.  Do you have information on this

person?  They have charged our client with a conspiracy here.

So who they might think is involved in that conspiracy, they

might not have been identified for us yet.  So I am going to

use that as the example.

          THE COURT:  All right.  I understand that argument.  I

find perhaps less compelling the argument that you are somehow

entitled to the government's theory of the case.  I think there

is some suggestion that perhaps these communications, and

perhaps this is focused more on the communications with FinCEN

and OFAC, but the suggestion that perhaps the government's

theory has evolved, I don't know why you get that.

          MR. KLEIN:  Your Honor, that was one reason, and I

will explain it in a little more detail because I used a

shorthand in the motion.  But that goes to the same idea.  If

O7C8STOA

```
1    they are pursuing an avenue, Oh, we think this one avenue of

2    evidence is relevant at this time, and later they no longer

3    think that, maybe they have abandoned that theory because it's

4    somehow helpful to our client.  Now, I don't know what that is

5    because I haven't seen it.

6           So, for example, they can say, Oh, we think how the

7    alleged North Korean hackers performed this function and we

8    want evidence on that.  And then there is no evidence there.

9    But that would actually be very helpful to us in rebutting the

10   conspiracy charge that relates to the North Korean hackers,

11   knowing that there was no evidence, that they couldn't find

12   anything.

13          THE COURT:  Let me think about that.  There is a

14   difference between pursuing an avenue of inquiry

15   pre-indictment.  Maybe you don't think so.  If they are doing

16   an investigation, not every tree is going to bear fruit.  So

17   the fact that there are some that don't bear fruit, I don't

18   know if those inquiries were conducted before the indictment is

19   issued.  I am not sure why you get to see the evolution of

20   their theory of the case.

21          MR. KLEIN:  Well, the lack of fruit could be very

22   relevant to us, proving that the actual tree has no fruit.  So

23   the lack of one --

24          THE COURT:  You're not doing well with the metaphor

25   extension.
```

O7C8STOA

1          MR. KLEIN:  Again, our theory does not rest solely on

2     this theory of the case.  I will say this is a novel, complex

3     case of first impression, so understanding their theory would

4     be generally helpful to us.

5          THE COURT:  You can't understand it from the really

6     long speaking indictment?

7          MR. KLEIN:  We did learn things also from their motion

8     to dismiss opposition and other things.  So I agree, we are

9     getting a fuller picture of what they are saying.  So I am not

10     saying we are not.  But again, our motion does not rest solely

11     on the theory-of-the-case idea.  And the cases that rejected

12     it, one in which I was involved in, the *Hutchins* case in the

13     Eastern District of Wisconsin, they are different and maybe

14     would have relied more on that theory.

15          So, again, we have other grounds.  I know you know the

16     *Stein* case very well.  If you look at the grounds Judge Kaplan

17     laid out, we are also pinning our motion on other things, too.

18          THE COURT:  Are you making an argument under *Kyles v.*

19     *Whitley* that there is problem in the investigation of the case,

20     that there was some sort of misconduct by the prosecution team?

21     Because what you're saying to me sounds more that there are

22     areas that you're not suggesting is being kept from you

23     deliberately as much as accidentally, something that is not

24     important to the government ends up being important to you.

25     But I am asking, because there is a line of cases under *Kyles*

O7C8STOA

1   *v. Whitley*, whether you are making that argument, and if so,

2   what showing do you have that there are flaws in the

3   government's investigation that warrant disclosure?

4           MR. KLEIN:  We are always mindful of that, your Honor.

5   We are not making that right now.  But, of course, we are

6   keeping that in mind, and we are always on attention for those

7   kind of things, but I am not resting this motion on that.

8           THE COURT:  I appreciate you being so forthright about

9   that.

10          Do you continue to believe that FinCEN and OFAC are

11  part of the prosecution team?  I saw that there were some

12  changes in your reply brief or some modifications of your

13  argument.  So let me understand what today's argument is with

14  respect to communications with those agencies.

15          MR. KLEIN:  Can I just go back for one moment on the

16  MLAT thing?  I just want to make one more request, your Honor.

17          In looking at the cases the government cited, in at

18  least one example the court conducted an in-camera review of

19  the MLATs or the exhibits or whatever it was.  We would make

20  that request here.  If you're not inclined to grant our motion,

21  that at least you conduct an in-camera review of the MLAT

22  request, the affidavits, whatever they have attached to it, and

23  any substantive communications.

24          Now I will turn to the OFAC and FinCEN issue.

25          THE COURT:  Thank you.

O7C8STOA

1          MR. KLEIN:  We filed our motion based on the evidence

2     we had or the information we had at the end.  The government

3     made a number of representations, which I walked through in our

4     opposition, and it's on --

5          THE COURT:  In your reply?

6          MR. KLEIN:  Sorry.  The reply.

7          So, because of that, we tailored our request.

8          THE COURT:  Well, now it seems that you're asking for

9     prudential *Brady* reviews.  I am trying to figure out who is

10    conducting those prudential *Brady* reviews, sir.

11         MR. KLEIN:  We are asking for three things, but that

12    is one thing we are asking for, your Honor.

13         THE COURT:  Yes.

14         MR. KLEIN:  So, we would ask that you order the

15    government to order OFAC and FinCEN to do a prudential *Brady*

16    review.  I don't care who, whether it's OFAC or FinCEN or the

17    prosecutors in this team, but someone conduct a *Brady* review of

18    their files.

19         THE COURT:  The concern I have, sir, is that my

20    understanding for part of the reason of the development of the

21    line of cases regarding who is in the prosecution team is

22    precisely to prevent this from happening, where you can ask the

23    government to go beyond the investigation it's done and to do

24    the investigation you would like it to do.  So there is a way

25    in which it undermines those cases that define what the

O7C8STOA

1    prosecution team is.  Let me try and say that a little bit more

2    cogently.

3         If they were part of the prosecution team, of course,

4    I can ask them to do all sorts of things, and the government

5    would have an obligation.  They are not, as I understand the

6    case law.  And because they are not, they are treated

7    differently.  So for you to ask me to order the government to

8    do that prudential review seems to me to be an end run around

9    an entire body of case law that is designed to prevent that.

10        You may say to me, Failla, it's really important, and

11   I understand that.  I have reversed convictions based on late

12   disclosures of *Giglio* material.  I am not averse to it.  I

13   don't want to do it again, but I will if I have to.  I am just

14   saying, we all can agree *Brady* is an important decision, the

15   disclosure of exculpatory information is very important.  I am

16   not sure why I am out there ordering other agencies to do

17   prudential *Brady* reviews.

18        MR. KLEIN:  So, yes, it is very important, your Honor.

19   I will start with that.

20        THE COURT:  No one is disagreeing with that.

21        MR. KLEIN:  The case law is a little more nuanced on

22   that, I understand.  Judge Rakoff, in *U.S. v. Gupta*, which is

23   848 F.Supp. 2d 491 (S.D.N.Y. 2012), my reading of that is Judge

24   Rakoff didn't limit it, the *Brady* part, to just joint

25   investigations, but also joint fact-gathering.

O7C8STOA

1      Now, I know the government has made a number of

2  representations here that they have laid out all the ways they

3  didn't work together, but there may be things beyond that.  And

4  that indicates that it's not so narrowly drawn.  It's just a

5  joint prosecution.  So I think you do have room to order the

6  government here to ask those agencies to do a *Brady* review.

7      We do have two other requests there.

8      THE COURT:  Yes, sir.

9      MR. KLEIN:  So, one is just to have the government

10  confirm that they have produced everything they have received

11  from OFAC and FinCEN.  I believe that is the case, but it's not

12  totally clear from my reading of their opposition.  So we would

13  like that confirmation.

14      THE COURT:  Let me just ask this question though.

15  Imagine a situation in which they make an overbroad request to

16  FinCEN or OFAC and they receive material that is demonstrably

17  outside of Rule 16 or *Brady* or Giglio.  I think they would have

18  the discretion to not turn that plainly irrelevant material

19  over to you.

20      This may be a moot point if they have turned over

21  everything.

22      MR. KLEIN:  I am arguing against sort of myself here.

23  If they have said they have turned over everything, or if they

24  have said we have turned over everything, but we have withheld

25  irrelevant things that don't qualify under any of those things,

O7C8STOA

| | |
|---|---|
| 1 | then we will take that representation.  But I just want to have |
| 2 | some clarity on what they have done there. |
| 3 | The second, more minor sort of related request is |
| 4 | because they have brought up -- |
| 5 | THE COURT:  Would this now be the third request? |
| 6 | MR. KLEIN:  The third, subpart. |
| 7 | Again, we tried to narrow our requests based on the |
| 8 | representations. |
| 9 | A case they put in was the *Griffith* case, which I also |
| 10 | had in this district.  The government made a lot of |
| 11 | representations about not doing a joint review, and then later |
| 12 | disclosed that the FBI actually, unbeknownst maybe to the |
| 13 | prosecutors, had been contact with those agencies.  So I would |
| 14 | just ask that they confirm that their agents have not had |
| 15 | separate contact with OFAC or FinCEN. |
| 16 | Again, in that case, we actually got substantive |
| 17 | discovery that was very helpful to our defense because they had |
| 18 | went and followed up.  So we would just ask for that also. |
| 19 | THE COURT:  Those were the questions I had regarding |
| 20 | the motion to compel. |
| 21 | Let me ask my friends at the front table, is there a |
| 22 | preference that we do each motion individually as distinguished |
| 23 | from doing all the defense motions? |
| 24 | MR. ARAD:  We would suggest, yes, your Honor. |
| 25 | THE COURT:  Then I will hear from you. |

O7C8STOA

1          There is something not fully satisfying about the

2     retrospective nature of sort of the disclosure analysis.  I am

3     thinking in particular of cases like *Coppa*, which is the case

4     we always cite regarding *Brady* disclosures after trial or after

5     a guilty plea.  And what you are supposed to do then is conduct

6     this post hoc analysis of whether it would have been material.

7          I understand that.  The problem with that is always

8     that that supposes that at the end of the day the information

9     will always come out.  And I am a little bit concerned in light

10    of recent, what I will call hiccups in this district, in cases

11    like *Jain* and *Nejad*, that the government might, just by

12    accident, by inadvertence, not produce everything that they are

13    supposed to.

14          So, let me understand why you have such a

15    philosophical opposition to turning over, for example, the MLAT

16    communications.  Let me just add to that, I thought the

17    practice of the office was to turn over search warrant

18    applications with Rule 16 discovery; is that correct?

19          MR. ARAD:  That is correct, your Honor.

20          THE COURT:  What is it about MLAT requests that make

21    them so different from search warrant requests that they don't

22    get turned over?

23          MR. ARAD:  The difference, your Honor, is that MLAT

24    requests involve diplomatic sensitivies that warrant

25    applications do not.  And so, from a policy perspective, there

O7C8STOA

1    are certain consequences that could flow from divulging those

2    diplomatic communications that would not flow from divulging

3    warrant applications.

4         THE COURT:  Perhaps I can ask a better question,

5    although I appreciate the answer you have just given.

6         I am just remembering MLAT requests that I have

7    authorized and MLAT requests that I have prepared.  There's

8    some niceties in there.  We thank you so much, and we give our

9    highest compliments and all of that stuff.  But I don't

10   remember the actual application from the government being sort

11   of beset with diplomatic issues.  I appreciate what you're

12   saying.  Perhaps there are later exchanges about why there may

13   be a problem or a concern about turning over information.  That

14   I get.  But the actual application itself implicates these

15   diplomatic sensitivities, and if so, how?

16        MR. ARAD:  It can, your Honor.  These applications

17   often discuss the need for urgency with respect to certain

18   applications, for example.  That need can sometimes arise with

19   the ways in which different governments interact with each

20   other.  That plainly is a diplomatic issue.  That's just one

21   example.  But, as your Honor just noted, if we need to draw the

22   line between the request and then subsequent communications,

23   where at some point the diplomatic issues arise, that becomes a

24   more difficult exercise.

25        Now, philosophically, this is the reason that MLAT

O7C8STOA

1    requests are different from warrant applications, but it is

2    also probably more significant for the government's position on

3    this issue that the law simply doesn't require that MLAT

4    requests be disclosed.  And the multitude of cases that are

5    cited in our brief demonstrate exactly that.  Certainly not

6    where the defense hasn't given a concrete reason to believe

7    that the MLAT request will reveal something that will be

8    material to the defense.  In fact, in the cases that the

9    government cited in its brief here defendants made more of a

10   showing than the defendant in this case has made.  I will give

11   just one example, your Honor.

12           I will wait for your Honor's cue on whether to dive

13   into the case law.

14           THE COURT:  I will let you.  I do think you perhaps

15   want to engage on the *Gupta* case, but perhaps you want to save

16   that until our discussion about FinCEN and OFAC.

17           MR. ARAD:  We can do that, your Honor.

18           The point with the MLAT requests here is that the

19   defense's request is entirely speculative.  It lays out a

20   number of ways in which perhaps the MLAT request might be

21   helpful.  But any defendant could lay out all of those

22   possibilities in any case, and that alone is not a reason to

23   compel discovery of the MLATs.

24           THE COURT:  Let me ask you that in a slightly

25   different way, and you will excuse the analogy.

O7C8STOA

1          I have a couple of cases, additional to this one,

2     involving classified information.  And there is this concept of

3     Section 2 meetings with the parties.  And part of the reason

4     for that is so that the parties can attune me to issues that I

5     might not figure out are important to the case.  They may be

6     relevant to a government theory of the case.  They may be

7     relevant to a defense argument.  But because I am simply not as

8     steeped in the issue, I don't appreciate the significance until

9     I am told what the significance is.  So keep that as a concept.

10          A fear one could have is that the government might

11     have a certain tunnel-vision in looking at materials and might

12     not appreciate their significance or their materiality to a

13     defense case.  That is what I think Mr. Klein is suggesting to

14     me.  Could you help me understand why I should not be worried

15     about that in this context?

16          MR. ARAD:  At the outset, I will say that there is a

17     risk that one could view something more narrowly than one ought

18     to.  But I think that that risk has been overstated by the

19     defense in this case.  The government, when reviewing documents

20     and deciding what needs to be produced and what doesn't, takes

21     an expansive view, particularly in light of recent hiccups that

22     your Honor has described.  So the risk exists, your Honor, but

23     the presence of the risk doesn't necessitate an open-file

24     discovery order on diplomatic communications.

25          THE COURT:  One moment, please, sir.

O7C8STOA

1          Let's then talk about the OFAC and FinCEN

2    communications.  You have heard, and I took down if you didn't,

3    Mr. Klein's three requests from the defense.  I can ask them of

4    you and you can tell me whether you wish to stave off or

5    perhaps limit an issue by responding to them or you may tell me

6    no as to everything.  Do you recall what the three requests

7    were?

8          MR. ARAD:  I believe one of the requests, your Honor,

9    was to confirm that the government has produced all of its

10   documents that it received from OFAC and FinCEN.

11         THE COURT:  Yes.  Are you willing to speak to that

12   issue or not?

13         MR. ARAD:  I am willing to speak to it, your Honor.

14         I cannot confirm that the government has produced all

15   of the documents that it has received from OFAC and FinCEN, but

16   the government is not under any obligation to produce all of

17   those documents.  And I can confirm for the Court that the

18   government has fully complied with its discovery obligations

19   under Rule 16, *Brady* and its progeny.

20         THE COURT:  Do you want to talk about the *Griffith*

21   case request confirming, hopefully, that your agents have not

22   had separate contacts of which you are unaware?

23         MR. ARAD:  It's a little hard for me to confirm the

24   negative.  I am not aware of any --

25         THE COURT:  I will try it this way.

O7C8STOA

```
 1              Talk to your colleague and then get back to me.
 2              MR. ARAD:  We did speak with our agents, your Honor,
 3    in formulating our response to the motion to compel, and we can
 4    confirm that the FBI has not had outside contacts with OFAC and
 5    FinCEN.  I believe that was the question.
 6              THE COURT:  It was.  So no one is going to be
 7    surprised unless your agents are misremembering things, which
 8    one hopes is not the case.
 9              MR. ARAD:  That's right.
10              THE COURT:  So that leaves us with this idea of the
11    prudential Brady review.  I have a little bit of skepticism of
12    it.  I have articulated that to the defense.  But far be it for
13    me to disagree with Judge Rakoff, but indeed, that is what I am
14    doing.  So if you want to engage with the Gupta decision or
15    other cases in this regard, that would be helpful.
16              MR. ARAD:  I think on the prudential Brady search
17    there are a few points.
18              First, there just aren't indications that OFAC and
19    FinCEN were part of the prosecution team in this case.  They
20    did not do the things that investigators do and that courts
21    look to in deciding whether somebody is part of the prosecution
22    team.
23              Second, I am not sure the government would be able to
24    order OFAC and FinCEN to conduct a prudential Brady review.
25    Regardless of whether it could --
```

O7C8STOA

| | |
|---|---|
| 1 | THE COURT: Can I just hear that again? |
| 2 | MR. ARAD: I am not sure that the government would be |
| 3 | able to order OFAC and FinCEN. |
| 4 | THE COURT: Of course. Could I? Yeah. |
| 5 | MR. ARAD: It's not for me to say. |
| 6 | THE COURT: It's always fun to be told you don't have |
| 7 | the power to do something. If you think I don't? |
| 8 | MR. ARAD: No. I would not say so. |
| 9 | THE COURT: I would take that particular mantel from |
| 10 | you. It wouldn't be your fault. It would be entirely mine. |
| 11 | I think the point -- again, going back to *Gupta*, |
| 12 | perhaps what you're starting to say is that this case isn't |
| 13 | Gupta. Yes, I am aware of that. But there are ideas in Judge |
| 14 | Rakoff's decision that might be mapped on to this case, and |
| 15 | that's what I want you to engage on. |
| 16 | MR. ARAD: It's difficult for me to see where the |
| 17 | ideas in *Gupta* map on to this case, your Honor. One of the |
| 18 | differences I think is that there is just no indication |
| 19 | whatsoever here that the files that OFAC and FinCEN have |
| 20 | contain *Brady* material. And so, we wouldn't even know what to |
| 21 | ask them to look for if we told them that they needed to find |
| 22 | *Brady* material. That would be a practical difficulty that we |
| 23 | would face. |
| 24 | And in this case, where there are no such indications, |
| 25 | I think it would set a dangerous precedent to require the |

O7C8STOA

1  government to ask every third-party agency, with which it has

2  any interaction in a case, to conduct a *Brady* review, without

3  any indication that *Brady* exists there, without any indication

4  of what exactly the *Brady* material would look like.  If it were

5  ordered in this case, I think perhaps it would have to be

6  ordered in every case, and that would bring the government's

7  investigations to a gridlock.

8          THE COURT:  Okay.  You're overstating the issue, but I

9  get it.  Thank you.

10         Are there questions that I asked of Mr. Klein that you

11 wanted to follow up on that I didn't know to ask you?

12         MR. ARAD:  No.  Thank you, your Honor.

13         THE COURT:  Thank you.

14         Mr. Klein, brief reply.

15         MR. KLEIN:  Yes, your Honor.

16         We would be fine in the first instance of taking the

17 MLATs that removes the diplomatic niceties that the prosecutor

18 mentioned are one of the reasons for not handing them over.  I

19 also remember doing MLAT requests, and I remember them being

20 much like your Honor does.  So we are fine if they want to

21 remove some of this diplomatic language or whatever it is that

22 causes this concern and have a redacted version that is more

23 focused.  So I will start there.

24         Number two, when the prosecutor mentioned there is no

25 indication that OFAC might have anything that's *Brady*, that's

O7C8STOA

1    just not true, your Honor, in my opinion.  They produced to us

2    a report from OFAC that is 60, 70 pages long, it has over 200

3    exhibits, on Tornado Cash, on what happened here.  So there is

4    a strong indication that OFAC has done a thorough investigation

5    about this and may have materials that are *Brady*.

6          So, the one thing we received from the government was

7    this report.  We have recently asked them to provide us an

8    unredacted version and the exhibits; they haven't responded

9    yet.  We hope we don't have to come back to your Honor on that

10   issue.  But there is an indication that they have substantive

11   materials and have done a substantive investigation and

12   therefore could have *Brady* materials.

13         THE COURT:  Thank you.

14         Let's move, please, to the motion to suppress.  Is

15   that Ms. Axel?

16         MS. AXEL:  Yes, your Honor.

17         THE COURT:  Understand that my first question to you

18   comes from the perspective of a very busy district judge.

19         Given that the government has had no success in

20   opening up any crypto wallets of any type, is this even

21   something about which we should be concerned?

22         MS. AXEL:  Yes, your Honor, and we did anticipate that

23   question.  I think we appreciate, too, I don't think the

24   government here takes the position that the issue is not ripe.

25   They didn't in their papers.  They didn't in our

O7C8STOA

1    meet-and-confer on the issue.

2            Your Honor, we think there are obviously important

3    fundamental rights here, including defendant's Fourth Amendment

4    right that would be abridged if the government were to continue

5    to try to use these devices to go off on to the internet and

6    try to seize assets.

7            THE COURT:  Just to the point you're now raising.

8    Imagine counter-factually that the government goes to some

9    judge somewhere next week, I won't say tomorrow, and gets a

10   search warrant or a seizure warrant for, for example, the

11   hardware wallets or the devices on which information about the

12   wallets is held.  Does that alleviate any of the concerns that

13   you have expressed in your suppression motion?

14           For example, one of the things that you're saying is

15   that the warrant is an inappropriate seizure warrant.

16   Something else is that there is a question about things being

17   in the residence or not being in the residence.  And I thought

18   one of the points that you had was that the government is sort

19   of telescoping its search warrants by allowing or arrogating

20   for itself the ability to search not merely the things -- well,

21   to search the things it has found as a result of the search.

22   And for that latter argument, I suppose, and I am just

23   thinking, and I will talk to the government about this too, I

24   am thinking about situations where the government conducts a

25   search and finds phones or laptops.  I thought the practice, or

O7C8STOA

```
1    at least it had been at one point, was to then get a search
2    warrant for the individual devices, and not to use the search
3    warrant that you used for the residence or for the business to
4    then search the computers.
5         Go ahead.
6         MS. AXEL:  I want to make sure, backing up a second,
7    that we are still not confused about what our position is.
8         THE COURT:  Let me hear it then, please.
9         MS. AXEL:  Our position is not that they cannot search
10   the devices.  They don't need a separate warrant to search the
11   devices.  That is not our position.  They can open the wallets.
12   They can search the so-called wallets.  I would return the
13   Court to maybe reverting back to our reply on this, because I
14   think we swatted away those hypothetical sort of histrionic
15   arguments about us asking for limitations, in the government's
16   brief.
17        THE COURT:  I didn't think you were calling me
18   histrionic.  I am not sure their arguments rose to that level,
19   but go ahead.
20        MS. AXEL:  Fair enough, your Honor.  But there were
21   some sort of worst-case scenario things that we are trying
22   constrain the government's ability to search devices it seizes
23   on the property, and why were we not making that same argument
24   with respect to the laptops or the phones?  And what we said
25   is, our position is the same with respect to these little USB
```

O7C8STOA

1    devices, and, in fact——and we may get to this in our

2    argument——sometimes now these wallets actually look like an ATM

3    card.  So whether it looks like a USB device or an ATM card, or

4    whether it looks like a phone or a laptop, our position there

5    is I think consistent with settled law here.  If those devices

6    are on the premises, they can search those devices.

7              THE COURT:  Of course.

8              MS. AXEL:  So I think the distinction here is that, if

9    they want to go out on the internet and then seize

10   cryptocurrency, or if they want to use an ATM card or passwords

11   found in a defendant's residence to go seize assets in his bank

12   account, they need a separate warrant for that.  That's a

13   really important procedural safeguard, your Honor.

14             First of all, if they had tried to actually prepare

15   this warrant under the venue provision that they have cited, in

16   order to go out on the internet and get something, they would

17   have had to make a much more particularized showing.  This is

18   totally overbroad with respect to any and all cryptocurrency.

19   And we see this, your Honor, not just in this case, but we do

20   see this in cases across the country, where they are sticking

21   this language in this --

22             THE COURT:  Which language is "this language," please?

23             MS. AXEL:  The language in Ms. Hutchins' affidavit

24   that says that cryptocurrency is found on the wallets.  And

25   that's misleading.  No personal animosity towards Ms. Hutchins.

O7C8STOA

1    I think this is a government policy that they include this

2    language.

3            And then we see the sloppiness that happens then, and

4    we see it in the opposition brief.  On the one hand, the

5    government admits that actually cryptocurrency lives on the

6    internet; it lives on the blockchain.  It does not live on

7    these wallets.

8            THE COURT:  What district are we then submitting this?

9    As a practical matter, if it's on the blockchain, to which

10   judge is this warrant being directed?

11           MS. AXEL:  I think Rule 41, the subdivision they have

12   provided, absolutely provides for them to be able to get a

13   warrant for that.  In fact, we have a string cite in the reply

14   brief where we show that the government knows exactly how to do

15   this.  We have cited multiple cases.  I can direct the Court to

16   it.

17           At footnote 4, the case in the text --

18           THE COURT:  What page, please?

19           MS. AXEL:  Page 7, footnote 4.

20           First, the *Firoz Patel* case is a criminal warrant in a

21   criminal case in the District of D C.  Then the four cases in

22   the footnote are civil seizure warrants.  But there is no issue

23   that once the government has the passwords and has the tracing

24   on the blockchain, they can come to a court and ask a

25   magistrate to issue a particularized warrant to seize those

O7C8STOA

1    assets.

2            But that's not what we have here.  We have a premises

3    warrant to go into Mr. Storm's home.  And with that warrant

4    they can only search and seize what is in the curtilage of that

5    home, and only for evidentiary purposes.

6            THE COURT:  Again, to my hypo, if they went next week

7    to get warrants of the type that are described in footnote 4,

8    or on page 7 of your reply, are you suggesting or arguing to me

9    that it is too late in the day for them to do that?

10           MR. AXEL:  No.

11           THE COURT:  I ask because you cite the *Kyllo* case and

12   there is a suggestion, which I understand, that if the

13   government obtains something by improper means, there are

14   certain times they can't fix it.  I did not understand, if that

15   case was cited, to make the argument that it can't be fixed

16   here.  Your suggestion instead is that, rather than rely on the

17   warrant for the residence, they should have appropriate,

18   particularized warrants for this information.

19           MS. AXEL:  I appreciate the question, your Honor.

20   That occurred to me as well when I reread the brief in

21   anticipation of this argument.

22           Your Honor, I think it would violate the warrant to go

23   out on the internet and use those passwords that it obtained

24   through this search.  It would go beyond the scope of the

25   Fourth Amendment.  I am not saying we wouldn't then move to

O7C8STOA

1    suppress that evidence, because using the passwords they went

2    out on the internet.  But obtaining the passwords themselves,

3    we would not argue is a violation of the Fourth Amendment

4    because the passwords are on the devices in the home.

5         THE COURT:  So, potentially, there is a needle they

6    could thread.  But, potentially, your argument would be a

7    fruits argument, that they could not now, having done what they

8    have done, go and obtain warrants for the wallets and other

9    devices.  This I understand.  Thank you.

10        MS. AXEL:  Yes.

11        THE COURT:  You will take this the right way.  I found

12   less compelling what I think was your last argument, which was

13   the suggestion that this was an end run around the asset

14   forfeiture laws.  I thought the government explained that that

15   was another process.  But let me understand your current view

16   as to the interplay, if any, between your motion to suppress

17   and the provisions for civil and criminal asset forfeiture.

18        MS. AXEL:  Your Honor, I do think there is an

19   important distinction between a search warrant and a seizure

20   warrant.  And I also was an AUSA and I dealt extensively --

21        THE COURT:  Everybody other than Mr. Patton is going

22   to be able to say that.

23        MS. AXEL:  I dealt extensively with foreign forfeiture

24   warrants in a case where I think, your Honor, there were assets

25   all over the world.  And I have a heightened sensitivity to the

O7C8STOA

```
1    type of tracing that is required to go seize assets for
2    forfeiture purposes.  And it's also very clear in a forfeiture
3    context, your Honor, that you can't seize substitute assets
4    pretrial.
5              So, because of that, I think, the tracing in a
6    forfeiture warrant is very clean and focused, and this "any and
7    all cryptocurrency," when obviously someone like Mr. Storm has
8    other, outside of the Tornado Cash protocol, has other
9    cryptocurrency-related projects, in other words, your Honor, he
10   has money that even the government would concede is clean.  And
11   so having this "any and all cryptocurrency" connected to
12   wallets in his home, there is a breadth that happens in a
13   search warrant of someone's home that doesn't happen in a
14   seizure warrant.  You cannot have substitute assets.
15             So I think if we are very clear about this process,
16   the search warrant allows for seizures for evidentiary
17   purposes.  If it so happens that then you can then under
18   criminal forfeiture statutes seize that property, then so be
19   it.  Then that may be appropriate.  But you still have to
20   satisfy first of all the search warrant standard.  And if you
21   don't have it, you really should get a seizure warrant, and
22   there would be heightened standard for the type of tracing
23   requirement.
24             THE COURT:  I am not disagreeing with what you are
25   saying.  I guess I understood the government to be suggesting
```

O7C8STOA

1    that part of the reason it seeks to seek this cryptocurrency is

2    not for asset forfeiture purposes, although they do make some

3    noise about this being the proceeds of some of the conduct, but

4    I thought as well that it had, in their estimation, evidentiary

5    purposes.  And to that end, they were having difficulty

6    disentangling what portion of the crypto was, in fact,

7    traceable to original TORN tokens, which a portion of which was

8    traceable to something else.  So I thought that was part of the

9    reason as well that what they were seizing had less specificity

10   than you might like.

11         So, what I am saying is, I am putting now to the side

12   the asset forfeiture issue.  To the extent that they are

13   seizing this for evidentiary purposes, and to the extent that

14   they tell me they can't disentangle what is and is not relevant

15   evidence, why can't they seize it while they figure it out?

16         MS. AXEL:  Your Honor, I think that's clearly

17   overbroad.

18         Again, let's go back to the bank account analogy.  And

19   even the government uses this.  But there is no reason why bank

20   accounts are different than crypto accounts, other than we are

21   all very familiar with them.  There is a statement in the

22   opposition, something like, the government, of course, would

23   never go out and try to seize a defendant's entire bank

24   accounts because there might be some assets that were tainted

25   on them.

O7C8STOA

1          And that's the case.  No magistrate in this courthouse

2     is going to grant that.  If you come in and say, the defendant

3     has some money that's tainted in his bank account and we can't

4     trace it, because perhaps there is foreign evidence or some

5     reason why we can't figure out which of -- he has 10 million in

6     his bank account, 2.6 million is tainted, and we want to seize

7     it all for evidentiary purposes under a search warrant.  No

8     magistrate in this courthouse is going to grant that.

9          So, that's the standard here, your Honor.  That would

10    violate the particularity requirement of the warrant.  They

11    have to actually show for evidentiary purposes what

12    specific -- they have to have better tracing for the criminal

13    purpose, the probable cause and the criminal purpose, and the

14    actual moneys to be seized.  And I think that that standard

15    would be very clear if we were really looking at a warrant that

16    went to his bank account.  But I think that that's a fair

17    analogy.

18          THE COURT:  Thank you very much.  Unless there is

19    anything you need me to know that I have not asked you about.

20          MS. AXEL:  No.  Thank you, your Honor.

21          One thing, I guess.  You did ask me about remedies.

22          So, I would say that, having thought about this in

23    anticipation of the argument, what we would simply ask the

24    Court to do is to use its power to excise both the words "any

25    and all" in paragraph 16 and to strike paragraph 17 of the

1    items to be seized.  And that would affect the remedy that we

2    are seeking.

3              THE COURT:  Thank you very much.

4              Mr. Gianforti.

5              MR. GIANFORTI:  Where would you like me to start, your

6    Honor?

7              THE COURT:  As you can tell from my first question to

8    Ms. Axel, I am trying to limit this or short-circuit this as

9    much as possible.  Why can't you get a supplemental or a second

10   warrant, as they have suggested in their papers?

11             MR. GIANFORTI:  We could.  We certainly could.  The

12   issue that we face, your Honor, and it wasn't raised squarely

13   in our opposition, but I think it's certainly implied in some

14   of the things we said, I think this is completely unripe at

15   this point.  We have seized nothing.  We are talking about

16   suppressing evidence that we don't have.  We are attempting to

17   access these wallets.

18             THE COURT:  Let me make sure I understand because I

19   thought I saw in your opposition that there were items that you

20   seized that might have, for example, what I know to be private

21   keys or information of that type.

22             So you have told me there is a hardware wallet.  What

23   does that look like?  Does it look like a bank card?

24             MR. GIANFORTI:  I believe it looks like a USB.  I

25   haven't physically seen it.  It's some kind of hardware device

O7C8STOA

1    that contains the private keys.

2          You are quite right, your Honor, that some of the

3    evidence that was seized from his home was, I think, scraps of

4    paper that appeared to have private keys.  We haven't been able

5    to connect up those private keys to any particular wallets on

6    the blockchain such that we may try to seize cryptocurrency.

7    If we were to determine, say, that that private key led to a

8    wallet that had cryptocurrency that was traceable to the

9    offenses, we would seek a proper seizure warrant, not the sort

10    of search and seizure warrant we have here, which was meant to

11    seize evidence.  As we have laid out in our warrant and in our

12    brief, cryptocurrency here could form evidence of the charged

13    crimes, at least $2.6 million of the cryptocurrency that

14    Mr. Storm had represents the proceeds from the Tornado Cash

15    scheme.

16          THE COURT:  Let me understand what you think you have

17    seized.  You do have a warrant application and a warrant that

18    you believe allows you to search for and seize any and all

19    cryptocurrency, correct?

20          MR. GIANFORTI:  Correct.

21          THE COURT:  Right now today you didn't actually seize

22    any cryptocurrency; also correct?

23          MR. GIANFORTI:  Correct.

24          THE COURT:  Why—and I am not telling you to do

25    something, I am asking a question—why not agree to excise that

O7C8STOA

1    portion of paragraph 16 and strike paragraph 17?  Because you

2    don't have any right now.  At most, what you have is

3    information that might lead you to find cryptocurrency or

4    wallets somewhere down the line, at which point you were

5    starting to tell me you might then ask for another warrant.  I

6    am actually trying to understand what the gap is between the

7    parties, and I am sure you have discussed this in

8    meet-and-confers that I wasn't present at, so maybe you both

9    know this.  But you today don't have cryptocurrency.

10              MR. GIANFORTI:  That's correct.

11              THE COURT:  Maybe some day you may be able to find it

12    with the information you did seize, in the same way it would be

13    like going to a home and getting a bank account statement and

14    being able to thereafter subpoena information about the account

15    and perhaps seize funds from the account.

16              So, I guess I am trying to figure out, having now

17    heard me speak at some length with Ms. Axel, what is the

18    difference between the parties on the issue of the request in

19    the warrant for the seizure of cryptocurrency?

20              MR. GIANFORTI:  I don't think there is one.  Because I

21    think we are on the same page in terms of what a search warrant

22    like the one we got allows and what a seizure warrant for

23    forfeiture purposes allows.  And we readily admit that what we

24    got was a search warrant which allows seizure for the

25    preservation of evidence.  And these devices that we are

O7C8STOA

1    attempting to get into, we may get into them before trial, at

2    which point we may be able to link up particular cryptocurrency

3    to the crimes that are charged, at which time we would seek a

4    subsequent seizure warrant.

5        THE COURT:  Well, perhaps, then, Ms. Axel may come

6    back to me and say that the Fourth Amendment damage has already

7    been done by obtaining information that allows you to examine

8    what you did seize, the scraps of paper with private keys and

9    things of that nature.

10        I realize I sound as though I am talking out of both

11    sides of my mouth.  I promise you I am not.  I am really trying

12    to understand the issue.

13        The defense has said to me that they are fine with you

14    obtaining certain materials during the search, that there were

15    things that you could properly seek during the execution of the

16    search warrant.  They are concerned about you going off and

17    trying to get things off of the internet.  And they believe

18    that what you should do is to have a more particularized

19    warrant with respect to the crypto assets.  And you're not

20    disagreeing with them as much as you're saying, we haven't been

21    able to get any cryptocurrency just yet, and maybe some day we

22    will, and maybe some day we will issue a second warrant.  So

23    that's why I am trying to figure out what the difference is

24    between the parties.

25        To that point as well, I began by asking Ms. Axel

O7C8STOA

1    whether this was ripe, and she said yes, because it's not as

2    though you have stopped looking at what you have seized.

3    You're telling me it is not ripe, and I wanted to understand

4    that better.  So excuse the extremely compound question.

5            MR. GIANFORTI:  I think I see where you're going.

6            So, maybe this will be helpful and you can tell me if

7    it's not.  We use this example in our brief.  This is really no

8    different than when the government goes in, as we did with this

9    warrant, and seizes a bunch of electronic devices, like phones

10   and laptops, and is able to bypass their encryption or

11   whatever, and then does a responsiveness review.  So we get

12   into a phone, we look for evidence of a crime, and that's the

13   evidence that we then have, and then the rest of the evidence

14   we don't use because it's not responsive to the warrant.  This

15   is the same thing where we are going into --

16           THE COURT:  One moment, please.

17           And this is where my information may be dated.  You

18   have a warrant that permits you to search for and seize

19   electronic devices.  But I thought you then needed a separate

20   warrant to open the devices.  You're saying that's now

21   telescoped.  To the extent that you find a laptop, you're

22   authorized to open that laptop -- okay.

23           MR. GIANFORTI:  The warrant covers both.  Every

24   premises warrant that I have executed in the job covers both

25   the search of the house for items and then the access to those

O7C8STOA

1    items.

2            THE COURT:  I understand that.

3            You may continue.  Thank you.

4            MR. GIANFORTI:  So, your Honor, if we get into these

5    devices, as we would any phone, we will look at them, we -- I

6    think what sounds like the concern here is that we are doing

7    some kind of an end run around the forfeiture process and

8    attempting to drain this man of all of his wealth via a search

9    warrant, which is not at all what we are trying to do.  We are

10   trying to simply access these devices, that may point us in the

11   direction of cryptocurrency that is evidence and proceeds of

12   the crime.  If that cryptocurrency ends up being forfeitable,

13   it will be subject to the forfeiture process in connection with

14   this case.

15           THE COURT:  I think there is a second issue that Ms.

16   Axel was raising, and that is, the use of the term "all

17   cryptocurrency" suggests or may suggest a measure of

18   overbreadth because you don't know today how much

19   cryptocurrency Mr. Storm has.  You might imagine that not every

20   token, every bit of it he has, is either evidentiary to prove

21   the government's claims in this case or that it's subject to

22   asset forfeiture.  And, as Ms. Axel noted, you can't seize

23   substitute assets.

24           So there is a question about whether the manner in

25   which you have sought to locate this cryptocurrency is itself

O7C8STOA

1    overbroad because there hasn't been a sufficient particularity.

2    For example, you didn't say, I would like to seize that

3    cryptocurrency which appeared on the wallet after the OFAC

4    sanctions were imposed because I am confident, or at least I

5    have probable cause to believe that that is traceable to the

6    offense, as distinguished from the stuff he has accrued over

7    the preceding several years.

8         MR. GIANFORTI:  The trouble, your Honor, is the way

9    that cryptocurrency exists.  Once we get into it, it's sort of

10   this undifferentiated mass, and then we have to use tracing

11   analysis to determine what portion of it is evidence or fruits

12   of the crime.

13        So we would theoretically get into a wallet.  Let's

14   say we get into a wallet and it indicates that that wallet

15   contains -- TORN is actually kind of a tricky example.  I think

16   we would say that any TORN is sort of evidence of proceeds of

17   the crime.  Let's say we were to get into a wallet and it

18   contains ETH, or one of these stable coins which is linked to

19   the US dollar, which is a common thing that people convert

20   cryptocurrency into.  We need to get access to that wallet in

21   order to do the tracing analysis that shows that it is linked

22   to the crime in some way.

23        So that's the issue.  It's a little different than,

24   say, a bank account.  First of all, you don't search a bank

25   account.  You can submit a subpoena, as you well know.  And if

O7C8STOA

1    we have reason to believe that a million dollars of the crime

2    proceeds flowed into an account, we can do that tracing

3    analysis through subpoenas and the like and figure out whether

4    it stems from a particular crime and then we go and seize that

5    million dollars from that account.

6            With cryptocurrency we go in and say, okay, we have

7    got 100 ETH sitting in this wallet.  That doesn't tell you

8    anything.  So then we have our really smart tracing people look

9    at it and they say, well, this ten ETH came from this

10   transaction on the blockchain; and if you go back far enough

11   this represents, this would be the TORN tokens.  So we are then

12   able to determine what is seizable from that point forward.

13           So, again, it's a little bit like the phone, when you

14   go in you don't know what you're going to find, and only by

15   going through it and looking at it are you able to determine

16   what is actually evidence responsive to the warrant.  It's the

17   same thing here.

18           THE COURT:  Those are the questions I had for you.

19   Are there responses you had to questions I asked Ms. Axel?

20           MR. GIANFORTI:  I don't think so, your Honor.  Thank

21   you.

22           THE COURT:  Thank you.

23           Ms. Axel, do you want to be heard in reply?

24           MS. AXEL:  Just a couple of small things, your Honor.

25           THE COURT:  Is there no gap that can be bridged here?

O7C8STOA

1    You have now heard me have different discussions with Mr.

2    Gianforti.  Is there anything, based on my conversation with

3    him, that might lead you to believe that a further

4    meet-and-confer might clarify the parties' positions?

5          MS. AXEL:  It's somewhat puzzling, your Honor.

6    Actually, on the one hand, the representation that they might

7    be willing to go get seizure warrants would close the gap.  But

8    I think the gap closer, your Honor, is the remedy that we

9    proposed.

10          Mr. Gianforti said, they open the wallet, they see 100

11    ETH on the wallet.  There is no ETH on the wallet.  It's just

12    passcodes that tell you what you can access with that wallet.

13    It's like your ATM card, going back to our factual analogy.

14    But the rest of what he said I agree with.  Once they open it

15    and they see the passcodes, they can map the crypto, they can

16    see where it came from, they can see what it went to, and then

17    they can take the next step of getting authority to go seize

18    something.

19          THE COURT:  Based on what you understand the

20    government to be doing right now with the information it

21    obtained from the execution of the search warrant at

22    Mr. Storm's residence, you have just heard Mr. Gianforti tell

23    me what they are doing, and what they had success with and what

24    they have not had success with.  What of that is violative of

25    the Fourth Amendment?

O7C8STOA

1          MS. AXEL:  Your Honor, accessing the devices is not

2   violative.  But, they have not taken off the table seizing any

3   and all cryptocurrency.

4          So, our remedy is, if you look at paragraph 16 of the

5   warrant, it says, Any and all cryptocurrency, to include A, B,

6   and C.  We are actually okay with A, B, and C.  It's just the

7   "any and all cryptocurrency" that's the problem.  But A, B, and

8   C is what is on the wallet, which is:  Representations of

9   cryptocurrency public keys and addresses; representations of

10  crypto private keys; any and all representations of

11  cryptocurrency wallets or their constitutive parts to include

12  seed phrases and recovery seeds.  We would be okay with that.

13  That allows them to search the devices.

14         THE COURT:  And if using the items that are listed in

15  A, B, and C they find something, then they come to me or

16  someone else to obtain a warrant to seize?

17         MS. AXEL:  That's why we also need 17 excised, because

18  that's the real problem.

19         17 says, The United States is authorized to seize any

20  and all cryptocurrency by transferring the full account balance

21  to a public cryptocurrency address controlled by the United

22  States.  That is the big problem.  So that they should not be

23  permitted to do.

24         THE COURT:  Stay there, please.

25         Mr. Gianforti, is there not a tension between having

O7C8STOA

|     |                                                                              |
| --- | ---------------------------------------------------------------------------- |
| 1   | paragraph 17, which seems to allow you to seize the crypto and                |
| 2   | move it somewhere, and telling me today that you would be                     |
| 3   | seeking a second warrant?  Could I understand the                             |
| 4   | reconciliation of that?                                                       |
| 5   | MR. GIANFORTI:  Your Honor, as I said before, this                            |
| 6   | warrant is really about securing evidence, and to the extent                  |
| 7   | any and all cryptocurrency is evidence of these crimes, we                    |
| 8   | would move it to an address that we control for the purposes of               |
| 9   | evidence preservation.  If we were intending to then forfeit                  |
| 10  | that as the proceeds of a crime, we would follow it up with a                 |
| 11  | seizure warrant.                                                              |
| 12  | THE COURT:  Thank you.  And I will let Ms. Axel                               |
| 13  | continue based on that clarification.                                         |
| 14  | MS. AXEL:  And now we have our clear Fourth Amendment                         |
| 15  | problem.  Because they are using passcodes, like taking your                  |
| 16  | passwords that are next to your desk, or taking your ATM card                 |
| 17  | that they seize from the drawer, and they are going to the bank               |
| 18  | and they are using that information to now seize your assets.                 |
| 19  | For whatever purposes, that is beyond the curtilage of the                    |
| 20  | home.  That is using information found in the searched premises               |
| 21  | to go seize assets that were not in the searched premises.                    |
| 22  | That's the point, your Honor.                                                 |
| 23  | THE COURT:  Are there any other points you want me to                         |
| 24  | know?                                                                         |
| 25  | MS. AXEL:  I think that is the key problem that we                            |

O7C8STOA

1    have here, your Honor.  It's the using information found in a

2    searched premises, one that one does have probable cause and a

3    warrant to search, and to go out on the internet or to some

4    other place.  I think the Fourth Amendment clearly does not

5    permit that.  You need a separate new warrant for that.

6            THE COURT:  Mr. Gianforti, do you agree or disagree?

7            MR. GIANFORTI:  I find this curtilage argument a

8    little puzzling, if I can borrow a word.  On the one hand they

9    are saying go out and get a seizure warrant.  On the other hand

10   they're saying you can't seize crypto because it's outside the

11   home.  That doesn't make any sense.  Under that argument,

12   because cryptocurrency resides effectively nowhere, we would

13   never be able to seize cryptocurrency.  That's the logical

14   conclusion of their argument.

15           Again, I think this word "seize" that appears here, I

16   just can't help but think the defense is seeing the word seize

17   as though it means forfeiture.  It's not forfeiture.  This is

18   securing evidence.  And if we want to move forward and forfeit

19   that evidence because we think it's the proceeds of a crime, we

20   will do so appropriately under the forfeiture law.

21           THE COURT:  Everyone is done on the suppression

22   points?

23           MS. AXEL:  Yes, your Honor.

24           THE COURT:  Thank you.

25           I am ready to go forward with the motion to dismiss,

O7C8STOA

```
1    but just in deference to our court reporter, and given the fact
2    I think that will be a longer argument, perhaps we will take a
3    five-minute break.  Is that acceptable to everyone?
4            MR. REHN:  Yes, your Honor.
5            THE COURT:  I will see you then.  Thank you.
6            (Recess)
7            THE COURT:  Mr. Klein, perhaps I can begin with you,
8    sir, on the motions to dismiss.  And this is a general
9    question, and I understand completely if you want to defer to
10   someone else on your team.  But one of the questions I had was
11   that I felt in reading the parties' submissions that you were
12   almost talking past each other at times.  There is a narrative
13   that you have given to me and there are themes to your
14   submissions.  And yours is, this is software, this is the
15   criminalization of thought.  He just built a better mousetrap
16   and he is now being prosecuted for it.  And then on the
17   government's side, there is a lot of no, no, no, this software
18   is only one component of what it is that they are prosecuting
19   him for.  It is beyond just putting Tornado Cash out there.
20   There's more acts.
21           My question, sir, and I will actually get to it, is, I
22   question my ability to decide among the factual narratives that
23   are being presented to me in the motion papers.  I feel almost
24   like I am stuck with the pleading language in the indictment,
25   especially on the issue of intent.  And if it turns out the
```

O7C8STOA

1    government can't prove that, your client gets acquitted.  But I

2    am not sure I get to dismiss the case based on what you say is

3    the narrative of the case, when the government says that is

4    not, in fact, what we are alleging.  So help me understand how

5    I have the power to basically kill it before it grows, and to

6    let this case be dismissed without allowing a jury to even

7    consider the government's evidence and allegations.

8         MR. KLEIN:  Yes, your Honor, and we think it is

9    important that you kill it before it grows.

10         So, I think we did put in some factual narrative about

11   Mr. Storm, his background, some things that are beyond the

12   scope of the indictment, just so your Honor can get a sense of

13   who our client is and some of the background.  But I think on

14   key points that would allow your Honor to dismiss this case on

15   all three counts, there's not disputes, and their factual

16   allegations, read by them, by us, and the Court, would permit

17   that.

18         So, you clearly have grounds under Rule 12 to do so.

19   And Rule 7, which you can look to about a properly formed

20   indictment, doesn't still override Rule 12, they have to state

21   an offense.

22         So, their factual allegations do not state an offense,

23   and we lay out those reasons.  And there's key undisputed

24   points, and I will give a few on the part I am talking about,

25   the 1960:  The lack of control, the immutability.  Those two

O7C8STOA

1   key points right there, which they don't dispute; they dispute

2   the legal significance of them, but they don't dispute those

3   factual allegations.

4           THE COURT:  On the immutability point, I thought what

5   they were saying was that all that was immutable was the

6   operation of the pools.  And you refer to it as the protocols.

7   You each refer to it differently.  I want to make sure you're

8   talking about the same thing.

9           MR. KLEIN:  Yes, your Honor.  We are talking about

10  what was immutable was the pools.

11          THE COURT:  And then the lack of control.  But please

12  continue, sir.

13          MR. KLEIN:  So I think your Honor is on safe ground.

14  And it's actually very important in a case like this, where

15  they are advancing a novel complex theory, really a first

16  impression——the 1960, my colleagues can speak on the other

17  parts——that my client should not have to bear the burden,

18  expense, stress, go all the way to trial and then on Rule 29 we

19  win.  So I think it is important that courts do dismiss

20  cases -- I agree it's rare, but they do dismiss cases when

21  things are like this.

22          Now, we don't dispute their indictment is 36 pages.

23          THE COURT:  Yes.  It is what it is.  But they do

24  accurately recite the statutory language, do they not?

25          MR. KLEIN:  Yes, they do, your Honor.

O7C8STOA

1          THE COURT:  So they are fine on Rule 7 purposes.  They

2     are adhering to the statute, and they are giving you a sense of

3     what it is they believe your client did that is violative.  You

4     just believe that what they have stated does not suffice.

5          MR. KLEIN:  Yes, your Honor, that's the basis of our

6     motion.  Each count has different failings that are fatal to

7     it, and there are different factual allegations that are

8     undisputed that lead there.  But, yes, that's exactly our

9     point.

10          THE COURT:  You have mentioned the immutability

11     argument so perhaps I will talk to you about that now.

12          The government suggests that independent of the

13     operation of the pools, that there were aspects of Tornado Cash

14     that Mr. Storm or his colleagues retained the ability to affect

15     or to control.  Do you agree with that?

16          I am not sure that they told me what all of them were,

17     but to them immutability means less than what it means to you.

18     So I would like to understand why immutability, why you believe

19     it is dispositive, because you suggest that it is, and whether

20     you and the government have completely coextensive use -- let's

21     perhaps close the door.

22          So I guess I would like, perhaps, if I can have the

23     CliffsNotes version.  I understand what you believe to be

24     immutable.  I want to understand better its significance.

25     Thank you.

O7C8STOA

```
1         For example, sir, is it because the immutability
2    predated the charges in the case, is it because it impacts in
3    some way your client's ability to form the requisite intent, or
4    something else?
5         MR. KLEIN:  Yes, your Honor.  It is relevant for a
6    number of reasons.  I will focus on 1960, your Honor, because
7    that is what I am going to talk about, and Ms. Axel can talk
8    about the other two counts in particular.
9         For 1960, the pools, which are immutable as of
10   May 2020, predates their time period they are looking at,
11   because they are immutable, our client had no control, or no
12   one had any control, other than the user, over the
13   cryptocurrency.  And that goes to the core of 1960.
14        So when it's immutable, it's a software that's
15   running, it's open source, it's immutable, and it's
16   noncustodial.  So there are other elements there.  The
17   immutability is part of that.
18        So our client had no control, and that's why we
19   emphasize that repeatedly throughout our motion and our reply,
20   that those provisions of 1960 and 1960 itself, to be a money
21   transmitter, control is key.  It's one of the key limiting
22   principles of that statute.  And it's what distinguishes a
23   software provider from, like, a software service provider.
24        The other components that your Honor is focusing on,
25   like the UI, so I will take the pools as one and the UI as
```

O7C8STOA

1    another.

2             THE COURT:  And I guess the relayer network.

3             MR. KLEIN:  Yes.

4             So the pools are on chain.  And some of the amicus

5    talk about this too, your Honor.  The pools are on chain.  The

6    UI is off-chain.  And the UI is just a way to access the pools.

7    But the UI itself does not give my client any control or anyone

8    else, other than the user, control of the funds that are

9    transmitted.  It's just a way to interface.  It's just a nicer

10   way to interact with the pools.  You could still do everything

11   you need to do without using the UI.  And we believe, and they

12   don't allege differently, for example, that the alleged North

13   Koreans didn't even use the UI.

14            So the UI is a component that is not necessary, not

15   required, and simply is a way to, like, in a nicer package,

16   interact with the pools themselves.  And the pools themselves

17   are why Tornado Cash exists.  That is the important component.

18   And again, those were open source, noncustodial, immutable.

19            So that goes to the control on it, which is super key

20   for 1960.

21            And the pools -- again, my client didn't control them.

22            Does that help answer the question, your Honor?

23            THE COURT:  With respect to 1960.

24            Am I mistaken in thinking that you're suggesting

25   immutability goes to intent?

O7C8STOA

| | |
|---|---|
| 1 | MR. KLEIN:  Yes, it does.  And I believe we briefed |
| 2 | this issue on the sanctions and other parts of it. |
| 3 | THE COURT:  So you're deferring that to your |
| 4 | colleague. |
| 5 | MR. KLEIN:  Yes. |
| 6 | THE COURT:  You are then the person I should be |
| 7 | talking to about money transmitting businesses, what they are |
| 8 | and what they are not.  Could you speak to the government's |
| 9 | argument that they have alleged in the disjunctive that -- and |
| 10 | they have adequately alleged a transaction that in any way or |
| 11 | degree affects interstate or foreign commerce? |
| 12 | MR. KLEIN:  Your Honor, I believe that's in the money |
| 13 | laundering section too.  Ms. Axel will address that question. |
| 14 | THE COURT:  Then you and I are going to run out of |
| 15 | questions pretty soon. |
| 16 | MR. KLEIN:  I am fine with that, your Honor. |
| 17 | THE COURT:  That's fine. |
| 18 | Mr. Klein, are you speaking to overbreadth or is that |
| 19 | also Ms. Axel? |
| 20 | MR. KLEIN:  It's actually Ms. Axel or Mr. Casey. |
| 21 | THE COURT:  Sir, I don't have additional questions for |
| 22 | you, but I'm sure there is something you want me to know, so go |
| 23 | ahead. |
| 24 | MR. KLEIN:  Your Honor, I would really emphasize for |
| 25 | you the importance of looking at the lack of control, the lack |

O7C8STOA

1    of a fee, and then the express exemption for network access or

2    a software provider.

3            THE COURT:  You do speak of lack of fee.  The

4    government responds by saying that in fact there were fees.

5    They may have been a little bit more circuitous than you are

6    suggesting, but it's not as though your client was doing this

7    out of the goodness of his heart.  He was earning money for

8    this.

9            MR. KLEIN:  So my client, there is no allegation he

10   ever received a fee, to be very clear.  Their only allegation

11   is that some relayers might have charged fees for some

12   transactions.

13           THE COURT:  I thought that they structured the network

14   of relayers in a way that they thought was useful to them.

15           MR. KLEIN:  All they did, your Honor, there was a vote

16   on the protocol that set up a network of relayers based on how

17   many TORN tokens they had.  And on the UI, all it did was have

18   a list of optional relayers.  That was it.

19           Again, it was just a way for someone to quickly look

20   at something; it was a provision of information.  They didn't

21   charge a fee when you picked a relayer.  They didn't get a fee

22   from that relayer.  That's it.

23           THE COURT:  All right.

24           Anything else you would like me to know?

25           MR. KLEIN:  No.  I just think that the real important

1    thing is the software component here is providing the software

2    versus providing a service.  And I think the limiting

3    principles that are really important here is to focus on the

4    lack of control, which is implicit throughout 1960, as well as

5    the fee, which my client did not charge.  The UI did not charge

6    a fee, just to be very clear.

7            THE COURT:  As you tell me each thing, you're actually

8    implicating questions, which is great.

9            This software service dichotomy that you're saying to

10   me is something the government, again, opposes mightily.  They

11   suggest that it is the functional capabilities of Tornado Cash

12   and not some abstract software in the ether that matters.  Is

13   that for you to speak to or one of your colleagues?

14           MR. KLEIN:  I can speak to that.  I think what is at

15   issue is all software, to be clear.  Every component is

16   software.  So there are different components.  My client had

17   involvement in levels involving each component.

18           THE COURT:  Perhaps I can ask a better question, so

19   let me do that.

20           If your client created Tornado Cash and just put it

21   out there and never did anything with it again, I am not sure

22   we would be here today.  What I am understanding the government

23   to say is that it is not merely that your client developed and

24   implemented Tornado Cash, but that he remained involved in its

25   operation, and actually did things with it.  So I don't think

O7C8STOA

1    he is being punished for having been a good software engineer.

2    I think the point is that it is what he did with it,

3    particularly upon receiving notice that there were incidents of

4    fraud or hacking or sanctions.  That's why we are here.  That's

5    what I understood.

6          So I am reacting, and sort of bristling a bit, at your

7    suggestion this is all about software, because the government

8    keeps telling me it's not.  A jury may decide that that's all

9    he did, but they are vehemently opposing that argument.  So I

10   do need you to sort of engage with the government on what they

11   think the conduct is.  And that goes back to my first question

12   to you, sir, in this section.

13         MR. KLEIN:  Your Honor, again, I think the key thing

14   here is that that really speaks to a negligence standard.  You

15   could have done more, you learned something and you could have

16   done more.  Which is not our standard here.  For 1960, there is

17   not an intent element.  It's essentially a strict liability

18   offense.  If you're a money transmitter and you qualify, then

19   you're guilty.  And our argument is, he is not a money

20   transmitter.  Maybe the points you're raising, there might be

21   some other criminal statute that covers that part, but

22   definitely not 1960, for the reasons I have articulated.  So I

23   think that is the key point.

24         THE COURT:  Thank you very much.

25         This time I think I would prefer to hear from the

O7C8STOA

1    individual defense attorneys, and then I think it's Mr. Rehn

2    who is handling the motion to dismiss and I will ask all my

3    questions at once.

4              Welcome back, Ms. Axel.

5         Ms. Axel, if your focus is on money laundering, then

6    that's where my focus will be as well.  And I hate when people

7    ask me hypotheticals, but I am going to ask you a hypothetical.

8              If there is an individual who runs a concededly

9    legitimate business, a restaurant, and someone approaches that

10   individual and says, I would love to use your restaurant bank

11   accounts to deposit the proceeds of criminal activity, because

12   then I can deposit them and it will be laundered and no one

13   will know where it comes from, and you will make something for

14   your efforts.  That suggests to me, if the restaurant owner

15   knowingly, intentionally gets involved in this knowing that it

16   is the proceeds of some unlawful activity, there is concealment

17   of money laundering.

18             So, I ask that because there has been a focus here on

19   the fact that there are legitimate aspects to Tornado Cash and

20   that not every client was a felon in training.  So saying, for

21   example, that your clients did not have agreements with the

22   perpetrators of the underlying unlawful acts, well, your client

23   didn't need to engage in the underlying acts so long as he

24   understood, potentially, that Tornado Cash was being used to

25   launder those funds.

O7C8STOA

1          So my point is, I am trying to understand how the

2    traditional money laundering model can be transferred, if at

3    all, to the Tornado Cash or to the cyber setting.

4          Separately, I didn't want you to focus too much on

5    your client's knowledge of or involvement in the underlying

6    criminal acts as much as his knowledge that the proceeds of

7    those criminal acts were being laundered through Tornado Cash.

8          So, can you help me with those things?

9          MS. AXEL:  Yes, your Honor.  And, yes, we are all

10   nervous of hypotheticals in this particular context, but the

11   hypothetical there your Honor gave us is very clear, a person

12   that actually conducted the financial transaction knowing that

13   the proceeds came from some form of proceeds of SUA.

14         So, there, your Honor, I think that is the

15   paradigmatic kind of example you have in drug conspiracy type

16   cases or car wash cases, where you have someone who agrees,

17   knowing that the proceeds come from some illegal activity, to

18   wash them through the process.

19         And, your Honor, what I would like to submit, it's

20   sometimes difficult to prove a negative, but what I would like

21   to submit to the Court is, having looked at every single

22   conspiracy case they have cited and that we have cited, there

23   are none where you either don't have the defendant being

24   actually a participant in the conspiracy to the substantive

25   offense.  Of course your Honor sees that all the time, drug

conspiracy plus money laundering, you get the additional

enhancement.  Then the other kind of paradigm, though, you see

is that there is some connection and usual interdependence

between the group conducting the unlawful activity and the

money laundering.  And I think it's actually completely

required by the text of the statute itself that you have that.

And I will tell you why.

The Court asked about financial transactions, and the

Court also read from the very beginning of (a)(1).  Someone has

to conduct the transaction knowing that it has the SUA in it.

And when the government came back here and said, well, we don't

need DPRK, because, of course, Mr. Storm had no contact with

DPRK.  That is not alleged.  He didn't agree to conduct their

transactions.  Once you have severed that, you don't have a

co-conspirator who is actually knowingly conducting

transactions with the proceeds of a crime.  You don't have it.

So, they attempted to broaden, and your Honor asked

about the financial institution, they attempted to broaden what

a financial transaction is here and said it's not just a

financial institution, it also includes essentially a fire

transfer, a transfer of funds by wire.  Those transfers, of

course, here are only happening -- that is what is happening

with the protocol itself.  And the only people who are

knowingly conducting transactions, specific transactions,

knowing that they contain the proceeds of SUA, are the illegal

O7C8STOA

1    bad actors, not Mr. Storm, not anybody with respect to

2    Peppersec.

3         And that's true even if you span out and look at the

4    UI as well.  The UI itself also is agnostic to who is

5    conducting the transactions.  Mr. Storm does not know.  And the

6    UI itself is not conducting the transactions, only the protocol

7    is conducting the transactions.

8         So I think you fail right at the beginning.  I don't

9    see any case, your Honor, where you have a third party

10   conducting transactions, and then you have alleged

11   co-conspirators over here who don't know exactly what is being

12   transferred at any one time; they are not connected to those

13   transactions.  I see nothing.

14        There is a case the government cites *Gamez*.  And in

15   the *Gamez* case, there is a law review article there cited, and

16   it says, "When money laundering statutes are used against third

17   parties, who are not responsible for the underlying illegal

18   activity, proving knowledge of the funds' illegal source

19   becomes more difficult."

20        And I think that's exactly the tension here, your

21   Honor.  We have jumped completely away from what money

22   laundering was intended to cover here.  We actually don't have

23   a co-conspirator who is doing a financial transaction,

24   conducting a wire transfer in and out of that protocol, knowing

25   that it contained SUA, the proceeds of SUA.

O7C8STOA

```
 1              And I don't think the government can disagree that
 2    that's the standard.  I look at paragraph 78 in the indictment
 3    and it says, "It was a part and object of the conspiracy that
 4    Defendant Roman Storm, the defendant, Semenov, the defendant,
 5    and others known and unknown"——and that's referring to
 6    co-conspirators——"knowing that the property involved in a
 7    financial transaction would and did conduct and attempt to
 8    conduct such a financial transaction."
 9              Once you move past a co-conspirator doing that, I am
10    not saying, your Honor, that you can't agree that as part of
11    your conspiracy one of your co-conspirators does it.  I am sure
12    your Honor is familiar with sometimes the jury instruction
13    language that says, a person did this, and then the defendant
14    conspired with that person and joined the conspiracy knowing of
15    its illegal object.  We have that language in the 371 context.
16    But here, your Honor, we don't have that.  We have a third
17    party.  And once you get to that, then we are in an agnostic
18    space.  We refer to this as an agnostic protocol.  The UI is
19    agnostic as well.  And in there, we are not even in the
20    heartland of money laundering at all.
21              I took a turn last night on the FinCEN website, and if
22    you look at the history of money laundering, and then the BSA
23    rules that we know today on AML and KYC, you see that the money
24    laundering laws didn't come into existence until 1986.  And
25    what we really know today is KYC and AML came because the
```

O7C8STOA

1    government felt, the governments of the world felt that they

2    had not sufficiently constrained inputs into the money system

3    from agnostic participants, people who were engaged in the

4    financial services industry but didn't care whether they dealt

5    with money launderers.  The Western Unions of the world, your

6    Honor, were not regulated until at least the 90s.  The MSB

7    requirement of a CTR doesn't come into place until 1994.  And

8    then the Patriot Act and its progeny after 9/11 started in

9    2001.

10           So what I would submit to the Court is money

11   laundering is actually the highest standard here, the one that

12   you really can't meet when you're actually talking about your

13   standard Western Union, your standard MSB.  And so the

14   government has come up with laws to try to restrict ways into

15   the financial system.  And that's where you can get 1960 and

16   the BSA and the specific money services businesses laws.

17           And it just so happens, your Honor, that now we are in

18   a new space, with new technology, and Congress has not reached

19   it, and the existing laws do not reach it.  And I think this is

20   a question of first impression for the Court, not just in 1960,

21   but as to all of these.  Because the government is trying to

22   take conduct that it doesn't like, that it views as not

23   compliant——and, your Honor, I heard a DOJ official speak about

24   this, and they viewed it as a compliance case.  But the problem

25   is that the laws that they have on compliance and the BSA just

O7C8STOA

1    simply don't reach this, not yet.  So as a policy they are

2    asking the Court to use judicial authority to extend these

3    statutes where they were not meant to go.

4           THE COURT:  One moment.

5           Are you discussing in any way immutability or did you

6    leave that with your colleague?

7           MS. AXEL:  I think immutability also comes up in the

8    conspiracy to commit money laundering in light of the dates

9    charged.  Again, the immutability for the Tornado Cash

10   protocol, which is the pools, if you will, your Honor, in their

11   vernacular themselves, that software is finalized in May of

12   2020, and the alleged conspiracy begins in September 2020.  I

13   do think, your Honor, that date shows that you can't have an

14   agreement to commit the law when the protocol that is the thing

15   that accomplishes the transactions was already done at that

16   point in time.

17          So I do think the timing undermines the government's

18   allegations of an agreement to an unlawful objective.

19          THE COURT:  All right.

20          You speak about the IEEPA charge as well, and you are

21   seeking to place Tornado Cash within the informational

22   materials exception.  The question I have sort of harkens back

23   to what I was saying to Mr. Klein a little while ago.  It's not

24   clear to me the degree to which I can discredit or look away

25   from the allegations in the indictment, including, in

O7C8STOA

particular, the charging language, which we all agree is

correctly cited, and determine that something fits within the

informational materials exception.  Again, that to me seems to

be the code, but I thought the government is telling me, or

they will tell me, that this case is about more than code, it's

about conduct using the code that's been developed.

So, I guess I don't know that I have seen courts

finding that software applications, something different than

just code, fits within the informational materials exception.

But you believe otherwise?

MS. AXEL:  I'm sorry.  What was the end of the

question?

THE COURT:  The end of it is, I haven't seen apps

referred to as informational materials.  You say code, okay.

But when I look at that list, which one of you will tell me

should be close to exhaustive or one of you will tell me is not

exhaustive, but I just don't see Tornado Cash fitting within

it.  And even if I did, the government is telling me this case

is about more than the Tornado Cash protocols.

So let me understand better, or perhaps now that I

have told you the concerns I have, tell me why I should not

have those concerns and why Tornado Cash falls within the

informational materials exception.

MS. AXEL:  I think, your Honor, I would refer the

Court back to the two *TikTok* cases because I think they are

O7C8STOA

1   very, very close to what we have here.  And I think that the

2   Court can look past the word "services," which is a conclusory

3   word the government uses, I think, and look at actually what

4   facts are alleged.  And I think those facts, your Honor, make

5   clear that this app and this protocol, we might call the UI

6   more like an app, and the Tornado Cash protocol itself do

7   clearly fall within the informational materials exemption.

8          The government wants to say and distinguish *TikTok* as

9   being something very expressive, because our kids go on TikTok

10  and they post videos and this is definitely a core element of

11  speech.  But, in fact, the TikTok regulations, your Honor, were

12  much more restrictive.  They were designed to get to the

13  commercial aspects of TikTok.  And so, when that case came in,

14  the government said the same thing as the government is saying

15  here.  That this was not core speech that was being enjoined.

16  That the core speech could continue, but it was commercial

17  aspects.  And that because it was commercial, it didn't

18  necessarily fall within the informational materials exception.

19  And whether you are talking about services or the word

20  commercial here, either way, both courts said, we are going to

21  look past those labels.  What you actually are doing through

22  here is you are indirectly restraining speech, and it falls

23  within the informational materials exemption.

24          I think Congress was pretty clear in 1994.  I am old

25  enough, your Honor, to remember what a CD-ROM had on it, and it

O7C8STOA

1    either had software or it had things made with software.  And

2    you had your Word documents, your Honor, that you took home to

3    work on your floppy disk.  So that is what we are talking

4    about.  Those were informational materials on that type of

5    software.

6             So we think this falls within the heartland of what

7    the informational materials exemption was meant to cover.

8             The Court didn't ask here about immutability, but I do

9    want to touch on that.

10            THE COURT:  I asked earlier about immutability.

11            MR. AXEL:  As to IEEPA.

12            THE COURT:  I meant it as to all of those provisions

13   which were in your portfolio.  So fine, go ahead.

14            MS. AXEL:  I think the immutability argument is even

15   stronger here, your Honor, given the date that they allege that

16   this conspiracy began, which is in April of 2022.  The app and

17   Tornado Cash had been going for nearly two years at this point.

18   So I think when you claim that there is a conspiracy to violate

19   IEEPA, and you measure willfulness as of that date, when the

20   protocol is immutable years before that fact, I don't see how

21   you can make out a willfulness claim on that.

22            And willfulness, your Honor, the Court I know

23   expressed some reluctance about getting to intent standards,

24   but again, this is out of the heartland of any IEEPA case.

25   This is the government reaching to find a theory that has never

O7C8STOA

1    existed before.

2              I would refer the Court to DeFi Education Fund's

3    lengthy summary of cases.  The IEEPA professionals out there,

4    the sanctions experts are baffled that anybody would think that

5    this is willful conduct, when you had no contact with the DPRK

6    at all and you designed something that was long in existence

7    that later they chose to use.  I don't think we are at all

8    close to an intention to provide services to the DPRK.  And you

9    need for willfulness a bad purpose, knowledge that conduct was

10   unlawful.

11             We cited the statutory history of the Trading with the

12   Enemy Act, your Honor, and I realize that goes way back to

13   World War I.  But even in the heights of World War I, your

14   Honor, Congress was concerned about prosecutorial overreach and

15   chose a very high standard.  In every one of those cases,

16   including *Griffith*, you see actual conduct that connected the

17   defendant to the DPRK.  In *Amirnazmi* that the government cites,

18   the defendant went and met with Mahmoud Ahmadinejad.  We don't

19   have any allegations here that would show any deliberate choice

20   to violate the law, much less to assist the enemy.

21             THE COURT:  One moment.  Perhaps I will hear from Mr.

22   Casey now.  Thank you.

23             MR. AXEL:  Thank you.

24             THE COURT:  Since you prepared for oral argument, sir,

25   I will find some question to ask you.  I wasn't going to

O7C8STOA

1    otherwise, but I feel bad.

2         Sir, let's talk about overbreadth. I didn't find the

3    facial overbreadth arguments to be as interesting as the

4    as-applied, simply because I feel as though by now some court

5    somewhere would have struck down these statutes, but you are

6    persisting with facially overbroad challenges. Would you at

7    least concede it is a less strong argument?

8         MR. CASEY: Well, your Honor, I would concede it's

9    perhaps a little less stronger than the as-applied challenges

10    here. But we do think that given the unprecedented nature of

11    the government's theory here, that it calls into question the

12    applicability of these statutes and the possibility of the

13    scope and the overbreadth that's possible here.

14         THE COURT: Let me say this, sir, and I certainly

15    don't mean to be talking past you. To me, the point of facial

16    overbreadth is that you're not thinking about the situation in

17    which it's being deployed. You're just looking at the statute

18    and it just can't be that it recites criminal conduct.

19         So I have had money laundering cases. I have not

20    struck down that statute as overbroad. I don't know that I

21    have had an unlawful money transmitting case. And my IEEPA

22    work was as a prosecutor so it's been a while. But I feel as

23    though there are prosecutions that have been sustained in this

24    district and in other courts which would suggest that a facial

25    overbreadth challenge would not work. That's why I am

O7C8STOA

1    suggesting you focus your efforts on the as-applied.

2           In that regard, what you say to me is that these

3    statutes are, in this case at least, content-based regulations

4    of constitutionally protected speech.

5           Now, this is the issue that I was discussing with

6    Mr. Klein a little while ago, which is you keep focusing on the

7    idea, on the software, on the code, and the government keeps

8    focusing on the conduct.  So could you help me to understand

9    why the government's functional capabilities argument does not

10   save them in this case?

11          MR. CASEY:  Sure, your Honor.

12          So, the Second Circuit in *Corley* recognized that

13   computer code is a form of speech that's protected by the First

14   Amendment, your Honor.  And in *Corley*, the court recognized

15   three ways that the code can have communicative

16   content -- excuse me, the ways in which the computer program

17   can communicate through the code.  The first of those is to the

18   user of the program; the second is to the computer; and the

19   third is to another program.  And to the extent the government

20   is arguing that its indictment is aimed at the functional

21   aspects of the code, that would go to the second form of

22   communication, to the computer.

23          But in *Corley*, your Honor, the court held where the

24   prohibition applied to computer codes solely because of its

25   capacity to instruct a computer --

O7C8STOA

1          THE COURT:  I will ask you to slow down.

2          MR. CASEY:  In *Corley*, the court held that where the

3    prohibition applied to a computer code solely because of its

4    capacity to instruct a computer, the regulation is deemed

5    content neutral.

6          And here, your Honor, it's worth noting that the

7    government's own theory in its indictment is that Tornado Cash

8    is considered a multi-part service that includes websites that

9    provide information and access to the software code.  So it's

10   clear here, your Honor, the government isn't targeting just the

11   functional aspects of Tornado Cash, but it's going to the heart

12   of the message that the Tornado Cash project itself conveys.

13         THE COURT:  Pause, please.  I want to make sure I

14   understand that.  Not just functional aspects but the content.

15   Let me understand that better.  Just give me a little more

16   detail.

17         MR. CASEY:  Sure.  It may help if I discuss what was

18   decided in *Corley*.  In *Corley*, the issue there was software

19   that decrypted DVDs and allowed the user to essentially gain

20   unauthorized access to the video content that resides on the

21   DVDs.  That, your Honor, is more akin to malware with no

22   legitimate purpose.  And while the court there still found that

23   there was a speech component to that code, the prohibitions

24   there were targeted against the software's nonspeech

25   components.

O7C8STOA

1          In contrast, here, your Honor, the software does have

2     a legitimate purpose, and it is designed to assist users in

3     exercising their constitutionally protected right to maintain

4     confidentiality over their private financial information, which

5     is something the Second Circuit has also recognized.  That in

6     itself is a form of protected expression.  As the Coin Center

7     brief points out, the Tornado Cash suite of software itself

8     carries a political message that people should be able to make

9     private peer-to-peer transactions online without having to put

10    their trust in traditional intermediaries.

11          THE COURT:  I do want you to pause there, sir.  That's

12    where you started losing me.  I appreciate that what you're

13    suggesting is that Tornado Cash has a message about the

14    importance of privacy and the promotion of privacy.  But if it

15    existed for the sole purpose of allowing bad actors to launder

16    their funds through it, the promotion of privacy might give way

17    to the fact that it's being used for criminal purposes.  You

18    could look at it and say, here is a very noble message that

19    it's communicating.  I might look at it and say, it is a haven

20    for criminals.  And we would both be right.  So I am not sure

21    how I get to look at this idea that I must accept its privacy

22    vindication, or the idea that it vindicates privacy interests,

23    above the bad things it's allowing people to do.  Tell me why I

24    can.

25          MR. CASEY:  Your Honor, I believe that the cases cited

O7C8STOA

1  by the government to argue that the First Amendment is not

2  implicated where software is used for criminal purposes, those

3  cases all involve malware, and those have no legitimate

4  purposes whatsoever.

5       THE COURT:  This is what you said earlier.

6       MR. CASEY:  Whereas the contrast here, there is a

7  legitimate purpose and an expressive purpose in the code

8  itself, as well as in the websites that talk about it, and

9  provide access to information about the code, your Honor.

10      THE COURT:  One moment, please, sir.

11      Those were the questions I had for you.  Is there

12  something else you need me to know?

13      MR. CASEY:  No, your Honor.  I would just emphasize

14  again that there is in the Second Circuit a constitutionally

15  recognized interest in maintaining confidentiality over one's

16  financial transactions, and that also should affect, to your

17  Honor's point earlier, why is this piece of software different.

18      THE COURT:  Thank you, sir.

19      Mr. Rehn, thank you.  Will you be going to the podium?

20      MR. REHN:  I will go to the podium.

21      THE COURT:  Okay.

22      Sir, you will let me know if I have been misstating

23  your arguments to defense counsel this morning into afternoon.

24  But as I understood it, the government's theory of culpability

25  was not that Mr. Storm developed or participated in the

O7C8STOA

1    development of Tornado Cash, but that he and his colleagues

2    developed and marketed and paid for and operated Tornado Cash,

3    made lots of money in the process, knowing that Tornado Cash

4    was being used to launder criminal proceeds, and, indeed, that

5    Tornado Cash could be used to conceal the proceeds and to

6    frustrate the efforts of law enforcement and of victims to

7    uncover those proceeds.

8            Is that your argument?

9            MR. REHN:  That's correct, your Honor.

10           THE COURT:  Go ahead.  I would like to unpack the

11   argument, but if there is something you want to say in

12   response, I will hear you now.

13           MR. REHN:  I just want to make the point that the

14   indictment clearly alleges that the Tornado Cash service was an

15   integrated service that composed a number of features.  And we

16   openly acknowledge that one of those features——namely, the

17   smart contracts in which the pools commingled customer

18   deposits——became immutable as of May 2020.  But there were a

19   number of other features, including the website, the user

20   interface, the relayer network, the TORN tokens that enabled

21   them to make profits from the enterprise, and other features,

22   all of which the defendant and his co-conspirators controlled

23   during the relevant time period, and, in fact, made a number of

24   changes to during the relevant time period in order to make

25   Tornado Cash more popular and more profitable.

O7C8STOA

1          THE COURT:  What you just said to me answers in part

2     the next question that I have, but I want to make sure I

3     understand this as well.

4          Looking at the indictment, I think the earliest

5     charges begin in September of 2020, and that is the money

6     laundering conspiracy.  And given what I understand to be the

7     sequence of events, it doesn't appear to me that the government

8     is arguing or ascribing criminal culpability to the mere

9     development or the initial development of Tornado Cash.  And I

10    guess I am understanding, instead, that you begin to find

11    culpability when Mr. Storm and others operator Tornado Cash

12    with knowledge that there were hacking episodes and being told

13    by the victims that either -- I don't think they were occurring

14    on Tornado Cash, but that the proceeds of them were being

15    laundered through Tornado Cash.

16          Do I understand that?

17          MR. REHN:  That's correct, your Honor.  In order to

18    sustain a money laundering conviction, we will have to prove

19    that the defendant had knowledge that transactions involving

20    criminal proceeds were occurring.  So the timing in the

21    indictment is timed to when it is very clear.  There may well

22    be evidence before that time, but certainly by no later than

23    September 2020 the defendant was on explicit notice of

24    large-scale criminal proceeds being laundered through the

25    Tornado Cash service, and continued to operate and profit from

1      those transactions.

2             THE COURT:  Now you're anticipating my next question,

3      which is you're not suggesting that Tornado Cash was created in

4      the first instance to facilitate money laundering.  What you're

5      saying, I think, is, if you have a service and you learn that

6      that service is being used by bad actors to facilitate money

7      laundering, that suddenly you become a participant in a money

8      laundering conspiracy.  Yes?

9             MR. REHN:  That's correct, your Honor.  And in that

10     respect, the restaurant hypothetical that your Honor gave

11     earlier is exactly on point.  Any legitimate business that

12     becomes aware that its financial transactions are being used to

13     conceal the proceeds of unlawful activity, and continues to

14     engage in those transactions knowing that they are commingling

15     criminal proceeds with potentially legitimate proceeds, is

16     participating in a money laundering conspiracy at that point.

17            THE COURT:  That's a lot.  And I want to make sure I

18     understand that.  Because I am not sure what you expected

19     Mr. Storm and his colleagues to do.  Should they have shut down

20     Tornado Cash?  I am not sure that they knew ex-ante that a

21     particular transaction was money laundering or not.  So how do

22     you saddle him with criminal liability for not knowing in

23     advance that this is what it would be used for?

24            That's the first of my concerns.  So answer that,

25     please.

O7C8STOA

1      MR. REHN:  In respect to that concern, that's part of

2    why the indictment time frame is what it is.  I actually expect

3    there is likely to be evidence at trial that the defendants did

4    understand and anticipate that a large part of the market for

5    the Tornado Cash service was likely to be criminal actors.  But

6    it's at the point of which you know that the transactions you

7    are actually conducting through your business are, in fact,

8    criminal proceeds is when we tie the money laundering

9    conspiracy to begin.

10      THE COURT:  All right.  But is there some sort of

11    tipping point?  This is a service that I understand has more

12    than one customer.  It has hundreds, thousands of participants

13    in the Tornado Cash service?  I don't know.  Do you?

14      MR. REHN:  We have some evidence as to the number of

15    transactions, the number of wallets that transacted with it,

16    but that doesn't necessarily tell us how many individual actors

17    or entities.

18      THE COURT:  Fair enough.  Let's try it this way.

19      If Tornado Cash had one customer, one and only one,

20    and that customer was a foreign government subject to

21    sanctions, or a noted drug dealer, or an obvious fraudster, I

22    can understand you saying, at the point that Mr. Storm and his

23    colleagues allowed this bad actor to continue to deposit or to

24    process or mix funds through Tornado Cash, that he was at that

25    moment participating in money laundering.  I understand the

O7C8STOA

1  argument.

2          My concern is, if Tornado Cash has a thousand

3  customers and one of them is a bad actor, and those

4  transactions get processed through Tornado Cash, are they

5  criminally liable?  What if it's half of the customers?  What

6  if it is two-thirds of the customers?  I can give you whatever

7  fraction you want.  What I am asking is whether there is some

8  tipping point at which, in a situation where you have multiple

9  customers, your knowledge that one of them is depositing the

10  proceeds of criminal activity makes you liable for money

11  laundering?  This is the concern I have.

12          So, here, is one customer enough?

13          MR. REHN:  Well, it depends on the facts and

14  circumstances of each individual case.  But certainly a single

15  transaction as to which a defendant has knowledge is designed

16  to conceal proceeds and the defendant knowingly participates in

17  that transaction has been held to be sufficient evidence.

18          When you're talking about a business like this,

19  though, and especially a business that is a financial

20  institution, the law and a number of prosecutions require that

21  there be protocols and procedures put in place to address that

22  risk and to attempt to prevent those transactions from going on

23  on an ongoing basis.

24          THE COURT:  That's a question I am going to ask you

25  later.  Well, I will do it now.

O7C8STOA

| | |
|---|---|
| 1 | Is Mr. Storm being prosecuted because he didn't have |
| 2 | anti-money laundering or know-your-customer protocols? |
| 3 | MR. REHN:  That was one of the requirements of the |
| 4 | business that he would have had to implement under the money |
| 5 | transmitting laws. |
| 6 | THE COURT:  Yes, of course.  But that doesn't make him |
| 7 | a money launderer, does it? |
| 8 | MR. REHN:  That's correct.  With respect to the money |
| 9 | laundering, however, it is relevant that he did not take any |
| 10 | steps to attempt to prevent himself from continuing to conduct |
| 11 | transactions in criminal proceeds.  And as to that, it isn't |
| 12 | really different from a non-financial institution.  So the |
| 13 | restaurant example again.  If the restaurant knows that one |
| 14 | particular waiter is depositing criminal proceeds along with |
| 15 | their tips at the end of the day, they have an obligation to |
| 16 | stop that particular thing from happening, regardless of the |
| 17 | percentage of their revenue that the business constitutes.  If |
| 18 | they are aware that there is a particular actor that is |
| 19 | committing money laundering, they are by then conducting |
| 20 | transactions that commingle those criminal proceeds helping to |
| 21 | conceal them. |
| 22 | And that's exactly what is alleged here.  There is a |
| 23 | number of specific hacks the defendant is on notice of and |
| 24 | getting complaints from victims.  There will be evidence they |
| 25 | got inquiries from law enforcement -- |

O7C8STOA

1           THE COURT:  Slow down, please, sir.

2           MR. REHN:  There are many ways in which the defendant

3    and his co-conspirators are aware a large number of

4    transactions, well over a billion dollars, as alleged in the

5    indictment, are being laundered through the Tornado Cash

6    service.  And they do nothing to screen potentially legitimate

7    transactions from the ones that involve the proceeds of these

8    crimes.  And there is a number of steps they could have and we

9    argue legally required to take to address that risk.  Those

10   don't necessarily have to be perfect.  Every financial

11   institution doesn't necessarily have perfect measures.  But the

12   fact that they engaged in this conduct and profited from it at

13   this level, and continued to do so in full knowledge that that

14   was what was going on, does give rise to criminal liability

15   under the money laundering statute.

16          THE COURT:  You spoke again about how they profited,

17   and I know there is a dispute between the parties as to the

18   degree of profits.  But are you suggesting that if Mr. Storm

19   forwent any profits from these deposits into Tornado Cash, he

20   had pride in what he had created and didn't see a need for

21   further financial remuneration from it, do we not have this

22   case?  If he didn't realize any funds from it, do we not have

23   this case?

24          MR. REHN:  We may have an issue with the 1960 charge

25   in that instance.  But we wouldn't have a problem with the

O7C8STOA

money laundering count, because it's not an element of the

offense that you profit from it.

I think the reason I am coming back to that is, it is

evidence of his bad intent and his willingness to continue to

engage in it.  And there will be evidence that a very high

percentage of the Tornado Cash transactions were, in fact,

criminal and that the defendant understood that and, in fact,

he and his co-conspirators understood specifically that taking

steps to address that would hurt their profitability.  So that

will go to the degree to which this was a knowing violation of

the law and the nature of the conspiracy that will be proven at

trial.  But I agree with your Honor that profitability itself

is not necessarily an element of the offense.  And you could

imagine a philanthropic money launderer.

THE COURT:  I will try to.  Yes.

Let's talk about smart contracts.  A focus of the

defense motion to dismiss in this regard is that, because of

the immutability of the contracts, there really wasn't anything

that Mr. Storm was doing or could do as of late 2020 or

April 2022.  Do you agree with that?  Because perhaps what

you're saying is, agreeing with the idea that the pools were

immutable, there were enough other moving parts that weren't,

that that's what you're predicating liability on.  Is that what

the argument is?

MR. REHN:  Your Honor, in this case, the liability is

1    predicated on a number of additional affirmative acts that the

2    defendant was taking with respect to the Tornado Cash business

3    throughout the charged time period.  In fact, the business was

4    not immutable.  In fact, the indictment alleges multiple

5    instances in which the defendant made changes to the Tornado

6    Cash service.  One important illustration of that is the pools

7    were made immutable in May of 2020.

8              THE COURT:  And eventually they went to open source.

9              MR. REHN:  They are claiming that their user interface

10   eventually went to open source.  As to the pools, I think the

11   code is sort of built into them on the blockchain so people can

12   see the code earlier than that.

13             But as to the business, the defendant was raising

14   funds from investors months after May of 2020, in August of

15   2020.  And in his pitch to investors, he is describing his

16   business and saying, we anticipate we are going to be able to

17   monetize this and here's a few examples of how we are going to

18   do that.  Then, in December 2020, they start implementing those

19   ways of monetizing the service.  By releasing the TORN tokens,

20   by beginning to develop the relayer network, ultimately

21   deploying what is called a relayer algorithm.  All of these are

22   things designed to increase the profitability of the business,

23   while also making it more popular because they enhance the

24   anonymity that they are offering to their customers.  And they

25   are doing this in a context in which they are aware that in

O7C8STOA

1   doing so, they are only increasing the degree to which the

2   Tornado Cash service effectively conceals the proceeds of what

3   they now know is large-scale criminal conduct flowing through

4   their business.

5           THE COURT:  There is a degree to which I feel you're

6   imposing criminal liability because of the failure to make

7   changes.  We talked earlier about the failure to implement or

8   to have anything resembling know-your-customer rules or

9   anti-money laundering rules.  Are you arguing criminal

10  liability from the failure to make changes to the UI?

11          MR. REHN:  We are arguing criminal liability from the

12  participation and continued transactions knowing that they

13  involved the proceeds of criminal activity, through, among

14  other things, the user interface as well as the relayer

15  network.  And there will be both a general argument to the jury

16  that the jury can come to the conclusion that the defendants

17  had that intent from the fact that they failed to take any

18  steps to prevent it.  But, in addition, there will be a number

19  of particular moments in time where the defendants are

20  particularly aware of transactions involving the proceeds of

21  criminal activity, and are processing those transactions

22  through the user interface in full knowledge of that fact.

23          So a very prominent example alleged in the indictment

24  takes place in December of 2021.  There was hack of a

25  cryptocurrency exchange.  It's the single biggest deposit day

O7C8STOA

1    in the history of the service.  And when that happens, all of

2    those criminal proceeds flow into the service, a very strong

3    majority of all the funds in the Tornado Cash service are, in

4    fact, those criminal proceeds.  So the subsequent

5    withdrawals --

6              THE COURT:  Stop.  What should they have done?

7              MR. REHN:  At that point in time, they are operating a

8    means by which the criminals can withdraw the funds to clean

9    cryptocurrency addresses.  They can prevent that.  They can

10   easily say, we are going to stop those withdrawals because we

11   know they involve these criminal proceeds.

12             THE COURT:  But isn't there a degree of

13   retrospectiveness to that issue?  I don't know that they knew,

14   on the day that it was their biggest deposit day, that it was

15   going to be their biggest deposit day.  So I am concerned about

16   faulting them, and indeed imposing criminal liability on them,

17   for a happenstance that a bad thing happened and that folks

18   decided to launder the proceeds of the bad thing through

19   Tornado Cash.  Perhaps you are going to tell me that they not

20   only knew that this could happen, it was a feature of Tornado

21   Cash.  But to say that I know at the end of the day this was

22   their biggest deposit day doesn't give me insight into the fact

23   they knew it was going to be or that they knew that this awful

24   hacking incident would have its proceeds laundered through

25   Tornado Cash.

O7C8STOA

1          MR. REHN:  So I think I have three responses to that,

2     your Honor.

3          THE COURT:  Okay.

4          MR. REHN:  The first is, they did in fact market the

5     service specifically to money launderers.  And there will be

6     evidence of that at trial, and we think that will be one of the

7     bases on which the jury can find the requisite intent to be a

8     conspiracy to commit money laundering.

9          Just to take an example of that, the defendant created

10     marketing materials that showed dirty ETH, and then it showed a

11     washing machine, and the washing machine had the Tornado Cash

12     logo on it.  So it was very explicit what they contemplated

13     their customer base wanted.

14          THE COURT:  I will look forward to the demonstrative

15     exhibits if this goes forward.

16          MR. REHN:  Secondly, there will be evidence that the

17     Tornado Cash service sort of exploded in popularity and there

18     was huge discussion, both publicly and among the defendant and

19     his co-conspirators, that the source of that explosion and

20     popularity was the fact that it was such a useful tool for

21     hackers and money launderers.  They saw it over and over again,

22     everybody sees our service as a tool for hackers and money

23     launderers.

24          In fact, they are sending each other examples of

25     people who have been prosecuted for similar conduct.  So in the

O7C8STOA

1    fall of 2021, Storm actually sent a news story about the Silk

2    Road case to his co-conspirators and said, I understand one of

3    our developers just quit because this is all about hackers and

4    money launderers.  So they have this knowledge that the

5    business as an ongoing enterprise is a money laundering

6    enterprise.  So I think that could also be the basis for

7    finding a money laundering conspiracy.

8            Then, third, even if that wasn't enough, which I think

9    it clearly is, it's not just the deposits.  So, yes, it's not

10   necessarily the case that the defendants knew that this

11   cryptocurrency hack would happen in December of 2021, and then

12   the hacker would deposit those specific proceeds on that date.

13   But it's the subsequent withdrawals as to which they are on

14   notice, before those withdrawals happen, that people are going

15   to be withdrawing criminal proceeds, and they are in a position

16   where they have every opportunity to not process those

17   withdrawals, because they control the user interface and they

18   can implement measures to prevent those withdrawals from

19   happening.  Every withdrawal in the subsequent days and weeks

20   until those criminal proceeds were out of the service involved

21   criminal proceeds.  Maybe commingled with a lesser percentage

22   of some legitimate proceeds, but those withdrawals themselves

23   certainly involved criminal proceeds, and they were fully on

24   notice of those specific ones during that incident.

25           THE COURT:  You mentioned Silk Road a moment ago, the

O7C8STOA

*Ulbricht* case.  You suggest to me that that is a useful

comparator in this case, but I thought I understood that Silk

Road was developed from the start as a place for criminals to

facilitate their transactions.  Once again, this case differs

because Tornado Cash, at least you're not yet alleging that its

genesis was the desire to facilitate criminal conduct.  So

perhaps you're saying that Silk Road is useful insofar as

contemporaneous references to it by Mr. Storm and his

colleagues show knowledge, intent, absence of mistake.  But I

didn't see that Silk Road was on all fours with this case.  Are

you suggesting that it is?

           MR. REHN:  I think that's a fair point, your Honor.  I

don't think we will necessarily attempt to prove that the

defendants from the very outset, when they first came up with

the Tornado Cash service, were specifically viewing it as a

criminal enterprise from the outset, necessarily.  The evidence

may support that finding.  But even without that, I don't think

*Ulbricht* turns out differently if Ulbricht comes up with the

Silk Road concept, and after operating it for a few months

realizes that his customer base is all criminals, and then

starts marketing to them and is specifically profiting from

those transactions in full knowledge that they are taking

place.  And the language in the *Ulbricht* case about, it is as

if the defendant put out a notice to the whole world, you're

welcome to come and launder your criminal proceeds on my

O7C8STOA

1    website, is exactly the case here.  The defendants, both

2    explicitly and implicitly, were sending that message to the

3    criminals of the world.  This is a great opportunity to conceal

4    your criminal proceeds.  All you have to do is pay us a little

5    fee when you withdraw them.

6            THE COURT:  The washing machine seems like an

7    interesting metaphor.

8            Let me ask a question that goes back to sort of my

9    initial questions to you.

10           So let me ask you to think about something like

11   WhatsApp.  As I understand it, one of the great benefits of

12   WhatsApp to those who use it is that the communications are

13   encrypted.  They are harder to intercept.  They are harder for

14   law enforcement to monitor or intercept.  So I have had cases

15   where participants in the criminal conduct specifically used

16   WhatsApp in order to avoid law enforcement detection.  WhatsApp

17   must know that one of its great selling points, the encryption

18   component, allows it to be used by folks engaged in criminal

19   conduct.  But I don't see you charging WhatsApp with criminal

20   offenses.  So what is the difference between the folks who

21   operate WhatsApp and the folks who operator Tornado Cash that

22   makes you believe the latter are subject to criminal liability?

23           MR. REHN:  Well, I think there are a few reasons for

24   that, your Honor.  One important distinction is that on

25   WhatsApp all the communications are, as I understand it at

O7C8STOA

 1    least, encrypted and not visible to the operators of WhatsApp.

 2    And so, while WhatsApp may have some statistical inference that

 3    some percentage may be criminal communications, it doesn't have

 4    any specific knowledge of any particular criminal

 5    communications.

 6            THE COURT:  Sure.  But if the AG wrote to WhatsApp and

 7    said, by the way, we have had X thousand prosecutions this

 8    year, and fully 50 percent of them involved the use of WhatsApp

 9    in order to encrypt communications and thereby make it more

10    difficult for law enforcement to find or uncover criminal

11    activity, please stop this, and they said no, they are on

12    notice.  This point you're giving to me is, by not having them

13    visible, perhaps the WhatsApp folks might not know.  But if you

14    told them, then they have to know.  Does that change your

15    belief that that does not result in criminal liability?

16            MR. REHN:  It doesn't because of the encrypted nature

17    of it.  Even if they knew that a very large percentage were

18    criminal, they wouldn't necessarily be able to sort out the

19    wheat from the chaff; they wouldn't have a way of doing that.

20            THE COURT:  And you believe Mr. Storm could do that?

21            MR. REHN:  Absolutely.  In fact, the indictment

22    alleges an instance in which they attempted to do so involving

23    the Roman network hacks, where they did in fact implement a

24    change to the user interface to screen out deposits directly

25    from sanctioned wallets.

1          Now, there will be evidence that that was a pretextual

2    PR move, and they understood that that would be ineffective.

3    But they could have also implemented a number of other measures

4    to be more effective, including requiring every depositor to

5    identify themselves, as well as doing screening going back

6    further than the first transaction deposit.  So there are a

7    number of things they absolutely had the ability to do.

8          THE COURT:  If you have other reasons why WhatsApp was

9    different, may I hear them?

10         MR. REHN:  Well, I do think that the regulated context

11   in which this case occurs is relevant not just to the 1960, but

12   to the 1956 charge as well.  Because one reason the government

13   cannot require WhatsApp to maintain records of its users has to

14   do with the fact that WhatsApp provides expressive activity and

15   there are First Amendment reasons.

16         THE COURT:  Eventually you are going to tell me why

17   this isn't an expressive activity.

18         MR. REHN:  Courts have upheld for many decades the

19   government's ability to require financial institutions that

20   process financial transactions to maintain data.  Yes, there is

21   a lesser constitutional interest in financial privacy, but it's

22   certainly constitutional for the government to require

23   institutions that are processing financial transactions as a

24   business to maintain customer information and anti-money

25   laundering measures and the like.

O7C8STOA

1    THE COURT:  Turning now to the money laundering

2    charge.  I understood, and still understand, that the defendant

3    doesn't have to actually be involved in the actual conduct of

4    the underlying unlawful activity, but just has to be aware of

5    the funds and proceeds of a specified or unlawful activity.

6    The concern I have again, though, is the idea of the

7    scale of the Tornado Cash enterprise and how you evince

8    agreement with a particular bad actor when you have so many

9    actors on the platform.  So I would like you to help me with

10   that, and then I will probably ask follow-ups as need be.

11   MR. REHN:  Certainly, your Honor.

12   The government is not required to prove an agreement

13   with the people committing the specified unlawful activity.  As

14   far as the government is aware, there is no case that has ever

15   held that that's a requirement of the statute.  When the jury

16   will be instructed on the elements of money laundering, there

17   will not be an instruction that the defendant must have

18   conspired with somebody who committed the specified unlawful

19   activity.

20   THE COURT:  Did I understand correctly from Ms. Axel

21   that the results of her search were that --

22   Ms. Axel, this was regarding money laundering,

23   correct?

24   MS. AXEL:  Yes, your Honor.

25   THE COURT:  Her search suggests that the defendant in

O7C8STOA

1    question either was also a participant in the underlying

2    activity or that there was some mutual interdependence.  Are

3    you suggesting that neither of those is required?

4         MR. REHN:  That's correct, your Honor.  And there is

5    no case that has ever held as such.  In fact, just to take sort

6    of an obvious example, the *Stavroulakis* case, the defendants

7    conspired with each other to launder proceeds, which they

8    understood to be the proceeds of the specified unlawful

9    activity, but the person providing them with the proceeds was a

10   government agent acting undercover.  So they couldn't possibly

11   have had a conspiracy with anybody committing the specified

12   unlawful activity, because you can't conspire with an agent of

13   the government to break the law.  So that's sort of an obvious

14   case where there was no such requirement.

15         But there are a number of prosecutions, both in this

16   district and throughout the country, involving third-party

17   money launderers who understand that their businesses are

18   receiving and concealing criminal proceeds, but don't

19   necessarily form a specific agreement with any one of those

20   criminal actors.  These are very common cases where there are

21   whole networks of people moving money around on different shell

22   entities and things like that in order to conceal what they

23   understand are criminal proceeds, and not all of those people,

24   or maybe even not any of the people in the networks, have

25   formed an agreement with the actual criminals.

O7C8STOA

```
1        THE COURT:  The concern that remains for me, and maybe

2   you will be able to dispel it, is that, again, perhaps I am

3   misperceiving the size or the complexity of Tornado Cash, but I

4   am worried about imposing criminal liability for money

5   laundering based on negligence, not conscious avoidance but

6   actual negligence.  Perhaps you will say to me, fear not,

7   Failla, because the evidence at trial will show that this isn't

8   negligence and they absolutely knew what they were doing.  But

9   please understand the concern I have.  Mr. Klein, and perhaps

10  Ms. Axel, spoke about liability predicated on negligence.  I

11  wish not to have people convicted of federal criminal offenses

12  based on negligence.  So give me some comfort that that is not

13  what is going to happen here, and not merely based on the

14  evidence in your case, but based on the construct of bringing

15  cases of this type in this setting.

16        MR. REHN:  Yes, your Honor.

17        We would first say that it really isn't this case.

18  Second, I would just say that that is an issue to be resolved

19  based on the proof at trial, and certainly not a basis on which

20  to dismiss the indictment.  It would be, I think, unprecedented

21  for a court to say, I don't think you will be able to clear the

22  negligence versus criminal conduct bar at trial so I am going

23  to dismiss this count.

24        THE COURT:  By the way, if I had a nickel for every

25  time somebody tells me that this is unprecedented, I could
```

O7C8STOA

1    retire.  It would certainly exceed my government salary.  They

2    think your prosecution is unprecedented and you think dismissal

3    of the prosecution would be unprecedented.  I accept that you

4    all feel this way.

5            Go ahead.

6            MR. REHN:  But this case is precedented.  There is the

7    *Ulbricht* case we have talked about.  There is the *Sterlingov*

8    case in the District of Columbia.  There are number of cases in

9    which defendants who operated services like these, that were

10   primarily of use to criminals seeking to conceal their criminal

11   proceeds, were found to be criminally liable.  And there is no

12   wave of cases in which the government is going after sort of

13   innocent actors because one criminal managed to slip a little

14   money through their program.  There are not examples of that.

15   And the reason is because we understand we will have to prove

16   beyond a reasonable doubt that the defendants formed the intent

17   to join a conspiracy to launder the funds of unlawful activity.

18   And in proving that, we will present direct evidence that these

19   defendants were specifically aware of both the general use of

20   their service and a number of large-scale specific instances in

21   which they were, in fact, laundering those funds.

22           So I don't think that there is some sort of concern

23   about a hypothetical prosecution that is raised in this

24   particular case.

25           THE COURT:  I might still have those concerns, but I

O7C8STOA

| | |
|---|---|
| 1 | appreciate your belief that this is not the case where those |
| 2 | concerns should be manifest. |
| 3 | Mr. Klein and I had thoughtful discussions about the |
| 4 | 1960 count, and he is quite convinced that control has to be |
| 5 | shown, and that it can't be shown here because of the |
| 6 | immutability issues we have been discussing earlier.  You have |
| 7 | said to me in response that control is not necessary and that |
| 8 | there are other factors that may be considered. |
| 9 | Tell me, please, what I can look at to give me the |
| 10 | same comfort that I would have if there were evidence of |
| 11 | control.  Perhaps I should ask the antecedent question which |
| 12 | is, you're not claiming control of the funds here, correct? |
| 13 | MR. REHN:  Your Honor, that's the one issue as to |
| 14 | which we think there is sort of a legal question presented by |
| 15 | these motions to dismiss.  If the Court were to find that |
| 16 | control of the funds was absolutely required, we would not be |
| 17 | able to prove control of the funds at trial. |
| 18 | And there's a number of reasons why that proof is not |
| 19 | required under the statute.  As a matter of sort of first |
| 20 | principles, it's the language of the statute.  There is no |
| 21 | language that suggests that control is required in the statute. |
| 22 | In fact, section 1960 uses the word control, but in reference |
| 23 | to control all or part of the business, and it doesn't say |
| 24 | anything about control when it's talking about transferring |
| 25 | funds on behalf of the public.  No case has ever suggested that |

O7C8STOA

1    control is an element of the offense -- control of the funds

2    being transferred is an element of the offense.  And it's

3    contrary both to the text of the statute and the intent of

4    Congress to pass a statute that applied to this sort of

5    marketplace activity not any particular technological means of

6    accomplishing it.  And it would really defeat the intent of

7    Congress if we were to import that sort of an attextual

8    limitation and prevent the statute from being applicable in

9    this context.

10    THE COURT:  What am I going to see instead?  What is

11    the proof going to be instead?

12    MR. REHN:  The proof will be that the defendant's

13    business transmitted funds from one cryptocurrency address to

14    another by conveying instructions to the blockchain to

15    accomplish those transfers.  And that is very similar to a

16    number of other 1960 prosecutions that have taken place.  There

17    is the *Murgio* case from 2016, the *Harmon* case from 2020, the

18    *Sterlingov* -- those latter two are District of Columbia cases.

19    But in all of those cases, the courts held that if the

20    government is able to prove that the business at issue enabled

21    its customers to transfer funds from one cryptocurrency address

22    to another, that is money transmitting.  I think in the *Harmon*

23    case there is a reference to the fact that Harmon controlled

24    the intermediate wallet.  The court doesn't suggest that that

25    is a requirement of what the government would have to prove at

O7C8STOA

trial.  And, in fact, in *Murgio* and *Sterlingov*, there is not

even a reference to that as being one of the facts in the case.

So, it is not something that courts have held is

something that the jury has to find.  What we will have to

prove is that the business was involved in transferring funds

on behalf of the public, and it's clearly the case here.  As we

have discussed, the way that a transfer of funds happens on the

blockchain is that instructions are communicated to the network

of computers that make up the blockchain.  So prior to those

instructions being communicated, the wallets on the blockchain

have one balance of funds.  After the instructions are

communicated, there is a different balance of funds in

accordance with the instructions.  The instructions that

conveyed that transaction, that conveyed that transfer of funds

in this case, are accomplished by the defendant's user

interface and other contracts the defendant created and

controlled, as well as the relayer network, which the defendant

created, exercised a degree of control over, and conspired with

the other people who were involved in that network.

THE COURT:  I suspect I shouldn't be asking this, but

it's not stopping me from asking this.  Would you agree that

the most aggressive or the least traditional of your charges is

the 1960 charge?

MR. REHN:  I think that with respect to this control

question, the defendant's argument is novel in that no court

O7C8STOA

```
1    has really addressed this argument before.  I am not aware of a

2    defendant making this argument before.  There are no cases they

3    have cited where a court has held that control is required.  So

4    in that sense, it's sort of new in the sense that no court has

5    addressed it.  We don't think it's novel in the sense of this

6    is a novel application of the statute.  The intent of Congress

7    is manifest.  It didn't care about the technological means by

8    which the funds are being transferred.  That wasn't what

9    Congress was concerned about.  That's why the statute was

10   passed decades ago and has been applied repeatedly to

11   cryptocurrency businesses.

12          What Congress cares about is the economic function

13   that these type of businesses serve.  What that economic

14   function is is they allow customers to move money around.  And

15   the concern is that if you don't have certain anti-money

16   laundering and know-your-customer protections in place for

17   those type of businesses, it allows criminals to exploit those

18   businesses to conceal the crimes.  So congress put in place a

19   regulatory regime to address that, and that regulatory regime

20   was meant to be generally applicable to businesses of this

21   type.

22          And the defendant doesn't dispute that his business is

23   functionally identical to the businesses at issue in *Faiella*,

24   in *Harmon*, and *Sterlingov*.  What he says is, because we

25   designed our system so that we don't see the note during the
```

O7C8STOA

```
1   transfer, that means we technically didn't have control of the
2   funds, and so you can't prosecute us.  But there is no reason
3   on offer why Congress would have wanted statutory liability to
4   turn on such an arbitrary distinction when the economic
5   function of the business is exactly the same.
6           THE COURT:  Let's turn perhaps finally to the issue of
7   due process arguments.  You heard me speak with Mr. Klein about
8   the difference between Rule 7 and Rule 12.  They are not
9   arguing that you haven't tracked the language of the statute.
10  I didn't see a request for a bill of particulars.  I think they
11  understand what the issues are.  But I think their concern is
12  this broader one, and that is that it's not necessarily clear
13  to folks operating in the cyber or crypto spaces that conduct
14  of the type alleged here can subject them to criminal
15  liability.
16          So, on an issue of fair notice, how is it that
17  Mr. Storm or someone in his position should have known, for
18  example, that he should have stopped these transactions, or
19  that he should have employed know-your-customer,
20  anti-laundering protocols, or something like that.  Or, if you
21  would like, let me say this a little bit differently.  Even if
22  I find that the statutes are not facially ambiguous or facially
23  overbroad, can't I have the concern that in this setting they
24  are being applied in a way that people did not expect and could
25  not have expected?
```

O7C8STOA

1    MR. REHN:  Your Honor, I don't think that's true.  I

2    think there's different aspects of that with respect to each

3    count.

4            THE COURT:  Please.

5            MR. REHN:  So, first with respect to the 1960 charge,

6    as I have now said several times, there are multiple prior,

7    very similar prosecutions, and defendants were on notice of

8    them.  And there will be evidence that this defendant in

9    particular knew about those cases and, in fact, discussed, oh,

10   do we need to start complying?  And the answer was, no, there

11   is no obligation, that would hurt our market share.  So there

12   is going to be evidence of that at the trial.

13           But, more generally, this is actually -- we have seen

14   this repeatedly in these cases where cryptocurrency businesses

15   in particular have come in and said, oh, the statute shouldn't

16   apply to my conduct because I didn't know that it would apply

17   to my conduct.  The first case I think was the *Faiella* case

18   where the argument was, well, cryptocurrencies aren't funds.

19   And that was a loser because under the plain language of the

20   statute they are.

21           And there have been similar attempts to try to prevent

22   what appears to be a plain application of the statute from

23   applying to a new type of business.  And that's simply not what

24   due process requires.  Due process requires that the statute's

25   application to the conduct be clear from the language of the

O7C8STOA

statute.  But it doesn't require that the government never

bring a case in a new technological context.  The wire fraud

statute was passed decades before the dawn of the internet.  It

certainly couldn't be the case that that is what due process

means.  And there will be ample evidence that the defendants

engaged in conduct that is a clear violation of the statutory

language, which is really what is required.

Briefly, I think a similar analysis applies to the

money laundering.  I did want to mention on the IEEPA theory,

the defendant himself, when he was on notice that the Lazarus

Group's sanctioned wallet was using the Tornado Cash service to

launder its funds, told his co-conspirators that they face

criminal liability for this.  So he was certainly on notice

that engaging in these transactions involved criminal

liability.

Now, what they chose to do was put a Band-Aid on it

and make a public statement that they had addressed the issue,

while then profiting to the tune of millions of dollars from

those transactions over the subsequent weeks.  But they

certainly were fully aware that they faced potential criminal

liability, and that's why they did what they did, and the

evidence is going to show that at trial.

THE COURT:  Anything else, sir?  Anything that I asked

your adversaries that you wish to speak to?  And then I will

have the briefest of reply from my friends at the back table.

O7C8STOA

1          MR. REHN:  Let me just check my notes briefly.

2          I will just make one point.  It doesn't sound like the

3     Court will reach this issue.  But on the money laundering

4     charge, as we have explained, the transactions were conducted

5     through the user interface, which participated in conducting

6     those transactions by conveying those messages to the

7     blockchain.  Even if the Court accepted everything that Ms.

8     Axel said about that issue, there still are transactions

9     involving criminal proceeds in this case, and those are the

10    relayer fees.  Because when those transactions occur, the

11    relayers take fees out of the funds being withdrawn.  So the

12    funds being withdrawn involve criminal proceeds, and then the

13    relayers take a portion of those funds involving criminal

14    proceeds.  The relayers keep a portion for themselves and then

15    they kick back some of the proceeds into the TORN token

16    holders.

17         So those transactions, which are unambiguously

18    involving participants in the conspiracy, at a minimum, are

19    transactions involving criminal proceeds.  We think the whole

20    thing are transactions that the conspirators are participating

21    in involving criminal proceeds, but even if you looked at just

22    those transactions, there is no question there.

23         THE COURT:  Thank you.

24         MR. KLEIN:  I will stay here to speed it up.

25         THE COURT:  We run as long as we need to run.  I have

O7C8STOA

1    a sense of your arguments.  They have been exceptionally well

2    presented.  But I will hear from you.

3         Go ahead, sir.

4         MR. KLEIN:  30 seconds on the 1960.

5         There are no cases, of the ones the prosecutor cited,

6    *Murgio*, which I was involved in representing Anthony Murgio,

7    and the others, they all involved --

8         THE COURT:  Microphone closer to you, please, sir.

9         MR. KLEIN:  They all involved control.  Every single

10   case.  The reason why this is raised for the first time here is

11   because this is the only case ever with a 1960 prosecution

12   where the defendants didn't have control of the funds, period.

13   There is no case where that is not the case.  The *Sterlingov*

14   case, the *Murgio* case, every case they cited to you, the person

15   had control.  They were a centralized intermediary.  So they

16   are radically different.  And that is exactly why FinCEN has

17   the software provider exemption, for this exact kind of case.

18   That is what that exemption speaks to.  When you are just

19   providing the tool, which it was, to do something, you

20   shouldn't be prosecuted, you shouldn't be held accountable.

21   And that's where we are with 1960.

22        THE COURT:  Thank you.

23        Ms. Axel.

24        MS. AXEL:  Yes, your Honor.

25        First, with respect to the conspiracy to money

O7C8STOA

1    launder, a couple of quick responses.  One is, again, your

2    Honor, there is no case that we find that there is no link in

3    the chain between whoever committed the substantive offense and

4    the money launderers.  The government comes in and cites -- it

5    was the government informant case.  And in that particular

6    case, your Honor, still, that government agent provided that

7    knowledge that the proceeds had come from a specified unlawful

8    activity.  It's a legal impossibility to conspire with a

9    government agent so we have a legal impossibility problem.

10   But, nevertheless, in terms of the link in the chain --

11             THE COURT:  *Stavroulakis*.

12             MS. AXEL:  -- that person provided that link so that

13   you had, when the transaction was conducted by the money

14   launderers, you had clear knowledge that they had involved SUA

15   and an intent to join that agreement.  And here, by severing

16   the chain between the people conducting the transactions,

17   knowing that they contained the proceeds of SUA, and the

18   alleged conspirators, meaning Peppersec, we don't have that

19   connection, and there is no case in the world like that.

20             I also turn the Court back to 1968(a)(1) and respond

21   to the relayer point there as well.  There, still, the relayers

22   do not engage in financial transactions knowing that the

23   proceeds involved are from unlawful activity.  They also are

24   agnostic.  They are on the back end of the pool.  They don't

25   know who is the person that initiated the transaction.  And the

O7C8STOA

1   nature of the pool itself of course breaks the chain, and we

2   don't know what went into it.  So you do not have an alleged

3   member of the conspiracy who knowingly, knowing that the

4   property involved in the financial transaction represented SUA,

5   conducted that transaction.  So it just fails money laundering

6   out of the get-go.

7           Again, there were allegations about what could have

8   been done.  None of that shows knowledge that actually SUA was

9   involved in particular transactions and the defendant

10  conducted, caused, or conspired to conduct those particular

11  transactions.

12          I don't know if I need to respond to the WhatsApp

13  point.

14          THE COURT:  No.  Thank you.

15          MS. AXEL:  Obviously, the Court is familiar with

16  agnostic tools that criminals can use for ill purposes, and

17  this is like those cases.  *Ulbricht*, *Sterlingov*, and the *Helix*

18  cases, all of those actually were centralized processes where

19  you actually had the defendant in those cases touching

20  transactions, receiving money from transactions.  So you didn't

21  have this problem that the person didn't conduct a transaction

22  knowing that it involved unlawful proceeds.  Those were all

23  factually different.

24          Your Honor, in summation, we would submit that either

25  this is a 1960 case or it's not.  And what the government has

O7C8STOA

1    tried to do here is that they have stepped in to what is really

2    a regulatory landscape, and they have acknowledged there is a

3    legal issue as to whether Congress reached this conduct because

4    the defendant did not control actually the proceeds that went

5    through Tornado Cash.  That's a legal issue.  But that

6    regulatory landscape is really what Congress intended to

7    address this type of conduct.  You can't skip past that strict

8    liability regulation and then say instead, because we as the

9    prosecutorial want to reach conduct we don't like, we are going

10    to try to reach this much higher standard of intent and twist

11    and violate the words of the statute.  That is an unfair

12    expansion and that, your Honor, also would violate fair notice

13    provisions.

14          Finally, with respect to your Honor's standard, I

15    would remind the Court of the *Aleynikov* case.  You referenced

16    Rule 12.  In that case, it's a perfect -- well, nothing is

17    perfect.  It is an example that the Court can look to.  In that

18    case, Judge Cote dismissed one of three counts, the other two

19    went to trial.  And when it got to the Second Circuit, the

20    court found the indictment was insufficient as to all three.

21    Because in that case, as here, the government was trying to

22    push sort of novel theories where the facts did not make out a

23    sufficient indictment.  And I think that's a good analogy for

24    what we have here.  Our counsel at the table here said, courts

25    have allowed, of course, certain cases to be brought expanding

O7C8STOA

1   to new technology, but they have now pushed beyond the bounds

2   of where the law allows them to go.

3           So, here, your Honor, this is not a case where the

4   laws that we have reached this particular conduct.  Other ones,

5   they may have.  But we also have seen courts in this district

6   and elsewhere beginning to stand up to sort of new regulation

7   by enforcement, and we would submit that that's what is

8   happening here and that the Court should find that this

9   particular prosecution goes beyond the bounds of the statutes.

10          THE COURT:  Thank you.

11          Mr. Casey, last words?

12          MR. CASEY:  Nothing to add.

13          THE COURT:  This has been really interesting, and I

14  know that's not what either one of you wanted to hear, but it

15  is, it's interesting.  These are very interesting concepts, and

16  I want to take the time to think about them.  I am sure someone

17  will get a copy of this transcript, and I would welcome it

18  immediately upon your receipt of it.  I will try and get back

19  to you as soon as I can, but I don't know when that will be.

20          That leads to the issue of a request for an

21  adjournment of the trial.  I am sure you're both right.  The

22  defense needs more time.  The government thinks they have had

23  enough time.  I am thinking of this a little bit differently

24  because I would like the time that I need to actually decide

25  these very important issues correctly.  So recognizing that

O7C8STOA

1   this is over the government's objection, it looks like I may

2   have some time opening up in December.

3        Now, I have a trial Monday so that won't help you.  I

4   have a trial that was in October but it now looks like it's

5   moving, and I don't think I have enough time to deal with this.

6   So what I am looking at is, I think, beginning either of the

7   first two weeks of December.  What I don't know speaking with

8   you is whether you think this is a two-week trial, a three-week

9   trial, a two-month trial.  None of us—really, I mean me—wants

10  to have a jury concerned about holiday issues, but I have a

11  trial that begins the first week of January, and that's a

12  six-week trial, criminal, classified, lots of fun.  I am not

13  moving that.  So if you said to me, this is a three-week

14  trial -- also, let's be clear, I don't want to make this a

15  February or March trial because this other trial, the

16  January 1, who knows when it will end.  I thought this was a

17  two-week case, but I could be wrong.

18        MR. REHN:  I think it's a two-week case.

19        THE COURT:  I was looking at, I think the 2nd of

20  December.  Is there a problem with that, other than we will all

21  have less pleasant Thanksgivings than we might otherwise?  Does

22  someone else have a scheduling conflict for the 2nd of

23  December?

24        Mr. Rehn, if you want to jump up and scream about

25  moving the trial, I get that you don't want me to do it.  I am

O7C8STOA

1    taking the heat for this.  It's not for them, it's for me.

2            MR. REHN:  We understand, and the government is

3    prepared to go to trial at our earliest convenience.  We would

4    prefer the date that the Court has scheduled.  I think we are

5    available if the trial were to start on December 2nd.

6            THE COURT:  Mr. Klein.

7            MR. KLEIN:  Your Honor, the defense is also available

8    on December 2nd.

9            THE COURT:  So, this is your motion to adjourn.  I am

10   granting your motion through the 2nd of December.  We will

11   issue a new trial scheduling order to count back as to *voir*

12   *dire*, things of that nature.

13           Mr. Klein, something else, sir?

14           MR. KLEIN:  Just because the Thanksgiving holiday is

15   right before, and we all have families, I know how your

16   schedule works, but I would prefer not to have to be in New

17   York on the Monday, but I guess we will see what your schedule

18   is.

19           THE COURT:  Do you want to begin on Tuesday the 3rd?

20           MR. KLEIN:  Yes, your Honor.

21           THE COURT:  Can I still be done by the 13th, sir?  I

22   don't know what your case is.  You may not know what your case

23   is.

24           The answer is, I could do that, but I don't know how

25   pleased the jury would be to go into a third week.

O7C8STOA

1          MR. KLEIN:  You mean into the week of the 16th?

2          THE COURT:  That is what I am saying.

3          MR. KLEIN:  I wouldn't be pleased to go into that week

4     either.

5          THE COURT:  I like families too.

6          You can talk with the government.  I will set it for

7     the 2nd.  As we get closer to, we will see where we are because

8     we won't have done the summons yet for the jury.  We will do a

9     new trial order.

10          May I understand, is there an application from the

11    government under the Speedy Trial Act?  Did we not have time

12    set through the trial date?  It may have been that I excluded

13    only through the date of today's proceeding.  I am not

14    remembering.

15          MR. REHN:  I believe it was excluded through the trial

16    date, although I don't have the order in front of me.

17          THE COURT:  I can look.

18          MR. KLEIN:  That's our memory too, your Honor.

19          THE COURT:  Is there an application now to extend

20    that?

21          MR. REHN:  Yes, your Honor.  In light of the Court's

22    considerations of the issues raised by the defendant's motions,

23    which actually I think the pendency of those motions may, in

24    fact, toll the Speedy Trial Act.

25          THE COURT:  It does.  I am in the reasonable period of

O7C8STOA

1  time to resolve from the hearing, which would be about 30 days.

2       MR. REHN:  In an abundance of caution, we would ask

3  that the Court exclude time from September 23rd to December

4  2nd, to allow the Court to consider the issues, the parties to

5  consider the Court's rulings on those issues, and to prepare

6  for trial.

7       MR. KLEIN:  No objection.

8       THE COURT:  May I address Mr. Storm directly, sir?

9       MR. KLEIN:  Yes, you may.

10      THE COURT:  Mr. Storm, you have heard in prior

11  conversations about the Speedy Trial Act, and I have excluded

12  time in the past through the trial date based on the importance

13  of everyone having the time that they need to prepare for

14  trial.  Here, there are certain periods of time that are

15  excluded automatically, and that would be for the filing of

16  motions, the hearing on the motions, and a certain period of

17  time for me to decide them.  I will be as prompt as I can in

18  resolving these motions, but I also want to have the time that

19  I need.  I also would like to be sure that everybody has what

20  time they need to prepare for this trial.  And given that there

21  is a request from your side to have it moved, I think it's only

22  fair that time be excluded because one of the reasons given was

23  that your counsel wanted time to review everything and prepare.

24  So I am making a finding that the ends of justice served by

25  excluding the period of time between that last date in

O7C8STOA

1   September and the 2nd of December outweigh the interests that

2   you have and the public have in you getting to trial more

3   quickly.

4           Do you understand, sir?

5           THE DEFENDANT:  Yes, I do, your Honor.

6           THE COURT:  I thank you.

7           Mr. Rehn, checking with your team, anything else we

8   should be doing today?

9           MR. REHN:  Nothing from the government, your Honor.

10          THE COURT:  Mr. Klein, something else, sir?

11          MR. KLEIN:  Yes, two things.  One, we don't want to

12  presume that we will be in trial.  We are standing on our

13  motions.

14          THE COURT:  I get that, but I have to prepare for all

15  eventualities.

16          MR. KLEIN:  We understand, your Honor.

17          The second thing is that on April 4 the government

18  filed a CIPA notice, Section 4 notice.  It's docket number 36.

19          THE COURT:  Yes.

20          MR. KLEIN:  We would object to that, and we would ask

21  for a Section 2 *ex parte* presentation to your Honor.  I am not

22  sure your Honor has finished your determination of what you

23  have received.

24          THE COURT:  I thought I had, but let me do this.  Let

25  me put on my docket that when my current trial is over, we will

O7C8STOA

1  reach out to you for a Section 2 hearing.

2          MR. KLEIN:  Yes, your Honor.  And we would like to

3  make a request now that it be done virtually, since we are in

4  Los Angeles, if possible.

5          THE COURT:  That's complicated.  Because when I have

6  done the Section 2 hearings, they have been in a classified

7  space, and I don't know how to get you in there in a

8  nonelectronic format.  So perhaps I can have only a subset of

9  the team, or perhaps Mr. Patton can convey your thoughts.

10         MR. KLEIN:  Yes, your Honor.  We will figure it out.

11         THE COURT:  So know that when I complete the civil

12 trial we will reach out to you.

13         MR. KLEIN:  Yes, your Honor.

14         THE COURT:  Anything else, sir?  Was there something

15 else?

16         MR. KLEIN:  Nothing from the defense.

17         THE COURT:  Thank you all for a great oral argument

18 today.  Have a great weekend.  I will talk to you when I can.

19          (Adjourned)

20

21

22

23

24

25