# Exhibit 2

**AMENDED DISCLOSURE OF ANTICIPATED TESTIMONY OF JEREMY SHERIDAN**

Jeremy Sheridan is a Managing Director at FTI Consulting, Inc. ("FTI"), a global consulting and expert firm headquartered in Washington D.C.  Mr. Sheridan focuses on financial crime investigations involving digital assets, cryptocurrencies, blockchains, and smart contracts.  Prior to joining FTI, Mr. Sheridan worked as an agent with the U.S. Secret Service, where he conducted over 60 federal and state financial and cybercrime investigations, resulting in 37 arrests and a 100% conviction rate.  He may be called to testify to rebut the testimony of the government's disclosed experts, Special Agents Stephen George ("SA George") and Joel DeCapua ("SA DeCapua"), regarding their tracing and analysis of the flow of certain digital assets.  Specifically, Mr. Sheridan may provide testimony to rebut SA George's proposed testimony regarding digital assets that he contends were used to finance the purchases of Mr. Storm's Washington residences and his Tesla automobile.  Mr. Sheridan may also provide testimony to rebut SA DeCapua's analysis and computation of purportedly illicit funds that were allegedly deposited into Tornado Cash smart contracts.

Below are the opinions that Mr. Sheridan is expected to offer.  To the extent Mr. Sheridan's opinions are characterized as expert opinions, he is qualified to offer them based on his training and experience investigating financial crimes involving digital assets, cryptocurrencies, blockchains, and smart contracts as well as information derived from  public blockchain data, the reports and analyses of SA George and SA DeCapua, and the discovery available in this case.  The opinions, and specific bases and reasons for each opinion, are set forth below.

I.  **Categories of Funds Identified by SA George**

As a threshold matter, SA George identifies three broad categories of funding sources that he appears to suggest represent profits or proceeds from Tornado Cash: (1) "TORN token distributions"; (2) "funds processed through the Tornado Cash service"; and (3) funds connected to the Multisender service."  (George Disclosure ¶ 4.)

On (1), SA George identifies only one type of "TORN token distribution"—"early adopter TORN distributions," which consist of vouchers that were distributed to early users of the Tornado Cash protocol and could be exchanged for TORN.  (*Id.* ¶ 5.)  This category of funds is referred to as "Early Adopter Vouchers" throughout the remainder of this disclosure.

On (2), this category consists of funds that were processed via Tornado Cash smart contracts (aka "the protocol"), and SA George does not otherwise trace such funds to illicit activity or provide any support for his conclusion that such funds are attributable to

1

> Mr. Storm's development of the Tornado Cash protocols. This category of funds is referred to as "Tornado Cash Withdrawals" throughout the remainder of this disclosure.
>
> On (3), SA George states that Multisender was a "separate service" that "utilizes smart contracts to send cryptocurrency to multiple recipients in one simplified transaction." (*Id.* ¶ 2.) SA George does not explain how such funds are in any way connected to Tornado Cash.

In addition, while SA George does not attribute any source of funds to the allocation of TORN that Mr. Storm received in his capacity as a co-founder and developer of the Tornado Cash protocol, this allocation will be referred to as "Founders' TORN" throughout the remainder of this disclosure, to distinguish such TORN from TORN exchanged for Early Adopter Vouchers and any funds associated with Tornado Cash Withdrawals. In sum, none of the transactions SA George identified involve Founders' TORN because Founders' TORN were not accessible until the first vesting date in December 2021.

## II. Mr. Sheridan's Proposed Testimony regarding SA George's Analysis of the Source of Funds for the Auburn House

In response to SA George's opinion that "approximately nine percent" of the $375,000 used to purchase the Auburn House "came from funds involved in the Tornado Cash Service," Mr. Sheridan will explain, using the spreadsheet that the government provided along with SA George's disclosure that appears to reflect his analysis,[1] that the nine percent figure calculated by SA George overstates the contribution amounts and misattributes amounts from other sources. There are other errors in his analysis, as detailed below.

### A. SA George's Conclusions and Analysis

In paragraph 5 of his disclosure, SA George states:

> "[T]he Auburn House was partially purchased in two transactions using fiat currency deposited into and withdrawn from a traditional financial institution in the name of the defendant. Special Agent George traced the funds composing these deposits back to various sources associated with the defendant, including early adopter TORN distributions, Multisender profits, and a withdrawal from the Tornado Cash service. In all, of the nearly $375,000 traced to the purchase of the Auburn House, approximately nine percent came from funds involved in the Tornado Cash Service."

Documents provided by SA George identified BECU (Boeing Employee Credit Union) bank statements that contained transactions related to the purchase of the Auburn

---

[1] *See* TrialDiagrams-Auburn Residence 2025.02.17.xlxs (the "Auburn Analysis").

residence. According to SA George, the source of the funds for these transactions is as follows:

- On March 29, 2023 $440,000 USD was deposited to Roman Storm's BECU account from Binance.US (5925, Roman Storm) via wire transfer.

- SA George sourced the $440,000 from Binance from the following transactions:

    o On November 19, 2020, 99.94 ETH ($47,153.69) was transferred via the Tornado Cash 100 ETH pool (0xa160) to 0xb1f0 (TxID: 0xb9ee0621…).

    o SA George values the 99.94 ETH at $47,153.69, of which he attributes $20,080.18 to the purchase of the residence.

    o SA George identified a series of token swaps which occurred over the course of several months and included the aforementioned 99.94 ETH. These swaps occurred between 11/21/2020 and 03/21/2023.

    o Included within the aforementioned period are also a series of transactions SA George considered in his calculations (*e.g.*., airdrops, staking rewards, and redeemed Early Adopter Vouchers).

    o Most notably, an Early Adopter Voucher was swapped for TORN on 03/12/2021, valued at $14,249.47, and subsequently swapped for cUSDC, worth approximately $13,984.36. SA George attributes $14,645.67 as proceeds from Early Adopter Vouchers used for the purchase of the Auburn residence, however, his spreadsheet used for calculating this contribution lists the original amount of $14,249.47 in his data.

    o Compound Staking Rewards and DOT staking rewards contributed $79,762.68 and $254,337.64.. (Note: these funds have no relationship with any Tornado Cash function)

    o An airdrop was executed on 12/26/2020 for $2,695.87 worth of 1inch token (1,669.09 tokens) using the same addresses (0xa76) that received the Early Adopter Vouchers.

<u>Sources of Funds Identified by SA George as Attributed to the Auburn Residence</u>

Tornado Cash Withdrawals:

- November 19, 2020: 99.94 ETH ($47,153.69) withdrawn from Tornado Cash (0xa160) to 0xb1f0 (TxID: 0xb9ee0621…), of which SA George attributes $20,080.18 (5.35% of $375,083.44).

Polka Dot Staking Rewards:

- November 21, 2020: 48,570 DOT ($281,094) withdrawn from Polka Dot Staking Rewards (1BVyMF) to Binance (0x3f5c, Michael Vazhenin), swapped to 450 ETH ($233,654.10, Binance Order History), then to 0xb1f0 (TxID: 0x42d6bb77…).
- Net Contribution: $254,337.64 (67.81% of $375,083.44).

Compound Staking Rewards:

- Between 09/05/2020 and 11/20/2020 there were COMP airdrops totaling 6.998 COMP which SA George does not include in his provided documents, however, he does take those airdropped amounts into consideration. This quantity of COMP is combined with the 178.46 transaction described below and used for the subsequent swap to Compound USDC.
- July 13, 2021: 178.46 Compound Gov. ($68,575.60) was sent to 0x1de (TxID: 0x3c4938ed…).
- August 17–19, 2021: 185.46 Compound Gov. ($82,917.56) swapped to 3,604,028.03 Compound USDC ($79,762.68, TxIDs: 0xc43eae15…, 0x244e4900…, 0x86108877…).
- Net Contribution: $79,762.68 (21.27% of $375,083.44).

Tornado Cash Early Adopter Voucher:

- March 12, 2021: 108.99 Early Adopter Vouchers swapped to 108.99 TORN ($14,249.47), then to 641,575.49 Compound USDC ($13,984.36, TxIDs: 0x7f2f864d…, 0xd771318a…).
- Net Contribution: $14,645.67 (Note: there is an unexplained discrepancy of $396.20 in SA George's reporting and calculation. His spreadsheet lists $14,249.27 in the working section of his calculations, which is confirmed on-chain with the identified transaction ID, but his final amount for this transaction applied to the Auburn residence purchase is $14,645.67.) (3.90% of $375,083.44).

1INCH Airdrop:

- December 26, 2020: 1,669.09 1INCH ($2,695.87) to 0xa76 (TxID: 0x1bbdecc6…).
- March 12, 2021: the 1,669.09 1INCH was swapped to 287,071.45 Compound which was then swapped to USDC ($6,257.27, TxID: 0xb914c539…).
- Net Contribution: $6,257.27 (1.67% of $375,083.44).

Summary Breakdown

- Total Traced: $375,083.44 (of $440,000 deposited).
- Attributed Sources:
    - Polka Dot Staking Rewards: $254,337.64 (67.81%).
    - Compound Staking Rewards: $79,762.68 (21.27%).
    - Tornado Cash Withdrawals: $20,080.18 (5.35%).

4

- Early Adopter Vouchers: $14,645.67 (3.90%).
- 1INCH Airdrop: $6,257.27 (1.67%).

### B. Mr. Sheridan's Proposed Testimony

SA George's assertion that approximately 9% ($33,757.51) of the $375,083.44 used to purchase the Auburn House came from Tornado Cash overestimates contribution amounts incorrectly applies Tornado Cash functions to revenue and compensation, does not consider sanctions or Relayer Registry timelines, misattributes certain funds, does not account for comingling and tracing limits, and is not consistent with LIFO methodology. As the Auburn Analysis demonstrates:

#### 1. SA George Overstates the Amount of Funds Attributable to Tornado Cash Withdrawals

The workbook attributes $20,080.18 (5.35%) to Tornado Cash, not 9% (which would be $33,757.51), a shortfall of $13,677.33 (3.65%). SA George's 9% attribution is based on combining Tornado Cash Withdrawals (5%) and Early Adopter Vouchers (4%), which are two entirely distinct sources of funds, neither of which appear to reflect profit from Mr. Storm's development efforts.

#### 2. SA George Incorrectly Applies Tornado Cash Functions to Revenue and Compensation :

SA George appears to conclude that Tornado Cash Withdrawals and Early Adopter Vouchers consist of revenues and/or compensation from the development of Tornado Cash, without providing any evidence or support for that assumption.

#### 3. SA George Does Not Consider the Timing of Withdrawals, Which Predate OFAC Sanctions and the Implementation of the Relayer Registry:

The Tornado Cash Withdrawals relevant here occurred on November 19, 2020 (TxID: 0xb9ee0621…), over 20 months before OFAC sanctioned certain Tornado Cash smart contracts on August 8, 2022, (*See* Dkt. 1, ¶ 74) and nearly 16 months before the implementation of the Relayer Registry, which the government contends is the source of Mr. Storm's profits from Tornado Cash (*id.* ¶¶ 29-30). SA George does not otherwise provide any basis for characterizing Tornado Cash Withdrawals as an illicit source of funds.

#### 4. SA George Misattributes Sources of Certain Funds:

SA George's disclosure (George Disclosure ¶ 5.) attributes funds to "Multisender profits," but none of his documents identify any of the Auburn residence purchase funds coming from Multisender profits.

### 5. SA George Does Not Account for Comingling and Tracing Limits:

Funds commingled across swaps (*e.g.*, ETH to Compound USDC, TxID: 0x186cd9f8…) make precise attribution unreliable due to cryptocurrency's inherent fungibility. George's 9% is also inaccurate because it lacks specificity, as the workbook's 5.35% Tornado Cash allocation is diluted by $354,983.26 (94.65%) from other sources, consisting of Polka Dot staking rewards ($254,337.64, 67.81%) from November 21, 2020 (Binance Order History); Compound staking rewards ($79,762.68, 21.27%) from July 2021–August 2021 (TxIDs: 0x3c4938ed…, 0x244e4900…); 1INCH airdrop ($6,257.27, 1.67%); and Early Adopter Vouchers ($14,645.67, 3.90%, pre-sanctions March 12, 2021).

### 6. SA George's Analysis is not Consistent with LIFO Methodology:

SA George's designation of his analysis as last in, first out methodology ("LIFO") is unclear as (1) the assets involved in these transactions are heavily comingled making linear attribution of specific assets problematic and (2) he appears to instead use a first in, first out methodology ("FIFO") as he prioritizes the Tornado Cash Withdrawals for analysis, which are the earliest ("first in") in the timeline. To the extent he claims to apply LIFO, he does not justify his choice of LIFO instead of other acceptable alternatives.

### III. SA George's Analysis of the Source of Funds for the Lake Tapps House and Mr. Sheridan's Proposed Testimony

In response to SA George's opinion that "approximately 75% of the funds used to purchase the Lake Tapps House were traced back to withdrawals from the Tornado Cash service," Mr. Sheridan will explain, using the spreadsheet that the government provided along with SA George's disclosure that appears to reflect his analysis,[2] that the 75% percent figure reflects a transaction history bias that is inconsistent with the purported LIFO methodology and does not consider the timing of withdrawals vis-a-vis Founders' TORN, OFAC sanctions, or the Relayer Registry.

#### A. SA George's Conclusions and Analysis

In paragraph 6 of his disclosure, SA George states:

> "The Lake Tapps House was purchased with funds deposited into a traditional financial institution in an account in the defendant's name. Special Agent George traced the funds composing the deposit used to purchase the home to multiple withdrawals from the Tornado Cash service. The ETH withdrawn from the Tornado Cash service was exchanged, in multiple transactions, to different types of cryptocurrency and then to United States dollar pegged stablecoins. The

---

[2] *See* TrialDiagrams-Ilmira Residence 2025.02.17.xlxs (the "Lake Tapps Analysis").

6

entirety of the funds was later converted to an equivalent amount of fiat currency via an account at a well-known United States-based cryptocurrency exchange in the defendant's birth name, Roman Ganchenko. Approximately 75% of the funds used to purchase the Lake Tapps House were traced back to withdrawals from the Tornado Cash service."

Background materials provided by SA George contained transactions related to the purchase of the Lake Tapps House residence. According to SA George, the source of the funds for these transactions is as follows:

Funding Sources into Chase Bank (796123227):

- May 31, 2021: $1,043,258.89 USDC withdrawn from wallet 0x0b60 (TxID: 0xc1bed6da41c7994ee3f3a5a899e03d3dd9c60fea952915d6d58922897a37549a, estimated value $1,045,062.28) and $359,505.12 USDC from LINK swaps (TxIDs: 0xe339ea85…, 0x0f8dffdca…, estimated value $360,126.57), withdrawn from 0x9d69 (TxID: 0x8940d8f5717c2734c8fcad555147288736c7f154d5dc4427c7ed6156c6862186), deposited into Coinbase (0xc0fc3, Roman Ganchenko) as $1,402,764.02 USDC (estimated value $1,405,188.84).
- June 2, 2021: $1,402,764.02 USD swapped from USDC and deposited into Chase Bank (796123227, Roman Storm, Coinbase subpoena production).
- Total Deposits: $1,402,764.02 USD.

<u>Sources of Funds Identified by SA George</u>

Tornado Cash Withdrawals:

- SA George identified four withdrawals of 100 ETH each ($184,140 per withdrawal, total $736,560), which were processed through the Tornado Cash protocol and arrived at wallet 0x0b60.
- SA George identified four withdrawals of 10 ETH each ($18,414 per withdrawal, total $73,656) which were processed through the Tornado Cash protocol and arrived at wallet 0x0b60.
- SA George states that the total ETH withdrawn: 440 ETH (400 + 40) has an estimated value $810,216 ($736,560 + $73,656).
- From the time the ETH was processed through Tornado Cash and received into Mr. Storm's wallet (0x0b60), to the time it was swapped for cDAI as part of the Lake Tapps House asset flow, the value of ETH had increased from $1,841.40 to $2,954.22. Therefore, at the time the function on the Tornado Cash smart contract was executed and the quantity of ETH was transferred, the total USD value was only $810,216 USD.

> However, SA George reports $1,045,062 of ETH was transferred from Tornado Cash into Mr. Storm's wallet (0x0b60). The distinction in reporting between token quantity and USD amount is not addressed in SA George's reporting and presents a potential inflated quantity of asset transfer related to Tornado Cash.
> - Between 05/02/2021 and 05/31/2021 SA George reports that Mr. Storm executes a series of token swaps where the funds ultimately enter a Coinbase address under the control of Mr. Storm.
> - Included in this deposit to Coinbase are assets which derived from LINK airdrops between 04/08/2021 and 05/19/2021, which were in turn swapped for USDC, totaling approximately $360,126.57. SA George only attributes $357,702 as a contributing amount to the purchase of the Lake Tapps house, based on his claimed use of LIFO methodology.  As SA George has already applied the $1,045,062 from the Tornado Cash Withdrawals to the purchase of the residence, he only needs an additional $357,702 to get the total purchase.

### B. Mr. Sheridan's Proposed Testimony

Special Agent George's assertion that approximately 75% ($989,707.37) of the $1,318,609.83 used to purchase the Lake Tapps House was traced to Tornado Cash withdrawals does not consider Founders' TORN, sanctions, or Relayer Registry timelines, does not account for comingling and tracing limitations, and reflects a transaction history bias that is not consistent with his claimed LIFO methodology.  Based on his analysis of SA George's Lake Tapps Analysis, Mr. Sheridan has concluded, using the very same data:

### 1. SA George Does Not Consider the Timing of Withdrawals, Which Predate Founders' TORN Availability, OFAC Sanctions, and the Implementation of the Relayer Registry:

The Tornado Cash withdrawals identified in the Lake Tapps Analysis occurred on March 30, 2021, prior to the completion of the vesting period and unlock of Founders' TORN, the implementation of the OFAC sanctions on certain Tornado Cash smart contracts, and the creation of the Relayer Registry.  SA George's findings failed to address the distinctions between different Tornado Cash functions and the implications of Tornado Cash Withdrawals and redemptions of Early Adopter Vouchers at different periods in time when he universally attributes all transactions to "Tornado.Cash Service".

8

### 2. SA George's Analysis Reflects a Transaction History Bias and is not Consistent with LIFO Methodology:

Again, SA George's designation of his analysis as last in, first out methodology ("LIFO") is unclear as (1) the assets involved in these transactions are heavily comingled making linear attribution of specific assets problematic and (2) he appears to instead use a first in, first out methodology ("FIFO") as he prioritizes the Tornado Cash Withdrawals for analysis, which are the earliest ("first in") in the timeline. For example, the LINK airdrops totaled $360,126.57 and happened in May 2021, however SA George only attributes $357,702 to the purchase of the residence, and instead applies precedence to the Tornado Cash activity which occurred March 2021. George neglected to consider all applicable accounting methodologies that could have been used to determine the percentage contribution towards the residence purchase. Rather than presenting a balanced analysis, he relied solely on an inconsistently applied approach that merely prioritizes any transactions involving Tornado Cash.

### IV. SA George's Analysis of the Source of Funds for the 2022 Tesla Overstates Contribution Amounts and Misattributes Funds from Other Sources

In response to SA George's opinion that "nearly 100% of the funds" used to purchase the 2022 Tesla were "derived from TORN distributions and profits from the Multisender service," Mr. Sheridan will explain, using the spreadsheet that the government provided along with SA George's disclosure that appears to reflect his analysis,[3] that his calculations fail to show any ties to revenues and/or compensation from the development of Tornado Cash.

### A. SA George's Conclusions and Analysis

In paragraph 7 of his disclosure, SA George states:

> "The 2022 Tesla was purchased with funds withdrawn or transferred from traditional financial institution accounts in the name of the defendant. Deposits into the traditional financial institution accounts came from an accounts [sic] at cryptocurrency exchanges, including an account at a well-known United States-based cryptocurrency exchange in the defendant's birth name, Roman Ganchenko, and an account at the FTX cryptocurrency exchange in the name of Roman Storm. Based on Special Agent George's tracing . . . nearly 100% of the funds composing this transaction were derived from TORN distributions and profits from the Multisender service. Of the nearly $94,000 used to purchase the 2022 Tesla, approximately 23% came from TORN token distributions and approximately 77% from profits from Multisender. In addition, Special Agent George traced some of the TORN token distributions used to purchase the 2022

---

[3] *See* TrialDiagrams-Tesla Residence 2025.02.17.xlxs (the "Tesla Analysis").

9

Tesla to a cryptocurrency address that interacted with addresses associated with the purchases of the Auburn House and the Lake Tapps House."

Source of Funds Identified by SA George

Background materials provided by SA George identified transactions related to the purchase of the Tesla. According to SA George, the source of the funds for these transactions is as follows:

- SA George documents that the $30,000 deposited to Chase Bank on 06/17/2022 was sourced from a Coinbase withdrawal of $100,002.14 linked to Multisender profits of approximately 120 ETH (that were swapped for USDC).
- Between 07/03/2022 and 09/16/2022 there were 5 withdrawals from FTX to US Bank totaling $70,700, which derived from Multisender.app profits and Early Adopter Voucher redemptions.
- Early Adopter Vouchers were received on 03/03/2021 and were eventually swapped for the stablecoin USDC. (The Early Adopter Voucher has no relationship to Founders' TORN, which was distributed to the co-founders and developers of the Tornado Cash protocol.)
- On 06/06/2022 Mr. Storm received Multisender.app profits in the form of ETH, worth $210,366, of which $100,000 was transferred to Mr. Storm's Coinbase account.
- Funds that entered Chase Bank were further distributed to other banks. SA George's findings demonstrate how the transfers from Chase Bank to US Bank were used for the purchase of the Tesla.

Summary Breakdown:

- Total Tesla purchase: $93,907.07.
- Attributed sources:
    - Multisender.app: $72,204.93 (76.89%).
    - Early Adopter Voucher: $21,700 (23.10%).
    - Coinbase Reward: $2.14 (0.0023%).

B. Mr. Sheridan's Proposed Testimony

SA George's assertion that the funds used to purchase the Tesla were sourced from revenues and/or compensation from the development of Tornado Cash is incorrect. As SA George's Tesla Analysis demonstrates:

10

1. **SA George Does Not Consider the Timing of the TORN-Early Adopter Voucher Swaps, Which Predate OFAC Sanctions and the Implementation of the Relayer Registry**:

The $21,700 attributed to TORN stems from a March 3, 2021, swap of 616.77 Early Adopter Vouchers valued at $6,050.51 (TxID: 0x39f3ec633721ce5a60cecb4eed783697622933ae0658161be0b7e83b52582ed0), over a year before OFAC sanctioned Tornado Cash on August 8, 2022 and one year before the implementation of the Relayer Registry.  These funds were acquired and processed through swaps (e.g., 790 TORN withdrawn on March 12, 2021, to 0xaa28, yielding $31,377.66 USDC across transactions such as TxID: 0x5508e33628963c3a6d67b72da978e7749a720769e2e6eac3cb15f5fd983abcf3) that have no connection to TORN Mr. Storm earned for his work developing the Tornado Cash protocol.

2. **SA George Fails to Treat Multisender Profits as Independent Revenue:**

The $72,204.93 from Multisender reflects profits from Multisender.app, a distinct service for bulk cryptocurrency transfers that has no connection with any Tornado Cash smart contracts.  SA George's Telsa Analysis shows no direct link between Multisender profits and Tornado Cash pools or any sanctioned addresses.  These include 120 ETH ($210,366) withdrawn June 6, 2022, and 600 Binance Coin ($49,000) withdrawn June 3, 2022, processed through standard exchanges (Coinbase, FTX).  SA George's assumption that Multisender profits are connected to illicit activity lacks any evidence.

## V.    DeCapua Analysis

### A.  SA DeCapua's Conclusions and Analysis

Background materials provided by SA DeCapua identified transactions related to 31 cryptocurrency incidents involving Tornado Cash.  From these incidents, SA DeCapua calculated $1.191B in illicit cryptocurrency assets being processed by Tornado Cash.  As part of his materials, SA DeCapua identified the Python script code utilized to analyze the blockchain transaction data associated with these incidents.

### B.  Mr. Sheridan's Proposed Testimony

1. **SA DeCapua's Findings Can Not Be Replicated**

The dataset provided by SA DeCapua was analyzed using his provided Python script.  The script failed to replicate his reported results due to the presence of errors when executing the script,

specifically involving the inclusion of failed transactions in the quantity of funds and his addition of "IN/OUT" designations for transactions.[4]

This inability to reproduce SA DeCapua's results suggests that there may be issues with the script, the data, or the methodology used. The presence of errors when executing the script on the provided data indicates a lack of robustness and reliability in the code. Given the inability to replicate the results and the presence of errors in the script, it is reasonable to conclude that any opinions or conclusions drawn from the script's output are invalid.

### 2. SA DeCapua's Calculation of Total Illicit Activity Cannot Be Replicated

Separate and apart from the issues with SA DeCapua's Python Script, Mr. Sheridan is unable to replicate SA DeCapua's calculation of $1.19 billion in total deposits into Tornado Cash that are allegedly tied to illicit activity. The data provided with SA DeCapua's disclosures includes sub-folders for each of the 31 alleged criminal incidents, each of which contains spreadsheets with transactional data for those incidents. There is no spreadsheet or other data that directly connects the transactional data to SA DeCapua's calculation of $1.19 billion in allegedly illicit proceeds deposited.

On March 10, 2025, the government produced a spreadsheet entitled "Deposits_to_Tornado_Cash_20250308.xlsx" that the government stated "compile[s] all the Tornado Cash deposits tied to the 31 criminal incidents from the spreadsheets in the individual folders into one spreadsheet." This spreadsheet does not tie directly to the data in the 31 individual folders (*e.g.*, through a pivot table). Further, this spreadsheet appears to include some, but not all, of the transactions included in the 31 individual folders, and SA DeCapua does

---

[4] Specifically, SA DeCapua appeared to use the "**etherscanpull.py**" script to pull transactional data for seven smart contract addresses from Etherscan.io, the output of which is recorded in certain .csv files also included with his disclosure. These .csv files include a column titled "direction" with an "IN" or "OUT" value for each transaction. In running the Python script, however, there is no "direction" data generated, and no "direction" parameters were identified in the review of his code, suggesting SA DeCapua may have added that column manually. As a result, Mr. Sheridan will testify that, when the "**combine_csvs.py**" script was run against the resulting .csv files, he received an error code that reads: "An unexpected error occurred: ['direction'] not in index." In addition, the .csv files generated from the "**combine_csvs.py**" include a column titled, "isError," which appears to indicate whether a transaction failed. It is not clear to what extent SA DeCapua excluded failed transactions from his calculations; if he did so, his methodology is unclear given the error when attempting to run the script, as described above.

not disclose how he chose which transactions to include and which to exclude.  As such, Mr. Sheridan is unable to replicate SA DeCapua's calculation using the data provided.

If SA DeCapua subsequently testifies regarding these deficiencies, Mr. Sheridan will likely have additional testimony to address those points, and he reserves the right to do so.

### VI.     Mr. Sheridan's Data, Methodology, and Sources

#### A.  Data

Mr. Sheridan's proposed testimony relies on his use of Etherscan and BSCscan, which are publicly available blockchain explorers, to independently reconstruct and assess the findings presented by SA George.  These explorers were also used to conduct original tracing, a flow of funds analysis, identification of fund origin and destination, and attribution of account ownership or control.  Software tools including Chainalysis Reactor and TRM were used at later stages for validation and confirmation of findings for the SA George analysis, but were not required for the basic asset tracing conducted by Mr. Sheridan.

#### B.  Methodology

Mr. Sheridan's used the information produced in SA George's documents to trace on-chain fund movements and analyze the accuracy of the reported hashes, origin, flow, and destination of funds involved.  Each transaction was analyzed to ensure SA George's reported values and conclusions matched what was recorded on-chain.  Additionally, Mr. Sheridan cross-referenced public blockchain records using the above-referenced tools with SA George's provided cryptocurrency exchange data to corroborate the timing and amounts of funds entering centralized exchanges.

Mr. Sheridan used the information produced in SA DeCapua's documents in an attempt to replicate SA DeCapua's quantification of allegedly illicit funds sent to Tornado Cash.  All of SA DeCapua's source data was analyzed using known Tornado Cash deposit pools in addition to other purported Tornado Cash deposit addresses identified by SA DeCapua.  Mr. Sheridan used SA DeCapua's provided Python code and dataset for analysis.  The quantity of illicit funds assigned to each incident by SA DeCapua was cross-referenced with Chainalysis Reactor and TRM blockchain forensics software.

#### C.  Sources

Mr. Sheridan's proposed testimony is based on his review of documents provided by counsel in the course of this matter, including SA George's Disclosure and SA DeCapua's disclosure, the Auburn Analysis, the Lake Tapps Analysis, the Tesla Analysis, the "Major Tornado Cash Hacks";

"data_from_etherscan_daily"; and "Deposits_to_Tornado_Cash_20250308.xlsx" spreadsheets, and all supporting materials produced by the government. Mr. Sheridan also reviewed publicly available blockchain data retrieved from the above-referenced blockchain explorer tools and the publicly available Vesting Analytics Platform (cryptorank.io).

**Approval and Signature**

I approve the disclosure of my qualifications, anticipated opinions, and bases for such opinions, as set forth above.

_Jeremy Sheridan_
Jeremy Sheridan