P7E1STO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                       23 Cr. 430 (KPF)

ROMAN STORM,

               Defendant.          Jury Trial
------------------------------x

                             New York, N.Y.
                             July 14, 2025
                             9:46 a.m.

Before:

              HON. KATHERINE POLK FAILLA,

                            District Judge

APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  NATHAN M. REHN, ESQ.
    BEN ARAD, ESQ.
    BENJAMIN A. GIANFORTI, ESQ.
    KEVIN G. MOSLEY, ESQ.
    TARA M. LA MORTE, ESQ.
    Assistant United States Attorneys

WAYMAKER LLP
    Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
    KERI CURTIS AXEL, ESQ.
    KEVIN M. CASEY, ESQ.
    VIVIANA ANDAZOLA MARQUEZ, ESQ.

    -and-

HECKER FINK LLP
    Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
    CHRISTOPHER MOREL, ESQ.

P7E1STO1

(Case called)

MR. REHN:  Good morning, your Honor.  Thane Rehn appearing for the United States, and I'm joined at counsel table by Benjamin Gianforti, Ben Arad, and Kevin Mosley.

THE COURT:  Thank you very much.  Your paralegals are where?

MR. REHN:  We have paralegal Dean Iannuzzelli here in the courtroom with us.

THE COURT:  Yes, sir.

MR. REHN:  And another paralegal named Oliva Sebade who is working on other projects so she'll be in and out.

THE COURT:  The reason for asking is I wanted to be sure how they pronounce their surnames.  May I just hear, is it Iannuzzelli?  Is that the way it's pronounced?

MR. IANNUZZELLI:  Yes, your Honor.

THE COURT:  Thank you, sir.  Given that I hate when people mispronounce Failla, I wanted to make sure I got that right.

Good morning, Mr. Klein.  Hi.

MR. KLEIN:  Good morning.  Brian Klein.  With us is Roman Storm.

THE COURT:  Yes, sir.  Good morning.

A.  I'm joined by my colleagues Keri Curtis Axel, David Patton, Lee Miles, who's a consultant, and my colleagues back here, if you want me to introduce everybody.

P7E1STO1

THE COURT:  Yes, please.

MR. KLEIN:  We have Kevin Casey, Chris Morel, and Viviana Andazola Marquez.

THE COURT:  Thank you very much.  We're missing someone perhaps?  Do I have——I'm sorry.

MR. KLEIN:  Oh, Ms. James, Becky James.

THE COURT:  Becky who has a surname, yes.

MR. KLEIN:  Yes, she's back in the office doing some work.

THE COURT:  That's fine.

All right.  Let me tell you where things are.  It is my understanding that there are jurors who are assembling in the jury room.  There are at least three trials of which I am aware.  We have a trial, Judge Cote has a trial, there may be another criminal trial.  And I'm getting a nod that there is.  There may be another civil trial as well.  Criminal trials have priority for the venire.  It is my hope but not my expectation that my friends at jury administration will give us the first venire because we need so much more than everyone else.  We are expecting a venire of about 90 jurors this morning because, given a four-week trial between the middle of July and middle of August, I anticipate that everyone is going to have a vacation.

Just a couple of housekeeping matters before we begin.  One of them was understanding the surnames of the government

P7E1STO1

paralegals.

A second was the instruction that I need to give you so that I can tell the jury that I've given it. Please don't have any contacts with the jurors. Don't say hi to them. You know the drill already, but then I can say to them that I have given you that instruction.

On the issue of motions *in limine*, thank you for taking the entirety of my weekend. If I could just ask, please, for no reply submissions unless I've solicited one because I do understand what the parties are saying. Also, government——and I'm saying this much nicer than when I originally wrote it——I would like your final, correct answer in your first submission and to not correct it hours later when I've been doing things predicated on what you've told me in your first submission.

When we actually get to the point of jury selection, it is my expectation that there will be folks here who may want to speak privately about sensitive issues. Also, anybody who answers yes to the question 1, I will see in the robing room, or at sidebar, and that's what we're about to talk about, because if one person hears that a vacation gets them out of jury service, then everyone will hear that a vacation will get them out of jury service, and I'm not interested in letting that be a thought. Being in 110, we have two jury rooms, so my expectation is that we're going to be using one of them for

P7E1STO1

these sort of sensitive questions.  It's still not the biggest room around and I don't want to freak out our prospective jurors, so my hope would be, I was going to say to the defense, I didn't want all seven attorneys in the room, so I know you and the government will figure out an appropriate subset of folks who would be coming into the room with us.  Could I ask, Mr. Klein, if you could please speak with Mr. Storm about whether he wishes to be one of the people in that room.  It will count against your complement, but that's okay.  So just before that.

MR. KLEIN:  Yes, your Honor.

THE COURT:  Thank you so much.

All right.  I suppose I should ask this.  In a sense, having these private discussions is a form of courtroom closure.  I do it because it is easier than doing all of them at the sidebar.  Is there an objection, a Sixth Amendment objection to us conducting the questions of a sensitive nature in a robing room as distinguished from the sidebar of this courtroom?

MR. KLEIN:  No, your Honor; however you want to handle it.

THE COURT:  All right.  Thank you so much.

Counsel for the government?

MR. REHN:  No objection.

THE COURT:  Thank you.

P7E1STO1

All right.  At last count, I believe I have three remaining *in limine* motions to address, so let me talk about them, to the extent that I can.  These are only in order of the way that the pile is on my desk.

There was a motion from the government seeking clarification of the's Court's ruling.  I have received the defense's submission—early submission, thank you—regarding that, and I agree with the defense.  I didn't think there was a need for clarification, and I don't think there is one right now.  The defense is not going to be arguing about specific cryptocurrency mixes and therefore I don't believe there's a need to discuss the fact that some of them may have been subject to prosecution.

Separately, it's not an "everyone is doing it" defense, which would have troubled me, but simply that the modifications the government is suggesting could have been made either were not technically feasible or were not widely adopted, in fact perhaps maybe not adopted at all, and so I am adhering to my original ruling.  I am of course expecting the defense team to abide by the representations they've made in their July 13 letter.  There's no reason for them not to.  So I suppose I've granted the motion for clarification insofar as I'm adhering to my prior decision and that's my clarification.

Let's then talk please about the next motion, which was in opposition to what I'll call the Pertsev extraction, and

there are several components to that motion.  On the issue of whether the government can authenticate the records from Pertsev's phone, I believe they can, by several means, including those that they have outlined.  I'm not as worried as the defense.  And I should say——I'll say this to both sides——I'm not a jury, so please don't use like really hyperbolic, florid language, and for the love of god, do not start mentioning assassination attempts on the president or former FBI Director Comey.  You really dissipated the credibility of your argument when you went to that.  Also, the Orwellian comment of a couple of motions ago, it didn't land well with me.  I'm just not that judge.  Just give me reasoned——if you're right, I'll go with you, and you don't even have to use the word "Orwellian."  If you're not right, I'm not going to go with you, and that's where we are.

But getting back to the matter at hand, which is this opposition to the extraction, I absolutely believe the government can authenticate the records from the Pertsev phone by several means.  The fact that the Pertsev extraction, or the Graykey report hypothetically, theoretically, could possibly have been modified, even though the metadata shows that it wasn't, is not something that I'm going to waste my time on. At the very most it goes to weight, it's a subject for cross-examination, but not admissibility.

On the issue of whether there's some concern about a

message being forwarded, the government's exhibits at trial, as I understand them, will show that a message was forwarded. If it was forwarded, the fact that we don't know who was the original author of the message is what it is. I mean, it can be brought out in cross, but I don't think it is a basis for excluding the evidence.

I am denying the motion to inspect the grand jury minutes because I have read them this weekend and I can make the representation that the statement about the forwarded message from Mr. Pertsev was not material to the grand jury's decision to indict. So I've done that work for you.

On the issue of the *Brady* motion, I am denying the *Brady* motion because, number one, these materials are not in the possession, custody, or control of the government; number two, what the government received, as I understand it, was a printout or was materials responsive to their MLAT requests, and they didn't get the stuff that the MLAT requests didn't cover. As I understood the MLAT requests, they were seeking materials regarding Mr. Storm. So the idea that there's some exculpatory information out there is highly unlikely, but in any event, I go back to my original point. It's not in the government's possession, custody, or control, and there's no suggestion that the government deliberately structured its questioning or its request for information of the Dutch authorities in order to exclude exculpatory information.

P7E1STO1

All of that being said, I do have some concerns about the Pertsev statement. It's been suggested to me that Pertsev passing on the message in question should be seen as his adoption of it. I don't know that I agree with the government that that is an adoption. I'm not so sure that the import of the message is that, in failing to deny what he passed on, he was therefore admitting to it. More than that, the fact that Mr. Pertsev's——I should give him an honorific——Mr. Pertsev subsequently said, we're being contacted by CoinDesk, seems to me an indication that Mr. Pertsev wasn't adopting but instead was distancing himself from the substance of the statement and therefore not adopting it. I'll let in the statement for the nonhearsay purpose of state of mind and its effect on the recipient——namely, Mr. Pertsev. I presume the defense will then want a limiting instruction that it's not being admitted for its truth and it's being admitted for state of mind. So I'm saying this, looking over to the defense table to remind them to remind me to give such limiting instruction if that is what you want. You may make a decision that you'd rather not call attention to it, and that's fine too. But if you want a limiting instruction, gotta let me know. So that is my resolution of that motion.

Those are the two easy ones.

The custodian of records one I find fascinating. May I ask, is there someone on the defense team with whom I can

P7E1STO1

discuss this motion?  The answer is yes.  The question is going to be who it is.

MR. KLEIN:  Yes, your Honor.

THE COURT:  Okay.  Mr. Klein, thank you so much. Mr. Klein, as I'm talking to you, I am looking at three declarations.  I'm looking at one from the Apple custodian of records, I'm looking at one from the X custodian of records, and I'm looking at one from the Dragonfly custodian of records. Taking those individually, my review of the Apple exhibits is that they're largely photographs—photographs of people and photographs of a passport.  I didn't understand that there was anything else—for example, I didn't understand that there were email messages or things of that nature—but perhaps I've overlooked it.  Is that your understanding as well, sir?

MR. KLEIN:  One second, your Honor.

THE COURT:  Of course.

MR. KLEIN:  Your Honor is correct about what consists largely of the Apple exhibits.

THE COURT:  Okay.  The custodian of records says, we keep these things in the ordinary course, it's in the ordinary course to keep these things.  What is it that you want with respect to the Apple custodian?  The Apple custodian cannot say, I don't think that a particular picture is of Mr. Storm or Mr. Semenov or Mr. Pertsev.  They can say that on this iCloud account, there are these pictures, and some of them have

P7E1STO1

merchandise that says Tornado Cash on it.  But I don't understand what the end game is with the Apple custodian.  You want the Apple custodian to come in and say what?

MR. KLEIN:  I don't want them to come in and say anything, but if the government wants to bring them in, then they would come in and take the stand and then they would, as to the records——

THE COURT:  And what are they going to say that's different from the attestation?  They're not in a position to say who these people are.  They're in a position to say they've got a bunch of photographs that they keep in the ordinary course of business.

MR. KLEIN:  I guess that's where we sort of tease a different argument out, your Honor, which is that those aren't Apple's business records.  They're the records of the account holder that Apple happens to hold.  So they're not——if there were photos of an Apple party, an Apple corporate event, something like that, then I think that would be correct, but these are not photos of an Apple event.

THE COURT:  You're not disputing the authentication. You're not saying these things don't exist on Apple's files as they exist.  You're saying that Apple, despite having certified that these are their business records, that they can't be their business records.

MR. KLEIN:  That is correct, your Honor.

P7E1STO1

THE COURT:  So the Apple person coming in isn't going to do us any good because the most that that Apple person can say is, you're right, we didn't take the photographs, or, I mean, they're not going to agree with you that they're not their business records.  They've certified that they are their business records.  Seems to me the Apple certification gets these things in, and somebody else at the trial is going to tell me who these people are.  But let me hear from you on that.

MR. KLEIN:  We stick by our point.

THE COURT:  It's a point you're not making very well. You've got better points to make.  We're going to get to the better points you have, sir.  I don't understand why you're fighting about the Apple.

MR. KLEIN:  We can move past the Apple records, your Honor, and go to my better points, I guess.

THE COURT:  But you're not consenting.  Or are you?

MR. KLEIN:  One moment, your Honor.

THE COURT:  Okay.

MR. KLEIN:  Your Honor, I have nothing more to say other than we stand on our objection.

THE COURT:  All right.  All right.  Then let's talk about X.

The X certification has them as both business records and electronic process records, and I presume, once again,

P7E1STO1

you're not disputing that these tweets are on X.  You're disputing that these tweets are the business records of X.

MR. KLEIN:  That is correct, your Honor.

THE COURT:  All right.  And again, I just want to make sure I understand the argument.  One could argue that the certification is a way to get these authenticated as X tweets, and that someone else is going to have to tell me that there has to be some other basis for letting them in.  For example, if they are Mr. Storm's tweets, they come in as a statement of a party opponent.  If they are Mr. Semenov's tweets, they're potentially statements of a co-conspirator in furtherance of the conspiracy.  So once again, I don't understand what you get out of having the custodian.  It seems to me if they come in as business records, there's still the concept in business records of hearsay witness hearsay.  And so it could be that the tweet is a business record, as they define it.  However, there's going to have to be some other way of explaining why it's coming in.

MR. KLEIN:  Your Honor, we're making both arguments.  It's hearsay and it is double-hearsay.  So we're not conceding that in the first instance it's not hearsay.  And we would also argue that it's double-hearsay, right?  So I think, again, this goes to the basic principle we're putting forth here, which is that these are not Twitter's—or X's now—business records, not tweets from Elon Musk or some communications from Elon Musk to

P7E1STO1

some subordinate of Musk. These are outsiders who have happened to use their service. It's not X's business records. It has this hearsay problem on several layers.

THE COURT: How do you square that with the *El-Gamal* decision from the Second Circuit?

MR. KLEIN: One second, your Honor.

THE COURT: Of course.

I mean, you're not suggesting, sir, are you, that the X custodian is lying? You just think that they are wrong when they say that; even though they're reciting that these are their business records, that they're just simply wrong.

MR. KLEIN: Yes, your Honor. These companies get requests and subpoenas; by function, they have custodians there who fill out these certifications and send them back.

THE COURT: Yes, under penalty of perjury.

MR. KLEIN: I know, your Honor, but I don't know that a lot of thought goes into that process in terms of this custodian knowing what the Federal Rules of Evidence are and what hearsay is. And so, yes, that custodian may get it and say, well, this is a record we hold, right, and maybe focused on the authenticity of it, but where we disagree is that that is an X——that is an X communication. It's a hearsay statement.

THE COURT: Right. Even though——

MR. KLEIN: And it's not their business record, so we just disagree with that.

P7E1STO1

THE COURT:  Okay.  Okay.  But once again, sir, if I have the custodian come in, what's the custodian going to tell you?  I mean, you have an objection, but I don't know how your objection is aided by hauling in X's custodian, other than, what, you get to cross-examine them as to the elements of a business record?

MR. KLEIN:  They have to bring in someone with knowledge, your Honor, and the custodian doesn't have any personal knowledge about those tweets.  They're just looking at a database and pulling things.

THE COURT:  Sure.  But, okay, work with me, please. If we have the custodian's certification and somebody else testifies that they got these tweets, they saw these tweets, they know that they're coming from Mr. Storm, Mr. Semenov, someone, whoever, then why isn't that enough?

MR. KLEIN:  That's not what they're doing, though, your Honor.  They're offering in a certification from a custodian who doesn't know anything about these personally and doesn't have that information.

THE COURT:  All right.  But what if it's subject to connection by somebody who does?  Are you still objecting?

MR. KLEIN:  Yes, your Honor.  It's hearsay.

THE COURT:  All right.  Then let's talk about Dragonfly, please.  Dragonfly, again, there's a certification that it's business records.  There's a whole tranche——and it's

P7E1STO1

the first tranche, sir, I would say, 1300 through maybe 1320 of the government exhibits——they're draft agreements and deal documents.  How are those not business records?  It seems to me that your beef, if I may, is with the Telegram chats.

MR. KLEIN:  That is our beef, your Honor.

THE COURT:  Okay.  But you're nevertheless objecting to everything.

MR. KLEIN:  We are, your Honor, but I want to focus our beef on the Telegram chats.

THE COURT:  Well, no.  What's your problem with the custodian certification of the deal documents and the draft agreements?  Those are quintessential business records.

MR. KLEIN:  Your Honor, I would agree with you on that.

THE COURT:  Okay.  Your problem was with the Telegram records, and the Telegram——

MR. KLEIN:  Yes, and any other chats.

THE COURT:  Let's call them that.  And yes, the texts and other messages that are not the deal documents.  They argue that they are.

MR. KLEIN:  Yes, your Honor.

THE COURT:  For those, let me understand specifically what your concern is.

MR. KLEIN:  Several, your Honor.  First of all——and I don't have the certification in front of me.  I believe it's by

P7E1STO1

a compliance officer.

THE COURT:  Chief compliance officer, yes.

MR. KLEIN:  So someone who had, in my—who I would represent to the Court I have no reason to believe had anything to do with these deals, had no personal knowledge about them, had no personal knowledge about these communications.

THE COURT:  Sure.  But that can't be necessary. Certification has to be by somebody.  The custodial certification that we get from AT&T is not from the person, the operator on the call.  It's from someone who says, I've gone through our records, you asked me for records, these are the records I've given you, these were records that were kept or made at or about the time that they indicate, and were made in the course of regularly conducted business activity, and it is our practice to keep them.  So, I don't know.  Are you suggesting that the custodian has to have been personally involved in order to be the custodian?

MR. KLEIN:  Your Honor, what I'm suggesting is that that is not the correct person if they're going to try to admit these records in.  That custodian is a compliance officer.  The company you're talking about, AT&T, they have a professional team of people who collect records who are familiar with the databases.  That's a very different situation than what we have here, which is a compliance officer with no knowledge of this, as far as I can tell.  I don't think the government's going to

P7E1STO1

say that this compliance officer had anything to do with this. And it's a much different company. So I think there is a difference between a large multinational company with a dedicated group of custodians who gather records and a small, let's call it a startup, venture capital company who puts a compliance officer on a record that has nothing to do with the daily duties of that person. There is probably a person at that company who could and would know about that.

THE COURT: And that's the person you want to see here in the courtroom testifying.

MR. KLEIN: Absolutely, your Honor.

THE COURT: All right. What are your other problems with the Dragonfly documents?

MR. KLEIN: It's what we talk about in our motion, your Honor. These are Telegram chats that we don't believe are the records that they regularly keep in the ordinary course of business. These are Telegram chats, and using Telegram chat as—

THE COURT: Of course.

MR. KLEIN: There are these chats between a principal at Dragonfly, and we understand that is a personal Telegram account, not a company account. That's the way Telegram operates. There's no proffer or any information that it isn't. So we think basically they would need to call the person whose Telegram chats they are to put them in and that person could

P7E1STO1

get up on the stand and——

THE COURT:  All right.  First of all, I don't know, and the government's going to tell me, whether these Telegram——I mean, these were all produced in response to a government subpoena, and so it was my understanding that Dragonfly somehow is keeping these things.

Ms. Axel please don't shake your head.  You do need a poker face at this trial.  Thank you so much.

Secondly, you're saying you'd need each author to come in.  Why couldn't a Telegram person say, yeah, these are Telegram chats, or are you going to have the same problem?

MR. KLEIN:  I'm not saying each author in every case, your Honor, but I'm saying I don't believe these Telegram chats were business records.  They're the personal Telegram account of this person that they happen to have collected.  Compliance officer is not the appropriate person to do that, to authenticate them or to put them in as business records, and so they would need the person on the Telegram chats.  From what I know, that's a personal Telegram account, and so the fact that this custodian, this compliance officer happened to have collected, it doesn't meet the necessary thresholds.

THE COURT:  Okay.  Thank you.

I'm going to hear from someone on the government's side.  Mr. Rehn?

MR. REHN:  Yes, your Honor.

P7E1STO1

THE COURT:  Mr. Rehn, do you want to start with Apple?

MR. REHN:  Certainly, your Honor.

THE COURT:  Actually, having just asked you a question, let me ask you a different question.

The idea of the 902(11) certification, now it's interesting because, at least for one part of it, it presupposes that the documents would fall in the business records exception.  Is it the government's perspective that if indeed the documents fall within the business records exception that the custodial certification is not merely a means of authenticating but a means of admitting in toto all of these exhibits?

MR. REHN:  Correct, your Honor, although as we outline in our papers, we also acknowledge that some of the exhibits contain hearsay within them.

THE COURT:  Okay.

MR. REHN:  And that we would need, as the Court has already explained—for example, with respect to the Twitter messages, we aren't suggesting that the content of the messages are business records.  What the Twitter custodian establishes is that these are authentic messages that are maintained by Twitter in the ordinary course of business, and so they clear that hurdle as business records, to be admitted, subject to the contents meeting another hearsay exception.  For example, as the Court has already pointed out, most of the messages we're

Case 1:23-cr-00430-KPF    Document 243    Filed 12/17/25    Page 21 of 36    21

P7E1STO1

interested in are messages involving the defendant, either his own statements or statements by others to him that explain the context of the subsequent statements or indicate that he was on notice of certain things.

THE COURT:  All right.  I've just realized that having asked Mr. Klein about *El-Gamal*, I didn't let him talk about it.

Sir, did you want to say something about *El-Gamal*, the 2020 decision from the Second Circuit, or would you rather I just continue?  I can let you speak in reply if you want to talk about it there.

MR. KLEIN:  Just continue.  I mean, I don't need to talk about that, your Honor.  I've raised my objections I think thoroughly with you.

THE COURT:  All right.  And Mr. Rehn, before I return to you, I just want to keep everyone apprised, I'm advised by my deputy that the jury administrators are not ready because they don't have enough jurors yet.  And I'll just leave that out there.

Okay.  Mr. Rehn, let me understand the government's understanding of the 902(11) certification.  I'm referring to the correct provision, yes?

MR. REHN:  I believe that's correct, yes, your Honor.

THE COURT:  Okay, fine.  Is it your position that is sort of, if you will, a vessel by which these materials get authenticated and get brought in, but to the extent that it is,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

all it gets you is the fact that it's a Twitter tweet and that the content of the tweet has to come in through some other way?

MR. REHN:  With respect to records that contain clear statements that are not themselves business records.  So we don't disagree.

THE COURT:  Okay.

MR. REHN:  So, for example, there are some business records that from their face are obviously not just business records in the sense that they are authentic records maintained by the company in the ordinary course of business, but the contents themselves are plainly business records, such as, for example, the subscriber records on the Apple iCloud account.

THE COURT:  Sure.  And that's what Judge Chen was talking about in the *Hunt* case, right?  She was saying if what you want to talk about is the metadata or the timing or the fact of a communication, then that's okay, but once you want to talk about the content, you can't get that in through the custodian.  That was the point of her decision, was it not?

MR. REHN:  I think that's right, your Honor.  I'm not sure which case you're referring to.

THE COURT:  I'm sorry.  Perhaps I'm giving you the wrong cite.  Excuse me.  *United States v. Hunt*, 534 F.Supp.3d 233, an Eastern District decision from 2021.  I'm looking in particular at—well, it's Westlaw headnote 24.  And I'll leave that to you.  I mean, I can leave that to both of you to talk

about at a later point because perhaps you're going to tell me I don't need to have it decided by the time we pick a jury. But then you've have *El-Gamal*, right? That is the one Second Circuit case I see on this issue. *El-Gamal* suggests that Facebook records were business records, but I don't know the content of those records. It looks more as though they were talking about the metadata and whether something was deleted or not deleted. So your position then is, you used the custodial certifications to get these things in, but somebody else is going to have to explain why the content of social media postings, the content of the tweets——or I don't know what they call them now——or the content of the Telegram chats is what you argue they are.

MR. REHN: So, yes, your Honor, we are not seeking the sort of expansive view of business records with respect to the social media communications to suggest that somehow Twitter maintains anything anybody says on Twitter as like a business record of Twitter. What they maintain is the record that those communications were made, and then those communications have to be admissible under their own individual hearsay exception.

THE COURT: As a second layer of hearsay.

MR. REHN: That's I think what the courts have said, and I think that's the line that *El-Gamal* is getting at as well.

THE COURT: All right. But let's talk about

P7E1STO1

Dragonfly.

MR. REHN:  Yes.

THE COURT:  I don't want to believe that the custodian misspoke, especially because he made the statement under penalty of perjury.  But is it the case that Dragonfly keeps its employees' Telegram chats in some database?  I mean, somebody issued a subpoena to Telegram, or to Dragonfly, right?

MR. REHN:  Yes, your Honor.

THE COURT:  And the stuff that you've marked for exhibits is what was produced in response to that subpoena, yes?

MR. REHN:  That's correct, your Honor.

THE COURT:  Dragonfly believes that the Telegram messages are its business records.

MR. REHN:  Absolutely.

THE COURT:  And how can that be?

MR. REHN:  This is how I think almost every business operates is that they issue devices to their employees and that the employees are expected to maintain the contents of those devices in the ordinary course of business, and then when they are served with legal process, they collect the contents and provide it, certify that this comes from the records that are maintained in the ordinary course of business, and that's exactly what we have here with respect to the Dragonfly records.  There's no requirement that they use any particular

P7E1STO1

method of maintaining the records.  It doesn't have to be on a central database or, you know, in a locked box in some office somewhere.  It just has to be maintained in the ordinary course of business.  And it's I think completely unexceptional that a business would have employees with devices who are——

THE COURT:  But——

MR. REHN:  ——making business records on its devices.

THE COURT:  Mr. Klein tells me that this comes from their personal accounts as well.  How do those come in?

MR. REHN:  That is incorrect, according to the Dragonfly certification.  Dragonfly has certified that these are its business records.  We didn't serve any individual with a subpoena; we served Dragonfly with the subpoena.  These are the records Dragonfly came back with, and it provided a certification that these are its business records.  These are employees of Dragonfly.  These are documents from the devices that Dragonfly has told us they maintain in the ordinary course of business, and so it's exactly what the federal rules are designed to authorize the admission of without having to call a custodian to that effect, given that we have this certification.

THE COURT:  Is there a Dragonfly witness at trial?

MR. REHN:  We are not anticipating calling one, which is why we are proposing to rely on the custodian.  Given the defense's position, we have reached out to them.

P7E1STO1

I do want to make another point with respect to this particular issue with Dragonfly.

THE COURT:  Go ahead.

MR. REHN:  So there's a stronger version of this and a weaker version of this, and the Court doesn't have to adopt the stronger version of this in order to——

THE COURT:  What is the "this," sir?

MR. REHN:  Of the——viewing these particular chats as business records.  So there are a number of decisions.  I believe it's *United States v. Figueroa* is a recent one in S.D.N.Y.  I don't have the citation handy, but we can provide that to the Court.  That discusses the issue of communications as business records.

THE COURT:  Is that Judge Liman's case?

MR. REHN:  I believe it's actually a magistrate judge. It involves emails sent in the ordinary course of business and whether they're business records.  Essentially what the court explains——it cites a number of authorities to this effect——is, if you can tell from the documents that these are the sorts of communications that were made in the ordinary course of business, then even the statements within them can come in for their truth.  Now the reason that's important is, we do think that, looking at these documents, we have venture capital partners communicating with the heads of one of their portfolio companies, and so the Court could make that determination.

P7E1STO1

THE COURT: But wait. Hold on. Excuse me, please.

Let me understand that a little bit more, please. You just said venture capital partners communicating with the heads?

MR. REHN: Of one of their portfolio companies——namely, Tornado Cash——and that's what capital partners do in the ordinary course of business. I think the Court could make that determination. But we don't think the Court needs to get that far because what we are seeking to do is analogous with what we're seeking to do with the Twitter records, which is, with respect to the Dragonfly chats, we will only admit records as to which there is an independent basis for admitting the contents of the records. So for example, where there are statements of the defendant in some of these chats, we think those come in under that hearsay exception. So it's the same principle as with the Twitter records. We know the chats were maintained by Dragonfly in the ordinary course of business. The Court doesn't need to decide if the contents count as business records or not because we're only seeking to——

THE COURT: I don't think the contents count. I mean, Wright & Miller suggests to me that they don't in their Section 7145. They suggest that the contents of social media records do not count, even though the, other facets of the records might. Now maybe——

P7E1STO1

MR. REHN:  I have the citation for the *Figueroa* case, which I think is the most on point in recent.  2023 WL 8373566, at *3.

THE COURT:  Okay.

MR. REHN:  It's the most recent discussion of this issue that I've seen in this district.  But I do acknowledge that it's a close question.  So what we're asking the Court to do is the weaker version, which is——

THE COURT:  Which is what, to let these——

MR. REHN:  These chats are authentic Dragonfly records, but the contents of them cannot be determined to be business records on their face, so the government needs to identify a valid hearsay exception to admit the contents of any particular chat; for instance, if it's a Roman Storm statement or something like that.

THE COURT:  Here's the problem with that.  I thought the point of the custodial certification was that you could get it for business records.  So if you're telling me that I don't get to make the decision that they're business records, then I need the custodian.

MR. REHN:  You can make the determination that the documents are business records without reaching the question of whether they contain hearsay, because we're only asking you to admit any contents that are subject to a hearsay exception.  So what I'm saying is there is an open question in the law——

P7E1STO1

although I think *Figueroa* is very helpful on this point——as to when the contents of business records that contain hearsay sort of meet the business records exception or not.  There has to be some additional analysis as to whether those contents themselves, like a contract, can be viewed to be business records as opposed to sort of hearsay contained within business records.  But all we're asking the Court to do is say, the document is a business record.  We don't need a custodian to come tell us that he collected these documents that were maintained in the ordinary course of business from Dragonfly.

THE COURT:  Slow down, sir.

MR. REHN:  All we need——and then to the extent the government seeks to admit particular chats, it will need to identify a hearsay exception as to the contents of those chats.  That's what we're asking the Court to do.

THE COURT:  All right.  But let me understand how different that is from what——I guess I didn't understand what the defense was willing to agree to with respect to these records.  I thought they were willing to agree that they were authentic records maintained by——

Yes, Mr. Klein.

MR. KLEIN:  Not the Telegram chats, your Honor.  So first of all, it's complete speculation by the government's part that these are company devices and not personal accounts on personal devices.  I don't know how they come up with that.

P7E1STO1

MR. REHN:  We're looking at a certification, your Honor.

THE COURT:  I was looking at the certification as well.

MR. KLEIN:  We think the certification is wrong.

THE COURT:  Oh, okay.  But I got what I got.  I have a certification that seems to suffice under 902(11).  But go ahead.  Keep going.

MR. KLEIN:  We don't agree with that part, first of all.

THE COURT:  Okay.

MR. KLEIN:  We don't think there's any evidence of that other than this certification, which we think is wrong.

And also, you know, I think your Honor has identified the right issue here, which is, these are chats, right?  These aren't Telegram——Telegram isn't preserved on a Dragonfly server.  It's different than like Apple or X or those communications and those tweets or whatever they are on those.  Those photos are kept by Apple on their servers.  This is Telegram.  This is a separate company.  We believe these are personal devices, not company devices, not held on the company server, at a minimum.  And so we think that's a big distinguishing factor here, your Honor.

THE COURT:  Except there's nothing to tell me that.  What tells me that they are personal devices and not held on

P7E1STO1

the company's server?

MR. KLEIN:  Well, then I think we should call the custodian.

THE COURT:  Custodian tells me these are their records.

MR. KLEIN:  I think the custodian is wrong.

THE COURT:  You have no basis to say that.  You have speculation as to why he's wrong.  I wish I had something more from you.  But go ahead.  Tell me what else is wrong.  Because what I was trying to figure out is, Mr. Klein, you're willing to agree——let's go to the easy one.  Apple.  You're willing to agree that those——well, actually, let's put that to the side, because I still don't understand what your beef with Apple is.  With X, you agree that those are authentic tweets; you just don't agree with the content; you don't agree that the X custodian can attest to the content, correct?

MR. KLEIN:  Yes, your Honor.  We agree that those are——if an X custodian got up here, they were held by X and those are authentic tweets, yes, we object to the hearsay.

THE COURT:  Of course.  But if somebody else came forward and said, these tweets were done by Alexey Pertsev and they're in furtherance of the conspiracy, I make the finding that they're in furtherance of the conspiracy, what's your complaint?

MR. KLEIN:  Well, so are we going back to talk about X

P7E1STO1

or Dragonfly?

THE COURT:  No.  I'm talking about X.  Dragonfly, your problem is with the Telegram chats.  I understand.

MR. KLEIN:  Yes.  Okay.  So for X, our problem is, again, that these are not X communications about X business.  They are hearsay.  X happens to hold these records on their servers, presumably.  We're not disputing that.

THE COURT:  Yes.

MR. KLEIN:  But it goes to the issue of substance that's in there.  It's not an X record.

THE COURT:  Yes, I understand, it's not an X record, but you're saying by dint of it being the statement, even if it's a statement of a party opponent, that gets me the second layer of hearsay but not the first?

MR. KLEIN:  Yes.

THE COURT:  Okay.  Mr. Rehn?

MR. REHN:  Your Honor, with respect to the authenticity of all of these records as records maintained by the relevant entities in the ordinary course of business, this is exactly what Federal Rule of Evidence 903(11) is designed.

THE COURT:  Oh, it's 903 and not 902?

MR. KLEIN:  902──I'm sorry──is designed to address, is designed not to drag a parade of custodians into court to testify to things they've already certified to under the penalty of perjury that add nothing to the pursuit of truth at

trial.  And so the Court should accept the certifications. That's what the rule of evidence calls for.  There's no authority that's been cited by the defense.  The ability of the defense to lodge some sort of an objection is preserved in the rule, but all we have gotten is complete speculation with no apparent basis in any proffered facts to the Court to second-guess what the Dragonfly custodian of records informs the Court under penalty of perjury.  These records were produced by Dragonfly in response to a grand jury subpoena, and Dragonfly provided us with a certification that these are records maintained in the ordinary course of business.  So that meets the criteria of the rule.  There's no objection on the table that actually addresses any reason to second-guess that certification, and so we think that that should be a fairly easy thing for the Court to rule on.

With respect to the contents of the chats, we think that the Court doesn't need to address the sort of slightly harder question of the hearsay within hearsay because we will only seek to admit them, and when they come in, we will ask the Court, for example, to find that they are a statement of the defendant or a statement to the defendant and only admit it for notice or a statement of a co-conspirator or for some other reason that meets another hearsay exception.  And so we can sort of contact these companies and tell them to, you know, cancel the flights for their custodians to resolve this issue,

P7E1STO1

and the issue of the contents of all of these messages can be addressed when they arise at trial, in our view.

THE COURT:  All right.  Thank you.

Let me look at the *Figueroa* case and let me look at the transcript of this at the end of the day.

I'm advised by my deputy that we have 85 prospective jurors.  I'd like 90.  I hope a few more will come.  Not shockingly, as happens when folks have been sitting around for an hour and a half, every one of them seems to wish to use the bathroom before coming over here, so imagine about 15 minutes or so, everyone will come over.  I'm going to give you guys the 15 minutes to do the very same thing.

But is there anything else we need to talk about before we start getting ready for jury selection?  Mr. Klein?

MR. KLEIN:  Just a few quick questions about it, your Honor.  How does your Honor seat them in the box and how do you number them?

THE COURT:  We'll be seating 18 in the box, because I believe that's how many are there, and then another 18 in the first couple of rows.  My deputy, if you're watching, is putting little numbers where they will be sitting.  And we will try to—off the record a moment, please.

(Discussion off the record)

THE COURT:  Back on the record.  Anything else, Mr. Klein?

P7E1STO1

MR. KLEIN:  A few more questions.  Then do you ask all the questions of the voir dire to all of them or there's generals that you ask to all and then you do——

THE COURT:  What I do, sir, is I give some preliminary instructions, and then my team is going to hand out the questionnaires to the jury.  It will look very suspiciously like the one you edited and gave back to me.  I am going to begin with Juror No. 1 and asking them whether they have yes answers, and depending on the answers that they give, I will either ask follow-up questions in open court or I will determine that we have to ask them at sidebar.  Anyone who answers yes to No. 1 is going to have to be at sidebar.  I say sidebar.  I actually mean the robing room, because again, they're all going to tell me about their vacations and that can't be it.  But if it's other questions, then there may be follow-ups.  I tend to think that I ask enough follow-up questions to give you a sense of whether there's a challenge for cause.  And we'll talk about how we deal with that, whether that's at sidebar.  If someone says, for example, I work for the IRS, or someone says, I used to work for Tornado Cash, well, okay, everybody might agree quite quickly to let that juror go.  But I suspect we'll be having those discussions in the robing room.

MR. KLEIN:  Your Honor, the final voir dire questions, maybe I'm missing——

P7E1STO1

THE COURT:  No.  It's fine.  We haven't worked together before, sir.  Once I get 36 folks who are qualified that we agree are not subject to for-cause challenges, then each of the 36 gives me the answers to that last page of questions, and from there, you can exercise your peremptory challenges.

MR. KLEIN:  Okay.  And then I know there was a subject of revision.  I think we actually missed getting a copy of the final order——

THE COURT:  The only things that were changed is that I saw that I put MLARS.  I wrote it out in the wrong question and switched it.  And the track changes sometimes had the effect of adding or deleting spaces.  I don't think there was a substantive change that I made, but we will pass them out, yes.

MR. KLEIN:  Thank you.

THE COURT:  Okay.  Anything else?

MR. KLEIN:  Not from the defense, your Honor.

THE COURT:  Okay.  Anything else from the government?

MR. REHN:  No, your Honor.

THE COURT:  Okay.  Then god willing we begin with jury selection soon.  Thank you.

All right.  I'll get up for now.  Thanks.

(Jury selection conducted)