P7F1STO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                         23 Cr. 430 (KPF)

ROMAN STORM,

              Defendant.          Jury Trial
------------------------------x

                                New York, N.Y.
                                July 15, 2025
                                2:11 p.m.

Before:

                 HON. KATHERINE POLK FAILLA,

                                District Judge

                       APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  NATHAN M. REHN, ESQ.
    BEN ARAD, ESQ.
    BENJAMIN A. GIANFORTI, ESQ.
    KEVIN G. MOSLEY, ESQ.
    TARA M. LA MORTE, ESQ.
    Assistant United States Attorneys

WAYMAKER LLP
    Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
    KERI CURTIS AXEL, ESQ.
    KEVIN M. CASEY, ESQ.
    VIVIANA ANDAZOLA MARQUEZ, ESQ.

    -and-

HECKER FINK LLP
    Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
    CHRISTOPHER MOREL, ESQ.

AFTERNOON SESSION

2:11 p.m.

(In open court)

THE COURT:  Please be seated.

Counsel, I wanted to talk to the attorneys at sidebar for a moment, please.  Thank you.

(At the sidebar)

THE COURT:  We have three jurors who are being problematic, and we haven't even sworn them in yet.  All three have cried in front of my deputy, two in the presence of the other jurors and one outside of the presence of the other jurors.  She came back and cried.  With the things that we knew, that they have other, they have conflicts, they have things they want to do.  And we can handle that, and I think that's out of their system.  And hopefully it will be, but I'll let you know if they continue to cry.  The issue is that one of the—so that was Ms. Salto, Ms. Hammond, and Ms. Lam.

Ms. Lam, however, went one step further and punched a wall, and in the close proximity of my deputy, in frustration.  Now please understand, I am torn, because I cannot incentivize getting off of this jury, but I also am not going to put my deputy or anyone in peril.  It is my suggestion that at the end of our trial day, that I meet with Ms. Lam privately and say to her that such behavior is unacceptable, that we all have conflicts, that we saw dozens of people with conflicts, that

P7F1STO1

she was nonetheless selected as a juror with knowledge of those conflicts, and that she cannot act out as she did this afternoon. But, I mean, I would listen to you if you said, I think we should excuse her now, but my concern is, then you will lose every—you'll lose two more immediately, and everybody else will wonder. So right now they're being fed with snacks, which we're trying to keep them happy. And Ms. Noriega is the greatest at wrangling, at herding the cats that are jurors. She will certainly let us know if there are additional issues. But I thought the wall punching was a bridge too far.

May I have your thoughts? May I have the defense's thoughts, Mr. Klein?

MR. KLEIN: Your Honor, we're fine with your plan. We are sorry to hear that, but we are fine with the plan suggested.

THE COURT: Thank you.

Mr. Rehn.

MR. REHN: Same, your Honor.

THE COURT: All right. Now while we're together, do I understand—I see there's a full crowd. They're not jurors. They're here to see openings. Is there an issue that we should be talking about in front of everybody or—

MR. REHN: Well, there is an issue with respect to the openings.

P7F1STO1

THE COURT:  What is that, please?

MR. REHN:  We——you had asked——I had thought you had asked both parties if we had slides for the openings the other day.  You certainly asked the government.

THE COURT:  No.  What happened yesterday was that the defense asked about slides.  It was Mr. Patton who asked about slides with forwarded chats because the concern was he did not want to open on those.  That was all I heard.  I did not ask about slides generally.  Do you have a problem with their slides?

MR. REHN:  We became aware immediately before the judge entered the chambers that they're planning to use slides in their opening.  We asked to review them.

THE COURT:  Okay.

MR. REHN:  For the most part they're nonobjectionable, but there are two slides that contain hearsay statements, that they're claiming are demonstratives, but one of them is Google search results for a Google search term.

THE COURT:  How is that coming in?

MS. AXEL:  Well, your Honor, I offered to take out the Google itself, but, I mean, the point is that the information is available on the internet, so there were two——there were——

THE COURT:  How is that Google information coming in at this trial?

MS. AXEL:  Oh, the experts will testify that you can

P7F1STO1

find the Tornado Cash on the internet, and we also have an Etherscan page, which is a blockchain explorer, and I told Mr. Rehn I would be happy to delete the Google search and just show the Etherscan page. We have a couple Etherscan pages to show that this information is publicly accessible.

MR. REHN: The issue is, the Etherscan contains the raw blockchain data but it also has Etherscan's own attributions to particular contracts, which are clearly statements of an out-of-party declarant, and the demonstratives that they're proposing to show, which are all of the demonstratives, the purpose of it is that those are in fact the particular contracts, my understanding.

THE COURT: All right. The Google is not coming in. The Google is out.

Let me hear about the Etherscan. I'm sorry. The response.

MS. AXEL: Just to clarify, I'm also happy to have my colleagues jump in, but the first Etherscan does not have any particular attributions. The second one does.

So did you want to speak to that one?

MR. KLEIN: No. Go ahead.

MS. AXEL: Okay. So the second one does have an attribution to the pool contracts.

MR. REHN: So they're proposing to put before the jury during opening a third-party statement identifying particular

contracts as being associated with Tornado Cash, which, just by way of background, there's been a lot of discussion among the parties about a blockchain data stipulation, and the defense has consistently taken the position, and we'd likely reach agreement on the stipulation, removing all such attributions and only containing the raw data.

MS. AXEL:  Your Honor, this is the pool contract. Everyone knows what the addresses are.  There are no disputes about what the pool contract addresses are, and the experts will testify to what the pool contracts are.  So you could go and you could find them easily on the internet, and they are appropriately attributed on Etherscan.  And we do view——the fact that this is the proper address will come in.

THE COURT:  Usually when you're using hearsay, we have a preview in advance.

I am not letting in the Google.  I am letting in the Etherscan.  I hope it is as you described to me and not beyond that.

All right.  Thank you.

We are hoping that our jurors are here.  Several of them are also quite late, which is not promising.  We hope to have them soon?

THE DEPUTY CLERK:  I just wanted to remind you about the fact that Ms. Lam said that she was thinking about not coming tomorrow.

THE COURT:  Oh, yes.  If Ms. Lam elects not to come tomorrow, we have ways of making her come, so I can mention that in my conversations with her as well.  I presume there's no objection to my having those discussions with her in your absence.  I will give you the results tomorrow.  Yes?

MR. REHN:  Yes.

THE COURT:  Mr. Klein?

MR. KLEIN:  As long as we're here, can we tee up this issue of the remaining certifications or the——

THE COURT:  I was hoping that was resolved.  Is it not?

MR. KLEIN:  One point, your Honor.

THE COURT:  Oh, Mr. Klein.

MR. KLEIN:  Your Honor, I'll be very brief.

When I went back and looked at the exhibits, one of the exhibits they tend to say is the certification is not a signed certification.  It's just a——GX 1212, it's just essentially an email with no signatures and no one's attested to it.  So if they can get a signed version of that, under your ruling, that would be acceptable, or they have to call the custodian.  But we can't accept an unsigned certification.

THE COURT:  Can you get a signed certification?

MR. REHN:  We can attempt, but just to be clear, this wasn't raised in their response to our motion, when we teed up and listed all the certifications at issue.

THE COURT:  I understand.

MR. REHN:  And so, you know, in our view, it should be viewed as forfeited because they had the opportunity to raise the objection, they didn't, and so the Court should just deny the objection, overrule the objection.

THE COURT:  Get the signed certification.  I'm sure—well, Mr. Klein, if they get the signed certification a little later in this trial, if they get it sometime during the next four weeks, will you accept it?

MR. KLEIN:  It will meet your ruling, yes, your Honor.

THE COURT:  And therefore you will—

MR. KLEIN:  We maintain—yes, your Honor.  We maintain our previous objection, but that will follow your ruling and that would be acceptable under your ruling.

THE COURT:  Get the signed certification so the person doesn't have to come in.

MR. REHN:  Yes, your Honor.

THE COURT:  All right.  Thank you.  Let's go.

(In open court)

THE COURT:  Friends, we'll be starting soon.  We just need to make sure all of our jurors are here.  Please be patient.  Thank you.

(Jury present)

THE COURT:  Please be seated.  Thank you.

Ms. Noriega, will you please swear in the jury.

P7F1STO1

THE DEPUTY CLERK:  Yes, your Honor.

Will the jury please stand and raise your right hand.

(A jury of 12 and four alternates was duly impaneled and sworn)

THE DEPUTY CLERK:  Thank you.  Please be seated.

THE COURT:  All right.  Good afternoon, and thank you. This case is now officially on trial.

Now as I said to you, the evidence at trial is expected to be presented over about 15 trial days, so about three weeks.  Maybe slightly more or less.  We'll know as the case goes on.  And I mentioned as well my trial day is a little bit different from the other judges in that I begin at 9, but we have a brief break in the morning and afternoon, and only a 45-minute break for lunch, so that you're out at about 3:45 p.m.  Today we may go just a tiny bit longer to get openings and this witness in.  But if it turns out, for example, that we are finishing a witness's testimony so that they don't have to come back the next day, we might go a few minutes over.  We'll be playing it by ear.

Let me talk to you a little bit about the roles that we are each playing at this trial.

In order to do my job, I may have to interrupt the proceedings from time to time, and in fact, before you came in, I had some discussions with counsel, and those are to confer about the rules of law that should apply here, and sometimes

we'll talk here in the courtroom, sometimes we'll even talk in your presence, but if these conferences take a little more time, as a convenience to you, I may excuse you from the courtroom.  I'm going to try and avoid these interruptions as much as I can, but I want you to be patient and I want you to understand that these conferences are necessary to ensure the fairness of the trial and that they often have the effect of making the trial proceed more quickly in a more streamlined fashion.

I'll talk to you a little bit now about the burden of proof here, and that is beyond a reasonable doubt.  I'll instruct you in greater detail at the end of this trial, but for now let me say that reasonable doubt is doubt based on reason and common sense.  It is a doubt that a reasonable person has after weighing all of the evidence.

The burden of proof never shifts to Mr. Storm for the simple reason that the law never imposes upon a defendant in a criminal case the burden or the duty of calling any witnesses or producing any evidence.  Instead, the law presumes Mr. Storm to be innocent of any and all charges against him.

If, after careful consideration of all of the evidence presented, and following the rules of law that I will explain to you at the conclusion of the trial, you have a reasonable doubt as to Mr. Storm's guilt of a particular charge in the indictment, you must acquit him of that charge.  You must find

him not guilty.  If, however, after careful consideration of all of the evidence, and following the rules of law that I will explain to you, you have no reasonable doubt as to Mr. Storm's guilt, then you must convict him of that charge.  You must find him guilty.

It is also a fundamental principle of law that a criminal defendant has the right not to testify.  If Mr. Storm chooses not to testify, you may not draw any inference against him based on that decision, and that fact may not enter into your deliberations in any way.

Let me explain now how the trial will proceed.

First, the government and then Mr. Storm will present their opening statements.  An opening statement is neither evidence nor argument.  It is an outline of what the party believes the evidence at trial will show.  It is offered to help you follow the evidence as it is presented.

You will then hear the testimony of witnesses.  The government will call its witnesses first.  The witness will give direct testimony, then he or she may be cross-examined by defense counsel; there may be redirect testimony, or recross-examination.  And there will be stipulations, which are agreements between the parties, and exhibits that will be received in evidence.

After the government's case, Mr. Storm may, but need not, call witnesses.  If he calls witnesses, those witnesses

P7F1STO1

will be examined and cross-examined just as the government's witnesses were.  If he presents evidence, there's a possibility that the government may present rebuttal evidence.

After all of the evidence has been presented, the attorneys for the government, the attorneys for Mr. Storm will make their closing arguments.  They may review evidence, and they may make arguments to you as to what conclusions they think you should or should not draw from the evidence.  These arguments, they are not themselves evidence.  They may be helpful to you in reviewing the evidence during your deliberations.

After closing arguments, I will instruct you on the law, then you will retire to deliberate on your verdict.  It must be unanimous.  It must be based solely on the evidence or lack of evidence presented at the trial.

That naturally leads to the question of, what is evidence?  Evidence consists of the testimony of witnesses, documents, and other things received or admitted into evidence, and stipulations agreed to by the attorneys.

There are certain things that are not evidence.  They may not be considered by you.  Let me talk to you about what is not evidence.  First, statements and questions by attorneys, they are not evidence.  Nor are the statements that I make, including these, and the questions that I ask of a witness.  It is the answers to those questions that are evidence.  And as I

suggested a moment ago, arguments by attorneys are not evidence.

Second, objections to questions are not evidence. Lawyers have an obligation to their clients to make an objection when they believe the evidence being offered is improper under the Federal Rules of Evidence. Do not be influenced by any objection or by my rulings on them. If the objection is sustained, if I sustain an objection, you ignore the question and you ignore any answer that may have been given. If the objection is overruled, then you treat the answer as you would any other. And if you are instructed that a particular item is received for a limited purpose only, you must follow that instruction.

Third, any testimony that I tell you to exclude or to disregard is not evidence and may not be considered by you.

And fourth, anything you may have heard outside the courtroom or seen outside the courtroom is not evidence. It must be disregarded. You are to decide this case solely based on the evidence presented in the courtroom.

And in deciding the facts of this case, you will have to decide the credibility of witnesses. When I use that term, what I mean is, how truthful or believable the witnesses are. There is no formula to evaluating the evidence. What we say here is that you bring your common sense into the courtroom. You bring into the courtroom all of the experience and

background of your lives.  The same types of tests that you use in your everyday dealings are the tests that you use and should use in deciding how much weight, if any, to give to the evidence in this case.  The law does not require you to accept all of the evidence admitted at trial, and in determining what evidence you will accept, you must make your own evaluation of the testimony from each of the witnesses and your own evaluation of the exhibits that are received in evidence.

It is essential, however, that you must keep an open mind until you've heard all of the evidence in the case because a case can only be presented step by step, witness by witness. You may have had experiences in your past where you hear someone give a version of events and it seems to you to be compelling, but upon hearing someone else's version of those same events, or upon the original person being questioned about those events, things may seem very different.  There may be another side to any witness's story, and so you should use your common sense and your good judgment to evaluate each witness's testimony based on all the circumstances.  I cannot emphasize enough, you must keep an open mind until the trial is over. You should not reach any conclusions until you have all of the evidence before you.

Please do not decide this case based on implicit biases.  What I mean by that is that everybody, including me, has feelings or assumptions or fears or stereotypes that they

may not even be aware of.  And these hidden thoughts can impact what we see and hear, how we remember what we see and hear, and how we make important decisions.  Because you are making very important decisions in this case, I strongly encourage you to evaluate the evidence carefully and to resist jumping to conclusions based on personal likes or dislikes or generalizations, or gut feelings, sympathies, stereotypes, or biases.

Finally, let me caution you about certain rules and principles governing your conduct as jurors in this case.

First, you must not talk to each other about this case, or about anyone who has anything to do with this case, until the end of the case when you go to the jury room to deliberate on a verdict.  And the reason for this requirement is that you must not reach any conclusion on any charge until all of the evidence is in.  Keep an open mind until you start your deliberations at the end of the case, and you will hear me say that to the point where you're sick of hearing me say that, but it will remain with you.

Second, do not communicate with anyone else about this case, or with anyone who has anything to do with it, until the trial has ended and you have been discharged as jurors.  When I say anyone else, I mean anyone else.  That includes your family and your friends.  And no communicating means no communicating on any social media platform.  You can tell your friends and

your family that you are a juror in a criminal case, but do not tell them anything else about it unless and until you have been discharged by me.

Third, do not let anyone talk to you about the case or about anyone who has anything to do with it. If any person should attempt to communicate with you about this case at any time during the trial, either in or out of the courthouse, immediately report that to my deputy Ms. Noriega and to no one else. And when I say report that to no one else, I mean no one else, including your fellow jurors.

To minimize the possibility of any improper communications, please go straight to the jury room when you arrive at the courthouse in the morning. Please remain either in the jury room or in this courtroom for as much of the trial day as possible.

Fourth, do not do any research or any investigation on your own about this case or about anyone who has anything to do with the case. To the extent that there are news reports about the case, don't read them. Don't listen to them. Don't research this case using the internet or anything else. Your decision in this case must be based solely on the evidence or the lack of evidence that is presented at this trial. All that you need to know will be presented in this courtroom by the very capable attorneys who represent the parties. And I expect you to inform me immediately, through Ms. Noriega, if you

become aware of another juror's violation of these instructions.

Finally, each of you has been given a notebook and a pen. I see that you walked in with them. And that is because I permit jurors to take notes. You do not have to take notes. They are an aid to your own recollection. The court reporters that you have seen in this case in this courtroom record everything that is said in the courtroom, and any portion of the testimony can be read back to you or provided in transcript form during your deliberations.

If you do take notes, please be aware that note-taking may distract you from something important that is happening on the witness stand. If you do take notes, please make sure you have your juror number on the cover of the notepad, and please be sure that you are the only one reviewing your notes. Your notes are not to be shared with fellow jurors during deliberations, and the fact that one juror has taken notes will not entitle him or her to any greater voice in the deliberations. As I mentioned, a transcript will be available to all jurors if there is any difficulty in remembering the testimony.

If you choose to take notes, the notes must be left at the end of each trial day in the jury room, and we will make sure that the doors are locked and that those notes are secure.

From this point until the time that you retire to

deliberate, it is your duty not to discuss this case and not to remain in the presence of other persons who may be discussing the case. I have instructed the parties that they are not to have contact with you. So if you see them in the morning and they do not say hi or they do not acknowledge you, they are not being rude. They are following my instructions.

This concludes my preliminary instructions to you. And we will begin now with opening statements. I will ask you to give your undivided attention to the attorneys as they make their opening statements.

Mr. Mosley?

MR. MOSLEY: Good afternoon.

In the fall of 2021, a woman got scammed out of $250,000. Later that year, hackers broke into the computer system of a company headquartered here in New York City, and stole about $200 million. Just a few months later, North Korean hackers stole about $600 million from an online gaming platform.

In each case, the criminals hid their dirty money by running it through Tornado Cash, a business designed, owned, and operated by this man, the defendant, Roman Storm. The evidence will show that the defendant operated Tornado Cash to make money for himself and his business partners by hiding other people's money, including dirty money. He knew that a variety of different criminals, including those North Korean

hackers, used Tornado Cash to hide hundreds of millions of dollars in dirty money.

And when you learn that the U.S. government sanctioned those North Korean hackers, making it illegal for anyone in the U.S., like the defendant, to help them hide the stolen funds, what did he do?  He messaged his partners, saying, "Guys, we're done for."  The evidence will show that over the next month, the North Korean hackers kept running dirty money through the defendant's business.  By the time the hackers were done, the defendant's business had hidden more than $350 million in additional stolen funds.

In short, the defendant was running and profiting from a giant washing machine for dirty money, and he knew it.  In fact, he even marketed Tornado Cash as a washing machine. During this trial, you will see a photo of the defendant wearing a T-shirt showing a washing machine with the Tornado Cash logo on it.

To be clear, Mr. Storm had choices.  Once he learned that he was washing criminals' dirty money, he could have gotten out of the business, or he could have changed his business to make it unattractive to criminals.  Instead, the evidence will show that when he had a choice, he chose to commit crimes.  He chose to lie, to mislead, and to continue laundering criminal funds, because that choice made him more money.  The evidence will show that that choice made him

millions of dollars.

And that is why we're here today, because the defendant and his business partners agreed to run a business that hid dirty money.  That is called money laundering, and that is a crime.  And when you're hiding dirty money for someone or something that is sanctioned, as those North Korean hackers were, that is called a sanctions violation, and it is also a crime.

So I'm going to talk to you about what you can expect in this trial.

First, I'm going to tell you about what we expect the evidence will show, and then I'll tell you about the types of evidence you will see.

So let me first tell you about what the evidence will show.  Roman Storm and his co-conspirators created and operated Tornado Cash, which was a cryptocurrency mixer. "Cryptocurrency" and "mixer" are two terms you will hear during this trial.  You will hear that cryptocurrency—or crypto for short—is just a kind of money that exists on the internet.  As far as the law is concerned, crypto is no different from any other kind of money, such as U.S. dollars, or Japanese yen.  A key practical difference, though, is that cryptocurrency transactions can be tracked online by anyone.  In other words, you can follow where crypto goes, transaction by transaction, in public online records.  Of course this is a huge problem if

you are doing crimes of cryptocurrency and don't want to get caught. And the evidence will show that Roman Storm solved that problem with Tornado Cash.

The evidence will show that when the defendant and his co-conspirators set up their company in 2019, they set up Tornado Cash to be a mixer. Basically, that is what it sounds like—it mixes a bunch of people's crypto together so that when it comes out, you can't tell whose crypto it was anymore or where it came from. For all intents and purposes, it makes the crypto untraceable. That's how the defendant's business washed dirty money. The dirty crypto came out looking clean because it had been mixed up with a bunch of other crypto and couldn't be traced to the crime anymore.

So how did that work? Let me give you an example that you've probably seen in the movies. So there's some suspect who's being chased by the cops, and you hear all the dramatic music in the background and you see all the jerky camera angles, and you hear the cops say they see the guy and he's wearing a black baseball cap and a green hoodie. And the cops are about to close in, and then the suspect walks into a crowd of hundreds of people, all about the same size, all wearing black baseball caps and green hoodies, and then he disappears. The evidence will show that Roman Storm did the same thing for dirty money. Criminals could avoid being tracked by running their money through the defendant's washing machine. It would

be mixed up with other crypto so it would come out looking clean.  And the evidence will show that the defendant knew that his business was washing dirty money.

How did he do it?  The evidence will show that the defendant built an online computer program that accepted crypto, mixed it up, and spat it back out.  During this trial, we will walk you through all of the evidence, showing the features Roman Storm and his co-conspirators included in the Tornado Cash service, how they worked, and how the defendant controlled them.

You'll also see from the evidence how Roman Storm's customers could go to the Tornado Cash website to deposit and withdraw crypto.  You will learn that Storm and his co-conspirators made the website extremely easy to use.  Even someone new to crypto could deposit, wash, and withdraw crypto in a matter of minutes.  The evidence will show how it was fairly easy to follow crypto going into Tornado Cash but it was nearly impossible to connect the crypto going in to the crypto going out.

The evidence will show that that's what Roman Storm designed Tornado Cash to do, and it worked exactly as intended.  Just remember the washing machine.  Dirty money goes in and comes out clean, basically untraceable and virtually impossible for law enforcement or anyone else to track.

For Roman Storm, all of this paid off handsomely.  He

made millions from operating Tornado Cash.

The evidence will show that Roman Storm and his co-conspirators knew they were cleaning dirty money for lots of criminals by operating Tornado Cash.  Storm knew this because he and his co-conspirators were approached over and over again in 2020, in 2021, and in 2022, by people who had had money stolen from them, people like the woman I mentioned earlier who got scammed out of the $250,000.  She asked the defendant for help finding the money that was stolen from her.  So did companies who had been scammed or hacked, and law enforcement officials and journalists investigating these crimes.  What was the defendant's response?  He said there was nothing he could do.  He claims he had no control over Tornado Cash.  This, ladies and gentlemen, was a lie.  In reality, while certain parts of the business could not be changed, the defendant was in full control of other parts of the business——the parts that most people, including the North Korean hackers, used, and the parts that made the defendant and his partners a lot of money. In fact, the defendant and his co-conspirators made changes to those parts of the business over time to offer even more anonymity to their customers——in other words, to make it even better for criminals trying to hide their money.  And these changes made Tornado Cash even more profitable for the defendant.

During this trial, you will learn that the defendant

chose to remove the switch that could have shut off one part of the washing machine.  He did that so he could pretend the whole washing machine was out of his control.  But you will also learn that he was still in control of the other parts of the washing machine—parts that he easily could have changed to stop washing dirty money.  And on top of that, you will learn that he was running the whole laundromat.  He had the keys to the front door, he paid the gas and the electric bills that kept it running, and he still said, we're open for business. He could have stopped washing dirty crypto and making it look clean, but he chose not to.  Instead, he chose to launder money time after time, knowing full well that he was doing business with criminals.  That is a crime.  And because he kept going, he attracted some pretty big criminal customers.  The evidence will show how Storm's business cleaned a large portion of more than $600 million the sanctioned North Korean hackers stole. And when he found out, Roman Storm told his partners that they could all go to jail for helping the North Koreans, but still he pressed on with the business.  He didn't want to leave all that money on the table.

The evidence will show that for a month, after the U.S. government announced sanctions against them, the North Korean hackers continued using Storm's business to launder money, making about 1400 deposits into Tornado Cash worth more than $350 million.  During that time, more than half of the

money that went into Storm's business was dirty money.

Now let's turn to the millions of dollars the defendant made from hiding money.  The evidence will show that a few months after the North Koreans moved hundreds of millions of dollars in dirty money through Tornado Cash, Roman Storm cashed out.  You will hear that he hid his actions by using someone else's account.  The evidence will show that Storm sold millions of crypto over a few days, ultimately making millions of dollars for himself and millions of dollars for his co-conspirators.  But he also made sure to cover his tracks, to hide his criminal profits, and to give his co-conspirators advice on how to do the same.

The evidence will show, at the end of the day, that that's exactly why the defendant and his business partners did this, to make money.  So that's what the government will prove to you at trial.  The defendant and his co-conspirators designed Tornado Cash to generate millions of dollars of profits from hiding the sources of money.  Criminals used the defendant's business to move hundreds of millions of dollars in dirty money.  The defendant knew it, and he continued to move it to conceal it, and he ultimately cashed out for millions of dollars.

Now what will the evidence actually be in this case? First, you'll see documents.  You will see documents Storm hoped to keep secret—his encrypted chats with his

co-conspirators and his investors about how he ran Tornado Cash as a business.  You'll see them talking about dirty money being laundered through their business, and you'll see the defendant and his partners talking frankly about why they feared criminal prosecution and what they could do to avoid it, mainly by making false statements about their control over the business.

And you will also see the defendant's communications with victims, how he told them he couldn't help them, even as he kept operating a business that was laundering money.

You will also hear live testimony from witnesses.  As I said earlier, you will hear from the woman who had cryptocurrency stolen from her, as well as the victims of other frauds and hacks whose money went into the defendant's business, never to be seen again.  You will hear how the defendant's response to them was, essentially, tough luck.

You will hear directly from people who used Tornado Cash to commit crimes and to hide the money they stole.  The evidence will show how they sent cryptocurrency to Tornado Cash because it was easy to use, and they were confident it would be effective in hiding their money and making it hard for law enforcement to track.

You'll hear from another witness who traced dirty money from several crimes to Tornado Cash, including the $600 million associated—including some of the $600 million in the hack associated with North Korea.  He will show you how

criminals used the defendant's business to move dirty money.

Another witness will explain exactly how the defendant used someone else's account to cash out in August of 2022, pulling out millions that he made from the business, hiding it, and splitting it with his co-conspirators.

And as promised, you will hear witnesses explain all of the technical details.  This includes details of how cryptocurrency transactions work, how the Tornado Cash service worked, and how the defendant controlled the business.

Each piece of evidence is part of a bigger picture. By the time we are finished, what will be clear is that the defendant and his co-conspirators agreed to serve as a washing machine to make money that they knew was dirty look clean. They agreed together to move dirty money from scams and hacks, knowing that their customers were using their business to hide that the money came from crime, which is a crime.

It will also be clear that the defendant and his co-conspirators agreed together to keep moving dirty money for North Korean hackers, which violated U.S. sanctions and is also a crime.

As I sit down, I'm going to ask you to do three things during this trial: first, pay attention to the evidence; second, follow Judge Failla's instructions on the law; and third, use your common sense, the same common sense you use in your everyday lives.  If you do these three things, then at the

end of the trial, you will come to the only conclusion that is consistent with the evidence, with the law, and with common sense—that the defendant, Roman Storm, is guilty.

THE COURT:  Thank you.

Ms. Axel.

MS. AXEL:  Roman Storm is a United States citizen who lives in Seattle, Washington.  He's a software developer.  He writes computer code for a living.  And he's innocent of these charges.

Let me say this right upfront.  Roman had nothing to do with those hacks and scams that the government was talking about.  Absolutely nothing.

With two colleagues, Alexey Pertsev and Roman Semenov, Roman started a United States-based consulting company called Peppersec, Inc.  That company developed or programmed what came to be known as Tornado Cash.

Tornado Cash was innovative technology.  It provided a solution to a huge problem that was plaguing people in cryptocurrency—the problem of financial privacy, or keeping your private transactions from the public.  This was a legitimate software project backed by U.S. investors and built for perfectly legitimate purposes.

But many legitimate products are misused by bad actors, and unfortunately, so was Tornado Cash.  Tornado Cash was used by criminals who hacked and scammed people in all

sorts of ways that had nothing to do with Tornado Cash or with Roman.  These criminals, acting without any assistance from Roman, misused Tornado Cash to cover their tracks as they moved their stolen money around to different addresses, and the FBI believes that some of these hackers were from North Korea, but Roman had nothing to do with the hackers and scammers.  You will not see any evidence that he communicated with them or helped them, and there is none.  In fact, he didn't want them to use Tornado Cash.  It was affirmatively bad for the project to have criminals use it.  And the evidence will show that the overwhelming majority of people who used it were normal people who were using it for their own financial privacy, which was the purpose that Roman intended.  These people, the legitimate members of the Ethereum community, told Roman that the software he had written was important in providing them privacy. Prominent people endorsed the software, and US-based venture capital firms backed Peppersec, and many people supported the project through their own personal donations.  And Roman lived and worked openly in the United States, using his own name. The software code for Tornado Cash was made publicly available, put it up on the internet.  This was a public project with an important purpose.

What the government has to prove to you is that Roman had a criminal agreement for a criminal purpose.  But the evidence will show that Roman's agreement with the Peppersec

co-founders was to build a privacy protocol, or privacy software, and to make it freely available to everyone.  That was his purpose, not to help hackers and scammers and evade sanctions.

And there's something remarkable, ladies and gentlemen, you're going to hear about this trial, or throughout this trial.  Even though everyone agrees that Roman didn't hack anything or steal anybody's money, the prosecutors are going to call as their witnesses these people who did hack, who did scam, who did defraud and steal, and those hackers and scammers are going to get up here and testify about how they used Tornado Cash on their own, for their own purposes, in the hopes that they can get leniency in their criminal cases.

(Continued on next page)

MS. AXEL:  (Continuing)

The evidence will show that Roman didn't want those thieves to use Tornado Cash.  He didn't agree with anyone to launder money or to operate any, or to evade sanctions.  He is innocent.  So let's talk now in a little bit more detail about what you are going to learn and how you will see for yourself that he is not guilty.

Let me tell you a little bit about Roman Storm -- and remember, as the Court told you, what I say is not evidence and I know you will listen to the evidence as it comes in.  So, I submit to you the evidence will show that Roman is a software developer.  What does that mean?  He is a programmer, he is a coder, he is someone who sits at a computer and writes computer code to solve problems.  You may also hear it referred to as a software engineer because a software engineer uses code, again, to build applications.

Roman was born in 1989 in Kazakhstan, which was part of the Soviet Union at that time.  He moved to Russia later with his family.  He always had a passion for computers.  His father had one, he would tinker with it, and he became the technology expert in his family, helping them use the computer.

In 2009, at the age of 19, he moved to the United States.  He chose to come to Silicon Valley, the home of the tech industry here in the United States, but like many immigrants with no formal education, first he took a variety of

odd jobs, working as a busboy, for a security company working as a security guard.  He continued to teach himself programming using online tools and then he started to get tech jobs for companies like Cisco and Amazon.  The Amazon job eventually took him to Seattle, Washington, where he lives today with his family.

At the same time, around 2015 Roman learned about Bitcoin and he became very interested and enthusiastic about this technology.  As a software engineer he was fascinated.  Here was a way that a person could control their own assets and move them from one person to another with just software.  He was also excited then about Ethereum which is the next big thing in the blockchain and cryptocurrency industry.  And the evidence will show that the Ethereum network not only facilitates what they call peer-to-peer or direct transactions between two people, but in Ethereum you can also build applications.

In 2019, at a conference, Roman met Vitalik Buterin, the creator of Ethereum.  And in the Ethereum community Vitalik Buterin is a very famous person, he is like a crypto rock star.  And Roman asked Vitalik what he could work on that would be the next big important thing that the Ethereum community needed and Vitalik said privacy.  And that was the idea that sparked Roman to work on what became Tornado Cash, with the goal of providing financial privacy to people who needed it.

So let me turn now to what the evidence will show about the Ethereum network and financial privacy.  What do I mean when I say financial privacy?  Well, it is the right to keep your financial transactions private from the public and this is a right that many of us just simply take for granted. How would you feel if someone took your bank account and published it on the internet and everyone could see it?  They could figure out maybe where you shop, what you like to eat, how much money you have in your account.  Maybe even where your kids go to school.  You would not feel very safe and you certainly would feel --

MR. REHN:  Objection, your Honor.

THE COURT:  I will allow.  I am going to remind the jury this is not evidence and I am sure Ms. Axel is going to move on quickly from this.

MS. AXEL:  Thank you.

You will learn that that's how it is on the blockchain where transactions are and traceable by default.  That means people can find out what you are spending money on -- I will move on, your Honor.  You are going to learn about the technology in this trial and I won't try to cover everything today.  There will be expert witnesses for all of that.  But to explain why the software was needed, it helps to understand a little bit about blockchain technology and the Ethereum network specifically.  And we, the defense, want you to understand what

the evidence will show and to listen to the experts and to understand the details because they're critically important to the issues in this case.

So, what does Ethereum do?  Well, it is like an operating system but it doesn't live on your computer or on your work server and it is not owned by a company like Microsoft or Apple.  Instead, it is free on the internet and available to everyone.  And I'm going to ask Mr. Demarco to put up a slide here and the slide you are seeing is going to illustrate, in a simple way, a transaction on Ethereum.

Now, in our simplified version of a transaction here you will see that our user wants to send one ETH to a recipient.  And there is lots of transactions.

Does your monitor not work?

THE COURT:  Are other monitors working?

JUROR:  Yes.

THE COURT:  I will say first there is lots of transactions one can do on Ethereum, not just transfer ETH, which is a native cryptocurrency, but we are going to look at that because there is going to be a lot of talk about cryptocurrency transfers in this case.

In our example the user wants to send one ETH to the recipient.  To do that they need a request which, of course, is written in computer code and that request is sent to the network.  It is grouped with other requests and then validated

or approved by the network.  And as shown in this slide, Ethereum is a massive distributed ledger operated by what are called nodes.  And I'm going to apologize for some jargon but you will hear this in the case.  These are people using their own computers or servers to validate or approve transactions.  These nodes are not run or operated in a centralized way, meaning they're just individual people who operate their own computers, or in some cases servers or groups of servers but separately.  That's why they call it a distributed ledger.  No central person controls it but it is maintained by lots of people using their computers separately.

And then, as you see, we see the check marks, the nodes validate or approve the transaction and that creates a block.  You know it is called the blockchain.  So the block is that group of transactions and as I'm going to show you in a minute these blocks are constantly being validated.  This is all very public and you can go and look, or someone who knows what they're doing can go and look and see what is in each block and then the block is added to the blockchain.  When the block is approved, then the user's account is decreased by one and the recipient's account is increased and the transaction is completed.  And you will see that as we put by the user's account being marked in red for minus, it went down, and the recipient's account being marked in green, for a plus it went up.  And we use the word tokens being transferred.  But to be

clear, there are no tokens or at least not in the way that there is cash.  The blockchain is a ledger so one account goes up and the other goes down.  It is like a Zelle transaction. When your friend sends you $20 for lunch, your account goes up by the $20 and theirs goes down by the $20, there is no real cash exchanged.  And with U.S. dollars we are used to the idea that money can be exchanged but in blockchain they can't, they're just these values that get moved on the ledger.

And these transactions are all public so I have shown you here how you can see these what -- we did shortened wallet addresses and how you can see the amounts move, and now we are going to look at where you can find this information.

So we will show you there is a website called etherscan.io.  This is a blockchain explorer and one can find it on the internet and it has a search bar where one can enter a block, or an address, or a transaction and look it up and you can see exactly what that transaction was.  And here are the blocks and, as I told you, they get made every -- regularly every 12 seconds, actually, and here are all the transactions. And you can see those long numbers, numbers and letters, those alphanumeric strings that says "from" and "to", those are actually transactions between accounts.  And when you click on those long alphanumeric strings you can see all the activity in that account.  That's what I mean when I say this information is public.  And this provides you the background to understand

why financial privacy is important on Ethereum.  So we are going to look at an example.

We have an employee named Tony, and Tony gets paid in Ethereum at his tech job so his boss needs Tony's account in order to pay him.  So, Tony provides the account number to his boss and we have shortened that again, again it is a long alphanumeric string but we put 0X56C, and Tony provides that number to the boss.  So what happens next when he gets paid? Looking at the next slide, the boss, who has the 0X112 account pays Tony.  Tony's account goes up by .5 ETH, then you see those in green and red in our examples.

Just as a technical matter, the experts will tell you that the Ethereum network charges a fee to run a transaction and you will learn all about that later.  We have simplified this as an example of what the boss would pay and Tony would receive but now they both have each other's account numbers. So what does that mean?

Well, using a blockchain explorer or going directly to the blockchain, they can trace and look at the transactions, they can open the account history and they can look at all the transactions that each other have ever made and then they can watch the account going forward.  That might not be desirable for the boss who maybe doesn't want Tony to know what all the other employees get paid.  And for Tony, maybe he doesn't want his boss to know what he uses his money on, or perhaps where he

shops, maybe the political causes he contributes to.  You can see this could be a real problem for both of them.  And you are going to hear from experts that there are high profile examples of people being kidnapped and extorted.

MR. REHN:  Objection.

THE COURT:  Finish this, counsel.

MS. AXEL:  Because they were de anonymized, which means their anonymity was compromised.  And remember, because all the transactions are traceable, even if Tony moves his Ethereum to a new account, anyone can, following his account, can see that, too.  This is why the Ethereum community needed a solution to this problem and Tornado Cash is the solution.

Tornado Cash solves this problem through software code that operates autonomously, which means automatically.  Let's look at a slide that illustrates the deposit function of Tornado Cash.

So, again, this is simplified and the experts will provide the evidence here, but this is to illustrate a deposit transaction.  The user, here we have given it the wallet abbreviation 0X34D, wants to send one ETH to the Tornado Cash pool.  They send a deposit message with the transaction instructions and they have a secret note or a password that only that user has.  And of course these instructions are all in computer code.  The Tornado Cash pool then smart-contracts -- here the example you are seeing is the one

P7F5sto2                    Opening - Ms. Curtis Axel

ETH pool that takes deposits of one ether at a time, it reads that instruction, and then, just like we saw, the nodes validate or approve the transaction and it happens automatically and the ETH is moved into the pool.

Now, as I said, these pools are automatic, autonomous, smart contracts.  They are complex computer programs that operate automatically with no one running them.  So these smart contracts process the transaction with no human intervention.  There is just two more points I want to make on this slide about Tornado Cash before we leave it.  One is no one can access these pools other than the user who I said had their secret note, their password that allows them to access it.  That secret note can tell the smart contracts to execute a function that releases the Ethereum, it is called a withdrawal, but no one else can do that, no one else can get into these pools.  So, if anyone asked for Roman's help on this, he told them the truth.  If hackers can put crypto into these pools, there is nothing he could do to get it out.

The second thing I want you to know about these pools is Tornado Cash charges no fees.  Anyone can use this pool for no cost.  It didn't have to be this way.  That was an option.  Fees could have been programmed into the code.  Some software programs like this are called protocols, have what they call a protocol fee, and literally into the code the instruction is baked that they could take, for example, maybe a percent of a

withdrawal and that goes to a wallet somewhere.  The code can do whatever it's programmed to do.  But in this instance Tornado Cash had no protocol fee and Tornado Cash did not earn any revenue then from people using these pools.

In the interest of time, ladies and gentlemen, I will not go through a withdrawal transaction but the same points I raised here are true of withdrawals.  The Tornado Cash smart contracts act automatically and aren't operated by anyone and no one else can access these pools other than the user with their secret note, and the Tornado Cash pools don't charge any fee and that's the way Peppersec designed it.

So, who is Peppersec?  Well, here is a picture for you.  Who are these people?  This is Alexey Pertsev in the back, Roman Semenov on the scooter, and Mr. Storm, of course. And these are the Peppersec co-founders.  Peppersec was initially a consulting company made up of Pertsev and Roman, and they primarily performed security audits checking other people's code for bugs.  In 2019 Semenov joined the team, they continued to do security audits and some coding projects under contract and they began the development work that led to Tornado Cash.  And as you will see in this picture, the team was excited about working on something important to the Ethereum community but they were not sophisticated businesspeople.

Now, the government mentioned a t-shirt that Roman

wore at a conference.  What they did not tell you was that he wore it as a reputable tech conference in Boston in 2019.  And people of the jury, I want you to keep in mind, it is just a t-shirt, worn in poor taste.  It is like a comic strip or a meme.  It was a joke.  It is not evidence of a crime.

And the founders were very busy in 2019 developing the technology.  They launched a test pool in August 2019.  Most of the pools then were created in late 2019 including the pool that would accept ten ETH or a hundred ETH.  And the evidence will show also that the community embraced this technology.  Many people, including Vitalik Buterin, participated in what they call a trustless ceremony on May 18, 2020, and they call it trustless, which is also jargon in this sphere, but it means you don't have to trust us anymore, we don't have control, we have given up control.  And after the ceremony, those pools were immutable, meaning permanently changeable.  There is no secret key.

And so, again, if you look at the blockchain, these pools have a smart contract address, another long immutable string, and again we could look at etherscan.io and see them there and they're permanent on the blockchain.  The experts will testify that once this is done and you see the immutable dates there all in May of 2020, no one could change them.

Now, the government is going to call as witnesses other blockchain protocols that held users' crypto assets and

those software programs, those protocols got hacked and their users' assets were stolen.  Roman, again, had nothing to do with these hacks.  So the government's case is entirely based on the idea that he should have done something, that he could have done something to stop hackers from using the pools.  But, he couldn't.

As the evidence will show, anyone who is sophisticated enough to hack these other protocols was sophisticated enough to find and use these pools on their own.  How could they find them?  As we have been discussing, they're publicly available, they're on the blockchain, they're findable on the internet. If one simply runs an internet search for the contract addresses for the Tornado Cash pools, they can easily find them on the internet, on a blockchain explorer such as Etherscan that we were looking at.

For example, here on Etherscan you can easily find the address, and we are showing you an example for the 10 ETH pool in the same way that we showed you how to use Etherscan.io before.  And it is similarly easy to find the rest of the pools including the hundred ETH pool and I am not a computer expert.

The point is, ladies and gentlemen, the hackers could find Tornado Cash pools and access them at any time and no one could stop them.  The government just has this wrong.

Now, the government told you their evidence will show that Roman made a lot of money because he sold TORN tokens in

2022.  And the experts will testify that profits from selling tokens is not the same thing as company profits, just like company profits are different than what an executive could make if they sell their own personal stock.  And, of course, as you well know, it's not unusual for founders of startups to make money when a project becomes popular.  And Tornado Cash had widespread support and the participation of many people in the Ethereum community and, as I told you before, the vast majority of users were normal people using it for financial privacy.  In fact, the government talked a lot about a $600 million hack in March 2022 but that hack was terrible for the price of TORN, terrible for Tornado Cash generally, and terrible for Mr. Storm reputationally.  And that's why he messaged:  Guys, we're done for.  Roman's reputational and financial interest was in widespread adoption of this technology by real users, not by criminals.

You are going to hear about people who lost money to scammers and hackers and that's awful.  It's a tragedy.  It would be great if we lived in a world where there were no scammers or hackers but Roman had nothing to do with these scams and hacks.  So, when the government talks about these hacks, as they will again and again, I want you to keep in mind what you don't hear.  You will never hear that evidence -- any evidence that Roman and the co-founders participated in any hacking or that he had any agreement with or even any

communication with these scammers or hackers.

The world is full of products that have legitimate uses and are misused.  Your phones, encrypted messaging applications like WhatsApp and signal, VPNs that you may use for work or even a hammer that you buy at a local hardware store that someone can misuse to break into somebody's house and steal their stuff.  This is a sad fact of life but it is not a crime to make a useful thing that's misused by bad people.

The government must prove that man had a criminal agreement with a criminal purpose and it cannot.  He agreed to build software to help normal people have privacy in their financial transactions and then he made it available to everyone.  He did not agree to help bad actors to use that software and, in fact, their use of Tornado Cash ultimately killed his dream of the software being broadly used, broadly adopted, and broadly respected.

So at the close of evidence, ladies and gentlemen, we are going to ask you for the only verdict that makes sense on this evidence and that is a verdict of not guilty.

THE COURT:  Thank you very much.

Will the government call its first witness?

MR. REHN:  The government calls Henfeng Lin.

HENFENG LIN,

    called as a witness by the Government,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Please state and spell your full name for the record.  Please be seated and speak into the microphone.

THE WITNESS:  Henfeng Lin.  H-E-N-F-E-N-G and last name Lin, L-I-N.

THE COURT:  Thank you.

Counsel, you may inquire.

DIRECT EXAMINATION

BY MR. REHN:

Q.  Good afternoon, Ms. Lin.

A.  Good afternoon.

Q.  Where do you live?

A.  I live in Cumming, Georgia.

Q.  Where are you originally from?

A.  I'm original from Taiwan.  I lived in New Jersey for about 22 years and I moved to Georgia about six years ago.

Q.  What do you do for a living?

A.  I'm a court interpreter.

Q.  And directing your attention to September and October of 2021, were you living in Georgia then?

A.  Yes.

Q.  And were you a court interpreter at the time as well?

A.  Yes.

Q.  Did there come a time when you began communicating on your

cellphone with a particular person?

A.   Yes.

Q.   What was that person called?

A.   His name is Liu Ming Ya.

THE COURT:   May I have the spelling of that name, please?   I will take from either of you.

THE WITNESS:   M-I-N-G, and Y-A, and last name L-I-U.

THE COURT:   Thank you so much.

Q.   How did you become connected to that person?

A.   Like, one day in the beginning of September I got a text on the WhatsApp and he was asking do I know any available house for sale and a realtor agent.   And I told him he got a wrong message and I'm not a person who he is intent to.   And then he asked me, do I speak Chinese?   So I said yes, I do speak Chinese, so we kind of like connect that way.

Q.   Did you continue to talk using WhatsApp?

A.   Yes.

Q.   Did there come a time when you switched to a different messaging application?

A.   Yes.

Q.   What messaging application was that?

A.   It is called L-I-N-E.

Q.   Is there a reason you switched over to the Line messaging application?

A.   Yes.   Because he was asking me, say I don't think you

checked the WhatsApp too much and do you use other app?  And I say yes, because I'm from Taiwan so most of my friend use the Line app as a text message.

Q.   What language were these messages in?

A.   I was using the traditional Chinese.

Q.   Did there come a time where you took those messages off of your cellphone and saved them?

A.   Yes.

Q.   When did you do that?

A.   I save it on November 21st or 22nd time frame.

Q.   Ms. Lin, you have in the witness box with you a binder containing some exhibits and they have been marked as Government Exhibits 1701 through 1708, and also Government Exhibit 1710, and then you have corresponding exhibits that have been numbered as Government Exhibit 1701-T through 1708-T and also 1710-T.

     Do you see those messages?

A.   Yes.

Q.   Or those documents I should say.

A.   Yes.

Q.   What are these documents?

A.   These are the conversations between me and the person who scammed me on the app and in typing in the Chinese.

Q.   Are the exhibits marked as, without the "T" at the end, are those the original messages in Chinese?

A.   Yes.

Q.   Are the exhibits with the "T" at the end, are those translations of those messages into English?

A.   Yes.

Q.   Before you took the witness stand, did you previously review these translations of the original Chinese chats?

A.   Yes.

Q.   Are these translations a fair and accurate translation of the original messages?

A.   Yes.

        MR. REHN:   Your Honor, the government moves to admit Exhibits 1701 through 1708, 1710, as well as 1701-T through 1708-T and 1710-T.

        MR. PATTON:   Your Honor, can we have a moment?

        THE COURT:   You may.

        (Counsel conferring)

        MR. PATTON:   No objection.

        THE COURT:   Government's Exhibits 1701 through 1708, 1710, 1701-T through 1708-T and 1710-T are all admitted to into evidence.   They may be shown to the jury.   Thank you.   O.

        (Government's Exhibits 1701 through 1708, 1710, 1701-T through 1708-T and 1710-T received in evidence)

        MR. REHN:   Mr. Iannuzzelli, can you please pull up for all of us Government Exhibit 1701 and can you expand the width so we can see it across the screen?

P7F5sto2                          Lin - Direct

BY MR. REHN:

Q.   Ms. Lin, are these the original Chinese language messages?

A.   Yes.

Q.   Is this how they looked when they were in your phone?

A.   Yes.

Q.   And these are the ones that you removed from your phone and saved in November of 2021?

A.   Yes.

         MR. REHN:  Now, Mr. Iannuzzelli, can you please show the witness Government Exhibit 1701-T?  Or show it to all of us and expanding?

Q.   Ms. Lin, are these the translations of those messages into English?

A.   Yes.

Q.   For today's purpose will it be OK if we focus on the English translations of these messages?

A.   Yes.

Q.   So, looking at this particular set of messages, what is the date here?

A.   September 29, 2021.

Q.   And was that around the time that you switched from WhatsApp over to Line with this person?

A.   Yes.

Q.   And I see some messages with a person named Katie.  Do you see that?

A.   Yes.

Q.   Who is Katie?

A.   Because my first name is sometimes hard for my friends to pronounce, so I say they can call me Katie.

Q.   And I see something else that says "Wen."  Who is the person that is identified as Wen?

A.   It is the person identified before, then he make himself a nickname here as Wen.

Q.   And will you understand if we refer to that person as Wen?

A.   Yes.

Q.   Now, at the beginning of this conversation, what were the topics being discussed when you first began talking to this person?

A.   Just kind of like general talking, how the weather because we just met online, it is like friend chitchatting, so just like talking about he has an investment business, his company. And he say I live in California.  And then I say I have two kids.  Like something general.

Q.   So at the beginning here we see mostly friendly conversation?

A.   Yes.

Q.   Did there ever come a time when the subject of cryptocurrency was raised in these chats?

A.   Yes.

Q.   And who introduced that subject?

P7F5sto2                         Lin - Direct

A.   The Wen person.

MR. REHN:  Mr. Iannuzzelli, can you please show us Government Exhibit 1702-T, and if you could expand at the top?

Q.   Ms. Lin, what is the date on this particular part of these messages?

A.   October 12, 2021.

Q.   If we can read the translation of at least some of these messages I will read the Wen messages, and if you will read the Katie messages?

A.   *Watching my son doing homework.*

Q.   *A good American mom.  I just checked out the trend of cryptocurrencies and international gold.*

A.   *Any good tips?*

Q.   *Lately cryptocurrencies have been pretty good and it is at low point.  BTC has risen fiercely during this period rising from 42,000 two weeks ago to 56,000, a gain of more than 30 percent in the last 10 days or a little more.*

A.   *Wow.  You know how to do research.*

Q.   *Thanks but it is hardly research.  As long as you follow you will know.*

A.   *Still going up or?*

Q.   *Based on the trends, it will go up definitely and inevitably.  It is a good time to buy low, especially BTC, which fell very hard last month it only rebounded at the end of the month and is now steadily going up.*

P7F5sto2                         Lin - Direct

A.   *Where to buy this?*

Q.   *At exchange app.*

And we can stop there for the moment.  Before this conversation, Ms. Lin, had you ever downloaded any sort of crypto exchange app?

A.   No.  Never.

Q.   If we look at the bottom of the screen here, is there a particular crypto app that Wen recommended to you?

A.   The Crypto.com.

Q.   And so, after he recommended that, what did you do?

A.   I followed his instruction to download crypto app on my phone.

Q.   And as you continue to communicate with Wen, did he continue to discuss cryptocurrency with you?

A.   Yes.

MR. REHN:  Let's look at Government Exhibit 1703-T. And if we can expand again?

Q.   What was the date on this chat?

A.   October 14, 2021.

Q.   What was being discussed in this particular set of messages?

A.   It is about he encouraged me, say it is a good time to invest.

Q.   Were you at all reluctant to invest in cryptocurrency?

A.   Yes, because I don't know anything much about it and then

P7F5sto2                       Lin - Direct

so I was not very active, tried to gain to invest to begin with.

Q.   Did there come a time where you did decide to invest?

A.   Yes.

Q.   Why did you decide to invest?

A.   Because he kept persuading me, and then he say he know how to invest, and then he say it is a very good market now and he know all the good trading strategy.

Q.   Where did you get the money that you used to invest?

A.   I got it from my own savings account.

          MR. REHN:  Mr. Iannuzzelli, can you please show the witness what has been marked for identification as Government Exhibit 1712, and if you could expand the top for the witness?

Q.   Ms. Lin, do you recognize this document?

A.   Yes.

Q.   What is this?

A.   It is my checking account bank statement.

Q.   From what month?

A.   October 2021.

Q.   And I see on this particular document that there are some parts where some personal information is covered up.  Do you see that?

A.   Yes.

Q.   Is that how it looked on the original bank statement?

A.   Yes, that's my house address.

P7F5sto2                              Lin - Direct

Q.   And on this version that's been removed from this document;
is that right?

A.   That's correct.

Q.   And aside from that and some other places on the document,
is this the bank statement as you originally received it in
October of 2021?

A.   Yes.

          MR. REHN:  Your Honor, the government moves to admit
Government Exhibit 1712.

          MR. PATTON:  Your Honor, could we approach very
briefly?

          THE COURT:  Side bar.

          (Continued next page)

(At side bar)

MR. PATTON:  My apologies.  I should have checked with your Honor earlier about this.

Just on what your Honor's preference is about a standing objection given our *in limine*s about the victims and about their funds.  I don't have any additional objections to what we have talked about before and I have reviewed the exhibits that the government has given us before, but I just want to make sure we are still on record as objecting to the victims and to their money and all the *in limine* objections we made previously.

THE COURT:  I think what I would prefer is for you to say subject to our prior -- we maintain our prior objections.  We can do it that way.  Or, the government can acknowledge that for all of the *in limine*s, that they have preserved their objections to all of the *in limine*s to the extent that --

MR. REHN:  I think that could create a messy record.

THE COURT:  That's a point to have.  So it will have to be we maintain our prior objection.

MR. PATTON:  OK.

THE COURT:  All right.  But no speaking objections.  No speaking objections.

MR. PATTON:  I was trying to avoid by that.

MR. REHN:  We meant to ask, your preference is "objection"?

THE COURT:  Yes.  I might ask you for one word but I don't want a speaking objection.

May I ask how long the direct is?

MR. REHN:  It is about half hour.

THE COURT:  Still?

MR. REHN:  I would say another -- I'm not sure exactly, but a half hour or so.

THE COURT:  We really need to break at 4:00 or our jurors will be sad and we have more jury discussions to have after the trial day.  So, is there a convenient breaking point close to 4:00?

MR. REHN:  What time is it now?

THE COURT:  20 minutes to 4:00.

MR. REHN:  I will see how far I get.  I'm not sure, it is sort of one set of events.

THE COURT:  If you come to a convenient breaking point at any point after the next 10 minutes, stop then.  If we stop at 3:55, that's fine.  If we stop at 3:50, that's fine.  But get to it.  I don't know your outline.

P7F5sto2                          Lin - Direct

(In open court)

THE COURT:  Government Exhibit 1712 is admitted over the defense objection.  It may be shown to the jury.

(Government's Exhibit 1712 received in evidence)

MR. REHN:  Mr. Iannuzzelli, can you bring that up for the rest of us, please?  Mr. Iannuzzelli can you please now go to page 4 of this document and can you expand the very bottom, unredacted -- the lowest unredacted transaction?

BY MR. REHN:

Q.  Do you see what is expanded on the screen, Ms. Lin?

A.  Yes.

Q.  I read something that says 10/22 but then it says purchased authorized on 10/19.  Do you see that?

A.  Yes.

Q.  Can you explain what that transaction was?

A.  In the first, beginning, when he told me to make the transaction, tried to invest, and he told me to use the bank card, that's like a bank card transaction.  It didn't go through in the beginning but it did go through October 22.

Q.  Did you try to make a bank card transfer on October 19?

A.  Yes.

Q.  And were there some issues with that?

A.  Yes.

Q.  And did you discuss that issue with Wen?

A.  Yes?

MR. REHN:  Mr. Iannuzzelli, can you show the witness what is in evidence, can you show us all Government Exhibit 1704-T?

Q.  Ms. Lin, what is the date of the messages in this section of the chat?

A.  October 19.

MR. REHN:  And Mr. Iannuzzelli, can you please expand the top three messages?

Q.  Ms. Lin, can we read these messages using the same method where I will read the Wen messages?

A.  Yes.

Q.  *Your bank card set a limit.*

A.  *Yes.  I transfer it but I still don't see the money.*

Q.  *Go to the bank cashier to do the wire, then there is no limit.*

Ms. Lin, after you told Wen about the issues you were having with the bank card, what did he suggest that you do?

A.  He told me to go to a bank to do the wire transfer.

Q.  And did you make a wire transfer from your bank account?

A.  Yes.

Q.  Did you do that on October 19?

A.  Yes.

MR. REHN:  Mr. Iannuzzelli, can we go back to Government Exhibit 1712 and go to page 4 again, and can you expand the other unredacted transactions that show up on

P7F5sto2                           Lin - Direct

October 18 and 19?

BY MR. REHN:

Q.  So, looking at the bottom, Ms. Lin, do you see where it

says:  Wire transfer Fed Metropolitan Commerce?

A.  Yes.

Q.  How much is that transfer?

A.  $25,000.

Q.  What is that transfer there?

A.  I'm sorry?

Q.  What was that transaction?

A.  That's the wire transfer from my Wells Fargo Bank account

to the Metropolitan Commercial bank account which is hosted by

crypto.com.

Q.  So had you downloaded the crypto.com app at this point?

A.  Yes.

Q.  Was this to fund that crypto.com app?

A.  Yes.

Q.  And I see above that wire transfer I see two transfers into

your checking account.  Do you see that?

A.  Yes.

Q.  What was the purpose of those transfers?

A.  Because I don't have enough in my checking account so I

transferred from my savings account to my checking account to

make up the $25,000.

Q.  Did you transfer a total of $21,000 from your savings

account?

A.   Yes.

Q.   And was that the money that went into this $25,000 wire transfer to metropolitan?

A.   Yes.

Q.   So, did that show up as money in your crypto.com account?

A.   Yes.

Q.   After you had the money in your crypto.com account, what did you do with it?

A.   Then he started to instruct me to convert to the cryptocurrency and then make it a transfer to another website.

          MR. REHN:  Mr. Iannuzzelli, can you please show the witness what's been marked as Government Exhibit 1705-T or show us all?  I'm sorry.  It is in evidence.

Q.   Ms. Lin what is the date on these messages?

A.   October 19, 2021.

Q.   If we scroll down just a little bit, if you could start at the message that says "first search," I think you testified a moment ago that after you had the money in the crypto.com account, he instructed you to transfer to a different account. Is that right?

A.   Yes.

Q.   Are these the messages where he told you how to do that?

A.   Yes.

Q.   I see toward the bottom of these messages there is a link

to a particular website.  Do you see that?

A.  Yes.

Q.  Did you go to the website when he sent you that link?

A.  Yes.

Q.  On October 19 of 2021?

A.  Yes.

Q.  Did there come a time a little while later that you took a screenshot of what that website looked like?

A.  Yes.

Q.  And did the screenshot you took a little while later look the same way that the website had looked when you first looked at it?

A.  Yes.

          MR. REHN:  So let's take this exhibit down for a moment and now let's look at Government Exhibit 1717, just for the witness.

Q.  Ms. Lin, do you recognize this?

A.  Yes.

Q.  And is this the screenshot that you just testified about?

A.  Yes.

Q.  Is this that actual website that you went to when you clicked on that link in those messages?

A.  Yes.

          MR. REHN:  The government offers Exhibit 1717.

          MR. PATTON:  Your Honor, we --

THE COURT:  Same objection.

MR. PATTON:  Previous objections.

THE COURT:  Admitted.  This document is admitted over your objection and it may be shown to the jury.

(Government's Exhibit 1717 received in evidence)

MR. REHN:  Mr. Iannuzzelli, can you bring that up for us, please?

BY MR. REHN:

Q.  So looking at this, was this where you -- what was the purpose of Wen sending you this particular website?

A.  He told me this platform working with Forex, which is for the trading, and also that's why I wired the money to this one and that he can show me how to do the invest.

Q.  And did you visit this website on October 19 of 2021?

A.  Yes.

Q.  And did you open an account?

A.  Yes.

Q.  Was there anyone who told you how to open an account on this website?

A.  Yes.  He teach me step by step every step; I created an account and also how to transfer fund from crypto.com to the platform website and I took a screenshot and I showed him and he's very patient and showed me step by step that way.

MR. REHN:  Let's bring this down and bring up Government Exhibit 1706-T.  And if we could expand the messages

here?

Q.   What is the date on these messages?

A.   October 20, 2021.

Q.   And did Wen instruct you how to deposit cryptocurrency into the website that he had sent you?

A.   Yes.

Q.   Was that the cryptocurrency that you had got on the crypto.com app?

A.   Yes.

Q.   Did you in fact begin making deposits to the account at this time?

A.   Yes.

        MR. REHN:  So, Mr. Iannuzzelli, can you show the witness what's been marked as Government Exhibit 1715?

Q.   Ms. Lin, do you recognize this?

A.   Yes.

Q.   What is it?

A.   This is another transaction I deposit into that NTU Capital's account which that's the wallet address.  I have no idea, it's that person's wallet address.

        MR. REHN:  And if we could -- we would offer this into evidence, your Honor.

        MR. PATTON:  Same objections, your Honor.

        THE COURT:  Admitted over the defense objection.

        It may be shown to the jury.

P7F5sto2                        Lin - Direct

(Government's Exhibit 1715 received in evidence)

MR. REHN:  Mr. Iannuzzelli, can you bring up the bottom line on this exhibit?

BY MR. REHN:

Q.  Ms. Lin, was the first deposit reported on the website October 20 of 2021?

A.  Yes.

Q.  And how much was that?

A.  $6,129.25.

Q.  Was that connected to that bank card transaction that we looked at earlier?

A.  Yes.

MR. REHN:  If we could bring that down and expand the second line up?

Q.  Was there another deposit recorded on this website on October 20 of 2021?

A.  Yes.

Q.  How much was that?

A.  $24,624.82.

Q.  Was that connected to that $25,000 wire transfer originally from your checking account that we looked at earlier?

A.  Yes, because we got to deduct some transaction fee.

MR. REHN:  We can bring that down.  Mr. Iannuzzelli, can you please show all of us what has been marked Government Exhibit 1708-T?

Q.   Ms. Lin, once you had deposited some crypto from that crypto.com app into the NTU Capital website what, if anything, did you do?

A.   I'm sorry?

Q.   What did you do?  What sort of activity did you do on the website?

A.   He instruct me to invest and then say from that, he connect to the other trade phone call, met a trader, and then he can see the market go up and down in the gold market and then he say, OK, now it is time to buy.  And then I make that transaction and then he showed me the screenshot and told me make this transaction now and then that's the time for you to get the profit that way.

Q.   Did the website show you what was happening with the trading that you were doing?

A.   Yes.

Q.   And how did it appear to you that your trading was going?

A.   I was making profit, like at least like 5 to 10 percent every time I made that trade.

Q.   And based on that, did you make a decision about whether to make any additional deposits?

A.   Yes, because I opened everything under my name so I felt that everything is under my control on the trading so I make sure to put in more money.

          MR. REHN:  Mr. Iannuzzelli, can you please show the

witness what has been marked Government Exhibit 1713?

Q.   Ms. Lin, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   This is my savings account bank statement.

Q.   Is this the savings account statement from that same month, October 2021?

A.   Yes.

Q.   Does this also have some personal information removed?

A.   Yes.

Q.   Aside from that, is this the same as the document you got from the bank on that month?

A.   Yes.

          MR. REHN:  Your Honor, the government moves to admit 1713.

          MR. PATTON:  Same objection, your Honor.

          THE COURT:  Admitted over defense objection.

          It may be shown to the jury.

          (Government's Exhibit 1713 received in evidence)

          THE COURT:  Mr. Rehn, I will ask you to be attentive to the clock.

          MR. REHN:  I am.

          Mr. Iannuzzelli, can you please go to page 2 and could you expand the first two entries on this document?

BY MR. REHN:

P7F5sto2                         Lin - Direct

Q.  Do you see here, Ms. Lin, two transfers to a checking
account?

A.  Yes.

Q.  Is that your checking account?

A.  Yes.

Q.  And are those the two transfers we looked at earlier on the
checking account statement?

A.  Yes.

        MR. REHN:  Mr. Iannuzzelli, could you please now go
down to the next two transactions?

Q.  Ms. Lin, what is the date on these transactions?

A.  October 22.

Q.  And what do these transactions represent?

A.  These it is a wire transfer to crypto.com's account which
is the bank with the Metropolitan Commerce Bank.

Q.  And what was the amount of this transfer?

A.  $150,000.

Q.  And when you transferred this money to that crypto.com
account, did you then transfer it to that same website?

A.  Yes.

Q.  And was that because of the trading that you were talking
about earlier that looked like it was profitable?

A.  Yes.

        MR. REHN:  We can bring that down and,
Mr. Iannuzzelli, can you please expand the next two entries on

P7F5sto2                           Lin - Direct

this statement?  I'm sorry, I meant bring the expansion down.

Q.  Was there another wire transfer on October 28?

A.  Yes.

Q.  How much was that?

A.  $20,000.

Q.  Between this transfer and the last transfer, had you continued to trade on the website?

A.  Yes.

Q.  And what did it look like was happening with your trading?

A.  The trade always successful and I'm making a profit.

Q.  And did that lead you to send an additional wire transfer on October 28?

A.  Yes.

        MR. REHN:  We can bring that down.

        Mr. Iannuzzelli, can you expand the section on page 2 of this document that says Statement Period Activity Summary?

Q.  Ms. Lin what was the balance of your savings account at the beginning of October 2021?

A.  $203,472.14.

Q.  Ms. Lin, what was the balance of your savings account at the end of October 2021?

A.  $12,414.57.

Q.  Do all of these withdrawals represent the transfers that you made so you could fund the trading on the website?

A.  Yes.

P7F5sto2                         Lin - Direct

MR. REHN:  We can bring that down.

Your Honor, I was going to shift to a slightly different topic so that might be a good ending point.

THE COURT:  I think this is a good time to end for the day.

We have made progress, ladies and gentlemen of the jury.  First of all, we have you, we have a jury now, and we have had the openings and now we have had a witness.  I'm going to let you go for the day and I'm going to be telling you this at every break:  Do not discuss the case with each other or with anyone else and keep an open mind until all of the evidence has been received into evidence.

We thank you very much.  See you tomorrow.  Be here at 8:45 so we can beginning at the crack of 9:00.

THE COURT:  Ms. Noriega --

THE DEPUTY CLERK:  Yes.

THE COURT:  Thank you so much.

THE DEPUTY CLERK:  All rise.

(Continued on next page)

P7F5sto2                         Lin - Direct

(Jury not present)

THE COURT:  Please be seated.

The witness can step down.  I just have some legal issues to discuss with the parties so anyone who is not interested in those is also welcome to leave.

Thank you.  We will see you tomorrow.

(Witness steps down)

THE COURT:  Counsel, as I mentioned to you at side bar, there are some juror issues that I want to discuss.  I have your permission to speak with our one juror, but my deputy advised me that Ms. Brown, I believe, who is our first alternate juror, had mentioned to us during the voir dire that a relative had recently passed.  His funeral is set for Friday and it will be Friday in the morning and she would need -- she obviously needs to be at it so I'm not going to put you on the spot right now, but I think you and your teams should caucus and discuss whether we are excusing this juror, which I don't want to do, whether we are not sitting on Friday.  You may tell me to ask her to come back after the repast and hear evidence but I'm not sure that I would want to come back from a funeral to hear evidence.

So, I'm just letting you know that that is the information she has just communicated to my deputy over the break.  So, please talk amongst yourselves and then tell me in the morning what you would like to do.

P7F5sto2                        Lin - Direct

Mr. Rehn, we have the same list of witnesses that you gave me yesterday?

MR. REHN:  Yes, your Honor.

THE COURT:  Thank you.

Mr. Klein, something else, sir?

MR. KLEIN:  Just to clarify who the witnesses are, it is Mr. Evans?

MR. REHN:  Actually, because of a travel issue there is another witness who will come on tomorrow morning, so Mr. Evans, Mr. Ho, Mr. Bram, and Mr. Llacuna.

THE COURT:  I'm sorry.  May I hear the last two again, please?

MR. REHN:  Bram and Llacuna.

THE COURT:  Thank you so much.

Is there hope that we get through them all tomorrow?

MR. REHN:  I think that would not be unrealistic.

THE COURT:  That is as committal as I can get from you at this time.  Thank you.

Are the parties going to be local?  Perhaps I can reach out to you later on this evening to discuss any juror issues that may arise after today.  Is that fair?

MR. KLEIN:  We are here, your Honor.

MR. REHN:  Yes, your Honor.

THE COURT:  Anything you would like to bring to my attention?

P7F5sto2                         Lin - Direct

MR. REHN:  Nothing from the government, your Honor.

THE COURT:  Should I be staying up late waiting for any written submissions?  Please say no.

MR. KLEIN:  No, your Honor.  Not from the defense team.

MR. REHN:  Nothing from the government, your Honor.

THE COURT:  I thank you all.  We have made progress, we will make more.

Thank you.  We are adjourned.

(Adjourned to July 16, 2025, at  9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                         Page

HENFENG LIN

Direct By Mr. Rehn . . . . . . . . . . . . . . . .81

GOVERNMENT EXHIBITS

Exhibit No.                                       Received

 1701 through 1708, 1710, 1701-T through . . . .84

          1708-T and 1710-T

1712      . . . . . . . . . . . . . . . . . . . . .93

1713      . . . . . . . . . . . . . . . . . . . . 102

1715      . . . . . . . . . . . . . . . . . . . . 100

1717      . . . . . . . . . . . . . . . . . . . . .98