P7G1STO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                      23 Cr. 430 (KPF)

ROMAN STORM,

             Defendant.          Jury Trial
------------------------------x

                                New York, N.Y.
                                July 16, 2025
                                9:06 a.m.

Before:

                HON. KATHERINE POLK FAILLA,

                                District Judge

                       APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  NATHAN M. REHN, ESQ.
    BEN ARAD, ESQ.
    BENJAMIN A. GIANFORTI, ESQ.
    KEVIN G. MOSLEY, ESQ.
    TARA M. LA MORTE, ESQ.
    Assistant United States Attorneys

WAYMAKER LLP
    Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
    KERI CURTIS AXEL, ESQ.
    KEVIN M. CASEY, ESQ.
    VIVIANA ANDAZOLA MARQUEZ, ESQ.

    -and-

HECKER FINK LLP
    Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
    CHRISTOPHER MOREL, ESQ.

(Trial resumed)

THE COURT:  I'm advised by my deputy that we are awaiting two jurors, so that's not a great way to begin, and hopefully we'll find out who they are and that they are going to be showing up soon.

Let me please speak to the parties.  I was just handed a limiting instruction and was told that there is partial agreement on it?  Yes?

MR. PATTON:  I think there's full agreement, your Honor.

THE COURT:  Okay.

MR. PATTON:  This is for the issue, if you'll recall, your Honor——

THE COURT:  I need you closer to the microphone for our court reporter.  Thank you so much.

MR. PATTON:  If you'll recall, we objected to any number of things with respect to Ms. Lin's testimony, but one of them was her testimony that she believed some of the stolen funds were sent to the Tornado Cash and that was based on what she was told by an investigative firm.

THE COURT:  Yes.  You're a very tall man and that is a very short microphone.

MR. PATTON:  Sorry.  Are you still having trouble?

THE COURT:  I am.  Excuse me, sir, yes.

MR. PATTON:  And your Honor allowed that testimony to

P7G1STO1

come in for the purpose of showing why she sent an email to the hello@tornado.cash address.

THE COURT:  Of course.  And this is the instruction for that.

MR. PATTON:  This is the instruction that it is only to be considered for that purpose and not for the truth of the matter of whether her funds were actually sent to Tornado Cash.

THE COURT:  All of this I understood.  I was confused by the use of the term "partial."  But there's full agreement on this limiting instruction, yes?

MR. PATTON:  Correct.

THE COURT:  Okay.

MR. PATTON:  Well, I mean, I showed it to the government and they told me so, but——

THE COURT:  All right.  And I imagine there's a particular time you'd like me to give it, which is when she is discussing what she did.

MR. PATTON:  Yes.  Obviously I don't know when that will be, but——

THE COURT:  Thank you.

All right.  But are there matters as to which there is disagreement that we should be addressing this morning?

MR. REHN:  Not with respect to the instruction, your Honor.

THE COURT:  Objection; nonresponsive.  Are there any

P7G1STO1

matters as to which there is disagreement that we——

MR. REHN:  There's nothing we need to discuss this morning, it sounds like, but we——

THE COURT:  You're still not answering my question. What is the dispute, Mr. Rehn?

MR. REHN:  The government——we just wanted to inform the Court we are planning to file a short letter——it probably will be filed at the beginning of the lunch break——relating to the objections we made during the opening statement to just seek some clarification from the Court.  And based on our conversation with defense, we don't think it relates to anything that's likely to come up this morning.  So we just wanted to alert the Court that's coming.  And we don't think it's very complicated, but it's just a short letter.

THE COURT:  All right.  While I have your attention, did I receive last night an amended 1710?

MR. REHN:  That was, I believe, emailed to the Court earlier in the day yesterday.  The defense had asked us to remove a couple of messages, and we removed those at the defense's request and we emailed them to both the Court and the defense before we called Ms. Lin to the stand, and we subsequently filed it in a more formal way.

THE COURT:  The version that has been shown or will be shown to your witness is the version that was sent to us earlier in the day.

MR. REHN:  It was, yes, your Honor, and it was the one the defense had reviewed and agreed they didn't have any further objections to.

THE COURT:  Okay.  Further to our communications last evening, my proposal is that we get through this trial day and we show our jury that we can make progress and then perhaps I can discuss with them scheduling issues that we've been addressing in our telephonic conferences.  I don't want to do it this morning because I'd like them to see that we can make progress, but I also don't want to do it so late that they can't make plans or change plans.  So perhaps I could speak to the parties at the end of the trial day and perhaps we could keep the jurors just a little bit longer.  Is that acceptable?

MR. PATTON:  That's fine, your Honor.

MR. REHN:  Yes, your Honor.

THE COURT:  Okay.  Ms. Noriega, we are awaiting one juror?

THE DEPUTY CLERK:  One juror, Judge.

THE COURT:  Okay.  Let's see if our one juror has arrived because really, she should be here by now.

May we please have the government's witness back on the stand.  This is Ms. Lin?

MR. REHN:  Yes, your Honor.

THE COURT:  All right.

MR. KLEIN:  Your Honor, it occurred to me, we haven't

done a witness exclusion order.

THE COURT:  We have not, to the extent that the percipient witnesses ought not be in the courtroom, unless they are the case agent and, as well, the expert witnesses are permitted to remain.  I thought that was understood by the government.  May we have that understanding?

MR. REHN:  Yes, your Honor.  Everybody on the government's team is under the understanding that we will not bring witnesses into the courtroom until they're called to the stand.

MR. KLEIN:  Fantastic, your Honor.

THE COURT:  Okay.  That's great.  One thing not to worry about.  But Ms. Lin can come in, yes, sir?  Thank you.

Counsel, our juror still has not arrived and should have, so we're reaching out to her to make sure we can find her.  If, for example, she's in a security line, we'll go over and get her, but I don't know what's up.  Thank you.

Ms. Alex, my expectation is you haven't seen the government's letter yet that I haven't seen yet either because it hasn't been sent.  Knowing the parties as I do, are you going to want an opportunity to respond to it?

MS. AXEL:  Yes, your Honor.

THE COURT:  Is it possible I could have that response soon?  We'll just go with soon?

MS. AXEL:  We absolutely can expedite it, your Honor.

P7G1STO1

Probably——we would try to do it tomorrow, but probably, if we could have midday tomorrow, that would be ideal.

THE COURT:  Let's see what we could do.  I haven't seen it so I don't know its complexity.

MS. AXEL:  We haven't seen it.

THE COURT:  All right.  Thank you.

MR. KLEIN:  Your Honor?

THE COURT:  Yes.

MR. KLEIN:  One thing might expedite this for us responding:  If the government can just give a preview of what they're going to say, then we can at least start thinking through the issues now.

THE COURT:  I presume it relates to the objections they were making yesterday during the opening.

MR. KLEIN:  Yeah, it was a little unclear the nature of that.

THE COURT:  You're welcome to have those offline discussions.  I don't want to be spoiled, sir.

Sir, she's here?

THE COURT SECURITY OFFICER:  Yes.  She's coming in.

THE COURT:  Terrific.  Thank you so much.

We've been advised that the last of the jurors has arrived, as you've heard the CSO say, and Ms. Noriega is going to get them ready, so we'll begin very shortly.  Thank you.

(Jury present)

THE COURT:  Please be seated.  Thank you.

We're going to continue with the government's case.

I am just going to ask my jurors, those of you who arrived on time, great, thank you, keep doing it.  Those of you who had some difficulty arriving on time, please arrive earlier because we don't want to delay this trial.

Mr. Rehn, you may continue.  Thank you very much.

And may I please remind the witness you remain under oath.

Counsel.

HANFENG LIN, resumed.

DIRECT EXAMINATION

BY MR. REHN:

Q.  Good morning again, Ms. Lin.

A.  Good morning.

Q.  Do you recall we left off yesterday afternoon discussing two wire transfers that you made out of your savings account in October of 2021?

A.  Yes.

Q.  I'd now like to turn back to your checking account.

MR. REHN:  Mr. Iannuzzelli, can you please show the witness what has been marked for identification purposes as Government Exhibit 1718.

Q.  Ms. Lin, do you recognize this document?

A.   Yes.

Q.   What is this?

A.   This is my checking account statement at November 2021.

          MR. REHN:  Your Honor, we'd move to admit.

          THE COURT:  All right.  Subject to the continuing defense objection, the exhibit is admitted and may be shown to the jury.

          (Government's Exhibit 1718 received in evidence)

Q.   And Ms. Lin, I think I forgot to ask you this yesterday, but there's actually two names on this checking account; is that right?

A.   Yes.

Q.   Who is the other person?

A.   That's my husband.

          MR. REHN:  Mr. Iannuzzelli, can you please go to page 3.  And could you expand the section of this statement going from November 4th to November 8th.

Q.   Ms. Lin, I see here there's a deposit made in a branch on November 4th.  Do you see that?

A.   Yes.

Q.   Could you explain what that transaction was.

A.   I was talking to my sister.  I said, I have this—the investment opportunity, and then it's making great profit, so I was asking her if she want to invest with me, so she went to her bank branch and deposited that money.

Q.   And when you told her that it was making good profits, was that based on what you saw on that website we talked about yesterday?

A.   Yes.

Q.   And Ms. Lin, I see on November 8th there's a $50,000 transfer to that same Metropolitan Commerce account.  What was that transaction?

A.   That's a transfer from my checking account to the crypto.com bank, the Metropolitan Commerce Bank.

Q.   Is that the same $50,000 you got from your sister?

A.   Yes.

Q.   And what did you do with that money when it went to your crypto.com account?

A.   Then I transferred to that ntucapital.com.

          MR. REHN:  Mr. Iannuzzelli, could we please bring back up Government Exhibit 1715.

Q.   And Ms. Lin, do you recall that this was a screenshot you took from that website?

A.   Yes.

          MR. REHN:  And Mr. Iannuzzelli, could you please expand the top three lines here.

Q.   Ms. Lin, at the bottom do you see a deposit on August 23, 2021?

A.   Yes.

Q.   And how much is that deposit?

A.  14,000——I'm sorry.  $148,828.61.

Q.  Ms. Lin, do you recall yesterday we looked at a $150,000 wire from your savings account?

A.  Yes.

Q.  Does that relate to this deposit here?

A.  Yes, minus the transaction fee, processing fee.

Q.  And could you look at the next line up from October 29, 2021.

A.  Yes.

Q.  Is that a deposit of close to $20,000?

A.  Yes.

Q.  Does that relate to the transfer from your savings account we looked at yesterday?

A.  Yes.

Q.  And then on the top I see a deposit at November 9, 2021. Do you see that?

A.  Yes.

Q.  And what does that deposit relate to?

A.  The $50,000 I borrowed from my sister.

        MR. REHN:  Mr. Iannuzzelli, could we go back to the full page.

Q.  Ms. Lin, how many deposits in total did you make to this website?

A.  Five.

Q.  And what was the total dollar amount of the money you

deposited across those five deposits?

A.  Close to $252,000.

Q.  I'm going to ask a yes or no question.  Was that a significant amount of money for you?

A.  Yes, that's my life savings.

MR. PATTON:  May we approach.

THE COURT:  Yes.  Sidebar, please.

(Continued on next page)

(At the sidebar)

THE COURT:  I presume you're concerned about the life savings.

MR. PATTON:  Yes.  Your Honor was very clear that there was to be one yes or no question.

THE COURT:  And he did say yes or no.

MR. PATTON:  I understand that, but the witness needed to be prepared for that.

MR. REHN:  I did ask her to only ask that question──answer that question with a yes.

THE COURT:  I will strike the last part of the question and tell the jury to disregard it, and I will ask you, going forward, with your victim-witnesses, or else we just won't let them testify to that question at all──

MR. REHN:  Understood.

THE COURT:  I know you tried to lead her.  You have to lead her more with that.  And you will not object to that leading, Mr. Patton.

MR. PATTON:  I won't.

The other thing, I let it go, but for the future, the idea of a source of the funds coming from her sister, that's also totally irrelevant, where her funds came from, and it ties into the same issue of, like, she was borrowing from her sister to be able to do this.  They have said that the relevance of this is that the funds actually went to Tornado Cash.

THE COURT:  I disagree with that.  He can get the sources of it, but not the life savings part.  So I'm going to have them disregard the last part of that.  Thank you.

(Continued on next page)

(In open court)

THE COURT:  Members of the jury, I told you yesterday in the preliminary instructions that sometimes I would ask you to disregard evidence and, if I did, that you could not consider it.  There was a yes or no answer that was sought from this witness.  She answered as she did.  The yes or no part you can keep; the remainder of the answer I am telling you to disregard, and you may not consider it.  Thank you.

Mr. Rehn.

MR. REHN:  Thank you, your Honor.

BY MR. REHN:

Q.  Ms. Lin, when was the first deposit?  Was that on October 20th?

A.  October 20, yes, that's on the record, yes, and the time.

Q.  And was the last deposit on November 9th of 2021?

A.  Yes.

Q.  During the period when you were depositing these funds, were you able to track your account on this website?

A.  Yes.

Q.  And do you recall anything in particular that happened about a week after you made your last deposit on November 9th?

A.  Yes.

Q.  And what was that?

A.  He instruct me to make another trade on the website and then at November 15th, and everything just go down to neg——0,

to negative.

Q.   And Ms. Lin, we've been looking at a couple of screenshots from this NTU Capital website.  When did you make those screenshots?

A.   November 22, 2021.

Q.   Did you ever try to visit the website again after that?

A.   Yes.

Q.   Did there come a time where you were not able to visit it?

A.   Yes.  In the following year, February, the website just disappeared.

Q.   After you saw your account balance go to 0, did you tell Wen about that?

A.   Yes.

MR. REHN:  Mr. Iannuzzelli, could you please show the witness Government Exhibit 1710T.  Just the witness.

We can bring that up.

Q.   Ms. Lin, what is the date of these messages?

A.   November 16, 2021.

Q.   And did you ask a question of Wen after telling him that the money was gone from the account?

A.   Yes.

Q.   And how did he respond?

A.   He say, don't worry, you will definitely get the money back, the market is good, and then as long as you put together the money and you should do the same thing, he would help me

P7G1STO1                    Hanfeng Lin - Direct

out, just give him some capital and money and to be able to bring back all the money.

Q.  Did you make any more deposits to the website?

A.  No.

MR. REHN:  Would you bring that down.

Q.  After this happened what did you do in response to it?

A.  I was in a panic and I was—I was—I was just in shock.  I don't know what happened, why everything's gone.  I mean, I thought I was making all the—

Q.  Ms. Lin, could I just ask you to answer what you actually did in response to this.

A.  I—I was—I just—I just panicked.  I tried to ask him if he could help me out.

Q.  Did there come a time where you tried to investigate what happened to your money?

A.  Yes.

Q.  What did you do to investigate that?

A.  I have the difficult conversation with my husband about the money all gone, and then he was thinking to have hired this company called Payback.  They say they are specialize retrieve the money for the victim.

Q.  And did you hire that company?

A.  Yes.

Q.  And did that company ultimately give you some sort of a report on what happened to the money?

A.   Yes.

Q.   And without getting into the details of that report, what was your general understanding of what happened to the money after you received that report?

A.   The trace, they give me a trace report and showed me the money, which is in the scammer's wallet, and where did he go, and he went to four locations on the wallet.

Q.   What was the largest?  Where did the largest amount of the money go, according to the report?

A.   The $150,000 went to tornado.cash.

Q.   Did you notify Tornado Cash about this?

A.   Yes.

        MR. REHN:  Mr. Iannuzzelli, could you please show the witness what has been marked as Government Exhibit 253.  And expand the top.

        THE COURT:  Mr. Patton, at some point are you asking me to make a limiting instruction?

        MR. PATTON:  Yes.  Now would be a good time.

        THE COURT:  All right.  Thank you.  One moment, please.

        Members of the jury, in certain instances evidence may be admitted for a particular purpose and not generally for all purposes.  You just heard evidence that the witness heard from an investigative firm that certain funds went to Tornado Cash. That evidence was admitted only to explain why the witness

contacted Tornado Cash, and you may consider that evidence only in determining why the witness contacted Tornado Cash.  You may not, however, consider it for the truth of whether any of Ms. Lin's funds were in fact sent to Tornado Cash.

Thank you.  Counsel, you may continue.

MR. REHN:  Thank you, your Honor.

BY MR. REHN:

Q.  Ms. Lin, do you recognize Government Exhibit 253?

A.  Yes.

Q.  What is this?

A.  That's the ADR letter I sent to Tornado Cash.

Q.  And did you send that by email?

A.  Yes.

Q.  What was the email address you sent it to?

A.  Hello@tornado.cash.

Q.  Where did you get that email address?

A.  The Payback company provide me the letter and the email address.

Q.  And what was the date of this letter?

A.  April 18, 2022.

MR. REHN:  Your Honor, the government offers Exhibit 253.

MR. PATTON:  Continuing objection, your Honor.

THE COURT:  Subject to the defense's continuing objection, Government Exhibit 253 is admitted into evidence and

P7G1STO1                        Hanfeng Lin - Direct

may be shown to the jury.

(Government's Exhibit 253 received in evidence)

BY MR. REHN:

Q.  So Ms. Lin, now that we can all see the letter, or the email, I should say, do you see at the top there's a From address?

A.  Yes.

Q.  Is that your email address?

A.  Yes.

Q.  And then a little bit below that there's a To address?

A.  Yes.

Q.  Is that the hello@tornado.cash email you mentioned earlier?

A.  Yes.

Q.  And did you have an attachment to this email?

A.  Yes.

MR. REHN:  Mr. Iannuzzelli, could you please go to page 2 of this exhibit.

Q.  Ms. Lin, is this the attachment to the email that you sent?

A.  Yes.

MR. REHN:  And Mr. Iannuzzelli, could you please expand from "Dear Sir or Madam" down through the chart that's sort of around halfway down.

Q.  Ms. Lin, did you actually write this letter?

A.  No.  The Payback company prepared for me.

Q.  And then you were the one who sent it to the

hello@tornado.cash?

A. Yes.

Q. Could I ask you to read just the first part through NTU Capital of that second paragraph.

A. "Commencing on or around November 15, 2021, I fell victim to a multilayered scam operation orchestrated by NTU Capital Limited (the 'Fraudsters' or the 'Company')."

Q. I can stop you there. And do you see a little bit below that there is a little sentence that says, "the company is a client of yours, owner of wallet"?

A. Yes.

Q. And this was the letter you sent to that Tornado Cash email address?

A. Yes.

Q. And below that, do you see a string of letters and numbers there?

A. Yes.

Q. Do you know what that is?

A. That's partial of the trace report of the transaction ID and where my money went.

Q. And do you see below that there is a chart that has a little bit more information, including a date and something called a transaction hash and some other information?

A. Yes.

Q. Do you know what that chart represents?

P7G1STO1                        Hanfeng Lin - Cross

A.   That's a part of a trace report on—showing me where, when I transferred the money, from the fraudster's wallet it go to this Tornado Cash account.

Q.   Ms. Lin, after you sent this letter, did you hear anything back from Tornado Cash?

A.   No.

Q.   Did you get any email in response?

A.   Nothing.

Q.   Ms. Lin, were you ever able to locate the money that you lost?

A.   No.

Q.   Do you know where it went?

A.   No.

MR. REHN:  No further questions.

THE COURT:  Mr. Patton?

CROSS EXAMINATION

BY MR. PATTON:

Q.   Good morning, Ms. Lin.

A.   Good morning.

Q.   My name is David Patton.  I represent Roman Storm.

I just want to ask you initially, this scam started when this person who sort of eventually claimed to be your friend reached out to you on WhatsApp, right?

A.   Yes.

Q.   And the conversation started in English but then it changed

to I think what you described as traditional Chinese, correct?

A. Yes.

Q. You hadn't met this person before.

A. No.

Q. And the way he essentially scammed you was by sort of pretending to be a friend of yours, right?

A. Yes.

Q. The chat messages on WhatsApp that we looked at, those were between October and November of 2021, right?

A. That's right.

Q. And that's the same time as those bank transfers that we were also looking at, right?

A. Yes.

Q. And you said that you then reached out to an investigative firm of some sort and they told you that they believed the money had been sent to a number of different places, right?

A. Yes, they run a trace report which had all transactions, transaction ID, and then—and then the blockchain I think.

Q. And so in response to that information that you got, you sent the email we were just looking at to this hello@tornado.cash address, right?

A. Yes.

Q. And that was in April of 2022?

A. Yes.

Q. So roughly five months or so after the scam had occurred?

P7G1STO1                      Evans - Direct

A.  Yes.

Q.  And several places that you learned that your money went, that included Coinbase, right?

A.  Yes.

Q.  Binance?

A.  Yes.

Q.  FTX?

A.  Yes.

Q.  And unfortunately, you were never able to recover any of your money, correct?

A.  Correct.

MR. PATTON:  I have no further questions, your Honor.

THE COURT:  Thank you.

MR. REHN:  Nothing further, your Honor.

THE COURT:  Ms. Lin, you may step down.  Thank you very much.

Government will call its next witness, please.

MR. ARAD:  Government calls Joseph Evans, your Honor.

THE COURT:  All right.  Thank you.

(Witness sworn)

THE DEPUTY CLERK:  Please state and spell your name for the record.  Be seated and speak into the mic.

THE WITNESS:  Joseph B. Evans.

JOSEPH B. EVANS,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ARAD:

Q.  Good morning, Mr. Evans.

A.  Good morning.

Q.  Are you testifying pursuant to a subpoena today?

A.  I am.

Q.  What is your profession, sir?

A.  I'm a lawyer.

Q.  Where do you work?

A.  Law firm McDermott Will & Emery.

Q.  Where geographically is the office you work in?

A.  I work in──in Manhattan.

Q.  What's your position?

A.  I'm a partner at the law firm.

Q.  Approximately how long have you been a partner there?

A.  I've been a partner for seven years.

Q.  Is there a particular industry that you work for?

A.  Yes.  I only work for blockchain clients.  I only work with clients that either deal with crypto or have a blockchain-related business.

Q.  Did there come a time when you began working for a company called BitMart?

A.   Yes.

Q.   What does BitMart do?

A.   BitMart is a cryptocurrency exchange.  It's where one might go to buy or sell different types of cryptocurrencies.

Q.   Are you familiar with something called Tornado Cash?

A.   I am.

Q.   Did you represent BitMart in anything having to do with Tornado Cash?

A.   I did.

Q.   Could you please tell us about that.

A.   Sure.  BitMart suffered a hack in December of 2021 in which assets were taken from their platform, and we had conducted an investigation with the help of some crypto tracers, experts, that identified certain of those assets going to what we believed to be Tornado Cash.

          MR. KLEIN:  Your Honor.

          THE COURT:  Mr. Klein?

          MR. KLEIN:  Limiting instruction?

          THE COURT:  All right.  I'm going to give a shortened version since I just gave it to you a few moments ago.

          This evidence is being admitted only to explain why the witness or his client contacted Tornado Cash, and you may consider that evidence only in determining why the witness or his client contacted Tornado Cash.  You may not, however, consider it for the truth of whether any of these funds were in

P7G1STO1                     Evans - Direct

fact sent to Tornado Cash.  Thank you.

BY MR. ARAD:

Q.  After the third party gave you its conclusions, what, if anything, did you do to help your client with this hack?

A.  Two things.  One is that we sent a message to what we believed to be Tornado Cash and a couple of others, and we also spoke with the government.

MR. ARAD:  Mr. Iannuzzelli, please show the witness only what's been premarked for identification as Government Exhibit 1009.

Q.  Mr. Evans, do you recognize this document?

A.  I do.

Q.  What is it?

A.  This is an email that I sent to what I believed to be Tornado Cash on December 14, 2021.  These are one of the communications that I just referenced.

MR. ARAD:  Your Honor, the government offers this item into evidence as Government Exhibit 1009.

THE COURT:  Continuing objection, sir?

MR. KLEIN:  Continuing objection.

THE COURT:  All right.  Over the defense objection, Government Exhibit 1009 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1009 received in evidence)

BY MR. ARAD:

Q.   Sir, what's the date of this document?

A.   December 14, 2021.

MR. ARAD:  Mr. Iannuzzelli, would you please blow up the text on this document.

Q.   And which recipients are in the to field?

A.   Three email addresses, hello@peppersec.com, alexey@peppersec.com, and roman@peppersec.com.

Q.   And who are the recipients in the cc field?

A.   Todd Harrison and Sam Ashworth; those are colleagues of mine at the law firm.  James Daniels and Shaun MaGruder, which are members of the crypto tracing firm, at the time was called BlockTrace; and there's a legal@bitmart address, which is a listserv for the in-house legal team at BitMart.

Q.   Please read for the jury the text of this email, starting with "Tornado Cash" and ending with "thank you."

A.   "Tornado Cash, We represent BitMart.  I have attached a letter seeking information and a demand to freeze certain assets at Tornado Cash.  As stated in the attached letter, we request a response by no later than December 16, 2021, at 5 p.m. (EST).  Please let us know if you have any questions. Thank you."

MR. ARAD:  Mr. Iannuzzelli, we can take this down.

Please show the witness what's been premarked for identification as Government Exhibit 1005.

Q.   Mr. Evans, do you recognize this?

A.   I do.

Q.   What is it?

A.   This is a letter that I wrote and attached to that email to what I believed to be Tornado Cash.

         MR. ARAD:  Your Honor, the government offers this item into evidence as Government Exhibit 1005.

         THE COURT:  Over the defense's continued objection, Government Exhibit 1005 is admitted into evidence and may be shown to the jury.

         (Government's Exhibit 1005 received in evidence)

         MR. ARAD:  Mr. Iannuzzelli, will you please blow up from the date through "Dear Tornado Cash."

BY MR. ARAD:

Q.   Mr. Evans, what's the date of this document?

A.   December 14, 2021.

Q.   Who did you send it to?

A.   I addressed it to Tornado Cash care of Roman Storm, Roman Semenov, Alexey Pertsev, and Nikita Dementev.

         MR. ARAD:  Mr. Iannuzzelli, please blow up the portion of this document that begins "Dear Tornado Cash" and ends at the final word of the first paragraph.

Q.   Mr. Evans, please read this portion of the document for us.

A.   "Dear Tornado Cash:  We represent BitMart in connection with the cybersecurity incident that occurred on December 4, 2021, and December 5, 2021 ('the incident') which resulted in

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

P7G1STO1                       Evans - Direct

the theft of a significant amount of cryptocurrency ('the

Assets').  The incident has been widely reported.  We have

conducted an investigation with the assistance of BlockTrace.

Our investigation to date reveals that certain assets were

transferred to Tornado Cash and that a significant portion of

those assets remain at Tornado Cash.  We demand that Tornado

Cash immediately take all possible action to ensure that the

assets are frozen and returned to BitMart.  We also request all

information associated with the assets."

Q.   Thank you, Mr. Evans.  Would you please summarize what you

intended to convey in this paragraph.

A.   Sure.  I was telling what I believed to be Tornado Cash

that my client BitMart had suffered a hack and that we thought

the assets were with them and so we wanted them to freeze them

and give them back to us, and we also asked them for

information.

          MR. ARAD:  Mr. Iannuzzelli, please expand the next

paragraph of the document.

Q.   Sir, would you please read this for us.

A.   "We have attached a spreadsheet containing the transaction

hashes, originating digital wallet addresses, and destination

wallet addresses reflecting BitMart assets being transferred

into Tornado Cash (the 'Transaction Data').  Between

December 4, 2021 and December 5, 2021, we have identified 211

separate 100 ETH (Ethereum) transactions and seven separate 10

ETH transactions originating from the following digital address (a digital address ending in 7091) to a digital address that is associated with Tornado Cash (ending in 6967).  We request the following information concerning the Transaction Data:"

Q.  Thank you.  Would you please summarize what you intended to convey here.

A.  Yeah.  We're telling Tornado Cash that we did an investigation and we have specific transactions that we believe that went to them.  It's one thing to say, we think you have our assets and another thing to say, here are the very specific transactions and the specific identifier of those transactions. I was communicating to them that we knew what we were looking for specifically.

MR. ARAD:  Mr. Iannuzzelli, please expand the items labeled 1-4 in this document, if you're able to get the four on the screen at the same time.  If not, 1-3 is fine.

Thank you.

Q.  Mr. Evans, would you please read item No. 1.

A.  "All IP addresses associated with the digital addresses contained in the transaction data."

Q.  And item No. 2?

A.  "All contact information, names, addresses, phone numbers, email addresses, IP addresses, email accounts, Telegram handles, and any other information associated with the digital addresses contained in the transaction data."

P7G1STO1                    Evans - Direct

Q.   Item No. 3, please?

A.   "All onboarding information, know-your-customer information, anti-money laundering information, and personally identifying information associated with the digital addresses contained in the transaction data."

Q.   You mentioned anti-money laundering.  Is that sometimes referred to as AML?

A.   Yes, AML is——

MR. KLEIN:  Objection, your Honor.

THE COURT:  I'll allow it, but there's been a lot of motion practice about this.

MR. ARAD:  Understood.

Q.   And No. 4, sir, would you please read that for us.

A.   "All transaction details, confirmations, records, reports, emails, messages, or any other records concerning the transaction hashes contained in the transaction data."

Q.   Could you please summarize the purpose of listing these items.

A.   Yes.  We were asking for a whole bunch of information, and the specific information that we're asking for here, if we got it, we think might have led us to identify the hacker, the person that stole the money, and so——or stole the cryptocurrency in this instance, and so this is the type of information that you might ask one to try to investigate and find the person that stole the money from——from BitMart.

P7G1STO1                     Evans - Direct

MR. ARAD:  Mr. Iannuzzelli, please expand the next paragraph of the document.

On the next page, sir.  Thank you.

Thank you.

Q.  Mr. Evans, would you please read this.

A.  "Based on our investigation it appears that Tornado Cash is in possession of stolen assets.  We ask that you freeze those assets immediately and return them to BitMart.  Time is of the essence.  There are ongoing investigations into the incident, and Tornado Cash can reasonably anticipate litigation. Accordingly, we demand that Tornado Cash immediately preserve all data, records, and other information concerning the transaction data and any of the information sought in the above information requests."

Q.  Could you please summarize this for us.

A.  Sure.  We're telling them again that we think that Tornado Cash is in possession of the stolen assets, we are asking for a freeze, we don't want them to leave, go anywhere else, and we're also asking that they don't delete any information that they have currently so that we may one day be able to get it even if they don't hand it over to us right away.

MR. ARAD:  Mr. Iannuzzelli, please expand the next paragraph.

Q.  Would you read this, please.

A.  "We request the information requested above and a response

to this letter by no later than close of business on December 16, 2021 at 5 p.m. (ET).  In connection with this letter, we reserve all rights and waive none.  Please feel free to contact me with any questions."

Q.  Thank you, sir.

MR. ARAD:  Mr. Iannuzzelli, will you please show the witness, and the witness only, what's been premarked as Government Exhibit 1001.

Q.  Mr. Evans, do you recognize this?

A.  I do.

Q.  What is it?

A.  This is an Excel file that we sent along with the letter, and my letter referred to something called transaction data.  This is what we were referring to.  And so it was a series of transaction hashes is what they're called, and other information that would tell the recipient which transactions specifically we're asking about.

MR. ARAD:  Your Honor, the government offers what's been marked as Government Exhibit 1001 into evidence.

THE COURT:  I understand the defense is objecting to it.  It is admitted over the defense objection and may be shown to the jury.

(Government's Exhibit 1001 received in evidence)

BY MR. ARAD:

Q.  I'd like to go through these columns one by one.

P7G1STO1                    Evans - Direct

A.   Sure.

Q.   What is TXID?

A.   TXID here is a shorthand for something called transaction hash.  Some people call it transaction ID.  Every blockchain transaction——in this case, it's on the Ethereum blockchain——has what's called a transaction hash, a series of numbers that identify one specific transaction, and so on the column here, A, Transaction ID, each of those are specific transactions in which ETH was transferred from one place to another.

Q.   And the dates in column B, what do they signify?

A.   The date of the transaction.

Q.   How about the block in column C?

A.   Transactions on the blockchain happen in what are called blocks, and so each transaction of the blockchain happens in a block and they're tied to the next one, so that's called "block" "chain."  The block identifies a specific block that these transactions on the left occurred in.  There would be many transactions per block, but that's what the block is identifying, the number that identifies the block that contains the transaction hash on column A.

            THE COURT:  Can I ask you to speak a little closer to the microphone and a little bit slower.

            THE WITNESS:  Sure.

            THE COURT:  Thank you so much.

Q.   What about the next column, Mr. Evans, column D?

P7G1STO1                       Evans - Direct

A.   So the column labeled From, what the numbers and letters there are identifying is a digital address.  The digital address identifies the digital wallet in which the assets came from.

Q.   And the next column, column E?

A.   It's labeled To, and it's also identifying a digital address, and that digital address is identifying where we trace the assets going to.  In this case that—that column E, the To line, ending in 6967, is what we believe to be a digital address associated with Tornado Cash.

Q.   And lastly, what about column F?

A.   Now these were all Ethereum transactions and so each one of these numbers just identifies how much Ethereum was associated with each transaction.  There were the series of a hundred, and some ten, and so it's that many ETH.  That's not the U.S. dollar amount, that's the number of ETH.  I think it was around a little over $3,000 each at the time.

Q.   Mr. Evans, around this time approximately how much in dollars was 100 ETH worth?

A.   Over 300,000, I think.  I don't have the exact date, time. I think it was around $3,300 at the time, per ETH.

Q.   Just to clarify, is that amount for the entire spreadsheet or just one line in the spreadsheet?

A.   One line, yeah.  So each—each 100 is a transaction of a hundred Ethereum.  At the time I believe it was around $3,200,

P7G1STO1                         Evans - Direct

$3,300 each, and so each one of these lines is a separate 100-ETH transaction.

MR. ARAD:  Mr. Iannuzzelli, please show the witness only what's been premarked for identification as Government Exhibit 1011.

Q.  Mr. Evans, do you recognize this document?

A.  I do.

Q.  What is it?

A.  This is the response that I received from the email that I sent to what I believed to be Tornado Cash, and so I got this on December 15, 2021, so the response to my email and the attached letter and the attached Excel file.

MR. ARAD:  Your Honor, the government offers this item into evidence as Government Exhibit 1011.

THE COURT:  Subject to the continuing defense objection, Government Exhibit 1011 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1011 received in evidence)

MR. ARAD:  Mr. Iannuzzelli, can you please expand the From line.

BY MR. ARAD:

Q.  Mr. Evans, what does it say in the From line of this email?

A.  From Roman Storm.

MR. ARAD:  Mr. Iannuzzelli, can you please expand the paragraph that begins, "Our company."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7G1STO1                        Evans - Direct

BY MR. ARAD:

Q.   And Mr. Evans, will you please read this.

A.   "Our company does not have any ability to affect any change or take any action with respect to the Tornado Cash protocol—it is a decentralized software protocol that no one entity or actor can control.  For that reason, we are unable to assist with respect to any issues relating to the Tornado Cash protocol."

Q.   Did Tornado Cash assist?

A.   No.

        MR. ARAD:  Mr. Iannuzzelli, we can take this down.

Q.   Sir, when you corresponded with Tornado Cash as we just saw, where were you located?

A.   You mean personally?

Q.   Yes.

A.   I was actually located in my apartment in Manhattan.

Q.   Manhattan, New York?

A.   Yes.

Q.   Sir, what if any other ways, aside from email, did you try to contact Tornado Cash?

A.   I also contacted them via Telegram.  It's a messaging application that's—

        MR. ARAD:  Mr. Iannuzzelli, please show the witness what's been premarked for identification as Government Exhibit 1006.

P7G1STO1                         Evans - Direct

And please expand the texts.

Exactly.  Thank you.

Q.  Do you recognize this?

A.  I do.

Q.  What is it?

A.  This is a Telegram chat that I sent to what I thought was Tornado Cash, and it's also attaching the same letter and transaction data that I attached to my email.

MR. ARAD:  Your Honor, the government offers this item into evidence as Government Exhibit 1006.

THE COURT:  Subject to defense's continuing objection, Government Exhibit 1006 is admitted into the evidence and may be shown to the jury.

(Government's Exhibit 1006 received in evidence)

BY MR. ARAD:

Q.  Mr. Evans, could you please read the bubble containing the date and the bubble underneath it.

A.  "December 14.  Joe Evans created the group BitMart, McDermott Will & Emery, Tornado Cash."

Q.  And will you please read the message underneath that.

A.  "Tornado Cash, this is Joseph Evans from McDermott Will & Emery.  We represent BitMart.  Please see the attached correspondence.  Feel free to ask me any questions here via email or by cell."

Q.  Is this the same message that you sent by email?

A.   Yes.  Nearly identical if not exactly identical.

Q.   Do you see the next bubble that has two lines of text in it?  What does that convey?

A.   Well, there's attachments referenced, which is the letter and the transaction data that I attached to the email, and the next bubble says, "Poma added Roman Storm," and there's a parens that says, "(Never send me your private notes, keys, or funds)," and then there's another bubble that says, "Poma added Alexey Pertsev."

Q.   What is your understanding of who Poma is?

A.   I didn't know specifically.  It was a—it was a—there was a—a screen name that was given to me as one of the—one of the people that founded or was associated with Tornado Cash.

Q.   To your knowledge—well, would you please read the—to your knowledge did Tornado Cash do anything at all to help your client?

A.   Not that I know of, no.

        MR. ARAD:  Mr. Iannuzzelli, please show the witness what's been premarked for identification as Government Exhibit 2070.

Q.   I'll give you a moment to read the document, sir.

        Do you recognize it?

A.   I do.

Q.   What is it?

A.   It looks to be a Cellebrite extraction report.  Cellebrite

P7G1STO1                    Evans - Direct

is a forensic tool that pulls data out of phones, and this looks to be the same message that we just looked at on the Telegram screenshot that we looked at previously.

MR. ARAD:  Your Honor, the government offers Government Exhibit 2070 into evidence.

THE COURT:  Subject to the defense's continuing objection, Government Exhibit 2070 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2070 received in evidence)

MR. ARAD:  Mr. Iannuzzelli, please display this document for the jury on the right side of the screen and Government Exhibit 1006 on the left.

And please expand the one on the left.

BY MR. ARAD:

Q.  Mr. Evans, have you read both of these documents in their entirety?

A.  I have now, yes.

Q.  I'm sorry?

A.  Yes.

Q.  Are they the same substantively?

A.  The message is the same.

Q.  Do you see the time stamp that says 6:39 p.m. on the left side?

A.  I do.

MR. ARAD:  Mr. Iannuzzelli, will you please expand the

P7G1STO1                    Evans - Direct

time stamp on the blue bubble on the right side.

Q.  Do you see that that says 11:39:19 p.m. UTC?

A.  I do.

Q.  What is UTC?

A.  Uniform Time Code, I think?

Q.  Is it a different time zone?

A.  I know it as UTC, but I don't know really.

Q.  Which time zone were you in when you were sending this message?

A.  I was Eastern.  I was in Manhattan.

Q.  So could the time zones account for the time difference in these two?

        The question is whether it's possible.

A.  Yeah, it looks like it's possible.  Seems to be the same message at 11:39 and 6:39.  I guess UTC is five hours ahead.

        MR. ARAD:  Mr. Iannuzzelli, we can take this down.

Q.  Mr. Evans, what else, if anything, did you do to get help for BitMart with this hack?

A.  We reached out to a couple of other parties that we had—we had traced assets to.  We also interfaced with the government, and specifically the FBI.

        MR. ARAD:  Mr. Iannuzzelli, please display what's been premarked Government Exhibit 1008 for the witness.

Q.  Do you recognize this document?

A.  I do.

P7G1STO1                    Evans - Direct

Q.   What is it?

A.   This is an email that I sent on December 14, 2021, to two members of the FBI, Justin Vallese and Christopher Wong.

          MR. ARAD:  Your Honor, the government offers Government Exhibit 1008 into evidence.

          THE COURT:  Subject to the defense's continuing objection, Government Exhibit 1008 is admitted into evidence and may be shown to the jury.

          (Government's Exhibit 1008 received in evidence)

          MR. ARAD:  Mr. Iannuzzelli, will you please blow up from From to Attachments.

BY MR. ARAD:

Q.   Sir, whose name is in the From field?

A.   That's mine, Joseph Evans.

Q.   And in the To field?

A.   Justin Vallese and Christopher Wong, who are FBI agents.

          MR. ARAD:  Mr. Iannuzzelli, please scroll down to the second page of the document.  And please expand from the From line down to the end of the text.

Q.   Mr. Evans, was this the first message in this email chain?

A.   In this email chain, yes.

Q.   Who sent it?

A.   Justin Vallese, the FBI agent.

Q.   Please read this email from "Hello Joe" to "All the best."

A.   "Hello Joe, hope that you are doing well.  I wanted to

check in to see if there was anything you needed.  Please let me know if there is anything we can assist you with.

"Also, Special Agent Chris Wong in Chicago Office has been engaged with Binance on BitMart funds frozen at Binance—wanted to make the connection here just for your awareness. All the best."

MR. ARAD:  Mr. Iannuzzelli, please scroll up to the top of the document.

MR. KLEIN:  Your Honor, may we have a sidebar?

THE COURT:  Yes.  Sidebar, please.

(Continued on next page)

P7G5sto2                    EVANS - DIRECT

(At side bar)

THE COURT:  Mr. Klein.

MR. KLEIN:  Your Honor, maybe I misunderstood your prior ruling, but things that we are allowing in were things that the witness had received related to Tornado Cash.  Now we are in another sublayer of, like, this has gone to the FBI, only part of it relates to Tornado Cash.  So they're basically putting in, you know, when a lawyer for a company wrote to the FBI about multiple different things, it is not directly all tied to Tornado Cash.  So, I just think this is compounding the problem of our prior objection which you ruled on.

THE COURT:  Yes.

MR. KLEIN:  But I think this is another layer of it.

THE COURT:  How so?

MR. KLEIN:  Because it is one thing if they write to Tornado Cash and say I learned about your assets going here, and they're writing to TornadoCash.com or who they think is Mr. Storm.  Now they are just writing a third-party about it.  They're not even writing to Mr. Storm, who they think is Mr. Storm or Tornado Cash -- hello@TornadoCash.  So this is just -- this would allow anybody else to write about this.

THE COURT:  Well, all right.

Mr. Arad?

MR. ARAD:  This is the first time the defense has raised this objection, your Honor.

The relevance of this document is that it shows whether the witness -- it shows the witness' understanding of what Tornado Cash was going to do to help, and in particular as that relates to what other entities that were also involved in implicating the hack were willing to do.  The witness' understanding of that explains whether he took any further action which is directly relevant to his testimony.

THE COURT:  All right.  I will let in this.  I overrule your objection.

While we are here, I want to mention our prior side bar.  Mr. Patton, I am sure you didn't mean to misremember my prior ruling, and listening to you I misremembered my prior ruling.  I can read it to the parties, my law clerk pulled it out of the transcript, but I did allow one question as to whether it was life savings, college savings, things of that nature.  I wouldn't allow, I said, the collateral consequences which was the:  I need therapy afterwards.

MR. PATTON:  No, no, no.  Your Honor, I then followed up.  That was earlier in the conversation.  I then followed up and asked you to reconsider that, which you did and said, OK, I will allow a single question.

THE COURT:  On substantiality?

MR. PATTON:  A single yes or no question.

THE COURT:  I want to see that.

MR. REHN:  That is our understanding too, your Honor,

P7G5sto2                         EVANS - DIRECT

and I asked the question as you had approved it.

THE COURT:  That's good.  I appreciate that.  Now we all understand it.  Thank you so much and I appreciate the correction.

OK, we are good, but friends, we can't have sidebars. we are going to lose our jury so fewer side bars, please.

(In open court)

THE COURT:  Counsel, you may inquire.

MR. ARAD:  Mr. Iannuzzelli, please scroll back up to the top of the document?  Please expand from "Justin" to "our investigation," which is the end of the second to last sentence.

BY MR. ARAD:

Q.  Sir, would you please read this paragraph?

A.  Justin, thank you for reaching out.  It is nice to meet you, Chris.  I would like to introduce you to Shawn Magruder and James Daniels from BlockTrace who are working with MWE on this investigation.

MWE is McDermott Will & Emery, the law firm that I work for.

We are very interested in learning about the FBI's findings concerning Binance.  It sounds like there has been good progress on your end.  If there is any information that you can share about Binance, the company is obviously eager to hear about any updates.  In particular, if you can share the transaction hashes that you see going into Binance and the deposit addresses in which assets were received at Binance, that would greatly assist in our investigation.  We have some updates on our investigation to --

MR. ARAD:  Mr. Iannuzzelli, would you please expand just the last two lines of that paragraph?

Q.   And Mr. Evans if you can read the last sentence in full?

A.   We have some updates on our investigation to date that we wanted to share with you.

MR. ARAD:  Mr. Iannuzzelli, can you please expand the portion of the next paragraph where the first word on the line is "address" to the end of the paragraph?  Go down a little bit with your cursor where the first word on the line is "address".  There you are.

Q.   Sir, would you please read, beginning with the beginning of Tornado Cash?

A.   Tornado Cash has not provided any information.  We have contact information for Tornado Cash (via Telegram), which appears to be associated with the following persons:  Roman Storm, Roman Semenov, Alexey Pertsev, and Nikita Dementev.  Any assistance that you can provide in getting information/freezing assets at Tornado Cash would be extremely helpful.  We have attached the transaction data that is relevant to Tornado Cash.

MR. ARAD:  Mr. Iannuzzelli, you can minimize this expansion, and then expend the last three lines of the next paragraph, the 1inch paragraph.

Q.   Mr. Evans, can you please read beginning with:  1inch refuses?

A.   1inch refuses to provide information without a request from law enforcement but agreed to preserve.  Any assistance in obtaining information from 1inch would be very helpful.  We

P7G5sto2                        EVANS - DIRECT

have attached the transaction data that is relevant to 1inch.

Q.   What is your understanding of the circumstances under which 1inch would provide information?

A.   My understanding was that 1inch --

THE COURT:   The objection is overruled but this is the end of this part of the inquiry.

MR. ARAD:   OK.

THE COURT:   Go ahead, sir.

A.   The 1inch required a law enforcement request to give information to them.

Q.   Is your understanding that Tornado Cash would have provided information with the law enforcement request?

MR. KLEIN:   Objection.

THE COURT:   I did say this was the end of the discussion.   Thank you.

MR. ARAD:   You can take this down, Mr. Iannuzzelli.

Q.   Does Tornado Cash ever provide any information with respect to this hack?

A.   Other than the communications that we read, nothing.

Q.   Mr. Evans, do you represent victims of Tornado Cash other than BitMart?

A.   I do.

MR. ARAD:   No further questions.

THE COURT:   Thank you.

Mr. Klein?

P7G5sto2                          Evans - Cross

MR. KLEIN:  Yes, your Honor.

CROSS-EXAMINATION

BY MR. KLEIN:

Q.  Good morning, Mr. Evans.

A.  Good morning.

Q.  You work at a law firm called McDermott?

A.  I do.

Q.  Tell me about your experience with the cryptocurrency, in brief.

A.  I have been working in the cryptocurrency industry since 2012.  I have a practice that only works for blockchain companies.  We have about 22 lawyers that just do this kind of work.

Q.  I am going to turn your attention to, first, your Government Exhibit 105.  Give us a second to pull it up?

A.  It is on the screen.

Q.  You can see it?

A.  Yes.

Q.  Great.

So you wrote this letter in December 2021?

A.  That's right.

Q.  And in this letter you requested a bunch of information from Mr. Storm, Mr. Semenov, Mr. Pertsev, and someone named Mr. Dementev?

A.  That's right.

P7G5sto2                          Evans - Cross

Q.   You don't know if they had any of that information, do you?

A.   No.

Q.   Now I'm going to turn your attention to what's marked as Government Exhibit 1011.  Can you see that?

A.   I can.

Q.   The prosecutor spoke to you about this for a moment and you -- this is an e-mail chain you had; right?  You wrote an e-mail to Roman Storm?  Or you got a response from Roman Storm?

A.   Yeah, I sent the e-mail on December 14 and served a response on December 15.

Q.   And he wrote aback:  Our company does not have -- blah, blah, blah.  Right?

A.   Yes.

Q.   Do you see just below that:  Sleep well with audit by Peppersec?

A.   I do.

Q.   Peppersec could be the company he is referring to; right?

          MR. ARAD:  Objection.

          THE COURT:  I'm not going to have the witness speculate.  The witness sent the e-mail to whomever he sent the e-mail to.  No speculation.

          If you know, sir, you can answer but I don't want you speculating.  That's my point?

          THE WITNESS:  I can't answer without speculating.

          THE COURT:  Thank you.

P7G5sto2                     Evans - Cross

Move on, counsel.

BY MR. KLEIN:

Q.  Let's turn back -- let's keep on this for a second.

So, Mr. Storm wrote back:  Our company does not have any ability to affect any change or take any action with respect to the Tornado Cash protocol; right?

A.  That's what it says.

Q.  You didn't have any reason not to believe him at that time, did you?

A.  No.

Q.  He also wrote:  It is a decentralized software protocol that no one entity or actor can control.

Do you know what decentralized is?

A.  I do.

Q.  What is it?

A.  A decentralized protocol is one in which no one person or tight knit group of people or entity controls.  It means that there is not one person in charge or one company in charge.  It is decentralized among a whole bunch of different people that are participating in that particular protocol.

THE COURT:  Mr. Evans, can I ask you to get closer to the microphone?

THE WITNESS:  Sorry.

THE COURT:  Just to make sure we can all hear you, sir.

P7G5sto2                        Evans - Cross

MR. KLEIN:  Your Honor, do you want him to repeat that?

THE COURT:  No.

BY MR. KLEIN:

Q.  Then next he writes:  For that reason, we are unable to assist with respect to any issues relating to the Tornado Cash protocol.

You had no reason not to believe that at the time either, did you?

A.  I had no reason not to believe that.

Q.  Now I'm going to direct your attention to Government Exhibit 1006 and this is the text exchange you talked about?

A.  Yes, the Telegram exchange.

Q.  And what is Telegram?

A.  Telegram is a messaging application.  It is pretty popular and common among the cryptocurrency industry.  It is similar to a WhatsApp or another type of messaging application.

Q.  And it is encrypted; right?

A.  I believe it is.

Q.  And what does encrypted mean?

A.  Encrypted is some level of security protection for those particular messages but I don't -- I'm not an expert on that protocol.

Q.  So you got this, you sent a Telegram message and you got a response which is at the bottom.  This response is similar to

P7G5sto2                    Evans - Cross

the one you got in the e-mail; correct?

A.   It is.   Nearly identical, if not exactly identical.

Q.   And again, this person wrote back:  Our company does not have any ability to affect any change or take any action with respect to the Tornado Cash protocol.

A.   Yes, that's what it says.

Q.   And if it was a decentralized protocol that would be correct?

THE COURT:  I'm sorry.  May I have the question again please, sir?

Q.   If it was a decentralized protocol that would be correct; right?

MR. ARAD:  Objection.

THE COURT:  I don't know that this witness is competent to speak to that issue.

Sir, do you know?

THE WITNESS:  I do.

THE COURT:  You may answer but into the microphone please, sir.

THE WITNESS:  If it is a truly decentralized protocol, a company wouldn't have the ability to change or take action.

BY MR. KLEIN:

Q.   And again, with this text, you had no reason not to believe the response here at the time; did you?

A.   I did not.

P7G5sto2                          Evans - Cross

Q.   Let's talk about your inquiries.

You mentioned you engaged with other companies about this matter; right?

A.   A few, yes.

Q.   You wrote other similar types of inquiry letters or what lawyers might call demand letters?

A.   I did.

Q.   Similar to the one you wrote that we discussed earlier?

A.   Yes.

Q.   And you reached out to 1inch?

A.   I did.

Q.   Did they respond?

A.   Only that they required a law enforcement request.  I actually don't think that response came directly to me but I came to know that they would only respond to law enforcement requests.

Q.   They never responded directly to you?

A.   They never responded directly to me.

Q.   You reached out to AWS?

A.   I did; Amazon Web Services.  And did not receive a response.

Q.   You reached out to Cloudflare?

A.   I did.

Q.   They didn't respond either, did they?

A.   Did not.

P7G5sto2                    Evans - Redirect

Q.  Reached out to Binance?

A.  I did.

Q.  They didn't give you a substantive response?

A.  No.

          MR. KLEIN:  Nothing further.

          THE COURT:  Thank you.

          Redirect?  Brief redirect, Mr. Arad.

          MR. ARAD:  I will be brief.

          THE COURT:  Thank you.

REDIRECT EXAMINATION

BY MR. ARAD:

Q.  Hello again, sir.

A.  Hi.

Q.  You testified that you didn't know whether Tornado Cash was a truly decentralized protocol?

A.  That's correct.  I didn't know one way or the other.

Q.  What was your understanding of whether 1inch was willing to provide any information?

A.  My understanding was that they would only provide information if it was a law enforcement request.

Q.  What about Cloudflare and Amazon Web Services; would they provide information with a law enforcement request?

A.  I don't know.

          MR. ARAD:  Mr. Iannuzzelli, please display Government Exhibit 1008 and please expand the last paragraph.  Please

highlight the two sentences that begin:  We understand.

Q.  Please read this?

A.  We understand that these entities will not provide information without a law enforcement request or subpoena.  Any assistance obtaining this information would be helpful.

Q.  Was it your understanding that Amazon Web Services and Cloudflare would provide information with a law enforcement request?

A.  I say in this e-mail that's my understanding.  And I believe what happened was we looked at their terms and conditions on the website and we had some correspondence with our investigator with some prior experiences, but this was my experience at the time.

Q.  The answer is yes?

A.  To whether that was my understanding at the time, yes.

           MR. ARAD:  Yes.

           Thank you.  No further questions.

           THE COURT:  Thank you.

           Sir, you may step down.

           MR. KLEIN:  Your Honor, can I have one quick follow-up?

           THE COURT:  One, sir.

RECROSS EXAMINATION

BY MR. KLEIN:

Q.  Mr. Evans, the only people to directly respond to you in

any way that we talked about were in the e-mails and Telegram messages that we talked about from Mr. Storm; correct?

A.   That's correct.

MR. KLEIN:   Thank you.

THE COURT:   Step down, sir.   Thank you.

THE WITNESS:   Thank you.

(Witness excused)

THE COURT:   Government's next witness, please?

MR. MOSLEY:   Government calls Andy Ho.

SYVIET ANH HO,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

THE DEPUTY CLERK:   Please state and spell your first name for the record.

THE WITNESS:   My name is Ho Syviet Anh.   H-O, S-Y-V-I-E-T, A-N-H.

DIRECT EXAMINATION

BY MR. MOSLEY:

Q.   Good morning, Mr. Ho?

A.   Yes.   I also go by Andy.

Q.   For the purposes of our conversation today, will it be acceptable for me to call you Mr. Ho, or in some cases Andy?

A.   Yes, please.

Q.   Did you get a subpoena to testify today Mr. Ho?

A.   Yes.

P7G5sto2                          Ho - Direct

Q.   Do you have an understanding of what that subpoena requires?

A.   So it requires me to represent my company, Sky Mavis, to provide factual information about what happened with the Ronin Bridge hack in 2022.

Q.   Mr. Ho, did the government promise you anything in exchange for your testimony today?

A.   No.

Q.   Mr. Ho, where do you currently live?

A.   I am currently living in Ho Chi Minh City, Vietnam.

Q.   How far did you get in school, Mr. Ho?

A.   I got a bachelors degree in computer science from Nanyang Technological University, Singapore.  I graduated in 2016.

Q.   You testified to this a little bit earlier but what do you do for a living?

A.   I am the CTO and co-founder of Sky Mavis.

Q.   What is that a CTO?

A.   CTO is chief technology officer.

Q.   And what are your duties?

A.   So, my duty is to run the engineering department, manage the engineers, and also participate in high-level strategic decisions of the company.

Q.   Directing your attention to late March of 2022, were you the CTO of Sky Mavis then?

A.   Yes.

Q.   Were your duties at that time the same as they are now?

A.   Yes.

Q.   Startin in March of 2022, what did Sky Mavis do?

A.   In March 2022 we operate things, a blockchain gaming project called Axie Infinity, and we also run, develop the infrastructure for a blockchain called Ronin Network.

Q.   I'm sorry.  Could you repeat that?  Can I get a readback on that.  Can you repeat the last answer?

A.   We were developing the infrastructure for a blockchain called Ronin Network.

THE COURT:  Did you say, sir, it was a block chain gambling project?

THE WITNESS:  Blockchain gaming.

THE COURT:  Blockchain gaming.  Excuse me.  I beg your pardon.  Thank you.

Q.   Mr. Ho, what is Axie Infinity?

A.   So Axie Infinity is an NFT-based development project run on Ronin Network.

Q.   Mr. Ho, what is the Ronin Network?

A.   So, Ronin Network is a blockchain created specifically for gaming experience.

Q.   Mr. Ho, what is an NFT?

A.   NFT stands for non-fungible tokens.  It's like a certificate that you own something unique.  So non-fungible is one of a kind, tokens mean that it is stored on blockchain.

Q.   In March 2022, did you have any experience with cryptocurrency?

A.   Yes.

Q.   And in March of 2022, were you familiar with blockchain explorers?

A.   Yes.

Q.   Mr. Ho, how does the Axie Infinity game work?

A.   So, Axie Infinity has some smart contract that is deploying on Ronin Network and people need to buy some Axie from the marketplace and they can use the Axie on the game to play and to earn some tokens by playing the game.

Q.   Mr. Ho, can you actually -- I will clean this up with an exhibit, your Honor.

        MR. MOSLEY:  Mr. Iannuzzelli, can you show the witness what is marked Government Exhibit 950?

Q.   Mr. Ho, can you see that on the screen?

A.   Yes.

Q.   What is it?

A.   It is a banner that we used to promote for marketing purposes for the game.

Q.   When you say it is a banner, is that something that would appear on a website?

A.   Yes.

Q.   Is that something that would appear on the website if someone was trying to play the Axie game?

A.   Yes.

Q.   Is what you are seeing an accurate representation of what someone would have seen going onto the website?

A.   Yes.

          MR. MOSLEY:  Offering for admission Government's 950.

          MS. AXEL:  No objection.

          THE COURT:  Government Exhibit 950 is admitted into evidence and may be shown to the jury.

          (Government's Exhibit 950 received in evidence)

BY MR. MOSLEY:

Q.   Mr. Ho, what is the words in the middle of the banner?

A.   I'm sorry?  Can you repeat the question?

Q.   I will ask you a different question.  The game is called Axie Infinity; correct?

A.   Yes.

Q.   Drawing your attention to the little, for the lack of a better word, creatures on the sides of the words; what are those?

A.   So that, they are some mascots, Axie characters that we give them the look of the Axies that players can own and interact with within the game.

Q.   With respect to the game, are Axies NFTs?

A.   Yes.

          MR. MOSLEY:  Mr. Iannuzzelli, you can take down Government's 950.

Q.   If somebody wanted to play the Axie game, how would they have gone about doing it?

A.   Normally they will need some cryptocurrency and they will use the cryptocurrency to buy the Axie on the marketplace, and then they can use the Axie in the game to play.

Q.   If I have my own cryptocurrency can I use it in the game?

A.   If you have your own cryptocurrency it depends on the cryptocurrencies that you have.  Some of the currency can be used on Axie marketplace to play, to buy the Axie character. Some of the cryptocurrency can be used to pay for the fee when you interact with the Axie smart contract.

Q.   If I wanted to get, if a person had Ethereum and they wanted to use it to play that game, how would they do that?

A.   Normally if you have Ethereum on Ethereum blockchain, you will need to move your cryptocurrency from Ethereum to Ronin before you can use that to buy the Axie on the marketplace.

Q.   What would the person use to move Ethereum to the Ronin Network?

A.   So, the player will interact with a system called Ronin Bridge that facilitates the moving of Ethereum from Ethereum blockchain to Ronin.

Q.   Is cryptocurrency stored in the game system somewhere?

A.   Can you repeat the question?

Q.   Is cryptocurrency stored on the game system someplace?

A.   The cryptocurrency is generally stored on the blockchain so

P7G5sto2                         Ho - Direct

it is not stored on the game server.

Q.   In March of 2022 could somebody withdraw cryptocurrency from the game?

A.   Withdraw?

Q.   Yes.

A.   Yes.

Q.   How would they do that?

A.   So, when you deposit, which means that you move the cryptocurrency from Ethereum to Ronin, and then you can spend the cryptocurrency to buy and play and trade Axie, and then when you are done and you want to move your cryptocurrency from Ronin back to Ethereum, you again interact with the Ronin Bridge by initiating a withdrawal transaction.

Q.   When was the Ronin Network created?

A.   So, Ronin Network was developed from 2020 and it went live in 2021.

Q.   We talked about you just testified as to withdrawals.  How would a person go about doing a withdrawal?

A.   So, normally you have some cryptocurrency on Ronin Network and you send a transaction from your personal account to the Ronin Network Bridge, and then the validators of Ronin Network will provide the authorizations that can be used to release your token on Ethereum.

Q.   Is a validator required to do a withdrawal from the game?

A.   From Ronin Network to Ethereum the validator is required.

P7G5sto2                        Ho - Direct

Q.   Are withdrawals shown on the blockchain?

A.   The withdrawal transaction is going to be shown on the block explorer.

Q.   And what would that look like?

A.   So, when you initiate the transaction sending your cryptocurrency from your personal wallet to the Ronin Bridge smart contract, it will be deployed on the block explorer and the block explorer will deploy your transaction and you can use block explorer to view it.

Q.   In late March of 2022, do you remember how much crypto was stored in the game?

A.   On Ronin Network the amount of cryptocurrency that people deposit from Ethereum to Ronin was more than 170,000 ETH and some USDC stable coin.

Q.   Do you know how much in USDC was stored in the Ronin Network?

A.   So it varies over time but around 25 million USDC.

Q.   Do you know what the value of that was in dollars in March of 2022?

A.   So the Ethereum was valued at around $600 million dollars, and 25 million USDC was valued at $25 million.

Q.   In late March of 2022 were you made aware of any problems with the Ronin Network?

A.   Yes.

Q.   About what were you made aware?

P7G5sto2                          Ho - Direct

A.   In the morning of 29 March, 2022.

Q.   What did you learn?

A.   So I received a message on our internal channel from my co-founder Alexander that he notified me that someone tried to withdraw 5,000 ETH but he couldn't.

Q.   Knowing what you knew about the Ronin Network at the time, should that person have been able to make the withdrawal?

A.   Yes.  If everything worked as designed it should be able to facilitate that transaction.

Q.   What, if anything, did you do after you heard this, after you received this news?

A.   I went on to check the bridge and I found out that the amount of Ethereum on the Ronin Bridge was less than 5,000 ETH to facilitate that transaction.

Q.   I'm sorry, Mr. Ho.  Can you repeat that answer?  I didn't quite hear it.

A.   So, I went to check on the smart contract on Ethereum of the Ronin Bridge and the balance of Ethereum on the smart contract was less than 5,000 Ethereum.  That is why the transaction couldn't happen.

Q.   You said there was -- do you know how much was withdrawn from the Ronin Network?

A.   I'm sorry.  Are you asking about that particular transaction or?

Q.   You said when you would -- I believe that you testified

that you had seen what the balance was left on the Ronin Network.  Do you know how much was withdrawn?

A.  There was some more than 170,000 ETH withdrawn from the Ronin Network Bridge.

Q.  The more than 170,000 ETH that was withdrawn from the Bridge, do you know how much that was worth in U.S. dollars at the time?

A.  At that time it's worth around 600 million U.S. dollars.

Q.  In addition to the around 600 million U.S. dollars that was withdrawn, was there any other cryptocurrency that was withdrawn?

A.  That there was 25.5 million USDCs that were withdrawn from the Bridge.

Q.  Based on your earlier testimony, was that worth around $25.5 million?

A.  Yes.

Q.  Did you determine -- what did you do after you made this discovery?

A.  So, I discovered that the balance was not enough for the withdrawal transaction and I determined that there was something wrong, and I tried to look for some withdrawals that should not happen and I found two transactions that was not authorized.

Q.  How do you know those transactions were not authorized?

A.  So, normally, if you have normal authorized transactions

P7G5sto2                        Ho - Direct

you have two transactions; one from Ronin Network, which I described earlier that moved the cryptocurrency from your wallet to the Bridge, and then another transaction from the smart contract on Ethereum to your on Ethereum, and for those two transactions there was no Ronin Network transaction, corresponding transaction on Ronin Network, only on Ethereum.

Q.  So after you discovered this what, if anything, did you do?

A.  So, when I discovered this I determined that we got hacked and I immediately notified my CEO and other co-founders.

Q.  Did you do anything else with respect to this hack?

A.  After I -- after the founder group was notified we notified the creditors and they brought in security experts and we engaged with some security firm to have -- to work with the incident response.

Q.  Did you undertake an investigation to find out what happened?

A.  Yes.

Q.  Did you participate in that investigation?

A.  Yes.

Q.  During the course of that investigation, did you review documents?

A.  Yes.

Q.  I want to show the witness what has been marked Government Exhibit 951.

THE COURT:  Counsel, just keep in mind at some point

P7G5sto2                        Ho - Direct

we -- I would like to take the morning break with the jury.  I don't know if you are moving into a new topic area.

          MR. MOSLEY:  This might be a good time because we are sort of starting one, but I think this is a good time.

          THE COURT:  Let's take our morning break now.  Thank you very much.

          Let me remind members of the jury, do not discuss this case with each other or anyone else.  Keep an open mind until all of the evidence is in.  And, yes, my friends in the front row, you will be repeating it to me after a while.

          We will see you in about 10 minutes.  Thank you very much.

          All rise.

          (Continued on next page)

P7G5sto2                         Ho - Direct

(Jury not present)

THE COURT:  Parties are welcome to sit down.  I am asking for logistical purposes:  Do we believe this witness will go through until lunch?

MR. MOSLEY:  I'm sorry, your Honor.  I didn't hear you.

THE COURT:  Sure.  Do you believe this witness will be with us through all of lunch?

MR. MOSLEY:  No.

THE COURT:  All right then.

MR. MOSLEY:  Well, my part of it won't.

MS. AXEL:  I think it may.  He may.

THE COURT:  And that's fine.  We will see if we can finish him before lunch.  If not, we will finish him after and that's fine.

I will see everyone in 10 minutes.  Thank you.

(Recess)

(Continued on next page)

(Jury present)

THE COURT:  Counsel, you may continue to inquire.  I remind the witness you remain under oath.

Thank you.

MR. MOSLEY:  Mr. Iannuzzelli, could you please show the witness what is marked Government Exhibit 951?

THE COURT:  The number please, sir?

MR. MOSLEY:  951, your Honor.

BY MR. MOSLEY:

Q.  Mr. Ho, do you recognize this document?

A.  Yes.

Q.  Is this one of the documents you reviewed during the course of your investigation of the hack?

A.  Yes.

Q.  Did this document assist you in determining what happened as a result of the hack?  Or how the hack happened?  I'm sorry.

A.  Yes.

MR. MOSLEY:  I would like to offer Government Exhibit 951.

MS. AXEL:  Continuing objection, your Honor.

THE COURT:  All right.  This Exhibit 951 is admitted over the defense objection and it may be shown to the jury.

(Government's Exhibit 951 received in evidence)

BY MR. MOSLEY:

Q.  Mr. Ho, what is this document?

P7G5sto2                         Ho - Direct

A.   This is a screenshot of some messages on LinkedIn between someone appeared to be a recruiter reaching out to one of our dev ops engineers.

MR. MOSLEY:  Mr. Iannuzzelli, can you highlight the area of the message of the 3:56 p.m.?

Q.   Mr. Ho, do you see the reference to somebody, H-U-Y, I believe it is Huy?

A.   Yes.

Q.   Do you know who that is?

A.   That is the dev op engineer that worked for us in March 2022.

MR. MOSLEY:  You can take this down, Mr. Iannuzzelli.

Q.   What is a dev op engineer?

A.   A dev op engineer is usually an engineer who worked with the server, deploy the service into the server and making sure the service is up and running, and they might sometimes troubleshoot problems with the server.

Q.   And what was Mr. Huy's duties at that time?

A.   So, as a dev op engineer, his job was to deploy services into the server, monitor the server activities, and troubleshoot problems with the server when there is an issue.

Q.   Did you review other documents like this during the course of your investigation, Mr. Ho?

A.   Yes.

Q.   Based on your investigation, did you come to any

P7G5sto2                          Ho - Direct

conclusions related to how the hack happened?

A.   Yes.

Q.   What did you learn?

A.   So, we learned that someone approached our employees on LinkedIn, offered them a very high-paying job, and to be able to get the job they needed to do an interview process with open apps to download a homework assignment that they needed to download from the computer to do the homework, and when they run the application on their computer, their computer will get compromised and the hacker will get access to the laptop of the engineers.

Q.   And what, if anything, did you learn about what was done with that access?

A.   Can you repeat the question?

        MR. MOSLEY:   Can you read it back, court reporter, please?

        (Record read)

A.   So, like what I mentioned before, the validators are responsible to provide the authorization of moving the cryptocurrency to the Ronin Bridge, and when the hacker got access to the server, it includes some of the validators on Ronin Network, and they accessed to the validators and used the keys on the server to create a false authorization to use to withdraw funds from the Ronin Bridge.

Q.   Did you say false authorization?

A.  Yes.

Q.  This $600 million hack on your company, was this a significant event for your company?

A.  Yes.

            MR. MOSLEY:  No further questions.

            THE COURT:  Ms. Axel?

            MS. AXEL:  Thank you, your Honor.

CROSS-EXAMINATION

BY MS. AXEL:

Q.  Good morning, Mr. Ho.  Now, I heard a number of names.  I want to get these relationships right.  Sky Mavis is a company; is that correct?

A.  Yes.

Q.  And it is based in Vietnam?

A.  No.  It is headquartered in Singapore.

Q.  Headquartered in Singapore.

        And it is an information technology company?

A.  I'm not sure about this question.

Q.  How would you describe what the company does?

A.  So, we provide some services relative to gaming and blockchain technology.

Q.  What is Sky Mavis' relationship with Axie?

A.  So we are the creator of the Axie project and Axie game.

Q.  You created Axie's game?

A.  Yes.

P7G5sto2                        Ho - Cross

Q.   Did you work on the development of that?

A.   Yes.

Q.   And what is Sky Mavis' relationship with Ronin?

A.   We also created Ronin.  The development started in 2020 and it went live in 2021, and right now we are the development team behind Ronin Network.

Q.   And do you lead the development team?

A.   Yes.

        MS. AXEL:  So, I would like to show you what we have marked as Exhibit 6510, and if we could just display it on the screens?

        MR. REHN:  Can we get a copy?

        MS. AXEL:  Sure.

        (Counsel conferring)

BY MS. AXEL:

Q.   Do you see Defense Exhibit 6510 in front of you?

A.   Yes.

Q.   Is that a Ronin blog that Ronin has put on the website?

A.   I believe so.

Q.   And this is called a Security Breach Post Mortem.  Do you see that?

        THE COURT:  I'm sorry.  Before we start reading into it, are you offering this exhibit into evidence?

        MS. AXEL:  I'm happy to offer it, your Honor.

        THE COURT:  I don't want you to read its content

P7G5sto2                          Ho - Cross

unless it is in evidence.  Please authenticate it.

MS. AXEL:  I will move to admit Defendant's Exhibit 6510.

MR. MOSLEY:  Objection, your Honor; hearsay.

THE COURT:  Is it not coming from his company?

MR. MOSLEY:  I'm not sure what it is.

THE COURT:  Please ask some more questions to see whether he had any involvement in its development.  Thank you.

BY MS. AXEL:

Q.  Mr. Ho, did you, after the discovery of the hack that you told us about, did you make various announcements to the Ronin community?

A.  We engaged a different member of the company.  I didn't provide the update myself, but the company did provide it, did provide updates to the community.

Q.  And I'm going to be looking at page 3 of this document. First let me just ask you, when you investigated the Ronin hack, did you find that events -- well, talk to me first -- let me ask you this first:

With respect to the validators you told us, and you said there were compromised validators; do I understand that correctly?

A.  Yes.

Q.  How many validators were compromised?

A.  At that time Ronin Network has nine validators and around

P7G5sto2                         Ho - Cross

four validators was compromised because Sky Mavis runs four
validators, and one validator lost a communication channel with
one of the Sky Mavis back-end service and the attacker used
that communication channel to get the fifth authorization.

Q.   Through the phishing attack, the hacker was able to get the
four validators.  Do I understand that correctly?

A.   He got the access to the computer of the dev op engineers
and the dev op engineer's laptop had the credential to be able
to get four validators of Sky Mavis.

Q.   And who were those validators of Sky Mavis?

A.   So we have four validators run by Sky Mavis and five more
run by other entities.

Q.   Who were the validators run by Sky Mavis?  Who had these
keys?

A.   So, the validator has that sub machine and they run the
software and it runs the same Ronin code within the machine.
So, we deploy four of the machine and it has a permission to be
the prior validators.

Q.   So there is no human that actually holds these keys, it is
each one is run by a separate machine?

A.   The validator, we put a key within the machine and the key
will be used for authorization purposes and the code will use
the key on the server for authorization.

Q.   Can you describe to us how that works?  How does the code
work that it determines whether to validate the transaction?

P7G5sto2                        Ho - Cross

A.   So, in terms of the breach, there is a smart contract logic that you need authorization which is basically a signature that is issued by the key of the validator to be able to submit and withdraw funds.  So, the key is stored within the server and the code will use a key and use a key to sign the signature and get authorization for the transaction.

Q.   Would you describe this system as decentralized?

A.   I think it has -- yeah, it is arguable, but I think it is some decentralization setup in the Ronin Network at that time.

Q.   There was?

A.   Yes.

Q.   And you said then there are five other keys?

A.   There are nine.  Nine validators.

Q.   Nine validators total, you told us about four, so there are five other keys.  Who holds those keys?

A.   So, there were nine validators, Sky Mavis runs four of them, so we generated four of the keys of four validators belonged to Sky Mavis, and the other five entities then generated their own key and put it in their own server.

Q.   Who were the five entities?

A.   I don't remember right now.

Q.   OK.  Well, Ronin reported after the hack --

         THE COURT:  Wait.  I'm sorry.

         Are you reading from a document?  You can ask him questions but I don't want you to testify, please.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MS. AXEL:  Your Honor, this information would be in the 3500 as well as in the materials.  I think I can ask him. He can say no.

THE COURT:  Let me listen to a question or two but I -- go ahead.

BY MS. AXEL:

Q.   Ronin reported after the hack that in fact there was also a key associated with the Axie DAO; is that correct?

A.   Yes.

Q.   And would you describe what is the Axie DAO?

A.   So, within the Axie community there was some members who are very -- who were very active community members and we tried to set up some -- tried to set up a DAO with a concept for decentralization within the Axie community.  And some community members got contacted by Sky Mavis and they repeatedAxie DAO and they run one of the validators for Ronin at that time.

Q.   There is a lot of terminology there.  Would you tell us what is a DAO?

A.   So, the DAO is Decentralized Autonomous Organization and it combines a lot of parties, members from within the community of a decentralized project.

Q.   And did Axie have an active DAO?

A.   Can you repeat the question?

Q.   Did Axie have an active DAO?

A.   We have an active community with communities and we

P7G5sto2                          Ho - Cross

encouraged them to participate in the governance process.

                (Continued on next page)

BY MS. AXEL:

Q.   What do you mean by governance process?

A.   So just some certain actions that we want to socialize within the community and we encourage people to discuss and bring——bring up ideas, and we also created a system for them to vote on the action.

Q.   How did you create a DAO?

MR. MOSLEY:   Your Honor, objection.

THE COURT:   I'll allow.

MR. MOSLEY:   What's the relevance of this, and it's going way outside of the scope of——

THE COURT:   I'll allow a little.   Go ahead.

BY MS. AXEL:

Q.   The question was:   How did you create a DAO?

A.   I don't know from the legal basis what being categorized as a DAO so——

THE COURT:   All right.   Then I don't want you testifying about how you created it if you don't know, sir.

Go ahead, counsel.

Q.   You also mentioned that you created a system for voting. What did you mean by that?

A.   So we created——

MR. MOSLEY:   Objection, your Honor.

THE COURT:   I'll allow.

Were you involved in that creation of that system,

P7G1STO3                        Ho - Cross

sir?

THE WITNESS:  Some of it.  Involved——

THE COURT:  No.  Were you, sir?

THE WITNESS:  I didn't involve——

THE COURT:  Did or did not?

THE WITNESS:  Did not.

MS. AXEL:  Your Honor, he testified that there was a system created for voting.

THE COURT:  And he just said he wasn't involved in it, so how can he speak to it?  Thank you.

BY MS. AXEL:

Q.  Does Axie have a token associated with the DAO and governance?

MR. MOSLEY:  Objection, your Honor.

THE COURT:  I'll allow.

Q.  You may answer the question.

A.  Axie has a token, Axie Infinity project has a token. Whether it's associated with the DAO, I——I'm not so sure about that.

THE COURT:  Okay.  Then we'll stop asking him questions about stuff he doesn't know about.  Please ask him questions about stuff he does know about and he did testify about.

Q.  With respect to the validator node you mentioned, that was associated with the Axie DAO, so please describe for me the

relationship between the Axie DAO and that validator.

MR. MOSLEY:  Objection, your Honor.

THE COURT:  I'll allow if he can speak to it.

A.  So the Axie DAO at that time was considered to members, and they—they run the validator node, yeah.  That's all.

Q.  And was the Axie DAO validator node—just one second.

In the course of your investigation did you learn that the Axie validator node had been whitelisted?

MR. MOSLEY:  Objection.

THE COURT:  I'll allow.

A.  Do you mean the Axie DAO validator?

Q.  Yes.

A.  What do you mean by whitelisted?

THE COURT:  Do you know what the term means, sir?

THE WITNESS:  I don't understand it.

THE COURT:  Okay.  Then let's not ask that question. Let's move on to something he does know.

Q.  Okay.  With respect to the Ronin network, were you involved in the development of the Ronin network?

A.  Yes.

Q.  And does the Ronin network also have tokens associated with it?

A.  Yes.

Q.  What do you use those tokens for?

A.  So the token at Ronin network is called RON, and you can

use RON to pay for the transaction fee for the Ronin network.

Q.   And do you use the RON token in playing the game on Axie?

A.   On Axie, we don't really use RON within the game.

Q.   It's only for paying for transaction fees for the Ronin network.

A.   It has other use because it is a token and it has market value.  It can be used for other purposes.

Q.   You can buy and sell RON?

A.   Yes.

Q.   Now what is the relationship then between——is there any relationship between the RON token and the Ronin Bridge?

A.   You can use RON to pay for transaction fee, so when you interact with Ronin Bridge, you need to use RON to pay for the fee.

Q.   And was any RON stolen by the hackers?

A.   No.

Q.   Is there a treasury of RON that the network maintains?

          MR. MOSLEY:  Objection, your Honor.  Relevance.

          THE COURT:  Is there a treasury?  I'll allow that question.

          THE WITNESS:  Yes.

          THE COURT:  Move on.

Q.   Was that treasury affected by the hack?

          MR. MOSLEY:  Objection, your Honor.

          THE COURT:  Sustained.

P7G1STO3                           Ho - Cross

A.   No.

          THE COURT:   Sustained.   It means don't answer the
question.   Excuse me, sir.

Q.   Does Ronin also have network validators that validate the
blockchain?

A.   I don't understand that question.

Q.   In the Ronin blockchain, in order to make blocks, do you
have validator nodes?

A.   Yes.

Q.   Is that a different type of validator than the validators
you've been talking about with respect to the Ronin Bridge?

A.   No.

Q.   It's the same.

A.   Yes.

Q.   And does the Ronin network also have a decentralized
exchange called Katana?

          MR. MOSLEY:   Objection, your Honor.

          THE COURT:   I'll allow.

          MR. MOSLEY:   There's no relevance.

          THE COURT:   You can answer the question if you know.

A.   Yes.

Q.   And what does Katana do?

A.   So Katana is a decentralized chain that you can provide
liquidity and you can also use it to trade tokens,
cryptocurrency.

Q.   Was Katana frozen after the Ronin hack?

A.   I don't remember.

          THE COURT:  Move on, please, counsel.

Q.   Now you worked with a company called CrowdStrike to investigate the cause of the hack; is that correct?

A.   Yes.

Q.   And you were eventually able to recover some of the stolen funds; is that right?

A.   That's correct.

Q.   How much of the stolen funds were you able to recover?

A.   So we got $6 million back from Norwegian police.

Q.   And did you understand that that $6 million had gone through Tornado Cash?

A.   I don't have that knowledge.

Q.   In addition to Tornado Cash, you learned that hack proceeds were transferred to other crypto protocols, correct?

          MR. MOSLEY:  Objection.

          THE COURT:  I'll allow.

A.   Can you ask it again.

Q.   In addition to Tornado Cash, you learned that hack proceeds were transferred to other crypto protocols, correct?

A.   Yes.

Q.   Proceeds went to the Chinese exchange Huobi, correct?

          MR. MOSLEY:  Objection; hearsay, your Honor.

          THE COURT:  Now you're testifying.

P7G1STO3                          Ho - Cross

A.   I don't remember.

          MS. AXEL:  Can we have a sidebar, your Honor.

          THE COURT:  Yes.

          (Continued on next page)

P7G1STO3                    Ho - Cross

(At the sidebar)

THE COURT:  It seemed to me that the government went to great efforts to not talk about the hack and the fact of the hack.  I allowed a little bit of discussion——and I didn't realize I was mistaken——into the DAO and the decentralized nature of the company.  I'm not sure now what the purpose is of the questioning about the others, because he wasn't talking about where the proceeds went.

MR. MOSLEY:  And he has no basis.  I mean, that wasn't——

MR. REHN:  It's all hearsay.

MR. MOSLEY:  That was all hearsay.  It wasn't part of his testimony.  There's no foundation for it.

THE COURT:  Does he know?

MR. REHN:  He said he didn't.  He just said he's been told by other people.

MS. AXEL:  That is true for all of the victims that he's putting on, that they were told where their proceeds went.  I think I should be allowed to a leading question, did it go here, did it go there.  He knows because he hired a consultant, just like all the other victims did.

MR. REHN:  What's the relevance?

MS. AXEL:  It's the same relevance to all the testimony about where the proceeds went.

MR. MOSLEY:  But there wasn't any testimony.

THE COURT:  One at a time, please.

MR. REHN:  He is not testifying where the proceeds went.  Kevin's point is that this is——

THE COURT:  Right.

MS. AXEL:  Your Honor, in general, the victims are testifying about where proceeds went.

THE COURT:  But this——

MS. AXEL:  I think it's within the scope of cross-examination, to put him on as someone who investigated the hack.  He's already testified that they did in fact hire CrowdStrike, and he also testified affirmatively that he know it went to Huobi.  I only have a couple more questions on that, two direct questions.  And he does know.  He testified yes, he did know.

THE COURT:  Well, you can clean up on redirect whether he has personal knowledge.  You can clean that up on redirect.

But two questions, and what is left?  Because I don't want to have another sidebar.

I need to know now what the objections will be.

MS. AXEL:  Subsequent measures they took afterwards to prevent this kind of hacking.

MR. GIANFORTI:  No.

I'm sorry.  I'm sorry.

THE COURT:  That's not what he testified to.

MS. AXEL:  I can't recall what else, your Honor,

P7G1STO3                          Ho - Cross

without my notes.  That's what comes to mind.

MR. PATTON:  I can grab your notes.

MS. AXEL:  Whether he reached out to Mr. Storm or anyone associated with Tornado Cash.

THE COURT:  He can testify to that, yes.

MS. AXEL:  And your Honor, I think we would ask that the person who is the person taking the witness is the one who should make the objection.

THE COURT:  I'm not disagreeing with that.  I don't need the three of you as a collective to speak.

All right.  Do you want to look at your notes and tell me if there's something else, just so we can preview it here and not have another sidebar.

MS. AXEL:  Okay.

I think that's it.

THE COURT:  Okay.  Thank you.

(Continued on next page)

P7G1STO3                        Ho - Cross

(In open court)

THE COURT:  You may inquire, counsel.

MS. AXEL:  Thank you, your Honor.

BY MS. AXEL:

Q.  Mr. Ho, I had asked you about——we just ended with a question about if you had learned where the hack proceeds went in addition to Tornado Cash.  So my next question is:  In the course of your investigation and working with CrowdStrike, did you also learn that hack proceeds had been transferred to FTX?

A.  I——I didn't recall it.

Q.  Okay.  Did you learn that hack proceeds had been transferred to crypto.com?

A.  I didn't recall.

Q.  With respect to the Huobi exchange, did you reach out to them and ask——and send them an inquiry regarding the hack to try to get any proceeds back?

MR. MOSLEY:  Objection, your Honor.

Q.  Did you reach out to Mr. Storm or anyone associated with Tornado Cash concerning the hack and inquiring about getting any proceeds back?

A.  No.

MS. AXEL:  No further questions.

THE COURT:  All right.  Thank you.

Redirect?

MR. MOSLEY:  Nothing further for this witness, your

P7G1STO3                        Bram - Direct

Honor.

THE COURT:  Okay.  Thank you very much.

Sir, you may step down.  Thank you very much for your time.

(Witness excused)

THE COURT:  Government's next witness, please?

MR. REHN:  The government calls Justin Bram.

THE COURT:  Thank you.

(Witness sworn)

THE DEPUTY CLERK:  Thank you.  Please be seated and, into the microphone, please state and spell your full name for the record.

THE WITNESS:  Justin Bram, J-U-S-T-I-N, B-R-A-M.

THE COURT:  Thank you.

Counsel, you may inquire.

JUSTIN BRAM,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. REHN:

Q.  Good morning, Mr. Bram.

A.  Good morning.

Q.  Where are you from?

A.  I'm originally from Connecticut.

Q.  Where do you live now?

A.   Mostly in Los Angeles but also sometimes in New York.

Q.   What do you do for a living?

A.   I work in the cryptocurrency industry; currently work at a new blockchain called N1.

Q.   Are you testifying today because you received a subpoena?

A.   Yes.

Q.   And was the subpoena relating to a cryptocurrency mixer called Tornado Cash?

A.   Yes.

Q.   Were you ever involved with a cryptocurrency mixer called Tornado Cash?

A.   Yes.

Q.   In connection with that, did you receive payments?

A.   Yes.

Q.   Who asked you to become involved with Tornado Cash?

A.   So I originally——Roman Storm and Roman Semenov.

THE COURT:  Can I ask the microphone to be a bit closer to you, sir, or bring yourself closer to the microphone.

THE WITNESS:  How's that?

THE COURT:  I'll know when you speak into the mic.

THE WITNESS:  How's that?

THE COURT:  Better.  Thank you.

BY MR. REHN:

Q.   You mentioned Roman Storm and Roman Semenov?

A.   Correct.

Q.   Did you have any communications with Roman Storm?

A.   Yes.

Q.   Have you ever met him in person?

A.   No.

Q.   Have you ever had any video calls with him?

A.   Yes.

Q.   Do you think you would recognize him if you saw him in person?

A.   I do.

Q.   Do you see him in the courtroom today?

A.   I do.

Q.   Could you identify him.

A.   It's the gentleman over that way with the glasses and a blue shirt and a black jacket on top.

THE COURT:  The record will reflect that the witness has identified Mr. Storm.

Q.   Before we get into Tornado Cash, I'd like to ask you a little bit of background about your involvement in cryptocurrency.

How long have you been involved with cryptocurrency?

A.   Since about the 2020—2020, mid-2020.

Q.   And how did you get involved in crypto?

A.   I was originally working at Snapchat, and someone that I had met there was leaving Snapchat to start a new startup in the crypto space, and he sort of onboarded me and showed me how

crypto worked.

Q.   What kind of startup was that?

A.   I was in the decentralized finance space, so they were helping to automate transactions on the blockchain.

Q.   And in addition to your work for that startup, did you start doing any other professional activities in connection with crypto?

A.   I did.  I created a YouTube channel with the goal being to increase my personal brand and also just highlight different and exciting projects in the crypto space.

Q.   So in your YouTube channel what sort of videos would you post?

A.   I posted usually about two educational videos a week, roughly about ten minutes long, highlighting new and innovative applications and things you could do with crypto.

Q.   What is cryptocurrency?

A.   There's many different types of cryptocurrency and they all serve different purposes, or many of them do.  There's some like Bitcoin, which is a decentralized blockchain where you can transmit value on it, and there's other types of cryptocurrencies, like stablecoins, that are just representations of the dollar on the blockchain.

          THE COURT:  Can I ask you please to speak just a little bit slower so I can take better notes.  Thank you so much.

P7G1STO3                    Bram - Direct

Q.  Can people own cryptocurrency?

A.  Yes.

Q.  And how do people hold the cryptocurrency that they own?

A.  There's two ways.  You can hold it through a centralized exchange or you can do what's called self-custody and you can hold it yourself.

Q.  And if you're holding it yourself, what does that actually look like?

A.  You manage what's called a private key.  You can think of it like a password.  And as long as you have that password or private key, you have access to your funds and no one else does.

Q.  And if you're holding it on an exchange, what does that look like?

A.  An exchange would be like Coinbase, and Coinbase would handle that private key or password management, and you would log in with a normal web login to Coinbase to manage your funds.

Q.  Can people transfer cryptocurrency to other people?

A.  Yes.

Q.  And how do they do that?

A.  You would look at—you would get a recipient address, you would put that address into your wallet, and you could send the funds that way directly to them.

Q.  Are you familiar with a cryptocurrency known as Ether?

P7G1STO3                     Bram - Direct

A.   Yes.

Q.   Or is it sometimes called ETH, E-T-H?

A.   Yes.

Q.   Are there any particularly distinctive characteristics of Ether?

A.   Ethereum is what's called a programmable blockchain, which means you can build any sort of application that you could imagine on the blockchain.

Q.   And when you say application, did that just mean like a computer program?

A.   Computer program, yes.

Q.   Have you ever heard the term "smart contract"?

A.   Yes.

Q.   What is that?

A.   A smart contract is another word for one of these blockchains.  It——the code basically allows you to execute any function.  So a smart contract could be a decentralized finance application like a lending protocol, it could be a swapping protocol to trade tokens, or could even be a social application.

Q.   And are these essentially computer programs that exist on the Ethereum network?

A.   Yes.

Q.   Do companies sometimes run those?

A.   Yes.

P7G1STO3                    Bram - Direct

Q.   Have you ever heard the term "cryptocurrency mixer"?

A.   Yes.

Q.   What is that?

A.   A mixer——because all transactions on the blockchain are public in nature, a mixer allows you to put funds into it and then withdraw to a totally separate address, breaking the connection of where funds started and where they're going.

Q.   Did there ever come a time when you learned about a cryptocurrency mixer called Tornado Cash?

A.   Yes.

Q.   When was that?

A.   About mid or early to mid-2021.

Q.   How did you learn about Tornado Cash?

A.   My current employer at the time had just shared with me that he had used Tornado Cash before and had received what's called an airdrop from the platform.

Q.   After you learned about it did you do some research into Tornado Cash?

A.   Yes.

Q.   Did that research include going to the Tornado Cash website?

A.   Yes.

Q.   And based on reviewing the Tornado Cash website, what was your understanding of the service that Tornado Cash provided?

A.   I understood it was a place to enable privacy on the

P7G1STO3                     Bram - Direct

blockchain, where you could deposit funds and then withdraw them to a totally separate address.

Q.  What, if anything, did you decide to do after learning about the Tornado Cash service?

A.  I decided to make an educational YouTube video about how the service works and how you could use it to retain your privacy.

        MR. REHN:  Mr. Iannuzzelli, could you show the witness what has been marked for identification as Government Exhibit 1523.

        And could you expand.  Thank you.

Q.  Mr. Bram, do you recognize what this is?

A.  Yes.

Q.  And what are we looking at here?

A.  This is a screenshot of the title and description for the YouTube video I put out about Tornado Cash.

Q.  And when did you make that video, approximately?

A.  This would have been in mid-2021.

        MR. REHN:  The government offers Government Exhibit 1523.

        MR. KLEIN:  No objection.

        THE COURT:  Government Exhibit 1523 is admitted into evidence and may be shown to the jury.

        (Government's Exhibit 1523 received in evidence)

BY MR. REHN:

P7G1STO3                          Bram - Direct

Q.  And now that we're all looking at it, Mr. Bram, could you
tell us what the title of your video was.

A.  It says Tornado Cash Anonymous Transactions and High-Yield
Staking.

Q.  And anonymous transactions, were those the sort of mixing
transactions you talked about earlier?

A.  Yes.

Q.  What was high-yield staking?

A.  There was also an opportunity to do something called yield
farming with Tornado Cash or anonymity mining, and you could
basically generate a yield by using the service.

Q.  And I see on this video, on this screenshot, underneath the
title, it says Private.  Do you see that?

A.  Yes.

Q.  What does that mean?

A.  I decided to make the video private so it wouldn't be
viewable by the public.

Q.  When you initially posted this video in 2021, was it a
private video or was it a public video?

A.  Public.

Q.  So did you take this screenshot at some point later in time
when you made it private?

A.  Yes.

Q.  Mr. Bram, after you made this video, did you reach out to
anyone from Tornado Cash about it?

A.  I did.

MR. REHN:  Mr. Iannuzzelli, could you please show the witness what has been marked for identification as Government Exhibit 1502.

Q.  Mr. Bram, do you recognize this?

A.  I do.

Q.  What is it?

A.  It's me reaching out to the Tornado Cash Twitter handle letting them know that I had created a video explaining how Tornado works and asking them to share the video.

Q.  And after that did you exchange some messages with the Tornado Cash Twitter account?

A.  I did.

MR. REHN:  The government offers Government Exhibit 1502.

MR. KLEIN:  No objection.

THE COURT:  Government Exhibit 1502 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1502 received in evidence)

MR. REHN:  Mr. Iannuzzelli, could you share it with the rest of us.

And could you just expand the top half through the first bubble, please.

BY MR. REHN:

Q.  So Mr. Bram, what are we looking at here, just generally?

A.   This is, again, a screenshot of the Tornado Cash Twitter handle description, and then below that is a message I had sent to the Tornado Cash Twitter handle explaining that I'd made a video about Tornado Cash.

Q.   Did you follow the Tornado Cash Twitter account around this time?

A.   Yes.

Q.   What sort of things did it post about?

A.   General information about the service, I believe new technical updates that were coming out, and that's all I remember.

Q.   Would it be fair to say that the Tornado Cash Twitter account was promoting Tornado Cash?

A.   I think so, yes.

          MR. KLEIN:  Objection.

          THE COURT:  Let's not lead the witness.  Thank you.

Q.   Now on the screen here I see a message in a blue bubble. Who wrote that message?

A.   Me.

Q.   And is this the message you mentioned earlier where you reached out regarding your YouTube video?

A.   Yes.

          MR. REHN:  And Mr. Iannuzzelli, could you scroll down a few more messages, until we get to the first gray bubble.

Q.   Now on the screen here we have blue bubbles.  Are those the

messages that you wrote, Mr. Bram?

A.  Yes.

Q.  And then we have some gray bubbles.  Are those the messages you got back in return?

A.  Yes.

Q.  Now when you first reached out to this Twitter account, did you know who was handling or in charge of the tornado.cash Twitter account?

A.  No.

Q.  Did you later learn who was handling this account?

A.  Yes.

Q.  How did you learn that?

A.  Because after some back-and-forth in this conversation, the person running the account asked me to message them on Telegram, and it was Roman Storm.

        MR. REHN:  Mr. Iannuzzelli, could we go to page 6 of Government Exhibit 1502 and could you expand the last three messages on this page.

Q.  And is this the message you were referring to where you moved the conversation to Telegram?

A.  Yes.

Q.  And who was rstormsf?

A.  Roman Storm.

Q.  And so did you understand that he was the one handling the Tornado Cash Twitter account?

A.  Yes.

Q.  After you contacted him on Twitter did you have further communications with him beyond what's on these Twitter messages?

A.  Yes.

Q.  And did you communicate on Telegram?

A.  Yes.

Q.  What is Telegram?

A.  It's a messaging application similar to WhatsApp.

          MR. REHN:  So Mr. Iannuzzelli, could we please go back to page 1 of this exhibit.

          And pull up those first four messages again.

Q.  Mr. Bram, when did you send your message to the Tornado Cash Twitter account regarding your YouTube video?

A.  I believe I sent it initially the date here; it says May 11, 2021.

Q.  And was that around the time you created and posted that video?

A.  Yes.

Q.  And what was the time you sent that message?

A.  8:38 a.m.

          MR. REHN:  Mr. Iannuzzelli, could you please show the witness what has been marked for identification purposes as Government Exhibit 1931.

Q.  Mr. Bram, do you recognize this?

A.   Yes.

Q.   What is it?

A.   It's a screenshot of the Tornado Cash Twitter account sharing or quote tweeting the post I had made, sharing the YouTube video on Twitter.

MR. REHN:  The government offers Exhibit 1931.

MR. KLEIN:  No objection.

THE COURT:  Government Exhibit 1931 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1931 received in evidence)

MR. REHN:  And could we pull that up and expand just the Twitter message, or the Twitter post, I should say.

BY MR. REHN:

Q.   And Mr. Bram, what was the date of this post?

A.   May 11, 2021.

Q.   And was it in the evening?

A.   Yes.

Q.   Was that later in the day, the same day that you had messaged Roman Storm about your video?

A.   Yes.

Q.   And could you read the tweet.

A.   "Amazing video that really well describes how to use Tornado Cash."

Q.   Did you see this tweet around the time that it was posted?

A.   Yes.

Q.   And on the version we're looking at here, there's a space underneath that says, "This post is unavailable."  Do you see that?

A.   Yeah.

Q.   Since you posted your initial tweet promoting your video, have you taken that tweet down?

A.   Yes.

Q.   At the time that this tweet was sent out in May of 2021, was the link to the video actually present here?

A.   This was a link to my tweet which had a link to the video, yes.

          MR. REHN:  We can bring that down.

          And if you could show the witness just the first second of Government Exhibit 1522.

          Slight technical difficulties switching to video.  It will just take a moment, your Honor.

          THE COURT:  Okay.

          MR. REHN:  Hopefully we've resolved it.

          THE COURT:  Okay.

BY MR. REHN:

Q.   Are you able to see the video now?

A.   Not yet, no.

          MR. REHN:  There we go.

Q.   Can you see it now?

A.   Yes.

Q.   And do you recognize what this is?

A.   Yeah.  This is the video I'd put out on my YouTube channel about Tornado Cash.

MR. REHN:  The government offers Government Exhibit 1522.

MR. KLEIN:  No objection, your Honor.

THE COURT:  Government Exhibit 1522 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1522 received in evidence)

MR. REHN:  Mr. Iannuzzelli, could you please play the first five seconds of the video.  Hopefully with volume.

(Video played)

BY MR. REHN:

Q.   Mr. Bram, who is speaking in this video?

A.   That's me.

Q.   And what is the video about?

A.   The video is about how to use Tornado Cash, how it works, and then how to earn a yield from some of the various yield farming techniques.

MR. REHN:  Can we skip ahead to the 39-second mark and then play to the 46-second mark.

(Video played)

MR. REHN:  A little bit further.

(Video continued)

Q.   So looking at the screen right now, what are we looking at?

P7G1STO3                    Bram - Direct

A.   We're looking at——I'm now screen-recording the Tornado Cash application.

Q.   And was this a website?

A.   Yes.

Q.   What was the address for the website?

A.   Tornado.cash.

       MR. REHN:   Could you play the next 12 seconds or so, through around the 58-second mark.

          (Video continued)

Q.   What is this on the screen now?

A.   Now it's a screen recording of the Tornado Cash Medium site where this is a blog post about how——introducing private transactions on Ethereum.

       MR. REHN:   Mr. Iannuzzelli, could you please show the witness what has been marked for identification as Government Exhibit 1901.

Q.   Do you see Government Exhibit 1901?

A.   Yes.

Q.   Is this the Medium post that you referenced in the video?

A.   Yes.

       MR. REHN:   The government offers Exhibit 1901.

       MR. KLEIN:   No objection, your Honor.

       THE COURT:   Government Exhibit 1901 is admitted into evidence and may be shown to the jury.

          (Government's Exhibit 1901 received in evidence)

P7G1STO3                        Bram - Direct

          MR. REHN:  Can we bring this up.

BY MR. REHN:

Q.  Mr. Bram, what was the date of this Medium post?

A.  August 6, 2019.

Q.  And who was it authored by?

A.  Tornado Cash Medium page.

          MR. REHN:  And could we go to page 2.  And
Mr. Iannuzzelli, could you expand the graphic.

Q.  Mr. Bram, could you please read the text on this graphic.

A.  Yes.  It says, "Tornado mixer noncustodial anonymous
transactions on Ethereum."

Q.  And I think you described a mixer earlier, but could you
explain why the word "mixer" is used when we talk about mixers.

A.  Because essentially various amounts of funds are getting
mixed into this software.

          MR. REHN:  I think we're going to be smoother going
forward.

          THE COURT:  Your lips to god's ear.  Yes.

          MR. REHN:  And Ms. Sebade, if you could bring up
Government Exhibit 1522 and play the next 30 seconds of the
video through the 1:30 mark.

          (Video continued)

BY MR. REHN:

Q.  Mr. Bram, in this section of the video, did you say that if
you had 10 ETH that you wanted to transfer to a totally new,

clean Ethereum address, you would be able to use Tornado Cash?

A.   Yes.

Q.   Was that your general understanding of what Tornado Cash did?

A.   Yes.

Q.   When you say that Tornado Cash would transfer to a totally new clean Ethereum address, what does that mean?

A.   That means you could transfer funds to an entirely new address that has absolutely no transaction history.

Q.   And why would an address with no transaction history be of particular relevance?

A.   Because on the blockchain things are naturally what's called pseudoanonymous, so if I were to send you funds, say, a hundred dollars of Ethereum, you would now be able to see my entire transaction history and my entire balance, but with something like Tornado Cash, if I were to basically break the connection of funds from my address, then I would have privacy.

Q.   So from a user's perspective, was it especially valuable to be able to move the funds to a clean address with no transaction history?

A.   Yes.

        MR. REHN:  Ms. Sebade, could you play the next seven or eight seconds of this video.

        (Video continued)

        MR. REHN:  Stop there.

Q.   You mentioned something called a relayer system in that section.  Did you hear that?

A.   Yes.

Q.   Was the relayer system the way that you could move money to a new clean address?

A.   Yes.

Q.   And why did you need the relayer system to do that?

A.   The transactions on the Ethereum blockchain cost something—what we call gas.  Gas is how you pay for transactions, and it's paid for with a native Ether token, and so you can't withdraw from that new address without a relay because you would need ETH from that address, which would have to come from somewhere, so with a relayer, you could now withdraw without having to pay any gas from this new address.

Q.   So the relayer enables you to move ETH into the brand new address.

A.   Yes.

Q.   Did the relayer charge a fee for providing this service?

A.   Yes, I believe so.

          MR. REHN:  Ms. Sebade, if you could now play to 1:51.

          (Video continued)

Q.   Mr. Bram, do you recall testifying—well, first off, what are we looking at on the screen now?

A.   We're looking at a screen recording of the Tornado Cash application, specifically the deposit screen.

P7G1STO3                      Bram - Direct

Q.   And was this the actual place where you would interact and make your deposits and withdrawals?

A.   Yes.

Q.   How do you get to the app?

A.   It is linked from the tornado.cash landing page.

          MR. REHN:  And Ms. Sebade, if you could go back to the 51-second mark of this video.

Q.   When you said the landing page, is that what you're referring to?

A.   Yes.

Q.   Looking at this landing page, could you show us what you would do to get to the app that we were just looking at.

A.   There's a button that says—or two buttons that says "launch app."  One is at the top right and one's at the middle left of the landing page.

Q.   Those buttons that say "launch app"?

A.   Yes.

Q.   And if you clicked on those, you would get to the page we were just looking at?

A.   Yes.

          MR. REHN:  Could we go back to the 1:50 mark.

          And could you play for the next about five seconds.

          (Video continued)

Q.   So Mr. Bram, in this portion of the video did you refer to depositing in fixed amounts?

A.   I did.

Q.   Could you show us on the screen what you are referring to.

A.   So you can see on the middle left-hand side there's a slider where you can select the amount of ETH you want to deposit, from .1 ETH all the way up to 100 ETH.

Q.   And when you say all the way up, can you pick any number between those two or are you limited in your choices?

A.   You're limited in your choices to those specific amounts, .1 ETH, 1 ETH, 10 ETH, or a hundred ETH.

Q.   And what was your understanding, if any, of why Tornado Cash only allowed deposits in fixed amounts?

A.   So the reason is, it is required to protect a user's anonymity.  If everyone were depositing random amounts like 1.16278 ETH, and then someone withdrew it later on, it would be pretty obvious that you would be able to connect those addresses because it's such a precise and specific amount.

Q.   And so if all of the deposits are exactly 10 ETH, are you able to connect the deposits to withdrawals?

A.   It would be very difficult.

        MR. REHN:  Ms. Sebade, could you please play for the next 25 seconds or so.

            (Video continued)

Q.   Was that section of the video basically similar to what you were just explaining to us?

A.   Correct, yes.

P7G1STO3                      Bram - Direct

MR. REHN:  Ms. Sebade, could you now play the next 15 seconds.

(Video continued)

Q.  Mr. Bram, in this portion of the video are you referring to something called the anonymity set?

A.  Yes.

Q.  What was that?

A.  So the anonymity set was basically how many deposits in that category of deposit——whether it's 1 ETH, 10 ETH, or a hundred ETH——were sitting in the pool.  You can see on the screen here it's selected for 1-ETH deposits, and there's 14,320 equal user deposits of 1 ETH in this anonymity set.

Q.  So that information was displayed on the app for each of the deposit amounts?

A.  Yes.

Q.  What was the reason for that information being displayed?

A.  So the larger the anonymity set, the harder it would be to identify where funds came from and where they're going.  You could imagine if there's only three people that deposit, well, then you almost have a one-in-three chance of guessing which deposit is correlated with which withdrawal, but with over 14,000, obviously it becomes a lot more challenging to try to correlate the addresses together.

Q.  So as a user, is it better for there to be more deposits or fewer deposits?

A.   More.

Q.   And is there a benefit to each user from the fact that there are many other users who are able to access Tornado Cash?

A.   Yes, there's a network effect.

           MR. REHN:  Ms. Sebade, could you please now play the next 12 seconds of the video.

           (Video continued)

Q.   Mr. Bram, did you say in that clip that the anonymity set means that when you withdraw 1 ETH to a totally clean Ethereum address, it would be nearly impossible to say that the deposit could be connected to you in any way?

A.   Yes.

Q.   What did you mean by that?

A.   Just as I described before, the larger the anonymity set, the harder it is to correlate between a deposit and a withdrawal address.

Q.   And is that based on the expectation that all the deposits and all the withdrawals look the same on the blockchain?

A.   Yes.

           MR. REHN:  Ms. Sebade, could you please play the next 18 seconds.

           (Video continued)

Q.   Did you mention in that section of the video that people should use a VPN so that their IP address can't be tracked?

A.   Yes.

P7G1STO3                     Bram - Direct

Q.   What is an IP address?

A.   As far as I understand it, it's a number that is tied to your computer, and so if you know someone's IP address, you know which computer the information is coming from.

Q.   And does somebody who runs a website have the ability to see that IP address?

A.   I believe so.

Q.   When you were discussing that issue, were you relying on another Medium post that we saw on the screen that was written by Tornado Cash?

A.   I was.

        MR. REHN:  Ms. Sebade, could you please play from 3:05 to 3:23.

        (Video continued)

Q.   Mr. Bram, in that portion of the video—and I apologize for repeating this, but we have a transcript, so I'm ensuring that we get it on the transcript.

A.   I understand.

Q.   —did you say once you hit deposit, a text file is going to be automatically generated with a private key that you'll be able to use to withdraw your funds later?

A.   I did.

Q.   And did you ever make a deposit to Tornado Cash through the website?

        MR. REHN:  And if we can just click back a couple of

P7G1STO3                    Bram - Direct

seconds.

Q.  The website that we're looking at on the screen, did you yourself make a deposit?

A.  Yes.

Q.  And when you did that, did the website provide you with that private key like you described in the video?

A.  It did, yes.

Q.  And what was the purpose of the private key?

A.  So the private key, you can think of like a password to withdraw your funds.  You need to input the private key to get your funds out.  It proves that you own those funds.

Q.  So in order to withdraw funds from Tornado Cash, you need that private key?

A.  Yes.

Q.  And when you did the deposit, was it the website that gave you that private key?

A.  Yes.

Q.  Did you do any work to make that key for yourself or did the website just give it to you?

A.  It gave it to you.

Q.  Would you have known how to generate that private key by yourself?

A.  I would not have, no.

Q.  So would you have been able to make a deposit that you could have withdrawn later without using the website?

A.  I'm not sure.

MR. REHN:  And Ms. Sebade, could you please go forward to the 3:30 mark and play from 3:30 to 3:45.

(Video continued)

Q.  Mr. Bram, in this portion of the video, did you generally say that after you deposit to Tornado Cash, it's best to wait a few days before you withdraw the money from Tornado Cash?

A.  Yes.

Q.  And why is that?

A.  You could imagine that if there's one user depositing let's say 10 ETH five different times and then ten minutes later you see ten withdrawals, five different times, you might be able to correlate that the two addresses are related, but if there's a huge time break——maybe wait a week, three days, what have you—— it's harder to correlate the two addresses being related.

MR. REHN:  And could we now play the next six seconds of the video.

(Video continued)

Q.  Mr. Bram, in this portion of the video, did you explain how to withdraw from Tornado Cash?

A.  Yes.

MR. REHN:  And if we could just go back so we can see the page again.

Q.  So for withdrawals, would you also use the Tornado Cash app?

A.   Yes.

Q.   And what are we looking at on the screen here?

A.   We're looking at a screen recording of the withdrawals tab on Tornado Cash.

Q.   Is this the same app we saw earlier except on this screenshot, the withdraw tab is clicked instead of the deposit tab?

A.   That's correct.

Q.   Looking at the screen, could you explain how you would actually withdraw.

A.   Yes.  So you see there's that field for note that says please enter your note.  You could copy and paste your note, which is that private key we spoke about, or the password, and then you can copy and paste your recipient address right below it where you want the funds to be sent to.

Q.   And that's the same private note that the website gave you when you made the deposit.

A.   Correct.

Q.   So you go back to the website and put the note in to get the withdrawal?

A.   Correct.

          MR. REHN:  Ms. Sebade, if you could play the next 10 seconds.

          (Video continued)

Q.   Mr. Bram, did you say in this portion of the video that you

can withdraw to a new address that is not connected to your identity?

A. Yes.

MR. REHN: We can skip ahead now to the 4:39 mark. And if you could play the next about 30 seconds, till 5:10.

(Video continued)

Q. Mr. Bram, in this portion of the video were you discussing something called the anonymity mining program?

A. Correct, yes.

Q. And I believe I heard you say that they wanted to incentivize deposits in the app; is that right?

A. Yes.

Q. What was Tornado Cash doing to give people an incentive to keep their deposits in the app?

A. They would be rewarded with Tornado or TORN tokens, the longer you kept your phones in the pool or the anonymity set.

Q. When you say "rewarded," does that mean you'd be able to receive those tokens?

A. That's correct, yes.

Q. Essentially you'd be paid from Tornado Cash in TORN tokens?

A. Yes.

Q. What is the TORN token?

A. The TORN token is what we would call a governance token. Basically if you own the Tornado token, you can vote on how Tornado software gets built and deployed. And it also had a

market price and was traded on the open market and could be sold or bought at any time.

Q. Is the TORN token basically another kind of cryptocurrency?

A. Yes.

Q. Was that created by Tornado Cash?

A. Yes.

Q. And those TORN tokens, I think you said they had value, they could be bought and sold?

A. Correct.

Q. Did you yourself ever own TORN tokens?

A. Yes.

Q. Did they have value to you?

A. Yes.

Q. And did you participate in the governance process at all?

A. Nothing on chain governance, no.

Q. So was the value to you derived from the market value of the tokens?

A. Yes.

MR. REHN:  We're not quite done with the video.

Could we go to the 5:28 mark and play a few seconds.

(Video continued)

Q. On that portion of the video were you referring to another Medium post?

A. Yes.

Q. And was that another post from Tornado Cash?

P7G1STO3                     Bram - Direct

A.   Yes.

MR. REHN:  And if we could bring the video down and show the witness what's been marked for identification purposes as Government Exhibit 1904.

Q.   Mr. Bram, is this the document that you referred to in your YouTube video?

A.   Yes.

Q.   Is this another Medium article written by Tornado Cash?

A.   Yes.

Q.   And what is the date of this article?

A.   December 17, 2020.

MR. REHN:  The government moves to admit Government Exhibit 1904.

MR. KLEIN:  No objection, your Honor.

THE COURT:  Government Exhibit 1904 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1904 received in evidence)

MR. REHN:  If we could just bring that up briefly.

BY MR. REHN:

Q.   Is that the same article we were looking at in your video?

A.   Yes, I believe so.

MR. REHN:  And we can bring that down.

Q.   Mr. Bram, did you——strike that.

Do you recall testifying earlier that you exchanged some messages with Roman Storm at the Tornado Cash Twitter

account?

A.  Yes.

Q.  Aside from Roman Storm, did you contact anyone else associated with Tornado Cash on Twitter?

A.  Yes, Roman Semenov.

Q.  What was your understanding of Roman Semenov's role in Tornado Cash?

A.  He was one of the founders.

Q.  And so Roman Storm and Roman Semenov are different people?

A.  Yes.

        MR. REHN:  Ms. Sebade, could you please show the witness what has been marked for identification as Government Exhibit 1501.

Q.  Mr. Bram, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's a direct message on Twitter with me reaching out to Roman Semenov.

        MR. REHN:  The government offers Government Exhibit 1501.

        MR. KLEIN:  No objection.

        THE COURT:  Government Exhibit 1501 is admitted into evidence and may be shown to the jury.

        (Government's Exhibit 1501 received in evidence)

        MR. REHN:  Ms. Sebade, could you bring up the exhibit

P7G1STO3                    Bram - Direct

and expand the top portion where we see the Twitter profile.

BY MR. REHN:

Q.  Mr. Bram, what is the Twitter profile here?

A.  This is Roman Semenov's Twitter profile.  You could see his profile picture up top, his name, and then his user name right below that.

Q.  And did you exchange messages with Roman Semenov?

A.  Yes.

        MR. REHN:  Ms. Sebade, could you please go down and expand the bottom two blue bubbles and the gray bubble at the bottom of the screen.

Q.  So again, as we look at this, are the blue messages the one that you wrote?

A.  Yes.

Q.  And are the gray messages the one that Mr. Semenov wrote?

A.  Yes.

Q.  So if we look at your two messages, what are you sending to him?

A.  I'm sending him a link to my tweet where I shared that YouTube video that we talked about.

Q.  What was his response, if you could read it?

A.  He said, "Hi, this video is awesome!  You got all the technical details right and did a thorough review."

Q.  Did you interpret that as an endorsement of your video?

A.  Generally that, yeah, that he liked it and thought it was

correct.

          MR. REHN:  Could we go to page 2 of this exhibit.

          And if we could expand the top gray bubble.

Q.  And if I could ask you to read the portion of this message
beginning, "we're playing it safe."

A.  Sure.  "We're playing it safe because the project is
already in high risk area, so don't ever talk about any
potential profits, because TORN is—" the token— "is
positioned as a utility token and not a security."

          MR. REHN:  And if we could bring that down and look at
the next two bubbles.

Q.  And could you read the next message.

          MR. REHN:  Could we just bring up all three at the
same time.

Q.  So if you could read the next message.

A.  It says, "That being said the community members totally can
educate public about such opportunities."  Winky face.

Q.  And I think you said "winky face" at the end.  What are you
referring to?

A.  The emoji at the end there.

Q.  What's your understanding of what winky face emoji means?

A.  Similar to a smile, I suppose.

Q.  Now, Mr. Bram, in your YouTube video did you talk about
potential profits from the anonymity program on Tornado Cash?

A.  Yes.

Q.   And did those profits come in the form of TORN payments?

A.   Yes.

Q.   And did you understand Mr. Semenov to be discouraging you from talking about those profits?

A.   No.

Q.   Could you read the third message.

A.   It says, "So WE don't ever talk about any potential profits."

Q.   When you received this message, what was your understanding, if any, of who Semenov was referring to when he said "WE don't ever talk about any potential profits"?

A.   The team, or the founders.

Q.   And who did you understand the founders to be?

A.   Roman Storm and Roman Semenov.

Q.   And going to the first message, what was your understanding, if any, of who Semenov was referring to when he said, "we are playing it safe because the project is already in high risk area"?

A.   I assume he meant himself and Roman and the team broadly.

Q.   So was he——when he was talking, when he was referring to not talking about profits, who was he referencing?

A.   I believe the two Romans——Roman Storm and Roman Semenov.

         MR. REHN:  Ms. Sebade, could we please go to page 4 of Government Exhibit 1501.

         And if we could expand the sort of second gray bubble

down to the bottom.

Q.  Mr. Bram, could you read the top message from Roman Semenov beginning, "The current Tornado Cash version."

A.  Sure.  It says, "The current Tornado Cash version is just the first step, the privacy on Ethereum can be so much more convenient and cheap."

MR. REHN:  And if we could go down a few more messages to the—I'm sorry.  Keep this up, but go to the last blue bubble.

Could we keep the same screen we had before with the message from Semenov, starting from, "The current Tornado Cash version" to the bottom.

Thank you.

BY MR. REHN:

Q.  Could you read the bottom blue bubble on the screen here.

A.  It says, "What are your thoughts for tornado V2 if you can share?"

Q.  What did you mean when you used the term V2?

A.  The next version of the software.

Q.  So when you sent this message, was it your understanding that new versions of Tornado Cash would be released over time?

A.  I thought it was definitely a possibility, yes.

MR. REHN:  Going now to page 6.  And Ms. Sebade, if you could expand just the top of this page showing the top five messages.

P7G1STO3                       Bram - Direct

Q.   And Mr. Bram, again, are the gray bubbles here from Roman Semenov?

A.   Yes.

Q.   And could you read the first message from Roman Semenov here.

A.   It says, "It depends on which features make it into the protocol, the more features the longer to develop.  We don't make any promises on future developments though, howey test and all."

Q.   Mr. Bram, when you received this message, was it your understanding that additional features of Tornado Cash could be developed and released over time?

A.   Yes.

Q.   And do you see there are then three blue bubbles from you?

A.   Yes.

Q.   And could you read the middle message.

A.   "How big is your team?"

Q.   And then looking toward the bottom of this page, could you read the responsive message.

A.   Yes.  It says, "We're very small, just a few people.  One of our co-founders lives in the U.S."

Q.   What was your understanding when you received this message, if any, of who he was referring to when he said that "one of our co-founders lives in the U.S."?

A.   I'm not sure if I knew at the time, but I took it to

mean——I now know it as Roman Storm.

MR. REHN:  Ms. Sebade, could we now bring back up Government Exhibit 1502, which is in evidence.

Q.  Mr. Bram, do you recall testifying earlier about these Twitter messages with Roman Storm?

A.  Yes.

MR. REHN:  Ms. Sebade, if you could go to page 2 and expand the bottom two messages on this page.

Q.  Mr. Bram, now in this exhibit, again, are the gray bubbles the messages from Roman Storm?

A.  Yes.

Q.  Could you read that message.

A.  It says, "Maybe you should join community multisig."

Q.  So did Roman Storm ask you to join something called the community multisig?

A.  He suggested it, yeah.

Q.  What was the community multisig?

A.  So there's two types of governance.  One is this on-chain governance that involves sort of the technicals of how the software works, but a community multisig was also being formed which controlled a small portion of Tornado tokens, and that was used to fund marketing initiatives or privacy research.

Q.  You mentioned marketing initiatives.  What was being marketed in those initiatives?

A.  The Tornado Cash software.

MR. REHN:  Ms. Sebade, could you please show the witness what has been marked as Government Exhibit 1503.

Q.  Mr. Bram, do you recognize this document?

A.  Yes.

Q.  And what is this?

A.  It's a screenshot of Telegram messages that I had with someone named Rezan.

Q.  Did you know who Rezan was when you received this message?

A.  No.

Q.  And was this a message you received shortly after Roman Storm asked if you wanted to join the community multisig?

A.  Yes.

MR. REHN:  The government offers 1503.

MR. KLEIN:  No objection.

THE COURT:  Government Exhibit 1503 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1503 received in evidence)

Q.  Mr. Bram, if you could read the top two messages here.

A.  So Rezan says, "Hello, sir, Roman from Tornado Cash told me that you would be interested in helping with the community multisig?"  And I said, "yeah, would love to chat about that."

Q.  Before this did you have any prior experience with a multisig?

A.  No, I don't believe so.

Q.  Now that's not a term everybody may be familiar with, so

P7G1STO3                     Bram - Direct

could you explain just a little bit more what it is and how it works.

A.  So multisig stands for I believe multiple signatures, and it sort of allows you to control money with other people.  So if a multisignature requires two of three confirmations, that means two of three people assigned to that multisig have to sign off on a transaction for it to happen.

Q.  So—and what is in the multisig?  What are they—what are they controlling?

A.  This multisig held Tornado tokens.

Q.  So was it basically a crypto wallet?

A.  Yes.

Q.  And you testified earlier I think that you can hold your own funds in a crypto wallet and you have the password; is that right?

A.  Correct.

Q.  So what's the difference between a wallet that you own for yourself and a multisig wallet?

A.  Multisig, multiple users have to determine how those funds are used, spent, or send it—sent, whereas if you're just holding the funds yourself, you can do what you please with them.

Q.  And did you join the community multisig?

A.  Yes.

Q.  And when you joined, how many members were there?

P7G1STO3                    Bram - Direct

A.   Two others.

Q.   And I think you said that the funds in the multisig were in the form of TORN tokens; is that right?

A.   Correct.

Q.   And so of the three members, did you all have to agree to spend those funds?

A.   Two of the three of us did, yes.

Q.   So anytime two of the three of you agreed to spend the funds, you could spend them.

A.   Yes.

Q.   And you mentioned that you were spending them on marketing initiatives and research?

A.   Yes.

Q.   And what was the form of those funds again?

A.   TORN tokens.

Q.   Where did the TORN tokens come from?

A.   They came from the larger Tornado Cash treasury.

Q.   And when you were spending on market initiatives with those TORN tokens, was it your experience that people were willing to accept TORN tokens to engage in those marketing initiatives?

A.   Yes.

Q.   And I'm not sure if I asked this question.  What was your understanding, if any, of who Roman is in this message here?

A.   I took it to mean Roman Storm who was controlling the Tornado Twitter account that mentioned the multisig to me

P7G1STO3                       Bram - Direct

first.

MR. REHN:  Ms. Sebade, could you please show the witness what has been marked as Exhibit 1505.

Q.  What is this document?

A.  This is a screenshot of a group chat between me and two other members that were on the Tornado Cash multisig.

Q.  So I think we've mostly been looking at some Twitter messages and now we're looking at Telegram messages; is that right?

A.  Correct.

Q.  And what is Telegram?

A.  It's a messaging app, basically the same as WhatsApp.

Q.  And can you have a chat on Telegram among multiple participants?

A.  Yes.

Q.  And can you give a title to the chat?

A.  Yes.

MR. REHN:  The government offers Exhibit 1505.

MR. KLEIN:  No objection.

THE COURT:  Government Exhibit 1505 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1505 received in evidence)

MR. REHN:  If we could bring that up and expand sort of the top half or so.

BY MR. REHN:

Q.  Mr. Bram, do you see a title of this particular chat that we're looking at here?

A.  Yes.

Q.  And what was the title of the chat?

A.  It says Tcash multisig.

Q.  And what was, what does Tcash refer to?

A.  Tornado Cash.

Q.  And what was the—do you see that it says "Rezan invited Justin Bram"?

A.  Yes.

Q.  Is that the same Rezan we were looking at the messages from earlier?

A.  Yes.

Q.  And Mr. Bram, what was the first message from Rezan after you joined the Tornado Cash multisig chat?

A.  They say, "Hey, @Justin_C_Bram, let me present you @ethdev_torn candidate with me for the Tornado community multisig."

MR. REHN:  And Ms. Sebade, if we could now expand starting from "Rezan invited Justin Bram" down a few messages.

Q.  Do you see here that the first message you just read refers to somebody named ethdev_torn?

A.  Yes.

Q.  And then below that there's a message from something that's referred to here as "Deleted Account"?

P7G1STO3                    Bram - Direct

A.   Yes.

Q.   So based on the message from Rezan and based on I believe you received these originally, do you understand whose messages are represented by the messages in this chat that say "Deleted Account"?

A.   Yes, it's ethdev_torn.

          MR. REHN:  Ms. Sebade, could we go down to page 3 of Government Exhibit 1505.  And if we could pull up the bottom four messages.

Q.   Mr. Bram, are your messages in blue here?

A.   Yes.

Q.   Could you read your message beginning, "Is there."

A.   "Is there some compensation for the risk/liability and time involved?"

Q.   And how did Rezan respond?

A.   They said, "We're thinking of 100 TORN per month."

Q.   So did you understand that as an offer of payment of 100 TORN per month for your service on the community multisig?

A.   Yes.

Q.   Did that offer of TORN payments have value to you?

A.   Yes.

Q.   And I think you mentioned earlier there was market value for TORN tokens.  Do you recall that?

A.   Yes.

Q.   And do you recall approximately how much TORN tokens were

worth at this point in time, in 2021?

A.   I don't know exactly, but probably somewhere between 20 to $80 per token.

Q.   So what was your monthly pay for being on the multisig, in dollars form?

A.   I believe when I first joined, it was about $8,000 a month, but the TORN price was very volatile and over the next few months went down pretty significantly.

Q.   So if it was at $80, you were getting $8,000 a month; and if it dropped down to, say, $40, you were getting $4,000 a month?

A.   That's correct.

          MR. REHN:  Ms. Sebade, could you now show the witness what has been marked for identification as Government Exhibit 1514.

Q.   What is this document?

A.   I didn't hear the question.

Q.   What is this document?

A.   Oh, it's a screenshot of the——that Tornado Cash multisig group chat.

Q.   Are these some messages from a few days later, on June 9, 2021?

A.   Yes.

          MR. REHN:  The government offers 1514.

          MR. KLEIN:  No objection, your Honor.

P7G1STO3                     Bram - Direct

THE COURT:  Government Exhibit 1514 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1514 received in evidence)

MR. REHN:  And Ms. Sebade, if you could expand the top portion of this through the, "Oh, nice" message.

BY MR. REHN:

Q.  Now again, Mr. Bram, is this further chats in the Tornado Cash multisig chat?

A.  Yes.

Q.  And do you see at the top there's something that says, "a link for withdrawal"?  Do you see that?

A.  Yes.

Q.  What was that?

A.  So that was a link to another application called sablier finance that streamed the Tornado tokens to us, and we could use that website to withdraw them.

Q.  So this is the actual mechanism by which you got paid those TORN tokens?

A.  Yes.

Q.  And could you read the first two blue bubbles here.

A.  Yes.  I said, "Awesome, thanks, anyone going to buy anything fun or just saving up?"

Q.  When you refer to—when you ask if anyone was going to buy anything fun or just saving up, what are you referring to?

A.  Basically whether they would sell the Tornado tokens to

purchase something else or hold them.

Q. So was this around the time you got your first payment of a hundred TORN tokens?

A. I don't recall.

Q. And in response, do you see a message from Deleted Account?

A. Yes.

Q. And was that ethdev_torn?

A. Yes.

Q. How did he respond?

A. To this message at the bottom?

Q. What was——could you read his message.

A. "Oh, nice. That's cool. Hmm . . . probably just save and hodl unless something urgent comes up. I'm genuinely bullish on TORN."

Q. What does hodl mean?

A. It stands for "hold on for dear life" or to hold the token, basically.

Q. And in the crypto world, when people say hodl or hold on for dear life, what does that generally indicate?

A. To hold the tokens, to keep them.

Q. And why would somebody hold tokens instead of selling them?

A. Because they think they'll go up in value, or to participate in the governance.

Q. And when people say that they're bullish on something in the crypto world, what do they generally mean by that?

A.  They think the price will go up.

MR. REHN:  And if we could bring this down and bring back up that same message, several messages past it.

Q.  So in response to the message you received that said that ethdev was going to hold on for dear life and that he was bullish on TORN, how did you respond?

A.  I said, "Yeah, V2 is exciting.  I was thinking of staking ETH TORN but not sure if I just want TORN."

Q.  So your response was that V2 was exciting?

A.  Yes.

Q.  What did you mean by V2?

A.  The chat we referenced earlier where I heard from Roman about some of the features they were considering for the next version of software.

Q.  So from your perspective, was the value of TORN connected to the release of new versions?

A.  It's tough to say.  I think the market is mostly trading on hype, and so when there's new announcements, new software, new developments, sometimes people buy the token thinking the price will go up.

Q.  And were you anticipating that new versions of Tornado Cash would be released over time?

A.  Yes.

Q.  With different features or different functions or additional features or functions?

P7G1STO3                      Bram - Direct

A.  Yes.

Q.  And could you read the response from Deleted Account.

A.  "Ya, tbh I tried asking Roman about V2 and he made it sound like it was still probably a bit distant in the future and specs were still pretty undefined.  But I trust they've got something exciting in the works."

Q.  And generally speaking, what do you understand this message to be about?

A.  The future of Tornado Cash.

Q.  And who did you understand him to be referring to when he said Roman here?

A.  I'm not sure which Roman here.

Q.  Do you have a sense of who it might be?

        THE COURT:  Leading.  He said he didn't know.  Nice try.

Q.  Do you see your responsive message in the next blue bubble?

A.  Yes.

Q.  What do you say there?

A.  "I'm scheduling a video call with him.  I'm building a meta transaction network too so wanted to bounce ideas."

Q.  Around this time were you scheduling a video call with somebody in particular, named Roman?

A.  I don't recall on the timing, exactly.

Q.  Did you have a video call with anybody named Roman in June of 2021?

P7G1STO3                        Bram - Direct

A.   I'm not sure if it was June, but I did have a video call with Roman Storm, yes.

               (Continued on next page)

P7G5sto4                    Bram - Direct

MR. REHN:  Ms. Sebade, could you show the witness what has been marked Government Exhibit 1516?

Q.  Mr. Bram, what is this?

A.  This is a screenshot of the Tornado Cash multisig group chat from Telegram.

THE COURT:  Counsel, may I just inquire?  May I have a sense of how much longer you have on direct?

MR. REHN:  It is probably 15 minutes.

THE COURT:  OK.  We will let you finish that and we will break for lunch.  Thank you.

MR. REHN:  I think we identified this but we had not moved it into evidence.

THE COURT:  Are you moving now sir?

MR. REHN:  I am.

THE COURT:  Mr. Klein.

MR. KLEIN:  No objection, your Honor.

THE COURT:  Thank you.  Government Exhibit 1516 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1516 received in evidence)

BY MR. REHN:

Q.  Mr. Bram, I think you said this was some additional Tornado Cash multisig chats in June of 2021; is that right?

A.  Yes.

Q.  If we could expand the first few messages here?  And if you could read the -- first off the gray messages with the little,

P7G5sto4                    Bram - Direct

I guess is that a dinosaur?

A.   Yes.

Q.   Whose messages are there?

A.   Rezan.

Q.   If you could read the messages from Rezan?

A.   It says:  To give you some background, I dropped the quorum because (1) Roman put pressure on me to pay WUT quickly and (2) the snapshot set up for LP plus stakers wasn't ready.

Q.   Do you see the part where he says Roman put pressure on me to pay WUT quickly?

A.   Yes.

Q.   What is WUT?

A.   It stood for What's Up Tornado, a community-run marketing channel for Tornado Cash.

Q.   And what sort of activities did that marketing channel engage in?

A.   They posted updates about, I believe software development, tutorials, and just general news for the community.

Q.   Was somebody putting pressure on the multisig to pay them?

A.   I don't recall --

        MR. KLEIN:  Objection, your Honor.

        THE COURT:  I agree.  Ask a better, less leading question.

        MR. REHN:  Yes, your Honor.

BY MR. REHN:

P7G5sto4                    Bram - Direct

Q.   Let's go ahead and scroll down to the message that begins:
The issue is...

          Could you read that message, please?

A.   It says:  The issue is that WUT wants to get paid ASAP and
the Tornado team really like his work.  Hopefully we can reason
him to be a bit patient.

Q.   When you received this message, who, if anyone, did you
understand Rezan to be referring to when he says "the tornado
team"?

A.   The founders.

Q.   Which founders in particular?

A.   Roman Storm and Roman Semenov.

Q.   Was it your understanding that Roman Storm and Roman
Semenov wanted to pay WUT for the work they were doing?

A.   Yes.

          MR. REHN:  We can bring this down.  Ms. Sebade, if you
can show the witness what has been marked for identification
Government Exhibit 1517?

Q.   What is this?

A.   Another screenshot of the same Tcash multisig Telegram
group chat.

Q.   What was the date on this one?

A.   June 23, 2021.

          MR. REHN:  The government offers Government Exhibit
1517.

MR. KLEIN:  No objection, your Honor.

THE COURT:  Government Exhibit 1517 is admitted into evidence.  It may be shown to the jury.

(Government's Exhibit 1517 received in evidence)

MR. REHN:  If we can expand the top few messages?  A little further than that?

BY MR. REHN:

Q.  Could you read the two messages that you sent at he beginning portion of the chat?

A.  Just had a good video call with Roman.  Might try to meet up with him in Seattle early next week.

Q.  Mr. Bram, did you have a video call with Roman Storm around this time?

A.  Yes.

Q.  On that call, what was discussed?

A.  We generally just talked about what the Tornado Cash multisig -- community multisig could do to help the Tornado Cash community.

MR. REHN:  And if we bring this part down and if we could go -- there we go.

Q.  And I see a message here from Rezan and two messages from you a little lower down here.

A.  OK.

Q.  Could you read the message from Rezan?

A.  Roman for the Tornado team or are you speaking of Sherpa

P7G5sto4                      Bram - Direct

Cash?

Q.  Can you read the two messages you sent in response?

A.   Roman of the Tornado team, he just kind of lit a fire under me of us getting stuff done.

Q.  During that video call, what sort of things was he encouraging you to do?

THE COURT:  He, Mr. Storm?

MR. REHN:  Yes.

A.  I don't remember exact specifics, but I think just directly seeing if we could add value to the Tornado Cash community around education, marketing.  Stuff like that.

Q.  And if we could go down at least one more message, maybe a couple more just to the bottom?  Did you describe that video call to Rezan?

A.  Yes.

Q.  Did the initiatives that you were just describing include things like content on your YouTube channel?

A.  Yes.

Q.  Aside from your YouTube video, did you ever hear Roman Storm promoting any other YouTube videos?

A.  I don't recall.

MR. REHN:  We can bring this down.

Q.  So Mr. Bram we be have been looking at messages from the May and June 2021 time period.  How long did you participate in Tornado Cash for?

P7G5sto4                           Bram - Direct

A.   Until the end of 2021.

Q.   So, for about six months?

A.   Yes.

Q.   And were you getting paid the 100 TORN tokens throughout that time?

A.   Yes.

Q.   Approximately how much did you earn, in total?

A.   $135,000.

Q.   Did there come a time when you decided to step down from participating in the Tornado Cash multisig?

A.   Yes.

Q.   What were the reasons for that decision?

A.   There were three main reasons.  The first was that I was starting a new job and wanted to focus on that.  The second was that there were some callouts in the community forums that the multisig wasn't really doing anything or adding value to justify their compensation and I agreed with that so I decided to step down.  And then lastly, the regulatory climate in the U.S. was heating up so I decided to step down for that reason as well.

Q.   And when you say the climate was heating up in the U.S., what are you referring to?

A.   Over the six months that I was there a lot of hacks were happening and those were going into the Tornado Cash protocol and it just seemed like a bad look.

MR. REHN:  Ms. Sebade, can you please show the witness what has been marked for identification Government Exhibit 1520?

Q.  Mr. Bram do you recognize this message?

A.  Yes.

Q.  And if you could explain what the message is?

A.  It is a message on the Tornado Cash forum where I'm basically called -- or the multisig is called out for not really adding value and I take the opportunity to step down from the multisig.

MR. REHN:  The government offers Exhibit 1520.

MR. KLEIN:  No objection, your Honor.

THE COURT:  Government Exhibit 1520 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1520 received in evidence)

MR. REHN:  If we could expand the bottom message, the one from Justin Bram?

BY MR. REHN:

Q.  So, are you responding to a message from somebody else in the community?

A.  Yes.

Q.  Generally speaking, what was that message conveying?

A.  The message sent initially?

Q.  The one that you were responding to.

A.  It was basically asking what the multisig had accomplished

P7G5sto4                      Bram - Direct

and what had they done to deserve the 100 TORN tokens per month per member.

Q.   Was that what you were referring to earlier whether you said that that callout from the community was an opportunity. for you to step down?

A.   Yes.

Q.   When did that happen?

A.   November 28, 2021.

Q.   Could you read your message?

A.   Hello.   Thank you for your justified concerns (@regerd). Due to my new obligations with another protocol and the regulatory climate in the U.S. (I'm currently the only anon U.S-based member) I'm going to be stepping down.  It was a pleasure to serve with the other members and I truly wish them well.  Thank you all for your support.  Best, Justin Bram.

Q.   At the time you stepped down from Tornado Cash, had you become aware of hacks that were entering the service?

A.   Yes.

Q.   Were you concerned about any potential liability you may have for participating in Tornado Cash?

A.   Yes.

          MR. REHN:  We can bring that down.

Q.   Mr. Bram, did there come a time when you were served with a subpoena in connection with this case?

A.   Yes.

Q.   Did that subpoena include a requirement for you to testify here today?

A.   Yes.

Q.   After your receipt of that subpoena, did you enter into any agreements with the government prior to your testimony?

A.   Yes.

Q.   What type of agreement is that?

A.   Non-prosecution agreement.

Q.   And what is your understanding of what you are required to do under the non-prosecution agreement?

A.   I am required to testify as a witness and tell the truth.

Q.   And what, if anything, does the agreement provide in return?

A.   It guarantees that there will be no legal consequences for my actions regarding Tornado Cash.

Q.   Now, you mentioned a moment ago that you had some concern about liability from Tornado Cash; is that right?

A.   Correct.

Q.   Do you, yourself, think that you committed any crimes?

A.   No.

Q.   Did you sign the non-prosecution -- so why did you sign the non-prosecution agreement?

A.   Based on the advice of counsel it seemed the best way to protect myself in case there were any legal challenges from the government.

P7G5sto4                        Bram - Direct

MR. REHN:  Nothing further your Honor.

THE COURT:  Thank you.

Now seems like a good time to take a break for lunch and so we will do that and I will see all of you in 45 minutes which is 2:30.  I'm going to ask you not to discuss the case with each other or anyone else and to keep an open mind until all of the evidence is received.

I am also going to remind the witness he remains under oath and that he should not be having substantive discussions with the government about his testimony.

Thank you, everyone.  45 minutes.

(Continued on next page)

(Jury not present)

THE COURT:  Mr. Bram, you are welcome to step down.

(Witness steps down)

THE COURT:  Counsel, sit for a moment, please?  I don't want to take too much of your lunch time.  Everyone else is welcome to leave if they wish to.

Counsel, I wanted to follow up with you on our discussions about juror availability and schedule.  We can do this in open court or I can have representatives from each team meet with me in the robing room.  What is your preference?

MR. KLEIN:  Here is fine, your Honor.

MR. REHN:  No objection.

THE COURT:  Fine.

I don't have -- we are now on our fourth witness, which is lovely.  I don't know that they will all proceed as quickly.

MR. REHN:  I actually believe they will.  This is about the pace we expect, your Honor.

THE COURT:  Again, your lips to God's ears, sir.  And the reason I mention that is I do believe at the end of day I do need to speak to our jurors about the fact that we will not be sitting on Friday and that we will very likely not be sitting on the 1st of August, and that we will -- and that we would be leaving early on the Friday between, I guess that is the 25th.

So, my suggestion is that I just start -- what do people in the business say -- socializing them to the idea of maybe staying a little bit late a couple days next week or working through, as Mr. Patton suggested, to 1:30 on Friday. But, I do have to let them know that they're not sitting Friday. It is not fair to tell them tomorrow.

Do you have any objections to my speaking with them at the end of the trial day today?

MR. KLEIN: No, your Honor.

MR. REHN: No, your Honor.

THE COURT: And if we are at this pace, maybe -- I think they will be happy to see the pace at which we are moving and I will accept Mr. Rehn's representations that at least some of the government's witnesses will be at this pace as well.

What I propose to tell them is that they're not sitting Friday because -- and they know why, because of the funeral for the cousin of one of the alternate jurors, and also that I'm not going to make them change anything or stay later tomorrow, I don't think they have enough time to adjust their schedules, but that we should talk about whether next week there are days they could stay a little bit later.

Is that acceptable to everyone?

MR. KLEIN: Yes, your Honor.

MR. REHN: Yes, your Honor.

THE COURT: OK then. I will let you have your

P7G5sto4                        Bram - Direct

lunches.  I thank you very much.

Mr. Klein -- sorry about that.  I faked you out by saying you could go and then not letting you go.

Mr. Klein, do you have a sense your cross will take the whole of the afternoon?  Please say no.

MR. KLEIN:  No.  No, your Honor.

THE COURT:  Thank you, sir.

MR. REHN:  The next witness is Andre Llacuna.

THE COURT:  We will begin him today, we will finish him today.  Who knows what we will do today.

MR. REHN:  It depends on the length of the cross.  Are we going until 4:00 today?

THE COURT:  We can go until probably 3:45.  If he is 5 or 10 minutes away from completion then I will go a little bit extra, as I have warned the jury.

MR. REHN:  Depending on the length of the cross, my guess would be we would get a lot of his direct in today but we will see.

THE COURT:  OK.  Who is crossing?

MR. PATTON:  I am, your Honor.

THE COURT:  All right.  I will give you all of this lunch break to streamline your cross.

MR. KLEIN:  Mr. Bram I am crossing.

THE COURT:  I understand that.  No, I am speaking of Mr. Llacuna.  But, sir, I appreciate if you accept my thought

P7G5sto4                              Bram - Cross

that you can streamline as well.

Thanks so much everybody.  See you in 45.

(Continued on next page)

P7G5sto4                        Bram - Cross

A F T E R N O O N   S E S S I O N

1:30 p.m.

THE COURT:  Mr. Klein, you may inquire.  Thank you.

MR. KLEIN:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. KLEIN:

Q.  Good afternoon, Mr. Bram.

A.  Good afternoon.

Q.  I'm going to start by playing you some portions of the video you created that the prosecutor showed you.  I'm going to show you some portions that they skipped over.

MR. KLEIN:  So, can you please call up the first 15 seconds of the video and play seconds 1 through 15?

(Video played)

Q.  You were excited by Tornado Cash, weren't you?

A.  Yes.

Q.  You were excited about its technology?

A.  Yes.

Q.  You were excited about how it helped the privacy too; right?

A.  Yes.

Q.  Now, before lunch you talked about, you were asked about reasons you stepped away from the project.  Do you remember that?

A.  Yes.

P7G5sto4                    Bram - Cross

Q.   And one of the reasons you mentioned was you had concerns
about the regulatory risks; right?

A.   Yes.

Q.   But you didn't think you did anything wrong; did you?

A.   Correct.

Q.   You thought Tornado Cash was above board; right?

A.   At the time, correct; yes.

          MR. KLEIN:   I'm going to play another clip.   This is
from 3:14 to 3:31.

          (Video played)

Q.   What you are talking about here is when you conduct a
transaction on the protocol; right?

A.   Yes.

Q.   And you get a secret note?

A.   Yes.

Q.   And that's sort of a password just the user has who is
doing the transaction; right?

A.   Correct.

Q.   And so, that note allows you to conduct your transaction,
to take your Ethereum on one end, run it through the protocol,
and on the other end it's -- you can't see that it came through
you; right?

A.   Correct.

Q.   And only the user has that secret note?

A.   As far as I understand, correct.

P7G5sto4                        Bram - Cross

Q.   So you are not aware of anybody else having that; right?
Unless the user gives it to them.

A.   Correct.

Q.   So no one else in the world has that secret note; right?

A.   Correct.

Q.   Mr. Storm wouldn't have your secret note, would he?

A.   No, he wouldn't.

Q.   None of the other founders would have your secret note,
would they?

A.   No, they wouldn't.

Q.   The only person who can conduct a transaction is the user;
correct?

A.   As far as I understand it, correct.

Q.   And that was one of the exciting features about this, was
the sort of non-custodial nature of it; right?

A.   Yes.

Q.   And another exciting feature about Tornado Cash was it was
decentralized; right?

A.   Yes.

Q.   And decentralized means that no one controls it; right?  It
is controlled by the community?

A.   Correct.

Q.   There is no one person controlling it, there is no one
central actor?

A.   Correct.

P7G5sto4                    Bram - Cross

Q.   So Mr. Storm wouldn't control it himself; right?

A.   Unless he had a majority of the Tornado token that's correct.

Q.   Unless someone had the a majority of the Tornado tokens they couldn't control it; right?

A.   Yes.

Q.   All right.  Let's move on.

     I want to focus you for a minute on, cutting back a little bit to when you talked about the fee for Ethereum.  Do you remember that?

A.   Yes.

Q.   And that's a fee that you pay on the Ethereum network so that you can move your ETH, which is the cryptocurrency around; right?

A.   Yes.

Q.   That's not a fee you pay as part of Tornado Cash; right?

A.   Correct.

Q.   You didn't pay a fee when you conducted your transaction to the UI; did you?

A.   It depends if you used a relayer.

Q.   We will talk about that in a minute.

     UI didn't charge you a fee, did it, itself?

A.   As far as I understood the UI did not charge a fee, correct.

Q.   So let's get to that.  You talked about a relay.  What are

relayers?

A.   A relayer allows a user to withdraw Tornado Cash to a fresh address without having ETH in that address to pay for gas.  So, because with that new address you wouldn't be able to pay for the transaction if there was no ETH in it to begin it.

Q.   And relayers are, they're like independent actors.  There is different people can be different relayers, right?  It is not one relayer for the whole system?

A.   That's my understanding, yes.

Q.   Lots of people can be different relayers.  Anybody can sign up to be a relayer; right?

A.   Correct.

Q.   Let's talk for a minute about privacy, it is one of the things you talked about a moment ago.

         Privacy was an important issue in the cryptocurrency community at this time, wasn't it?

A.   Yes.

Q.   And tell me why it was important.

A.   It was important at the time and to some extent still is because as, I mentioned earlier before lunch, transactions on the blockchain are pseudo-anonymous so you your entire transaction history is all public on the blockchain.

Q.   And one example you actually gave was about your employer, right, in your video, that I recall?

         MR. REHN:  Objection.

P7G5sto4                           Bram - Cross

THE WITNESS:  I believe so.

THE COURT:  The example that he gave was of the employer paying someone in ETH, yes.

MR. KLEIN:  May I proceed.

THE COURT:  You may.

BY MR. KLEIN:

Q.  And so, why would that be important, for example, with an employer, if your employer is paying you with crypto?  And I am using crypto as shorthand for cryptocurrency.

A.  One example I could think of is if your employer is sending you funds to your address if you don't want them to see, let's say your net worth and how much money you hold on chain or what you do with that money.

Q.  And so, if they're paying you in ETH, one thing you could do to protect your privacy would be to send your ETH through Tornado Cash; right?

A.  Correct.

Q.  And that would help protect your privacy?

A.  Correct.

Q.  I want to talk to you about when you first got involved in Tornado Cash.  So you created this video and you sent it -- you published it; right?

A.  Correct.

Q.  And it was on a YouTube channel or where was it?

A.  My YouTube channel, yes.

P7G5sto4                          Bram - Cross

Q.   That's publicly available?

A.   Yes.

Q.   How many people approximately, at that time, did you have subscribing to your channel?

A.   Somewhere between 15,000 to 30,000.

Q.   That is a lot of people.

And so, and you were in the business of sort of not full-time business you but you were creating videos to educate people about crypto and other things; right?

A.   Correct.

Q.   So to prepare for that video you took a number of steps including researching Tornado Cash; right?

A.   Correct.

Q.   So, would it be correct you looked at the Twitter account?

A.   Sorry.  I didn't hear the question.

Q.   Did you look at their Twitter account?

A.   Yes.

Q.   Was that publicly available?

A.   Yes.

Q.   Did you go to the website?

A.   Yes.

Q.   Was that publicly available?

A.   Yes.

Q.   Did you check out Discord?

A.   I believe so.

Q.   And that's publicly available, too, isn't it?

A.   Yes.

Q.   And there was a community chat group too, wasn't there?

A.   Yes.

Q.   That was publicly available also, wasn't it?

A.   Yes.

Q.   And you looked at Medium posts, right?  The prosecutor
showed you some of those.

A.   Correct.

Q.   And those were publicly available; right?

A.   Correct.

Q.   What is Medium?  The jury may not know what a Medium post
is.  Can you explain for us?

A.   It is simply a blog so anyone can post articles on an
account about news, anything they want.

Q.   Do you recall -- excuse me.

         As part of your research when you looked at these
Medium posts, do you recall reading a Medium post about
Tornado Cash compliance efforts?

A.   I believe so.

Q.   And do you recall learning that in fact the Tornado Cash
project had instituted geo-blocking of sanctioned countries?

A.   I'm not sure when I learned that but I have learned that,
yes.

Q.   Would it refresh your memory if I showed you the Medium

post?

A.   Yes.

MR. KLEIN:   Your Honor, may I approach?

THE COURT:   You may.

MR. KLEIN:   I have copies for the Court and for the witness.

THE COURT:   Please give it to my deputy and we will give it to the witness.   Thank you.

MR. KLEIN:   I have one for your Honor, too.

THE COURT:   Thank you.

BY MR. KLEIN:

Q.   Mr. Bram, I direct you to the Medium post dated June 3, 2020.

A.   OK.

Q.   Take a moment to look through this.

MR. REHN:   Are we just refreshing his recollection on the date?

THE COURT:   I assume.

It is just for refreshing recollection, sir, yes?

MR. REHN:   The date he learned I think was the pending question.   Does he need to read the whole thing for that?

MR. KLEIN:   I'm asking him to review it.

THE COURT:   All right.

BY MR. KLEIN:

Q.   Do you remember that --

THE COURT:  Does this refresh your recollection, sir?

A.  Yes, I have seen this before today.

Q.  Does this refresh your recollection that there were restrictions placed on the Tornado Cash protocol relating to IP addresses from sanctioned countries?

MR. REHN:  Your Honor, I think he is just asking him to read the document.

THE COURT:  Exactly, which I am not letting him do. No.  Sustained.

BY MR. KLEIN:

Q.  Do you recall, as you researched Tornado Cash before your video and read Medium posts, that Tornado Cash had placed IP sanctions -- IP geo-blocking on sanctioned countries?

A.  I recall that but I'm not sure on the timeline if it was before the video or after the video.

Q.  But you were aware of it at the time you were involved in Tornado Cash?

A.  Yes.

Q.  You talked briefly with the prosecutor about how you had to contact with Mr. Storm, my client?

A.  Yes.

Q.  And you learned he was here in the U.S.?

A.  Yes.

Q.  And he encouraged you -- let me step back.

He was very excited about the first video you did,

wasn't he?

A.   I believe so, yes.

Q.   And he in fact encouraged you to create more videos; right?

A.   Yes.

Q.   More educational videos?

A.   Yes.

Q.   He encouraged you to make those publicly available?  Or they would have been publicly available, right, because you were putting them on YouTube?

A.   They were, yes.

Q.   He wanted to have you help spread the word about Tornado Cash; right?

A.   Yes.

Q.   He didn't ask you to create videos pitching Tornado Cash to money launderers, did he?

A.   No.

Q.   He didn't ask you to create videos about Tornado Cash pitching it to hackers; did he?

A.   Before you said pitching?

Q.   Pitching.

        THE COURT:  Yes, sir.

A.   Like presenting?  Sorry, I don't --

Q.   Yes; present, educate hackers about Tornado Cash.  He didn't ask you --

        MR. REHN:  I'm going to object at this point.  This is

cumulative.

THE COURT:  I don't think it is making much of a point but I will let him ask one more go ahead, sir.

Q.  He didn't ask you to create educational videos to pitch Tornado Cash to North Koreans, did he?

A.  No.

Q.  I want to talk to you for a moment about your involvement with the multisig.  So, can you remind us how you first got involved with the multisig?

A.  Yes.  I created the YouTube video, brought it to the attention of the Tornado Cash Twitter account, and then Roman Semenov's Twitter account and they introduced me to Rezan, who brought me into the multisig.

Q.  It was you, Rezan, and somebody else; right?

A.  Correct.

Q.  And you were in a chat group just with those two?

A.  Initially, yes.

Q.  And you talked -- when you were talking about this you talked about the Tornado Cash community?

A.  Correct.

Q.  Tell me about the Tornado Cash community.

A.  It is a little hard to define.  I would say it is sort of a loose collective of folks that hold the Tornado Cash token or people that are enthused by the project.

Q.  And at that time there was a lot of enthusiasm about this

project, wasn't there?

A.   I would say so.

Q.   In the Ethereum community?

A.   Yes.

Q.   And in the broader crypto community?

A.   Yes.

Q.   And so this community was a pretty large and growing community of people?

A.   I would say so.

Q.   And when you got involved in multisig you didn't have any prior experience with multisig, did you?

A.   I did not.

Q.   You are not a coder, are you?

A.   No.

Q.   And so, but you did learn how to do multisig; correct?

A.   Correct.

Q.   And you conducted a couple of transactions?

A.   Correct.

Q.   And in connection with that there was a vote by the community to pay you some TORN each month; right?

A.   Correct.

Q.   So you weren't paid by Mr. Storm, were you?

A.   I was not.

Q.   The community got together, voted on a proposal, and then you were paid 100 TORN a month while you were one of the

multisig people?

A.   That is correct.

          MR. KLEIN:  One moment, your Honor?

          (Counsel conferring)

          MR. KLEIN:  One more topic area, your Honor?

          THE COURT:  Sir.

          MR. KLEIN:  Sorry, your Honor.  I lost my pad.  Oh,
here it is.  Lot of paper.

Q.   I'm going to direct your attention to Government Exhibit
that's in evidence 1501.

          MR. KLEIN:  Can you please pull up page 2,
Mr. Demarco?  The screen is just the wrong size for reading
glasses.  That's better.

          Sorry, I'm going to go back to the multisig real
quick.

Q.   Just to be clear, Mr. Bram, it was the community that voted
to use DAO funds to pay you; correct?

A.   Correct.

Q.   And what was the DAO?

A.   The DAO is -- DAO stands for Decentralized Autonomous
Organization.  It is a collection of people that hold a token
that can vote on different proposals.

Q.   So you were paid by the DAO?

A.   Yes.

Q.   Back to Exhibit 1501.  Do you remember when the prosecutor

showed you this?

A.  Yes.

Q.  And he directed your attention to the top where it talks about -- I'm not going to read it because I'm not the witness but it talks about risk; right?

A.  Yes.

Q.  And it talks about there were risks associated with the profits right there.  Can you read that again, do you mind rereading that section so the jury knows what we are talking about because I confused everybody now?

A.  Sure.  I will read the whole thing.

We don't have APY figures on our UI and the UI for LP staking for legal reasons.  We are playing it safe because the project is already in high risk area, so don't ever talk about any potential profits, because TORN is positioned as a utility token and not a security.

MR. KLEIN:  Can you go to page 6, please?  And can you pull up the part that says how that depends on?

Q.  Can you read the part that starts with "depends on"?

A.  Yes.

It depends on which features make it into the protocol.  The more features, the longer to develop.  We don't make any promises on future developments though, Howey test and all.

Q.  At this time, and this is in 2021, wasn't a big concern in

P7G5sto4                          Bram - Cross

the cryptocurrency community whether cryptocurrency was
considered to be securities by the SEC, like stocks?

            MR. REHN:  Objection, your Honor.

            THE COURT:  I'm not sure what relevance this has to
anything but I will allow.

            Do you know, sir?

            THE WITNESS:  Yes.  It was a big topic of discussion.

Q.   And the Howey test is something you are familiar with?

A.   Yes.

Q.   What is it?

            MR. REHN:  Objection, your Honor.

            THE COURT:  I will allow.

A.   It is a test that I believe -- I'm not a lawyer but it
basically determines whether an asset is a security or not a
security.

Q.   OK.  And at that time it was your understanding that there
was a lot of risk about whether something is a security or not
in terms of specific cryptocurrency; correct?

            MR. REHN:  Objection, your Honor.

            THE COURT:  I will allow.

            THE WITNESS:  Yes.

            MR. KLEIN:  Nothing further.

            THE COURT:  Thank you.

            Redirect?

            MR. REHN:  Briefly, your Honor.

P7G5sto4                          Bram - Redirect

THE COURT:  Yes.

REDIRECT EXAMINATION

BY MR. REHN:

Q.  Mr. Bram, if we can go right back to GX 1501 and if we go to that same page, page 6, do you recall being asked about this message here during cross-examination that begins:  It depends on which features make it into the protocol?

A.  Yes.

Q.  Did you have any understanding of who would make decisions about implementing features into it?

A.  I was assuming It was the founders.

Q.  And do you recall testifying on cross-examination about geo-blocking features on the Tornado Cash website?

A.  Yes.

Q.  Did you have an understanding of who had the ability to implement those features on the website?

A.  Yes.

Q.  And what was your understanding?

A.  I assume the founders would be able to.

Q.  Does geo-blocking depend on knowing a user's IP addresses when they visit a website?

A.  I believe so, but it is a little beyond my technical understanding.

Q.  So, based on your understanding that the founders had the ability to implement geo-blocking, was it your understanding

P7G5sto4                    Bram - Redirect

they had the ability to collect IP addresses of who visited their website?

A.   I believe they could do that, yes.

Q.   Now, do you recall testifying during cross-examination about your understanding that Tornado Cash was decentralized?

A.   Yes.

Q.   What was the basis for that understanding?

A.   Well, in our industry, decentralization is debating a lot and it is not really a black and white issue.  It gets into the nuance of people have different definitions of levels of decentralization.

Q.   Is the basis for your understanding then that that was a word that was used sometimes in the community?

A.   Yes.

Q.   But there wasn't a clear definition, from your perspective?

A.   I would agree with that, correct.

Q.   Do you actually know how much control the founders had over individual features of Tornado Cash?

A.   I don't know myself because I'm not an engineer.  I just know what I heard from various marketing information in the community.

Q.   Do you actually know how many smart contracts are involved in Tornado Cash?

A.   No.

Q.   Do you actually know which of those smart contracts the

founders group control?

A.   I don't know myself, no.

Q.   Do you actually know whether the founders had any control over the app?

A.   Over the front end application do you mean?

Q.   Yes.

A.   I assume they did.

Q.   So, when you testified on cross that the community had control, what exactly was that based on?

A.   It is based on my understanding that the majority of -- if there was a governance vote on the Tornado Cash governance system, which is a smart contract system, that if the majority of votes vote yes or no for a given proposal, that proposal will be enacted.

Q.   But do you actually know who was holding the switch and deciding whether to implement features or not?

A.   I believe the code would automatically execute based on the, if the majority of votes voted "yes" for a proposal.

          MR. REHN:  Nothing further.

          THE COURT:  Thank you.

          Sir, you may step down.  Thank you very much.

          (Witness excused)

          THE COURT:  Can the government please call its next witness?

          MR. REHN:  The government calls Andre Llacuna.

ANDRE MARCUS QUIDDAOEN LLACUNA,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

      THE DEPUTY CLERK:  Please be seated and into the microphone, please state and spell your full name for the record.

A.   A-N-D-R-E, M-A-R-C-U-S, Q-U-I-D-D-A-O-E-N, L-L-A-C-U-N-A.

DIRECT EXAMINATION

BY MR. REHN:

Q.   Good afternoon, Mr. Llacuna.

A.   Good afternoon.

Q.   Where are you from?

A.   I am from Arcadia, California.

Q.   Is that where you grew up?

A.   Yes.

Q.   How old are you?

A.   I'm 23 years old.

Q.   What is your educational background?

A.   I went to Arcadia High School, graduated, and then I did some schooling at Cal State L.A. for nursing, and then I dropped out and then I went to a local barber college.

Q.   And what do you do for a living now?

A.   I'm a hair stylist.

Q.   How long have you been doing that work?

A.   Ever since 2018.

Q.   Did there come a time when you were arrested?

A.   Yes, there was.

Q.   Approximately when was that?

A.   Early March 2022.

Q.   And what were you arrested for?

A.   I was arrested for conspiracy to commit wire fraud and conspiracy to commit money laundering.

Q.   At a high level, what was it you did that led to you being arrested?

A.   For me getting arrested, me and a co-conspirator created a rug pull, which is a scam to de -- to -- we stole from people by doing what is called a rug pull to steal funds from investors.

          THE COURT:  And the term you are using, sir, is rug pull?

          THE WITNESS:  Rug pull, yes.

          THE COURT:  Thank you very much.  I need you closer to the microphone.  Thank you so much.

Q.   We will come back to that concept of a rug pull in a few minutes.  Is that the basis for the wire fraud charges?

A.   I believe the wire fraud charges, yes, it was.

Q.   And I think you also mentioned money laundering.  What was the basis for that?

A.   The basis for the money laundering charge was we tried to take the funds that we stole and then tried to hide them and

P7G5sto4                       Llacuna - Direct

wash them so that they wouldn't be able to be traced back to us.

Q.   Is there a particular service that you used to do that?

A.   Yes, there is.

Q.   What was the name of that service?

A.   The name of the service was Tornado Cash.

Q.   After your arrest, did there come a time when you met with FBI agents and prosecutors?

A.   Yes, there was.

Q.   And in connection with that meeting, did you make a decision about what to do with respect to the criminal charges against you?

A.   Yes.

Q.   What decision did you make?

A.   I decided to plead guilty to my charges.

Q.   Did you also decide to cooperate with the government?

A.   I did.

Q.   How many times did you meet with the government?

A.   Two times.

Q.   And did during those meetings were you asked a lot of questions?

A.   Yes.

Q.   And did you tell the government about the crimes you had committed?

A.   I did.

Q.   Did you tell the government about the people you had committed the crimes with?

A.   I did.

Q.   And did you ultimately enter a guilty plea to those crimes?

A.   Yes, I did.

Q.   In connection with your guilty plea, did you enter into an agreement with the government?

A.   Yes, I did.

Q.   I'm going to show you for identification purposes what has been marked GX 3509-009.  Could you explain what this document is?

A.   Yes.  This is a document that is showing my guilty plea that I entered.

Q.   Does this document explain what you are obligated to do under your cooperation agreement?

A.   Yes, it is.

          MR. REHN:  The government offers GX 3509-009.

          MR. PATTON:  No objection.

          THE COURT:  GX 3509-009?

          MR. REHN:  I believe so, your Honor.

          THE COURT:  It is admitted into evidence.  It may be shown to the jury.

          (Government's Exhibit 3509-009 received in evidence)

BY MR. REHN:

Q.   If we could bring that up and look at the first paragraph,

P7G5sto4                      Llacuna - Direct

do you see there are two counts listed there?

A.   Yes.

Q.   Is Count One related to the wire fraud that you were describing?

A.   Yes, it is.

Q.   Is Count Two related to the money laundering that you were describing?

A.   Yes, it is.

MR. REHN:  We can bring that down.

Q.   What is your understanding of what your cooperation agreement obligates you to do?

A.   For my cooperation agreement I was told to come here and just be honest and tell the truth and tell my truth and testify for this case.

Q.   Were you also obligated to have meetings with the government?

A.   I'm sorry.

Q.   Are you also obligated to meet with the government when requested?

A.   Yes.

Q.   So the cooperation agreement requires you to testify?

A.   Yes.

Q.   Is that why you are testifying here today?

A.   Yes.

Q.   If you do what the cooperation agreement requires you to

do, what is your understanding of what the government is required to do?

A.   If I testify honestly, then the government will file a motion to the Court for my case that will basically allow -- or that will make it so that the government won't have a set sentencing arrangement for me so it will be up to the Court to decide my sentencing.  And then it will also, they will file a motion that will state that I did testify for them.

Q.   So will the government actually recommend any sentence for you?

A.   No, it won't.

Q.   And who will decide what sentence you will ultimately receive?

A.   The Courts will.

Q.   Does the sentence you receive depend in any way on the outcome of this trial?

A.   No, it does not.

Q.   What happens if you do not testify truthfully?

A.   Then my agreement will be voided and won't -- yeah, it will be voided.

Q.   Will your guilty plea still be in place, though?

A.   Yes.

Q.   I would like to now ask you about cryptocurrency.  Did there come a time when you became interested in crypto?

A.   Yes.

P7G5sto4                        Llacuna - Direct

Q.   When was that?

A.   I believe I was in middle school when I got interested in

cryptocurrency.

Q.   And how did you get interested in cryptocurrency?

A.   There was a game that I used to play called Minecraft and I

would play with a few of my friends and they introduced me to

this new thing called Bitcoin.

Q.   Did you actually buy and sell Bitcoin when you were in

middle school?

A.   No.  I was too young to purchase it so my parents wouldn't

let me.

Q.   Did there come a time where you actually did start

purchasing crypto?

A.   Yes.

Q.   When was that?

A.   Around 2019 or 2020.

Q.   And what sort of crypto did you get involved with?

A.   I was purchasing mainly Ethereum.

Q.   Did you ever get involved with something called NFTs?

A.   Yes.

Q.   What is an NFT?

A.   An NFT is a non-fungible token.  It's basically a digital

asset that usually comes with, like, a picture.

Q.   So what kind of a picture would it be?

A.   It could range from anything, whatever the artist wanted to

P7G5sto4                      Llacuna - Direct

create.

Q.   And do NFTs come in sets?

A.   You could purchase them individually but, yes, they're typically part of like a pool group, like a single artist creating multiple pieces of art.

Q.   And then do multiple people purchase one of those NFTs?

A.   Yes.

Q.   Do NFTs have any benefits for their owners?

A.   Yes.  Usually they do come with some benefits.

Q.   What sort of benefits might an NFT have?

A.   NFT could typically have benefits that help the purchaser financially.  Usually they can come with different, I guess, options of what you are able to do and also could just be an asset hoping that it will appreciate over time.

Q.   Do NFTs sometimes have recreational uses, too?

A.   Yes, I believe so.  There is a well known one, I think here in New York called Neko X.  If you buy one you could get free food over there so, yes, there are some recreational benefits.

Q.   And are these the sort of things you were buying and selling?

A.   Yes.

Q.   Is there a particular platform where you can buy or sell NFTs?

A.   Yes.  We were using Open Sea.

Q.   What is Open Sea?  How does it work?

A.   It is a marketplace to where you could buy or sell NFTs.

Q.   Is it a website?

A.   Yes.

Q.   Do you have an account there where you go and buy and sell NFTs?

A.   Yes.

Q.   Was there anyone else who you talked about your interest in NFTs with?

A.   Yes.

Q.   Who was that?

A.   I shared an interest with NFTs with a person named Ethan Nguyen.

Q.   How do you know Ethan Nguyen?

A.   I have known him ever since elementary school.

Q.   And how close are you?

A.   We would be friends.  We were not super close but, again, I am a hair stylist, I have cut his hair multiple times and we always talk.

Q.   Did there come a time where you discussed doing a project together?

A.   Yes.

Q.   And who brought that idea up?

A.   Ethan brought up the idea to me.

Q.   What sort of a project was it?

A.   An NFT project.

P7G5sto4                        Llacuna - Direct

Q.   What was it going to be called?

A.   It was called Frosties.

Q.   What was the Frosties project?

A.   It was an NFT project that was created.  It was just an idea that he had that I came along board with.

          MR. REHN:  Ms. Sebade, can you please show the witness what has been marked Government Exhibit 2516?

Q.   Do you recognize this?

A.   Yes.

Q.   What is this?

A.   This is the Frosties NFT website.

          MR. REHN:  The government offers Exhibit 2516.

          MR. PATTON:  No objection.

          THE COURT:  Government Exhibit 2516 is admitted into evidence.  It may be shown to the jury.

          (Government's Exhibit 2516 received in evidence)

BY MR. REHN:

Q.   I think you said it is the Frosties NFT website.  Can you explain that a little bit more?  What was this website?

A.   This is the website that we used to give information about what we were selling and it shows images of the NFTs we were selling, as well as an area where you could purchase them.

Q.   Mr. Llacuna, were you involved in creating this website?

A.   Yes.

Q.   What was the purpose of the website?

P7G5sto4                    Llacuna - Direct

A.   The purpose of this website was to answer questions that people had, and also to build some sort of hype around the project.

Q.   Now, looking at this document I see two boxes on the left, each of which has an image in it.  Can you explain what those are?

A.   Yes.  Those are the arts that were created.  All of them have different traits and all of them were generated randomly.

Q.   And so, are those the Frosties?

A.   Yes, they are.

Q.   So what was the idea of what you were selling?

A.   So, our idea was to create this image and this, I guess art, that we would sell to some of our investors.

Q.   How much were you selling the Frosties for?

A.   0.04 Ethereum each.

Q.   And I see on the right side of the screen there is a white box that says "private sale."  Do you see that?

A.   Yes.

Q.   And below that it says 0.04 ETH.  Is that what you are referring to?

A.   Yes.

Q.   And could people buy as many as they wanted?

A.   Yes.

Q.   Do you have a sense of how much 0.04 ETH was worth at this time?

A.   I believe around $200 to $300.

Q.   So you would buy one of these images for $200 to $300 essentially?

A.   Yes.

Q.   How many Frosties were you going to sell?

A.   8,888.

Q.   Was there any significance to the number 8,888?

A.   There were a couple reasons why we chose that.  One reason was because it looked like a double scoop of ice cream, which kind of fit the theme for Frosties.  Another reason was because 8,888 was a number that kind of gave a sense of scarcity while still being readily available.  If there is 888, that would kind of be a little bit short and we wouldn't be able to sell it for that much, while going past that would kind of ruin the sense of exclusivity you get from buying one.

Q.   So the total amount were 8,888?

A.   Yes.

          MR. REHN:  We can bring this one down and, Ms. Sebade, if you can show the witness what has been marked for identification purposes as Government Exhibit 2518?

Q.   What is this, Mr. Llacuna?

A.   This is the front page of the Frosties NFT website.

Q.   Is this additional content that was available at that Frosties website?

A.   Yes.

P7G5sto4                        Llacuna - Direct

MR. REHN:  The government offers Government Exhibit 2518.

MR. PATTON:  Your Honor, I should just note we have our continuing objections from earlier but I don't have anything additional to offer.

THE COURT:  OK.  And over those objections I am admitting this exhibit, Government Exhibit 2518.

It may be shown to the jury.  Thank you.

(Government's Exhibit 2518 received in evidence)

MR. REHN:  Ms. Sebade, if you could expand the top section, basically all the graphic material first?

BY MR. REHN:

Q.  Mr. Llacuna, again, I see a similar image up top of some characters.  Do you see that?

A.  Yes.

Q.  And then below I see some boxes with some different characters in them.

A.  Yes.

Q.  Are those examples of Frosties that were for sale?

A.  Yes, they are.

Q.  And so there were 8,888 of those?

A.  Yes.

MR. REHN:  Ms. Sebade, if you could scroll down a little ways to get to the section of the website that says Launch Roadmap?

Q.   Was this another section of the website, Mr. Llacuna?

A.   Yes.

Q.   And I see text that says Launch Roadmap.  Do you see that?

A.   Yes, I do.

Q.   What does Launch Roadmap refer to?

A.   The Launch Roadmap referred to key points throughout our sale to help incentivize people to purchase it, so each time one of the milestones were reached, we would do what that percentage says.

          MR. REHN:  So if we can focus in in particular, and maybe expand a box around the 100 percent sold part?

Q.   First off, what exactly does 100 percent sold represent on the Launch Roadmap?

A.   This would mean that all 8,888 Frosties would have been sold.

Q.   Can you read what it says under 100 percent sold?

A.   It says:  Immediate start on development roadmap, starting with staking, metaverse development, and marketing campaigns!

Q.   And let's focus in on the metaverse development.  What does that mean?

A.   So we believed that the Frosties could have been used to create a video game in the web free space.

Q.   And so would that be a video game where the Frosties would interact?

A.   Yes.

Q.  So what are you telling people with this metaverse development statement here?

A.  We were telling people that if they purchased this NFT, then these are some of the benefits they would get and they would at some point get access to this game that we were developing.

Q.  Were you actually intending to develop a game?

A.  No, we were not.

MR. REHN:  We can bring that down and, Ms. Sebade, if you can scroll down to the section of the website that says Development Roadmap?

Q.  Mr. Llacuna, could you read the text underneath Development Roadmap?

A.  In order to ensure the longevity of Frosties, we will implement several strategies in order to increase floor price.

Q.  What, exactly, does that mean?

A.  That means that even after being sold out, we still would try to develop the Frosties so that people who did purchase them still had an incentive to keep them.

Q.  So were these strategies a reason to purchase Frosties?

A.  Yes.

Q.  And could you list -- could you read the strategies that are listed under Development Roadmap?

A.  It was metaverse development, breeding functions, marketing campaigns, 3D model of existing Frosties, and staking.

Q.   And I think we have already talked about metaverse development.  What about breeding functions; what would that be?

A.   Breeding functions would mean if you purchased two or more Frosties you would be able to have access to create another Frostie, a miniature Frostie and get that for free.

Q.   What about 3D models of existing Frosties?

A.   That would be another, a separate project in which people who held a certain amount of Frosties would get a free 3D version of what they had.

Q.   Mr. Llacuna, where it says at the top of this page we will implement several strategies in order to increase floor price, was that true?

A.   No, it was not.

Q.   Why did you make that statement if it wasn't true?

A.   We made that statement because we believed it was what people wanted to hear in order to purchase them.

        MR. REHN:  Could we scroll down to the section of this website that says Team?

Q.   Mr. Llacuna, do you see the section of the website that says Team?

A.   Yes.

Q.   And I see the first person listed is somebody represented as Frostie.  Who is that?

A.   That is Ethan Nguyen.

Q.   And then the next person is somebody listed as André.   Who is that?

A.   That is me.

Q.   Did you guys actually put your full real names out there behind this project?

A.   No, we did not.

Q.   Were these the only identifying information you provided?

A.   Yes.

Q.   And then I see the third person is somebody listed as Ratt. Who is that?

A.   That is another team member of ours, his name is Matt Nguyen.

Q.   He is related to Ethan?

A.   No, they are not.

Q.   So, were the three of you the primary people behind the Frosties project?

A.   Yes, we were.

          MR. REHN:   If we can expand those three?

Q.   Did you have an arrangement about how you were going to divide up the money from the Frosties project?

A.   Yes.

Q.   What was your arrangement?

A.   It would change every week depending on how much work was put in.   It was all dependent on I guess a few factors, but ultimately it was divided to where Ethan would get around

50 percent of the profit, I would gain around 20 to 30 percent, and Matthew would gain around 10 percent.

Q. Was there a little bit left over for some of the other team members too?

A. Yes.

MR. REHN: We can bring that down. Can we go back to the top of this exhibit and expand the text under: A collection of 8,888 Frosties?

Q. So, does this again represent that Frosties will have certain functions?

A. Yes.

Q. Was that true?

A. No, it was not.

Q. Mr. Llacuna, what was the date you were actually planning to sell the Frosties?

A. January 7 and January 8.

Q. What year was that?

A. 2022.

Q. Aside from the Frosties website, did you promote the Frosties anywhere else?

A. Yes, we did.

Q. What other places did you promote the website at?

A. We would promote them on Twitter and Discord.

Q. What is Discord?

A. Discord is a messaging app where you can talk to other

P7G5sto4                          Llacuna - Direct

people.

Q.   And so, what did you do on Discord to promote the project?

A.   So, on Discord my role was to basically create a community, talk to the community, get people interested, and make them feel welcome.

Q.   And did you do that by telling people what features the Frosties would have?

A.   Yes.

Q.   And were all of the statements you made true?

A.   No.

Q.   What about Twitter?  Did you also promote on Twitter?

A.   Yes, we did.

          MR. REHN:  Let's bring this down and if we can show the witness what has been marked for identification as Government Exhibit 2526?  And if you could just expand for the witness?

Q.   Mr. Llacuna, do you recognize this document?

A.   Yes.

Q.   What is that?

A.   This is the Frosties Twitter page.

Q.   Was this how the Twitter page appeared in early 2022?

A.   Yes.

          MR. REHN:  The government offers Exhibit 2526.

          MR. PATTON:  Same continuing objection, your Honor.

          THE COURT:  Over the defense's continuing objection,

Government Exhibit 2526 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2526 received in evidence)

BY MR. REHN:

Q. Mr. Llacuna, is this the main page for the Frosties Twitter account?

A. Yes, it is.

MR. REHN: Ms. Sebade, if we can expand the pinned Tweet there in the bottom toward the center, the whole Tweet? The pinned Tweet.

Q. Mr. Llacuna, can you read this?

A. Yes. It says: Metaverse game update. Here's a sneak speak into our future Frostie utility with our metaverse game that is in development.

Q. And can you just read the whole Tweet?

A. I'm sorry?

Q. Can you read the rest of the Tweet?

A. Mint date is coming up on January 7 so be sure to join discord.gg/Frosties for updates.

Q. In the first part of this Tweet do you say there is a metaverse game in development? Was the metaverse game actually in development at this time?

A. No, it was not.

Q. And then at the second part there is a link to the discord.gg/Frosties. Is that the Discord section? Is it

called a section or --

A.   Yes.   That was how people would get access to our Discord group.

Q.   Group.   So this was the discord group you were describing earlier?

A.   Yes.

Q.   So, if you weren't going to build a metaverse, what was your actual plan after the Frosties sale?

A.   Our plan was to do what we call a rug pull and just completely erase our tracks while keeping the funds.

Q.   Is that term "rug pull" common in the NFT world?

A.   Yes, it is.

Q.   So when did you -- did you actually sell the Frosties on January 8 and 9, as planned?

A.   January 7 and 8, yes.

             MR. REHN:   We can bring this down.

Q.   How many of the 8,888 Frosties did you sell?

A.   We sold all of them.

Q.   And that was 0.04 ETH per Frostie?

A.   Yes.

Q.   How did people pay for the Frosties?

A.   They would connect their cryptocurrency wallet where they could purchase them and purchase them through that.

Q.   Where would it be connected to?

A.   It would be connected through Metamask or Open Sea.

Q.   And did you provide a particular ETH address that customers were supposed to send the payment to?

A.   Yes.

Q.   So, how much ETH, in total, did customers send you to buy these Frosties?

A.   I believe it was over 300 Ethereum.

Q.   And do you recall how much that was worth in dollars at that time?

A.   Around the time it was worth over $1.1 million.

Q.   And that was the ETH you got from the customers who wanted to buy these Frosties?

A.   Yes.

Q.   So after the customers sent that money into the ETH address, what, if anything, happened to the Frosties website?

A.   It was taken down.

Q.   What about the Discord?

A.   It was also taken down.

Q.   And what about the Twitter?

A.   It was also taken down.

Q.   Who took them down?

A.   Ethan Nguyen.

Q.   What about the metaverse development that you had told the purchasers you would do?

A.   It was non-existent.

Q.   Was there any reaction from people who purchased the

P7G5sto4                      Llacuna - Direct

Frosties when that happened?

A.   Yes, there was.

Q.   What sort of reaction?

A.   Obviously a negative reaction.  A lot of the people who purchased it were unhappy, mad, sad.  Yeah.

Q.   So I think you testified a moment ago that the customers had sent their ETH to a particular address.  Do you recall that?

A.   Yes.

Q.   Who was in control of that address?

A.   That address was in control of Ethan Nguyen.

Q.   After the sale, what, if anything, did Ethan do with the ETH that came into that address from the customers?

A.   He then sent it to one of my crypto wallets.

Q.   So after he did that, who was in control of all of the ETH from the Frosties sale?

A.   I was.

Q.   How were you storing those ETH?

A.   I was storing them in a cold wallet called a Ledger.

         THE COURT:  Called a what, please, sir?

         THE WITNESS:  Ledger.

         THE COURT:  Ledger.

         THE WITNESS:  Yes.

BY MR. REHN:

Q.   You used a couple of terms there.  First you said a cold

wallet and a Ledger.  I would like to first ask you what a cold wallet is.

A.  A cold wallet is an offline wallet, it is not stored on your computer, it is an actual device that you have to have tangible -- that you have to have tangible to use.

Q.  And what is a Ledger?

A.  A Ledger is a brand of a cold wallet.  It is kind of like a USB drive that holds your cryptocurrency.

Q.  What does it look like?

A.  It looks like a small key chain.

Q.  And does it have a USB connector?

A.  Yes.  You can plug it into your computer.

Q.  So if you want to spend the ETH or send them to somebody else, what do you do?

A.  You would unlock the wallet, it would have a phrase you would type in, and then you would plug it into your computer and from there you could spend your cryptocurrency.

Q.  Why did you get one of those?

A.  I got it because it was a bit more secure than a wallet that would be online.

Q.  When you were planning the Frosties game, did you have any concern that people would see where the ETH was?

A.  Yes.

Q.  Why was that?

A.  Because all of the transactions would be able to be seen on

P7G5sto4                        Llacuna - Direct

the blockchain.

(Continued on next page)

P7G1STO5                     Llacuna - Direct

BY MR. REHN:

Q.  So after Ethan sent you the ETH, you had it all on one ledger; is that what you said?

A.  Yes.

Q.  Where was that ledger?

A.  I had it at my house.

Q.  Did you get any other ledgers?

A.  Yes, I had multiple.

Q.  And so I think you testified before that the plan was to split up the ETH from the Frosties sale; is that right?

A.  Yes.

Q.  And you were going to split it up among the three of you, primarily?

A.  Yes.

Q.  And so just mechanically, what was your plan for actually splitting up the ETH from that one ledger among your partners?

A.  Originally the plan was to split up each ledger with the amount that each person was told they would get.

MR. REHN:  Ms. Sebade, could you please show the witness what has been marked as Government Exhibit 2514.

Q.  Mr. Llacuna, do you recognize this?

A.  Yes.

Q.  What is it, just at a high level?

A.  I'm sorry?

Q.  At a high level, what kind of a document is this?

P7G1STO5                       Llacuna - Direct

A.   Yes.  So this is a screenshot of a cryptocurrency transaction—or, sore—a wallet.  It will show the address, which is who has access to that wallet, and then it will also show at the bottom all of the transactions they've done.

Q.   And does the—

MR. REHN:  And if you could scroll down, Ms. Sebade, to the bottom.

A little further.  Can we get to the very bottom. Thank you.

Q.   Do you recognize the transactions that are listed on this document?

A.   Yes, I do.

Q.   What are these transactions?

A.   These are the transactions that I made after the Frosties NFT pool happened.

Q.   Did the dates and times listed here represent the dates and times of the transactions?

A.   Yes.

MR. REHN:  Your Honor, the government offers Government Exhibit 2514.

MR. PATTON:  Same thing, your Honor.

THE COURT:  Over the defense's continuing objection, Government Exhibit 2514 is admitted and may be shown to the jury.

(Government's Exhibit 2514 received in evidence)

MR. REHN:  Ms. Sebade, if you can bring that up and leave it right where it is, and if you could expand the very bottom line.

BY MR. REHN:

Q.  So Mr. Llacuna, do you understand that the transactions here are listed in reverse order so the very first one is at the bottom?

A.  Yes.

Q.  So if we look at the first transaction in this wallet, what is it?

A.  This is me—or this is Ethan sending me the Ethereum from that project.

Q.  And so where it says "in," does that mean the Ethereum was coming into the wallet?

A.  Yes.

Q.  How much Ethereum did Ethan send you?

A.  358.

Q.  And what was the date that you did that?

A.  That was on January 9th—

Q.  Now—

A.  —2022.

Q.  And then I see several transactions shortly after that, on January 9, 2022.  I see four of them, it looks like.  Do you see that?

A.  Yes.

MR. REHN:  Ms. Sebade, could you just highlight the four transactions after the 358 ETH coming in.

Q.  Mr. Llacuna, are these transactions going out of that wallet?

A.  Yes, they are.

Q.  And so are these transactions that you did?

A.  Yes, they are.

Q.  Where were you when you did these transactions?

A.  I was at home doing these transactions.

Q.  And who were you sending the ETH to in these four transactions?

A.  I was sending them to other wallets.

Q.  Did you notice anything happening when you did that?

A.  Yes, I did.

Q.  What did you notice?

A.  I noticed that people would soon realize that the money was moving out of those wallets and into these new ones.

Q.  When you said people were realizing that the money was moving out, what people are you referring to?

A.  People who purchased the Frosties NFT and who were watching the transactions.

Q.  So where were those people?

A.  They could have been anywhere.

Q.  But where did you see them reacting?

A.  On Discord.

Q.  So after the Frosties project got taken down, were people talking about it on Discord?

A.  Yes.

Q.  Were you kind of observing those comments while you were doing these transactions?

A.  Yes.

Q.  So how would those people know that you were doing these transactions?

A.  Every single transaction would have been able to be seen on this website.

Q.  Did you continue with those types of transactions?

A.  No.  We stopped.

Q.  Why did you stop?

A.  Because it was obvious to us that no matter how many wallets we sent it in and out of, it would still be traceable.

Q.  Did you have any conversations with the other members of the Frosties team about this issue?

A.  I did.

Q.  How did you have those conversations?

A.  We were in a Discord voice call.

Q.  And was that around this time, generally?

A.  Yes.

Q.  Who was on the Discord call?

A.  It was most of the members from that one page.  It was me, Ethan Nguyen, Matt Nguyen, and some other of the members of the

team.

Q.  And generally speaking, what was the issue you were discussing?

A.  The issue was how would we be able to hide this money.

Q.  Were you also exchanging text messages with anyone during this call?

A.  Yes, I was.

Q.  Who were you texting with?

A.  I was texting my girlfriend.

MR. REHN:  And if we could bring this down.  And Ms. Sebade, if you could show the witness what's been marked as Government Exhibit 2519.

Q.  Do you recognize this exhibit?

A.  Yes.

Q.  What is this?

A.  These are text messages between me and my girlfriend.

Q.  And were these text messages you exchanged with your girlfriend at the time you were on that Discord call you were just describing?

A.  Yes.

MR. REHN:  The government offers Government Exhibit 2519.

MR. PATTON:  Same objection, your Honor.

THE COURT:  All right.  And over that objection, this exhibit is admitted and may be shown to the jury.  2519 is

P7G1STO5                      Llacuna - Direct

admitted.

                 (Government's Exhibit 2519 received in evidence)

                 MR. REHN:  Now, Ms. Sebade, if you could pull up the
bottom three messages.

BY MR. REHN:

Q.  Mr. Llacuna, could you read the first message you sent here
at 8:14.

A.  Yes, it's, "I just wanna keep u safe."

Q.  What did you mean by that?

A.  I wanted to keep her protected from everything that was
going on at this time.

Q.  What did she say in response?

A.  "You so funny you keep calling it tornado shark."

Q.  What were you talking about on the call when she said that?

A.  We were talking about Tornado Cash.

Q.  Were you calling it Tornado Shark?

A.  Yes.

Q.  Do you know why?

A.  It was the first thing that came to my head.

Q.  Prior to this call had you ever heard of Tornado Cash?

A.  No.

Q.  So how did you first hear about it then?

A.  It was while we were discussing ways to hide the money.

Q.  Who brought it up?

A.  It was either Ethan or Matt, one of the two.

Q.   Did they tell you how they found out about it?

A.   Yes.  We——

          MR. PATTON:  Objection.

          THE COURT:  I'm not allowing it for its truth, just for state of mind, and its effect on the recipient.

          You may answer, sir.

          But it's not to be admitted for its truth.

          Go ahead, sir.

A.   Yes.  We found it through reddit.

Q.   And after hearing about Tornado Cash, did you take any steps to investigate it?

A.   Yes.

Q.   What sort of steps did you take?

A.   We would look at YouTube videos, we would look at their website, just to kind of see what Tornado Cash offered.

Q.   Focusing on what you learned from the website, what do you remember learning about the Tornado Cash from the website?

A.   Yes.  From the website, we learned that it was what's called a mixer, where you could pool your cryptocurrency with other people's cryptocurrency and then pull it out as a way to hide it.

Q.   And after learning about Tornado Cash did you and the other members of the Frosties team make a decision whether to use it?

A.   Yes, we decided to use it.

Q.   Why did you decide to use it?

P7G1STO5                    Llacuna - Direct

A.   We decided to use it because it seemed like the best option for us to hide the money and get away with it.

Q.   What about it was valuable to you?

A.   I'm sorry?

Q.   What about it was valuable to you for that purpose?

A.   It was valuable because then people would be unable to trace back the original——I guess original way we got the cryptocurrency.

MR. REHN:  Ms. Sebade, if we could bring this down and show the witness what's been marked for identification purposes as Government Exhibit 2512.

Q.   Do you recognize this document, Mr. Llacuna?

A.   Yes, I do.

Q.   What does it appear to be to you?

A.   This is the Tornado Cash website.

Q.   Is this how the website looked to you when you accessed it during that Discord call?

A.   Yes.

MR. REHN:  Your Honor, the government offers Exhibit 2512.

MR. PATTON:  Same.

THE COURT:  All right.  Over the defense objection, Government Exhibit 2512 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2512 received in evidence)

MR. REHN:  So if we could bring that up and just kind of expand the web page.

BY MR. REHN:

Q.  Mr. Llacuna, is this the web page you were looking at when you were having that conversation about how to hide the money that you just mentioned?

A.  Yes.

Q.  Now looking at this website, do you see a link near the top for docs?

A.  Yes, I do.

MR. REHN:  Could we circle that just so everybody can see where it is.

Q.  Did you read any documents that you accessed on this website?

A.  Yes, I did.

MR. REHN:  So if we could bring this down and show the witness what's been marked for identification as Government Exhibit 1979.

THE COURT:  Exhibit number again, please, sir?

MR. REHN:  1979.

Q.  Do you recognize this document?

A.  Yes.

Q.  And what is this document?

A.  This is a document stating that it was best to use Tornado Cash—

P7G1STO5                     Llacuna - Direct

THE COURT:  No.  Don't start talking about the contents.

Q.   Just what type of a document?  Do you recall seeing this document on the Tornado Cash website?

A.   Yes.

MR. REHN:   The government offers Exhibit 1979.

THE COURT:   The defense has their objection. Objection is overruled.  Document is admitted.  Government Exhibit 1979 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1979 received in evidence)

BY MR. REHN:

Q.   And Mr. Llacuna, if you could just read the top part, the title of this document.

A.   Yes.  It is "Tips to remain anonymous."

Q.   And is this something you looked at when you were talking about how to hide the money?

A.   Yes.

Q.   And do you see what the first tip to remain anonymous is on this document?

A.   Yes.

Q.   And what is that?

A.   It says use TOR and/or a VPN.

Q.   Before you read this document were you familiar with a VPN?

A.   Yes.

Q.  Did you have one?

A.  No.

Q.  After reading this, what, if anything, did you decide to do?

A.  We decided to purchase VPNs.

MR. REHN:  We can bring that down.  And let's go back to Government Exhibit 2512 and expand it.

There we go.

Q.  Mr. Llacuna, do you see a button in the middle that says "launch app"?

A.  Yes.

Q.  Do you know what that button did?

A.  Yes.

Q.  What did it do?

A.  That would launch the application to where you could use Tornado Cash to deposit or withdraw money.

MR. REHN:  Ms. Sebade, could you please show the witness what's been marked as Government Exhibit 2513.

Q.  Do you recognize this, Mr. Llacuna?

A.  Yes.

Q.  What is it?

A.  This is the screen after you click "launch app," where you would be able to deposit or withdraw.

MR. REHN:  The government offers Exhibit 2513.

THE COURT:  The defense has its objection.  The

objection is overruled.  Government Exhibit 2513 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2513 received in evidence)

Q.  So is this what you saw when you were on that Discord call?

A.  Yes.

Q.  And did you access this from the Tornado Cash website?

A.  Yes.

Q.  Do you see in the middle where it says deposit?

A.  Yes.

Q.  And what is below that?

A.  Below that it shows the token you could deposit with, in this case Ethereum, and amount you'd want to deposit.

Q.  And what was your understanding of how much ETH you could deposit into Tornado Cash?

A.  You could deposit them in increments of .1, 1, 100, or 10.

MR. REHN:  Ms. Sebade, could you bring back up Government Exhibit 2519 and go to page 2.

And if you could expand the first three messages, or the three messages starting at 8:31.

Q.  Mr. Llacuna, could you read the three messages you sent at 8:31 on January 10th.

A.  Yes.  It says, "ok, I'm using the ledger to move money out to other accounts in the ledger.  Then when everyone has their ledgers," and then—

Q.  So Mr. Llacuna, what were you planning to do at this point

in time?

A.  At this time I was going to put the money into Tornado Cash and then I would be able to take that money and move them to other accounts.

Q.  And do you see that the time here on these messages——do you see the little parentheses after the time?

A.  Yes.

Q.  Can you just read that.

A.  UTC-8.

        MR. REHN:  Ms. Sebade, can you go to page 3 of the Government Exhibit 2519, and can you expand the top four messages on this page.

Q.  Mr. Llacuna, can you read the message you sent at 8:52.

A.  "I dunno but we need to do transactions of 100."

Q.  What did you mean by that?

A.  I meant that we were doing transactions of a hundred Ethereum each.

Q.  And so were you able to deposit all 358 ETH at once into Tornado Cash?

A.  No.

        MR. REHN:  Ms. Sebade, can you bring back up Government Exhibit 2513.

Q.  Mr. Llacuna, can you indicate on this exhibit how you actually did a transaction of 100 ETH.

A.  Yes.  So I would click the 100 Ethereum option and then I

would do that multiple times, three times, and then I would move 10 Ethereum five times, and then whatever was left over in 1-Ethereum transactions.

Q. How long did it take you to do this?

A. Maybe 20 to 30 minutes.

Q. And so how many deposits in total did you make?

A. I'm not too sure. Maybe——

MR. REHN: Could we bring out Government Exhibit 2514.

And if you could scroll down towards the bottom again, Ms. Sebade.

Q. And so we looked at this before. Do you remember?

A. Yes.

Q. And the first thing we saw after you got the 358 ETH was the four transfers you made?

A. Yes.

Q. And then if we start above that, do you see three 100-ETH transfers?

A. Yes.

Q. Were those the Tornado Cash deposits you just mentioned?

A. Yes.

Q. How many 10-ETH transfers did you do?

A. Four.

MR. REHN: And if we could scroll up a little bit.

Q. And did you also do a number of 1-ETH transfers?

A. Five.

MR. REHN:  And if we could take that down.

Q.  So did you have any understanding of why Tornado Cash allowed deposits in these fixed amounts?

A.  I believe it was because that way, whoever was using Tornado Cash, everyone was pulling in the same amount.  That way it was harder to notice if people were pulling out that same amount later on.

Q.  When you made those deposits, what happened on the website?

A.  I'm sorry?

Q.  When you made the deposit, what happened on the website?

A.  The website would give me a code or a token, basically a password, where I would be able to use that password to collect my money later on.

Q.  And so the code was what you would need to use to get the money back later?

A.  Yes.

Q.  Did you come up with that code yourself?

A.  No.

Q.  Did you know how to come up with a code by yourself?

A.  No.  It was randomly generated.

Q.  And the website is what did that for you?

A.  Yes.

Q.  And what did you do when you got the code so that you could get your money back for each deposit?

A.  I would write it down.

THE COURT:  I missed what you said, sir?

THE WITNESS:  I would write it down.

THE COURT:  Write it down.  Okay.

Q.  After you deposited the money into Tornado Cash, what did you do next?

A.  We waited.

Q.  Why did you wait?

A.  While we waited, other people would pull out certain amounts of the same amount that we deposited so nobody would be able to tell when we were the ones that would withdraw that money.

Q.  And how long afterward did you make those withdrawals?

A.  A few days.

MR. REHN:  Ms. Sebade, could you please show the witness what's been marked as Government Exhibit 2521.

THE COURT:  Counsel, are you nearing the end of your direct examination?

MR. REHN:  Yes.

Q.  Do you recognize this?

A.  Yes, I do.

Q.  What is it?

A.  This is the part of the website where you're able to withdraw the money.

MR. REHN:  The government offers exhibit 2521.

THE COURT:  As the defense continues its objection,

the Court overrules the objection.  Government Exhibit 2521 is admitted into evidence and may be shown to the jury.  Thank you.

          (Government's Exhibit 2521 received in evidence)

BY MR. REHN:

Q.   Mr. Llacuna, do you recognize this?

A.   Yes.

Q.   Is this how the website looked when you withdrew those funds from Tornado Cash?

A.   Yes.

Q.   And is there a space here I see to enter the note?

A.   Yes.

Q.   And below that I see recipient address.  What is that?

A.   The note was the password we got that——that was randomly generated that you could enter into to get the money, and the recipient address would be the wallet you would want the money to go into.

Q.   So when you withdrew from Tornado Cash, did you withdraw to a brand new address?

A.   Yes.

Q.   What does that mean?

A.   That means that that new address would only show one transaction, which would be the amount you withdrew from Tornado Cash.

Q.   Are there any transaction fees associated with making a

transaction on Ethereum?

A.  Yes.

Q.  So if you didn't have any money already in that address, who paid those transaction fees?

A.  You would pay it beforehand.

Q.  And who would you pay it to?

A.  You would pay it to the website.  That way it would be used as a gas fee.

Q.  Which website?

A.  Tornado Cash.

Q.  So when you withdrew, did you get all of the money you had put in back?

A.  All of the money minus that fee.

        MR. REHN:  Let's go back to Government Exhibit 2519, and go to page 3 again.

Q.  And we looked at this before.  Do you see at the top it says, "I dunno but we need to do transactions of 100"?

A.  Yes.

        MR. REHN:  If we could expand the bottom five messages.

Q.  And Mr. Llacuna, if you could read your message that you sent to your—to Katelyn at 8:55.

A.  Yes.  It says "yes, to wash it."

Q.  Could you read the response from Katelyn.

A.  "Washy washy."

Q.   Did she send you any images along with that?

A.   Yes.

Q.   What are those?

A.   Soaps.

Q.   And how did you respond?

A.   "Wash wash."

Q.   And when you said "wash wash," what were you referring to?

A.   I was referring to us cleaning the money.

Q.   And how did you clean the money?

A.   By using Tornado Cash.

          MR. REHN:  Nothing further.

          THE COURT:  All right.  Now seems like an appropriate time to take our afternoon break, so we will break for about 10 minutes and then we'll come back and finish off for the day.

          I'm going to ask you please not to discuss this case with each other or anyone else and keep an open mind until all of the evidence is in.

          We will see you in 10 minutes.  Thank you so much. All rise.

          (Continued on next page)

(Jury not present)

THE COURT:  Stay here for a moment, please.

Let me advise the witness, sir, you remain under oath and you should not be discussing the substance of your testimony with the government now that you are on cross-examination.

You can step down for the ten minutes.  Okay?  Thank you.  We'll let you go.

Mr. Patton, I know you don't know until you know, but do you think you would take up the remainder of the afternoon with cross-examination?

MR. PATTON:  I would be very surprised if we took up the remainder of the afternoon.  I expect under 15 minutes, 20 minutes.

THE COURT:  Great.  So we'll have another government witness available then.

MR. REHN:  Your Honor, we've gone a little faster.  We could probably get somebody, but we don't currently have somebody present, so it's up to the Court if we break a little earlier than we expected.  And that's in part because the crosses have not been as long as we anticipated.

THE COURT:  Well, I mean, Mr. Klein, you're shaking your head.  Do you have a view that you wish to express?

MR. KLEIN:  I mean, your Honor, we are taking Friday off, as your Honor knows.  We have reasons.  But they need to

be ready to go.

THE COURT:  I'm not disagreeing with you, sir.  The only thing I will say—and this is not a defense—is that I need time to speak with the jury this afternoon, so if Mr. Patton's done at 3:15 or 3:20, then I think we should have someone, but if he's done at 3:30, I'm going to need that time anyway to speak with them.  So yes, I think we should get someone, even if we're just beginning that person.

All right.  Thank you.  I'll see you in 10.  Thank you.

THE DEPUTY CLERK:  All rise.

(Recess)

(Jury present)

THE COURT:  Please be seated, everyone.  Thank you.

Mr. Patton, you may examine.  Thank you.

MR. PATTON:  Thank you, your Honor.

CROSS EXAMINATION

BY MR. PATTON:

Q.  Good afternoon, Mr. Llacuna.  My name is David Patton.  I represent Roman Storm.

A.  Good afternoon.

Q.  On this Frosties scam you've been talking about, you were kind of the face of it, right?

A.  Yes, partly, yes.

Q.  You were like the hype man in the community.

P7G1STO5                    Llacuna - Cross

A.   Yes.

Q.   So when you were getting people excited and telling them lies about what was going to happen, you were doing that so that they would give you their money eventually, right?

A.   Yes.

Q.   And you testified that this sort of scam is known as a rug pull, right?

A.   Yes.

Q.   The name essentially means that with your hyping, you get people to metaphorically come on to this rug that looks nice and then you end up yanking it out from under them, right?

A.   Yes.

Q.   And the actual pulling of the rug, in this instance, you did on January 9, 2022, right?

A.   Yes.

Q.   January 9th, you had everybody's money, right?

A.   Yes.

Q.   And that's when you and your co-conspirators shut everything down, right?

A.   Yes.

Q.   And you talked about how you then took that money from Ethan's wallet and started distributing it to some other wallets, right?

A.   Yes.

Q.   And that combined with shutting down the servers and

everything else, that got people talking in the Frosties

community about, hey, what's going on here, right?

A.  Yes.

Q.  And you said that's when you and the others realized, uh,

we got to figure out a plan here about what to do with the

money, right?

A.  Yes.

Q.  Because as you said, anybody could go to the blockchain and

see where the money was going.

A.  Yes.

Q.  See that it was going to these other wallets.

A.  Yes.

Q.  And so you had a call on January 10th, the next day, right?

A.  Yes.

Q.  And it was on that call that someone raised the idea of

Tornado Cash, right?

A.  Yes.

Q.  Before that date you'd never heard of Tornado Cash, right?

A.  No.

Q.  You'd never heard of Roman Storm?

A.  No.

Q.  You'd never heard of anyone who developed Tornado Cash,

right?

A.  No.

Q.  And in fact, you never had any contact with anyone at

Tornado Cash, right?

A.   No.

Q.   Never, throughout any of this time period you've been testifying or any other time period, you never had any communication with anyone at Tornado Cash, right?

A.   No.

Q.   So after hearing about Tornado Cash you started to do some research, right?

A.   Yes.

Q.   And you did that by going online, right?

A.   Yes.

Q.   You didn't have to like go to the dark web or anything, right?

A.   No.

Q.   You learned about it from reddit, right?

A.   Yes.

Q.   From YouTube, right?

A.   Yes.

Q.   You did some Google searches and found out more about it, right?

A.   Yes.

Q.   And you ultimately went to the Tornado Cash website, right?

A.   Yes.

Q.   And wasn't hard to find, right?

A.   No, it was not.

Q.   You again talked about how it was visible to anyone on the
blockchain where transactions would go, for instance, where you
had moved the money from Ethan's wallet to these other wallets,
right?

A.   Yes.

Q.   And it was also visible when you ultimately sent money to
Tornado Cash, right?

A.   Yes.

Q.   What's not visible is where it goes after that, right?

A.   Yes.

Q.   But anybody who wanted to trace things could see that the
money had gone to Tornado Cash, right?

A.   Yes.

Q.   I take it all this connecting with the Frosties community
that you helped build and all the other things you did online,
were you using a laptop or an iPhone?

A.   I have a computer, a laptop, and a phone, yes.

Q.   And you were using both?

A.   Yes.

Q.   And you were communicating with your co-conspirators in
this scam in a couple of different ways, right?

A.   Yes.

Q.   One of those ways was using iMessage, right, with your
iPhone?

A.   Yes.

Q.   That's an encrypted messaging application?

A.   I believe so.

Q.   And——

        THE COURT:  I'm sorry.  Counsel, please excuse me.
You said, did you say, "I believe so"?

        THE WITNESS:  I'm not too sure about the encryption of
iMessage, but, yes.

        THE COURT:  That's fine.  All I'm asking is that each
of you give each other a little space so I can hear the whole
of his question and the whole of your answer.  I thank you.

        Go ahead, counsel.

BY MR. PATTON:

Q.   So for committing the fraud and the money laundering, you
ended up pleading to two counts, right?

A.   Yes.

Q.   And that was right here in this courthouse, right?

A.   Yes.

Q.   And those two counts combined expose you to a maximum of 40
years in prison, right?

A.   Yes.

Q.   And so you ended up deciding to cooperate with the
government, right?

A.   Yes.

Q.   And I think you testified the government can't guarantee
you any particular sentence, right?

A.   Yes.

Q.   But your hope in cooperating is that the judge will give you a more lenient sentence because you have cooperated, right?

A.   Yes.

Q.   You pled guilty to the fraud because you lied to people and you took their money, right?

A.   Yes.

Q.   And you pled guilty to the money laundering because you yourself knew that these were illicit funds, right?

A.   Yes.

Q.   And you were trying to conceal where they were going, right?

A.   Yes.

Q.   And you knew that.  You had specific knowledge of the funds you were trying to conceal, correct?

A.   Yes.

Q.   I think you used—you testified on your direct examination that you used Tornado Cash as a way to get away with it, right?

A.   Yes.

Q.   As a way to get away with the fraud, right?

A.   Yes.

Q.   Again, as we've been talking about, you pulled the rug on the fraud on January 9, 2022?

A.   Yes.

Q.   And you were arrested for that fraud two months later,

P7G1STO5                    Reyes - Direct

right?

A.   Yes.

Q.   In March of 2022.

A.   Yes.

          MR. PATTON:  No further questions, your Honor.

          THE COURT:  All right.  Thank you.

          Redirect?

          MR. REHN:  Nothing further, your Honor.

          THE COURT:  Okay.  Thank you.

          Sir, you may step down.  Thank you very much.

          (Witness excused)

          MR. REHN:  Your Honor, I've been informed of the witness entering the courthouse through security so she'll be here very shortly.

          THE COURT:  Okay.  We can pull her out of the line if need be.  Is she coming through the front security?

          MS. LA MORTE:  She's here.

          THE COURT:  Oh, she's here.  Okay.  May I please have her name.

          MR. REHN:  Jocelyn Reyes.

          THE COURT:  Jocelyn Reyes.  Thank you so much.

          (Witness sworn)

          THE DEPUTY CLERK:  Please state and spell your name for the record.

          THE WITNESS:  Jocelyn Reyes.  J-O-C-E-L-Y-N,

P7G1STO5                        Reyes - Direct

R-E-Y-E-S.

THE COURT:  Thank you.

Counsel, you may inquire.

MR. GIANFORTI:  Thank you, your Honor.

JOCELYN REYES,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. GIANFORTI:

Q.  Good afternoon, Ms. Reyes.

A.  Good afternoon.

Q.  Ms. Reyes, what do you do for a living?

A.  A forensic accountant.

Q.  Where are you employed?

A.  The FBI.

Q.  How long have you been employed with the FBI as a forensic accountant?

A.  A little over three years.

MR. GIANFORTI:  One moment.  Just having a technical difficulty, your Honor.

THE COURT:  Of course.

Q.  And before you—could you tell us a little bit about your educational background.

A.  I attended the University of Houston and obtained a bachelor's in accounting and supply chain management.

Q.  And did you join the FBI right out of college or did you do something before that?

A.  I did something prior.

Q.  What was that?

A.  I was AN audit consultant.

Q.  Were you an audit consultant for a particular company?

A.  AMS-PAR.

Q.  Where was that located?

A.  In Houston, Texas.

Q.  How long were you there?

A.  For about six years.

Q.  And did you go straight from there to the FBI?

A.  That was the only job that I worked at prior to the FBI, yes.

Q.  Okay.  All right.  And you mentioned that you're a forensic accountant with the FBI.  What exactly does a forensic accountant with the FBI do on a day-to-day basis?

A.  A forensic accountant uses a combination of accounting, audit, and investigative skills to analyze financial information.

Q.  And in the course of your time with the FBI, what are typical records that you would review?

A.  Bank statements, credit card statements, payroll data, and any other financial information.

Q.  And who do you generally receive your instruction from in

any given matter?

A.   From my supervisors and case agents.

Q.   And do you work on any particular kinds of cases?

A.   Money laundering cases.

Q.   All right.  Now, Ms. Reyes, in connection with your testimony today were you asked to review certain financial records?

A.   Yes.

Q.   Were some of those records from an entity called Rho?

A.   Yes.

Q.   Were some of those records from an entity called Evolve Bank & Trust?

A.   Yes.

          THE COURT:  I'm sorry.  The name again, sir?

          MR. GIANFORTI:  Evolve.

          THE COURT:  Evolve.  Thank you.

Q.   And if I refer to Evolve Bank & Trust as just Evolve, will you know what I'm referring to?

A.   Yes.

Q.   Great.  Were you also asked to review certain payroll records?

A.   I was.

Q.   Were those records from an entity called Rippling?

A.   Yes.

Q.   So with respect to the Rho records, the Evolve records, and

P7G1STO5                        Reyes - Direct

the Rippling records, who provided you with those records?

A.   The case team.

Q.   For this case?

A.   Yes.

Q.   And with respect to those records, were you asked to prepare summary charts based on those records in connection with your testimony today?

A.   Yes.

Q.   Who requested that you prepare those summary charts?

A.   The case team, which includes the case agent and the AUSAs.

Q.   Is that me?

A.   Yes.

Q.   Thank you.

        And the charts that appeared——I'm sorry.  The charts that you prepared, do those contain the data that you were provided with by the case team?  Are they based on that data?

A.   Yes.

        MR. GIANFORTI:  One moment, please.

        All right.  Ms. Sebade, could you please pull up Government Exhibit 1071.

        THE COURT:  Is this just for the witness only, sir?

        MR. GIANFORTI:  Yes.

        THE COURT:  Thank you so much.

BY MR. GIANFORTI:

Q.   All right.  Ms. Reyes, do you recognize this document?

P7G1STO5                        Reyes - Direct

A.   Yes.

Q.   What is it?

A.   It's a summary of the Rippling records, payroll records.

Q.   The records that you were provided by the case team?

A.   Yes.

Q.   Okay.  And the records that you used to prepare the summary charts that we asked you to put together?

A.   Yes.

          MR. GIANFORTI:  Your Honor, the government offers Government Exhibit 1071.

          MS. AXEL:  Your Honor, we would object to this one. It certainly needs to be redacted.

          THE COURT:  All right.  May I see the parties at sidebar, please, just so I'm sure I understand the objection. Thank you.

          (Continued on next page)

P7G1STO5                        Reyes - Direct

(At the sidebar)

THE COURT:  Okay.  First of all, may I understand you've shown these exhibits to the defense?

MR. GIANFORTI:  They were produced in connection with our exhibits, yes.

THE COURT:  Thank you.

Let me understand what your objection is, just to this one, or maybe to all of them.

MS. AXEL:  Well, obviously, your Honor, you know, we didn't have notice that this witness was coming on today.

THE COURT:  Oh, you can't do that.  Yes, you didn't, but of course——

MR. GIANFORTI:  We would have——

THE COURT:  Stop.

MR. GIANFORTI:  I'm sorry.  I'm sorry.

THE COURT:  Second time you've done this.

MR. GIANFORTI:  I'm sorry, Judge.

THE COURT:  I would have stopped for the day, but it is your co-counsel who was pushing for us to go forward, which I agreed with.

MS. AXEL:  I understand, and I'm just asking for a little time and patience.  So——

THE COURT:  Same here.

MS. AXEL:  The binder that we have in court that was put together and produced to us doesn't have the actual

spreadsheet.  Obviously I have a set that I've prepared for this witness back in the office that has the actual spreadsheet.  I don't have it in front of me.  Nor do I have notes about the origin of this document.  It also has PII.  Obviously all of it——

THE COURT:  Of course.  The PII, I mean, it will be shown to the jury, but we wouldn't let that be filed.

Let me just ask a question.

MS. AXEL:  Okay.

THE COURT:  This was certainly not a dare by anybody, but I think there was a question as to whether there was going to be a witness when Mr. Patton finished, and Mr. Patton, you are a gentlemen for actually having a cross-examination.

Do you want to stop?  Do you both want to stop?  If you both want to, I will.

MR. GIANFORTI:  I would prefer it, just because there was a little bit of prep I was planning on doing tonight for her, just putting the exhibits in order.

THE COURT:  She decides.  She's the one who's doing cross.

MS. AXEL:  I would love to also say that at 3:15 they also emailed us their updated deck, so yes.

THE COURT:  Because both of you are now——and I know she's here.  But I have to do this.  I don't mean to channel my inner Judge Cote, whom we all revere, but you need to have more

witnesses, and even if they're just roaming the halls, you need to have them.

We made great progress today.

Can we hold off on your objections until tomorrow so I actually know what they are?

MS. AXEL:  Absolutely.  And I'll have a chance to look at the document.

THE COURT:  Of course.  And if it's PII, I'm not as worried about that.

MR. GIANFORTI:  And I'm planning on putting in a bunch of bank statements, and there are—what I was planning on doing was basically giving her a binder or disc to admit them en masse instead of one by one, which is what I'm forced to do because I haven't prepared that binder yet.  So that's what I was planning on doing tonight.

THE COURT:  I hear you, but again, you need to be prepared.  I mean, again, I have things to do with this jury. It will not be a waste of time.  But in fact, she should actually have a chance to review documents.

MS. AXEL:  Thank you.

THE COURT:  No, no.  Of course.  This was an incredibly close call that you just narrowly avoided resting your case.  It cannot happen again.  Even if you have all of your witnesses in the hallway.

We will break.  We're in agreement.  We're in

P7G1STO5                    Reyes - Direct

agreement.  I see heads nodding.  She decides, Mr. Klein.  She decides.

MR. KLEIN:  Absolutely, your Honor, and I was just going to say, we would like to know a complete list for tomorrow so we're not caught by surprise.

THE COURT:  Same here, sir.

MR. KLEIN:  Because that's the issue.  They're supposed to be ready, and we need to be ready too.

THE COURT:  Perhaps they are used to folks who are less surgical and more blunderbuss with their cross-examinations than your exceptionally well-channeled cross-examinations.  So you're the victim of your own success.

MR. KLEIN:  I'm going to print that up and frame that, your Honor.

THE COURT:  Only compliment I'm going to give you.

MR. KLEIN:  That's not being framed.

THE COURT:  Do you want to tell us now while we're together or——why don't you just tell us.  Tell me who you're planning to call.  Ms. Reyes.

MR. REHN:  Ms. Reyes will finish.  We have Jeremy Henry.  Emiline Stewart.  Pete Dickerman.  And Joel DeCapua for sure tomorrow.  We will prepare standby witnesses——

THE COURT:  Yes, you will.

MR. REHN:  ——in the event that they are necessary.  I must say we are moving faster than even we anticipated, and you

thought we were overambitious in listing six.

MR. KLEIN:  Can we know who those standbys are.

MR. REHN:  I can't tell you now.  We will tell you tonight.

THE COURT:  Okay.  So I'll talk to the jury.  I'll talk to the jury.  Anything else?  Because my plan is, as soon as I let them go, I'm going back immediately and speaking with them.  Do you need me for anything?  No.

I have your love notes from early this afternoon, which I have not read.  I'm pointing to the government.

I'll get a response from you when I can get a response from you.

MS. AXEL:  As soon as we can, your Honor.

THE COURT:  I understand you have things to do.

Okay.  All right.  Let us just tell ourselves in our sort of community that we've had a productive day.

MR. REHN:  Very much so, your Honor.

THE COURT:  We have.

MR. KLEIN:  I agree.  Your Honor, I agree.  I am completely in agreement.  I'm just thinking about Friday.  I wasn't completely in agreement on that.

THE COURT:  I'm not dragging her back from her funeral.

MR. KLEIN:  I understand, your Honor.  I'm not—that was my end-of-the-day joke.

P7G1STO5                        Reyes - Direct

THE COURT:  Okay.  Let us go.

MS. AXEL:  Thank you.

(Continued on next page)

P7G5sto6                    Reyes - Direct

(In open court)

THE COURT:  Members of the jury, you may remember yesterday when I gave you preliminary instructions that I said that sometimes there would be objections and sometimes I would hear them at side bar, but if they took a little extra long I might excuse you.  Well, this might be one of those so here is what I would like to do.  We are going to break for the day and I am going to excuse you but I would like to speak with you just for a few moments about some logistical housekeeping issues.  The parties know that I will be speaking with you, they've consented to my doing that.  I will try and keep it as brief as I can.

So, we are going to let you go to the jury room, I will be there in just a moment, and we are done with our first full day of trial and you should pat yourselves on the back because we have been very productive so I thank you for that.

I am going to ask you a few things:  Number one, please be here by 8:45 tomorrow morning so that we can start at the crack of 9:00; number two, do not discuss this case with each other or with anyone else; number three, keep an open mind until all of the evidence is received; and number four, have a wonderful evening.  Thank you so much.

All rise, please.

(Continued on next page)

P7G5sto6                     Reyes - Direct

(Jury not present)

THE COURT:  I am standing for my back.  I'm not sure if there is anything else for us to discuss.

That was a fun day.  We will do this again tomorrow. I will be looking for your letters, if there are any tonight. Thank you.  Have a good evening.

MR. KLEIN:  Thank you, your Honor.

THE COURT:  Oh, one more thing.  If anything troubling comes as a result of my discussions with the jury, of course I will let you know.  Let's hope not.

(Adjourned to July 17, 2025, at  8:45 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 HANFENG LIN

Direct By Mr. Rehn . . . . . . . . . . . . . . 117

Cross By Mr. Patton  . . . . . . . . . . . . . 131

 JOSEPH B. EVANS

Direct By Mr. Arad . . . . . . . . . . . . . . 134

Cross By Mr. Klein . . . . . . . . . . . . . . 160

Redirect By Mr. Arad . . . . . . . . . . . . . 166

Recross By Mr. Klein . . . . . . . . . . . . . 167

SYVIET ANH HO

Direct By Mr. Mosley . . . . . . . . . . . . . 168

Cross By Ms. Axel  . . . . . . . . . . . . . . 184

 JUSTIN BRAM

Direct By Mr. Rehn . . . . . . . . . . . . . . 202

Cross By Mr. Klein . . . . . . . . . . . . . . 266

Redirect By Mr. Rehn . . . . . . . . . . . . . 282

ANDRE MARCUS QUIDDAOEN LLACUNA

Direct By Mr. Rehn . . . . . . . . . . . . . . 285

Cross By Mr. Patton  . . . . . . . . . . . . . 331

 JOCELYN REYES

Direct By Mr. Gianforti  . . . . . . . . . . . 339

GOVERNMENT EXHIBITS

Exhibit No.                                                    Received

253   . . . . . . . . . . . . . . . . . . . . 129

950   . . . . . . . . . . . . . . . . . . . 172

951   . . . . . . . . . . . . . . . . . . . 181

1001  . . . . . . . . . . . . . . . . . . . 143

1005  . . . . . . . . . . . . . . . . . . . 138

1006  . . . . . . . . . . . . . . . . . . . 148

1008  . . . . . . . . . . . . . . . . . . . 152

1009  . . . . . . . . . . . . . . . . . . . 136

1011  . . . . . . . . . . . . . . . . . . . 146

1501  . . . . . . . . . . . . . . . . . . . 233

1502  . . . . . . . . . . . . . . . . . . . 211

1503  . . . . . . . . . . . . . . . . . . . 240

1505  . . . . . . . . . . . . . . . . . . . 243

1514  . . . . . . . . . . . . . . . . . . . 247

1516  . . . . . . . . . . . . . . . . . . . 252

1517  . . . . . . . . . . . . . . . . . . . 255

1520  . . . . . . . . . . . . . . . . . . . 258

1522  . . . . . . . . . . . . . . . . . . . 217

1523  . . . . . . . . . . . . . . . . . . . 209

1718  . . . . . . . . . . . . . . . . . . . 118

1901  . . . . . . . . . . . . . . . . . . . 218

1904  . . . . . . . . . . . . . . . . . . . 232

1931  . . . . . . . . . . . . . . . . . . . 215

1979  . . . . . . . . . . . . . . . . . . 320

2070  . . . . . . . . . . . . . . . . . . 150

2512  . . . . . . . . . . . . . . . . . . 318

2513  . . . . . . . . . . . . . . . . . . 322

2514  . . . . . . . . . . . . . . . . . . 311

2516  . . . . . . . . . . . . . . . . . . 294

2518  . . . . . . . . . . . . . . . . . . 297

2519  . . . . . . . . . . . . . . . . . . 316

2521  . . . . . . . . . . . . . . . . . . 327

2526  . . . . . . . . . . . . . . . . . . 304

3509-009  . . . . . . . . . . . . . . . . 288