P7H5sto1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                        23 Cr. 430 (KPF)

ROMAN STORM,

              Defendant.                Jury Trial
------------------------------x

                                        New York, N.Y.
                                        July 17, 2025
                                        9:03 a.m.

Before:

                HON. KATHERINE POLK FAILLA,

                                        District Judge

                        APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  NATHAN M. REHN, ESQ.
     BEN ARAD, ESQ.
     BENJAMIN A. GIANFORTI, ESQ.
     KEVIN G. MOSLEY, ESQ.
     TARA M. LA MORTE, ESQ.
     Assistant United States Attorneys

WAYMAKER LLP
     Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
     KERI CURTIS AXEL, ESQ.
     KEVIN M. CASEY, ESQ.
     VIVIANA ANDAZOLA MARQUEZ, ESQ.

     -and-

HECKER FINK LLP
     Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
     CHRISTOPHER MOREL, ESQ.

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

P7H5sto1

(Trial resumed)

THE COURT:  Good morning.  Please remain standing for the jury.

(Jury present)

THE COURT:  Please be seated.  Thank you.

My compliments to the jury for arriving early today. Thank you so much.  We can begin.  Let's continue.

MR. GIANFORTI:  Thank you, your Honor.

Before I begin asking Ms. Reyes questions, there are records that the parties have agreed to move into evidence that are subject to authentication.  They are going to form part of her testimony as well.

THE COURT:  Yes.

MR. GIANFORTI:  They're subject to authentication certifications that we got from the companies that issued them, so Rho and Evolve.

THE COURT:  Yes.

MR. GIANFORTI:  And we are agreeing that they're business records that can be admitted at this time so I thought I would admit them before I start asking questions of Ms. Reyes.

THE COURT:  Thank you.

Is there a certification that I will be receiving later today from the parties to that effect?

MR. GIANFORTI:  The two that are relevant here, your

Honor, you already have.

THE COURT:  The Rho and the Evolve?

MR. GIANFORTI:  Yes.

THE COURT:  Thank you.

MR. GIANFORTI:  They're Government Exhibit -- we won't be seeking to admit these but they're Government Exhibit 900, that's Rho; and 1101, that's Evolve.

THE COURT:  And Ms. Axel, you agree?

MS. AXEL:  Yes, your Honor.

THE COURT:  Thank you so much.  Given that I will be admitting these documents --

Let me talk to the jurors for a moment.  You have just heard us use the term "stipulation" and I mentioned it during our first day of jury selection.  It is an agreement between the parties.  In this case the agreement --

This is a stipulation, sir, or is there a custodial certification?

MR. GIANFORTI:  It is pursuant to certification and your Honor's order with respect to authenticity of business records.

THE COURT:  All right.  The certification is from the custodians of records of the Rho entity and Evolve entity, that certain records were maintained in the ordinary course of business that allows them to be authenticated, it allows them to be admitted in this case.

Sir, thank you very much.

MR. GIANFORTI:  I can list them now, your Honor, if that is helpful.

THE COURT:  Please do.  Yes.

MR. GIANFORTI:  So, with respect to Rho, that would be Government's Exhibits 902A through L.

(Counsel conferring)

MR. GIANFORTI:  Would it be preferable if I list, instead of doing a range, do actual individual exhibits as opposed to a range?

THE COURT:  I'm fine either way.

MR. REHN:  My experience, your Honor, I have had issues with transcripts before where it wasn't clear which exhibits were admitted, so I have been advised to always read every exhibit into the record.

THE COURT:  That's fine, although you may not have had the brilliant reporter that we have currently.  But, yes, go ahead.  Just to be sure let's list them individually.  Thank you, sir.

MR. GIANFORTI:  Let's see if I remember my alphabet now.  That would be 902A, B, C, D, E, F, G, H, I, K --

THE COURT:  J?

MR. GIANFORTI:  My children are rolling their eyes somewhere.

J, K, L.  Also Government Exhibit 903, 910, 912, 913,

P7H5sto1

914, 916, 918, 919, 923, 924, and with apologies for the long list I'm about to read in the 3100 series it is 3101, 02, 03, 04, 05, 06, 07, 08, 09, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24.

THE COURT:  Sir, are these only the Rho documents?

MR. GIANFORTI:  These are only Rho.  I will do them all separately, if that is preferable, your Honor.

THE COURT:  It is and I thank you.  All of those documents are admitted into evidence and may be shown to the jury.  Thank you.

(Government's Exhibits 902A, 902B, 902C, 902D, 902E, 902F, 902G, 902H, 902I, 902J, 902K, 902L, 903, 910, 912, 913, 914, 916, 918, 919, 923, 924, 3101, 3102, 3103, 3104, 3105, 3106, 3107, 3108, 3109, 3110, 3111, 3112, 3113, 3114, 3115, 3116, 3117, 3118, 3119, 3120, 3121, 3122, 3123, 3124 received in evidence)

THE COURT:  And for Evolve, sir?

MR. GIANFORTI:  Then, with respect to Evolve it is Government's Exhibits 1103, 1104, 1105, and 1106.

THE COURT:  A mercifully shorter list, sir.

MR. GIANFORTI:  Yes.

THE COURT:  Those, too, are admitted into evidence and made be shown to the jury thank you very much for working on this beforehand.

(Government's Exhibits 1103, 1104, 1105, 1106 received

in evidence)

          MR. GIANFORTI:  One more matter, your Honor.  With respect to records that were provided by Rippling.

          THE COURT:  Rippling, yes.

          MR. GIANFORTI:  I believe the certification for those is GX 1071.

          Mr. Iannuzzelli, can you confirm that that is the correct exhibit?

          The parties are not seeking to admit those records but rather are, they form the basis of a summary chart that I will introduce through Ms. Reyes, which we believe is appropriate under Federal Rule of Evidence 1006 and the parties agree to that.

          THE COURT:  Do I understand you to be saying that you are not seeking the admission of the underlying records but merely seeking admission of a later summary chart that will be made from those records?

          MR. GIANFORTI:  Correct.

          THE COURT:  Typically I see people admit both for belt and suspenders, but if the parties have agreed only to use the summary chart we will go with that at some later point.

          Thank you.

          MR. GIANFORTI:  That is it for the introduction of exhibits, your Honor, so I can begin my examination, if you ready.

P7H5sto1                        Reyes - Direct

THE COURT:  Please do.  Thank you.

MR. GIANFORTI:  Thank you.

JOCELYN REYES, resumed.

DIRECT EXAMINATION  (Continued)

BY MR. GIANFORTI:

Q.  Good morning, Ms. Reyes.

A.  Good morning.

Q.  Ms. Reyes, let's pick up where we left off yesterday.  To refresh the jury, you testified yesterday that you are a forensic accountant with the FBI; is that right?

A.  Yes.

Q.  And you have been doing that for about three years?

A.  Yes.

Q.  And I believe you also testified yesterday that you were asked to review certain financial records in connection with this case; is that right?

A.  Correct.

Q.  And some of those records were from an entity called Rho; is that right?

A.  Yes.

Q.  Were those records for a Rho account ending in 5627?

A.  Yes.

Q.  Were you also asked to review financial records from an entity called Evolve?

A.  Yes.

Q.   Were those for an Evolve account ending in 2661?

A.   They were.  Yes.

Q.   Did the Evolve statements that you reviewed indicate that they were also associated with a company called Mercury?

A.   Yes.

Q.   And I think you also testified yesterday that you were asked to review certain payroll records from an entity called Rippling.  Do you remember that?

A.   I do.

Q.   Just to give the jury just a little bit more background, we got into this yesterday, can you describe in more detail what, exactly, a forensic accountant does in terms of your day-to-day casework?

A.   A forensic accountant uses a combination of accounting, audit, and investigative skills to analyze financial information.

Q.   Thank you.

     I believe you testified yesterday that you were asked to prepare some summary charts with respect to the Rho, Evolve, and Rippling records that you were asked to review; is that right?

A.   Yes.

Q.   I believe you also testified that it was me that asked you to prepare those summary charts; is that right?

A.   Yes.

Q.   Let's focus on Rho for a moment.  So that Rho account ending in 5627, did that account have an account name of some kind?

A.   It did.

Q.   What was the name of that account?

A.   Peppersec Inc.

Q.   And the Rho records that you reviewed, did they reflect that that account had particular users?

A.   Yes.

Q.   Do you recall who any of those users were?

A.   Roman Storm and Alexey Pertsev.

          MR. GIANFORTI:  Mr. Iannuzzelli, can you please pull up Government Exhibit 903 which is in evidence?

Q.   Ms. Reyes, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   It's the account statement for Peppersec Inc.

Q.   For what time period?

A.   From August 1, 2020 through August 31, 2020.

Q.   And this is the 5627 account that we were talking about a moment ago?

A.   Yes.

          MR. GIANFORTI:  Actually, Mr. Iannuzzelli, could you blow up the lower left-hand corner, please?

Q.   Ms. Reyes, do you see where it says "Summary" here on the

screen?

A.   Yes.

Q.   And do you see where it says "Credits"?

A.   Yes.

Q.   What were the total credits for in account in August of 2020?

A.   $900,000.

Q.   Thank you?

        MR. GIANFORTI:   Mr. Iannuzzelli, can you put up the second page of this document, please, and blow that up?   Thank you.

Q.   Ms. Reyes, what is reflected in this callout that we were looking at now?

A.   Two transactions made on August 24, 2020.

Q.   Were these both deposits or credits, as the form indicates?

A.   Yes.

Q.   And what were the amounts of these two deposits or credits?

A.   The first was $18,000; the second was $882,000.

Q.   So that is a total of $900,000?

A.   Yes.

Q.   Does this statement indicate where these credits came from?

A.   Not specifically.

        MR. GIANFORTI:   Mr. Iannuzzelli, could you please now pull up Government Exhibit 924, which is in evidence, and go all the way to the bottom of that spreadsheet and blow up the

last two lines, so rows 357 and 358, please?

Q.  Ms. Reyes, do you see those two highlighted lines on the spreadsheet?

A.  Yes.

Q.  What do those reflect?

A.  The two transactions that occurred in August 24, 2020.

Q.  Are these the same $900,000 credits that we saw on the statement?

A.  Yes.

Q.  Under Column C -- well, what is Column C, if you can tell from this?  We can scroll up, if need be.

A.  Column C is the description.

        MR. GIANFORTI:  Mr. Iannuzzelli, if we can go back down to the bottom?

Q.  With respect to those last two lines, what is reflected in the description column?

A.  Dragonfly International Holding Ltd.

        MR. GIANFORTI:  You can take that down, Mr. Iannuzzelli.  Mr. Iannuzzelli, could you now please pull up Government Exhibit 3107 which is in evidence?

Q.  Ms. Reyes, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's the Rho -- Peppersec Inc.'s Rho bank account statement.

Q.   For what period of time?

A.   From January 1, 2021, through January 31, 2021.

         MR. GIANFORTI:  Mr. Iannuzzelli, can you please go to the second page of this document?

Q.   Ms. Reyes, do you see at the top of this page where it says Infura?

A.   Yes.

Q.   How much was paid to Infura out of this account in January of 2021?

A.   $1,000.

Q.   Do you see Infura in other statements for this account that you reviewed?

A.   Yes.

Q.   Approximately how frequently was this account making payments to Infura?

A.   On a monthly basis.

Q.   Was $1,000, give or take, a typical payment to Infura in the statements that you reviewed?

A.   Yes.

         MR. GIANFORTI:  Mr. Iannuzzelli, can you put that back?

Q.   Do you see there are a number of items here, Ms. Reyes, that refer to Rippling?

A.   Yes.

Q.   What is your understanding of what those payments were for,

P7H5sto1                         Reyes - Direct

based on the records you reviewed to prepare for your

testimony?

A.   Those payments were for payroll.

Q.   Did you see Rippling in other statements for this account

you reviewed?

A.   Yes.

Q.   Approximately how frequently was this account making

statements to Rippling?

A.   On a monthly basis.

Q.   I don't want to put you on the spot but I'm going to ask

you to do a little quick math in your head.  What were the

approximate total payments made to Rippling out of this account

in January 2021?  And we can blow those up, if they are small

on your screen.

A.   About $9,000.

Q.   Thank you.

        And then do you see the two line items here for

something called GitHub?

A.   Yes.

Q.   Did you see GitHub in other statements for this account

that you reviewed?

A.   Yes.

Q.   Approximately how frequently was this account making

payments to GitHub?

A.   On a monthly basis.

P7H5sto1                        Reyes - Direct

Q.  How much was paid out of this account to GitHub in January of 2021?

A.  $60.

Q.  Great.

        MR. GIANFORTI:  You can take that down, Mr. Iannuzzelli, and could you now please pull up Government Exhibit 913, which is in evidence?

Q.  Ms. Reyes, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's Peppersec Inc.'s Rho bank statement.

Q.  For what period of time?

A.  February 1, 2022 through February 28, 2022.

Q.  So it is a statement a little bit more than a year later from the one we were just looking at?

A.  Yes.

        MR. GIANFORTI:  Mr. Iannuzzelli, please go to the second page.

Q.  I would like to walk through a few of these items as well. Do you see sort of in the middle of the page where it says "Infura" again?

A.  Yes.

Q.  How much was paid to Infura in February of 2022?

A.  $1,200.

Q.  Now, focusing on the bottom of this page, do you see those

two line items for Rippling at the bottom?

A.   Yes.

Q.   And that is payroll data or that's payroll information;
that's what you testified?

A.   Yes.

Q.   And approximately how much was paid out of its account to
Rippling in February of 2022?

A.   About $31,000.

         MR. GIANFORTI:   And then, Mr. Iannuzzelli, could you
pull out where it says "Alchemy" sort of in the middle of the
page?   Thank you.

Q.   Ms. Reyes, do you see this line item for Alchemy?

A.   Yes.

Q.   Approximately how much was paid out to Alchemy out of this
account in February of 2022?

A.   $49.

Q.   Did you see Alchemy in other Rho statements you reviewed?

A.   Yes.

Q.   Approximately how often were payments to Alchemy made out
of this account?

A.   On a monthly basis.

Q.   OK.   Great.

         MR. GIANFORTI:   Mr. Iannuzzelli, could you please go
to the next page of this document?   Could you blow up those two
items?

P7H5sto1                         Reyes - Direct

Q.   Ms. Reyes, do you see these two line items for GitHub on the screen?

A.   Yes.

Q.   Approximately how much was paid to GitHub out of this account in February of 2022?

A.   $120.

MR. GIANFORTI:  You can take that down, Mr. Iannuzzelli.  Can we please go back to Government Exhibit 924 and could you highlight row 8 of the spreadsheet?

Q.   Do you see the highlighted row, Ms. Reyes?

A.   Yes.

Q.   What is reflected in that row?

A.   A wire made on May 17, 2022.

Q.   And who was that wire made to?

A.   Based on the description, Mercury.

Q.   And what was the amount?

A.   $300,000.

Q.   Do you see the column that says "User"?

A.   Yes.

Q.   What information is reflected in that column or what user is listed, I should say.

A.   Roman Storm.

Q.   Thank you.

MR. GIANFORTI:  Mr. Iannuzzelli, can you please pull up Government Exhibit 1103 which is in evidence?

P7H5sto1                          Reyes - Direct

Q.  Ms. Reyes, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It is Peppersec Inc.'s Mercury statement.

        MR. GIANFORTI:  Mr. Iannuzzelli, can you just blow up the footnote actually for a moment?

Q.  This footnote refers to Evolve and Mercury, right?

A.  Yes.

        MR. GIANFORTI:  You can take that down or the callout, Mr. Iannuzzelli.

Q.  Do you see where it says "Summary of Account Activity" on this page?

A.  Yes.

Q.  I'm sorry, I may not have asked you this.  What time period does this statement reflect?

A.  May 1, 2022 through May 31, 2022.

Q.  And under Summary of Account Activity, do you see where it says "Starting Balance"?

A.  Yes.

Q.  What was the starting balance for this account?

A.  Zero.

        MR. GIANFORTI:  Can you turn to the next page, Mr. Iannuzzelli, and blow out that first line?

Q.  Do you see this first deposit into the account on May 17, 2022?

P7H5sto1                     Reyes - Direct

A.   Yes.

Q.   What was the amount of that deposit?

A.   $300,000.

Q.   Does this tie out to the $300,000 that we saw leaving the Rho account on that date?

A.   Yes.

          MR. GIANFORTI:   You can take down that callout.

Q.   Do you see the two items for GitHub on May 25 and May 26, 2022?

A.   Yes.

Q.   And how much was paid to GitHub over those two days, approximately?

A.   About $600,000.

Q.   I think that may be the total -- is that the total balance or are you adding the balances there or is the payment further to the left?

A.   That was the balance.

Q.   So what were the payments?

A.   The first was for $1,320; the second was for $76.14.

          MR. GIANFORTI:   You can take that down, Mr. Iannuzzelli.

Q.   Ms. Reyes, with respect to Rippling and the records you reviewed, did those records reflect a particular name associated with the account?

A.   Yes.

P7H5sto1                         Reyes - Direct

Q.   And what was that?

A.   Peppersec Inc.

          MR. GIANFORTI:  Mr. Iannuzzelli, could you please pull up for the witness and the parties and the Court, Government Exhibit 3007?

Q.   Ms. Reyes, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   These are the summary charts I was asked to create by the case team.

Q.   Are the charts in this PowerPoint presentation based on data that you received from Rho, Evolve, and Rippling?

A.   Yes.

          MR. GIANFORTI:  The government offers Government Exhibit 3007.

          MS. AXEL:  No objection.

          THE COURT:  Government Exhibit 3007 is admitted into evidence and may be shown to the jury.

          (Government's Exhibit 3007 received in evidence)

          MR. GIANFORTI:  Thank you.

          Mr. Iannuzzelli, can you please publish that and go to the second slide?

BY MR. GIANFORTI:

Q.   So, Ms. Reyes, what are we looking at here?

A.   Withdrawals from Peppersec Inc. Rho bank account no. 5627,

P7H5sto1                        Reyes - Direct

from January 2021 through December 2021.

Q.  And this is the same Rho bank account we were talking about a few minutes ago?

A.  Yes.

Q.  And this reflects, basically, calendar year 2021; right?

A.  Yes.

Q.  Now, this chart reflects three different categories which each have a different color.  What are those three categories or buckets that you put together?

A.  Payroll, other expenses, and monthly recurring expenses.

Q.  So let's take each of those in turn.  How did you determine which transactions reflected Peppersec's payroll?

A.  Based on payments to Rippling.

Q.  And the monthly recurring expenses category, what does that reflect?

A.  That reflects payments to Alchemy, Infura and GitHub, to name a few.

Q.  And were those just as it suggests, expenses that were incurred on a monthly basis?

A.  Yes.

Q.  And the category "Other Expenses," what does that encompass?

A.  Everything other than payroll and monthly recurring expenses.

Q.  And what was the total payroll that you identified that was

paid out of this account in 2021?

A.   $290,273.23.

Q.   And what were the total monthly recurring expenses you identified in 2021 that were paid out of this account?

A.   $32,676.76.

        MR. GIANFORTI:   Mr. Iannuzzelli, can you please go to the next slide?

Q.   Ms. Reyes, what are we looking at here?

A.   Withdrawals from Peppersec Inc. Rho bank account 5627, from January 2022 through April 2022.

Q.   And this is the same Rho account we were just talking about; right?

A.   Yes.

Q.   So this chart also has the same three categories that we were talking about a moment ago.  Do they reflect the same thing in this chart?

A.   Yes.

Q.   So focusing on payroll, how much total payroll did you identify being paid out of this account between January and April 2022?

A.   $85,066.03.

Q.   What were the total monthly recurring expenses you identified between January and April 2022?

A.   $6,370.64.

        MR. GIANFORTI:   Can we now turn to the next slide?

P7H5sto1                       Reyes - Direct

Q.   Ms. Reyes, what are we looking at here?

A.   Withdrawals from Peppersec Inc. Evolve/Mercury bank account ending in 2661, from May 2022 through August 2022.

Q.   And this is the same Evolve account you were talking about a few minutes ago?

A.   Yes.

Q.   This slide also appears to have the same categories as the two prior slides.  Do those categories reflect the same things as they did previously?

A.   Yes.

Q.   What was the total payroll out of this account during the period reflected on the slide?

A.   $9,373.33.

Q.   What were the total monthly recurring expenses for this time period?

A.   $2,679.46.

        MR. GIANFORTI:  Mr. Iannuzzelli, could you please turn to the next slide?

Q.   Ms. Reyes, what are we looking at here?

A.   Peppersec Inc.'s Rippling payroll summary from December 7, 2020, through August 31, 2022.

Q.   What is this chart based on?

A.   This chart is based on the records provided by Rippling.

Q.   Do you see the column labeled "Employee Name"?

A.   Yes.

P7H5sto1                         Reyes - Direct

Q.   Are those names that you pulled from the Rippling data itself?

A.   Yes.

Q.   Do you see the column labeled "Department"?

A.   Yes.

Q.   Do you see that some of the employees listed here, it says "engineering" for their department?

A.   Yes.

Q.   Is that also information that came from the Rippling data?

A.   Yes.

Q.   Do you see the total gross earnings column?

A.   I do.

Q.   Can you just explain to the jury what that means, in plain language?

A.   Total gross earnings are the earnings before tax.

Q.   And what were the total gross earnings you identified in the Rippling data for the period of December 7, 2020 to August 31, 2022?

A.   $379,298.27.

Q.   Ms. Reyes, based on your review of the Rippling records, was that total gross, those total gross payments, were they made entirely in the form of salaries?

A.   They included signing bonuses.

Q.   Is that reflected in the column that says "Signing Bonuses"?

A.   Yes.

Q.   Is that a designation that was reflected in the Rippling
data, that they were signing bonuses?

A.   Yes.

Q.   And what were the total signing bonuses paid during this
period by Peppersec?

A.   $13,000.

          MR. GIANFORTI:  No further questions.

          MS. AXEL:  If I can have just one moment, your Honor,
to confer with Mr. Demarco?

          THE COURT:  Yes.

          (Pause)

          MS. AXEL:  May I, your Honor?

          THE COURT:  Yes, you may inquire.

CROSS-EXAMINATION

BY MS. AXEL:

Q.   Good morning, Ms. Reyes.

A.   Good morning.

Q.   You testified that you are a forensic accountant; is that
correct?

A.   Yes.

Q.   So, would you tell us just a little bit more about what
that means?

A.   So, as a forensic accountant I analyze and review bank
records provided for each of the cases that I work on.

P7H5sto1                         Reyes - Cross

Q.   And you have a college degree in accounting; correct?

A.   Correct.

Q.   You are also trained by the FBI?

A.   Yes.

Q.   And did you tell us yesterday you specialize in money laundering?

A.   Yes.

Q.   What does that mean?  What do you look for?

A.   I look for payments, funds going through facilitators' accounts.

Q.   That do you mean by facilitators?

A.   An individual that accepts funds, for a cut, into their account to funnel through.

Q.   Do you also look for suspicious activity in accounts?

A.   Yes.

Q.   And what would that look like?

A.   For example, suspicious patterns within the account.

Q.   A lot of cash, for example?

A.   Yes.

Q.   A lot of cash withdrawals, a lot of cash deposits; things like that?

A.   Those are some examples.

Q.   And in this case you went through all the bank records you testified about; correct?

A.   Yes.

P7H5sto1                       Reyes - Cross

Q.  Did you combine them in a spreadsheet?

A.  Yes.

Q.  So the deck that we looked at is based on a summary
spreadsheet that you prepared combining all the accounts; is
that right?

A.  Yes.

Q.  OK, let's look at what you introduced as your summary, this
is exhibit 3007.

         MS. AXEL:  Mr. Demarco, can I have it on the screen?

Q.  Let's look at the next page, the first page.  I understand
this summarizes all withdrawals from the account for the
calendar year of 2001; do I have that right?  '21, calendar
year '21; is that right?

A.  Yes.

Q.  And when you prepare a pie chart like this, is this based
on your spreadsheet data?

A.  Yes.

Q.  And what is the pie chart meant to represent?

A.  It represents each of the categories listed below.

Q.  Is it supposed to add up to a hundred percent?

A.  Yes.

Q.  So, in this case this one adds up to 99 percent; is that
right?

A.  Yes.

Q.  And so why doesn't it add up to a hundred percent?

P7H5sto1                        Reyes - Cross

A.   I will have to refer back to my spreadsheet.

Q.   OK.   So off the top of your head you don't know today as we sit here?

A.   I would have to review my spreadsheet.

Q.   So the answer is, no, you don't know today?

A.   Once I review my spreadsheet I will be able to answer that question.

Q.   But you can't answer it off the top of your head; right?

A.   Correct.

Q.   If I look in other expenses, what types of expenses are in that bucket?

A.   Other expenses includes payments to Experian and some tax payments to the IRS, to name a few.

Q.   And there are other things in there too, correct?

A.   Yes.

Q.   Like legal expenses?

A.   Yes.

Q.   You saw payments to lawyers from this account; right?

A.   Yes.

Q.   Now, if I look at the amount of payroll, that is $290,000 over the calendar year; is that right?

A.   For 2021:

Q.   Correct.

         So, by my rough math that is maybe about $24,000 a month in payroll; is that right?

A.   Yes.

Q.   Let's look at the next page.  So this is your analysis of the Rho account from January to April 2022; is that right?

A.   Yes.

Q.   And you agree that this pie chart is supposed to add up to 100 percent; is that right?

A.   Yes.

Q.   And this one in fact adds up to 104 percent.  Do you see that?

A.   Yes.

Q.   Why does it add up to more than 100 percent of expenses?

A.   I will have to refer to the spreadsheet I used to create this pie chart.

Q.   So you would agree with me that there is an error in here; right?

A.   I would have to refer to the spreadsheet.

Q.   But it is not correct that there is 104 percent on this chart, Ms. Reyes; isn't that right?

A.   I will have to refer to the spreadsheet I created.

Q.   Is the spreadsheet going to tell you why it is 104 percent instead of 100 percent?

A.   I will be able to review and answer that question once I review the spreadsheet.

Q.   And you will agree with me this is a mistake; right?

A.   I will have to review the spreadsheet.

P7H5sto1                         Reyes - Cross

Q.  So let's look at the amount of payroll reflected here in the first four months of 2022.  Do you see this?  And the total amount you have now is $85,000; is that right?

A.  Yes.

Q.  So over this four-month period now we have only about $20,000 in payroll for this period, right, per month?

A.  About.  Yes.

Q.  It went down?

A.  I will have to review the prior slide.

Q.  OK.  Well, you would agree with me that it was about $24,000 in the prior slide?

A.  Can you please repeat your question?

Q.  The question is:  This is about $20,000 a month so it went down a little; is that right?

A.  Yes.

Q.  OK.  And then let's look at your next slide.  So this is another four-month period from May to August 2022; correct?

A.  The slide shows the period May 2022 through August 2022.

Q.  May, June, July, August.  Is that four months?

A.  Yes.

Q.  And for this four-month period the payroll paid was only $9,373.33; is that right?

A.  Yes.

Q.  Which is only $2,500 a month, at most?  Is that right?

A.  About, yes.

Q.   And looking at the last page here of 3007, you noted that you also saw employment taxes paid for these individuals; isn't that right?

A.   I noted, I stated that the total gross earnings was before taxes.

Q.   But you also saw employment taxes paid out of this account including to the IRS, you stated; correct?

A.   The payments -- the IRS payments in the bank account was separate from the taxes I saw paid out of the Rippling account.

Q.   Out of the Rippling account did you see employment taxes being paid?

A.   Yes.

Q.   Did you also see employment taxes being paid out of the Rho account?

A.   I saw payments to Rippling.

Q.   OK.  We will get back to that.

     And you prepared some previous versions of this spreadsheet; didn't you?  Ms. Reyes?

A.   Yes.

     MS. AXEL:  We will take this down, and for Ms. Reyes only and the counsel, let's look at what has been previously marked as 3539-024.

     MR. GIANFORTI:  Objection.

     THE COURT:  I will see the parties at side bar.

     (Continued next page)

(At side bar)

THE COURT:  Yes.  Let me understand.

MR. GIANFORTI:  So I think I see where this is going, which is --

THE COURT:  There were errors in the prior versions.

MR. GIANFORTI:  No.  No.

THE COURT:  Oh, OK.

MR. GIANFORTI:  Although, yes, there were errors.

THE COURT:  OK.

MR. GIANFORTI:  Apparently.  I think where this is going is previous versions of this exhibit, there was more detail in the pie charts, so like the other expenses was broken out into more categories, including legal.

THE COURT:  OK.

MR. GIANFORTI:  And then we folded other expenses -- I'm sorry -- folded legal into the broader category of other expenses, so I think that Ms. Axel is going to try to impeach Ms. Reyes on that basis but there has been no statement which establishes that -- there has been no statement by Ms. Reyes that's impeachment, essentially, because she hasn't testified in a misleading way.  She said that she admitted that there was legal expenses that were folded in this other expenses category, so I don't think it is proper to impeach her with these prior versions of the exhibit.

THE COURT:  Ms. Axel, do you want to speak about what

the purpose is of bringing these prior versions?

MS. AXEL:  Yes, your Honor.  And I am happy to just ask her first setup questions if everybody would prefer.  I sort of thought they would prefer to be looking at the materials but I am happy to just ask setup questions about the type of analysis she did.  She did break out both the expenses in far more detail.  There are other errors in her prior spreadsheets.  And, in addition, there is differences in the way that have even reported the payroll data.

So, I think I am allowed to ask her about the prior versions and we can then refresh recollection or impeach, as appropriate as we go along, and I will ask the questions first and then do the documents, if everybody prefers it to be done that way.

THE COURT:  You can use the documents.  This is appropriate cross-examination.

MS. AXEL:  And we won't show them to the jury.  Or would you prefer?

MR. REHN:  There has been no allegation of anything to impeach.

THE COURT:  Well, other than the fact that her -- well, she had a different way of breaking these out.  I don't --

MR. REHN:  She hasn't testified to the contrary.

THE COURT:  But she hasn't been asked the question.

P7H5sto1                     Reyes - Cross

MR. REHN:  Right.

THE COURT:  All right, so then you will be asking the set up questions.

MS. AXEL:  I will.

THE COURT:  But I don't --

MR. REHN:  If she testifies that she did in fact break it out differently in a prior version I don't see any reason to show her that.  There would be nothing to impeach.

THE COURT:  Is that not correct?

MS. AXEL:  I'm a hundred percent sure she is going to say she wants to see the other versions but we will ask the questions first.

THE COURT:  OK.  We will ask the questions first.

Let me have a sense of how long this cross is.

MS. AXEL:  It is not long.  I think there are two prior versions and then I will quickly ask about some of the records they introduced.  It wouldn't be more than 20 minutes.

THE COURT:  OK.  All right.  And in terms of letting in the prior versions, I think I need to see them and I need to see what she says.

MS. AXEL:  OK.

THE COURT:  If it turns out that she answers the questions in a way that allows Ms. Axel to continue cross-examining, what is your position on the admission of the prior versions?

P7H5sto1                      Reyes - Cross

MR. REHN:  What would be the basis for admitting them?

THE COURT:  OK.

MR. REHN:  We would object to the admission.

THE COURT:  That's fine.  All right.

MS. AXEL:  I think it depends on what she says.  We may move.

MR. GIANFORTI:  OK.

THE COURT:  Exactly.

It may aid you both to have them in the record so that the jury can understand the differences and whether they matter or not.

MR. GIANFORTI:  Right.  We will see what she says.  I think she will say what Ms. Axel is expecting her to say.  So, that's fine.

THE COURT:  OK.  Thank you.

P7H5sto1                         Reyes - Cross

(In open court)

MS. AXEL:  May I continue, your Honor?

THE COURT:  You may.  Thank you.

BY MS. AXEL:

Q.  Ms. Reyes, you prepared various draft versions of your analysis; isn't that correct?

A.  Yes.

Q.  And in prior versions in fact you broke out the expenses in more detail; is that right?

A.  For which account?

Q.  For the Rho account I am looking at, so with respect to Rho account no. 5627 on a prior version of the deck you broke that out in more detail as to the expenses; is that right?

A.  Yes.

Q.  Yes.

And so in some versions for the Rho account in its entirety you had only 45 percent payroll; is that right?

A.  I would have to refer back to the spreadsheet.

Q.  OK.  Would it refresh your recollection if I show you the spreadsheet, one of your prior drafts?

A.  Yes.

MS. AXEL:  Can we have on the screen 3537-0012?

Q.  Do you have it in front of you?

A.  No.

THE COURT:  One moment.  I am sure it is coming.

MS. AXEL:  Sorry.  3539-0012.

THE COURT:  3539.

MS. AXEL:  I think I misspoke, yes.  Coming up.  OK. Can we go to page 3?

Q.  Now, Ms. Reyes, is this a deck that you previously prepared?

A.  Yes.

Q.  And on this deck does it show payroll listed as 45 percent of the expenses in this account?

A.  Yes.

Q.  And how do you square that with the 80 percent in the deck that we previously looked at?

A.  The time period was different between this deck and the other deck shown.

Q.  Is this time period for the entirety of the Rho account?

A.  I would have to refer back to my spreadsheet.

Q.  Let me try something else.  Showing you page 2 of this document, does this refresh your recollection as to the time period that you analyzed in this particular deck?

A.  Yes.

Q.  What is that time period?

A.  August 24, 2020, through June 7, 2022.

Q.  And so, for this entire period of time was this the entire period of time for the Rho bank account?

A.  Yes.

P7H5sto1                        Reyes - Cross

Q.   And for this period of time then payroll, as a whole, was about 45 percent; am I correct?

A.   I will have to refer back to my spreadsheet.

Q.   Would it refresh your recollection to look at page 3 of the deck which you already identified was your work product?

A.   Yes.

Q.   So for this period of time, the entire period of time of the account, payroll is 45 percent; correct?

A.   Based on this slide, yes.

Q.   And legal expenses for this period of time were about $23,000; is that correct?

A.   The chart -- based on the chart, yes.

Q.   Right.

     Ms. Reyes, this pie chart, to my math, adds up to 91.41 percent; is that correct?

A.   About.  Yes.

Q.   So there is something missing here, too?

A.   So this chart is broken down into two for the entire period.

Q.   What does that mean, broken down into two?

A.   To better explain I broke down the expenses into two pie charts for the entire period of this account in this instance.

Q.   I see.  So there is another pie chart that then makes up the additional approximately 8 percent?

A.   I would have to review the entire deck.

P7H5sto1                      Reyes - Cross

Q.   OK.  Can I ask you, before we move off this, what you have listed as crypto for 6 percent?

A.   Yes, I do see the crypto category.

Q.   Yes.  Do you recall what the expenses were that you grouped together in crypto?

A.   I would have to look at the spreadsheet.

Q.   There are no crypto transfers into this account; correct?

A.   I would have to refer back to the spreadsheet.

Q.   Are you referring to your spreadsheet or Exhibit 924 which is the spreadsheet of this particular account?

A.   Both.

Q.   We don't have your spreadsheet; correct?

A.   I don't know that.

Q.   So you mentioned there was another 8 percent that is not on this particular pie chart.  Do you recall preparing a pie chart concerning that additional 8 percent?

A.   I would have to refer back to the entire deck.

Q.   Would it refresh your recollection if I show you page 4 of 3539-012?

A.   Yes.

Q.   OK, showing you page 4 of 3539-0012, is this your additional pie chart?

A.   Yes.

Q.   And so here you have a number of other expenses listed; correct?

P7H5sto1                         Reyes - Cross

A.   Yes.

Q.   And did Peppersec have expenses such as corporate registrations and taxes?

A.   Based on this pie chart, yes, those were listed.

Q.   And did it also pay for accounting services?

MR. REHN:  Objection, your Honor.

THE COURT:  I'm still waiting to hear the -- is there an inconsistency?  I'm not sure why we are continuing to talk about this.  I don't think you have established inconsistency with her prior testimony.

MS. AXEL:  Again, I think, your Honor, we are going to ask that the person that is handling the witness be the person to --

THE COURT:  I agree as well.

Mr. Rehn, sit down.

But I can ask myself, I would like to know where we are going with this.

MS. AXEL:  I can set this one up as with respect to the other but, again, we are asking her about additional ways she broke down the data and then she has asked for her recollection to be refreshed about that.

THE COURT:  But you seem to be reciting these categories into the record rather than asking whether her recollection has been refreshed which is not, I understand, the way to do it.  And I am still not sure there is inconsistency

P7H5sto1                        Reyes - Cross

between the testimony that she gave and the testimony you are asking her about now.

(Continued on page)

P7H1STO2                        Reyes - Cross

MS. AXEL:  It isn't all necessarily for inconsistency. It's also to probe into the additional ways that she put——she broke down the data.

THE COURT:  As a method of impeachment?

MS. AXEL:  As not——and eliciting additional information from the witness about the analysis she performed.

THE COURT:  And to which she did not testify on her direct examination.

MS. AXEL:  She did, your Honor, I believe testify that she looked at all the expenses and broke them down, and this is asking about that process and what she discovered.

THE COURT:  All right.

MS. AXEL:  Thank you.

BY MS. AXEL:

Q.  Ms. Reyes, did you——and again, I asked you earlier with respect to attorneys, and you had testified before that there was a $22,000 amount that you had identified for legal counsel; is that correct?

A.  I would have to refer back to the statement.

MR. GIANFORTI:  Objection.  Same objection.

Q.  What is the total amount——oh, sorry.

THE COURT:  Sustained.  I mean, show her something to refresh her recollection.  If not, let's move on.

Q.  Okay.  What is the total amount of legal expenses that you determined that Peppersec incurred?

P7H1STO2                         Reyes - Cross

MR. GIANFORTI:  Objection.

THE COURT:  Same.  Sustained.

Q.  In addition to the $23,000 amount that you identified, did you also identify another $16,000 in legal expenses?

MR. GIANFORTI:  Objection.

THE COURT:  Sustained.

Q.  Would the spreadsheet that you created refresh your recollection as to the total amount of legal expenses?

MR. GIANFORTI:  Objection.

THE COURT:  I'll allow.

A.  Yes.

Q.  Is there anything else that would refresh your recollection as to the total amount of legal expenses that Peppersec incurred?

A.  No.

Q.  Okay.  Ms. Reyes, in——

MS. AXEL:  We can take this down for now.

Q.  Ms. Reyes, in other versions of your deck, did you also break the Peppersec Rho account into different time periods?

A.  I would have to refer back to those prior decks that you mentioned.

Q.  Did you——for example, so in the deck that you testified about, you had broken Peppersec down, as we looked at, to calendar year of 2021.  Do you recall that?

A.  Yes.

Q.   And then you also broke it down into a period of January 2022 to April 2022; is that right?

A.   Yes.

Q.   Okay.  But in other analyses, you also broke it into different quarters; is that right?

A.   Yes.

Q.   And for example, in some instances you broke it into a quarter of 2021 and 2022; is that correct?

A.   Yes.

Q.   Okay.  So for example, you did the first quarter of 2021 and 2022, right?

A.   Yes.

Q.   And later you did the second quarter of 2021 and 2022; is that right?

A.   Yes.

Q.   And later you did the third quarter of 2021 and also 2022; is that right?

A.   Yes.

Q.   Why did you break it into these different iterations?

A.   I was asked to break it down by quarter by the case team.

Q.   And what did you discover through that analysis?

A.   I would have to refer back to the spreadsheet that I used for that analysis.

Q.   And did you also isolate the second quarter of 2022 in your analysis?

A.   I would have to refer back to that spreadsheet.

Q.   And Ms. Reyes, where is your spreadsheet?

A.   Which spreadsheet are you referring to?

Q.   Well, you said several times that you would need to refer to your spreadsheet.  Where is that?

A.   It was given to the case team.

Q.   Okay.  When you reviewed the bank records, all of the bank records were in the name of Peppersec Inc.; is that correct?

A.   Yes.

Q.   And let me show you Government Exhibit 903, which you were asked about and was moved in evidence.

     And you see there is Peppersec Inc.  Is that how it was on all of the bank records that you examined?

A.   Yes.

Q.   And were all of them at the Taft Street address in Seattle, Washington?

A.   Based on this statement, yes.

Q.   Wasn't that true of all the statements you looked at?

A.   Yes.

Q.   And you understand that's Peppersec's address.

A.   I don't know.

Q.   Okay.  And you understand, Ms. Reyes, don't you, that Peppersec is a Delaware corporation?

          MR. GIANFORTI:  Objection.

          THE COURT:  If she knows, although it would seem to be

P7H1STO2                        Reyes - Cross

outside of the scope of what she was doing.

Did you have any work in determining the corporate status of Peppersec?

THE WITNESS:  No.

THE COURT:  Thank you.

Move on, counsel.

BY MS. AXEL:

Q.  So let me show you what has been marked as Government Exhibit 914.  And this is one of the statements that is in evidence and you reviewed it, correct?

A.  Yes.

Q.  And if you look at page 2 of Exhibit 914, it indicates a payment to Delaware Corp. & Tax.  Do you see that?

A.  Yes.

Q.  And how did you identify that payment, on your analysis?

A.  As Delaware Corp. & Tax.

Q.  Oak.  You understand it's a payment to the State of Delaware?

MR. GIANFORTI:  Objection.

THE COURT:  You can answer the question.

A.  I would need to review more information about this transaction.

Q.  Okay.  Let us look at what has been marked as Government Exhibit 916, which is also in evidence.

And looking at page 2 of the document at the bottom,

Ms. Reyes, do you see what's reflected as a debit to Washington Department of Revenue?  Do you see that?  There are two.

A.  Yes.

Q.  And do you understand that to be a tax payment to the State of Washington?

MR. GIANFORTI:  Objection.

THE COURT:  If she knows.

A.  I would need more information to determine that.

Q.  Well, you told us that you saw tax payments to Washington State in the Rippling records, correct?

THE COURT:  I don't know that that was what she testified.  I think she said she saw tax payments in the Rippling records.  I don't know she said to which entity.  But I'll let her testify, not me.

A.  I did not state that I saw tax payments to Washington State Department, as you previously mentioned.

Q.  So it's your testimony you don't recall whether you saw tax payments to Washington State in Rippling.

A.  I saw tax payments to the IRS.

Q.  Okay.  And looking at the bank statements, did you identify these expenses as tax payments to the State of Washington?

MR. GIANFORTI:  Objection.

THE COURT:  One moment, please.

I'll allow.  Do you want the question repeated?

THE WITNESS:  Yes, please.

P7H1STO2                      Reyes - Cross

THE COURT:  Counsel, if you could, please.

MS. AXEL:  Of course.

BY MS. AXEL:

Q.  Did you identify these in your analysis as tax payments to the State of Washington?

THE COURT:  Please excuse me.  Counsel, are you referring to the two bottom entries on the page, the screen that we're seeing?

MS. AXEL:  I am.

THE COURT:  Thank you very much.

You may answer.

A.  I would have to refer back to that spreadsheet.

Q.  So you don't know.

A.  I would have to refer back to the spreadsheet created.

Q.  Okay.  And let's look at Exhibit 918, which is another bank statement that has been entered in evidence.  And showing you page 2 of 918.  Do you see there on May 4, 2022, a payment to the California Secretary of State?

A.  Yes.

Q.  And how did you classify that payment in your schedule?

A.  I would have to refer back to that schedule.

Q.  Did you see payments to California authorities for employment taxes in your analysis?

MR. GIANFORTI:  Objection.

THE COURT:  I'll allow.

A.   Can you please repeat that question.

Q.   Sure.  I'll try to make it better.

     Did you see payments in your analysis to the California state authorities for employment taxes?

A.   I saw this payment to the California Secretary of State.

Q.   Only this one?

A.   I would have to review the entire statement.

Q.   And before we leave this one, you will also see at the bottom there's a payment to Goodwin Procter LLP.  Do you see that?

A.   Yes.

Q.   And did you classify that as a legal payment?

A.   I would have to refer back to that document.

Q.   And would your spreadsheet refresh your recollection?

A.   Yes.

Q.   Okay.  Let me look at one more.

     Let's show you what has been marked as Government Exhibit 3100.  Oh, actually, 3104.  Can we show you what's marked as Government Exhibit 3104, which is a bank statement that's moved in evidence also.

     And on page 2 of this document, Ms. Reyes, do you see the payment to Manatt, two payments to Manatt?

A.   Yes.

Q.   You see those.  And do you understand that Manatt is a law firm?

P7H1STO2                    Reyes - Cross

A.   Based on what the AUSA told me, yes.

Q.   Okay.  And so did you classify these as legal expenses?

A.   Based on the memo reference column, yes.

Q.   Okay.  All right.  Let's go back a minute.

          You identified two credits on Exhibit 3102.  Let's show you what was entered as 3102 in evidence.

          And you identified these as the initiating credits into this account, meaning monies that came into this account, right?

A.   Yes.

Q.   And there were no other monies that came into this account, correct?

A.   That is not correct.

Q.   Okay.  How much money came into this account?

A.   I would have to refer back to my spreadsheet.

Q.   Okay.  Was there a regular source of income?

A.   I would have to refer back to my spreadsheet.

Q.   On a month-to-month payment——on a month-to-month basis, did you see regular income coming into the account?

A.   I would have to refer back to my spreadsheet.

Q.   So for example, we looked at Exhibit 918.  Let's have that one back.

          And looking at page 2 of this document, Ms. Reyes, are there any credits coming into this account on this page, any money coming in?

P7H1STO2                        Reyes - Cross

A.   Yes.

Q.   What do you see?

A.   26 cents.

Q.   In interest, correct?

A.   Yes.

Q.   What else do you see?

A.   $50,000.

Q.   And then that was reversed; is that right?

A.   Based on the memo reference column, yes.

Q.   Yes, that was reversed.

        Let's look at—maybe this will help.  Let's look at what was marked as 924.  What do you understand 924 to be?

A.   This is a spreadsheet provided by Rho.

Q.   And what does it show?

A.   A list of transactions.

Q.   So would this show all the debits and the credits into this account, over the period of time of this account?

A.   I would have to refer back to the statement to verify that.

Q.   And Mr. Gianforti asked you about the very last two columns of this, right?  The last two rows.

        MS. AXEL:  Give us just a minute to widen these columns so we can see them.

        Richie, we're going to need to see A and—yeah.  There we go.  That's good.

Q.   Okay.  Ms. Reyes, you were asked about these two credits

P7H1STO2                       Reyes - Cross

into this account.  Do you see that?

A.  Yes.

Q.  Okay.  And these payments were both made in August of 2020, correct?

A.  Correct.

Q.  For most of the life of this account, correct, this is the money that's in this account from which the disbursements are made, right?

A.  Yes.

Q.  And Dragonfly you understand to be a venture capital company, correct?

MR. GIANFORTI:  Objection.

THE COURT:  I'll let her answer if she knows.

Do you know?

THE WITNESS:  No.

THE COURT:  Okay.

Q.  You don't know who Dragonfly is.

A.  No.

Q.  And looking at all of the activity in this account, did you see unusual cash payments coming in?

MR. GIANFORTI:  Objection.

THE COURT:  Well, unusual cash payments in the way she's defined them at the beginning of her cross?

MS. AXEL:  Yes.

THE COURT:  Do you recall at the beginning of your

P7H1STO2                    Reyes - Redirect

cross-examination when you were talking about things that you were looking at?

THE WITNESS:  Yes.

THE COURT:  Did you speak about unusual cash transactions?

Well, you know what, perhaps ask a few preliminary questions.  Thank you.

MS. AXEL:  Yes, yes.

BY MS. AXEL:

Q.  You testified about the beginning of your training and experience in analyzing accounts as an FBI agent, correct?

A.  I testified that I was a forensic accountant.

Q.  And you also testified that you were trained by the FBI, correct?

A.  Yes.

Q.  And that you looked for suspicious activity in accounts, correct?

A.  Correct.

Q.  And in this account do you see large cash withdrawals?

A.  No.

Q.  Did you see a lot of cash payments into the account?

A.  No.

MS. AXEL:  No further questions.

MR. GIANFORTI:  Very briefly, your Honor.

REDIRECT EXAMINATION

BY MR. GIANFORTI:

Q.  Ms. Reyes, do you recall that Ms. Axel was asking you on cross-examination about certain expenses that you saw coming out of the account that may have been legal expenses?

A.  Yes.

Q.  Do you have any idea of what those payments were for beyond the fact that they may be going to lawyers?

A.  No.

Q.  Do you know the substance of anything that those law firms may have said to anybody at Peppersec?

A.  No.

Q.  And do you recall that Ms. Axel was asking you about a chart that you had prepared, an earlier version of Government Exhibit 3007, where the chart reflected that payroll out of the Rho account reflected 45 percent of the expenses out of that account for essentially the life of the account?

A.  Yes.

Q.  Do you recall that you were testifying on direct about an approximately $300,000 payment that came out of the Peppersec account?

A.  Yes.

        MS. AXEL:  Objection, your Honor.  Leading.

        THE COURT:  I'm not sure how that—I'm going to let him go, but I'm not sure how it relates.  I want to hear.  Keep

going.

Q.  So when you calculated that 45 percent, did that include the $300,000 payment that came out of that account during the life of the account?

MS. AXEL:  Objection.  Vague.

THE COURT:  I will allow.  Overruled.

A.  No.

MR. GIANFORTI:  Can we please pull up, just for the witness to refresh her recollection, 3539-12.

MS. AXEL:  Objection, your Honor.

BY MR. GIANFORTI:

Q.  Is there something that could refresh your recollection as to—

THE COURT:  You have the answer you have, sir.  Thank you.

Are you asking these questions because of the testimony she's just given?

MR. GIANFORTI:  Yes.

THE COURT:  You haven't established a basis to refresh the recollection.

MR. GIANFORTI:  It's inconsistent with what she was saying previously, your Honor, because she testified on direct as to the $300,000 payment.

THE COURT:  I don't want you to speak the objections, sir.  You asked her a question and she gave you an answer.

P7H1STO2                       Henry - Direct

Let's move on.

MR. GIANFORTI:  Okay.  One moment.

No further questions.

THE COURT:  All right.  Thank you so much.  You may step down.

(Witness excused)

THE COURT:  Government's next witness, please.

MR. GIANFORTI:  Your Honor, the government calls Special Agent Jeremy Henry.

(Witness sworn)

THE DEPUTY CLERK:  Thank you.  Please be seated.  And into the microphone, please state and spell your full name for the record.

THE WITNESS:  Jeremy Henry.  J-E-R-E-M-Y, H-E-N-R-Y.

THE COURT:  I'm going to ask you to speak up just a little bit, sir, so we all can hear you.  Thank you very much.

THE WITNESS:  Yes, your Honor.

THE COURT:  All right.  Counsel, You may inquire. Thank you.

MR. GIANFORTI:  Thank you.

 JEREMY HENRY,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. GIANFORTI:

P7H1STO2                    Henry - Direct

Q.  Good morning, Special Agent Henry.

          Sir, where do you work?

A.  I work out of the FBI field office in Seattle, Washington.

Q.  What's your position there?

A.  I'm a special agent.

Q.  How long have you been a special agent with the FBI?

A.  Since about 2021.

Q.  Are you assigned to a particular squad?

A.  I am.  I'm assigned to the Tacoma resident agency.

Q.  All right.  So during your time with the FBI, have you participated in the execution of search warrants of physical locations?

A.  Yes.

Q.  Approximately how many times have you done that?

A.  Dozens of times.

Q.  All right.  Now directing your attention to August 23rd of 2023, did you participate in a search of 16738 Southeast 328th Place in Auburn, Washington, on that date?

A.  Yes.

Q.  Was that search conducted pursuant to a search warrant?

A.  Yes, it was.

Q.  Is that location, Auburn, is that in the general vicinity of Seattle-Tacoma, Washington?

A.  Yes.

Q.  How would you describe the address that you searched on

P7H1STO2                     Henry - Direct

that date?

A.   It was a large single-family home at the end of a long driveway, with an attached garage, multiple vehicles, several outbuildings.

Q.   Who was the primary resident at that address at that time?

A.   Roman Storm.

Q.   Sir, what was your role in executing the search warrant for that address?

A.   I was the search team leader.

Q.   Could you share with the jury, just at a high level, what that means, being search team leader for a search.

A.   The search team leader is responsible for coordinating with the case agent, if they aren't the case agent; meeting the intent of whatever the mission is there; organizing a team to actually search the residence; ensuring that the search is conducted in accordance with the legal process that we have, and internal FBI policy.

Q.   Sir, are you familiar with the term "operations order"?

A.   Yes.

Q.   Could you describe to the jury what that is, at a high level.

A.   Yeah.  An FBI operations order is an internal FBI document drafted by typically the team leader for a search or an arrest operation.  It covers kind of the overall concept of a mission. It includes some more particular details also about the

participants that will be involved in the operation, roles and responsibilities for those participants; it's also got details about equipment logistics, communications plans, medical plans, that kind of thing.

Q.  Sir, was there an operations order in place for the search of the address that we were talking about a moment ago?

A.  Yes, there was.

Q.  Who drafted that operations order?

A.  I did.

Q.  Did you do that in your capacity as search team leader?

A.  Yes.

Q.  Okay.  Could you just describe to the jury how your day began on August 23, 2023.

A.  Yeah.  Typically an FBI search or arrest operations are conducted early in the morning, so we met quite early in the morning.  I organized the search team, ensured accountability of all of our people and things, and then I briefed the search team and then we moved to the residence.

Q.  Just one moment.

All right.  So could you just describe to the jury how the search unfolded from the moment that your team entered the home.

A.  Yes.  So when we arrived at the residence, I conducted an initial walk-through of the house with our photographer before setting up our evidence collection station and then beginning

P7H1STO2                        Henry - Direct

the search from there.

Q.  Why did you conduct a walk-through?

A.  Before conducting a search, it's FBI policy, we conduct an initial walk-through of the house and we take what are called entry photographs of the entire residence.  That's to document what the property looks like before we actually manipulate anything in the property.

Q.  And you said that a photographer did that; is that right?

A.  Yes.

Q.  So you didn't personally take the photographs during the walk-through?

A.  No, I did not.

Q.  Did you review the photos that were taken?

A.  Yes.

        MR. GIANFORTI:  All right.  Ms. Sebade, could you please pull up, just for the witness and the parties and the Court, what's been marked for identification as Government Exhibit 2551.

Q.  Special Agent Henry, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It is an entry photograph of the front side of Mr. Storm's house taken from the driveway.

        MR. GIANFORTI:  Government offers Government Exhibit 2551.

MR. KLEIN:  No objection.

THE COURT:  All right.  Government Exhibit 2551 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2551 received in evidence)

MR. GIANFORTI:  Ms. Sebade, could you please pull up for identification Government Exhibit 2552.

BY MR. GIANFORTI:

Q.  Special Agent Henry, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's a photo taken from inside Mr. Storm's house in the dining room area.

Q.  And is there anything that you notice in the lower right-hand corner of this photo?

A.  Yeah, the bottom right-hand corner is a neon sign containing the Tornado Cash brand.

MR. GIANFORTI:  The government offers Government Exhibit 2552.

MR. KLEIN:  No objection, your Honor.

THE COURT:  Sir, are there any objections to any of the photographs the government is seeking to admit through this witness, if you know?

MR. KLEIN:  I don't think so.  I only see one more, your Honor, so if it's just the one more, then no.

MR. GIANFORTI:  There are no more, in fact.

P7H1STO2                    Henry - Direct

THE COURT:  There are no more, in fact.  Okay.  Thank you.

Government Exhibit 2552 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2552 received in evidence)

BY MR. GIANFORTI:

Q.  All right.  And sir, was this neon sign that we see in the lower right-hand corner, was that in fact seized from Mr. Storm's house?

A.  Yes, it was.

MR. GIANFORTI:  Your Honor, may I approach.

THE COURT:  Go ahead.

Q.  Special Agent Henry, I just handed you what's been marked for identification as PX 3.  Do you recognize this item?

A.  Yes, I do.

Q.  What is it?

A.  It's the same neon sign depicted in that photograph.

MR. GIANFORTI:  Your Honor, the government offers PX 3.

THE COURT:  I believe, Mr. Klein, it's the thing by the agent.

MR. KLEIN:  Oh, sorry, your Honor.  I didn't see it over there.

THE COURT:  Okay.

MR. KLEIN:  No objection.

THE COURT:  Okay.  Thank you.  PX 3 is admitted into evidence.

(Government's Exhibit PX 3 received in evidence)

MR. GIANFORTI:  And your Honor, would it be all right if we just plugged it in briefly to display to the jury?

THE COURT:  Sure.  If you——

MR. GIANFORTI:  I can do it.  There's an outlet over here.

THE COURT:  Okay.  Go ahead, I cannot——yes, yes.

MR. GIANFORTI:  Your Honor, may the record reflect that the sign is operable, it lights up.

THE COURT:  The record will reflect that the sign is operable, it lights up.

BY MR. GIANFORTI:

Q.  All right.  And Special Agent——

MR. GIANFORTI:  We can take down that image if it's still published.

Q.  Special Agent Henry, could you describe to the jury what happened after the photos were taken and the walk-through was done, in terms of how the search unfolded.

A.  Yes.  We established a collection point for all the evidence we were going to take in the house, and then we assigned searchers to each of the rooms in the house and began searching the house.

Q.  At a high level, what were you searching for that day?

A.   Items included in the attachments for the search warrant, mostly electronic devices, hard drives, that kind of thing.

Q.   Did the warrant also include Tornado Cash paraphernalia like the sign we were just looking at?

A.   Yes.

Q.   All right.  And in fact was any electronic—any electronic devices seized in connection with the search?

A.   Yes.

          MR. GIANFORTI:  All right.  May I approach again, your Honor.

Q.   Special Agent Henry, I've just handed you what's been marked for identification as PX 1A, PX 1B, and PX 1C.  Do you recognize these items?

A.   Yes.

Q.   What are they?

A.   They're several hard drives we seized from Mr. Storm's house.

Q.   What, if anything, happened with these three hard drives after they were seized from the home?

A.   We—we packaged them according to FBI policy and then we mailed them off to the New York field office.

          MR. GIANFORTI:  No further questions.  Thank you.

          THE COURT:  Are you seeking to admit these?

          MR. GIANFORTI:  Yes.  I'm sorry.

          THE COURT:  Mr. Klein, is there an objection to PX 1A,

P7H1STO2                    Henry - Direct

1B, 1C, sir?

MR. KLEIN:  No, your Honor.

THE COURT:  Thank you.

PX 1A, 1B, 1C, are admitted into evidence.  Thank you very much.

(Government's Exhibits PX 1A, PX 1B, PX 1C received in evidence)

THE COURT:  Cross-examination?  Or not?

MR. KLEIN:  It would be or not, your Honor.  No.

THE COURT:  Okay.  Thank you very much, sir.  Thank you for your time.

(Witness excused)

THE COURT:  Next government witness, please.

MR. ARAD:  The government calls Emiline Stewart, your Honor.

THE COURT:  Actually, one moment, please.

Mr. Arad, may I have a sense of your direct.  Is this a long or short witness?

MR. ARAD:  This is a short witness, I think about 20 to 30 minutes.

THE COURT:  Perhaps then let's take our morning break now, just so that we can get everything ready for the next witness.

So we're going to take our morning break.  It is ten minutes long.  I'll remind you—Juror No. 2 wants to tell me

what I'm about to say but I will say it nonetheless.  Do not discuss this case with each other or anyone else.  Keep an open mind until all the evidence is received.  We'll see you in 10 minutes.  Thank you so much.

THE DEPUTY CLERK:  All rise.

(Juror not present)

THE COURT:  Mr. Arad, you'll excuse me.  I saw juror discomfort, hence we took the break.

I'll see you in 10.  Thank you.

(Recess)

THE COURT:  Please be seated except for the witness. Thank you.

(Witness sworn)

THE DEPUTY CLERK:  Please be seated and, into the microphone, please state and spell your full name for the record.

THE WITNESS:  My name is Emiline Stewart. E-M-I-L-I-N-E, S-T-E-W-A-R-T.

EMILINE STEWART,

    called as a witness by the GE,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ARAD:

Q.  Good morning, Ms. Stewart.  Where do you work?

A.  I work for the Federal Bureau of Investigation.

P7H1STO2                        Stewart - Direct

Q.   What's your title?

A.   Digital forensic examiner.

Q.   How long have you been in that role?

A.   About two and a half years.

Q.   What are your duties and responsibilities in that role?

A.   I'm responsible for the collection, preservation, and analysis of digital evidence.

Q.   At a high level, what was your role in this investigation?

A.   I received a request to examine digital evidence.

Q.   And going back to your training for a moment, what kind of job training is required to do your job?

A.   I received about 400 hours of training from the FBI.

Q.   Is there additional training after that?

A.   Yes.

Q.   What is that training?

A.   It involved various classes on new forensic tools and techniques.

Q.   Have you ever been asked to forensically analyze evidence from a hard drive?

A.   Yes.

Q.   What is a hard drive?

A.   A hard drive stores information in devices such as computers and laptops.

Q.   Approximately how many hard drives would you say you've analyzed?

P7H1STO2                      Stewart - Direct

A.   About a hundred.

Q.   In your training and experience, what is the standard process for forensically analyzing a hard drive?

A.   It starts with verifying that we have legal authority, and then we continue to a physical examination of the devices.  We obtain the data from the device, we process it in Forensic Tool and then we generate a report for review.

Q.   I want to start with the extraction.  How do you conduct an extraction of an electronic device?

A.   We connect the device to a write blocker to ensure that none of the information is changed as we obtain a copy of all the data that was on it.

Q.   And once you obtain a copy, what's the next step that you take?

A.   We process it in Forensic Tool.

Q.   What does processing mean?

A.   It categorizes the data so it's easier for review.

Q.   Is that sometimes called parsing?

A.   Yes.

Q.   What, if anything, do you do to ensure that the data on the hard drive has not changed during processing?

A.   We use something called hashing.  You can think of it kind of like a digital fingerprint.  It's essentially just a math formula that generates a string of random numbers and letters that can uniquely identify a file.

Q.  Now let's turn to this case.  Did you examine hard drives in connection with this case?

A.  Yes.

Q.  How many?

A.  Three.

Q.  Ms. Stewart, on the table in front of you, you should have an exhibit that is marked PX 1.  Do you see it?

A.  Yes.

Q.  Do you recognize it?

A.  Yes.

Q.  How do you recognize it?

A.  These are the drives that I examined.  My initials are on the bag.

Q.  What's in the bag?

A.  Three hard drives.

Q.  Please open the bag.  Are the hard drives in there marked with exhibit numbers?

A.  Yes.

Q.  And is one of them marked PX 1A?

A.  Yes.

Q.  That's the one we're going to focus on today.  Did you forensically examine this hard drive?

A.  Yes.

Q.  Okay.  Let's take a step back for just a minute.

How did you first come to be involved in this case?

A.   I received a request from the case agent for assistance.

Q.   And what does it mean to receive a request for assistance from a case agent?

A.   My team handles all the digital evidence for the bureau in the New York office so we receive requests from various agents and they're randomly assigned to different examiners.

Q.   And so when you received the request from this hard drive, what was the first thing that you did?

A.   I verified the legal authority.

Q.   And after that?

A.   I conducted a physical examination.

Q.   What does that consist of?

A.   In this case I labeled the bag that the drives came in for this particular item.

Q.   What came after the physical examination?

A.   I obtained the data from the drives.

Q.   And what did you do with that data?

A.   I processed it in Forensic Tool.

Q.   How did that go?

A.   Initially the processing failed, so I moved to a different tool.  That tool was taking a really long time, and at that point the initial tool I processed it in had been updated, so I went back to that tool and the processing completed successfully.

Q.   And when you say processing tool, what do you mean by that?

A.   The tool I use is called Axiom.  It's the tool that
categorizes the data to make it easier to view.

Q.   Are there others?

A.   Yes.

Q.   Did you verify that the processed copy was the same as the
preprocessed copy?

A.   Yes.

Q.   How did you do that?

A.   I used hashing.

Q.   And did the hashes match?

A.   Yes.

Q.   What kinds of files did you find in the hard drive, on a
broad level?

A.   Various file types to include documents and photographs.

Q.   Before you on the desk you should have what's been marked
for identification as PX 4.  Do you see that?

A.   Yes.

Q.   Do you recognize it?

A.   Yes.

Q.   How do you recognize it?

A.   My initials are on the tag.

Q.   And what is it?

A.   It's a USB containing files from the hard drive that I
examined.

Q.   Did you review all the files on that USB?

A.   Yes.

Q.   Are the files contained on the USB true and correct copies of certain of the documents and files recovered from the hard drive and the certain associated metadata?

A.   Yes.

Q.   How do you know that?

A.   I did a visual comparison.

          MR. ARAD:  Your Honor, the government offers the exhibits contained within PX 4 subject to connection.

          MR. PATTON:  Your Honor, could we approach.

          THE COURT:  Sidebar, please.

          (Continued on next page)

P7H1STO2                    Stewart - Direct

(At the sidebar)

THE COURT:  Mr. Patton.

MR. PATTON:  So I just didn't want to have the discussion in front of the jury.

I just wasn't quite clear on what the request was. We're not—my understanding was the witness is here for authentication purposes, but there's a lot of underlying information in these hard drives that we will object to, that we do object to, so I don't object to authenticating or the chain of custodies, but we are going to object to some of the underlying information on those hard drives.

THE COURT:  I understand.

MR. ARAD:  That's fine, your Honor.  That's why I was admitting only subject to connection so that when we actually—

THE COURT:  So the connection that you're talking about are the individual files that I will admit either with the defense's consent or over their objection.

MR. ARAD:  Exactly.

MR. PATTON:  I guess what I'm struggling with—and maybe I just have it wrong—is admitting subject to connection. We're not admitting.

THE COURT:  I think the point they're making is, that hard drive is the hard drive, or the USB is what she prepared. It is a chain of custody issue.  There are documents that are going to be extracted from that that they will seek to

P7H1STO2                       Stewart - Direct

introduce, or materials that they will seek to introduce individually.  You will agree or disagree, and I'll make those decisions.  If your concern is that in admitting PX 4 we are agreeing to the admissibility of every single thing in it, that's not what they're asking for.

          MR. PATTON:  As long as we're clear on that.

          MR. ARAD:  Correct.  We're clear on that.

          THE COURT:  We're clear on that.

          Okay.  No more sidebars, people, please.

          (Continued on next page)

(In open court)

THE COURT:  Mr. Patton, I understand as a result of our sidebar discussion that the defense does not object to the admission of PX 4.

MR. PATTON:  That's correct, your Honor.

THE COURT:  Thank you very much.

PX 4 is admitted into evidence.  Thank you.

(Government's Exhibit PX 4 received in evidence)

MR. ARAD:  Ms. Sebade, please display what's been premarked Government Exhibit 2 for the witness only, please.

BY MR. ARAD:

Q.  Ms. Stewart, do you recognize this?

A.  Yes.

Q.  What is it?

A.  It's one of the files from the drive.

MR. ARAD:  Your Honor, the government moves to admit Government Exhibit 2 into evidence.

MR. PATTON:  Subject to your Honor's previous rulings.

THE COURT:  Yes.  Government Exhibit 2 is admitted into evidence.  It may be shown to the jury.  Thank you.

(Government's Exhibit 2 received in evidence)

BY MR. ARAD:

Q.  Ms. Stewart, will you please describe this image.

A.  It states, "Do you wanna know how to stay anonymous on Ethereum?  Ask me!"  And there's an image in the middle with a

pile of the symbol for Ethereum, a washing machine, and a clean Ethereum on the far side.

MR. ARAD:  Ms. Sebade, please display——

THE COURT:  Well, just excuse me for a moment, please. I'm sorry.  Are you saying the thing is a symbol for Ethereum?

THE WITNESS:  Yes.

THE COURT:  Okay.  Thank you very much.

Counsel, you may continue.

MR. ARAD:  Ms. Sebade, will you please display what's been premarked Government Exhibit 1 for the witness only.

BY MR. ARAD:

Q.  Ms. Stewart, do you recognize this?

A.  Yes.

Q.  What is it?

A.  It's another file from the hard drive.

MR. ARAD:  Your Honor, the government moves to admit Government Exhibit 1 into evidence.

MR. PATTON:  Subject to previous objections, your Honor.

THE COURT:  Yes, I understand.  That objection was overruled.  And Government Exhibit 1 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1 received in evidence)

BY MR. ARAD:

Q.  Ms. Stewart, please describe what you see in this image.

P7H1STO2                          Stewart - Direct

A.   There is a group of five men, and two of them are wearing

shirts with a design similar to the previously shown exhibit.

          MR. ARAD:  Ms. Sebade, can you please expand the logo

of the T-shirt on the person standing second from the left.

Q.   Ms. Stewart, do you see any difference between the logo we

looked at a moment ago and this one?

A.   Yes.  There is lines coming from the pile of the Ethereum

symbol on the left.

Q.   Are there other photos depicting this logo or a logo like

it on PX 1?

A.   Yes.

Q.   Do you recall the exhibit numbers?

A.   3 through 9.

Q.   Ms. Stewart, are you familiar with metadata?

A.   Yes.

Q.   What is metadata?

A.   Metadata provides additional information about a file.

Q.   Can you give me an example of metadata.

A.   A created date and time stamp.

Q.   Do you often work with metadata in your job?

A.   Yes.

Q.   Did you examine metadata from the nine images or the two

images we just looked at and the other seven images that you

mentioned?

A.   Yes.

Q.   How did you do that?

A.   I reviewed them in the Axiom report that was generated.

Q.   And remind us, what is Axiom?

A.   Axiom is the forensic tool that was used to process the information on the hard drive.

        MR. ARAD:  Ms. Sebade, please display for the witness what's been premarked Government Exhibit 3008.

Q.   Ms. Stewart, do you recognize this?

A.   Yes.

Q.   What is it?

A.   This is metadata from the files that were on the drive.

Q.   Did you create this document?

A.   No.

Q.   Is it a true and accurate representation of metadata from Axiom for this hard drive?

A.   Yes.

        MR. ARAD:  Your Honor, the government offers Government Exhibit 3008 into evidence.

        MR. PATTON:  No objection.

        THE COURT:  Government Exhibit 3008 is admitted into evidence and may be shown to the jury.

        (Government's Exhibit 3008 received in evidence)

        MR. ARAD:  Ms. Sebade, could you please expand the Source column.

BY MR. ARAD:

P7H1STO2                    Stewart - Direct

Q.  Ms. Stewart, what does Source mean here?

A.  This is the path where the file was located on the drive.

Q.  Do you see where it says Excerpt next to the heading that says Source?

A.  Yes.

Q.  What does that mean?

A.  It's part of the path, not the full path.

Q.  So this is a longer file path?

A.  Yes.

        MR. ARAD:  Ms. Sebade, please expand where all of the rows say User/R Storm.

Q.  Ms. Stewart, do you see where it says User/R Storm?

A.  Yes.

        (Continued on next page)

P7H5sto3                    Stewart - Direct

BY MR. ARAD:

Q.   What does that mean?

A.   This is the user name that the files were stored under.

MR. ARAD:   Ms. Sebade, can you remove the expansion and highlighting and now expand where the file path says: Telegram/stable.

Q.   Ms. Stewart, what does it tell you that Telegram/stable is in the file path for each of these photographs?

A.   The files came from the Telegram folder.

Q.   What, if anything, does that tell you?

A.   They came from Telegram.

Q.   What is Telegram?

A.   Telegram is a chat application.

Q.   What, if anything, does it mean that the files came from Telegram?

A.   They could have been sent or received within the Telegram application.

Q.   Do you think -- why wouldn't --

MR. ARAD:   Ms. Sebade, please move to expand the created date/time column, please?

Q.   Ms. Stewart, what does this column signify here?

A.   This could be the date and time that the files were sent or received.

Q.   And why would it be the date and time they were sent or received versus the date they were created?

P7H5sto3                    Stewart - Cross

A.   If you notice, several of these have the exact same date and time.  It is unlikely that a person would be able to create multiple files at that exact same time.

MR. ARAD:  Lastly, Ms. Sebade, please expand the Recovery Method column or highlight it.

Q.   Ms. Stewart, what does the recovery method column tell you?

A.   This is how the tool is able to pull the information from the drive.

Q.   And for each of these entries, what does it say?

A.   Carving.

Q.   What does that mean?

A.   When files are deleted they aren't initially removed from the drive, they are moved to a specific space, and forensic tools are able to use a process called carving to access that space and recover deleted files.

Q.   So what does it signify that each of these files was found by carving?

A.   They were deleted.

MR. ARAD:  No further questions.

THE COURT:  Thank you.

Cross-examination, Mr. Patton.

CROSS-EXAMINATION

BY MR. PATTON:

Q.   Good morning, Agent Stewart.

A.   Good morning.

MR. PATTON:  If we could please pull back up the summary chart we were looking at, Government Exhibit 3008?

Q.  Agent Stewart, that column there that is headlined "created date/time."  Do you see where I am referring to?

A.  Yes.

Q.  That doesn't tell you the date that the underlying photograph was actually taken; right?

A.  Correct.

Q.  And I think you said these are all photographs; right?

A.  Yes.

Q.  What that column tells you is when it was saved or downloaded to the device that you were extracting it from; correct?

A.  Yes.

Q.  There is a separate piece of metadata, and you will correct me if I am getting this wrong, but I think the acronym is EXIF, Exchangeable Image File Format; right?

A.  Correct.

Q.  EXIF refers to metadata for a photograph itself; right?

A.  Correct.

Q.  Which would give you more information about when the actual photograph was taken; correct?

A.  Yes.

Q.  And the EXIF data is not on this chart; correct?

A.  This is EXIF data from the files as they were present ON

P7H5sto3                          Stewart - Cross

the drive.

Q. I'm sorry. I should have clarified. The date associated with the metadata of the actual photographs is not on this chart; correct?

A. Correct.

MR. PATTON: Could I have just one moment, your Honor?

THE COURT: Yes.

(Counsel conferring)

MR. PATTON: No further questions, your Honor.

THE COURT: Thank you.

Redirect?

MR. ARAD: None, your Honor.

THE COURT: Thank you.

You may step down. Thank you so much.

(Witness excused)

THE COURT: Next witness, please?

MR. ARAD: The government calls Special Agent Peter Dickerman.

PETER DICKERMAN,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

THE DEPUTY CLERK: Please be seated, and into the microphone please state and spell your full name for the record.

THE WITNESS: My name is Peter Dickerman. First name

P-E-T-E-R, last name Dickerman, D as in delta, I-C-K-E-R-M-A-N.

MR. ARAD:  Your Honor, may I approach to place just one more document with the witness?

THE COURT:  Yes, you may.

MR. ARAD:  Thank you.

Your Honor, before I begin, I'm going to be referring to certain exhibits that I would like to admit pursuant to a stipulation between the parties.

THE COURT:  All right.  Is there a stipulation you wish to read into the record?

MR. ARAD:  Yes, your Honor.

THE COURT:  You may.

MR. ARAD:  Thank you.

It is hereby stipulated and agreed, by and between the United States of America, by Jay Clayton, United States Attorney for the Southern District of New York, by the undersigned counsel and Roman Storm, the defendant, by and with the consent of his attorneys, that Government's Exhibits 402, 403, 413 through 438, 440, 441, and 442 contain authentic copies of records from Apple.  The records contained in Government's Exhibits 417 through 442 pertain to the Apple iCloud account Pertsev.one@gmail.com.  Government Exhibits 402 and 403 are business records pursuant to Federal Rule of Evidence 803(6).

It is further stipulated that no party will raise any

objection under Federal Rule of Evidence 901 with respect to any exhibit referenced above.

It is further stipulated and agreed that this stipulation may be received into evidence at trial.

The stipulation is dated July 15, 2025, and it is signed Thane Rehn on behalf of Jay Clayton, the United States attorney, as well as Brian Klein, on behalf of defendant Roman Storm.

THE COURT:  Thank you.  Is that stipulation itself given a government exhibit number?

MR. ARAD:  Yes.  It is marked Government Exhibit S2.

THE COURT:  Thank you.

And so are you moving for the admission of Government Exhibit S2, as well as 402, 403, 413 to 438, 440, 441, and 442?

MR. ARAD:  Yes, your Honor.

THE COURT:  Taking a page out of Mr. Rehn's book, I am going to admit the following exhibits into evidence and allow them to be shown to the jury:  S2, 402, 403, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 428, 429, 430, 431, 432, 433, 434, 435, 436, 437, 438, 440, 441 and 442.

Thank you.

(Government's Exhibits S2, 402, 403, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 428, 429, 430, 431, 432, 433, 434, 435, 436, 437, 438, 440,

P7H5sto3                     Dickerman - Direct

441, 442 received in evidence)

            THE COURT:  Thank you.

            MR. ARAD:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. ARAD:

Q.  Hello, Agent Dickerman.

A.  Good morning.

Q.  Where do you work?

A.  I work at the Internal Revenue Service, Criminal Investigation.

Q.  How long have you worked there?

A.  For approximately 22 years.

Q.  What is your title?

A.  My title is Special Agent, Computer Investigative Specialist.

Q.  What are your responsibilities?

A.  My responsibilities are the acquisition, preservation, and analysis of digital assets.

Q.  Can you briefly describe for me what you were asked to do in this case?

A.  I was asked to travel to the Netherlands, specifically Amsterdam, and meet with Dutch law enforcement to obtain copies of data from a cellphone that they had taken into their possession.

Q.  Are you one of the case agents on this case?

P7H5sto3                       Dickerman - Direct

A.   I am not.

Q.   So, how would you describe your role, in just a few words?

A.   As a forensic examiner in support of this case.

Q.   Special Agent Dickerman, what is your educational background?

A.   I have a bachelors of science degree in accounting from the University of Rhode Island.

Q.   Please tell us what training, if any, you have received with respect to cellular phone extractions.

A.   The most relevant training related to cellphones was a course on the forensic examination of sequelae databases. Those databases are the structure that almost all information on a cellphone is contained within.

Q.   And have you had other training with respect to cellphone data?

A.   I have.

Q.   Are you a member of any professional groups for forensic examiners?

A.   I am, yes.

Q.   Which?

A.   I am a member of the International Association of Computer Investigative Specialists.

Q.   Let's talk about cellphone extractions.  During your time in law enforcement, have you performed cellphone extractions?

A.   Yes, I have.

Q.   Approximately how many?

A.   Several hundred.

Q.   What is a cellphone extraction?

A.   It is a collection of the information on a cellphone.

Q.   And what does law enforcement use cellphone extractions
for?

A.   They use them to review and verify communications that took
place through that cellphone to review pictures that were
either taken on that cellphone or sent to that cellphone, and
other application use that was on the cellphone.

Q.   Let's say law enforcement had somebody's phone and had the
password to that phone.  Why not just look through the phone
and take screenshots of relevant evidence?  Why make a copy and
work with that?

A.   Screenshots would not be the most complete way to capture
that.  A lot of what you can see in a screenshot is not
necessarily all of the information that is available.

Q.   Let's talk just a little bit more about your experience.
Approximately how long have you been performing cellphone
extractions in your job?

A.   Approximately 12 years.

Q.   Have you analyzed cellphone extractions that were performed
by other people?

A.   Yes, I have.

Q.   Approximately how many of those have you done?

A.   Certainly more than 50, possibly more than a hundred.

Q.   Are you familiar with a tool called GrayKey?

A.   Yes, I am.

Q.   What is it?

A.   GrayKey is a piece of hardware that is used to extract data from cellphones or information from cellphones.

Q.   How do you use GrayKey to extract information from cellphones?

A.   You would connect the cellphone to one of the cables on the GrayKey piece of hardware, and through a user interface initiate the extraction that you wish to perform.

Q.   And what, if anything, does GrayKey produce in addition to the extraction?

A.   Additionally it will produce a progress report -- a GrayKey progress report.

Q.   What kind of information does a GrayKey progress report contain?

A.   Information about the cellphone and information about the steps that happened from the time the phone was connected to the time the process was complete.

Q.   Let's talk about the information from the cellphone.  What kind of information from the cellphone is included in a GrayKey report?  Just a few examples.

A.   So, generally the name of the device, the serial number of the device, the user of the device.

Q.  Now let's talk about what, if anything happens, after the extraction.  Is there another step that you typically take in the forensic process once you have the extraction?

A.  Yes.  So, the extraction itself is just a file or collection of files in order to review those that need to be processed or parsed through an application.

Q.  You said processed or parsed.  Do those mean the same thing?

A.  Yes.

Q.  And what does processing mean?

A.  It means moving through, for a cellphone, the sequelae databases that I mentioned earlier, and pulling the information out of those databases and putting them into a format that is equally understandable by the average person.

Q.  Did you do that in this case?

A.  I did.

Q.  Which processing software did you use in this case?

A.  Cellebrite Physical Analyzer.

Q.  Approximately how many times have you used Cellebrite Physical Analyzer or Cellebrite to conduct extractions?

A.  To process the extractions, so I have used it several hundred times to use that -- for that purpose.

Q.  Let's talk more about this case.  You said that you went to the Netherlands to obtain files.  When was that?

A.  That was in November of 2024.

P7H5sto3                         Dickerman - Direct

Q.   Did you conduct the cellphone extraction yourself?

A.   No, I did not.

Q.   So, is this like those 50 other cases that you discussed earlier where you analyzed extractions performed by other people?

A.   Yes.  Very similar to that.

Q.   Who gave you the extraction to examine in the Netherlands?

A.   Dutch law enforcement.

Q.   Did they give you access to the entire extraction?

A.   They did.

Q.   And what else, if anything, did they give you with respect to the extraction?

A.   They gave me a GrayKey progress report as well.

Q.   What did you look for when you reviewed the extraction?

A.   I looked for photographs that would authenticate or attribute the phone to the owner or user of it, and I looked for the messages that were previously provided.

Q.   When you say you asked to attribute the phone to its user, what do you mean by that?

A.   I mean look for information on the phone that would show who the user of it is, whether that be selfies or phone numbers that were associated with the user.  Other information like that.

Q.   You also mentioned that you were asked to look for certain chats.  Please go ahead.

P7H5sto3                        Dickerman - Direct

A.  Yes.

Q.  Did you retrieve from the Netherlands all of the chats that you intended to retrieve when you went?

A.  I did.  Yes.

Q.  Generally speaking, is it possible to find information on a GrayKey report that will help reveal the user's identity?

A.  Yes.

Q.  Did you find any information like that in this case?

A.  I did.  Yes.

           MR. ARAD:  Ms. Sebade, please display for the witness only what's been marked Government Exhibit 2300.

Q.  Special Agent Dickerman, do you recognize this document?

A.  Yes, I do.

Q.  What is it?

A.  It's the GrayKey progress report in this case.

           MR. ARAD:  Your Honor, the government moves to admit Government Exhibit 2300 into evidence.

           MR. KLEIN:  Subject to prior objection, your Honor.

           THE COURT:  Yes.  I understand.  The objection is overruled.  Government Exhibit 2300 is admitted into evidence. It may be shown to the jury.

           (Government's Exhibit 2300 received in evidence)

           MR. ARAD:  Ms. Sebade, please expand for the jury the Target Device Information section of this document.

BY MR. ARAD:

Q.  Special Agent Dickerman, where does this information in this section of the document come from?

A.  It comes from the cellular phone.

Q.  You said some of the information here could potentially help figure out who the cellphone's user is.  Can you point us to it.

        MR. ARAD:  And Ms. Sebade, can you highlight these?

A.  Yes, so the device name of Pertsev iPhone.  The owner name of Alexey Pertsev.  And the e-mail addresses Pertsev.one@iCloud.com, Pertsev.one@gmail.com and Alexi@Tornado.cash.

Q.  Let's go through those.  What is a device name?

A.  Device name is a entry when a person is setting up their phone initially has the option to choose and can change it at any time.  It is something that the user assigns to that phone.

Q.  And what is an owner name?

A.  An owner name, in the case with an Apple device such as an iPhone, is the name that they've used when they registered an account with Apple under an Apple ID.

Q.  What does it mean when you see certain accounts listed on a GrayKey report as we do here?

A.  It means that those accounts or e-mail addresses were used for various services and/or applications on the phone.

Q.  Special Agent Dickerman, is there other information on this report that, maybe not on its face but in another way, helps

P7H5sto3                        Dickerman - Direct

you attribute the device?

A.   Yes.

Q.   Would you please point that out?

          MR. ARAD:  Ms. Sebade, would you please highlight these in a different color?

A.   The model number of iPhone 13 Pro, the serial number, the phone numbers, the IMEIs, and the unique device ID.

Q.   Let's talk about those.  What is the model?

A.   The model is an iPhone 13 Pro.

Q.   And the serial number?

A.   That is the serial number, that is LGF6PN0W4L.

Q.   What is an IMEI?

A.   IMEI is a number that the cellphone networks used to allow a cellphone to communicate and differentiate itself from other cellphones.

Q.   How do you use information, like what is highlighted in blue, to attribute a phone?

A.   From Apple there is iCloud information that is used when a phone is registered with Apple and this information is stored with Apple.

Q.   So you mentioned an iCloud.  What is an iCloud account?

A.   ICloud is a cloud or web-based storage solution that Apple provides for users to back up their data and enable them to use Apple products.

Q.   How do users back up data onto an iCloud?

A.   They have the ability to choose various settings on their devices of what information they wish to back up and to what extent and they will, when connected to a network, initiate that backup and sync those backups.

Q.   Do users Link their devices to iCloud accounts?

A.   They do.

Q.   Did you review an iCloud account in this case?

A.   I did, yes.

Q.   What was the account log in information for that iCloud account?

A.   That was Pertsev.one@gmail.com.

Q.   Do you see that on the GrayKey report?

A.   I do.

Q.   Where do you see that?  Can you point it out?

A.   It is in the bottom line of the accounts section of the chart.

         MR. ARAD:  Ms. Sebade, please display Government Exhibit 403 and go to the registrations_account tab.

Q.   Special Agent Dickerman, what is this file?

A.   This is a spreadsheet that was provided by Apple.

Q.   What kind of information does it contain?

A.   Information about devices that were registered to this particular account.

Q.   What do the rows here represent?

A.   They represent the various devices that were registered.

MR. ARAD:  Ms. Sebade, please move Government Exhibit 403 to the right side of the screen and display Government Exhibit 2300 on the left, and now please highlight cell A16 on the spreadsheet and please zoom in so that, from Serial Number down is visible and larger.  And if you could highlight the serial number, please?

Q.  Special Agent Dickerman, what is highlighted here in the spreadsheet?

A.  The cellphone's serial number.

Q.  Does that serial number also appear in the GrayKey report?

A.  It does, on the serial number line of the targeted device information section.

MR. ARAD:  Ms. Sebade, would it be possible to change the color of the serial number highlight on the GrayKey report? Ms. Sebade, could you please highlight cell B16 and also cell C16 in the spreadsheet?

Q.  Special Agent Dickerman, what do these cells contain?

A.  They contain the IMEI numbers relating to the iPhone PSR.

MR. ARAD:  Ms. Sebade, we don't have to change the numbers on the GrayKey report if it is too cumbersome.  Could you please highlight, Ms. Sebade, cell H16 in the spreadsheet?

Q.  Special Agent Dickerman, what is highlighted here?

A.  That is the product description or model of the cellphone.

Q.  Does that match the model on the GrayKey report?

A.  It does.

P7H5sto3                          Dickerman - Direct

Q.   Do you see on the GrayKey report next to iPhone 13 Pro in brackets it says iPhone 14,2 and then a series of letters and numbers?

A.   Yes.

Q.   What does that signify?

A.   So it is a more specific way of referring to that cellphone.  It is not something that the average user or person would be aware of but it is something that refers to that specific model of cellphone.

Q.   In the spreadsheet, do you see that it says:  Graphite 256GB-RUS next to the model?

A.   I do.

Q.   What does that mean?

A.   Graphite refers to the color of the iPhone, 256 GB refers to the storage size of the cellphone, and RUS refers to the country of origin being Russia.

        MR. ARAD:  Ms. Sebade, will you please highlight cells M and N16 in the spreadsheet?

Q.   Special Agent Dickerman, what does it say here?

A.   It says Alexey Pertsev.

Q.   Does that match information on the GrayKey report?

A.   Yes.  It matches the owner name.

        MR. ARAD:  Lastly, Ms. Sebade, please highlight cell O16 in the spreadsheet.

Q.   What is highlighted here?

A.   The e-mail address Pertsev.one@gmail.com.

Q.   And do you see that in the GrayKey report?

A.   I do.  It's the one that is circled in red at the moment.

          MR. ARAD:  Ms. Sebade, please take these down and display Government Exhibit 433.

Q.   Special Agent Dickerman, do you recognize this photo?

A.   I do, yes.

Q.   Where have you seen it?

A.   In two places.

Q.   Where?

A.   On the iCloud information provided by Apple and during my review of these cellphone extraction while I was in Amsterdam.

Q.   That is the Alexey Pertsev iCloud information?

A.   Yes, the Pertsev.one@gmail.com.

          MR. ARAD:  Ms. Sebade, please expand the text that starts RIJ and the small text next to it.

Q.   Special Agent Dickerman, please read the English text here?

A.   Driving license.

          MR. ARAD:  Ms. Sebade, if you can zoom out again and then zoom in on lines 1 through 13?

Q.   Can you please read the first and last name?

A.   Alexsei Pertsev.

Q.   And date?

A.   Is April 26, 1993.

Q.   Special Agent Dickerman, did you bring a copy of this back

P7H5sto3                      Dickerman - Direct

from the Netherlands?

A.   I did not.

Q.   Why not?

A.   The Dutch law enforcement did not allow it.

          MR. ARAD:   Ms. Sebade, please display Government

Exhibit 417.

Q.   And before we talk about this one, Special Agent Dickerman

did you intend to bring the driver's license photo back from

the Netherlands?

A.   No.

Q.   Special Agent Dickerman, do you recognize this?

A.   Yes, I do.

Q.   Where do you recognize it from?

A.   From two locations.

Q.   Where?

A.   From the iCloud information from Apple that we previously

were talking about, and also from the cellphone extraction.

Q.   Whose iCloud?

A.   The Pertsev.one@gmail.com iCloud.

          MR. ARAD:   Ms. Sebade, please zoom in on the photo and

the text to its right?

Q.   Will you please read what is labeled Given Names and

Surname?

A.   Alexsei Pertsev.

Q.   And the date below those?

A.   April 26, 1993.

Q.   Is that the same date as on the driver's license?

A.   Yes.

Q.   Did you bring a copy of this back from the Netherlands?

A.   Yes.  It was contained within a chat message.

        MR. ARAD:  Ms. Sebade, please display Government
Exhibit 419.

Q.   Do you recognize this, what is in this photo?

A.   I do.

Q.   Where have you seen it before?

A.   In two places.

Q.   Where?

A.   On the iCloud information from Apple and also during my
review in the Netherlands of the telephone extraction.

        MR. ARAD:  Ms. Sebade, can you please expand?

Q.   And Special Agent Dickerman, can you please read the name?

A.   Alexsei Pertsev.

Q.   Did you bring a copy of this back from the Netherlands?

A.   I did not.

Q.   Did you intend to?

A.   I did not.

        MR. ARAD:  Ms. Sebade, please display Government
Exhibit 429.

Q.   Do you recognize this photo?

A.   Yes, I do.

P7H5sto3                        Dickerman - Direct

Q.  Where have you seen it?

A.  I have seen it in two places.

Q.  Where?

A.  In the cellphone extraction and in the Apple iCloud.

Q.  Have you seen other photos of these two people together?

A.  Yes, I have.

Q.  Where?

A.  Both in the cellphone extraction and in the Apple iCloud.

Q.  And in the cellphone extraction approximately how many, would you say, photos of these two people have you seen?

A.  I would say more than 20.

Q.  Did you bring back a copy of this photo from the Netherlands?

A.  This photo, yes.

        MR. ARAD:  Ms. Sebade, please display Government Exhibit 438.

Q.  Do you recognize this photo?

A.  Yes, I do.

Q.  Where have you seen it?

A.  I have seen it, again, in two places.

Q.  Where?

A.  On the cellphone extraction and on the iCloud.

Q.  What is the man in the photo wearing?

A.  A t-shirt with the Tornado Cash logo on it.

Q.  Have you seen other photos of this person wearing

Tornado Cash apparel?

A.   Yes, I have.

Q.   Where have you seen those photos?

A.   Both on the cellphone extraction and within iCloud.

Q.   Which iCloud account?

A.   Pertsev.one@gmail.com account.

Q.   And throughout this time when we have referred to an iCloud account, which iCloud account have we been referring to?

A.   That same one, the pertsev.one@gmail.com.

MR. ARAD:  Ms. Sebade please display Government Exhibit 441 and play the first few seconds of it?

(Video played)

MR. ARAD:  Thank you.

Q.   Do you recognize this?

A.   I do, yes.

Q.   Where have you seen it?

A.   I have seen it in the cellphone extraction and in iCloud as well.

Q.   Identical in both places?

A.   Yes.

MR. ARAD:  Ms. Sebade, please display Government Exhibit 442 and play just the first few seconds.

(Video played)

MR. ARAD:  Thank you.

Q.   Do you recognize this?

A.   I do.  Yes.

Q.   Where have you seen it?

A.   Again, in the cellphone extraction and within iCloud.

        MR. ARAD:  Ms. Sebade, please display Government
Exhibit 413 and please expand the content under User Accounts?

Q.   Special Agent Dickerman, what is this?

A.   This is the user account information from an iCloud backup.

Q.   Which iCloud account is this associated with?

A.   Peppersec@yandex.ru.

Q.   Is that a different iCloud account from the one we have
been discussing up until now?

A.   It is.

        MR. ARAD:  Ms. Sebade, please display this item on the
right side of the screen and Government Exhibit 2300 on the
left?

Q.   Special Agent Dickerman, do you see Peppersec@yandex.ru on
the GrayKey report?

A.   I do.  It is the first phone number or first account e-mail
address listed.

Q.   In the Apple document on the left, do you see a phone
number?

A.   I do, yes.

Q.   Could you please point it out?

A.   In the second column -- well, third column over under
Entries, it's the phone number listed.

MR. ARAD:  Ms. Sebade, please highlight that.

Q.  Do you see this phone number in the GrayKey report?

A.  I do, with one difference to it.

Q.  Where do you see it?

A.  The country code that is listed is different in it.

Q.  The question is where in the GrayKey report do you see the phone number?

A.  Sorry.  It is the first phone number listed in the phone number line and splitting where the 8 and the 3 are.

MR. ARAD:  Ms. Sebade, can you please highlight that?

Q.  You mentioned a difference between these two.  What is the difference?

A.  The country code is listed differently for these two instances of the cellphone.

Q.  Do you believe that these are the same phone number or different phone numbers?

A.  I believe them to be the same phone number.

Q.  What is the explanation for the different country codes?

A.  So, the country code that is appropriate I believe is the 7 that is listed on the GrayKey report, otherwise it would not allow that number to be used effectively.  On the iCloud account the address that is listed is a U.S. number, so that would likely cause the country code to default to a U.S. country code.

Q.  How many digits are in the phone number starting from 903

P7H5sto3                    Dickerman - Direct

and then ending with 208?

A.  So there are 10 digits.

        MR. ARAD:  Now I want to shift gears and, Ms. Sebade, we can take these down.

Q.  Generally speaking, how can you go about making sure that an extraction is a correct copy of the device that it came from?

A.  I'm sorry.  Can you repeat that?

Q.  Yes.

        Generally speaking, how can you make sure that an extraction is a correct copy of the device that it came from?

A.  So, one of the ways that you can do that is to verify information that is on that cellphone from an independent source.

Q.  As we have been doing for the past several minutes?

A.  Yes.

Q.  Special Agent Dickerman, before you should be two binders of documents, one containing what's been premarked Government's Exhibits 2241 to 2242 and 2244 to 2249, and the other one should have documents marked Government Exhibit 1367 to 1378 and 1370 to 1375.

A.  Yes, I have them.

Q.  Do you recognize these binders?

A.  I do.

Q.  Have you reviewed them?

P7H5sto3                      Dickerman - Direct

A.   Yes, I have.

Q.   How do you recognize the binders?

A.   By my application of my initials.

Q.   Let's talk about the first binder, the one with exhibit numbers that start GX 22.  What does that contain?

A.   That contains a chat conversation from the cellphone extraction.

Q.   And what about the other binder?  What does that contain?

A.   That contains the same chat conversation but from a different source.

Q.   Let's talk about another way to verify that a cellphone extraction is authentic, and actually before we go there, Special Agent Dickerman I just want to confirm, are those the same messages in both binders?

A.   They are.

Q.   But from different sources?

A.   That's correct.

Q.   Let's talk about another way, as I mentioned a moment ago, to verify that a cellphone extraction is authentic.  Are you familiar with hash values?

A.   Yes, I am.

Q.   What is a hash?

A.   A hash is a digital fingerprint.

Q.   So if a fingerprint can identify a person, what does a hash value identify?

A.   A set of files or some data.

Q.   Does the Pertsev phone extraction have hashes?

A.   It does.

Q.   Did you see those hashes when you were in the Netherlands?

A.   Yes, I did.

Q.   Have you compared them to any other hashes?

A.   Yes.

Q.   Where?

A.   To the files that make up the cellphone extraction.

Q.   Anywhere else?

A.   To the presence of those hashes on the GrayKey progress report.

          MR. ARAD:  Ms. Sebade, would you please pull up Government Exhibit 2300 again and go to the second page?

Q.   Special Agent Dickerman, are the hashes displayed here?

A.   They are.  They're in the lower two lines of each of those charts.

Q.   Are these the hash values that you compared to the hash values of the Pertsev phone extraction?

A.   Yes.

Q.   Do they match?

A.   They did.

Q.   If the Pertsev phone extraction had been modified in any way since it was taken, would these hashes match?

A.   No, they would not.

P7H5sto3                        Dickerman - Direct

Q.  I want to shift gears one more time.  After getting back

from the Netherlands, did you do anything to make sure that the

GrayKey report was authentic?

A.  I did.  Yes.

Q.  What did you do?

A.  I performed a forensic analysis of that PDF file.

Q.  Did you do anything else?

A.  I reviewed the metadata of it and verified that it was

authentic.

Q.  Let's talk about the metadata.  What is metadata?

A.  Metadata is information about information.

Q.  And what kinds of information can you find in the metadata

of a GrayKey report?

A.  Information like the time and date that a file was created

and information about how it was created.

        MR. ARAD:  Ms. Sebade, please put up Government

Exhibit 2300-A just for the witness.

Q.  Special Agent Dickerman, do you recognize this?

A.  I do.

Q.  What is it?

A.  It is a screenshot of the metadata relating to the GrayKey

progress report.

Q.  Did you create this?

A.  I did.

        MR. ARAD:  Your Honor, the government offers

Government Exhibit 2300-A.

MR. KLEIN:  Subject to prior objections, your Honor.

THE COURT:  All right.  Those objections are overruled.  Government Exhibit 2300-A is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2300-A received in evidence)

MR. ARAD:  Ms. Sebade, please highlight the Created and Modified fields of the most right window on this page.

BY MR. ARAD:

Q.  Special Agent Dickerman, according to this, when was this document treated?

A.  It was treated on August 11, 2022 just after midnight.

Q.  What does it say next to modified?

A.  There is no entry there.

Q.  What does that mean?

A.  It means that there was no record of any modification.

MR. ARAD:  Ms. Sebade, please move this document to the right side of the screen and display Government Exhibit 2300 on the left.  Please highlight or expand the bottom two rows of the GrayKey report.

Q.  Special Agent Dickerman, what do these rows indicate?

A.  They are a record of the GrayKey progress report being created.

Q.  What are the times?

A.  On August 11, 2022 at approximately 20 minutes after

P7H5sto3                          Dickerman - Direct

midnight and approximately 25 minutes after midnight.

Q. Do you see that it says UTC?

A. I do.

Q. What does that mean?

A. UTC is the time from which all time zones across the world are offset, so it's essentially what the time is in England.

Q. Do you see that there are two progress report-generated rows?

A. I do.

Q. In your experience, does that mean that more than one report was generated?

A. No, it does not.

Q. Have you seen this before?

A. I have, yes.

Q. And in cases where you have seen this before, has there been more than one GrayKey progress report?

A. There has not.

Q. I see that the time here is 00:24:59. Is that expressed in a different way than the time on the metadata?

A. Yes. That is in a 24-hour clock versus a 12-hour clock.

Q. And if the time on the right side of the screen were expressed in a 12-hour clock, what would it say?

A. It would say 00:25:10.

Q. There is a difference of a few seconds between these two. What does that tell you, if anything?

SOUTHERN DISTRICT REPORTERS, P.C.

A.   It would just say when that file was finished being created versus when it -- when the process initiated.

MR. ARAD:  Now, Ms. Sebade, could you please highlight on the left side and expand the Created and Modified field in the middle window?  And if you could please highlight the Created and Modified fields?

Q.   Special Agent Dickerman, what time is listed here?

A.   Listed as 6:25:10 milliseconds p.m.

Q.   Why does this say 6:25:10 on August 8 in the evening?

THE COURT:  August 10.

Q.   I'm sorry, August 10 in the evening, whereas the other metadata field that we looked at says just after 12:25 at night on August 11.

A.   That field there was influenced by the fact that the computer I was pulling up these files on was set to Mountain Time rather than being set to Greenwich Mean Time or UTC.

Q.   So are these really expressing the same time?

A.   They are.

Q.   Special Agent Dickerman, theoretically, is it possible that a very sophisticated person could modify a GrayKey report in a way that would not show up in metadata?

A.   It is possible, yes.

Q.   Have you ever seen that done?

A.   I have not.

Q.   Did you do anything -- or actually you mentioned earlier

doing a forensic analysis of the GrayKey report in order to determine that it had been modified.

A. Yes.

Q. Can you tell us about that?

A. So, I processed it through what is my primary forensic processing tool, it is called X-Ways Forensics.

Q. How long have you been using X-Ways Forensics?

A. Approximately 14 years.

Q. How reliable to you find it?

A. I find it extremely reliable.

Q. If a PDF has been modified like the GrayKey report, what are some of the ways you would see that in X-Ways Forensics?

A. You would see anomalies or inconsistencies with the metadata and you could potentially see other versions of the PDF that would show where a value is changed or where text was changed.

Q. And with respect to the GrayKey report we have been looking at, did you see any of that?

A. I did not.

Q. Did you see any other signs of modification?

A. No, I did not.

Q. Before you on the desk you should have what's been marked for identification as PX 5. Do you see that?

A. Yes.

Q. Do you recognize it?

P7H5sto3                    Dickerman - Direct

A.   I do, yes.

Q.   How?

A.   It has my initials on the tag.

Q.   What is that?

A.   It's a thumb drive.

Q.   What does it contain?

A.   It contains the government's exhibits that originate from the cellphone extraction.

Q.   And did you review all of those, each and every one?

A.   I did.

Q.   Are the documents and files contained on the thumb drive true and correct copies of documents and files recovered from the Pertsev phone extraction?

A.   They are.

Q.   How do you know that?

A.   Through my direct review of each of those documents.

Q.   Do you see a sheet of paper in front of you that is marked Government Exhibit 2301 with a list of exhibits on it?

A.   Yes.

Q.   Are those the exhibits that are contained on the thumb drive?

A.   Yes, they are.

         MR. ARAD:  Your Honor, the government offers the exhibits contained in PX 5 and listed in GX 2301, into evidence, subject to connection.

MR. KLEIN:  Subject to prior objections and objection.

THE COURT:  Objections are overruled.  PX 5, GX 2301 are admitted into evidence.

(Government's Exhibits PX 5, GX 2301 received in evidence)

MR. ARAD:  No further questions.

THE COURT:  Counsel, just before you sit down, may I ask you a question?  There were binders in front of the witness.  You are not asking to admit those exhibits?

MR. ARAD:  Correct.

THE COURT:  Thank you so much.

Mr. Klein, thank you.  You may inquire.

MR. KLEIN:  Yes, your Honor.

CROSS-EXAMINATION

BY MR. KLEIN:

Q.  Good morning, Agent Dickerman.

A.  Good morning.

Q.  I have a few questions here for you.  So you went over to the Netherlands in November last year?

A.  Yes; November 2024, yes.

Q.  And this was to view the GrayKey report?

A.  So it was to obtain the messages that were previously provided.

Q.  You actually never saw a phone, this phone, did you?

A.  I did not.

Q.  So you never were able to take the phone and match it up in any way to the GrayKey report; were you?

A.  That's correct.  I didn't have access to the phone.

Q.  OK.  And so, as part of that process you were shown a GrayKey extraction report created by the Dutch; right?

A.  Created by the GrayKey hardware and software.

Q.  Well, the Dutch are the ones who created the report though, right, using the GrayKey software?

A.  Yes.

Q.  So it was created by the Dutch?

A.  Yes; through their actions.

Q.  Yes.

And that report was created back August 2022?

A.  Yes.

Q.  And then when you were there, were you at like a computer terminal or something?  A desk?  Where were you?

A.  I was using a computer, yes.

Q.  Was there a Dutch official with you when you were doing this?

A.  Yes, I was working with Dutch law enforcement.

Q.  How many people were there that day you did this review of the GrayKey report?

A.  I worked with primarily three different Dutch law enforcement officers.

Q.  Who were they?

A.   I don't have their names in front of me.

Q.   You don't remember them?

A.   Not off the top of my head at this moment.

Q.   And were they the ones who did the GrayKey report?

A.   One of them was.

Q.   Do you remember that person's name?

A.   I would have to refresh my memory from my memorandum.

Q.   You don't remember.

A.   At this moment, no.

Q.   And you mentioned -- I think you mentioned that one of these officials parsed the phone?

A.   No.

Q.   Or the extraction?  I don't want to put words in your mouth, if you could explain that again.

A.   That's not correct.

Q.   Did you parse the phone?

A.   Yes, I initiated that parsing, yes.

Q.   You did?

A.   That's correct.

Q.   We might come back to that in a moment.

        When you were there you searched the extraction?

A.   I did, yes.

Q.   You don't remember all your search terms, do you?

A.   No, not at this moment.

Q.   And you weren't allowed to bring back to the United States

everything your search terms hit on, were you?

A.   That's correct.

Q.   So everything your search terms hit on would be still in the Netherlands?

A.   Can you repeat the question?

Q.   I will move on.

     One of the things you searched for and brought back were Telegram messages; correct?

A.   Yes.

Q.   And those Telegram messages include forwards in them, don't they?

A.   Some of them, yes.

Q.   But the extraction you brought back does not include the identity of the author of the forward, does it?

A.   There are messages that do not include the author, yes, that's correct.

     MR. KLEIN:   Can we pull up Exhibit 2300-A and pull up Exhibit 2300 and have them side by side, please, Mr. Demarco?

Q.   Now, you talked a minute about how -- or you testified about how you ran the 2300-A to help establish the authenticity I guess of 2300; is that right?  Did I understand that testimony correct?

A.   2300, yes.

Q.   And you talked about how you had Mountain Time in this; is that correct?

A.   In the screenshot that's in 2300-A, yes.

MR. KLEIN:   And it has a date in 2300-A at the bottom right above the sticker -- There you go.  Thank you, Mr. Demarco.

Q.   And if we look at the bottom of the event log in this GrayKey report which is 2300, those seconds don't match up, do they?  Even if the Mountain Time explains some of it there is something -- they don't match up, do they?

A.   That's correct, yes.

Q.   So it -- let me see anything else.

One second, your Honor?

THE COURT:   Yes.

(Counsel conferring)

MR. KLEIN:   Sorry.  One second.  I have to look at a note, your Honor.  One second?

(Counsel conferring)

BY MR. KLEIN:

Q.   Special Agent Dickerman, you claimed that you are the one who parsed the data when you were over there?

A.   That's correct.

Q.   Wasn't a Dutch official?

A.   No.  It was using their computer but it was at my direction, yes.

Q.   Do you remember meeting with prosecutors here in advance of your testimony?

P7H5sto3                        Dickerman - Cross

A.   I do.

Q.   Do you remember speaking with them on July 7 on a call and you spoke with -- I've got initials here at least Mr. Gianforti here, Mr. Arad, and Mr. Rehn?

A.   Not specifically what I talked about on that date but I do recall talking to them.

Q.   Would it refresh your memory to read notes of that telephone call?

A.   I would expect so, yes.

Q.   OK.

        MR. KLEIN:  Mr. Demarco, can you pull up just for the witness 3540-014?

Q.   I will give you a moment to look at this, Agent Dickerman, and I'm going to direct your attention about halfway down.  Let me know when you have had a chance to review that, Agent Dickerman.

A.   Yes.

Q.   Does this refresh your memory that you had a telephone call with the prosecutors?

A.   Yes.

        (Continued on next page)

Q.  And on that call, did you discuss who did the parsing of the data?

A.  Yes.

Q.  And did you tell them that the Dutch official took over and initiated the parsing process, which you——

A.  I don't recall those specific words, but as it states there, it shows that we were working in concert with each other.

Q.  My question is:  Did you parse the data or did the Dutch officials?

A.  I believe that it was myself that——that was clicking within the application to——to parse that.

Q.  Did you tell the prosecutors that the Dutch official parsed it?

A.  I don't recall saying that specifically.

MR. KLEIN:  One second, your Honor.

Your Honor, I'd like to introduce just the portion of this exhibit that discusses the parsing, which is a bullet point there.

THE COURT:  You want to introduce it, admit it into evidence?

MR. KLEIN:  To impeach this witness, your Honor.

THE COURT:  No.

Did you write this, sir?  Did you write this document?

THE WITNESS:  I did not.

THE COURT:  No.  You have your answers.  Thank you.

MR. KLEIN:  Nothing further, your Honor.

THE COURT:  Thank you.

Redirect?

MR. ARAD:  Nothing on re direct.

THE COURT:  Mr. Dickerman, thank you very much.  You may step down.

(Witness excused)

THE COURT:  Counsel, should Agent Dickerman leave the binders up on the——oh, you're coming to get it.  Okay.  Thank you very much.

And the next government witness, please?

MR. REHN:  The government calls Joel DeCapua.

THE COURT:  Thank you.

(Witness sworn)

THE DEPUTY CLERK:  Please be seated, and into the microphone, please state and spell your full name for the record.

THE WITNESS:  My name is Joel DeCapua, spelled J-O-E-L, last name D-E-C-A-P-U-A.

THE COURT:  Counsel, you may inquire.

MR. REHN:  Just one moment, your Honor, get a little organized here.

THE COURT:  Of course.

JOEL DeCAPUA,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. REHN:

Q.  Good afternoon, Special Agent DeCapua.

A.  Good afternoon.

Q.  Where do you currently work?

A.  The Federal Bureau of Investigation.

Q.  What is your title there?

A.  Special Agent.

Q.  How long have you worked at the FBI?

A.  So now it's approximately been 16 years.

Q.  Are you part of a specific group?

A.  I am.

Q.  What is the name of that group?

A.  We call ourselves CY3.

Q.  And do you have a more formal title as well?

A.  CY3 is our formal title.

Q.  Is there—have you ever heard the term cybercrime
investigators?

A.  Yes, so our job is to investigate cybercrimes.

Q.  So what does that mean?

A.  So in general, it means that whenever there's a complaint
that we receive from someone from the public saying, our
network was hacked or a hacker took over my computer, it would

come to my desk and we would investigate to see if a federal crime was committed. We gather evidence and make a determination whether it's something we can bring to a prosecutor's office.

Q. And how long have you been doing that kind of work?

A. So it would have been since 2014, so a little over 10 years.

Q. During your time at the FBI have you worked on investigations that relate to cryptocurrency?

A. I have.

Q. And beyond cryptocurrency have you worked on the investigations related to digital currencies more generally?

A. I have.

Q. When did you first begin working on matters relating to digital currencies?

A. So I first began in 2005 as an investigator with the State of Indiana, working different types of virtual currencies. This is before cryptocurrency was even invented yet.

Q. What was the type of digital asset that was being used then?

A. It was called eGold.

Q. And that was, you said, before what we now call crypto even existed?

A. That's correct.

Q. When did you first begin on working on investigations

related to cryptocurrency?

A.   It would have been 2014 or 2015.

Q.   Approximately how many investigations involving
cryptocurrency have you been involved with?

A.   Hard to put an exact number.  I've worked a lot of
investigations.  I would—I would say it's somewhere in the
high double digits.

Q.   In your work with the FBI, what's the primary focus of the
investigations that you typically do?

A.   Investigating hackers, cybercriminal, ISMA violation.

Q.   What is hacking?

A.   Where someone breaks into someone else's computer.

Q.   Do people sometimes obtain money or other types of property
from hacking?

A.   They do.

Q.   Do they sometimes obtain cryptocurrency?

A.   They do.

Q.   As part of your investigative work, have you traced the
proceeds of hacks?

A.   I have.

Q.   And have you traced the proceeds of other types of criminal
incidents?

A.   I have.

Q.   Could you give us some examples of other types of criminal
incidents for which you have traced the proceeds.

A.  So there's the investment fraud schemes, there's been——so in addition to where cryptocurrency is, what is the goal to the hacker to steal, there's also a lot of situations where the hacker buys their tools using cryptocurrency, so I would also trace cryptocurrency associated with any type of servers that the hacker buys and those types of things.

Q.  And in addition to your primary work investigating hacking, do you sometimes get called in to do cryptocurrency tracing for other types of law enforcement investigations?

A.  I do.

Q.  For approximately how many criminal incidents have you done this type of cryptocurrency tracing work?

A.  Again, it's really hard to put a number on it, but maybe a dozen.

Q.  And do you have certain——well, we've been using the term "criminal proceeds."  Are you familiar with what that term means?

A.  I am.

Q.  What does that mean?

A.  At its simplest level, it means the money that a criminal gets based off of their crime.

Q.  And does that include money in the form of cryptocurrency?

A.  It does.

Q.  And is it a regular occurrence for you to see that crimes result in the criminal's obtaining cryptocurrency?

A.   It is.

Q.   And so is it a regular part of your job duties to trace that cryptocurrency?

A.   It is.

Q.   Could you explain at a high level what cryptocurrency tracing is.

A.   So it's where you look at something called a blockchain and you try to determine the source of funds or the destination of funds in order to collect evidence.

Q.   And are you familiar with the tools and methods that are generally used to conduct cryptocurrency tracing?

A.   I am.

Q.   What are some of the tools and methods?

A.   Well, at the most basic level, there's just manually looking at the blockchain and determining the source or the destination of cryptocurrencies.  There's also commercial vendors that the FBI uses to make that process a little bit more simple.  I'm familiar with both the manual version and relying on vendors.

Q.   And have you actually developed some tools that the FBI uses to conduct cryptocurrency tracing?

A.   I have.

Q.   What sort of tools?

A.   So it's automation tools that just, instead of making the tracing of virtual currency a very slow, manual process, prone

to human error, it automates it using scripting.

Q. And so when you use those tools, do you create computer programs to essentially pull data from the blockchain?

A. It pulls data from another entity that has pulled data from the blockchain. So any tool that I build isn't directly talking to the blockchain; it's talking to some blockchain explorer.

Q. And is that a material that has been——is that a tool that's been widely used within the FBI?

A. So not the automated tracing one, just because we didn't have licenses for the API keys that it relied on.

Q. What is a blockchain explorer? That's a term you just mentioned.

A. It's a——I know it as a public place where someone can go and review raw blockchain data, that doesn't require me to become a full node and download the entire blockchain from a specific network.

Q. Does anyone aside from you do cryptocurrency tracing?

A. Yes.

Q. Does that include other law enforcement officers?

A. Yes.

Q. Is there also a private sector industry that does cryptocurrency tracing?

A. There is.

Q. Are the basic tools and methods that you used in this case

P7H1STO4                    DeCapua - Direct

generally used by others who do cryptocurrency tracing?

A.   Yes.

          MR. REHN:  Your Honor, the government offers Special Agent DeCapua as an expert witness.

          THE COURT:  Is there voir dire from the defense?

          MR. CASEY:  Subject to previous objections, your Honor.

          THE COURT:  All right.  But I guess I'm asking more pointedly, are there questions you wish to ask about his qualifications or is it just the prior motion *in limine*?

          MR. CASEY:  No, your Honor.

          THE COURT:  Okay.  Thank you.

          Agent DeCapua is so qualified.  Thank you.

          Let me be sure what I'm qualifying him as an expert on.

          MR. REHN:  To testify as to cryptocurrency tracing.

          THE COURT:  Yes.  He is so qualified.  Thank you.

BY MR. REHN:

Q.   Special Agent DeCapua, have you done any work on a case related to a cryptocurrency mixer called Tornado Cash?

A.   I have.

Q.   What sort of work did you do?

A.   I analyzed cryptocurrency transactions to determine the amount of cryptocurrency associated with particular criminal incidents to determine how much of those proceeds ultimately

ended up at Tornado Cash mixer.

Q.  And what time period did you focus on?

A.  So I believe it was September of 2020 through August of 2022.

Q.  And in doing that work, at a high level, what sources did you rely on, or what materials?

A.  So a lot.  I relied on raw blockchain data from the Ethereum and Binance blockchains; I relied on some materials that were provided from the prosecution team that showed certain communications that were made that included the defendant; and some Google searches that the defendant made; I also relied on some public statements that were made from certain cryptocurrency exchanges as they announced why the customer's money went missing.  That sums it up.

Q.  And you mentioned blockchain data.  How do you get the blockchain data that you analyze?

A.  I used a blockchain explorer called Etherscan.

Q.  And I think you testified earlier that a blockchain explorer essentially allows you to pull sort of the raw transactional data from the blockchain itself?

A.  That's exactly right.

Q.  Beyond the work you did to prepare to testify at this trial, have you done any other work on the investigation relating to Tornado Cash?

A.  No.

P7H1STO4                      DeCapua - Direct

Q.   Do you have any personal knowledge of the facts about this case, other than what you've learned over the course of your expert work on this matter?

A.   I don't.

Q.   So in your typical work, what steps do you take when you are tracing the proceeds from a particular criminal incident?

A.   So the first thing I'd want to do is make sure I'm starting in the right place, which is identifying, for instance, a victim address, and then from there I would look at all the transactions on that victim address and determine where the cryptocurrency is being sent.  From there—that would be the first wallet.  Then I would move on to wallet 2 or address 2 and etc., etc., as I just follow the bouncing ball of transactions from one address to the next address to the next address to the next address, looking for a service that I recognize, such as Tornado Cash.

Q.   Is there typically a source that you rely on to identify that victim address as a first step?

A.   So I'll get that victim address from a lot of different places.  In general, it's usually from a victim complaint that we will receive.  But for this investigation, there was a wide variety of different sources.

Q.   And did that include statements made by victims at the time of the incidents that you examined?

A.   Yes.

P7H1STO4                      DeCapua - Direct

Q. Special Agent DeCapua, are you familiar generally with the sort of online crypto community?

A. I am.

Q. And when incidents happen involving the theft of cryptocurrency, are those incidents typically widely discussed within that community?

A. They are.

Q. Is there any particular attributes of that community that you've identified that contribute to that?

A. Yes. Usually people who are into cryptocurrencies are also highly connected individuals in terms of the different internet social media services, and it's a small community that requires specialized knowledge, and normally when there is any type of incident where an exchange gets hacked or some type of major incident affecting the community occurs, it is highly discussed on social media.

Q. And does the public nature of the blockchain contribute to that?

A. It does.

Q. Have you ever heard of something called a postmortem?

A. I have.

Q. What is that?

A. In Latin, it means after death, and in general, it just means—in the context of cryptocurrency incidents, it's where the victim will publish publicly their analysis of what

P7H1STO4                      DeCapua - Direct

happened, why they were victimized.

Q.  And so is that one of the things you might look at to identify a victim address to investigate further?

A.  Yes.

Q.  And once you have an address to investigate, does that allow you to begin looking at the blockchain data itself?

A.  Can you repeat that question.

Q.  Once you have that victim address to investigate, does that allow you to start looking at the blockchain data itself?

A.  It does.

Q.  And when you're looking at the blockchain data, are there any particular characteristics that are common to criminal incidents?

A.  Yes, there's lots.

Q.  Could you name some examples of what you're looking at when you're analyzing the blockchain data.

A.  So it depends on the type of incidents, but in general, if we're talking exchanges, so what a normal exchange hot wallet looks like, in my experience, is you'll see transactions going in and out every day, small transactions.  It always holds a balance.  Something that would be characteristic of an incident is if somebody—all the money from that wallet just gets sucked out and now it's a zero balance.  That tells me that maybe something nefarious happened right there.  And that applies for wallets that have Ether in them and then wallets that have

other types of cryptocurrency, such as tokens.  That's one thing.

Another thing is just the pattern of, I guess you would say, liquidation.  So for instance, if an exchange has a lot of tokens that are stolen, it's hard to cash out tokens or exotic cryptocurrencies, so you'll see those cryptocurrencies start consolidating into something that is more liquid, such as Ether.  So if I saw hundreds of different cryptocurrencies stolen and then I see them being transferred into Ether, that tells me that, oh, you know, this looks very odd; this doesn't look like a normal day-to-day activity of a—of an exchange and maybe something criminal has happened.

Q.  And did you observe those sorts of patterns in some of the incidents that you analyzed in connection with this case?

A.  I did.

And one more pattern is, when you see that, that money quickly moving from address to address to address to address, it's something that you normally would not see a large exchange or cryptocurrency service do.  It has the characteristics of someone trying to hide the location of the funds.  That's usually another red flag for me.

And I did—I saw all three of those in my analysis.

Q.  So there were a few terms you used in those answers that I just want to make sure we all understand.

You mentioned an exchange.  What is an exchange?

A.   The exchange is a public service where someone can buy cryptocurrencies and exchange cryptocurrencies, so if you want to use U.S. dollars, you can buy some Ether at an exchange and vice versa.  You can also trade your Ether for U.S. dollars.

Q.   And then you mentioned something called tokens.  What are tokens?

A.   Tokens just mean other cryptocurrencies that happen to operate on a blockchain.  So for the Ethereum blockchain, you have Ether, which is the main cryptocurrency, and then you have lots of different cryptocurrencies that you can trade using the Ethereum blockchain, and they're referred to in common parlance as tokens.

Q.   Are there a large number of different kinds of tokens?

A.   There are.

Q.   And so you said something about those being less liquid than something like Ether itself.

A.   Yes.

Q.   Why would that be?

A.   Because for cryptocurrency to be liquid, you have to have buyers and sellers, and because there's so many tokens that just don't have a lot of people buying and selling them, it's hard to liquidate them without crashing the price.

Q.   And is it relatively easier to liquidate Ether?

A.   Yes.

Q.   And is that because Ether is much more widely bought and

sold among a larger group?

A.   Yes.

Q.   Special Agent DeCapua, you mentioned earlier that you reviewed data from the blockchain in your analysis.

A.   That's correct.

Q.   So I'd like to show you what is marked as Government Exhibit 3003-G-B.  Do you recognize this document?

A.   I do.

          MR. REHN:  And before I inquire about it, I'd like to read a stipulation.

          THE COURT:  Okay.

          MR. REHN:  This will be marked as S4, a stipulation regarding blockchain data.

          It is hereby stipulated and agreed, by and between the United States of America, by Jay Clayton, United States Attorney for the Southern District of New York, by the undersigned counsel, and Roman Storm, the defendant, by and with the consent of his attorneys, that, as relevant here:

          Government Exhibit 3003-G-B is a true and accurate spreadsheet containing data from the Ethereum blockchain;

          The data in the spreadsheet accurately reflects information about the blockchain transactions listed on the exhibit.

          And it is signed by counsel for both parties this morning, July 17, 2025.

P7H1STO4                    DeCapua - Direct

And so the government offers, pursuant to this stipulation, Government Exhibit 3003-G-B.

THE COURT:  As well as S4, sir?

MR. REHN:  As well as S4, your Honor.

THE COURT:  Yes.  Both are admitted into evidence. Government Exhibit 3003-G-B can be shown to the jury.  Thank you.

(Government's Exhibits S4 and 3003-G-B received in evidence)

BY MR. REHN:

Q.  Special Agent DeCapua, do you have that in front of you?

A.  I do.

MR. REHN:  And so Ms. Sebade, if we can widen the columns a little bit, in particular the Transaction, the column B, and so forth, yes.

BY MR. REHN:

Q.  Just to give us a sense of what the actual data that you were analyzing looks like, I'd like to walk through some of these fields.

Do you see, first off, column A, it says Blockchain and Token?

A.  I do.

Q.  What is that a reference to?

A.  So it's a reference to which specific blockchain the data is from.  I believe for all of these it's Ethereum.  The ETH

stands for Ethereum, and then the second ETH stands for Ether in particular.

Q.  And are all of the transactions on 3003-G-B transactions involving Ether, the primary cryptocurrency of the Ethereum blockchain?

A.  They are.

Q.  And the next column is something called Transaction Hash. What is that?

A.  Transaction hash is just a unique identifier for a particular transaction.  You'll never find two of the same transaction hashes for different transactions.

Q.  So if you have the transaction hash, which is the strings of letters and numbers here in column B, are you able to go to the blockchain and get information about that transaction?

A.  Yes.

Q.  Does that include information about what the originating wallet is and what the destination wallet is?

A.  It does.

Q.  Is that reflected here in any columns of the spreadsheet?

A.  It is column F and column G.

Q.  And so I see those labeled From and To.  Do you see that?

A.  I do.

Q.  So focusing first on the entries in the From column, what are those entries?

A.  So the From, this is the Ethereum address that sent value

P7H1STO4                      DeCapua - Direct

for a specific transaction.

Q.   And so you said the Ethereum address.  Is that sometimes also referred to as a wallet address?

A.   They're semi-interchangeable, yes.

Q.   And is that basically a unique string of letters and numbers?

A.   Yes.  Hexadecimal.

Q.   I won't ask you to define that one.

A.   Thank you.

Q.   So for that unique string of letters and numbers, does that——if you have that, can you identify any particular address on the Ethereum blockchain?

A.   Yes.  The addresses are unique and so——

Q.   Okay.  And so if you have one, you can identify that particular address.

A.   That's correct.

Q.   And is an address essentially a place where the owner of that address can store and hold cryptocurrency?

A.   It is.

Q.   And the owner can receive or transmit cryptocurrency from that address?

A.   That's right.

Q.   And is that sometimes called a wallet address?

A.   Yes.

          MR. REHN:  And if we could scroll over a little bit

P7H1STO4                    DeCapua - Direct

more to the right, I guess.

Q.   Do you see there's a column marked Value?

A.   I do.

Q.   And what does Value represent?

A.   That represents how much Ether was transferred in that particular transaction.

Q.   And so here, do we see that the values of these particular transactions tend to have the same value?

A.   Yes.

Q.   And what is the most common value of the transactions on this spreadsheet?

A.   Is 100 Ether.

Q.   And does this spreadsheet generally include transactions from that date range you discussed earlier, from September 2020 through around July or August of 2022?

A.   It does.

Q.   And focusing in particular on late 2021 and into 2022, what was the general range of the price of Ether during that time?

A.   So it was very volatile.  I think it was between 1,000 U.S. dollars to maybe 3,000 U.S. dollars during that time period.

Q.   And so if you make a transaction of 100 ETH when the price of ETH is let's say $2,000, how much—what is the U.S. dollar value of that transaction?

A.   So it would—if the price of ETH is 2,000 and it's 100 ETH, then it's just going to be 2,000 times 100, which I believe is

P7H1STO4                    DeCapua - Direct

$200,000.

Q.  And so each of these deposits could be in the hundreds of thousands of dollars.

A.  That's correct.

            MR. REHN:  We can bring that down.

            Now just for the witness, Ms. Sebade, if you could show him what has been marked as Government Exhibit 3003-G.

            This is still G-B.  Oh, now it's up.  Sorry.

Q.  So Special Agent DeCapua, do you recognize this spreadsheet?

A.  I do.

Q.  Is this a spreadsheet that you created?

A.  It is.

Q.  And with respect to this spreadsheet, does it contain all of the transactional data from the transactions that we were looking at on Government Exhibit 3003-G?

            THE COURT:  G-B.

Q.  G-B.  I apologize.  Does that include within it, what we're looking at now, the transactional data from the transactions that are on 3003-G-B?

A.  It does.

Q.  And I apologize for my—the question.  I will try to make it as clear as possible here.

            Does this also contain some additional transactions?

A.  It does.

Q.   And are those additional transactions either involving

tokens other than Ether or blockchains other than the Ethereum

blockchain?

A.   They do.

Q.   Does this also contain some additional information that you

attributed to these transactions?

A.   It does.

Q.   And is that in column A of this spreadsheet?

A.   It is.

Q.   And generally speaking, did you attribute these

transactions to any particular incidents?

A.   Yes, for each transaction I attributed it as the value came

from ultimately one of the incidents that I analyzed.

Q.   And are all of these transactions deposits to a particular

place?

A.   They are.

Q.   And what is that place?

A.   The Tornado Cash mixer.

          MR. REHN:  And we can now bring down 3003-G and bring

back up 3003-G-B.

          THE COURT:  You're not seeking the admission of

3000-G, sir?

          MR. REHN:  We are not.

          THE COURT:  Thank you.

BY MR. REHN:

Q.  So for 3003-G-B, based on what you just said, is it your testimony that all of these transactions represent deposits into the Tornado mixer originating in a criminal incident that you identified?

A.  That's correct.

Q.  And if one wanted to ascertain which criminal incident you attributed these transactions to, one could look at Government Exhibit 3003-G to determine that.

A.  Yes.

Q.  Now was this the only spreadsheet that you looked at or created in the course of this case?

A.  No.

Q.  Approximately—well, before I get to that, how many transactions are listed on this spreadsheet?

        MR. REHN:  If we could scroll to the bottom.

A.  You have to go down to the bottom.

        5,499, but that includes the header, maybe, so maybe 5,498.

Q.  And all of those are the deposits into Tornado Cash that you identified as originating in a criminal incident?

A.  Yes.

Q.  Now beyond those particular transactions, did you look at a number of other transactions?

A.  I did.

Q.  This number of transactions, what is this in terms—is this

like a significant percentage of the total transactions you looked at, a small percentage?

A.   This is the small──a small percentage because these are just the final leap from the hacker's wallet into Tornado Cash. There's a whole journey I took for each of my analyses that oftentimes included multiple hops through different addresses.

Q.   So would it be fair to say that you looked at at least many tens of thousands of transactions?

A.   I don't know the exact number, but it's probably that.

Q.   And for purposes of your testimony today, when we're talking about these Ethereum deposits into the Tornado Cash mixer, did you convert that ETH value to a dollar value?

A.   I did.

Q.   How did you do that?

A.   So I used the value that Etherscan attributed for that specific day.

Q.   So does Etherscan have dollar values for ETH that are listed?

A.   Yes.

Q.   And so for each deposit you identified how much Etherscan said ETH was worth on that day and then you attributed that as the dollar value for that deposit?

A.   That's correct.

Q.   So deposits of 100 ETH might have different dollar values, depending on when they were made.

A.   Depending on which day and what the value of ETH was on that specific day.

THE COURT:  Counsel, in the next five minutes, I want to break for lunch, so——

MR. REHN:  We were about to turn to his exhibits, so this may actually be a good time.  That was sort of the setup for getting into these exhibits, so this may be the right time.

THE COURT:  So the next section is not a five-minute section is what you're telling me, sir.

No, it is not.

MR. REHN:  I would say no, it is not.

THE COURT:  Okay.  That is fine.  Then now seems like a great time to break for lunch.  And we will break for lunch and we'll start up again at 25 after 1.  I'm trying to get very technical here.

As always, do not discuss this case with each other or anyone else.  Keep an open mind until all of the evidence is in.  Have a great lunch.  We'll see you in 45 minutes.  Thank you.

THE DEPUTY CLERK:  All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Can I just have the parties be seated for a moment.  The witness can step down and have some lunch. Thank you.

I just wanted to talk to the parties about my discussions yesterday with the jury after the close of the trial day.

They were very generous and very appreciative.  What they said is that—and of course, you know, now that they're becoming a jury and are not just 16 individuals, they of course are quite sad for Ms. Brown and wanted her to have the time that she needed for that funeral so when I suggested to them that I could have brought them back for an hour, hour and a half of testimony, they were very happy that I did not make them do that.

With respect to going forward, they understand—although perhaps you'll be telling me that we're moving at a more rapid pace and we're actually on track even with these days off.  Who's to say.  But they understand, and if they need to stay a little bit later next week, they're getting accustomed to the process.

They do like the idea of the Friday breaking at 1:30, just going straight through to 1:30, with one break for the whole day, so that Ms. Klein can catch her bus home.

So I don't have a sense—and the government has a

better sense of whether this trial is proceeding at the pace you expected or more or less slowly, and we don't have to make any decisions today, but know that they are willing to stay with a little bit of advance notice if that's what's appropriate.

Mr. Rehn, you were about to say something and I just shushed you for a moment.  So go ahead.

MR. REHN:  We do still expect we're likely to close by the end of next week, so we actually have proceeded—once the testimony has started, we've been going at a, from our perspective, a rapid clip, and we are on pace to conclude our case within two weeks.

THE COURT:  Okay.  So by next Friday; you think you may be resting next Friday.

MR. REHN:  Very likely.

THE COURT:  That's really interesting.

No, no.  Here's what I mean by that, Mr. Klein.  Excuse me.  I'll be more precise.  Because if we let them go, then if there were mid-trial motions, I wouldn't be making them wait for the mid-trial motions.  Of course I'm not going to stop you if you finish on Thursday, but I'm just saying if it's Friday, that may work out well.

But okay.  Understood.  Thank you.

So you're all welcome to discuss this outside of my presence, and if you think folks need to stay a little later or

not, you'll let me know, but if you think that we're going at the right pace and we're still going to finish, then perhaps we can just keep the schedule next week with the 3:45 departure time and then the 1:30 departure time on Friday.  But I wanted to communicate to you that, based on my conversations with the jury, they were very understanding, they are, you know, reasonably flexible, and they want to work with you to get this done.  So that's a good thing.  That's a good development.

And issues in the past that I may have mentioned about jurors seem to have calmed down.

Mr. Klein.

MR. KLEIN:  Your Honor, we just want to note we filed our opposition before lunchtime, so—

THE COURT:  My thoughtful law clerk advised me of same.  You'll understand that I haven't had a chance to read it.  I don't know that I'd be deciding it today, but it is so noted that it has been filed.  Thank you.

MR. KLEIN:  And then there was one other thing.  There was an issue with the last exhibit that I discussed with Mr. Rehn.

THE COURT:  The 3003-G-B, sir, or something else?

MR. KLEIN:  G-B.

THE COURT:  Yes, sir.

MR. REHN:  So we've been back and forth with defense counsel on this exhibit, a number of times.  It's possible

P7H1STO4                          DeCapua - Direct

there's some extra data at the bottom that would need to be removed, and we'll check that, and if so, we'll correct it.

THE COURT:  Okay.  So when it's time to give all the exhibits to the jury, there might be an amendment.  You're not going to be looking at those stray lines of data in this examination.

MR. REHN:  No.  We are going to look at it again in this examination.

THE COURT:  Okay.  Now I know I'm asking too much, but do you have a sense of the length of your direct?

MR. REHN:  I would say I anticipate it will likely finish today, but I am not sure.

THE COURT:  Oh, it may go into tomorrow?  Or not tomorrow, Monday.

MR. REHN:  I'm not exactly sure how long it will take, but it may take much of the afternoon, at least.

THE COURT:  I see.  Okay.  None of us wants a redo of yesterday.  Yes.  Okay.

And then Mr. Casey?

MR. REHN:  We do have another witness prepared, your Honor.

THE COURT:  Forewarned is forearmed, yes.

Mr. Casey, you'll have whatever cross-examination you have to begin right after that, so you're ready to begin today or Monday if the witness finishes Monday?

MR. CASEY:  I'm ready to begin today, your Honor, but of course it depends what comes in on direct.

THE COURT:  That's great.  We look forward to seeing it, sir.  Thank you.

All right.  Anything else to bring to my attention?

MR. REHN:  Not from the government.

THE COURT:  Thank you so much.

And as always, the paralegals are doing an awesome job at just getting the data and calling it out and making this trial run more smoothly so my thanks to both of you, and if I've misdescribed your jobs, sorry.  But I'm just saying, it's really running smoothly, and I thank you, and your colleague as well.  I'm sorry.  Thank you.

Okay.  Take care, everybody.

THE DEPUTY CLERK:  All rise.

(Luncheon recess)

A F T E R N O O N   S E S S I O N

1:25 p.m.

THE COURT:  Thank you.  Please be seated.

Agent DeCapua, I remind you, you remain under oath.

Counsel, you may continue.

MR. REHN:  Thank you, your Honor.

BY MR. REHN:

Q.  Good afternoon, Special Agent DeCapua.

A.  Good afternoon.

Q.  Special Agent DeCapua, in the witness box there should be a binder containing some exhibits.  Do you see that?

A.  I do.

Q.  Could you look in there and see if there are a set of exhibits that are marked as Government's Exhibits 3002-1 through 3002-61?

A.  3002-1 to 3002-61?

Q.  Yes.

A.  I see them.

Q.  At a high level, what are these documents?

A.  These are a PowerPoint presentation that summarizes the work that I did.

Q.  And does this summarize the blockchain tracing analysis that you did?

A.  It does.

Q.  And the opinions that you drew from that blockchain tracing

P7H5sto5                    DeCapua - Direct

analysis?

A.   It does.

          MR. REHN:   Your Honor, the government offers
Government Exhibit 3002-1 --

          THE COURT:   Through 3002-61, sir?

          MR. REHN:   I could read all 61.  I don't actually know
if we are going to use all of them in the direct.

          THE COURT:   I see.

          MR. REHN:   So we have labeled them separately.

          THE COURT:   OK then.

          Mr. Casey, I imagine that you are going to be
continuing the objection you made previously, sir, to the
admission of 3002-1?

          MR. CASEY:   Yes, your Honor.  And if it is just -1
that is the only objection, your Honor.

          THE COURT:   That is what we are being told, sir, yes.

          I am admitting Government Exhibit 3002-1 over the
defense objection and it may be shown to the jury.  Thank you.

          (Government's Exhibit 3002-1 received in evidence)

BY MR. REHN:

Q.   Looking at this -- and Special Agent DeCapua we will be
able to display them on the screen for you, although you are
welcome to review in whichever manner you prefer.

          I would like you to begin by giving us an overview of
the work that you did and the conclusions that you reached.

A.   So, initially the prosecution team reached out to me to ask for me to assist with some crypto tracing pertaining to their investigation on Tornado Cash, and my job was essentially to look at all the different criminal heists and incidents that happened, all the hacks where the proceeds of any of those crimes ultimately was sent to Tornado Cash for mixing.  I started out looking at a wide variety of incidents and then over time, as we got closer to trial, things were narrowed based on the time range I was looking at and specific loss amounts to 16 specific incidents that I focused on.

Using the blockchain tracing that I described before I concluded that just a little over $1 billion of cryptocurrency was ultimately transferred to Tornado Cash that were proceeds of one of these 16 incidents.

Q.   And was there a particular criteria you used at the beginning to determine what types of incidents you were going to be investigating?

A.   There was, because it was -- there was a lot, and so I had to filter it somehow just to have a reasonable amount of work to do so I -- it was limited to $5 million or up.  So, any type of scheme that was under $5 million I didn't include in my analysis.

Q.   So just to take an example, suppose there was an incident where someone made a fraudulent NFT sale for $1 million and deposited the funds into Tornado Cash.  Would that be included

in this number?

A.   It would not.

Q.   And suppose there was an incident where an individual victim was defrauded of a few hundred thousand dollars and that money was deposited into Tornado Cash.  Would that be included in this number?

A.   It would not.

Q.   And that is because you only looked at incidents where the losses were greater than $5 million?

A.   That's exactly correct.

Q.   And when you did your tracing work, did you actually identify more than the 16 incidents you will be testifying about today?

A.   I did.

Q.   And what did you use to narrow it down to the 16 incidents that will be the subject of your testimony today?

A.   So, initially I looked at 31 incidents and it was narrowed down because the focus was the prosecution team said these are the 16 we are going to look at, because they're the ones that we know the defendant was aware of.

Q.   And did they provide you with documents relating to that?

A.   Yes.

Q.   So, do you see this number saying that more than $1 billion in criminal proceeds went into Tornado Cash?

A.   I do.

Q.   Does this $1 billion number represent all of the criminal proceeds that were deposited into Tornado Cash?

A.   No.

Q.   Based on what you have just described that was excluded from your analysis, would the actual number be higher than this or lower than this?

A.   It would be higher.

MR. REHN:   The government now offers Government Exhibit 3002-2?

THE COURT:   Mr. Casey, the same objection?

MR. CASEY:   Same objection, your Honor, but with regard to -2, to the extent the government is also seeking to admit the referenced exhibits on that slide, we would object.

MR. REHN:   We will be seeking to admit those shortly but not at this moment.

THE COURT:   OK.   Then with that understanding, I am admitting Government Exhibit 3002-2 over the defense objection. Thank you.

(Government's Exhibit 3002-2 received in evidence)

THE COURT:   It may be shown to the jury.

BY MR. REHN:

Q.   Special Agent DeCapua, you mentioned there were 16 complaints you are focusing on for your testimony today; is that right?

A.   That's right.

Q.   What are we seeing on the screen now?

A.   This is a list of the 16 that I referenced.

Q.   Is there a date of each incident?

A.   There is.

Q.   And what does that date represent?

A.   The date represents the date that the incident occurred.

Q.   And at the bottom do you see that there is a list of sources?

A.   I do.

Q.   And you mentioned a moment ago that the prosecutors asked you to look at some documents and narrow down the list of incidents?

A.   That's correct.

Q.   Are those the documents you looked at to do that?

A.   They are.

          MR. REHN:   Your Honor, at this time the government would like to read a stipulation.

          THE COURT:   You may.

          MR. REHN:   This is called Stipulation Regarding Business Records, it is Government Exhibit S2, and I will omit the "hereby stipulated" part because we have heard that twice now.

          Paragraph 1.   Government's Exhibits 203 through 277, 282 through 288, 304 through 306, and 1272 through 1277, contain authentic copies of records from Google.   The records

contained in Government's Exhibits 209, 212, and 1276 pertain to the Google account rstormsf@gmail.com.  Government's Exhibits 203 to 212 are business records pursuant to Federal Rule of Evidence 803(6).

I would offer Government Exhibit 209 -- or I'm sorry Government Exhibit 208 -- I believe it is actually 209, and stipulation S2.

THE COURT:  I do want to be sure I am saying the right thing.  Am I admitting into evidence Government's Exhibits 203 to 277, 282 to 288, 304 to 306 and 1272 to 1277 in addition to S2?

MR. REHN:  We are not at this moment moving those into evidence, only 208 -- 209.

THE COURT:  209?

MR. REHN:  209.

THE COURT:  Please make up your mind.

MR. REHN:  Let me just make sure, your Honor.

THE COURT:  Yes.

MR. REHN:  It is 208.  My apologies, your Honor.

THE COURT:  Thank you.

Government's Exhibits S2 and 208 are admitted into evidence and may be shown to the jury.

(Government's Exhibits S2, 208 received in evidence)

MR. REHN:  So if we could show Government Exhibit 208.

BY MR. REHN:

Q.  Special Agent DeCapua, do you recognize what kind of document this is?

A.  I do.

Q.  And could you describe generally what it is?

A.  This is -- it's Google subscriber information.  So, when law enforcement is doing an investigation and they need to get records from Google, we can send them legal process that they will then provide records associated with a specific account to us and the records that we get from Google look like this.

MR. REHN:  Ms. Sebade, if you could expand the text underneath Google subscriber information?

Q.  What is the e-mail associated with this particular account?

A.  It's rstormsf@gmail.com.

Q.  Who is the subscriber of this e-mail?

A.  It says the name is Roman Storm.

MR. REHN:  If we can bring that down?

Now the government offers, pursuant to stipulation S2, Government Exhibit 209-62.

THE COURT:  209-62.  Government Exhibit 209-62 is admitted into evidence, may be shown to the jury.

(Government's Exhibit 209-62 received in evidence)

MR. REHN:  Ms. Sebade, if we can bring up Government Exhibit 209-62 beside Government Exhibit 208?

I will read again the relevant text from the stipulation:

The records contained in Government Exhibit 209 pertain to the Google account rstormsf@gmail.com.

BY MR. REHN:

Q.   Special Agent DeCapua, do you see on the left side of the screen there is a portion of Government Exhibit 209?

A.   I do.

Q.   And does that exhibit look familiar to you?

A.   It does.

Q.   What sort of an exhibit is that?

A.   So, again, when law enforcement is investigating a crime, we can request specific records from different companies, including Google, and so what I am looking at here, this is actually a search history, a Google search history.  Because when someone is logged into Google and they go into Google and they start typing searches, that type of information is logged by Google, and then pursuant to a search warrant, law enforcement can obtain it if it is relevant to their investigation.

Q.   Based on the stipulation I just read, do you understand that Government Exhibit 209 is records from that rstormsf@gmail.com?

A.   I do.

Q.   If we look at portions of Government Exhibit 209, will you understand if I refer to those as the Roman Storm Google history records?

P7H5sto5                          DeCapua - Direct

A.   Yes.

MR. REHN:  Ms. Sebade, we can bring down Government Exhibit 208 and if we could expand the text that is in Government Exhibit 209-62?

Q.   So I think you said this would be the search history for the user of the Roman Storm account; is that right?

A.   The Google search history, correct.

Q.   Google search history.

So, what did the Roman Storm account search for on October 23, 2020 at 8:17 p.m.?

A.   The word "KuCoin hacker."

MR. REHN:  All right.  If we can bring up Government Exhibit 231, which is not yet in evidence so just for the witness, and this is actually within the range that I read earlier from the stipulation so we offer Government Exhibit 231.

THE COURT:  231 admitted into evidence and may be shown to the jury.  Thank you.

(Government's Exhibit 231 received in evidence)

MR. REHN:  Ms. Sebade if we can expand this?

BY MR. REHN:

Q.   Special Agent DeCapua, do you recognize what kind of a document this is?

A.   I do.

Q.   And what does this document appear to be to you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7H5sto5                    DeCapua - Direct

A.   This is an e-mail.

Q.   And who is the e-mail from?

A.   It is from Amber Itigo with an e-mail address@kucoin.com.

Q.   Who is it to?

A.   To hello@tornado.cash.

Q.   What is that the date of this e-mail?

A.   October 26, 2020.

Q.   If I could ask you to read the text of the e-mail?

A.   It says:  Dear Sirs/Madams.  Thanks for reading my e-mail. This is Amber from KuCoin Exchange.  We found that the hacker of KuCoin has transferred the ETH to your platform.  Please kindly check the info on blockchain.

        And then there is a link from etherscan.io that appears to share a transaction hash.

Q.   Can you read the last line?

A.   Please help us block these tokens and let me know if there is any update.  Regards, Amber.

        MR. REHN:  And if we can bring that down and bring back up Government Exhibit 3002-2?

Q.   What is the first incident that you had identified as part of your tracing analysis?

A.   The first incident, chronologically, is KuCoin.

Q.   And did we just look at a couple of documents relating to that incident?

A.   We did.

Q.   What is the next incident on your tracing analysis?

A.   Chronologically it is Compounder Finance.

MR. REHN:   The government now moves into evidence the two exhibits listed at the bottom by Compounder Finance, Government Exhibit 233 and Government Exhibit 209-61.

THE COURT:   233 and 209-61 are admitted into evidence and may be shown to the jury.

(Government's Exhibits 233, 209-61 received in evidence)

MR. REHN:   Ms. Sebade if you can bring up Government Exhibit 233?   And if we could expand the top portion and just get the text of the e-mail?

BY MR. REHN:

Q.   Special Agent DeCapua, is this an e-mail to that same hello@Tornado.cash email address we looked at earlier.

A.   Yes.

Q.   What is the date of this e-mail?

A.   December 2, 2020.

Q.   If we could read the first portion of the e-mail through: Into the team...?

A.   *Dear Tornado team.   We are writing to you as there has been recently a scam and a rug pull from a project called Compounder.Finance.   The project has scammed approximately $13 million and we are investigating further into the team. Here is a post we wrote in public about it.*

Q.  I can stop you there, Special Agent DeCapua, and in the interest of time we can go down to the lower part of the e-mail beginning with "moreover" and if you can read that?

A.  *Moreover, we expect that the thief will also be using Tornado Cash to mix/hide the trace of the stolen funds, which are currently at the following two wallets.*

Q.  Do you see there are two wallets identified in the e-mail?

A.  I do.

MR. REHN:  We can bring that down.

The government now offers -- 209-61 is already in evidence, if we can bring that up and expand?

BY MR. REHN:

Q.  Special Agent DeCapua, did the Roman Storm Google account search for any terms on December 8, 2020?

A.  It did.

Q.  And what are the terms that are represented in this exhibit?

A.  The first term that was searched was "Compounder Finance" and the second term that was searched just a few seconds later was "Compounder Finance scam."

MR. REHN:  We can bring that down and go back to Government Exhibit 3002-2, and if we can go to the third incident that is listed here?

Q.  What is the name of that incident?

A.  Alpha Homora.

P7H5sto5                    DeCapua - Direct

Q.  What is the date of that incident?

A.  February 13, 2021.

Q.  And at the bottom is there an exhibit listed connected to that incident?

A.  There is.

          MR. REHN:  The government offers 209-59.

          MR. CASEY:  Objection, your Honor.  May I approach or have a side bar?

          THE COURT:  Now?  Three cases in?  Side bar, please.

          (Continued next page)

P7H5sto5                      DeCapua - Direct

(At side bar)

MR. CASEY:  So, your Honor, when they introduced this one I want to make clear my objection that to the extent they are admitting any of these we are objecting to them.  There re several bases for that.  The one is that to the extent they are admitting the Google searches through Special Agent DeCapua, that wasn't in his disclosure and didn't consider them as part of this analysis.

THE COURT:  Hang on, sir.  You have to speak at a pace that the court reporter can take down so let's go with these individually.  Let me understand.

First of all, are these subject to a stipulation or are these not?

MR. REHN:  These are included in the stipulation we just read.

THE COURT:  Let me ask a better question.  Excuse me.

Are all of the exhibits that are listed here in this small font, are they all part of the stipulation?

MR. REHN:  All the 200 series are, your Honor.

THE COURT:  I see.

MR. REHN:  We will get to the 2000 series later.

THE COURT:  OK.

MR. REHN:  And those are the chats from the cellphone.

THE COURT:  So these have already been admitted.

MR. REHN:  For the chats subject to connection.

P7H5sto5                    DeCapua - Direct

THE COURT:  Excuse me.  Let me say that differently.

The stuff that is coming in right now --

MR. REHN:  Yes.

THE COURT:  -- is stuff that you have agreed to admit pursuant to stipulation; yes?

MR. CASEY:  No, your Honor.

THE COURT:  No?

MR. CASEY:  A portion of it.

THE COURT:  231, is that part of the stipulation? Yes.

MR. REHN:  I can clarify, your Honor.

THE COURT:  OK.

MR. REHN:  Pursuant to the Court's order --

THE COURT:  Yes.

MR. REHN:  -- there are -- some of these are sort of the vessel is part of the stipulation, like the e-mails are an authentic copy.

THE COURT:  OK.

MR. REHN:  The contents thereof --

THE COURT:  Yes.

MR. REHN:  -- are not the business records.

THE COURT:  OK.

MR. REHN:  So for some of them the whole thing is a business record, and for some of them it is the fact that the e-mail is sent is the business record.

THE COURT:  OK.

MR. REHN:  So, the contents are subject to hearsay exception which is with respect to the Google history, it is statements of the defendant.

THE COURT:  Yes.

MR. REHN:  It is his own statement.  With respect to the e-mails to him, it is admitted solely for the purpose of demonstrating he was on notice of certain facts.

THE COURT:  Yes.  No one asked me for a limiting instruction with respect to the two e-mails that were put in so I assumed no one wanted one.

What is your objection now to Alpha Homora, sir?  That is where we are.

MR. CASEY:  I need to look at files but certain of these are subject to the rules.  Sorry, your Honor.

THE COURT:  That's fine I don't mind getting hit.

MR. CASEY:  Alpha Homora specifically, that one is one of the --

MR. REHN:  That's a Google search.

THE COURT:  Google search, right.  So what is the objection to that, please, sir?

MR. CASEY:  No, there is rule of completeness, your Honor, but this witness didn't disclose that he considered any Google searches in connection with this, his analysis.

THE COURT:  I thought he began by saying that he did

that.  I thought he talked about that earlier in his testimony. I did not understand that he did not do this.  I thought he said he was looking at things, that it was a close community --

MR. CASEY:  It is not in his disclosure the government gave to us, your Honor.

MR. REHN:  Not every single one of these exhibits was included as disclosure material, that's correct.  Many of them were, but not all of them.

THE COURT:  OK.

MR. REHN:  To be clear, Special Agent DeCapua will refer to certain e-mails later as part of his tracing analysis but for this it is to explain why he is limiting his testimony to these 16 incidents.  It has nothing to do with his basis for a subsequent tracing analysis.  So, we are putting them in at thyme as we introduce the incidents as evidence in the case. It is not something he is relying on.

THE COURT:  Ms. Axle would be upset that we have the Greek chorus on the other side.

I am letting in this document, sir.  Thank you.

(In open court)

MR. REHN:  Ms. Sebade, if you can bring up Government Exhibit 209-59?  And if you could expand that?

THE COURT:  Sir, did we admit 209-59?

MR. REHN:  The government offers 209-59.

MR. CASEY:  Subject to prior objection, your Honor.

THE COURT:  Sir.

Government Exhibit 209-59 is admitted into evidence and may be shown to the jury.  Thank you.

(Government's Exhibit 209-59 received in evidence)

BY MR. REHN:

Q.  Special Agent DeCapua, on February 15, 2021, what did the Roman Storm Google account search for?

A.  Searched for the words:  Alpha Homora hack.

MR. REHN:  We can bring that down and bring back up Government Exhibit 3002-2.

Q.  What was the next incident that you considered in your tracing analysis, chronologically?

A.  It was an incident for an entity called Furucombo.

Q.  Was that on February 27 of 2021?

A.  It is.

MR. REHN:  Your Honor, the government now offers Government Exhibit 235, pursuant to stipulation S2.

MR. CASEY:  Subject to prior objection, your Honor.

THE COURT:  Government Exhibit 235 is admitted into

P7H5sto5                          DeCapua - Direct

evidence, and may be shown to the jury.

(Government's Exhibit 235 received in evidence)

MR. REHN:  Ms. Sebade, if you can expand that?

BY MR. REHN:

Q.   Is this another e-mail to that hello@tornado.cash account?

A.   It is.

Q.   If you can read this e-mail, please?

A.   *To Tornado Cash.  Dear sir/ma'am.  This is Chun Lin Li from Ministry of Justice Investigations Bureau, Taiwan (ROC).  We are investigating the Furucombo's proxy smart contract compromised event on 2021/2/28.  As the hacker used your service to swap tokens, we need your help to provide the hacker's IP address or any information that hacker's identity that could be identified.  The hacker used the Ethereum wallet as below.*

And then there is two Etherscan links that appear to show an Ethereum wallet.

MR. REHN:  We can bring that down and if we could go to Government Exhibit 209-58, which the government offers?

MR. CASEY:  Subject to prior objection, your Honor.

THE COURT:  Government Exhibit 209-58 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 209-58 received in evidence)

BY MR. REHN:

Q.   Special Agent DeCapua, what did the Roman Storm Google

account search for on February 27 of 2021?

A.   The word:  Furucombo.

MR. REHN:  We can bring that down and bring back up Government Exhibit 3002-2.

Q.   What was the next incident, chronologically, that you looked at?

A.   Uranium finance.

Q.   And if we could offer Government's Exhibits 209-53, 209-54 and 209-55 at this time?

MR. CASEY:  Subject to prior objection, your Honor.

THE COURT:  Government's Exhibits 209-53, 209-54 and 209-55 are admitted into evidence and may be shown to the jury.

(Government's Exhibits 209-53, 209-54, 209-55 received in evidence)

MR. REHN:  Ms. Sebade, if you could bring up Government Exhibit 209-53?

BY MR. REHN:

Q.   Special Agent DeCapua, did the Roman Storm Google account search for a particular term on April 28, 2021?

A.   It did.

Q.   And what was the term that it searched for?

A.   The words:  Tornado Cash.

Q.   What do you see appearing three seconds later in the Google history?

A.   I see the actual visitation of a link.

Q.   And so, does that indicate that the Roman Storm Google account visited the article at that link?

A.   Yes.  It indicates that the storm account searched for this term, got the search results, and then clicked on this link.

Q.   Does the link indicate to you a particular incident related to your tracing analysis?

A.   It does.

Q.   And what is that?

A.   It is the Uranium Finance exploit.

          MR. REHN:  We can take that down and bring up Government Exhibit 209-54.

Q.   Special Agent DeCapua, did the Roman Storm Google account search for another term on April 28, 2021?

A.   It did.

Q.   What was that term?

A.   The words:  Uranium Finance.

Q.   Is there an entry shortly thereafter in the Google history?

A.   There is a couple seconds after.

Q.   And what does that indicate from the Google search history?

A.   It indicates that the term "Uranium Finance" was searched, Google provided search results, and then this link was clicked by the user of that account.

          MR. REHN:  We can bring that down and bring up Government Exhibit 209-55.  And if we could expand that?

Q.   Did the Roman Storm Google account search for another term

on April 28, 2021?

A.   It did.

Q.   What was that term?

A.   The term:  Uranium hack.

Q.   Is there an entry shortly thereafter?

A.   There is.

Q.   If you could read the title of that entry?

A.   BSC Protocol Uranium Finance Hacked for $50 million.

Q.   Did the Roman Storm Google account visit that link on April 28, 2021?

A.   It did.

        MR. REHN:  Your Honor, I would now like to read another stipulation.

        THE COURT:  You may, sir.

        MR. REHN:  This is entitled Stipulation Regarding Publicly Available Materials, Government Exhibit S3, and it says:  The exhibits set forth below consist of true and correct copies of materials that were publicly available on the dates listed below.  And, as relevant here, Government Exhibit 1916 was available on April 28, 2021.

        The government offers Government Exhibit 1916.

        THE COURT:  And, as well, S3, sir?

        MR. REHN:  S3 as well, your Honor.

        MR. CASEY:  Objection, subject to the prior objection to the exhibit, your Honor.

THE COURT:  Government's Exhibits S3 and 1916 are admitted into evidence and may be shown to the jury.

(Government's Exhibits S3, 1916 received in evidence)

THE COURT:  Just so I am not misdescribing it, are the stipulations marked as "Government Exhibit" or just "S3".

MR. REHN:  They do say "Government Exhibit."  I apologize, your Honor.

THE COURT:  That's fine.  I want to be precise.  Thank you.  They are both admitted.  1916 may be shown to the jury.

BY MR. REHN:

Q.  Does the title of this exhibit match the title that the Roman Storm Google account visited on this date?

A.  It does.

Q.  And if you could just read the headline and the sub-headline?

A.  *BSC Protocol Uranium Finance Hacked for $50 million.  The project is in contact with Binance's security team, but the funds have already been sent to privacy protocol Tornado Cash.*

MR. REHN:  We can bring that down and bring back up Government Exhibit 3002-2.

Q.  What was the next incident you will be focusing in on your testimony, chronologically?

A.  Liquid.com.

Q.  What was the date of that incident?

A.  August 19, 2021.

MR. REHN:  The government now offers Government Exhibit 209-49.

MR. CASEY:  Subject to prior objection, your Honor.

THE COURT:  Government Exhibit 209-49 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 209-49 received in evidence)

MR. REHN:  If we could expand that?

BY MR. REHN:

Q.  Special Agent DeCapua, is there a term that the Roman Storm Google account searched for on August 19, 2021?

A.  There is.

Q.  What is that term?

A.  Liquid hacker.

MR. REHN:  We can bring that down and bring back up Government Exhibit 3002-23.

Q.  What was the next incident that you analyzed?

A.  Vee Finance.

Q.  What was the date of that incident?

A.  September 20, 2021.

MR. REHN:  Your Honor, the government now offers Government Exhibit 209-46.

MR. CASEY:  Prior objection, your Honor.

THE COURT:  Government Exhibit 209-46 is admitted into evidence over defense objection and may be shown to the jury.

(Government's Exhibit 209-46 received in evidence)

P7H5sto5                    DeCapua - Direct

BY MR. REHN:

Q.   Special Agent DeCapua, is there a term that the Roman Storm Google account searched for on September 21, 2021?

A.   Yes.

Q.   What is that term?

A.   Vee Finance.

         MR. REHN:  We can bring that down and if we could bring back up Government Exhibit 3002-2?

Q.   What was the next incident you looked at?

A.   BitMart.

Q.   What was the date of that incident?

A.   December 4, 2021.

         MR. REHN:  If we could bring up Government Exhibit 1010, which is in evidence?  Let's actually bring up Government Exhibit 1005 and if we could expand the top portion of this document?

Q.   And if I could ask you to read this, just the first line of this e-mail -- letter, I should say.

A.   *Dear Tornado Cash.  We represent BitMart in connection with the cyber security incident that occurred on December 4, 2021...*

Q.   And if we could read the sentence beginning:  Our investigation?

A.   *Our investigation, to date, reveals that certain assets were transferred to Tornado Cash and that a significant portion*

*of those assets remain at Tornado Cash.  We demand that --*

Q.  I think that's enough.

MR. REHN:  We can bring that down and if we could go back to Exhibit 3002-2?

Q.  What was the next incident, chronologically, that you looked at?

A.  Crypto.com.

Q.  What was the date of that incident?

A.  January 17, 2022.

MR. REHN:  The government now -- we now have an exhibit, your Honor, that was -- it is 2001 and 2001-T.  I'm going to read a stipulation regarding Russian translations which is marked as Government Exhibit S5.  With the usual preamble, stipulation S5 reads:  Government's Exhibits in the 2000 series with -T in the exhibit number contain true and accurate English translations of the portions of the corresponding numbered exhibits that are in Russian.

Your Honor, the government offers -- actually, can we bring up Government Exhibit 2001, just for the witness?

THE COURT:  Just for the witness.

BY MR. REHN:

Q.  Special Agent DeCapua, do you see Roman Storm's name on this document?

A.  I do.

MR. REHN:  Your Honor, the government offers

P7H5sto5                       DeCapua - Direct

Government Exhibit 2001, which is one of the records that were

authenticated by Special Agent Dickerman earlier today.

          MR. CASEY:  Subject to prior objection, your Honor.

          THE COURT:  Government Exhibit 2001, 2001-T and S5 are

admitted into evidence.

          MR. REHN:  Thank you, your Honor.

          (Government's Exhibits 2001, 2001-T, S5 received in

evidence)

          MR. REHN:  So we will be focusing on the English

translations today, your Honor.

          THE COURT:  Sir.

          MR. REHN:  If you can bring up Government

Exhibit 2001-T?

BY MR. REHN:

Q.  Special Agent DeCapua, do you recognize what kind of a

document this is?

A.  I do.

Q.  What is it?

A.  This is the type of report that a company called Cellebrite

generates when you extract information from an Apple IOS

system.

Q.  And do you see that there is a -- it says Chats and

Telegram at the top?

A.  I do.

Q.  What does that indicate to you?

P7H5sto5                        DeCapua - Direct

A.   It indicates on this specific device this is an extraction of particular chats from the messaging service called Telegram.

Q.   Does each chat in Telegram have a name or a title?

A.   It does.

          MR. REHN:  Ms. Sebade, if we can expand the box at the middle, at least down through Roman Storm's name?

Q.   Do you see there is a name here?

A.   I do.

Q.   What is the name?

A.   1inch; and then there is a less than/greater than sign Tornado.cash.

Q.   Do you see that Roman Storm is one of the participants in the chat?

A.   I do.

          MR. REHN:  Could we now go to page 2 of this document and if we could expand the message at the top of page 2, just the text of the message?  We don't have to look at the attachments.  Actually, if we could go down to the bottom first and get the date on this message?

Q.   What was the date of the message we are looking at here?

A.   January 18, 2022.

Q.   And if we can go to the top, Special Agent DeCapua, who is this message -- is this a forwarded message or an original message?

A.   It says forwarded at the top so it was a forwarded message.

Q.   And who was the person who forwarded this message?

A.   Anton Bukov.

Q.   Can you read the message that Anton Bukov forwarded on this date?

A.   *Crypto.com is spinning in a tornado.  Click.   There is $15 million in Ethereum (and that's a total of 4,600 ETH!!) being laundered right now through Tornado Cash, Ethereum mixer. This is what the on-chain data tells us.  In brief, Tornado Cash and Ethereum mixer are these things for privacy. They mix the funds and hide the path from wallet A to wallet B. Neat things, aren't they?  And how are you doing?*

          MR. REHN:   We can bring that down and if we can go back to Government Exhibit 3002-2?

Q.   What was the next incident after that crypto.com incident you looked at?

A.   Qubit Finance.

          MR. REHN:   Your Honor, the government offers Government Exhibit  -- well, let's bring up Government Exhibit 2008-T.

          THE COURT:   Is that what you are seeking to admit?

          MR. REHN:   First, if we can show just the witness and the Court Government Exhibit 2008?

          THE COURT:   Thank you.

BY MR. REHN:

Q.   Special Agent DeCapua, does this look similar to the chat

P7H5sto5                     DeCapua - Direct

we looked at previously?

A.   It does.

Q.   And is Roman Storm on this document?

A.   He is.

          MR. REHN:   Your Honor, the government now offers

Government Exhibit 2008 and 2008-T.

          MR. CASEY:   Subject to prior objection, your Honor.

          THE COURT:   Government's Exhibits 2008 and 2008-T are

admitted into evidence and may be shown to the jury.

          (Government's Exhibits 2008, 2008-T received in

evidence)

BY MR. REHN:

Q.   Special Agent DeCapua, is this another section of that same

1inch Tornado Cash chat?

A.   It is.

Q.   Can we go to page 2 of this document -- oh, I'm sorry.

Let's actually do this in English, so if we can bring up

Government Exhibit 2008-T?

          THE COURT:   May I ask a question, sir?   The title of

the chat, is that picked by the participants in the chat or the

person who originates the chat, the 1inch less than/greater

than Tornado Cash, who named that?   If you know.   And if you

don't, that's fine by me.

          THE WITNESS:   I don't know for sure so I don't feel

comfortable saying.

P7H5sto5                         DeCapua - Direct

THE COURT:  I don't want you to speculate, so thank you.

Would you please?

MR. REHN:  Do we have the English version?  So if we can go to page 2 and if we can expand the top message?

Q.  And what is the date on this message?

A.  January 31, 2022.

Q.  Does this message have a -- who is the sender of this message?

A.  It is Roman Semenov.

Q.  Is this a forwarded message or a message authored by Roman Semenov?

A.  It is a message authored by Roman Semenov.

Q.  Could you read the message, please?

A.  *It turns out that Qubit had an audit done and then decided that they are the smartest and can finish a bunch of features without checking them.*

*And then there is a link to a Twitter post.*

Q.  Is the text of that Twitter post a little lower down in the message?

A.  It is.

Q.  And if you could read just the first sentence of that Twitter post?

A.  *Follow up on @Qubit.Fin's post about the recent attack, here's our brief postmortem.*

Q.   I can stop you there.  Do you recognize that term
"postmortem?"  I think you testified about that earlier?

A.   I do.

Q.   Can you remind us what that is?

A.   It is where someone explains what the problem was that
caused them to be subject to a hack or an exploit.

         MR. REHN:  Ms. Sebade, if we can now go to the bottom
of page 5 of this exhibit?

Q.   Is there a message here from Roman Storm?

A.   There is.

Q.   What is the date on that message?

A.   It's February 1, 2022.

Q.   Does that contain a link to a YouTube video?

A.   It does.

         MR. REHN:  Then if we could scroll down a little bit
further?

Q.   Is there another message on the screen now?

A.   There is.

Q.   Who is the author of that message?

A.   Roman Storm.

Q.   Could you read that message, please?

A.   *It's a good idea.  You take an ancient hack and promote it
again.*

         MR. REHN:  If we could bring that down and if we could
bring back up Government Exhibit 3002-2?

P7H5sto5                         DeCapua - Direct

Q.  Now, Special Agent DeCapua, I believe we were just looking at the Qubit Finance incident; is that correct?

A.  That's correct.

Q.  What is the next incident that you analyzed as part of your tracing work?

A.  Ronin Network.

MR. REHN:  If we could bring up just for the witness and the Court Government Exhibit 2044?

Q.  Special Agent DeCapua, do you recognize this as a similar Telegram chat to the ones we have been looking at?

A.  I do.

Q.  And if you could tell us whether Roman Storm is on this chat?

A.  He is.

MR. REHN:  Your Honor, the government offers Government Exhibit 2044 and 2044-T.

MR. CASEY:  Subject to prior objection, your Honor.

THE COURT:  Government's Exhibits 2044 and 2044-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2044, 2044-T received in evidence)

MR. REHN:  If we could bring up Government Exhibit 2044-T?  Actually, Ms. Sebade, if I can ask you to first expand sort of the top portion of this as the information about the chat?  That whole box, I guess.

P7H5sto5                     DeCapua - Direct

Q.   Special Agent DeCapua, what is the title of this chat?  Or the name of this chat.  I should say.

A.   It is:  Bablo Peppersec.

Q.   Is there a group photo for this chat?

A.   There is.

Q.   What does the chat appear to be?

A.   It is like a bag of cash.

Q.   Who are the participants in this chat?  And we may just scroll down a little bit.

A.   So, I see test ICO bot, I see Roman Storm, I see Tornado monitor, I see Alexey Pertsev, and I see Roman Semenov.

         MR. REHN:  If we could go to page -- give me one second -- page 4 of this exhibit -- I'm sorry.  I have the wrong notes here.  Go to page 10 of the exhibit at the bottom. And if we could expand just the very bottom message here?

BY MR. REHN:

Q.   Special Agent DeCapua, what is the date of this message?

A.   It's March 29, 2022.

Q.   And who is the author of this message?

A.   Roman Semenov.

Q.   Could you please read the message?

A.   *Did you already see the $600 million hack today?  Shit might seriously hit the fucking fan now.*

         MR. REHN:  Can we scroll down to the next page?

Q.   Special Agent DeCapua, was there a reply to that message?

P7H5sto5                    DeCapua - Direct

A.   There was.

Q.   And who was that reply from?

A.   Roman Storm.

Q.   And what did Roman Storm write in reply?

A.   *No.  What happened there?*

          MR. REHN:  Can we scroll down to the next message?

Q.   Could you read the next two messages?  Are those also authored by Roman Storm?

A.   They are.

Q.   Could you please read those?

A.   *What kind of hack?  How is it different from others?  Why might shit hit the fucking fan?*

Q.   And was there a response to that from Roman Semenov?

A.   There was.

Q.   Could you please read that message?

A.   *A private key was fucking stolen from a bridge.*

          MR. REHN:  Can we scroll to the next page?

Q.   Did Roman Storm reply to that?

A.   He did.

Q.   What did he say?

A.   *From which one?*

          MR. REHN:  Can we scroll to the next message?

Q.   Then is there a reply to an earlier message from Roman Storm?

A.   There is.

Q.   Is that the earlier message where Roman Storm said *what kind of a hack?  How is it different from others.*

A.   It is.

Q.   What did Roman Semenov say in response to Roman Storm's question?

A.   He said:  *By the fucking amount of the hacked.*

        MR. REHN:  If we can scroll down?

Q.   Did Roman Storm respond?

A.   He did.

Q.   What did he say?

A.   *Could you be more specific?*

        MR. REHN:  Can we go to the next page, please?

Q.   What was Roman Semenov's response?

A.   *Half a billion.*

        MR. REHN:  Can we go down to the next message?

Q.   Was there a reply to the original message now from Roman Storm?

A.   Yes.

Q.   And what did Roman Storm say?

A.   *Oh.  I thought it's 600,000.*

Q.   Was there a message shortly thereafter from Roman Storm?

A.   There was.

Q.   That did he say?

A.   *Send me the info, please.*

Q.   And what was the response from Roman Semenov?

A.   The word:  *Ronin Bridge.*

MR. REHN:  And if we could go to the next page?

Q.   Is there a further message from Roman Semenov?

A.   There is.

Q.   What did he say?

A.   He said:  *173K ETH.*

Q.   And if we could look at the next message, what does that appear to be?

A.   It's Roman Semenov sending a Twitter link for the Twitter account Ronin_network.

Q.   Does that look like a link to a Tweet?

A.   It does.

MR. REHN:  Your Honor, I would like to read another portion of Government Exhibit S3.

THE COURT:  Yes.  Previously admitted as a stipulation?

MR. REHN:  Yes.

THE COURT:  You may.

MR. REHN:  I just want to make sure I have the right number, your Honor.  Give me one moment?

THE COURT:  Yes.

MR. REHN:  So, S3 was about publicly available materials and it includes Government Exhibit 2044-2 at the date March 22, 2022.

And if we could bring up government exhibit, just for

the Court and the witness at this time, Government Exhibit 2044-2.

BY MR. REHN:

Q. Special Agent DeCapua, does that appear to be the Tweet that Roman Semenov sent on March 29?

A. Can you switch back to the prior exhibit, please?

MR. REHN: Can we bring back up the government exhibit?

A. Yes, it does.

MR. REHN: The government offers Government Exhibit 2044-2?

MR. CASEY: Prior objection, your Honor.

THE COURT: Government Exhibit 2044-2 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2044-2 received in evidence)

BY MR. REHN:

Q. Special Agent DeCapua, if you could read the larger tweet, the second one on the screen here?

A. *The Ronin Bridge has been exploited for 173,600 Ethereum and 25.5 million USDC. The Ronin Bridge and Katana Dex have been halted.*

MR. REHN: If we can go back now to Government Exhibit 3002-2?

Q. After the Ronin Network incident, when was the next incident you looked at in your analysis?

A.   Inverse Finance.

MR. REHN:  For Inverse Finance, if we could bring up, just for the witness, Government Exhibit 2048-T?

THE COURT:  And not 2048, sir?

MR. REHN:  I apologize, your Honor.  The sequencing of these translations, I will pick it up eventually, I'm sure. Government Exhibit 2048, please, just for the witness and the Court.

BY MR. REHN:

Q.   Special Agent DeCapua, is this another section of this Bablo Peppersec we have been looking at?

A.   It is.

MR. REHN:  The government offers Government Exhibit 2048 and Government Exhibit 2048-T?

MR. CASEY:  Subject to prior objection, your Honor.

THE COURT:  The objections are overruled. Government's Exhibits 2048 and 2048-T are admitted into evidence and may be shown to the witness.

(Government's Exhibits 2048 and 2048-T received in evidence)

MR. REHN:  Again, I think it is probably more productive to focus on the English version.

THE COURT:  It is.

MR. REHN:  So we will bring up Government Exhibit 2048-T.

P7H5sto5                         DeCapua - Direct

BY MR. REHN:

Q.  Special Agent DeCapua, is this that same Bablo Peppersec

chat with the money bag group photo we looked at before?

A.  Yes, it is.

Q.  And is Roman Storm on this chat?

A.  He is.

        MR. REHN:  Could we go to page 4 of this exhibit,

please?  And if we could expand the text in the middle here.

Q.  Was there a message sent on April 30 of 2022?

A.  There was.

Q.  And is that -- who was that message from?

A.  It's from Roman Semenov.

Q.  What did Roman Semenov say in that message?

A.  It says:  *That moron spoiled all the stats with Ronin and

Beanstalk.*  And then there is a Twitter link.

Q.  And is there some text from that Twitter link below?

A.  There is.

        MR. REHN:  If I could ask you to look at that text,

and then if we can bring up just for the witness Government

Exhibit 2048-1 and I will just read from stipulation S3, again,

as to Government Exhibit 2048-1, the date is April 29 of 2022

and the government offers Government Exhibit 2048-1?

        MR. CASEY:  Subject to prior objection, your Honor.

        THE COURT:  Government Exhibit 2048-1 is admitted into

evidence and may be shown to the jury.

P7H5sto5                      DeCapua - Direct

(Government's Exhibit 2048-1 received in evidence)

BY MR. REHN:

Q.  Special Agent DeCapua, do you recall we were talking about the Inverse Finance incident as one of the incidents in your analysis; is that right?

A.  That's correct.

Q.  And first could we read what the text of this Tweet is?

A.  *15 percent of Tornado deposits are from the Ronin exploiter.*

Q.  And if we could look at the graphic -- and Ms. Sebade, if you could expand the graphic a little bit -- do you see something that says wallet profiler?

A.  I do.

Q.  Is there an address associated with that?

A.  Yes.

Q.  What is the address that's listed in this Tweet?

A.  Tornado Cash router.

Q.  And below that does that say:  Incoming ETH?

A.  It does.

Q.  If you could read the top three sources of incoming ETH to Tornado Cash router, according to this Tweet?

A.  Unknown, 75 percent; Ronin Bridge exploiter, 15 percent; Beanstalk flashloan, exploit 7.17 percent.

Q.  Can we actually go down to the next one as well?

A.  Inverse Finance exploiter, 1.32 percent.

Q.   And with respect to -- now, we have already talked about the Ronin Bridge is one of the incidents you investigated; is that correct?

A.   That is correct.

Q.   And was Inverse Finance the next one that we were looking at?

A.   Yes.

Q.   Was Beanstalk another incident you investigated?

A.   It was.

MR. REHN:  If we can go back to the message associated with this Tweet, 2044 -- do I have that right or is it 2048?  I think we are at 2048 -- actually, at page 4 of 2048.

Q.   Did Roman Semenov, is he the one who sent this Tweet?

A.   That's correct.

Q.   And in his message he referenced just the Ronin and Beanstalk incidents but the Tweet itself also mentioned the Inverse; is that right?

A.   It does, yes.

MR. REHN:  If we can go back now to Government Exhibit 3002-2.

Q.   Do we see those three incidents as incidents you analyzed in March and April of 2022?

A.   I do.

Q.   If we can go now to Government Exhibit  -- I'm sorry if I could ask you, what is the next incident, chronologically, you

P7H5sto5                         DeCapua - Direct

investigated?

A.   RARI Capital.

          MR. REHN:  And with respect to Rari Capital, if we could look at, just for the witness, Government Exhibit 23-11?

          (Continued on next page)

P7H1STO6                        DeCapua - Direct

MR. REHN:  Actually, you know, I think we'll skip that one.  Let's go to the next one.

Let's go ahead and go back to 3002-2.

BY MR. REHN:

Q.  And Special Agent DeCapua, if we could do Harmony Protocol. Is that the next incident you looked at chronologically?

A.  It was.

Q.  And what was the date of that incident?

A.  June 3, 2022.

MR. REHN:  And if we could now——I'd like to read another portion of stipulation S2, your Honor.

THE COURT:  You may, sir.

MR. REHN:  Government Exhibits 552-563 contain authentic copies of records from X, formerly known as Twitter.

And the government offers Government Exhibit 562.

MR. CASEY:  Subject to prior objection, your Honor.

THE COURT:  Government Exhibit 562 is admitted into evidence and may be shown to the jury.  Thank you.

(Government's Exhibit 562 received in evidence)

BY MR. REHN:

Q.  Special Agent DeCapua, if I could ask you to read the three messages after the blue heart.

A.  "Hey, Roman, our Harmony to ETH bridge got exploited today and the hacker is holding it in ETH.  He may use Tornado Cash. The hacker may use Tornado Cash.  Is there any patterns we can

P7H1STO6                    DeCapua - Direct

learn?"

Q.   And what were the date of those messages?

A.   June 24, 2022.

          MR. REHN:  All right.  We could bring that down.  And
if we could go to—the government offers Government
Exhibit 209-21, which is another portion of Government
Exhibit 209.

          MR. CASEY:  Subject to prior objection, your Honor.

          THE COURT:  Government Exhibit 209-21 is admitted into
evident and may be shown to the jury over the defense
objection.

          (Government's Exhibit 209-21 received in evidence)

BY MR. REHN:

Q.   And Special Agent DeCapua, if I could ask you to read the
searches from the Roman Storm Google account that took place on
July 1st of 2022.

A.   The term "Tornado Cash" was searched twice.

Q.   And then after those searches was there a particular
website that was visited?

A.   Yes.  Of the search results, the website that was visited
was, "Harmony ropes in FBI after losing 100 million in
exploited one token," and then it trails off.

          MR. REHN:  All right.  I think we just have one more.
If we go back to Government Exhibit 3002-2.

Q.   What's the last incident you looked at as part of your

P7H1STO6                      DeCapua - Direct

tracing analysis, Special Agent DeCapua?

A.   Uniswap Phishing.

Q.   What was the date of that incident?

A.   July 11, 2022.

Q.   So this was the last in time that you looked at?

A.   It is.

Q.   And Special Agent DeCapua, if I could bring up for you and the Court Government Exhibit 2007.

And Special Agent DeCapua, does this look similar to some of the chats we've looked at to date?

A.   It does.

Q.   And is this another portion of that 1inch Tornado Cash chat?

A.   It is.

Q.   And do you see Roman Storm in this chat?

A.   I do.

          MR. REHN:   Your Honor, the government offers Government Exhibits 2007 and 2007-T.

          MR. CASEY:   Subject to prior objection, your Honor, and an additional objection on rule of completeness grounds.

          THE COURT:   I missed the last thing that you said, sir.

          MR. CASEY:   On rule of completeness grounds, your Honor.

          THE COURT:   All right.  Government Exhibits 2007 and

2007-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2007 and 2007-T received in evidence)

MR. REHN:  Ms. Sebade, if we could now bring up Government Exhibit 2007-T.  And if we could go to page 1 of this exhibit and if we could expand the top message.

BY MR. REHN:

Q.  And Special Agent DeCapua, what is the date of this message?

A.  It's July 12, 2022.

Q.  And who is reported as the author of this message?

A.  Sergej, and then there's the word 1inch after his name.

Q.  And what is the text of the message?

A.  "Our threat intel detected a potential exploit on Uniswap V3 on the ETH blockchain.  The hacker has stolen 2,295 ETH so far, and they are being laundered through Tornado Cash.  Can someone notify @uniswap?  We can help.  Thanks."

Q.  So Special Agent DeCapua, was what you just read a portion of a tweet?

A.  Yes.

MR. REHN:  And if we could offer Government Exhibit 2007-1, and I'll read from stipulation S3 again.

As to Government Exhibit 2007-1, it was publicly available on July 12, 2022.

THE COURT:  Same objection, sir?

MR. CASEY:  Yes, your Honor.

MR. REHN:  Could we please bring up—

THE COURT:  Oh.

MR. REHN:  Sorry.

THE COURT:  Yes.  You do have to let me actually admit the exhibits, sir.  Thank you.

Government Exhibit 2007-1 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2007-1 received in evidence)

BY MR. REHN:

Q.  Special Agent DeCapua, is this the tweet that we were looking at?

A.  It was.

Q.  And I see CZ here as the author of this tweet.  Do you happen to know who that is?

A.  I do.

Q.  Is that person a prominent person in the crypto community that you were describing earlier?

A.  It is.

MR. REHN:  If we could bring that down and go back to Government Exhibit 2007-T.

Q.  And that links to that tweet in this chat that we were looking at a moment ago; is that right?

A.  That's correct.

MR. REHN:  Ms. Sebade, if we could scroll down and

look at the next two messages.

Q.   Special Agent DeCapua, are these messages authored by the person who sent that tweet, Sergej?

A.   Yes.

Q.   Could you please read that, those messages.

A.   "Fuck, guys, you don't need to spend anything on marketing."  And then there's what appears to be a smiley face emoji.  "Even CZ has written about you."

          MR. REHN:  All right.  And if we could now go to page 6 of this exhibit.

          And if we could actually go to page 5, I believe.  And if we could expand the top chat.

Q.   Is this another message from Sergej?

A.   It is.

Q.   And is this on July 16, 2022?

A.   It is.

Q.   And if you could read that message.

A.   "Fuck, you are being advertised for free."  And then again, there's smile emojis.

Q.   And then what's the next message?

A.   @rstormsf.

Q.   Can we scroll down to the next message.

          Who's the author of this message?

A.   Roman Storm.

Q.   Could you read that message.

P7H1STO6                      DeCapua - Direct

A.   "It's fucking funny."

Q.   And then did Roman Storm reply to the "you are being advertised for free" message?

A.   He did.

Q.   What did he say?

A.   "Thanks, guys——"

Q.   And if we could go to the next message.

     And if you could read the next message from Roman Storm.

A.   "——for making a video clip like this."

Q.   And then was there a message from Sergej?

A.   There was.

Q.   And could you read that message.

A.   Smile emoji.  "None of this would have happened without you."

     MR. REHN:  Scroll down.

     Go up just a little bit.

Q.   If we could read the next two messages from Sergej.

A.   "No one would have been able to launder fucking stolen tokens through Tornado."

Q.   And then the next?

A.   "I am joking, of course."  And then smiley face emoji.

     MR. REHN:  We can bring that down.

     Okay.  Could we go back to Government Exhibit 3002-2.

Q.   I believe we've been through these incidents now

P7H1STO6                    DeCapua - Direct

chronologically, Special Agent DeCapua; is that right?

A.   That is right.

MR. REHN:  Okay.  So the rest of the slides won't take quite that long, your Honor.

THE COURT:  That's fine.  I do think our jurors might want a break in a few moments.  So I don't know whether we should take that five-minute break——five-minute break, yeah—— now or whether there's another section you want to cover.

MR. REHN:  We're going to start getting into the tracing, so it's probably a good spot to take that break.

THE COURT:  All right.  Let's take our brief afternoon break now and then we'll come back in as quick as you can. Five minutes, hopefully, ten minutes maximum.  Do not discuss this case with each other or anybody else.  Keep an open mind until all the evidence is in.  Thank you very much.

THE DEPUTY CLERK:  All rise.

(Continued on next page)

P7H1STO6                       DeCapua - Direct

(Jury not present)

THE COURT:  The witness can step down.

Can I just talk to the parties for a second, please. Thanks so much.

Mr. Casey, you raised an objection a few moments ago, a rule of completeness objection, and I wanted to understand it better, sir.  Did you attempt to meet with the government to ask them to put in additional chats that they did not, are you going to attempt to place in such chats during cross-examination, or something else?  I just want to make sure I understand it, please.

MR. CASEY:  So we have conferred with the government with regard to certain chats, your Honor, but this one specifically, we didn't realize until it was disclosed I believe last night or perhaps earlier in the day that this was going to be admitted in connection with Special Agent DeCapua's testimony.

THE COURT:  Okay.  Just speak up, please.  Thank you.

MR. CASEY:  And so we would like to move to just include one additional portion of the chat that's been shown, your Honor, and I could do so prior to cross-examination or—

THE COURT:  Okay.  So Mr. Rehn, are you aware of the piece they wish to include?

MR. REHN:  I am not.  We did have a very long and productive discussion regarding rule of completeness issues.

This isn't one of the exhibits they flagged.  This wasn't on our original exhibit list.

THE COURT:  This could be a short and productive discussion.  When I hear rule of completeness, I want to understand what I'm doing.  If the parties can agree and we can obviate that objection, that would be great.  If there's a dispute, I'll work it out.

Thank you.  I'll see you in a few minutes.  Take care.

(Recess)

(Continued on next page)

(Jury present)

THE COURT:  Please be seated.  Thank you.

Counsel, you may continue.

BY MR. REHN:

Q.  Special Agent DeCapua, I'd now like to turn to look at some of the actual cryptocurrency tracing work that you did in this case.

So was the first incident that you traced that KuCoin hacking incident that we discussed earlier?

A.  Chronologically, yes.

Q.  And if you look in that binder, I'd like to direct your attention to Government Exhibits 3002-3 through 3002-13.  And as you look at those, the question will be:  Are these summaries of the tracing work based on the data from the blockchain that you've reviewed?

A.  It is.

MR. REHN:  Your Honor, the government offers Government Exhibits 3002-3 through 3003-13.

MR. CASEY:  Subject to prior objection, your Honor.

THE COURT:  Government Exhibits 3002-3 through 3002-13 are admitted into evidence and may be shown to the jury.

(Government's Exhibits 3002-3, 3002-4, 3002-5, 3002-6, 3002-7, 3002-8, 3002-9, 3002-10, 3002-11, 3002-12, 3002-13 received in evidence)

MR. REHN:  And I'm realizing I broke my own rule and

P7H1STO6                      DeCapua - Direct

did not read all of them.

THE COURT:  I can do it.

MR. REHN:  Again, in an abundance of caution.

THE COURT:  No.  In the interest of completeness, Government Exhibits 3002-3, 3002-4, 3002-5, 3002-6, 3002-7, 3002-8, 3002-9, 3002-10, 3002-11, 3002-12, and 3002-13, for completeness.  Thank you.

MR. REHN:  Thank you, your Honor.

Ms. Sebade, could we bring up Government Exhibit 3002-3.

BY MR. REHN:

Q.  Special Agent DeCapua, I see on the left side of the screen a green square with a logo.  What is that representing in terms of your analysis?

A.  It represents accounts owned by KuCoin.

Q.  And what is KuCoin?

A.  It's a Bitcoin exchange.

Q.  And then I see an arrow that's pointing to something that——I guess I'll let you describe what it's pointing to.

A.  It's pointing to a graphic that looks like a big wallet that's labeled KuCoin Hacker Wallet 1.

Q.  And what is that meant to represent?

A.  It represents the address into which the KuCoin criminal proceeds that were stolen were transferred into initially.

Q.  And so instead of putting that string of letters and

numbers we talked about earlier, you're just representing that with this graphic; is that right?

A.  Yes.

Q.  And then there's some numbers and a date underneath the arrow.  Could you just explain what the arrow and the numbers represent.

A.  So the arrow represents the funds actually leaving the KuCoin wallet and going to the hacker's wallet, so that's what the arrow means.  The direction is the direction of the funds.  And then the actual numbers underneath it, it says specifically how much cryptocurrency was moved.  So in this case it's 11,486 ETH and 19.83 million USDT, which is another type of cryptocurrency.

Q.  And when we see an arrow like this, does that represent just one transaction or is that more of a flow of funds that involved multiple transactions?

A.  It represents multiple transactions, a flow of funds.

Q.  And then the date, does that mean that all of the transactions included in those numbers happened on that particular date?

A.  Yes.

Q.  So just based on all of that, if you can just explain what happened on September 25, 2020, as represented by this illustration.

A.  On September 25, 2020, a hacker was able to move 11,486 ETH

P7H1STO6                      DeCapua - Direct

into a wallet that they controlled that I've labeled KuCoin Hacker Wallet 1, and also 19.83 million USDT into the same wallet.

Q.  Okay.  And then did you engage in some work to trace what happened to the crypto that went into that wallet?

A.  I did.

MR. REHN:  And if we could bring up Government Exhibit 3002-4.

Q.  So what does this represent?

A.  So it represents the USDT cryptocurrency being transferred into multiple different intermediary wallets controlled by the same hacker.

Q.  And if I remember correctly, you testified earlier today about something called tokens?

A.  Yes.

Q.  Is USDT an example of a token?

A.  It is a token on the Ethereum blockchain, yes.

Q.  And so the USDT that came out of KuCoin was transferred to these intermediary wallets; is that right?

A.  That's correct.

MR. REHN:  Could we now look at Government Exhibit 3002-5.

Q.  Special Agent DeCapua, what is represented on this exhibit?

A.  So from those intermediary wallets where the hacker's stolen funds were sitting, the hacker swapped those funds, the

USDT, for the Ether, and so the arrows that you see in the circle that says Crypto Swap, that's a swap service that exchanges different types of cryptocurrencies for other types of cryptocurrencies, and the arrows going back and forth represents that the person controlling those multiple intermediary wallets used that swap service and swapped the USDT for ETH.

Q.   And what was the date that that happened?

A.   September 28, 2020.

Q.   And just to make sure I understand what you mean by crypto swap, so is that similar to sort of like a currency exchange you might see at an airport for regular money, where you'd go and swap one kind of money for another?

A.   In a very simplified manner, yes.

Q.   And so at a crypto swap, could you exchange USDT for ETH?

A.   You can.

Q.   And that's what's represented here on September 28, 2020?

A.   That's correct.

MR. REHN:   All right.   Let's go to Government Exhibit 3002-6.

And I'm sorry, Ms. Sebade——oh, okay.   It's there.

Q.   So what happened after that?

A.   So now the proceeds of that swap, some of that ETH that they traded the USDT for, now they're moving it back into the original wallet, which I labeled KuCoin Hacker Wallet 1.

P7H1STO6                      DeCapua - Direct

Q.   And then if we—so the ETH now has gone back to the wallet that originally got the other kinds of tokens from KuCoin; is that what you're saying?

A.   That's correct.

Q.   And if we could now go to Government Exhibit 3002-7.

What happened next?

A.   Now there were two transfers of ETH from the KuCoin Hacker Wallet 1 into another wallet which I am calling KuCoin Hacker Wallet 2.

Q.   And what was the date that that happened?

A.   October 23, 2020.

Q.   Let's take a look then at Government Exhibit 3002-8.

What was the next step in the flow of funds?

A.   From KuCoin Hacker Wallet 2, there was 115 deposits of ETH going into wallets associated with the Tornado Cash mixer, to the tune of about 11,500 ETH, which is most of the ETH that was left over in that wallet.

Q.   Now I just wanted to make sure I understand.  I see there's actually a little bit more ETH flowing into the mixer than originally came from KuCoin.  Do you see that?

A.   I do see that.

Q.   Is there an explanation for why there's more ETH at the end?

A.   Because if you remember, some of the USDT was swapped for ETH, so the hacker swapped the USDT, got some extra ETH, that

ended up in KuCoin Wallet 1 and then was transferred over to Wallet 2, and then all but 20 ETH from Wallet 2 is transferred into the Tornado Cash mixer.

Q. Now you testified earlier today about some of the characteristics that you look at on the blockchain that are— that sort of signify a criminal incident.  Do you recognize any of those characteristics in the flow that we're looking at here?

A. Yes.  So the big flow—the big characteristic here was just an exchange's hot wallet suddenly had an enormous amount of money disappear from it, and so that indicates that something potentially serious has happened at that exchange.

Q. And then are there other attributes that you look at as well?

A. To a lesser extent, the liquidation of USDT into ETH.

Q. And looking at this flow of funds—

MR. REHN:  And if we could go to Government Exhibit 3002-9.

Q. Do you recall testifying earlier that each wallet on the blockchain has an address?

A. That's correct.

Q. And so what is—did you identify the address for the wallet that's listed here as KuCoin Hacker Wallet 2?

A. I'm sorry.  Can you repeat the question.

Q. And so is what's on the screen now the beginning of the

P7H1STO6                    DeCapua - Direct

wallet address for KuCoin Hacker Wallet 2?

A.   It is.

Q.   Is that the full address or just the first few letters and numbers?

A.   That's just the first few letters and numbers.

        MR. REHN:   So if we could bring up, Ms. Sebade, Government Exhibit 231 side by side with Government Exhibit 3002-9.

        And Ms. Sebade, if you could expand the Etherscan link that's in the email on Government Exhibit 231, and if you could also expand the first letters and numbers of the wallet address, that's the address for KuCoin Hacker Wallet 2 on Government Exhibit 3002-9.

BY MR. REHN:

Q.   So Special Agent DeCapua, what do you notice about these wallet addresses?

A.   They're the same.

Q.   So what is the date of this email?

A.   October 26, 2020.

        MR. REHN:   And Ms. Sebade, if you could de-expand.

Q.   What was the date of the flow of funds into the Tornado mixer?

A.   It is between October 23rd of 2020 and October 26 of 2020.

Q.   And so was this email identifying this wallet sent to the Tornado—the hello@tornado.cash address during the time frame

in which you identified funds flowing into the Tornado mixer?

A.  It was.

MR. REHN:  All right.  We can bring that down.

Q.  And if I could ask you now to look at Government Exhibits 3002-10 through 3002-13 in your binder, Special Agent DeCapua.

A.  Okay.

Q.  Did you identify some additional proceeds from the KuCoin hack that flowed into Tornado Cash?

A.  I did.

Q.  And are these some charts that identify those additional flow of funds?

A.  They are.

MR. REHN:  If we could pull up—or if we could offer Government Exhibits 3002-10, 3002-11, 3002-12, and 3002-13.

THE COURT:  I thought I had previously admitted through 3002-13.

MR. REHN:  Oh, I'm sorry.  I got ahead of myself before.  So they're already in.

We could bring up Government Exhibit 3002-10.

THE COURT:  They are in.  Thank you, sir.

BY MR. REHN:

Q.  So Special Agent DeCapua, is this some additional transactions involving that same wallet that we were discussing in the previous set of exhibits?

A.   It is.

Q.   And so in addition to the transfers we were talking about before, was there additional crypto that was taken from the KuCoin exchange?

A.   There was.

Q.   What was the date of those withdrawals?

A.   September 25th of 2020.

Q.   And did you then follow and trace the proceeds of those funds?

A.   I did.

Q.   So if we could go to Government Exhibit 3002-11.

So what was the next thing that happened after the withdrawals from KuCoin?

A.   So it went through a series of multiple transactions with the middleman addresses and wallets.  And that all happened around the time period September 27th of 2020 through March 3rd of 2021.

MR. REHN:  And then if we could bring up Government Exhibit 3002-12.

Q.   And then what happened after the crypto was deposited into those intermediary wallets?

A.   So from that web of intermediary wallets, the attacker started swapping that—those various types of crypto for ETH.

Q.   And then if we could go to Government Exhibit 3002-13.

What do we see there?

A.   So finally, the fruits of those swaps, the ETH that is in the final hop in the chain of wallets, was deposited into Tornado mixer accounts between October 15th of 2020 and March 3rd of 2021.

Q.   And so does that represent all of the original crypto that you identified as having been taken in the KuCoin hack?

A.   A small portion of it.

Q.   Were you able to trace the other—the rest of the crypto that was taken?

A.   I was to a certain extent.  A lot of it just is still sitting in addresses right now.  It was never actually cashed out.

       MR. REHN:  So if we could bring that down.

Q.   And Special Agent DeCapua, if I ask you to take a look at Government Exhibit 3002-14.

       MR. REHN:  And we can just show it to the witness on the screen.

Q.   And Special Agent DeCapua, what does this exhibit represent?

A.   This is just a very broad summary of my tracing for the KuCoin incident.

       MR. REHN:  And the government offers Government Exhibit 3002-14.

       MR. CASEY:  Subject to prior objection, your Honor.

       THE COURT:  Objection is overruled.  Government

Exhibit 3002-14 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 3002-14 received in evidence)

BY MR. REHN:

Q. So Special Agent DeCapua, just, can you provide a general overview of what your tracing analysis revealed about the KuCoin hack.

A. So it revealed that the proceeds of the KuCoin hack were deposited into Tornado Cash through a series of 512 deposits between the dates October 15, 2020, through March 3, 2021. The total ETH deposited from those wallets into Tornado Cash was 50,930, which has an approximate dollar value at that time of 21.3 million U.S. dollars. And the majority of the deposits were made in a shorter time period; specifically, 49,710 of the 50,930 ETH was deposited between October 15th and October 26th of 2020.

Q. All right. So Special Agent DeCapua, I'd like you to look at Government Exhibit 3002-52.

MR. REHN: Which we can just show to the witness.

Q. Do you recognize this chart?

A. I do.

Q. And does this chart contain a summary of data that you pulled from Etherscan regarding the overall volume of Tornado Cash deposits?

A. It does.

MR. REHN:  Your Honor, the government offers Government Exhibit 3002-52.

MR. CASEY:  Subject to prior objection, your Honor.

THE COURT:  Government Exhibit 3002-52 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 3002-52 received in evidence)

BY MR. REHN:

Q.  So Special Agent DeCapua, could you explain what this chart represents.

A.  Sure.  So one thing I was asked to look at through my analysis was the four Tornado Cash contracts that were part of their mixing service for Ether, and so these lines represent—each line represents a different day, and each line represents the amount of volume of Ether deposits into a Tornado Cash wallet during that specific day.  So when you see a really tall line, that means that on that specific day, Tornado Cash had a lot of deposits.  When you see a smaller line, that means that that day was a little bit slower for Tornado Cash and not as many people deposited Ether.

Q.  And so what's the date range of the chart?

A.  It's September 1st of 2020 through August 8th of 2022.

Q.  Now on this chart I see—you mentioned that the longer lines represent a day with higher deposits?

A.  That's correct.

Q.  And so if it's about two years, are you telling me there's

about 700 blue lines on this chart?

A.   That's correct.

Q.   And so for example, I see one especially large line that goes over 30,000.  What does that represent?

A.   That represents one day of a lot of business at Tornado Cash.

Q.   And so for that day, for example, is that the only day where there's more than 30,000 ETH going into Tornado Cash?

A.   Yes.  There's another day where it gets very close, but this was the only day where it was above 30,000.

Q.   And so on this chart can we identify particular date ranges in connection with the dates of the tracing that you did?

A.   That's correct.

Q.   And did you actually look at this chart and identify the tracing you did in connection with the KuCoin incident?

A.   I did.

        MR. REHN:  And if we could show the witness Government Exhibit 3002-16.  And before we offer it——

Q.   Special Agent DeCapua, is this a chart that just identifies that date range from the prior chart?

A.   It is.

        MR. REHN:  Your Honor, the government offers Government Exhibit 3002-16.

        MR. CASEY:  Subject to prior objection, your Honor.

        THE COURT:  Government Exhibit 3002-16 is admitted

into evidence and may be shown to the jury.

(Government's Exhibit 3002-16 received in evidence)

Q. Special Agent——

THE COURT: Counsel, may I ask a question of the witness.

Sir, perhaps it's old age, but it looks to be two different shades of blue. Is that simply because you have so many days that you're trying to fit into the graph?

THE WITNESS: I used Microsoft Excel for this and so I think it's a quirk of Excel, but the shades of blue don't represent anything. It all should be the same shade of blue.

THE COURT: Thank you. Sorry to ask.

Okay. Counsel, you may continue.

BY MR. REHN:

Q. Special Agent DeCapua, I believe you testified a moment ago, do you recall, that most of the proceeds of the KuCoin hack were deposited into Tornado Cash from October 15th through October 26th of 2020?

A. I do recall.

Q. And so have you circled that date range on the chart here?

A. Yes, I did.

Q. And looking at that, do you notice anything noteworthy about Tornado Cash volumes during that time period?

A. Yeah, there was a gigantic spike.

Q. So prior to that time period and that incident, had Tornado

Cash volumes ever reached 10,000 ETH in a single day?

A.   No.

Q.   And during that incident did they reach 10,000 ETH?

A.   It did.

Q.   And so relative to prior patterns, what would you say about the period during which the KuCoin hack's deposits were going into Tornado Cash?

A.   It was suddenly like a doubling of Tornado Cash's business.

         MR. REHN:  We can bring that down.  And if we could show the witness Government Exhibit 3002-17.

Q.   And Special Agent DeCapua, what does this represent?

A.   This represents the proportion of KuCoin proceeds, or this represents——looking at all the Tornado Cash ETH deposits for that time period in October of 2020, this shows which proportion came from KuCoin as opposed to what part I just didn't know where it came from.

         MR. REHN:  The government offers Government Exhibit 3002-17.

         MR. CASEY:  Subject to prior objection, your Honor.

         THE COURT:  Yes, sir.  Government Exhibit 3002-17 is admitted into evidence and may be shown to the jury.

         (Government's Exhibit 3002-17 received in evidence)

BY MR. REHN:

Q.   So looking at this exhibit, Special Agent DeCapua, what does the total volume of the circle represent?

A.   It represents all the deposits during the October 15th through the 26th time period of ETH into Tornado Cash.

Q.   And so if we look at all of the deposits that went into Tornado Cash during that time period, what percentage of them represent the proceeds of that KuCoin hack that you identified?

A.   61 percent.

          MR. REHN:   All right.   We can take that down.

Q.   Special Agent DeCapua, can we take a look at another example.   I'd like to ask you about the BitMart hack.

          And so if I can ask you to take a look in your binder at Government Exhibits 3002-18, 3002-19, 3002-20, 3002-21, 3002-22, 3002-23, 3002-24, 3002-25, 3002-26, 3002-27, 3002-28, and 3002-29.

          And what are those charts, generally?

A.   They're a summary of my work tracing the BitMart criminal proceeds to Tornado Cash.

          MR. REHN:   The government offers the aforementioned exhibits.

          MR. CASEY:   Subject to prior objection, your Honor.

          THE COURT:   Yes.   They are admitted.   And since Mr. Rehn was kind enough to list them, I won't relist them, but they are all admitted and may be shown to the jury.

          (Government's Exhibits 3002-18, 3002-19, 3002-20, 3002-21, 3002-22, 3002-23, 3002-24, 3002-25, 3002-26, 3002-27, 3002-28, and 3002-29 received in evidence)

MR. REHN:  So Ms. Sebade, if you could bring up Government Exhibit 3002-18.

BY MR. REHN:

Q.  Now this looks familiar, so I don't know if we need the full explanation, but if you just give us a general summary of what we're seeing here on the screen.

A.  BitMart is hacked on December 4, 2021, and multiple types of cryptocurrencies are transferred into a wallet that I labeled the BitMart Hacker Wallet 1.

Q.  And then did you subsequently trace what happened to that cryptocurrency?

A.  I did.

MR. REHN:  So could we bring up Government Exhibit 3002-9.

THE COURT:  -19?

MR. REHN:  I'm sorry. -19.

Q.  So what happened after the crypto was taken out of BitMart?

A.  So as I mentioned, lots of different types of cryptocurrencies are transferred into this wallet and then the hacker goes ahead and swaps it, kind of like what the KuCoin hacker did, and exchanges all those different types of cryptocurrencies for Ether.

Q.  All right.  And if we could go to Government Exhibit 3002-20.

What happened after that?

A.   So now some of the Ether that the hacker had just traded the other cryptocurrencies for is transferred into a second wallet controlled by the hacker, BitMart Hacker Wallet 2.  He also transfers some other cryptocurrencies aside from Ether.

Q.   Okay.  And then if we could look at Government Exhibit 3002-21.

What happened next?

A.   So again, the hacker repeats the process where all the other crypto aside from Ether is swapped for Ether and so now there's even more Ether in Hacker Wallet 2 and less of the other cryptos.

Q.   And then if we could go to Government Exhibit 3002-22.

What does that represent?

A.   And so the final hop in the chain is the hacker transferring all this ETH into Tornado Cash mixer.

Q.   And what was the value of the ETH that the hacker transferred into the Tornado mixer?

A.   It's about $88.9 million.

Q.   And if we could go to Government Exhibit 3002-23.

What does that represent?

A.   So this was an additional deposit into Tornado mixer that didn't come from BitMart Hacker Wallet 2; it actually came from BitMart Hacker Wallet 1, for some reason.

Q.   Okay.  So if we could now go to Government Exhibit 3002-24.

And as with the previous example, did you identify the

wallet, the actual wallet address for the wallet that is represented here by BitMart Hacker Wallet 2?

A.   Yes.

Q.   And is that the first set of letters and numbers in that wallet address?

A.   It is.

        MR. REHN:   And so if we could pull up Government Exhibit 1005 alongside this exhibit.   This is another exhibit that's in evidence.

Q.   And do you recall we looked at this before?   This was that letter to Tornado Cash?

A.   Yes.

        MR. REHN:   And if we could take——Ms. Sebade, if you could expand the second full paragraph of this letter.

        And if you could highlight the address that comes after the words "following digital address."

Q.   Do you see that, Special Agent DeCapua?

A.   I do.

Q.   And do you see that——if you could just read that sentence from that letter.

A.   "Between December 4, 2021 and December 5, 2021, we have identified 211 separate 100 ETH transactions and 7 separate 10 ETH transactions originating from the following digital address," and then it lists the Ethereum address 0x4bb7d and then it continues on.

Q.   And is that the same Ethereum address that you identified
in your tracing analysis?

A.   It is.

Q.   And so around the time that these funds were being
deposited into Tornado Cash, was this letter sent to the people
listed here on the letter?

A.   It was.  Few days after, but it was.

          MR. REHN:  We could bring that down.

          And is 3002-25 in evidence?

          THE COURT:  It is.

          MR. REHN:  Government Exhibit 3002-25.

          THE COURT:  Yes, it is.

          MR. REHN:  So if we could bring up Exhibit 3002-25.

BY MR. REHN:

Q.   So in addition to the proceeds we were looking at a moment
ago, did you identify some additional proceeds from the BitMart
hack that were deposited into Tornado Cash?

A.   I did.

Q.   And does this next set of charts represent those proceeds?

A.   They do.

Q.   And was there a different—did this involve a different
type of cryptocurrency?

A.   Yes.

Q.   What was the difference?

A.   So it was actually a different blockchain.  Everything that

P7H1STO6                      DeCapua - Direct

we've been looking at previously has been on the Ethereum

blockchain, but for the BitMart hack, there was funds stolen

from a different blockchain called the Binance Smart Chain

blockchain.  So now I've shifted gears from looking at the

Ethereum blockchain to the Binance blockchain for the rest of

this analysis on BitMart.

Q.  Okay.  Is there anything different about tracing using the

Binance Smart Chain versus the Ethereum smart chain?

A.  I used a different wallet explorer service.

Q.  In terms of the methods that you use, are there any

significant differences?

A.  No different.

Q.  So if we look at this, are we again seeing a flow of funds

out of BitMart on December 4th of 2021?

A.  Yes.

        MR. REHN:  Can we bring up Government Exhibit 3002-27.

Q.  And so could you explain what we're seeing on this one.

A.  So this is just, again, the general flow of stolen

cryptocurrency as it goes from BitMart to Tornado Cash.

Q.  And so was this similar to the other ones we've looked at

in terms of the swap followed by the large transfer?

A.  That's correct.  A lot of different types of

cryptocurrencies were stolen from BitMart, but then the hacker

swapped it to the main cryptocurrency of the Binance Smart

Chain blockchain, which is something abbreviated BNB.

P7H1STO6                        DeCapua - Direct

Q.   And based on your analysis did Tornado Cash also accept BNB deposits?

A.   Yes.

Q.   Could we go to the next slide, 3002-28.

And so what does this show?

A.   So this shows that the ultimate destination of the stolen BitMart cryptocurrencies on this particular blockchain goes to Tornado Cash in a series of 258 deposits on December 5, 2021. It was BNB, deposits of BNB into Tornado Cash mixer.  And the approximate U.S. dollar amount at that time was $14 million.

Q.   And if we could go to Government Exhibit 3002-29.

And what does that show?

A.   So this shows that there's additional deposits from BitMart Hacker 3, and so it shows that also on December 5th, the wallet labeled BitMart Hacker 3 sends 317 different deposits again of BNB—specifically, 31,700 BNB—to Tornado Cash, with the approximate value of $17.7 million.

MR. REHN:  And so if we could bring that down.  And if we could show the witness only what's been marked as Government Exhibit 3002-30.

Q.   And what does this represent?

A.   This represents just a very general overview of the BitMart hack, and how I traced it to Tornado Cash.

MR. REHN:  The government offers Exhibit 3002-30.

MR. CASEY:  Subject to prior objection, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT:  The objection is overruled.  Government Exhibit 3002-30 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 3002-30 received in evidence)

BY MR. REHN:

Q.  And if we bring that up.  Again, Special Agent DeCapua, if you could just summarize what we've learned from the analysis you did on the charts you've shown us.

A.  So my analysis showed that the criminal proceeds from BitMart was transferred ultimately to Tornado Cash, and particularly, there was 219 ETH deposits, 575 BNB deposits from the BitMart hacker to Tornado Cash.  The deposits occurred on December 4th and 5th.  The total ETH deposited was 21,270.  The total BNB deposited was 56,690.  And combined, they had—at the time that they were deposited into Tornado Cash, they had an approximate U.S. value of $121 million.

Q.  And so all of those deposits took place on December 4th and 5th of 2021?

A.  Yes.

MR. REHN:  Could we bring up Government Exhibit 3002-52.

THE COURT:  This is for the—excuse me.

MR. REHN:  3002-52 I believe is in evidence.

THE COURT:  Okay.  Yes.  The chart, yes.

Q.  Special Agent DeCapua, do you recall discussing this chart?

P7H1STO6                    DeCapua - Direct

A.   I do.

Q.   And do you recall you testified a moment ago about that, the largest-volume day, you noticed that one blue spike there?

A.   Yes.

Q.   Did you identify on this chart the date of all those deposits from the BitMart hack that you were just discussing?

A.   Yes, December 5th.

          MR. REHN:   And if we could show the witness only what's been marked as Government Exhibit 3002-32.

Q.   And is this that same chart with the date of the BitMart incident circled?

A.   It is.

          MR. REHN:   The government offers Government Exhibit 3002-32.

          MR. CASEY:   Subject to prior objection, your Honor.

          THE COURT:   The objection is overruled.   Government Exhibit 3002-32 is admitted into evidence and may be shown to the jury.

          (Government's Exhibit 3002-32 received in evidence)

BY MR. REHN:

Q.   So Special Agent DeCapua, that date we discussed earlier, the single highest-volume day for Tornado Cash during this time period, what date was that?

A.   It was December 5th of 2021.

Q.   And did you analyze all of the deposits that went into

P7H1STO6                      DeCapua - Direct

those Tornado Cash Ethereum contracts on that date?

A.   I did.

Q.   And did you also examine the proportion of all of those deposits that came from this one single incident?

A.   I did.

           MR. REHN:  And if we could take a look at Government Exhibit 3002-33, just for the witness for now.

Q.   And what does this represent, Special Agent DeCapua?

A.   This is the proportion of the BitMart hack proceeds that make up all the ETH deposits between December 4th and December 5th of 2021.

           MR. REHN:  The government offers Exhibit 3002-33.

           MR. CASEY:  Subject to prior objection, your Honor.

           THE COURT:  Of course.  The objection is overruled. Government Exhibit 3002-33 is admitted into evidence and may be shown to the jury.

           (Government's Exhibit 3002-33 received in evidence)

BY MR. REHN:

Q.   And Special Agent DeCapua, we looked at a version of this before, so if you could just try a summary again of the basic— what we learned from this chart in looking at it.

A.   It shows that on December 4th and 5th, 2021, that giant day, that 54 percent of the volume of ETH deposited into Tornado Cash was proceeds from the BitMart hack.

           MR. REHN:  All right.  We can bring this down.

P7H1STO6                    DeCapua - Direct

Q.  Special Agent DeCapua, I'd like to ask you about another example, and if I could ask you to look in your binder at Government Exhibits 3002-34, 3002-35, 3002-36, 3002-37, 3002-38, 3002-39, and 3002-40.

A.  I see those.

Q.  And what do these represent?

A.  Again, these are summaries of my cryptocurrency tracing for the Furucombo hack.

        MR. REHN:  The government offers Government Exhibits 3002-34 through 3002-40?

        MR. CASEY:  Subject to prior objection, your Honor.

        THE COURT:  Yes, of course.  The objection is overruled.  Government Exhibits 3002-34, -35, -36, -37, -38, -39, and -40 are admitted into evidence and may be shown to the jury.

        (Government's Exhibits 3002-34, 3002-35, 3002-36, 3002-37, 3002-38, 3002-39, 3002-40 received in evidence)

        THE COURT:  Mr. Rehn, it happens that I have a sentencing this afternoon, so I'd ask you to go for about 10 minutes more and then we'll finish for the day.  Thank you, sir.

        MR. REHN:  Yes, your Honor.  Hopefully we can make it through this one.

        THE COURT:  That is what we're aiming for, yes, sir. Thank you.

BY MR. REHN:

Q.   Special Agent DeCapua, if we could bring up Government Exhibit 3002-34, and again, we're familiar with this, but if you could explain again what this represents.

A.   Furucombo is a decentralized exchange that suffered a hack on February 27th, and this represents all the different types of cryptocurrencies that were stolen from that exchange and sent to the wallet controlled by the hacker.

Q.   And again, did you look at blockchain data relating to this incident to trace where that money went?

A.   I did.

Q.   Let's look at 3002-35.

         And what happens during this date range?

A.   So like the hacks before it, now we see the hacker swapping the various types of cryptocurrency for ETH between the time period of February 27th and March 9th of that year and then transferring, swapping the ETH into the original wallet.

Q.   And if we could look at Government Exhibit 3002-36.

         And what happened here?

A.   So now the hacker transferred the ETH into a second wallet. He transferred the ETH and then he transferred also some of the other cryptocurrencies that were stolen from Furucombo.

Q.   And if we could look at Government Exhibit 3002-37.

         What happened here?

A.   Once again, the hacker swaps some of the other crypto for

ETH.

Q.   And if we could go to Government 3002-38.

And what happens here?

A.   And ultimately the hacker, in a series of 76 deposits, sends the ETH to Tornado Cash mixer.  Specifically, there was 6,628 ETH with approximate U.S. dollar value of 15.3 million U.S. dollars.

Q.   Could we go to Government Exhibit 3002-39.

And what happened here?

A.   The Furucombo hacker also happened to make 20 deposits from Hacker 1 also to Tornado Cash.  Those 20 deposits added up to about 2,000 ETH, which had an approximate U.S. dollar value at the time of those transactions of 3.05 million U.S. dollars.

MR. REHN:  And if we could now go to Government Exhibit 3002-40.

Q.   And if you could explain what this represents.

A.   So the only thing that changed is now in the top left in and the lower right you see the wallet addresses suddenly appear, which gives you the actual address of those specific wallets.

MR. REHN:  And now let's bring up an exhibit we looked at earlier, Government Exhibit 235.  And if we could bring up alongside Government Exhibit 3002-40.

And Ms. Sebade, if you could highlight in the email the sentence, "The hacker used the Ethereum wallet as below,"

and then the two links below that.

And if you could also highlight the wallet addresses on the 3002-40.

BY MR. REHN:

Q.   Special Agent DeCapua, if we look at the Ether links, where do we see the wallet addresses on these links?

A.   So it's at the very end of the link.

Q.   So I see it says "address" and then there's a slash, and then there's a long string of letters and numbers?

A.   That's correct.

Q.   So the one on the top there begins with what?

A.   0xb624.

Q.   And is that a wallet that you identified as part of your cryptocurrency tracing?

A.   Yes, it's a Furucombo Hacker Wallet 1.

Q.   And then the next one down, if you could read the first few letters on that one.

A.   0Xfd94.

Q.   And Special Agent DeCapua, what was the date range of the deposits into Tornado mixer that you identified from these two wallets?

A.   It was between February 27th and May 22nd of 2021.

Q.   So was this email on the left sent during that date range?

A.   Yes.

MR. REHN:  We could bring that down.

And if we could show the witness what's been marked as Government Exhibit 3002-41.

Q.   Special Agent DeCapua, what is this slide?

A.   This is a summary of my analysis on the Furucombo hack.

MR. REHN:   The government offers Exhibit 3002-41.

MR. CASEY:   Subject to prior objection, your Honor.

THE COURT:   Of course.   The objection is overruled. Government Exhibit 3002-41 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 3002-41 received in evidence)

BY MR. REHN:

Q.   And Special Agent DeCapua, if you could just explain the overall results of your tracing analysis with respect to this incident.

A.   So I found that through tracing the Furucombo criminal proceeds, I found that they were sent to Tornado Cash, specifically in 96 Ether deposits that occurred between February 27th and May 22nd of 2021, for a total ETH deposited of 8,828 and a total approximate dollar value of 18.35 million U.S. dollars.

MR. REHN:   We can bring that down.

Your Honor, I can assure you we do not intend to do this much detail with all 16 incidents.   We're going to focus in particular on one more incident during Special Agent DeCapua's testimony, but it is a longer section, and so I could

P7H1STO6

begin now or this would be a good time to break.

THE COURT:  Only because I have the sentencing today, I think we should break for the day, although I do appreciate it.  I know you're ready to go forward, but I don't want to keep someone waiting.  So let us break for the day.

Ladies and gentlemen of the jury, we have made progress this week, and a lot of that is because you've been here and on time and engaged, and we thank you.

We will not see you tomorrow for reasons we have discussed.  We will see you on Monday.  Be here by 8:45.  We will begin at the crack of 9.  Have a great weekend.  Do not discuss this case with each other or with anyone else.  Keep an open mind until all of the evidence is received.  And you have our thanks for your attentiveness this week.

All right.  All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Please be seated for a moment.

Special Agent DeCapua, you're excused for the day.
Thank you so much.

Counsel, did we work out an agreement on the Rule 106
issue or still working it out?

MR. REHN:  Your Honor, with respect to the exhibit
that it was raised on——I'll wait till the witness leaves.

THE COURT:  Oh, of course.

MR. REHN:  We conferred about two exhibits during the
break.  With respect to one of them, the portion that the
defense counsel was concerned about is actually in the exhibit
we admitted.  We just hadn't displayed it during the testimony.
So it is in evidence.

With respect to the other one, they proposed an
addition.  We're going to go back and take a look at it and see
if we can agree to that, in which case we will amend the
exhibit that was introduced.

THE COURT:  I did not hear you.

MR. REHN:  If we agree to their proposed addition to
the exhibit, we will amend the exhibit that was introduced to
reflect that material, provided that we can work out an
agreement with the parties.

THE COURT:  I will hope for that.

One other thing then, please.  I still have not had a

P7H1STO6

chance to really substantively deal with the parties' letters regarding the opening and regarding Mr. Green, the expert. You have your choice. I probably need about five minutes of oral argument, maybe less, from the parties. More on the second issue than the first issue. I can do that tomorrow by phone in the afternoon or I can do that Monday morning before we begin. It's whatever——I don't think it's going to come up before Monday, so I think we can wait. But also just, I don't want you wondering all weekend. So I leave it to you all. What's convenient for you?

MR. KLEIN: Your Honor, I think it would be helpful for planning purposes, if you're talking about Dr. Green, to do that tomorrow afternoon, if it's not an inconvenience for the Court.

THE COURT: And I suggested a telephonic conference with presence waived. Is that acceptable to the government?

MR. REHN: Yes, your Honor. That's acceptable.

THE COURT: Mr. Rehn, if you want to say something else, just get it out. Go ahead.

MR. REHN: We're available at the Court's convenience. I did want to raise one issue for the Court before we break.

THE COURT: Okay. Did you say 2:30 was available? We have 2:30. Can I set this for 2:30 tomorrow?

MR. REHN: Sure. That's fine, your Honor.

THE COURT: Okay. 2:30 tomorrow we'll talk. Because

P7H1STO6

I do have a couple other matters tomorrow.

Mr. Rehn, the issue you wish to raise?

MR. REHN:  Your Honor, I just wanted to highlight that we still have not received any 26.2 materials from the defense, and I also wanted to highlight that the defense has not produced any exhibits relating to any of their proposed experts.  We, of course, produced our exhibits along with our original exhibit list for our experts.  We don't know if they intend to use anything.  They certainly haven't told us, and we would just ask for clarification on that.

THE COURT:  All right.  Mr. Klein, are you speaking to this issue?

MR. KLEIN:  Sure, your Honor.

26.2, your Honor, there may be one or two statements that we are reviewing that we may be producing tomorrow.  As for the expert——

THE COURT:  Of whom, sir?  Statements of whom, please?

MR. KLEIN:  One of the experts.

THE COURT:  I see.

MR. KLEIN:  And then for the experts, I think he's talking about, like, a PowerPoint.  We're not offering exhibits in, but if you mean the demonstrative that we would offer as an exhibit, I don't think those are——

THE COURT:  Let me ask the question this way:  The materials analogous to what I've been introducing today, is

P7H1STO6

there anything like that?

MR. KLEIN:  There will be for some of them, your Honor, definitely.

THE COURT:  Okay.

MR. KLEIN:  And when they're ready, we will produce them in advance to the government.

THE COURT:  When's that going to be, sir?  We're in the middle of trial.

MR. KLEIN:  Well, we're working with our—we are not sure who we need or want to call, and so those things aren't finalized.

THE COURT:  Okay.

MR. KLEIN:  And we will endeavor to do that, but when we know that, we will produce them in advance.

THE COURT:  Right.  For Court as well as, I mean, I—

MR. KLEIN:  Oh, of course.

THE COURT:  I care about the government, but I care more about me.  So as soon as you make those decisions, please produce them so we can have a chance to look at them.  Thank you.

MR. KLEIN:  When they're ready and if we're going to call that expert, we will produce them to your Honor and to the government.

THE COURT:  Okay.  All right.  Mr. Rehn, you have an answer.

P7H1STO6

MR. REHN:  Thank you, your Honor.

MR. KLEIN:  And then, your Honor—

THE COURT:  Sir?

(Continued on next page)

P7H5sto7

MR. KLEIN:  And then, your Honor, two things, it is kind of related.  One is the government's witnesses, it appears that they've cut some witnesses, which is great.  If they have decided not to call some of the witness -- and we talked to the government earlier today about this -- we would just like to know if there are witnesses they're no longer going to call.

THE COURT:  Right, so you can stop doing the cross preparation for them.

Are there witnesses we are not calling?

MR. REHN:  Yes, there are, your Honor.  We will tell the defense before close of business today.  I just want to confirm with the team before we commit to that, but we will them before 5:00.

THE COURT:  Again, realizing I'm not as important as either side, if you could just copy my law clerk on the e-mail as to, for example, who the next set of witnesses might be and who you might not be calling so then I'll stop looking at the 3500 material as well, that would be great.

MR. REHN:  We will inform the Court the same time as defense counsel, your Honor.

THE COURT:  Thanks so much.  So fewer than 20 then, sir?

MR. REHN:  I don't have a number in front of me but we are reducing our witness list.

THE COURT:  I understand.  Thank you.

P7H5sto7

Mr. Klein, something else?

MR. KLEIN:  No.  It is just that and knowing their witnesses, but that is going to be in the same e-mail we are all getting so that's it.

THE COURT:  That's it.  All right.

Thanks everybody.  You know where to find me.  I'm going to go sentence someone.  Thank you.

(Adjourned to July 18, 2025, at  2:30 p.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

JOCELYN REYES

Direct By Mr. Gianforti . . . . . . . . . . . 361

Cross By Ms. Axel . . . . . . . . . . . . . . 378

Redirect By Mr. Gianforti . . . . . . . . . . 407

 JEREMY HENRY

Direct By Mr. Gianforti . . . . . . . . . . . 409

 EMILINE STEWART

Direct By Mr. Arad . . . . . . . . . . . . . . 419

Cross By Mr. Patton . . . . . . . . . . . . . 434

PETER DICKERMAN

Direct By Mr. Arad . . . . . . . . . . . . . . 439

Cross By Mr. Klein . . . . . . . . . . . . . . 467

 JOEL DeCAPUA

Direct By Mr. Rehn . . . . . . . . . . . . . . 475

                        GOVERNMENT EXHIBITS

 Exhibit No.                                        Received

  902A, 902B, 902C, 902D, 902E, 902F, . . . . . 359

            902G, 902H, 902I, 902J, 902K,

            902L, 903, 910, 912, 913, 914,

            916, 918, 919, 923, 924, 3101,

            3102, 3103, 3104, 3105, 3106,

            3107, 3108, 3109, 3110, 3111,

            3112, 3113, 3114, 3115, 3116,

            3117, 3118, 3119, 3120, 3121,

            3122, 3123, 3124

 1103, 1104, 1105, 1106 . . . . . . . . . . . . 359

 PX 1A, PX 1B, PX 1C  . . . . . . . . . . . . . 418

 S2, 402, 403, 413, 414, 415, 416, 417,  . . . 438

            418, 419, 420, 421, 422, 423,

            424, 425, 426, 427, 428, 429,

            430, 431, 432, 433, 434, 435,

            436, 437, 438, 440, 441, 442

 PX 5, GX 2301  . . . . . . . . . . . . . . . . 467

 S4 and 3003-G-B  . . . . . . . . . . . . . . . 489

 2001, 2001-T, S5 . . . . . . . . . . . . . . . 530

 2007 and 2007-T  . . . . . . . . . . . . . . . 550

 3002-3, 3002-4, 3002-5, 3002-6, 3002-7, . . . 557

            3002-8, 3002-9, 3002-10,

            3002-11, 3002-12, 3002-13

                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

3002-18, 3002-19, 3002-20, 3002-21, . . . . . 573
          3002-22, 3002-23, 3002-24,
          3002-25, 3002-26, 3002-27,
          3002-28, and 3002-29

3002-34, 3002-35, 3002-36, 3002-37, . . . . . 583
          3002-38, 3002-39, 3002-40

1    . . . . . . . . . . . . . . . . . . . . . 429

2    . . . . . . . . . . . . . . . . . . . . . 428

S2, 208    . . . . . . . . . . . . . . . . . . 509

PX 3    . . . . . . . . . . . . . . . . . . . . 416

S3, 1916    . . . . . . . . . . . . . . . . . . 526

PX 4    . . . . . . . . . . . . . . . . . . . . 428

209-62    . . . . . . . . . . . . . . . . . . . 510

209-59    . . . . . . . . . . . . . . . . . . . 521

209-58    . . . . . . . . . . . . . . . . . . . 522

209-53, 209-54, 209-55    . . . . . . . . . . . 523

209-49    . . . . . . . . . . . . . . . . . . . 527

209-46    . . . . . . . . . . . . . . . . . . . 527

209-21    . . . . . . . . . . . . . . . . . . . 548

231    . . . . . . . . . . . . . . . . . . . . 512

233, 209-61    . . . . . . . . . . . . . . . . 514

235    . . . . . . . . . . . . . . . . . . . . 522

562    . . . . . . . . . . . . . . . . . . . . 547

2007-1    . . . . . . . . . . . . . . . . . . . 551

2008, 2008-T    . . . . . . . . . . . . . . . . 533

2044, 2044-T . . . . . . . . . . . . . . . 536

2044-2 . . . . . . . . . . . . . . . . . 541

2048 and 2048-T . . . . . . . . . . . . . 542

2048-1 . . . . . . . . . . . . . . . . . 544

2300 . . . . . . . . . . . . . . . . . . 445

2300-A . . . . . . . . . . . . . . . . . 462

2551 . . . . . . . . . . . . . . . . . . 414

2552 . . . . . . . . . . . . . . . . . . 415

3002-1 . . . . . . . . . . . . . . . . . 504

3002-2 . . . . . . . . . . . . . . . . . 507

3002-14 . . . . . . . . . . . . . . . . . 568

3002-52 . . . . . . . . . . . . . . . . . 569

3002-16 . . . . . . . . . . . . . . . . . 571

3002-17 . . . . . . . . . . . . . . . . . 572

3002-30 . . . . . . . . . . . . . . . . . 580

3002-32 . . . . . . . . . . . . . . . . . 581

3002-33 . . . . . . . . . . . . . . . . . 582

3002-41 . . . . . . . . . . . . . . . . . 587

3007 . . . . . . . . . . . . . . . . . . 373

3008 . . . . . . . . . . . . . . . . . . 431