P7I1STOF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                          23 Cr. 430 (KPF)

ROMAN STORM,

              Defendant.          Jury Trial
                                      Conference (Remote)
------------------------------x

                                  New York, N.Y.
                                  July 18, 2025
                                  2:35 p.m.

Before:

                  HON. KATHERINE POLK FAILLA,

                                  District Judge

                         APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  NATHAN M. REHN, ESQ.
    BEN ARAD, ESQ.
    BENJAMIN A. GIANFORTI, ESQ.
    KEVIN G. MOSLEY, ESQ.
    Assistant United States Attorneys

WAYMAKER LLP
    Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.

    -and-

HECKER FINK LLP
    Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7I1STOF

(Case called)

THE DEPUTY CLERK:  Counsel, please state your name for the record, beginning with the government.

MR. REHN:  Good afternoon, your Honor.  This is Thane Rehn for the United States, along with Benjamin Gianforti, Ben Arad, and Kevin Mosley.

THE COURT:  Good afternoon.  Thanks to all of you.

And representing Mr. Storm?

MR. KLEIN:  Good afternoon, your Honor.  Mr. Klein, Mr. Patton, and our client is on the line too.

THE COURT:  Thank you so much.

Mr. Storm, may I just acknowledge that you're on the call?

THE DEFENDANT:  Yes, your Honor, I am.

THE COURT:  Thank you for letting me know.

And Mr. Klein, I believe we discussed this yesterday, but I had an understanding that you and your client were waiving his physical, in-person presence for this, correct?

MR. KLEIN:  That is correct, your Honor.

THE COURT:  Okay.  Thanks so much, everyone.

So I know you're working on trial things, and I appreciate you interrupting your afternoon for me.  I wanted to give you a resolution of the motion that came from the government regarding certain statements made in the defense opening.  And so I had thought and I sort of hinted yesterday

P7I1STOF

that there might be a need for five or ten minutes of oral argument, but I've actually been working on this since my sentencing ended yesterday, so I think I have my answers.

And so let me do this.  I don't think I need to restate in any great detail what the government's arguments are, but suffice it to say they fall into two categories, one of which concerns references to privacy in the opening statement, and the other of which concerns what I'll call examples of high-profile incidents that were discussed during the opening.

With respect to the former, which is the references to privacy, I've gone back and I've looked at the motions *in limine*, the arguments that were made, the opposition arguments, the sort of commitments that were made, and my own decisions in that regard, and then I went and looked at the references to privacy that have occurred at the trial so far.  So as to that motion, let me just say this.  Like the defense, I understood the government's motion *in limine* to really be focused on First Amendment or constitutional principles—namely, arguments that were resolved in the motion to dismiss decision.  And I understood that Mr. Storm was not to make arguments for jury nullification based on the First Amendment or to suggest that his conduct was somehow protected by the First Amendment because those issues had been resolved.  Instead, I understood that if he testified, he would discuss his belief concerning

P7I1STOF

the importance of privacy, but once again, I understood him to be doing that without cloaking himself in the First Amendment or offering some sort of constitutional primer to the jury, which was, of course, my concern.  I didn't think the government's motion *in limine* back then, or my resolution of it, was designed to remove the word or the concept of privacy from the trial, that indeed, since I was allowing the defense to introduce evidence on the benign uses of Tornado Cash, it was all but certain that privacy would come up.  It has come up with the government witnesses, Mr. Bram and Agent DeCapua.  And so I do understand what the government's problem is.  The defense is suggesting that all it was doing in the opening was merely referring to the colloquial concept of privacy rather than to some sort of legal doctrine.  I think the government's concern—and I caught it on rereading the transcript—was that at one point Ms. Axel briefly adverted to a right to privacy when discussing privacy, before proceeding to discuss the concept in more colloquial terms.  I agree with the government that the statement came very close to the line, and I understand why they might have seen it as a violation of my rulings or of the commitments that the defense had made in their opposition papers.  And I might agree with that if only she hadn't pivoted so quickly to talk about colloquial issues.  So I am therefore cautioning the defense that while they can, and I expect they will, discuss the concept of privacy, I am

P7I1STOF

directing them to stay away from statements like the right to privacy, which have legal connotations that I don't think they're trying to get into.  So it's the word "right" that causes me concern, and I'm asking the defense not to use that construct going forward.

The other half of the government's motion is the question of high-profile examples.  There was a reference during the opening statement of the defense to high-profile examples of people being kidnapped and extorted, and I understand that these are being sourced to Dr. Green, although perhaps they're coming from other witnesses.  In resolving this motion, I went back and looked at what I had allowed of Dr. Green's testimony and then looked at the parties' arguments, and so let me speak to that issue.

In my rulings with respect to Dr. Green, I allowed testimony that was probative of Mr. Storm's state of mind and testimony about considerations of prospective investors in the cryptocurrency business.  From the defense opposition to the government's motion, I feel like two different things are being said, so I want to break them out.

To the extent that the defense is arguing that the information about these high-profile examples is necessary to bolster Dr. Green's opinion "that there was a real need for tools that enhance privacy in cryptocurrency transactions"—and that's from the proposed limiting instruction—I am

P7I1STOF

excluding that testimony on Rule 403 grounds.  There is and there will be plenty of less inflammatory evidence in the record suggesting a need for privacy in cryptocurrency transactions, and to have the witness suggest—which is what I think he is going to be suggesting—that either you have tools like Tornado Cash or your kids could be kidnapped would be unduly prejudicial and confusing to the jury.

But there is a big caveat or however here, and I want everyone to hear it carefully.  This evidence might be admissible to the extent that it is probative of Mr. Storm's *mens rea*.  This is what's suggested earlier in the defense opposition at page 2.  There's a sentence that begins, "Rather, it is simply part of his explanation as to why privacy features are important to noncriminal users of Tornado Cash.  This testimony rebuts the government's suggestion that Mr. Storm's implementation of privacy features on Tornado Cash reflects criminal intent."  Now that I think I might well agree with. So I'm not interested in bolstering Dr. Green's opinion, but if indeed this evidence would be probative of Mr. Storm's *mens rea*, I think it would be admissible under my prior decision. For example, evidence of these high-profile examples might explain why Mr. Storm developed Tornado Cash or why he acted or declined to act upon being informed that proceeds of hacks were being run through Tornado Cash, but—but—for it to be probative of Mr. Storm's state of mind, I'd need to have some

evidence that Mr. Storm was aware of it or that what I'll call a reasonable participant, an average participant in the cryptocurrency community would have been aware of it.  And that's because I thought about the testimony from Special Agent DeCapua, I believe it was yesterday, and when he was talking about individuals who are involved in the cryptocurrency space, he referred to them as highly connected individuals in terms of the different internet social media services.  He said it's a small community that requires specialized knowledge, and he said that when there was any type of incident in which an exchange gets hacked or some type of major incident affecting the community occurs, it is highly discussed on social media. Now this testimony would suggest to me that bad news of the type suggested by the high-profile examples in the defense's opening would also travel quickly and thoroughly through the cryptocurrency community.  So as a result, I would need to have some understanding, if there's going to be discussion of one of these incidents, that it was so well known either in the world or in the cryptocurrency community that Mr. Storm or someone in his position would have had to have known about it.

In addition, because I'm admitting this evidence only to the extent it is probative of Mr. Storm's state of mind, the event in question would have to predate or at least be concurrent with the conduct charged in the indictment.  And while I'm not yet interested in splitting hairs, I'm not so

P7I1STOF

sure that an event that took place in August of 2022 would be especially probative. And I say this only because I did a quick Google search on cryptocurrency kidnapping events and the only ones that I saw—but it was a very quick search—took place in 2025, which is, as you know, long after the events charged in the indictment, and therefore to me irrelevant.

And so let me say this in a little bit simpler form. To the extent I let in evidence about these high-profile events, I would need some indication from the defense that the events took place within the appropriate time period, which is before or during the period charged in the indictment, as well as something that would allow me to conclude that the event was so widely publicized that Mr. Storm or someone in his position in the crypto community would have known about it.

And so I guess, Mr. Klein, I can direct the question to you or to someone else on your team. I don't know whether you want to. I know you're quite reticent to give me actual events, sir. I suppose you could. I'd accept them. I'd welcome them. But I hope you understand my decision, which is, that it has to be in the right time frame, and I'm told these are widely known or high profile, which suggests that someone in the crypto community would have known, but I think I need to know that a little bit more. So do you want to respond, sir.

MR. KLEIN: Your Honor, I understand your ruling and—I think we understand your ruling, and we'll proceed

accordingly.

THE COURT:  Okay.  So you will instruct Dr. Green. It's coming from Dr. Green, sir, or should I expect it to come from someone else?

MR. KLEIN:  That may come from others, your Honor, to be clear, not just Dr. Green, but Dr. Green may testify about a high-profile incident within the time frame you're discussing. But now that we've heard your ruling, we have to sort of obviously figure that out and deal with that accordingly.

THE COURT:  Okay.

MR. KLEIN:  But I do understand your Honor's ruling, and we will operate within its parameters.

THE COURT:  Okay.  All right.  If it's coming from other people, I guess I'm a little confused.  I understood from your opposition that it was coming from Dr. Green, but perhaps your opposition is written as it is because the government was referring to Dr. Green.

MR. KLEIN:  That's right, your Honor.  We were responding specifically to Dr. Green.  This evidence may come in through government witnesses or it could come in through other witnesses we may call.  But I want to take into account your ruling and talk about it with the team here.

THE COURT:  Okay.

MR. KLEIN:  If I don't commit to, you know, this incident on the call, I think you understand.

P7I1STOF

THE COURT: I do understand, sir. One of the things that I'm learning working with the parties in this case is that both sides—and right now I'm talking to you—are very careful to adhere to the letter of my rulings, and sometimes I just worry that the spirit might get lost. So I hope I'm making clear to you the purposes for which I believe it can be admitted and the factual predicates that would allow its admission. And I guess we'll go from there. You understand it, and if it turns out that it's wrong, I'll strike the testimony or I'll strike the witness, and I can do that.

All right. So Mr. Klein, it sounds like you're saying that you understand and will work with your team to ensure that this decision is implemented; yes, sir?

MR. KLEIN: Absolutely, your Honor.

THE COURT: May I also understand that you'll refrain from the concept of right to privacy as opposed to just privacy and why privacy is great?

MR. KLEIN: Yes, your Honor, also to that.

THE COURT: Thank you.

Mr. Rehn, is there anything confusing about my decision?

MR. REHN: Your Honor, it isn't confusing. It does appear from the government that there should be a proffer from the defense about any such incident prior to such testimony being presented in front of the jury. I don't know that a

P7I1STOF

limiting instruction would be fully curative under those circumstances, given the way in which it appears the defense is attempting to tee up this testimony, and I do think that an actual proffer of what they're talking about is appropriate.

THE COURT:  Well, I mean, I think the proffer is that——I have a sense of the types of events they're talking about.  They have to figure out if any of them are in the time frame and if any of them were sufficiently publicized that Mr. Storm could have been aware of them.  I understand what you're saying, but I've been quite respectful of the defense's reticence, and I don't think at this point it is impermissible for them to think about these issues.  They understand, to a degree, the defense is playing with fire if they do something wrong.  I could strike the answer, I could strike the testimony.  There are all manner of curative instructions that I could give, and I do believe that those would eliminate the 403 prejudice that I've identified earlier.  So I am going to trust in the defense team and their obligations as officers of the court.  So I'm not going to require further discussion. Thank you.

All right.  I've kept you guys long enough.  I thank you very much.  I wish we didn't——

MR. KLEIN:  Your Honor, just a few quick things, and I'll be super quick about them, your Honor.

THE COURT:  Go ahead, Mr. Klein.

MR. KLEIN:  Just very, very quickly.

First of all, we are contemplating filing a very short letter motion related to Mr. Werlau's expected testimony, certain areas of it.  We're not trying to relitigate your ruling, we understand your ruling, but there are certain issues relating to potential government exhibits tied to him that we want to brief.  We would file that by noon tomorrow.  He's not testifying on Monday, just so your Honor knows.  But I want to give you a heads up on that, your Honor, because I understand you would like us to give you a heads up on these things.

THE COURT:  Yes.

MR. KLEIN:  The other one is, we've been working diligently with the government to deal with rule of completeness issues, and we've gotten rid of a lot of them and reached agreement with them.  We are trying to finalize that with them and we will be working with them over the weekend and today to finalize that, but I think we would anticipate filing something Sunday evening about it if we can't reach agreement on the remaining disputes, and I wanted to give you a heads up on that too, your Honor.

THE COURT:  Okay.  I am so informed.

MR. KLEIN:  And there is one last thing, your Honor, just so there are no surprises Monday morning.  We notified the government earlier today, and they don't object.  Mr. Patton is going to cross-examine Agent DeCapua, not Mr. Casey.

P7I1STOF

THE COURT:  They don't object?  That's interesting.  I had all my discussions with Mr. Casey.

MR. KLEIN:  I understand that, your Honor.  But they do not object.

THE COURT:  All right.  I don't think therefore it's for me to say anything about that, but may I understand that Mr. Casey, who's worked so hard on this case, will get someone else to cross?

MR. KLEIN:  Yes, he will, your Honor.  We are committed to giving the junior members of the team people to cross and we are working towards that goal, and obviously there have been some witnesses cut who we had assigned to people who are more junior members, but we are working hard to get people active roles in the case, including more junior members than Mr. Casey even.

THE COURT:  All right.  And will I ever see Ms. James?

MR. KLEIN:  You will see her, your Honor.  She was in court the other day in the gallery, but you will see her. You'll probably definitely see here at the Rule 29 hearing, your Honor.

THE COURT:  Oh.  Okay.  All right.  Let me just ask, because why not.  While I wait for this master work at noon tomorrow, what has changed with Mr. Werlau?  Has there been an additional disclosure or something?

MR. KLEIN:  Your Honor, though we got slides for him

P7I1STOF

back when the exhibits were disclosed and then you made rulings on him, and going through the slides and looking at your rulings, we think there are a few slides and central areas of testimony that cut against your rulings, and so we wanted to bring that to the Court's attention in a short letter motion. I think it will be under three pages. It will be under three pages.

THE COURT: It will be under three pages. Okay. Mr. Rehn—oh, I'm sorry. Mr. Klein? I don't wish to cut you off. Is there something else you wanted me to know?

MR. KLEIN: I have a question, but it's not related to this. And I don't know if the government wanted to respond to the Mr. Werlau comments first.

THE COURT: Yes. I guess I'd like to know, Mr. Rehn, now that I'm getting something from the defense at noon tomorrow, should I anticipate a response from the government and will you email us with a projected response time that should not exceed 24 hours?

MR. REHN: Your Honor, we will make every effort to do that. I would just ask that the defense counsel confer with the government. It may save everybody a lot of time if they just tell us, you know, if there's like a word in a slide, it may well be something we can actually agree to. So I would ask that the Court instruct the parties to confer before filing any motions on this.

P7I1STOF

THE COURT:  I mean, Mr. Klein, that's a pretty sensible thing.  I don't know.  You've had luck with the Rule 106 stuff, or at least most of it, so perhaps——do you think, Mr. Klein, that these are slides that must be excised or they can be edited?

MR. KLEIN:  Several of them can be edited.  One or two would be excised.  And I'm happy to call the government after this call and hopefully we could work things out.  We would be glad not to write a short letter motion.

THE COURT:  Well, exactly.  And I think just as a practical matter, you ought to talk to them before you talk to me.  And don't spring it on both of us at the same time.  But okay.  Thank you.  Thank you, Mr. Rehn.

All right.  Mr. Klein, there was something else you wanted me to know?

MR. KLEIN:  Yes.  One last thing, and as we're preparing for next week, it sounds like the government may rest, and I'll knock on wood here, Thursday, some point——and obviously we don't know exactly when and they don't either, and I'm not asking them to commit to a time or day, but if they do, I wanted to know the timing.  We would——we are trying to plan for our witnesses, and we need a number of witnesses to be available to start testimony right away.  And so two questions, your Honor.  We would plan to start potentially, like, if they rest Thursday morning and we know enough in advance, to start

P7I1STOF

our witnesses that afternoon.  And let's say they rest the end of the day Thursday and we know sufficiently in advance, like, we all can see it coming on Wednesday, that we would, I understand, start Friday morning and then the Rule 29 conference would be in the afternoon?  I'm just trying to plan ahead with our witnesses because we have people traveling too.

THE COURT:  Fair enough.  My suggestion of a Rule 29 conference in the afternoon was predicated on the government finishing on Friday.  If the government finishes on Thursday, seems to me we're doing the Rule 29 conference on Thursday, and depending on when that would take place, I guess that would determine whether I was sending the jurors home early for the day or not.

Mr. Klein, just because we haven't had a trial together, please understand that Rule 29 conferences to me take various forms, or in my experience have taken various forms. I've had some that are as simple as a defense counsel saying, we move for a judgment of acquittal on all grounds that we could have, and then the government says, we oppose on all grounds that we could have, and then that sort of ends it. That's not what's happening here.  I presume I'm getting a written motion from you.  But maybe I'm presuming too much.  So I obviously will need some time to read some things, or I'll need some time to have some argument.  And I just don't have a sense.

P7I1STOF

MR. KLEIN:  Your Honor, we weren't planning on a written motion at the time they rest.

THE COURT:  Okay.  That's fine.

MR. KLEIN:  We were planning on more than that 30-second conversation you mentioned with both parties.  So sometimes I've seen judges handle it differently, and obviously you'll handle it as you see fit.  Sometimes I've had judges, you know, let us make like a short argument and then say come back and then we can file briefing later with more details, depending on what happens with the case.

THE COURT:  Exactly.  I mean, sir, this wasn't a *sub silentio* request for you to give me a written submission.  I'll take the oral presentation.  I'll take the government's oral presentation.  I don't know.  You guys know better than I how long you want to make them.  And we'll make the determination there.  As to whether we tell the jury, have an extra hour for lunch or have an extra whatever, I don't know.  But, I mean, I, again, do not know, nor do you, when the government is going to rest.  We'll have to be a little bit flexible in that regard. It was not my contemplation that you would start your witnesses and then we'd take the Rule 29 out of order, and if I suggested that, please, you may have misunderstood what I was saying.  I was assuming government was resting on Friday.  This may all be academic because the government may be going fully all through Friday.  But I will be prepared to talk to you about Rule 29

once the government rests.

MR. KLEIN:  Thank you, your Honor.  I appreciate the clarification.  I was a little confused.

THE COURT:  No.  Again, I was hearing from the government that they'd finish on Friday, and I thought to myself, well, that's very convenient because the jury goes home early on Friday.  Let's do the Rule 29 afterwards.

On the issue of your readiness, you're telling me, sir, that you will have your witnesses ready and will have a greater sense as we all get more clarity as to the anticipated length of the government's remaining case in chief.

MR. KLEIN:  Yes, your Honor, we will have our witnesses ready.  That's our goal.  That's why I was, you know——we'll just see how it plays out this coming week and see how the government keeps us updated on how long they anticipate they need to finish their case.

THE COURT:  Sure.  And again, Mr. Klein, recognizing that the defense has no obligation to do anything to present a defense, it would be helpful to me if you could let me know when we begin what you think the number of days you think your case might be, because for instance, if we finish on July 31st, you know, you already know the date permutations and the issues that we have.  So I just want to be aware as well.

MR. KLEIN:  Yes, your Honor.  We understand that, and we'll keep you apprised for sure.

THE COURT:  Much appreciated.

Mr. Rehn, I don't even want to ask this question, but I'm going to ask this question.  Is there a chance of a government rebuttal case?

MR. REHN:  Yes.

THE COURT:  Okay.  Okay.  Thank you.  And the defense is aware of that now too, if they weren't aware of it beforehand.  And you'll give us a hint as to what that might look like?

MR. REHN:  I mean, it will depend, of course, on the defense case.  One thing that is hampering our ability to prepare is the issue we raised with the Court yesterday, which is, we've gotten essentially no disclosures from the defense, essentially no exhibits.  They have a witness list; they haven't given us any proffers as to what the witnesses will say, they haven't given us slides that the experts will use. There seems to be a significant number of issues to work out with those witnesses, and we request that the defense produce their exhibits for their experts in particular in very short order so that we can begin looking at them and determining whether there are objections or other issues that need to be resolved.

THE COURT:  Mr. Klein, I understood and I took a note yesterday that you were going to be producing one to two witness statements tomorrow, which is today.  Did I take down

P7I1STOF

the wrong note?

MR. KLEIN:  You're right, your Honor.  No, you did not.  And we plan to do that this afternoon.  We just wanted to get through this conference and then we're going to do that.  You are correct.

THE COURT:  Okay.  Well, we're all waiting.  Thank you.

All right.  Mr. Klein, anything else?

MR. KLEIN:  Not from the defense, your Honor.

THE COURT:  Thank you.

Mr. Rehn, anything else?

MR. REHN:  No, your Honor.

THE COURT:  All right.  I'll be watching my emails.  Take care, everyone.  Thank you.

MR. KLEIN:  Have a nice weekend.

(Adjourned to Monday, July 21, 2025, 8:45 a.m.)