P7L1STO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                     23 Cr. 430 (KPF)

ROMAN STORM,

            Defendant.          Jury Trial
------------------------------x

                          New York, N.Y.
                          July 21, 2025
                          8:55 a.m.

Before:

              HON. KATHERINE POLK FAILLA,

                         District Judge

APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  NATHAN M. REHN, ESQ.
    BEN ARAD, ESQ.
    BENJAMIN A. GIANFORTI, ESQ.
    KEVIN G. MOSLEY, ESQ.
    TARA M. LA MORTE, ESQ.
    Assistant United States Attorneys

WAYMAKER LLP
    Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
    KERI CURTIS AXEL, ESQ.
    KEVIN M. CASEY, ESQ.
    VIVIANA ANDAZOLA MARQUEZ, ESQ.

    -and-

HECKER FINK LLP
    Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
    CHRISTOPHER MOREL, ESQ.

P7L1STO1

(Trial resumed; jury not present)

THE COURT:  Ms. Noriega, is our Juror No. 2 here?

THE DEPUTY CLERK:  Yes.

THE COURT:  Okay.  Thank you.

So just to keep you updated on events, he is here. He's in a little bit of discomfort, but he is okay.  His wife is trying to set an appointment for him, and of course we've asked that she try to set an appointment at the end of our day, or at the beginning of tomorrow's trial day to make it easier, but who knows.  When we get an appointment, his wife will call my chambers, who will then advise us.

My working assumption is that the parties wanted to continue with this juror on the jury, but if as a result of the tooth issues and the uncertainty, you both decided you wanted him to be excused, that's fine too.  I just want to know because today's day is dependent in some measure on what his wife is able to achieve appointmentwise.  So have the parties discussed this issue at all?  Mr. Klein?

MR. KLEIN:  We haven't, your Honor.

THE COURT:  Okay.  Do the parties want to discuss this issue?  Or not.  I mean, you've had a chance; you've been here before I got on the bench.

MR. KLEIN:  Yes, your Honor.  It wasn't—and we didn't get to it.  We were talking about a few other things.  We would like to proceed.  Obviously, as we learn what's happening, we

P7L1STO1

may reevaluate, but for now we'd like to continue with this juror. That's the defense position.

THE COURT: Okay. Is that the government's position as well?

MR. REHN: Yes, your Honor.

THE COURT: Okay. And if that means we're ending at 1 today or 2 today to accommodate his doctor's appointment? Well, that may cause you to reevaluate your position. Of course what we don't know is what is wrong. If his doctor tells him he needs emergency root canal, we'll be revisiting everything.

Mr. Klein, I was advised by my deputy that there are other matters that the parties wanted to bring to my attention; is that correct?

MR. KLEIN: Three from the defense, your Honor.

THE COURT: Three.

MR. KLEIN: Very short ones, just to——

THE COURT: That you couldn't have included in your submissions over the weekend.

MR. KLEIN: Oh. Well, one was to say, you saw, obviously, our filing on the rule of completeness. We are continuing to work through documents. We've been getting new exhibits. There may be a few additional rule of completeness challenges. We've gotten lots of new translations, lots of new exhibits. We wanted to identify the ones we were certain of in

our filing last night.  So I just wanted to alert the Court to that.

There are two other quick issues.  One Mr. Patton is going to raise and one Ms. Axel is going to raise.

THE COURT:  Okay.

MR. PATTON:  Your Honor, we have an agreement with the government that a clause in Agent DeCapua's testimony should be stricken.  We don't think that anything needs to be said to the jury about it, but it should not be in the record.  This is the full sentence.  Early in his testimony, he said, "So initially I looked at 31 incidents, and it was narrowed down because the focus was the prosecution team said these are the 16 we are going to look at because they're the ones that we know the defendant was aware of."

THE COURT:  Yes.  There was no contemporaneous objection.

MR. PATTON:  There wasn't, your Honor.  It was in the answer.  It wasn't an objectionable question.  But in reviewing the transcript, we think that the clause "because they're the ones that we know the defendant was aware of" should be stricken.  And that's at transcript 506.  The full sentence is line 17-20.  And the government has agreed with that.

THE COURT:  Madam Reporter, can it be stricken days later?

THE REPORTER:  We don't normally take things out of

P7L1STO1

the record.  I mean, if the jury asks for the testimony, then——

THE COURT:  Right.  To Madam Reporter's point, I can grant the request, and it would seem to me that it comes into play only if the jury asks for Agent DeCapua's testimony and that one piece of it is going to be redacted out.  Is that a fair resolution of what the parties have agreed to?

MR. PATTON:  It is, your Honor.  And I don't think, as a practical matter, it will come up in other respects, but to the extent that there were arguments about, you know, the evidence in the record or other witnesses referring to what Agent DeCapua said, I mean, I can't think of the universe in ways in which it might come up.  I think your Honor has identified probably the only likely one.

THE COURT:  All right.  But you're asking me not to tell the jury to disregard it because that will only bring it to their attention.

MR. PATTON:  Correct.

THE COURT:  What you're saying is, as we talk about what to submit to the jury in response to their requests for transcripts, if indeed they want them, that we should be mindful of that.

MR. PATTON:  That's right.

THE COURT:  And the government has agreed to that.

MR. REHN:  Yes, your Honor.

THE COURT:  All right.  Okay.

And I'm sorry.  Someone else?  Ms. Axel?  Thank you so much.

MS. AXEL:  Thank you, your Honor.

This is also just a point of order, and with respect to the record as it came in.  So the government moved in records from Rho Bank.

THE COURT:  Yes.

MS. AXEL:  And Mr. Gianforti represented that we had an agreement about those.  I think he was clear, your Honor, and so I just want to make sure that the record is clear, that he was moving them in pursuant to the custodian of records certification that the Court had already said, over our objection, could be relied upon to enter the Rho documents, including emails, and so he represented that we had an agreement.  We obviously did try to work together subject to maintaining our objection to the Court's ruling.  We worked together on rule of completeness and summary issues as to what records needed to support the 1006, but we did not agree and we maintain our objection to the introduction of those records pursuant to the custodian of records certification.

THE COURT:  Just so that I'm clear, are you saying that he did not misspeak because you object to what I did, but my having done it, you've agreed to let them in through this certification, maintaining the objection?

MS. AXEL:  Yes, your Honor.

P7L1STO1

THE COURT:  Okay.  No, I understand that.  Thank you.

MS. AXEL:  Thank you.

THE COURT:  And the record will reflect that.

My deputy advises me, just to put this on your radar screens, that our Juror No. 11, Ms. Nelson, has a mom who is turning 90 on August 5th, and she was wondering if we could leave early that day.  Let's see.  We'll burn that bridge when we get to it.  But I want you to have that on your radar screens because I have that on my radar screen.

And we are at the moment just missing one juror, who is not our juror with the tooth issue.

Yes, Mr. Rehn.  Something to add to the statements on the record this morning?

MR. REHN:  I had a few things to flag as well, your Honor.

THE COURT:  Just a few.  Go ahead.

Also, my law clerk advises—and I'm sure Mr. Casey didn't mean to do this—that if he's filing something at 11:59 in the evening, he ought to send us a courtesy copy because we don't get things automatically.  So your Rule 106 letter—oh, he did.  I take that back.  There was a courtesy copy.  But it was filed at 11:59.  I will tell you I was not waiting for it. All right.  Thank you.

Mr. Rehn.

MR. REHN:  Yes, your Honor.  So a couple of matters.

First, the Court had instructed the government to obtain a certification as to the 902(11) status of the Binance records.

THE COURT:  Yes.

MR. REHN:  We obtained that certification on Friday, marked it as an exhibit, submitted it, so we would ask that the Court's ruling regarding the business records certifications also be applied to the Binance records covered by that certification.

THE COURT:  And that's over the defense objection?  Or is that one that you agreed to now that we have an actual signed certification?

MR. KLEIN:  Your Honor, it's not clear to me which Binance entity this person works for.  It just says Binance. So the issue was—and this is the issue, your Honor.  Binance US is very different from the foreign Binance.  These records are from the foreign Binance.  We objected to the foreign Binance.  So it just says Binance on the bottom of this.

MR. REHN:  Your Honor, the certification says on its face that these are domestically maintained records.  I actually consulted with the counsel for Binance on Friday about this issue, just to make sure I was comfortable representing to the Court.  That attorney happens to be a former colleague of mine for many years.  She advised me she had done her homework and confirmed two things: first, when the subpoena was

originally served on Binance in the summer of 2023, the individual who collected the records was in the United States; those records were maintained in the United States; the individual who collected those records for production were produced to us by that in the United States; and, in addition, the person signing this certification was physically in the United States, had authenticated the records again in connection with this certification, and that these are 902(11) domestically maintained records of regularly conducted business activity.  The face of the certification is clear as to those points, and so we don't think that any further certification is necessary.

THE COURT:  All right.  Then they are admitted pursuant to my prior decision and over the defense objection.  Thank you.

Something else, sir?

MR. REHN:  Yes, your Honor.  When Ms. Stewart was on the stand regarding the exhibits on the hard drive——

THE COURT:  Yes.

MR. REHN:  ——she made reference to Government Exhibits 1-9, but we only formally moved 1 and 2 into evidence.

THE COURT:  Yes.

MR. REHN:  So we would ask that we admit Government Exhibits 3-9, which are additional pictures of the T-shirt.

MR. KLEIN:  Your Honor, we need to look at those

P7L1STO1

exhibits before we——we'll spend a moment looking at them.

THE COURT:  Thank you.  And please let me know as soon as you can.  They are additional photographs, I am told.  But go ahead.  All right.  And you'll let me know during the break, sir?  Mr. Klein, during the break?

MR. KLEIN:  We'll look at them right away, your Honor.

THE COURT:  Go ahead.  Thank you.  In fact, if one of you passes the word on to my law clerk, someone from one of your team passes on the word to my law clerk that you agree with them, then I'll adopt them at the break.

Okay.  Go ahead.

MR. REHN:  We wanted to just flag for the Court one issue relating to a prior ruling in the case relating to the terms AML and KYC.  As the Court is well aware, we are not planning to elicit any discussion of those terms from our expert witness.

THE COURT:  Yes.

MR. REHN:  After his testimony, we intend to introduce, probably through a paralegal, a number of documents in which the defendant uses those or similar terms in his discussions, considering and then rejecting the idea of making changes to Tornado Cash in response to criminal activity.  We don't intend to have any discussion of what the defendant may or may not have meant by that, but we think that evidence is highly probative of the defendant's control over Tornado Cash

P7L1STO1

and his willfulness with respect to his refusal to make appropriate changes given his knowledge of the criminal activity that was going on on the platform.  It's solely coming in through words of the defendant or others sort of responding to him those terms are used.  I don't think there is any sort of formal discussion of the meanings of the regulation.  In context they appear to be more of an informal "can we do something about this" kind of conversation.  And we're not arguing any sort of regulatory implication of those terms.

THE COURT:  But are you going to mention AML or KYC? You're putting in documents that have references to either the initials or the terms, correct?

MR. REHN:  The documents say that, and typically in the defendant's own words, which is why we're flagging that for the Court.  There's sort of no way to put in this evidence of the defendant's control and intent without using the words he actually used to describe what he could have done, but we aren't going to be arguing that there was some specific regulatory obligation to do that.  It's just evidence of his intent with respect to how he operated the business.

MR. PATTON:  Your Honor, we object to that.  I haven't—the government hasn't reviewed with us the particular communications that they're talking about.  Happy to take a look at them.  But if the idea is that Mr. Storm was weighing whether or not to implement features that would comply with KYC

P7L1STO1

or AML and then decided against them, that is precisely what should not be part of the trial. So, happy to take a look at what they're proposing, but on its face, it sounds like it should not come in.

THE COURT: Mr. Rehn, I thought the whole point of our discussions and your decisions about dropping one of the 1960 prongs was that we were not going to be having discussions about Tornado Cash's obligations under certain regulations under the BSA to maintain certain types of information, and so we were talking about not mentioning any of these things. I don't know that you said to me then that we were going to be letting Mr. Storm mention these things but nobody else. I thought, for example, Mr. Werlau was going to be told not to speak about these things. In fact, that was the nature, was that not, of the discussions we were having this weekend?

MR. REHN: That's absolutely right, your Honor. And to be clear, Mr. Werlau will not be talking about those terms, and we will not introduce any of those exhibits either during his testimony, or even before his testimony, to ensure that there's no confusion with respect to that point. But one of the essential arguments in this case is the degree to which the defendant had control over Tornado Cash, so if the defendant sends a message to Roman Semenov, say, saying, should we put KYC into Tornado Cash, that's highly probative of that issue, and there's no——

P7L1STO1

THE COURT: But doesn't that go right back to the 1960 charge that you now don't want me to give the jury? I mean, I hear you, and I can't agree. I don't think this is something that you should spring on me before the jury comes out. I think you should have discussed this with the defense. And I'm having difficulty at this exact moment threading the needle as to what it is you're introducing without undoing some carefully crafted decisions that I've made previously. So I hear you. I do think you should talk to the defense. But I'm not sure that—to the extent that they start talking about knowing your customer or anti-money laundering and he's not talking about it in the colloquialism, like, wouldn't it be great if we knew our customers, or, wouldn't it be great if we did things to prevent anti-money laundering, but actually speaking about protocols that sound kind of like the regulations you don't want me to discuss, I find that problematic. You might be able to persuade me, but at the moment I find that problematic, so I'd have to hear more, sir.

MR. REHN: Certainly, your Honor. So we will confer with the defense. We'll look at the exhibits. There may be certain redactions that could be made to address this issue, but we'll talk to the defense and come back to the Court before we introduce those exhibits.

THE COURT: All right. Is there something else, sir?

MR. REHN: The only other thing is just, we are

P7L1STO1

continuing to have a couple of discussions about some stipulations, and those affect which witnesses we may need to call; in particular the OFAC stipulation that the parties have discussed with the Court previously. I think we're very close, but we're discussing those issues. And the defense also proposed a couple of stipulations over the weekend. So we're trying to work those out timely enough so that we'll have time to ensure our witness is available, if we can't reach an agreement.

THE COURT: Okay. But we still have the witnesses that you listed Thursday evening?

MR. REHN: Yes, for today.

THE COURT: Okay. I mean, I didn't think Agent DeCapua was going to take the whole day, but I haven't heard Mr. Patton's cross, so perhaps I'm wrong.

Okay. Other things, sir?

MR. REHN: Nothing further, your Honor.

THE COURT: All right. Can I just put something in counsel's minds. I don't know when we finish today because I don't know when we are going to break because of Juror No. 2, and as of a few moments ago, Juror No. 3 has still not shown up, because there is a problem on the 4 and 5 trains. They are delayed. So we hope she comes soon. That would be great. Is it possible—the answer is going to be yes, but is it possible that I could see a subset of counsel—okay, we'll start in one

P7L1STO1

moment——at the end of our trial day?  I want to talk through some things that are coming up as I'm putting together the jury charge.  So perhaps if I could have the one or two attorneys who are the law people on the teams and we could meet just to talk about some issues just so I have some clarity on some points.  Can I let you figure out who among your team would be available at the end of the day for perhaps maybe 20 to 30 minutes?  It's a yes.

MR. REHN:  Yes, your Honor.

MR. KLEIN:  Yes, your Honor.

THE COURT:  Okay.  Terrific.  Thank you.

Are we ready to go?

MR. KLEIN:  Yes, your Honor.

MR. REHN:  Yes, your Honor.

THE COURT:  Okay.  Can Agent DeCapua please——Mr. Klein?

MR. KLEIN:  Just real quick.  Can we get an order from the government today, just so we all know?

MR. REHN:  I believe it will be E.G. Galano, Ben Gibbs, William Lopez, and a paralegal summary witness.

THE COURT:  And Mr. Rehn, just before the jury comes in, is it the government's present intention to respond to the Rule 106 letter?

MR. REHN:  Your Honor, we would prefer that we attempt to work these issues out.  On reviewing it, I think some of the

P7L1STO1

exhibits are ones we had actually advised the defense we were unlikely to seek to admit, and some of them are ones we probably will agree, so there may be a much more limited set for the Court to consider.

THE COURT:  I should stop reading?

MR. REHN:  I think there will be much less disagreement than is suggested by the defense letter.

THE COURT:  All right.  I had assumed the parties had met and conferred about these issues.

MR. REHN:  We did, your Honor.  As I mentioned on Friday, we had a long and productive meet-and-confer.

THE COURT:  Long and productive, that's what I'm hearing, although the letter didn't suggest as much.  Go ahead.

MR. REHN:  Some of these were issues that the defense raised for the first time over the weekend.  We hadn't had a chance to confer.  But of course we'll attempt to meet with them as promptly as we can.

THE COURT:  Will I need to make any of these decisions before the lunch break?

MR. REHN:  I don't believe so, your Honor.

MR. KLEIN:  We don't know, your Honor, what they're going to introduce, and we did notify everybody we were going to file this on Sunday evening.

THE COURT:  Yeah, 11:59 is not——

MR. KLEIN:  We were working late, your Honor.

P7L1STO1

THE COURT:  So was I.  Thank you.  All right.

MR. REHN:  With respect to rule of completeness issues, for example, one of the exhibits is already in evidence so there's no need for the Court to even resolve.  Even if one of the exhibits were to come in now, we could always add more if the Court were to determine that was appropriate.

THE COURT:  All right.  We'll be looking at the letter, thank you, but I'm hoping over the lunch break you can work out something.

We have a dentist appointment at 1:00.  Rats.  That's a legal term, of course.

Is it still the wish of the parties to keep this juror on?

Oh, what time would he have to leave?

Okay.  The appointment would be in Harlem.  He probably needs to leave at 12:30.

MR. REHN:  Your Honor, I think in light of some of these issues we've been discussing, including the rule of completeness issues, the stipulations, and these exhibits with some of these terms, it may actually be very productive for the parties and the Court if we have the chance to have a longer meet-and-confer session this afternoon, so this may actually make sense as an opportunity to do that.

THE COURT:  Your lips to god's ear, Mr. Rehn.

Mr. Klein, do you agree?

P7L1STO1

MR. KLEIN:  One second, your Honor.

THE COURT:  Spending the afternoon trying to hash out legal issues, sir?  That's the plan.

MR. KLEIN:  Yes, your Honor.

THE COURT:  Okay.  So we're keeping him on.

MR. KLEIN:  And we're just rolling through with no lunch.

THE COURT:  We'll take the morning break if someone needs to use the restroom, but we'll end at 12:30, and—we'll end at 12:30.  Okay.  Perhaps I should tell the jury that, or Ms. Noriega can tell the jury that, or we can tell them as soon as they come out.  They're actually waiting behind the door. Are we ready to begin?

MR. KLEIN:  Yes, your Honor.

THE COURT:  All right.  Agent DeCapua, please get him on the stand, please.

Agent DeCapua, I remind you you're still under oath. And our jurors are about to come in, so please remain standing. Thank you.

(Continued on next page)

P7L1STO1                    DeCapua - Direct

(Jury present)

THE COURT:  Please be seated.  Thank you very much.

Good morning, and welcome to the second week of trial in this case.  I hope you had terrific weekends.

And just to talk a little bit about today, today is going to be a shortened day because one of our jurors has an issue that he'd like to address with a dentist.  So we understand, sir——you may not understand——you have a dentist appointment at 1 p.m. today.

JUROR:  Thank you.

THE COURT:  And so we're going to go until 12:30 and we'll just break for the day, because we don't want anyone to be in discomfort or pain at this trial.  And so we wish you a pleasant visit to the dentist, sir, inasmuch as one can have one.

So just because we're starting a lot later than any of us would like, we may just take a very brief break in the morning and then I'll let you go at 12:30.

All right.  We have Agent DeCapua.  We'll continue his direct examination.

Mr. Rehn, when you are ready, sir.

MR. REHN:  Thank you, your Honor.

JOEL DeCAPUA, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. REHN:

Q.  Good morning, Special Agent DeCapua.

A.  Good morning.

MR. REHN:  Could we please bring up Government Exhibit 3002-2.

Q.  Special Agent DeCapua, do you remember looking at this exhibit on Thursday?

A.  I do.

Q.  And could you remind us, at a high level, what this exhibit was.

A.  These are the lists of hacks or incidents that I analyzed and traced the criminal proceeds of each into Tornado Cash.

Q.  And do you recall that we looked at many of the exhibits that are listed at the bottom of this screen?

A.  I do.

MR. REHN:  I believe we may have missed one, so I'd like to ask Ms. Sebade to bring up Government Exhibit——

Q.  Actually, first, before we do that, do you see an incident listed as Rari Capital, April 30, 2022?

A.  I do.

Q.  And do you see below that the exhibit assigned to that is 2311 and 2311-T?

A.  I believe it's 2311-1.

MR. REHN:  Okay.  Could we bring up Government Exhibit 2311.

THE COURT:  For the witness only or is this in

P7L1STO1                         DeCapua - Direct

evidence, sir?

MR. REHN:  Just for the witness, your Honor.

Q.  Special Agent DeCapua, do you recognize what kind of a document this is?

A.  I do.

Q.  And could you explain what it is, please.

A.  This is a Telegram group chat.

Q.  What is the title of this group chat?

A.  DeFi.

MR. REHN:  And if we go to, Ms. Sebade, page 110.

Q.  Special Agent DeCapua, do you see if Roman Storm is in this chat?

A.  I do.  It's third from the bottom.

MR. REHN:  Your Honor, the government offers Government Exhibits 2311 and 2311-T pursuant to the Russian translation stipulation.

MR. PATTON:  You have our continuing objection, your Honor.

THE COURT:  All right.  Overruled, and the exhibits, 2311 and 2311-T, are admitted into evidence.  They may be shown to the jury.

(Government's Exhibit 2311 received in evidence)

MR. REHN:  Ms. Sebade, if you could bring down 2311 and bring up 2311-T.

Oh, I apologize, your Honor.  I realize that this one

actually doesn't have a translation.  This is just the original exhibit.

THE COURT:  It is in fact 2311-1, sir, that you're seeking to admit?

MR. REHN:  That would be the attachment, which we'll look at momentarily.

THE COURT:  Okay.  I'm not admitting then 2311-T, inasmuch as there is no translation.  You have not yet moved for the admission of 2311-1.

Go ahead, sir.

MR. REHN:  Thank you, Ms. Sebade.

First, is this visible for the Court now?

And if we could go to page 166, and if you could expand the message there.

BY MR. REHN:

Q.  Special Agent DeCapua, do you see this message?

A.  I do.

Q.  And could you read what the message is sending.

A.  So someone is sending a link to a Twitter post by Twitter user Fei Protocol.

MR. REHN:  And your Honor, we would now offer Government Exhibit 2311-1 pursuant to stipulation S3, which says that this is a link that was publicly available on April 30, 2022.

THE COURT:  Mr. Patton, to that, do you agree?

MR. PATTON:  Your Honor, that's likewise subject to our continuing objection.

THE COURT:  I see.  So you've stipulated to it being publicly available, but you object to it being admitted.

MR. PATTON:  Well, pursuant to our previous discussion, yes.

THE COURT:  I understand.

All right.  I'm overruling the objection and I am admitting Government Exhibit 2311-1, which can be shown to the jury.

(Government's Exhibit 2311-1 received in evidence)

MR. REHN:  Ms. Sebade, if you could bring up 2311-1 and expand the tweet.

BY MR. REHN:

Q.  And Special Agent DeCapua, if you could please read the tweet that was in that chat.

A.  "We are aware of an exploit on various Rari Fuse pools.  We have identified the root cause and paused all borrowing to mitigate further damage.

"To the exploiter, please accept a $10m bounty and no questions asked if you return the remaining user funds."

Q.  What was the date of this tweet?

A.  April 30, 2022.

MR. REHN:  Ms. Sebade, if we could now go back to Government Exhibit 3002-2.

Q.   Special Agent DeCapua, what was the date that you identified in your tracing analysis as tied to the Rari Capital incident?

A.   Was April 30, 2022.

Q.   Okay.  All right.  So I would now like to ask you some questions about the incident that's third from the top on the right-hand column, the Ronin Network.  Do you see that?

A.   I do.

Q.   Is that an incident that you investigated as part of your analysis?

A.   It is.

Q.   So in the witness box with you, you should have Government Exhibits 3002-42, 3002-43, 3002-44, 3002-45, 3002-48, 3002-49, and 3002-50.  Have you had a chance to review those exhibits?

A.   Yes.

Q.   What are these exhibits?

A.   These are slides created as a summary of my work tracing the Ronin hack.

         MR. REHN:  Your Honor, the government offers the aforementioned exhibits.

         THE COURT:  With a continuing objection, sir?

         MR. PATTON:  Yes, your Honor.

         THE COURT:  Thank you.

         The objection is overruled, and the Court admits Government Exhibits 3002-42, -43, -44, -45, -48, -49, and -50.

Each may be shown to the jury.  Thank you.

(Government's Exhibits 3002-42, 3002-43, 3002-44,
3002-45, 3002-48, 3002-49, 3002-50 received in evidence)

MR. REHN:  If we could bring up Government
Exhibit 3002-42 for the court.

BY MR. REHN:

Q.  Special Agent DeCapua, could you explain for us what we're
seeing on this chart.

A.  So this chart represents the initial transfer from the
victim, Ronin, into what I'm naming the Ronin Hacker Wallet.
And you'll see that on March 23, 2022, there was a large
movement of cryptocurrency, in particular 173,600 ETH, and some
other types of cryptocurrencies as well.

Q.  And Special Agent DeCapua, you have experience looking at
Ethereum transactions generally?

A.  I do.

Q.  And is that an unusually large transaction, in your
experience?

A.  It is.

MR. REHN:  I'd like to look at an exhibit we looked at
briefly on Thursday.

If we could bring up Government Exhibit 2044-T and go
to page 10.  And if we could expand the message at the bottom
of this page.

Q.  Special Agent DeCapua, do you recall looking at this on

Thursday?

A.   I do.

Q.   And if I could ask you just to read that message again.

A.   "Did you already see the $600,000,000 hack today?  Shit might seriously hit the fucking fan now."

Q.   Special Agent DeCapua, we were just looking at a slide that said there was a transfer of 173,600 ETH.  What was the approximate dollar value of that in March of 2022?

A.   So sitting here today, I don't know the exact amount, but it was a very, very large amount.

MR. REHN:  If we could now go to page 14 of 2044-T.

And Ms. Sebade, if you could move that to the side and also bring up 2044-2.

And if you could expand the central message on the left and the tweet on the right.

Q.   Special Agent DeCapua, do you recall looking at these documents on Thursday?

A.   I do.

Q.   And do you see a reference——if I could just ask you to read the larger text in the tweet on the right-hand side of the screen.

A.   "The Ronin Bridge has been exploited for 173,600 Ethereum and 25.5 million USDC.  The Ronin bridge and Katana Dex have been halted."

Q.   Special Agent DeCapua, do you recognize this transaction

P7L1STO1                    DeCapua - Direct

from your tracing analysis?

A.   I do.

Q.   And is this the transaction we were looking at on
Government Exhibit 3002-42?

A.   Yes, the initial transfer from the Ronin Bridge into the
hacker's wallet.

          MR. REHN:   All right.   We can bring that down.

          And if we could go back to Government Exhibit 3002-42.

Q.   And so this is that initial transfer we were just looking
at that was described in that tweet.

A.   That's exactly correct.

          MR. REHN:   Could we now bring up Government
Exhibit 3002-43.

Q.   Special Agent DeCapua, could you explain what, if any,
tracing analysis you did following from that initial transfer.

A.   So I wanted to ask the question where the value went after
it landed in the Ronin hacker wallet, and so I discovered that
the value was transferred to multiple intermediary wallets
between the dates of March 23, 2022, and May 19, 2022.

Q.   And did you conduct additional tracing to see what happened
to the ETH and other crypto that was transferred to those
intermediary wallets?

A.   I did.

          MR. REHN:   And if we could bring up Government
Exhibit 3002-44.

Q.  Special Agent DeCapua, could you explain what is depicted on this chart.

A.  So one of the things I found in those intermediary wallets is the Ronin hacker was swapping some of the extra cryptocurrencies and transferring them into ETH, and so this additional bubble saying crypto swap represents those swaps where additional ETH was being traded out for the other cryptocurrencies that were stolen.

Q.  And when that was traded out, was that coming back to the intermediary wallet?

A.  It was.

Q.  And in what form was it coming back to the intermediary wallets?

A.  As ETH.

        MR. REHN:  And if we could now bring up Government Exhibit 3002-45.

Q.  And Special Agent DeCapua, could you explain what we're seeing in this chart.

A.  So from those intermediary wallets I then saw a series of 1,751 transactions where the value was then sent into Tornado Cash.  This took place over a period of time from April 4th to May 19th of 2022, and it was for 175,100 ETH, with an approximate U.S. dollar value of 449 million.

Q.  Special Agent DeCapua, what was the first date that the funds from the Ronin hack were transferred into Tornado Cash?

P7L1STO1                      DeCapua - Direct

A.   April 4, 2022.

MR. REHN:  Could we bring up Government Exhibit 279.

THE COURT:  In evidence, sir?

MR. REHN:  Just for the witness.  I apologize.

THE COURT:  Thank you.

Q.   Special Agent DeCapua, just looking at this document, can you describe what it appears to be.

A.   It's an email from *The Wall Street Journal* to hello@tornado.cash.

MR. REHN:  And your Honor, the government offers Government Exhibit 279, pursuant to the business records stipulation.

MR. PATTON:  Continuing objection.

THE COURT:  All right.  You're admitting it for its truth, sir, or for its effect on the recipient?

MR. REHN:  For its effect on the recipient.

THE COURT:  All right.  This exhibit is admitted into evidence, but let me explain to you the limited purposes for which you may consider it.  You may not consider it for the truth of the contents of the statements that are made in it, but the effect that these statements might have on the person who received it.

Thank you very much.  It may be shown to the jury.

(Government's Exhibit 279 received in evidence)

MR. REHN:  Thank you, your Honor.

P7L1STO1                       DeCapua - Direct

BY MR. REHN:

Q.   Special Agent DeCapua, could you please tell us who this email was sent from.

A.   It's from David Uberti from——whose email address is david.uberti@wsj.com.

Q.   And what's the date of this email?

A.   April 4, 2022.

Q.   And could you remind us how that date relates to the tracing analysis that we were just looking at.

A.   It's the first date where value was sent from one of the hacker's wallets into Tornado Cash.

Q.   And who was this email sent to?

A.   The email address hello@tornado.cash.

Q.   And if I could ask you to read this email.

A.   "Hi Tornado.cash.  I'm a cybersecurity reporter for *The Wall Street Journal*.  I'm following the digital assets stolen from the Ronin Bridge hack that was revealed last week.

"Etherscan suggests that the attackers moved 2,001 ETH to an address this morning and subsequently have been transferring it to tornado.cash in a series of transactions.

"I was curious if you'd like to comment at all on this, as it appears that these hackers are trying to use Tornado Cash to launder stolen funds.  You say here that 'maintaining privacy and preserving financial freedom should never come at the expense of noncompliance.'  Do you see this

sort of activity in conflict with that statement at all?

"Would love to chat more.  Thanks in advance for your time.

"Dave."

MR. REHN:  And we can bring that down and go back to Government Exhibit 3002-45.

Q.  Special Agent DeCapua, for what period of time—over what period of time was the Ronin hacker depositing funds into Tornado Cash?

A.  It was from April 4th to May 19th, so a month and a half, approximately.

Q.  And was that span of time after the email that we were just looking at was sent?

A.  It was after.

Q.  And I see that there is a number of deposits.  Do you see that?

A.  I do.

Q.  How many deposits in total were made into Tornado Cash over that period?

A.  1,751 deposits.

Q.  And what was the total amount of ETH that was deposited into Tornado Cash over that time period?

A.  175,100 ETH.

Q.  So based on those numbers, what can you conclude about the nature of those deposits, in terms of the amount of each

P7L1STO1                    DeCapua - Direct

deposit?

A.   That they were 100 ETH each.

          MR. REHN:  All right.  If we could bring that down and bring up Government Exhibit 3002-48.

          Special Agent DeCapua, in your tracing analysis, did you determine any information about the wallet that was connected to the initial exploit of the Ronin network?

A.   I did.

Q.   And what did you determine?

A.   That it was sanctioned by the U.S. government on April 14, 2022.

          MR. REHN:  If we could now bring up just for the witness Government Exhibit 2047.

Q.   Special Agent DeCapua, what kind of a document is this?

A.   This is a Telegram group chat.

Q.   What's the name of this chat?

A.   Bablo Peppersec.

Q.   Is Roman Storm in this chat?

A.   He is.

          MR. REHN:  Your Honor, the government offers Government Exhibits 2047 and 2047-T.

          MR. PATTON:  Continuing objection.

          THE COURT:  Government Exhibits 2047 and 2047-T are admitted into evidence and may be shown to the jury.

          (Government's Exhibits 2047 and 2047-T received in

P7L1STO1                    DeCapua - Direct

evidence)

MR. REHN:  Can you make this now visible, Ms. Sebade. Thank you.

BY MR. REHN:

Q.  Special Agent DeCapua, do you recall that we looked at some other portions of this Telegram group chat on Thursday?

A.  I do.

Q.  And just to reorient us, what was the name of this chat?

A.  Bablo Peppersec.

Q.  Was there a group photo associated with this chat?

A.  There was.

Q.  What was the group photo?

A.  A big bag of cash with a dollar bill sign.

Q.  And who are the participants in the chat?

A.  Test_ico_bot, you have Roman Storm, with admin next to it, Tornado Monitor, Alexey Pertsev, and Roman Semenov.

MR. REHN:  And if we could now bring up Government Exhibit 2047-T, which we offer pursuant to the Russian language stipulation.

THE COURT:  2047-T has been admitted into evidence. Thank you.

MR. REHN:  Oh, thank you, your Honor.

And if we could go to page 2 of this document.  And Ms. Sebade, if you could just expand the top message on this page.

P7L1STO1                      DeCapua - Direct

BY MR. REHN:

Q.  Special Agent DeCapua, can I ask you to tell me who that message is sent by?

A.  Sent by Roman Storm.

Q.  And what was the date of this message?

A.  April 14, 2022.

Q.  And what is being sent in this message?

A.  There's a Twitter link from a user called web3isgreat, and then there is a message after the Twitter link.

Q.  And what does that message read?

A.  "Guys, we are fucking done for."

Q.  Special Agent DeCapua, do you see in the message there's something that says Telegram cloud photo size?

A.  I do.

Q.  What does that indicate to you?

A.  It indicates that—it's a link to something.

        MR. REHN:  And if we can bring up just for the witness Government Exhibit 2047-1.

Q.  Special Agent DeCapua, what does this appear to be?

A.  This is an article that was written about the Ronin hack.

Q.  Does this appear to be the thing that was linked to in that message we were just looking at?

A.  Yes.

        MR. REHN:  Your Honor, the government offers Government Exhibit 2047-1.

MR. PATTON:  Continuing objection.

THE COURT:  All right.  The exhibit is admitted over the defense's objection.  2047-1 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2047-1 received in evidence)

BY MR. REHN:

Q.  Special Agent DeCapua, what is the date on this article?

A.  April 14, 2022.

Q.  And if I could ask you to read the title of this article.

A.  "FBI links Axie Infinity hack to North Korean Lazarus hacking group."

Q.  And Special Agent DeCapua, if I could just ask you to read the article for us.

A.  "According to the FBI, infamous cybercrime group Lazarus was behind the March Axie Infinity exploit that saw $625 million taken from the game's blockchain bridge.  Lazarus are a criminal group with strong ties to North Korea, and are suspected of being behind infamous cyberattacks including the WannaCry ransomware that impacted a wide number of industries including hospitals and manufacturing, as well as legislative and justice systems.  The U.S. Treasury Department has added the crypto wallet that received the stolen funds to its sanctions list, which may make it substantially harder for the attackers to withdraw the money.  The wallet still contains around 150,000 ETH, valued at around $445 million, but has been

slowly siphoning it out to various other wallets, exchanges, and tumblers over the past weeks."

And then there are some links.

MR. REHN:  Ms. Sebade, if we can bring that down and go back to Government Exhibit 2047-T.

And go to that message we were looking at.

Q.  Special Agent DeCapua, who sent this article in this chat?

A.  Roman Storm.

MR. REHN:  If we could now go to page 6 of this document.  And if we could expand the middle two messages.

Q.  Special Agent DeCapua, what is the date on these messages?

A.  April 15, 2022.

Q.  So are these the following day?

A.  That's correct.

Q.  I ask you to read the first message.

A.  "A guy got five years of prison for sanctions."

Q.  Who sent that message?

A.  Roman Storm.

Q.  And is there a message that was sent a few minutes later?

A.  Yes.

Q.  Who sent that message?

A.  Roman Storm.

Q.  Special Agent DeCapua, could I ask you to describe what that second message is.

A.  It's a link to a tweet by someone named Mike Burgersburg.

Q.  And is there some text sort of what that tweet said underneath?

A.  There is.

MR. REHN:  Your Honor, I'd now ask to bring up just for the witness Government Exhibit 2047-4.

Q.  Special Agent DeCapua, does this appear to be that tweet that you were just looking at?

A.  Yes.

MR. REHN:  And your Honor, the government offers this pursuant to the stipulation regarding publicly available records.

THE COURT:  Mr. Patton, is there still an objection?

MR. PATTON:  There is, your Honor.

THE COURT:  All right.  Thank you.

This is admitted over the defense objection. Government Exhibit 2047-4 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2047-4 received in evidence)

BY MR. REHN:

Q.  Special Agent DeCapua, if I could ask you to read this tweet that Roman Storm sent on April 15th of 2022.

A.  "@TornadoCash laundered 26,300 Ether ($72.9 million) for the North Korean government over the last two weeks.  Every holder of $TORN is an accomplice to violating sanctions.  All Ether held in or withdrawn from @TornadoCash wallets is

sanctionable."  And it says "1/n."

MR. REHN:  If we could bring that down and go back to Government Exhibit 2047-T at page 6.

And if we could expand that message we were just looking at and then the next message down, Ms. Sebade.

Q.  Special Agent DeCapua, after Roman Storm sent that tweet, did he send another message?

A.  Yes, a couple seconds later.

Q.  Could you please read that message.

A.  "Shit!"

MR. REHN:  We can bring that down.

And now we can go to——just for the witness, if we could show Government Exhibit 2062.

Q.  Special Agent DeCapua, what does this document appear to be?

A.  Again, this is a Telegram group chat.

Q.  Was this in that same Bablo Peppersec chat we've been discussing?

A.  It is.

Q.  And is Roman Storm in this chat as well?

A.  He is.

MR. REHN:  Your Honor, government offers Government Exhibit 2062 and also 2062-T pursuant to the Russian language stipulation.

MR. PATTON:  Continuing objection.

P7L1STO1                    DeCapua - Direct

THE COURT:  Government Exhibits 2062 and 2062-T are admitted into evidence over the defense objection and may be shown to the jury.

(Government's Exhibits 2062 and 2062-T received in evidence)

MR. REHN:  Ms. Sebade, if we could now bring up Government Exhibit 2062-T.

And if we could go to page 2.  And if I could ask you to expand the third message on this page.

BY MR. REHN:

Q.  Special Agent DeCapua, do you see a message on the screen?

A.  I do.

Q.  Could you please give me the date of that message.

A.  April 15, 2022.

Q.  Is that the same date as the earlier messages we were looking at?

A.  It is.

Q.  And who is this message sent by?

A.  Roman Semenov.

Q.  Could I ask you to read that message.

A.  "Regarding Telegram chats, we also have to bear in mind that law enforcement is reading them too and can use them against us later."

MR. REHN:  And we can now go to page 5 of this exhibit.

And if you could expand the bottom message on this page.

Q.   Special Agent DeCapua, did anybody reply to that message we were just looking at?

A.   Yes.

Q.   Who replied to that message?

A.   Roman Storm.

Q.   And when did he reply?

A.   April 15, 2022, several hours later.

Q.   Special Agent DeCapua, can I ask you to read how Roman Storm replied to that message.

A.   "Cleaned it up."

MR. REHN:   All right.   If we can bring that down.

And if we could go back to Government Exhibit 3002-48.

Q.   So Special Agent DeCapua, we were talking about this slide earlier, and is this wallet that's labeled Ronin Hacker Wallet, is that the wallet that was sanctioned on that date, April 14th?

A.   It is.

Q.   And earlier we looked at some tracing analysis from that crypto from the Ronin network.   Did you also break down your tracing analysis to look if any of those deposits were made after those sanctions were imposed?

A.   I did.

MR. REHN:   Could we look at Government

Exhibit 3002-49.

Q. Special Agent DeCapua, based on your tracing analysis, what, if anything, did you learn?

A. That after sanctions, still a large amount of Ether was sent to the Tornado Cash mixer.

Q. Approximately how many deposits were made following the announcement of sanctions on that wallet?

A. 1,442 deposits.

Q. And approximately how much ETH was deposited into Tornado Cash after the announcement of sanctions on that wallet?

A. 144,200 ETH.

Q. And based on those numbers, what can you determine about the amount of each of those deposits?

A. 100-ETH increments.

Q. Special Agent DeCapua, did you analyze what the dollar value was at the time of those deposits that were made after the announcement of those sanctions?

A. I did.

Q. What was the dollar value?

A. Approximately 351 million U.S. dollars.

Q. And did you look at the date range over which those deposits were made?

A. I did.

Q. And what was that date range?

A. It was between April 22nd of 2022 and May 19th of 2022.

Q.   And approximately how long of a time period is that?

A.   Less than a month.

Q.   So over that time period of a little less than a month, did you calculate approximately how many deposits per day on average were being made?

A.   I did.

Q.   And what was that?

A.   About 50 deposits per day.

Q.   And so do those all represent deposits that were made originating in that wallet labeled here as Ronin Hacker Wallet after the announcement of sanctions?

A.   Yes.

          MR. REHN:  We can bring that down.

          Could we now bring up Government 3002-50.

Q.   Special Agent DeCapua, did you examine what percentage of overall Tornado Cash deposits during that time period originated from that Ronin hacking incident?

A.   I did.

Q.   And could you explain for us what you learned from that analysis.

A.   That during that time period, about 55 percent of all the deposits into Tornado Cash were from the Ronin hack.

Q.   And that's over a period of almost one month?

A.   That is correct.

Q.   Is that what's depicted on Government Exhibit 3002-50?

A.  It is.

MR. REHN:  We can bring that down.

Q.  Special Agent DeCapua, I'd like to now show you something we looked at on Thursday, Government Exhibit 3002-51.

MR. REHN:  Oh, I think that is actually not in yet. Sorry.  I'll do that first.

Was that one admitted earlier?

THE COURT:  I don't believe so.

Q.  Special Agent DeCapua——

MR. REHN:  If we could show just the witness Government Exhibit 3002-51.

Q.  Do you recognize this?

A.  I do.

Q.  And what is this?

A.  This is my final tabulation of all the various hacks and exploits that I looked at and the total dollar amount value of criminal proceeds from those incidents that ended up at Tornado Cash.

Q.  Does this summarize all that blockchain transactional data you were describing over the last bit of your testimony?

A.  It does.

MR. REHN:  The government offers Government Exhibit 3002-51.

MR. PATTON:  Continuing objection.

THE COURT:  The objection is overruled.  The Court

admits Government Exhibit 3002-51.  It may be shown to the jury.

(Government's Exhibit 3002-51 received in evidence)

BY MR. REHN:

Q.  And Special Agent DeCapua, how many incidents are listed on this chart?

A.  16.

Q.  Are those the same 16 incidents that we've discussed before?

A.  They are.

Q.  And did you tabulate the total amount that you were able to attribute to those 16 incidents that was deposited into Tornado Cash?

A.  I did.

Q.  And what was that total amount?

A.  A little more than 1 billion U.S. dollars.

Q.  And I think you talked about this on Thursday, but just to remind me, is that the total amount of all criminal proceeds that were deposited into Tornado Cash?

A.  No.

Q.  Were there criteria you used to exclude incidents from your analysis?

A.  Yes.

Q.  So would the true number be higher than this or lower than this?

A.   Higher.

MR. REHN:  We can bring that down.

And now I will ask to show you something which I believe is in evidence, Government Exhibit 3002-52.

Q.   Special Agent DeCapua, do you recall looking at this chart on Thursday?

A.   I do.

Q.   And could you just remind us what this chart is.

A.   These blue lines represent the daily volume of Tornado Cash, Ethereum, ETH contracts.  The days where there's a very tall blue line, that means that Tornado Cash received a lot of ETH that day; on days with a smaller blue line, that means that's a day where there was a little less business for Tornado Cash.

Q.   Does this span approximately two years?

A.   It does.

Q.   And so each of those lines references a day, so approximately how many lines are on the chart?

A.   I would have to do the full calculation, but it's going to be over 600.

Q.   Special Agent DeCapua, just looking at the chart, do you observe anything about sort of the nature of the deposit flow? Would you describe it as a smooth flow or as having peaks and valleys?

A.   It has peaks and valleys.

P7L1STO1                        DeCapua - Direct

Q.   And when we see some of these taller blue lines, do those represent individual days?

A.   They do.

Q.   And I believe we looked on Thursday at the single biggest day in this chart.  Do you recall that?

A.   I do.

Q.   And could you remind us if you were able to identify one of the incidents you traced that was associated with that day.

A.   I was.

Q.   And which incident was that?

A.   It was the BitMart hack.

Q.   So let's take a look at whether—were you able to also identify whether other incidents aligned with any of the large days on this chart?

A.   I was.

          MR. REHN:  So I'd first ask to show the witness Government Exhibit 3002-53.

Q.   And actually, if you have the charts there with you, Special Agent DeCapua, could I just ask you to look at charts 3002-52, 3002-53, 3002-54, 3002-55, 3002-56, 3002-57, 3002-58, and 3002-59.

A.   Okay.

Q.   And Special Agent DeCapua, can you just describe what these charts represent.

A.   They are summaries of my work tracing the volume of Tornado

Cash ETH flows during this time period and then tracing the criminal proceeds from different hacks into Tornado Cash.

MR. REHN:  Your Honor, the government offers the aforementioned exhibits.

MR. PATTON:  Continuing objection.

THE COURT:  All right.  Government Exhibits 3002-53, 3002-54, 3002-55, 3002-56, 3002-57, 3002-58, and 3002-59 are admitted into evidence over the defense objection.  They may all be shown to the jury.

(Government's Exhibits 3002-53, 3002-54, 3002-55, 3002-56, 3002-57, 3002-58, and 3002-59 received in evidence)

MR. REHN:  So if we could first bring up Government Exhibit 3002-53.

BY MR. REHN:

Q.  And Special Agent DeCapua, I believe we looked at this date range on Thursday, but could you just remind us what date range is marked out on 3002-53.

A.  It's between September 1st of 2020 and August 8th of 2022.

Q.  For the whole chart?

A.  For the whole chart, yes.

Q.  And is this a version of the chart that we were looking at just a moment ago?

A.  It is.

Q.  What information has been added to this particular chart?

A.  There's a little arrow in a box pointing to the days that

the KuCoin criminal proceeds were being sent to Tornado Cash.

Q.   And I believe you testified about this on Thursday.  Do you recall that testimony?

A.   I do.

Q.   Could you just remind us what you observed about the volume on that date range as opposed to earlier date ranges.

A.   Well, on that specific date range is the highest volume that Tornado Cash had ever seen.  You can see just in the bars how much business doubled during that——the time that the KuCoin hackers were sending their——their ETH to Tornado Cash.

MR. REHN:  Okay.  Could we bring up Government Exhibit 3002-54.

Q.   And I think we talked about this on Thursday.  Could you just remind us what you observed about that highest-volume day.

A.   This is that——that day, December 5th, where the BitMart hackers sent all of their stolen ETH into Tornado Cash, and it was by far the highest-volume day that Tornado Cash had ever seen.

MR. REHN:  Could we bring up Government Exhibit 3002-55.

Q.   Was there anything about your tracing analysis that connected to April 2nd of 2022?

A.   Yes.  For the——for the incidents that happened at Vee Finance and Inverse Finance, April 2nd was the day that——that those hackers sent the value into Tornado Cash, and that's

represented by that tall blue line.

MR. REHN:  Could we bring up Government Exhibit 3002-56.

Q.  What date range is indicated here?

A.  So this is between April 4th and May 19, 2022, and if you recall, the Ronin hackers, they spread out the amount of time that they took to send their stolen ETH into Tornado Cash, and so this entire area right here that's indicated between these two arrows represents that period of time.

Q.  And do you notice anything about sort of the average daily volume during that period as opposed to other periods?

A.  Yes.  So just compared to the daily volume in the preceding couple weeks and the—and the couple weeks coming afterwards, you can see that there's a—there's much higher volume during the time period that the Ronin hacker was sending value to Tornado Cash.

MR. REHN:  Could we please bring up Government Exhibit 3002-57.

Q.  Special Agent DeCapua, are we now indicating the second highest blue line on this chart?

A.  We are.

Q.  Did that connect to any of the incidents you traced?

A.  Yes.

Q.  And could you remind us what incident was associated with the deposits made on that date.

P7L1STO1                        DeCapua - Direct

A.   It was the Beanstalk incident.

          MR. REHN:   And if we could now bring up Government Exhibit 3002-58.

Q.   Are there two additional dates indicated on this chart, Special Agent DeCapua?

A.   There are.

Q.   And did you identify deposits traced to any of the incidents you traced on those dates?

A.   I did.

Q.   And what incident was connected with deposits on those dates?

A.   This is the Rari Capital incident that occurred in 2022, the—it was sent to Tornado Cash in two separate days, and so that's why there's the double peak.

Q.   And do you notice anything about those days as compared to the general volume of Tornado Cash?

A.   They're high-volume days.

          (Continued on next page)

P7L5sto2                      DeCapua - Direct

MR. REHN:  Can we now bring up Government Exhibit 3002-59?

Q.  Special Agent DeCapua, what's identified on this chart?

A.  This is the handful of days that the Harmony hacker was sending the stolen ETH into Tornado Cash.

Q.  So for this particular incident was it a range of dates as opposed to a single date where the deposits were made?

A.  Range of days.

Q.  What do you notice about the range of days associated with those deposits from the Harmony hack?

A.  Again, compared to the preceding time period and the time period coming after, it is some of the highest volume days that Tornado Cash had during that time period.

Q.  So, based on the analysis that you did of the overall Tornado Cash volume, did you draw any conclusions about, any associations between volume and some of the incidents you traced?

A.  The conclusion I drew is whenever one of the hackers that was responsible for one of the incidents that I was looking at, whenever they transferred cryptocurrency into Tornado Cash, that was always a banner day for Tornado Cash, the volume was extremely high that day as compared to all the other days.

Q.  Special Agent DeCapua, do you also look at the overall volume of deposits into Tornado Cash over particular periods of time as compared to the criminal proceeds that you traced?

P7L5sto2                         DeCapua - Direct

A.  I did.

MR. REHN:  If we could show the witness what's been marked for identification purposes as Government Exhibit 3002-60?

THE COURT:  60, sir?

MR. REHN:  Yes, your Honor.

THE COURT:  Thank you.

Q.  So Special Agent DeCapua, what does this chart represent?

A.  This represents for all of the ETH that was deposited into the Tornado Cash contracts between the specified time period at the top of the page, this shows what proportion of those, of the total were actually tied to identified criminal proceeds for the 16 incidents that I analyzed.

MR. REHN:  Your Honor, the government offers Government Exhibit 3002-60.

MR. PATTON:  Continuing objection.

THE COURT:  Government Exhibit 3002-60 is admitted into evidence, over defense objection, and may be shown to the jury.

(Government's Exhibit 3002-60 received in evidence)

BY MR. REHN:

Q.  Special Agent DeCapua, over the time period of February 25 to August 8, 2022, what percentage of Tornado Cash deposits were traceable to the criminal incidents that you analyzed?

A.  37 percent.

Q.  Now, does that represent -- does that mean that everything that is on the blue side is not a criminal deposit?

A.  No.

Q.  What can we say about what is on the blue side of the chart?

A.  We don't know where those proceeds came from.

Q.  What can we say about what is on the gray side of the chart?

A.  Those resolve to the 16 incidents that I specifically looked at.

Q.  So just those 16 incidents represented 37 percent of all Tornado Cash volumes over this time period?

A.  That's correct.

Q.  Special Agent DeCapua, did you also look at a narrower time range within this time period?

A.  I did.

        MR. REHN:  If we could show the witness what's been marked Government Exhibit 3002-61?

Q.  What time range did you analyze for the purposes of this chart?

A.  April 2 to July 2 of 2022.

Q.  So, is that an approximately three-month time period?

A.  That's correct.

        MR. REHN:  The government offers Government Exhibit 3002-61.

P7L5sto2                        DeCapua - Cross

MR. PATTON:  Continuing objection.

THE COURT:  Government Exhibit 3002-61 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 3002-61 received in evidence)

BY MR. REHN:

Q.  Special Agent DeCapua, over the three months between April 2 and July 2 of 2022, focusing just on the 16 incidents you have described in your testimony, what percentage of Tornado Cash deposits were attributable to these 16 incidents?

A.  About 50 percent.

MR. REHN:  Nothing further, your Honor.

THE COURT:  Thank you.

Mr. Patton, cross?

MR. PATTON:  Yes, your Honor.

CROSS-EXAMINATION

BY MR. PATTON:

Q.  Good morning, Agent DeCapua.

A.  Good morning.

Q.  You testified last week, I believe, that you have been investigating crypto since before people used the word crypto; right?

A.  I think I would say it was before cryptocurrencies were actually invented.

Q.  You talked about something called E-gold?

A.  I would call that a virtual currency and not a crypto.

P7L5sto2                          DeCapua - Cross

Q.   For about the past 15 years you have been an investigator
with the FBI; right?

A.   That's correct.

Q.   And a decent portion of that time has been focused on cyber
and crypto; right?

A.   That's correct.

Q.   Fair to say you are one of the most knowledgeable FBI
agents when it comes to cyber and crypto?

A.   I wouldn't -- I wouldn't put it that way.  There is very
knowledgeable people within the FBI on both cryptocurrencies
and cybercrime.

Q.   And you are one of the most knowledgeable; correct?

A.   Some people would say that, I suppose.

Q.   Crimes involving crypto come in all shapes and sizes;
right?

A.   That's correct.

Q.   You have talked a lot about hacking incidents here in
court; right?

A.   Yes.

Q.   That's one big category of crimes involving crypto; right?

A.   It is.

Q.   Frauds and scams is another category; right?

A.   Yes.

Q.   There is something called ransomware is another big
category; right?

P7L5sto2                       DeCapua - Cross

A.   Yes.

Q.   What is ransomware?  Sorry.

A.   So, ransomware --

          MR. REHN:  Objection, your Honor.  Beyond the scope.

          THE COURT:  I will allow the one question, but
counsel, really we ought to move to the substance of his
direct.

          Go ahead.

          MR. PATTON:  Your Honor --

          THE WITNESS:  So, ransomware is a type of cybercrime
where a hacker will take over a computer network and render it
inoperable, and then they would say to the victim if you want
to get your computer systems back, you have to pay me a ransom,
which is almost always in some form of cryptocurrency.  So
really it is just a -- it is like a ransom just using high-tech
means.

          MR. PATTON:  Your Honor, if I may, I just have one
more on this line.

          THE COURT:  You can ask it.  I'm not sure I will allow
it.

          MR. PATTON:  OK.

BY MR. PATTON:

Q.   So the crimes that you were talking about there are
involving people going online, typically, but they're also
crimes involving crypto that happen in person; correct?

P7L5sto2                    DeCapua - Cross

MR. REHN:  Objection, your Honor.

THE COURT:  I will allow.

Yes or no?

MR. PATTON:  Your Honor, may I offer an example?

THE WITNESS:  I am trying to think.  In-person crimes involving crypto.

BY MR. PATTON:

Q.  So, for instance, somebody might have their private key or pass code robbed or stolen from them; correct?

THE COURT:  I will let you answer that.

THE WITNESS:  Hypothetically?  That could happen.  I haven't been involved in any of those types of investigations.

THE COURT:  Then let's please move on.

BY MR. PATTON:

Q.  You are aware -- you have talked a lot about the blockchain tracing tools that you have used in your investigation; right?

A.  Yes.

Q.  One thing is called Etherscan; right?

A.  That's correct.

Q.  And this is a publicly available resource to follow where transactions go on the blockchain; right?

A.  It is.

Q.  It is something you use; right?

A.  That's correct.

Q.  It is something people in private industry use; correct?

P7L5sto2                        DeCapua - Cross

A.   I believe so, yes.

Q.   It can also be used by criminals; correct?

A.   It could.

Q.   They can identify where big wallets might exist; correct?

A.   So I'm just thinking about my use of Etherscan and my understanding of it, and I don't think there is a way to just ask the question:  Show me where big wallets exist.

Q.   I wasn't suggesting that, Agent.  My apologies if that was confusing.

        People, both for non-criminal purposes and criminal purposes can use publicly available tools to see how much money, how much crypto is in someone's wallet and transfers in and out of those wallets; correct?

        MR. REHN:  Objection.

        THE COURT:  I will allow.

A.   Yes.

Q.   And you mentioned in your testimony last week that some of the crypto that was stolen in some of the hacks you testified is still sitting in certain wallets out there; right?

A.   That's correct.

Q.   Sometimes a significant amount; correct?

A.   Yes.

Q.   Can you explain for us, if it is known where the crypto is sitting, in what wallet address the crypto is sitting in why can't law enforcement or, say, the victim of the hack just go

get it?

A.   Because in order to transfer the cryptocurrency from any specific address you would need custody of the private key which is something that, in general, is going to be kept in whoever the owner of the address is, in their phone or computer or whatever wallet software that they use.

Q.   So without that private key you just can't get into the wallet; correct?

A.   Correct.

Q.   And that is also why you sometimes are aware that some people who've, say, forgotten their private key, there are well known stories of people who can't access their own money; right?

A.   Yes.

Q.   When you were doing some of the flowcharts for some of the specific hacks you looked at do you recall that in some of those charts you had arrows going to, I believe you called them, multiple intermediary wallets?  Do you remember those graphics?

A.   I do.

Q.   What types, just generally speaking, what types of wallets are those, those intermediary wallets?

A.   Types of wallets?

Q.   Well, there are different types of wallets; correct?

A.   When I think of types of wallets I'm thinking there is

P7L5sto2                        DeCapua - Cross

paper wallets, there is wallets that are -- there is different

types of wallet software that you can use.

Q.  So maybe we will start at a very basic level.  I'm not

trying to get too in the weeds on the tech but, for instance,

there are wallets in real life like actual hardware wallets;

right?  That's one type of wallet; right?

A.  That's correct.

Q.  Sometimes those are called ledger wallets?

A.  That is one type of hardware wallet.

Q.  Often times they're referred to colloquially as cold

wallets; right?

A.  Sometimes colloquially.

Q.  And there are wallets that are maintained online; correct?

A.  Correct.

Q.  And the multiple intermediary wallets, let's just start at

a basic level, what sort of wallets are we talking about there?

A.  Those are going to be wallets that are stored online.

Q.  And how -- maybe this is obvious, but how easy is it to

just create those wallets?

A.  Very easy.

Q.  Fair to say one can create many of those wallets in a very

short period of time?

A.  Yes.  To be a little specific with the language, within a

wallet you can easily create additional addresses.

Q.  And you use "wallet" as sort of a colloquial term for

what's an account; right?

A.   I would say address.   But I would think of it as like a bank account, yes.

Q.   And there is a public-facing address; right?

A.   Address, yes.

Q.   Which is how, you know, if you wanted to tell somebody where to send me crypto, you would give them that public-facing address; right?

A.   That's correct.

Q.   As opposed to the private key which only you have and which is the only way to access the wallet; right?

A.   That's correct.

Q.   And you testified that one -- there are various things you look for to sort of suss out whether or not a hack has occurred, various blockchain data in addition to other data?

A.   That's correct.

Q.   And one is that if there has been a big drain out of a location and then quick disbursing into multiple wallets, that's a sign of a hack; right?

A.   Correct.

Q.   And hackers can move proceeds, as we have seen from some of your flowcharts, to many different wallets very quickly; right?

A.   Yes.

Q.   And this can create sort of -- I will use a very technical term -- this can be a little bit of a game of Whac-A-Mole?

P7L5sto2                          DeCapua - Cross

A.   A little bit, yes.

Q.   You can look one day at where proceeds are held in a wallet and the next day they might be in five different wallets; right?

A.   That's correct.

Q.   Over the weekend the prosecutors here gave you some transcripts of witnesses who testified here at the trial to review; right?

A.   Yes.

Q.   They gave you a copy of Joe Evans' testimony?

A.   I don't remember the name of that individual.  I believe he was the attorney that represented BitMart.

Q.   Exactly.

        And they gave you the testimony of a gentleman named Andy Ho.  Do you recall that?

A.   I do.

Q.   And he is an executive at a company called Sky Mavis?

A.   Yes.

Q.   And they operate a gaming program called Axie Infinity?

A.   I don't know if they still operate it but I think he testified that they did operate it.

Q.   They did at the time of the Ronin hack; right?

A.   That's exactly right.

Q.   And they also developed the Ronin Network; correct?

A.   That's correct.

P7L5sto2                    DeCapua - Cross

Q.  So, Mr. Evans was the attorney for BitMart, which was one of the victims of the hack that you have talked about; right?

A.  Yes.

Q.  That you say traced some of the proceeds of that were traced into Tornado Cash; right?

A.  Yes.

Q.  And same thing with Ronin, you have just gone over that this morning; right?

A.  Yes.

Q.  Agent, did the prosecutors share with you the transcript of the very first witness they called, a woman named Henfeng Lin who said she was scammed and sent money to a place called NTU Capital?

A.  No.

Q.  Are you aware, Agent DeCapua, that the money that Ms. Lin talked about being scammed out of, never actually went to Tornado Cash?

        MR. REHN:  Objection, your Honor.

        THE COURT:  You are either aware or not, sir.

        THE WITNESS:  Not aware.

BY MR. PATTON:

Q.  Did you trace that, the money from NTU Capital or Ms. Lin's scammed money?

A.  I did not.

Q.  And you didn't -- you weren't asked by these prosecutors to

P7L5sto2                    DeCapua - Cross

trace that money; right?

A.  I was asked to trace all the money if it met that threshold of $5 million within a specific time frame, etc.

Q.  Are you aware that NTU Capital has been accused by the government of running roughly a hundred million worth of crypto scams?

A.  No.

Q.  The various charts and graphs and things that you have gone over, who made the decision about what to share with the jury?

A.  The prosecutors.

Q.  You testified last week, I think, that the prosecutors came to you and said we want you to take a look at these particular hacks and trace them; right?

A.  So it started out just in general to look at all the incidents and then the prosecution team gave me --

THE COURT:  One moment, please.

Counsel, we had discussions about this this morning. Are you ready for the answer?

MR. PATTON:  Absolutely, your Honor.  I mean, I'm happy to discuss this at side bar.

THE COURT:  No, no.  I will let him answer.

Please answer the question, sir.  Thank you.

THE WITNESS:  The prosecution team gave me a list of incidents that they had identified and said look into these, and then anything else you can find where the proceeds were

transferred into Tornado Cash.  And then, as the months went by and trial came closer and closer, then it was, well, of all the incidents that you have identified, let's narrow it down just to a specific time period.

BY MR. PATTON:

Q.  And I believe all of your tracing occurred sometime in the time frame -- pardon me.  I will start over.

Remember that line graph chart you were reviewing this morning shows the lines of high volume deposits?

A.  Yes.

Q.  That time frame was September 1, 2020 to August 8, 2022; right?

A.  Yes.

Q.  And one of your criteria for that time period was hacks of above $5 million; right?

A.  Yes.

Q.  And you were focused on hacks above $5 million where you did tracing that showed there were deposits made to Tornado Cash; correct?

A.  Yes.

Q.  But, Agent, you are aware that during that time frame there were many, many other hacks of greater, or scams greater than $5 million; right?

A.  I found a lot of scams that were under that threshold that I did not count.  I'm not sure if there were any above

$5 million. The other criteria was I had to be able to positively trace it into Tornado Cash and so I took a conservative approach. Sometimes I wouldn't be sure and so I would just move on to the next one.

Q. Understood, Agent.

You didn't include, say for example, a February 2022 Wormhole Bridge hack to the tune of $320 million; right?

A. I have never even heard of that one.

Q. How about the BXH Exchange hack in November of 2021 to the tune of $139 million?

A. I didn't include it.

Q. How about Badger DAO in December of 2021 to the tune of $119 million?

A. What was the date on that again?

Q. December 2021.

A. Not included.

Q. How about Cream Finance in October 2021 to the tune of $130 million?

MR. REHN: Objection, your Honor.

THE COURT: One moment, please. Can we meet at side bar?

(Continued next page)

(At side bar)

THE COURT:  Let me please explain my comment of a moment ago.

We began the day by you asking me to strike a portion of this witness' testimony where he attempted to say that the 16 that he had worked on were things that had been identified as being involved, that had been tied to Mr. Storm or that Mr. Storm knew about.  Am I correct?

MR. PATTON:  He was testifying that the prosecutors said that Mr. Storm knew about them.

THE COURT:  OK.

MR. PATTON:  Yes.

THE COURT:  My concern was as you asked him why he focused on the ones that he focused on that he was going to say that.

MR. PATTON:  I understand.  I wasn't trying to go there, your Honor, and I'm happy to basically end this with a summary which is just that there were many hacks of sizeable amounts that he did not find in the tracing Tornado Cash.

THE COURT:  Except some of them he did and I excluded them because of issues with certification of records.  There were the 31 that were tied to him, I thought -- excuse me, that they were tied to Tornado Cash.  How did we get from 31 to 16?

No, Mr. Klein.  One at a time, thank you.

MR. REHN:  I can attempt to answer that question, your

P7L5sto2                    DeCapua - Cross

Honor.

THE COURT:  All right.

MR. REHN:  Our understanding was the Court actually permitted us to go ahead with all 31.  We made a decision, in an abundance of caution, only to present evidence of 16 as to which there was documentary evidence in the case.

THE COURT:  OK.

MR. REHN:  Separately, though, what the witness has actually testified to is he doesn't know about the incidents that the defense counsel is just attempting to read into the record so there is no foundation for this objection that there were others.

MR. PATTON:  He either knows or doesn't.

MR. REHN:  He said doesn't know.

MR. PATTON:  I'm not badgering him.  If he says doesn't know --

THE COURT:  One at a time.  But you are going to then testify that there are other hacks he didn't include.

MR. PATTON:  I think we will hear from our experts about this.

THE COURT:  And --

MR. REHN:  That's not been disclosed.

THE COURT:  That will be another fun fight.

Please end this section.

MR. PATTON:  OK.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7L5sto2                      DeCapua - Cross

THE COURT:  Because, again, you are on the precipice of him answering the question the way you don't want him to.

MR. PATTON:  That's fine.

THE COURT:  May I ask how long?  You may have an hour for all I know.

MR. PATTON:  I think it will be less than an hour.

THE COURT:  Should I try to take the break around 11:00?

MR. PATTON:  Sorry.  What time is it now?

THE COURT:  10:30.  We haven't yet had a full hour of testimony.

MR. PATTON:  At your Honor's pleasure, 15 minutes, 20 minutes; that's fine.  Would you like me to suggest when there is a decent breaking point?

THE COURT:  Yes.  In the next half hour.  Let's go back.  Thank you.

P7L5sto2                    DeCapua - Cross

(In open court)

BY MR. PATTON:

Q.  Agent, you testified that you sometimes do tracing
yourself; right -- I will clarify where this is going -- and
sometimes you use third-party vendors; correct?

A.  Yes.

Q.  Are you familiar with a private company called Chainalysis?

A.  I am.

Q.  Fair to say they're one of the more well-known, reputable
private firms in the space?

A.  Yes.

Q.  They often partner with the FBI and other law enforcement
agencies?

A.  I won't say partner.  I know that they offer their tool, it
is one of the vendors that offers blockchain tracing tools for
the FBI that the FBI subscribes to.

Q.  You, yourself, in your own tracing, will sometimes check
your results against what Chainalysis is doing just sort of as
a gut check; correct?

A.  I will.

Q.  Let's talk a little bit about the first hack that you
reviewed on your list of 16.

        MR. PATTON:  Could we please, Mr. Demarco, pull up
Government Exhibit 3002-9?

Q.  Agent, you recognize this as one of your slides?

A.   I do.

Q.   And fair to say you had broken these slides up into component pieces but this contains the full information; right?

A.   That's correct.

Q.   And what we are looking at here is the initial hack on the far left in ETH and USDT going into KuCoin hacker Wallet 1; right?

A.   That's correct.

Q.   And in a minute we will look at -- you did a separate chart for different types of cryptocurrency that was hacked; right?

A.   That's correct.

Q.   But for now just focusing on this hack, from Wallet 1 on the same day of the hack and the next day we have one of those arrows going to multiple intermediary wallets; right?

A.   That's correct.

Q.   And that's what we were talking about earlier as sort of this thing hackers like to do in terms of the game of Whac-A-Mole; right?

A.   Hackers will often, when they're moving money or laundering it, create additional wallets and then move value into those wallets.

Q.   And this is one of those standard things you look for that they're disbursing into multiple different wallets; correct?

A.   That's correct.

Q.   And then they go into this crypto swap a few days later;

P7L5sto2                        DeCapua - Cross

right?

A.   Yes.

Q.   Explain the crypto swap.  What does that mean and, in particular, how does that happen?

A.   So, for this case in particular it was the USDT was the extra crypto that was stolen from KuCoin that the KuCoin hacker now had in their possession.  So, in order to transfer that USDT into ETH, you would have to use a service called a swap service where you essentially will be able to offer your USDT in exchange for some ETH.

Q.   And these are typically what are known as decentralized exchanges; correct?

A.   Yes.

Q.   And from your tracing that you did on KuCoin, you know that there were three decentralized exchanges that were used in this crypto swap; right?

A.   I don't remember exactly.  I remember there was more than one.

Q.   Do you recall that Uniswap was one?

A.   I don't recall specifically.  Uniswap is one of the most popular ones.  And so, when you are moving this amount of USDT -- I would be making an assumption.  I would have look at my actual tracing analysis to tell you which specifically which swap services were used.

Q.   Is there something in your notes that you could take a look

P7L5sto2                    DeCapua - Cross

at?

A.   I can check.  So, these seem to be evidence exhibits, not my note.

Q.   Do you have your notes available to you?

A.   Not sitting here.

Q.   Does another one of the exchanges called Kyber Networks ring a bell?

A.   It does.

Q.   And how about 1inch?

A.   Yes.

Q.   And you are familiar, generally, with these decentralized exchanges; right?

A.   I am.

Q.   And these are basically automatic smart contracts; right?

A.   I don't know for sure.

Q.   Well, nobody is actually going up to a teller; right?

A.   No.

Q.   These are blockchain protocols that happen automatically; correct?

A.   What I can tell you is you can go to the service, the swap service, and you can give it your order and the order happens automatically.

Q.   And none of these decentralized exchanges -- Uniswap, Kyber Networks, 1inch -- they don't have anything like a user registry; correct?

A.  I have no idea.

Q.  You don't have to give them your name to engage in this transaction; right?

A.  I don't know.

Q.  After this swapping occurs it goes back into the multiple intermediary wallets; right?

A.  That's correct.

Q.  And then back to Wallet 1; right?

A.  That's correct.

Q.  And then to yet another wallet that you have marked as Wallet 2; right?

A.  That's correct.

Q.  Although, if we were to count the multiple intermediary wallets, it might be fair to describe it as however many wallets there have been now, Wallet 10, 20, 30; right?

A.  That's correct.

Q.  And you have a wallet address associated with that Wallet 2; right?

A.  Yes.

Q.  And then the deposits are made between October 23rd and October 26, 2020; right?

A.  That's correct.

Q.  And you recall you testified last week about an e-mail that was sent to this hello@tornado.cash talking about the KuCoin hack; right?

P7L5sto2                      DeCapua - Cross

A.   I do.

Q.   And it contained that wallet address that you have marked here?

A.   Yes.

          MR. PATTON:   Could we pull up Government Exhibit 231 that is in evidence?

Q.   And that e-mail giving that wallet, that was sent on October 26; right?

A.   I see that.

          MR. PATTON:   If we can go back to the flowchart, 3002-9?

Q.   And after October 26 there were no more deposits into Tornado Cash; correct?

A.   Correct.

Q.   In one sense, though, Agent, is it fair to say because of this multiple wallets dynamic, the Whac-A-Mole dynamic, that even if, say, Tornado Cash or any other exchange blocked a particular wallet, the hacker could simply pretty quickly move things into a different wallet; correct?

A.   That is correct.

Q.   And within a fairly short period of time, circumvent any sort of blocking on a particular wallet; correct?

A.   If the blocking was just a block on one particular wallet then, yeah, it would be very easily circumvented.

Q.   And the e-mail we looked at gave one particular wallet;

P7L5sto2                         DeCapua - Cross

correct?

A.   That's correct.

          MR. PATTON:   Could we look at now Government

Exhibit 3002-13?

Q.   This is that second chart we talked about with different

types of cryptocurrency; right?

A.   Yes.

Q.   So same hack but different blockchain; right?

A.   Same blockchain, different cryptocurrency.

Q.   Different cryptocurrency; to the tune of about

$150 million?

A.   That's how much was originally stolen from KuCoin.

Q.   Right.

          Roughly $16 million or just a bit above 10 percent

ended up being deposited into Tornado Cash?

A.   That's correct.

Q.   Here we see that it is a slightly different pattern than

the first chart we were looking at; right?

A.   That's correct.

Q.   Here over a period of about a week Wallet 1 is transferring

to these multiple intermediary wallets; right?

          I'm sorry.   My apologies.   I was looking at a

different date.

          Over a period of about six months; right?

A.   That's correct.

P7L5sto2                         DeCapua - Cross

Q.   It is going into multiple intermediary wallets; correct?

A.   Yes.

Q.   And again, this is in, given the speed at which things can happen, right, on the blockchain and online, this is a fairly extended period of time; correct?

A.   It is.

Q.   But the challenge for KuCoin or law enforcement goes back to what we were talking about earlier which is even though you may know it is sitting in Wallet 1, you can't actually get at it without the private key; right?

A.   That's correct.

Q.   And so then we see more crypto swapping going on from all these multiple intermediary wallets; right?

A.   That's correct.

Q.   And now, instead of it going to a single wallet like we saw in the first flow chart, now all these multiple intermediary wallets are depositing into Tornado Cash; right?

A.   Not all of them but it wasn't a single wallet for the KuCoin case in particular.  So, I think you said all the intermediary wallets.  Some of the intermediary wallets were depositing into Tornado Cash.

Q.   My apologies.  I was imprecise in my language.

         On the earlier chart we saw the multiple intermediary wallets eventually put the crypto that was in those wallets into what you had marked as Wallet 2; right?

P7L5sto2                      DeCapua - Cross

MR. PATTON:  Can we go back to the earlier chart, Mr. Demarco?

Q.  You see here on 3002-9 we don't have the multiple intermediary wallets going directly to Tornado, it went to Wallet 2 first; right?

A.  That is correct.

Q.  Now if we can go back, so here we have a slightly different pattern; right?

A.  Yes.

Q.  Here multiple wallets are making deposits and to be clear not nearly all of the money that was hacked; right?

A.  That's correct.  I think it is five or six.

Q.  Are making deposits, so five or six different wallets, right, are making deposits into Tornado Cash?

A.  That's correct.

Q.  And you don't have the addresses for those wallets up on the chart; correct?

A.  Correct.

Q.  And that wasn't included in the e-mail that we looked at earlier; right?  From KuCoin?

A.  No.

Q.  Let's talk about the similar chart you did for BitMart.

MR. PATTON:  Can we pull up 3002-24?

Q.  BitMart, if you will recall, this was the highest line on that line graph chart; right?

P7L5sto2                    DeCapua - Cross

A.   That's correct.

Q.   Pretty sizeable hack here; right?

A.   Yes.

Q.   And it occurred on December 4; right?

A.   Yes.

Q.   And I won't go through all of the details that we have done with KuCoin but, in essence, we see swapping from one wallet going to a second wallet; right?

A.   That's correct.

Q.   And then in that second wallet there is more swapping going on; right?

A.   Correct.

Q.   And here we have a wallet address; right, for that Wallet 2?

A.   We do.

Q.   And deposits are made from that address on December 4 and 5; right?

A.   That's correct.

Q.   So the day of the hack and the day after the hack; right?

A.   Yes.

Q.   And there was even some on December 5 that came from the first wallet; right?

A.   That's correct.

Q.   We don't have an address for that wallet on this chart; right?

A.   Correct.

Q.   And you also testified about and you have reviewed Mr. Evans, the BitMart lawyer's testimony, right, and he sent a letter to Roman Storm and Semenov and Pertsev; correct?

A.   I believe it was to hello@tornado.cash.

          MR. PATTON:  Can we pull up GX 1005?

Q.   Do you see up at the top there that he names a few people and there is an additional one named Dementev?

A.   I do.

Q.   Do you see that the date of this letter is December 14?

A.   I do.

Q.   And you see that's nine days after the last deposit from that flowchart we were just looking at?

A.   Yes.

Q.   You are aware from reviewing Mr. Evans' testimony that he also sent them a Telegram chat; correct?

A.   I don't specifically remember that in that testimony.

          MR. PATTON:  Could we please pull up Government Exhibit 1006 which is in evidence and could we expand that?

Q.   Do you see that this is entitled:  Joe Evans created the group BitMart, McDermott Will & Emery, Tornado Cash?

A.   I do see that.

Q.   And he says:  Tornado Cash, this is Joe Evans from McDermott Will & Emery.  We represent BitMart.  Please see the attached correspondence.  Feel free to ask me any questions

here via e-mail, and he gives his contact information; right?

A.   I do see that.

Q.   There is a response from the title Poma that says:  *Our company does not have any ability to affect any change or take any action with respect to the Tornado Cash protocol.  It is a decentralized software protocol that no one entity or actor can control.  For that reason, we are unable to assist with respect to any issues relating to the Tornado Cash protocol.*

     Do you see that?

A.   I do.

Q.   Do you know from reviewing Mr. Evans' testimony that he is a fairly experienced lawyer in the space of cryptocurrency; right?

     MR. REHN:  Objection, your Honor.

     THE COURT:  Sustained.

Q.   You know that he testified that he had no reason to think that anything about this was incorrect; right?

A.   I don't recall seeing that.

Q.   But you reviewed his testimony?

A.   I reviewed the portion of the testimony that was relevant to my direct examination.  I didn't review the entire transcript.

Q.   You didn't think this was relevant?

A.   I didn't think this Telegram chat I have never seen is relevant?

Q.   Correct.  And his view of it.

          MR. REHN:  Objection, your Honor.

A.   I have never seen this Telegram chat.  I didn't know it existed.

          MR. PATTON:  Can we pull up Government Exhibit 3002-45?

Q.   This, again, is one of these flowcharts and you testified about this one this morning; right?

A.   I did.

Q.   This is from the Ronin hack; right?

A.   It is.

Q.   And again, we see the same pattern of the hack going into one wallet, and then on the day of the hack and then continuing for about two months, the crypto going into multiple intermediary wallets; right?

A.   That's correct.

Q.   And then again going through these decentralized exchanges in the crypto swap; right?

A.   That's correct.

Q.   Do you know which of the decentralized exchanges were swapping the crypto here?

A.   I don't know for sure.  Again, that type of information is going to be in my notes.

          MR. PATTON:  Could we pull up Government Exhibit 3002-49?

P7L5sto2                      DeCapua - Cross

Q.   This is the same hack; right?

A.   Correct.

Q.   But now you've added a tag here that that first wallet had sanctions placed on it on April 14; correct?

A.   Yes.

Q.   And that was before it -- well, I will be more precise.

It was sanctioned, it looks like, maybe midway between the time frame when money was going from that wallet to multiple different wallets?

A.   Yes.

Q.   And you don't have a tag for any of those multiple intermediary wallets about sanctions; correct?

A.   Correct.

Q.   We also looked at some chats and an article that attributed this hack to something called the Lazarus Group; right?

A.   Yes.

Q.   You are aware that they are known as a very sophisticated hacking group; right?

     (Discussion off record)

Q.   You are aware that the Lazarus Group is a well-known, sophisticated hacking group; correct?

A.   Correct.

     MR. PATTON:  Your Honor, this might be a decent moment for a short break, if I am not violating your rule too badly.

     THE COURT:  All right.  We will take the morning

P7L5sto2                    DeCapua - Cross

break.  Let's be as quick as we can because you know we are leaving early today, so we will break for 10 minutes maximum but if it can be shorter, all the better.

I don't want you guys to be uncomfortable.  Do not discuss the case with each other or anyone else, keep an open mind until all the evidence is in.  We will see you in 10 minutes.

Thank you.

(Continued on next page)

(Jury not present)

(Recess)

THE COURT:  Mr. Patton, I understand you wanted to speak with me.  Can the witness remain or do you need him to step out?

MR. PATTON:  I think it is OK to discuss it while he is present.

THE COURT:  OK.

MR. PATTON:  When I moved -- our side bar conversation and I moved on from that line of questioning, my colleagues reminded me that I didn't just make it clear that those were -- those were instances of hacks that he did not trace.

THE COURT:  That's the argument you can make in your summation.  I think it came across.  He said he didn't know so, by extension -- you asked him about Wormhole, about BXH.

MR. PATTON:  Correct.

THE COURT:  And about Badger DAO.

MR. PATTON:  Correct.

THE COURT:  He said he didn't know.  So, by extension, he didn't trace them.

MR. PATTON:  If the record is clear on that.  I think there is some concern it wasn't clear.

THE COURT:  The questioning on that area is done, sir.  There is still some cross-examination to come, sir?

MR. PATTON:  There is, your Honor.

THE COURT:  30 minutes or so?  Less?

MR. PATTON:  I think at most.

THE COURT:  At most.

Is there redirect?

MR. REHN:  So far it would be very limited, your Honor.

THE COURT:  So the next witness is ready?

MR. REHN:  Yes.

MR. GIANFORTI:  Yes.

THE COURT:  Delightful.  Let's see if we can get the jury together.

Mr. Rehn, before the jury comes out, in further to our discussions of this morning, may I please understand the exhibits you are hoping to introduce through the paralegal?  The defense will be taking notes as well.

MR. REHN:  Do we have that -- I don't know if I have the list directly in front of me.

THE COURT:  If you do not, can you e-mail to my chambers address or to Mr. Kenny, copying your adversaries, what these exhibits are?  Because I am looking at the representations made by the government in their motions *in limine* and in our oral argument and I want to compare them with what these exhibits actually say.

MR. REHN:  Certainly, your Honor.

MS. AXEL:  Your Honor, may I raise one thing?

P7L5sto2                    DeCapua - Cross

THE COURT:  Yes, Ms. Axel.

MS. AXEL:  Your Honor, the next two witnesses Mr. Galano and Mr. Gibbs --

THE COURT:  Yes.

MS. AXEL:  -- are both individuals that provide certain services, decentralized infrastructure providers.

THE COURT:  Yes.

MS. AXEL:  These are not custodian of records, I am sure the government appreciate that because they brought them live.

THE COURT:  Yes.

MS. AXEL:  I do think we will want to spend time with these witnesses to make sure that this jury understands the difference between these services and Web 3 and how they work in Web 2, and I'm just fronting that ahead of time.  This is particularly acute in light of Mr. Werlau's revised disclosure which suggests certain screening procedures that might work for Web 2, our conventional internet, would also work here in blockchain.  So I think we are going to want to spend some time on that.  I just want to let the Court know that.

THE COURT:  I understand that and I was worried about it with Mr. Patton's testimony.  I appreciate that it is always fun to have a government witness turned to be your own witness, but if these witnesses are not experts in decentralized finance I am concerned.

P7L5sto2                        DeCapua - Cross

I will listen to you, but is it actually within the scope of their direct testimony?

MS. AXEL:  I believe it will be, your Honor, because they're going to testify about what their services do.  But one reason I am raising this, and I also want to note there are prominent people, too, and so some of what they do is going to be relevant to their credibility.  But if we have issues on scope we have let the government know, we have let counsel for the witnesses know, that we may issue wish to recall them.  No one wants that, your Honor.  Obviously counsel for witnesses who are here from out of town don't want that.  But, if we are concerned about it, we may ask the Court to then make them available in our case-in-chief.

THE COURT:  All right.  Whose witnesses are these?

MR. GIANFORTI:  Mr. Galano is mine and Mr. Gibbs is Mr. Rehn's.

THE COURT:  Are you aware of this?

MR. GIANFORTI:  No.  This is the first time I am hearing of this particular concern.

THE COURT:  Of course, because new one talks to each other in this case.  This is the worst meet and conferring I have found in almost any criminal case.

Ms. Axel, I appreciate that you want to use these witnesses to prove your points.  I'm not sure I am going to let you.  I have to see what the questioning is like and I have to

P7L5sto2                        DeCapua - Cross

see what the direct is like.  If you need to recall them -- if the government wants to let them be your witnesses in the course of being their witnesses, that would be lovely.  If not, you will recall them and that's the way it is.  You are asking me to decide these things in a vacuum without seeing their direct testimony so I am so aware of how you wish to use them and whether that works or not we will have to see.  Thank you.

Mr. Kenny, please let them know we are ready.

(Continued on next page)

P7L5sto2                     DeCapua - Cross

(Jury present)

THE COURT:  Please be seated.

Thank you.  We had some legal issues we wanted to address during the break.  Those are now addressed.  We will now continue with the cross-examination of Mr. Patton.

MR. PATTON:  Thank you, your Honor.

BY MR. PATTON:

Q.  Agent, throughout your testimony you have testified about a number of chats involving Mr. Storm; correct?

A.  That's correct.

Q.  And in your work as an investigator you understand that it is important, when you're reviewing communications, whether it is e-mails or chats or anything else and you are trying to sort of suss out the meaning of those things, that context matters; right?

A.  That's correct.

Q.  Different contexts can change the meaning of the same words; right?

A.  That's correct.

Q.  Do you recall that the government showed you those chats where Semenov was saying to Mr. Storm have you heard about this $600 million hack; right?

A.  Yes.

Q.  And there is -- I'm not trying to be precise here but there is a back and forth where Mr. Storm is kind of like, *What are*

P7L5sto2                        DeCapua - Cross

*you talking about?*  And, *Oh.   I thought you said 600,000, not 600 million.*

Do you recall that exchange?

A.   I do recall it.

Q.   You are aware that there was a fair amount of discussion leading up to that exchange; right?

MR. REHN:  Objection.

THE COURT:  Sustained.

MR. PATTON:  Well, your Honor -- could we please put up Government Exhibit 2044-T?  It is in evidence.

Q.   You recognize this is one of the chats that you have been testifying about, the Bablo Peppersec that Mr. Storm is a part of; right?

A.   Yes.

Q.   If we could scroll down to the next page, this is a message from Roman Storm to the others on March 29, 2022; right?

A.   Yes.

Q.   And he is attaching a Tweet; right?

A.   Yes.  So the entire message is just the link of the Tweet.

Q.   Well, in fact he typed something below what he has forwarded there, right, starting with:  *A cool idea...*

A.   Yes.

Q.   So he types into the others:  *A cool idea on how to stop hackers.*  Right?

A.   Yes.

P7L5sto2                      DeCapua - Cross

Q.   Now you have reviewed this exchange; right?

A.   So, I have reviewed this group chat, yes.  This specific exchange, I don't remember this specific exchange.

Q.   Well, you understand that they then have a series of back and forth about technical aspects of this idea to help stop hacks; right?

A.   So I don't remember seeing that.

Q.   And you know that that all precedes the discussion about the 600 -- Semenov informing Mr. Storm of what turns out to be the Ronin hack; right?

        MR. REHN:  Objection.

        THE COURT:  Do you recall, sir?

A.   I don't remember reviewing any of those chats.

Q.   So you were testifying about what Mr. Storm, his response to learning of the Ronin hack, but you weren't aware of the context surrounding it?

A.   So I --

        THE COURT:  I think he wasn't aware of your description of the context surrounding it, sir, but go ahead.

BY MR. PATTON:

Q.   What is your recollection of the context surrounding it?

A.   So we are talking about the Ronin hacks now?

Q.   Correct.

A.   Talking about the Telegram group chat for the Ronin hacks.

Q.   This series of conversations involving Mr. Storm and

P7L5sto2                         DeCapua - Cross

Semenov and some of the others in this group chat that you have talked about a number of times --

A.   Yes.

Q.   -- and on the same day, March 29, where Semenov says to the others, whoa, there has been this enormous hack, right, and Mr. Storm has some questions for him about it; right?

A.   Can you just repeat what you just said?

Q.   Sure.

THE COURT:  Will it aid you, sir, in reviewing the full chat?

THE WITNESS:  Absolutely.

THE COURT:  Is that necessary?  He can, but I --

MR. PATTON:  I'm happy to let him do that.

BY MR. PATTON:

Q.   But if you don't recall, that's fine, but you testified about that particular piece of the exchange; right?  Semenov informing Mr. Storm of that?

A.   Yes.  Semenov informing Mr. Storm of the hack.

Q.   Right.  And you recall that there was a lot of discussion leading up to it; right?

A.   I didn't read all the discussions leading up to it.

Q.   Fair enough.

MR. PATTON:  If we could pull up Government Exhibit 2047-4?

Q.   Do you recall that this was part of a separate -- this is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7L5sto2                         DeCapua - Cross

the substance of a link that was sent in a different one of these chats, same Bablo chat; right?

A.   Yes.

Q.   And it's sent from somebody called Dirty Bubble Media?

A.   I see that.

Q.   And it's a public Tweet, right, saying that holders of TORN are accomplices to violating sanctions.

A.   I see that.

          (Continued on next page)

Q.   And you recall that Mr. Storm's reaction in that chat upon seeing this was—pardon my French— "Shit," right?

A.   I would have to see—we talked about a lot of chats over the past few days so I would have to see the exact chat.  That sounds about right, but I'm not 100 percent certain.

Q.   I'm just talking about what you testified to this morning, right, about an hour ago?

A.   But there was other chats on Thursday.

Q.   I'm talking about the ones this morning associated with this tweet, right?

A.   I don't know if he responded "Shit" to this specific tweet.

Q.   Do you recall that there were conversations between Mr. Storm and the others in that chat group essentially about concerns now about law enforcement, right?

MR. REHN:  Objection, your Honor.

THE COURT:  I'll allow it.

A.   Concerns about law enforcement reading the Telegram chats.

Q.   Correct.  In response to all this public discussion about the Ronin hack, right?

A.   That's correct.

MR. PATTON:  If we could pull up Government Exhibit 2017.

Q.   You recall that last week you testified—

MR. PATTON:  If we could blow up the sort of name, the header up front.  Yeah, thank you.

P7L1STO3                          DeCapua - Cross

Q.  You testified about a number of chats with this name of 1inch > < tornado.cash, right?

A.  I do.

Q.  Going back to this notion of context in trying to discern meaning in what people are saying, are you familiar with a term called trolling?

A.  I am.

Q.  What does that mean, generally?

A.  So it's where people post stuff sarcastically in a way to—either for self-amusement or to sow confusion.

Q.  Fair to say sometimes it's to like give somebody else a hard time?

A.  Yes.

Q.  And that can happen in social media, right?

A.  That's correct.

Q.  That can happen in group chats, right?

A.  Yes.

        MR. PATTON:  Could we scroll down to the next page on this.  And—yeah, there we go.

Q.  It's this guy Sergej, or Sergej, from 1inch, right?

A.  I see that.

Q.  And he's forwarding along a tweet that you testified about last week, right?

A.  Yes.

Q.  He's forwarding along this tweet from a guy named CZ?

A. Yes.

Q. And CZ is kind of a very big name in the crypto world, right?

A. He is.

Q. He's a famous person in crypto circles, right?

A. Yes.

Q. And his tweet is saying that his product has been hacked and they're laundering it—the hackers are laundering it through Tornado Cash, right?

A. I don't know if it was his product that was hacked, but he's tweeting and saying that Uniswap V3 on the ETH blockchain has been hacked. Hacker has stolen 4295 ETH so far, and it's being laundered through Tornado Cash.

Q. Regardless, he's saying money is going to Tornado Cash that is illicit proceeds, right?

A. Correct.

Q. And Sergej is sending this to Roman Storm and Semenov and Pertsev, right, and whoever else is on this group chat, right?

A. Yes.

Q. And along with forwarding it, saying, "Fuck, guys, you don't need to spend anything on marketing," right?

A. Yes.

Q. With some smiley faces after it?

A. Yes.

          MR. PATTON: And if we could just keep scrolling

through these chats.

Q.  And you testified about these particular texts, right?

A.  I did.

Q.  He goes on to say, "Even CZ has written about you," right?

A.  Yes.

        MR. PATTON:  Keep scrolling down.

Q.  And by the way, these are on July 12th, right?

A.  Yes.

        MR. PATTON:  Keep scrolling.

Q.  And then the next one up at the top, this is the first time somebody is responding to this, right?  It's Pertsev responding, and he says, "It would be necessary to spend twice as much to change the opinion from 'a money laundering tool' to a 'privacy solution for everyone.'"  Right?

A.  Yes.

Q.  Does he seem to think that this is good free marketing?

        MR. REHN:  Objection.

        THE COURT:  Sustained.

Q.  And then if we go on down to a few more chats, Semenov chimes in with a question, right?  "What kind of exploit is there?"  And then he goes on to say, "Ah, shit, it's just phishing.  I wonder if CZ wrote such a bad headline on purpose to hype it up."  You see that?

A.  I do.

Q.  So he refers to what CZ has said as a bad headline,

correct?

A.  So he says, "I wonder if CZ wrote such a bad headline on purpose to hype it up."

Q.  Yes.  And it goes on.  The next person says yes, right?

A.  Yes.

Q.  "I guess he lost money himself."  It goes on.

And then Sergej chimes in to the Pertsev chat about it costing twice as much money to change opinions from money laundering to privacy solution.  He says, "Nothing is needed," right?

A.  Yes.

MR. PATTON:  And then if we could keep scrolling down.

Q.  These are all on July 12, right?

A.  Right.

Q.  He says, "Bad PR is also PR," referring to it as bad PR, right?

MR. PATTON:  Sorry.  We skipped over that.  If we could just scroll back up to the bad PR.

Q.  You see that?

A.  I do.

Q.  And again, that's on July 12th, right?

A.  Yes.

Q.  And then if we keep scrolling to the very next one, right, we see there that that's July 16th, correct?

A.  Correct.

P7L1STO3                    DeCapua - Cross

Q.   That's four days later, right?

A.   Yes.

Q.   And I believe when you testified, you read the Sergej talking about free marketing, and then you read Roman's tweet—if we scroll down a little bit here—in response to Sergej again saying—

          MR. PATTON:  Sorry.  Go back up just a little bit.

Q.   Now, four days later, saying, "Fuck, you are being advertised for free," right?

A.   Correct.

Q.   And you read Mr. Storm's response, "It's fucking funny," right?

A.   Correct.

Q.   You have no idea what this four-day-later text, the advertising for free, was referring to, do you?

A.   I'm assuming it's referring to CZ's tweet.

Q.   And that's why you suggested that Mr. Storm was responding to it with, "It's fucking funny," right, referring to CZ's tweet?  That was your understanding?

A.   I—just within the context of this conversation, it looks like Roman Storm's responding "It's fucking funny" to the assertion that it's free advertising, that CZ is giving them free advertising.

Q.   Agent, are you aware that Sergej actually sent a different video on July 16th that had nothing to do with that CZ tweet?

A.  I didn't see it in the texts.

Q.  Agent, I want to talk now about that graph you made, those line graphs.  You recall the chart I'm talking about?

A.  I do.

MR. PATTON:  If we could pull up Government Exhibit 3002-32.

Q.  And you did a whole variety, variations on this, circling different points in time, right?

A.  Correct.

Q.  So the one we're looking at here, it's the same general line graph, but this particular one has a red circle around the BitMart hack, right?

A.  Correct.

Q.  Which was December 4-5, right?

A.  Correct.

Q.  And I think you testified, and it's sort of apparent from the chart, that this was the biggest single day of deposits into Tornado Cash that you traced from a hack, correct?

A.  That's correct.

Q.  And then you created various pie charts to associate with some of these time periods, correct?

A.  Yes.

Q.  Right?  You did one for KuCoin?

A.  Yes.

Q.  Did one for Ronin, right?

A.   That's correct.

Q.   I'm not going to go through all of them, but let's take this BitMart example.

MR. PATTON:   If we could pull up Government Exhibit 3002-33.

Q.   So these are the pie charts you did associating with certain slices of time around these hacking incident deposits, right?

A.   That's correct.

Q.   And so this was, as you testified to, the biggest line on that chart, right?

A.   It was.

Q.   And in this instance 54 percent came from BitMart and 46 percent came from what you titled all other Tornado Cash deposits, correct?

A.   That's correct.

Q.   And you said you don't know what those deposits are; they could be everyday, ordinary, noncriminal people or they could be—some portion of it could also be illicit funds, right?

A.   Correct.

Q.   You don't know, right?

A.   Correct.

Q.   But what you did was, you created pie charts just for the periods of these spikes, correct?  Certain of these spikes, correct?

A.  I'm not sure if there's a one-to-one correlation, but of the tie periods that I examined, it was more—there are certain pie charts where there are specific date ranges.

Q.  Right.

MR. PATTON:  So let's go back to the line graph, 3000—yeah, there we go.

Q.  The total time period you studied was September 1, 2020, to August 8, 2022, right?  A little shy of two years.

A.  That's correct.

Q.  And you did pie charts—I don't know, you tell me; roughly five or six different pie charts?

A.  Probably something close to that.  I don't know exactly how many.

Q.  And some of them, like KuCoin and BitMart and Ronin, were the dates when those hacks were deposited into Tornado Cash, right?

A.  Yes.

Q.  And others were broader time frames around this, like, early 2022 period, right?

A.  That's correct.

Q.  But you didn't do a pie chart for the whole period of time, did you?

A.  There was one pie chart that had a pretty broad period of time.

Q.  You have a pie chart that covers the full period of time

that you——

A.  I don't think it was the full period of time.  I mean, we could just look at the pie charts.  I don't remember sitting here right now exactly the time periods for all the different pie charts that I made, but I suppose we could look through them and refresh my memory and then talk about them.

Q.  Agent, are you aware that if you did a pie chart for this full period of time, the hacks that you've been talking about, these biggest lines throughout this period, would take up 10 percent of that——

A.  I'm not aware of that.

Q.  ——of that pie chart?  You didn't look into that?

A.  I——I sliced up the data in many different ways.  I don't remember that the specific 16 that I looked up only made 10 percent, as you say, of the whole.

Q.  You sliced it to the time periods that the prosecutors asked you to slice it to, correct?

A.  Correct.

Q.  Agent, in your work as an investigator, you're called upon at times to distinguish between suspicious and nonsuspicious activity, correct?

A.  Yes.

Q.  And there are lots of things that ordinary people, regular folks not committing crimes do in life that don't necessarily raise red flags, right?

P7L1STO3                      DeCapua - Cross

A.   Yes.

Q.   Forgive the basic question.

And a lot of those things involve very common privacy applications online, correct?

MR. REHN:  Objection, your Honor.

THE COURT:  I'll allow it.

Q.   So for instance, VPNs, right?  You know what a VPN is, right?

A.   So I do know what a VPN is.

Q.   It stands for virtual private network, right?

A.   That's correct.

Q.   And it's something that both everyday folks and businesses use, and it's something that criminals sometimes use, right?

A.   So I think you're conflating two things.  There's virtual private networks, where someone has to log into work, so they log in through the virtual private network created from their personal laptop to their work's network.

Q.   Right.

A.   That is the common type of VPN.  I think what you're referring to is the VPN proxies, which basically allow people to browse the internet anonymously.

Q.   Well, let's stick with the former type that you were talking about, right?

A.   Okay.

Q.   Those are extremely common, correct?

P7L1STO3                    DeCapua - Cross

A.   Yes.

Q.   Businesses sometimes encourage their employees to use them, right?

A.   Correct.

Q.   And individuals choose to use them, right?

          MR. REHN:   Your Honor, objection as to scope at this point.

          THE COURT:   I'll allow it.

A.   So if someone needs to log into their work network, you would use the VPN that's set up to allow you to do that.

          THE COURT:   Sir, I believe he's asking whether an individual can use a VPN just in their individual communications.

          THE WITNESS:   It would be very strange.  I don't think a regular person would use a VPN in their regular communications.

          THE COURT:   All right.  Counsel, please move on.

BY MR. PATTON:

Q.   Well, let's take a really common example then.  Encrypted messaging applications, right?  Things like, say, WhatsApp and Apple's iMessaging, those are encrypted messaging applications, right?

A.   They are.

Q.   And what that means is that not even the people at WhatsApp or Apple have access to the substance of the messages, right?

THE COURT:  If you know.  If you don't, that's fine.

A.   Correct.

Q.   This is something you know from law enforcement because in your investigations, you can only get those messages if you actually have the hardware, correct, like the phone?

A.   So I know it more from just being a user of WhatsApp and Apple products.

Q.   That they're encrypted, correct?

A.   End-to-end encryption.

Q.   And that is useful for everyday noncriminals, but it's also something sometimes criminals use, correct?

A.   Yes.

MR. PATTON:  Nothing further, your Honor.

THE COURT:  Thank you.

Brief redirect?

MR. REHN:  Very brief, your Honor.

REDIRECT EXAMINATION

BY MR. REHN:

Q.   Special Agent DeCapua, if I could have Ms. Sebade show you Government Exhibit 3002-9 again.

And do you recall being asked some questions about this slide on your cross-examination?

A.   I do.

Q.   And in particular, do you recall there were some questions about the crypto swaps at the bottom of the slide?

P7L1STO3                      DeCapua - Redirect

A.   Yes.

Q.   Special Agent DeCapua, in your tracing analysis were you able to trace the flow of funds through those crypto swaps?

A.   I was.

Q.   Special Agent DeCapua, you were also asked about an email that was sent to hello@tornado.cash in connection with these transactions.  Do you recall that?

A.   Yes.

Q.   And if I could show you Government Exhibit 231.

         And Special Agent DeCapua, does the email that was sent identify a particular wallet?

A.   It does.

Q.   And is that a wallet beginning in 34a174?

A.   It is.

Q.   And if we could go back to Government Exhibit 3002-9.

         Special Agent DeCapua, was that the wallet that was being used to make deposits into Tornado Cash at this point in time?

A.   It was.

Q.   So did the recipient of the email at Government Exhibit 231 have information that would have allowed him to identify the wallet that made those deposits?

A.   Yes.

Q.   Did the recipient of that email need to engage in any tracing through any intermediary wallets to identify those

deposits?

A.   No.

MR. REHN:  Nothing further, your Honor.

THE COURT:  Thank you.  Sir, you may step down.

MR. PATTON:  Your Honor, may I just ask one——

THE COURT:  No, thank you.

(Witness excused)

THE COURT:  Government's next witness, please?

MR. GIANFORTI:  The government calls E.G. Galano.

(Witness sworn)

THE DEPUTY CLERK:  Please be seated, and into the microphone, please state and spell your full name for the record.

THE WITNESS:  Full name is Eleazar Galano III. E-L-E-A-Z-A-R, last name Galano, G-A-L-A-N-O.  And I go by E.G., my initials.

THE COURT:  Sir, you're welcome to put the microphone a little closer to you.  It should move.

THE WITNESS:  Thanks.

THE COURT:  Counsel, you may inquire.

MR. GIANFORTI:  Thank you.

ELEAZAR GALANO III,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

P7L1STO3                     Galano - Direct

BY MR. GIANFORTI:

Q.  Good morning, Mr. Galano.

A.  Good morning.

Q.  Sir, where do you work?

A.  I work at Consensys.

Q.  Sir, did there come a time when you were served with a subpoena in connection with this case?

A.  Yes.

Q.  Did that subpoena include a requirement that you testify here today?

A.  Yes.

Q.  Sir, where do you currently live?

A.  In Los Angeles, California, or in Burbank, California. Sorry.

Q.  Thank you.

    Did the government pay for your travel here from California?

A.  Yes.

Q.  Id the government pay for your hotel while you're staying here in New York?

A.  Yes.

Q.  Other than your flight and your accommodations, has the government given you anything of value in exchange for your testimony today?

A.  No.

P7L1STO3                         Galano - Direct

Q.   Do you expect to receive anything of value from the

government after you testify today?

A.   No.

Q.   Does the outcome of this case affect you financially one

way or the other?

A.   No.

Q.   All right, sir.  Now I'd like to ask you a few background

questions.

          First, how far did you go in school?

A.   I left university in my senior year.

Q.   What did you study there?

A.   Computer science.

Q.   And could you please describe to the jury at a high level

your career since leaving college.

A.   Yes.  After I left college, I worked at several startups

and tech companies, such as Sony, primarily as a back-end

developer building software, primarily in the infrastructure

space, so things to try to scale web technologies, APIs,

infrastructure.  Did that for about half a decade before I

transitioned into the Ethereum blockchain infrastructure space.

Q.   And you said a moment ago that you work at a company called

Consensys, right?

A.   That's right.

Q.   When did you start there?

A.   In 2016.

Q.   What's your current role at Consensys?

A.   I'm the head of a team called DIN.  That's part of Infura.

Q.   And focusing on the time period of 2020 to 2022, what was your role at Consensys at that time?

A.   I was the head of engineering for the Infura product group.

Q.   I'm sorry.  You said you were head of product; is that right?

A.   Head of engineering.

Q.   Head of engineering.  I'm sorry.

     Okay.  And could you just describe for the jury, at a high level, what your responsibilities entailed in that period of 2020 to 2022 as head of engineering for Infura.

A.   Yeah.  I'm one of the co-founders of Infura, so it was a combination of leading our engineering teams, figuring out our product roadmap with our product managers, coordinating with customers and potential customers, doing like business development; a little bit of everything.

Q.   Could you describe to the jury, in as plain language as you can, what Infura does.

A.   Infura is a blockchain infrastructure product.  So typically, to interact with a blockchain like Ethereum, you need to join the network or have access to the data for the network.  Typically this requires running a piece of software called node software.  It's a peer-to-peer technology.  You pretty much run it.  It gets all of the data so that you have

the current state of the network transactions, account balances, things like that, and you have to have that up-to-date information to be able to participate in using any of the applications built on Ethereum, and so Infura offers that as a hosted service. We run the infrastructure so that users can quickly interact with the blockchain without having to do that.

Q. Sir, are you familiar with a term "software as a service"?

A. Yes.

Q. What does that mean in general?

A. It basically means there's software that somebody would otherwise have to host themselves or run and manage themselves and a company is doing that on your behalf. A lot of products that we use these days are SaaS products.

Q. Does Infura offer software as a service?

A. Yes.

Q. Is that the node software you were speaking about a moment ago?

A. That's right.

Q. Sir, focusing on that time period of 2020 to 2022, did Infura have any competitors in this space?

A. Yes.

Q. Could you name a few.

A. Alchemy, QuickNode, Chainstack, Cloudflare are a few of them.

P7L1STO3                          Galano - Direct

Q.   And, sir, could you describe to the jury, at a high level, how Infura makes its money, or at least how it made its money in that 2020 to 2022 time frame.

A.   Yeah.  We start out with having a free tier that anybody can quickly use to start building a new product and consuming blockchain data, and then if they graduate beyond that tier, we have paid tiers that they subscribe to on a monthly or annual basis.

Q.   And when you say access to blockchain data, that's another way to describe that blockchain traffic?

A.   Yes.

Q.   Again, focusing on this time period of 2020 to 2022, who would you describe as a typical Infura customer at that time?

A.   Developers that were exploring building applications for Web3 or Ethereum.

Q.   And I believe you testified a moment ago that Infura makes its money principally through a subscription model; is that right?

A.   That's right.

Q.   Are there different subscription levels that Infura offered during that 2020 to 2022 time frame?

A.   Yes.

Q.   During that time frame was there a subscription level known as Team?

A.   Yes.

P7L1STO3                        Galano - Direct

Q.   Was there also a subscription level known as Growth?

A.   Yes.

Q.   How would you describe the difference between Team and Growth accounts during that time frame?

A.   Our—our tiers are structured so that there was like a size that should fit like different stages of a product.  Our free tier should be useful for people just kind of building something in school or building something at a hackathon; our Developer tier is usually for an individual doing their own tinkering projects; the Team tier is meant for once a project reaches a level of maturity where you have multiple people working on it, maybe you have your first version of an application out there and your early users are starting to use it; and then the Growth tier are like orders of magnitude more traffic required, so you're actually starting to get traffic users on your application, and that's when you typically graduate to that Growth tier; and then we have like a custom tier beyond that.

Q.   All right.  And how do, you know—given any particular blockchain product that might be a customer of Infura, how does it typically come about that that project would graduate say from Team to Growth?

A.   We—we had like soft limits in place that we would monitor based on like when an application, or when a customer of ours was starting to cross a threshold, it would incur a lot of

costs for our team, and so we would proactively reach out to some of these customers and ask them to upgrade from say the tier that they're on to the higher tier.

Q. So is another way of putting that that each tier comes with some kind of cap to its traffic?

A. Yes.

Q. Okay. And what happens when a particular blockchain project hits its cap?

A. If they hit like a—a cap, there's a limit at which their application might stop functioning, and so that's why we would proactively reach out to them and try to get them to upgrade to a different plan or do some capacity planning for them so it doesn't cause an outage for their users.

Q. Sir, in your capacity as head of engineering for Infura during this 2020 to 2022 time frame, were you generally familiar with how the company generated and stored records in the ordinary course of its business at that time?

A. Yes.

Q. Were you generally familiar with the kinds of business records that Infura generated and stored at that time?

A. Yes.

Q. All right. Sir, so next to you, you're going to see a binder that contains various documents. Are you familiar with this binder?

A. Yes.

Q.   Have you reviewed its contents?

A.   Yes.

Q.   And at a high level, what's in that binder?

A.   Communications between myself and members of the Tornado Cash team as well as invoices.

Q.   And are the records in that binder true and correct copies of certain business records that Infura kept during this time period we're focused on?

A.   Yes.

Q.   All right.  Okay.  And you mentioned a moment ago that there are certain communications in that binder; is that right?

A.   That's right.

Q.   Were some of those communications over Twitter?

A.   Yes.

Q.   Were some of those communications over Telegram?

A.   Yes.

Q.   And were some of them over email?

A.   Yes.

Q.   All right.  And sir, and these are true and correct copies of those communications as they existed in Infura's records?

A.   Yes.

Q.   And sir, if you look at the cover of this binder, does it list a number of government exhibits?

A.   Yes.

Q.   In particular, does it list the following government

exhibits:  802, 803, 803-1, 810, 813, 814, 815, 816, 817, 818, 819, 821, 823, 825, 827, 829, 831, 833, 835, 837, 839, 841, 843, 845, 847, 849, 851, 852, 853, 854, 855, 856, 858, 860, 862, and 867?

A.  Yes.

MR. GIANFORTI:  Your Honor, the government offers the exhibits that I just listed.

MS. AXEL:  Objection, your Honor.

THE COURT:  Is there a voir dire you wanted to make of this witness on these exhibits?

MS. AXEL:  Your Honor, it's just a huge, long list. The list was not run by us in advance, so I can't make individualized objections should we have any to any of these particular exhibits.

THE COURT:  Now is the time to be making those individualized objections.  Do you need to look at the documents?

MS. AXEL:  There are over 20 of them.  I don't even know if I can——I'll follow the screen.  It's going to take a few minutes.

THE COURT:  Please do.

(Pause)

MS. AXEL:  Your Honor, we would object to 803-1, which we don't have.  I'm not sure what it is.  And then we would object to the emails, your Honor, which are mostly hearsay

within hearsay, we would say.

THE COURT:  All right.  I'm admitting them over your objection.  So I am admitting, although, counsel, did you not send your adversary your 801?

MR. GIANFORTI:  My understanding is that it was produced long ago.

THE COURT:  Had you identified it as an exhibit in the recent past?

MR. GIANFORTI:  Yes, yes, we produced it as an exhibit on July 7th.

THE COURT:  All right.  I'm hoping that that representation is correct.  I am admitting these exhibits:  Government Exhibits 802, 803, 803-1, 810, 813, 814, 815, 816, 817, 818, 819, 821, 823, 825, 827, 829, 831, 833, 835, 839, 841, 843, 845, 847, 849, 851, 852, 853, 854, 855, 856, 858, 860, 862, and 867.  If I've missed something, please let me know, sir.

MR. GIANFORTI:  I think you may have skipped 837, according to my team.

THE COURT:  837.  Thank you.  837.  Anything else, sir?  Have I misnamed any of the other exhibits?

MR. GIANFORTI:  802 is not on the transcript.  802 apparently is not reflected in the livestream.

THE COURT:  802 was the first one.

MS. AXEL:  803 has embedded in it a .csv file.  We

would ask for that to be admitted as well.

THE COURT:  Is the government consenting to the admission of that?

MR. GIANFORTI:  Yes.  We're just determining that, whether we marked it as an exhibit previously so we can move it in.

THE COURT:  All right.  It is admitted.  Thank you.

MS. AXEL:  And we have it marked should we need to add it.

(Government's Exhibits 802, 803, 803-1, 810, 813, 814, 815, 816, 817, 818, 819, 821, 823, 825, 827, 829, 831, 833, 835, 837, 839, 841, 843, 845, 847, 849, 851, 852, 853, 854, 855, 856, 858, 860, 862, and 867 received in evidence)

THE COURT:  You may continue with your questioning, counsel.

MR. GIANFORTI:  And we'll figure out whether we marked that csv file that Ms. Axel was talking about, and we'll so move that exhibit once we have the exhibit number.  Or we can give it one if it doesn't have one already.

THE COURT:  Okay.

BY MR. GIANFORTI:

Q.  All right.  Mr. Galano, are you familiar with someone named Roman Storm?

A.  Yes.

Q.  Have you ever communicated directly with Mr. Storm?

P7L1STO3                      Galano - Direct

A.   Yes.

Q.   Approximately when did your communications with Mr. Storm begin?

A.   Sometime in 2020.

Q.   All right.  And who initiated those conversations, if you recall?

A.   I did.

Q.   Why did you open a line of communication with Mr. Storm?

A.   I had seen a posting cross my Twitter feed about the new work that he was doing that looked really interesting.  It was getting a lot of traction in the spaces that I follow.  And so I had reached out to him, typically to see if he was an Infura customer or a potential Infura customer.

Q.   Was Mr. Storm working on a particular project at that time that you were aware of?

A.   Yes.

Q.   What was that project?

A.   Tornado Cash.

Q.   And I think you testified earlier that at some point Tornado Cash became a customer of Infura; is that right?

A.   That's right.

Q.   And was this around this time in 2020?

A.   Yes.

Q.   All right.  So when you first became aware of Mr. Storm and Tornado Cash, were they already an Infura user, as far as you

knew?

A. Yes, they were already a user.

Q. And what sort of level of service were they using at that time?

A. They were on like our free tier that anybody can sign up and start using the service.

Q. And the free tier comes with a cap like the other tiers that are paid; is that right?

A. Yes.

Q. So focusing on the time period of May 2020 to August 2022, did Tornado Cash stay at that free level of service for that entire period of time?

A. No.

Q. How, if at all, did their service change over that period of time?

A. As the traffic of the account grew, they graduated onto our paid tiers and different levels of the paid tiers.

Q. Do you recall which paid tiers they graduated to?

A. Yes, they went to our Team tier and then to our Growth tier.

Q. Okay. And you testified earlier that the Growth tier is an order of magnitude more traffic available to them than the Team tier?

A. Yes.

Q. All right. And, sir, I asked you a moment ago to focus on

P7L1STO3                         Galano - Direct

the period May 2020 to August 2022.  Did Infura's relationship

with Tornado Cash end in August of 2022?

A.  Yes.

MR. GIANFORTI:  All right.  Ms. Sebade, could you

please pull up Government Exhibit 802, which is in evidence.

All right.  Thank you.

Q.  Mr. Galano, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  This is the Twitter communications between myself and

Roman.

Q.  Okay.  And do you see what this first message on the screen

is dated?

A.  Yes.

Q.  What is it?

A.  May 13, 2020.

Q.  Was this the first time you ever reached out to Mr. Storm?

A.  Yes.

Q.  And why did you reach out to him?

A.  I had seen one of the early postings about Tornado Cash,

thought it was interesting; in that role that I mentioned,

being like a founder, and part of my role being business

development, used this as an opportunity to thank him for the

content he had always been posting and open up a conversation

about Infura.

Q.   And do you see towards the bottom of the screen there are messages on the left?  Those are from Mr. Storm, right?

A.   Yes.

Q.   And do you see where it says "Tornado Cash is not-for-profit project"?

A.   Yes.

Q.   What was your understanding of that at the time?

A.   Fairly common for people to respond to me in this way, which is a lot of people are starting to build like a proof of concept or like example project and didn't have a clear way to monetize early on, they were building it more like as an open source public good.

Q.   All right.  Thank you.

        MR. GIANFORTI:  Ms. Sebade, could you please pull up Government Exhibit 803, which is in evidence.

Q.   Mr. Galano, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   This is a Telegram chat between myself and the Tornado Cash team.

Q.   Okay.  And the name of this Telegram exchange is Tornado Cash > < Infura; is that right?

A.   That's right.

Q.   Okay.  And E.G. Galano (Infura), that's you?

A.   Yes.

MR. GIANFORTI:  Could you expand the top of that, please, Ms. Sebade.

Q.  And romanstorm@peppersec.com, that's Mr. Storm?

A.  Yes.

Q.  All right.  Sir, do you see the message that you sent to Mr. Storm towards the bottom of the screen with a time stamp of 14:02?

A.  Yes.

Q.  And that's from May 14, 2020?

A.  Yes.

Q.  Could you please just read that first message from you into the record.

A.  Starting from the top?

Q.  No.  I'm sorry.  Starting at the——sort of the second message up from the bottom under the 14:02 that's from you.

A.  Second message from the bottom.  Okay.  The "I was talking to Roman"?

Q.  Yes, please.

A.  Okay.  "I was talking to Roman and asking what's the rough estimate on requests per day you guys are doing."

Q.  What did you mean by that question?

A.  I wanted to get an estimate of, like, what level of traffic they were seeing.  It's a way that we helped our customers capacity plan and get on the right subscription level based on how much they planned on utilizing our service.

MR. GIANFORTI:  Ms. Sebade, can you blow that out for a second, just full screen?

Q.  Sir, do you see sort of two thirds of the way down the page the date changes to May 15, 2020?

MR. GIANFORTI:  If you can highlight it, Ms. Sebade?

A.  I'm not seeing where the date changes -- oh, yes.  I can see it now.

MR. GIANFORTI:  You can blow that out again, Ms. Sebade, and go to the second page?

Q.  Now, Mr. Galano, I would like to read into the record a couple of these different messages, starting with the one from you with a time stamp of 9:08.  Do you see that?

A.  Yes.

Q.  So you will be you and I will read Mr. Storm's messages.

So, go ahead.

A.  *Got it.  Thanks.  Is there a revenue model for you guys as maintainers of Tornado Cash?*

Q.  *Unfortunately, no.*  Sad face emoji.  *Due to the nature of our product, our legal advisors push against monetization, so the commercial laws won't be applicable to us.  We might have a VC round soon but it's still in the works at the moment.*

And we can stop there.  Are you familiar with the term "VC", Mr. Galano?

A.  Yes.

Q.  What does that mean usually?

A.   Venture capital.

Q.   Do you recall why you asked Mr. Storm if Tornado Cash had a revenue model?

A.   Yes.

Q.   Why did you ask that?

A.   We didn't want to charge projects that were too early in their development cycle.  A lot of our early users were students and people that were still building things that were generally good for the ecosystem and we didn't want to stifle that growth.  And so, we would try to get discounts or grants to projects that were building something interesting but didn't have a clear monetization strategy yet.

          MR. GIANFORTI:  Ms. Sebade, can you please pull up Government Exhibit 804 in evidence and can you just blow that up?

Q.   Mr. Galano, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   It's an e-mail conversation where I was introducing Roman and the Tornado Cash team to my co-founder Michael Wuehler.

Q.   Who on this e-mail is representing the Tornado Cash team based on the e-mail addresses?

A.   Alexey and Roman.

Q.   And do you see a Poma at Tornado.cash?

A.   Yes.  Sorry.

Q.   Can you please read this e-mail into the record?

A.   Sure.

*Hi Michael.  I wanted to introduce you to the Tornado Cash team.  As we discussed, they don't currently have a way of monetizing their application and would like to see if there is some kind of arrangement we could come to to help them out on the costs.  Guys, Michael is our co-founder and leads our business and operation functions.  Let's continue the discussion here.*

Q.   Did you mention to Mr. Wuehler that they don't have a way of monetizing their application for the same reason that you described a moment ago, that you wanted to let them know that this was not a revenue-generating business yet?

A.   Yes.

          MR. GIANFORTI:  Ms. Sebade, can you please go back to Government Exhibit 803 and pull up the third page?  Actually, go down.  Could you please blow up sort of the bottom third?  Perfect.

Q.   Mr. Galano, this is the Telegram exchange we were looking at before, right?

A.   Correct.

Q.   Do you see where it says November 11, 2020?

A.   Yes.

Q.   We are going to read this into the record again.  I will be Mr. Storm, you can be yourself.  This is starting at time stamp

P7L5sto4                      Galano - Direct

9:25:

    *A lot of out customers suffered today due to Infura outage.*

A.  *Hey Roman.  We're really sorry about the impact this had on your users.  I've already published a full postmortem on our blog with details and follow-up action items.*

Q.  What did you mean by the term "postmortem"?

A.  Postmortem is typically what an engineering team will release explaining why a service had an outage, so we were explaining why the incident occurred and what we had done to remedy the situation.

Q.  So, in plain language, basically Infura services went down for a period of time?

A.  Correct.

Q.  Do you remember this incident generally?

A.  Yes.

    MR. GIANFORTI:  Ms. Sebade, could you please bring up Government Exhibit 814 which is in evidence?

Q.  Mr. Galano, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's an invoice from our team to Roman and the Tornado Cash team.

Q.  What is the date of this invoice or receipt?

A.  July 1, 2020.

Q.   You said this was directed towards the Tornado Cash team; is that right?

A.   Yes.

Q.   Do you see where it says Infura+ Team?

A.   Yes.

Q.   Is that a reference to the team subscription level that we were talking about a few minutes ago?

A.   Correct.

Q.   How much was this bill for?

A.   $225.

Q.   Did the Tornado Cash team get a discount for a period of time?

A.   Yes.

        MR. GIANFORTI:   Ms. Sebade, could you briefly blow up where it says "bill to"?

Q.   So, Mr. Galano, this particular account went to -- was associated with the e-mail hello@tornado.cash?

A.   Yes.

Q.   And the name Roman Storm?

A.   Yes.

        MR. GIANFORTI:   You can take that down.   Let's go to Government Exhibit 849, which is in evidence.

Q.   Mr. Galano, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   This is another invoice to the Tornado Cash team.

Q.   And for what time period?

A.   February of 2022.

Q.   So this is a little bit more than a year and a half later from the one we were just looking at?

A.   Yes.

     MR. GIANFORTI:  Ms. Sebade, can you please blow up the "bill to" area?

Q.   Mr. Galano, what is reflected here?

A.   It's bill to Roman Storm, his address, and the same e-mail hello@tornado.cash.

     MR. GIANFORTI:  You can zoom out.  Thank you.

Q.   Mr. Galano, do you see where it says Infura+ Growth as one of the line items?

A.   Yes.

Q.   Is that a reference to that growth tier account that you mentioned earlier in your testimony?

A.   Yes.

Q.   Do you see a couple lines above that where it says: 1 million requests add-on?

A.   Yes.

Q.   What does that mean?

A.   So, our tiers had limits that people generally needed to stay within and the million request add-on pack was something that we introduced to allow people to pay for usage beyond

that.  It is a way of starting to customize their plan for increased usage.

Q.  And if Tornado's usage had exceeded that amount, its users would find that it didn't work anymore?

A.  Yes.

Q.  And how much was this bill for, in total?

A.  $1,200.

MR. GIANFORTI:  Ms. Sebade, can you please pull up Government Exhibit 858, which is in evidence?

Q.  Mr. Galano, what are we looking at here?

A.  This is another invoice to the Tornado Cash team.

Q.  What does it say under "bill to"?

A.  Bill to Peppersec Inc., the address, and then I think -- OK.  Sorry.  There is no e-mail address this time.

Q.  Is this the same Seattle, Washington address we saw on the previous exhibit?

A.  Yes.

Q.  And then do you see where it says Infura+ 1 million requests day add-on?

A.  Yes.

Q.  How much did that level of service cost?

A.  $1,400.

Q.  What period of time is this invoice for?

A.  This was for April of 2022.

Q.  Could you just explain to the jury exactly what service

this bill is billing in this case?

A.   This is for an application that's using our RPC services, that software as a service model I was describing earlier, somebody was reading, interacting with the blockchain data that we have --

Q.   Sorry.  Go ahead.

A.   And this million requests add-on pack is to pay for the additional capacity beyond that growth tier that the customer was using.

Q.   So this reflects blockchain traffic to Tornado Cash above and beyond what was covered by the growth tier account?

A.   Yes.

Q.   And how much was that extra service billed at again?

A.   $1,400.

Q.   Do you see a memorandum on the lower right-hand corner where it says to send ETH, DAI, or USDC to a particular address?

A.   Yes.

Q.   Do you know why this invoice was included in this -- why this memo was included in this invoice?

A.   Around this time we started to accept crypto payments from our users.

        MR. GIANFORTI:  And Ms. Sebade, can you please pull up Government Exhibit 803 again and go to page 4?

        Actually, one moment, your Honor?

(Counsel conferring)

MR. GIANFORTI:  Ms. Sebade, can you please pull up page 8 of this document and could you please blow up the first quarter of this page, basically?

Q.  Mr. Galano, let's read this into the record.  I'll start with the time stamp of 22:03 as Mr. Storm, you can be Michael Wuehler.  That's your co-founder at Infura, right?

A.  Right.

Q.  *@eggalano we are running low on fiat = can we pay in crypto?*

A.  *Hey Roman, we can move you off of credit card billing and over to manual billing and can accept ETH, USDC, or DAI for payments.  We would need company name and physical address and we will get that set up for the next billing cycle.*

Q.  *Perfect.  Let's do that.  Peppersec Inc, 7220 South Taft Street Seattle, Washington, 98178.  Let's use USDC.*

Mr. Galano, is this roughly around the time period that you recall Tornado Cash starting to make payments to Infura in crypto?

A.  Yes.

MR. GIANFORTI:  No further questions.

THE COURT:  Cross-examination.  Ms. Axel?

MS. AXEL:  Yes, your Honor.

Can I have Exhibit 851 on the screen, where we just were?

P7L5sto4                        Galano - Cross

        May I inquire, your Honor?

            THE COURT:  You may.  Thank you.

CROSS-EXAMINATION

BY MS. AXEL:

Q.  Mr. Galano, this is the invoice that we were just looking at; is that correct?

A.  Correct.

Q.  And it is in fact directed to Peppersec Inc.; is that right?

A.  That's correct.

Q.  So Peppersec is the entity that was paying you; isn't that right?

A.  That's right.

            MS. AXEL:  We can take that down.

Q.  Mr. Galano, you are a software engineer yourself, correct?

A.  Correct.

Q.  A developer?

A.  Yes.

Q.  And you are a fairly high-profile person in the Ethereum community, right?

A.  Yes.

Q.  Co-founder of Infura?

A.  Yes.

Q.  Which was purchased by Consensys; right?

A.  Correct.

Q.   Consensys is the MetaMask company; right?

A.   Correct.

Q.   And have you a large Twitter following; right?

A.   Yes.

Q.   You speak at conferences, you're well known?

A.   Yes.

Q.   And you said you loved the Tornado Cash project; isn't that right?

A.   Yes.

Q.   And you testified today here that you also thought it was interesting; right?

A.   Yes.

Q.   Why did you find it interesting?

A.   Because privacy is seen as, like, a missing piece of what brings mainstream adoption to cryptocurrency and blockchain, that without having privacy be a part of that a lot of people would hesitate to use it.

Q.   When did you move into the blockchain industry yourself?

A.   2016.

Q.   Who were Infura's typical customers?

A.   Developers that were fairly new -- I guess everybody was new to the Ethereum ecosystem at the time but developers building on Ethereum, primarily.

Q.   I believe you used the word dApps?

A.   Right.

Q.   Whats a dApps?

A.   Stands for decentralized application.

Q.   And those are the types of applications that partner with Infura?

A.   Yes.

Q.   You mentioned also that you reach out and find people on Twitter; correct?

A.   Correct.

        MS. AXEL:   And the government showed you -- let's take a look at it again -- what's been marked as Exhibit 802.  Can I have that?

Q.   You told us that you reached out to Mr. Storm directly on Twitter; isn't that right?

A.   Yes.

Q.   And he wasn't hard to find, was he?

A.   No.

Q.   He built the project in his own name; right?

A.   Right.

Q.   It was a very public project; right?

A.   Correct.

Q.   And you said it was gaining traction in the community; right?

A.   Right.

Q.   People were very interested in it because privacy is a value; right?

A.   Right.

Q.   I want to just cover some of the tech words you used that I'm not sure were fully explained.

          MS. AXEL:  You can take that down.  Thank you, Mr. Demarco.

Q.   You used the word API at one point.  What is an API?

A.   Stands for Application Programming Interface.

Q.   How does that word fit in with what you described that you do?

A.   All right.  So, to be able to interact with the blockchain, so send a transaction, you run this node software yourself and the application that you use connects to that.  The API is the way that it does that, it's the standard of how you send and receive messages between a wallet or an application that's using the blockchain and the blockchain data itself.  And so, Infura hosts that API as a service so that instead of running that software yourself, there is a publicly available endpoint that any application can point to without having to run and manage infrastructure.

Q.   So your customers are applications; right?

A.   Right.

Q.   Things that aren't running on blockchain themselves?

A.   Right.

Q.   And so in this case with respect to Tornado Cash, the application in question was the Tornado Cash user interface;

correct?

A.   Correct.

Q.   That ran on Tornado.cash.ETH.Limo; right?

A.   Correct.

Q.   You weren't partners with the Tornado Cash pools that live on the blockchain; right?

A.   No.

Q.   Now, these RPC nodes, right, or the node that you run, right, it reads information on the blockchain; am I correct?

A.   Correct.

Q.   And therefore sort of stands as an intermediary between this application or website and then transactions that occur on the blockchain; is that right?

A.   Right.

Q.   Please correct me if I am wrong.

A.   Let's see.  Can you say that again so I can make sure?

Q.   Would you tell us exactly the relationship between then the RPC node and then again the blockchain versus the application?

A.   OK.  So a blockchain is a decentralized database that exists on a peer-to-peer network:  Collectively, all of the nodes in the network maintain a copy of this database and if you want to interact with any of the applications built on it, you either need to run that software yourself or rely on somebody else to host that data for you and then you're interacting with their copy of it.  And that's effectively what

P7L5sto4                        Galano - Cross

happens when somebody is interacting with services or --

sorry -- applications through Infura, is they're interacting

with our copy of that database.

Q.   And the node doesn't always write transactions to the

blockchain; correct?

A.   Correct.

Q.   The node sometimes just reads transactions that are going

on on the blockchain?

A.   Yes.

Q.   Why would the application need to do that?  Why would the

application want to just read blockchain data as opposed to

writing to it?

A.   A lot of times users are just exploring data on there, just

perusing what is the balance of this thing, what is the current

state of this application.  Analytics types of things.  It's

more rare to actually send a transaction that affects the state

of the blockchain.

Q.   So read transactions are more common than write

transactions?

A.   Yes.

Q.   Would an application also need to read the blockchain data

simply to write the computer programming language necessary to

do a write transaction?

A.   Yes.

Q.   Do you understand that is what the user interface did?

P7L5sto4                    Galano - Cross

A.   I'm sorry.

Q.   Did you understand that that's what the Tornado Cash user interface did?

MR. GIANFORTI:  Objection.

THE COURT:  I think we are getting -- no, sustained. that's beyond the direct.

BY MS. AXEL:

Q.   And you also use the term software as a service, Mr. Galano, correct?

A.   Correct.

Q.   That means you get paid for this function -- Infura gets paid for the service it provides; correct?

A.   Correct.

Q.   But you also testified that it was very common for projects -- open source projects to not be monetized; is that correct?

A.   Yes.

Q.   And isn't it also common for, in open source projects, for developers sometimes to just pay for infrastructure associated with their applications?

A.   Yes.

Q.   Or sometimes they fundraise for it?

A.   Yes.

Q.   But they don't charge users; correct?

A.   Correct.

Q.   And I want to look back at the long text chain that we looked at or the message in 803.

MS. AXEL:  Mr. Demarco, can I have -- the government showed the second page of the exhibit which ends in Bates 7865.

Q.   With Mr. Gianforti you read this part of the message that says:  *Pushing against monetization.*  Do you remember that?

A.   Yes.

Q.   Can I direct your attention to the bottom of this page? Mr. Storm also told you there at the very bottom:  *We don't generate any money.*  Is that right?

A.   Right.

Q.   To your knowledge, did that ever change?  Did the application ever charge any money?

A.   Not to my knowledge.

Q.   Just so we are clear, that occurred on June 1, 2020; is that right?

A.   June 1, 2020; yes.

Q.   And, you also testified in response to a question from Mr. Gianforti that you wanted Mr. Wuehler to know that Tornado Cash was not a revenue generator; isn't that right?

A.   Right.

Q.   To your knowledge, did it ever generate any revenues?

A.   Not to my knowledge.

Q.   And as you described, Infura acts between someone using this user interface and the blockchain; correct?

A.   Correct.

Q.   Can Infura see and store then, IP information?

A.   It can.

Q.   And that would be the IP information of the user of the user interface; correct?

A.   Yes.

Q.   Would you just remind us all before we go down this, what is IP information?

A.   IP information, it stands for -- maybe I shouldn't get into that -- IP information is every computer or device that is connected to the internet has a unique IP address.  An IP address is a way that you can identify where traffic is coming from.  It's typically correlated with your internet service provider so you can figure out what location traffic is coming from.

Q.   And what did you do with this data?

A.   This was -- at the time in 2020 we had had firewalls in place which is like a protective measure to prevent traffic from specific areas of the world or to set specific rate limits so that a given user can't use more than, like, what would be a reasonable amount of traffic capacity that might overwhelm our systems.

Q.   And you used the word firewalls.  Do you mean the same thing as a geoblock?

        MR. GIANFORTI:  Objection.

P7L5sto4                     Galano - Cross

A.   Yes.

THE COURT:   I will allow.

I understand, we are going beyond the scope.  Counsel, are you nearing completion with the cross-examination?  Because we do have a juror who has a medical appointment.

MS. AXEL:   I would say it is about 10 minutes.

THE COURT:   No, then we need to break for the day.  I will hold you to the 10 minutes tomorrow.

I'm sorry, sir.  We have an issue.

Ms. Axel, were you at the end of a particular point?  If you had one question left in an area I would give you that, but if you are moving on to a new point, then I think we should stop for the day.

MS. AXEL:   I think there is a little bit more on that point.

THE COURT:   Let's finish that and we will break for the day.  Thank you.

MS. AXEL:   No, I think there is a little bit more on this topic.  I will ask one more question.

THE COURT:   Thank you.

BY MS. AXEL:

Q.   With respect to this IP address information, were you ever -- are you aware of the Ronin hack, sir?

MR. GIANFORTI:   Objection.

THE COURT:   Sustained.

Q.  Were you ever approached by any victims of any hacks and asked for this data?

MR. GIANFORTI:  Objection.

THE COURT:  Sustained.

Q.  Does Infura preserve this kind of data anymore?

MR. GIANFORTI:  Objection.

THE COURT:  He already began down that road.

You can answer that one question, sir.

THE WITNESS:  Can you repeat the question?

Q.  Does Infura continue to preserve this information data?

A.  No we do not.

Q.  Why not?

THE COURT:  I will allow.

A.  It was in our best interest to not maintain those records.

Q.  And when did you stop maintaining these types of records?

A.  I believe it was towards the end of 2023.

MS. AXEL:  Is that would be a good stopping point, your Honor.

THE COURT:  All right.  Sir, I'm sorry we will have to have you come back tomorrow.  We thank you very much for your patience.

To our jurors, we are going to break for the day and I will see you tomorrow bright and early at 8:45 so we can begin at the crack of 9:00.  We will see if we can go a little longer to address what is happening in this case.  I am going to

P7L5sto4                        Galano - Cross

remind you, as always, not to discuss the case with each other or anyone else, and to please keep an open mind until all of the evidence is in.

Have a great afternoon and evening.  Thank you.

All rise.

(Continued on next page)

P7L5sto4                      Galano - Cross

(Jury not present)

THE COURT:  Please be seated for a moment.

The witness can step down, sir.  I'm going to remind you two things.  One thing, you are under oath, sir.  Two, please do not discuss the subject of your testimony with the prosecutors because you are now on cross-examination.

THE WITNESS:  OK.

THE COURT:  Thank you very much.  We will see you tomorrow.

(Witness steps down)

THE COURT:  Counsel, a lot of things came up this morning and I wish to work with you to be as efficient as possible, so if there are -- I have read Mr. Casey's letter regarding Rule 106 and rule of completeness, and to the extent that the parties can work out these issues, that's better.  The fewer things for me to have to decide.  So I'm happy to give you the opportunity, I just need to know how much time you need to have it.

Mr. Klein?

MR. KLEIN:  We had spoken with the government, and after your conference we were going to find a time to meet and confer on a number of issues this afternoon, your Honor, so we are hoping -- and that will be on the list of issues to discuss.

THE COURT:  Of course.  No one wishes juror 2's tooth

P7L5sto4                         Galano - Cross

to have become infected but if we can make some productive use out of the afternoon, yes.

I was going to ask you if it was the parties' preference that we discuss charge issues tomorrow to allow you to work out these other issues today.  I have other things to keep me busy so I can do that, if that's your preference.

MR. KLEIN:  Your Honor, we are ready today but if you think it is better tomorrow.

THE COURT:  I'm ready today, too.  I'm asking you what works best for you or do you want to split the team, do you want to have one person meeting on the charge issues and one person, other people meeting on other issues.

MR. KLEIN:  I think we should use the time today early to deal with the charge issues, to start with them, and we can talk right after with the prosecution team and we will get back to the Court.

THE COURT:  Is that acceptable to the government?

MR. REHN:  It is, your Honor.  Obviously we don't know what issues the Court has flagged so we may need time to research them, but we would be happy to have an additional conversation.

THE COURT:  Is it acceptable to the parties, and I just want to do this so I can spread out, if we can meet in the alternate jury room in a few minutes?  Do you want to stay out here in open court?  I will do whatever you want.  I need to

get my stuff and I need to spread it out.

MR. KLEIN:  Yes.

MR. REHN:  Happy to do whatever the Court prefers, your Honor.

MR. KLEIN:  I'm not going to be there, your Honor, so I will let Ms. Axel answer.

MS. AXEL:  That is fine.

THE COURT:  Certainly, Mr. Storm, you are always welcome but also welcome not to be there.  This isn't a charge conference, this is a pre-charge conference charge conference, just to understand some things that the parties have submitted.

MR. KLEIN:  Our client is going to waive his presence to be there, your Honor.

THE COURT:  Mr. Storm, I am seeing you nod your head, sir.

THE DEFENDANT:  Yes, I do.

THE COURT:  Thank you very much.

Someone else wants to speak?

MR. KLEIN:  We had two things.

THE COURT:  Mr. Klein, that's fine.  Please, go ahead.

MR. KLEIN:  One thing is, your Honor, and the exhibit issue became a little bit of a delay and we don't want those delays, so when the government lets us know who the witnesses are, we ask that they identify the exhibits they plan to put in because it is a little bit of a scramble for us sometimes to

look at those exhibits quickly, especially when there is a long list of them, and we are not sure what our previous objections are, where they are.  So we would ask them to identify their witnesses as well as -- I get exhibits might pop up, but at least an array of exhibits they expect.

THE COURT:  I understand what you are saying.  I would have thought that this is the only witness from Consensys. Perhaps I am mistaken.

MR. REHN:  You are correct, your Honor.  Our exhibit folderring system typically has the exhibits folderred by the relevant witness and so it should be apparent.  That's why we hadn't received any prior requests like this from the defense. We were under the impression they intuited that the exhibits folder to a particular entity or witness would be the ones that would be introduced during that witness' testimony.

THE COURT:  But is it the case that every exhibit in the range for the Consensys witness was introduced today?

MR. REHN:  It is not, your Honor.

THE COURT:  All right.

MR. REHN:  The list is somewhat overinclusive.

THE COURT:  And to the extent it is overinclusive, are you telling me that those other exhibits are simply not going to be introduced during this trial or that they're coming in in some other way?

MR. REHN:  At least with respect to those exhibits

they will not be and I think that is generally the case.

THE COURT:  I think to the defense's point, if you can say we are going to call Mr. Galano and it is our intention to introduce everything in the Consensys group or almost everything, I do think that would be the appropriate thing to do.

Our next witness is who, please?

MR. REHN:  Ben Gibbs.

THE COURT:  Mr. Gibbs.  Mr. Gibbs is from where, please?

MR. REHN:  He is from Last Mile Labs.

THE COURT:  Is Mr. Gibbs' -- is there a folder of Last Mile Labs exhibits?

MR. REHN:  There is, your Honor.

THE COURT:  Is it your intention to introduce most or all of the exhibits in the Last Mile Labs folder?

MR. REHN:  It is not, it is actually very limited, but I can give the Court those numbers now.

THE COURT:  I think the defense's point is it's a waste of their time to look at exhibits and wonder about objections if you are not going to introduce them.  So, if it is possible, and I think in most cases it is possible, to give them a general sense of the exhibits you tend to introduce, then please do so.

It was my understanding that if we were calling a

witness you were going to introduce most or all of the exhibits in that witness' category but, if not, let them know so they're not spinning their wheels, please.

MR. REHN:  Certainly, your Honor.

THE COURT:  OK.  Good.  That's all we have to talk about.

Mr. Klein, what is the other issue, please?

MR. PATTON:  Your Honor, this one is from me.  It's a substantive issue and I will say at the outset I'm happy to preview it but we are also happy to write on it.

THE COURT:  And it is, sir?

MR. PATTON:  This relates to the government's first witness, Ms. Lin.  As your Honor knows, we objected to her testifying as not being a victim of Tornado Cash and Mr. Storm. Your Honor overruled that objection.  We also objected to her basis for thinking her funds went to Tornado Cash and the government offered it, said, first, we are entitled to call Ms. Lin because we are entitled to prove up that illicit funds actually went to Tornado Cash; and secondly, we are entitled to say she thinks that because it explains her outreach to Tornado Cash, her e-mail to the hello@tornado.cash e-mail address.

Now, we assumed that the government would, at some point, connect up the actual flow of money to Tornado Cash because otherwise she has utterly no relevance to this case.

THE COURT:  And your questioning of Agent DeCapua suggested that you demonstrate that they had not traced it or it couldn't be traced and in fact the funds did not go to Tornado Cash.

MR. PATTON:  Correct, your Honor.  So that raises a number of issues.  One, we think that unless they have somebody else -- we are not aware that they have somebody else tracing or have information.  Obviously if they do, then this is unnecessary.  But if they don't, then we think at the very least Ms. Lin's testimony ought to be stricken and there ought to be an instruction to the jury.  And we also would like some time to discuss with our client about moving for a mistrial because they called a very sympathetic alleged victim who, from our research over the weekend, we can't find a connection between her funds and Tornado Cash.  And we thought that Agent DeCapua might be able to fill in those blanks as to the basis for the government thinking that but apparently he hasn't.

So I don't know what their other basis for connecting the dots between Ms. Lin and Tornado Cash is.

THE COURT:  Mr. Rehn?

MR. REHN:  Yes, your Honor.

Based on the colloquy that the parties had at the pretrial conference, we asked our block trace team to do the tracing.  I just conferred with the guy who did the initial tracing, he said it took him 20 minutes.  We disclosed

yesterday a supplemental disclosure for Stephan George, the IRS-CI agent who is already disclosed as a tracing expert, we disclosed it yesterday after he, himself, did the tracing. Again, it is a few short hops from the transaction hash that Ms. Lin sent to the defendant via e-mail back to her initial deposit onto that NTU Capital website, both of which are in evidence.

And so, just to connect those dots, we have produced supplemental disclosure to confirm that in fact those funds did flow into Tornado Cash.

THE COURT: And it is Agent George who will testify to this?

MR. REHN: Correct, your Honor.

THE COURT: All right.

MR. REHN: According to our tracing people, it is a very straightforward, a few hops from the initial deposit to the deposit into Tornado Cash.

THE COURT: Once again, and you know I say this with not a shred of annoyance in my voice, it would be neat if you could preview this with each other before having me hear it with them for the first time whichever side. Both sides are springing things on each other and me at the same time without consulting or conferring with each other.

Mr. Patton, I simply don't know not being today a blockchain tracing expert, whether in fact these funds can be

traced.  You have received the supplemental disclosure.  Do you believe it to be inaccurate, sir?

MR. PATTON:  Your Honor, we will take a look at the supplemental disclosure.  That is not what the government noticed Mr. George for so it's a little bit surprising to hear him being used as tracing these funds and a little unusual that the FBI agent that they have for tracing funds wasn't used.  So, we will take a look at it and we will get back to your Honor.

THE COURT:  OK.

MR. REHN:  Your Honor, we disclosed two separate tracing experts and one from the IRS and one from the FBI, so the suggestion that there is something unusual about using one of them as opposed to the other for this purpose I think is incorrect.  We did produce, in discovery, the entire tracing report that Ms. Lin herself obtained that she testified about and the tracing that our agent did is consistent with that so it is not like there is a surprise as to the basic hops that are involved in this.  Those are all in the discovery, clearly marked as relevant to Ms. Lin, part of her own materials that she provided to us.

THE COURT:  Obviously I appreciate the zealous advocacy on both sides.  I just wish that there weren't so many instances of which I am being told something and apparently the other side is hearing it for the first time.  So, I can't make

you talk to each other any more than you are talking to each other, but once in a while if this keeps happening -- I mean, I think things should be discussed with each other -- I appreciate the element of surprise, really important, but I would like things to be discussed with each other before you discuss them with me.

So, Mr. Patton, I simply don't know, factually, whether this stuff can be traced or not but you have the disclosure and you will work with that.

MR. PATTON:  We will review what they apparently produced, speaking of midnight missives, what they produced yesterday, but we will get back to the Court on that.

THE COURT:  All right.  For everyone's benefit, after Mr. Gibbs and assuming he is not the longest of witnesses, who is next?

MR. REHN:  Austin Dever, D E V E R.

THE COURT:  Thank you so much.  Next?

MR. REHN:  Probably Shakeeb Ahmed.  And Kurush Dubash, and he is a representative of Alchemy.

THE COURT:  I beg your pardon, sir?  May I hear it again, the company?

MR. REHN:  What was that?

THE COURT:  Mr. Dubash is from where, please?

MR. REHN:  Alchemy.

THE COURT:  Alchemy.  Thank you.

MR. REHN:  And I omitted one, your Honor.  I may have these somewhat out of order, but FBI Agent William Lopez.

THE COURT:  Where in that group?

MR. REHN:  Likely before Ahmed.

THE COURT:  Gibbs, Dever, Lopez, Ahmed, Dubash.

MR. REHN:  I expect that will get us through tomorrow.

THE COURT:  I am going to ask the jury to see if we can stay at least until 4:00, maybe a little beyond, to try and make up, and I'm not going to ask the government whether you think you are finishing this week because that will depend on some of the conversations you have today.

I'm not a horrible person -- you wonder what that sentence is the preface to.  If folks want to meet after lunch and our court reporter is available I can do that as well.  I can do now, I can do 2:00, it is entirely up to you.  I'm trying to give you a break if you need it.

MR. PATTON:  Our preference would be 2:00, your Honor, but we can make either happen.

MR. REHN:  That's fine, your Honor.  We will meet at 2:00 in the unused jury room behind this courtroom.

Anything, any other issues, anything else I should be looking out for this evening?  I guess I won't know until I know.  OK.  I will see some subset of you at 2:00.  To the rest of you, thank you so very much.

(Luncheon recess; continued on next page)

P7L1STO5

(In open court; jury not present)

THE COURT:  First of all, thank you very much.  And could you introduce yourself, because I don't think we've met.

MS. JAMES:  Yes, your Honor.  I'm Becky James.

THE COURT:  Ms. James, I'm very happy to finally make your acquaintance.  If we've met before, I apologize if we've been introduced.

Counsel, some of these issues are going to sound incredibly stupid and pedantic, but I want to work out as many as I can beforehand because I have this belief that that will make the charge conference shorter.  Also, there are some suggestions that the parties have made.  I'm not sure whether they're strategic or not.  There are some suggestions from the defense, for example, where they're asking me to sort of telescope certain issues or immediately proceed to something because a matter is not at issue.  And if the parties are at agreement, for example, that a particular charge can be shortened, a paragraph can be removed because it isn't relevant, then great, we'll talk about it, but I didn't want to be misadvised on any of these things.

So let me just have a couple of housekeeping matters.

In the old days, before the pandemic, we used to allow the jurors to give us notes for the exhibits that they wanted to see, so we'd wait for the note and they'd say, we'd like to have Exhibits X through Y.  My understanding from my

deputy—and this is a pandemic thing that I think continues—is that at the end of evidence, Ms. Noriega is going to get from your paralegals all of the exhibits that were introduced.  They will all be loaded onto a laptop so the jurors will have access to all of the exhibits that have been introduced.  And so I will just adjust the charge.  It used to say, if you want an exhibit, you can ask for it, but now they'll have it.  So keep that in mind.  I also ask you to keep that in mind so that your very, very thoughtful paralegals will have the list of all admitted exhibits and will be ready to have the thumb drive with all of the exhibits ready.

A second thing, taken slightly out of order but only because I promised my deputy I would do it, I'm begging the government to come closer to 8:45 each morning because I think that there are pretrial day discussions that can be had that should be had, and then maybe we won't take the jurors' time. Today was an example of that.

Okay.  Let me keep going.

Again, these will vary in terms of substantive nature, but I want to make sure I ask all of them.

With respect to the evidence that is coming in, do we actually have, Mr. Rehn or your team, any audio or video recordings made by or at the direction of law enforcement?

MR. REHN:  I do not believe so, your Honor.

THE COURT:  Okay.  Because I received a charge

P7L1STO5

regarding those, and so I won't give it.

Are there statements of Mr. Storm that are coming in through means other—unless he testifies, of course—through means other than the chats and emails?  For example, I didn't think there was a post-arrest; I didn't think you were introducing his proffer statements.

MR. REHN:  That's correct, your Honor.  There is an interview he gave.  There are two interviews—one during the charged time period and one shortly before trial—as to which we are likely to seek to admit some short segments of those interviews.

THE COURT:  Can I trouble you to get closer to the microphone, sir.  And I had just said I was hoping for more informality.  Perhaps I should tell you, sit down, make yourself at home.

MR. REHN:  Happy to sit, your Honor.

THE COURT:  Sit down, yes, and you'll be much closer to the microphone.  Thank you.

So I want to see what that looks like.  Are you asking for the charge on false exculpatories?

MR. REHN:  I don't know for sure.  Actually, some of that may relate to some of the rule of completeness issues the defense has raised, where—

THE COURT:  Okay.

MR. REHN:  If—yeah, anyways, there are some things

they want to put in which we think shouldn't come in, but that may require an instruction.

THE COURT:  Okay.  In terms of transcripts, I am seeing transcripts of Russian-language conversations, in particular the Telegram chats.  There was a charge given about transcripts of recordings.  I know at one point there were recordings——I didn't think of this as a case, for example, where there are recordings where there would be transcripts, where you're following along as the recording is happening, a recording in a different language.  But you tell me.  For example, for the interviews of which you speak, are there transcripts that are going to be provided?

MR. REHN:  We have prepared transcripts.  I'm sorry.  I keep standing.

THE COURT:  Whatever works for you, sir.  Again, I'm trying to be as informal as possible.  I just want to get answers.  Whatever works, sir.

MR. REHN:  In addition to those, there are a small number of audio messages that were attached to Telegram chats——

THE COURT:  Okay.

MR. REHN:  ——as to which we have prepared only a English-language text translation on paper.  We haven't had somebody sort of interpret it in audio.  So, you know, I guess the recording will come in, but it will be incomprehensible to the jury.  It's the translation that is relevant.

THE COURT:  Well, there's a charge about the transcripts of recordings coming in, but that the recordings themselves are the best evidence of what was said.  It sounds like I'm not giving that charge if the transcripts are translations.

MR. REHN:  As to the translations, we agree, your Honor, because——the parties have reached a stipulation as to the translations being accurate.

THE COURT:  Nonresponsive.  Are you admitting English-language transcripts as well?

MR. REHN:  Of the interviews, yes.

THE COURT:  Okay.  Then that charge is going to stay in.  Thank you.

With respect to Mr. Bram, Mr. Llacuna, and perhaps Mr. Ahmed, you know, the government has submitted an accomplice witness testimony charge, but this isn't quite that.  I've changed it.  And I'm telling this to both parties but I'm focusing on the government here.  I'm changing it to, rather than accomplice witnesses, to people testifying pursuant to cooperation or nonprosecution agreements because that's what these folks are.  But I don't understand them to be accomplices in the sense of people involved in the charged conduct.  Am I correct?

MR. REHN:  We aren't taking the position that they are——

P7L1STO5

THE COURT:  They're not accomplices.

MR. REHN:  I think that's——I think we would agree with that, your Honor.

THE COURT:  Okay.  Who from the defense table wants to speak, if anyone?  As it happened, this may be the rare case in which the defense isn't necessarily fighting or talking about the credibility of the witnesses.  It doesn't seem that you dispute their credibility, but I didn't think of them as accomplice witnesses as I usually think of the term.  You know, they're cooperators, but they're cooperators who may have been involved in different conduct.  Ms. Axel, it may be the case that it only works when you see my charge, but what I'm talking about are references to accomplice testimony because I don't think they're accomplices.

MS. AXEL:  We would agree with that, your Honor.  I haven't looked at this particular instruction.  I'm happy to look at your edit of it.

THE COURT:  Okay.  I will give it to you when it is done.  There's a portion of that instruction, though, that talks about individuals pleading guilty to charges arising out of the same facts.  Again, I feel like we're one step——we're sort of adjacent but not in the same——these are different facts.  They may have used Tornado Cash, but they didn't conspire to money launder, if anyone did; they didn't conspire to operate an unlicensed money transmitting business; they

didn't conspire to violate the IEEPA.  So I don't think that paragraph matters.  But perhaps what I'll do is, you know what, I'll put in "if applicable" or "KPF proposes to delete" so you see what it looks like.

          To my friends at the defense table, your requested charge about Mr. Storm's testimony ends by asking the jury to treat his testimony as they would the testimony of any witness with an interest in the case.  Now I've had some problems with those charges in the past.  I tend to charge, "treat his testimony like that of any witness," because that "interest in the case" thing gets very problematic.  The cases I'm going to call to the parties' attention, so that you're not surprised, are *United States v. Solano*, 966 F.3d 184; and *United States v. Jenkins*, 43 F.4th 300.  This is in fact the request that you have submitted, but I just don't know that you want to submit that request.  I would end it by saying, "just as you would the testimony of any witness," and I would take out the words "with an interest in the case."  Now again, the government may disagree with me, but these I believe are the most recent Second Circuit decisions about how you charge a jury when a defendant testifies, and they go through cases I have personal knowledge of—the *Gaines* case, the *Brutus* case, the *Mehta* case.  So I guess I'm just saying, I will listen to you if you want to keep that requested charge.  I will also listen to you if you want to take out language in light of these cases.  I just

P7L1STO5

don't know if you saw them.  So I'm telling you about them. You now have them.

MS. AXEL:  Thank you, your Honor.  We will look at them.

THE COURT:  Thank you.

Now we're in the meat of the charge.  And I promise you, it's going to sound like the stupidest point to me, and yet it's the thing that keeps me up at night.  This is the rare case in which we are charging—or you're asking me; you have charged, I've done no charging—the government has charged the conspiracy offense but not the substantive offense.  And it's often really easy, in the cases where they're both charged, to say, conspiracy, first you have to find a conspiracy, second element is whether the defendant knowingly and willfully or knowingly and intentionally joined the conspiracy.  And you just say, for the object, see later when we talk about money laundering.  Here, we're not.  We just had the conspiracy.  And so I'm going to use money laundering as an example.  Arguably each of you is asking me to prove too much.  The defense is asking me to actually charge that the offense happened, that the objectives were committed, and that's footnote 22 of their proposed charge.  The government wants me to charge, for example, for the third element I think of money laundering, they want me to charge that the defendant knew.  Now the defense as well actually believes that the defendant—and it's

P7L1STO5

not enough that a conspirator knew but that the defendant has to know. I've tried it both ways. It's really hard, and I know why it's hard, because we're just charging the conspiracy offense, but if you think about it——and I'm going to ask you just to indulge me for a moment——when you talk about the conspiracy, I don't have to mention Mr. Storm's name at all until I get to the second element. Is there a conspiracy? Did one or more people agree to do A, B, C, and D? Then next, did Mr. Storm? Now I would completely understand and I might even agree with you if you want to take away some of these issues by saying, the object is money laundering, and here you'll have to show that Mr. Storm and one other agreed to do X, agreed to do Y, and just invert the order. But if you think about it in the way that Sand prescribes the charge, the first question is: Did the conspiracy exist? The second is whether the defendant is a part of it. I'm fine inverting the order, but I'm just telling you, each of your charges, in one way or another, requires me to invert the order because it asks me to talk about Mr. Storm's involvement before I get to the point of asking the question of whether he's involved. I'm fine doing that. I just want you to understand that.

And to the government, if you have seen the defense proposed charge, I believe it is footnote 22 where they are suggesting that it sort of saves time or streamlines things if you require the commission of the objectives, I'm not planning

on doing that, but I will listen to you if both sides say——let me back up a moment. There are some things here that I'm not sure the parties disagree on. And if that's the case, then I don't know why I bother charging the jury. We may just agree on something. For example, does anybody actually believe that the hacks didn't happen, that there wasn't an SUA? There is certainly a question about whether Mr. Storm knew about it, but am I really charging the jury that they have to find that an SUA happened? I will if you want me to, but that's a real question for you. Because the government, for example, in this second element, proceeds of the specified unlawful activity, you want me to charge the following——that either the financial transaction in fact involved the proceeds of one of these specified unlawful activities or that Mr. Storm believed that it did. Now let's pause there. You cite here the *Wade* charge, but I didn't charge belief in *Wade*. The belief prong I thought came into play if it was a sting operation, where the government says, here, here's wire fraud proceeds, and someone ends up trying to launder them. Mr. Storm's knowledge comes into play, to me, in the third element. So I'm asking the government to look at the second element and see whether you really want that belief part, and, if so, what you're citing to for that proposition. I read the *Bankman-Fried* charge, I've read the *Chastain* charge, I've read the *Mizrahi* charge from Judge Oetken and the lengthy Russian name I can't pronounce

P7L1STO5

from Judge Abrams.

MR. REHN: *Rahmankulov*, most likely, your Honor.

THE COURT: *Rahmankulov*, yes. Thank you. I don't believe this is a belief case. I think there is a specified unlawful activity. But you tell me. You wanted to speak, Mr. Rehn.

MR. REHN: I don't actually have our charge in front of me. We cite in that instruction the Second Circuit case that that comes from. It's a Second Circuit case where the Second Circuit actually held the evidence was insufficient to prove a substantive money laundering charge because there was insufficient evidence that the SUA had in fact happened, but it was—it was affirmed a conspiracy money laundering charge because the evidence was sufficient to prove that the defendant believed there had been an SUA. And so that's where that language comes from in our charge.

THE COURT: Fair. Thank you.

MR. REHN: It's in the footnote to that part of our instruction.

THE COURT: I thought the footnote was only to *Wade*. I'll have to look more closely. Thank you. But is there really a case in which the defense is going to protest that there was—I don't know. Wait. Before you say anything. Actually, the defense does. The defense is suggesting—and I don't know if the government saw this—that wire fraud cannot

P7L1STO5

suffice as an SUA under the *Prevezon Holdings*, a case from Judge Griesa.

To my friends at the defense table, let me say this. I looked at *Prevezon Holdings*, but the most recent case that I've seen on this issue is a summary order, *United States v. Greenwood*, 2025 WL 354692, which was part of the OneCoin prosecution, and in that case, it upheld wire fraud as an SUA, assuming, as the evidence tended to prove, that that wire fraud was domestic in nature. So to your extraterritoriality point, I might agree with you except I believe that the government is going to be moving for wire fraud on people like Ms. Lin and folks for whom the wire fraud is domestic. So if that is the case, I read this *Greenwood* decision from the Second Circuit to permit wire fraud as an SUA. I've also seen it in other cases. I think some recent decisions of colleagues of mine continue to use it as an SUA. So it may be that upon reading *Greenwood* and upon understanding that the government's only going to be arguing for domestic wire fraud, that you may agree that that does suffice. If not, you'll certainly tell me. But I guess the belief issue comes down to that. If there's a dispute, then I may keep the belief part of it.

Okay. On the wire fraud SUA, the defense didn't give any charges about it because they believe it shouldn't be included. So the government, on your charges, you actually argue that the defendant must have participated in the scheme

P7L1STO5

or artifice to defraud, which I don't think is right. Secondly, you argue that you can find the existence of a scheme to defraud "if you find that the person or persons involved in the internet fraud schemes conducted themselves in a manner that departed from traditional notions of fundamental honesty and fair play in the general business life of society." I don't know why we're taking that on. That might be a relic from another case that is not this case, in which case tell me now and I will happily delete it.

MR. REHN: Yes, your Honor. That's actually an instruction we sort of struggle with in the office and there's ongoing sort of litigation, and it's certainly not necessary in this case and so—

THE COURT: That's the right answer. And presumably I can take out the requirement of the defendant's participation?

MR. REHN: Yes, your Honor.

THE COURT: Thank you so much.

All right. Government, know as well that the defense has suggested that—they're asking for the deletion of certain paragraphs regarding the duration of involvement or the knowledge of members, and I know those are very common in drug cases where someone comes into an existing conspiracy. I don't know if that's what you're charging here. I don't know that that's what the jury is hearing about. But please look at what the defense is suggesting that you delete, and if you agree

P7L1STO5

that it's just not necessary, I will delete it.  If you do not agree, you'll tell me why we need it.

Ms. Axel or Ms. James, do you want to speak to your point in footnote 22?  And I hope I'm not misstating it, but let me get to it.

Yes.  You are suggesting that a person who is part of the conspiracy conducted a financial transaction.  You're asking not for the agreement but for the actual conduct; is that correct?  And if so, why, please?

MS. AXEL:  Yes, that's correct, your Honor.  I mean, I think—well, footnote 22.  Sorry.  I'm looking at footnote 23.

THE COURT:  I'm looking at page 20 of your request to charge.

MS. AXEL:  Yes, your Honor, I think it is the case, and you indicated the other instructions that you've read, and we've read them as well.

THE COURT:  I'm so sorry.  I'm not hearing you.

MS. AXEL:  Yes, your Honor, I think it is the case that a co-conspirator has to conduct the financial transaction, and we are asking the Court to instruct that based on the authorities below and other jury instructions, including the ones cited I think in the—

THE COURT:  But for example, *Rahmankulov*, *Bankman-Fried*, *Mizrahi*, cases like that have the substantive offense as well, and I completely get if you're charging

P7L1STO5

substantive as well, someone had to do something, but here, where it's conspiracy alone, I think the agreement is enough. I don't think you actually have to conduct the transaction. Why would you believe otherwise?

MS. AXEL:  I think the co-conspirator has to conduct the transaction.

THE COURT:  No, they have to agree to do the transaction; they don't actually have to do it.  The agreement is what's being penalized or what's being charged, not the conduct.  You believe nonetheless that in a straight conspiracy, that there has to actually be a transaction conducted and not just one contemplated?

MS. AXEL:  Well, now I think we're mixing two issues up, because I don't think this is an issue of a contemplated transaction.  We actually have the transaction.  But even if you had the contemplated transaction, your Honor, yes, I think you have to contemplate that a co-conspirator is the person who conducts the transaction.  Otherwise this is a vicarious liability principle that is limited by, you know, lots of Supreme Court cases that we've identified as well.  And so you just can't say that; there has to be a reason for someone to be vicariously liable for some third party's actions, and the doctrines we have are conspiracy and agency, but beyond that, I don't think he is responsible for what third parties do.

THE COURT:  Ms. Axel, excuse me.  I think I'm talking

P7L1STO5

past you, and I don't mean to do that.  What I'm saying is, they certainly have to agree to conduct a financial transaction.  They do.  That's the first element.  They have to agree to conduct or to attempt to conduct a financial transaction.  The transaction has to involve the proceeds of a specified unlawful activity.  I get that.  But I don't think a transaction has to be conducted.  What I'm saying is, the conspiracy, the agreement involves the understanding that Mr. Storm or one of his confederates is going to conduct something, but I don't think someone has to conduct something. And excuse me if I wasn't clear earlier.  What you were saying in your footnote 22 is, "Here, the government alleges that the objective of the conspiracy was achieved.  Deleting this unnecessary language will streamline the instruction and focus the jury on what is at issue."  I agree that this is a case where transactions seem to have been undertaken, but the charge is still conspiracy, and I don't think you have to prove a transaction being committed.  You disagree.

MS. AXEL:  I think here it's an issue of the fact that if we put that language back in this particular sentence, it's just what is the subject and what is the object of the sentence gets very confused and attenuated.

THE COURT:  Oh, that's why we're having this conference, Ms. Axel.

MS. AXEL:  And this is just not——I think we probably

don't disagree with the Court about what the law is, but this is not a case where we are talking about someone committing to something that was not conducted.  The government's theory of the case is that there were thousands of financial transactions that were conducted up and through the period of August 2022.  So we're just factually——we are just eliminating what we see as sort of surplusage that makes it confusing for the jury, because we're not talking about, you know, someone agreeing to attempt to do something or someone agreeing that something might happen in the future, which many conspiracies do.  This is not that.  They're alleging that all these transactions happened.  So I think given that, we are just saying then, as to these transactions that they have claim happened, that a person——that as part of the conspiracy had to have conducted them.  And otherwise we've just eliminated the "woulds" from the standard instruction language.

THE COURT:  And what confuses me about that——and again, it's part of the reason we're having this conference——is that your object of the conspiracy is a completed concealment money laundering charge, that a person who is part of conspiracy conducted a financial transaction, that it involved the proceeds, that he knew it involved the proceeds, and that it was designed in part to conceal.  That's great for a substantive.  I just think for the conspiracy, you just have to agree to it.  So I mean, once again, I'm not——government, did

you look at the proposed defense instructions?

MR. REHN:  I did review it, your Honor, but I don't remember the intricacies of what they're proposing here.  So I would have to look at it again.

THE COURT:  Well, maybe you ought to look at it then.  And I'm fine.  We could have this discussion every day this week if you wanted to, but I'm just saying, I'm trying to devise an instruction that does not confuse the jury.  And somehow the conspiracy on its own tends to do that because I'm writing it in terms of "agreed that somebody did this."  I don't think, for example, that the government needs "attempt to conduct a transaction" because I do agree with Ms. Axel; no one attempted to conduct, they were conducted.  But the other stuff, well, I find potentially confusing.  But you understand now where I am.

I'm moving now to unlicensed money transmitting, Count Two.  Government, the defense argues——well, I think there's a dispute, and maybe I can understand it.  For the conspiracy charge, Mr. Rehn, are you arguing that Mr. Storm or one of his co-conspirators controlled, conducted, managed, supervised, directed, or owned part or all of the business?

MR. REHN:  Yes, your Honor.

THE COURT:  Okay.  Is anybody really going to argue that Mr. Storm didn't qualify for one of these things?  Your point is, I believe, that he or a co-conspirator had to agree

P7L1STO5

to do that, correct, sir?

MR. REHN:  Yes, your Honor.

THE COURT:  Okay.  The defense's point is that this is one of those special statutes where he himself has to be doing one of these things.  You may disagree, but I'm telling you that this may be one of those cases where it's not worth the fight because there may be evidence sufficient to support the factual issue.  Do you really think they're going to find that it's Mr. Semenov who did all the control and not Mr. Storm?  I don't know.  But I'm telling you I believe I understand from the defense that they are taking the position that it is not sufficient that a co-conspirator controls, conducts, manages, supervises, directs, or owns.  Even in the conspiracy context, they believe, it must be demonstrated that Mr. Storm did.  Do I understand that correctly, Ms. Axel?  And please tell me, or Ms. James, please tell me if I'm wrong.

MS. JAMES:  No, your Honor.  We contend under *Hoskins* and *Ahmed*, the cases that we cited——

THE COURT:  *Hoskins* and *Ahmed*?  Yes.  Then let me do this, Mr. Rehn.  I'm well aware, sir, that you've got a lot of things to do that do not involve the jury charge, but on page 33 there is this argument that the defense is raising. *Hoskins* is an FCPA case.  I'm not sure I accept the defense's position, but I'm telling you that that's something you ought to at least respond to.  Even if you tell me tomorrow or

P7L1STO5

Wednesday that they're wrong, I just want to know.  It's something that's out there that you have to respond to, sir.

MR. REHN:  Yes, your Honor.  It usually is the case that we deal with these at the charge conference, but would the Court like a written filing?

THE COURT:  No.  I can take an oral filing, sir.  I'm just saying, I don't want to do this all at the charge conference because our charge conference would be ten hours long.  So I want you to be aware of it now, because I want to have a shorter charge conference.

Government, with your proposed third element on the overt act, you say you have to be unanimous on the overt act.  I don't believe that's correct in light of *United States v. Kozeny*, 667 F.3d 122.  I'm pretty sure that the language should be, "You need not reach unanimous agreement on whether a particular overt act was committed in furtherance of the conspiracy.  You just need to all agree that at least one overt act was so committed."  *Kozeny* still seems to be the law, but if either side has found a Second Circuit case overruling *Kozeny*, let me know.  It's not my intention to charge the jury incorrectly.  I'm just familiar with *Kozeny* from my prior life.

MS. JAMES:  We'll look at that, your Honor.

THE COURT:  Thank you so much.

With respect to Count Three, the IEEPA conspiracy, I'm understanding, or I thought I understood—and let me just tell

you the cites that I have.  Under *United States v. Homa International Trading Corp.*, 387 F.3d 144; *United States v. Abdullaev*, 761 Fed. App'x 78; and then decisions from other circuits, I'm understanding that the willfulness standard for Count Three conspiracy would be what I call *Bryan* willfulness, which is a general purpose to do with the law forbids.  Is that the parties' understanding as well?  And let me tell you. You're wondering, well, what are you distinguishing that from, Failla?  Great question.  *Cheek* and *Ratzlaf*, which requires special heightened willfulness for antitrust and tax violations in reverse order.  I understand *Homa* to require basic *Bryan* willfulness.  If anybody thinks anything else, tell me.  But I'm working from basic willfulness.

Yes, Ms. Axel.

MS. AXEL:  Yes, your Honor, we have the same citation, so I'm wondering if there's language that we requested that the Court thinks is not consistent with that?

THE COURT:  No.  I just want to know if anybody is saying that he needs to know about the sanctions in particular as distinguished from the generally unlawful nature of his acts.  And I also am asking, candidly, because I find *Homa International Trading* to be a little confusing, by citing to *Bryan*, but also saying that there was a knowledge of the sanctions, which is to me saying both things at once.  So once again, if you want to stave off the appellate issue by saying

P7L1STO5

that he needed to know about the sanctions, tell me.  There is, again——I've told you guys about this already.  I see Mr. Rehn not interested in giving any inch of territory, and I understand why.  I understand in the past we've had a discussion about this, about this idea of blocked property versus SDNs.  I see it, and you guys already know that there is this dispute.  Question for the defense:  There is a proposed multiple conspiracies or multiple agreements charge.  I'm a little confused about it.  I know the concept of multiple conspiracies, but here, they charged three conspiracies.  I don't think this is a situation where——and I charge that everybody has to consider each one separately.  So I'm not sure what you're striving for.  I think your charged is called multiple agreements?  It is.  Right.  There are multiple conspiracies charged in this case.  So if what you're charging is the idea of a multiple conspiracies charge, I guess I want to understand it a little bit better.

MS. AXEL:  Yes, your Honor.  The instruction is obviously modeled after the typical multiple conspiracies one, but I think that the typical factual predicate for that is where, you know, a defendant may say that whatever conspiracy here is being charged is not the one that I was part of, right?

THE COURT:  Yes.

MS. AXEL:  And's that's an exculpatory theory.  So I think here, your Honor, the theory that we have is Mr. Storm

P7L1STO5

and Mr. Semenov had an agreement.  It was a noncriminal agreement.  So rather than the typical multiple conspiracies instruction that the Court gives, we've amended that to be multiple agreements, meaning, you know, the hackers have this agreement over here and Peppersec has this agreement over here. They're not part of the same agreements.

THE COURT:  Now I understand it.  Thank you.  I think that's better—not that I'm telling you what to do—if that's your theory of the defense charge.  I'm imagining there's going to be a theory of the defense where you say, yeah, they were bad people, our guys just didn't conspire with them.  I'll look for it there because I assume there will be a theory of the defense charge at the end of the case.

MS. AXEL:  Yes, your Honor.

THE COURT:  Okay.  I think it should go there.  Thank you.  Because otherwise to me it confused me and therefore it might confuse the jury.  Just one moment, please.

Okay.  That was everything on my list.  And I want to just respond to a point that Mr. Rehn was making.  Yes, these are things usually done at the charge conference, and I'm aware of that, but I had Mr. Klein breathing down my neck last week about when he was going to see a charge, and I wanted to work on it in my time.  So to the extent that you can help me by working through these issues and that I can tell you why I'm not putting in certain charges or why I am putting in certain

charges, I wanted to do that now.  If any of the cases I've cited to you has been overturned, please tell me at your earliest convenience.

Mr. Rehn, to your point——and again, I say this with no criticism——take the time you need to think about this. Ms. Axel, the same.  I don't need answers today.  I just want you understanding the issue that I have.  I have a largely completed charge, but I think it's confusing when it comes to the conspiracies part.  So I'm just trying to make it a little bit more understandable for the jury.

Okay.  Now I'm really getting ahead of myself.

On the verdict form, it looks like the defense is asking me to have a special verdict form for the four objectives of Count Three.  Am I correct, Ms. Axel?

MS. AXEL:  That is my recollection, your Honor, but I don't have that here.

THE COURT:  Maybe I'm getting far too ahead of ourselves, and I can wait.  But government, just know that that's what they want, and you'll tell me how I feel about that.

Is there anything you want to bring to my attention? And it's fine if there isn't.  I've given you a whole lot of stuff to think about.

MR. REHN:  I had one thing, your Honor, but it's more something that you won't have to think about going forward.

Just to let the Court know that the Second Circuit issued its decision in the *Jean-Pierre* case, finding that a Cellebrite extraction is not a statement and the introduction does not violate the confrontation clause and affirming the nature of that extraction in *United States v. Adamu*. It came out this morning.

THE COURT: Well, I got my list of Second Circuit opinions, but I was too busy dealing with your witnesses. *United States v. Adamu*, sir?

MR. REHN: It may be listed as *Landji*, but I thought it was *Adamu*.

THE COURT: It's showing up as *Adamu*. And it's Landji. I see it now. Okay. I'll be reading that today. Thank you.

MS. AXEL: I'm sure, from our perspective, that is not going to reverse all the issues with respect to Special Agent Dickerman's sojourn to the Netherlands.

THE COURT: I'm sure it won't, but it's not going to cause me to undo my decision either, so that's fine.

MS. AXEL: I have one thing also.

THE COURT: Please.

MS. AXEL: I think we are planning to submit an additional or a variation on our instruction to include the Berman Act. So——

THE COURT: Include the?

P7L1STO5

MS. AXEL:  The Berman Act.  So I think we have it primarily ready to go, so we will be getting the Court a revision on IEEPA.  Yes, very soon.

THE COURT:  Okay.  I'm sure the government will respond in due course.

MR. REHN:  Yes, your Honor.

THE COURT:  Well, now I have something to do next weekend.  Thanks.

MS. AXEL:  And does the Court want to discuss the blocked property issue at all?

THE COURT:  I know the parties have a disagreement about it.  I know we've talked about it previously.  I think I understand the dispute, but maybe I should wait and see your changes.  Yes, Ms. Axel?

MS. AXEL:  I think I guess I might ask too for the government to maybe reconsider its position because we've been negotiating the OFAC stipulation.  I think as to that issue of blocked property versus SDN, I think we've come closer together.  I certainly myself have proposed language that I discussed with OFAC counsel.  I think—your Honor, I think it is very clear and will be clear I think in the stipulation, which I think we are going to reach, that I think—I think the parties agree that the wallet address is actually added to the SDN list as a description of the Lazarus Group.  So I think there shouldn't be any dispute that I'm correct on the blocked

P7L1STO5

property issue, but I think rather than calling it an SDN, the way I would describe it today is it's a descriptive property of the SDN, which is the Lazarus Group.

THE COURT:  Please understand that I don't want to tank your stipulation discussions by discussing their impact on the charge.  Let me get your stipulations and then we'll continue this discussion, I'm sure.  Great.  Something else to think about.  Thank you.

Okay.  Ms. Axel, anything else?

MS. AXEL:  No.  That's all for now.

THE COURT:  Okay.

MR. REHN:  Nothing further, your Honor.

THE COURT:  Thank you very much for your time this afternoon.  Thank you.

(Adjourned to July 22, 2025, at 8:45 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 JOEL DeCAPUA

Direct By Mr. Rehn . . . . . . . . . . . . . . . 638

Cross By Mr. Patton  . . . . . . . . . . . . . 673

Redirect By Mr. Rehn . . . . . . . . . . . . . 726

 ELEAZAR GALANO III

Direct By Mr. Gianforti  . . . . . . . . . . . 729

Cross By Ms. Axel  . . . . . . . . . . . . . . 754

GOVERNMENT EXHIBITS

Exhibit No.                                             Received

3002-42, 3002-43, 3002-44, 3002-45, . . . . . 644
          3002-48, 3002-49, 3002-50

2047 and 2047-T   . . . . . . . . . . . . . . . 651

2062 and 2062-T   . . . . . . . . . . . . . . 658

3002-53, 3002-54, 3002-55, 3002-56, . . . . . 666
          3002-57, 3002-58, and 3002-59

802, 803, 803-1, 810, 813, 814, 815,  . . . . 739
          816, 817, 818, 819, 821, 823,
          825, 827, 829, 831, 833, 835,
          837, 839, 841, 843, 845, 847,
          849, 851, 852, 853, 854, 855,
          856, 858, 860, 862, and 867

279   . . . . . . . . . . . . . . . . . . . . 648

2047-1   . . . . . . . . . . . . . . . . . . . 654

2047-4   . . . . . . . . . . . . . . . . . . . 656

2311   . . . . . . . . . . . . . . . . . . . . 640

2311-1   . . . . . . . . . . . . . . . . . . . 642

3002-51   . . . . . . . . . . . . . . . . . . 663

3002-60   . . . . . . . . . . . . . . . . . . 671

3002-61   . . . . . . . . . . . . . . . . . . 673