P7M5sto1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          23 Cr. 430 (KPF)

ROMAN STORM,

                Defendant.              Jury Trial
------------------------------x

                                        New York, N.Y.
                                        July 22, 2025
                                        8:50 a.m.

Before:

                HON. KATHERINE POLK FAILLA,

                                        District Judge

                        APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  NATHAN M. REHN, ESQ.
     BEN ARAD, ESQ.
     BENJAMIN A. GIANFORTI, ESQ.
     KEVIN G. MOSLEY, ESQ.
     TARA M. LA MORTE, ESQ.
     Assistant United States Attorneys

WAYMAKER LLP
     Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
     KERI CURTIS AXEL, ESQ.
     KEVIN M. CASEY, ESQ.
     VIVIANA ANDAZOLA MARQUEZ, ESQ.

     -and-

HECKER FINK LLP
     Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
     CHRISTOPHER MOREL, ESQ.

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

P7M5sto1

(Trial resumed; jury not present)

THE COURT:  I just had a conversation with juror no. 2 who thanks all of us for his good wishes.  He has his antibiotics now, he is feeling much, much better and I know we are all happy about that because if you were like me, you were having sympathy jaw pains yesterday.  He is well and the jurors are gathering.

I say this as a declarative statement and with no sense of shaming:  I didn't get anything from anybody last night and I'm not sure what that meant but I did, this morning, receive a motion to quash from the Sullivan & Cromwell firm.  I wanted to make sure both parties had seen that.  Am I correct that they have?

MR. KLEIN:  Your Honor, I haven't looked at it.  I did see it come across the email because it came across as we were getting here to Court.

THE COURT: Of course.  At 7:15 this morning.  Yes.  I was wondering, I didn't know if you wanted to write in response, sir.  My thought was, just because you would want to know sooner rather than later about this information, that we have an oral argument at the end of tomorrow's trial day or at the end of Thursday's trial day depending on what works better for everyone.

I didn't think the government had a horse in this particular race.

MR. REHN:  Your Honor, we agree with the position outlined in the motion but I don't know that we intend to file any written submission.

THE COURT:  Yes, I think you are not speaking either; correct?  It is going to be Chainalysis who is speaking.

MR. REHN:  We will be available if the Court has questions for us but we don't intend to submit.

THE COURT:  Fair enough.

Mr. Klein?

MR. KLEIN:  I am hoping to speak with the lawyers there and try to resolve any dispute there is so maybe this won't even happen.  So, I have emailed them about a few issues they raised but I agree we can handle this orally, your Honor.

THE COURT:  Given that you are initiating discussions with them, would you prefer that I hold something Thursday afternoon rather than tomorrow afternoon to give you this evening and tomorrow to try and work something out?

MR. KLEIN:  No, I think tomorrow is fine, your Honor, because we would like to know sooner rather than later but there may be a narrowing of the issues for your Honor and I will let the Court know if there is.

THE COURT:  Thank you so much.

Then I'm going to advise my law clerk that he should reach out to Mr. DeFilippis and advise him that we are looking at something 4:30, 5:00-ish.  I think we should talk about how

P7M5sto1

far we should go with the jury today to make up for yesterday. And, in fact, should my deputy start using the business term "socializing the jury" to maybe a 4:15 or 4:30 departure today. Yes?

MR. KLEIN:  Yes, your Honor.

THE COURT:  Ms. Noriega, you are authorized to see how late they can stay and let's start the bidding at 4:30.

My law clerk will work on setting up oral argument on the motion to quash.

I was told there were a few things to discuss. Mr. Klein, you are standing.  Are you one of the things?

MR. KLEIN:  Well, I'm not one of the things but there are things I would like to discuss.

THE COURT:  Go ahead, please, sir.

MR. KLEIN:  I wanted to respond, and sorry I did not get back to your clerk about this for Exhibits 3 through 9.  We maintain our prior objections and we object to that.  We object to Exhibits 1 and 2 also and they're in the same series.

THE COURT:  I see.  I understand, and I understand the reasons why, and therefore I will admit Exhibits 3 through 9 for the same reasons I admitted Government's Exhibits 1 and 2. These are the photographs, yes?

MR. GIANFORTI:  Yes.

THE COURT:  Government's Exhibits 3 through 9 are admitted.

P7M5sto1

(Government's Exhibits 3 through 9 received in evidence)

MR. KLEIN:  Your Honor, with regard to the rule of completeness letter we filed the other night, we did meet and confer with the government --

THE COURT:  We will try not to have the hum today, sir, but I am grad you worked things out as to some.  What remain?

MR. KLEIN:  It is on page 2, your Honor.

THE COURT:  I'm looking.

MR. KLEIN:  Exhibit 1 remains, Exhibit 2 remains, Exhibit 5 remains, Exhibit 6 remains, Exhibit 7 remains.

THE COURT:  Sir, I don't understand 7, because 7 and 8 refer to two different documents but they say the same exact thing.  If you look at the -- let me be more specific about that, sir.

What you are asking me to include in Exhibit 7 is actually language that is found in Exhibit 8.  If you have a problem with Exhibit 7, it is not actually -- you haven't told me why that portion of Government Exhibit 205-T comes in.  I'm just saying that it is the same -- the words are different but the ideas are the same at 4, 7 and 8.  So I think you want to tell me why 7 should come in because the language to which you are referring to in Exhibit 7 appears nowhere in Government Exhibit 2005-T.

P7M5sto1

MR. KLEIN:  Your Honor, one moment?  I am trying to check the exhibit.

THE COURT:  Of course.

MR. KLEIN:  Your Honor, can we revert back on that one in a minute?

THE COURT:  Yes.  Does that mean 8 you have a problem with or 8 is resolved?

MR. KLEIN:  8 we resolved.

THE COURT:  Thank you.  And then on the next page, sir?

MR. KLEIN:  Exhibit 9.

THE COURT:  OK.

MR. KLEIN:  And we are reviewing a new version of Exhibit 10 that they provided us so I don't have an answer on that one but we are reviewing it, we are actively trying to do that.

THE COURT:  OK.

(The Court and Deputy Clerk confer)

THE COURT:  Jurors say 4:30 today.  They are able to stay until 4:30.  We should take them up on their generous offer.

Excuse me, Mr. Klein, on these 10 and 11, you are working on a new version of 10.  11 is resolved, sir?

MR. KLEIN:  Yes, your Honor.

THE COURT:  Thank you so much.  I will talk to the

government about that momentarily.

          Other issues?

          MR. KLEIN:  Your Honor, we received some slides tied to expert Mr. Werlau.  These are newly produced slides the night before around midnight, so we just got them.  We notified the government that we objected to a term.  They are not willing to remove it.  We can talk about that now or later, your Honor.

          THE COURT:  What is the term, sir?

          MR. KLEIN:  They use the word "clean addresses" in a summary chart and the issue is they are new addresses.  We believe "clean" the use of that, and this is for after funds go into Tornado Cash and they leave the smart contract's protocol, they get a new address so that's what they get, they get a new Ethereum address.  They are using the conclusory term "clean" which we believe is argumentative, misleading, and draws a legal conclusion because they are accusing our client of money laundering and they have raised that term and used that to describe dirty and unclean funds to go to a legal conclusion, and this is an expert testifying which is different than a fact witness who may say something.

          So, in that instance we believe they should change the word "clean" to "new".  And it is a new address, factually.

          THE COURT:  What did Agent DeCapua use?  Did he use either term in his testimony?  Neither?

MR. KLEIN:  I don't think --

THE COURT:  To whom am I directing this?  Mr. Rehn why can't you use "new"?

MR. REHN:  Your Honor, as you may recall, there was a witness who testified earlier in the trial called Justin Bram.

THE COURT:  Yes.

MR. REHN:  And he admitted into evidence a YouTube video that he produced that the defendant specifically endorsed via Tweet and said it was an accurate description of Tornado Cash.

THE COURT:  Yes.

MR. REHN:  In that YouTube video the withdrawal addresses are described as clean, new addresses, exactly the words that are on the slide, and so we are just adopting the defendant's words to describe how the withdrawal process worked.

THE COURT:  But you are not adopting his words, you are adopting Mr. Bram's words that he didn't object to.

MR. REHN:  He didn't just not object, he endorsed the video and described it as an accurate description of how Tornado Cash operated.  And so it is just rooted in the evidence in the case as the way that the defendant and the people who are promoting the service with his encouragement, were describing the addresses.

THE COURT:  Disagree.  Please make them "new

P7M5sto1

addresses."  And I understand it means you have to change the slides but get someone to change the slides.  New addresses, sir.

Mr. Klein?

MR. KLEIN:  One more issue, your Honor.

THE COURT:  Yes, sir.

MR. KLEIN:  It is an important one, we talked about it yesterday briefly with Mr. Patton.  Special Agent George's new testimony on the first government witness' movement of funds allegedly into Tornado Cash.

THE COURT:  Yes.

MR. KLEIN:  So, we have asked the government for the materials underlying that analysis.

THE COURT:  Yes.

MR. KLEIN:  They said they were going to provide them.  We don't know we will get them all.  We will see.  We also made a *Brady* request because it is very clear to us that Special Agent George's testimony and his methods are utterly flawed and I can give you a quick example.

THE COURT:  I don't want the example.

MR. KLEIN:  We do plan to file a *Daubert* letter about this later today.

THE COURT:  Sir, you filed -- why now?  We have had several months of motion *in limine* practice and now you are going to tell me that Agent George's methods are flawed?

P7M5sto1

MR. KLEIN:  We just learned about this, your Honor. We were just disclosed this 3500 material and that he was going to do this analysis the other night so this is all new to us. We were not aware that they were going to do this and we believe they did it over the weekend, I believe maybe Saturday or Sunday, I don't remember the day exactly.  So, we literally learned about this, this is a new area that was not disclosed in disclosure way back then, was not disclosed, frankly, until late this weekend or Monday even.  So, this is all new to us.

These materials that were provided are new and, your Honor, again, it is fundamentally flawed for a variety of reasons and would be completely misleading and unsound in its science so we do plan to file a letter and object to this newly disclosed area of expert testimony.

THE COURT:  And that letter is coming today, sir?

MR. KLEIN:  Yes, it is.

THE COURT:  Is the government going to respond in writing or orally.  I guess you will have to see it.

MR. REHN:  I expect we will have to see it but just to clarify one issue, your Honor, the methodology is the same that was disclosed in Stephan George's original expert disclosure. I don't believe the defense made any objection to the LIFO methodology.

THE COURT:  I didn't want the flaws, I don't want why the flaws are incorrect.

MR. REHN:  I understand, your Honor.

THE COURT:  I will see the letter and then you will tell me why the letter is wrong.

MR. REHN:  Understood, your Honor.

THE COURT:  Mr. Rehn -- wait, Mr. Klein -- Mr. Patton, I don't really appreciate the tag teaming but let me hear your fourth issue of the morning, sir.

MR. PATTON:  Thank you, your Honor.

This has to do with a witness that the government intends to call I think later today.  This is one of the -- this was the witness we objected to who was disclosed to us the week before trial who, for lack of a better term, is a cooperator.

THE COURT:  Mr. Ahmed.

MR. PATTON:  Exactly.  Mr. Ahmed.

We had objected on all the same grounds that we had objected to Mr. Llacuna, the earlier cooperating witness.  The government responded that he was a hacker who used Tornado Cash in Manhattan and for all the reasons we said Llacuna was relevant plus venue, he should be permitted and your Honor overruled our objection.

In going through the materials, we have seen that the only way that Mr. Ahmed used Tornado Cash, he did two different hacks, one hack he didn't use Tornado Cash at all, the other hack he -- the hack required him to send cryptocurrency to the

P7M5sto1

place he was hacking and in order to prepare for that, he created a new wallet, or in the government's recent language, a clean wallet.

THE COURT:  Go with new, sir, before you have me undo my prior decision.

MR. PATTON:  He created a new wallet and he did that by using Tornado Cash.  In other words, the money he used for -- the money that he deposited and withdrew from Tornado Cash was not SUA, it was legitimate money in preparation for then doing the hack.  He didn't use Tornado Cash for any of the proceeds of the hacks.  So --

THE COURT:  It was the seed money for the hack?

MR. PATTON:  Correct.

So, the money he -- even under Mr. Ahmed's telling of it that went to Tornado Cash, was not SUA.  And we raised this yesterday with the government to say, Are we missing something here?  Are you going to say that there was some other funds that he was using Tornado Cash for?  And they said, no, that this was all along their intention to use Mr. Ahmed for this purpose to show that a user used Tornado Cash in Manhattan and that they were never going to claim that any SUA was deposited into Tornado Cash by Mr. Ahmed.

THE COURT:  That may hurt them on Count One and Count Three but what about Count Two?

MR. PATTON:  Your Honor, I don't know how it is

P7M5sto1

possibly relevant given the subsection that they are relying on that is, in essence, a money laundering theory under 1960. Surely not just anyone using -- they've explicitly disclaimed that Tornado Cash generally was -- that operating a mixer is criminal in nature. They've done that in their various briefing, I assume that is their position, it ought to be their position. There is no evidence at all that Mr. Ahmed's use of Tornado Cash, in any way, relates to the crimes of conspiracy to either money launder or operate an unlicensed money transmission business or sanctions. I just don't see how it goes to any of those things.

THE COURT:  Mr. Arad?

MR. ARAD:  Thank you, your Honor.

This evidence is relevant in a number of ways.  It is relevant and important evidence of venue.  With respect to the money transmitting charge, the fact that Tornado Cash transmitted these funds is evidence that Tornado Cash was engaged in money transmitting.  1960 contains a promotional prong and the fact that this individual used Tornado Cash in order to promote his illegal activity fits within that portion of the statute which is charged in the indictment, your Honor.

With respect to the money laundering count, while it may be true, it may be true that not every mixture is criminal, the fact that this criminal chose Tornado Cash to use in his criminal endeavor is very important evidence that Tornado Cash

P7M5sto1

was used by criminals.

THE COURT:  Well, what is it then, sir?  Is this evidence of the underlying SUA?

MR. ARAD:  It is not evidence of the underlying SUA.

THE COURT:  And it is not evidence of the conspiracy.

MR. ARAD:  Except, your Honor, insofar as it shows that criminals used Tornado Cash in order to conceal funds involved in their criminal activities.

THE COURT:  Hold on.  Let me look at this.

Yes, but if -- that seems to be an SUA you didn't charge or just sort of an atmospheric.  If the idea is that it is just showing that criminals used Tornado Cash, as you say, to conceal funds involved in their criminal activities, to what count does that -- it doesn't pertain to Count Three, we are in agreement on that; correct?

MR. ARAD:  There is an intent to conceal element that could pertain to Count Three, your Honor.

THE COURT:  There is nothing that Mr. Ahmed did that had anything to do with any violation of IEEPA, correct?

MR. ARAD:  That is correct.

THE COURT:  So this doesn't go to Count Three.  You are saying it goes to Count Two because it displays the money -- it evinces that this was a business, a money transmitting business.

MR. ARAD:  Yes; and also that it was a money

P7M5sto1

transmitting business that could be used by criminals specifically to promote their unlawful activity, which is language that we included in the indictment.

THE COURT:  Does it not have to be -- you are talking about the definition of "unlicensed" under the prong of 1960 under which you are proceeding; correct?

MR. ARAD:  I'm talking about sub-prong (c) of 1960.

THE COURT:  We are talking about the same thing, sir.

"Unlicensed" is defined in that section either to involve -- to involve the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support criminal activity.  Does not Mr. Storm have to know or his co-conspirators know that these funds are intended to be used to promote or support unlawful activity?

MR. ARAD:  There is evidence generally, your Honor, that the defendant knew that Tornado Cash could be used and would be used to promote unlawful activity.  He is a sophisticated coder who -- in addition, your Honor, there are actual messages about seeding hacks which is exactly what this witness used Tornado Cash for.  These are messages involving the defendant himself.

THE COURT:  On that proffer I will allow it but if that testimony turns out to be something different, I'm striking the whole thing.

P7M5sto1

No, Mr. Patton.  Your objection is noted.

MR. PATTON:  I just want to explain why it is not just that it's not relevant but it is incredibly prejudicial under Rule 403.  At least according to the 3500 they have this person saying he heard Tornado Cash was used by nation state actors.  It is a very broad sweeping collection of hearsay about why he turned to Tornado Cash to seed this wallet.  The fact that someone who is a criminal used Tornado Cash has taken sort of the government's arguments, which we already think cross the line into just outer orbit in terms of relationship to Mr. Storm, and so we object not only because it is not relevant but it really is highly prejudicial.

THE COURT:  I understand your argument.  I will give the limiting instruction.

Turning to the government's issues to bring to my attention, I am advised that all of our jurors are here, we really should start soon, but does the government have something to raise?

MR. GIANFORTI:  Your Honor, just wondering if you want to hear from us on the rule of completeness issues.

THE COURT:  I wondered if I was going to get a submission from you.  If I'm not getting something in writing then, yes, I do.  If I need to hear from them for this morning's witnesses then we should talk now.  If I don't, we should wait until lunch or the end of the day.

P7M5sto1

MR. GIANFORTI:  I don't think any of these chats will come up in the witnesses this morning's and we are prepared to address them orally.

THE COURT:  Let's address them orally either --

Mr. Klein, do you disagree?

MR. KLEIN:  No, your Honor.

THE COURT:  Let the man speak, Mr. Klein.

Mr. Gianforti, let's address them at the lunch break or end of the day.  At the lunch break you will tell me if they are coming to a point where they would otherwise be admitted.

MR. GIANFORTI:  Yes, your Honor.

THE COURT:  I was told yesterday you guys were going to be meeting and making productive use of the afternoon.  Not so sure about that.  I think there is still an issue that Mr. Rehn was going to assist me on which was the introduction of certain materials through a paralegal.  I asked for a list of what those materials were.  I thought there was going to be discussion.  Mr. Rehn, has there been any resolution or productive discussion on those issues?

MR. REHN:  I think that is related to these other issues in that I think a small subset of these were documents that the defense has identified as a rule of completeness implicating.  Aside from that, we haven't heard any objection from the defense to these exhibits.  We can --

THE COURT:  Sir, we had a whole discussion yesterday

P7M5sto1

about how you -- you began the topic by saying that you wanted to introduce these things.  We had a whole discussion about prior rulings on AML and KYC and the concepts coming in.  I, therefore, asked you what exhibits you were proposing to introduce through the paralegal so that I could see whether they could, for example, be redacted as you suggested or whether they couldn't.  I thought, therefore, you were going to have a discussion with the defense to see if any resolution could be reached.  If you have not, I need to know what those exhibits are and I am asking you if you don't have it off the top of your head, to write to my law clerk this morning so that we can compare and figure out what my ruling is on this because at some point that's going to come into play.

MR. REHN:  Yes, your Honor.  We actually were -- we have had discussions with the defense about those exhibits.  There are four exhibits.  We were preparing a written submission --

THE COURT:  OK.

MR. REHN:  -- as to those exhibits which we would request that the Court take into consideration.  We hope to file that today.  I can send the Court -- we sent to the defense the full list of the paralegal exhibits yesterday evening but I can send to the Court both that list and also highlight the ones where this terminology comes up.

To be clear, as I said yesterday, we have no intention

P7M5sto1

of admitting those through a paralegal prior to Mr. Werlau's testimony so this issue will not arise for the next couple of days, we expect.

THE COURT:  OK.  I will wait then for your written submission but I have been doing my own research on the issue and I would like to be able to put it to use.

We have a restless jury, I can hear them now.

Mr. Klein, yes, sir?

MR. KLEIN:  Your Honor, just to be clear, we got a list at 11:00 at night with like 30 exhibits that he was talking about and there are exhibits we -- I just don't want us to look bad in front of the jury when they put a witness up and we are trying to figure out objections to 30 exhibits that we just learned about at 11:00 last night that they're going to introduce.  We are going to work our way through them, some of them we have already objected to but, I want to say it really feels like --

THE COURT:  I feel on both sides that there is this strange trial by ambush.  I don't understand it.  I don't.  And I thought we had this -- I feel like we ended yesterday's discussion by saying that you were going to know who the witnesses were and get a sense of what the exhibits were and here we are.  So I, sir, candidly, I don't know what you did between 3:00 yesterday and 11:00 last night.

MR. KLEIN:  Your Honor, we met and conferred with them

P7M5sto1

on multiple stipulations and this, we asked them right in the afternoon to give us a list of all these exhibits.  We got them for some witnesses which we dealt with but this witness we got at 11:00 at night separate from all the other exhibits.  That's not -- we can't --

THE COURT:  No.  Of course.

MR. KLEIN:  So we are just dealing with this as it comes in.  We did meet and confer and we did resolve a lot of issues but this came in at 11:00 at night, 30-plus exhibits including what we have already objected to.  It is very hard when people have gone to bed or whatever, to look at exhibits in a massive list.  So we have tried to do that this morning but we are human, and I'm not asking for court sympathy, but it just feels like this is a real problem for us and we don't want the jury to think negatively of us like we haven't done our duty, which we have been trying to do.

THE COURT:  I will be as gentle as I can.

Ms. Noriega, let's get the jury.

Madam reporter, are we ready?

OFFICIAL REPORTER:  Yes, your Honor.

THE COURT:  Can we please have the witness come forward.

MR. GIANFORTI:  Yes, your Honor.

THE COURT:  Thank you, Mr. Galano.

And Ms. Axel, 10 minutes of cross left.

P7M5sto1

MS. AXEL:  Yes, your Honor.

THE COURT:  Thank you.

(Continued on next page)

P7M5sto1                    Galano - Cross

(Jury present)

THE COURT:  Good morning, thank you.  Please be seated.

Mr. Galano, thank you very much.  I will remind what I told you at the end of yesterday which is that you remain under oath.

Ms. Axel?

THE WITNESS:  I understand.

ELEAZAR GALANO, resumed.

CROSS-EXAMINATION   (Continued)

BY MS. AXEL:

Q.  Mr. Galano, you and I did not speak last night, correct?

A.  Correct.

Q.  And, in fact, we have never spoken outside of my inquiry of you in court yesterday, correct?

A.  Correct.

Q.  But you have met with the government a couple of times?

A.  Correct.

Q.  Let me show you what was marked yesterday and entered as Exhibit 803.

MS. AXEL:  Mr. Demarco, can I have page 7872, please?

Q.  Mr. Galano, did there come a time where you shared some login information with Mr. Storm?

A.  Yes.

Q.  Why did you do that?

A.   Let me see.  Are you referring to the message at time stamp 07:30 from Michael Wuehler, the CSV file?

Q.   Yes, on April 5, 2022, the monopipe CSV.

A.   The context for that, typically that data shows usage data, how their application was, like, sending traffic to us.  It would include things like which API methods were being sent, you can kind of determine when there were spikes in traffic. I'm trying to remember what the -- can you zoom back out?  I want to see if I can recall what the context was here.

THE COURT:  Sir, was there a binder of exhibits given to you?

THE WITNESS:  Yes.  It was here yesterday.

THE COURT:  Perhaps the government could approach.

MR. GIANFORTI:  Sure.

THE COURT:  Ms. Axel, is it all right if he looks at the paper copies?

MS. AXEL:  Of course.

THE COURT:  You may approach.  Thank you so much.

Just if that is easier.

THE WITNESS:  Thanks.

What was this exhibit number?

MS. AXEL:  803.

THE COURT:  803.

THE WITNESS:  OK, I think I recall the details of this.

Typically our team will talk to one of our users like Mr. Storm's team when we see significant spikes in traffic, typically to get them to upgrade to another tier or maybe their account is being abused unknowingly, and so we will try to proactively reach out and say, Are you aware of this?  It might affect your bill.  And one of the questions they will ask is what more information can you give us?  We are not sure where this traffic is coming from.  So, this file included method -- API method requests that were coming in and you can look at that correlated with IP address information to see maybe there is some user that took the API key that their application was using, put it in their own application, and was using it for some other purpose to get, basically, free access to Ethereum data.

Q.  And you understand that was the concern, Mr. Storm's concern here?

A.  Yes.

Q.  Were you able to get to the bottom of that?

A.  Let me see if I can go to the next page.

I don't believe we were -- it is really hard to determine just based off of IP address what is legitimate traffic versus illegitimate traffic.

MS. AXEL:  And can we show you what's been marked in as 803-1 and is also evidence in?  No, that's not it.  Can I have 803-2?

P7M5sto1                    Galano - Cross

Q.   Mr. Galano, then is this the CSV information that was provided to Mr. Storm?

A.   Yes.

            MS. AXEL:   Your Honor, I think we need to move this in evidence.

            MR. GIANFORTI:   That's right.   I don't think it was moved in yesterday and we have no objection.

            THE COURT:   Government Exhibit 803-2 is admitted into evidence and may be shown to the jury.

            (Government's Exhibit 803-2 received in evidence)

BY MS. AXEL:

Q.   Mr. Galano, you testified that you maintained this kind of data, or Infura did, until or about 2023; is that correct?

A.   Yes.   I was wondering if I could correct that date after checking our records.

Q.   Of course.

A.   After checking our records, it was December of 2022 that we stopped collecting that data.

Q.   And do you maintain or track these IP addresses in any way?

A.   No.

Q.   Do you maintain a user registry of any kind?

            MR. GIANFORTI:   Objection.

            THE COURT:   I will allow but this is going to end soon.

A.   We do have a user registry and people have to sign up to

use our service.

Q.   Does that mean somebody has their own RPC account with you?

MR. GIANFORTI:   Objection.

THE COURT:   Allow.

A.   Their own -- what do you mean by RPC account?   The ability to use the RPC API.

Q.   Does mean they have their own API?

A.   They have -- let me see.   They have access to use our service.   Our service is a collection of several API -- RPC APIs, so when they're registered to use our service they can create their own endpoint along with the access credentials to use that.

Q.   And they would pay for that service directly with Infura?

A.   Or be on the free tier; yes.

Q.   Or be on the free tier.

So, a user using an application, though, like the Tornado Cash UI, would not need to have that account with Infura?

A.   Let me make sure I understand the question.   A user of the Tornado Cash UI would not need an Infura account.

Q.   Correct.

A.   That's correct, because in that case the traffic is coming from the API key that's deployed in whatever instance of the Tornado Cash UI they're interacting with, in which case it would be the Tornado Cash chains.

P7M5sto1                        Galano - Cross

Q.   In that sense your user registry doesn't connect to that Tornado Cash UI?

A.   Correct.

Q.   OK.  And let me then ask you to take a look at what was marked yesterday as Exhibit 819 and is in evidence.  So you spoke about the different tiers.  So as of November 1, 2020 the Tornado Cash UI was operating at this team tier; is that correct?

A.   Correct.

Q.   And the cost for that was $225; is that right?

A.   That's right.

Q.   And then let's look at 821.

So, as of then December 1, 2020, the Tornado Cash UI account was at -- corresponded to the growth tier; am I correct?

A.   Yes.  That's right.

Q.   So that was, as you said, moving up a tier in terms of traffic?

A.   Yes.

Q.   And then the cost went up to about a thousand dollars; right?

A.   Right.

Q.   And does that happen automatically, the moving between tiers based on the traffic?

A.   No.  Their team would have to opt into moving to a new

tier.  Like, our personnel wouldn't have that ability because it requires their authorization.

Q.  But that's -- you would contact them like we saw on Telegram as they do approve?

A.  Yes.  That's right.

Q.  And then showing you Exhibit 841, do you see that in front of you, that says October 1, 2021 bill for the October to November time period.  Do you see that?

A.  Yes.

Q.  So at this point we see it moving to a different 1 million requests add-on.  Is that a different tier?

A.  It's an add-on.  So, before we had that ability to charge people for these add-ons we would only have a custom tier which would require, like, high touch sales and negotiations, so we tried to create a pay-as-you-go model where a team could self-service and add on these request packs is what we called it.  So, in this case they added 15 request packs to cover the traffic that their application was using.

Q.  So would this be a significant jump in traffic over the growth tier that we saw in the prior months?

A.  Yes.  I would say that's significant.

Q.  And then looking at Exhibit 843, do you see that one from November 1, 2021?

A.  Yes.

Q.  And this is 32 of those.  How much does that correspond to

in terms of 32 -- the quantity 32 on this invoice?

A.   Sorry.  How much does?

Q.   What does it mean in terms of the metrics of traffic?

A.   We build these add-ons in the amount of RPC requests per day that an application would use, so adding a request pack of 1 million means you can use an additional 1 million RPC requests per day, so this would have added the capability of using with 32 million RPC requests per day in addition to the number that the growth tier gives you.

Q.   So this was a significant jump from October 1, 2021 to November 1, 2022, as we saw?

A.   Yes.

Q.   And then let me show you what's been marked as Exhibit 847. Do you see that one?

A.   Yes.

Q.   And so this has gone -- if I understand, this has gone down again in terms of the amount of traffic you anticipated; is that right?

A.   Yes, it has gone down.

Q.   So we have a growth tier plus a 1 million request add-on; is that right?

A.   Right.

Q.   In the amount of $1,200?

A.   Right.

Q.   And then let's look at what's marked as 851, and I believe

P7M5sto1                        Galano - Cross

you were shown this one or a similar one here and this also is the Infura+ 1 million requests add-on; is that correct?

A.   Correct.

Q.   Mr. Galano, is there an additional charge if a customer of yours wants to use crypto to pay?

A.   No, there isn't.

Q.   No.

So, can you tell me why it went from $1,200 to $1,400?

A.   I don't recall the details.  Can you go back to the previous invoice for $1,200 so I can see what the discrepancy is?

Q.   Sure.  We were looking at previously 847, and we could also show you 849 would be the February invoice.

A.   So this was growth tier for $1,000 and one add-on to be $1,200.

Thank you for the side by side.

MS. AXEL:   Thank you, Mr. Demarco.

A.   Then can we go to that --

Q.   Back to 851?  Yes.

A.   Thank you.

Q.   And this says $1,400.  Do you have an understanding of why it went up $200?

A.   I'm not sure what this is, if this is a mistake in billing or if this might have been an additional invoice for capacity that was used beyond the growth tier.  Sometimes invoices have

been issued retroactively for traffic that was used over a period of time.  I'm not sure.  I would have to look more closely.

Q.  All right.  But here we basically have the growth tier plus a million requests a day add-on.  Is that the basic structure again?

A.  That's what is strange about this invoice, is typically the growth tier would always be listed here and then the request add-ons are listed separately.  I'm not sure why this is just an invoice for only the requests add-ons.  That's what makes me think maybe it was a supplementary invoice.

Q.  Let me look at 858, finally, and this one is, appears to be the same; would you agree?

A.  Yes.

Q.  So it appears that $1,400 was billed for both March and April of 2022; is that right?

A.  That's right.  In this case I think we might have just changed the formatting of our invoices.

Q.  Yes.

And you were asked on direct that if this bill was paid the application wouldn't work.  Do you recall that?

A.  If -- can you repeat that?

Q.  Yes.  I believe you were asked on direct that if this invoice was not paid to Infura, the Tornado Cash UI application wouldn't work.  Do you recall that question?

P7M5sto1                         Galano - Cross

A.   Yes.

Q.   The UI would populate for the user; isn't that right?

A.   The UI would pop --

          MR. GIANFORTI:  Objection.

          THE COURT:  I will allow.

A.   The UI would populate for the user even if they went beyond the request limits of the tier that they were on.

Q.   Even if the invoice wasn't paid, so the Infura service didn't work, the UI would populate; correct?

A.   Yes.  That's right.  Our team didn't -- wasn't very heavy-handed with enforcement of the limits.

Q.   Yes.

          And the user could use their own RPC node; isn't that right?

A.   They could.

Q.   Like you just testified they could have their own accounts; correct?

A.   Correct.

Q.   And if someone has a MetaMask wallet, Consensys has an account; isn't that right?

A.   Correct?

Q.   Mr. Galano, can Infura write to the Tornado Cash pool smart contracts today?

A.   You mean send transactions to?

Q.   Yes.

A.  I believe we could.

MS. AXEL:  Thank you.  No further questions.

MR. GIANFORTI:  It will be brief.

THE COURT:  Of course.

REDIRECT EXAMINATION

BY MR. GIANFORTI:

Q.  Mr. Galano, Ms. Axel asked you some questions both today and yesterday about the concept of a node and Infura running nodes.  Do you recall that?

A.  Yes.

Q.  Could you just refresh the jury about what exactly a node is, just so we are all on the same page?

A.  A node is a piece of peer-to-peer software.  It's the thing that downloads the data that comprises the blockchain so that before you can send any kind of transaction, specifically write to modify this decentralized database, you have to have up-to-date information.  The node software is what is -- is the application that users would run to be able to participate in interacting with the network.

Q.  And in this context of the node, are you familiar with the concepts of reads and writes to a blockchain?

A.  Yes.

Q.  Could you just explain what you mean by that?

A.  You can think about it in the context of looking at, like, your bank account information and if you are just looking at

transactions that had already happened, that's a read.  When you are actually making a transfer from one account to another, that's a write transaction.

Q.  And so in the service that Infura was offering to its customers, did it enable customers to both make read transactions and write transactions with respect to the block, whatever blockchain they're using?

A.  Yes.

Q.  Mr. Galano, do you recall yesterday that Ms. Axel asked you some questions about something known as a dApp or decentralized app?

A.  Yes.

Q.  Could you just explain to the jury what that means again?

A.  The definition of a dApp is an application that uses blockchain data where a normal application would traditionally use a database.  It has to persist state, mean like information that is stored and used across many users and that data is stored on a blockchain and the UI, the interface that users use to interact with it, might just be a standard web application and that kind of combination is considered a dApp.

Q.  And, sir, yesterday I think you received some questions about whether you're, to put it colloquially, kind of a big deal in the crypto space.

        Do you remember that?

A.  Yes.

Q.  Sir, in your capacity as somebody who knows a lot about crypto -- actually, I'm going to ask you another question.

Do you generally follow crypto-related developments in the industry?

A.  Generally follow crypto related developments in?

Q.  Just in your day-to-day work to track what is going on in the industry.

A.  Yes.

Q.  And you are familiar with the jargon that is used in the industry?

A.  Yes.

Q.  So the term "decentralization," does that have a set meaning?

A.  Not something I think everybody would agree to.  There is a general understanding of what it means.

Q.  Fair to say there is a spectrum of decentralization among blockchain projects?

A.  Yes.

Q.  Some are maybe completely decentralized, some are maybe much less decentralized?

MS. AXEL:  Objection.

THE COURT:  This better end soon unless you want to open up recross.

MR. GIANFORTI:  It is going to end soon.

THE COURT:  You may answer.

P7M5sto1                        Gibbs - Direct

THE WITNESS:  Yes.

MR. GIANFORTI:  One moment?

(Counsel conferring)

MR. GIANFORTI:  No further questions.

THE COURT:  Thank you.

MR. GIANFORTI:  Thank you.

THE COURT:  Sir, you may step down.  Thank you so much.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Next witness, please.

MR. REHN:  The government calls Ben Gibbs.

BENJAMIN GIBBS,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Please be seated, and into microphone please state and spell your name for the court reporter.

THE WITNESS:  Benjamin Gibbs.

DIRECT EXAMINATION

BY MR. REHN:

Q.  Good morning, Mr. Gibbs.

A.  Good morning.

Q.  What do you do for a living?

A.  I'm the co-founder and CEO of Last Mile Labs Incorporated.

Q.   How long have you been running Last Mile Labs?

A.   A little over three years.

Q.   What sort of work were you doing before that?

A.   Dev ops and sys admin work.

Q.   What is dev ops?

A.   Developer operations.  It is a kind of working within IT organizations that deliver software and making that process a little smoother for them.

Q.   And what was -- you said sys admin?

A.   Yes, systems administration.

Q.   Are you testifying today pursuant to a subpoena?

A.   Yes.

Q.   Could you please describe for the jury, at a high level, what it is that Last Mile Labs does?

A.   We provide a free public goods service that makes it easy to connect end users to specific types of blockchain content.

Q.   Does that include content on the blockchain that's known as the Ethereum network?

A.   Yes.

Q.   Who owns Last Mile Labs?

A.   Myself, my brother, and one VC investor.

Q.   And I think you mentioned that you described it as a free public goods service.  Is Last Mile Labs a for-profit or not-for-profit company?

A.   It is for-profit.

P7M5sto1                        Gibbs - Direct

Q.   So, how does Last Mile Labs earn money?

A.   We received a pre-seed VC investment but the majority of our funding comes from grants and private donations.

Q.   Does Last Mile Labs charge its users to access its service?

A.   No.

Q.   So, I think what you said is that Last Mile Labs makes it easier for users to access content on the blockchain; is that right?

A.   Yes.

Q.   And in particular on the Ethereum network?

A.   Yes.

Q.   What sort of content is available on the Ethereum network?

A.   In this particular case, the Ethereum Name Service.

Q.   The Ethereum Name Service?  What is that?

A.   It's an alternate naming system that creates -- that you can map human readable names to Ethereum addresses.

Q.   So are you familiar with something called the Domain Name Service?

A.   Yes.

Q.   And what is the Domain Name Service?

A.   It is the way that your computer finds the server that it needs to connect to to receive content.  For example, if you type in google.com, that resolves to an IP address and your request is routed to the appropriate destination.

Q.   Would there be an owner of that domain, google.com?

P7M5sto1                        Gibbs - Direct

A.   Yes.

Q.   And how does that, whoever that owner is, how do they obtain the ownership of that domain?

A.   They have to procure it through a domain registrar.

Q.   And do they usually pay for that?

A.   Yes.

Q.   So, could you compare that process for a traditional website to the process for getting a domain on the Ethereum Name Service?

A.   More or less.

Q.   And I think you said that on the Ethereum Name Service there is a human readable name.  Could you explain what you mean by that?

A.   So, a name like the NYC.ETH and that would map to a corresponding Ethereum address.

Q.   So on the Ethereum Name Service there are what you describe as human readable names?

A.   Yes.

Q.   And one of those would -- an example might be something like NYC.ETH?

A.   Yes.

Q.   And then you said it maps to an Ethereum address?  What does that mean?

A.   So a wallet address or a smart contract address that is a string of -- a long string of letters and numbers.

P7M5sto1                          Gibbs - Direct

Q.   So, if you can already identify an address through a long string of letters and numbers, why would somebody register a human readable name to associate with that address?

A.   For ease of use for sending and receiving any type of assets, for branding purposes or identity.

Q.   Do these human readable names sometimes get referred to as domain names?

A.   Yes.

Q.   And with respect to the Ethereum Name Service, do these names typically end in .ETH?

A.   Yes, typically.

Q.   So, can a person own a .ETH domain name?

A.   Yes.

Q.   How does someone obtain?

            THE COURT:   Whoa, whoa, whoa.   One moment.

            Do you own one, sir?

            THE WITNESS:   Yes.

            THE COURT:   Thank you.

            Go ahead.   Please continue.   You may continue sir, thank you.

BY MR. REHN:

Q.   How does someone obtain a .ETH domain name?

A.   They would need to go through a registration process through any number of websites that would provide a work flow and you would select the domain name that you desired and

P7M5sto1                         Gibbs - Direct

connect your wallet and purchase it for the time frame that you want to obtain it for.

Q.   And so, you have to pay to obtain that .ETH domain name?

A.   Typically, yes.

Q.   Similar to how you would have to obtain a .com domain name?

A.   Yes.

Q.   Is it possible to identify information about the owner of a .ETH domain name?

A.   Yes.

Q.   How would you do that?

A.   You can use the official ENS domain's management app and you can type in a name and see who the wallet that is the target wallet and the owner and manager addresses for it.

Q.   And I think you said one of the benefits was that you could send and receive value using that human readable name; is that right?

A.   Yes.

Q.   Why might you want to send and receive value with a human readable name instead of with a string of letters and numbers that we typically see with a wallet address?

A.   It can be confusing or error prone, or you can have a typo and it can end up being sent to the wrong destination.  So, it is a little more memorable and easier to use.

Q.   So, if NYC.ETH wanted to accept payments, would you expect them to provide that human readable name to people?

P7M5sto1                    Gibbs - Direct

A.   Yes.

Q.   Is there something else someone can do with a .ETH domain name?

A.   Yes.

Q.   What's another example of something someone can do?

A.   You can use it for pointing to decentralized content which would be referred to as a decentralized website or a dWebsite.

Q.   And so, would that look to a user like a traditional website?

A.   More or less, yes.

Q.   So, for example, could there be a Google.ETH website?

A.   Yes.

Q.   And what sort of content can someone put on an ENS website?

A.   Anything that you could kind of normally use in a website that would be HTML or JavaScript.

          (Continued on next page)

BY MR. REHN:

Q. And does the person who owns that ENS domain have the ability to decide what content is available at that domain?

A. Yes.

Q. How does the owner of the domain do that?

A. They configure a specific record type called a content hash, and they would input a content identifier that would signify where the content is located on a specific storage network or protocol.

Q. So there was a lot to unpack there. I heard the term "content identifier." Could you explain what that is.

A. Content identifier, depending on the storage protocol, is basically a data format that describes what protocol and how to use it and where to kind of look for the information, so it's a—almost like a signature that points to your specific files or data that you wish to serve.

Q. And that content identifier is placed where, by the owner of the domain?

A. In the content hash field of the ENS domain.

Q. And is that information available on the blockchain?

A. Yes.

Q. And can that information be put on the blockchain by the owner of that domain?

A. Yes.

Q. And the owner also authorizes another person to decide what

P7M1STO2                    Gibbs - Direct

content is available at that domain?

A.   Yes.

Q.   Can anyone decide what's available at that domain if they're not authorized by the owner?

A.   No.

Q.   So what about if the owner of that domain wanted to update the website that's available at that domain, could they do that?

A.   Yes.

Q.   How would they do that?

A.   Depending on the protocol used, they would make their changes and then they would take the new content identifier and then replace that value in the content hash record field of the ENS domain name.

Q.   And would that update be recorded on the blockchain?

A.   In specific circumstances, yes.

Q.   So if you saw that content identifier being updated on the blockchain, would that indicate a change to the website?

A.   Yes.

Q.   So would blockchain data help to determine how frequently a particular .eth website has been updated?

A.   It can.

Q.   Now I want to ask you some questions now, not from the owner's side but from the user's side.

          So for a user using, say, a laptop they've just bought

off the shelf, could they access that .eth domain using an ordinary web browser?

A.   Not with typical store brought—store-bought software, no.

Q.   So would they need to install special software to access the .eth domain?

A.   Yes.

Q.   In your experience is that special software widely used by the public?

A.   Not typically.

Q.   So is there another way for users with ordinary laptops to access a .eth domain?

A.   Yes.

Q.   And I think you said at the beginning of your testimony that Last Mile Labs makes it easier for users to access content on the Ethereum network.  Is this what you were referring to?

A.   Yes.

Q.   So do you have a particular service that provides that access?

A.   Yes, we operate eth.limo.

Q.   You said eth.limo?

A.   Yes.

Q.   Mr. Gibbs, in the witness box there, there's a binder containing an exhibit.  If I could just ask you to take a look at that.

THE COURT:  Counsel, is it a single exhibit in the

binder?

MR. REHN:  It's a single multipage exhibit, and it's marked for identification purposes as Government Exhibit 1611.

THE COURT:  1611.  Thank you.

Q.  Have you reviewed that exhibit?

A.  Yes.

Q.  Have you reviewed that exhibit before your testimony today?

A.  Yes.

Q.  Does that provide an accurate overview of the process by which the eth.limo service provides access for users?

A.  In the specific context of IPFS content, yes, at a high level.

MR. REHN:  Your Honor, the government requests that we use Government Exhibit 1611 as a demonstrative aid for the jury.

THE COURT:  And not be admitted into evidence.

MR. REHN:  Yes.

THE COURT:  All right.  It may be used as a demonstrative aid for the jury.

MR. REHN:  And Mr. Iannuzzelli, if we could bring up the first page of this exhibit.

BY MR. REHN:

Q.  Mr. Gibbs, do you see that in front of you now on the screen?

A.  Yes.

Q.  Now I see sort of four different things on this exhibit.
Do you see that?

A.  Yes.

Q.  I'd like to just make sure we're understanding what we're
looking at.  So if we start on the left-hand side where there's
a little person and it says User, what does that represent?

A.  That would be someone desiring to connect through our
service to access a particular ENS dWebsite.

Q.  And those are the websites you talked about earlier that
ended in .eth?

A.  Yes.

Q.  Would that person be able to access, say, google.eth
directly?

A.  Not without special software, no.

Q.  So is there something they would enter into their computer
to use your service?

A.  Yes, they would type in, you know, google.eth and then add
.limo in the address bar and hit enter.

        MR. REHN:  Could we go to page 2 of this exhibit.

Q.  Is that what's represented here on page 2?

A.  Yes.

Q.  And so if a user types a .eth.limo address into their
computer, where is that request directed?

A.  It's received by our front-end service.

Q.  And is that a computer server that you host?

P7M1STO2                        Gibbs - Direct

A.   Yes, collection of servers.

Q.   And if you receive that request, what, if anything, does the eth.limo server do with that request?

A.   It would parse off the .limo suffix and then it would perform a lookup on the appropriate blockchain to determine the content hash record for it to extract the information where we need to route the request to.

Q.   Again, there was a lot of information there.  I think you had testified earlier about content identifiers.  Is that the information you're attempting to obtain from the blockchain?

A.   Yes.

Q.   So where would you go to seek that information?

A.   We would query the smart contracts for the Ethereum name service protocol.

Q.   So I see on the upper right-hand side of the screen there's a little blockchain icon and then it says ENS.  Do you see that?

A.   Yes.

Q.   Is that where the Ethereum Name Service resides?

A.   Yes.

        MR. REHN:  So if we could go to the next slide.

Q.   So does this represent the process you just described?

A.   Yes.

Q.   And when you send that request to the Ethereum Name Service, what information are you expecting to have returned to

you?

A.  A valid content hash record.

Q.  And does that content hash record enable you to find the content of that particular website?

A.  Yes.

        MR. REHN:  So if we go to the next slide.

Q.  And so is that what's represented here?

A.  Yes.

Q.  And is that content identifier another sort of long string of letters and numbers?

A.  Yes.

Q.  So when you get that information, what, if anything, does eth.limo do with it?

A.  We would decode the value and inspect it and ensure that it was valid and a supported type for our service, and then we would attempt to locate the content that it represents.

Q.  And is it frequently the case that that content is on a peer-to-peer network?

A.  In most cases, yes.

Q.  So I see represented at the bottom right-hand side of the screen that there's something that says peer-to-peer network, and then it says IPFS.  Do you see that?

A.  Yes.

Q.  What's IPFS?

A.  It's the InterPlanetary File System, and it is a

peer-to-peer shared storage protocol.

Q.   Is it actually interplanetary?

A.   The developers claim it is.

        THE COURT:  With what planets?

        THE WITNESS:  Mars, potentially.

        THE COURT:  Mars.  Eventually.  Of course.

Q.   For purposes of today, can we stick to Earth?

A.   Yes.

Q.   And so that peer-to-peer network, is that—what is a peer-to-peer network?

A.   It's a collection of individual nodes that talk amongst one another and more or less kind of pass a phone book around that they maintain that maps peers to content that they possess on the network.

Q.   And so is it possible for somebody to host content, including the content of a website, on a peer-to-peer network?

A.   Yes.

Q.   And is that true for the IPFS network in particular?

A.   Yes.

Q.   Are there companies that provide hosting services on the IPFS network?

A.   Yes.

Q.   Do those companies charge for that service?

A.   Depending on the service tier, but usually, yes.

Q.   Could you give me some examples of some companies that

P7M1STO2                        Gibbs - Direct

provide those hosting services.

A.   Filebase, Fleek, Piñata.

Q.   What was that third one?

A.   Piñata.

Q.   And so why would somebody pay to have one of those services host content on the peer-to-peer network?

A.   To take over the responsibility of running and maintaining their own IPFS infrastructure, ease of use.

Q.   Any other advantages?

A.   Availability, reliability, potentially better workflow options or API integrations.

Q.   And you mentioned availability and reliability.  Why would paying to have somebody host that content provide availability and reliability?

A.   Could you repeat that.

Q.   Why would paying someone to host content on the peer-to-peer network provide availability and reliability?

A.   These are experts and professionals that understand at a deep level kind of how the technology works, and they're able to provide typically a better tier of service than someone that would be operating the instances themselves.

Q.   So if the owner of a .eth website wanted to ensure that the website would be available on a reliable basis, would you expect them to pay for that service?

A.   Depending on their objectives.

Q.  If they were seeking availability and reliability as you described, would that be a means of achieving that?

A.  Yes, if they didn't have the skills or time to do so themselves.

MR. REHN:  So Mr. Iannuzzelli, if we could go to the next slide.

Q.  So Mr. Gibbs, how does the eth.limo service actually find the contents of that website?

A.  After we would extract and parse the content hash record and determine that it is IPFS content as indicated by the identifier, we would then proxy that request to our IPFS gateway cluster that we maintain.

Q.  And does that allow you to access that IPFS network?

A.  Yes, it would allow our nodes to search the network and find and retrieve the content.

Q.  And does the IPFS network then deliver the content to eth.limo?

A.  Yes.

MR. REHN:  Mr. Iannuzzelli, could we go to the next slide.

Q.  Mr. Gibbs, after eth.limo obtains the contents, what, if anything, does it do with the content?

A.  It would then proxy it back to the requesting user.

MR. REHN:  Mr. Iannuzzelli, could we go to the next slide.

Q.   And is that what's depicted here?

A.   Yes.

Q.   So from the user's perspective, what did they do to initiate this process?

A.   They would just need to type in website.eth.limo in their browser and the rest of the resolution process that we just described would take place.

Q.   And then from the user's perspective, after they initiated the process, what would they receive on their computer?

A.   They would receive some type of web content.

Q.   From the user's perspective, how long would this process typically take?

A.   It can depend on the performance of the IPFS network and availability of the content, but typically it's within several seconds.

Q.   And so is that similar to the time it would take to access a more traditional website?

A.   Depending on its configuration.

Q.   So what, if anything, is the value of the eth.limo service to an ENS domain owner?

A.   It would extend the reach and availability for other people to be able to access content that they have chosen to use ENS for.

Q.   I think I recall you testifying earlier that most users don't have the software they would need to go to .eth directly.

Do you recall that?

A.   Yes.

Q.   So if the owner of a .eth website wanted broad availability, would your service be of value to them?

A.   Yes.

Q.   Are there other services that also provide access to ENS domains?

A.   Yes.

Q.   Could you give me an example or two.

A.   Eth.link.

Q.   And does eth.link work in a similar way to your service?

A.   Yes.

Q.   In your operation of eth.limo, do you promote your services to the people who own and operate .eth websites?

A.   Yes.

Q.   What are the qualities of the service that you promote?

A.   That it's reliable to performance and secure.

Q.   And why do you promote those qualities in particular?

A.   They're attractive to builders and other engineers that would like to have a consistent user experience for the content that they want to serve.

Q.   And what are you hoping that people who operate .eth websites do to make use of your service?

A.   That they would build on the ENS protocol, make use of the content hash records and advertise, with links on social media,

etc., with the limo suffix to promote their—their content.

Q.  So if they're promoting their content that's available on the Ethereum network, you would say—did you say they would use links to do that?

A.  In those cases, yes.

Q.  And so why wouldn't they just use a .eth link?

A.  It wouldn't be a valid clickable link in a message, if you were to see it represented somewhere.

Q.  And that's where your .limo service comes in?

A.  Yes.

Q.  Mr. Gibbs, did there come a time when you heard about something called Tornado Cash?

A.  Yes.

Q.  How did you hear about Tornado Cash?

A.  Industry chatter over time and just kind of being in proximity to—to the entire ecosystem.

Q.  Did you ever communicate with anyone from Tornado Cash?

A.  Yes.

Q.  Who did you communicate with?

A.  Roman Storm.

Q.  Did you ever meet Roman Storm in person?

A.  No.

Q.  How did you communicate with Roman Storm?

A.  Over Telegram.

Q.  What's Telegram?

P7M1STO2                      Gibbs - Direct

A.   It's a messaging app.

Q.   How were you introduced to Roman Storm?

A.   Through my brother.

Q.   Do you know how your brother met Roman Storm?

A.   Through outreach on Twitter, through our company Twitter account.

Q.   Did you ever communicate with Roman Storm yourself on Twitter?

A.   No.

        MR. REHN:  Mr. Iannuzzelli, could we show the witness what's been marked for identification as Government Exhibit 1608.

Q.   Mr. Gibbs, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   This is a Telegram group chat with my brother, myself, and Roman.

Q.   Roman?

A.   Roman Storm.

        MR. REHN:  Your Honor, the government offers Government Exhibit 1608.

        MS. AXEL:  No objection.

        THE COURT:  Government Exhibit 1608 is admitted into evidence; it may be displayed to the jury.

        (Government's Exhibit 1608 received in evidence)

MR. REHN:  And Mr. Iannuzzelli, if we could expand the upper portion of this.

BY MR. REHN:

Q.  Mr. Gibbs, is there a name of the group that these messages were in?

A.  Yes.

Q.  What was the name of the group?

A.  Limonado.

Q.  Who were the participants in this?

A.  My brother, myself, and Roman Storm.

Q.  And I see there's three participants here.  There's EthLimo.  Who's that?

A.  That's my brother.

Q.  And then there's Ben and then a line and it says eth.limo.  Who's that?

A.  That's me.

Q.  And then it says Roman Storm.  Who's that?

A.  Roman Storm.

Q.  Approximately when did you begin communicating with Roman Storm on Telegram?

A.  It was April 2022, I think here it's roughly 21st or 22nd.

MR. REHN:  Mr. Iannuzzelli, could we go to the bottom of page 1, and expand the two messages from Roman Storm at 7:18 p.m.

Q.  Mr. Gibbs, could you read those messages.

A.   "So who else uses limo?"

"Just curious how fast u grow."

Q.   Mr. Gibbs, did you respond to these questions?

A.   I believe so.

MR. REHN:  Mr. Iannuzzelli, could we please now go to page 2 and expand the portion of the page starting at 7:23 p.m.

Q.   Mr. Gibbs, do you see that you sent a message at 7:23?

A.   Yes.

Q.   Could you please read that message.

A.   "Ooh, man, quite a few.  We've sort of stolen eth.links thunder."

Q.   Mr. Gibbs, what did you mean by that?

A.   We had garnered a more significant sort of market and mindshare of links that were being shared on social media that used .limo as opposed to .link.

Q.   Mr. Gibbs, could you please read the next four messages from Roman Storm.

A.   "Their stuff is shit."

"Takes 3 hrs to update."

"Limo takes 15 min."

"Cache invalidation."

Q.   Mr. Gibbs, when Roman Storm said "Their stuff is shit," who did you understand him to be referring to?

A.   The eth.link service as operated by Cloudflare at the time.

Q.   And then do you see that he says, "Takes 3 hrs to update"?

P7M1STO2                      Gibbs - Direct

A.   Yes.

Q.   Who do you understand him to be referring to with that message?

A.   That there was a significant delay between when a website's content would—would change after the underlying source material was modified for the content hash, or content identifier.

Q.   So if a person was updating a website, it would take three hours before that showed up sort of on the link?

A.   Yes, in some cases.

Q.   And then he says, "Limo takes 15 min."  What did you understand that to mean?

A.   That we reflected updates in a much more timely fashion.

Q.   Mr. Gibbs, based on your experience operating the eth.limo service, why would it matter how long it takes to update the website?

A.   Users and developers prefer to have a faster experience and one that is more frequently refreshed, so that updates can be displayed quickly.

Q.   Would that be more important to someone who is making regular updates to a website?

A.   Yes.

          MR. REHN:  Mr. Iannuzzelli, could you please go to page 4 and expand the message from Roman Storm starting at 7:29 p.m.

Q. And I actually direct your attention, Mr. Gibbs, to the fourth message down, the one from Roman Storm that begins ".limo." Do you see that?

A. Yes.

Q. Could you read that message from Roman Storm.

A. ".limo is default on TC site."

Q. Mr. Gibbs, did you have an understanding of what it means to be the default on the TC site?

A. I believe that it was referring to mirrors that were available on the official tornado.cash website.

Q. And what do you mean by mirrors?

A. Alternate links to different ways to access Tornado Cash.

Q. Was there a .eth domain associated with Tornado Cash?

A. Yes.

Q. And did the tornado.cash website provide a link to that .eth domain?

A. Yes.

Q. Could you please read your next message—your next two messages, actually.

A. "I think my brother said there were still some eth.link urls on tornado.cash."

"If I remember correctly."

Q. Mr. Gibbs, what do you mean to communicate with these messages?

A. That there were still some urls that were using the

eth.link service as opposed to the eth.limo service on the tornado.cash site and——in some location.

Q. What, if anything, were you hoping Roman Storm would do in response to that?

A. We wanted to replace those urls with .limo.

Q. Was it your understanding that if you wanted to suggest a change to the tornado.cash site, you would ask Roman Storm?

A. That was my impression.

MR. REHN: And Mr. Iannuzzelli, if we could highlight the next message.

Q. And Mr. Gibbs, if I could ask you to read that message.

A. "Hmm. Just let us know where."

MR. REHN: All right. Mr. Iannuzzelli, could we please go to the next page.

Q. And Mr. Gibbs, if I could ask you to read the message on this page. What's the first message from Roman Storm?

A. "I know docs are outdated."

Q. And then what did you say in response?

A. I tagged my brother and I said, "do you remember where that is?"

Q. And what were you asking your brother for?

A. Where those eth.link urls, where they were on the site.

Q. And again, those are clickable links on the tornado.cash website?

A. Yes.

Q. Did your brother provide you with that information?

A. I believe so.

        MR. REHN:  Mr. Iannuzzelli, could we please go to page 6.  And could we expand what we're looking at here.

Q. Mr. Gibbs, do you recognize what this is?

A. Yes.

Q. What is it?

A. This is—this is the—it looks like the tornadocash.eth.limo dWebsite that has a link to a eth.link url.

Q. And can you—why are you sending this information to Roman Storm?

A. Can you repeat that.

Q. Why are you sending this information to Roman Storm?

A. We wanted to prune all occurrences of eth.link from the site.

Q. So that the site would only have eth.limo links?

A. Yes.

        MR. REHN:  Mr. Iannuzzelli, could you please go to page 7.  And if you could expand the first four messages on this page.

        There you go.

Q. Mr. Gibbs, could I just ask you to read first the message from your brother at the top.

A. "Sorry taken on mobile, if you go directly to the website

P7M1STO2                          Gibbs - Cross

using .limo and click on the new version it'll redirect you using .link."

Q.   And could you read the three responses from Roman Storm?

A.   "Ohh Nova."

     "Ok."

     "Will fix."

Q.   Mr. Gibbs, when Roman Storm said "Will fix," what did you understand that to mean?

A.   That the link would be updated.

Q.   On which website?

A.   The——would have been the tornadocash.eth dWebsite, I believe.

          MR. REHN:  No further questions.

          THE COURT:  Cross exam.

CROSS EXAMINATION

BY MS. AXEL:

Q.   Good morning, Mr. Gibbs.

A.   Good morning.

Q.   Mr. Gibbs, you have a lot of respect for Tornado Cash, right?

A.   Yes.

Q.   You respect its dedication to privacy and security on the blockchain, correct?

          MR. REHN:  Objection, your Honor.

          THE COURT:  I'll allow.

P7M1STO2                    Gibbs - Cross

A.  Yes.

Q.  Eth.limo is also committed to privacy; isn't that right?

A.  Yes.

Q.  Now you testified that eth.limo provides a gateway to the decentralized web.  Do I understand that correctly?

A.  Yes.

Q.  In this context what do you mean when you say decentralized?

A.  It would be content that is kind of stored in a nontraditional manner, meaning it's either blockchain native or on one of these decentralized storage protocols.

Q.  And which were you referring to as the decentralized storage protocols, in what you talked about before?

A.  It could refer to either IPFS, Arweave, or any other number of protocols that offer similar capabilities.

Q.  And those decentralized storage protocols actually store the content that's displayed on a .ens site, right?

A.  Yeah, it either the protocol itself or nodes participating within the network.

Q.  And you talked also about DNS, which we're more familiar with, right, like the dot-com domain names, correct?

A.  Yes, that was mentioned.

Q.  What is the biggest difference between ENS and DNS?

A.  That the vast majority of devices and software today natively support DNS resolution but they do not natively

P7M1STO2                          Gibbs - Cross

support ENS resolution.

Q.  And you testified that you would need special software to access those .ens domain names directly, correct?

A.  Yes, sans a gateway service.

Q.  Sands and Gateway, are those the names?

A.  Sorry.  Either that or absent gateway service to provide connectivity to it.

Q.  I see.  Oh, sans, S-A-N-S, not Sands.

And so, but a sophisticated developer like yourself could access the .ens domain name without .eth.limo, correct?

A.  Yes.

Q.  Because you have the correct software.

A.  I'm sorry.  Could you repeat that.

Q.  You have the right software to do that.

A.  Yes.

Q.  Okay.  Let's take a look at what the government marked as 1611, the demonstrative exhibit.

MS. AXEL:  Mr. DeMarco, can I have that up.

Q.  And Mr. Gibbs, you didn't prepare this document, right, the government did?

A.  I did not prepare it.

Q.  Okay.  And so in the instance of you as a sophisticated user, if you're the person on the left in this, can you access then where it says blockchain ENS directly?

A.  Yes.

P7M1STO2                        Gibbs - Cross

Q.   And that means you could open up a .ens website.

A.   Yes.

Q.   And you could find its content.

A.   Yes.

Q.   Without your service.

A.   Yes.

Q.   And so as you testified, in fact, the use of eth.limo was to provide broad availability to users; do I understand that correctly?

A.   Yes.

Q.   Normal users.

A.   Correct.

Q.   Let's look at page 3, or the third animation.

     Okay.  So as I understand it, you've described that when someone uses .eth.limo, it connects to the .ens, the blockchain data; is that right?

A.   Yes, the service does.

Q.   Okay.  And then it would access as a blockchain data a hash?

A.   Yes, a version, yes, a flavor of that.

Q.   You can correct me.

A.   It would return a content hash record for the ENS domain name.

Q.   And that would be the most recent hash that was affiliated with that .ens domain name, correct?

A.  It depends.  We do have a caching limit for the service that is at——I believe right now it's five minutes.  So if we had received a lookup and that hash had changed within that five minutes before the cache expired, we would return the old value until it expired, at which point we would then re-retrieve that on the next request.

Q.  So there's maybe a five-minute delay if that hash has been updated on the blockchain.

A.  Yes.

Q.  But after that, then eth.limo would retrieve the most recent hash.

A.  Yes.

Q.  Okay.  And with respect to the prior hashes, meaning prior versions of the domain name at .ens, do those continue to exist on the blockchain?

A.  There would be records of those updates there, but they would not be reflected as the most recent, or the current record status.

Q.  But a sophisticated user who knows how to read blockchain data could find them, correct?

A.  Yes.

        MS. AXEL:  All right.  Let's take a step to the next page, Mr. DeMarco, or the next animation.

Q.  Okay.  So after querying the blockchain for the latest hash, then eth.limo looks to find the content, correct?

P7M1STO2                        Gibbs - Cross

A.    Yes.

Q.    Because you don't actually host the content.

A.    Correct.

Q.    Can you compare this for the jury just to how DNS works then.

A.    Can you clarify that a little more.

Q.    Yeah.  I mean, in the case of a normal website, like *The New York Times*, right, if you use a web browser, you actually are contacting *The New York Times* and they're hosting the content; isn't that right?

A.    Well, in—

            THE COURT:  Who is "they" in that sentence?

            MS. AXEL:  The user.

            THE COURT:  Thank you.

A.    In the context of DNS, your browser would actually be making a request to the DNS servers that are configured for the network that you're on and they would actually perform the lookup to identify the IP address that *New York Times* is represented by, and then it would return that to you, and then at that point your browser would make the connection to *The New York Times* hosted servers or however it's applied.

Q.    And then at that point then your browser is connecting what *The New York Times* is hosting.

A.    Yes.

Q.    Okay.  But in this context, the content identifier is

not——is reaching the decentralized network, not a centralized entity.

A.  Yeah, it's a——it would be——if it was IPFS, it would be on a peer-to-peer network and one or more nodes would contain that content.

Q.  Would host the content that you're about to see on your website.

A.  Yes.

Q.  So just to put a visual to that.

MS. AXEL:  Can we take a look briefly at what's marked as Government Exhibit 2513.  We're going to come back to this.

THE COURT:  In evidence?

MS. AXEL:  Yes, it is, your Honor.

Q.  So Mr. Gibbs, showing you what's been marked as Government Exhibit 2513, do you see there in the Wayback Machine it says tornadocash.eth.link?  Do you see that?

A.  Yes.

Q.  And you testified that .eth.link, in the period we were looking at, was one of your competitors?

A.  Yes.

Q.  But provides a similar service.

A.  Yes.

Q.  And in fact you now also run eth.link, right?

A.  Yes.

Q.  Okay.  So when we talk about eth.link or eth.limo accessing

the content, this is what you mean, right?  It accesses the user interface content.

A.  Yes.

MS. AXEL:  Okay.  So can we go back now to 1611 at page 3.

Q.  So if I understand your testimony then, when eth.limo goes to access that user interface content, it's not getting it from Tornado Cash UI directly, it's getting it from this peer-to-peer network.

A.  Yes.

Q.  And each of these is an individual node.

A.  Typically.

Q.  Okay.  We've heard that word a lot.  Would you tell us in this context, what are IPFS nodes?

A.  These are going to be individual nodes running the IPFS software that communicate over a specific protocol to discover one another and then share a sort of directory of peers and content that they can use to consult to look up and traverse this network to locate which peers contain the content that have been requested.

Q.  How does someone go about acting as an IPFS node?

A.  Anybody can run the software themselves.

Q.  And I believe you testified that there are certain companies that do that as a service, correct?

A.  Yes.

P7M1STO2                          Gibbs - Cross

Q.  But it's not just companies; there are also individuals that do this.

A.  Yes.

Q.  So there was also some testimony about updating a website or a UI.  Do you recall that?

A.  Yes.

Q.  So if the owner of a .ens domain name updates the content by updating their transaction hash, how does that information get spread among this IPFS network?

A.  Once the content became available on the IPFS network, any peer that requested that content identifier would retain a local copy of that and, depending on the configuration, they would most likely re-provide that content back to the network and it would sort of propagate in that capacity.

Q.  Do the individuals that access the node have to accept the updated content?

A.  It's a unique identifier so they would——they don't have to accept it if they don't request it.

Q.  I'm sorry.  The last part was they don't request it?

A.  If they——if they don't request the content, then they don't have to accept it.  They can request the content of the latest identifier or any identifier and attempt to discover and locate that on the network, and it is up to the configuration of the IPFS node operator whether or not they would like to re-provide that content to the network.

Q.  So if the node operator prefers the last version, they can keep it.

A.  Yes, in between garbage collection cycles, which is a configurable setting.

Q.  Okay.  Meaning they could configure their garbage collection cycles to keep it.

A.  Yes, correct.

Q.  So sort of like if you don't like Apple's new operating system, you can just elect not to populate it to your phone?

A.  You could retain versions that you wanted and persist those on the network, yes.

Q.  The IPFS node operator, meaning you.

A.  Yes.

Q.  Did Last Mile Labs pin IPFS content?

A.  We did at one point.

Q.  Why?

A.  We were friends and collaborators with a couple of projects that provided some interesting, like, profile landing pages for ENS dWebsites, and so we thought it would be a good idea to replicate that content on the network and, for performance reasons, offer pinning on our instances on behalf of those projects.

Q.  Did you ever pin tornado.cash.eth content?

A.  Not to my knowledge.

Q.  Does eth.limo provide access today to

tornado.cash.eth.limo?

A.   I——I don't know about tornado.cash.eth.limo.

Q.   Now does eth.limo provide access to tornado.cash today, or tornado.cash.eth?

A.   I don't rec——we don't provide tornado.cash——or I'm not familiar with tornado.cash.eth.

Q.   Now through this whole process eth.limo is not conducting or initiating any transactions between the user and a blockchain, right?

A.   No, it's a read only service.

Q.   Okay.  Let's go to the next page.

Okay.  One more clarification.  Does eth.limo provide access today to tornadocash.eth.limo?

MR. REHN:  Objection, your Honor, and may we approach.

THE COURT:  Sidebar.

(Continued on next page)

Case 1:23-cr-00430-KPF   Document 255   Filed 12/17/25   Page 74 of 301   879

P7M1STO2                        Gibbs - Cross

(At the sidebar)

THE COURT:  What is your issue, sir?

MR. REHN:  Two issues.  Number one, this is about what is happening today.  It's not relevant to the time period of the indictment.  The defendant and his co-conspirators transferred ownership of the tornadocash.eth domain on August 8, 2022, at which point eth.limo stopped providing services due to the sanctions against Tornado Cash.

And whether they've recently restarted those services, we actually don't know, but it would have to do with the Van Loon decision, and it would open the door to referring to both cutting it off and then restarting it, which is totally irrelevant to issues in the case.

MS. AXEL:  First, we dispute that entirely.  The Van Loon decision does not open that issue at all.

Second, your Honor, I think it is relevant to the witness's credibility.  The government's position is that Mr. Storm should have implemented some sorts of blocks or checks or searches to keep users from accessing that pathway to Tornado Cash through this interface, and this witness is permitting that to happen today so it's relevant to his credibility as a witness.

THE COURT:  I disagree.  I'm not allowing the questioning.

You've repeatedly asked with different permutations

(212) 805-0300

P7M1STO2                    Gibbs - Cross

and he repeatedly said he does not know.  I'm not going to let you try again.

          Thank you.

          (Continued on next page)

P7M1STO2                          Gibbs - Cross

(In open court)

MS. AXEL:  Okay.  Let's have back up 1611, yes.  Can we move to the next one.

One more.

BY MS. AXEL:

Q.  Okay.  So Mr. Gibbs, this workflow, the relationship between the user and ENS and the IPFS network, this workflow only applies if the user is using eth.limo, correct?

A.  Most——well, at least some software that I am familiar with, such as Brave Browser, at one point in time——I'm not sure if it still does the same way——it did provide similar resolution workflows.

Q.  Okay.  But you've testified that a sophisticated user could go to the blockchain directly through .ens, correct?

A.  They could query that information themselves, yes.

Q.  And a sophisticated user could also get the IPFS hash to obtain the content directly from IPFS; isn't that correct?

A.  Yes.

Q.  Now when someone accesses tornado.cash.eth.limo, your service eth.limo masks the user's IP address; isn't that correct?

A.  We do not record IP addresses, no.

Q.  And so you don't keep any of that information.

A.  We retain some logs on a 31-day rolling basis that only include request URI and any browser headers that were sent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

along with it.

Q.   But not IP address information of users.

A.   Not IP addresses.

Q.   Could you record that information?

A.   We could, yes.

Q.   Why don't you?

A.   It's not valuable to us.

Q.   Does eth.limo have a privacy policy?

A.   Yes.

Q.   Does that include not saving users' IP information?

A.   It does explicitly mention that.

Q.   Are you familiar with the Federated Learning of Cohorts?

MR. REHN:  Objection, your Honor.

THE COURT:  Sustained.

Q.   Mr. Gibbs, are you familiar with the Ronin Bridge hack in March of 2022?

A.   Not intimately, no.

Q.   Did you ever block traffic to tornado.cash.eth.limo because of any particular hack you heard about?

MR. REHN:  Objection, your Honor.

THE COURT:  Beyond the scope.  Sustained.

Q.   You testified about the process of acquiring a .ens name; isn't that right?

A.   Yes.

Q.   Are you aware that people often use Tornado Cash prior to

P7M1STO2                          Gibbs - Cross

purchasing a .ens name?

MR. REHN:  Objection, your Honor.

THE COURT:  Sustained.

MS. AXEL:  Okay.  We can take that exhibit down.

Let's look at Exhibit 1608, which is in evidence.

And we're going to look at page ending in 909, the third page.

Actually, let's look at 910.  I think that's where you testified.

BY MS. AXEL:

Q.  Okay.  Mr. Gibbs, you testified here that you made Mr. Storm aware that there was still a link on the Tornado Cash UI to eth.link urls, right?

There we are, at 7:30.  Do you see that?  Do you remember that?

A.  Yes.

Q.  And you testified that those were mirrors.  Would you explain to me again what a mirror is.

A.  They can just be alternate locations for accessing the same kind of content.

Q.  And so in this case, you were making Mr. Storm aware that there was a mirror that reflected a link to eth.link; is that right?

A.  Yeah.  There were links that used eth.link or—on the site.

Q.  And you understood that the Tornado Cash website reflected

different mirrors over time, right?

A.  Can you elaborate a bit more on that.

Q.  Well, you've testified that it had a link to eth.limo, right?

A.  Yes.

Q.  And eth.link, correct?  And did you also understand that it also contained a link directly to the IPFS hash where the content with——where the UI was found?

A.  Yes.

Q.  And again, a sophisticated developer then could use that link and go directly to the content, right?

A.  Yes.

Q.  Without using eth.link or eth.limo.

A.  Yes.

Q.  And at that particular location they could find whatever the IPFS peer-to-peer network was maintaining.

A.  They would retrieve that specific content identifier that was listed there, from the IPFS network.

Q.  If we go back in this exhibit to page 908.

        You state there that eth.limo is a public good, right?

A.  Yes.  That was my brother that said that.

Q.  Oh.  Okay.  Well, we can take that down.

        I believe you also testified today that eth.limo you operated as a public good; isn't that right?

A.  Yes.

P7M1STO2                      Gibbs - Cross

Q.   But you also testified that it was a for-profit company, right?

A.   Yes.

Q.   How do you reconcile those two things?

A.   Well, we like to think of using the eth.limo service as a rising tide that sort of lifts all ships within the ENS ecosystem and particular——particularly for dWebsited option and that through this process it will lead us to market discovery for monetizable products in perhaps completely different areas.

Q.   So maybe some day you'll make money.

A.   Maybe.

Q.   And at this time you also indicated you were supported by venture capital funding; is that correct?

A.   Yes.

Q.   And you said you also received grants; is that right?

A.   Yes.

Q.   Who did you receive grants from?

A.   To——off the top of my head, the ENS DAO is the most significant contributor.  We also received some from Gitcoin and Giveth.

Q.   And you also receive some private donations you said; is that right?

A.   Yes, from time to time.

Q.   Are those public?  Can you tell us who they are?

          MR. REHN:  Objection, your Honor.

P7M1STO2                    Gibbs - Redirect

THE COURT:  I'll allow.

A.  I don't really remember, to be honest.

Q.  Okay.  Did you then charge any protocols for providing access to their .eth domains?

A.  We have not charged anybody for that.

Q.  Never.  Right?

A.  Never.

Q.  And so you did not charge Mr. Storm for that; is that right?

A.  That's correct.

MS. AXEL:  One moment, your Honor.

No further questions.  Thank you.

THE COURT:  Thank you.

Redirect?

MR. REHN:  Very briefly, your Honor.

THE COURT:  The briefest of redirect?  Thank you.

REDIRECT EXAMINATION

BY MR. REHN:

Q.  Mr. Gibbs, do you recall testifying on cross-examination about whether a user could access a prior version of a website on the IPFS network?

A.  Yes.

Q.  And I believe you testified on cross-examination that they could if they knew the content identifier; is that right?

A.  Yes.

P7M1STO2                     Gibbs - Redirect

Q.  And would that content also still have to be stored on the IPFS network?

A.  In some capacity, yes.

Q.  So if it was no longer stored there, it would no longer be accessible there; is that right?

A.  That's my understanding.

Q.  Now if a user accessed the .eth domain, would they be directed to that older version or the current version?

A.  Can you repeat that.

Q.  If a user accessed the .eth domain, like the example you gave of nyc.eth, using your service, would they be directed to the current version of nyc.eth or to some older version?

A.  It——depending on the cache timer.  If it was in the cache, it could have been an old one.  Once the cache is invalidated, it would then be whatever is currently available in——yeah.

Q.  So can the owner of that domain determine what content is available when somebody goes to that human readable domain?

A.  Yes, they have control over those records.

Q.  Can they also just take down all the contents of that human readable domain if they want to?

A.  Yes.

        MR. REHN:  No further questions.

        THE COURT:  All right.  Sir, thank you very much.  You may step down.

        (Witness excused)

THE COURT:  Mr. Rehn, is the government's next witness brief?

Oh, all right.  Whoever of the team wishes to talk. Mr. Arad?

MR. ARAD:  It's hard to say exactly, your Honor.  I would imagine around 20, 30 minutes.

THE COURT:  Okay.  Let's start then.  We'll start rather than taking the morning break.

I'm just looking.  If anyone is uncomfortable, subsequently, you know, raise your hand.

Great.  Okay.  Let's get the next witness then.  Thank you.

MR. ARAD:  The government calls Shakeeb Ahmed.

(Witness sworn)

THE DEPUTY CLERK:  Please be seated.  Please state and spell your full name for the record, into the microphone.

THE WITNESS:  My name is Shakeeb Ahmed, spelled S-H-A-K-E-E-B, Ahmed, A-H-M-E-D.

THE COURT:  Counsel, you may inquire.

SHAKEEB AHMED,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ARAD:

Q.  Good morning, Mr. Ahmed.  How old are you?

P7M1STO2                    Ahmed - Direct

A.  I'm 36.

Q.  Where did you graduate from high school?

A.  Louisville, Kentucky.

Q.  What's your educational background?

A.  I have a bachelor's degree in computer engineering.

Q.  Where from?

A.  University of Illinois at Urbana-Champaign.

Q.  What is your profession?

A.  I'm a software security engineer.

Q.  Where do you live currently?

A.  Currently incarcerated in prison, in West Virginia.

Q.  Are you in prison because you pled guilty to certain crimes?

A.  Yes.

Q.  What did you plead guilty to?

A.  I pled guilty to hacking two cryptocurrency exchanges and stealing their funds.

Q.  We'll talk more about that.

        Did you ever—did there ever come a time when you learned of something called Tornado Cash?

A.  Yes.

Q.  At a very high level, what is Tornado Cash?

A.  It's a tool to anonymize cryptocurrency.

Q.  And did you use Tornado Cash in connection with one of your crimes?

P7M1STO2                        Ahmed - Direct

A.   Yes.

Q.   Have you been sentenced for the offenses you pled guilty to?

A.   Yes.

Q.   What was your sentence?

A.   36 months.

Q.   To your knowledge when are you eligible to be released to a halfway house or home confinement?

A.   October of this year.

Q.   Why are you testifying here today?

A.   Well, I'm hoping for a reduction in that sentence.

Q.   Do you have an agreement with the government regarding your testimony here today?

A.   Only so far as to tell the truth.

Q.   And who determines if you've told the truth?

A.   The government does, I believe.

Q.   If you testify truthfully, what has the government promised you it will do?

A.   Promised——they haven't promised, but I'm hoping that they will file a Rule 35.

Q.   And what is a Rule 35?

A.   Request for reduction in sentence.

Q.   What's your understanding of who decides whether you get a reduced sentence?

A.   That's up to my sentencing judge.

Q.   And if you do get a reduced sentence, what's your understanding of who decides what the reduction will be?

A.   My sentencing judge.

Q.   Has anyone made you any promises about whether you'll be resentenced?

A.   They have not.

Q.   Or if you are resentenced, about what the resentencing will be?

A.   They have not.

Q.   What is your understanding of whether the outcome of this trial affects the possibility of your resentencing?

A.   It does not.

Q.   Shifting gears, sir, when were you arrested for the crimes you pled guilty to?

A.   July of 2023.

Q.   Had you ever been arrested before?

A.   No.

Q.   And before your arrest, where did you work?

A.   I was an engineer at Amazon.

Q.   Specifically, what kind of engineer were you there?

A.   Sure.  I was a technical lead in their bug bounty program.

Q.   What is a bug bounty program?

A.   It's a platform that companies offer for third-party members of the community to identify bugs or issues in the company's infrastructure.

P7M1STO2                        Ahmed - Direct

Q.  When you say bugs in the company's infrastructure, are you referring to code?

A.  Yes.

Q.  What's the purpose of Amazon employing people to find bugs in its own code?

A.  Well, the idea is to—to fix it before someone nefarious abuses it.

Q.  Now while you were employed at Amazon, is that when you committed the crimes that you pled guilty to?

A.  Yes.

Q.  What were those crimes?

A.  Hacking two crypto exchanges.

Q.  What were those exchanges called?

A.  First one was called Crema Finance and the other one was called Nirvana Finance.

THE COURT:  May I just have the spellings of both, please.

THE WITNESS:  Crema is spelled C-R-E-M-A; Nirvana is spelled N-I-R-V-A-N-A.

THE COURT:  Thank you, sir.

Q.  And during your testimony today, if I refer to these incidents as the Crema hack and the Nirvana hack, would you know what I'm referring to?

A.  Yes.

Q.  Now you mentioned that these are cryptocurrency exchanges.

Can you explain what a cryptocurrency exchange is, at a high level.

A. Sure. It's a place where individuals can buy and sell cryptocurrency.

Q. Let's take these one at a time, starting with Crema. Was there any other way that users could interact with Crema?

A. Sure. There's—there's two sides. There's the side where users are buying and selling cryptocurrency, and the other side is other users providing their own cryptocurrency as liquidity for the other users to trade on.

Q. Why do users provide their own cryptocurrency for others to trade on?

A. They're hoping to earn a yield or a fee whenever people—whenever people trade with it, they earn a fee, so that's why they do it.

Q. And was the Crema hack related to that fee?

A. Yes. So I—yes, it was.

Q. Can you explain for us briefly how the hack worked.

A. Sure. So I found a way to grossly inflate that fee to my benefit, and I took advantage of that to drain the exchange of all of its liquidity.

Q. When you say grossly inflate the fee, like, was it multiplied?

A. Yeah, by thousands of percent.

Q. And when you say drain, what do you mean exactly?

A.   Extract, take out, everything that they had.

Q.   So how much money did you make on this hack, approximately?

A.   Eight plus million dollars' worth.

Q.   Did you use Tornado Cash to pull off the Crema hack?

A.   Yes.

Q.   In a minute we'll talk about how Tornado Cash works, but how did you use Tornado Cash to pull off the Crema hack?

A.   So whenever you interact with one of these programs like Crema, you have to pay what's called a transaction fee, or a gas fee.  And that has to come from—that's in the form of cryptocurrency that you own.  So I needed to pay these tokens to kick off this hack.  And I didn't want to use cryptocurrency that was directly linked to me, so I put it through Tornado Cash first.

Q.   So there's a lot to unpack there.  You mentioned interacting with Crema.

A.   Mm-hmm.

Q.   Were you referring to making your money, your crypto available on Crema?

A.   Yes.  That's—you do a transaction to do that, so yes.

Q.   And what's the fee that you mentioned?

A.   The fee is the fee you need to spend to—to issue that transaction, to talk to the program.

Q.   And so where did Tornado Cash come into the picture?

A.   Sure.  So before I kick off with the hacks, I have my own

P7M1STO2                    Ahmed - Direct

crypto which I use to do the hack.  I take that cryptocurrency, I put it through Tornado Cash.  Now I'm assuming that cryptocurrency is anonymized.  I then use that cryptocurrency in conjunction with the hack to put—to trigger it, to do the hack.

Q.   And why does that cryptocurrency need to be anonymized?

A.   Because that would be the one lead to the perpetrator.

Q.   So let's talk more about Tornado Cash.  How did you first learn about it?

A.   I heard it at least—heard about it at least three years ago when it was being used in various hacks that were purported to have been carried out by nation-state attackers like Lazarus.

Q.   Did you gain confidence in Tornado Cash based on what you just described?

A.   Yes, I did.

Q.   Can you explain why.

A.   Yeah.  So if high-profile attackers are using it, then I figured there was something to it.  And also the fact that there was a lot of money contained within its pools.

Q.   Can you explain that.  Why does the amount of money contained in Tornado Cash's pools make it more effective?

A.   Sure.  So the more money that's in the pool, the more money you can hide behind, so it helps with your anonymity to have more money in that pool.

P7M1STO2                      Ahmed - Direct

Q.   Let's talk about how you accessed Tornado Cash.

          THE COURT:  One moment before that.

          Mr. Patton, do you want a limiting instruction at this
time?

          MR. PATTON:  Your Honor, may we approach?

          THE COURT:  Yes.

          (Continued on next page)

P7M1STO2                    Ahmed - Direct

(At the sidebar)

THE COURT:  Sir, I'm not trying to call attention to the testimony.  He mentioned that he had heard it was involved in the attacks.  There is some evidence in this trial about the hacks.  I'm not sure you're disputing that the hacks took place, but if you want me to instruct him that that testimony came in only for its effect on him as the recipient of the information and not for its truth, I will give that instruction.  Again, I didn't know if you wanted to call attention to it.

MR. PATTON:  No, I appreciate it, your Honor.  Obviously we object to all of this testimony, and in particular the testimony about what he heard, but yes, we would take that limiting instruction.

THE COURT:  All right.

MR. ARAD:  No objection.

THE COURT:  It wasn't for you to object to, but okay.  Thank you.

And then we're finishing up soon?

MR. ARAD:  It's not going to be much longer.

THE COURT:  And then we'll take the break before the cross.  Thank you so much.

(Continued on next page)

(In open court)

THE COURT:  Members of the jury, you heard this witness testify a moment ago about things he had heard and reasons why he had done something, and he mentioned information he had heard.  I'm telling you that that information that he heard is being admitted only for its effect on Mr. Ahmed, not for its truth.  Thank you very much.

Counsel, you may continue.

BY MR. ARAD:

Q.  Mr. Ahmed, how did you access Tornado Cash?

A.  Through the Tornado Cash website.

Q.  Is that sometimes called the user interface?

A.  Yes.

Q.  Or the UI?

A.  Yes.

Q.  Where were you when you accessed Tornado Cash?

A.  In my apartment in Manhattan.

Q.  And that's where you were when you used Tornado Cash in the hack?

A.  Yes.

Q.  When was that?

A.  July of 2022.

Q.  In connection with the Crema hack, approximately how many deposits did you make into Tornado Cash?

A.  Two.

P7M1STO2                        Ahmed - Direct

Q.  Please describe how that worked on the user interface.

A.  Sure.  You load up the Tornado Cash website, you connect your cryptocurrency wallet to the website, you select which pool you want to deposit your funds into, you do the deposit, and you receive a long string of numbers and letters which you can use later to withdraw what you deposited.

Q.  You mentioned selecting the pool.

A.  Yes.

Q.  What did you mean by that?

A.  Well, Tornado Cash had different size denominations of the amount you could enter into Tornado Cash.  So there's a 1-Ethereum pool, a 10-Ethereum pool, and I believe a hundred-Ethereum pool, so the deposits and the withdrawals are always a fixed size based on what the pool is.

Q.  So those are the deposits.  Can you tell us how withdrawal works.

A.  Yeah.  So I mentioned that long string of numbers and letters.  You come back to the website at some point in the future when you want to withdraw, you enter in that—that sequence of numbers and letters, and you perform your withdrawal.

Q.  Are you familiar with something called a relayer?

A.  Yes.

Q.  What is a relayer?

A.  Well, a relayer is a third-party entity that will perform

the withdrawal on your behalf, without—and the reason, you
don't have to pay transaction fees when you perform the
withdrawal.

Q. Did you use a relayer in connection with your withdrawals?

A. Yes.

Q. So you said the reason is that you don't have to pay the
transaction fee.

A. Yes.

Q. Can you expand on that a little bit.

A. Yes. So when you're performing a withdrawal, right, you
can pay the transaction fee to—to get a withdrawal out. So
there's no relayer in the picture. But in the process of
paying that transaction fee, you've now created a link to
yourself with the withdrawal that's in—that you're trying to
do. So if you're using what you withdrew for a nefarious
purpose like I was, it defeats the purpose.

Q. Is it fair to say that a relayer hides payment of the fee?

A. Yes.

Q. Is that similar to the reason you needed to use Tornado
Cash in the first place?

A. Yes.

Q. How did you use a relayer?

A. From what I remember, there was a list on the Tornado Cash
website that you could pick from, and it would submit it to
that relayer.

P7M1STO2                      Ahmed - Direct

Q.   You said relayers were third parties.  Did you ever interact directly with the relayer?

A.   No.

Q.   Who or what did you interact with in order to select the relayer?

A.   The Tornado Cash website.

Q.   Do you have an understanding of whether the relayer was compensated for this work?

A.   I believe they took a cut out of the withdrawal.

Q.   And did you pay that directly or—

A.   The relayer would take it out of the withdrawal and then send the remaining funds.

Q.   Out of the withdrawal that came out of Tornado Cash?

A.   Yes.

Q.   How soon after depositing your cryptocurrency in Tornado Cash did you withdraw it?

A.   I waited a couple days, between 24 and 48 hours.

Q.   Why not do it right away?

A.   Doing it right away would have decreased my anonymity.

Q.   How would doing it right away have decreased your anonymity?

A.   Well, the public information that anyone can see is deposits being made, withdrawals coming out.  So if you make a deposit and immediately withdraw, there's more of a likelihood that that was the person who deposited.  So the idea of waiting

P7M1STO2                      Ahmed - Direct

a bit is to have more people deposit; it's like, oh, okay, any of those people.

Q.  Did you come up with this idea on your own?

A.  Yeah, I knew it intuitively.

Q.  Did you also read about it?

A.  If I recall correctly, the Tornado Cash website did say something about keeping deposits in longer.

MR. ARAD:  Mr. Iannuzzelli, can you please display for the witness, the parties, and the Court what's been premarked Government Exhibit 1979.

Q.  Mr. Ahmed, do you recognize this?

A.  Yes.

Q.  What is it?

A.  It's a screenshot of the Tornado Cash website.

Q.  And do you recognize this page specifically?

A.  I can't say exactly if I have read it or not before; before I committed the hack, at least.

Q.  But had you read it before preparing to testify here?

A.  I don't—I can't recall if I did or didn't.

Q.  Do you recall reading something like it?

A.  Yes.

Q.  On the Tornado Cash website?

A.  I can't say specifically where.

MR. ARAD:  Your Honor, the government offers Government Exhibit 1979 into evidence.

P7M1STO2                      Ahmed - Direct

MR. PATTON:  Objection.

THE COURT:  He has no specific memory of seeing it, sir, so it's not admitted.

MR. ARAD:  So we can take this down.

BY MR. ARAD:

Q.  And let's go back to the user interface.  How long did it take you to make your deposits?

A.  Just a few minutes.

Q.  And the withdrawal?

A.  Again, a few minutes.

Q.  Are you or were you aware of any other way to access Tornado Cash other than the user interface?

A.  I was not, but I had a sense that there would be other ways based on how things are done in this space.

Q.  Did you look for any other ways?

A.  No.

Q.  Why not?

A.  I found no need to make it more difficult for myself to use it.

Q.  Mr. Ahmed, I understand you used Tornado Cash to hide the fees that you paid.  Did you use it to hide your profits?

A.  No.

Q.  Why not?

A.  I didn't want to cede direct control of the profits.

Q.  So that was the Crema hack.  Let's talk about the other one

P7M1STO2                        Ahmed - Direct

you mentioned.  That was called Nirvana?

A.  Yes.

Q.  How did that one work?

A.  It was another exchange that allowed users to buy and sell just one token.  It had a mathematical relationship between the amount you buy and what you're charged for it.  I discovered a way to suppress that price so I could buy a lot of tokens for real cheap and then sell it right back at a price that—where it thought the price should be, at a much higher price, and I was able to profit from that spread.

Q.  About how much money did you make?

A.  3.5 million.

Q.  Did you use any mixers in connection with the Nirvana hack?

A.  Yes.

Q.  Which?

A.  I used a mixer on Solana called Solana Mixer, and then I used another mixer called Samourai.

Q.  You didn't use Tornado Cash?

A.  I did not.

Q.  And why not?

A.  I wanted to create distance from the manner in which I pulled off the first hack to the second.

Q.  You say you wanted to create distance.  Can you explain what you mean by that.

A.  Sure.  So if I—the similarities—there were a lot of

P7M1STO2                      Ahmed - Direct

similarities between the two hacks to begin with.  They were both done on Solana, that people hadn't really hacked anything on Solana before, so the fact that both of the hacks are pulled off using Tornado Cash I figured would be a sign that they were being done by the same person and that would have drawn more scrutiny, and I didn't want to do that.

Q.  By the way, did Tornado Cash or the other two mixers you used require you to provide any information about yourself?

A.  They did not.

Q.  Did you have to log in with a user name and password?

A.  No.

Q.  If they had required these things, would you have used them?

        MR. PATTON:  Objection.

A.  No.

        THE COURT:  Overruled.  You may answer.

        The jury may consider the answer.

A.  No.

Q.  Why not?

A.  'Cause it's like leaving your calling card at the scene of the crime.

Q.  Did you keep your profits from these crimes?

A.  No.  I——I gave it all back.

        MR. ARAD:  No further questions.

        THE COURT:  This is a good time to take our morning

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7M1STO2                    Ahmed - Cross

break, so let's—oh, Mr. Rehn, something you wanted?  Oh, no, you're just getting ready for the break.  Great.

All right.  So we're going to take our break.  I will see you in ten minutes.  Thank you very much for your attention to this matter, and I'll ask you for it to continue.  Please do not discuss this case with each other or anyone else, and please keep an open mind until all of the evidence has been received.

Please rise for the jury.

(Jury not present)

THE COURT:  All right.  I'll see you in ten minutes.  Thank you very much.

(Recess)

(Jury present)

THE COURT:  Please be seated.  Thank you very much.

Mr. Patton, you may inquire.

CROSS EXAMINATION
BY MR. PATTON:
Q.  Good morning, Mr. Ahmed.
A.  Good morning.
Q.  You testified that you engaged in two separate hacks, right?
A.  Yes.
Q.  One involving something called Crema, right?
A.  Yes.

P7M1STO2                        Ahmed - Cross

Q.   And the other for something called Nirvana, right?

A.   Yes.

Q.   For neither one of these hacks did you use Tornado Cash for the proceeds of the money you stole in those hacks, correct?

A.   That's correct.

Q.   And you only used Tornado Cash for the Crema hack at all, correct?

A.   Yes.

Q.   You didn't use it in any way, shape, or form for Nirvana, right?

A.   That's correct.

Q.   And the way that you used it for Crema was that you wanted a new wallet that wouldn't be identified with you, correct?

A.   Yes.

Q.   And that's challenging when you first fund a wallet because the Ethereum blockchain charges what's generally known as a gas fee, correct?

A.   Yes.

Q.   And so if you have paid for that gas fee, that would identify you with this new wallet, correct?

A.   Yes.

Q.   And so you were using Tornado Cash for this new wallet so that the gas fee wouldn't be traced to you, correct?

A.   Yes.

Q.   And the money you used, the money that you deposited into a

P7M1STO2                        Ahmed - Cross

Tornado Cash smart contract and then withdrew, that was crypto you already had?

A. Yes.

Q. And that wasn't the proceeds of a hack?

A. No.

Q. Or other criminal activity?

A. No.

Q. You committed—you committed that Crema hack when, July of 2022; is that right?

A. Yes.

Q. And when were you caught?

A. About a year later.

Q. About a year later. And that's for the one that you used Tornado Cash to create this new wallet, right?

A. That's right.

Q. This separate hack that you didn't use Tornado Cash in any way, shape, or form, Nirvana, law enforcement only found out about that after you were arrested for the Crema hack, right?

A. That's correct.

Q. And only because you voluntarily told them about it, right?

A. That's correct.

Q. So you didn't actually sort of get tracked or found out by law enforcement on the Nirvana hack, right?

A. I don't know how much they knew or didn't know, so it may very well be possible that they knew a lot because based on how

they handled Crema, I think they had an inkling.

Q.  So meaning for the Crema hack, they seemed to nail you down pretty well.

A.  Yes.

        MR. ARAD:  Objection.

        THE COURT:  I'll allow.

Q.  And you used a variety of methods to attempt to conceal the proceeds from both of these hacks, right?

A.  Correct.

Q.  You mentioned a couple of those methods.  You used an anonymizing method that you referred to as Solana, right?

A.  No.

Q.  Well——

A.  That was for the——the transaction fees for the second attempt, not for the proceeds.

Q.  For the proceeds, you used something called Monero.

A.  Yes.

Q.  And you did a number of——and Monero is another way to anonymize transactions, correct?

A.  Yes.

Q.  And you used a number of other methods, correct?

A.  Yes.

Q.  Tell us about those methods.

        MR. ARAD:  Objection.

        THE COURT:  I'll allow.

A.  Sure.  The other one that I——I believe you're referring to is called Samourai.  It is a Bitcoin mixer.

Q.  And so Monero and Samourai, those were other anonymizing protocols you used, right?

A.  Yes.

Q.  But there were other ways to sort of try to hide your tracks, right?

A.  True.

Q.  Multiple transactions, right?

A.  Sure.

Q.  You would bridge from one blockchain to another blockchain, right?

A.  Yes.  There are many techniques.

Q.  What were some of the others?

A.  You're describing them.

Q.  So the use of Tornado Cash that you were talking about to open this new wallet, you talked about using a relayer, right?

A.  Yes.

Q.  And you paid some sort of fee to the relayer, correct?

A.  Yes.

Q.  You didn't have to pay any sort of fee just for the Tornado Cash protocol itself, correct?

A.  Deposit?  Not to the protocol itself, yes, correct.

Q.  The fee you paid was to a relayer, correct?

A.  Yes.

P7M1STO2                        Ahmed - Cross

Q.  And the fee that you were referring to earlier for the wallet, that's an Ethereum blockchain fee, that's not a Tornado Cash fee, correct?

A.  Yeah.

Q.  Throughout any——well, you ended up pleading guilty to a count of what's essentially unauthorized access to someone else's computer services, right?

A.  Computer fraud.

Q.  And that——

        (Reporter interrupted for clarification)

        THE COURT:  Let me warn both sides, let him finish his question, let him finish his answer, so that the court reporter gets both.  Thank you both.

        Mr. Patton.

Q.  That carried a five-year maximum sentence, right?

A.  Yes.

Q.  You ended up getting sentenced to three years, right?

A.  Yes.

Q.  And now you're hoping here that that will be further reduced, correct?

A.  Yes.

Q.  At no point in any of the Crema hack or the Nirvana hack did you have any communication with Roman Storm, right?

A.  I did not.

Q.  Or any other developer associated with Tornado Cash,

P7M1STO2                    Ahmed - Cross

correct?

A.  That's correct.

Q.  You never engaged in a conspiracy with them, an agreement with them to commit crimes, did you?

          MR. ARAD:  Objection.

          THE COURT:  I'll allow.

A.  I did not.

          MR. PATTON:  No further questions, your Honor.

          THE COURT:  Redirect?

          MR. ARAD:  No redirect.  Thank you, your Honor.

          THE COURT:  Thank you very much, sir.  You may step down.

          (Witness excused)

          THE COURT:  Will the government please call its next witness.

          MR. GIANFORTI:  The government calls Austin Dever.

          THE COURT:  Austin Dever.  Thank you.

          Let me please remind the jury of one thing as a consequence of that witness's testimony.  Ultimately the issues of conspiracy and whether one has done or not done something, those are things of which I will instruct you, not the witness. Thank you.

          (Witness sworn)

          THE DEPUTY CLERK:  Please be seated, and into the microphone, please state and spell your full name for the

P7M1STO2                        Ahmed - Cross

record.

THE WITNESS:  My name is Austin Dever, A-U-S-T-I-N, last name D-E-V-E-R.

THE COURT:  Counsel, you may inquire.

MR. GIANFORTI:  Your Honor, may we approach just with a binder of exhibits.

THE COURT:  You may.

MR. GIANFORTI:  Thank you.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DIRECT EXAMINATION

BY MR. GIANFORTI:

Q.  Mr. Dever, sir, where do you work?

A.  I work at GitHub, a technology company.

Q.  Sir, did there come a time when you were served with a subpoena in connection with this case?

A.  Yes, there was.

Q.  Did that subpoena include a requirement that you testify here today?

A.  Yes, it did.

Q.  Where do you currently live?

A.  I currently live in Seattle.

Q.  Seattle, Washington?

A.  Yes.  That's correct.

Q.  Sir, did the government pay for your travel here from Seattle?

A.  Yes, they did.

Q.  Did the government pay for your hotel while you are staying here in New York?

A.  Yes, they did.

Q.  Are you also hoping to get meals reimbursed?

A.  Yes.  That would be great.  Thank you.

Q.  So, other than your flight and accommodations, has the government given you anything of value in exchange for your testimony here today?

P7M5sto3                          Dever - Direct

A.   No, they did not.

Q.   Do you expect to receive anything of value from the government after you testify today?

A.   I do not.

Q.   Does the outcome of this case affect you financially, one way or the other?

A.   No.  Not at all.

Q.   All right.  I would like to ask you a few background questions now.  How far did you go in school?

A.   I have a bachelors degree.

Q.   And when did you graduate?

A.   2004.

Q.   Can you give the jury just a high-level summary of your career, to date?

A.   Sure.  I started my career at the Central Intelligence Agency as a case officer conducting intelligence operations globally.  Spent about a decade in the intel community, variety of roles both as a direct employee as a contractor for multiple government agencies.  When I left tech, after -- I mean when I left the IC after a decade I moved into the technology industry.  I served as a threat intel analyst, a threat intelligence analyst, a penetration tester, and I have managed threat intelligence teams and red teaming programs.

Q.   And are those the things you do at GitHub today?

A.   Yes.  That's correct.  I manage GitHub's threat

intelligence and red teaming program.

Q.   Could you describe to the jury in a few words what "threat intelligence" means in the context of a company like GitHub?

A.   Sure.

Threat intelligence in the GitHub context involves tracking nation and state adversaries who seek to abuse our platform, as well as sophisticated cybercrime activity on the GitHub public platform.

Q.   Just taking a step back, what exactly does GitHub do?

A.   GitHub is a web-based platform that allows software developers to store, manage, and collaborate on code.  We provide a variety of products that allow software developers to build code more efficiently and to take various actions on it.

Q.   What does penetration testing mean in this context?

A.   Penetration testing is a security discipline that in my context involves simulating attacks on the company's systems, networks, or individuals.

Q.   And what does red teaming mean in this context?

A.   Red teaming is similar.  It essentially involves clandestine operations targeting the company's networks to test them for security vulnerabilities.

Q.   Sir, in your capacity as a manager for threat intelligence and red teaming, are you generally familiar with how the company generates and stores records in the ordinary course of business?

A.  Yes, I am.

Q.  Are you generally familiar with the kinds of business records that GitHub maintains?

A.  Yes, I do.

Q.  Sir, next to you is a binder that contains various documents.  Are you familiar with that binder?

A.  Yes, I have seen it before.

Q.  Have you reviewed its contents?

A.  I have.

Q.  And at a high level, what is contained in that binder?

A.  The binder contains screenshots from an internal audit tool that GitHub uses to analyze account information.

Q.  And did the government identify for you certain accounts of interest in this case?

A.  Yes, they did.

Q.  Are the records in that binder true and correct copies of GitHub's business records with respect to those accounts?

A.  Yes, they are.

Q.  Sir, if you look at the cover of this binder, does it list a number of government's exhibits?

A.  Yes, it does.

Q.  In particular, does it list Government's Exhibits 652, 655, 659, 660, 665, 667, 669, 670, and 671?

A.  Yes, it does.

            MR. GIANFORTI:  Your Honor, the government offers the

exhibits just listed.

MR. CASEY:  No objection, your Honor.

THE COURT:  Government's Exhibits 652, 655, 659, 660, 665, 667, 669, 670 and 671 are admitted.

(Government's Exhibits 652, 655, 659, 660, 665, 667, 669, 670, 671 received in evidence)

THE COURT:  Mr. Gianforti, did I leave any out?

MR. GIANFORTI:  I don't believe so, your Honor.

THE COURT:  Thank you.

MR. GIANFORTI:  Thank you.

THE COURT:  They may be shown to the jury.

BY MR. GIANFORTI:

Q.  Sir, if you know, the business records that GitHub does keep, do you know where they're stored in terms of where GitHub keeps its servers, for instance?

A.  GitHub has a distributed cloud infrastructure largely stored through Microsoft Azure, but we do use other cloud services like AWS.  Persistent records are stored in one of those repositories.

Q.  Do you happen to know where any of those Microsoft servers are, off the top of your head?

A.  The physical location?

Q.  Yes.

A.  No, I don't.

Q.  Sir, you testified a moment ago about how GitHub allows

P7M5sto3                          Dever - Direct

people to collaborate on coding projects; is that right?

A.   Yes, that's correct.

Q.   So, specifically in that context, how does GitHub make its money?

A.   GitHub makes its money in a variety of ways but the major revenue streams are paid accounts.  We also offer free accounts but paid accounts for individuals and organizations provide additional services such as additional storage or what we call nets for running coding work streams.  We also have a coding assistant AI product called Co-Pilot that is a market leader and it generates quite a bit of revenues in the development community.

Q.   Sir, are you familiar with the term "repository"?

A.   I am.

Q.   What does that mean in this context?

A.   GitHub stores information in both public and private repositories.  Public repository is essentially a space in which individuals, organizations, or enterprises can store their code in what we know as a file structure and collaborate on it.  Public repositories are globally viewable, they can be searched from anywhere in the world, copied, downloaded.

         Private repositories have the exact same structure except they are as the name implies:  Private.  They can't be searched, they can't be seen unless the owner of the private repository chooses to share it with others.

P7M5sto3                        Dever - Direct

Q.   So private repositories, they may have a list of authorized users; is that right?

A.   Yes, that's correct.

Q.   Just in general, GitHub has some kind of user registry?

A.   Yes.  That's correct.

Q.   With respect to any particular repository, public or private, is the owner of that repository able to take it down any time they want?

A.   Yes.  Owners have complete administrative control over their repositories.

Q.   Sir, a moment ago I asked you if the government identified for you certain GitHub customers of interest.  Do you remember that?

A.   Yes, I do.

Q.   Was one of those customers known as Peppersec?

A.   Yes, it was.

Q.   Was one of those customers known as Tornado Cash?

A.   Yes, it was.

Q.   And was one of those customers known as rstormsf?

A.   Yes.  That's correct.

        MR. GIANFORTI:  Mr. Iannuzzelli, could you please bring up Government Exhibit 665 which is in evidence?

Q.   Mr. Dever, do you recognize this document that is up on the screen?  It should be in front of you.

A.   Yes, I do.

P7M5sto3                        Dever - Direct

Q.   Do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   This is a screenshot from GitHub's internal audit tool, which we call Staff Tools, that shows the owners of the Peppersec organization.

Q.   And, sir, do you see where it says "Owners" on the lower part of the screen?

A.   Yes, I do.

Q.   Do you see anybody listed there?

A.   I do.  This shows three GitHub handles.  The handles are account names are Pertsev, Poma, and rstormsf.

Q.   Are there names associated with each of those handles?

A.   There are.  Alexey Pertsev, Roman Semenov, and Roman Storm, respectively.

Q.   Can you just remind the jury what "Owners" signifies in this particular context?

A.   An owner controls an organization, in this case Peppersec. This gives them complete security control, the ability to add or remove individual users.  This is a paid organization, it would provide the ability to assign specific roles to users as well as to remove users and other owners from the organization.

Q.   And would these owners be able to remove repositories, if they so wished?

A.   Yes.  That's correct.

P7M5sto3                          Dever - Direct

MR. GIANFORTI:  Mr. Iannuzzelli, you can take that down and could you please bring up Government Exhibit 652 which is in evidence?

Q.  Mr. Dever, do you recognize this document?

A.  I do.

Q.  What is it?

A.  This is a screenshot from the same audit tool that shows the public repositories associated with the Peppersec organization.

Q.  And these are repositories that anybody could navigate to on the internet and look at and download?

A.  Yes.  That's correct.

MR. GIANFORTI:  Mr. Iannuzzelli, could you please go to the third page of this document?  Thank you.  Could you blow up the lower third -- actually, a little higher than that, please?  Just one more up.  One more row up.  One more down. There you go.

Q.  Mr. Dever, are these some of the public repositories associated with the Peppersec account?

A.  Yes.  They appear to be.

Q.  Do you see that a number of them have the word "tornado" in them?

A.  I do.

Q.  And one of them reads Tornado Cash-relayer-registry; is that correct?

A.   Yes.

           MR. GIANFORTI:  You can take that down,
Mr. Iannuzzelli, and could you please bring up Government
Exhibit 659, which is in evidence?

Q.   Mr. Dever, do you recognize this document?

A.   I do.

Q.   What is it?

A.   This is a screenshot from the same internal audit tool that
shows the owners for the Tornado Cash organization.

Q.   Do you see where it says "Owners" on the lower part of that
screen?

A.   I do.

Q.   Who is listed there?

A.   Three GitHub accounts are listed.  Pertsev, for Alexey
Pertsev; Poma, or Roman Semenov; and rstormsf for Roman Storm.

Q.   These are the three users we just saw in the Peppersec
account?

A.   Yes.  That's correct.

           MR. GIANFORTI:  You can take that down,
Mr. Iannuzzelli, and could you please pull up Government
Exhibit 670 which is in evidence?

Q.   Mr. Dever, do you recognize this document?

A.   I do.

Q.   What is it?

A.   This is a screenshot from the same internal audit tool that

shows public repositories associated with the Tornado Cash organization.

Q.  So, in other words, repositories that are freely available to anybody who could navigate there?

A.  Yes, that's correct.  Globally accessible.

MR. GIANFORTI:  Mr. Iannuzzelli, can you blow up the last row of this right there?  That's perfect.

Q.  Sir, do you see where it says Tornado-cli?

A.  I do.

MR. GIANFORTI:  Mr. Iannuzzelli, can you bring up the second page and sort of scroll down through the second and third page for Mr. Dever?  Stop there for a second.

Q.  Mr. Dever, do you see at the top the first row reads tornado-classic-UI?

A.  Yes.

Q.  In general, did you just see several public repositories that appear to be associated with Tornado Cash?

A.  I do.

MR. GIANFORTI:  Mr. Iannuzzelli, you can take that down, and could you please bring up Government Exhibit 669, which is in evidence?

Q.  Sir, do you recognize this document?

A.  I do.

Q.  What is it?

A.  This is a screenshot from the same internal audit tool that

shows private repositories associated with the Tornado Cash organization.

MR. GIANFORTI:  Mr. Iannuzzelli, if you could again scroll down the second and third pages?  If you could pause there for a second?

Q.  Mr. Dever, do you see sort of at the bottom of the page it says 2-3, it says Tornado-relayer-registry?

A.  Yes.

Q.  And below that it reads Tornado-relayer-registry-UI?

A.  Yes.

Q.  Am I correct that these pages, in general, reflects several Tornado Cash-related private repositories?

A.  Yes.  That appears to be the case.

MR. GIANFORTI:  Mr. Iannuzzelli, could you please pull up Government Exhibit 671 which is in evidence?

Q.  Sir, do you recognize this document?

A.  I do.

Q.  What is it?

A.  This is a screenshot from the same internal audit tool that shows the payment history for the Tornado Cash organization.

MR. GIANFORTI:  Mr. Iannuzzelli, if you scroll down from this page down to the sort of second and third page?

Q.  Mr. Dever, if you could just review that?  So, sir, what do these records reflect, these line items that we are looking at?

A.  These reflect payments from the Tornado Cash organization

P7M5sto3                          Dever - Direct

to GitHub.  Specifically they appear to show that the Tornado Cash organization purchased what GitHub calls seats. For paid organizations, seats essentially allow owners to invite collaborators, assign them roles to allow them to work on large coding projects.

Q.  So, are seats one of GitHub's revenue sources in this case?

A.  Yes.  That's correct.

Q.  And based on the records you just reviewed, over what period of time was Tornado Cash a paying customer of GitHub?

A.  December 2020 until, I believe -- if you wouldn't mind scrolling back up to the top -- June 2022.

          MR. GIANFORTI:  Mr. Iannuzzelli, can you go back down to the bottom of this table, please.

Q.  Mr. Dever, reviewing this table of payments, what, if anything, do you notice about the number of seats that Tornado Cash was paying for over the period of time that it was a customer of GitHub?

A.  The seats increased over time.  Looks like the initial payment was for 10 seats, and I believe the last payment was for 30 seats.

          MR. GIANFORTI:  Mr. Iannuzzelli, you can take that down and could you please pull up Government Exhibit 667 which is in evidence?

Q.  Sir, do you recognize this document?

A.  I do.

Q.   What is it?

A.   This is a screenshot from the same internal audit tool that shows the account overview data for the rstormsf account.

Q.   Do you see an e-mail account on the left-hand side of that page?

A.   I do.

Q.   What is that e-mail account?

A.   Reads rstormsf@gmail.com.

Q.   And next to "User Info" there is a photo there; right?

A.   Yes.  That's correct.

Q.   And there is a little icon of a person and what does it say next to that?

A.   Yes, that's correct.

Q.   What does it say next to the little icon?

A.   It says:  Roman Storm.

Q.   Thank you.

        MR. GIANFORTI:  You can take that down, Mr. Iannuzzelli.  Could you now pull up Government Exhibit 655 which is in evidence?

Q.   Sir, do you recognize this page?

A.   I do.

Q.   What is it?

A.   This is a screenshot from the same internal audit tool that shows the enterprises and organizations that the rstormsf account is a member of.

P7M5sto3                        Dever - Direct

Q.   Could you describe to the jury what the difference is

between an enterprise and an organization within this context?

A.   Yes.  Happy to.

An organization is either free or paid.  Anyone in

this room can go to GitHub and say I want to create a

collaborative coding project and invite individuals to

collaborate with them.  That would be a free organization.

A paid organization would essentially provide

additional benefits, additional bandwith to collaborate,

additional tools to collaborate on that project.

Enterprise is a business offering.  If you think about

a corporation hosting their code on GitHub and buying services

support, that much more professional, large-scale environment.

MR. GIANFORTI:  Could you go to the second page of

this document, Mr. Iannuzzelli?

Q.   Do you see the header at the top of the page that reads

Organization Affiliations?

A.   Yes, I do.

Q.   If you look at the table below it, what is the third entry

up from the bottom?

A.   That reads Peppersec.

Q.   And what is the very last entry in that table?

A.   Tornado Cash.

Q.   Do you see the heading that says Organization Security?

A.   I do.

P7M5sto3                          Dever - Direct

Q.   And what is the very last item listed there?

A.   Tornado Cash.

Q.   And just above that?

A.   Peppersec.

Q.   Sir, did there come a time in August of 2022 when GitHub terminated its relationship with Tornado Cash?

A.   Yes.  That's correct.

          MR. GIANFORTI:  No further questions.

          THE COURT:  Mr. Casey, you may inquire.

          MR. CASEY:  Your Honor?

          THE COURT:  Sir.

          MR. CASEY:  May I have a side bar, please, regarding that last question?

          THE COURT:  All right.

          (Continued next page)

P7M5sto3                      Dever - Direct

(At side bar)

THE COURT:  Mr. Casey, thank you, sir.

MR. CASEY:  Your Honor, that last question, they only terminated the account in August of 2022 because of the sanctions that were not to be mentioned.

THE COURT:  But they didn't ask the follow-up question as to why it was terminated.  They ended there.  It shows the end of the relationship.  They're not asking about sanctions.

MR. GIANFORTI:  And I asked a similar question which went unobjected to, I believe, with Infura.  And they didn't object this time either, I should note.

THE COURT:  Yes.  No, let's move on.

P7M5STO3                      Dever - Cross

(In open court)

THE COURT:  You may inquire, sir.  Thank you.

CROSS-EXAMINATION

BY MR. CASEY:

Q.  Good morning, Mr. Dever?

A.  Good morning.

Q.  GitHub is a U.S.-based company; is that correct?

A.  Yes.  That's correct.  We are headquartered in the U.S.

Q.  Is it own by Microsoft?

A.  Yes, it is.

Q.  Is it true that over 90 percent of Fortune 100 companies use GitHub?

A.  Can't speak to the exact number but it sounds correct from a ballpark perspective.

Q.  Some of the biggest companies in the world post their code on GitHub?

A.  Yes.  That's correct.

Q.  And that might include companies like Spotify?

MR. GIANFORTI:  Objection.

THE COURT:  We don't need the examples.  Thanks.

Q.  I just want to go back to this concept of the private versus public repositories.  So, just to understand, a repository is where the organization using GitHub posts various types of code; is that correct?

A.  Yes.  That's correct.  The repository is a space for

storing code.

Q. And if it's a public repository I think you said that it is globally available?

A. Yes, that's correct. Globally searchable, viewable, coinable, downloadable.

Q. Even if you don't have any sort of membership with GitHub you can search for the code and find it on GitHub?

A. Yes. That's correct.

MR. CASEY: Mr. Demarco, could you please pull up GX 670, please?

Q. I believe you said this is a screenshot showing the public repositories associated with the GitHub account Tornado Cash; is that correct?

A. Yes. That's correct.

MR. CASEY: Mr. Demarco, if you could please scroll a bit downwards?

Q. Just to clarify, all of these items listed here, they're all available for public viewing; is that correct?

A. They were at the time the screenshot was taken; correct.

Q. Just to be clear, this is like a list of public repositories but if you actually go online and you were to click on these, there is more information about each of them available; is that correct?

A. Yes. That's correct. At the time the screenshot was taken, if you had gone to these repositories and clicked on

them you could have seen the actual code and files associated with each of these repositories.

Q.  Could you also see who contributed to the code?

A.  Yes, you could.

MR. CASEY:  Mr. Demarco, could you please put up GX 652, please?

Q.  This is the public repository for the organization Peppersec; is that correct?

A.  Yes, that's correct.

MR. CASEY:  Mr. Demarco, if you could please scroll down?  That's good.

Q.  Mr. Dever, does this list of repositories include projects other than those associated with Tornado Cash?

A.  I don't have direct knowledge of what repositories in this organization were directly associated with Tornado Cash.  I do see repositories that do not include Tornado Cash in the title.

Q.  Do you recognize any of the descriptions listed here such as AveBot?

MR. GIANFORTI:  Objection.

THE COURT:  I will ask you.  Do you recognize the description, sir?  He says no.  Let's move on.

Q.  If you can scroll down a bit further, Mr. Demarco?  We can move on from that one.

You mentioned private repositories on GitHub.  Do most companies have private repositories?

P7M5STO3                         Dever - Cross

THE COURT:  Sir, do you mean do most users of GitHub maintain both public and private repositories.

MR. CASEY:  Yes.

THE COURT:  Sir, do you understand the question?

THE WITNESS:  I do.  It is a very difficult question to answer.  I don't know that we maintain statistics that have that breakout.  But, it is not uncommon for a user or organization to also have private repositories.

BY MR. CASEY:

Q.  So you have seen many companies keep at least a portion of the code in a private repository versus a public one?

A.  Yes.  That's correct.

Q.  You said there is nothing unusual about that; is that correct?

A.  No, not at all.

Q.  And you mentioned the concept of purchasing seats.

A.  Yes, that's correct.

Q.  And you said a seat allows owners to invite collaborators; is that correct?

A.  The owner of any organization can invite collaborators. Paying for seats gives you additional options for assigning roles, more granular roles to those users, as well as increased security controls and the ability to run what we call actions, work flows, or essentially to take actions on your code.

Q.  And that includes for private repositories?

P7M5STO3                        Dever - Cross

A.   Yes.   That's correct.

Q.   So if you purchase seats for your account, anyone who is assigned a seat can work on both private and public repositories?

A.   As long as the owner has assigned them the permissions to work on those repositories, yes, they could.

          MR. CASEY:   Then, Mr. Demarco, can we please pull up GX 655?

Q.   Mr. Dever, could you please remind us what this exhibit shows?

A.   This is a screenshot from GitHub's internal audit tool that shows the enterprises and organizations that the rstormsf account is a member of.

          MR. CASEY:   Mr. Demarco, could you please scroll down to the next page?   That's good.   Thank you.

Q.   Does it appear that this user is involved in projects other than Tornado Cash?

A.   Sorry.   Would you please repeat that?

Q.   Sure.

          Does it appear from looking at this exhibit that the particular user here was involved in projects other than Tornado Cash?

A.   Yes.   That's correct.

          MR. CASEY:   You can take that down, Mr. Demarco.

          Nothing further, your Honor.

P7M5STO3                      Dubash - Direct

THE COURT:  Thank you.

MR. GIANFORTI:  No redirect.

THE COURT:  Thank you.

Sir, you may step down.  Thank you very much.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Government's next witness, please.

MR. GIANFORTI:  The government calls Kurush Dubash.

THE COURT:  And I will ask you please to spell that for court reporter and Judge.

MR. GIANFORTI:  Standard spelling.

KURUSH DUBASH,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Please be seated, and into the microphone, please state and spell your full name for the record.

THE WITNESS:  Kurush Dubash.  K-U-R-U-S-H, D-U-B-A-S-H.

THE COURT:  Counsel, you may inquire.

MR. GIANFORTI:  Thank you.

DIRECT EXAMINATION

BY MR. GIANFORTI:

Q.  Good afternoon, Mr. Dubash.

A.  Good afternoon.

Q.  Sir, where do you work?

A.  I currently work at a company called Alchemy.

Q.  Did there come a time when you were served with a subpoena in connection with this case?

A.  Yes.

Q.  Did that subpoena include a requirement that you testify here today?

A.  Yes.

Q.  Sir, where do you currently live?

A.  Sorry.  Could you repeat that?

Q.  Where do you currently live?

A.  In New York.

Q.  New York City?

A.  That is correct.

Q.  So did the government pay for your travel down to the court house today?

A.  No.

Q.  And were you given anything of value in exchange for your testimony here today?

A.  No.

Q.  Does the outcome of this case affect you financially, one way or the other?

A.  No.

Q.  Sir, I would like to ask you a few background questions. How far did you go in school?

A.   I received a bachelors degree.

Q.   What was that degree in?

A.   Computer science.

Q.   Where did you get that degree from?

A.   The University of California, Berkeley.

Q.   What year did you graduate?

A.   2017.

Q.   Could you describe to the jury your career, to date, from when you graduated, to present?  At a high level.

A.   Sure.

     So, after 2017 I started as a software engineer at a company called Adobe and worked there a little under four years, where in about 2021 I joined a company called Alchemy where I have been a software engineer for a little over four years.

Q.   And you are still a software engineer today?

A.   That is correct.

Q.   And focusing on the time frame of 2021 when you first joined Alchemy through 2022, were a software engineer at that time too?

A.   That is correct.

Q.   Could you please describe to the jury what your responsibilities were as a software engineer at Alchemy in 2021-2022?

A.   Sure.  So, as a software engineer, my duties include

creating new software and services, maintaining the general
health of our systems, fixing any technical bugs, and
supporting other services as well.

Q.  And could you just describe to the jury, again in sort of
plain English as you can, what Alchemy does?

A.  Sure.  So, Alchemy is a service that helps run the
blockchain software.  So, the blockchain is a technology and in
order to communicate with this technology you have to run a
really, really powerful computer, and running these computers
are expensive and tedious, so Alchemy's service is that we run
a bunch of these powerful computers and we allow our customers
to access and update information with these computers over the
internet.

Q.  Are those powerful computers sometimes referred to as
nodes?

A.  That is correct.

Q.  And for which blockchains does Alchemy provide this
service?

A.  There are many different blockchains that we supported.
Over time we have added several different ones.

Q.  Do you support the Ethereum blockchain?

A.  We do.

Q.  Sir, are you familiar with the term "software as a
service"?

A.  I am.

P7M5STO3                        Dubash - Direct

Q.   What does that mean?

A.   Software as a service is typically a term for a business whose main product is a software operation.

Q.   Does Alchemy offer software as a service?

A.   Yes.

Q.   Is that software the node software for a particular blockchain?

A.   I would say the access to the node software.

Q.   Thank you.

     Sir, focusing on this time period of 2021 and 2022, did Alchemy have any competitors in this space?

A.   Yes.

Q.   Could you name some of those competitors?

A.   Two would be Infura and QuickNode.

Q.   Sir, at a high level, focusing on this period of 2021 and 2022, how did Alchemy make its money on these blockchain services?

A.   So, Alchemy would make its money by counting the number of requests that a customer would make to the blockchain service, and depending on the number of requests, you would be in a certain tier and you would have a certain quota for each tier.

Q.   And when you say quota, what do you mean by that?

A.   The quota would just be the number of requests you can make for that given tier.

Q.   Is it like the same as a company?

A.   That is correct.

Q.   Focusing on 2021 and 2022, do you recall what the different tiers were within Alchemy?

A.   I do.  There were three tiers.

Q.   What were they?

A.   So there was a free tier, there was a growth tier, and then finally there was an enterprise tier.

Q.   Could you just tell the jury a little bit more what came with the free tier of service?

A.   Sure.

So, the free tier had that quota or that cap where you could send some number of requests for free.  After you hit that cap, you would no longer be able to send us those requests.

Q.   At that point would someone have to upgrade to a paid tier? Is that fair to say?

A.   That is correct.

Q.   And then the growth tier, how would you describe that level of service?

A.   So the growth tier, similar to free, would also give you a higher cap now so you could send more requests and you would then have the ability to optionally choose to go past quota if you needed more requests and pay as you go.

Q.   And the enterprise tier, what is that?

A.   The enterprise tier was very similar to the growth tier but

P7M5STO3                        Dubash - Direct

typically had higher limits and custom defined contracts for the customers.

Q. So, sir, you mentioned a moment ago that Alchemy users had the ability to essentially go pay-as-you-go after they hit their cap. Is that what you said a moment ago?

A. That is correct.

Q. Within Alchemy, is that sometimes referred to as auto scaling?

A. That is correct. We call it auto scaling.

Q. And that's an option that the user chooses; right?

A. That is correct. The user can turn that on and off.

Q. Why might a user opt for auto scaling as opposed to a cap where things just stop?

A. A user might choose to turn on auto scaling because their application is using our service and they go past their quota and they don't want their application to be unresponsive or just go down so they could automatically scale up.

Q. Sir, in connection with this case, did the government identify for you a particular customer of interest of Alchemy's?

A. Sorry. Could you repeat that?

Q. During the course of this case, did the government identify to Alchemy a particular customer of interest?

A. Correct.

Q. Was that customer Roman Storm?

A.   Correct.

Q.   Do you recall roughly when Roman Storm became an Alchemy customer?

A.   I would have to check the dates for the exact date but I would assume 2021.

Q.   And do you recall what level or what tier Roman Storm was at when he first became an Alchemy customer?

A.   I believe he was the free tier.

Q.   How, if at all, did Roman Storm's account change over the period of 2021 to 2022?

A.   It would depend on which specific account you are referring to.

Q.   OK, then we will take a look.

Sir, did Alchemy terminate its relationship with Roman Storm in or about August 2022?

MR. CASEY:  Objection, your Honor.

THE COURT:  I will allow.

A.   That is correct.

Q.   Sir, in your capacity of a software engineer at Alchemy, are you familiar with how the company generates and stores records in the ordinary course of its business?

A.   I am.

Q.   Are you generally familiar with the kind of business records that Infura generates and stores?

A.   Sorry.  Could you repeat that?

P7M5STO3                      Dubash - Direct

Q.  Are you generally familiar with the kind of business records that -- I'm sorry, I think I said Infura -- that Alchemy generates and stores?

A.  That is correct.

          MR. GIANFORTI:  Mr. Iannuzzelli, could you please pull up for the witness Government Exhibit 703?

Q.  Mr. Dubash, do you recognize this document?

A.  I do.

Q.  What is it?

A.  This is a document showcasing account information for a user named Roman Storm.

Q.  Is this the kind of record that Alchemy keeps in the regular course of business?

A.  That is correct.

          MR. GIANFORTI:  Your Honor, the government offers Government Exhibit 703 into evidence.

          MR. CASEY:  No objection, your Honor.

          THE COURT:  Government Exhibit 703 is admitted into evidence and may be shown to the jury.

          (Government's Exhibit 703 received in evidence)

BY MR. GIANFORTI:

Q.  Sir, do you see on the left-hand side of the screen there is a first name and last name listed?

A.  That is correct.

Q.  What is reflected there?

P7M5STO3                    Dubash - Direct

A.   Roman Storm.

Q.   Do you see that there is a user name and an e-mail account

associated with this account?

A.   Yes.

Q.   What is that e-mail account?

A.   It says rstormsf@gmail.com.

Q.   Thank you.

          MR. GIANFORTI:  Mr. Iannuzzelli, you can take that

down, and could you please pull up what's been marked for

identification as Government Exhibit 720?

Q.   Mr. Dubash, do you recognize this document?

A.   I do.

Q.   What is it?

A.   This document contains payment information through our

payment processor called Stripe.

Q.   Is this the kind of record that Alchemy keeps in the

regular course of business?

A.   Yes.

          MR. GIANFORTI:  Your Honor, the government offers

Government Exhibit 720.

          MR. CASEY:  No objection, your Honor.

          THE COURT:  Government Exhibit 720 is admitted into

evidence and may be shown to the jury.

          (Government's Exhibit 720 received in evidence)

          MR. GIANFORTI:  Mr. Iannuzzelli, can you please scroll

over to column X and highlight it?

BY MR. GIANFORTI:

Q.   Mr. Dubash, do you see where it says Card Name under column X?

A.   I do.

Q.   And what is reflected in that column?

A.   Roman Storm.

Q.   And then do you see the columns sort of right next to that Card Address line 1 and then there are two marked Card Address columns under AA and BB?

A.   Yes.

Q.   What is the address that is reflected across those columns?

A.   7220 S. Taft Street, and in Seattle, Washington.

         MR. GIANFORTI:  Mr. Iannuzzelli, could you go back to Column B and highlight it?

Q.   Mr. Dubash, what is reflected in Column B of this spreadsheet?

A.   These are daytimes for when these payments were processed.

Q.   And looking over the spreadsheet, over what period of time was Roman Storm a paying customer of Alchemy?

A.   Between April 2021 and August 2022.

Q.   Do you see the column next to that Column C that says amount?

A.   Yes.

Q.   What is reflected there?

A.   These are the various amounts for the payments for those transactions.

Q.   And, sir, do you see that there are a number of different payments in Column C that are all $49?

A.   Yes.

Q.   What does that reflect, those $49 payments?

A.   The $49 payments were the payment for the growth subscription.

Q.   That's a tier of paid service that you were testifying about earlier?

A.   That is correct.

Q.   And do you see that there are also a handful of months where the payments from this account actually exceeded $49?

A.   Yes.

Q.   For example, in June of 2021 the payment amount was almost $200?

A.   Yes.

Q.   What, if anything, does that tell you about just that there were payments made above that $49 fee?

A.   If there are payments above the $49 fee, typically that was the amount that was charged as the pay-as-you-go amount.

Q.   That's the auto scaling?

A.   That is correct.

        MR. GIANFORTI:  Mr. Iannuzzelli, you can take that down, and please pull up Government Exhibit 722.

P7M5STO3                         Dubash - Direct

Q.   Mr. Dubash, do you recognize this document?

A.   I do.

Q.   What is it?

A.   This document contains records at the high level for all the requests made for this account.

Q.   And by requests, do you mean blockchain requests?

A.   Correct.

Q.   Do you know what the terms "read" and "write" mean in this context of blockchain activity?

A.   I do.

Q.   Could you describe to the jury what you mean by read and write?

A.   Sure.

     So, when interacting with the blockchain technology, there can be either read operations or write operations.  The way to think of it is if you are viewing a website you are reading information, you are getting some information.  To make a write operation is to change something, say like make a comment or upload a photo.

     So, if you are getting information from a blockchain, that's read.  If you are changing information on the blockchain, that's a write.

Q.   Would a transaction on the blockchain reflect a write transaction in this case?

A.   That is correct.

Q.   Because that would reflect a change, say somebody's value going to somebody else?

A.   That is correct.  It is a change in state.

Q.   Does this spreadsheet collect both read and write calls that were made through Alchemy?

A.   Yes.

          MR. GIANFORTI:  Mr. Iannuzzelli, could you please go to row --

          THE COURT:  Is this document in evidence, sir?

          MR. GIANFORTI:  Oh.  Did I not move it?

          THE COURT:  No, I don't believe you did.

          MR. GIANFORTI:  The government offers Government Exhibit 722.  My apologies.

          MR. CASEY:  No objection, your Honor.

          THE COURT:  Thank you, Mr. Casey.

          Government Exhibit 722 is admitted into evidence and may be shown to the jury.

          (Government's Exhibit 722 received in evidence)

          MR. GIANFORTI:  Mr. Iannuzzelli, please go to row 14041.

BY MR. GIANFORTI:

Q.   Mr. Dubash, do you see Column C that reads App Team?

A.   Yes.

Q.   What does that mean?

A.   App Team just means it was the user-defined name for that

team's application.

Q. So the customer puts this in, Alchemy doesn't put it in; is that right?

A. That is correct.

Q. And starting with row 14041, what is reflected under Column B?

A. It says: Tornado.cash.

MR. GIANFORTI: Mr. Iannuzzelli, can you just scroll over a few rows? Stop right there.

Q. Mr. Dubash, do you see column M here?

A. Yes.

Q. And it reads: Plan Usage Cap Type. Is that right?

A. That is correct.

Q. What is reflected in that column for the tornado.cash app team?

A. It reads auto scale.

Q. That is Alchemy's pay-as-you-go service?

A. That is correct.

MR. GIANFORTI: No further questions.

THE COURT: Cross-examination.

MR. CASEY: Yes, your Honor.

THE COURT: Thank you.

CROSS-EXAMINATION

BY MR. CASEY:

Q. Good afternoon, Mr. Dubash. I just have a question an auto

scaling.  I'm sorry.  Could you remind us what exactly that means?

A.  Auto scaling is the option for the customer to enable them to go back their allotted quota if they are on a paid tier.

Q.  Is there anything unusual about a customer having auto scaling?

A.  No, not typically.

MR. CASEY:  Mr. Demarco, could you please pull up GX 722, please?  I believe you testified that this is the call history or request history for Mr. Storm's account; is that correct?

A.  That is correct.

Q.  And you said the app team column is something that the user names himself?

A.  Correct.  It is the user inputs the name.

Q.  And you said this reflects all requests for information to the blockchain both read and write; is that correct?

A.  That is correct.

Q.  Is there a way to tell which of these consist of read requests and write requests?

A.  Yes.

Q.  Is it true that Column C is where that information would be reflected?

A.  That is correct.

Q.  And if Mr. Demarco were to filter that column for

ETH_sendraw transaction, it would show all the write requests for this account during this period; is that correct?

A.   That is correct.

MR. CASEY:  Mr. Demarco, if you wouldn't mind doing that?  Then, Mr. Demarco, if you could please scroll down?

Q.   So, Mr. Dubash, just to clarify, for this time period for this account, the totality of write requests are reflected here now?

A.   That is correct.

Q.   There is approximately 35 lines?

A.   That is correct.

Q.   Just to understand the scope of the service that Alchemy provides, generally speaking, when a user transfers cryptocurrency on the Ethereum network, does the user's wallet itself send the request to the Ethereum node?

A.   It would depend.

Q.   For example, if a user has a MetaMask wallet and they want to make a transfer of funds using that wallet, ultimately it is the wallet that would connect and send the write request to the blockchain; is that correct?

A.   Correct.

Q.   When a customer uses Alchemy's RPC services what, if any data, does Alchemy collect about that user?

A.   We would collect high-level metadata on the request coming in such as whether it is a read or the method in this case and

P7M5sto3                          Dubash - Cross

the team that is making that call in addition to other metadata that is typically collected for the requests.

Q.  Does Alchemy collect any IP address information about the user?

A.  Can you clarify specifically what time period?

Q.  During this time period, so 2021 to 2022.

A.  During this time period I believe Alchemy would retain IP addresses for seven days, after which they would be automatically deleted.

Q.  Does Alchemy continue to collect such data for seven days?

          MR. GIANFORTI:  Objection.

          THE COURT:  Sustained.

Q.  Just to clarify, when a user transfers funds, Alchemy collects IP address information on the user conducting the transaction; is that correct?

          MR. GIANFORTI:  Objection.

          THE COURT:  I will allow.  Talking about during the relevant time period, sir?

          MR. CASEY:  Apologies.  During the relevant time period.

A.  We would collect information on the IP address from whatever the request is coming from.

Q.  When you say whatever the request is coming from, can you clarify that?

A.  It would depend on who was making the request for access to

the blockchain.  If it was from a server or from a MetaMask account, that's what would be logged.

Q.  So if it is from a MetaMask wallet it would log the IP address of the MetaMask wallet's owner or whoever is using it?

A.  It would depend on the application that the MetaMask wallet is using and whether MetaMask was configured to run through Alchemy.

Q.  So if it was configured to require MetaMask to connect directly to Ethereum node, would Alchemy collect the IP information of that user's -- the owner of the wallet or the user of the wallet?

            THE COURT:  Again, during the relevant time period.

            MR. CASEY:  During the relevant time period. Apologies, your Honor.

A.  If the user was using Alchemy as their provider, then yes.

Q.  I'm sorry.  If we can go back to GX 722 which is still up? I think we saw that there is approximately 35 write transactions during this period; is that correct?

A.  That is correct.

            MR. CASEY:  And then Mr. Demarco, I apologize, but could you unfilter Column C so that we show the entirety?  And then if you could scroll all the way down, please?

Q.  So it appears there is approximately 38,000 calls or requests during this time period to this account; is that correct?

A.   That is correct.

Q.   So aside from the 35 that we saw, the remainder are all read requests; is that correct?

A.   That is correct.

            MR. CASEY:   Nothing further, your Honor.

            THE COURT:   Thank you.

            Redirect?

            MR. GIANFORTI:   No redirect.

            THE COURT:   Sir, thank you very much.   You may step down.

            THE WITNESS:   Thank you.

            (Witness excused)

            THE COURT:   Government's next witness, please.

            MR. ARAD:   The government calls William Lopez.

            THE COURT:   Mr. Arad, do you contemplate Mr. Lopez' direct taking us through the lunch break?   We were going to break in about 15 minutes.   I don't have a sense of how long the direct is, sir.

            MR. ARAD:   It might be around 40 minutes.

            THE COURT:   Let's start with it then, please, and then we will break.   You will excuse me, but I'm not aware of the witnesses after Mr. Joseph.   I don't know if the defense is. Perhaps at the break you can tell me -- Mr. Lopez -- who is next.   Just tell me at the break.

            MR. ARAD:   Sure.

P7M5sto3                      Lopez - Direct

THE COURT:  Thank you.

WILLIAM LOPEZ,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Please, into the microphone, state and spell your full name for the record?

THE WITNESS:  My name is William Lopez.  L-O-P-E-Z.

DIRECT EXAMINATION

BY MR. ARAD:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Where do you currently work, sir?

A.  For the Federal Bureau of Investigation.

Q.  What is your title?

A.  I am a special agent.

Q.  How long have you been a special agent?

A.  Since 2018.

Q.  Are you assigned to a particular unit at the FBI?

A.  I am.  I'm assigned to the CAST unit.

Q.  What does that stand for?

A.  Stands for Cellular Analysis Survey Team.

Q.  How long have you been a member of the CAST team.

A.  I became fully certified in 2022.

Q.  Broadly speaking, what are your duties and responsibilities in CAST?

P7M5sto3                        Lopez - Direct

A.   The CAST unit specializes in looking at historical call detail records and cell site information and location data based on, off of phones and other electronic devices.

Q.   At a high level, what are you trying to determine when conducting a cell site analysis?

A.   The purpose of the cell site analysis is to determine historically, or sometimes in real-time, the general location of a device, based off of the cell site it is utilizing and other location GPS data, if it is available.

Q.   Did you have to complete training in order to be able to do this job?

A.   In order to be a CAST asset there is 350 hours of training just to get certified.

Q.   Are there examinations associated with that?

A.   Each level of training has an independent examination, as well as other evaluations within each level.

Q.   And once you have been certified, do you have any ongoing training requirements?

A.   Every year there is an annual week-long recertification where we learn the updated technologies and anything else that is relevant to our training and investigations.

Q.   Approximately how many times have you performed a cell site analysis?

A.   Hundreds, if not thousands of times, at this point.

Q.   Have you testified in court before about that kind of

analysis?

A.   I have.

Q.   Approximately how many times?

A.   Approximately four times in court.

          MR. ARAD:  Your Honor, the government offers Special Agent Lopez as an expert witness.

          THE COURT:  On what please, sir?  On cell site information or the review of phone records?

          MR. ARAD:  On cell site information, your Honor.

          THE COURT:  All right.  Is there an objection from the defense?

          MR. PATTON:  Just our ongoing objection, generally, that we briefed, your Honor.

          THE COURT:  Agent Lopez is so qualified.  Thank you.

BY MR. ARAD:

Q.   Special Agent Lopez, were you asked to perform a cell site analysis in connection with this case?

A.   I was.

Q.   Was that about a particular phone number?

A.   It was.

Q.   At a general level, what were you asked to do with respect to this case?

A.   I was given the call detail records for a particular phone number and given certain dates to look at to see where the device -- the general location of that device on those dates.

MR. ARAD:  Mr. Iannuzzelli, would you please display for the witness, the Court, and the parties, what's been premarked Government Exhibit 3001?

Q.  Special Agent Lopez, do you recognize this?

A.  I do.

Q.  What is it?

A.  This is a report I prepared in anticipation of this trial in the examination of a phone number shown on the screen ending in 7909.

MR. ARAD:  Your Honor, the government offers Government Exhibit 3001 into evidence.

MR. PATTON:  Our continuing objection, your Honor.

THE COURT:  The objection is overruled.  Government Exhibit 3001 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 3001 received in evidence)

BY MR. ARAD:

Q.  Special Agent Lopez, did you prepare Government Exhibit 3001 after examining T-Mobile cellphone records?

A.  I did.

Q.  Were those records for the phone number that is on the screen?

A.  It was.

Q.  What kinds of records did you examine from T-Mobile?

A.  These were call detail records.

Q.   Does Government Exhibit 3001 accurately summarize certain portions of those records?

A.   It does.

Q.   I would like to begin by discussing the basic concepts involved in cell site analysis.  At its most basic level, how does a cellphone make or receive a call?

A.   So, a cellphone is very similar to a two-way radio that little kids use, but instead of needing to be line of sight of the other user, a cellphone has the components and the capability of using the infrastructure of cellular networks like radios and antennas to transmit radio frequency signals all over the place.  So someone in New York can pick up the phone, obviously easily call someone in California, and that's all done through these networks through the infrastructure of T-Mobile in this case, their cellphone towers, the antennas, and radios on those towers.

Q.   So I think you ended your answer by discussing the infrastructure.  Does that include something called cell sites?

A.   It does.  The term cell sites and cell towers can be used interchangeably.  They're referring to the same thing.

        MR. ARAD:  Mr. Iannuzzelli, will you please display Slide 3 of this presentation?

Q.   Special Agent Lopez, what is this?

A.   This is a cell tower.

        What I was mentioning before about the radios,

antennas, that is what you can see on the right-hand side of this.  And what you also see is the triangular shape of the tower and that is how the network is set up.  Each of these towers, they are broken up into three sectors each comprising of 120 degrees, so when we do this analysis we are able to see which side of the tower the radio frequency signal is coming from.

Q.  How do cellphones connect to cell towers like this?

A.  The phone is transmitting radio frequency to the tower and the tower is taking that radio frequency signal with the radios and antennas and interpreting that radio frequency signal.

Q.  Who operates these cell towers?

A.  The infrastructure is owned and operated by T-Mobile.  The big three providers, Verizon, T-Mobile, and AT&T, all operate their own equipment.

Q.  When a provider's cellphone connects with one of its towers, does the provider maintain any information about that?

A.  It does.  If you are a user of any of these providers you will see your cellphone bill each month and if you look at a detailed version of that bill you can see if you made a call, received a call, SMS text messages are on there.  That's all kept and maintained by the provider.

Q.  Generally speaking, what determines which cell tower a cellphone will connect to?

A.  The cellphone is always looking for the best possible

signal at the moment of the transaction.

Q.   And in the New York City metro region, does a cellphone connect only to towers that are operated by its service provider?

A.   Yes.  If you have a T-Mobile phone or AOL Time Warner phone, it is only going to utilize that provider to make that transaction.

Q.   How would you describe the density of T-Mobile cell sites in Manhattan?

A.   Manhattan is obviously a very unique place, it is one of the most populace cities so you will see cell sites on almost every corner of New York City, especially Manhattan, and maybe even every other block, whereas if you looked at somewhere very rural and where there is not a very dense population, the towers and cell sites would be much more spread out.  But, here in New York City, they're very close together.

        MR. ARAD:  Mr. Iannuzzelli, will you please display Slide 6?

Q.   Special Agent Lopez, what is on this slide?

A.   This is a mapping of, you can see Manhattan and all the T-Mobile cell sites located within Manhattan.

Q.   If a particular area has a high density of cell sites, does that assist with your efforts to determine the cellphone's location?

A.   Yes.  So the way the network is set up where I was

mentioning before, very rural areas and cell sites will be much more further spread apart and it is going to cover a larger footprint, whereas here in New York City you will see that the towers and the cell sites are close together and the footprint of those is obviously just made to be much smaller because of the amount of people that it has to service.

MR. ARAD:  Mr. Iannuzzelli, can you please turn to Slide 4?

Q.  Are you familiar with the term "sector", Special Agent Lopez?

A.  Yes.

Q.  Using Slide 4, could you please explain that to the jury?

A.  Sure.  So on the right-hand side you can see what looks like a clock, and the black dot in the middle of the clock is the top view of a cellphone tower and you can see how it's broken up into three sectors, each comprising of 120 degrees. The middle point of that sector is referred to as the azimuth and it is marked in black here so you can see zero degrees, 120 degrees, 240 degrees, each represent three different sectors, Sector 1, 2, and 3.

Q.  And can you sometimes tell which sector a cellphone might be located in at a particular time?

A.  When we are requesting these records from the provider, the cell site as well as the sector is provided to us to give us a better general idea where the phone is located during a

P7M5sto3                        Lopez - Direct

particular transaction.

MR. ARAD:  Mr. Iannuzzelli, we can take this exhibit down for now.

Q.  Special Agent Lopez, you testified that a cellphone would typically connect with a cell site with the strongest signal; is that right?

A.  Correct.

Q.  Will the clearest and strongest signal, generally speaking, be the closest cell tower to the location of the cellphone?

A.  It can be but it's not always the -- it is not always going to be the answer that the cellphone is going to choose the closest tower.  It could be depending on the geography or the landscape, especially like an area of New York City which is dense with buildings, the network could be set up that a tower two blocks away better services you than one that is around the corner but is blocked by a building.

Q.  Let's go back to the T-Mobile records you examined for a minute.  Do service providers, including T-Mobile, keep records of which cell sites cellphones connect to?

A.  Yes, they do.

MR. ARAD:  Mr. Iannuzzelli, can you please display for the witness, the parties, and the Court, what's been marked Government Exhibit 3202?

Q.  Special Agent Lopez, do you recognize this?

A.  Yes.  This is a set of call detail records from T-Mobile.

P7M5sto3                        Lopez - Direct

Q.   For which phone number?

A.   The phone number ending in 7909.

          MR. ARAD:  Your Honor, the government offers Government Exhibit 3202 pursuant to the records custodian declaration that's been premarked Government Exhibit 3201.  I will note for the Court that this was not part of the prior discussions about exhibits that would be admitted pursuant to certifications.

          THE COURT:  All right.  Let me just see that, please.  You are not seeking to introduce the declaration?

          MR. ARAD:  Correct.  Just this exhibit.

          THE COURT:  Thank you.

          MR. PATTON:  Objection.

          THE COURT:  Same objection but not objecting to the -- well, all right.  You admit the declaration exists, sir?

          MR. PATTON:  Yes.

          THE COURT:  Yes.  Thank you.  I am overruling the defense objection.  I am admitting Government Exhibit 3202.  It may be shown to the jury.

          (Government's Exhibit 3202 received in evidence)

BY MR. ARAD:

Q.   Special Agent Lopez, let's walk through the information on the spreadsheet.  Let's begin with the first column, the Date column.  What does this tell you?

A.   Sure.  That is meant to note the date of the particular

transaction.

Q.   And the time?

A.   That is the time in Coordinated Universal Time for the transaction.

Q.   And what is Coordinated Universal Time?

A.   It is a standard of time that is utilized for all T-Mobile records.  And, for example, during the time period we are referencing the -- you can take the Coordinated Universal Time and subtract four hours and that will bring you to Eastern standard time.

Q.   How about the calling number?

A.   That is the number that initiated the transaction.

Q.   When you say transaction, what do you mean by that?

A.   On this T-Mobile call detail record we have SMS text messages and voice calls.

Q.   What about the called number column?

A.   That is the receiving device, receiving number for the particular transaction.

Q.   Toward the right side of the screen, what does the first LTE site ID tell you?

A.   That is going to note that is a unique set of numbers kept by T-Mobile and it is going to note which cell site or cell tower was utilized during the transaction referenced.

Q.   And the first LTE sector ID?

A.   That is what we were looking at before with that clock

graph that will show you which sector was utilized, 1, 2, or 3.

Q.  You mentioned that the transactions here seem to be primarily incoming and outgoing calls.

A.  Correct.

Q.  If the user of the cellphone was using an application -- actually, I will first ask, are you familiar with an application called Telegram?

A.  Yes.

Q.  And if the user of this particular cellphone was using that application on their phone, would Telegram communications show up in this chart?

A.  No.  That's a different data set.  Those are data transactions and what we have here in the call detail records are only voice calls and SMS text messages.

Q.  So what do you do with the data in this chart when you are performing a cell site analysis?

A.  So this, I would take this information, the date, the time, the cellphone tower and the sector, and I am able to map that to create a visualization of the general location of a phone during the said transactions.

MR. ARAD:  Mr. Iannuzzelli, we can take this down.

THE COURT:  You were about to something?

MR. ARAD:  I was going to say I'm happy to go on but this is a natural breaking point, if the Court wants to break.

THE COURT:  I think it is appropriate for us to take

P7M5sto3                    Lopez - Direct

our lunch break so I think we will do that.

We are going to take a 45-minute lunch break and we will resume at 1:30.  I am going to ask, as I always do, to not discuss this case with each other or anyone else and keep an open mind until all of the evidence is in.

Enjoy your lunch.  We will see you in 45 minutes. Thank you.

(Continued on next page)

(Jury not present)

THE COURT:  Agent Lopez, you are welcome to step down.

(Witness steps down)

THE COURT:  Friends, I am sure I was thrown off because we have gone through all of the witnesses I knew we had and if you guys have been talking about who is next, that's great, but I would love to know in the several hours, the three hours of time we have this afternoon, who our witnesses will be.  May I please know?

MR. REHN:  Yes, your Honor.

We are evaluating whether we will call that paralegal witness or not in light of some of the exhibit issues that are still percolating.

THE COURT:  I think you might want to hold off on that.

MR. REHN:  I think we may.  So, our next witness would be Philip Werlau, who will take us to the end of the day.  We have moved at a very rapid clip this morning, more quickly than the government expected which is great.  So, we will have Philip Werlau up next.

THE COURT:  And the defense now -- were you aware until now?  No.  Of course not.  You are aware of now.  Great.

MR. KLEIN:  Just learning it as your Honor is learning it.

THE COURT:  Something for us to talk about is, I mean

P7M5sto3                          Lopez - Direct

I think we should keep the jury until 4:30 today because they're committed to that.  Whether we need to keep them late for the remaining days this week I guess depends.

You will excuse me, but I don't know how many other government witnesses remain.  I don't know that you do.

MR. REHN:  It is not a very high number, your Honor, so I am expecting we are likely to rest on Thursday.  Given how fast we moved today, I don't know how long the crosses will be but --

THE COURT:  Everyone has been very thoughtful about directs and crosses and you have my compliments for not meandering.

MR. REHN:  I could give the rest of the witnesses.

THE COURT:  We would love to know, yes.  Go ahead.  In order?

MR. REHN:  Yes, your Honor.

THE COURT:  OK.  In approximate order.

MR. REHN:  Moz Mirbaba.

THE COURT:  Spelling?

MR. REHN:  M-O-Z, M-I-R-B-A-B-A.

THE COURT:  Thank you so much.

MR. REHN:  Stephan George.  Connor O'Sullivan.

THE COURT:  Yes.

MR. REHN:  And somewhere in there it will be the summary witness, the paralegal.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7M5sto3                        Lopez - Direct

THE COURT:  Mr. Klein, I will direct this to you.  We are now both so informed.  It would be even better if over the lunch break or somewhere near that the government would let the defense know what exhibits they plan to introduce through each.

I do think, Mr. Klein, that Mr. Werlau is going to take us the rest of the afternoon and I don't think we are finishing him today but given the pace that we are going, tomorrow we just go back to regular time, sir?

MR. KLEIN:  I think that would be right, your Honor.  We can always decide at the end of the day but I think that would be right.

THE COURT:  That's fair.  We will see how we are going.  Maybe we will have very long crosses.

Sir, are you ready, if the government rested on Thursday?

MR. KLEIN:  Yes.

THE COURT:  That wasn't meant to be a trick question, sir.

MR. KLEIN:  No.

THE COURT:  We may have mid-trial motions at some point depending on when in the day and depending on their length.  We will see what we do with the jury.  For example, if the government rests at 3:00 on Thursday, we will let the jury go.  But OK.  And then your first witness, sir?

MR. KLEIN:  We are still debating that, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT:  Good grief.

MR. KLEIN:  Well --

THE COURT:  OK.

MR. KLEIN:  Some of it is the scheduling, we weren't sure when they would end and we have witnesses with varied schedules.  So, let us talk about that at lunch and I think we can give an answer by the end of the day.  But if we still are -- the schedule is a little more aggressive than we thought and I think the Court thought, but we will be ready.

THE COURT:  We are the victims of our own successes.  I said, you guys are giving great, tailored cross-examinations and not wasting anyone's time.  I am sure the jury appreciates that.  We have been through, according to my deputy, 13 witnesses in six trial days.  Not bad.

MR. KLEIN:  Your Honor, can I ask, do we know how long Mr. Werlau, just an estimate?  It is unclear to us if he is going to go into the next day.

THE COURT:  Well --

MR. KLEIN:  We weren't notified about him being here today or he was going to be on, so we are just trying to navigate that.

THE COURT:  I am imagining -- not that I know anything -- that the direct is going to take -- we are not going to finish the direct today.

MR. REHN:  I do not anticipate fishing the direct

today, your Honor.

THE COURT:  That's helpful, your Honor.

I will see you in just under 45 minutes, unless anybody has to raise something else and that is Mr. Rehn.  Go ahead.

MR. REHN:  I want to raise, and I think this is important, your Honor.

THE COURT:  Please.

MR. REHN:  Two things.  Number one, there has been no disclosure of any defense exhibits in connection, for example, with any expert witnesses, any demonstratives, any summary exhibits.

THE COURT:  What about the things that I thought there were disclosures made about experts in the last couple of days.  There were going to be.  I heard references to them.  Were they?

MR. KLEIN:  Your Honor, we did disclose 26.2 materials.

THE COURT:  Did we?

MR. KLEIN:  The defense did.

THE COURT:  When?

MR. KLEIN:  Sunday morning.  I meant to get it out Saturday but it got stuck in my inbox.  It went out first thing Sunday morning.

MR. REHN:  We received two e-mails, your Honor, but I

am just saying they have suggested there will be some things that they are going to want to display for the jury.

THE COURT:  Yes.

MR. REHN:  And given how aggressively they have been litigating our slides, the government needs some notice or it is going to be a significant issue.

THE COURT:  Well, I'm not -- they're still trying to figure out who their witnesses are but I ask, I plead for the defense to give me more information.  So, I really would like to know.

Mr. Rehn, your other beef?

MR. REHN:  Well, there was a reference during a side bar yesterday during Special Agent DeCapua's testimony to some -- I think Mr. Patton suggested there would be some expert testimony about other hacks that didn't go through Tornado Cash.

THE COURT:  I did hear about that; yes.

MR. REHN:  As far as I recall there was nothing in any expert disclosure about that.  As far as I can tell, that testimony would be wholly irrelevant to this case because the existence of other criminal activity that used other mixers has no bearing on whether the defendant committed a crime.  And so, we would be vigorously objecting to that, both on disclosure and relevance grounds.

THE COURT:  Because I wouldn't care if you just

objected, it is the vigorous objection that is going to move me.

Mr. Patton, let say this.  Again, not that I matter, but I had the reaction that it was news to me and my law clerk and I were, if you will, spitballing how it might come in, if at all.  I'm just letting everybody know that before anyone testifies about it, you really have to let me know and let the government respond because I have concerns.  It doesn't mean I won't let it in, I just need to know what for.

MR. PATTON:  We will, your Honor.

THE COURT:  Is it your present intention to admit evidence of other hacks that either -- well, let's start right there.  Currently your present intention to admit such evidence, sir?

MR. PATTON:  Your Honor, I can promise there wouldn't be anything detailed.  The question is whether or not, based on the agent's testimony, depending on what we hear from Mr. Werlau, we do think it is misleading to suggest that, like, all the big hackers use Tornado Cash.

THE COURT:  I didn't think that was what they were saying, but OK.

So what is your point -- well, you got Agent DeCapua to admit that he wasn't aware of certain hacks.  We don't know whether those hacks existed.  Is it for the purpose of demonstrating that there were hacks in the land that went

through some other mixer?

MR. PATTON:  Well, that hacks that met his criteria other than the Tornado Cash piece of his criteria, that there were many of those hacks of, you know, fairly sizeable magnitude, in the hundreds of millions of dollars, similar to the ones that he testified about that he did not trace to Tornado Cash and we have experts that can say those hacks were not traced to Tornado Cash.

THE COURT:  To what point?  I don't know that the government was suggesting that every single hack in the 2020 to 2022 time period went only through Tornado Cash.

MR. PATTON:  Whether they say it explicitly or not I think certainly that could be an impression that the jurors get, that he was looking at large hacks and all the ones he talked about went through Tornado Cash.

THE COURT:  He was told specifically to look at 16 hacks down from an earlier number, so the jury already knows that there are other hacks out there.  I just -- I am straining to see the relevance, sir, and perhaps with more time you will be able to persuade me, but I just don't -- I don't know that it matters.  I don't think the government would disagree that there were hacks in the land that were run through mixing services other than Tornado Cash.

Friends?

MR. REHN:  That's exactly right, your Honor, and I

don't believe there was any suggestion otherwise.

THE COURT:  But if they asked Mr. Werlau or one of your other witnesses, sir, are you aware of hacks that went through something other than Tornado Cash and that person said, yes, you are not going to disagree with that?

MR. REHN:  Your Honor, there was testimony from a government witness to that effect today so I don't think there has been any suggestion that every single hack went through Tornado Cash.

THE COURT:  Although I am not sure that Ahmed's hacks are of the qualitative size that -- I think there should be a way for you to come to agreement.  What I don't want, Mr. Patton, is chapter and verse on a bunch of hacks that have nothing to do with this case that will confuse the jury.

MR. PATTON:  We are certainly not looking to do anything lengthy or detailed, and by that I mean truly less than a minute.  But, let us confer and we will let your Honor know, and confer with the government.

THE COURT:  Right, because the meet and confers are so productive.  Got it.

OK, thanks.  I have kept you now for -- do you, in all seriousness, do you want me to tell the jury to have an additional 15 minutes of lunch so that you can have a full 45?

MR. KLEIN:  That would be appreciated, your Honor.

THE COURT:  Ms. Noriega, can we let them know?

P7M5sto3                      Lopez - Direct

THE DEPUTY CLERK:  Yes, Judge.

THE COURT:  Thank you very much.  I will see you in 45 minutes.

(Luncheon recess)

(Continued on next page)

P7M1STO4                         Lopez - Direct

AFTERNOON SESSION

1:54 p.m.

(Jury present)

THE COURT:  Be seated.  Thank you very much.

Mr. Arad, you may continue.

BY MR. ARAD:

Q.  Agent Lopez, as part of your role, do you sometimes do work to attribute a phone number to a particular individual?

A.  I do.

MR. ARAD:  Mr. Iannuzzelli, please display for the parties and the Court and the witness what's been marked as Government Exhibit 321.

Q.  Special Agent Lopez, do you recognize this document?

A.  I do.

Q.  What does it appear to be?

A.  These are Google Pay records.

Q.  For whose account?

A.  Thomas Schmidt.

MR. ARAD:  Your Honor, the government offers this exhibit pursuant to the custodial declaration marked as Government Exhibit 320.  I note, as I did before, that these documents were not part of the prior discussions about documents being admitted under custodial declarations.

THE COURT:  All right.

MR. PATTON:  Objection, your Honor.

THE COURT:  Government Exhibit 321 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 321 received in evidence)

MR. ARAD:  Mr. Iannuzzelli, could you please expand the phone number toward the bottom of this page.  And the name above it.

BY MR. ARAD:

Q.  As you analyze and attribute this cellphone number, what does this document tell you?

A.  The phone number that I analyzed ending in 7909 was also used here on the Google Pay account of Thomas Schmidt.

Q.  And if I refer to this as the Schmidt cellphone or the Schmidt cellphone number over the course of your testimony, will you know what I'm referring to?

A.  I will.

MR. ARAD:  Mr. Iannuzzelli, please display for the Court, the witness, and the parties only Government Exhibit 3402.

Q.  Special Agent Lopez, do you recognize this?

A.  I do.

Q.  What is it?

A.  It is an application to rent an apartment.

MR. ARAD:  Your Honor, the government offers this exhibit pursuant to the custodial declaration marked as Government Exhibit 3402, same qualification as before.

THE COURT:  This exhibit is 3402 and the declaration is also 3402?

MR. ARAD:  The declaration is 3401.

THE COURT:  Same objection, sir?

MR. PATTON:  Same objection.

THE COURT:  Overruled.  It is admitted into evidence, may be shown to the jury.

(Government's Exhibit 3402 received in evidence)

MR. ARAD:  Mr. Iannuzzelli, will you please expand the portions of the Application Information section that go through the phone number.

BY MR. ARAD:

Q.  Special Agent Lopez, what's the name of the applicant here?

A.  The applicant is Thomas Hunter Schmidt.

Q.  And is this the same phone number that we've been talking about during the course of your testimony?

A.  This is the same phone number that I analyzed ending in 7909.

MR. ARAD:  Mr. Iannuzzelli, can you please scroll down to the second page of this application.

And could you please expand the Previous Address Information section.

Q.  Special Agent Lopez, what's the previous address listed here?

A.  Previous address is listed as 17 John Street in New York,

New York.

Q.  And do you see the Residency From Date at the top right?

A.  I do.

Q.  What is that date?

A.  It is February 28, 2022.

        MR. ARAD:  Mr. Iannuzzelli, we can take this down.

Q.  Special Agent Lopez, what type of cell site location
analysis were you asked to conduct in this case?

A.  Historical cell site analysis for the phone number ending
in 7909.

Q.  For approximately what time frame?

A.  Time frame that we looked at was March 15, 2022, to
April 6, 2022.

        MR. ARAD:  Before we examine certain dates within that
range, Mr. Iannuzzelli, can you please display, only for the
Court, parties, and the witness, Government Exhibit 2245.

        And your Honor, this was previously admitted subject
to connection.

        THE COURT:  Yes.  So it can be shown to the jury.  Did
you say it was previously admitted?

        MR. ARAD:  Subject to connection.

        THE COURT:  This is the connection?

        MR. ARAD:  This is the connection.

        THE COURT:  I'll hear the connection.  Thank you.

BY MR. ARAD:

P7M1STO4                      Lopez - Direct

Q.   Special Agent Lopez, have you seen this before?

A.   Yes.

Q.   What is it?

A.   This is a Cellebrite extraction for a Telegram chat.

Q.   And did this chat take place on certain dates that you analyzed location of the cellphone for?

A.   It did.

MR. ARAD:  Your Honor, the government offers Government Exhibit 2245.

MR. PATTON:  Objection.

THE COURT:  Objection?  Overruled.  Government Exhibit 2245 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2245 received in evidence)

MR. ARAD:  Mr. Iannuzzelli, could you please scroll to the second page.

Q.   Special Agent Lopez, do you see on this page—

MR. ARAD:  And Mr. Iannuzzelli, I'll ask you to expand these names as we go.

Q.   —the name Tom Schmidt?

A.   I do.

Q.   And do you see the name Alexey Pertsev?

A.   I do.

Q.   And the name Poma Semenov?

A.   I do.

Q.  And the name Roman Storm?

A.  I do.

        MR. ARAD:  Mr. Iannuzzelli, please scroll to the next page.

        And if you could please expand the first two messages.

Q.  Special Agent Lopez, what is the date of these first two messages?

A.  March 15, 2022.

Q.  Who is listed as the sender?

A.  Sender is Tom Schmidt.

Q.  Would you please read these two messages.

A.  Sure.  The first one says, "yo any interest in chatting with www.sismo.io?  They're interested in using Tornado's relayer network to put their attestations on chain."

        MR. ARAD:  Mr. Iannuzzelli, could you please display this document on one side of the screen and slide 7 of Government Exhibit 3001 on the other side.

        THE COURT:  Is this admitted?

        MR. ARAD:  It is.

        THE COURT:  Thank you.

BY MR. ARAD:

Q.  Special Agent Lopez, what's shown on slide 7 of Government Exhibit 3001?

A.  Slide 7 is showing the call detail records for the same date, March 15, 2022.  It's showing which cell sites the phone

number ending in 7909 is utilizing throughout the entire day.

Q.  And do you see the gray box on the left side of that screen and the similar but smaller box on the top right side?

A.  I do.

Q.  What are those?

A.  Those are displaying the transaction times and the type of transaction, in this case all incoming calls on March 15, 2022.

Q.  Now turning your attention back to the chat, what is the time of both of these messages?

A.  The time that's on the right-hand side in the blue bubbles is in UTC, and like I testified before, previously, at March 15, 2022, you would take UTC, subtract four hours, and that's—that would give you Eastern Standard Time.

Q.  And what time zone are the times on the slide on the left listed in?

A.  Those are in Eastern Standard Time.

Q.  So if you were to convert the time that these messages were sent to Eastern Standard Time, what time would that be?

A.  It would be 1:58 p.m.

Q.  And is that time within the time range of the box on the left side of the slide?

A.  Yes, it is.

Q.  Does that mean that these messages were sent and received within the time period during which the Schmidt cellphone was located in Manhattan?

A.  That's correct.

MR. ARAD:  Mr. Iannuzzelli, in the chat message, if we could take those down and then expand the next message, the bottom one on this page.

Q.  Special Agent Lopez, what's the date of this message?

A.  Message was——took place on March 18, 2022.

Q.  And could you please read it.

A.  Sure.  "I remember we've talked with @borodutch about very similar project (or maybe it was this one?)"

Q.  And who's the sender on this message?

A.  Poma.

MR. ARAD:  Mr. Iannuzzelli, could you please display slide 8 of the slide deck.

Q.  And Special Agent Lopez, what's shown here on slide 8?

A.  These are the cell site records for March 18, 2022, for the entire day.  Again, it's showing which tower the phone utilized during particular transactions throughout the day.

Q.  What's the time of the message that you just read on the right?

A.  If we were to convert that time, the UTC time you can see listed as 1:38 p.m. but if we subtract four hours and convert it to Eastern Standard Time, it would be 9:38 a.m.

Q.  And turning your attention to the small gray box on the left side of the slide, what does that contain; can you remind us?

A.   Those are all the transactions that took place on March 18, 2022, throughout the day.  You'll see OG is outgoing, IC is incoming, and they're all voice calls that were recorded that day for the phone number ending in 7909.

Q.   So you said a moment ago that the message on the right was sent at 9:38 a.m. Eastern time?

A.   That's correct.

Q.   Is that time within the range of times when calls were sent and received from the Schmidt phone in Manhattan?

A.   It is.

     MR. ARAD:  Mr. Iannuzzelli, could you please scroll to the next page of the chats.  And we'll expand some in a minute.

Q.   But Special Agent Lopez, what are the dates of these chats?

A.   These chats take place on April 1, 2022.

     MR. ARAD:  And Mr. Iannuzzelli, could you please scroll to slide 9.

Q.   What's shown here, Special Agent Lopez?

A.   These are the historical cell site records for April 1, 2022, for the phone number ending in 7909.

Q.   Is that the same date as the messages on the right?

A.   It is.

     MR. ARAD:  Mr. Iannuzzelli, could you please expand the first message.

Q.   Special Agent Lopez, what's the time of this message?

A.   This message is sent in UTC time as 5:53 p.m.

Q.  We're not going to read each and every one of these
messages, but we will read some.

         MR. ARAD:  Mr. Iannuzzelli, could you please scroll to
pdf page 5 of the messages.  And could you please expand the
bottom message.

Q.  Special Agent Lopez, let's read these chats.

         Who sent this message, before we begin reading?

A.  Message was from Roman Storm.

Q.  And to the extent that other messages we read are sent by
others, I can read those as you read Roman Storm's part.

A.  Okay.

Q.  Let's begin with this one.

         MR. ARAD:  And Mr. Iannuzzelli, if you could scroll
and expand as we go, that would be great.

A.  "@haseebq @tomhschmidt @ashwinr14.  If you're in SF, let me
know."

Q.  "We are not, sadly."

A.  "Miami?  Dubai?"

Q.  "Haseeb is in SG, Ash in PR.  I'm in NY."  And we can pause
there.

         Special Agent Lopez, you testified that the first
April 1st message we looked at was at 5:53 p.m. UTC.  What time
was the message that I just read?

A.  This message was—took place at 6:44 UTC.

Q.  And if you were to convert that time range, 5:53 UTC to

6:44 UTC to Eastern time, what would the time range be?

A. Time range would be 1:53 Eastern Standard Time to 2:44 Eastern Standard Time.

Q. Turning your attention to the box on the left side of the slide, does the time range of that chat conversation come within a couple of minutes of the first call listed here?

A. Approximately two minutes.

MR. ARAD: Mr. Iannuzzelli, could you please scroll to pdf page 10 of the chat.

Q. Special Agent Lopez, who were the senders of the messages on this page?

A. Senders for these messages are Roman Storm and Tom Schmidt.

Q. And do you see the top message says that it's been forwarded?

A. Correct.

Q. Could you please read the message sent by Roman Storm in the middle of the page.

A. Sure. It states, "If u know some torn holders, please ping them to vote."

Q. And could you please read the next message.

A. "Tom Schmidt: kk."

Q. And what are the times of these two messages?

A. Both times are in UTC at 8:47 p.m. and 8:49 p.m.

Q. In Eastern Standard Time, what would that be?

A. That would be 4:47 p.m. and 4:49 p.m.

P7M1STO4                        Lopez - Direct

MR. ARAD:  Mr. Iannuzzelli, could you please scroll to slide 10 in the slide deck.

And if you go back to the last page of the chat, please.

Q.  So what's on the slide deck here?

A.  Left-hand box is displaying the same analysis for the call detail records, showing, for April 6, 2022, all the calls that took place that day.

Q.  And can you just remind us, what were the times of the two messages on the bottom of the chat here, in Eastern time?

A.  Would be 4:47 p.m. and 4:49 p.m.

Q.  And are those times within the range of calls sent or received by the Schmidt cellphone in Manhattan on April 6, 2022?

A.  They are.

Q.  Do you see that on the left side of the slide?

A.  Yes.

Q.  How far, approximately, are the times of the messages from the time at the bottom of box No. 1?

A.  Approximately less than 20 minutes.

MR. ARAD:  Mr. Iannuzzelli, we can take these down.

And Mr. Iannuzzelli, could you please display for the witness and the parties and the Court Government Exhibit 1152.

Q.  Special Agent Lopez, as part of your responsibilities, do you sometimes ascertain an individual's location by ways other

P7M1STO4                        Lopez - Direct

than cell site analysis?

A.  Yes, I do.

Q.  Could you give me an example.

A.  Sure.  If the individual has a set of financial records, if the individual were using some sort of internet-based applications and we subpoenaed that or got a search warrant for those, for that set of data, we could ascertain location based on that as well.

Q.  And Special Agent Lopez, turning your attention to the screen, do you recognize this document?

A.  I do.

Q.  What is it?

A.  Credit card statement for Thomas H. Schmidt.

          MR. ARAD:  Your Honor, the government offers Government Exhibit 1152 pursuant to the custodial declaration marked as Government Exhibit 1150, and the Court's prior ruling.

          THE COURT:  Same objection, sir?

          MR. PATTON:  Yes.

          THE COURT:  The objection is overruled.  Government Exhibit 1152 is admitted into evidence and may be shown to the jury.

          (Government's Exhibit 1152 received in evidence)

          MR. ARAD:  Mr. Iannuzzelli, could you please expand at the top left the name.

BY MR. ARAD:

Q.  And Special Agent Lopez, what name is listed here?

A.  Thomas H. Schmidt.

        MR. ARAD:  And Mr. Iannuzzelli, could you please go to pdf page 34 of this document.

        And if you could expand, please, the lines for the May 2 and May 3 transactions.

Q.  Special Agent Lopez, do you see that four of those transactions are not listed as taking place in New York?

A.  I do.

Q.  Where are they listed as taking place?

A.  The state of Washington and California.

Q.  And does that make you think that these transactions did not take place in New York?

A.  No.

Q.  Why not?

A.  Because for these particular merchants, I know that they are big national corporations and they have payment processing centers in places that the user isn't necessarily located.

Q.  Could you please turn your attention to the May 2nd entry for Dig Inn 80 Pine in New York.  Where is Pine Street?

A.  That's lower Manhattan.

Q.  And could you then turn your attention, please, to the May 3rd entry for the Crosby Street Hotel in New York.  Where is Crosby Street?

A.   Located in Manhattan as well.

           MR. ARAD:  Mr. Iannuzzelli, please scroll to pdf
page 35.

Q.   Special Agent Lopez, do you see that all of these
transactions except the one on the bottom are on May 3rd and
May 4th?

A.   Yes.

Q.   I'd like to focus on the May 3rd and 4th transactions.  Do
you see that, like on the last page, some of these transactions
are not listed as taking place in New York?

A.   I do.

Q.   And same question as with the last page.  Does that tell
you that they did not take place in New York?

A.   No.  Like I mentioned previously, you could tell by looking
at some of these, the companies where these transactions took
place, you know, they're big national companies and they have
payment processing centers other places than New York.

Q.   I just want to look through a few of these examples.

           MR. ARAD:  Mr. Iannuzzelli, could you please highlight
the NYCT Pay Go entries.  Those are the second and third.

Q.   Special Agent Lopez, do you see these highlighted entries?

A.   I do.

Q.   Do you recognize this Apple Pay NYCT Pay Go moniker?

A.   Yes.

Q.   What do you recognize that as?

P7M1STO4                        Lopez - Direct

A.   That is rec——that would be a subway transaction, and that's the cost of the subway, and that's how the subway, the moniker for their transactions, is listed on credit card statements.

MR. ARAD:  Mr. Iannuzzelli, you can minimize this. And if you could next expand the entry on May 4th for Xi'an Famous Foods.

Q.   Special Agent Lopez, do you see that next to Xi'an Famous Foods, there's an open parentheses and then it says FiDi?

A.   Yes.

Q.   Where is FiDi?

A.   That's referring to the Financial District in lower Manhattan.

MR. ARAD:  Mr. Iannuzzelli, please take these down.

And if you could display just for the parties, the Court, and the witness what's been marked as Government Exhibit 2247.

Q.   Special Agent Lopez, do you recognize this?

A.   I do.

Q.   What is this?

A.   It's a cellphone extraction for a Telegram chat.

MR. ARAD:  Your Honor, the government offers Government Exhibit 2247 into evidence.

MR. PATTON:  Same objection.

THE COURT:  Objection is overruled.  Government Exhibit 2247 is admitted into evidence and may be shown to the

jury.

(Government's Exhibit 2247 received in evidence)

MR. ARAD:  Mr. Iannuzzelli, could you please scroll to the next page.

BY MR. ARAD:

Q.  And Special Agent Lopez, do you see on this page——and Mr. Iannuzzelli, if you could please just highlight these as we go——Tom Schmidt?

A.  Yes.

Q.  Alexey Pertsev?

A.  Yes.

Q.  Poma Semenov?

A.  Yes.

Q.  And Roman Storm?

A.  Yes.

MR. ARAD:  Mr. Iannuzzelli, could you please scroll to the next page.

Sorry.  Mr. Iannuzzelli, could you please go back to the last page that we looked at.

And could you expand the first line here.

Q.  What is the name of this chat, Special Agent Lopez?

A.  Chat is named Tornado Cash/Dragonfly.

MR. ARAD:  Mr. Iannuzzelli, we can go back to the next page.

Q.  Special Agent Lopez, what is the date of these messages?

A.   Messages took place on June 9, 2022.

Q.   Let's read these together.  If you could again please read the messages sent by Roman Storm and I'll read the rest.

A.   "Folks, TC is running low on funds.  Any ideas?  We have 1-3 funding to keep running.  Governance is planning to launch a sale of torn."

        "There is torn streaming to keep development but the price keeps dropping."

        "What should we do to stay afloat?"

Q.   "Let's chat.  Want to grab some time tomorrow?"  Link.

        MR. ARAD:  And then seeing that the receipt of the messages have no text in them, Mr. Iannuzzelli, could you please scroll to the next page.

Q.   And then if you could read Roman Storm's part, please.

A.   "@tomhschmidt.  Ping.  Meeting."

Q.   "I'm in the Zoom."

        And Special Agent Lopez, do you see what the date is when Thomas Schmidt says he's in the Zoom?

A.   Yes, that's June 10, 2022.

Q.   And the top message you said was June 9th?

A.   At the start of the thread that we read was starting on June 9th, correct.

        MR. ARAD:  Mr. Iannuzzelli, could you please display again Government Exhibit 1152, pdf page 52.  And please expand all the purchases that took place on June 9th and 10th of 2022.

P7M1STO4                         Lopez - Direct

Q.  Special Agent Lopez, according to this document, where did almost all of these purchases take place?

A.  In New York.

Q.  And with respect to the two purchases that took place elsewhere, do these purchases tell you that they did not actually take place in New York?

A.  No.

Q.  And why not?

A.  Like we learned previously, we know from this example that DoorDash processes their payments in California, and a quick Google search of this clothing company would tell you that it's in Newcastle, Great Britain.

        MR. ARAD:  Mr. Iannuzzelli, will you please highlight the Matto John Street payment.

Q.  Special Agent Lopez, where is John Street?

A.  In lower Manhattan.

        MR. ARAD:  And Mr. Iannuzzelli, could you please also highlight the Pret A Manger payment on June 10th.

Q.  Special Agent Lopez, do you see the number right underneath Pret A Manger, 10007?

A.  Yes.

Q.  Does that number tell you anything about the location of this transaction?

A.  It does.

Q.  What?

A.   The store is located in lower Manhattan.

Q.   What is that number?

A.   That is the store number.  I'm sorry.

THE COURT:  The 10007, sir?

THE WITNESS:  That is the zip code for the store number.

Q.   Were you thinking about the numbers preceding the zip code?

A.   Yeah, I apologize.  The numbers to the left of that reference the actual store number.

Q.   No problem.  And I think you said this, but just to make sure that we're clear, where is the 10007 zip code?

A.   In lower Manhattan.

MR. ARAD:  No further questions.

THE COURT:  Cross-examination?  Thank you, Mr. Patton.

CROSS EXAMINATION

BY MR. PATTON:

Q.   Good afternoon, Agent Lopez.

A.   Good afternoon, sir.

Q.   So I'd like to talk to you about the cellphone records that you studied with the phone number ending in 7909.  You recall testifying about that?

A.   Yes, sir.

Q.   And you reviewed location data on that phone number between March 1st and August 8, 2022, correct?

A.   I believe the dates were—it was March 15, 2022, to

P7M1STO4                         Lopez - Cross

April 6, 2022.

Q.  Just as a general matter, you looked at dates—I'm not referring to any particular charts.  I'm saying you looked at location data for that phone from March 1 to August 8.  I understand you did charts of subsets of that time, correct?

A.  Yes, sir.  I received records for—for the greater period of time.

Q.  Okay.  And does March 1 to August 8 sound correct for the full period of time that you looked at?

A.  I don't remember exactly, but—

Q.  Agent, one thing you created that we didn't go over here in court is you made yourself sort of a chart—do you recall this—of locations and dates?  It was a very simple chart?

A.  Are you referring to a spreadsheet?

Q.  Yes.

A.  Yes, yes.  Sorry.  Yes.  I know what you're talking about.

        MR. PATTON:  Just so we're on the same page, could we show the witness only 3535-002.

Q.  Do you recall—

A.  Yes, sir.

Q.  —doing this?

A.  Yes, sir.

Q.  Okay.  And just to yourself, don't—not for the jury, if you take a look at the first date you did there.

        MR. PATTON:  And if we could scroll to the end of

P7M1STO4                     Lopez - Cross

this.  All the way down.

There we go.

Q.  With the exception of one outlier, does it look like you went to—my apologies, I got it wrong earlier—August 10th?

A.  Yes, sir.

Q.  And in addition—

MR. PATTON:  We can take that down.  Thank you.

Q.  In addition to doing that chart for yourself, you also did a disclosure of your anticipated testimony here today, correct?

A.  Yes.

Q.  And do you recall that towards the end of that you listed the dates within this time frame that I've just been talking about, March 1 to August—I think maybe it was 8 but 10, that you listed the dates where you got a ping in Manhattan, where that cellphone pinged in Manhattan?

A.  I'm sorry.  Could you rephrase the question, repeat the question.

Q.  Sure.  You wrote up a disclosure of what you anticipated testifying to about here, right?  And in that disclosure, you had a section where you listed the complete set of dates where you got a ping on this phone number we've been talking about, where it pinged in Manhattan, correct?

A.  Okay.

Q.  Do you recall that?

A.  Yes.  Loosely.

Q.  Well, let's try to do better than loosely.

MR. PATTON:  If we could show the witness only 3535-006.

Q.  Do you see—does this look familiar to you, Agent Lopez?

A.  Yes, it does.

MR. PATTON:  And if we could scroll down to the bottom of the second page.  And if we could blow up—there we go.

Q.  And I'm not losing my mind, right?  You did do a collection between March 1, 2022, and August 8, 2022, right?

A.  Correct.

Q.  And you listed out the dates when the cellphone we've been talking about pinged, 7909, in Manhattan, correct?

A.  Correct.

Q.  And Agent Lopez, I'm happy to give you a moment to review this yourself, unless you happen to recall this, but roughly speaking, it was a little less than half the days between March 1 and August 8 had a ping in New York, right?  If you want to take just a moment, it's—there aren't that many.

A.  I'll have to do some math on the fly here, but—

Q.  Does that sound about right?

A.  Sure, there were days that the phone did not ping in Manhattan, correct.  There was no transaction at all.

Q.  Well, roughly half the days, right?

A.  Okay.

Q.  And if you recall that—

P7M1STO4                    Lopez - Cross

MR. PATTON:  We can take this down.

Q.  That spreadsheet that I showed you earlier, between——in this time frame, the phone pinged in quite a number of other cities and states, correct?

A.  I don't remember how many exactly, but there were——there were other cities and states, yes, correct.

Q.  Seattle was one location, correct?

A.  Are we talking about the phone number ending in 7909?

MR. ARAD:  Objection.

Q.  Correct.  The 7909, correct.

THE COURT:  If you recall cities of which it pinged to, or do you just recall it pinging in other cities?

THE WITNESS:  I don't remember exactly.  That wasn't part of my core analysis that was in the presentation.

THE COURT:  And counsel, if I may.

Were you asked to look for instances in which the phone pinged, to use your term, in Manhattan?

THE WITNESS:  Yes, ma'am.

THE COURT:  So you weren't really fixated——I mean, there were times what it pinged somewhere else, but you weren't looking at that.

THE WITNESS:  That's correct.

THE COURT:  Thank you.

Counsel, move on.

MR. PATTON:  Your Honor, could we have a sidebar.

P7M1STO4                        Lopez - Cross

THE COURT:  Sure.

(At the sidebar)

MR. PATTON:  So the government is——the sole reason for Agent Lopez testifying, your Honor, is to establish a venue, and one of the criterion for venue is foreseeability, and we contend——government may disagree, but——that Mr. Schmidt was not based in New York, and the fact that the cellphone was frequently pinging in places like Seattle and San Francisco and Florida is highly relevant to——and he did this work.  He created a spreadsheet.  I'm happy to——I was hoping he would have a recollection of that, but if he doesn't, I'm happy to enter it into evidence.  But it's highly probative of the foreseeability prong.

THE COURT:  I guess my concern, sir, is the testimony that I heard from him is that what he was told to do was to indicate when it was pinging in Manhattan and not when it was pinging in other places.

MR. PATTON:  But he did that work.

THE COURT:  I don't know that.  There may be 3500 material that you've seen that I have not, sir, but he just said to me he was asked when it was Manhattan.

Let me please hear from the government.  I'm not making your arguments for you.

MR. ARAD:  I would just say that Mr. Patton has already established that there were numerous dates during this

P7M1STO4                          Lopez - Cross

time frame when the phone pinged in places other than New York and that it was multiple other places, so the point has already been made.  The witness has already answered the question.  I don't see any reason to—

THE COURT:  Was this witness tasked with identifying other cities?

MR. ARAD:  He was not tasked with that.  I believe that he did identify certain other cities over the course of his work, but he was not tasked with doing that.

THE COURT:  All right.  But he did identify other cities.

MR. ARAD:  Right.

THE COURT:  You can ask him about those cities and you can refresh him on those cities.  How many cities are there?

MR. PATTON:  There are maybe half a dozen, a little more.  We've got Florida, Seattle—I'm not going to go through in great detail.  I just—here's the entirety of what I would like to get out.  The cities where it pinged, and for two of the heavier examples, Seattle and San Francisco, that they pinged in March, in April, in May, in June, in July, that is, that it wasn't just like a one-off thing, that there were consistent pings in Seattle throughout this period.  And if he doesn't recall, I'd like to introduce this into evidence.

THE COURT:  I don't want that.  I don't know that enough to know whether it should be introduced into evidence.

I have no idea what it is.  And I don't know whether that's a draft or something, some final work product.  You can try and refresh his recollection on it, though.  But yes, you can ask those questions.

MR. PATTON:  I would like to lay the foundation for it.  Obviously if he can't——

THE COURT:  What is this document?

MR. ARAD:  I believe it's a draft of his analysis.  He wanted to send us a preliminary set of his findings, and he did it in the form of this document.  This is not——

THE COURT:  What is your opposition to its admission?

MR. REHN:  Out-of-court statements.

THE COURT:  Really?  One of you.  I'm sorry.  Where's Ms. Axel?

MR. ARAD:  I think, your Honor, that we have the witness here in court, he can testify about these matters.  The way this is written is actually quite confusing without somebody to explain it, and I don't see the purpose of admitting it into evidence, particularly if the witness is going to be allowed to talk about these various cities.

THE COURT:  I'll let him talk about it.  I don't know enough about it to let it in as an exhibit.  You can refresh his recollection with it, sir.

MR. PATTON:  I understand the Court not knowing enough at this point, but I'd like to lay the foundation that he did

P7M1STO4                        Lopez - Cross

do this work.

THE COURT:  He's going to say he did the work.

MR. PATTON:  He's an expert, so like, this is his work product on precisely the subject matter at issue.  I don't know how, if he says yes, I did this work, I checked to see where this cellphone——what cities it pinged in and I created a chart, why that's any different than the charts the government introduced.  It's no more hearsay than what the government just introduced.

MR. ARAD:  I think it would be more precise not to describe it as work product but to describe it as some preliminary findings that he wrote down along the way.

MR. PATTON:  I'm not going to describe it for him. I'll have him describe it.

THE COURT:  I'll let you lay a foundation.  We'll see.

(Continued on next page)

P7M1STO4                         Lopez - Cross

(In open court)

MR. PATTON:  Mr. DeMarco, could we pull back up, just for the witness, 3535-02.

BY MR. PATTON:

Q.  Agent, you recall this is the spreadsheet we were just talking about?

A.  Yes, sir.

Q.  Can you tell us, just without going into the details of this, what this is generally and how you created it.

A.  Sure.  So this was just kind of a work product.  I was at——I was given records for two different sets of numbers.  I was given a date range of interest for those numbers.  I have a software program that I could plug in the records, look at the dates for each of the records, and determine generally where, what tower that phone was utilizing on a particular day, and then I just made a column to note whether that phone was in Manhattan on that day and, if it was not in Manhattan and there was data for it, where that phone was.

Q.  And then you created a chart that has, in one column, a location, in another column, a date, and then in another column, whether or not it hit in that location on that date; is that correct?

A.  Correct.

MR. PATTON:  Your Honor, I would at this time offer 3535-002, and I'm happy to give it a defense exhibit number.

MR. ARAD:  Objection.

THE COURT:  Mr. Arad, is there any voir dire you wish to do of this witness on this document?

MR. ARAD:  I'm sorry?

THE COURT:  Is there any voir dire you wish to ask of this witness on this document?

MR. ARAD:  There is, your Honor.

THE COURT:  You may.

VOIR DIRE EXAMINATION

BY MR. ARAD:

Q.  Special Agent Lopez, did you create this document at the end of your analysis?

A.  No.

Q.  Did you create this document at some point before you were done with your analysis?

A.  I believe this is one of the first things I did after receiving the records.

Q.  And for what purpose did you create this particular document?

A.  I was being asked to create a document similar to—to this.

Q.  Were you asked to find out the dates when this cellphone pinged in cities other than New York?

A.  No.  That column was completely created by me and just to show that there was transactions on a particular date and where they were, but I was not asked by anybody or directed to

P7M1STO4                        Lopez - Cross

do—-create that column.

Q.  Approximately how long has it been since you last saw this document?

A.  I couldn't even give a guess.  I do so many of these.  And I don't even remember exactly when I received the records for these—for this case.

Q.  Off the top of your head, do you know what percentage of the hits in this document were in New York City?

A.  I have no idea.

Q.  Or what percentage were in any other city?

A.  I have no clue.

            MR. ARAD:  No further questions.

            THE COURT:  Let me ask a question, sir.  You did put this document together, yes?

            THE WITNESS:  Yes, your Honor.

            THE COURT:  Did you try to be accurate when you were putting it together?

            THE WITNESS:  Yes, your Honor.

            THE COURT:  Did you believe it was accurate at the time you put it together?

            THE WITNESS:  Yes, your Honor.

            THE COURT:  It's admitted over the government's objection.  3535-002 is admitted into evidence and may be shown to the jury.

            (Government's Exhibit 3535-002 received in evidence)

P7M1STO4                        Lopez - Cross

MR. PATTON:  Thank you, your Honor.

Mr. DeMarco, could we show this.

BY MR. PATTON:

Q.  So Agent Lopez, I won't go through in too much detail, but on this first sheet, we see that for 7909, we have some hits in San Francisco and Seattle, correct?

A.  So the—are you talking about the left side, sir, where you see—

Q.  I'm talking about the 7909 number.

A.  Okay.

Q.  And if you see there, there are a number of spots where it says hit, right?

A.  Yes, sir.

Q.  And that indicates that the cellphone, the 7909 cellphone, hit on a tower on that date in this general location, right?

A.  Yes, sir.

THE COURT:  Just so that I understand, sir, the column A, you see column A?

THE WITNESS:  Yes, ma'am.

THE COURT:  Is that for the phone number ending 4854?

THE WITNESS:  No, your Honor.  That's for the phone number ending in 4854.

THE COURT:  That's what I just asked.

THE WITNESS:  Oh, I'm sorry.

THE COURT:  Excuse me.  I'll try again.  Column A

corresponds with column C?

THE WITNESS:  Yes, your Honor.

THE COURT:  Column G corresponds with column E?

THE WITNESS:  Yes, your Honor.

THE COURT:  Thank you.

Counsel.

BY MR. PATTON:

Q.  Well, I just want to clarify, Agent Lopez.  The column A that has the location, you see that?

A.  Yes.

Q.  And then you have two phones here, right?  One ends 4854, right?

A.  Yes.

Q.  And the other ends in 7909?

A.  Yes.

Q.  And so let's just, as an easy one, take the very first location you have, which is in row 2, and that's San Francisco, California, right?

A.  Correct.

Q.  And if we go across, you have a hit in San Francisco for the 4854 on March 1, correct?

A.  Correct.

Q.  And you have a no hit in San Francisco on March 1 for 7909, correct?

A.  No hit there signifies there was no transaction data for

P7M1STO4                    Lopez - Cross

that phone on that particular day.

Q.  Understood.  Which means you can't say anything about San Francisco or anywhere else for that matter, right?

A.  That's correct.

Q.  But if we go, say, to the next one down, so row 3, which is still San Francisco, now both phones hit on March 2nd in San Francisco, correct?

THE COURT:  No.  That's not what he's saying.  That's why I had the whole conversation with him, sir.  I'll try that again.

Sir, if there's a hit in San Francisco, is that only for column C?

THE WITNESS:  Yes, your Honor.

THE COURT:  All right.  Counsel, that's what I'm saying.  Column A and column C work together, column E and column G work together.

BY MR. PATTON:

Q.  Agent, I just want to be clear on that.  What is the hit referring to there?

MR. ARAD:  Objection.

THE COURT:  Let him testify in accordance with what he's just told me twice already.

Go ahead.

A.  So, sir, if you look at column E, which refers to the number ending in 7909, and you look at row 3, the green hit is

related to column F there, which is also marked green, that there's a hit in the general area of S.D.N.Y. in Manhattan.

Q.   Got it.   My apologies.   So the Seattle and San Franciscos we're looking at here are related to 4854, correct?

A.   Yes, sir.

Q.   Got it.   And throughout the 4854, we see multiple cities related to San Francisco, Seattle, and if we scroll down a little bit, if we keep scrolling, then there are a number there in Florida, correct?

A.   Correct.   And I'd just like to just make a quick note. When I——when I notated the city and the state, these are just general.   It could be in a different city technically, but I was just looking at a big map and it's near this area, so it's not a hundred percent precise.

Q.   I understand.   Sometimes the cell towers can be less precise than say, for instance, in Manhattan.

A.   Sure.   But I was just talking more so about the general location, so, you know, it could be in a specific city outside of Miami but I just called it Miami 'cause it was——it was close and it wasn't——it was just a general analysis I was trying to create.

Q.   Understood.   Understood.

          MR. PATTON:   And we can take this down, Mr. DeMarco.

Q.   The testimony you were giving where there were the Telegram chats and then you were comparing to cell site location maps,

P7M1STO4                        Lopez - Cross

remember, you had certain things up on the screen at the same time?

A.  Yes.

Q.  The chats from Telegram, those chats are not recorded in your cell site location data, correct?

A.  Can you rephrase that.

Q.  Sure.  The maps you were showing, right, that showed that this cell site at different points in time connected to certain cell towers in Manhattan, right, that's from voice data, voice calls, correct, on the cellphone?

A.  That's correct.

Q.  That location data is not related to the time of the Telegram chats themselves.  Or maybe more precisely I should say, it's not mapping the chats, correct?

            MR. ARAD:  Objection.

            THE COURT:  Sir, can you answer the question?

            THE WITNESS:  I think I understand that.

            THE COURT:  All right.  You were mapping voice calls and SMS messages, yes?

            THE WITNESS:  Yes, ma'am.

            THE COURT:  You couldn't map Telegram chats?

            THE WITNESS:  No, that came from T-Mobile records received to and from the phone.

            THE COURT:  But I imagine if there's a Telegram chat in that same time period, they didn't move that far.

P7M1STO4                        Lopez - Cross

THE WITNESS:  Correct.

THE COURT:  Counsel, please continue.

BY MR. PATTON:

Q.  And I think you went through and pointed out that some of the Telegram chats were within various time frames of voice calls that were made, right?

A.  Correct.

Q.  And sometimes—and that time frame varied across various dates that you analyzed, correct?

A.  That's correct.

Q.  Do you recall—do you recall that there was one set of chats and it was on April 1, where one of the participants said "I'm in New York"?

A.  Yes, I remember that.

Q.  And do you recall that none of the other chats you reviewed said "I'm in New York"?

A.  Yes, correct.

Q.  Because that was something you were looking for in trying to analyze location, correct, what people were saying about where they were located?

A.  Yeah, I mean, you look for a bunch of, whatever is available, you look at to try to ascertain, you know, someone's general location.

MR. PATTON:  And if we could pull up Government Exhibit 2245.

THE COURT:  In evidence, sir?

MR. PATTON:  It is in evidence, your Honor.

THE COURT:  Thank you.

Q.  This is one of the Telegram chats that you testified about on your direct examination.  And if we could go to page——well, let's go to page 3.  And if we go down to the bottom, you see there's a chat here that references Tornado, right?  Do you see that?

A.  Yes.

Q.  And if we scroll down, that one is on March 15th, right?

A.  Correct.

Q.  And if we scroll down, there's a couple more——there is one chat at the bottom of that page.

MR. PATTON:  If we could blow that up.

Q.  That's March 18th, right?

A.  Correct.

MR. PATTON:  Okay.  And if we could keep scrolling.

And now blow it up.

Q.  And we're now onto April 1, right?

A.  Yes.

Q.  And here the sender is Roman Storm saying, "Is this legit? @haseebq," right, with a link?

A.  Yes.

MR. PATTON:  If we could just continue to scroll down slowly.

P7M1STO4                    Lopez - Cross

Q.   Tom Schmidt chimes in.  And again, this is April 1, right?

A.   Yes.

Q.   Let me ask you just——we can keep scrolling down.

Do you recall any discussion involving Tornado or Tornado Cash on April 1?

A.   Off the top of my——you asked me off the top of my head do I have a recollection.

Q.   Sure.  But there aren't that many.  We can go through them here.

A.   I do not remember, or recall.

(Continued on next page)

P7M5sto5                          Lopez - Cross

BY MR. PATTON:

Q.  We have Roman Storm here:  Funny thing they did the --

Sorry, let's go back up.  Let's be clear about it.  Go back up.  One more.

So, after Roman messages, the next one is Tom Schmidt: *Yes, they spammed all of our portfolio companies with this e-mail.  It is very annoying -- gave them a bunch of feedback to avoid this in the future.*

If we could keep scrolling down?

*Apologies.*

Keep scrolling, Roman Storm says:  *Funny thing, they did the same thing with the tribe folks.*

Keep scrolling.  And then there is something forwarded where Roman says:  *KPMG are our third-party auditors.  I apologize that they reached out to you.  We made it clear to them that this was an anonymous transaction that took place on chain.*

Right?  Do you see that?

A.  Yes.

Q.  And then Roman says:  *I'm in SF till Tuesday.*

We continue and that is still April 1; right?

A.  Yes, sir.

Q.  And we go down further and Roman says:  *If you are in San Francisco, let me know.*

Right?

P7M5sto5                        Lopez - Cross

A.   Yes.

Q.   And further down -- and he's done a -- sorry.  Go back up.
Sorry.  He hits @haseeb and @tomschmidt and @ashwin; right?

A.   Yes.

Q.   And go down.  Tom Schmidt says:  *We are not, sadly.*

         Roman says:  *Miami, Dubai?*

         Right?

A.   Correct.

Q.   Further down, and we are still on April 1 here; right?

A.   That's correct.

Q.   Further down -- keep going -- and then Tom Schmidt says:
*Haseeb is in SG, Ash in PR.  I'm in NY.*

         Right?  And Roman asks:  *PR?  Portugal?*

         And Tom Schmidt says:  *Puerto Rico.*

         This is 4/1.  Then the next thing is April 6; right?

A.   Yes.

Q.   So, a fair summary of that chat that Roman reaches out and
says something about if you are in San Francisco and --

         MR. ARAD:  Objection.

         THE COURT:  I will allow him to ask the question but I
am asking him to be faithful to the actual documents he is
summarizing.

         MR. PATTON:  I will do my best, your Honor.

BY MR. PATTON:

Q.   And then he, in a separate chat, lists other cities, Miami

and Dubai with question marks; right?

A.   Right.

Q.   He doesn't, in any of those chats on April 1, ask if anyone is in New York; correct?

          THE COURT:   Do you recall Mr. Storm asking if anyone was in New York?

A.   No, I do not.

Q.   You also looked at some American Express records; right?

A.   Right.

Q.   You were looking at American Express statements; right?

A.   Yes.

Q.   Statements that anyone who has a credit card, when you get billed, a typical statement; right?

A.   Yes.

Q.   And those have dates on them; right?

A.   Yes.

Q.   But they don't have times on them; right?

A.   Right.

Q.   Even the dates, is it fair to say sometimes the dates on a statement that are posted don't always align with the dates of usage of a card?

A.   Are you asking about a specific transaction or are you saying generally?

Q.   Just generally.  Sometimes you can use a credit card on one date but the posted date on the statement can be a different

P7M5sto5                        Lopez - Redirect

date; correct?

A.   That's correct.

          MR. PATTON:  Your Honor, may I have one moment?

          THE COURT:  Yes.

          (Counsel conferring)

          MR. PATTON:  No further questions, your Honor.

          THE COURT:  Thank you.

          Redirect?

          MR. ARAD:  Brief redirect, your Honor.

REDIRECT EXAMINATION

BY MR. ARAD:

Q.   Special Agent Lopez, do you recall during cross-examination
being asked questions about the substance of the chats that we
read?

A.   Yes.

Q.   Do you recall being asked detailed questions about that
substance?

A.   Yes.

Q.   About who the participants were?

A.   Yes.

Q.   Do you recall being asked to summarize the substance of
certain of those chats?

A.   Yes.

Q.   Are you a case agent on this case?

A.   I am not.

Q.   What was your role in this investigation?

A.   My role in this investigation was to look at the historical call detail records and determine which cell sites were utilized on the dates of interest.

Q.   As part of your investigation into this case, were you ever required to learn who Roman Storm is?

A.   No.

Q.   Were you ever required to learn what Tornado Cash is?

A.   No.

Q.   Were you ever required to learn what something called Dragonfly is?

A.   No.   And sitting here I have no idea what those things are.

Q.   Aside from analyzing the location of Tom Schmidt's phone, were you required to learn anything about the participants in the chat that we looked at?

A.   No, I was not.

Q.   Let's shift gears to clear up something else.

          MR. ARAD:   Could we please display -- I don't know what the Government Exhibit was that the defense just put into evidence, the spreadsheet?

          THE COURT:   3535-002.

          MR. ARAD:   Mr. Iannuzzelli, if we could please display this?   Thank you.

Q.   So, right off the bat, do columns A, B, and C here pertain to the phone number that you were asked to analyze in this

P7M5sto5                        Lopez - Redirect

case?

A.   I do not.

Q.   So, if we are thinking about that phone number, can we just ignore those columns altogether when they're not there?

A.   The only thing I did with that number is on the spreadsheet on that particular day and that was the last I've seen or heard from this phone number.

Q.   And so can we just ignore columns A, B, and C?

A.   Yes.

          MR. ARAD:  Scrolling down, Mr. Iannuzzelli, please?

Q.   Please pay attention to the cities here, Special Agent Lopez, or not necessarily cities but just locations, however they're marked.

          THE COURT:  In which column, sir?  G?

          MR. ARAD:  In Column G.  Thank you, your Honor.

          Please continue scrolling down, Mr. Iannuzzelli.

Q.   Do you see a lot of blank columns here or blank cells here?

A.   Yes.

          MR. ARAD:  Mr. Iannuzzelli, please keep scrolling.

Q.   Please note these locations.

          MR. ARAD:  Please keep strolling Mr. Iannuzzelli.

Q.   And that location.

          MR. ARAD:  Please keep scrolling.  And please keep scrolling.

Q.   Special Agent Lopez, do you recall being asked on

cross-examination about cellphone pings for the cellphone you analyzed in Seattle?

A.   Yes.

Q.   Did you see even one Seattle ping just now?

A.   I did not.

Q.   Are most of the pings that we just saw while scrolling in the Southern District of New York?

A.   They are.

Q.   Does any other specific location that was noted come even close to the number of pings in the Southern District of New York?

A.   It does not.

MR. ARAD:  No further questions.

THE COURT:  Thank you, sir.  You are welcome to step down.

THE WITNESS:  Thank you, your Honor.

(Witness excused)

THE COURT:  Sorry I called you by somebody else's name earlier.

THE WITNESS:  I forgive you.

THE COURT:  You are very kind.

Government's next witness, please?  We will begin and then we will take the break at maybe 10 after 3:00.  Thank you.

MR. REHN:  Your Honor, the government calls Philip Werlau.

P7M5sto5                        Werlau - Direct

PHILIP WERLAU,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

       THE DEPUTY CLERK:  Please be seated, and into the microphone please state and spell your full name for the record.

       THE WITNESS:  My name is P-H-I-L-I-P, Werlau, W-E-R-L-A-U.

       THE COURT:  Counsel, you may inquire.

       MR. REHN:  There is something on my screen --

       THE COURT:  Can we?

       MR. REHN:  Thank you.

DIRECT EXAMINATION

BY MR. REHN:

Q.  Good afternoon, Mr. Werlau.

A.  Good afternoon.

Q.  Where do you work?

A.  I work at a company called AnChain.AI.

Q.  What is AnChain?

A.  AnChain is a blockchain analytics and investigations firm.

Q.  What is a blockchain analytics and investigation firm?

A.  We produce data analysis on blockchain data, certain statistics.  We also perform investigations into blockchain crime.

Q.  Are you contracted with any other companies in connection

with your testimony today?

A.   I am.   BlockTrace.

Q.   And what is BlockTrace?

A.   BlockTrace is also a blockchain investigations firm.

Q.   What is your title at AnChain.AI?

A.   Senior investigator.

Q.   What sort of work do you do as senior investigator?

A.   Primarily investigate cryptocurrency crime into exploitation, as well as stolen funds.

Q.   What was your title before you were a senior investigator?

A.   I was engineering manager.

Q.   Do you have any particular focus at AnChain.AI?

A.   Yes.   I have a specialization in smart contracts and decentralized finance.

Q.   How long have you been doing smart contract investigations, in particular?

A.   A little over three years.

Q.   So what sort of work do you do on a day-to-day basis?

A.   It depends on the case.   Sometimes I will be doing asset tracing, tracing assets as they go from one wallet to another. Sometimes I will be doing investigations to into exploitation where certain programs are exploited and funds are stolen.

Q.   Have you ever had to analyze a smart contract?

A.   Yes.   Often.

Q.   How many smart contracts have you analyzed, approximately?

A.   It's hard to say.  It is certainly in the hundreds.  I
would ballpark it at somewhere between 500 to 1,000.

Q.   What is a smart contract?

A.   A smart contract is a program that is deployed to a
blockchain.

Q.   Now is that different from a computer program that runs on
an ordinary computer?

A.   They're different in a couple of different ways.  Firstly,
a smart contract is executed on multiple computers
simultaneously, whereas a traditional program is executed on
one computer, a smart contract is executed on every computer
that's on the blockchain network.  Yes.

Q.   And have you ever had to do something called a code audit?

A.   I have.

Q.   What is a code audit?

A.   So, a code audit, it depends.  There are certain, different
types of code audits.  They typically involve reviewing code
related to a program usually looking for things like
vulnerabilities or certain other requirements.

Q.   Just so we are clear, when we talk about code, is that
computer code?

A.   That's correct.

Q.   Is there something called source code?

A.   Yes.

Q.   Is there any other kind of code?

A.   Yes.

So, source code is usually the code that a developer of a program will read and use, it is more understandable. This is as opposed to compiled code which is usually what computers run.  Not every language is compiled but many are and the source code is what the developers would use --

THE COURT:  We do need you to speak up a little bit and be a little slower.  Thank you so much.  If you could repeat that part of your answer, sir?

THE WITNESS:  Sorry.

So, the source code is what the developers use, whereas the compiled code is what the computer typically uses.

Q.   When you are doing a code audit, what are you looking at?

A.   That would be the source code.

Q.   Have you done code audits of smart contracts?

A.   I have.

Q.   Have you done code audits for other kinds of computer programs?

A.   I have.

Q.   What sorts of computer programs?

A.   So, as a web developer I also was involved in code audits of websites as well, as well as some compiled code.

Q.   Do you write source code in addition to auditing it?

A.   I do.

Q.   Have you ever written the code for a smart contract

P7M5sto5                        Werlau - Direct

yourself?

A.   I have.

Q.   What type of a smart contract?

A.   There were a couple.  One was an NFT platform, so there were two contracts, one was for a non-fungible token for artwork, there was an associated contract for a storefront to sell that artwork.

Q.   So, could you just describe that overall project in a little more detail?

A.   Sure.

     So, we were contracted out by an organization that sells artwork for charitable funds.  We would create an NFT to represent this artwork to be sold to customers and we built a storefront that would allow the sale of these artwork to customers as well.  And this was all done on the blockchain.

Q.   So the blockchain featured the NFTs, those are sort of artworks that exist on the blockchain?

A.   That's correct.

Q.   And then where was the storefront located?

A.   The storefront was broken into two parts.  Part of it was deployed to the blockchain to do the sales, the other part of it was a traditional website or web application to interface with the storefront which users navigate to purchase the artwork.

Q.   So when you say that it was associated -- the smart

contract was associated with the storefront, what exactly does that mean?

A.   So there was a connection between them.  The website would communicate with the blockchain smart contract.

Q.   Do most websites connect with smart contracts and communicate with them?

A.   No.

Q.   Let me ask the question a different way.  Do most smart contracts interact with websites of some sort?

A.   That, yes.

Q.   Is there a reason for that?

A.   So, smart contracts on the blockchain, they are a little less user friendly, you might need more technical sophistication, things like a wallet by having a web application --

Q.   Mr. Werlau, if I can ask you to speak more slowly?  There is a lot of information but we have plenty more time?

THE COURT:  She is telling you again where she stopped:  Things like a wallet by having a web application -- please, finish.

A.   It allows easier access to the website -- a website allows easier access to the blockchain smart contract to interface and interact with it.

Q.   Do most users have the ability to interact with smart contracts directly?

P7M5sto5                    Werlau - Direct

A.   No.

Q.   Now, we have used the terms "website" and "web application."  Is there a difference between those two terms?

A.   I would say yes.  Usually when I say a website I'm talking about a static page to display content, whereas a web application is more dynamic and interactive.

Q.   So that web application that you designed, the NFT project you were talking about earlier, so could that interact with the blockchain?

A.   That's correct.

Q.   Could the web application read information that was on the blockchain?

A.   That's correct.

Q.   Could it also write information to the blockchain?

A.   In this case the website did not interact directly with the blockchain, the user would, so the website would prompt the user to take an action and their wallet would go directly to the blockchain.

Q.   Do some web applications work in that manner?

A.   Yes.

Q.   And do some web applications that interact with the blockchain actually write directly to the blockchain as well?

A.   Yes, they do.

Q.   Besides that NFT project, have you worked on any other web projects that interact with the blockchain?

A.   Yes.

Q.   Could you describe another one?

A.   So, I was responsible for developing a piece of software called web3soc.  This was for performing monitoring and alerting for security incidents that occurred on the blockchain.

Q.   And did that also interact with smart contracts?

A.   It read from smart contracts but it did not write to any smart contracts.

Q.   Was that, again, a typical like a web application and it could read information on the blockchain?

A.   That's correct.

Q.   For that web3soc web project, did that website have any sort of a login system?

A.   It did.

Q.   What is a login system?

A.   A login system is a -- most users are familiar with this. It is a way of adding user name and password, and logging into an account associated with you.

Q.   Did the NFT project have a login system?

A.   Not a traditional one, not a user name and password, but you could log in using your wallet.

Q.   Now, I think you said earlier -- how long have you been working with AnChain.AI?

A.   Three and a half years.

P7M5sto5                          Werlau - Direct

Q.   So that is since about 2021?

A.   That's correct.

Q.   What did you do immediately before your work with AnChain?

A.   Before working with AnChain I worked in a security
operation center.

Q.   What type of work did you do while you were doing that?

A.   I started as an analyst during my time there.  I became the
manager of the soc and then worked as an engineering -- senior
engineer.

Q.   What sort of work were you doing in senior engineering?

A.   Configuring our network to determine detections, adding
support for new features and new vendors.

Q.   Prior to that, what sort of work were you doing?

A.   So, as the analyst I was reviewing security incidents and
responding to them.

Q.   Then, before you were working at that company, what sort of
work were you doing?

A.   So, before working in cyber security I was a developer -- a
web developer.

Q.   What kind of a web developer were you?

A.   Specifically what is called a full-stack web developer.

Q.   What is a full-stack web developer?

A.   In web development we usually break it down into two
different categories, front-end and back-end.  Front-end is
what users typically see, it is on their computer, what they

P7M5sto5                    Werlau - Direct

interact with.  The back-end is typically what is going on on the servers, it is happening in a remote location.  Typically engineers will work as one or the other; a full-stack engineer is one that works both front-end and back-end.

Q.  Are you familiar with the front-end design of websites and user interfaces?

A.  That's correct.

Q.  Are you also familiar with the back-end, sort of what's going on underneath the hood?

A.  Yes, that's correct.

Q.  In your time as a web developer, was that more traditional website development?

A.  Can you rephrase the question?

Q.  As opposed to these blockchain-related web applications we have been talking about, was sort of the kind of website you were more familiar with?

A.  Yes.  That's correct.

Q.  Did you ever work on web applications with login systems?

A.  Yes, I did.

Q.  In your experience as a web developer, would you say those are fairly common?

A.  Would.

Q.  How long were you a web developer?

A.  I would say 18 years if you include my time to this point. Sorry.  Let me take that back.  Specifically as a web

P7M5sto5                        Werlau - Direct

developer, I spent seven years.

Q.   And how long, overall, have you been working with computer and software?

A.   Overall, 15 years.

Q.   Do you have a degree in computer science?

A.   I do not.

Q.   Do you have a college degree?

A.   I do not.

Q.   So how did you get into this line of work?

A.   So, while I do not have a college degree, I did study computer science.  During my time in college I did have a medical issue that made me take time off, it kind of derailed my college experience.  And I had already started working as a developer at that time and I felt I knew what I needed and decided to continue working.  Since then I have picked up most of what I have known through experience on my job.

          MR. REHN:  Your Honor, at this time the government moves to qualify Mr. Werlau as an expert regarding blockchain technology, smart contracts, and internet applications.

          THE COURT:  Does the defense want to do any voir dire?

          MR. KLEIN:  No, your Honor; subject to previous objections.

          THE COURT:  All right.

          MR. REHN:  May I inquire on that basis, your Honor?

          THE COURT:  I'm sorry.  I'm asking if they wanted to

ask any questions.  They don't wish to, so now you are asking me to qualify him, yes, sir?

MR. REHN:  Yes.

THE COURT:  He is so qualified, over the defense objection, as an expert on blockchain technology, smart contracts, and internet applications.  Thank you.

And counsel, perhaps now that I have done that, let's take our break now.  I am looking at my computer, I don't want to deprive the jurors of their afternoon break.  We will break for 10 minutes and come back and continue with your direct.

Thank you all very much.  Let me remind you in case you have thought about this:  Don't discuss this case with each other on anyone else, keep an open mind until all the evidence is in.  We will see you in 10 minutes.

Thank you.

(Continued on next page)

P7M5sto5                        Werlau - Direct

(Jury not present)

THE COURT:  Counsel, I will see you in 10 minutes.  I want to check on our juror.  Thank you very much.

(Recess)

(Continued on next page)

(Jury present)

THE COURT:  Please be seated.

Counsel, you may continue.  Thank you.

BY MR. REHN:

Q.  Mr. Werlau, I would like to ask you a few preliminary questions about your involvement in this case before we get to the substance.

A.  OK.

Q.  To your knowledge, have you met any of the witnesses who are testifying in this case?

A.  I have not.

Q.  Have you ever met the defendant Roman Storm?

A.  I have not.

Q.  Do you have any personal knowledge of the facts of this case other than what you have learned over the course of your expert work on this matter?

A.  I do not.

Q.  Is there anyone who assisted you with the work you have done in this case?

A.  Yes.

Q.  Who is that?

A.  That would be Marshall Yale and Jim Daniels, both consultants with the IRS.

Q.  Does Marshall Yale also work for BlockTrace?

A.  That's correct.

P7M5sto5                     Werlau - Direct

Q.   I think you said earlier BlockTrace is a similar analytics

company to AnChain.AI?

A.   That's correct.

Q.   What kind of work did these personnel do to assist you?

A.   They assisted me in some of the blockchain analytics work

that we did with the use of blockchain data, as well as

productions of some of the graphs showing that data.

Q.   Did they help with your review of the source code?

A.   Yes.

Q.   When you conduct smart contract investigations and other

types of code audits and the similar work you have described,

is it typical for you to be assisted by others?

A.   Yes, it's very common.

Q.   Have you been compensated for your work on this case?

A.   Yes, I have.

Q.   How have you been compensated in this case?

A.   So, in two parts.  At the beginning of this case I was

contracted as a part of my position at AnChain, at which I was

compensated as part of my salary.  For the end of this case I

am contracted through BlockTrace, and which I am being paid a

fixed fee for my time.

Q.   How much is that fee?

A.   That would be $5,000.

Q.   You said you worked with BlockTrace personnel to prepare

for today; is that right?

A.  That's correct.

Q.  Aside from that fee for your contract with BlockTrace, are you being compensated for the work that BlockTrace does or has done in this case?

A.  No, I am not.

Q.  Is your pay dependent in any way on the opinions you give in this courtroom?

A.  It's not.

Q.  Is your pay, in any way, dependent on the outcome of this case?

A.  It is not.

Q.  Mr. Werlau, have you analyzed some source code in preparation for your testimony today?

A.  Yes.

Q.  And some other materials as well?

A.  That's correct.

Q.  At a very high level, what was the topic of your analysis?

A.  Understand how Tornado Cash worked.

Q.  And what was the time frame that you reviewed?

A.  The time frame ranged from September of 2020 until August 8 of 2022.

        MR. REHN:  Before we talk about your findings I want to ask you about some of the materials you reviewed, and in connection with that, your Honor, the government asks to use Government Exhibit 3005-1 as a demonstrative aid for the jury.

THE COURT:  You may.

MR. REHN:  So, if we could bring up 3005-1?

Q.  Mr. Werlau, have you reviewed the different pages of this exhibit before?

A.  I have.

Q.  Generally speaking, what do these slides represent?

A.  So this slide represents the GitHub organization for the Tornado Cash, so this is where source code related to the Tornado Cash UI NCLI, was stored.

Q.  So, you analyzed some source code in connection with this case?

A.  That's correct.

Q.  And did you collect that from this particular GitHub organization?

A.  Yes.  That's correct.

Q.  If we look at this, I see on the left-hand side it says: Site admin/tornado cash.

Do you see that?

A.  Yes.

Q.  Below there are three owners listed.  Do you see that?

A.  Yes, I do.

Q.  Could you read those names for me?

A.  Yes.  So the first one is Alexey Pertsev, the second is Roman Semenov, and the third is Roman Storm.

Q.  Mr. Werlau, in your review of the documents and materials

P7M5sto5                          Werlau - Direct

for this case, did those three names come up frequently?

A.   They did.

Q.   Based on your experience as a web developer, did you form any conclusions about their role with respect to Tornado Cash?

A.   Yes.   Their role was as founders.   They developed the original program and were responsible for updates.

Q.   So, during my questions today when I refer to the Tornado Cash founders, will you understand that I am referring to Roman Storm, Roman Semenov, and Alexey Pertsev?

A.   Yes, I will.

Q.   And on the right-hand side of the screen there is two boxes, one says Tornado Cash UI.  Do you see that?

A.   I do.

Q.   Was that a source, a bunch of the source code that you looked at?

A.   That is correct.

Q.   Another said Tornado-cli.  Do you see that?

A.   I do.

Q.   Are both of these collections of source code that exist within this Tornado Cash organization?

A.   Yes.   That's correct.

          MR. REHN:   If we could go to page 2 of Government Exhibit 3005-1.

Q.   Mr. Werlau, did you also look at blockchain records in connection with this case?

A.   Yes.   That's correct.

Q.   Generally speaking, what are the types or categories of information you can get from blockchain records?

A.   So, you can typically get things like transactions or transfers of assets, interactions with smart contracts so understanding how they're interacting with it, what function they're calling and what information they're passing to it, as well as things like event data any time certain actions are taken, certain events are admitted.

Q.   So, in addition to sort of transactional information, is there additional information about the events that went into the transaction?

A.   Yes.   That's correct.

Q.   Is there something called internal logs?

A.   Yes.   So, internal transactions are communications that occur in between smart contracts.

Q.   Is there code for smart contracts on the blockchain?

A.   Yes.   That's correct.

Q.   Did you analyze some of the code for some of the contracts at issue today?

A.   I did.

Q.   So earlier we were looking at source code from GitHub. Where would you go to get the source code for a smart contract?

A.   So, the smart contract source code would be stored on Etherscan, which is the same thing as we are seeing here, a

P7M5sto5                         Werlau - Direct

transaction.  This website that showed transaction information was also the repository for the source code.

MR. REHN:  Can we go to page 3 of this exhibit?

Q.  Mr. Werlau, what is this?

A.  So this is the Tornado.cash landing page website.

Q.  Did you review historical versions of this website as part of your preparation?

A.  Yes.  That's correct.

Q.  Did you review documentation regarding the Tornado Cash.cash website?

A.  Yes.  That's correct.

Q.  Let's go to page 4 of this exhibit.  Can you describe what we are looking at here?

A.  So, this is the Tornado Cash.ETH web application.

Q.  I see that for the web application, unlike the website, the address is Tornado Cash.ETH.  Do you see that?

A.  Yes, I do.

Q.  What is the difference between a .ETH website and a .cash and another kind of traditional website?

A.  Sure.

So, traditional websites use what is called domain names.  This is part of what is called the DNS service, Domain Name Service.  On blockchain like Ethereum they have the similar network called the Ethereum Name System or ENS, and this .ETH domain served a similar role.

Q.  So just like a traditional website, can somebody own a domain in the Ethereum Name Service?

A.  Yes.  That's correct.

Q.  Let's go to page 5 of the exhibit.  Did you review any communications in preparation for your testimony?

A.  I did.

Q.  What sort of communications?

A.  Private communications between the founding members.

        MR. REHN:  We can take that exhibit down.

Q.  So once you have all of this information, what types of analyses did you do?

A.  So, we performed a code analysis, code audits of the source code itself to understand how it functioned.  We reviewed blockchain records to understand transactions that were made, for example deposits and withdrawals from Tornado Cash, things like proposals and governance, as well as changes to their Ethereum name system for the domain name changes. Additionally, we also looked at financial records like invoices and IPFS records as well.

Q.  So, there is a lot there, we are going to start with kind of a more general question.  Did you first determine sort of what the function of Tornado Cash was?

A.  Yes.

        MR. REHN:  Your Honor, the government seeks to use Government Exhibit 3005-2 as a demonstrative aid.

THE COURT:  Mr. Klein, I didn't know whether you were speaking.

MR. KLEIN:  No objection.

THE COURT:  No objection.  OK.

3005-2 may be shown as a demonstrative aid.

BY MR. REHN:

Q.  Mr. Werlau, can you just provide an overview of what Tornado Cash did, functionally, during the time period in question?

A.  So, the primary purpose of Tornado Cash was to break the connection between deposits and withdrawals.  In a blockchain transaction information is typically public, you can very easily see the sender and recipient of funds, and Tornado Cash allowed users to break that connection; deposits funds with one address, withdraw them from another, without having a connection between those two.

Q.  So just trying to understand that with reference to the chart here, if we look up the people on the left, what is represented by the people on the left?

A.  So, the four people on the left represent four different depositors into Tornado Cash.

Q.  And what about the people on the right?  What are they doing?

A.  The four people on the right represent withdrawers of Tornado Cash.

P7M5sto5                          Werlau - Direct

Q.  And I see that every deposit and every withdrawal is in the same increment of 100 ETH.  Do you see that?

A.  Yes.  That's correct.  I do.

Q.  And what is the significance of that?

A.  So this is basically to make them all look the same. They're forced to deposit the same denomination, to make it so that no deposit is uniquely identifiable.

Q.  So, just for example, if the person at address 1 deposits 100 ETH into Tornado Cash, are you able to tell which of the addresses on the right-hand side are withdrawing in connection with that person 1 deposit?

A.  No, we are not.

        MR. REHN:  We now ask to use Government Exhibit 3005-3 as a demonstrative.

        MR. KLEIN:  No objection.

        THE COURT:  3005-3 may be used as a demonstrative.

BY MR. REHN:

Q.  So, Mr. Werlau, at a high level, did you identify some different parts of Tornado Cash?

A.  Yes, I did.

Q.  Can you explain what the parts of Tornado Cash were?

A.  The first part I identified was the website and web application, the portion that the users would be interacting with.  The second part was the relayer network.  And the third-party was a collection of smart contracts.

P7M5sto5                        Werlau - Direct

Q.  At a very high level, what was the function of the website and web application?

A.  The website and the web application served as an entry point and allowed users to connect to and interact with the Tornado Cash system from a website or a computer.

Q.  At a very high level, what was the function of the relayer network?

A.  The relayering network was a collection of third-parties that were there to pay the transaction fees or gas fees, as they're called, for users to initiate a withdrawal.

Q.  At a very high level, what was the function of the smart contracts?

A.  The smart contracts took a number of different roles from actually storing the funds themselves to routing transactions to their appropriate pool, as well as making other checks for the transaction's validity.

Q.  Of these three parts, do any of them exist on the blockchain?

A.  Yes.  Those would be the smart contracts.

Q.  So the smart contracts are the part of Tornado Cash that is on the blockchain?

A.  That's correct.

Q.  Are the other two parts on the blockchain?

A.  No.

Q.  OK, so we are going to work from left to right.  I would

like to start by asking you a little bit about the website and web application.

MR. REHN:  We now offer Government Exhibit 3005-4 as a demonstrative.

THE COURT:  Mr. Klein, may I understand you have no objection to demonstratives and you will let me know if you do?

MR. KLEIN:  I will, your Honor.

THE COURT:  Thank you so much.

3005-4 is not admitted but may be used as demonstrative exhibit.

BY MR. REHN:

Q.  Let's talk about the website and web application.  Can you give a general overview of your findings regarding the website and web application?

A.  Yes.

First, I saw that the founders, Roman Storm, Roman Semenov, and Alexey Pertsev, were in control of the website, the landing page, as well as the web application.

My analysis of the deposit activity during the period between September of 2020 and August of 2022 determined that approximately 96 percent of users making deposits into Tornado Cash did so using the web application interface.

In addition to this web application, the founders also created a CLI or a command line interface for more advanced user to access the platform.

And, in addition during this time, the founders regularly made updates to both the website, web application, and the CLI.

MR. REHN:  Let's start with the website.  We will bring up Government Exhibit 3005-5.

Q.   What are we looking at here?

A.   This is the Tornado.cash website also called the landing page?

Q.   You used the term landing page.  What do you mean by that?

A.   So this would be the first object that users of the platform would come in contact with, so when they went to Tornado.cash, this is the website that they would be greeted with.

Q.   Would they be able to access the web application from the landing page?

A.   Yes.  That's correct.

(Continued on next page)

BY MR. REHN:

Q.  So this was accessible at tornado.cash; is that right?

A.  Yes.

Q.  And I think you testified earlier that a person can own a domain for a website like that?

A.  Yes, that's correct.

Q.  How does someone obtain ownership of a website?

A.  There are multiple what are called domain registrars, companies that allow you to pay them for the service of registering your domain name.  In this case this domain was registered by a service called Google Domains, so it would be as simple as navigating to the website and, as long as that domain is available, you could purchase it.

Q.  Did you take steps to investigate who was the owner of the tornado.cash domain?

A.  Yes.

        MR. REHN:  If we could now bring up just for the witness Government Exhibit 261, which is covered by the stipulation regarding business records, at S2.

        And the government offers this document.

        MR. KLEIN:  No objection.  It is covered by a stipulation, your Honor.

        THE COURT:  Government Exhibit 261 is admitted into evidence and may be shown to the jury.

        (Government's Exhibit 261 received in evidence)

BY MR. REHN:

Q.  Mr. Werlau, do you recognize this document?

A.  I do.

        MR. REHN:  If we could expand sort of the top half of the document.

Q.  What is the date of this document?

A.  It is dated Wednesday, July 17, 2019.

Q.  And what is the subject?

A.  The subject reads, "Your Google Domains Purchase Receipt."

Q.  And who is it addressed to?

A.  The email is addressed to rstormsf@gmail.com.

Q.  And if you could just read the first line of the email.

A.  The first line reads, "Hello Roman Storm."

Q.  And the next line?

A.  "Thanks for making a purchase from Google Domains."

Q.  Does the document indicate which domain Roman Storm purchased?

A.  Yes, it indicates tornado.cash.

Q.  And is that the domain for the website we've been discussing?

A.  Yes, that's correct.

Q.  And this was in July of 2019; is that right?

A.  Yes.

        MR. REHN:  Okay.  We now offer Government Exhibit 275 pursuant to the same stipulation.  If we could bring that up

for the witness first.

And we move this into evidence, your Honor.

MR. KLEIN:  It's covered by a stipulation, your Honor. No objection.

THE COURT:  Government Exhibit 275 is admitted into evidence, may be shown to the jury.

(Government's Exhibit 275 received in evidence)

BY MR. REHN:

Q.  Mr. Werlau, if I could ask you to——

MR. REHN:  And again, Mr. Iannuzzelli, if we could expand sort of the top half of the document.

Q.  What's the date of this particular email?

A.  The date is listed as Saturday, July 2nd of 2022.

Q.  And what is the subject of this email?

A.  The subject reads, "Reminder:  Keep your info up-to-date for tornado.cash."

Q.  Okay.  And is that addressed also to rstormsf@gmail.com?

A.  Yes, that's correct.

MR. REHN:  Could we scroll down.

Q.  Does this document indicate who the registrant for this tornado.cash domain was?

A.  Yes, it lists the email rstormsf@gmail.

Q.  So does this indicate——based on the two documents we've looked at, what does this indicate to you about the time range during which Roman Storm was the owner of tornado.cash?

P7M1STO6                    Werlau - Direct

A.   Restate the question?

Q.   For this email in particular, does this indicate to you who was the owner of tornado.cash as of July 2, 2022?

A.   Yes, that would be Roman Storm.

MR. REHN:  We could bring that down.

Q.   When someone visits a website, where are the contents of the website typically stored?

A.   Typically that would be on a web server.

Q.   What's a web server?

A.   A web server is a computer who's responsible for taking requests for a specific page and returning the contents of that page.

MR. REHN:  And if we could offer now Government Exhibit 602 pursuant to a stipulation, S2, business records of Amazon.

THE COURT:  Government Exhibit 602 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 602 received in evidence)

MR. REHN:  If we could expand just the logo and the text underneath it in the middle of the page.

BY MR. REHN:

Q.   Mr. Werlau, are you familiar with AWS?

A.   Yes, I am.

Q.   What's AWS?

A.   AWS stands for Amazon Web Services.

P7M1STO6                    Werlau - Direct

Q.   Is that a provider of a particular type of services?

A.   Yes.  They're a cloud service, provider of cloud computing, of which web servers are one of them.

          MR. REHN:  And if we could go to page 2 of this document.

Q.   What account and domain is this web server record related to?

A.   So it's listed as being related to the tornado.cash domain.

Q.   And who's listed as the payer for this website hosting service?

A.   The account holder under the payment method is listed as Alexey Pertsev.

Q.   What's the email address associated with the account?

A.   The email address is listed as hello@tornado.cash.

Q.   All right.  I'd like to go back to Government Exhibit 3005-5 and look at page 2.

          And is this that tornado.cash website we were looking at earlier?

A.   Yes, this is the landing page.

Q.   Now there's a red circle.  Could you explain what that is.

A.   So in the red circle is the Launch App button.  When you click that button, this would redirect you to the web application.

Q.   Was there another term that was used for the web application?

A.   User interface is another one that's used often.

Q.   So it was called——is there a shorthand for user interface?

A.   Oh, yes.  UI is typically what's used, UI.

Q.   So in the course of my questions will you understand if we use web application and UI or user interface all as synonyms for each other?

A.   Yes, I'm using them synonymously.

Q.   And why is it called a user interface?  What do those words actually mean?

A.   So it is——the purpose of the user interface, as the name suggests, is for——to allow a user to interface with the application.  So in this case, it provides visuals and buttons to be able to interact more natively and intuitively with the application.

Q.   And did you review the web application that came up when someone clicked on this link?

A.   Yes, I did.

        MR. REHN:  If we could bring up Government Exhibit 3005-6.

        THE COURT:  As a demonstrative?

        MR. REHN:  As a demonstrative, your Honor.

        THE COURT:  All right.  Thank you.

Q.   So what is this, Mr. Werlau?

A.   So this is the tornadocash.eth web application or also referred to as the user interface, or UI.

Q.   And at the top of the slide I see that the address is tornadocash.eth; is that right?

A.   Yes, that's correct.

Q.   So we talked a little bit before about how somebody can obtain ownership of a traditional website.  How can somebody obtain ownership of a .eth website?

A.   So this is a somewhat similar process, but .eth domains are sold by ENS.  In this case you would make a purchase by making a blockchain transaction to purchase this domain name, or ENS name in this case.

Q.   And where is the information about who owns a particular ENS located?

A.   All of that information is recorded on the blockchain.

MR. REHN:  The government offers Government Exhibit 3003-M-B pursuant to a stipulation regarding blockchain data.

MR. KLEIN:  Yes, your Honor, there was a stipulation. We don't object.

THE COURT:  All right.  Government Exhibit 3003-M-E?

MR. REHN:  -B.

THE COURT:  B.  Thank you so much.  ──is admitted into evidence and may be shown to the jury.

(Government's Exhibit 3003-M-B received in evidence)

MR. REHN:  Spreadsheets sometimes give us a little bit of trouble.

P7M1STO6                         Werlau - Direct

THE COURT:  Yes.  It's probably because I misdescribed it, but yes.

MR. REHN:  Expand this a little bit like you just did. And if we could scroll over to the far left of this tab.

BY MR. REHN:

Q.  So Mr. Werlau, what do these blockchain records represent?

A.  On the screen are a list of registrant changes for the ENS records.

Q.  The ENS record for which domain?

A.  That would be the tornadocash.eth domain.

Q.  So for the tornadocash.eth, do these records tell you when it was first registered?

A.  Yes, that's listed as August 7th of 2019.

Q.  And are you able to tell who the owner was when it was first registered?

A.  Yes.  It was registered by an address which itself had an ENS name, poma.eth.

MR. REHN:  And if we could scroll over to the column H, I believe.

Q.  Does that say who the new owner was when it was first registered?

A.  Yes, that's correct, poma.eth.

Q.  Did you take some steps to investigate who poma.eth was?

A.  I did.

MR. REHN:  So Mr. Iannuzzelli, let's keep this open

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7M1STO6                          Werlau - Direct

because we're going to come back to it, but is it possible to pull up—and the government offers Government Exhibits 2038 and 2038-T.

THE COURT:  Sir, a stipulation, or is there an objection from the defense?

MR. KLEIN:  Objection, your Honor.

THE COURT:  Over the defense's objection, Government Exhibits 2038 and 2038-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2038 and 2038-T received in evidence)

BY MR. REHN:

Q.  Do you see what's on the screen in front of you, Mr. Werlau?

A.  Yes, I do.

MR. REHN:  And if we could expand the top half, Mr. Iannuzzelli.

Let's try one more time.  Could we expand the top half of this page.

Q.  Mr. Werlau, do you recognize what this document is?

A.  Yes, I do.

Q.  What is it?

A.  This is a private communication, a Telegram communication between the founders.

Q.  And what's the name of this communication among the

founders?

A.   The name is listed as Bablo Peppersec.

Q.   And what's the group photo?

A.   The group photo is a cartoon money bag.

Q.   All right.  If we could scroll down to page 2 and if we could just read through the chat.  And if I could ask you to read the messages from Roman Storm and I'll read the messages from others.

A.   First message from Roman Storm, dated November 25, 2021, reads:  "Send me the addresses."  And follows up with a message that says, "I'll give you two Ether each."

        The next message from Roman Storm reads, "For your work."

        MR. REHN:  Okay.  If we could skip the next message.  And I'm going to——if we could pull up the bottom two messages.

Q.   I actually will not read this message.  But is it fair to say that's a long string of letters and numbers?

A.   Yes, that's correct.

Q.   What does that appear to you to be?

A.   This appears to me to be an Ethereum wallet address.

Q.   So who is that message being sent back to Roman Storm from?

A.   That message is being sent from Alexey Pertsev.

Q.   Then is there a message from Roman Storm?

A.   Yes, Roman Storm replies "poma.eth?"

        MR. REHN:  Let's go to the next page, and expand the

top three messages.

Q.   And if you could read the two messages from Roman Storm.

A.   Yes.  Roman Storm replies, "Semenov, I think."  Follows up and says, "Or what is it there?"

Q.   And then Roman Semenov responds, "poma.eth."

So based on this, did you make any conclusions about who poma.eth was?

A.   Yes.

Q.   And who was that?

A.   Roman Semenov.

MR. REHN:  So if it's possible to go back to the spreadsheet.  And go back to that same tab we were looking at.

Q.   Do you see that there's actually two lines on this spreadsheet?

A.   Yes, I do.

Q.   And the first line there's an identified human readable new owner; is that right?

A.   That's correct.

Q.   And that's Roman Semenov?

A.   That's correct.

Q.   For the second line, is there a new owner that's listed as a wallet address?

A.   Yes, that's correct.

Q.   So is it your understanding that there was a transfer of ownership at some point?

A.  Yes, that is my understanding.

MR. REHN:  And if we could go over to the far left column.

Q.  When did Roman Semenov transfer ownership of the tornadocash.eth domain?

A.  This occurred on August 8th of 2022.

Q.  So between August of 2019 and August 8th of 2022, who was the owner of tornadocash.eth?

A.  The owner of tornadocash.eth during that time period was Roman Semenov.

Q.  So if Roman Semenov was the owner of the tornadocash.eth domain, what does that mean, practically?

A.  He could control the contents that were rendered when a user went to that—that page.

Q.  So could he make changes to the website himself?

A.  Yes, that's correct.

Q.  Could he also authorize others to make changes to the website?

A.  Yes.

Q.  Could anyone else make changes to that website without authorization from Roman Semenov?

A.  No, they could not.

Q.  So if we could go to the tab on the left, tornadocash.eth IPFS deployment.  Do you see that?

A.  I do.

Q.   Mr. Werlau, when somebody makes a change to a website that's on the .eth system, is that change recorded on the blockchain?

A.   That's correct.

Q.   And is that what is visible here on this tab?

A.   Yes.

Q.   And so from this tab, are you able to determine how often a website was changed?

A.   Yes, that's correct.

Q.   And how does somebody actually execute a change to the contents of a .eth website?

A.   So they would initiate a transaction on the blockchain to change the value that is recorded in that ENS record.

Q.   And so does that value then direct a computer to where to find the contents of the website?

A.   Yes, that's correct.

Q.   And here I see in column C that there's two changes at the beginning from poma.eth.  Is that Roman Semenov?

A.   Yes.

Q.   And then are the rest of the changes from someone else?

A.   Yes, that's correct.

Q.   Would that be somebody else authorized by Semenov to make those changes?

A.   I believe so, yes.

Q.   So if we go over to the A column, what does this represent?

A.   The A column is the block time.   This was the time at which this transaction was executed.

Q.   So when was the first change to tornadocash.eth?

A.   This is listed at February 26th of 2020.

Q.   And if we could scroll down.   From February 26, 2020, until August of 2022, how many changes to that website were made?

A.   There's listed 255 updates.

Q.   How many of them are listed before August of 2022?

A.   Before August.   Give me one second.

Q.   Before August 8th, I should say.

A.   That would be 250.

Q.   So what does that indicate to you?

A.   There were regular updates being made to the—to the website that's listed at that domain.

Q.   And the total was at least 250?

A.   That's correct.

MR. REHN:   All right.   We can bring that down.

Q.   So Mr. Werlau, I believe you testified about regular websites, that they're typically hosted on web servers, like AWS; is that right?

A.   Yes.

Q.   Is that also true of websites like .eth websites?

A.   They can be, but not always; not necessarily.

Q.   Is there another place where .eth websites are typically hosted?

P7M1STO6                         Werlau - Direct

A.   Yes, they're typically hosted in a system called IPFS.
That's the InterPlanetary File System.

Q.   And I think we looked earlier at some payment records for
the traditional website tornado.cash; is that right?

A.   Yes.

Q.   Is there a similar way to pay to host the contents of a
website on IPFS?

A.   Yes, there are third-party services that offer similar
services.

Q.   So is it a similar service to what AWS does?

A.   Similar in that you're—you're uploading content to IPFS
and it's making sure it's accessible, so it's somewhat
analogous.

Q.   So for IPFS, could anybody on an IPFS network host that
content?

A.   Rephrase the question?

Q.   What is an IPFS network, or what exactly is IPFS?

A.   Sure.  IPFS is a decentralized peer-to-peer file server.
If you're familiar with file-sharing services like Napster or
LimeWire from many years ago, it functions in a similar way,
where multiple users can make a file available, and as long as
one of them are connected to the network, that file is still
accessible, so individual users can go off the network, and as
long as one is available, the file is still accessible.

Q.   So could anyone who's operating on a peer-to-peer network

P7M1STO6                         Werlau - Direct

like that host particular content?

A.   Yes.

Q.   So if that's true, why would somebody pay for hosting
services on IPFS?

A.   So while multiple people can host a file, there's a
requirement that there's at least one person holding—hosting
that file to—for it to be accessible when you go to request
it.  So there's this concept called pinning.  Pinning is making
sure that at least one node on the network has the file
available when it's needed.

Q.   And what would be the value of that for somebody posting
content?

A.   To assure that it's accessible and that there's no down
time.

          MR. REHN:  The government offers Government
Exhibit 752.

          Well, first, if we could bring up Government
Exhibit 752 just for the witness.

Q.   Do you recognize what this is?

A.   Yes, I do.

Q.   And what is it?

A.   This is—

Q.   At a high level.

          THE COURT:  Excuse me.  I'm not seeing it.

          MR. REHN:  Oh, sorry.

P7M1STO6                        Werlau - Direct

THE COURT:  Now it's up.  Thank you.

Is everyone seeing this document who should be seeing the document?

Thank you.  Counsel, you may ask your foundational questions.  Thank you.

MR. REHN:  Yes, your Honor.  Thank you.

BY MR. REHN:

Q.  At a high level, could you describe what kind of a document this is.

A.  Yes.  This is a payment receipt from Pinata Cloud.

MR. REHN:  Your Honor, the government offers Government Exhibit 752.  The certification associated with this is at GX 751 on page 4.

MR. KLEIN:  Objection, your Honor.

THE COURT:  Government Exhibit 752 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 752 received in evidence)

BY MR. REHN:

Q.  So Mr. Werlau, I'd like to direct you to the portion on the right-hand side where it says Statement Descriptor and Last Updated.  Do you see that?

A.  One second.  On the left-hand side?

Q.  Right-hand side.

A.  Oh, on the right-hand side.  Statement Descriptor, yes. That reads Pinata Cloud.

Q.   And is that the sort of Pinata Cloud hosting services you were describing before?

A.   Yes, that's Pinata Cloud, the IPFS service.

Q.   And I'd like to direct your attention to the upper left-hand corner.  Who is being billed for hosting services on Pinata?

A.   This is being billed to the address hello@tornado.cash.

         MR. REHN:  We could bring that down.

         And if we could now bring up just for the witness Government Exhibit 2032-T.

Q.   Mr. Werlau, do you recognize this document?

A.   Yes.

Q.   Is this a portion of that same founder's chat we were looking at earlier?

A.   Yes, that's correct.

         MR. REHN:  The government offers Government Exhibits 2032 and 2032-T.

         MR. KLEIN:  Your Honor, could we just have a quick sidebar on this, or I object under the rule of completeness.

         THE COURT:  Oh, because we haven't—I'm letting it in, but we do have to discuss these other issues this afternoon, so we may return to this document.

         Government Exhibit 2032 and Government Exhibit 2032-T are admitted into evidence and may be shown to the jury.

         (Government's Exhibits 2032 and 2032-T received in

evidence)

BY MR. REHN:

Q. So Mr. Werlau, is this that same chat we were looking at before?

A. Yes, that's correct.

Q. If we could go to page 3, and if we could read the first two chats. Or it may be page 4, perhaps. Oh, no, yes, that's right.

If you go to page 3 and read the first two chats. I'll ask you, who is the first chat from?

A. The first chat is from Alexey Pertsev.

Q. And what does he say?

A. He writes, "DeFi Pulse wants us to add him to our UI."

Q. Do you understand what UI he's referring to?

A. Yes, that's the web application user interface.

Q. For Tornado Cash?

A. Yes, that's correct.

Q. And how does Roman Semenov respond?

A. Roman Semenov replies, "He can fuck off."

Q. Let's go to page 5. And I see three messages here. Let's actually read them. Look at the middle one. Do you see a link here?

A. Yes, I do.

Q. What's that a link to?

A. This link is to gateway.pinata.cloud.

P7M1STO6                      Werlau - Direct

Q.   Is that that Pinata Cloud service we were looking at before?

A.   Yes, and specifically this is their gateway service.

Q.   Is there a way to interface with that service to upload contents to it?

A.   Through the gateway?  You would interface through Pinata through their API keys.  The gateway would be used to request content after it's uploaded.

Q.   Could you explain what that API key is.

A.   Yes.  So the API key is how you would basically log into the system to interact with it.  So instead of using a user name and password, the API key is a long string of characters that access your keys to access the service.

        MR. REHN:  All right.  Could we go to the next page. And actually go to the next page.

        Page 7.  And if we could expand the top message there.

Q.   Is this that API key you were talking about?

A.   Yes, that's correct.

Q.   So if somebody shares an API key with other people, would any of them be able to update the contents there?

A.   That's correct.

Q.   So Mr. Werlau, we've been talking about the ownership of that web application, the user interface; is that right?

A.   Correct.

Q.   Aside from the UI, was there another way to access the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P7M1STO6                        Werlau - Direct

Tornado Cash?

A.   Yes.   The CLI also, the command line interface.

          MR. REHN:   If we could bring up Government
Exhibit 3005-7 for demonstrative purposes.

          THE COURT:   It may be used as a demonstrative.

Q.   Could you, at a high level, explain what the CLI was.

A.   Yes.   The CLI, also known as the command line interface,
was another way of interfacing with Tornado Cash.   Unlike the
web application UI, which was built for human beings, users to
navigate to a web page and interact with it, the CLI is more
meant for automation or for use with computers.   It requires a
little bit more technical sophistication to understand and use,
but can be useful when you want to automate interactions.

Q.   Was that Tornado Cash CLI also contained within the GitHub
repository?

A.   Yes, that is correct.

Q.   And were there changes made to the CLI over time?

A.   Yes.

Q.   How do you know that?

A.   I reviewed the commit history, which is the history of
changes that was made to the code over time.

Q.   Do you recall who made some of those changes?

A.   Yes, those would be the founders.

Q.   In your experience as a website developer, would you expect
the UI or the CLI to be more commonly used?

P7M1STO6                        Werlau - Direct

A.   Typically in an application like this, I would expect the web application UI to be more used.

Q.   Why is that?

A.   Because it is meant for human beings, it is user friendly, whereas the CLI is meant more for advance users that have particular, you know, considerations when using the platform.

             MR. REHN:  All right.  So if we could bring that down and go back to Government Exhibit 3005-3.

Q.   So Mr. Werlau, I think you said earlier there were these three parts of Tornado Cash; is that right?

A.   That's correct.

Q.   So we've talked about the website and the web application. Remind us what the next major part of Tornado Cash was.

A.   Yes.  The next major component was the relayer network.

Q.   And can you remind us again what the relayer network did.

A.   Sure.  So at a high level, the relayer network was a network of third parties which would execute a withdrawal on behalf of users.  This was important for users if they would be using a U wallet, a wallet which had no funds and no transaction history, and thus had no way to pay for the gas or transaction fees to execute the withdrawal.

             MR. REHN:  All right.  If we could bring up Government Exhibit 3005-8.

Q.   And if you could give us just a general overview of what your findings were with respect to the relayer network.

THE COURT:  And again, this is being introduced as a demonstrative, sir.

MR. REHN:  Yes, your Honor.

A.  So again, the relayers were a network of third parties. They would pay the transaction fees on behalf of users executing withdrawal.  This was important as most users making withdrawal would do so from a new wallet which had no transaction history, had no tokens in their account, and thus didn't have the funds to pay to execute the withdrawal.  And so the relayers would execute the withdrawal, and they would keep a portion of the withdrawal funds to compensate them for their service as well as compensate them for the gas that this paid.

Q.  So that bottom part, is that what you're referring to as relayer fees, the part where the relayer would take a portion of the withdrawal?

A.  Yes, that's correct.

Q.  And on the top it says Transaction Fees.  Is that unique to Tornado Cash?

A.  No.  Those transaction fees are to the Ethereum network itself.  So any transaction that occurs on the Ethereum network requires a transaction fee called a gas fee.

Q.  Why does the Ethereum network charge gas fees?

A.  Yeah, so there's a couple of different reasons.  The first is to prevent any single transaction from basically going into an infinite loop and causing the entire network to halt, so

there are certain limitations to how many actions can be accomplished in any given transaction. It also prevents spam on the network, causes, you know—there has to be some cost there so people don't flood the network with transactions. Additionally, those gas fees are also used to compensate miners and validators, those who maintain and, you know, work on the network.

MR. REHN: Let's bring up Government Exhibit 3005-9 for demonstrative purposes.

Q. So could you just give us a basic explanation of how gas fees work on the Ethereum network.

A. So on this diagram we have a user, an owner of one wallet wanting to send Ether to another wallet. They're going to initiate a transaction with the blockchain, and when they do so, an associated amount of gas will be charged to their account as well. And when that happens, the fees will then be transferred. So the initiator of this transaction is responsible for paying the fees to execute the transaction.

Q. Would gas fees also be needed to make deposits, deposits into and withdrawals from Tornado Cash?

A. Yes.

Q. So I'm showing you Government Exhibit 3005-10 for demonstrative purposes. Could you explain what this is.

A. Yes. So this diagram shows, at a high level, a deposit of ETH into Tornado Cash and shows, much like the transfer, when

P7M1STO6                        Werlau - Direct

you make a deposit, you also have to pay a gas fee to execute that transaction.

Q.   So when a user is making a deposit to Tornado Cash, does the user have funds in their wallet already?

A.   Yes, typically that would be the case.

Q.   And so are they able to pay the gas fee?

A.   Yes.

Q.   Is it the same situation for a withdrawal?

A.   No.

Q.   So I'm showing you Government Exhibit 3005-11 for demonstrative purposes.  What does this show?

A.   So this shows a diagram of a withdrawal of ETH from Tornado Cash.

Q.   And so what's different about a withdrawal than a deposit?

A.   When making a withdrawal, it's very common for a user to have no funds in that wallet and thus no way to pay the gas fees to execute that transaction, and that's where the relayers come in.

Q.   So why would the wallet receiving the withdrawal not have any funds in it?

A.   Because to have funds, they would have to have some type of transaction history, someone would have had to send them funds, and by doing so, they would have created a link to other addresses, which could have revealed their identity.

Q.   And so the relayer pays the gas fee?

P7M1STO6                    Werlau - Direct

A.   That's correct.

Q.   Does the relayer get anything for doing that?

A.   Yes.  The relayer is compensated both as a flat fee, which they can determine up to a certain value, a percentage of the transaction, as well as to compensate them for the price they paid for the gas.

Q.   Let's go back and look at Government Exhibit 3005-3, the demonstrative we've been talking about.

        Do you remember this slide?

A.   Yes.

Q.   All right.  We've talked about the website and the web application, and we've talked about the relayer network.  So what's the third major part of Tornado Cash?

A.   That would be the collection of smart contracts deployed at the blockchain.

Q.   So this is the part of Tornado Cash that's actually on the blockchain?

A.   Yes, that's correct.

Q.   Let's go to Government Exhibit 3005-12 for demonstrative purposes.

        Can you give us an overview of the findings you reached with respect to the smart contracts involved in Tornado Cash.

A.   So I broke the smart contracts down into three categories, primary categories which were used to execute a deposit or a

withdrawal on Tornado Cash.

The first one was the router.  This was a smart contract which was responsible for directing deposits and withdrawals to the appropriate pool.  I also determined that the router—during the period that I analyzed the code, the router was updated on multiple occasions, a new router was deployed, and the UI directed to it.

In addition to the router, there were a set of registries which contained information necessary to process the transaction and can be used to invalidate it or stop it.  In addition, these registries were used for the relayer system, in monetizing them.

And the last component were a set of pools, and these are where the funds ultimately were sent to, where they were deposited to and withdrawn from.

MR. REHN:  So let's go to Government Exhibit 3005-13, again, for demonstrative purposes, your Honor.

Q.  So let's start with the router.  Can you tell me a little bit about what the router does.

A.  The router serves as an entry point to the smart contracts of Tornado Cash.  When a user wants to initiate a deposit or a withdrawal, they would send it to the router and the router would determine which of the appropriate pools that transaction needs to be sent on to.  In addition, the router would also check the registries to confirm that the transaction was valid.

Q.   So I see on the screen here on the left-hand side there's a computer, and it seems to be showing the website application, the web application; is that right?

A.   Yes, that's correct.

Q.   So what is the significance of the connection between the web application and the router?

A.   So what this shows is that the user interfaced the web application, served as an entry point, and so wherever the user interface pointed to is where would be our entry point onto it. So the user interface determined which router we were going to be using.  And as I mentioned earlier, that I determined that the router had been updated at various points.  The way that was done was by updating the UI to point to a new router.

Q.   So everything that happens after this point could be changed by releasing a new router; is that what you're saying?

A.   Yes, that's correct.

Q.   And were there changes made to the smart contract process from time to time?

A.   Yes, on at least two occasions during my—my analysis.

Q.   Now we talked a moment ago about the web application.  Do you recall that?

A.   Yes.

Q.   Remind me who was in control of the web application.

A.   That was Roman Semenov was in control of the .eth domain, and generally the founders collectively were involved with

controlling the web application.

Q.  And so were they able to make any changes they wanted to that web application?

A.  Yes, that's correct.

Q.  Would that include deciding to direct it to a new router?

A.  That's correct.

Q.  And did you look at some of the changes that the founders made to Tornado Cash over time?

A.  I did.

Q.  Actually, before we get to that, was the router sometimes referred to as a proxy?

A.  Yes, in some of the internal documentation they——it was at times referred to as a proxy.

Q.  The founders would refer to it sometimes that way?

A.  That's correct.

Q.  So if we see references to either a proxy or a router, we're talking about this same entry point either way?

A.  In certain contexts, yes.  We need to be careful 'cause that term has a broader usage in blockchain, but in certain documentation, this router is referred to as a proxy.

Q.  And that's documentation among the founders discussing it?

A.  That's correct.

Q.  So I think you said you looked at some of the changes that the founders made to Tornado Cash?

A.  Yes.

Q.  Did you focus on any particular changes of significance?

A.  Yes, a couple.

Q.  All right.  Let's go to Government Exhibit 3005-14.

What does this show?

THE COURT:  Also for demonstrative purposes, sir?

MR. REHN:  Yes, your Honor.

THE COURT:  All right.

A.  So this shows the implementation of a new router that occurred in December of 2020, and this was done for the introduction of the anonymity mining system.

Q.  What was the anonymity mining system?

A.  Anonymity mining was a system used to reward users who made deposits.  The longer they held their deposit within Tornado Cash, the more anonymity points they received.  These points could later be used to redeem TORN tokens.

Q.  So people were being paid in something called TORN tokens?

A.  Yes.

Q.  And why would they want to pay people to leave deposits in Tornado Cash?

A.  So the service as a whole benefited by having more users having deposits in the system and for having them leave the deposits in there for longer.  So by incentivizing them to leave their deposits deposited, it increased the anonymity of all users of the platform.

MR. REHN:  Let's bring that down, and I'm showing

you——I'd like to show you Government Exhibit 1904, which I believe this is in evidence.

THE COURT:  You believe it is, sir?

MR. REHN:  I believe it is, yes.

THE COURT:  All right.

BY MR. REHN:

Q.  Mr. Werlau, do you recognize this document?

A.  Yes.  This is the tornado.cash governance proposal.

Q.  Was this released in connection with that December 2020 update that you were just discussing?

A.  Yes, that's correct.

Q.  And does this announce the creation of these TORN tokens?

A.  Yes.

MR. REHN:  So let's just bring that down for a moment. I want to establish some groundwork before we talk about the TORN tokens.

Q.  Can somebody just create a cryptocurrency?

A.  Yes.  It's actually surprisingly simple to do so.

Q.  How does somebody create a cryptocurrency?

A.  So tokens are——cryptocurrencies on the Ethereum blockchain are controlled by smart contracts, so creating a new token is as simple as deploying a new contract to the network.  There are open-source templates that people can use; you can copy them and deploy them with minimal changes to things like name and market cap, for the number of total supply of tokens.

P7M1STO6                        Werlau - Direct

Q.   And does it really——does it cost anything to create a
cryptocurrency?

A.   The only cost you pay is the gas fees associated with
deploying a contract.

Q.   And so is that what the founders did in December of 2020?

A.   Yes, that's correct.

Q.   If somebody creates a new kind of cryptocurrency, can they
decide how to distribute it?

A.   Yes.

Q.   It's up to the creator how it goes out.

A.   That's correct.

          MR. REHN:   All right.   Let's bring back up Government
Exhibit 1904, and if we could scroll to page 2, perhaps.

          There we go.

Q.   What does this portion of this document describe?

A.   This document shows the initial distribution of TORN
tokens.

Q.   How many TORN tokens did the founders create?

A.   There were 10 million TORN tokens initially minted.

Q.   And how were those TORN tokens distributed?

A.   So they were distributed:

          5 percent, or 500,000 TORN tokens, were allocated to
early users of the platform.

          10 percent of the tokens, or 1 million TORN tokens,
were allocated to the anonymity mining system that we just

spoke about.

55 percent, or 5.5 million TORN tokens, were allocated to the DAO treasury. The DAO is the Decentralized Autonomous Organization. This is the governance entity for the protocol.

And 30 percent, or 3 million TORN tokens, were allocated to founder developers and early supporters, which was unlocked over a period of time.

Q. So practically speaking, how many actually distributed out from Tornado Cash as opposed to in the treasury?

A. So that would be 4.5 million were distributed to nontreasury members.

Q. That's 45 percent?

A. That's correct.

Q. And how many of those went to the founders and the early supporters?

A. So that would be 2.5 million was sent to the founders, vested over a period of time.

Q. So was that the majority of the distribution?

A. Of the nontreasury distribution, yes.

Q. And what are early supporters here; are those investors?

A. In fact I don't—I don't actually know which members were included in early supporters.

Q. How about the founding developers; who are they?

A. Oh, the founding developers included the founders that we've been discussing—Roman Storm, Roman Semenov, and Alexey

Pertsev.

Q. Do you see on the red part of the pie chart, there's a—it says 30 percent?

A. I do.

Q. And then there's a little text over that arrow.

MR. REHN:  If we could expand that, Mr. Iannuzzelli.

Q. What does that read?

A. That reads "Team & investors."

Q. So what does that indicate to you about who made up that 30 percent?

A. Those would be the other early investors in the protocol.

THE COURT:  Counsel, when you come to a convenient stopping point, I think we'll break for the day.

MR. REHN:  I was just wrapping up the 2020 and we're going to move into the February 2022, so this might be a good time, actually.

THE COURT:  This right now might be a good time.

MR. REHN:  Yes.

THE COURT:  I must have been psychic.

Okay.  Great.

All right.  Well, then we have had a productive day. Thank you, members of the jury, for agreeing to stay late so that we can be productive today.

And we will see you tomorrow.  Be here by 8:45 so we can begin at the crack of 9.

P7M1STO6

Have a wonderful evening.  Do not discuss this case with each other or with anyone else.  Keep an open mind until all of the evidence is in.

All rise, please, for the jury.

(Continued on next page)

(Jury not present)

THE COURT:  The witness can step down.

Can I ask counsel to be seated for a few minutes. Thank you.

My first comment is directed to the paralegals of this case who I've already said are doing fantastic work.  I'm asking you a favor, and I'm just visiting on you the sins of other paralegals in other cases.  When your side rests, please make sure that all the exhibits you wanted to have admitted got admitted.  You may recall instances in which, at least for the government's case, there have been things admitted pursuant to stipulation but then not everything got admitted.  I just want to avoid the situation, which is quite distracting, when the government asks or the defense asks to reopen to let something in.  The paralegals are so on top of things that I know they're on top of this.  I just feel compelled to say it to you.  So I thank you in advance for making sure the lawyers that you support are on top of it.  So thank you for that.

Second point:  Based on our conversations this morning, it seemed to me that there were three open issues on which you need me to do something.  One is the Rule 106 issue, which Mr. Rehn suggested wasn't coming up this afternoon, until it came up this afternoon.  The second issue is the materials that would be introduced through the summary witness or paralegal.  The third is the motion to quash.

I'm going to work out of order, please.

You will see that you've received a scheduling order for a discussion on the motion to quash on Thursday. That is because I have a matter tomorrow that I didn't think was going to happen but it's going to happen. It has to happen. It may be a *Curcio*, it may be a guilty plea, it may be a whole bunch of things, but it's been on the docket for weeks. It is a pro se criminal defendant. If I move this, he will—just trust me—he will flip out. So I say that with all the respect I have for him. So I can't move it. I thought it might not happen tomorrow, but it looks like it will. So just know the motion to quash will be Thursday. If you want to submit something, fine; if you don't, fine. We'll talk about it there.

On the Rule 106 issue, Mr. Rehn, I may have misunderstood, but I thought you were saying there was a written response coming from the government. No, there's not. The written response is on the paralegal issue, sir?

MR. REHN: Well, the written—we were going to file something on this issue of the communications from the defendant that use certain terms.

THE COURT: Yes. I'm calling that the paralegal issue because I believe you want to introduce it through the summary witness; that's where you want to introduce these materials, correct, sir?

P7M1STO6

MR. REHN:  That's correct, your Honor.

THE COURT:  So there is a written document in gestation that I'm going to get.

MR. REHN:  Yes.  I mean, perhaps later in the day, but at some point.

THE COURT:  Yes.

Do you want to speak about the Rule 106 issue now, sir, or are you still meeting and conferring with the defense to work through things?

Mr. Gianforti, go ahead, sir.

MR. GIANFORTI:  I'll be handling this for the government team, your Honor, and I think the meeting and conferring has run its course.

THE COURT:  Okay.  Thank you.

Is the defense prepared to—Mr. Casey, terrific. Thank you.

All right.  Mr. Gianforti, I'll hear from you, but I had some thoughts.

MR. GIANFORTI:  Sure.

THE COURT:  With which you might be disagreeing, but that's okay.

On exhibit 1, which is Government Exhibit 231, I do agree with the defense that it should be supplemented to reflect the fact that Mr. Storm replied, because there is this intimation that the email went unanswered.  Tell me why I'm

P7M1STO6

wrong.

MR. GIANFORTI:  Your Honor, the government doesn't intend to argue this email in terms of a complaint was sent and no response was forthcoming.  And we don't think that his response——which you may recognize, your Honor, as sort of a stock response that they gave to every victim and law enforcement officer that reached out to them——doesn't give any additional context to the complaint itself because it obviously postdates it.  So that's why we don't think it's necessary in this context.

THE COURT:  All right.  I disagree, and it comes in.  Thank you.

MR. GIANFORTI:  Okay.

THE COURT:  For exhibit 2, which is Government Exhibit 1349, sir, my view is——and again, you can disagree, but I might disagree with you——I think if you're keeping in the attribution "just like a real company," then you get in the pieces that the defense is seeking, which suggest that it was acting like a real company.  So Mr. Casey's point——Mr. Casey, tell me if I'm wrong——is that the reason you want that additional information is to sort of blunt the idea that it wasn't a real company, correct, sir?

MR. CASEY:  Exactly, your Honor.

THE COURT:  All right.  So my point is, counsel, if that attribution "just like a real company" with a smiley face

P7M1STO6

comes in, so does the part identified by the defense.  If that attribution doesn't come in, then that part doesn't need to come in.  Do you understand, sir?

MR. GIANFORTI:  I understand what you're saying.

THE COURT:  Thank you.

On exhibit 5, this is the podcast interview.  Sir, if the first paragraph comes in, the second paragraph comes in.  I appreciate you may disagree.  Well, look, you can disagree with me lots.  What I mean to say is, you may be able to find some way of distinguishing those two statements.  I don't.  So your choices are to put in both paragraphs or to put in no paragraphs.  Understand, sir?

MR. GIANFORTI:  Even though it's hearsay.

THE COURT:  Sir, he's asked the question, "Why did you do this?"  You wanted to introduce the first paragraph where he says why he does it.  There's a second paragraph that he gives.  Yes.

MR. GIANFORTI:  All right.

THE COURT:  Yeah.  And maybe therefore you don't want to introduce that document.

Exhibit 6, which is Government Exhibit 2014, no, I disagree with the defense.  That information is not needed for rule of completeness.  It's not coming in.

Exhibit 7, there was the confusion.  Mr. Casey, have we figured out—I still don't know why you want that piece.

P7M1STO6

MR. CASEY:  I apologize, your Honor.  I think this is a formatting issue.  If you compare this against the government's GX 2005-T, there's a slight variation in the translation, because what we submitted is based on an initial draft provided by the government, and so what I highlighted in blue in the exhibit was meant to reflect what is in GX 2005-T, and what follows in yellow is what we would propose be added. And so I do think this is a different issue from exhibit 8, which addresses GX 2007 too, your Honor.

THE COURT:  And 8 is no longer an issue, sir; am I correct?

MR. CASEY:  Yes, yes.

THE COURT:  Yes, it is no longer an issue.

MR. CASEY:  Yes, that's correct.

THE COURT:  Okay.  I will have to look at 2005-T again, sir, because I didn't understand it and you say it's a formatting issue.  I'll look at formatting.

Exhibit 9, Government Exhibit 2032-T.  No, disagree with the defense.  That is not necessary material under Rule 106.  It's not coming in.

And that leaves me with exhibit 10.  I was told the defense was looking at a new version.  I don't know if there's a problem with the new version.  Sir?

MR. CASEY:  I apologize, your Honor.  I haven't had a chance to review it.  It was originally I think an

P7M1STO6

approximately 40-page document that they've cut down.

THE COURT:  I understand.  I don't want to hold you up, sir.  So you've gotten my answers to everything but this exhibit 10 and exhibit 7.  So I will understand that when I hear from you on exhibit 10, I'll respond back.  It might be, I don't know—do you want to tell me tomorrow morning?  What I'm saying—and I'll be less coy about it—is, I'm aware of how hard you're working.  I'm trying not to give you make-work projects.  I do better when I have things in writing.  You may disagree.  But if you're busy with, like, getting your witnesses together so I know who they are, then you can just tell me tomorrow morning whether you agree or disagree with the new exhibit 10.  Is that acceptable, Mr. Casey?

MR. CASEY:  Yes.  I appreciate that, your Honor.

THE COURT:  Okay.  And sir, I will tell you tomorrow morning, unless I email something tonight, about Government Exhibit 2005-T.  I just don't know.  I haven't seen it.

MR. CASEY:  Thank you, your Honor.

THE COURT:  Okay.  I believe those are the 106 issues that have been presented to me.  Are there any others?

Hearing none, I will understand that there are none.

I will wait for the government on the paralegal summary witness submissions.

The motion to quash we'll deal with on Thursday.

I don't even want to ask this, but let me ask:  Is

P7M1STO6

there anything else that's on the parties' minds?

Mr. Patton.

MR. PATTON:  I wouldn't want to disappoint you, your Honor.

THE COURT:  Oh, how could you, sir.

MR. PATTON:  Two things.  One is a request for your Honor to reconsider an objection from today for the Infura and Alchemy witnesses.  The government, if you'll recall, closed out those examinations by saying:  Did you terminate your relationship with them?

THE COURT:  Yes.

MR. PATTON:  And the reason why that's so problematic is that it very strongly implies that Alchemy and Infura found some wrongdoing or some reason to terminate them, when, as we all know but we cannot discuss with the jury, it was purely because of the sanctions that we are not discussing, which have now been overturned.  And it's just a highly problematic message to send to the jury, which I assume is why they asked the question because otherwise it doesn't have much relevance.

MR. GIANFORTI:  I deliberately did not invoke the reason why the relationship was terminated.  It was just to cabin the testimony in terms of time so the jury has a full scope of how long the relationship lasted with Tornado Cash or Roman Storm, as the case may be.  It's just, you know—as you noted at sidebar, your Honor, I didn't invoke anything beyond

P7M1STO6

that quite deliberately.

THE COURT:  The reconsideration motion is denied.

The parties will remember that when we were dealing with this issue, there were different permutations that we could do.  The government wanted to introduce the fact of the sanctions but not their withdrawal.  I proposed not mentioning the sanctions at all.  There was a discussion about mentioning the sanctions and mentioning the withdrawal.  Ultimately, what the defense asked me to do was to not mention the sanctions at all.  The government has been hamstrung in certain respects because there are certain documents and communications that aren't coming in as a result.  However, asking about the termination of the relationship I don't find to be in any way prejudicial.  So no, that motion is denied.

Your next point, sir.

MR. PATTON:  The next point is about the summary witnesses.  I think maybe we're at a place of agreement, but I just want to let the Court know about the discussions we've had about this, which is, my understanding is that the paralegal summary witness is simply going to be used to introduce and read certain communications, things like texts and emails. Maybe one or two——it was a little unclear whether there would be like one other type of document, which I think is fair game under the rule for voluminous records to narrow them down. What I'm concerned about and what I think other judges in the

P7M1STO6

district have been concerned about is where it starts turning into—

THE COURT:  A summation.

MR. PATTON:  —the summation, where it's tying documents to each other in a timeline and all the rest.  And so I just want to make sure it's cabined to the proper scope of a summary witness.

THE COURT:  Government told me, in response to your motion *in limine* on this very topic, that that's not what they were doing, that they hadn't yet prepared the summary charts or the summary witnesses, but I understood they were going to be abiding by the law, and I did not think that they were going to be making these witnesses summations before the summations.  There.  That's as subtle as I can be.

MR. PATTON:  I appreciate that.

THE COURT:  Yes, yes, my characteristic subtlety, sir.

Someone else from the defense table want to speak?

I knew it.  Mr. Klein.  Go ahead.

MR. KLEIN:  Your Honor, we'd just like to know who's coming up tomorrow and—

THE COURT:  Oh, well, I'm sure they'll tell you.  I have to believe they'll tell you the exhibits soon.  Soon?

MR. GIANFORTI:  I think Mr. Rehn may have sent you an email earlier today with the exhibits for Werlau, at least, but the rest of the witnesses we'll get to you promptly.

P7M1STO6

THE COURT:  Promptly.  Okay.  Yes.

MR. KLEIN:  It wasn't on the list, but if there are any additional ones for tomorrow, we just want to know that.

THE COURT:  For the will of god, no more exhibits, guys, for Werlau.

MR. GIANFORTI:  I'm not putting him on.  I'm not exactly sure.  But we will give prompt notice if there are additional exhibits.

THE COURT:  Very prompt, like within the next hour.

Okay.  Something else, sir?

MR. KLEIN:  And just who else is coming tomorrow.

THE COURT:  Well, we got that list earlier.  We got that list at the lunch break.

MR. KLEIN:  I didn't know if anything had changed, where we ended up.  I just wanted to double-check.  Werlau showed up this afternoon and he wasn't on the list yesterday afternoon.

THE COURT:  That's because we ran through everybody who was on the list and the government knows if we stop, I make them rest.

MR. KLEIN:  They said they were going to use the summary paralegal.

THE COURT:  But we didn't decide the summary paralegal issue so we couldn't.  So blame me, as I'm sure you will.

All right.  I thought we had the list of the

P7M1STO6

government witnesses.  Do we not?

MR. ARAD:  The Court does, your Honor.  We have not changed our plan for tomorrow's lineup since the lunch break.

THE COURT:  Okay.  Mr. Arad, excuse me if you are the wrong person to direct this question.  I am assuming that there is a summary witness testifying, and really the issue is just what I'm going to let him or her introduce, correct?

MR. ARAD:  I think that's right, your Honor.  There are two summary witnesses, and that would be a paralegal to put in a number of exhibits.  That's I think who we've been talking about this whole time.  There will be another summary witness that Mr. Rehn and I discussed with Mr. Patton this morning, who will testify very briefly and is going to present a few graphs that summarize information.

THE COURT:  That witness is who, please, sir?

MR. ARAD:  Connor O'Sullivan.

THE COURT:  Oh, yes.  That was a name that was given to me already.

MR. ARAD:  I just wanted to make clear that that was the other summary witness.

THE COURT:  To me it was not, so I appreciate knowing that.

And do we know which paralegal gets to be the sacrificial victim?

MR. ARAD:  It's going to be Angelica Cotto, your

P7M1STO6

Honor, C-O-T-T-O.

THE COURT:  Thank you.  Okay.  Much appreciated.

Now I know you want to speak.  Let me just ask a question first, please.

MR. ARAD:  Sure.

THE COURT:  It seemed to me that we made substantial progress today.  We're still aiming——unless, of course, the cross-examination of Mr. Werlau is a whole day tomorrow——still going to rest on Thursday, sir?

MR. ARAD:  I think that looks very likely, your Honor, yes.

THE COURT:  And we'll all know more tomorrow.  But okay.  Thank you.

Have I lost Mr. Rehn for good, sir?

MR. ARAD:  I don't know.  I certainly hope we haven't.

THE COURT:  I'll ask a better question.  Have I lost Mr. Rehn for this afternoon?

MR. ARAD:  I believe so.

THE COURT:  Okay.  That's fine.  Would you happen to know how much more direct?  Does he have an hour of direct, does he have two hours of direct?

MR. ARAD:  I think it's going to be more than an hour of direct, your Honor.  I can't say how much more than that.  It may be more than two hours left of direct.

THE COURT:  Wow.  Okay.

P7M1STO6

MR. GIANFORTI:  Judging by paper thickness, we're about halfway done.

THE COURT:  Thank you.  Mr. Klein and I want to know so that we can have a sense of when he might be beginning.

Okay.  Thank you.

Mr. Arad, now there are issues you'd like to bring to my attention.

(Continued on next page)

MR. ARAD:  There is just one thing that I wanted to say while we are talking about exhibits.  We are going to, as Mr. Gianforti said, share tomorrow's exhibits with the defense promptly.

THE COURT:  Yes.

MR. ARAD:  With respect to the summary witness I just mentioned, Connor O'Sullivan.

THE COURT:  Yes, sir.

MR. ARAD:  As I said, he is going to be testifying very briefly to just a few charts.  We produced versions of those charts to the defense when government's exhibits were due weeks ago.  It may be that we modify them very slightly and we will produce them to the defense as soon as we can tonight.

THE COURT:  Tonight.

MR. ARAD:  Yes.

THE COURT:  OK.  OK.  But you're telling me these are minor modifications and not wholesale redos of these exhibits so that Mr. Klein doesn't write me at midnight upset.

MR. ARAD:  The data represented in these charts is represented in charts we produced to the defense already when government's exhibits were due.  The kinds of changes that we are making are, I think, in the nature of changing date ranges, that sort of thing, or labeling and the way that certain things are marked.

THE COURT:  Not entirely responsive but I understand,

P7M5sto7

sir.

MR. ARAD:  I am doing my best because we haven't made all the changes yet so I don't want to --

THE COURT:  I know, and I am keeping you from making them because I am keeping you here.  I will let you go soon so that you can make them.

Anything else from the government?

MR. ARAD:  No, your Honor.

Mr. Klein, who is your first witness?

MR. KLEIN:  Your Honor, we were discussing that and --

THE COURT:  OK.

MR. KLEIN:  -- we did discuss it at lunch, your Honor.

THE COURT:  That's awesome, yes.

MR. KLEIN:  We did discuss it so we are not --

THE COURT:  Was I not fold that I was going to be told at the end of the day?

MR. KLEIN:  Your Honor, we --

THE COURT:  No, no, no.  My question to you is did you not tell me that you were going to tell me at the end of the day who it was?  The answer is yes.

MR. KLEIN:  You're right, your Honor, and I want to take that back because --

THE COURT:  Wow.

MR. KLEIN:  Here's what's happened, your Honor.

THE COURT:  Yes?

Case 1:23-cr-00430-KPF   Document 255   Filed 12/17/25   Page 297 of 301   1102

P7M5sto7

MR. KLEIN:  Is that we are juggling a few things right now with Mr. Werlau coming and Mr. George and our motion to exclude certain things from Mr. George.  So, depending on what happens with that, it will affect who we are going to call.  So we have -- it also depends, actually, if they rest in the afternoon on Thursday or if they rest at the end of the day because we have one witness who may only be available Thursday afternoon.

So, we are juggling these things, your Honor.  And I understand you want to know and I am sure the government would love to know, too.  I just want you to know they are in the air.

THE COURT:  I want to be as nice as I can in responding, sir.  I have been extraordinarily patient, even as you tried to mandamus me to suggest otherwise and I'm not bitter about that at all.  What I am telling you is I have let you remain silent for so long.  In every other case I have ever presided over I have gotten so much more information than you are willing to give me.  You have to tell me at some point because -- and I am sure the government will take this the right way -- I don't even care about them, I care about me.  I need to have a charge completed at some point and if you tell me that you have three days of testimony or two days or one day, I need to know whether the jury is getting the case Wednesday of next week or the following week.  So, on Friday,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7M5sto7

while you are in your case-in-chief, you have got to tell me who your contemplated witnesses are.

MR. KLEIN:  Your Honor, I am definitely not trying to frustrate you and if you are giving us permission to submit, *in camera*, some ideas.

THE COURT:  No.  No.  No.

MR. KLEIN:  So then --

THE COURT:  This trial by ambush thing is getting old. When you are on your case-in-chief this cannot persist.

MR. KLEIN:  Absolutely, your Honor, and we will abide by the same rule that they abided by for sure, which we agreed to at the very beginning, which is at the end of the day we will tell them who we are going to call the next day and will provide exhibits.

THE COURT:  That is not in fact what has happened. Many times they have told us early in the day what the next day is going to look like.  I need to know and you need to tell me how many days this is going to be because I will be sad, and therefore you will be sad if you tell me, as you have, that you have a week of a case, a defense case, and it is only a day.

MR. KLEIN:  I understand.

THE COURT:  The jury will be thrilled but we'll be sad.

MR. KLEIN:  I understand, your Honor.

THE COURT:  So, be mindful that at some point I'm

P7M5sto7

going to make you tell me.

          MR. KLEIN:  Yes, your Honor.

          THE COURT:  All right.

          And at some point you really -- I'm hoping that at some point you are going to start disclosing more things pursuant to 26.2.

          MR. KLEIN:  Yes, your Honor.

          THE COURT:  OK.  Is there anything else to discuss?

          MR. KLEIN:  Not from the defense.

          MR. ARAD:  No, your Honor.

          THE COURT:  I am expecting something from each of you. I will sit by my e-mails tonight waiting for it.

          Mr. Casey, thank you very much for our discussions today and see you tomorrow.  Thank you.

          (Adjourned to July 23, 2025, at  8:45 a.m.)

INDEX OF EXAMINATION

Examination of:                                        Page

ELEAZAR GALANO

Cross By Ms. Axel . . . . . . . . . . . . . . . 827

Redirect By Mr. Gianforti . . . . . . . . . . 838

BENJAMIN GIBBS

Direct By Mr. Rehn . . . . . . . . . . . . . . 841

Cross By Ms. Axel  . . . . . . . . . . . . . . 868

Redirect By Mr. Rehn . . . . . . . . . . . . . 886

 SHAKEEB AHMED

Direct By Mr. Arad . . . . . . . . . . . . . . 888

Cross By Mr. Patton  . . . . . . . . . . . . . 906

Direct By Mr. Gianforti  . . . . . . . . . . . 914

Cross By Mr. Casey . . . . . . . . . . . . . . 931

KURUSH DUBASH

Direct By Mr. Gianforti  . . . . . . . . . . . 936

Cross By Mr. Casey . . . . . . . . . . . . . . 950

WILLIAM LOPEZ

Direct By Mr. Arad . . . . . . . . . . . . . . 956

Cross By Mr. Patton  . . . . . . . . . . . . . 998

Redirect By Mr. Arad . . . . . . . . . . . . .1021

PHILIP WERLAU

Direct By Mr. Rehn . . . . . . . . . . . . . .1025

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

3 through 9   . . . . . . . . . . . . . . . . 810

652, 655, 659, 660, 665, 667, 669, 670, . . . 918

          671

2038 and 2038-T   . . . . . . . . . . . . . .1059

2032 and 2032-T   . . . . . . . . . . . . . .1068

261   . . . . . . . . . . . . . . . . . . . .1051

275   . . . . . . . . . . . . . . . . . . . .1053

321   . . . . . . . . . . . . . . . . . . . . 980

602   . . . . . . . . . . . . . . . . . . . .1054

703   . . . . . . . . . . . . . . . . . . . . 944

720   . . . . . . . . . . . . . . . . . . . . 945

722   . . . . . . . . . . . . . . . . . . . . 949

752   . . . . . . . . . . . . . . . . . . . .1067

803-2   . . . . . . . . . . . . . . . . . . . 830

1152   . . . . . . . . . . . . . . . . . . . . 991

1608   . . . . . . . . . . . . . . . . . . . . 861

2245   . . . . . . . . . . . . . . . . . . . . 983

2247   . . . . . . . . . . . . . . . . . . . . 995

3001   . . . . . . . . . . . . . . . . . . . . 959

3003-M-B   . . . . . . . . . . . . . . . . . .1057

3202   . . . . . . . . . . . . . . . . . . . . 965

3402   . . . . . . . . . . . . . . . . . . . . 981

3535-002   . . . . . . . . . . . . . . . . . .1009