P7N1STO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v.                                    23 Cr. 430 (KPF)

ROMAN STORM,

                    Defendant.              Jury Trial
------------------------------x

                                        New York, N.Y.
                                        July 23, 2025
                                        9:03 a.m.


Before:

                    HON. KATHERINE POLK FAILLA,

                                        District Judge


                            APPEARANCES

JAY CLAYTON
        United States Attorney for the
        Southern District of New York
BY:  NATHAN M. REHN, ESQ.
        BEN ARAD, ESQ.
        BENJAMIN A. GIANFORTI, ESQ.
        KEVIN G. MOSLEY, ESQ.
        TARA M. LA MORTE, ESQ.
        Assistant United States Attorneys

WAYMAKER LLP
        Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
        KERI CURTIS AXEL, ESQ.
        KEVIN M. CASEY, ESQ.
        VIVIANA ANDAZOLA MARQUEZ, ESQ.

        -and-

HECKER FINK LLP
        Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
        CHRISTOPHER MOREL, ESQ.

P7N1STO1

(Trial resumed; jury not present)

THE COURT:  We have much to discuss this morning.  And I did receive——although I received it at 5 this morning and not midnight last night——your submissions, because I wasn't sure when I was getting them.

Mr. Rehn, I want to begin with yours and then I want to hear from defense on yours and then we'll do the inverse.

Mr. Rehn, my concern about your submission is that, as you've noted, there is one fleeting reference to AML, the term AML in the transcript, and that is in Mr. Evans's testimony.  Unless you can point out to me, there's no reference that I'm aware to KYC.

MR. REHN:  There is, your Honor.  In the Evans exhibit, it says Know Your Customer, KYC.

THE COURT:  Listen to me, sir.  The initials KYC are nowhere identified as the abbreviation for Know Your Customer.

MR. REHN:  They are, your Honor.  They are in the letter from Evans to Storm, and it says, Know Your Customer, KYC, and then it says anti-money laundering, and that's why we asked Evans to clarify that that is AML, exactly in order to have the foundation so the jury would understand the——

THE COURT:  I'll have to look at that document again.  But sir, let me work backwards, and I want the defense to listen because it may be that they decide, upon hearing my preliminary views, that they don't want to talk about a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7N1STO1

particular issue.

Sir, I don't at all feel comfortable with Government Exhibit 2246, your third, and that is because there are references to legality and to compliance, which I think are much too close to the issues that we excluded in this case, and so I think discretion is the better part of valor here and you should give up on that one. But I'll hear from you as to why you shouldn't, and that's why—Mr. Klein, are you the person I will be speaking with this morning?

MR. KLEIN: Yes, but you may not be hearing from me if this is your ruling.

THE COURT: On that issue you may not. You may want to say, no, Failla, you're totally right. But my inclination, in the three hours I've had to think about this, or four hours I've had to think about this, is that that particular exhibit is too close to the issues I was trying to avoid. Now you can push back, sir, but you might do better focusing on the other two where I haven't decided fully what I'm letting you do. Go ahead.

MR. REHN: Your Honor, this particular exhibit is actually a very important part of the government's case with respect to the sanctions violations because of the timing of it, so I just want to flag that issue in particular. And again, I've never seen a case where a defendant's own words regarding the very issues at play in the case are redacted in

such a way as to prevent the jury from forming an accurate impression as to his state of mind.

THE COURT:  Sir, it seems to me that if this were to come in——and that's a huge if——it would come in with an instruction along the following lines:  Members of the jury, I am not charging you, I am not instructing you that Mr. Storm had a legal or regulatory obligation to implement any particular anti-money laundering or Know Your Customer protocol.  This evidence is only being admitted as potentially probative of his knowledge of protocols that could be implemented and their feasibility and his decisions about that.  That's the limiting instruction, isn't it?

Listen, I was doing that off the cuff, so it might get a little prettier on——

MR. REHN:  Yes.  I think we would propose just "regulatory obligation" as opposed to "legal," because I think that gets into——because this is a money laundering case, and so I think that we certainly agree that we are not arguing and that the jury should be explicitly instructed that any suggestion of any regulatory obligation is not relevant, so I think we would be comfortable with an instruction along these lines as to the regulatory issues.

THE COURT:  I see.  But if that's coming in, I still don't understand why 2246 is important.  Tell me why.  You say it's important for your sanctions point, but it's talking about

P7N1STO1

the legality of such a venture.  Legally it seems fine.  You're speaking about something, a compliant mixer, and I don't know whether these individuals are talking about the charges that are here in this indictment or regulatory obligations, that they have seen legal documentation they don't need to follow.  So it may be very important to you, but I need to understand how I can put it in consistent with my prior rulings.  And sir, yes, I do understand, because I'm aware of my prior rulings, that the focus was really on the testimony of expert witnesses regarding the regulatory structure.  So yes, you can tell me, as you just did, you've never seen a defendant's own words kept out, but the point is, there was an awful lot of motion practice about not discussing the regulatory structure, and I want to understand why it doesn't undo my decisions, or open the door to testimony of some sort to let this in.  Go ahead.

MR. REHN:  Your Honor, so I think that, first off, the Court has already approved a lot of colloquial talk about privacy rights.

THE COURT:  Yes.

MR. REHN:  And so there's nothing on the face of these chats that refers to any regulation, that refers to the Bank Secrecy Act, that refers to FinCEN, that refers to any of the issues relating to registration that have previously been discussed in this case.  On the face of the chats, there's nothing suggesting that that's what they're talking about.  In

P7N1STO1

the context of this case, when the defendant has learned on April 15th and has discussed with his co-conspirators that they are actively engaged in receiving deposits from a sanctioned entity, the fact that he then engages with his investors on whether it makes sense to implement certain protocols, never suggesting he's technically unable to do so but just whether they should consider doing it, and the subsequent discussion about whether to do it or not, involves financial considerations. That's critical evidence as to his state of mind with respect to whether he is going to continue to engage in what is at that moment in time an ongoing series of thousands of sanctions-violative transactions. It's essential evidence as to his state of mind in the midst of the conspiracy charged in Count Three.

THE COURT: It's coming in through a paralegal who will not be permitted to answer follow-up questions on what AML is and what KYC is, correct?

MR. REHN: Correct, your Honor, but there is——

THE COURT: So then how are you going to connect KYC, through Evans's testimony?

MR. REHN: We have an exhibit in the record that explains that KYC means Know Your Customer. That was admitted without objection. And Evans also, in the same letter——

THE COURT: Well, the testimony about it was objected to. I overruled the objection.

MR. REHN:  The point is, the testimony is in the record, so the jury will understand that KYC and AML have these meanings.

THE COURT:  How are they going to understand that we're talking about——we're not talking about colloquial terms, are we?  We're talking about legal terms or regulatory terms.

MR. REHN:  We disagree with that.  Actually, KYC is not a term that's in the regulation and it's frequently used colloquially, and in the other chats I think you can see that.  For example, in November 2021, Storm circulates the existing tool called an AML tool.  There's no regulatory suggestion that that's like BSA compliant or anything.  It's just a tool that's referred to as an anti-money laundering tool that can be implemented in these DeFi protocols.

THE COURT:  What prevents the defense from putting on a witness where they ask whether KYC or AML is a regulatory term?  You're going to want me to exclude them from asking that question.  How do I get to do that?

MR. REHN:  So I think it would depend on the context.  It would depend on what the——I mean, for example, if the person who authored the text were to explain it, that would be one thing.  Or somebody who received it.  I'm not sure if another person should be permitted to testify about what it means because the face of the chat would be something that the parties can argue from.  But the idea that the defendant's

discussion of what you can and cannot do with respect to Tornado Cash and his decision-making about why he chooses either to or not to implement controls, again, is exactly about his state of mind in the midst of the conspiracy charged in Count Three.  And in that context, I think there's a very strong argument that that's what the parties are thinking about and considering at that moment in time.  And there's no suggestion, again, in any of these chats, that anybody's talking about FinCEN.  Nobody refers to it——

THE COURT:  Except is this not happening after Mr. Storm has received the legal document from the venture capitalist explaining that Tornado Cash——which I presume no one's introducing into evidence and I don't think I would let into evidence, but we'll see.  You're not introducing that document into evidence, are you?

MR. REHN:  No, your Honor.

THE COURT:  Okay.  But he had that contemporaneous with these discussions, did he not, sir?

MR. REHN:  That was a document he received I believe in August of 2020, your Honor, so——

THE COURT:  Okay.  So it could have been in his mind. The point is, you're suggesting that I can intuit and that the jury can intuit from these statements that they're not talking about the BSA structure, they're using it in a colloquial sense.  And I'm not sure.  How can I be that confident?

P7N1STO1

MR. REHN:  What I'm saying is, the issue that the jury has to decide is whether the defendant—as the defense has teed this issue up, their arguments have been throughout this case, including in their opening statement, that the defendant couldn't have—he couldn't have done something, and so evidence of him discussing things he could have done, again, not talking about whether he has a regulatory obligation, just, should we do this, this is an idea, we're thinking about it, and then having his investors say, there's no market for it, clearly undermining the defense that this was all about legitimate users, is plainly directly relevant to his state of mind, and to the extent the Court finds it opens the door to certain background evidence, it may well, but it's critical evidence of his state of mind.

THE COURT:  You don't appear to be offering anything in the form of redactions, sir.

MR. REHN:  We would be open to a redaction.  So we had considered redacting the term KYC, AML if the Court would prefer to present it in that way.  The key point is, he's proposing a change, his investors reject it, and he does not implement that change.  So if the Court feels that a redaction would help to remove any suggestion that those terms imply some regulatory issue, we would be open to that as—in the alternative, your Honor, but again, this is sort of right in the middle of when the biggest thing that ever happened in

Tornado Cash is going on and the defendant is reacting to it.

THE COURT: So to the extent that 2246 makes references to compliance or compliant, wouldn't those have to be redacted? Don't those seem to suggest regulatory obligations that you're eschewing at this point?

MR. REHN: First off, we don't accept that characterization of them as referring to the BSA. Again, we do have a sanctions case, your Honor, and this is in the context of the North Korea Lazarus Group sanctions activity. So that would be the most obvious inference, given the timing of these chats, and the fact that the defendant had recently implemented a sanctions oracle into Tornado Cash in April 15th, and then subsequently was observing continuing laundering from the Lazarus Group. So we would certainly argue that that's what they're talking about, that it doesn't really have anything to do with——again, there's nothing about FinCEN or BSA or anything in here, and the context that's directly in the minds——again, at this point in time, your Honor, the jury has heard testimony substantially more than half of all of Tornado Cash's business over this month-long period that this is right in the middle of, is the Lazarus Group. So it's essentially a sanctions-violating enterprise at this point in time. And so the discussion——any discussions the defendant is having about how to react to that, what to do about it, in the context of a defense that isn't about lack of knowledge. Obviously he has

P7N1STO1

knowledge.  It's not about lack of sort of awareness that sanctions violations were illegal; he expressly says that he was aware of that.  The defense is claiming he couldn't do anything, and so evidence that right in the middle of that he's talking about things he could do is—again, it's the most directly probative evidence as to that, the core issue in dispute at this trial.  And there's, again, no indication whatsoever that it's about any other topic.  And if the defense attempts to argue it opens the door to certain limited testimony to attempt to contextualize it in some other way, we would be, you know, open to considering what exhibits they would argue are relevant to this and we could have that argument, but to place a communication about the very issue in dispute at this trial in which the defendant is deciding what to do, making a choice about how to manage Tornado Cash and then rejecting a choice that would have addressed what was half of the business at that point in time, I think is essential for the jury to understand the defendant's state of mind during that time period.

            THE COURT:  Mr. Klein?

            Mr. Klein, speak to all.

            MR. PATTON:  Your Honor, do you mind if I take this?

            THE COURT:  Mr. Patton?  All right.

            MR. PATTON:  Yes.  Just to the last point about sanctions, the discussion is about compliance and KYC and AML.

There's no reference to IEEPA or things that the government's discussing right now.  But in any event, at very best, it's unclear.  It seems to be pretty squarely addressed at the subsection of 1960 that the government's not proceeding with.  And at the very least, it's unclear.

We have a separate issue—I'm sure your Honor will appreciate this—to take up with the Court today.  Doesn't need to be resolved today.  But we are in fact attempting—we've subpoenaed one of the Dragonfly co-founders, Tom Schmidt, the person whose cellphone was the subject of the cell site analyst.  His counsel has told us that the government has informed him that he has jeopardy and so he is contemplating taking the Fifth.  We think that there is no basis for that.  But the point is, we are affirmatively trying to get somebody from Dragonfly to testify at this trial, and the government is not making it easy for us to do that.

But nothing in this chat appears to relate to anything other than 1960-style-related compliance issues.

And the other thing, your Honor, because I think this is going to come up—

THE COURT:  What about the other two, sir?  The other two exhibits, can they be redacted?

MR. PATTON:  We have the same issue in terms of the discussion surrounding what they might be required to do.  Again, so I'm looking now at 2043-T.  And again, there is

discussion of KYC, releasing a UI with KYC. One thing that is important to understand too is that around this time they're discussing releasing a different protocol.

THE COURT: Yes.

MR. PATTON: And I think one of the points of tension or confusion that kind of goes to the heart of some of this case is, the government sort of seems to be saying, well, you could have built a different thing, you could have built a different product.

THE COURT: Yes.

MR. PATTON: Right? And of course that's true that Mr. Storm could have built something entirely different than what he built. The question, of course, is whether what he built was unlawful, given his state of mind and the other things that the government said. So they can't simply say, for instance, you could have built an encrypted messaging application, but that gives WhatsApp some ability to in fact read the messages, right? I mean, it sort of defeats the purpose of the product. So to the extent that we're arguing about, could you have built something that wasn't anonymizing, well, of course there are tools that are not anonymizing. But the question is whether or not what he actually did was criminal. And that, in essence, is getting us back to this 1960 subsection that they've dropped. And so discussions surrounding what compliance efforts surrounding what he

P7N1STO1

actually built, what the legal requirements are, those just aren't relevant, and they are opening up a whole can of worms about those type of compliance issues that we thought were out of this case.

THE COURT:  Mr. Rehn.

MR. REHN:  So, your Honor, first off, we aren't suggesting that the—as the Court has already heard, the defendant made over 200 changes to the Tornado Cash service over the course of the charged time period.  There was evidence of that yesterday.  We are not in any way suggesting that the original design was criminal and therefore—that's not even when we started the charged conduct in this case.  The question is the operation of the business during the period when the defendant is on knowledge that through operating the business, he is engaging in these transactions that are criminal either because they conceal criminal proceeds or they are sanctions-violating.  That is the heart of the case.  He is actively operating the business and actively making changes, and we're going to hear about more of them in the testimony this morning.  And in that context, the ability to make changes—and we are not suggesting that he needed to be anonymizing, to be clear.  The testimony will be clear about that.  There are ways to implement changes that preserve the ability to make anonymous transfers on the blockchain that would have been easily apparent to him.

P7N1STO1

THE COURT:  Mr. Rehn, let me try and articulate a reaction that I have to an argument that Mr. Patton is making, and that is, I appreciate what you're saying about the timing and that these communications, in the thick of all of these hacks being run through Tornado Cash, are indicative of his intent.  But the problem we have is that at one point you wanted his statements to be indicative of his knowledge of obligations to register, and that's just not in the case anymore, and I find it difficult at the moment——though I may ultimately get to the point——to explain to the jury why there are regulations.  He's not being charged with violating them.  That's not what these discussions are about.  But for the defense, they could say, no, actually, he's talking about these regulations that are no longer in the case.  That's the problem.  They're a little bit hamstrung in their ability to say, once upon a time, there was another 1960 violation that was being charged and the government thought better of it, and decided not to charge it.  And as a result, they can't argue what may be a fair argument from this conversation, that he's talking about a regulatory structure that the government's no longer pursuing.  That's the concern I have.  And I'm not sure I said that correctly, but I think Mr. Patton understands what I'm saying.  But the point is, you're going to say, the only thing that you can deduce from these conversations is that he was worried about money laundering, but if the answer is, he's

P7N1STO1

worried about the other prong of 1960, the defense can't say that because that's no longer in the case. So what do they get to say to show that he was thinking about something else?

MR. REHN: So, your Honor, just to sort of—again, the context here is, we're talking about what was in the defendant's mind in 2022. The government obviously hadn't charged the defendant with anything then. But imagine if the government had just never charged the (b)(1)(C). That's essentially the situation we're in.

THE COURT: It's not, because he had, two years earlier, a document that said to him, rightly or wrongly, I don't think you have to worry about this being an unlicensed money transmitting business; however, it might be money laundering. I mean, that's the import of that particular document. So it's not like he never heard of the 1960. He had. He had a whole memo that was given to him about why they thought it didn't apply.

MR. REHN: And your Honor, to the extent that the Court finds that introduction of this opens the door to that, to the introduction of that document for that limited purpose, it may well, but this is no different from—there are many cases charging, for example, securities fraud or commodities market manipulation, where there's evidence about regulatory issues.

THE COURT: Yes.

P7N1STO1

MR. REHN:  But the defendant is not charged with regulatory violations, he's charged with criminal acts, and juries are routinely instructed that evidence of such background regulatory frameworks is only relevant insofar as it helps the jury make inferences about the defendant's state of mind.

THE COURT:  Right.

MR. REHN:  So to the extent that those issues are implicated in these chats, that's not a novel problem to this case, and it specifically doesn't have anything to do with a prior count that was charged because that was after the facts in this case.  So the fact that there was a count that we aren't proceeding on isn't relevant to what does the jury need to know with respect to these counts that have been charged, that the jury will be charged to consider.

And so with respect to determining the defendant's culpability for the three counts that it will have to consider, his decision-making process during the time period in question is essentially at the very heart of what the parties are disputing.  We've just heard it from Mr. Patton:  Oh, no, they were considering rolling out a new product.  We would submit that the evidence will show that's not what they were considering because of the fact that they were making changes to Tornado Cash itself, repeatedly, including changes that they claimed were designed to address the sanctions violations,

P7N1STO1

although they internally acknowledged that they knew they were ineffective.  And so the idea that the defendant's decision-making process around how to actively operate the business while he is engaging in these sanctions-violative transactions and these money laundering transactions cannot be admitted because then he would have to introduce evidence to rebut that and introduce other evidence of his state of mind. That's true in any trial in which a defendant's state of mind is at issue, especially in an area where there's a regulated space.  And again, many insider trading and securities fraud and market manipulation cases have this issue.

THE COURT:  Slow down, please, sir.

MR. REHN:  And it is routine for courts to instruct juries that such evidence is only for the purpose of the defendant's state of mind.  And the government has been extremely careful not to suggest, and will continue not to suggest, that there was a regulatory obligation or that the violation of some regulatory obligation triggers criminal liability under the counts charged.

THE COURT:  But can we let the jury know that these terms have regulatory meanings too?

MR. REHN:  First off, I mean, if the defense wants to introduce evidence that that was what in the defendant's state of mind, again, that is a permissible thing for the parties to argue about.  We would submit that the chats do not indicate

P7N1STO1

that that's how they're talking about it. They are colloquial. They are talking about, should we roll out UI with KYC. It's sort of like how the Court said, of course there can be evidence should we do something to know who our customers are. This is just a shorthand that's frequently used in many contexts as a general reference to the idea of having some sort of knowledge of who your customers are. It doesn't necessarily implicate a particular regulatory obligation. And in fact, the fact that the defendant didn't think he was under a regulatory obligation is actually affirmative evidence that's not what they were talking about, because they don't suggest, oh, should we register with FinCEN or should we do this or that? They just said, hey, should we put something on this platform so we know who our users are? That's what we would argue they're talking about.

THE COURT: Ms. Noriega, you may want to tell the jury that they may want to have another bagel.

Mr. Rehn, are you or someone else on your team going to be responding to the challenges to Agent George's testimony?

MR. REHN: I can respond, your Honor.

THE COURT: All right, sir. Agent George.

MR. REHN: Your Honor, so just a little bit of context.

So first off, there's sort of two arguments as to the disclosure that the defense makes, and we would submit that

P7N1STO1

both are meritless when you consider the record in this case. So first they make a huge argument about this last in, first out tracing method. To be clear, that method, that methodology, was disclosed in Stephan George's initial disclosure. He traced multiple sources of transactions using that method with respect to the defendant's own transactions.

THE COURT: But my problem, sir, is that when I read his initial disclosure, I understood that it was going to be used to trace Mr. Storm's assets. So my problems are, number one, I don't think you disclosed until July 20th, at best, that you were going to be using it to trace Ms. Lin's assets; number two, it seems to me, although perhaps I am mistaken, qualitatively different from what Agent DeCapua was doing to trace assets on the blockchain.

MR. REHN: So it's different in terms of the overall magnitude. What Agent DeCapua was doing was sort of an order of magnitude or multiple orders of magnitude different, and that's what makes this a more simple tracing exercise that the last in, first out, that the IRS uses——

THE COURT: But the defense says he's not even consistent in doing that.

MR. REHN: That goes to the weight of the evidence. As their own motion makes clear, your Honor, they're fully prepared to cross-examine and to attempt to rebut this testimony. They're fully read up on these issues. They've

P7N1STO1

been aware of this methodology for months.  And so I don't think there's an issue with respect to their ability to deal with the methodology.  As applied to this single chain of transactions, as I said earlier to the Court, applying that methodology to these transactions where we know that beginning point and end point from evidence that is already in the case, it takes a matter of minutes to generate that analysis.  And they've clearly already done a lot of work on that because they have in their motion ample discussion of their issues with the methodology, which I'm sure they will be ready to cross-examine Special Agent George on.

Another piece of context that's important for this, your Honor, the government disclosed documents pertaining to Ms. Lin, including a tracing analysis report that she herself had obtained, in July of 2024—almost a year ago.  We specifically called that out in our discovery letter, identifying her by name, and we also produced a 302 identifying her as a trial witness.  We did not know—and we of course produced her 3500 material in advance of trial.  The defense filed a motion very shortly before trial, the week before trial, seeking to preclude her from testifying as to the fact that her funds ended up in Tornado Cash.  The Court granted that motion on the Friday before trial.  Until the defense filed that motion, the government was not aware they were intending to contest that fact.  And so in response to that, we

P7N1STO1

asked our team to do their own analysis to determine if in fact the funds went into Tornado Cash.

THE COURT:  And Agent DeCapua couldn't do an analysis in that regard?

MR. REHN:  He perhaps could have, but because we had Special Agent George available to testify using the methodology that's closer to this sort of thing—so again, what Special Agent George does is he takes particular identified beginning points and end points and identifies the connections between those two.  What Special Agent DeCapua does is a much more in-depth analysis that involves things like attribution of particular wallets to hacks, which he described in detail during his testimony, and then very complex tracing of those, and he produced I think it may have been close to a thousand spreadsheets, your Honor.  So we could have asked him to do this and I'm sure—I imagine he could have done it.

THE COURT:  Where is he today?

MR. REHN:  I don't know.  He wasn't asked about this particular issue because we had another expert prepared to testify to it.

THE COURT:  All right.  But I'm still a little troubled.  You're saying to me that the fact of Ms. Lin's losses and a tracing analysis was produced in July of 2024.  I appreciate that.  But the disclosure of Agent George as the person connecting the dots was July 20th, was it not?

MR. REHN:  That's correct, your Honor, and again, the Court ruled the Friday before trial in response to a defense motion filed——

THE COURT:  Which was the 11th.

MR. REHN:  That's correct, your Honor.  We didn't meet with Special Agent George until the next weekend, and at that point we asked him to verify this analysis himself.  He did.  And then we produced it.  These sorts of things that come up in response to during-the-trial rulings, where we've already identified a methodology and an expert, and it's simply a matter of applying that same methodology by that same expert to a very discrete set of facts that have suddenly been put——we've been put on notice that those particular facts are in dispute is a perfectly permissible way to amend his existing disclosure.  The defense has known about these LIFO issues.  I understand they've been prepared to examine him as to his other tracing using the same methodology in this case, and so simply applying it to a new set of transactions, transactions which the defense has known about for over a year——or, I'm sorry, it's not quite over a year.  I think it was late July 2024, so for 11 months, I should say.  There's no prejudice to the defense.  And I think especially when you look at their motion, it's apparent from its face that they are very well armed to cross-examine Special Agent George on these issues.  There's no possible suggestion that they're somehow prejudiced or caught

in a situation where they aren't prepared to address these issues. They've already obviously done a lot of work. And so the evidence should be permitted here.

THE COURT: Who's speaking from the defense side? Ms. Axel? Thank you.

MS. AXEL: Your Honor, let me just—before we perhaps parse whether the LIFO methodology is appropriate, let me just speak to how Agent George actually approached what was timely disclosed in February and what we now have, which is why we are not prepared, and they have not adequately disclosed the basis for his opinion, nor do I think that he has one.

For example, as to the tracing that he previously did, your Honor, the LIFO methodology, we got a detailed spreadsheet, as one would expect to get when an agent is attempting to take one account and then say which portion of that account was actually the last in and then the next account and which one then was first out. And in addition to that detailed spreadsheet, which tracks his LIFO methodology as to the assets in question, I can show your Honor, in the spreadsheet itself was embedded all the Etherscan data that he relied on for the various steps in his analysis. We have nothing like that as to this. And of course the Court is well familiar with the briefing on Mr. DeCapua and knows, as to Mr. DeCapua, we had literally folders full of Etherscan data that was extracted. What we have really is a summary chart and

P7N1STO1

a spreadsheet that just indicates the amount in 11 different wallets. There are thousands of transactions out of those wallets. We were able to identify one for your Honor to point out that in the penultimate hop that they talked about here, that one wallet alone has $1.5 billion, which would appear to be then perhaps an innocent owner in the middle of this. I'm sure your Honor understands the rule of an innocent owner in terms of a forfeiture analysis. But that doesn't mean we had any moment to analyze all these hops, and we don't even have his LIFO methodology, which particular transactions and how he puts them to the next hop, much less the entire universe of data that he would have previously relied on. So setting aside that LIFO is not an attribution methodology, we don't even have the LIFO analysis that would typically be done by a tracing or forfeiture agent.

THE COURT: Ms. Axel, let me say this, please. I wasn't especially receptive to the defense's arguments for a *Brady* review of this. I don't think it qualifies as *Brady*. There were interesting submissions that you sent to me, but I don't think it qualifies. But let me understand the end game here. It would be striking Lin's testimony and then striking—well, you'd make your mistrial motion. I'll say nothing until I hear it. But it would be striking wire fraud as an SUA, yes?

MS. AXEL: I'm not sure I'm prepared to answer that

P7N1STO1

question, your Honor.  There were other—there may be other witnesses that bear on that.

THE COURT:  Okay.  But—

MS. AXEL:  We can probably put that over for the charge conference.

THE COURT:  And the government may respond.  I'm just trying to figure out, if her testimony gets stricken, what does that mean for my case?  It means you're going to ask for the testimony to be stricken, yes?

MS. AXEL:  Yes.  Of course we would ask for the agent, obviously, to not, you know, be permitted to testify on this under *Daubert*.

THE COURT:  Right.

MS. AXEL:  And then secondly, yes, we would ask Ms. Lin's testimony to be stricken and we would bring a mistrial motion.

THE COURT:  What if DeCapua can testify to it?

MS. AXEL:  Again, your Honor, we have a huge disclosure problem at this point.  Mr. DeCapua hasn't done this analysis.  I don't think Agent George has done it either.  We have just this very superficial layer of, you know, of a spreadsheet.  And again, it would be very late for the government to re-call a witness that it hasn't disclosed.  The Court set out—again, I think we actually have, your Honor—-they've supplemented a number of disclosures.  You know,

a lot of them, if they were within the four corners, we did not bring that to the Court's attention here. But this is over there, and it would be over there for Mr. DeCapua as well.

THE COURT: All right. One more thing, Ms. Axel. According to Mr. Rehn——and by the way, Mr. Gianforti, poker face, please. You may be upset, sir, but don't show it to me.

Ms. Axel, is it true that the government was not aware of your challenge to the tracing of Ms. Lin's funds until the Friday before trial, and does that matter?

MS. AXEL: Your Honor, it doesn't matter. I think we were given, with Ms. Lin's testimony, I understand——or was sent, you know, a report. We moved to exclude Ms. Lin from testifying about what she was told.

THE COURT: Yes.

MS. AXEL: So we thought that was out of the case. If Mr. DeCapua had timely——

THE COURT: Well, you wanted it to be out of the case but it wasn't out of the case.

MS. AXEL: Of course, your Honor. Yes.

THE COURT: I mean, my point, Ms. Axel, is that both of you were predicating certain actions on anticipated decisions from me that ended up being different than what you wanted, and I'm just trying to figure out the degree to which that matters.

MS. AXEL: I think we are allowed to rely on the

Rule 16 disclosures that the government made to us, and we prepared our case accordingly. Again, it would be a different scenario if we had received timely disclosure from Mr. DeCapua, who, as the Court points out, has 16 certifications in cybersecurity that Mr. George doesn't have and testimonial experience in this area, but we didn't have that, and he's already testified, and he did not disclose this work. So I don't think it was on us to sort of point out a negative, you know. They have the burden of proof.

THE COURT: All right. Thank you.

Mr. Rehn?

MR. REHN: So your Honor, again, this is just a fundamentally different type of analysis than what Special Agent DeCapua did.

THE COURT: Absolutely, and you're telling me he's competent to do it. The defense is saying, you didn't tell us he was going to do it and we don't think it's valid. On the latter point, I suppose the answer is, based on my previous decisions, that goes to the weight and not the admissibility of it, but I am a little bit concerned about the timing of the disclosure. Your response to that, sir, is, well, Failla, it's kind of your fault because you didn't tell us, until you did, what you were allowing in and out of the case.

MR. REHN: Your Honor, I wouldn't suggest that——

THE COURT: Listen, I'm fine. My skin is thick enough

P7N1STO1

at this point, sir, so don't worry.

MR. REHN:  No.  The issue is, as in any trial, when the pretrial motions get made, the parties learn more about each other's case, and there may be exhibits added and there may be amendments to disclosures, and in this particular instance, we had disclosed Special Agent George as the person who does LIFO tracing of particular transactions——

THE COURT:  Except, sir, you will agree——

MR. REHN:  ——of funds——

THE COURT:  Sir, don't cut me off.  You will agree with me that the transactions in his initial disclosure were very specifically limited to Mr. Storm's transactions, and not somebody else's, correct?

MR. REHN:  That is correct, your Honor.

THE COURT:  Okay.

MR. REHN:  But it's the same analysis, and it's a very discrete additional piece in terms of the transactions he's looking at that it——we've now disclosed it.  The defense has had, clearly, the opportunity to look into it.  Like I said, I think the data is sufficient, and I think their disclosure suggests that it is——I mean, their motion suggests that it is.

THE COURT:  Ms. Axel tells me that there are thousands of transactions going on in these wallets that they haven't had a chance to really trace out.

MR. REHN:  Those thousands of transactions don't

relate to the transactions that are involved in these hops using the LIFO method. And again, so that's not really relevant to how the LIFO method works, in terms of, it's a set of transactions over a period of just about two weeks that end up in Tornado Cash. This isn't—the thousands of transactions of those wallets at other times aren't relevant to that analysis under this methodology. And so again, they can cross-examine him on those; they obviously have the data for all of these wallets and that can be a subject of cross-examination and dispute and maybe even a rebuttal case from the defense, but the idea that his methodology, which, again, they didn't challenge on their *Daubert* motions to begin with, they didn't—

THE COURT: Because they didn't know it was being used for Lin's—

MR. REHN: I understand that, your Honor, but my point is, the primary reason his methodology is being used is that the defendant's own transactions, which presumably if they thought there was a problem with the methodology they would have attempted to dispute it, which suggests that this, you know, this current argument is not really aimed—I mean, they haven't really previously suggested any issue with this method of tracing. That doesn't mean that—I mean, we're not arguing that they should have obviously moved as to the Lin transactions previously, but it does suggest that the

indication that they weren't prepared to address this method is I think incorrect.

THE COURT: That's not what they're saying, sir. They're saying they weren't prepared to address it with respect to Ms. Lin because they didn't know until the 20th it was being applied to Ms. Lin and it was a surprise because other tracing on the blockchain had been done by Agent DeCapua. But all right.

I don't think that additional argument will be helpful to me, so I'm going to ask for your patience. I'm going to step off the bench and think very seriously about these issues. I'll come back as soon as I can.

Ms. Axel.

MS. AXEL: I'm sorry, your Honor. I mean, we do say that under the rules they have an obligation to share the data, and we don't have it. It was not disclosed. I don't believe that—given the rush, I don't believe that Agent George has it either.

THE COURT: Are you doing the cross, Ms. Axel?

MS. AXEL: I am.

THE COURT: If there is one, I really look forward to it.

All right. Thank you. I'll be back in a few minutes. Thank you.

THE DEPUTY CLERK: All rise.

(Recess)

THE COURT:  Please be seated.  Thank you.  Thank you very much for your patience.

On the issue of Mr. Rehn's motion to admit three exhibits, I am allowing all three exhibits in.  Looking back at Mr. Evans's testimony, I do see references to AML and KYC, and I know that the paralegal will not be testifying to those.  Those terms come in for their colloquial meaning.

Let me say this.  It is my intention to issue a limiting instruction when at least the first of these exhibits, if not all three of them, come in.  The parties are invited to propose something to me by 6 p.m. today.  I'm not staying up till midnight for this.  But what I'm thinking is the following:  That the terms would come in for their colloquial meaning.  To the extent that they could be interpreted to suggest a regulatory requirement, Mr. Storm is not being charged with any violation of any such regulation.  Now I'll let you look at the transcript and see if you want to embellish that, but as I said, the terms are in the record, and I found persuasive Mr. Rehn's arguments to me that my concern about confusion over the BSA and its obligations is greatly reduced because it was two years earlier.  The context in which these conversations were taking place and the one legal opinion he received suggested that there were no obligations under the BSA.  What I can't do is I can't exclude the possibility, as I

P7N1STO1

talked to you, that this is going to open the door to the defense introducing information.  I am saying, however, that I very much doubt that I would allow the admission of this information through expert witnesses.  There might be some document that Mr. Storm has that might come in.  The government might even want to stave off an issue by allowing Mr. Storm to introduce, perhaps not through himself but through another witness, some document that speaks to a regulatory structure, but I don't know.  I'm just saying, I thought that the record was not going to be opened, but it might be.  And I have to leave open that possibility.

I'm not going to require redactions.  That's coming in.

All right.  I'm changing gears now to Agent George. For me, there are three issues: methodology, completeness, and timing.

On the issue of methodology, I believe that Agent George is competent to testify to his methodology, which appears to be a different methodology from that of Agent DeCapua's, but it is a recognized methodology, and the question is whether this is a reliable methodology that is reliably applied.  I think it will be here based on what I understand the testimony to be.  The question is, does the methodology work.  It does to a degree, and I think the degree is going to be really explored on cross-examination.

P7N1STO1

On the issue of the completeness of the disclosure, that was my discussion with Ms. Axel. And I'm understanding, friends at the government table, that you have disclosed everything that underlies Agent George's testimony about Ms. Lin's tracing. And here's what I mean by that. Don't tell me now that there are additional exhibits. If there is additional 3500 material because you meet with him tonight, yes, of course, that gets disclosed. But you cannot tell me that there are additional GXs that you intend to introduce through him, because you've had your chance.

So then the issue becomes timing. The timing is late. But the timing is late because of me, because I did not decide these issues fully until the 11th of July. So I therefore am not going to penalize the government for that. It appears to me from the briefing that the defense is and will be ready. They have all of the information that they have. It is less detailed than Agent DeCapua's, but that is apparently a product of the methodology that is being used, and I think it's going to be quite fertile ground for cross-examination. And as I said, I do look forward to Ms. Axel's examination of Mr. George, but I will let him testify to this.

That is it except for this: Mr. Casey, are we talking about Rule 106 issues? Do they still live?

MR. CASEY: No, your Honor. With further discussions with the government, they produced a new version that I think

P7N1STO1

is acceptable to the defense.

THE COURT:  Sir, that is with respect to what I will call your exhibit 10, correct?  You told me there was a revised exhibit 10?

MR. CASEY:  Yes, your Honor.

THE COURT:  Sir, once again——and I know you said I'm wrong, but this time I might not be wrong——what you put down as exhibit 7 and the explanation you give does not pertain——the explanation you give for the introduction of your completeness portions of exhibit 7 does not in fact relate to that exhibit, so I'm denying it because you haven't told me.  You still keep talking about a conversation that took place a different year and a different month.  So I'll let you look back at that, sir.

MR. CASEY:  Thank you, your Honor.

THE COURT:  All right.  Thank you.

Let's do this, friends.  We're going to tell the jury we're going to go straight through till lunch today, so please take your restroom breaks now.  We'll tell the jury five or ten minutes we will sit.  They have been exceptionally patient. They're good people.  They understood that we had to address these issues.  I think some of them wanted to see what we were doing, but we'll just tell them we were doing stuff.

I'll see you in ten minutes.  Thank you very much.

THE DEPUTY CLERK:  All rise.

(Recess)

P7NVSTO2

(Jury present)

THE COURT:  Mr. Rehn, one moment.

Members of the jury, before we begin, I want to take a moment to thank you for your patience this morning.  As I mentioned to you in our preliminary instructions, sometimes issues come up, and sometimes they require argument.  And I could not have that argument in your presence.  So I really do appreciate your patience this morning.

We've worked through a number of things.  We have some clarity that will help the parties going forward.  We thank you for allowing us that time.

Mr. Werlau, I also thank you, sir, for your patience.  And we will resume your direct examination.

I know you know this, sir, but I'm just going to say it, because I am:  I want to be able to hear you.  And it's not you, it's us this courtroom is quite cavernous — and the acoustics, not so great.  So I'll ask you, please, to be louder and slower than you think you need to just so we all can hear you.

THE WITNESS:  Sure.

THE COURT:  Okay.  I'll let you get set up closer to the microphone.

And, Mr. Rehn, I will let you begin when you are ready.  I thank you, sir.

MR. REHN:  Thank you, your Honor.

PHILIP WERLAU,

     called as a witness by the Government,

     having been previously duly sworn, testified as follows:

DIRECT EXAMINATION (continued)

BY MR. REHN:

Q.  Good morning, Mr. Werlau.

A.  Good morning.

          MR. REHN:  If we could pull up again Government
Exhibit 3005-3.

Q.  Mr. Werlau, do you recall testifying about this
demonstrative exhibit yesterday?

A.  I do.

Q.  And you had identified the three different parts of Tornado
Cash?

A.  Yes, that's correct.

Q.  I believe we left off when we were talking about the third
part; correct?

A.  Yes, the smart contracts.

Q.  So I'd like to just go back into where we were talking
about the smart contracts before, and I believe we were looking
at 3005-14.

          Do you recall testifying about the December 2020
router yesterday?

A.  Yes, I do.

Q.  And could you remind us what the purpose of the

P7NVSTO2                          Werlau - Direct

December 2020 router was.

A.   Yes.  The December 2020 router implemented anonymity mining.  Anonymity mining was a system that rewarded users for leaving deposits deposited for longer.  This was important because the longer a deposit stayed in the system, the more anonymity it granted the user — not just the one who deposited, but all other users of the protocol.  And so they were rewarded with anonymity points which they could later redeem for TORN tokens.

Q.   So was Tornado Cash actually making payments to induce more people to leave deposits in the pools?

A.   "Payments" may not be the term I'd use, but they were distributing a system to receive tokens that had a monetary value.

Q.   Mr. Werlau, did you examine another change to Tornado Cash that took place after December 2020?

A.   Yes, I did.

Q.   What was the date of that change?

A.   On the second page.

          MR. REHN:  If we could go to Government Exhibit 3005-15.

Q.   And I didn't want the exact date, just the general range.

A.   Yes.  So that was on February of 2022.

          THE COURT:  Mr. Rehn, just one moment please.

          I think I know this, but I just want to be sure.  All

of the exhibits in the 3005 series are being introduced solely for demonstrative purposes?

MR. REHN:  Your Honor, I believe there will be one we will seek to admit as a summary chart, and I will identify it.

THE COURT:  You will let us know.  But, absent that, we understand it's being admitted for demonstrative purposes.

And, Mr. Klein, sir, may I also understand that you are not objecting to not -- I've used the term "admitted" incorrectly.  That these are being used for demonstrative purposes, meaning they are not being admitted into evidence, and you're not contesting their use as demonstratives.

MR. KLEIN:  That is correct, your Honor.

THE COURT:  Thank you so much.

We'll both know when there's the one that Mr. Rehn seeks to admit.  Thank you.

And, jurors, you now understand that as well.  These are demonstrative aids; they are not exhibits in the case.

Thank you so much.  Counsel, you may continue.

MR. REHN:  Thank you, your Honor.

BY MR. REHN:

Q.  So, Mr. Werlau, could you explain what the function of the February 2022 router was?

A.  The February 2022 router introduced the concept of the relay registry.  This required relayers to register on the platform in order to be recommended to users.

Q.  Did relayers have to make any payments to be included in that registry?

A.  Yes, that is correct.  Relayers would have to stake a certain number of tokens in a governance contract, basically lock up those tokens in order to be registered on the registry.

Q.  And did the Tornado Cash founders need any approval from anyone else to release a new router and connect it to the UI or the web application?

A.  No.  Control of the UI and CLI could change the path of entry so they were able to deploy a new router unilaterally.

Q.  Mr. Werlau, did you investigate the code for the smart contracts as it existed after the February 2022 router was released?

A.  Yes, I did.

Q.  And did you investigate how Tornado Cash deposits and withdrawals worked after that router was released?

A.  I did.

Q.  So I'd like to start with deposits.

        MR. REHN:  So if we could look at Government Exhibit 3005-16.

Q.  So I want to start at the web application or UI level.

        What are we looking at on the screen here first?

A.  On the screen we see the deposits page within the web application.  This is the screen in which they would use to make deposits.

P7NVSTO2                    Werlau - Direct

Q.  So could you just explain for us step-by-step how a customer would initiate a deposit into Tornado Cash.

A.  Sure.

So on the screen we see a label set token, and under that is a drop-down that lists ETH.  This is where we would pick the token that we want to deposit, supported ETH tokens, as well as others.

Second we would choose the denomination of the tokens to deposit.  Here, we see .1 ETH, 1 ETH, 10 ETH, and 100 ETH. We would then click the connect button to connect it to our wallet, and this would then allow us to initiate a transaction.

Q.  What, if anything, did the user receive from Tornado Cash when they clicked that connect button?

A.  So upon making a deposit, they would receive a secret note which would be used when making a withdrawal.

Q.  Did Tornado Cash retain a copy of the secret note?

A.  They did not.

Q.  What, if anything, is the significance of that?

A.  This means that only the user had access to their deposit, not Tornado Cash.

Q.  Could the web application have been designed to keep a copy of the secret note?

A.  Yes.

Q.  So was the decision not to retain a copy a design choice?

A.  That's correct.

MR. REHN:  Okay.  Let's go to Government Exhibit 3005-17.

Q.  So, Mr. Werlau, if you could explain for us what this chart represents after that customer initiated that deposit.

A.  So this diagram represents the flow of transaction information for a deposit, showing that the deposit first goes from the UI to the router.  The router then references the instance registry, and ultimately then deposits into the associated pool.

Q.  So the first communication from the router is to the instance registry?

A.  That is correct.

Q.  What is the instance registry?

A.  The instance registry holds a list or a registry of active and valid instances.  Those instances are the pools.  So making sure that if you're depositing into, for example, the 1 ETH pool, that that pool is present and valid.

Q.  So is a registry just a list of pools?

A.  Basically, yes.

Q.  Could that list be revised?

A.  Yes, updates could be made to the list.

Q.  Even though it was a smart contract?

A.  That's correct.

Q.  What would be the effect of revising that list?

A.  So updates could be made to add support for new

P7NVSTO2                      Werlau - Direct

cryptocurrency tokens, as well as new denominations of those tokens. Additionally, pools could be deactivated, restricting access to those pools from the router.

Q. So if a pool wasn't included in that list, would the router allow the deposit to go through?

A. No, it would not.

Q. Now, at this point in time, did the founders have the ability to control the instance registry?

A. Control of the instance registry was controlled by the governance.

Q. And what does that mean?

A. That means changes to the instance registry, as in adding new instances or disabling existing instances, required approval of the governance system. So votes had to be made, a proposal had to pass, in order for that to be done.

Q. I want to unpack that.

Who had the ability to vote on a proposal?

A. Proposals are voted on by holders of TORN tokens who had staked or locked up their tokens in the governance vault.

Q. Did you investigate any votes that took place in February of 2022?

A. Yes, proposal 10.

Q. And in connection with that proposal, how many TORN tokens voted?

A. I believe it's approximately 35,000.

Q.   And did you investigate how many TORN tokens the founders were in possession of at that time?

A.   Yes, approximately 800,000.

Q.   So what, if anything, does that tell you?

A.   Had the founders chosen to lock up their TORN tokens in the governance, they had enough tokens to swing a vote completely.

Q.   So aside from actually changing the instance registry that way, is there anything the founders could have done to replace the instance registry with a new version?

A.   Yes.  So as they had done in the times that they had deployed new routers, deploying an entirely new router, an entirely new instance registry, and then having the UI connect to these new instances would, in effect, replace the old ones. So that could be done unilaterally without directly a governance vote.

Q.   Okay.  What happens after the router connects to the instance registry?

A.   So once the router checks with the instance registry that the instance is valid, assuming it is, it then proceeds with the deposit.  Funds would be transferred from the user to the router, and then from the router to the instance pool.

Q.   Okay.  And I see at the bottom of the screen there's something called the pool.  Is that where the funds ultimately end up when they go through the router?

A.   Yes, that is correct.

P7NVSTO2                          Werlau - Direct

Q.   And so what is the function of the pool in this system?

A.   The pool ultimately holds the funds; it is also responsible

for the associated verification of withdrawals.

Q.   Now, I think you said that the deposit goes through the

router and then into the pool; is that right?

A.   Yes.  A review of the code shows that for a very momentary

instance the funds transfer from the user to the router, and

then instantaneously directed from the router to the pool

itself.

Q.   When that happens, is that visible on the blockchain?

A.   Yes.  Any transfer of assets emits an event that can show

who the sender and recipient of those assets were.

Q.   Does that allow you to distinguish between deposits that go

through the router and deposits that go through some other

mechanism?

A.   Yes, that is correct.

Q.   So when we were looking at the web application earlier, you

noted that there were four denominations of ETH listed on the

web application?

A.   Yes.  Correct.

Q.   Was there a separate pool for each of those?

A.   Yes, that's correct.  So each denomination had its own

pool.

Q.   Were those pools able to be changed in February of 2022?

A.   No.

P7NVSTO2                         Werlau - Direct

Q.   Why not?

A.   Those pools at that time were immutable.

Q.   What does that mean?

A.   It means that no changes could be made to the contracts controlling those pools after that time.

Q.   I believe you testified a moment ago that the instance registry could disable a pool.  If that was done, what would be the effect, if any, on a customer making a deposit using the UI?

A.   So to clarify, the instance registry disables the router's ability to communicate with the pool.  The pool is still present and, theoretically, you could go directly to the pool, circumventing the router.  But since the UI and the CLI direct it to the router, disabling the instance registry would disable your ability to access those pools from the UI.

Q.   Does that mean that the founders could create new pools?

A.   Yes, they could create new pools, add them to the instance registry, and have the router connect to those.

Q.   Now, I'd like to ask you about withdrawals.

Let's look at slide 3005-18.

What are we looking at now?

A.   What we're looking at here is the web application UI page for withdrawals.

Q.   And could you explain for us, looking at this image here, how the customer would withdraw funds from Tornado Cash?

P7NVSTO2                         Werlau - Direct

A.   Sure.

         So the first thing the customer would do is they would
provide the secret note.  This was the note that was provided
when they made a deposit and how the system associates the
withdrawal with their deposit.

         Next, they would establish the recipient address, the
address that's going to receive these funds.

         And then they could select a relayer, if they chose.
One would be chosen by default for them, and then they could
initiate the withdrawal.

Q.   I want to focus in on that last part where you're talking
about the relayer.  Here, below where it says "recipient
address," I see it says "current relayer."  Do you see that?

A.   Yes.

Q.   So were there more than one relayer in the network?

A.   Yes, that's correct.

Q.   Typically, how was the relayer selected for any particular
withdrawal?

A.   It changed over time; but once the relayer registry system
was introduced, relayers were chosen through what was called a
random weighted sampling.  So it was randomized, but with
greater odds that your relayer would be picked.  The more you
staked and the lower you charged those fees, to within certain
limits, the higher your likelihood of being chosen to be
recommended to the user.

Q.  I think you said that one of the factors was the more the relayer staked, the more likely they were to be chosen?

A.  Yes, that's correct, to a certain degree.

Q.  And could you remind us what you mean by "relayer staking"?

A.  So this involved the relayer locking their tokens up for a certain period of time.

Q.  Okay.  So after the customer clicks "withdraw," what does the web application do?

A.  So first on the UI side, the user interface will take that secret note and will use that to generate what's called a zero knowledge proof.  This is a way that we can prove to the system that we made the deposit associated with this withdrawal without revealing which deposit exactly.  So this information would then be sent to the relayer, and the relayer would bring this information onto the blockchain to communicate with the router and the smart contracts.

Q.  So let's look at 3005-19.

        And I see on the left-hand side of the screen the web application connecting to the relayer.  Is that the first step you just described?

A.  Yes.

Q.  So is it the relayer that actually moves that information onto the blockchain?

A.  That's correct.  The communication between the interface and the relayer happens over traditional web connections.

Q.  And so what happens after the relayer connects to the blockchain?

A.  So the relayer will submit it to the router.  Much like when we made a deposit, the router will check the instance registry to confirm that the pool we're interacting with is valid.  Next, it will check the relayer registry to confirm that the relayer in this case has, in fact, staked the recommended amount of TORN and has registered in the registry.

If they are not registered, this transaction -- there is a way to do customs, but through this process, this relayer would be rejected if they did not have the necessary TORN.

At this point, I believe we'll discuss this later, a certain number of their TORN tokens would be debited from their account.  And then finally, the withdrawal would be sent to the pool where the funds would be withdrawn, a portion would be sent to the relayer to compensate them for their service, and the rest of the funds would go on to the recipient.

Q.  I want to unpack that a little more.

So on the withdrawal side, if the pool is not listed in the instance registry, what happens?

A.  The transaction would fail.

Q.  That's the same as you describe on the deposit side?

A.  Correct.

Q.  And in the relayer registry, what happens if the relayer is listed there, but they don't have enough TORN tokens deposited?

A.   Again, they would also have their transaction rejected.

Q.   So both of those registries are programmed to be able to block the transaction?

A.   That's correct.

Q.   When was that relayer registry released?

A.   That relayer registry was involved in the February of 2022 update.

Q.   So was that released around the same time as the February 2022 router?

A.   That's correct.

Q.   And you said the recipient, they get some of the money back out of the pool; is that right?

A.   Yes.  Correct.  So the relayer will take a portion of the funds to compensate them for their services, both to reimburse them for the gas that they paid for, as well as a certain fixed fee.

Q.   Okay.  So we've talked through how the Tornado Cash deposit and withdrawal process actually worked.

        Did you also evaluate some potential changes that could have been made to the process?

A.   Yes, I did.

Q.   And can you remind us, in general, what would be the mechanism for implementing changes to this process?

A.   The mechanism would require a deploying use more contracts, such as a router, registries, and redirecting the UI and CLI to

P7NVSTO2                        Werlau - Direct

connect to these new contracts.

Q.  When you were evaluating some potential changes, what were the design objectives that you were considering?

A.  The primary design objective was to prevent bad actors from depositing and withdrawing from the network.

Q.  And did you identify any changes that could have achieved those design objectives?

A.  Yes, I did.

Q.  Based on your years of experience in web development, would the changes you identified have been apparent to a typical web developer in 2022?

A.  I believe they would.

Q.  Could you describe the changes that you identified.

A.  Yes.  So at a high level, the changes would involve establishing two new registries for user registry.  In addition, they would involve maintaining an off-chain database maintaining the connection between deposits and withdrawals.

        MR. REHN:  So if we could go to demonstrative 3005-20.

Q.  And I see in a different color now something called "User Registry."  Is that what you were just describing?

A.  Yes, that's correct.

Q.  So to be clear, this is something that's an alternative; this wasn't implemented.  Is that right?

A.  That's correct.

Q.  If you could just explain, again, what the user registry

P7NVSTO2                       Werlau - Direct

function would be in this process.

A.   Yes.   So the user registry, in our proposal, we would have the user create an account in the user interface.  This would be like any social media account, have a user name and password, and allow you to log in.

Once you did that, you would be able to associate wallets with your account.  And these wallets would then -- the Tornado Cash UI would update a user registry on the blockchain saying that this wallet is allowed to make a deposit.

MR. REHN:  And if we could go to 3005-21.

Q.   Mr. Werlau, could you explain how the user registry would work on the withdrawal side.

A.   Right.  So much like deposits, a user would log into their account on the user interface, associate a new wallet that they want to make a withdrawal to.  This would be recorded in an off-chain database, and then that address would be submitted to the user registry to approve withdrawals from that address.

Q.   Mr. Werlau, are web applications with user names and passwords a widely known concept in web development?

A.   Yes, it's a very common design pattern.

Q.   Could you give us an example of a web application that has like a user name and password system?

A.   Most social media.  Gmail, Spotify, these all have user name/password systems.

Q.   And is keeping records of user activity a common feature in

web development?

A.  Yes, very common.

Q.  Give us an example of that sort of a tracking user activity concept.

A.  Sure.  So going off the example of Spotify earlier, Spotify keeps tracks of things like user and listener behavior and, for example, at the end of the year can give you a summary of your listening behavior across the year.  So that information is drawn from tracking data throughout the year.

Q.  And was that a concept that was commonly understood in 2022?

A.  Yes, it was.

Q.  Now, this alternative you've described, would that still allow a Tornado Cash user to send money without revealing their transaction history publicly?

A.  Yes.

Q.  Why is that?

A.  Because the connection -- the information connecting deposit and withdrawal addresses would be maintained privately off the blockchain.

Q.  And was there anything about the way the design of the withdrawals was implemented that suggested to you that a user registry would have been an apparent solution?

A.  Can you repeat the question?

Q.  So looking at the diagram here, we see -- the contracts

that are in the black circles, are those examples of what actually existed?

A.   Yes, I understand.

So, yes, the existence of other registries which had the ability to deny transactions suggested that something like this could have been implemented.

Q.   If a system like this were implemented, what would that system allow Tornado Cash to do?

A.   So the system would allow Tornado Cash to both prevent bad actors from using the system, both on deposits and withdrawals; and if for some reason they were able to use the system, they would be able to reveal this information if they needed to.

Q.   So if Tornado Cash received an inquiry about a particular deposit, would they be able to provide information about that inquiry?

A.   Under the system I propose, yes, that's correct.

Q.   What sort of information?

A.   It would depend on what they collected.  At a minimum, they would be able to connect deposits and withdrawals, but they could also collect other information if they chose, such as IP address.

Q.   Okay.  Let's shift gears a little bit.

        MR. REHN:  I'd like to bring up Government Exhibit 3005-22.

Q.   So, Mr. Werlau, what does this represent?

P7NVSTO2                        Werlau - Direct

A.   This represents an example of deposits and withdrawals of the 100 ETH denomination, going through the February 2022 router.

Q.   And I think you described earlier that the deposits would go through the router into the pool?

A.   Yes, that's correct.

Q.   What about on the withdrawal side, would the withdrawals interact with the router as well?

A.   Yes, the request for the withdrawals would transit the router.

Q.   So on both the deposit side and the withdrawal side, are interactions with the router visible in the blockchain data?

A.   Yes, that's correct.

Q.   So from the user's perspective, is there a value to making a deposit that looks like other deposits based on blockchain data?

A.   Yes.   The main goal with using Tornado Cash is to blend in as much as possible with other users, blending in with the crowd.   And so by going through the router, you are making your transaction ununique and unremarkable from other transactions.

Q.   Did you look at some blockchain data for deposits and withdrawals after the February 2022 router was released?

A.   Yes, I did.

Q.   So I want to ask you about the idea of making a deposit directly to the pool without using the router.   Would it be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7NVSTO2                          Werlau - Direct

possible for someone to do that?

A.  Yes, it would.

Q.  Would it be something that the typical user of a web application would be able to do?

A.  No.  Using the web application, you would not be able to directly interact with the pool; it would go through the router.  You would have to take additional steps to interact directly with the pool.

Q.  Would those steps require any degree of technical sophistication?

A.  Yes, I believe they would.

Q.  But if someone managed to figure out how to do that, would you be able to identify that transaction from blockchain data?

A.  Yes.  If a user interacted directly with the pool, that transaction data would not show an interaction with the router, and that fact would make it unique from other transactions.

Q.  So I'd like to show you what's been marked as Government Exhibit 3003-B-B.

          MR. REHN:  And, your Honor, this has been stipulated as blockchain records pursuant to the blockchain stipulation.

          THE COURT:  All right.

          The designation again, please, sir.

          MR. REHN:  3003-B-B.

          THE COURT:  Oh, that is what you said.

          Okay.  Thank you.

P7NVSTO2                          Werlau - Direct

Mr. Klein, we've stipulated to this?

MR. KLEIN:  That's right, your Honor.

THE COURT:  Thank you so much.

Government Exhibit 3003-B-B is admitted into evidence and may be shown to the jury.

(Government's Exhibit 3003-B-B received in evidence)

BY MR. REHN:

Q.  Mr. Werlau, if you could just explain for us what this document is.

A.  This represents deposits into the Ethereum pool.

Q.  Into all four Ethereum pools?

A.  Yes, it's a combination of all four deposits, denominations.

Q.  And is this -- what's the time range on this document?

MR. REHN:  And, Mr. Iannuzzelli, you can start at the stop and scroll down.

A.  All right.  So the beginning time range starts September 1st of 2020, and ends August 8th of 2022.

Q.  So does this exhibit have blockchain data for all deposits that were made to those four ETH pools during that time period?

A.  Yes, that's correct.

Q.  How many deposits were there?

A.  There was over 140,000.

MR. REHN:  You can bring that down.

Q.  And now I'd like to show you Government Exhibit 3003-C-B,

which is also subject of stipulation.

THE COURT:  All right.  Government Exhibit 3003-C-B is admitted into evidence and may be shown to the jury.

(Government's Exhibit 3003-C-B received in evidence)

Q.  Mr. Werlau, what does this represent?

A.  This represents withdrawals to those same pools.

Q.  Withdrawals from the pools?

A.  Yes, withdrawals from the pool -- I mean the activity is going to the pools, but the withdrawal is coming from the pool.

Q.  I see.  I see.

A.  The funds are coming from the pool; the withdrawal transaction is going to the pool.

Q.  I see.  Because the user initiates the transaction.

A.  Yes.  Correct.

Q.  And does this represent that same time period we looked at?

A.  Yes, it does.

MR. REHN:  So, Mr. Iannuzzelli, if you could scroll down.

Q.  And, Mr. Werlau, if you could tell us approximately how many withdrawals there were from all four of those pools during the time period.

A.  There are listed over 130,000.

MR. REHN:  You can bring that down.

Q.  So, Mr. Werlau, is it safe to say this is voluminous data?

A.  I think that's a fair statement.

P7NVSTO2                          Werlau - Direct

Q.   I'd like to show you just for the witness and for the Court

and the parties what's been marked for identification purposes

as Government Exhibit 3009.

          Do you recognize this document?

A.   I do.

Q.   Does this document contain a summary of some data that was

in those two exhibits we just looked at?

A.   Yes.

          MR. REHN:   Your Honor, the government offers

Government Exhibit 3009.

          MR. KLEIN:   Objection.

          THE COURT:   The objection is overruled.

          Government Exhibit 3009 is admitted into evidence; may

be shown to the jury.

          (Government's Exhibit 3009 received in evidence)

          MR. REHN:   Mr. Iannuzzelli, if you could expand the

portion towards the top here, just the portion where we see the

chart.

Q.   Mr. Werlau, if I could ask you to explain what this chart

represents.

A.   Sure.   So this chart represents deposits and withdrawals to

the 100 ETH denomination pool from the time period of February

22nd of 2022 to August 8th of 2022.

Q.   Why did you pick that time frame?

A.   Specifically, this was the period after the relayer

registry was implemented.

Q.  And after that, February 2022 router was released?

A.  Yes.  Correct.

Q.  And so were you able to identify how many of those deposits and withdrawals involved the router and how many went directly to the pool?

A.  I was.

Q.  What were you able to identify?

A.  For the 100 ETH denomination during this time period, 100 percent of both deposits and withdrawals went through the router.

Q.  So did anybody come up with that idea of depositing directly to the pools during this time period?

A.  No.

Q.  Did anybody come up with the idea of withdrawing directly from the pools during this time period?

A.  Not from this specific pool.

Q.  Did you look at the similar data for the other pools during this time period?

A.  Yes, I did.

Q.  What was the general numbers for those pools?

A.  So we did find a handful of incidents in which there was direct interaction with the pool; but in all instances of all of the denomination pools, over 99 -- well over 99 percent of all transactions transited the router.

MR. REHN:  So let's bring back up Government Exhibit 3005-22.

Q.  Do you recall we were talking about this a few minutes ago?

A.  I do.

Q.  And is what's represented here users going through the router to access the pool?

A.  Yes, that's correct.

MR. REHN:  If we could go to page 2 of this exhibit.

Q.  What does this represent?

A.  So what this shows is the same numbers that we quoted earlier of the number of deposits and withdrawals that transited the router.  This is the example of those for the time period for the 100 ETH denomination pool.

Q.  And so if there are over 7,000 deposits and over 7,000 withdrawals, would that make it difficult to connect any particular deposits with any particular withdrawal?

A.  Yes, that's correct.

Q.  Why is that?

A.  Because all of these transactions look like each other; there's no uniquely identifying information that could allow you to pick one out from the others.

Q.  And, Mr. Werlau, in reference to that summary chart we were looking at a moment ago, I believe you said that there were no deposits that went directly to the pool during this time period?

P7NVSTO2                      Werlau - Direct

A.   Yes, that's correct.

Q.   If someone had deposited directly to the pool, would the blockchain data look the same as all of these deposits?

A.   No, it would be uniquely identifiable.

          MR. REHN:  So let's go to page 3.

Q.   What does this show?

A.   This represents hypothetical transactions that would occur directly to the pool; and in this case shows that none such events actually occurred.

Q.   And if somebody had done that, would they be able to obtain the value of blending in with the crowd that you described earlier?

A.   No.  If they were to both deposit and withdraw from the pool directly, they would be uniquely identifiable and distinguishable from other transactions.

Q.   Effectively speaking, wouldn't they actually be mixed with all those other deposits and withdrawals?

A.   No.

          MR. REHN:  Okay.  We can bring that down.

Q.   And if we can change topics.

          Mr. Werlau, did you also analyze the code to determine whether there was a way to monetize the service?

A.   Yes, I did.

          MR. REHN:  Let's put up Government Exhibit 3005-23 for demonstrative purposes.

Q.  Mr. Werlau, can you provide us with an overview of your conclusions regarding monetization.

A.  Sure.

So a cryptocurrency token called TORN was created for Tornado Cash.  This token served a purpose for the governance system, allowing holders to vote on proposals.  This token also held a value on the open market, so was a monetary reward for users of the system.  There were originally 10 million TORN tokens minted, of which a quarter or 2.5 million were distributed to the founders over a vesting period.

Later, these tokens were used in the relayer registry system, requiring relayers to lock up or stake their tokens in order to be registered.  As mentioned earlier, as relayers executed withdrawals, they would be compensated through a portion of the funds withdrawn; but, at the same time, they would also have a portion of their locked-up TORN tokens "burned" was the term used, but really they were moved to a governance folder for distribution to other TORN token holders who had locked up their tokens up for governance.

Q.  So I think what you testified yesterday about the first two points there, about the creation and distribution of the TORN tokens, do you recall that testimony?

A.  Correct.  Yes.

Q.  So let's just focus on the last three points.  We're dealing with the relayer registry.

Were you able to go back and look at historical versions of that web application to determine when the relayer registry was implemented?

A.   Yes, I was.

MR. REHN:   And if we go to Government Exhibit 3005-24 for demonstrative purposes.

Q.   What does this represent?

A.   So this represents the IPFS update to the ENS name that hosted the website.  And specifically what's highlighted by the red line is the update to the introduction of the relay registry.

Q.   What was the date that that was introduced?

A.   Yes.  The date for that entry is February 25th of 2022.

Q.   And was that close in time to the release of that February 2022 router we were discussing earlier?

A.   Yes, that's correct.

Q.   So let's look at Government Exhibit 3005-25, again, for demonstrative purposes.  Could you explain how a relayer would be included in the relayer registry?

A.   Yes.  So in order to be included in the relayer registry, there was a minimum number of TORN tokens that they were required to submit and lock up as a part of their registration process.

Q.   How many tokens did they have to purchase and put into the relayer registry?

A.   Without the number in front of me, I don't recall.  I believe it changed over time.

Q.   Was there any reason for the relayers to pay more than the minimum number of tokens?

A.   Yes.  As mentioned earlier, their chances of being selected for recommendation to a user was partially dependent on how many tokens they had locked up.

Q.   If we could look at Government Exhibit 3005-26, again, for demonstrative purposes.

          Could you explain what this represents.

A.   So this shows the relayer algorithm which was run by the UI web application to determine which relayer was going to be recommended by default to the user.

Q.   And so when a user opened this page, would a relayer be populated by default?

A.   Yes.  That's correct.

Q.   And would a relayer's amount of TORN staked increase their chance of being the default relayer for that withdrawal?

A.   Yes, within certain limits.

Q.   So let's look at Government Exhibit 3005-27, again, for demonstrative purposes.

          Could you just walk us through what this chart represents.

A.   So what this chart represents is the movement of TORN tokens from the relayers to the governance, and ultimately

distribution to TORN token holders.

Q.  And could you just walk us through how that works step-by-step.

A.  Sure.  So users of the relayer would pay fees to the relayer for their services for making withdrawal on their behalf.  Similarly, relayers would lock up their TORN with the relayer registry; and every time they made a withdrawal, a portion of those locked funds would be moved to the governance vault.  These funds were then eligible for distribution to other users who had staked or locked up their TORN tokens in the governance.

Q.  So if somebody owned TORN tokens, could they take advantage of this?

A.  Yes, that's correct.  If you own TORN tokens, you could lock them in the governance vault and receive distributions of TORN tokens.

Q.  Mr. Werlau, I believe you may have testified about this earlier, but did Tornado Cash users have to use a relayer to make a withdrawal?

A.  No.

Q.  Did you analyze any blockchain data to determine how many withdrawals did, in fact, use a relayer?

A.  Yes, in fact, I did.

Q.  Is that based on that same 3003-C-B exhibit that we looked at a few minutes ago?

A.  Yes, that's correct.

MR. REHN:  I'd like to now show just the witness and the Court and the parties Government Exhibit 3005-28.

Q.  Mr. Werlau, is this a chart that summarizes data that's in that government exhibit?

A.  Yes, that's correct.

Q.  And what's the date range here?

A.  The date range is listed as February 25th of 2022, until August 8th of 2022.

Q.  And was February 25th the day that that web app was updated to include the relayer registry?

A.  That is correct.

MR. REHN:  Your Honor, the government offers Government Exhibit 3005-28 as a summary chart.

MR. KLEIN:  Objection, your Honor.

THE COURT:  The objection is overruled.

Government Exhibit 3005-28 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 3005-28 received in evidence)

Q.  Mr. Werlau, I'd ask you to describe what we're looking at on this summary chart.

A.  So the summary chart shows a breakdown of transactions that used the relayer, did not use the relayer, or, as we are calling it, self-relayed their transaction, which means that the address sent as the relayer was the same as the recipient.

Q.   So of these transactions, which would be the ones that would generate those relayer fees and those relayer payments of TORN tokens to Tornado Cash?

A.   Right.   Those would be the transactions that used the relayer.

Q.   And so what percentage of overall withdrawals were those?

A.   94 percent of transactions utilized a relayer.

MR. REHN:   Bring that down.

Q.   I'd like to shift topics again.

Mr. Werlau, did you analyze the code and some blockchain data to determine how users accessed Tornado Cash?

A.   I did.

Q.   So I'd like to show you -- and this is -- show us all for demonstrative purposes Government Exhibit 3005-35.

So I see here sort of a big gray rectangle.   Do you see that?

A.   I do.

Q.   And are there some numbers along the bottom?

A.   Yes.   On the bottom on the X axis we have date and time listed, and that ranges from August of 2020 until September of 2022.

Q.   And so does this essentially represent values over time?

A.   Yes, that's correct.

Q.   And then what are the values that are represented on the left side of the chart?

A.  On the Y axis or the left-hand side of the chart is the gas limit.

Q.  What's the gas limit?

A.  So we have spoken recently -- previously about gas, this concept of any transaction on the blockchain requires a fee to be paid to the network.  This fee is dependent on the number of actions taken in transactions; so more complicated transactions require more gas.

There can be some variability in how much gas is required for a given transaction.  So the gas limit sets an upper bound on how many actions should be taken and, thus, how much it would cost to execute this transaction, essentially creating a cap preventing over-expense.

Q.  And for deposits to Tornado Cash, how was the gas limit typically set?

A.  So deposits to Tornado Cash, if they went through the UI or CLI, those limits would be set by the code in those programs.

Q.  Did you analyze the code for both the UI and the CLI?

A.  I did.

Q.  I want to start on the left-hand side of this chart.  I see towards the lower part a dotted red line.

MR. REHN:  And, Mr. Iannuzzelli, if we could just expand that.

Q.  It looks like it's the 1.2 million mark.  Do you see that?

A.  Yes, I do.

P7NVSTO2                     Werlau - Direct

Q.   What does that represent?

A.   This line represents a value of 1.2 million gas limit recorded.  And, specifically, this line represents the gas limit we'd expect from the UI during this time period.

Q.   Why would we expect the UI to have the deposits with a gas limit of 1.2 million during this time period?

A.   Our analysis of the source code during this time period revealed that the gas limit was set at a static value of 1.2 million.

Q.   Did there come a time where that changed in the UI code?

A.   Yes.

          MR. REHN:  And so, Mr. Iannuzzelli, if we could bring down that expansion.

Q.   And after that point in time, I see some solid red lines, do you see that?

A.   Yes.

Q.   What did those represent?

A.   The solid red lines represent the ranges of values that we would expect a gas limit to be.  So after a certain period of time, it went from being a static value to a range of values; and those red lines indicate the boundaries, the upper and lower bounds of those values.

Q.   And how were those upper and lower bounds identified?

A.   So an analysis of the source code revealed that at this time the code calculated the gas limit by estimating the amount

of gas that was going to be used in the transaction and then multiplying it by a factor.

Additionally, the exact ranges were determined by performing simulations.  My colleague Marshall Yale and I performed simulations to determine the upper and lower bounds of deposits using the code for that time period.

Q.  And I see that those red lines shift at different points in time.  At a high level, what do those shifts represent?

A.  The shifts represent changes that we determined either in the underlying protocol that changed the amount of gas that was used or in Tornado Cash that changed how that limit was calculated or the actions that were taken.

Q.  So we talked about the red lines.  I want to ask you about the green lines.

MR. REHN:  And, Mr. Iannuzzelli, if we could expand the dotted green line on the left-hand side so we can see the limit and the green line.

Q.  Do you see that, Mr. Werlau?

A.  Yes, I do.

Q.  What do the green lines represent on this chart?

A.  The green lines represent transactions that were initiated through the CLI or command line interface.  And so the dash line represents a static value of two million gas limit; and the solid green lines similarly represent a range of gas limit values, upper and lower bound.

P7NVSTO2                        Werlau - Direct

Q.  So was the gas limit originally hard-coded into the CLI?

A.  Yes, that is correct.

Q.  Is that the two million there?

A.  That's correct.

        MR. REHN:  You can bring down that expansion.

Q.  And then was there a period where there was calculation of a range, similar to what you've described with the user interface?

A.  Yes, that's correct.  At a certain period of time it was updated from a static value to similarly a multiple of the estimate of the gas use.

Q.  And is that what's represented by the solid green lines?

A.  That is correct.

Q.  So taking this chart, are we able to map any particular deposit that was made into Tornado Cash onto this chart?

A.  Yes.  Transaction information for deposits reports both the date and time, as well as the gas limit.

Q.  So let's take a look at Government Exhibit 3005-36, again, for demonstrative purposes.

        Mr. Werlau, what kind of a document is this?

A.  This is an example of an Ethereum transaction.

Q.  And is certain information on this highlighted?

A.  Yes.  We have highlighted the time stamp, so the date and time this transaction took place.  And at the bottom we have circled the gas limit reported for this transaction.

Q.   And does every transaction have a date and time and also a gas limit?

A.   Yes, that's correct.

Q.   And can we use those two pieces of information to place that on the chart?

A.   Yes, we can.

Q.   So let's look at Government Exhibit 3005-37.

What does this represent?

A.   The dot represents an example transaction mapped onto our graph for the date and time and gas limit.

Q.   And for this particular one, does it fall within the range you identified as being generated by the web application during that time period?

A.   Yes, that's correct.

Q.   So I think we've looked at some blockchain data a few moments ago for all the deposits into Tornado Cash during the time period.  Do you recall that?

A.   I do.

Q.   Can you remind us approximately how many deposits there were between September 2020 and August 2022?

A.   There were approximately 140,000 deposits.

Q.   So were you able to collect the date and the gas limit for every one of these transactions from the blockchain data?

A.   Yes.

Q.   And if you do that, would you be able to place a similar

dot like this on the chart for every single deposit?

A.   That is correct.

Q.   What would you generally expect that to tell you with reference to these lines?

A.   So we would expect that to tell us what distribution of users utilized the UI or CLI when interacting with Tornado Cash.

Q.   And if a majority of users were using the UI, what would you expect the dots to look like?

A.   Right.  So if the majority of users were using the UI, we would expect when it was a dash line, for that value to fall basically exactly on that line; and when they were solid lines, we would expect that value to fall somewhere in between those two red lines.

Q.   All right.  And did you actually do that exercise?

A.   Yes, I did.

         MR. REHN:  So if we could bring up Government Exhibit 3005-38 for demonstrative purposes.

Q.   What does this represent?

A.   This graph represents the same visual we've been seeing, but with all of the transaction history mapped onto the graph.

Q.   So just in terms of eyeballing it, what do you observe?

A.   So we see a very close association with the lines that we had drawn earlier.  So when we had dash lines, we see a solid line representing the dots falling perfectly within that value.

And when they switch to two lines, we see a spread of values almost perfectly within the bands.

Q. And so, again, looking at where that dotted red line was before, that $1.2 million mark -- 1.2 million gas mark, I should say --

MR. REHN: Mr. Iannuzzelli, if you could just expand that.

Q. Now, it looks like now to me is just a thick dark line. What does that actually represent?

A. There are so many dots placed on this dash line, it looks like a solid black line, but those are simply many, many, many deposits overlapping.

Q. And those are all deposits at the level that was fixed by the web application?

A. Yes, that's correct.

MR. REHN: And we can bring that down.

Q. So just eyeballing it, I see what you're saying. But were you able to actually quantify that information to determine how users access Tornado Cash?

A. Yes. We didn't just eyeball it. My colleague and I, Marshall Yale, ran simulations of transaction information to determine what the upper and lower bound of these deposits would be. So we ran those simulations using the code during these different time periods, and we simulated 1,000 transactions per denomination pool on the Ethereum ether pools.

Q.   And then were you able to compare that to this historical data that we're looking at?

A.   Yes, that's correct.

Q.   And so did you make a determination as to the percentage of users who use the web application?

A.   Yes.

Q.   So let's look at Government Exhibit 3005-39.

What does this show?

A.   So this shows a breakdown of the number of deposits that utilize the Tornado Cash UI, the CLI, and the percent that were unidentified.

Q.   And if you could just tell us what those percentages were.

A.   Yes.  Percentage that used the UI was 96.2 percent; percentage that used the CLI was 2.8 percent; and the percentage unknown was one percent.

Q.   And, again, is the UI the web application?

A.   Yes, that's correct.

Q.   Mr. Werlau, did you review some work done by another expert witness named Special Agent Joel DeCapua?

A.   I did.

Q.   And, in particular, did you look at a list of Tornado Cash deposits that Special Agent DeCapua identified as originating in certain criminal exploits?

A.   Yes, in fact, I did.

Q.   Were you able to map those particular deposits onto these

P7NVSTO2                    Werlau - Direct

charts we've been looking at?

A.  I was.

Q.  And in doing that, were you able to identify whether those deposits were made using the web app, the CLI, or some unidentified method?

A.  Yes, that's correct.

Q.  So I'm showing you what's been marked as Government Exhibit 3005-40.  And could you tell us what this represents.

A.  So here we see the chart from earlier with the values for the UI and CLI mapped out.  Additionally, all of these deposit transactions --

        THE COURT:  Slow down.  Slow down, sir.  Thank you.

A.  Specifically, what we see is these incidents mapped and highlighted directly on the graph.

Q.  And so just looking at this, do the transactions from these criminal incidents resemble other deposits on Tornado Cash?

A.  Yes, they resemble any other transaction that we identified.

Q.  Is there any -- do they appear to you to generally fall within the ranges that we've been looking at?

A.  That's correct.  They align very closely with the ranges that we identified.

Q.  So, Mr. Werlau, I'd like to focus your attention on the area on the right that says Ronin.  Do you see that?

A.  I do.

MR. REHN:  I think we've actually managed to zoom in on that part of the chart.  So if we could bring up Government Exhibit 3005-42.

Q.  What are we looking at here?

A.  We are looking at a zoomed-in section of the graph specifically related to highlight the Ronin hack deposits.

Q.  And are those deposits differentiated from the other deposits on this chart in some way?

A.  Yes.  The deposits related to the Ronin hack are highlighted in yellow to contrast them from other deposits that are blue.

Q.  So were you able to identify any patterns with respect to the Ronin hack?

A.  Yes, we identified two patterns:  The first was that all transactions fell within the boundaries of either the UI or the CLI; and the second was that at a certain period, the transactions went from lining up with activity with the UI to activity with the CLI, suggesting that their behavior shifted in which application they used, whether the web application or the CLI.

Q.  And so the red lines are the ones using the web application?

A.  Yes, the red lines are the web application, the green lines are the CLI.

MR. REHN:  If we go to page 2 of this exhibit.

Q.   Was there something that happened on April 14th of 2022?

A.   Yes.  On April 14th of 2022, sanctions were announced on the Ronin wallet.

Q.   Did you go back and look at versions of the web application from this time to identify if any changes were made?

A.   Yes, I was.  I did.

         MR. REHN:  And if we could go to Government Exhibit 3005-43.

Q.   Did you observe any changes of note around this time?

A.   Yes.  So this change which occurred on April 15th of 2022, has a note that reads:  Chainalysis Sanctioned Oracle introduced.

Q.   What does that mean?

A.   So the Chainalysis Sanctions Oracle was a source of information for sanction data.  So you could pull down a list of wallets which had been sanctioned.

Q.   And does the timing of that change in the web application correspond to the shift in behavior that you identified earlier?

A.   Yes, that's correct.

         MR. REHN:  If we could go to 3005-44.

Q.   Could you explain how that change to the web application worked.

A.   Sure.  So when a user went to interact with Tornado Cash and perform a deposit, the UI would reference the Chainalysis

Oracle to determine if the address in question was sanctioned on the sanction list. And if it was, it would reject the transaction.

Q. So I believe you testified earlier that there was an option to put changes into the smart contract architecture, is that right?

A. Correct.

Q. Do you recall we looked at a slide with a user registry here between the instances registry and the pool?

A. I do.

Q. For the change that was actually made in April, was it done that way?

A. No, the changes that occurred here occurred purely on the UI side, not on the blockchain side.

Q. Did you investigate the source code for the CLI?

A. Yes, I did.

Q. Was that same change implemented in the CLI?

A. It was not.

      MR. REHN: So if we could look at Government Exhibit 3005-45.

Q. So for deposits using the CLI, was there any change implemented whatsoever?

A. No.

Q. So did you form any opinions about the effect of the web application change in terms of ability to access Tornado Cash?

A.   Yes.  The changes that were made to the UI were minimally effective.  They could be fairly easily circumvented by using the CLI.

MR. REHN:  And if we could go to Government Exhibit 3005-46.

Q.   What does this represent?

A.   This represents the idea that, you know, if there are two doors to a building and you only close one, you're not preventing access.  And so they closed the UI door, but left the CLI door open.

Q.   Are there any other problems you identified with the change that was implemented to the web application?

A.   Repeat your question.

Q.   Besides this ability to shift to the CLI, would there be another way to avoid that change to the web application?

A.   Yes, you could go directly to the router.

MR. REHN:  And so I'd like to bring back up Government Exhibit 3005 — give me one moment — dash 20.

Q.   Do you remember we looked at this earlier?

A.   Yes, I do.

Q.   Can you remind us what this represents.

A.   This represents the user registry on deposits.

Q.   And this is an alternative that you identified; is that right?

A.   That's correct.  This is my proposed system to prevent bad

P7NVSTO2                          Werlau - Direct

actors from using the system.

Q.   So if this had been implemented, would somebody be able to go to the router to avoid any changes that were implemented at the user registry level?

A.   No.   Since this change occurs at the blockchain level, you could not circumvent it by going directly to the router.   This change is made after the router, and so it would be effective at blocking any transactions attempting to circumvent the UI or CLI.

Q.   Just to explain in a little more detail, how would the information in the user registry be populated?

A.   In my proposal, the owners of Tornado Cash, while also maintaining a database of this transaction information, would be responsible for maintaining updates to the user registry.

Q.   And so if they were aware that a particular user was identified with particular deposits, what would they be able to do?

A.   They would be able to invalidate their entry in their user registry and, thus, block their ability to interact with the protocol.

Q.   What if the deposit had already been made from that user, would they be able to do anything?

A.   If the deposit was already made, there was a user registry for withdrawals which would allow us to prevent a withdrawal of a misdeposit that we didn't catch.

P7NVSTO2                          Werlau - Direct

Q.   And what if the withdrawal had already been made, would
they be able to do anything?

A.   I don't know if I understand the question.

Q.   I'm sorry, I spoke a little fast.

     If the withdrawal had already been made, would they be
able to do anything with the information from the user
registry?

A.   I see what you're saying.

     Yes, because they would maintain transactions records
connecting deposits and withdrawals, they could at least reveal
the information of the source of those funds.

Q.   And, again, were user registries a common concept in web
development at this time?

A.   Yes, I believe they were.

     MR. REHN:  So we could bring that down.

Q.   Looking at the change that was actually made to the web
application in April, in your opinion, was that change easy to
bypass?

A.   Yes.

Q.   In your opinion, would that fact have been apparent to
someone who is familiar with how Tornado Cash worked?

A.   I believe it would.

     MR. REHN:  Nothing further, your Honor.

     THE COURT:  All right.

     Mr. Klein, thank you very much.

Just for myself, I'm just going to stand for a moment. My back is giving me a little trouble. So if anyone wants to stand, you're welcome to. Apparently no one else does. You're very kind, those of you who are just doing it in sympathy for me. All right. Thank you very much. Thank you, sir.

Mr. Klein, when you are ready. Thank you, sir.

MR. KLEIN: Just one second, your Honor.

THE COURT: Of course.

CROSS-EXAMINATION

BY MR. KLEIN:

Q. Good morning, Mr. Werlau.

A. Good morning.

Q. I want to step back and start at some basic concepts you were discussing scuffing with the prosecutor.

A. Okay.

Q. So you talked a lot about how -- I want to start off with some basics, just to re-center everybody. And you talked a lot about how users engage with Tornado Cash, right?

A. Yes.

Q. And it's something you've described as a mixer; correct?

A. Yes.

Q. That's in your slide, the word "mixer"?

A. Yes. It's an ill-defined term, but, yes.

Q. It's a term you used though?

A. It is. It is.

Q.   And you talked about ways people engage with Tornado Cash, right?

A.   Correct.

Q.   And, in essence, you said the most common way to engage was to go to the website, then engage with the UI, and then deposit the ETH into a pool; correct?

A.   My analysis of transaction history did, yes, reveal that the UI was the most common method of interaction.

Q.   And the website was public to anybody?

A.   Yes, it was publicly accessible.

Q.   Here in the U.S.?

A.   Yes.

Q.   Yes?

A.   Sorry.  Yes.

Q.   Okay.  And then you could use a relayer, but that was optional, right?

A.   Optional.  But if you wanted to maintain anonymity, it was necessary to do if you weren't going to use a new wallet without transaction history.

Q.   Okay.  And then you would deposit your funds into the pool if you used this process, right?

A.   Say that one more time.

Q.   If you used the UI, that was one way to deposit funds in the pool; correct?

A.   Yes.  Correct.

P7NVSTO2                        Werlau - Cross

Q.   And there was other ways to access the pools though, wasn't there?

A.   Yes, you could use the CLI --

Q.   I'd ask you just to answer my question yes or no.

A.   Yes, sir.

Q.   There were other ways to access the pool, weren't there?

A.   Correct.

Q.   One other method was the CLI, right?

A.   Correct.

Q.   That's short for command line interface?

A.   Yes, it's short for command line interface.

Q.   And the user -- there was a third way, too; correct?

A.   A user could interact --

Q.   Just --

THE COURT:  I'm sorry.

Just so that both the witness and the judge know, are you only asking him to answer your questions yes or no, unless it's obvious from the question?

MR. KLEIN:  I'll make that clear, if I need to, your Honor.

THE COURT:  We didn't know.  We now know.

Sir, he wants his questions to be answered yes or no or I don't know.

THE WITNESS:  Understood.

THE COURT:  Thank you so much.

Thank you, counsel.

BY MR. KLEIN:

Q. Yes or no, there was a third way to access the pools; correct?

A. Yes.

Q. And that way was to directly deposit funds into the pool?

A. Correct.

Q. You don't have to use the UI?

A. Correct.

Q. You don't have to use the command line interface?

A. Correct.

Q. Now, the user who's doing that, whatever method they choose, the UI, the CLI, the command line interface, or deposit directly, they control their ETH the whole time; correct?

A. Can you elaborate on what you mean by that?

Q. Sure. It's in a wallet they have, right? Is that right?

A. Yes. Yes.

Q. And from their wallet it goes directly to the pool; correct?

A. That is incorrect.

Q. From their wallet if they deposit directly into the pool?

A. Correct. If they were in turn track directly with the pool.

Q. And if they use the UI, it -- does the ETH get deposited into the UI? It doesn't, does it?

P7NVSTO2                      Werlau - Cross

A.   It doesn't get deposited into the UI, but it is -- sorry.

Q.   Okay.  The ETH doesn't get deposited into the command line interface, does it?

A.   It does not.

Q.   And once the ETH goes into the pool — so whatever way they choose, it's in that pool — the only way to access it is with the secret note; correct?

A.   Yes.

Q.   And the user who deposits their ETH into the pool has that secret note, right?

A.   Yes.

Q.   And unless they share it with somebody, no one else can get access to that ETH; correct?

A.   That is correct.

Q.   And so when they want to withdraw it, they need that secret note to withdraw the ETH; correct?

A.   Correct.

Q.   And they are the only one who can withdraw it if they are the only one who has the secret note, right?

A.   Yes, that is correct.

Q.   Now, these pools we've been talking about, they became what -- I'm going to use this term "immutable" in May 2020; correct?

A.   I do not recall the specific date they became immutable.

Q.   You know they are immutable, right?

A.  Yes, I know they are immutable.

Q.  You spent a lot of time researching Tornado Cash; correct?

A.  I did.

Q.  And one of the key features of Tornado Cash, if you looked at all the postings and all the Medium, was the fact that they were immutable; correct?

A.  Yes.

Q.  And you don't know that date?

A.  I do not recall off the top of my head what the date they became immutable.

Q.  Well, do you remember that it was sometime in 2020?

A.  Again, I do not recall the specific date.

Q.  Let's talk about what it means to be immutable and let's talk about the pools.

    So on this date they became immutable, which I'll just for purposes say it's May 2020, that means there can't be changes to the pools; correct?

A.  There cannot be changes to the instructions of the pools.

Q.  It can't be modified?

A.  There needs to be some caveat here.  When we say "immutable," the instructions are immutable, the data is not, and the flow of the instructions is dependent on the data.

Q.  The founders couldn't change the pools, could they?

A.  No, after they became --

Q.  That's my question.

P7NVSTO2                    Werlau - Cross

A DAO vote, a governance vote, couldn't change the pools, could it?

A. I don't know.

Q. No one could change the pools after May 2020; correct?

A. I don't know definitively the access the governance had to the pools.

Q. But you spent time researching this?

A. I did.

Q. Now, a lot of people talk about blockchains as being trustless. You've heard that concept before, haven't you?

A. I've heard the term.

Q. What does "trustless" mean to you?

A. "Trustless" means a reduction -- I mean, fully means no trust, but I take it to mean a reducing or minimizing of the number of parties you must trust to take an action.

Q. Ethereum is described as a trustless protocol, isn't it?

A. I have heard it described as such.

Q. And that's one of the largest protocols?

A. I believe so. I don't know, but I believe, yes, it is one of the largest --

Q. If I said it was the number two largest cryptocurrency blockchain, would that surprise you?

MR. REHN: Objection.

A. It would not surprise me.

THE COURT: I'll allow it.

P7NVSTO2                        Werlau - Cross

Sorry, I really don't want you testifying.  Thank you.

Q.  And Ethereum is well-respected?

MR. REHN:  Objection, your Honor.

THE COURT:  Sustained.

Q.  Ethereum is used by lots of people?

A.  I can speak to myself, but --

Q.  Sure.

A.  I use it, yes.

Q.  Now, your background includes a number of things in cryptocurrency, and one of them is doing code audits; correct?

A.  That's correct.

Q.  And one reason you do code audits -- well, explain what a code audit is.

A.  So they have different purposes, depending.  Typically, I'm doing a code audit for a vulnerability detection, finding vulnerabilities in the code and trying to repair them before it is launched.

Q.  And that's to prevent hacks and thefts?

A.  Correct.

Q.  And you do code audits for smart contracts; correct?

A.  That is correct.

Q.  And what's at issue here, the Tornado Cash, that's a series of smart contracts, right?  Part of it, the pools?

A.  Yes, that portion of it is smart contracts.

Q.  And so would one reason you would make the pools immutable

is to make them safe from hacks?

MR. REHN:  Objection.

THE COURT:  I'll allow.

A.  Can you reask the question.

Q.  Is one reason you would make the pools immutable to make them safe from hacks?

A.  I take issue with the word "safe."  It can reduce the attack surface within a protocol.

Q.  And the reason it does that is because they are immutable; correct?

A.  Correct.

Q.  And so one thing when these pools became immutable in May 2020, they became less subject to hacks, right?

A.  Yes, it reduced one of the ways it could be attacked.

Q.  So that means the founders couldn't go into the pools, right?

A.  That is correct.

Q.  In fact, no one could go into the pools except for the person with the secret note, right?

A.  Can you define "into the pool"?

Q.  No one could -- if I deposited my ETH into a pool and I had the secret note, I'm the only one who can withdraw it, right?

A.  That is correct.

Q.  So the founders -- there was no back door into these pools for the founders, right?

P7NVSTO2                         Werlau - Cross

A.   That I'm aware of.

Q.   There's no back door for anyone other than -- period.  The only person who could access was the person with the secret note, right?

A.   Correct.

Q.   So by making these pools immutable and providing just the user with the secret note, didn't that make the pools safer from hacks?

          MR. REHN:  Objection.

          THE COURT:  I'll allow.

          Yes, no, or I don't know.

A.   Can you repeat the question.

Q.   By making the pools immutable -- sorry.  I'm going to rephrase my own question, it was a little long.

          But by making the pools immutable and having the user be the one with the secret note, wasn't that making the user's deposit safer from hacks?

A.   Yes.

Q.   Let's talk for a minute about some of the things you reviewed.

A.   Okay.

Q.   You looked at GitHub; correct?

A.   Yes.

Q.   And you saw a number of repositories, right?

A.   Yes.

P7NVSTO2                    Werlau - Cross

Q.   And part of that you saw this was a Peppersec repository
for Tornado Cash, wasn't there?

A.   I do not recall specifically a Peppersec repository.

Q.   Do you recall whether that's where the Tornado Cash
governance proposals were held, code?

A.   I do not recall.

Q.   Or the relayer registry coding was held?

A.   The repositories I looked at were for the UI and the CLI
specifically.

Q.   You didn't look at other repositories?

A.   I did not.

Q.   You didn't look at the Tornado Cash governance repository?

A.   I didn't look at the repository, but I was given examples
of proposals.

Q.   Now, you talked about there were changes made to the UI and
the CLI, right?

A.   Yes.

Q.   You said, I think, there were many changes, right?

A.   That's correct.

Q.   So you must know that not all the changes were made by the
founders; correct?

A.   I did see certain commits made by other members.

Q.   In fact, there were many changes made to those by other
people; correct?

A.   I focused on the ones by the founders, but I did see

P7NVSTO2                          Werlau - Cross

others.

Q.  Okay.  And you must know, because you looked at all this,
that the DAO actually paid other community members to make
changes to the UI and CLI, right?

A.  That I have no knowledge of.

Q.  You didn't see that?

A.  Again, I focused on the portion that was related to my
testimony, so, no, I did not see that.

Q.  So you didn't look to see if other people were making
changes?

A.  I saw some of the changes, but my focus was on the changes
made by the founders.

Q.  And was that because the prosecutors directed you just to
look at what the founders did?

A.  No.

Q.  You just didn't look at others?

A.  Because it was specifically what I was looking at for,
yeah.

Q.  There was a large community of people involved with Tornado
Cash, wasn't there, beyond the founders?

A.  I personally don't know how large that community was, but I
know there were others beyond the founders.

Q.  Well, you said you studied Tornado Cash, right?  So you
must have seen the discussion boards?

A.  No, I had seen one or two postings for proposals, but I did

not generally see the form or look at general discussion on
Tornado Cash.

Q.  You looked at --

THE COURT:  Let him finish his answer, sir.

Thank you.

THE WITNESS:  I was finished.

THE COURT:  Thank you.

Now you may ask your next question.

MR. KLEIN:  Yes, your Honor.

Q.  You looked at Medium posts; correct?

A.  Yes, I looked at Medium posts.

Q.  Those are publicly posted; that's public, right?

A.  That's correct.

Q.  There was a lot of public information about Tornado Cash,
wasn't there?  The website was public?

A.  The website was public.

Q.  There was Medium posts about it?

A.  There was Medium posts about it.

Q.  There were discussion boards that were public?

A.  Yes.

Q.  Now, turning back to GitHub for a second, since the code
that you looked at, the CLI and UI, was on GitHub, people could
see it, right?

A.  Just to clarify, the UI code for a large period of the time
period we examined, only the minified version of the code was

available; we had to get a warrant process to get the full source code.

Q.  Glad you brought that up.

MR. KLEIN:  I'm going to object to the last part of that response.

Q.  But the minified code is still reviewable by someone like you, right?

THE COURT:  The objection is overruled, but go ahead.

A.  Reviewable, but more difficult.

Q.  But it's reviewable?

A.  Yes, but significantly more difficult.

Q.  It wasn't always minified either, was it?

A.  No.  Later the full source code did become publicly available.

Q.  Now, one thing you talked about with the prosecutor was design choices made by the founders; correct?

A.  Correct.

Q.  Now, and one thing you said was they could have made choices to require users to provide a lot of information; correct?

A.  Correct.

Q.  And you talked about how that's, in your experience, common; correct?

A.  Yes.

Q.  But you're aware a lot of things on the web don't require

P7NVSTO2                    Werlau - Cross

you to enter your personal information, right?

A.  Yes.

Q.  Things you use every day?

A.  A static website doesn't require login.

Q.  Let's talk about crypto for a minute.  You have a MetaMask wallet, don't you?

A.  I do.

Q.  Noncustodial wallet?

A.  Correct.

Q.  And what that means is that it's a place you can hold your crypto, right?

A.  Correct.

Q.  There's no registry required for that, right?  You don't have to provide your name or any information for that, do you?

        MR. REHN:  Objection, your Honor.

        There's multiple questions pending at this point.

        THE COURT:  Let's break it down, please.  Ask a question.

Q.  You don't have to provide your personal information for your MetaMask wallet, do you?

A.  That's correct.

Q.  You use Signal, don't you?

A.  Yes.

        MR. REHN:  Objection, your Honor.

        THE COURT:  I'll allow.

P7NVSTO2                      Werlau - Cross

Q.   What is Signal?

A.   Signal is a private messaging purpose.

Q.   It's encrypted, too, isn't it?

A.   Yes.

Q.   And that is encrypted so that the messages, when you send a message to someone else, it can be secured and no one else can look at it; correct?

A.   I'm not specifically familiar with all of the details of Signal.

Q.   You know it's encrypted?

A.   I believe so.  But, again, I'm not familiar with the details on exactly --

Q.   You don't have to give any information when you sign up for Signal, do you?

A.   I'm sorry, repeat that.

Q.   You don't have to give any information when you sign up for Signal, do you?

A.   I don't remember the sign-up process for Signal, so I can't say.

Q.   WhatsApp?

          THE COURT:  Move on, counsel.

Q.   Do you know what WhatsApp is?

          MR. REHN:  Objection, your Honor.

          THE COURT:  Sustained.

Q.   To use Ethereum, do you have to provide any information?

P7NVSTO2                          Werlau - Cross

A.   I would say yes.

Q.   Ethereum protocol requires you to enter your name?

A.   Well, I -- I would say that to use Ethereum, I need Ether.
And to obtain Ether --

Q.   The Ethereum protocol, I'm not talking about Ether.

A.   Okay.  No, the underlying protocol does not require your
name.

Q.   No information from you?

A.   I don't know if I would say no information; but no personal
information I think would be accurate.

Q.   There's nothing like the user registry you describe for
Tornado Cash, is there?

A.   That is correct.

Q.   There's nothing like that for Signal, is there?

A.   Again, I don't know the sign-up process for Signal, so I
can't speak to that.

Q.   Let's talk for a minute about the governance proposal
that's marked as Government Exhibit 1904.

          MR. KLEIN:  And that's admitted into evidence, your
Honor, so I'd like to pull that up.

Q.   Do you see that, Mr. Werlau?

A.   Yes, I see that.

Q.   So this describes Tornado Cash as a privacy solution;
correct?

A.   Yes, I see it.  It says it on the first line.

P7NVSTO2                         Werlau - Cross

Q.   And this was publicly posted?

A.   Yes, that's correct.

Q.   And it talks about one of the things you discussed was anonymity mining, right?  On page -- sorry, I'll flip over.

A.   Unfortunately, I don't see anything on this page.

Q.   Sorry, I thought --

A.   Yes, on this page -- oh, sorry.

Q.   Mr. DeMarco is not a mind reader, so I apologize.  That's my fault?

A.   I see a reference to anonymity mining on this page.

Q.   And the DAO has a role in anonymity mining, right?

        The DAO has a role in that mining process; correct?

A.   I'm unaware.  I'm not sure.  I'm unsure of the DAO's role in anonymity mining.

Q.   Governance pays for that, doesn't it?

A.   Again, I am unsure.

Q.   And you talked about -- I'm going to flip through here. And I'm sorry, I'm going to say the page in a minute.

        I think that's it for the moment on that, actually.

        Let's talk about the Tornado Cash website, which is Government Demonstrative 3005-5.  Do you recognize this?

A.   I do.

Q.   And you had concluded that Roman Storm controlled the website, right?

A.   That's correct.  Sorry.  Correction.  I determined that the

founders collectively controlled the website.

Q. And you're aware the founders had a company called Peppersec, right?

A. Yes.

Q. And you tied this to Mr. Storm because it was in his name, right?

A. That's correct.

Q. He also had a Twitter account in his name, didn't he?

A. I didn't review that personally.

Q. Let's talk about the router.

Remember your discussion about the router?

A. I do.

MR. KLEIN: There were a lot of demonstratives here, so give me a second. We can turn to, please, Mr. DeMarco, 3005-12.

Q. So that's one of the three smart contracts you talked about?

A. Repeat that. What was?

Q. The router is one of the three smart contracts you talked about?

A. Yes. Categories of contracts, but, yes.

Q. And the router just -- in essence, just pick which pool the user's ETH goes to; correct?

A. Not just. Again, it also referenced registries. But its main purpose was to direct transactions to their appropriate

pools.

Q.   And what is the Tornado Cash DAO?

A.   The DAO -- again, I did not look specifically at the DAO part, but a DAO, typically — it stands for decentralized autonomous organization — is the governance of a protocol, and it makes certain decisions and configuration changes.

Q.   You talked about a DAO proposal, right?

A.   Correct.

Q.   So you did look at some of it?

A.   Yes, in a specific instance, but not in its entirely.

Q.   Are you aware it came into existence in December 2020?

A.   I'm sorry, repeat the question.

Q.   Are you aware that it came into existence in December 2020?

A.   I don't recall the specific date it came into existence.  I would have to reference my notes.

Q.   Who controls the DAO?

A.   The DAO is controlled by all of the governance voters; so people who vote in the DAO, that would be TORN token holders who have locked their tokens up in the governance contract.

Q.   So not just the founders, anyone who has TORN?

A.   Correct.

Q.   And --

        THE COURT:  Please let him finish his answers.

        Thank you.

A.   But as mentioned earlier, the founders had enough tokens to

P7NVSTO2                        Werlau - Cross

make a swing vote in many of the proposals, had they wanted to.

Q.  You never saw the founders' vote, did you?

A.  Again, I only observed certain proposals of note, so I can't talk about all of them.

Q.  And in none of those they voted, did they?

A.  Again, I only reviewed specific examples, so I can't speak to the entirety of --

        MR. KLEIN:  Sorry, your Honor.

Q.  I'm asking about the examples you viewed.  The founders didn't vote in any of those.

A.  Yes.  In the example that I reviewed, the founders did not vote.

Q.  Examples or just one example?

A.  Sorry.  The example proposal 10 for the introduction of the relayer registry which we discussed earlier.

        (Continued on next page)

P7N1STO3                    Werlau - Cross

BY MR. KLEIN:

Q.  Were you only asked to look at one example?

A.  That was the one I focused on for my disclosure.  Again, I wouldn't feel comfortable discussing in detail any other proposal because I did not review it to the detail I did that one.

Q.  So are you aware that there were a number of DAO proposals?

A.  Yes.

Q.  And it was the governance mechanism for Tornado Cash, correct, for many of the things you talked about that could be changed, correct?

        MR. REHN:  Objection.

        THE COURT:  I'll allow.

A.  I'm sorry.  Can you repeat the question.

Q.  The DAO was the governance mechanism for many components of Tornado Cash, correct?

A.  Correct.

Q.  You only looked at one proposal.

A.  In detail.

Q.  Okay.  Did you look at proposal 13?

A.  I don't recall.

Q.  Would it refresh your memory if I showed it to you?

A.  Sure.

        MR. KLEIN:  I'd like to show what's marked as Defense Exhibit 8011.

P7N1STO3                     Werlau - Cross

THE COURT:  Just for the witness and the parties?

MR. KLEIN:  Yes, your Honor.  I'm sorry.

THE COURT:  Thank you.

MR. KLEIN:  Just for the witness.

A.  Do not recall seeing this proposal.

Q.  Let's talk about the relayers for a minute.

MR. KLEIN:  And we can turn to——and I hope I got this page right——3005-28.  Please.

No, that's not the page I was looking for, but——sorry. 3005-8.  My own handwriting is horrible.

Q.  Do you remember discussing this slide with the prosecutor?

A.  I do.

Q.  So the user picks a relayer, correct, through the registry?

A.  They can, but it is chosen for them by default.

Q.  It's optional to use a relayer, though.

A.  Again, if you're using a new wallet, no, but if you have existing Ethereum in the account, then yes, it's optional.

Q.  It's optional if you just deposit right into the smart contract, right?

A.  Deposits, yes.

Q.  And relayers are run by third parties, right?

A.  I believe so, yes.

Q.  And by that you meant not the user; the user doesn't also run the relayer, right?

A.  We report in our stats self-relayed.  We believe these were

just kind of people who reported the relayer as their own address, but yes, in essence, you wouldn't relay your own.

Q.  You used the term "we."  Who's the "we"?

A.  Sorry.  Marshall Yale and Jim Daniels help me put together some of the analytics, as I mentioned earlier.

Q.  You saw no evidence that the founders ran a relayer, did you?

A.  I saw no evidence to that.  I mean, but I——I also didn't look for that evidence.

Q.  That wasn't my question.  You saw no evidence they ran a relayer, did you?

A.  That's correct.

Q.  And the relayers set their own fees; isn't that right?

A.  To within limits, yes.

Q.  And the fees go to that relayer, not the founders, correct?

A.  That's correct.

Q.  You're aware that Tornado Cash had geoblocking, right?

A.  I'm aware that they had geo; they had the information.  I'm not specifically aware of blocking.

Q.  You're not aware that they blocked IP addresses——

A.  No.

Q.  ——from sanctioned countries?

A.  I know they included the chain link oracle, but that wasn't——that was for transactions, not necessarily visitation. If there was geoblock for visitation, I did not see that.

Q.   You didn't see it as instituted in June 2020?

A.   Again, I focused on the changes that were relevant to the portions of my disclosure, so while I reviewed everything, I didn't focus on every detail.

Q.   So you missed that.

A.   It might not have come up in my analysis.

Q.   You talked about a user registry as something——it's your proposal, correct?

A.   Correct.

Q.   And you talked about how this information could have collected personal identifying information, right?

A.   Correct.

Q.   And you talked about, well, you know this from your experience as an investigator that hackers target personal information held by——

          MR. REHN:  Objection, your Honor.

          MR. KLEIN:  I didn't even get my question out.

          THE COURT:  Ask your question.  Go ahead, sir.

Q.   You're aware from your role in cybersecurity investigation that hackers target personal information held by companies on the web, correct?

          MR. REHN:  Objection.

          THE COURT:  Sustained.

Q.   You talked about this UI, right?

          MR. KLEIN:  Oh, I might take a sip of water, too, your

P7N1STO3                    Werlau - Cross

Honor.  I was just——

THE COURT:  Of course, of course.  It seems to be the break for that, yes.

THE WITNESS:  Thank you very much.

THE COURT:  Of course.

MR. KLEIN:  Thank you.

BY MR. KLEIN:

Q.  You're aware that there were other——that Peppersec didn't have the only UI, correct?

A.  I don't know.

Q.  As part of your looking at this, did you look to see if there were other UIs?

A.  No.

Q.  You talked about an ENS name.  Do you remember that?

A.  Yes.

Q.  Can you remind the jurors what an ENS name is?

A.  ENS stands for Ethereum Name Service.  It is a plain-English readable, human readable name that can be used in place of things like a wallet address or, for example, a website, like the Tornado Cash web application.

Q.  And you yourself have an ENS name, don't you?

A.  I do.

Q.  And so if you know someone's ENS name, you can learn a lot about that person, correct, their ETH holdings?

A.  I mean, you can learn that from a wallet address.

Q.  So for example, from your ENS name, I can tell that you donated ETH to Ukraine in February 2022.

        MR. REHN:  Objection, your Honor.

        THE COURT:  Sustained.

Q.  I want to talk about the gas ratio.

        MR. KLEIN:  I want to turn to Exhibit 3005-35.  And again, I hope my penmanship is not horrible here.

        Yes.

Q.  You talked about—do you recognize this?

A.  Yes, I do.

Q.  This is the chart the prosecutor showed you before it got filled in with a lot of info?

A.  Correct.

Q.  And this relates to this, I'll call it the gas ratio analysis; is that a fair way to talk about it?

A.  Sure.  Gas limit, gas ratio.

Q.  Gas limit?  Sure.

        Now who helped you?  Who did you work with on this?

A.  I was assisted by Marshall Yale.

Q.  And where is he from?

A.  He's from BlockTrace.  He's also another consultant with the IRS.

Q.  And did he come up with this methodology?

A.  I believe this method—well, I don't want to speak to the methodology.  I—I can say what I believe, but I'm not for

sure.

THE COURT:  Do you recall which of the two, was it you or was it he, was it somebody else?

THE WITNESS:  It wasn't me.  I believe he received this from another case against one of the founders.  It was used in another——

MR. KLEIN:  Objection, your Honor.

THE COURT:  And I'm going to strike that.  I'm going to tell the jury to disregard that testimony.  That's——

MR. KLEIN:  Could we have a sidebar, your Honor, for a second?

THE COURT:  So we can avoid this?  Yes.

MR. KLEIN:  Well, we can keep going, your Honor, I guess.

Your Honor, sorry.  I'm fine to keep going

THE COURT:  Really?  I got down for nothing?  Okay.

MR. KLEIN:  I said it.  I apologize, your Honor.

THE COURT:  That's fine.  We're all good.

MR. KLEIN:  My apologies.

THE COURT:  No, it was another step day.  It's good.

Could you please reask your question so I know what the pending question is.  Thank you, sir.

MR. KLEIN:  Yes, your Honor.  I forgot it in that——

THE COURT:  Of course.  Take your time.

MR. KLEIN:  Let me start here.

BY MR. KLEIN:

Q.  So Mr. Yale, that's Marshall Yale, correct?

A.  Correct.

Q.  So he came up with this methodology?

A.  Again——

THE COURT:  I think he's saying Mr. Yale told him about it, sir.

THE WITNESS:  That is correct.  Mr. Yale informed me about this methodology.

Q.  And he learned it from someone else.

THE COURT:  Careful.  Yes or no.

A.  I don't know.

THE COURT:  Thank you.

Q.  You're not aware of this gas limit or gas ratio methodology being published in any journals, are you?

A.  Can you repeat the question one more time.

Q.  You're not aware of this gas——I'm going to call it the gas ratio analysis.  Is that okay if we just call it that——

A.  Sure.

Q.  ——for simplicity?  This gas ratio analysis hasn't been published in any journals, has it?

A.  Not that I'm aware of.

Q.  Or any peer-reviewed articles?

A.  Again, I don't know.

Q.  This is the first time you've used it?

A.   That's correct.

Q.   Do you know what the error rate is?

A.   No.

Q.   Have you subjected this to any type of scientific inquiry? Have you scrutinized it in any way?

A.   Yes.

Q.   Did you check for the error rate?

A.   No.

Q.   And you yourself have described this as an approximation, correct?

A.   That's correct.

Q.   Not exact?

A.   It is a conservative approximation.

Q.   Now one way to check if something like this methodology is accurate is to do a test of its reliability, right?

A.   Can you repeat that.

Q.   Were any tests done of the reliability of this?

A.   As I mentioned earlier, we ran simulations to determine the range so—

Q.   When you say "we," who's the "we"?

A.   Again, Marshall Yale, who assisted me in putting this information together.

Q.   Did you run the simulations?

A.   Yes.

Q.   And how many—you did 12 transactions.

P7N1STO3                          Werlau - Cross

A.  No.  Again, we did a thousand simulations per denomination pool per range.

THE COURT:  Counsel, if I may inquire.

Sir, you say per denomination pool per range.  What do you mean by the range, sir?

THE WITNESS:  I'm sorry.  So when I say denomination, there were pools for 1, 10, and a hundred, and per range, there were multiple bands, different time periods, so as the time period changed, we had to use different code to simulate it.

THE COURT:  So range is a temporal range.

THE WITNESS:  That's correct.

THE COURT:  Thank you for the clarification.

Counsel, you may continue.

MR. KLEIN:  Can I have a second, your Honor?  Sorry.

THE COURT:  Of course.

MR. KLEIN:  Thank you for your patience, everybody.

BY MR. KLEIN:

Q.  I guess I was asking about testing the transactions, with the gas ratio.

A.  What do you mean by testing them?

Q.  You tested it out 12 times, correct, or 12 transactions?

A.  Can you explain what you mean by test.

THE COURT:  Sir, are you distinguishing actual transactions from simulated transactions?

MR. KLEIN:  Yes.  He was confirming it based on 12

P7N1STO3                    Werlau - Cross

transactions.  Sorry if I wasn't clear.

A.  Right.  Yes, I did not perform transactions.  I personally did not perform any transactions.

Q.  You didn't test it actually?

A.  No.  I did not perform actual transactions onto the blockchain, personally.

Q.  So you never tested it?

A.  When you say tested, I did not actually execute a deposit onto the blockchain.  We simulated the code.  So when you say execution, this means running it locally.  It is the real code, it is actually running, it is——

THE COURT:  You didn't actually sign up for Tornado Cash and start doing transactions on Tornado Cash.

THE WITNESS:  That's correct.  I did not.

THE COURT:  Okay.  But you did simulations of transactions.

THE WITNESS:  That is correct.

THE COURT:  I don't want to speak for you, Mr. Klein, and you'll excuse me, you'll tell me if I'm wrong, but——I think what he's asking you is whether you actually took a transaction that really happened in real life and did some test to see if you knew through what medium it was implemented, whether you went and like, if you thought it was done through the UI, you're going to use your test and see whether it shows up on UI.

Mr. Klein, am I saying correctly what you're asking?

MR. KLEIN:  Yes, your Honor.

THE COURT:  Okay.  So that was a long question, but I think you know what I'm saying.  Okay.  Did you do any tests using transactions that had actually happened to see if, knowing whether they were UI, CLI, or directly, whether they ended up falling into the mechanism that you had set up?

THE WITNESS:  And we used real data.  That's what's plotted.  That's 140,000 transactions.  But are you asking if we actually ran a transaction and saw where it landed in our graph?

THE COURT:  Yes.

THE WITNESS:  I personally did not.  I believe Marshall Yale or someone assisting him did.

THE COURT:  Okay.  But you're also telling us, sir, that neither you nor Mr. Yale ever set up a Tornado Cash account to actually do a transaction.

THE WITNESS:  I can't speak for Marshall Yale.  I personally did not do an actual Tornado Cash transaction on the live network.

THE COURT:  Okay.  Sir, I thank you so much, and please continue.

MR. KLEIN:  Yes.

BY MR. KLEIN:

Q.  You talked about your user registry, right?

A.   In the proposal, yes.

Q.   Yes.  And that would require handing over a certain amount of personal information, correct?

A.   User name and password at a minimum.

Q.   So whatever it was.  One design choice the founders made was not to collect people's personal data, correct?

A.   I don't know the design decisions they made at the beginning.

Q.   Well, there was no—you suggested this as a proposal because that wasn't happening, right?

A.   Right.

Q.   So one design choice they made was not to collect people's personal information, correct?

THE COURT:  I think the dispute, sir, is:  Do you mean at the beginning of the founding of Tornado Cash or at the time he's looking at it?

MR. KLEIN:  At any point.

Q.   They weren't collecting people's personal information, were they?

A.   Not to my knowledge.

MR. KLEIN:  Nothing further, your Honor.

THE COURT:  Okay.  Brief redirect?  Briefest of redirect?

MR. REHN:  Just one moment, your Honor.

Nothing further, your Honor.

THE COURT:  You may step down, with your water.

(Witness excused)

THE COURT:  All right.  The next government witness, please.  Yes?  Are we ready?  We have someone?

MR. ARAD:  We do.

THE COURT:  Please call them.

MR. ARAD:  The government calls Moz Mirbaba.

THE COURT:  And, Mr. Arad, I obviously know nothing about these things.  Would the direct take us to lunch?

MR. ARAD:  Yes.

THE COURT:  Okay.  Would the direct take us past lunch?

You know what, never let it be said that I'm not a generous woman.  Let's break for lunch now.  Is that all right, Mr. Arad?

MR. ARAD:  That's fine.

THE COURT:  That is the correct answer.

All right.  We'll take a 45-minute break for lunch now, which gets us to 1:05, because we did push forward and I was mean and didn't let you take a break this morning.  So we're going to resume at 1:05.  I'm going to ask you to have great lunches and not to discuss this case with each other or with anyone else and to keep an open mind until all of the evidence is in.

All rise for the jury, please.  Thank you.

P7N1STO3

(Jury not present)

THE COURT:  Just very briefly.  And you're welcome to remain standing or sitting as you see fit.

Mr. Klein, perhaps we should have had an understanding that any member of the team who needs to run to the restroom can run as long as the remainder of the team stays.  We could have done that, and now we know that, so if I see you running out like I saw Mr. Rehn running out yesterday, I won't think that people are abandoning my case.

Just secondly, while I have your attention, will we finish Mr. Mirbaba?

MR. ARAD:  Yes.  His testimony won't be very long.  It would have taken us into lunch, but it's not going to be long testimony.

THE COURT:  That's fine.  And then after he?

MR. ARAD:  Stephan George will be testifying.

THE COURT:  Okay.  And do you think Mr. George takes us through the afternoon or we go beyond?

MR. REHN:  How late are we planning to go today?

THE COURT:  Well, I have a 4:00, so I was planning on stopping at 3:45 because it's a very delicate 4:00.  So that is my plan.  And I think the jury will be happy to go as well by that point.  So, I mean, you're not resting today, are you?

MR. REHN:  Well, we are unlikely to.  So we've been promised vigorous cross of Special Agent George.

P7N1STO3

THE COURT:  Of course.

MR. REHN:  So——

THE COURT:  I'm looking forward to it, yes.

MR. REHN:  So we have two more witnesses after him, but they're relatively short.

THE COURT:  Okay.  So we're finishing tomorrow morning.

MR. REHN:  I would expect so, your Honor.

THE COURT:  Okay.  All right.  Mr. Klein.

MR. KLEIN:  Briefly, your Honor, we anticipate our case being two to three days unless our client chooses to testify, and then it may go three to four, and our first witness is going to be——I don't want this name——I know it's going to cause a reaction, your Honor——Preston Van Loon, but he's not talking about the Van Loon case.

THE COURT:  He better not.  I will stop him.  He will never mention that case.  That is the case that dare not speak its name in this courtroom.

Okay.  Fine.  It's Mr. Van Loon.  And then after he?

MR. KLEIN:  That is a decision point still, your Honor, but you asked for the first name and the approximation, so I'm——

THE COURT:  But if the government's resting tomorrow, I need to know all of your witnesses for tomorrow and so do they.

P7N1STO3

MR. KLEIN:  And we will do that, your Honor.  We just have to have a talk at lunch, etc.

THE COURT:  One more question, just while I'm keeping you all.  Do I really have a motion tomorrow on the Chainalysis subpoena, or have you worked things out with them?  They gave you 7500 documents, 7500 pages, sir.

MR. KLEIN:  I understand, your Honor, and someone is speaking to them, I think maybe as we speak even, about it.  We're meeting and conferring and trying to resolve it short of——none of us want that hearing if we don't need it, I promise you, so we are trying to resolve that.

THE COURT:  When will we know?  Will we know today?

MR. KLEIN:  I think so.  I'm not on that phone call, your Honor, so I plan to call my colleague afterwards.  Supposedly we'll know, but I have to check.

THE COURT:  All right.  Anything else?

Yes.  Hi.

MR. MOREL:  Christopher Morel for Mr. Storm.

THE COURT:  Great to see you.  Hello.

MR. MOREL:  Thanks, your Honor.

Just two points with respect to Mr. Mirbaba.  First, we want to renew our objection to the admissibility of his testimony because we believe it's based entirely on hearsay.  Upon reviewing the 3500 material——

THE COURT:  Slow down please just for court reporter

P7N1STO3

and judge.  Thank you.

MR. MOREL:  Sorry.  Upon reviewing 3500 material, it's clear that Mr. Mirbaba never contacted Tornado Cash. Everything he learned about Tornado Cash was——

THE COURT:  I'm sitting down for this.  Go ahead.

MR. MOREL:  Everything he learned about Tornado Cash was through communications with a friend, who in turn hired a private investigator or detective.  Mr. Mirbaba never had any communications with this private investigator or detective.  So again, we believe the testimony is based entirely on hearsay and shouldn't be allowed.

THE COURT:  All right.  Mr. Arad, may I understand, who is this witness in the taxonomy of witnesses in this case?

MR. ARAD:  This witness was the victim of a cryptocurrency crime where the——

THE COURT:  A wire fraud ala Ms. Lin or a hack ala Ronin Bridge?

MR. ARAD:  It was a hack, your Honor.

THE COURT:  Okay.

MR. ARAD:  And the proceeds of the hack were eventually, at least in part, sent through Tornado Cash.

THE COURT:  And we know this how, please?

MR. ARAD:  Special Agent DeCapua included that in his analysis.

THE COURT:  Okay.

MR. ARAD:  I think that answers your Honor's question.

THE COURT:  All right.  Then the objection is overruled.

And the other point, sir, Mr. Morel?

MR. MOREL:  Yes.  We saw quite a bit of mention of collateral consequences in Mr. Mirbaba's 3500 material.  We emailed the government about it yesterday evening.  We want to make sure that when he's on the stand, he's limited to a yes or no type answer that your Honor has allowed for the other——

THE COURT:  Yes.  Having previously been known as the Patton rule, yes, he gets the one question about the substantiality of the losses.

MR. ARAD:  I've spoken with the witness about that, your Honor.

THE COURT:  Okay.  He's spoken with the witness about that, sir.

MR. MOREL:  And the last issue, which we will confer with the government about, we may be missing a piece of the 3500 material for Mr. Mirbaba.  The last we had was ending 024 and we this morning got 3500 material that ends 026, so not sure what happened with 025.

THE COURT:  Great question.

MR. ARAD:  We will look into it immediately.

THE COURT:  Okay.  Thank you.

Anything else?

P7N1STO3

MR. MOREL:  Nothing else, your Honor.

THE COURT:  All right.  I'll see you in just under 45 minutes.  Thank you.

THE DEPUTY CLERK:  All rise.

(Luncheon recess)

P7N1STO3                         Mirbaba - Direct

AFTERNOON SESSION

1:16 p.m.

(Jury present)

THE COURT:  Please be seated, everyone.  Thank you so much.

Government, please call your next witness.  Thank you.

MR. ARAD:  Government calls Moz Mirbaba.

(Witness sworn)

THE DEPUTY CLERK:  Please be seated and into the microphone, please state and spell your full name for the record.

THE WITNESS:  Mazyar Mirbaba.  M-A-Z-Y-A-R, last name M-I-R-B-A-B-A.

THE COURT:  Sir, thank you very much.  That microphone does adjust a little bit if it's easier for you.

THE WITNESS:  Is that good?

THE COURT:  We'll let you know if it's not.

Counsel, you may inquire.

MAZYAR MIRBABA,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ARAD:

Q.  Good afternoon, Mr. Mirbaba.  Where are you from, sir?

A.  I live in Denver, Colorado.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.   What do you do for a living?

A.   I work in insurance claims in the finance department.

Q.   Did there come a time when you became the victim of a cryptocurrency crime?

A.   Yes.

Q.   Approximately when was that?

A.   This was in April of 2021.

Q.   Are you familiar with something called Uranium Finance?

A.   Yes.

Q.   Was this involved in that crime?

A.   Yes.

Q.   How did you first learn about Uranium Finance?

A.   I was——I learned about it through some friends that were investing in this project.

Q.   And what was the project, as you learned about it?

A.   You would basically deposit your money into this portal and they would generate a yield, just like you would at a bank.

Q.   Did you understand this to be an investment?

A.   Yes.

Q.   Had you ever invested in crypto before you started learning about Uranium Finance?

A.   Yes.

Q.   When did you start?

A.   It was in about 2016.

Q.   And what was the extent of your investment in crypto?

A.   I had just dabbled in investing in a couple of crypto
tokens, Ethereum.

Q.   And after you made that investment in 2016, did you do much
with crypto?

A.   No.

Q.   Until you heard about Uranium Finance?

A.   Yes.

Q.   What made you decide to get involved in Uranium Finance
after you learned about it?

A.   I had two friends that were pretty savvy in investing, and
they had done their research, and they convinced me that it was
a good investment.

Q.   So you invested?

A.   Yes.

Q.   How much did you invest?

A.   A hundred thousand dollars.

Q.   After you invested was there a way that you could check on
your investment to see how it was doing?

A.   Yes.

Q.   How did you do that?

A.   You would go into the portal and you would have a digital
wallet that's connected, and you could see the yield that
you're generating on a daily.

Q.   The yield was the profit?

A.   Correct.

Q.   How often did you check?

A.   Every day.

Q.   And how was it doing in the first few days?

A.   It was——it was doing really good.

Q.   Did there come a time when it wasn't doing well anymore?

A.   Yes.

Q.   When was that?

A.   Within seven days of the investment, I had come to learn that all the funds had been siphoned out and stolen.

Q.   Do you have any understanding of where the money went after it was stolen?

A.   Yes.

Q.   Where?

         MR. MOREL:  Objection.

         THE COURT:  I'll allow.  Counsel, and there was a limiting instruction for other witnesses of this type.  Would you like me to read it?

         MR. MOREL:  Yes, your Honor.

         THE COURT:  Thank you.  I'll wait till I get an answer.

         MR. ARAD:  One moment, your Honor.

         THE COURT:  Of course.

         MR. ARAD:  Your Honor, I can withdraw the question.

         THE COURT:  Thank you.

BY MR. ARAD:

Q.  Did you ever contact the authorities about this?

A.  Yes.

Q.  Who specifically among the authorities?

A.  FBI.

Q.  And did you ever get your money back?

A.  No.

MR. ARAD:  No further questions.  Thank you very much, sir.

THE COURT:  Mr. Morel?

MR. MOREL:  No questions, your Honor.

THE COURT:  And therefore no redirect?

MR. ARAD:  No redirect.

THE COURT:  Okay.  See, I'm pretty clever like that.

Sir, we thank you very much for your patience, and you may step down.

THE WITNESS:  Thank you.

(Witness excused)

MR. MOSLEY:  Government calls Special Agent Stephan George.

THE COURT:  Thank you.

(Witness sworn)

THE DEPUTY CLERK:  Please be seated and into the microphone, please state and spell your full name for the record.

THE WITNESS:  My name is Stephan George.

P7N1STO3                       George - Direct

S-T-E-P-H-A-N, last name G-E-O-R-G-E.

THE COURT:  Counsel, You may inquire.

MR. MOSLEY:  Thank you, your Honor.  First I'd like to move a few documents into evidence.  The first is Exhibit No. 1213, which would be admissible as finance transaction records, which would be admissible pursuant to the Binance declaration, which is Government Exhibit 1215.

THE COURT:  All right.  And Ms. Axel, is there an objection to that?

MS. AXEL:  Continuing objection, your Honor.

THE COURT:  All right.  Thank you.  That objection is overruled.  Government Exhibit 1213 is admitted into evidence.

(Government's Exhibit 1213 received in evidence)

THE COURT:  Mr. Mosley, are there additional exhibits at this time?

MR. MOSLEY:  There are a couple more, your Honor. Just two.  One is Government Exhibit 1276, which is Google records, which are admissible pursuant to a stipulation between the parties, stipulation S2.

THE COURT:  Okay.  And Ms. Axel, the same objection?

MS. AXEL:  Accepting counsel's representation we've stipulated to this, no, your Honor.

THE COURT:  Thank you.  Government Exhibit 1276 is admitted into evidence and eventually will be shown to the jury.

(Government's Exhibit 1276 received in evidence)

THE COURT:  And the last of the exhibits, sir?

MR. MOSLEY:  Is Government Exhibit 654, which are a series of GitHub records, which are admissible pursuant to the GitHub declaration, which is Government Exhibit 673.

MS. AXEL:  That would be pursuant to the continuing objection, your Honor.

THE COURT:  All right.  And that is also admitted. Government Exhibit 654 is admitted into evidence.

(Government's Exhibit 654 received in evidence).

THE COURT:  Mr. Mosley, you may begin.  Thank you.

MR. MOSLEY:  Thank you, your Honor.

STEPHAN GEORGE,
     called as a witness by the Government,
     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MOSLEY:

Q.  Good afternoon, Special Agent George.

A.  Good afternoon.

Q.  How far did you get in school?

A.  I earned a bachelor's degree in accounting and a master's degree in accounting.

Q.  Do you use those in your job?

A.  I do.

Q.  Do you have any professional certifications?

A.   Yes.  I took the examination for the certified fraud examiner's designation, and I am currently a certified public accountant since 2013.

Q.   You say you took the certified fraud examiner's examination.

A.   Yes, that's correct.

Q.   Did you pass?

A.   I did pass.

Q.   And do you use these professional certifications in your job?

A.   I do.

Q.   Where do you currently work?

A.   I currently work for IRS Criminal Investigation as a Special Agent.

Q.   Is IRS Criminal Investigation also known as IRS-CI?

A.   Yes, it is.

Q.   So if I refer to IRS-CI, you'll know what I'm talking about?

A.   Yes.

Q.   And I believe I said this, but what's your title?

A.   My title is special agent.

Q.   And what are your duties as a special agent for IRS-CI?

A.   Sure.  As a special agent, a special agent in general is a law enforcement officer that investigates crimes, criminal activity.  As a special agent with IRS criminal investigation,

I investigate financial crimes, so violations of tax laws, money laundering laws, and other related financial crimes.

Q.   And how long have you been a special agent at IRS-CI?

A.   Since approximately 2016.

Q.   And are you part of any specific group or unit?

A.   Yes.  I've been assigned to our national cybercrimes unit based out of our Washington, DC, field office.

Q.   What is the national cybercrimes unit?

A.   The national cybercrimes unit is a group comprised of agents who have approximately three responsibilities, generally speaking.  The types of cases that we investigate are focused specifically on crimes that have utilized virtual currency and digital assets.  We also give guidance and assistance to other agents in the——in the nation who need help with their virtual currency cases.  And we also take on opportunities to be able to teach the public and teach other agents in how to investigate these types of crimes.

Q.   When did you join that unit?

A.   Last year.

Q.   Did you have to meet any specific qualification and guidelines to become part of that unit?

A.   Yes.  You have to interview for a position on that unit and you have to have a level of experience——investigative experience specifically——that would be appropriate for the kind of expertise in that unit.

Q. You mentioned I believe investigations into virtual currency. During your time at IRS-CI have you worked on investigations related to virtual currency?

A. Yes.

Q. For the purposes of this conversation, is there a relationship between virtual currency and cryptocurrency?

A. For the purpose of this conversation, they're one and the same.

Q. About how many cryptocurrency investigations have you worked on?

A. As a lead case agent, I've worked approximately 20 to 25 virtual currency investigations. However, with my other roles, I have investigated over hundreds of investigations related to virtual currency.

Q. Can you talk a little bit about what those other roles are, or were.

A. Sure. There was a period of time that I was assigned to assist the FBI with terrorism cases and counterintelligence cases and their use of virtual currency in those types of cases. I'm assigned as a task force agent on a DEA working group focusing on narcotics trafficking using virtual currency. I'm also subject matter expert internally for IRS-CI on virtual currency tracing and money laundering to be able to assist other agents if they have questions on how to work their cases. And I was also the cybercrimes coordinator for the Miami field

office whereas the responsibility that I had was to help agents and to oversee and give guidance within the Miami field office on their virtual currency investigations as well.

Q.  So have you been working on cryptocurrency and virtual currency cases even before you were in the cybercrimes unit?

A.  Yes, extensively.

Q.  Did those investigations involve cryptocurrency tracing?

A.  Yes.

Q.  How many of them?

A.  All of my investigations involving the use of virtual currency required me to do virtual currency tracing.

Q.  So as a percentage, that would be what?

A.  A hundred percent, approximately.

Q.  At a high level, what is cryptocurrency tracing?

A.  Cryptocurrency tracing is following transactions that occur on the blockchain utilizing these virtual currencies.

Q.  And very briefly for the jury, and I mean very briefly, what is a blockchain?

A.  The blockchain is a database of record of transactions.

Q.  What purpose does cryptocurrency tracing serve in your investigations?

A.  Cryptocurrency tracing in my investigations tells me who benefited from a crime, where did it go, what happened to it, where did it come from, it gives me information about the scheme itself and what happened.

P7N1STO3                        George - Direct

Q.  Did your cryptocurrency tracing involve the use of any special tools?

A.  Well, I use a lot of the publicly available blockchain explorers and I also use blockchain analytic software that takes the same information that's in the publicly available websites but it puts it into a visual format that's easier for me to look at.

Q.  And those tools, are they also available to the public?

A.  Yes, they are, for purchase.

Q.  And do you use any specific tools in your crypto tracing?

A.  Yes, I extensively use Chainalysis Reactor and TRM Labs.

          THE COURT:  The last one, please, sir?

          THE WITNESS:  TRM labs.

          THE COURT:  Thank you so much.

Q.  And do you conduct tracing exercises for—or let me ask you this question.  Special Agent George, are you familiar with the term fiat currency?

A.  I am.

Q.  What is that?

A.  Fiat currency is like the money in your pocket.  It's the—the dollar bill.  It's the—the U.S. dollar is an example of fiat currency.

Q.  And do you do investigations that involve tracing cryptocurrency and fiat?

A.  Yes, I do.

Q.  Do you often do any of those investigations involving crypto and fiat at the same time?

A.  Yes, I do.

Q.  How often?

A.  Very often.  Because in general, most——most users of virtual currency would like to eventually turn their virtual currency into fiat to be able to use.

MR. MOSLEY:  At this point, your Honor, I'd like to qualify Special Agent George as an expert in cryptocurrency and cryptocurrency flow of funds tracing.

THE COURT:  Any voir dire?

MS. AXEL:  Yes, your Honor.

THE COURT:  Thank you.  Please.

VOIR DIRE EXAMINATION

BY MS. AXEL:

Q.  Agent George, you've never previously been qualified as an expert witness, correct?

A.  That is correct, ma'am.

Q.  Not in tax matters, correct?

A.  That is correct, ma'am.

Q.  Nothing.  Not in cryptocurrency matters.

A.  That is correct, ma'am.

Q.  And you have a——as I understand, you're a CPA by education, certified public accountant?

A.  Yes, ma'am.

Q.   You have a bachelor's in business administration.

A.   Yes, that's correct.

Q.   And your training was in accounting.

A.   Yes, that's correct.

Q.   Do you have any education in computer science?

A.   No, ma'am.

Q.   According to your CV, you have one Global Information
Assurance certification, right?

A.   Yes, ma'am.

Q.   And that's in information security fundamentals, correct?

A.   Yes, ma'am.

Q.   And you're aware that the Global Information Assurance
certification program includes many certifications, correct?

A.   Yes, ma'am.

Q.   Including in digital forensics, for example?

A.   Yes, ma'am.

Q.   And you do not have that certification.

A.   No, ma'am.

Q.   Have you ever taken any courses on blockchain tracing?

A.   Yes, ma'am.

Q.   From whom?

A.   Chainalysis; TRM; I've taken NWAC3 which is the National
White Collar Crime Center; I've taken courses offered by FBI,
DEA; I've administered courses myself and provided the
curriculum and created the curriculum to train for law

P7N1STO3                         George - Direct

enforcement and local and federal law enforcement on how to investigate the use of virtual currency in their crimes.

Q.  And in addition to then this training as to tracing, have you had training on determining or attributing who owns particular cryptocurrency accounts?

A.  Yes, I've had training——

        MR. MOSLEY:  Objection.

        THE COURT:  I'll allow.

A.  Yes, I've had training and I've given that training as well.

Q.  And I understand you're offering a tracing here concerning a witness who testified, correct?

A.  Can you repeat the question, ma'am.

Q.  You're offering a particular tracing of a particular person's crypto who testified in this trial; isn't that right?

A.  I am offering a tracing of a particular transaction.

Q.  Okay.  What was the beginning of that tracing?

        MR. MOSLEY:  Objection, your Honor.

        THE COURT:  No.  Voir dire is regarding his ability. Ask questions about his education and experience, not about the specifics of his testimony, which you'll get in cross-examination.

        MS. AXEL:  Okay.  The Court will not permit questions at this time concerning methodology issues?

        THE COURT:  I'll hear a few, but let me hear one or

P7N1STO3                          George - Direct

two and see whether you're going beyond what I think you should.

MS. AXEL:  Okay.

THE COURT:  Go ahead.

BY MS. AXEL:

Q.  Mr. George, prior to beginning your analysis, did you receive a report from a company called BlockTrace?

A.  No.

Q.  Okay.  Did you review any crypto blockchain tracing analyses prepared by any other parties prior to beginning your analysis?

A.  No.

MS. AXEL:  Nothing further, your Honor.

THE COURT:  And do you continue to object?

MS. AXEL:  We do.

THE COURT:  All right.  Agent George, you are qualified as an expert witness.  Thank you.

Counsel, you may continue to inquire.

BY MR. MOSLEY:

Q.  Have you done any work on a case related to a cryptocurrency mixer called Tornado Cash?

A.  Other than the specific transactions I was asked to trace, I did not work on any other matters related to Tornado Cash.

Q.  With respect to Tornado Cash, what were you asked to do?

A.  There were a specific set of transactions that occurred,

P7N1STO3                         George - Direct

deposits into a financial institution.  I was asked to trace those deposits, where did they come from and what happened within the financial institution.  I was also asked to trace a specific transaction that left crypto.com and where did it end up.

Q.  Okay.  And did you focus on any particular time periods?

A.  Yes.  The——these transactions occurred between 2020 and 2022.

Q.  At a high level, what sources did you rely on?

A.  I relied on information provided through the blockchain and the transactions that show on the blockchain.  I also relied on communications that I had received from the investigative team.  I also relied on a document that the financial institution I mentioned earlier had produced concerning some account details.

Q.  And what were those account details, at a high level?

A.  Those account details tell me the——the name of the owner of that account as well as the activity within the account, what was deposited, what was withdrawn, what was exchanged or swapped, logs and how to access——like who——sorry——how it was accessed, that account was accessed.  That is, generally speaking, the information that I received.

Q.  Do you have any personal knowledge of the facts of this case other than what you've learned over the course of your expert work on this matter?

A.  No, I do not.

Q.  Special Agent George, when you're doing these types of tracings, what kinds of things do you look for?

A.  In doing these types of tracings, I am focused on the task and then the things that I'm looking for are surrounding that task.  Oftentimes when doing virtual currency tracing, you're looking for dates, times, amounts, patterns.  You're looking for things to be able to tell the story as to what happened with the transaction you're focused on.

Q.  Special Agent George, are you familiar with the term "cryptocurrency swap"?

A.  Yes, I am.

Q.  What is a cryptocurrency swap?

A.  That is when you exchange one type of cryptocurrency for another.

Q.  Do you encounter that often in your job?

A.  I do.

Q.  Special Agent George, were you asked to do a tracing related to a series of transactions beginning in December of 2020?

A.  The transactions that occurred in December 2020 were found based on my analysis from some transactions that occurred that were deposited into the financial institution.

Q.  Okay.  And tell me a little bit about that.  How did you get to the 2020 transactions?

A.  Sure.  So I was asked to focus in on a number of deposits

that occurred within the financial——within a financial
institution, a virtual currency exchanger.  And in focusing on
those transactions, I traced backwards, where did that money
come from that was used to deposit into the account, and I
found that it was sourced from a transaction that had occurred
in December of 2020.

Q.  Okay.  I'm going to show you, just show for the witness
only, what's been marked as Government Exhibit 3006-1.

Do you see that——

A.  I do.

Q.  ——Special Agent George?  What is this?

A.  This is an illustration that I made that would help
visualize my findings.

Q.  You say you made this.  Did you actually do the graphics
for this?

A.  No.  I——I needed a little bit of help in drawing this, so I
had——within IRS-CI we have a unit that helps with trial
illustration, and so I contacted them and asked somebody to be
assigned to help me to draw this up.

Q.  But you directed the creation of this chart.

A.  That is correct.

Q.  And this chart, is it a true and accurate representation of
the work that you did?

A.  Yes, it is.

Q.  And underlying this chart, what kinds of things did you

P7N1STO3                        George - Direct

rely on?

A.  I used the information available on the blockchain as well as I used the account records that I had mentioned earlier provided by the financial institution, as well as a communication that was provided to me by the investigative team.

MR. MOSLEY:  All right.  I offer Government Exhibit 3006-1.

MS. AXEL:  Your Honor, we have no objection to it being used as a demonstrative, but I would object to it coming into evidence at this time.

THE COURT:  And you're seeking——I'm asking because we've had one witness use these for demonstratives and I suppose others using them as exhibits.  I want to understand why this one is different.

MR. MOSLEY:  We can admit it as a demonstrative.  I'd also like to admit it as a summary chart.  If I can ask Special Agent George a couple questions?

THE COURT:  You may.  In furtherance of it as a summary chart, you're saying.

MR. MOSLEY:  Yes.

THE COURT:  All right.  Ask the questions.  Thank you.

BY MR. MOSLEY:

Q.  Special Agent George, you referred to some financial institution records?

P7N1STO3                         George - Direct

A.   Yes.

Q.   Where did those records come from?

A.   A virtual currency exchange platform known as Binance.

Q.   Did you review transaction records related to Binance?

A.   I did.

Q.   Special Agent——

          MR. MOSLEY:  Can you take this down for just a second.

          Can you bring up, Ms. Sebade, Government Exhibit 1213.

          THE COURT:  Which is now in evidence and can be shown

to the jury.

Q.   Special Agent George, can you take a look at these.

          MR. MOSLEY:  Ms. Sebade, can you go to Order History.

And Deposit History.  And Fiat Deposit History.  Go back to

Withdrawal.

Q.   Okay.  Special Agent George, are these the records you were

referring to?

A.   Yes, they are.

Q.   Did you review these records in the course of your tracing

analysis?

A.   Yes, sir.

Q.   How many records do you think you reviewed, or transactions

do you think you reviewed?

A.   There's thousands of transactions within this document.

          MR. MOSLEY:  We can take that down.

          I'd like to offer this Government Exhibit 3006-1 as a

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

summary chart.

MS. AXEL:  I'm going to continue to object, your Honor.  I understand that lays foundation for what's on the right-hand column but not for the intermediate tracing, which I don't think——

THE COURT:  I'll allow as a demonstrative, but I'm not admitting it as an exhibit.  It may be shown to the jury as a demonstrative.

MR. MOSLEY:  Can you bring that back up, please, Ms. Sebade.

BY MR. MOSLEY:

Q.  At a high level, Special Agent George, what did you do?

A.  Focusing in on the deposit that occurred into Binance, I traced those deposits backwards to determine where did they come from, and through all the activity, I found that these particular deposits were sourced from a smart contract that was associated with Tornado Cash from a transaction that occurred on December 18, 2020.

Q.  Okay.  Special Agent George, on the far left of this demonstrative, what is that meant to represent?

A.  There you have the Tornado Cash service logo and you have a document, and the document is supposed to represent a smart contract.

Q.  And briefly, what is a smart contract?

A.  A smart contract is a collection of code that follows the

instructions it's given, generally speaking.

Q.  And what is this calculation that's below the green line? What is that?

A.  So this is to represent the amount of units of cryptocurrency.  In this case 2.5 million units of TORN was disbursed by the smart contract on December 18, 2020.

Q.  And what are the transactions that are in the next——or what do the numbers represent in the next sort of column here where there are the three green arrows?

A.  Sure.  The 2.5 million units of TORN were disbursed equally amongst these three addresses here and 822,000 units for each address, approximately.

Q.  And what was the basis for the information in this part of the chart?

A.  So I——finding the transaction that it came from, there's a specific transaction hash, and so that particular transaction hash, I use it to look up the details of that transaction within the publicly available blockchain explorer, and finding that information, there it identified the amounts going to these addresses.

Q.  And did you look into any other information that helped you in your analysis of these transactions?

A.  Yes.  In looking at the information on the blockchain explorer related to this transaction, there were certain indicators on the blockchain explorer that made me think that

there was—this would have been tied to an event, so then I began to research on the internet the date and Tornado Cash and other information that I found on the blockchain explorer, and I came across a number of articles that referenced the information I was looking at on the blockchain explorer.

Q.   Did you rely on any one particular article for your trace?

A.   Yes.  There was an article produced by *Medium* that had percentages and units of cryptocurrency just like I saw in the transaction.

          MR. MOSLEY:  Ms. Sebade, you can take this down for now.

          Can you bring up Government Exhibit 1904.

          THE COURT:  In evidence, sir?

          MR. MOSLEY:  It is in evidence.

          THE COURT:  Thank you.

Q.   Special Agent George, do you recognize this?

A.   I do.

Q.   Is this the article you were talking about?

A.   Yes.

          MR. MOSLEY:  Ms. Sebade, could you have the date at the top of the article.

Q.   Special Agent George, can you read that date?

A.   December 17, 2020.

          MR. MOSLEY:  Okay.  Ms. Sebade, can you go to the second page.

Q.   Special Agent George, do you recognize what's on this page?

A.   Yes, I do.

Q.   Did it help you in your analysis?

A.   Yes, it did.

Q.   What part of this helped you in your analysis?

A.   Well, these amounts were also, generally speaking, the map that I had seen within the blockchain transaction, but very specifically, this 30 percent, 3 million TORN section is what I found to be pertinent to my trace.

Q.   In what way?

A.   Well, the—the breakdown that I had just given, the 2.5 million of the TORN that was disbursed by the smart contract, I found that amount to be within this 3 million TORN that is described here in this article.

Q.   And there's what looks like a pie chart underneath.  Do you see that?

A.   Yes, I do.

          MR. MOSLEY:  Ms. Sebade, what part of this pie chart was relevant to your analysis?

A.   The red part where it says Team & Investors, 30 percent.

          MR. MOSLEY:  Ms. Sebade, can you highlight the Team & Investors portion of this.

Q.   And that's what you're referring to?

A.   Yes, sir.

Q.   Do you have any sense of who those people were?

P7N1STO3                      George - Direct

A.   Well, after completing my analysis and looking at the other pieces of evidence that I had mentioned earlier, I believed those to be at least three individuals which are Mr. Storm, Mr. Semenov, and Mr. Petroff *[sic]*.

           (Continued on next page)

MR. MOSLEY:  We'll come back to that.

Can you take this down, Ms. Sebade, and bring back 3006-1.

BY MR. MOSLEY:

Q.  Okay.  So, Special Agent George, after the first set of transactions to these three addresses, can you tell me what happened next.

A.  Yes.  Then within 2021 and 2022, there were a number of transactions that occurred between these addresses listed under founders' TORN addresses column and the intermediary addresses column.

Q.  What do you mean by intermediary addresses?

A.  Sure.  This is my way of being able to help visualize what happened without making it very confusing or making it appropriate for the graph.  This intermediary addresses are addresses where activity occurred before it went into Binance.

Q.  So let's back up.

Briefly, what's an address?

A.  An address is much like the wallet in your pocket.  It can receive cryptocurrency, it can hold cryptocurrency, and it can send cryptocurrency out.

Q.  And this series of letters and numbers that are depicted here in this box, are those addresses?

A.  Yes, they are.

Q.  What are the one, two, three, four -- at the risk of doing

public arithmetic, there are six -- there are six characters, letters and numbers, what are those?

A. Those are to represent the first six digits of the address.

Q. After the three dots, there are four additional characters. What are those?

A. Those are to represent the last four digits of the address.

Q. And not to keep everybody in suspense, but what are the three dots in the middle?

A. All the letters and numbers in between.

Q. And is this just a shorthand graphical representation of those things?

A. That's correct.

Q. And you've reviewed these addresses on the blockchain when you were doing your analysis?

A. Yes, I did.

Q. Please, Special Agent George, tell the jury what happened next.

A. So between August 8th and August 11th, the cryptocurrency units of cryptocurrency — in this case, TORN, indicated by the green legend on the bottom — 48 deposits were made into the Binance account from August 8th to August 11th.

Q. And how much TORN?

A. Approximately 606,000 units of TORN.

Q. And, Special Agent George, do you have a sense of what TORN is?

A.   Yes.  TORN is a type of cryptocurrency that is native to the Tornado Cash environment.

MR. MOSLEY:  Okay.  I think you can take this down now, Ms. Sebade.

Q.   So the trace of transactions going into the Binance account, did you do any tracing or any analysis related to what happened with the cryptocurrency after this, after it went into the Binance account?

A.   Yes, I did.

MR. MOSLEY:  Ms. Sebade, can you bring up Government's Exhibit 3006-2 just for the witness.

Q.   What is this, Special Agent George?

A.   This is another illustration that I made to help visualize my analysis.

Q.   At a very high level, what's it an analysis of?

A.   Well, it shows the activity within the Binance account where TORN, the type of cryptocurrency, was converted into USDT, which is another type of cryptocurrency, and again was converted into DAI, which is another type of cryptocurrency, before leaving the Binance account.

THE COURT:  Once again, sir, are you putting together this chart or is someone putting it together for you?

THE WITNESS:  I provided the data and the information, and I had assistance in drawing the visual aspect of this chart.

THE COURT:  Thank you.

Q.  And what did you rely on to create this chart?

A.  I utilized the account details that were given by the Binance production.

Q.  Okay.

MR. MOSLEY:  Ms. Sebade, can you bring up Government's Exhibit 1213, please.

Q.  And Special Agent George, these are the Binance records you reviewed?

A.  Yes, that's correct.

MR. MOSLEY:  Ms. Sebade, can you bring up the -- you're going to have to scroll on the bottom to customer information.

Q.  Special Agent George --

MR. MOSLEY:  Ms. Sebade, can you highlight column E, please.

Q.  Special Agent George, do you see that?

A.  Yes, I do.

Q.  What's the name on the account?

A.  It says Michael Vazhenin.

MR. MOSLEY:  Can we bring up 3006-2 and focus on the upper left-hand corner.

Q.  Is that the name of the account that -- is Michael Vazhenin the name that was on the Binance records?

A.  Yes, that's correct.

P7NVSTO4                          George - Direct

Q.   And is this document based on those records that you reviewed on the Binance account?

A.   Yes, it is.

          MR. MOSLEY:  I'd like to offer Government's Exhibit 3006-2 as the summary chart.

          MS. AXEL:  Same objection.

          THE COURT:  I find this different than 3006-1, and I am admitting it into evidence over the defense objection.  It is an admitted exhibit.  Thank you.

          (Government's Exhibit 3006-2 received in evidence)

Q.   Special Agent George, what's the green circle again?

A.   Sure.  The legend shows that the green circle is TORN, a type of cryptocurrency.

Q.   And what does the 99.9 percent represent?

A.   This information means that of the deposits that were made into this account, in my analysis, 99.9 percent of it came from that smart contract that was associated with Tornado Cash that I spoke of earlier.

Q.   Okay.  And so there's this circle with a lot of -- the circular arrows.  What is that?

A.   That is to visually indicate a swap.

Q.   A swap of what?

A.   In this case, it was TORN was swapped out and USDT was received in exchange.

Q.   What is USDT?

P7NVSTO4                          George - Direct

A.   USDT is another type of cryptocurrency.

Q.   And does it have any special characteristics?

A.   It's what's called a stablecoin, which means that it's tied in value to the U.S. dollar approximately.

Q.   So if I had -- if a person had ten USDT, how much money would they have?

A.   They'd have approximately $10.

Q.   And so how much TORN in this tracing was converted into USDT?

A.   So approximately 600,000 units of TORN was converted into approximately 12 million units of USDT.

Q.   We're talking about the 600,000 units of TORN.  That was the TORN that was represented in the last slide?

A.   That's correct.

Q.   And how much value was that again?  I know you said it was 12 million USDT, but how much was that in U.S. dollar value?

A.   Approximately 12 million U.S. dollars.

Q.   And, Special Agent George, what happened after that?

A.   Well, after that, the USDT was then again converted into another type of cryptocurrency known as DAI.

Q.   And what is DAI?

A.   DAI is similar to USDT, is a stablecoin as well.

Q.   And is it pegged to any particular currency?

A.   It is pegged to the dollar.

Q.   So much like USDT, roughly one DAI is worth roughly a

P7NVSTO4                         George - Direct

dollar?

A.   Approximately, yes.

Q.   And how much was converted into DAI here?

A.   Approximately 11.6 million units of DAI.

Q.   Very, very quickly, I'm going to ask you about these columns on the bottom here.

This looks like a spreadsheet.  What is that?

A.   So these are snapshots that I'd taken from the Binance account records that show the time stamp, the amount, and the type of cryptocurrency for the swaps.

Q.   Okay.  So let's take the middle -- actually, let me see something.  Yeah, let's take the middle column.  In fact, there's three sets of columns here.

MR. MOSLEY:  Ms. Sebade, if you focus on the middle one and the third column, which is time.

Q.   What is that?

A.   So that is to represent in military time the time of the swap.

Q.   Okay.  And when did the first swap -- when did the first swap on this column occur?

A.   Within this column here, the first swap occurred on August 8th, 2022 at approximately 11:29 and three seconds p.m.

Q.   And when was the next transaction?

A.   The next transaction was on August 8th, 2022, at approximately 11:29 and five seconds p.m.

Q.   What's the time difference between those two?

A.   Approximately two seconds.

Q.   On the third transaction here, when did that happen?

A.   On August 8th, 2022, at approximately 11:29 and eight seconds p.m.

Q.   And between -- as to the second and third transactions, what's the time difference between those?

A.   Roughly three seconds.

          MR. MOSLEY:  Ms. Sebade, you can zoom back out.

Q.   Oh, Special Agent George, just real quick:  Why are these letters, these numbers, red in these columns?

A.   Sure.  So in this particular column, we are looking at TORN being converted into USDT.  And the red is to represent the lowering of TORN in that account.  So as the TORN was being used, that's why it's in red, it's lowering the balance in the account.

Q.   And the time pattern that you saw earlier, did that repeat itself throughout your trace?

A.   Yes, it did.

          MR. MOSLEY:  You can zoom back out, Ms. Sebade.

Q.   So this box, what is this box supposed to represent?

A.   This box represents all the activity within the Binance environment.

Q.   And how many transactions did you say were conversions from TORN to USDT?

A.   From TORN to USD were approximately 720 transactions.

Q.   And then the transactions from USDT to DAI?

A.   That was approximately 90 transactions.

Q.   So I'm going to do some public math again and take risks.

     The roughly 810 transactions you reviewed, would those be viewable on the blockchain?

A.   They would not be.

Q.   If you looked on the blockchain, what would you see?

A.   I wouldn't be able to pull up these transactions.

Q.   There are arrows coming out of the box.

A.   Yes.

Q.   What do those stand for?

A.   These --

Q.   Quick question for you.  In terms of -- you said that -- you testified, I believe, that you wouldn't be able to see these transactions on the blockchain?

A.   That's correct.

Q.   Why not?

A.   These transactions, these swaps in particular, are happening within the Binance institution, within the Binance account itself; so these wouldn't be on the blockchain.

Q.   Okay.  You've got some arrows coming out of this box.  What does that signify?

A.   The arrows coming out of the box represent the cryptocurrency leaving the account or being withdrawn from the

account.

Q.  Did you trace where it went?

A.  I did.

        MR. MOSLEY:  Ms. Sebade, can you bring up Government's
Exhibit 3006-3 just for the witness.

Q.  Special Agent George, what is this?

A.  This is another illustration that I made that would help
visualize my findings.

Q.  And they are, broadly speaking, findings of what?

A.  Findings of my analysis in tracing what happened to the
TORN that was deposited in the Binance account.

        MR. MOSLEY:  I'd like to offer Government 3006-3 as a
demonstrative.

        THE COURT:  As a demonstrative, so not as an admitted
exhibit.

        MR. MOSLEY:  Yes, your Honor.

        THE COURT:  It's coming in as a demonstrative, not as
an admitted exhibit.  The jury may see it.

Q.  Okay.  Special Agent George, drawing your attention to the
box on the left side of this diagram.  What is that?

A.  That is the Binance account we just discussed that we saw
on the previous illustration.

Q.  So this is just a graphical representation of what happened
in the previous slide?

A.  That is correct.

P7NVSTO4                      George - Direct

Q.   So when the cryptocurrency left the Binance account, what happened next?

A.   In leaving the Binance account, I traced approximately 7.5 million units of DAI was sent from the Binance account to an address ending in 0eef there in the middle of the illustration.

I also traced approximately 533,000 units of USDT leaving the Binance account and being sent to this address, the same address, 0eef.

Q.   So the 7.5 million DAI, how much is that in dollars?

A.   Approximately $7.5 million.

Q.   And the 533,000 in USDT, how much is that in dollars?

A.   Approximately $533,000.

Q.   At the risk of making you do public math, Special Agent George, about how much is that in total?

A.   Approximately $8 million.

Q.   Special Agent George, what happened next?

A.   Once the USDT had entered into that address, 0eef, it was then converted on August 9th, it was converted into DAI within the address 0eef.

Q.   And this dark box here, is that meant to convey that address?

A.   Yes, that's correct.

Q.   And similar to what we talked about before with the addresses, that is sort of an abbreviation of a longer address?

A.   Yes, that's correct.

P7NVSTO4                          George - Direct

Q.   Did you review any other -- actually, Special Agent George, what happened after this?

A.   Well, after the USDT was converted into DAI, then there was transactions that occurred on August 9th and August 10th, where approximately 2.6 million units of DAI were sent each to three addresses as shown in the illustration.

          MR. MOSLEY:  So, Ms. Sebade -- you read my mind there.

Q.   So describe what you're talking about, Special Agent George.

A.   Sure.  So on August 9th, there were two transactions from 0eef that were sent to address -- these two addresses, cd78 and 62de, and they both received 2.6 units of DAI each.  There's another transaction on August 10th, where 2.6 million units of DAI was sent from 0eef to db70.

Q.   Did you see any other -- like review any other information that helped you out with this analysis?

A.   I did.  I saw some correspondence that occurred between Mr. Storm and the other individuals that I had mentioned earlier, Mr. Semenov and Mr. Petro (ph).

          MR. MOSLEY:  All right.  Can you please show the witness Government's Exhibit 2058-T.

          THE COURT:  In evidence, sir?

          MR. MOSLEY:  I don't believe it is.

          THE COURT:  Thank you.  All right.

Q.   Special Agent George, what is this?

A.   This is a Cellebrite report where it shows communications between the parties listed on this page here.

Q.   Do you recognize this document?

A.   I do.

Q.   Did you review it as a part of your tracing exercise?

A.   I did.

Q.   Looking at page 1 of this document, does it tell you who was involved in this conversation?

A.   Yes.

Q.   Can you read those, please.

A.   Yes.

     Roman Storm is one, Alexey Pertsev is another, and Roman Semenov is the other.

Q.   Are there any other things, individuals or people, listed on this?

A.   There are other items here listed, but these are the three people that I can see.

     And I apologize earlier if I had misstated.  The name I was looking to say was Mr. Pertsev.

     MR. MOSLEY:  I'd like to offer Government's Exhibit 2058-T.

     MS. AXEL:  Subject to our prior objection.

     THE COURT:  Sir, you are also seeking to admit 2058 or just 2058-T.

     MR. MOSLEY:  And 2058.

THE COURT:  I presume one is the translation of the other.

MR. MOSLEY:  Yes, this is the translation, your Honor.

THE COURT:  All right.  Over the defense objection, I am admitting Government Exhibits 2058 and 2058-T.  And 2058-T may be shown -- they both may be shown to the jury, but I imagine we're going to show T to the jury.

MR. MOSLEY:  I believe so.  I can't read Russian.

(Government's Exhibits 2058, 2058-T received in evidence)

MR. MOSLEY:  Ms. Sebade, can you go to page 2, please. Actually -- and can somebody hand me my glasses.

THE COURT:  Off the record.

(Off record)

THE COURT:  Okay.  Back on the record.  Thank you.

MR. MOSLEY:  Including advancing age.

BY MR. MOSLEY:

Q.  Special Agent George, can you read this chat?

A.  Yes.  This particular chat says:  From Roman Storm. Basically, I offloaded 8 million yesterday.  Sent on August 9th, 2022.

MR. MOSLEY:  Ms. Sebade, can you scroll down. Actually, zoom out and then scroll down.  Okay.  And can you focus on the top.

Q.  And can you read that, Special Agent George, the one on the

top?

A.   Yes.  It says:  From Roman Storm.  I sent you guys 2.6 each.  Sent on August 9th, 2022.

Q.   And then can you read the next chat?

A.   From Roman Storm.  Binance's 24 limit will pass now and I will go and load some more.  Sent on August 9th, 2022.

Q.   And can you read the next chat?

A.   From Roman Storm.  Say thank you.  I've been doing it all day.  August 9th, 2022.

MR. MOSLEY:  Ms. Sebade, can you bring up the chart and this exhibit.

Q.   Special Agent George, did this series of communications help you in your analysis of this tracing exercise?

A.   Yes, it did.

Q.   What, if anything, did it tell you?

A.   Well, these communications, these statements here, say:  Thank you.  I've been doing it all day.  I sent you guys 2.6 each.  I offloaded the 8 million, that I had read on the previous page.

It tells me that there's a level of control that Roman Storm had over the Binance account where those swaps happened that I explained earlier; as well as the "I sent you guys 2.6 each" shows a level of control over the 0eef address where all the cryptocurrency went to after it left the Binance account.

Q.   And what, if anything, does it tell you about these

P7NVSTO4                         George - Direct

transactions over to the right?

A.  Well, in the particular communication he says, I sent you guys 2.6 each.  And the other people that are listed within the chat, along with Mr. Storm, are Mr. Semenov and Mr. Pertsev.  And so there in that communication he's essentially saying, I sent 2.6 to Pertsev, I sent 2.6 to Mr. Semenov.

Q.  Did you come to any conclusions about any of the other wallets listed shown here?

A.  Well, given the amounts are equal amounts and the three of them are in the chat, the conclusion can be made that Mr. Storm also gets to accept 2.6 million.

          MR. MOSLEY:  You can take these down.

Q.  Special Agent George, did you do any tracing related to any other Binance-related accounts -- or Binance-related transactions?

A.  Yes.  Within the same document, there were some transactions around the May and June time frame of 2022 that I looked at.

Q.  And what, broadly speaking, was that analysis?

A.  There was approximately 8,000 units of TORN that was deposited into that same account in May; and then it was converted into USDT in June of 2022.

Q.  And do you know how much TORN was converted to USDT?

A.  My memory, I believe, approximately 8,000 units of TORN was converted into approximately 160,000 units of USDT.

Q.   And, again, how much in dollars is 160,000 worth of USDT?

A.   Since USDT is a stablecoin, it's approximately $160,000.

          MR. MOSLEY:  Okay.  I would like to show the witness

Government's Exhibit 2055-T.

Q.   Special Agent George, do you recognize this document?

A.   I do.

Q.   What is it?

A.   This is another Cellebrite report that houses -- that has

communications between the parties listed on this page.

Q.   And who are the parties listed on the page?

A.   There you can see Roman Storm, Alexey Pertsev, and Roman

Semenov.

Q.   Did this report help you in doing your analysis?

A.   It did.

          MR. MOSLEY:  I'd like to offer Government's Exhibit

2055-T and 2055.

          THE COURT:  Can I just have the date of the

conversation, if there's --

          MR. MOSLEY:  Sure.  There's a range of dates.  Go back

to the first page.  And up at the top, can you highlight the

date there, Ms. Sebade.

          I'm sorry, your Honor, were you asking for the dates

of the entire conversation?

          THE COURT:  I was, actually, yes.  I just want to know

the date range, if I may know.

P7NVSTO4                      George - Direct

Q.  So when was the first communication, based on this, Special Agent George?

A.  The start time of this document shows communications on August 7th, 2019.

Q.  When was the last activity?

A.  Approximately August 10th, 2022.

THE COURT:  Thank you so much.

Defense has a continuing objection; is that correct, Ms. Axel?

MS. AXEL:  Yes, your Honor.

THE COURT:  Okay.  Thank you.

The objection is overruled.

Government Exhibits 2055 and 2055-T are admitted into evidence.  And you may show 2055-T to the jury.  Thank you.

(Government's Exhibits 2055, 2055-T received in evidence)

MR. MOSLEY:  Ms. Sebade, can you go to the second page, and the chat that is in blue on the bottom.

Q.  Can you read that, please, sir.

A.  Yes, sir.  It says:  From Roman Storm.  +8,340 TORN offloaded for 163,000 USDT.  Sent on June 21st, 2022.

Q.  What relationship, if any, does this have to the trace you did in June -- for the June transactions?

A.  Well, these amounts, they tie to my analysis and the activity that occurred within the Binance account.  And it was

around the same time frame as well, June of 2022.

Q. And who was this text message from -- or this chat message from?

A. It appears to be from Roman Storm.

MR. MOSLEY: Ms. Sebade, can you scroll back out and scroll down. Down again.

Okay. Can you take this down for a second.

(Counsel conferred)

MR. MOSLEY: Thank you, Ms. Sebade.

You can bring it back up.

Q. Special Agent George, can you read the text at the top of that page?

A. Sure. It says: From Roman Storm. Have your new chick tell us how to save money wisely. Sent on August -- sorry, June 21st, 2022.

Q. Can you read the second one.

A. From Roman Storm. Because of all of us are fucking idiots. Sent on June 21st, 2022.

Q. Can you read the next one.

A. From Roman -- I apologize. From Roman Storm. Give her a task to come up with a plan. June 21st, 2022.

Q. And this one on the bottom?

A. From Roman Storm. To fucking open various offshores. June 21st, 2022.

Q. And the last one.

A.   From Roman Storm.  And to buy real estate.  Sent on June 21st, 2022.

        MR. MOSLEY:  Can you zoom out again, Ms. Sebade, and scroll down.  Keep going.  One more.  One more.  Keep going.  Okay.  Stop here.

Q.   Special Agent George, the text that is the second one on here.

A.   Would you like me to read it?

Q.   Yes, please.

A.   It says:  From Roman Storm.  And it offers a web address.  Bscscan.com is one of those open blockchain explorers that's freely available on the internet.  And it's referencing an address here starting with 0x2828, ending in 0eef.  And this message was sent on June 21st, 2022.

        MR. MOSLEY:  Ms. Sebade, can you bring up Government's Exhibit 3006-3 alongside this.  Focusing, Ms. Sebade, on that middle box, in the middle of the page.  Okay.

Q.   Special Agent George, what was it again that was in the box on the left side?  There's the chat message and it has an address in it.  What is that again?

A.   That appears to be a cryptocurrency address.

Q.   And what are the first six?

A.   It is 0x2828.

Q.   And what are the last four?

A.   0eef.

Q.   What, if any, relationship does this have to the tracing analysis you did?

A.   It is the same address that which received the cryptocurrency that I described leaving the Binance account.

Q.   And what, if any, conclusions did you draw from that?

A.   Well, not only the addresses, but also if I'm allowed to mention the other text message that's on the screen here.

Q.   Actually, can you read that message on the screen, Special Agent George?

A.   Sure.  It says:  From Roman Storm.  I already withdrew here.  Sent on June 21st, 2022.

So the question, I believe, that you originally asked was what inferences that I had made.  And this information here, because they are the same address, and then this statement here, "I already withdrew here," tells me that this individual, Roman Storm, has a level of control over that Binance account and is able to initiate that withdrawal to this place.

MR. MOSLEY:  Ms. Sebade, can you -- you can take -- well, actually, don't take it down.  You can take the 3006-3 down for the moment.

Can you go to page 13 of 2055-T.

Q.   Special Agent George, what's the date of this message?

A.   On there at the top is dated June 21st, 2022.

Q.   Can you read it, please.

P7NVSTO4                        George - Direct

A.  Yes.  It says:  From Roman Storm.  As you can see, I did everything from the Russian Binance.

Q.  And can you read the second one.

A.  From Roman Storm.  No problem at all.  June 21st, 2022.

        MR. MOSLEY:  And can you zoom out, Ms. Sebade.

Q.  And read the third message.

A.  This is from Roman Storm.  And even from a Russian IP (VPN).  June 21st, 2022.

Q.  And read the last text here.

A.  From Roman Semenov.  Yup, I will also send a little TORN a bit later to avoid getting busted now.  June 21st, 2022.

Q.  Special Agent George, do you know what an IP address is?

A.  Sorry.  Can you repeat the question?

Q.  Sure.  Special Agent George, do you know what an IP address is?

A.  Yes, "IP" stands for internet protocol.  Imagine like a digital address for a computer.  And when it connects to the internet, it uses that digital address.

Q.  Did you review any IP addresses related to your tracing analysis?

A.  There was some IP address information in the Binance records that I had reviewed, yes.

        MR. MOSLEY:  Ms. Sebade, can you bring up Government's Exhibit 1213, and go to right here -- no, not right here.  Access logs.

Q.  Special Agent George, are these similar to what you were talking about?

A.  Yes, that's correct.

MR. MOSLEY:  Ms. Sebade, can you scroll down to June -- to access -- there's a --

Q.  Special Agent George, look at column H.  What column is that?

A.  Column H says "Time Stamp."

Q.  And what, if anything, do you conclude from that?

A.  Well, time stamp tells us the time that these -- and the time and the date, approximately, that these logins occurred. So when this account was accessed, logged into, these are the times and dates.

MR. MOSLEY:  Ms. Sebade, can you scroll down to June -- roughly June 21st — okay, I can't look at that — 2022. And then column E is -- can you block that column.

Q.  Okay.  What is this an example of, Special Agent George, in column E?

A.  Column E is the IP addresses that were associated with the logins into this account.

Q.  Okay.  And for the logins, can you --

MR. MOSLEY:  Ms. Sebade, can you highlight the June 21st sort of section.  Yeah, that's good.

Q.  What was the IP address associated with the transactions around June 21st?

P7NVSTO4                          George - Direct

A.   For these dates, the IP address was 77.223.96.17.

Q.   And then column F, what is that column?

A.   The title of that column is "Geolocation."

Q.   And do you know what that means?

A.   Yes.  It's an attempt to tie the IP address to a physical location in the world.

Q.   And where does -- what location is listed here?

A.   The location listed there is Moscow, Russia.

         MR. MOSLEY:  Ms. Sebade, I think you can take this down.

Q.   Special Agent George, did you review any other IP address information while you were looking -- doing your analysis?

A.   Yes, I did.

Q.   What was that?

A.   I saw login information, IP information related to logins from Google, as well as from GitHub.

         MR. MOSLEY:  Oh, I'm sorry, Ms. Sebade.  I'm sorry also, Special Agent George.  Can you bring up 1213 again. Really quickly, can you scroll down to August 8th -- or up, however this goes.  And sort of highlight some of the transactions that happened there.

Q.   Special Agent George, what's the IP address listed with those transactions?

A.   This IP address is also 77.223.96.17.

Q.   And where is that located?

A.   This is also located in Moscow, Russia.

MR. MOSLEY:  You can take this down, Ms. Sebade.

Q.   I'm sorry.  I interrupted you, Special Agent George.  You were talking about what other IP addresses you had looked at?

A.   Yes.  I had also seen IP addresses related to logins for a GitHub account and a Google account as well.

MR. MOSLEY:  I'd like to call up Government's Exhibit 654, which is in evidence.

Q.   Do you recognize this, Special Agent George?

A.   Yes, I do.

Q.   What is it?

A.   I believe this belongs to the GitHub data.

Q.   How much data is involved with this particular -- with this particular document?

A.   There's a lot of data here.

MR. MOSLEY:  Can you scroll down a little bit.

(Counsel conferred)

Q.   Special Agent George, you were talking about the data?

THE COURT:  Sorry.  Are you asking our paralegal, your paralegal?

MR. MOSLEY:  Oh, I was asking -- thank you, your Honor.

THE COURT:  Thank you, Ms. Sebade.

Didn't want her to be forgotten.  Thank you.

MR. MOSLEY:  That's good.

Q.   And this was the GitHub information that you reviewed?

A.   Yes.

          MR. MOSLEY:  Okay.  I would like to -- you can take this down, Ms. Sebade.

          I would like to bring up Government's Exhibit 1281, which is not in evidence.

          THE COURT:  All right.  Just for the witness then. Thank you.

          And counsel, if in the next five minutes you come to a convenient breaking point, we'll take our afternoon break.  I don't know if this is it, I'm just --

          MR. MOSLEY:  I think I can do another -- we'll see how it goes.  Another five minutes, then we can take a break.

          THE COURT:  Okay.  Thank you.

          MR. MOSLEY:  Can you bring up 1281, please.

BY MR. MOSLEY:

Q.   And Special Agent George, do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   This is information that highlights the IP address that was used to log into the accounts at these services, Binance, GitHub, and Google.

Q.   And does this reflect the analysis you did on the IP addresses?

A.   Yes, it does.

MR. MOSLEY:  I'd like to offer Government's 1281 as a summary chart.

MS. AXEL:  Same objection.

THE COURT:  The objection is overruled.

Government Exhibit 1281 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1281 received in evidence)

Q.  Special Agent George, I'd like to draw your attention to the first line here.  What is reflected on this chart, on that first line in the chart?

A.  It says that on June 21st, 2022, at approximately 7:34 p.m., an account at Binance under the name of Michael Vazhenin was -- there was activity from that -- in that account from an IP address labeled 77.223.96.17.

Q.  Michael Vazhenin, do you recognize that?

A.  Yes.

Q.  What is it?

A.  That is the same name that was listed on the account of records that I was doing my analysis on earlier.

Q.  And the second line, what is that?

A.  Same information, but this time it occurred on June 22nd, 2022, at approximately 11:37 a.m.  Same account at Binance using the same IP address.

Q.  And what was the IP address?

A.  77.223.96.17.

Q.   And what about the third line on this document?

A.   This was a login into an account belonging to Roman Storm at the GitHub service on June 22nd, 2022, at approximately 4:57 p.m.  And this IP address that was used to access his account was 77.223.96.17.

Q.   And going to the second series of spreadsheet cells that have -- on the second part of this document, can you tell us what's going on in the first line?

A.   Yes.  On August 8, 2022, at approximately 8:33 p.m., an account at Binance under the name of Michael Vazhenin was accessed using IP address 77.223.96.17.

Q.   What about the second line here?

A.   On the same date at 8:40 p.m., an account at Google under the name of Roman Storm was accessed using IP address 77.223.96.17.

Q.   I keep making you do public math, and I apologize.  What is the difference in time between the first line and second line?

A.   Roughly seven to eight minutes.

Q.   And the last line on this?

A.   Between 8:40 and 8:48 p.m. is approximately eight minutes or so.

Q.   I'm sorry, what?

A.   Approximately eight minutes of difference between the second and third times.

Q.   And what is happening on this third line?

A.   I apologize.  On August 8th, 2022, at approximately 8:48 p.m., an account at Binance under the name of Michael Vazhenin was accessed utilizing IP address 77.223.96.17.

Q.   With respect to your analysis in your tracing, can you draw any conclusions based on this IP address analysis?

A.   Yes.  The analysis of the transactions, in addition to the communications that I had reviewed and that we discussed earlier today, in addition to this IP activity, tells me that Roman Storm had access and control over the Binance account belonging to Michael Vazhenin.

        MR. MOSLEY:  This would be a good time to take a break, your Honor.

        THE COURT:  All right.  We'll take a break for the afternoon.  I'll ask you please not to discuss this case with each other or anyone else, and to keep an open mind until all of the evidence is in.

        And we'll see you in about ten minutes.

        Thank you very much.

        All rise.

        (Jury not present)

        THE COURT:  Mr. Mosley, may I just have a sense of the length of your anticipated range of your direct.

        MR. MOSLEY:  Not too much longer, your Honor.  Maybe ten minutes or so.

        THE COURT:  Ten minutes or so.  And that's the Lin

material -- I'm sorry, can the witness step down, please.  Can I have the witness step down.  Thank you, sir.  Don't mean to kick you out.

But the materials that were the subject of our discussions this morning, those will be covered in the remaining ten minutes or have you abandoned those?

MR. MOSLEY:  I have not.

THE COURT:  Okay.  So approximately ten minutes more.

All right.  So then we will begin the cross-examination this afternoon.

MS. AXEL:  Yes, your Honor.

If we could take up one matter.

We're slightly concerned with the discussion of offshore accounts and, you know, buying real estate and sales, that the jury might get confused that this is the money laundering SUA being alleged here.  So we were going to ask the Court if you would consider a limiting instruction.

THE COURT:  How so?  What's the limiting instruction that you're asking?

MS. AXEL:  Something along the lines of the testimony being offered by the government is to show that Mr. Storm made a profit.  It is not to be considered with regard to the money laundering charge.

THE COURT:  I don't know that they are making that point, but let me hear from the government.

MR. MOSLEY:  I think this is just --

(Counsel conferred)

THE COURT:  Mr. Mosley, is this evidence being offered for Count One in any respect?

MR. MOSLEY:  No, it's not being offered to show the circumstances surrounding these withdrawals and to show consciousness of guilt.

THE COURT:  Let me ask the question differently.

MR. MOSLEY:  Sure.

THE COURT:  Is this evidence only being used for Count Two or for all of the counts?  The defense is asking for a limiting instruction saying that you're not alleging that these transactions are themselves money laundering.

MR. MOSLEY:  We are not.  We are alleging that these are the -- this is the SUA, your Honor.

THE COURT:  This is the SUA?

MR. MOSLEY:  No, we are not.

THE COURT:  That's what I'm saying.

So then do you agree or disagree with the proposed limiting instruction of the defense?

MR. MOSLEY:  I don't know that it's necessary, your Honor.

THE COURT:  Okay.  But is it worth fighting?

MR. MOSLEY:  Your Honor, I think this is just to show that -- it is to show that he made a profit on it, but it's

P7NVSTO4                          George - Direct

also to show intent to -- in the operation of the Tornado Cash business, which is part of our overall case regarding the defendant's intent as to operating the business and his intent to make a profit from it and his consciousness that he is making profit from the business.

THE COURT:  I missed the very last thing of what you said, sir.  Please say it again.

(Counsel conferred)

MR. MOSLEY:  Yeah.  So, your Honor, as I said, this is evidence that is indicative of the circumstances surrounding the withdrawals.  It's also indicative of the defendant's intention to make a profit on the business.

THE COURT:  So is it fair to say that this evidence is being offered to show Mr. Storm's state of mind and, as well, his intention to make a profit, but it's not being offered as itself in support of the money laundering charges?

MR. MOSLEY:  Actually, that's right, your Honor, except for --

THE COURT:  Ms. Axel, I know you just wanted it for the profit, but it is more than that.

MS. AXEL:  Well, your Honor, I keep hearing whispers, at least, and I do think Mr. Mosley said it once, consciousness of guilt.  And the Court has ruled that this cannot come in as consciousness of guilt because it happens at around the time of the sanctions.

P7NVSTO4                          George - Direct

THE COURT:  Part of it can.  The June stuff can, not the August stuff.

MR. MOSLEY:  So there were transactions that happened in June, your Honor, that weren't anywhere near the sanction.

THE COURT:  All right.

I'm not giving the limiting instruction.

Thank you.  I'll see you in ten minutes.

(Recess)

(Continued on next page)

(Jury present)

THE COURT:  Thank you.  Please be seated.

Sir, I'll remind you that you're still under oath.
Thank you.

Counsel, you may inquire.

BY MR. MOSLEY:

Q.  Special Agent George, were you asked to do a tracing
exercise for transactions occurring in October and November of
2021?

A.  Yes.

Q.  What was that tracing exercise?

A.  I was asked to trace a specific amount of cryptocurrency in
a transaction that left crypto.com.

Q.  And what did you use to conduct this analysis?

A.  I used publicly available information on the blockchain
explorers that I mentioned before you can gather through the
internet, as well as blockchain analytics tools to be able to
view that information in an easier format for me.

MR. MOSLEY:  And Ms. Sebade, can you bring up
Government Exhibit 3006-4.  Oh, just for the witness.

THE COURT:  My question is:  Is that going to be a
demonstrative or a summary exhibit or something else?

MR. MOSLEY:  A demonstrative, your Honor.

THE COURT:  If it's a demonstrative, it can be shown
to everybody.  Thank you.

P7N1STO5                        George - Direct

BY MR. MOSLEY:

Q.   Special Agent George, what is this?

A.   This is another illustration, a visual illustration of the work that I did and the results of my findings.

Q.   Did you use any particular methodology to conduct this analysis?

A.   In tracing these funds, I used an accounting principle known as LIFO, which is last in, first out.

Q.   And how does LIFO work?

A.   It——just as the name describes, the last one in is the first one to go out.  If you think about——just as an example, if you think about a cookie jar, when you make a batch of cookies and you put it in, the last ones that go in, when you open the lid, they're the first ones to come out when you take a cookie out.

Q.   Are you familiar with the term "generally accepted accounting principles"?

A.   Yes.

Q.   What is that?  What does that mean?

A.   It's a standard of accounting principles that are generally accepted for accountants to use when they're accounting for inventory and other things, and LIFO is a generally accepted accounting principle.

Q.   And Special Agent George, why did you use LIFO in this particular analysis?

THE COURT:  I need you a little closer to the microphone, please, counsel.  Thank you very much.

MR. MOSLEY:  Sorry.  My voice is going on me.

Q.  Special Agent George, why did you use LIFO in this particular analysis?

A.  I use LIFO because, first of all, it's a generally accepted accounting principle that I've been trained on in school as a CPA, and it's something that, when I was working public accounting, that I would use.  But it's also the method that I find to be most accurate in this particular type of work.

Q.  What particular type of work are you talking about?

A.  Virtual currency tracing.

If I may add one more bit?  It is the type of method that I use for all my tracing when I do this kind of work.

Q.  Okay.  Special Agent George, how did you start this analysis?

A.  So I was asked to specifically look at the transaction here on the left-hand side of this illustration, leaving crypto.com for a transaction of 149,000 units of USDT, and I was asked if any of this amount in this transaction ended up in Tornado Cash.

Q.  Were you asked to do any investigating?

A.  No, other than the transactions and tracing, no.

Q.  Were you asked to conduct any sort of law enforcement action?

A.   No.

Q.   Were you doing this tracing as a special agent, in your special agent capacity?

A.   No.

Q.   When you do tracing, related to your general work, what are you doing?

A.   Sorry?

Q.   With respect to your general work as a special agent, when you're doing tracing, what are you doing?  What are you looking for?

A.   Oh, when I'm tracing transactions in my line of work as a special agent in my investigations, I'm looking to find out what happened, you know, where did this transaction come from, where did it go, what's the story here involved with the transaction.  That's when I do my investigations.

Q.   Special Agent George, are you familiar with the term "attribution"?

A.   I am familiar with that term, yes.

Q.   What does that mean?

A.   Attribution is tying a—in this case, it's tying a transaction on the blockchain to a person or a company or an individual.

Q.   And is that something you do in your general job as a law enforcement agent?

A.   Yes, in my investigations I do that often.

Q.   Were you asked to do that here with respect to this analysis?

A.   No, I was not.

Q.   Special Agent George, where did you start?

A.   There on the left-hand side underneath crypto.com, where you have in black letters 149K USDT to represent 149,000 units of USDT, that is where I started.

Q.   And this blue flag here, what is that meant to represent?

A.   So the blue flag is to represent what I call the targeted funds or the funds that I'm wanting to watch out for as I continue forward in my tracing.

Q.   Okay.  And the information in the orange line, what is that?

A.   The orange line information is the time stamp, so the date and the time of the transaction that occurred on the blockchain.

Q.   What happened next?

A.   So on October 22, 2021, there was a transaction leaving crypto.com into an address A, and in that transaction was 149,000 units of USDT that occurred on the blockchain, and so that is my target funds in blue, 149,000 units of USDT.

Q.   So how much USDT is in A here at this point?

A.   At this point in the trace, 149,000 units of USDT are in address A.

Q.   And when I ask you how much is in here, I'm asking you with

respect to the tracing exercise that you did.

A.   Yes, that's correct.

Q.   What happened next?

A.   Well, you can see that on October 22nd, at approximately 10:59 p.m., there was a transaction from address A to address B1, and in that transaction, on the blockchain, it was 60,000 units of USDT that was being sent from address A to address B1.

Q.   So what does this 60K blue flag mean in this particular instance?

A.   That means that my funds, the target funds that I'm looking for, the entire amount of that transaction, 60,000, is what's being transferred from A to B1.

Q.   And what happened next?

A.   There was also another transaction on October 22nd, at 11:02 p.m., where, from address A, 60,000 units of USDT were sent to address B2.

Q.   All right.  And then what happened next?

A.   There was another transaction on October 22nd, where at 11:03 p.m., approximately 60,000 units of USDT left address A and were sent to address B3.

Q.   Okay.  Drawing your attention to this blue flag here that says 29K, what does that mean?

A.   The 29K is the remainder of the funds, of the target funds that I'm looking for.  So for example, as we saw, in address A, it received 149,000 units of USDT.  That's the target fund that

I'm looking for.  After it's sent to B1 and after it's sent to B2, 149,000 minus 60, minus 60, leaves me with only with 29,000 left.

Q.  And once again, my apologies for all the public math.

Special Agent George, there's an arrow that goes to wallet B2.  And in the rest of this diagram there are arrows going into things and arrows coming out of things.  Is there an arrow coming out of D2?

A.  There is no arrows coming out of B2.

Q.  Why is that?

A.  Well, this particular task was to ask, did any of the target fund end up in the Tornado Cash environment, and so I have only illustrated addresses here where the flow of funds that were involved had ended up in Tornado Cash environment.

THE COURT:  Counsel, may I ask a question, please.

MR. MOSLEY:  Sure.

THE COURT:  Agent, is the reason that the amount going into B3 is 29,000 rather——I realize that if you subtract 120,000 from 149,000, that's what you get, but is the reason that you left that sort of lump amount, that 29,000 in B3 because in time, that was the last in time of the three transactions?

THE WITNESS:  Yes, your Honor, that's correct.

THE COURT:  I see.  So if B3 had been the first transaction, it might have been 60,000.

P7N1STO5                         George - Direct

THE WITNESS:  Yes, your Honor, that's correct.

THE COURT:  Thank you for the clarification.

Counsel, you may inquire.

BY MR. MOSLEY:

Q.  With respect to B2, did you do any looking into like doing any further tracing on B2?

A.  I did.

Q.  So now what happened next?

A.  Well, in reference to B3, there was a transaction on October 23rd, at 5:24 p.m., that on the blockchain, B3 sent 80,000 units of USDT to C2.  In that transaction, I'm only looking for 29,000 units of USDT, so that is why you see it on the illustration.  On B1, there were two transactions that I've listed here.  One was on October 23rd at 10:16, and in that transaction, it sent 25,000 units to C1, but the very next one, at 5:25 p.m. on the same day, it sent 140,000 units to C2.  The reason why you see the blue for 35,000 is because 60 minus the 25, it leaves you with 35,000.

Q.  And then what happened next with respect to C2?

A.  So there is a transaction that leaves C2 on October 25th, at approximately 8:09 a.m., and that transaction on the blockchain is 482,000 units of USDT being sent from C2 to D. My target fund that I'm looking for is the 35,000 that it received as well as the 29,000, in total, making the 64,000 units of USDT that is going to address D.

Q.  Special Agent George, I draw your attention to the C1 wallet, or box that's here.  Once again, you have an arrow going in.  And what is—how much is going in that you were tracing?

A.  Approximately 25,000 units of USDT that I was tracing.

Q.  And there's no arrow going out.  Why is that?

A.  Because where this particular 25,000 units of USDT went, it did not end up in Tornado Cash environment so it was not included in this illustration.

Q.  Did you do any tracing just to take a look and see where it went?

A.  Yes.  You have to see it through so you can determine that it didn't end up there in Tornado Cash, yes.

Q.  What happened after C2?

A.  After C2, as I mentioned earlier, on October 25th, C2 on the blockchain sent 482,000 units of USDT to D.  Of that, included within that amount is 64,000 units of USDT that I am looking for, that I am focused on.

Q.  And what happened next?

A.  After that, there was another transaction on October 25th, the same day, but this time at 8:39 a.m., and it sent on the blockchain, from address D, sent 500,000 units of USDT to address E, which comprised or housed the entire amount that I'm looking for, which is 64,000 units of USDT.

Q.  And then what happened next?

A.   And then on the same day again there was another transaction from address E being sent to what I've grouped here as intermediary addresses, or I, and that amount was 47,000 units of USDT leaving address E going to this group of intermediary addresses, as you can see on the illustration.

Q.   Special Agent George, did you do a trace through these intermediary addresses?

A.   I did.

Q.   And you followed the funds going through the intermediary addresses?

A.   Yes.  Each one.

Q.   And you used LIFO to do that?

A.   I did.

Q.   All right.  What happened next?

A.   Well, from the intermediary addresses there's a transaction that is being sent to address F, and that occurs on approximately November the 15th, and that transaction on the blockchain is 4 million units of USDT, but within that 4 million is my target funds that I'm looking for, the 47,000 units of USDT.

Q.   And what happens next?

A.   Well, within address F there is a swap.  As we've mentioned earlier, that's—a swap is an exchange for one cryptocurrency type to another.  And so in this case USDT was swapped for another cryptocurrency known as ETH.  Now you can see in the

green box there, the amount of USDT that was swapped was approximately 4 million units, 4,076,174 units of USDT was swapped for 857 units of ETH, but I only need 47,000 units of USDT, as you recall, approximately, so I take the exact number of USDT that I'm looking for and I divide it by the total amount of USDT that was converted. I get a percentage, which is approximately 1.14 percent. So that means I'm looking for 1.14 percent of ETH that it was converted to. So I take that 1.14 percent and I multiply that, comes to 857 ETH that it was converted into. And that leaves me with 9.78 units of ETH that I am now looking for from my original transaction.

Q. And then what happened after that?

A. The very next transaction after this swap, under this method, you can see that a hundred units of ETH are sent to the Tornado Cash environment, and within that hundred units of ETH, therein sits the 9.7 units of ETH that I'm looking for.

Q. What's a Tornado Cash environment?

A. Well, when you trace this transaction on public blockchain explorer—in this case I used etherscan.io—you can see that it specifically identifies that this transaction was sent to Tornado Cash.

Q. Special Agent George, I'm going to take you back a couple of steps to the intermediary addresses in box I. The transaction that leaves the intermediary address I, the intermediate—intermediary addresses, when did that occur?

A.   It left the intermediary addresses on approximately November the 15th at approximately 12:28 p.m.

Q.   And the transaction that went from F to the Tornado Cash here on your chart, when did that happen?

A.   That occurred on the same day at 12:34 p.m.

Q.   And what's the sort of difference in time between those two transactions?

A.   It's approximately six minutes or so.

Q.   And what is the series of letters and numbers underneath the very long green arrow?

A.   Sure.  Those series of letters and numbers represent something called a transaction hash.

Q.   What is a transaction hash?

A.   A transaction hash is a unique identifier for a transaction that occurs on the blockchain.  It tells you—it will pinpoint the transaction, the details, what time it happened, how much—how much units—how many units of cryptocurrency, which addresses were involved.  It's specific to a transaction on the blockchain.

Q.   When you say specific to a transaction on the blockchain, what do you mean?

A.   I mean that it pinpoints a transaction on the blockchain.

Q.   Pinpoints in what way?

A.   In the blockchain you have thousands, millions of transactions.  If you want to find the exact one that you're

looking for, you would use a transaction hash.

MR. MOSLEY:  Ms. Sebade, I'm going to have you bring up Government Exhibit 254.

THE COURT:  In evidence, sir?  Excuse me.

MR. MOSLEY:  It is in evidence, but I think I have the wrong exhibit number.

THE COURT:  Okay.

MR. MOSLEY:  Please bring up, Ms. Sebade, 253.

THE COURT:  Also in evidence, sir?

MR. MOSLEY:  Yes, your Honor.

THE COURT:  Thank you.  It may be shown to the jury.

BY MR. MOSLEY:

Q.  Special Agent George, have you seen this before?

A.  I have seen this before.

Q.  What is it?

A.  This is an email from Ms. Lin to hello@tornado.cash.

Q.  Did anything in this document have any effect on your tracing?

A.  The——it did not have any effect on my tracing, but it——it does mention some information that I found in my tracing.

Q.  And was your tracing complete by the time you looked at this document?

A.  Yes.

MR. MOSLEY:  Ms. Sebade, can you highlight the name that's at the top.

P7N1STO5                         George - Direct

Q.  Special Agent George, can you read that name.

A.  Yes.  Hanfeng Lin.

Q.  Special Agent George, do you know who that person is?

A.  I am loosely aware that this person, Ms. Lin, was a witness here in this trial, but I don't know her personally in any way, shape, or form.

Q.  Did you do any investigations in your law enforcement capacity related to her?

A.  No.

        MR. MOSLEY:  Ms. Sebade, can you go to page 2, please. And can you highlight this area underneath the big long black string of letters and numbers.  Can you highlight the part——yeah, that will work.

Q.  Special Agent George——

        MR. MOSLEY:  And Ms. Sebade, can you highlight that——there you go.  You're just anticipating my every move here.

Q.  Special Agent George, can you read this paragraph.

A.  Yes.  It says, "The scammers were committing financial crimes right under your nose, which involve, among other things, stealing and laundering large sums of money on a regular basis.  Money was transferred from my 'crypto.com' wallet in the total amount of 148,828 USDT utilizing your services and under your authorization."

Q.  Just with respect to your tracing, Special Agent George,

does any information in this paragraph relate to what you did?

A.  Yes, there is information in this paragraph that do—that does relate to my analysis.

Q.  In what way?

A.  The reference to crypto.com, the reference to the original transaction of 148828 USDT, which was my starting point.

MR. MOSLEY:  Okay.  You can unhighlight this, Ms. Sebade.

And could you please highlight the gray sort of boxes right underneath there, where it says Transaction Hash.

Q.  Special Agent George, again, what's a transaction hash?

A.  A transaction hash is a unique identifier that allows you to pinpoint a specific transaction on the blockchain.

Q.  And what are the first sort of six digits in this transaction hash?

A.  0x3fa4.

Q.  And what are the last four?

A.  015c.

MR. MOSLEY:  Can you highlight that, Ms. Sebade, just because it's hard to see.

How about you highlight the whole thing.

Sorry to keep you guessing.

Ms. Sebade, can you bring up Government Exhibit 3006-4 along with this document.

And can you also highlight the TX hash on the bottom

P7N1STO5                       George - Direct

underneath the green arrow.

BY MR. MOSLEY:

Q.   Special Agent George, did you compare the transaction hash, the two transaction hashes.

A.   Yes, I did compare the two transaction hashes.

Q.   What if any conclusions did you come to?

A.   That they are the same transaction hashes.

Q.   What does that mean to have the same transaction hashes?

A.   That means the transaction that's identified at the end of my trace is being referenced in this letter, in this email from Ms. Lin to hello@tornado.cash.

          MR. MOSLEY:  You can take those down, Ms. Sebade.

          THE COURT:  Sir, are you done with the communication from Ms. Lin?

          MR. MOSLEY:  Yes.

          THE COURT:  All right.  I'm going to read a limiting instruction that I read at the time of her testimony, given some of the statements that were presented in that letter.

          And that is:  As I've mentioned to you previously, in certain instances evidence may be admitted only for a particular purpose and not generally for all purposes.  In the letter that was read to you, you've heard evidence or assertions by Ms. Lin that certain funds went to Tornado Cash. That evidence was admitted to explain why she contacted Tornado Cash.  You may consider it only for that purpose.  You may not

P7N1STO5                         George - Cross

consider it for the truth of what is stated in her letter.  By which I mean whether those funds actually were sent to Tornado Cash, you have to use other evidence for that other than her letter.  Thank you very much.

Thank you, counsel.

BY MR. MOSLEY:

Q.  Special Agent George, were you asked to do any sort of computer science work with respect to this trace?

A.  No.

Q.  Were you asked to do any digital forensics work related to this trace?

A.  No.

MR. MOSLEY:  No further questions.

THE COURT:  All right.  Cross-exam.  Thank you, Ms. Axel.

MS. AXEL:  Can we just have that exhibit back up, 3006-4.

May I inquire, your Honor?

THE COURT:  You may.  Thank you.

CROSS EXAMINATION

BY MS. AXEL:

Q.  And Mr. George, you testified that you understood that attribution was tying a transaction to a person or a company or an individual; is that right?

A.  Yes, I did say that.

P7N1STO5                          George - Cross

Q.  And you were not asked to offer testimony concerning attributions; isn't that correct?

A.  I was not asked to offer testimony relating to attribution; that is correct.

THE COURT:  Please excuse me.  Counsel, is your microphone on?

MS. AXEL:  I think I set my binder on it again.

THE COURT:  That happens to the best of us.

Thank you.  Please continue.

MS. AXEL:  I appreciate that, your Honor.

BY MS. AXEL:

Q.  So you weren't asked to determine if any of these wallets belonged to the hacker as opposed to some other individual; isn't that correct?

A.  That's correct.

Q.  So in fact, at any point along this juncture in fact it could belong to a third party, the crypto?

A.  That's possible.

Q.  So it simply is like it could have gone from, if Mr. DeMarco was the hacker, from Richie to Viviana to Kevin to Roman, to Chris, and ended up with David; is that right?

A.  That's possible.

Q.  And David could have been the one to deposit into Tornado Cash at the end of all this, right?

A.  Yes, that's possible.

Q. So this doesn't prove that in fact the hacker moved the money into Tornado Cash, does it?

A. No, not at all.

Q. Now, Special Agent George, you signed a supplemental disclosure——you signed a disclosure notice, right?  Excuse me. Let me try this again.

Special Agent, you disclosed to the defense certain opinions that you were going to offer back in February 18th of 2025; isn't that right?

A. That could be correct, yes.

Q. And you signed a disclosure, right?

A. I did sign disclosures, yes.

Q. And you provided substantial spreadsheets that you prepared; isn't that right?

A. Yes.

Q. And Etherscan pages that you had excerpted into those detailed Excel documents; isn't that right?

A. Yes.

Q. And also documents that you also relied upon for the analyses that you disclosed on February 18, 2025, correct?

A. That sounds correct, yes.

Q. And that disclosure did not include anything you've just testified to concerning tracing these funds from crypto.com; isn't that right?

A. That is correct.

P7N1STO5                       George - Cross

Q.   And you provided a supplemental disclosure on that just this last Sunday, July 20th; isn't that right?

A.   That is correct.

Q.   Now in the course of preparing for your testimony, you met with the government approximately six times?

A.   I would have—I would have met—yes, six times is included. I did meet with them at least six times, yes, that's correct.

Q.   At least six times.

     And prior to July 20th, there was nothing to suggest that you were beginning to work on this tracing from crypto.com; isn't that right?

A.   I believe—

     THE COURT:  What do you mean by nothing to suggest?

     MS. AXEL:  In his meetings with the government.

     THE COURT:  Oh, it was never discussed before the 20th; is that what you're asking?

     MS. AXEL:  Correct.

     THE COURT:  Do you understand that question?

     THE WITNESS:  I do understand the question, your Honor, and I believe it might have been around June that this matter may have come up, from my recollection.

BY MS. AXEL:

Q.   You started working on it in June?

A.   I don't—can't tell you when I started working on it, but it—it didn't happen over one weekend.

Q.  Well, when did you start working on it, to the best of your recollection?

A.  It could have been the end of June, early July, of this year.

Q.  And Mr. George, you're aware, aren't you, of a tweet that occurred over the weekend from an individual named tayvano_?

A.  I'm not.

MR. MOSLEY:  Objection.

THE COURT:  I'll ask if he's aware, but that tweet is not coming in.

THE WITNESS:  I'm not aware of tweets.

THE COURT:  Thank you.

Q.  Okay.  On July 22, 2025, did not Mr. Mosley send you a tweet, X.com, tayvano_?

A.  Mr. Mosley did send me an email with a link to what I saw was X.com.

THE COURT:  Did you open it?

THE WITNESS:  I did not open it, your Honor.

THE COURT:  Fine.  Move on, counsel.

Q.  And you testified, correct, that your starting point of your tracing was the crypto.com wallet; is that right?

A.  The starting point of my tracing was a specific transaction of units of cryptocurrency leaving crypto.com.

Q.  And how did you get—who made you aware of that transaction, as your starting point?

A.   The investigative team, the prosecution.

Q.   So what data did you review in doing your analysis of these wallets?

A.   So I took that particular transaction hash, as we—and I looked into the blockchain, public blockchain explorers and blockchain analytics tools to be able to then trace that funds going forward.  Throughout the course of my analysis, that was the majority of the substance that I used to do my work.

Q.   Blockchain explorers?

A.   Blockchain explorers.

Q.   And blockchain analytics tools.

A.   And blockchain analytics tools; that is correct.

Q.   Which blockchain analytics tools did you use?

A.   I used two.  Chainalysis Reactor and TRM Labs.

Q.   Did you run those yourself?

A.   Yes, I did.

Q.   Now you testified before that Chainalysis Reactor used this in the course of your duties and responsibilities; we talked about that earlier, correct?

A.   Yes, ma'am.

Q.   And you've indicated that it shows cryptocurrency coming out and moving addresses, right?

A.   I indicated that it shows cryptocurrency coming in and out of addresses, yes, that is correct.

Q.   Well, you described what a Reactor graph looks like,

P7N1STO5                         George - Cross

correct?

A.   I'm sorry.  Could you repeat the question.

          MR. MOSLEY:  Objection, your Honor.

          THE COURT:  Let me hear the question again, please.

          MS. AXEL:  I was going to ask him an open question.

          THE COURT:  Then please ask another question.

Q.   Would you describe for the jury what does a Reactor graph look like?

          MR. MOSLEY:  Objection.

          THE COURT:  I'll allow.

A.   Depending on the transactions that you're looking for and depending on the flow of those transactions, they could look as very simple as one circle to another circle with a line in between or a complex graph of circles, lines, and all kinds of other indicators.

Q.   Okay.  So as to these wallets that you depicted on your charts, do some of them have many, many chains coming out of them, on the Reactor graph?

          MR. MOSLEY:  Objection.

          THE COURT:  I'll allow.

A.   Ma'am, in order to answer that question, I would have to say more than a yes or no.

Q.   Do any of these wallets, when you look at Chainalysis Reactor, have a complex list of transactions coming out of them?

A.   These wallets have——yes, some of them have many transactions that can go from the transaction——from the wallet outward, yes, that is correct.

Q.   And have you provided to the defense any of the Chainalysis tracing that you did using the Reactor tool?

MR. MOSLEY:  Objection.

THE COURT:  I'll allow.

A.   The question was, have I provided to the defense any of the analysis that I did utilizing the Chainalysis tool?

Q.   Correct.

A.   No, because they were the same exact findings as using the TRM tool.

Q.   Well, you may believe that the findings are the same, but the data that you looked at——

THE COURT:  Okay.  Don't.  I think you want to rephrase your question.

Q.   Okay.  The data you looked at you did not provide; isn't that right?

A.   The data is publicly available on the blockchain.

Q.   It's not publicly available how it's organized in the Reactor tool, is it?

A.   It——actually, in my opinion, it is.  It's just visually there in one place versus——it's all the same information.

Q.   The same information, but you can see how it connects, correct?

A.   Just as you can see on the public blockchain explorer.

Q.   Well, as you've indicated—

MS. AXEL:   Let's look at 3006-4 again.

Q.   As you've indicated, the blockchain tool sometimes shows a simple line between one address and another, correct?

A.   Yes, if both addresses are populated, it can show a potential line; that is correct.

Q.   But sometimes it shows many lines going out from a wallet; isn't that right?

A.   Only if the addresses that they could potentially go to are also already populated within the address.

Q.   So you've selected certain data in order to depict it this way, right?

A.   Pursuant to the methodology I used, that is the way I selected the data.

Q.   So in addition to the Chainalysis Reactor, you said you also used TRM Labs?

A.   Yes, ma'am.

Q.   Did that produce a report?

A.   It produces a graph similar to the one that I've demonstrated here in this—

Q.   But with more data, again.

A.   It includes times, time stamps, dates, it also includes amounts.  Maybe other data might be a U.S. dollar value, but it's very similar to the demonstration I have here.

Q.   And have you provided that to the defense?

A.   No, because I believe all of that was summarized in the data I presented.

Q.   Well, with respect to the data you presented, you're talking about——let's see.

Showing you what has been marked as Defense Exhibit 6001, and first off the screen.

THE COURT:  For the witness only, yes?

MS. AXEL:  For the witness only.

Q.   Is this the data that you provided?

A.   This is still——

THE COURT:  I'm not seeing it.  So I'll ask you to wait.  Thank you.

All right.  Thank you.  Counsel, you may inquire.

Q.   Mr. George, is this the data that you provided in support of your analysis?

A.   Yes, it is.

MS. AXEL:  And the defense would offer defense Exhibit 6001?

MR. MOSLEY:  No objection, your Honor.

THE COURT:  Defense Exhibit 6001 is admitted into evidence and may be shown to the jury.

(Defendant's Exhibit 6001 received in evidence)

BY MS. AXEL:

Q.   And Mr. George, this is the only data that you produced in

support of your summary chart; isn't that right?

A.   That could be correct.  I'm not privy to the emails that go between the prosecution and the defense, but I do recognize this Excel sheet as being part of my disclosure.

Q.   Okay.  And so this is 17 rows, correct, 17 transactions that you focused on?

A.   Yes, ma'am.

Q.   And so with respect to the transaction hashes here, how did you select those particular transaction hashes to put them on your Excel?

A.   Sure.  So as I mentioned earlier, I used the last in, first out accounting methodology, and so I identified the transaction of interest and then I applied that generally accepted accounting principle to the trace, so when it would come in, I would look for the next time it goes out and then I would follow that next time that it goes to the next one and to the next one.  That is how I identified the transaction hashes that are listed here in this Excel sheet.

Q.   Okay.  So let's break that down.

A.   All right.

Q.   So you went to a transaction hash and you looked at Etherscan to see the activity in that account; is that correct?

A.   Yes, ma'am.

Q.   And we discussed the prior work product that you'd produced with your disclosure when you provided Excel spreadsheets in

support of your analysis.  Do you recall that?

A.  I recall you mentioning that, yes.

Q.  And in that, you provided to the defense, right, you did a detailed spreadsheet that shows each transaction that you were focusing on and then you would move it over and indicate which was last in and first out; do you remember that?

A.  You're referencing a different trace, right, not the Lin trace, not this particular trace?

THE COURT:  That's correct, she is.

A.  Then yes, that is correct.

Q.  And that kind of analysis you don't have here, right?

A.  That doesn't look like this, no, that is correct.

Q.  So when you say that you went to this transaction and you looked in the last in and then you tried to determine which was the first out, right, we don't have any other transactions listed here, correct?

A.  Correct.

Q.  So we just have to trust your judgment you picked the right one.

A.  Ma'am, it's the same amount of trust you would have to have in the other Excel sheet, because the other Excel sheet only lists the transactions pertinent to the trace.  I found this trace didn't need those lines as you described because it was very clear.

Q.  Well, it's not true.  I mean, we can—with respect to your

other spreadsheets, you also provided other transactions, for example.

A.   True.

Q.   And this one you did not.

A.   No, ma'am.

Q.   Okay.  And then is it your testimony that every time—each one of these represents then every time there was a transaction and we go to the next one, it's the first out?

MR. MOSLEY:  Objection, your Honor.

THE COURT:  I'll allow.  If you understand the question, sir.

A.   Can you repeat the question.

Q.   Yes.  So for each transaction, as we go down the list for each one of these, you're saying when we move from line 1 to line 2, for example, that would be the first out from that next account?

A.   If the cryptocurrency is the same type, then yes, that would be the case.

Q.   So in the cookie jar example, that's a fairly simple example, right?  So sometimes you might have two transactions, though, instead of just one cookie, right, so you might have a $25 transaction and a $25 transaction and the next withdrawal is a $50 transaction; isn't that correct?

MR. MOSLEY:  Objection.

THE COURT:  I'll allow.

P7N1STO5                        George - Cross

A.   That's correct.  You can have a 25 first, a 25, and then a 50.  That could happen, yes.

Q.   Okay.  So what about, though, if we had, for example, three $10 transactions and then a $15 transaction after that; how would you do the math in that instance?

A.   Can you try to give me that—I didn't expect to do LIFO on the stand.  Can you give it to me one more time.

Q.   We've had a lot of math on the stand already.

A.   Math is fun, and we can do it.

Q.   I should give you more facts.

     Okay.  So if you were tracing criminal proceeds and you had a $10 transaction go in and then you had a $10 transaction that was not proceeds, then you had another $10 transaction come in, and then $15 went out, how much of that would be criminal proceeds?

A.   First of all, how do I know—

     MR. MOSLEY:  Objection.

     THE COURT:  Overruled.  You may answer, sir.

A.   How do I know that the next 10 is not proceeds?

Q.   You're accepting my hypothetical for the math.

     THE COURT:  If you can do that without speculating, sir, I'll let you answer that.  Go ahead.

A.   There is an aspect to this that requires me to look at the data to be able to—this is not something that you just, you know—this is something that you have to look at carefully, and

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

so this information that you've given me would require me to write it down, look at all the facts and all the details, and then to be able to give you a proper answer.  I don't want to speculate and give you an answer that could—might not be accurate.

Q.  Well, the question is:  If you have an intervening transaction, so you are tracing—in this case, you know which wallet you're tracing it from, so you're tracing it from a hacker and it comes in and you have an intervening transaction between your one transaction with proceeds, another transaction, and then a transaction that has proceeds again. How do you decide then when you go out, if the amount coming out doesn't match the increments of what went in?

A.  Sure.

MR. MOSLEY:  Objection.

THE COURT:  There's an objection from the government. I'm overruling it.  If you understand the question, I will let you answer the question, sir.

A.  If we're applying your scenario to what the analysis that we did here, if the—if 10 units of USDT came in—and you called it criminal proceeds in your scenario that you just gave.  If 10 units of USDT came in and there was a transaction that went outwards, the very next transaction of 3 units of USDT, I would apply 3 units from that 10.  Then the transaction after that, if it was USDT again and it was 11 units of USDT,

P7N1STO5                          George - Cross

the remaining 7 that I had, the net, would be——follow along in that 11 transactions.  Does that make sense, ma'am?

Q.  It does.  It does.  Thank you.

And so in that case, though, we would have to look at more than one deposit to the account to make the determination of how much criminal proceeds is moving out.

A.  You would have to look at more than one withdrawal in the account to determine the forward flow of that trace.

Q.  In your hypothetical, yes, I followed that.  Okay.  Thank you.

So let's look at——for example here, there is a good deal of a time break between 10/23/2021 and 10/25/2021; do you see that?

A.  Yes, ma'am.

Q.  Are there intervening transactions in those accounts during that time period?

A.  There were no——I can say with confidence that there would be no intervening transactions of the same cryptocurrency type withdrawn from the account between these time stamps.

Q.  And what data did you look at that would inform that conclusion that you gave me that there were no intervening transactions?

A.  The publicly available information on the blockchain explorers.

Q.  And did you provide that here, sir, in support of your

analysis?

A.   It is not listed in this Excel sheet, no, ma'am, other than the transaction hash.

Q.   You explained for a minute——you described LIFO and what that means.  It's an accounting concept, right?

A.   It is a generally accepted accounting principle, yes, ma'am.

Q.   And it doesn't tell you anything about who owns an account; we've established that, right?

A.   Yes, ma'am.

Q.   There are other methods besides LIFO; isn't that right?

A.   There are other accounting methods, yes.

Q.   What is FIFO?

A.   FIFO stand for first in, first out, and that is also a generally accepted accounting principle.

Q.   And is FIFO the method the IRS recommends for crypto tax accounting?

A.   It is a method that the IRS respects in doing calculations.

Q.   And if you used that method, you might come to a very different result; isn't that right?

A.   It's possible, and it's based on the activity within that particular address.

Q.   And there's something else called the lowest intermediate balance rule; isn't that right?

A.   Yes, I've heard of that method, yes.

P7N1STO5                     George - Cross

Q.   But you haven't used it?

A.   No, I have not.

Q.   And is there a reason that you don't prefer that method or do you know?

A.   Well, I prefer the LIFO method, first of all, because it's on equal——it's an equal standard to the other methods that you've described as the generally accepted accounting principle, and I find it to be most conservative in situations in my calculations when I do virtual currency tracing for all my investigations.

        MS. AXEL:  Okay.  Let's look back at the 3006-4.

Q.   Okay.  So Mr. George, you I think have identified——well, first of all, none of the wallet addresses are on this demonstrative, this slide, right?

A.   Yes, ma'am.  There are no wallet addresses listed on this illustration.

Q.   Okay.  And I think you testified that these 60,000 transactions occurred in this order; do I understand that correctly?

A.   The transactions here are listed with dates and time stamps to help you understand the order as well as the arrows to help point you in the right direction.

Q.   How would I match that to your spreadsheet?

A.   Are you looking to use my spreadsheet in addition to the illustration?

Q.  Yes.

A.  If we can pull them side by side, I can try and help walk through.

Q.  We don't probably have to see all columns in order for you to do this.

A.  No.  You can specifically focus in on column D, the time stamp; you can also focus in on column G, the asset type; and you can also focus in on column H, the value type.

Can you scroll to the right as well so I can see all the columns to make sure that I give you the most accurate answer.

Q.  Okay.  Mr. George, I think we've done the best we can, although we may have to scroll to the right.

A.  Well, if you don't, you can actually——if you just highlight columns A, B, and C and right click it, you can hide it.  Do the same thing for E and F.

And this should be a good spot.  We can see it.

Q.  Okay.  Excellent.  We're all on the same page.

Okay.  So if we look at the first transaction, 10/22, that's the crypto.com transaction going to wallet A; is that correct?

A.  That is correct, ma'am.

Q.  Okay.  So then there's a transaction in the next column, column 3, of 60,000.  Is that the first transaction going to B1?

P7N1STO5                      George - Cross

A.   You'll have to zoom in just a little bit so I can see the
dates.  I don't want to get anything wrong.  And on the
illustration on the left.

          Perfect.  So your question, ma'am?

Q.   My question was as to the second line of that.  Is that the
transaction from A to B1?

A.   So I see the date, 10/22, 2259; I also see the amount as
60,000.  I believe that looks to be from A to B1.

Q.   Okay.  Then is the second one down from A to B2?

A.   Based on the time stamp and—no, it is not to B2, as I can
see.  It is to A to B3, based on the information in the Excel
sheet that I can see.

Q.   Okay.  So you skipped the one from A to B2?

A.   It looks to be that the information from A to B2 does not
appear on this Excel sheet because it does not end at the
Tornado Cash environment, per the request I was given.

Q.   Okay.  So your request was not to trace all the proceeds
from crypto.com; do I have that right?

A.   That's not accurate.

Q.   Well, you didn't include this information.

A.   To be more clear, the request that I had received was,
please trace the information, the units of cryptocurrency that
left crypto.com and which ones ended up in the Tornado Cash
environment.  In order to do that effectively, I have to trace,
according to LIFO method, all of the transactions and then

identify of my list which ones ended in tornadocash.com——I'm sorry——Tornado Cash environment.  That is why they're listed on this Excel sheet.

Q.  So if there were chains of tracing, though, that didn't end up in Tornado Cash, you did not continue to pursue those.

A.  I pursued them, but I did not include them in this Excel sheet.

Q.  You have that work somewhere else.

A.  Yes, I do.  I have looked at that.  Whether I have it in a prepared format for you to look at or, you know——when you do a tracing, you work through things.  It might be my own personal notes.

        Yes, that is the work I have.

Q.  Where did those proceeds go?

        MR. MOSLEY:  Objection.

        THE COURT:  I'll allow, but counsel, I'm just going to remind you we're coming to the end of our day, so we'll finish up soon.

A.  Those proceeds, some of them went to other services, other exchange platforms.  That's what I recall from my recollection.

Q.  And is the same true from B1 to C1 where we also have a dead end?

A.  It's the same exact reason, yes.

Q.  And so you weren't asked to look if all of this went to Tornado Cash, right, just if some of it did.

P7N1STO5                        George - Cross

A.   The task was whether any of these funds ended up in the Tornado Cash environment.

MS. AXEL:  Okay.  I think it's a good time.

THE COURT:  Okay.  Now seems like a good time to break for the day.

I thank you all very much.  We'll reconvene tomorrow. Before I let you go, I think it's—well, I can let the witness step down, yes?  Yes.  The answer is yes.

Sir, we'll see you tomorrow.  We thank you very much.

Members of the jury, to the extent you might be wondering where are we—I don't mean existentially, I mean where we are in the progress of this case—I will say this. Based on my conversations with counsel, and understanding that anything can happen because, who knows, an answer could go on for minutes and the answer could be one word, my expectation is that the government will rest sometime tomorrow, and when that happens, there are some legal things that I have to do, so if it happens at the lunch break, great, you'll have maybe a little bit longer lunch.  If it happens before or after that, well, then you may just have another break.  Of course we're going to be mindful of your time, but there are things we have to do, and we will do them.  And then depending on what happens, it would be my expectation that the defense will put on a case.  Let me remind you, they are under no obligation to put on a case.  The burden is always with the government.  But

P7N1STO5

they can if they want to.  So if they do, that would begin right after the resting of the government's case.

So what does that mean for you timewise?  I don't know.  I don't know.  We're going to find out.  I don't mean to sound so cryptic, but I too will find out from the parties because we've been moving at an appropriate clip because of your diligence and because of your timeliness, and we really thank you for that.  But I thought it was fair for you to get a sense of where we are.  And also to prep you in case I tell you to hang out in the jury room for a little while, while I have conversations with the parties.  So we'll see what happens tomorrow when the government rests, though there will be these legal applications, and then we'll go on from there, and of course I'll let you know.

For now, we're letting you go for the rest of the day because I do have another matter.  I do thank you.  They thank you.  I wish you a great evening.  And I will ask you please not to discuss this case with each other or with anyone else, and to keep an open mind until all of the evidence is received.

Have a great evening.  Good night.

THE DEPUTY CLERK:  All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Counsel, please be seated for a moment.
Thank you.

Again, trying to plan ahead, Ms. Axel, you'll have the
cross time that you need.  Do you think half an hour, an hour?

MS. AXEL:  Half an hour sounds about right.

THE COURT:  Okay.  And it's fine if it goes over.  I
wouldn't presume to tell you how to do a cross.  I just want to
get a sense of timing.

There are two remaining government witnesses?

MR. REHN:  Yes, your Honor.

THE COURT:  Now there may be a redirect, Mr. Mosley,
maybe, brief?  Briefest of redirect?

MR. MOSLEY:  It will be brief, your Honor.

THE COURT:  Well put.

Okay.  The other two witnesses, their directs, I can't
tell, are they 20 minutes, 30 minutes, 40 minutes, it depends
on how long it takes them to read?

MR. REHN:  So, your Honor, the first will be a summary
witness putting in a summary chart.

THE COURT:  Yes.

MR. REHN:  So that will be maybe 20 minutes of direct.
And then there will be a paralegal who will be reading.  I've
been trying to sort of make it relatively concise while
ensuring the jury has some context for the documents that are

coming into evidence.  So it's hard to predict exactly, but I don't expect we're going to be there all day reading documents.

THE COURT:  Is there a possibility that we finish, that you rest at lunch?

MR. REHN:  I think that that is very possible, your Honor.

THE COURT:  Okay.  Okay.  And I'm not going to deprive you of your lunch.  It's just a question of whether we tell the jury to take a two-hour lunch rather than a 45-minute lunch, and I understand that.  We'll be watching.  And of course I don't understand how long the defense would have to cross the summary witnesses.  You don't know either.

MR. PATTON:  Five or six hours, your Honor.

THE COURT:  All right.  Levity, that's what we need today.  Thank you.

Okay.  For the Rule 29, I'm thinking it's probably an hour?  I imagine it's 20 to 30 minutes from the defense, the government saying their piece, right?  Mr. Klein, are you doing the Rule 29?

MR. KLEIN:  No, your Honor.

THE COURT:  Okay.  Who's the law person?

MR. KLEIN:  I think Ms. Axel and Ms. James will be doing it.

THE COURT:  Okay.  Great.  Okay.  You're burdening Ms. Axel a lot, but I know she can handle it.

MR. KLEIN:  She's capable of it.

THE COURT:  Of course.  I told you she's the brains of the operation.  But I'm budgeting an hour for that.

And then there is some meal of some sort.

And has the government checked to make sure all of the exhibits they want in are in?

MR. REHN:  That is definitely going to be a high priority this evening, your Honor.

THE COURT:  Objection. Nonresponsive. Okay. Thank you.  I understand.

Mr. Van Loon, he's your first witness.  He is how long a direct, sir?

MR. KLEIN:  Very short, your Honor.  Probably, we'll figure about 10 to 20 minutes.

THE COURT:  Is he a percipient witness, sir?  Is he talking about why Tornado Cash is awesome and privacy is awesome?

MR. KLEIN:  He used Tornado Cash, your Honor.

THE COURT:  Yes, I understand.  But he's a percipient witness; he's not an expert witness, he's not a character witness.

MR. KLEIN:  Oh, yeah, he's not an expert witness, your Honor.

THE COURT:  He is someone who has firsthand knowledge of the events here.

P7N1STO5

MR. KLEIN:  Yes, your Honor.

THE COURT:  Is there a disclosure to be made for him? Are there exhibits coming in through Mr. Van Loon?

MR. KLEIN:  We're not planning to offer any exhibits through him, your Honor.

THE COURT:  Okay.  Someone is going to cross Mr. Van Loon, or not, as the case may be.

Mr. Arad, you're looking at me.  I'm asking——if only you'd stop talking, you'd hear what's going on.  I am advised by Mr. Axel that Mr. Van Loon is 10 to 20 minutes and no exhibits, so there may or may not be a cross of this man, yes?

MR. MOSLEY:  That would be very brief.

THE COURT:  Okay.  And thanks for standing as you tell me that.

Mr. Axel, who's your next witness for tomorrow?

MR. KLEIN:  Mr. Klein, but——

THE COURT:  Mr. Klein.  See, again, I'm so sorry. I've done that twice today.  I've done it twice today, and it must just be I have Ms. Axel on the brain, which is——

MR. KLEIN:  Her husband is a lawyer, your Honor, so it's not——

THE COURT:  My apologies.  I also called Agent Lopez Agent Joseph, so clearly I'm bereft of sleep, as we all are.

May I understand, Mr. Klein, or Ms. Axel, or Mr. Patton, who the next witness is tomorrow?

P7N1STO5

MR. KLEIN:  Matt Edman, Dr. Matt Edman.

THE COURT:  I'm sorry.  Dr.?

MR. KLEIN:  He's a disclosed expert, your Honor.

THE COURT:  Yes, thank you.  And an hour on direct?

MR. KLEIN:  Longer, your Honor.  I would say hour and a half.

THE COURT:  And then the cross.  Exhibits?

MR. KLEIN:  There are slides we sent to——

THE COURT:  Close to midnight, I'm sure.

MR. KLEIN:  Close.  Oh, maybe they didn't get them?

THE COURT:  We didn't send slides?

MS. AXEL:  We sent some slides, but I'm not sure——

MR. REHN:  We did receive slides that had similar graphics to the opening.  Are those the Edman slides or somebody else?

MR. KLEIN:  Let us check, and we'll get you the Edman slides tonight.

THE COURT:  They have to have it.

MR. KLEIN:  Yes, your Honor, we understand.

THE COURT:  Is there a possibility of there being a third witness?  Because, as we know, the rule of the government, you have to be ready or you rest.  So is there someone in the wings?

MR. KLEIN:  Our witnesses were all coming for Friday, your Honor, because based on estimates we've been getting, we

brought Mr. Edman here and we got Mr. Van Loon.

Let us talk about that, your Honor. I'm sorry. Those are the two we had ready and we——

THE COURT: I understand. And perhaps the government will be kinder to you than you were to them when you said they had to find a wholly unprepared FBI accountant to come in and testify. So that's fine.

Am I allowed to know Friday's witness list? Yes. Great. Who are they?

MR. KLEIN: I think it will be Dr. Hurder, your Honor.

THE COURT: Yes.

Dr. Green?

MR. KLEIN: Potentially Dr. Green, potentially. There's also Mr. Schmidt. We raised that issue this morning about the immunity issue. He is scheduled to be here Friday.

THE COURT: Do you think he's going to show? Well, he will show. Do you want him to take the Fifth?

MR. KLEIN: There's also potentially a Chainalysis witness, the issue that's hopefully resolved. By the way, we're trying to have it resolved, I think it will be resolved, but I don't know that we have it locked down.

THE COURT: I would say I'm imposing a lot, but I actually am not. If I don't have a motion to quash hearing tomorrow, is someone going to tell me I don't have a motion to quash hearing tomorrow?

P7N1STO5

MR. KLEIN:  Yes, your Honor.

THE COURT:  But I actually saw a document.  Are you going to have a Chainalysis custodian testify?

MR. KLEIN:  We have more than a custodian.  We have a woman who worked there plus a percipient witness.

THE COURT:  Testifying about what, please?

MR. KLEIN:  Testifying about——Chainalysis ran a relayer, your Honor, during the time period in question, so they were one of the relayers.

THE COURT:  And they'd be testifying about what, please?

MR. KLEIN:  Running the relayer, how they did it, the fees they earned, how they purchased the TORN.

THE COURT:  All right.  I'll probably get a midnight relevance objection from the government, but okay.

Okay.  And then so Friday we have Hurder, Green, possibly Schmidt, possibly Ms. Chainalysis.  Okay.

MR. KLEIN:  Your Honor, I'd have to go back and look at our list who we have coming on Friday.  There's also a Mr. Alameda.

THE COURT:  Alameda.  Okay.

MR. KLEIN:  He also is a plaintiff in the *Van Loon* case.  He's not going to bring up the *Van Loon* case.  I just want to——

THE COURT:  Thank you for fronting that, sir.  And

P7N1STO5

he's going to testify about?

MR. KLEIN:  His use of Tornado Cash.

THE COURT:  To what end?

MR. KLEIN:  He used it for a different reason than Mr. Van Loon.

THE COURT:  So we're going to talk about the folks who used it for legal reasons?  I presume you don't have a hacker testifying.

MR. KLEIN:  No, we don't.

THE COURT:  That would be interesting.  Okay.

MR. KLEIN:  We have to file the grant of immunity. We're going to do that soon.

THE COURT:  Okay.  Well, I'll be looking for that. And I mean, number one, I get to know these things, but number two, and then there are more people for Monday, sir?

MR. KLEIN:  Potentially.  Last night we got together, we went through our list, and these are the people we've talked about for Thursday and Friday, so Thursday afternoon we will know who is coming Friday, the same rule the government operated under.  We have our witnesses for tomorrow.

THE COURT:  Yes, but the government at least told you in advance who all of the witnesses are.  Have you told them who all of the potential witnesses are?

MR. KLEIN:  We gave them a list a long time ago.

THE COURT:  They told you who was coming off when they

P7N1STO5

came off.  Are you telling them who's coming off as they're coming off?

MR. KLEIN:  We can do that, your Honor.

THE COURT:  Okay.  Is there a chance you rest on Monday?

MR. KLEIN:  I believe——if Mr. Storm does not testify, I believe we will be resting on Monday.

THE COURT:  When do I know if he's testifying?

MR. KLEIN:  That's an ongoing discussion, your Honor, and I can't tell you right now.

THE COURT:  You'll tell me when the decision is made?

MR. KLEIN:  Yes, but I can't promise you when that decision will be made.

THE COURT:  I understand.  It's a very important decision.  I understand that.  But I'm budgeting time for his testimony.

MR. KLEIN:  And we are too, your Honor.

THE COURT:  All right.  Off the record.

(Discussion off the record)

THE COURT:  If we finish Monday, that will be interesting in terms of, given how you all have budgeted this five-week, now three-week trial, it will be interesting in terms of a charge conference, and we'll be burning that bridge when we get to it.

Mr. Rehn, is there a rebuttal case?

P7N1STO5

MR. REHN:  It is possible but unlikely, I would say.

I do just want to flag one thing, your Honor.

THE COURT:  Yes.

MR. REHN:  In reference to the suggestion that we may rest by lunch tomorrow.

THE COURT:  You may not.

MR. REHN:  We may also rest earlier.  I mean——

THE COURT:  I understand.  Sir, that's why we're tracing out the time frame.

MR. REHN:  But I just didn't want an objection that we said we're definitely going to lunch, because it depends on how long the paralegal takes.  I just want to be clear in case we wrap at 11 or something.

THE COURT:  I don't think there was confusion. Because Ms. Axel said she may have 20 minutes of cross-examination; it may be 30, it may be 10.  You may have no redirect.  I understand that.  So it may be before, but I just want to be sure we have witnesses to fill tomorrow and Friday, recognizing that Friday is a 1:30 hard stop because of our juror who needs to be on a bus.  So it may be, of course, Mr. Klein, that some of your Friday folks may end up on Monday, and I understand that.  I just am trying to figure out when we have a charge conference.  And I'm trying to figure out how that looks, and maybe it's Monday.  Maybe you get the charge on Monday and we have it Tuesday.  I don't think the jury would be

devastated if they went home early on either of Monday or Tuesday so that we could get ready for summations. And if we were to finish, miraculously, like Monday at 10 a.m. and you both said, oh, Failla, for the love of god, give us till Tuesday to do summations, I mean, I'd at least think about it. So we're just trying——

MR. KLEIN: Probably would say for the love of god, give us till Tuesday, your Honor.

THE COURT: I'm just trying to figure out what our schedule is, because again, I had budgeted a three-week trial, right? I had budgeted it going past the 1st of August and now I don't know where you are, and that's fine, but we all need to know for the reasons we need to know.

Okay. Anything? Mr. Klein?

MR. KLEIN: Two couple quick issues. We want to move to strike the testimony of the expert about gas ratios.

THE COURT: Mr. Werlau?

MR. KLEIN: Yes. Again, I cross-examined him on that. He didn't have a scientific method, no peer reviews. He said he relied on the methodology from not just Mr. Yale but a third party who gave it to Mr. Yale, who gave it to him. He also said he never actually used it. Your Honor did the questioning somewhat on that. And so we think that portion of his testimony should be stricken.

THE COURT: Denied. Thank you. Next?

P7N1STO5

MR. KLEIN:  There is one exhibit, your Honor, GX 2062-T.  It's one of the translation issues, your Honor. There's a lot of translations, a lot of back and forth, and I would say we worked overall very well with the government in coming to a conclusion, so I just want to preface it with that. When it came up on the screen and it was shown, one of the translations we realized was a mistranslation, an obvious one, and we brought it to their attention, and so far the government is saying they're not willing to change it, but we object to it and we've asked that it be changed.

THE COURT:  Had you brought to the government's attention this concern about the translation previously?

MR. KLEIN:  Yes, your Honor.

THE COURT:  And you gave them a replacement translation or what——

MR. KLEIN:  Yes, your Honor.

THE COURT:  And did they agree to make the translation?

MR. KLEIN:  No.

THE COURT:  Back then?

MR. KLEIN:  Oh, no.  Sorry.  Back then we did——there were so many translations, so——

THE COURT:  Did you tell them before today, sir, that it's a mistranslation?

MR. KLEIN:  Before today, yes.

P7N1STO5

THE COURT:  When?

MR. CASEY:  I believe it was two days ago, your Honor.

THE COURT:  Monday was two days ago, sir.  Monday?

MR. CASEY:  I believe so, your Honor.

MR. REHN:  Your Honor, we completely disagree that this is an inaccurate translation, and the parties have stipulated that it is an accurate translation.  Our interpreter made this translation, their interpreter reviewed it, they told us they were ready to sign the stipulation, we signed the stipulation.  We disagree with their view that it's an inaccurate translation.  So that's sort of the state of play with respect to that.

THE COURT:  All right.  Denied.  Thank you.

What else, Mr. Klein?

MR. KLEIN:  The Dragonfly witness, Mr. Schmidt, your Honor.  I don't know when——we started to have that conversation this morning, and we don't have to have it now, I know you have to rush, but I at least wanted to flag that issue.

THE COURT:  What is the issue, sir, that at the moment he's taking the Fifth?  Are you going to ask the government to grant him immunity, are you going to ask me to order the government to grant him immunity?

MR. KLEIN:  Yes to those.  We're going to ask the government to grant him immunity.

THE COURT:  Okay.  Government will almost certainly

P7N1STO5

say no.  I will do my research tonight on the granting of immunity and my ability to compel it.  I am familiar with the concept from other cases.  We'll see if it's changed from the last time I looked at it.  My thoughtful law clerk will note that down as something we'll be looking at this evening.

Something else, Mr. Klein?

MR. KLEIN:  One moment.  I'm sorry.

That's it.

THE COURT:  Okay.  Mr. Rehn.

MR. REHN:  Nothing from the government, your Honor.

THE COURT:  I hesitate to ask this question, but as I may have hinted to you previously, I sit at my computer like a prom date waiting for a phone call to see what comes in at night.  Should I be waiting by my computer at 11:00 tonight for something to come in?

MR. REHN:  We do not anticipate that, your Honor.  And we are working diligently on the questions you raised regarding the jury charge, but we are anticipating likely filing something tomorrow.

THE COURT:  Okay.  Is there a motion *in limine* coming?

MS. AXEL:  No, no.  We also are, as we may have mentioned amending one of our IEEPA-related requested jury charges, and that will come in this evening.

THE COURT:  But that's for the Berman amendment, right?

MS. AXEL: The Berman amendment, yes, but in light of the stipulation that we worked out with the government and both of us I think digging into the SDN issue, we have one other more minor adjustment, and so we are going to submit it with a redline, your Honor, to be really clear about just the little things that we've changed.

THE COURT: Okay. I want to say, so that no one is surprised, to the extent either of you is asking me to relitigate the motion to dismiss——for example, to have me charge the jury on control or things like that——I'm not. That's the issue on appeal. But I will look to see what this is and I will wait for it.

All right. Mr. Rehn, anything else?

MR. REHN: I was just reminded by one of my colleagues that the Court had ordered us to submit a limiting instruction regarding the AML-KYC by I believe 6 today, so we will be filing that. And I believe you had ordered both parties to file proposed——

THE COURT: You have. I did. If 6 becomes 7 because of the hour of the day, fine. 6 can be 7. 6 can't be 11, for all of our sakes.

All right. I have a defendant who really needs to see me, so I am going to see him. Thank you very much for staying. We're adjourned.

(Adjourned to July 24, 2025, at 8:45 a.m.)

INDEX OF EXAMINATION

Examination of:                                          Page

 PHILIP WERLAU

Direct By Mr. Rehn . . . . . . . . . . . . . .1143

Cross By Mr. Klein . . . . . . . . . . . . . .1190

 MAZYAR MIRBABA

Direct By Mr. Arad . . . . . . . . . . . . . .1231

 STEPHAN GEORGE

Direct By Mr. Mosley . . . . . . . . . . . . .1237

Cross By Ms. Axel  . . . . . . . . . . . . . .1306

GOVERNMENT EXHIBITS

Exhibit No.                                             Received

2058, 2058-T  . . . . . . . . . . . . . . . . . .1270

2055, 2055-T  . . . . . . . . . . . . . . . . . .1274

654   . . . . . . . . . . . . . . . . . . . . . .1237

1213   . . . . . . . . . . . . . . . . . . . . . .1236

1276   . . . . . . . . . . . . . . . . . . . . . .1237

1281   . . . . . . . . . . . . . . . . . . . . . .1283

3003-B-B   . . . . . . . . . . . . . . . . . . . .1163

3003-C-B   . . . . . . . . . . . . . . . . . . . .1164

3005-28   . . . . . . . . . . . . . . . . . . . . .1173

3006-2   . . . . . . . . . . . . . . . . . . . . .1261

3009   . . . . . . . . . . . . . . . . . . . . . .1165

DEFENDANT EXHIBITS

Exhibit No.                                             Received

6001   . . . . . . . . . . . . . . . . . . . . . .1315