P7OVSTO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v.                              23 Cr. 430 (KPF)

ROMAN STORM,

                Defendant.              Jury Trial
------------------------------x

                                        New York, N.Y.
                                        July 24, 2025
                                        9:55 a.m.


Before:

                HON. KATHERINE POLK FAILLA,

                                        District Judge


                        APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  NATHAN M. REHN, ESQ.
     BEN ARAD, ESQ.
     BENJAMIN A. GIANFORTI, ESQ.
     KEVIN G. MOSLEY, ESQ.
     TARA M. LA MORTE, ESQ.
     Assistant United States Attorneys

WAYMAKER LLP
     Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
     KERI CURTIS AXEL, ESQ.
     KEVIN M. CASEY, ESQ.
     VIVIANA ANDAZOLA MARQUEZ, ESQ.
     BECKY S. JAMES, ESQ.
     -and-
HECKER FINK LLP
     Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
     CHRISTOPHER MOREL, ESQ.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P7OVSTO1

(Trial resumed; jury not present)

THE COURT:  My deputy advises me that there are before-matters, so who wants to begin?

Mr. Rehn, go ahead.

MR. REHN:  Your Honor, we wanted to raise an issue regarding one of the witnesses the defense identified as potentially testifying tomorrow.

THE COURT:  Okay.

MR. REHN:  This relates to the testimony from the company called Chainalysis.

THE COURT:  Yes.

MR. REHN:  As we understand it based on a conversation we had with Chainalysis last night, with their counsel last night, what the defense has indicated to them — and, again, we haven't gotten a clear proffer from the defense directly, so we don't know for sure.  But what the defense has indicated to Chainalysis is that they want to call them to establish that they were running a relayer during the time period in question.

THE COURT:  That's what was said to me yesterday by defense counsel.

MR. REHN:  And that they want to establish that they are a "reputable company."

THE COURT:  I don't know -- so, what, a character witness for Peppersec or Tornado Cash?

MR. REHN:  Well, there's a couple of issues with this

testimony, your Honor.

First off, as far as we are aware, there's zero evidence that the defendant was in any way aware that Chainalysis was running a relayer.  We don't believe he knew.  And so we don't see how it could be relevant to his state of mind.

Secondly, there are a number of --

THE COURT:  But would it not -- I mean, I'll certainly listen from the defense, but does it not go again to the argument that you've been making, that the relayer registry and its structure is a way of determining the for-profit or interested-in-profit status of Tornado Cash?

MR. REHN:  I don't believe they are going to question the fact that they earned fees through their relayer.  I mean, I think the parties agree as to that part of the testimony, that the Chainalysis relayer earned fees.

But in particular with respect to this company, there are a lot of collateral issues surrounding its intent and knowledge with respect to that and, in particular, its communications with law enforcement and the fact that the company filed a report in connection with the Dutch prosecution of Alexey Pertsev that was used at the trial.

It's impossible to assess Chainalysis's involvement without introducing a host of surrounding circumstances relating to its --

P7OVSTO1

THE COURT:  But you're basically putting the defense on notice that if this Chainalysis witness speaks, you're going to talk to them about all of their law enforcement work in investigating Tornado Cash.

MR. REHN:  Your Honor, I don't think it can be fairly limited to the fact that they ran a relayer as some sort of suggestion to the jury that it was sort of a legitimate part of the Tornado Cash business, given --

THE COURT:  Two different things, please, sir.

And, Ms. Noriega, we may have to tell the jury that we have a delay because people don't tell me things until they do.

I will hear from the defense, but I'm not yet convinced that they can't talk about their work as a relayer. I'm not sure what this reputable company thing — that does seem to open up the door to the information that you're discussing. But I also need to understand so that I can have a meaningful appreciation of this, what information -- what did they do? Did they file something equivalent to a suspicious activity report?

MR. REHN:  Your Honor, again, a lot of these issues are actually very fraught because there was communication with both the Dutch law enforcement and the American law enforcement before and after the time period of the relayer.  And there was a subsequent report that Chainalysis submitted to Dutch law enforcement regarding the relayer.

P7OVSTO1

THE COURT:  Regarding their relayer, their work as a relayer?

MR. REHN:  Regarding data they obtained.

THE COURT:  As a relayer.

MR. REHN:  As a relayer, for the purpose of the prosecution of Alexey Pertsev.

There are separately questions about the degree to which Chainalysis was aware of the nature of certain transactions on the relayer.  There's a lot of evidentiary issues with respect to that.

THE COURT:  Did you let them know that they were potentially subject to investigation or prosecution?

MR. REHN:  We have discussed at a high level some of the issues surrounding the relayer with Chainalysis, and I understand that they are evaluating that.

THE COURT:  Was that yesterday or has that been over time?

MR. REHN:  We have had more conversations over time. The last time we spoke with them was in the fall, when they initially produced this data to us, and we haven't engaged with them since.  But we highlighted a few issues with the data last night with them.

And my point is just there's very little, if any, relevance to this testimony.  And it introduces a host of issues that would distract the jury and would be unduly

P7OVSTO1

prejudicial.  And I think it should be --

THE COURT:  It sounds like unduly prejudicial to the defense -- or prejudicial to the defense.  And that's interesting, because usually you'd want that out there, but okay.

All right.  So that is an issue.

You have spoken to Chainalysis in the very recent past?

MR. REHN:  We spoke with their counsel last night, your Honor.

THE COURT:  This is Mr. DeFilippis?

MR. REHN:  That's correct, your Honor.

THE COURT:  All right.  Am I allowed to know what he said?  Is he going to let one of their representatives testify?

MR. REHN:  I don't want to speak for them.

THE COURT:  Will I see them at 4 o'clock today?

MR. REHN:  He said they are in communications with the defense as well.

THE COURT:  Okay.

MR. REHN:  So I know they were considering options in light of the conversation we had last night.

THE COURT:  Okay.

MR. REHN:  Like I said, I just don't think this testimony can be fairly admitted without the overall context, including the Dutch investigation and the American

investigation that were ongoing at the time.

THE COURT:  I understand.  Thank you.

Mr. Patton.

MR. PATTON:  Yes, your Honor.

So there are a few issues here.

THE COURT:  All right.

MR. PATTON:  From the 3500 material, Chainalysis has been discussing their work running a relayer with the government for at least two years.  So to the extent that they are now, after conversations last night with the government --

THE COURT:  Sir, that is why I asked the question whether discussions about their potential exposure happened more -- longer than last night, which I'm told they've been since the fall.  But go ahead.

MR. PATTON:  We have 3500 going back to at least 2023 in which they openly discuss using a relayer and not for law enforcement purposes.  In fact, they collected tens of thousands of dollars in relayer fees.

So to the extent that suddenly last night, because of a conversation they had with the government, now they have a Fifth Amendment claim, first of all, it's just been utterly waived.  They've talked about this with the government many times.

It also strikes us, again, along the time issues with Tom Schmidt, they don't face any realistic possibility of

P7OVSTO1

prosecution. Chainalysis is truly perhaps like the world's most renowned blockchain tracing company. We are not calling them as character witnesses of any sort.

THE COURT: But are you going to talk about the reputable nature of either Chainalysis or Tornado Cash in the testimony?

MR. PATTON: We would have to talk about, in a very limited way, who Chainalysis is. Because we're not calling somebody to say, you know, Yes, under cloak, you know, we were surreptitiously -- we're some --

THE COURT: Co-conspirator.

MR. PATTON: Yes. And that they are a reputable firm. They used Tornado Cash -- or they operated a relayer on Tornado Cash. They did so -- we certainly need to be able to prove up the fact that they are independent operators from Tornado Cash — they earn their own fees — all of the aspects of what it means to run a relayer that's been the subject of this trial.

And so it's highly relevant to all of those issues. Relayers weren't under the control of Tornado Cash; they operated independently, they charged their own fees, they set their own fees. And the fact that this was being done by a perfectly legitimate outfit and not some criminal is highly relevant.

THE COURT: All right.

MR. PATTON: And I will also say Mr. Storm did have

P7OVSTO1

conversations with Chainalysis about the oracle he implemented. Chainalysis made that oracle to be able to block sanctioned addresses shortly before Tornado Cash implemented it.  So they are going to be in the discussion of this trial anyway.

And Mr. Storm and the other founders implemented that oracle very shortly after it became available, and we think that's significant.  So that's not directly related to this issue, but the fact is Chainalysis is going to be a known quantity in the trial.

THE COURT:  I understand.

I'm leaving open the door to the possibility that all of their work, after everything went to hell, may be coming in. But I need to hear the evidence first.

Sir, while I have you standing, has your firm or your team come to an agreement with Chainalysis about the documents to obviate the need for the 4 p.m. hearing?

Mr. Klein.

MR. KLEIN:  Yes, your Honor.  I can report good news.

I just spoke with Sullivan & Cromwell's attorneys.

THE COURT:  Again, Mr. DeFilippis?

MR. KLEIN:  Yes.  Sorry.

THE COURT:  No, that's fine.

MR. KLEIN:  And we do not need that conference at 4 p.m.

THE COURT:  All right.  We will take it off of our

P7OVSTO1

calendar and let our court reporters know that we do not have a conference at 4 p.m.

But just so that I understand, sir, was the government also given a production of these 7500 pages of documents?

They were?

Are you introducing materials from Chainalysis in the testimony of the witness?

MR. KLEIN:  So, your Honor, we are trying to work out a stipulation with Chainalysis that we will present to the government that would obviate the need for witness testimony that would cover what happened during this time period and their running of the relayer.  I don't know if the government will agree.

THE COURT:  Well, just please remember the hell that we all went through because you allowed for custodial stips, but still required them to prove up the content of the information as, for example, coming in through another basis.

I mean, all I'm saying is if you're going to start suggesting suddenly that emails or business records, and they can come in without any other exception to hearsay, then I'll be sad, because that's exactly what we fought about for two weeks.  So I'm not sure how the documents will be coming in.

If it were, for example — sir, thank you for letting me speak — an invoice from Chainalysis about services provided, or an invoice -- or some sort of accounting record of a receipt

P7OVSTO1

of relayer fees, that I imagine that would -- that could be potentially a business record. I'm just -- having spent weeks now litigating Telegram chats, I have a little bit of PTSD about them.

So all right. So you're thinking then both a witness and somehow a custodial stipulation.

MR. KLEIN: Your Honor, we had subpoenaed both the custodian --

THE COURT: Yes.

MR. KLEIN: -- and a witness at Chainalysis who knows about the running of the relayer. We weren't sure what was going to happen; we weren't sure if we were going to reach a stip, so we have to cover all our bases.

THE COURT: Of course.

MR. KLEIN: And so we have both a live witness to talk about the running, and we would have a custodian to put in underlying records if we need that. We have been working on them on a stipulation that would obviate the need for that. We don't know if the government would agree, it sounds like they might not. But we have been trying to handle this issue the best we can.

I will note, your Honor, we do have a serious concern about the phone call that happened last night, and here's why, your Honor: The live witness, who would have a Fifth Amendment right, because it's not Chainalysis, right — Chainalysis can't

assert the Fifth. But the live witness -- after this phone, call we received a phone call that said, Now she's thinking about asserting the Fifth.

And so we are deeply concerned. They have been talking to these witnesses for over two years. We said we were calling this witness on Friday. We notified them about that potentiality, Chainalysis. They have a phone call last night. We receive a phone call afterwards that says, Now this witness out of the blue is going to assert the Fifth maybe.

THE COURT: Okay.

MR. KLEIN: So we would ask the Court to make an inquiry of what was said to this witness. And we'd like to know -- Mr. DeFilippis did not want to tell us — we've asked him multiple times. And we don't know what was said to this witness. And now they want to take the Fifth, and we have deep concerns about that.

So we'd ask that there be an inquiry made with both Mr. DeFilippis and whatever prosecutors were on that line so we can understand what happened. Because we may have to call this witness.

THE COURT: And have them assert the Fifth?

MR. KLEIN: I don't know if they are asserting the Fifth. But after a phone call with the government, we learn they might. And there could -- again, I don't know what was said on that phone call, but they literally have been in

P7OVSTO1

contact with Chainalysis for two years.  And out of the blue, last night we learn this woman may take the Fifth from merely a phone call.

THE COURT:  All right.

I received from the defense updated charges, so I have them, but I just got them as I came down here.

What else should I know?

MR. KLEIN:  Your Honor, there is a witness we intend to call that we've notified them about.

THE COURT:  Yes.

MR. KLEIN:  But you asked if we had sent the records to the government, we did, just to be very clear.

THE COURT:  You did say that.

MR. KLEIN:  Okay.  I just want to make clear, they have the same records we have.

THE COURT:  But they don't have necessarily the exhibits that you've extracted from those records.

MR. KLEIN:  We haven't decided which one to use because we were hoping to work the stip or have the live witness and not even put them in.  If we had the live --

THE COURT:  Slow down for the court reporter, sir.

Thank you.  Go ahead.

MR. KLEIN:  Two cups of coffee this morning.

THE COURT:  Sorry for you.  Go ahead.

MR. KLEIN:  We would not put records in if the live

witness testifies, because this witness would be able to explain what happened, and then we don't think we need to put the records in, because there will be evidence of what happened.  So that's why we haven't identified the records.

Turning to the next issue.  We have identified a witness — and we notified the government as soon as we had this person under subpoena and right after we identified them.  And we've talked to them.  And we're hoping to work this out, but I want to alert you to this issue, because they potentially may be called today if we run -- things go faster than anticipated.

It's an individual at a company who ran a prize contest at ETH Boston 2019.  And the reason why this is relevant, your Honor — and I can explain very clearly --

THE COURT:  All right.  Because it's not obviously relevant.  Go ahead.

MR. KLEIN:  Not obvious.

But if you remember from our opening, we mentioned the one time Mr. Storm or anybody wore this T-shirt was at ETH Boston 2019.

This company ran a prize contest.  They awarded a prize to Peppersec for the Tornado Cash, and at the time it was called Tornado Cash/ETH Mix.  They were awarded a prize for developing the UI.  There is a photograph that this witness can identify with Mr. Semenov wearing that T-shirt when they were awarded this prize.  So it's a photograph of the prize winner

P7OVSTO1

from -- and it shows the T-shirt very clearly, your Honor. And it shows it being worn at ETH Boston at this conference by Mr. Semenov.

They have obviously marked Government Exhibit 1, a photograph of this T-shirt. So it's highly relevant for us to put in that this T-shirt was worn, it was worn at this conference, and in the context in which it was worn.

And so that is a witness we plan to call. We've provided this exhibit to the government the other night. They have it. And we let them know what they want to testify about.

There is a very personal and compelling issue that we're working through with the government about remote testimony related to this witness, and I would only say the most compelling issue I can think of for someone to appear remotely.

THE COURT: Mr. Arad.

MR. ARAD: Your Honor, the defense provided a proffer of this witness's testimony not one minute before your Honor entered the courtroom this morning to the government; so we have not had a chance to confer as a team.

I will tell the Court that the government has serious concerns about the relevance of any of this testimony. And we would like to confer briefly and come back to the Court during --

THE COURT: You spoke about the T-shirt. You

introduced it.  You introduced it through the FBI witness with the metadata.  She acknowledged on her cross-examination that the data that she had could not definitively show when the photograph was taken.  Is that not correct?

MR. ARAD:  That's correct, your Honor.

THE COURT:  So why wouldn't -- I mean, I have problems about the remoteness of the testimony, but perhaps you may not and you may feel that it is -- given whatever extreme personal circumstances are discussed, that that remote testimony would be appropriate.  But I'm having a little difficulty with the relevance objection you're making.

MR. ARAD:  I understand that, your Honor.

Again, because we received a proffer from the defense just before your Honor came in and the team has not had a chance to confer about this, we'd like to have a moment to think about that and come back to your Honor about the relevance issue and also about the remote testimony issue.

THE COURT:  Sit, Mr. Klein.

Talk to Mr. Klein about the incredibly compelling personal reason which I'm not aware of.

MR. ARAD:  We will of course do that, your Honor.

And I just wanted to also provide some context, which is that we had a discussion last night with counsel for this witness, where counsel for the witness raised that personal issue to us.  But obviously we didn't get a proffer from the

P7OVSTO1

defense about it until this morning. And so I just wanted the Court to be aware of the full extent of discussions about this issue.

THE COURT: Is there a world in which the government would stipulate to the fact that Mr. Semenov wore the shirt at this conference in 2019 or no?

MR. ARAD: That's certainly something we'd discuss with the defense.

THE COURT: That would be, it seems to me, the easiest, most anodyne solution, but --

MR. ARAD: That occurred to us as well, your Honor. But we just haven't had a chance to even raise that with the defense.

THE COURT: Because you guys don't talk to each other until I'm walking downstairs. Okay. Fine.

Other issues that I should know about before the jury — who wishes to come out — comes out?

MR. ARAD: Not from the government, your Honor.

THE COURT: Mr. Klein.

MR. KLEIN: I just want to be clear, your Honor.

We notified them. They asked us an inquiry two nights ago what this person will be testifying about. I emailed back and said GX-1, which is the T-shirt photo in ETH Boston 2019, and it was when we sent the exhibit over. So they have known for a few days at least.

P7OVSTO1

Now, they did ask for an additional proffer this morning.

THE COURT:  Right.  So which you gave them as I was coming downstairs.

Sir, somehow each of you thinks that I'm going to favor you because you're going to tell me about the shortness of time within which you have received information.  Your decisions either to not tell people things or to not ask for things I find annoying on both sides.  So really none of you is making points with me with the discussions you're having this morning.

I will decide these issues.  But the answer you just gave, sir, just really borders on the ridiculous, that they should have -- now that they just got this information, that they should have asked you somehow sooner about this.

Both of you do this consistently, which is why we're here talking about matters that we should have resolved yesterday and not wasting the jury's time, but here we are.

Are there other matters, Mr. Klein, that you wish to ambush me with this morning, or is that it?

MR. KLEIN:  Your Honor, there are none.  I wasn't trying to ambush the Court obviously.

THE COURT:  Effective, not purpose, sir.

Ms. Noriega, let's get the jury ready.

And may I have the witness back on the stand, please.

MR. MOSLEY:  They are getting him right now, your Honor.

THE COURT:  Okay.  He's not on the security line, is he?

MR. MOSLEY:  No, he's just sitting right outside.

THE COURT:  Okay.  Welcome, sir.  Please come forward.

(Jury present)

THE COURT:  Good morning, everyone.  Please be seated.

Thank you for your patience as we addressed the legal issues that were needed to be addressed before testimony.

Ms. Axel, you may continue.  Thank you.

MS. AXEL:  Thank you, your Honor.

STEPHAN GEORGE,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

CROSS-EXAMINATION (continued)

BY MS. AXEL:

Q.  Good morning, Agent George.

A.  Good morning, ma'am.

MS. AXEL:  I'd like to have Mr. DeMarco place on the screen what has been marked and you displayed as 3006-1.

Q.  And, Mr. George, you previously identified this as a slide that you helped to create; correct?

A.  Yes, ma'am.

Q.  And you discussed it yesterday?

A.   Yes, I did.

Q.   Okay.  And let's start over on the left here again.  You have what looks like a tornado sign, and then it says 2.5 million TORN.  Do you see that?

A.   Yes, ma'am.

Q.   Okay.  So you understand that the Tornado Cash pool contracts that are being discussed in this trial are Ethereum pool contracts; isn't that correct?

A.   Ma'am, I don't know anything about the Tornado Cash pool contracts.

Q.   So do you understand, Mr. George, that TORN and ETH are two different types of cryptocurrencies?

A.   Yes, I understand that.

Q.   Okay.  And so do you understand that the TORN is an ERC-20 token?

A.   I am aware.

Q.   Can you explain to the jury what an ERC-20 token is.

A.   Generally speaking, it is a token that meets a certain standard of protocols, meaning it follows a certain type of rules in order to operate on this particular blockchain.

Q.   And as part of the Ethereum code, anybody can issue an ERC token; correct?

A.   A token can be utilized on this blockchain if it follows those rules as mentioned, the ERC-20 rules.

Q.   But that's a totally different token than ETH?

P7OVSTO1                        George - Cross

A.   I can't speak in totality to whether it is a totally different token than ETH.

Q.   It's outside your subject matter expertise?

A.   In this particular matter, it was not a factor in my tracing in the request I was asked to do.

Q.   Do you know?

A.   That's a technical aspect that I don't know if I want to articulate on because it is not a factor that I often have to pontificate when doing this type of work.

Q.   Meaning it's outside your expertise?

A.   It is not a factor that I have to navigate regularly in my work.  Whether it's outside of my expertise, I can't speak to that.  I don't know how to answer that question.

Q.   Well, you can't answer the question, which means you don't know.

MR. MOSLEY:  Objection.

THE COURT:  That's not what he said.  He said he was reluctant to do it.

But let's move on.  Thank you.

Q.   Okay.  So we're here talking about the TORN token though, right?  We're not talking about ETH, the token, on this chart.

A.   On this chart, there is transactions that utilized TORN tokens.

Q.   So the answer is yes?

A.   Okay.

P7OVSTO1                        George - Cross

Q.  All right.  And you identified yesterday that you had looked at the tornado.cash governance proposal; correct?

A.  I had looked at a document that talked about the Tornado Cash governance proposal, and I had looked at a reference to Tornado Cash governance on etherscan.io related to this specific transaction.

Q.  You looked at etherscan.io to see when the TORN was issued?

A.  Yes, ma'am.

Q.  Okay.  And you looked at the governance proposal to understand to whom the TORN was issued?

        MR. MOSLEY:  Objection.

        THE COURT:  I'll allow.

A.  I looked at the Tornado Cash governance proposal on the article that you're referencing to match the math, to match the units that were described in that article to the transaction that I saw on the blockchain.

Q.  Okay.  And when you looked at the Etherscan, when the TORN was allocated to the founders, it comes from a null set, right?  It's new.

A.  Yes.

Q.  Okay.  So let's look at that governance proposal.

        Showing you what's been marked as -- and is in evidence as 1904.

        MS. AXEL:  Mr. DeMarco, can I have the second page of that document.

P7OVSTO1                    George - Cross

Q.  Okay.  And we looked at this yesterday; correct?

A.  Yes, ma'am.

Q.  And you pointed out that 30 percent was to be allocated to the founding developers and early supporters, right?

A.  Yes, ma'am.

Q.  And you understand that this Medium article was a proposal; correct?

A.  I believe it says it in the title.  I don't remember it correctly, but --

        MS. AXEL:  We can look at page 1.

Q.  Does that refresh your recollection that this is a proposal?

A.  Yes, ma'am.

Q.  Okay.  And do you know the steps that were needed in order for the proposal to be approved by the community?

A.  I'm not aware of the steps in this particular matter to be approved by the community.

Q.  Are you aware that the community approved it?

        MR. MOSLEY:  Objection.

        THE COURT:  I'll allow.

A.  I'm aware there's an aspect, governance voting.  I'm aware that there's an aspect of a vote.

        THE COURT:  I believe she's asking you, sir, do you know if it was approved?

        THE WITNESS:  Oh --

P7OVSTO1                        George - Cross

THE COURT:  Ms. Axel, am I correct?

MS. AXEL:  I honestly can't remember the question.

THE COURT:  Okay.  All right.

MS. AXEL:  I'll take your word for it.

THE COURT:  Never mind.  I'll let you ask another question.  I don't want to be questioning the witness.

Thank you.

BY MS. AXEL:

Q.  Okay.  I believe I asked you the steps, and I think you answered that question.

So we'll take the Court's question:  Was the proposal approved?

A.  Based on the fact that the transaction that I reviewed matches in similarity to these percentages and the amounts of TORN, I believe it was approved.

Q.  Okay.  And you see there that it says that the founding developers and early supporters will be unlocked linearly over three years with a one-year cliff.  Do you see that?

A.  Yes, ma'am.

Q.  Do you know what a one-year cliff means?

A.  I'm not aware.

Q.  Okay.  And with respect to the tokens being unlocked linearly over a period of three years, do you know what that means?

A.  Based on the language there, it would be an aggregated

amount over three years.

Q. So they are not all released at once?

A. Based on the language there, that's correct, unlocked linearly over three years.

Q. Do you have an understanding that this is common, that founders' tokens are often just released over a longer period of time?

MR. MOSLEY: Objection.

THE COURT: I will allow.

A. I don't have that understanding; and I'm not aware of founders' tokens and how they typically operate in other environments.

Q. Okay. So you don't know when, in fact, Mr. Storm could have accessed any TORN tokens?

A. No, that's not something I pontificated in doing this. I matched an amount in the transaction to a subsection of the article that we're looking at.

Q. Let me show you what's the last page of this document. Let's look at --

MS. AXEL: You know, I don't have numbers, so actually go back a page or two, Mr. DeMarco. I think that's just the web stuff at the end. Yeah, right there. No. One more forward.

Q. Okay. So, Mr. George, did you also review these various addresses where -- for the vesting contracts for the TORN?

P7OVSTO1                       George - Cross

THE COURT:  We're looking at the top of the page, counsel?

MS. AXEL:  Yes, team 1 vesting, team 2 vesting, etc.

Q.  Do you see the vesting contract addresses there?

A.  I do see these vesting contract addresses, yes.

Q.  What do you understand that to be?

A.  These are similar titles to what I saw on etherscan.io. And I understand, when I did the math, in tying the units listed on the previous page that we were just looking at to the transaction itself, there's a portion of these addresses that I believe were tied to the 30 percent figure on that page.

Q.  So when you went to Etherscan, the contract addresses -- the addresses there matched what's in this post?

A.  I didn't verify it through this post, so I can't say yes to your question.  But, again, some of the titles there, team 1 vesting, team 2 vesting, team 3 vesting, these are some of the titles that I also saw in the Etherscan web page.

Q.  And you understand this Medium post is a public article; correct?

A.  Yes, I do.

Q.  And so these addresses here were listed publicly?

A.  Yes, ma'am.

Q.  And Etherscan, where you saw these same titles, is also public, right?

A.  Yes, ma'am.

P7OVSTO1                        George - Cross

Q.  So everyone could see how much TORN was allocated to the founders; correct?

A.  Yes, ma'am.

Q.  And when they could access that TORN?

A.  Based on the article, yes, ma'am.

Q.  And when they moved that TORN; correct?

A.  I'm sorry?

Q.  And when they moved that TORN; correct?

A.  And when they moved it, yes, ma'am, on the blockchain.

Q.  So any community member could follow if the founders decided to move TORN or sell it?

          MR. MOSLEY:  Objection.

          THE COURT:  I'll allow.

A.  There's a verbiage there that I cannot completely agree with.  When we say -- when you asked the -- can you repeat the question?  When the founders could move the TORN is part of your question; is that correct?

Q.  Yes.  So the community could see when the founders moved their TORN or sold it.

A.  The community would be able to see movements of cryptocurrency on the blockchain.  The community doesn't know is it a founder, doesn't know if it was sold, doesn't know if it was traded or exchanged to someone else for ownership.  The community can only see a movement of cryptocurrency moving from one address to another, that is it.  No context.  No story.  No

P7OVSTO1                         George - Cross

details.

Q.  So when you're saying if it moved from the founders'
contract, it was allocated to a new wallet, you wouldn't know
if that belonged to somebody else?

A.  No.  In my experience, you can hand that address to someone
else for value of cash, you can do a variety of things with
that address.

Q.  Okay.  So let's go back to 3006-1.

So starting here, Mr. George, you have a date listed
as December 18th, 2020 underneath the 2.5 million TORN.  Do you
see that?

A.  Yes, ma'am.

Q.  What is that date?

A.  This is the date of the transaction where these amounts,
822,000 each, were disseminated by the smart contact associated
with Tornado Cash.

Q.  And do you know if the founders could actually access that
TORN on that date, given the vesting schedule?

A.  The vesting schedule that was listed said that there was an
aspect to it about linearly for three years.  That is what the
vesting schedule said.

Q.  Right.  So you don't know if they could actually access it
on December 18, 2020?

A.  I don't know if they can physically access it and what they
can do with it on December 18, 2020.

P7OVSTO1                      George - Cross

Q.  Okay.  So you have movements here on -- of 822,407 TORN,

three different movements.  Do you see that?

A.  Yes, ma'am.

Q.  Do those come from three different contracts, vesting

contracts?

A.  On the blockchain they appear as one transaction associated

from this particular smart contract, from one smart contract.

Q.  So the 822,000 comes from one vesting contract?

        MR. MOSLEY:  Objection.

        THE COURT:  I'll allow.

A.  No, what I said specifically was there was one transaction

with these three details in that transaction.  So there was one

transaction where 822,000 units of TORN were sent out to these

three addresses, and that transaction came from a smart

contract associated with Tornado Cash.  One smart contract.

Q.  Associated with TORN?

        MR. MOSLEY:  Objection.

        THE COURT:  The contract associated with Tornado Cash

or with TORN, sir, and do you understand the difference?

        THE WITNESS:  The contract was associated with Tornado

Cash.

        THE COURT:  Thank you.

Q.  Associated with the pool smart contracts?

        MR. MOSLEY:  Objection.

        THE COURT:  I'm sorry, what is the -- the pool smart

                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

P7OVSTO1                         George - Cross

contracts.

Q.  Pool smart contracts.

        THE COURT:  Do you know?

Q.  Tornado Cash pools.

A.  I know nothing about the Tornado Cash pools.

Q.  Okay.  So we looked before on Exhibit 1904 at different vesting contracts:  Vesting contract 1, vesting contract 2, vesting contract 3.  What vesting contract did this movement of the three transactions of 822,000 TORN come from?

A.  Would you be able to pull up that document that you're referencing?

Q.  Sure.  We'll look back at that page we had of 1904.

        MS. AXEL:  Mr. DeMarco, can you put that back up.

Q.  Okay.  There are various team vesting contracts listed here, 1 through 5.  Do you see that, sir?

A.  Yes, I do.

Q.  Okay.  So my question is, and you identified -- while you didn't recognize the addresses, you recognized the names as consistent with your Etherscan review?

A.  Yes, ma'am.

Q.  Okay.  So when we were looking at the tracing chart you just did, 3006-1, what vesting contract did the TORN you were tracing come from?

        MR. MOSLEY:  Objection.

        THE COURT:  I'll allow.

P7OVSTO1                        George - Cross

A.   Whether that particular contract was labeled as vesting contract 1 or team 2 or team 3, that information was not on the blockchain.  The blockchain showed one transaction disseminated by a smart contract associated with Tornado Cash giving 822, 822, 822, along with a number of other units of cryptocurrency to other addresses in one transaction.

Q.   You're telling me the originating account was not one of these vesting contracts?

MR. MOSLEY:  Objection.

THE COURT:  You're misstating his testimony.

Q.   My question was — I'll ask it again then.  That originating account that sent the three instances of 822,000, was it any of these vesting contracts?

MR. MOSLEY:  Objection.

THE COURT:  That's not what he -- you guys are talking past each other.  He's talking about what he's seeing on the blockchain; you're talking about these contracts.

Please move on.

MS. AXEL:  May I clarify, your Honor?

THE COURT:  May you what?

MS. AXEL:  Clarify.

THE COURT:  You can try.

MS. AXEL:  Okay.

BY MS. AXEL:

Q.   Mr. George, you testified that when you reviewed the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

blockchain data, in fact, you did see these names for the vesting contracts; correct?

A.  I saw reference to team 1 vesting, team 2 vesting, team 3 vesting.

Q.  And you understand these are the ways by which the founders were allocated the tokens, right, through these vesting contracts?

A.  I matched the amounts to the amounts listed on the page 2 of this document.

Q.  Right.  And you testified as well that they were listed as vesting contracts, even though you couldn't identify these addresses; correct?

A.  Yes, that's correct.

Q.  Okay.  And so my question is, having identified that they came from vesting contracts, I'm asking you which one?

        MR. MOSLEY:  Same objection, your Honor.

        THE COURT:  Do you know?  If you don't, that's fine.

A.  Ma'am, I didn't look into the title of which contract it was.  There's one transaction.  The question that I was asked is where did this come from.  And so I saw this came from a Tornado Cash smart contract.  It ended up in these three addresses.  What happened next?  And I followed the flow of funds; I followed the money.  I don't look and see if this particular title and what contract it's associated with, I'm just looking where it came from and where it's going.

Q.  Okay.  But you did perform various exercises to try to attribute some of the transactions along the way; correct?

A.  The only two instances that I can recall that I did to attribute the, as you said, transactions, was by referring to the Binance document that was produced and by referring to communications that I received from the prosecution related to a level of initiation in these transactions.

Q.  Correct.  So you did some attribution on -- as to those two transactions; correct?

A.  That is correct.

Q.  But you didn't do any attribution as to other transactions?

        MR. MOSLEY:  Objection.

        THE COURT:  I'll allow.

A.  Attribution was not my priority.

Q.  Okay.  Let's go back and look at 3006-1.

        So we are still at the stage here of the 822,407 TORN going to three wallets.  Do you see that?

A.  Yes, ma'am.

Q.  What date did that occur?  It's not on your chart.

A.  When you add 822 plus 822 plus 822, you get approximately 2.5 million, and that's the date, December 18, 2020.

Q.  So the TORN moved to these three wallets on December 18, 2020?

A.  That's correct.

Q.  Okay.  And from these wallets, when did it move to the

intermediary addresses that you have there?

A.   It was approximately a year later, at the end of 2021/2022 time frame.  These transactions occurred from the three addresses in the middle that you've highlighted, to the intermediary addresses, and back and forth.

Q.   Tell me again what was the time period?

A.   The end of 2021, December of 2021, if I recall correctly, into 2022.  That time period.

Q.   Okay.  So no TORN moved until about a year later?

A.   From my recollection, I believe that is correct.

Q.   And, Mr. George, did you perform a tracing of these intermediary addresses?

A.   Yes, I did.

Q.   And where is that work?

A.   Well, to visualize that on this graph would be confusing and it would be a lot of lines going back and forth.  And so my goal with an illustration is to make it easily understandable by the jury, who typically doesn't have an expertise or experience in looking at these kinds of matters.

Q.   Did you prepare a spreadsheet for that that traced these addresses?

A.   I prepared my notes in order to do this trace, yes.  I have my notes.

Q.   You did it on notes; you don't have a spreadsheet?

A.   My notes are my spreadsheet, yes.  I make -- in order to do

P7OVSTO1                      George - Cross

this, this is a very tedious task.  There are many transactions.  I described LIFO methodology, the accounting principle that I used yesterday.  You have to be very meticulous as you go transaction by transaction.

And so in order for me to do that and keep track of what I'm doing, I have to utilize Excel to not only trace the transactions on the blockchain, but also trace my targeted funds, the funds I'm looking for.

Q.  Okay.  And did you provide that spreadsheet to the defense?

A.  I provided, I believe, my notes to the prosecution.

Q.  But by "notes" you mean the spreadsheet?

A.  Yes, ma'am, sorry.  I provided my spreadsheet to the prosecution.

MS. AXEL:  I would request that record, which we don't have.

MR. REHN:  It's been produced to the defense, your Honor.

THE COURT:  Thank you.

MS. AXEL:  I believe it has, but we'll follow up later.

BY MS. AXEL:

Q.  So then with respect to the Binance account there, so you see, you said, 48 deposits in this period of August 8th to 11th into the Binance account; correct?

A.  Yes, ma'am.

Q.  And in terms of -- you testified that you did some work on attribution, correct, looking at the identities of people, looking at things off of the blockchain; correct?

A.  Yes, ma'am.

Q.  Did you investigate who Mr. Vazhenin is?

A.  No, ma'am.

Q.  Do you know if he's a friend or a relative of Mr. Storm?

A.  I have no knowledge of his relationship with Mr. Storm.

Q.  Okay.  What is Binance, sir?

A.  Binance is -- as I understand it, it's the largest cryptocurrency exchange platform in the world by trading volume.

     And if I'm allowed to clarify on a matter that you had mentioned earlier about --

Q.  Sure.

A.  Yesterday you had referenced a graph about lines and circles.  And that graph that you referenced yesterday would be the one that you're talking about here.

Q.  Oh, you mean something like the Chainalysis reactor graph, where we see --

A.  No, ma'am.  You had asked if I had prepared a schedule where I had lines and circles going.  You referenced that yesterday in your questions to me yesterday.  That that you're talking about would have been this one here.

Q.  You mean when we talked about the intermediary addresses

P7OVSTO1                        George - Cross

you have a work product like that that has lines and circles?

A.  Yes, ma'am.  Yesterday you had mentioned it, and that was the product I believe you were referring to.

Q.  I see.  I see.  For the intermediary addresses here?

A.  Yes, ma'am.

Q.  And is that something that you use Chainalysis or TRM to produce?

A.  I utilize etherscan.io, I utilize blockchain analytics tools to help me be able to visualize the information and then put it into my Excel chart.

Q.  Okay.  Thank you, sir.

And so you just testified that Binance is the largest cryptocurrency by trading volume in the world; correct?

A.  As I understand it, yes.

Q.  And this is Binance International; correct?

A.  Whether it is the U.S. company or it is the global company, I'm not aware.  I can't speak to that.  But Binance is a very large and well-established cryptocurrency exchange platform.

Q.  But there is a global company and a U.S. company, right?

A.  As I understand it.

Q.  And the same tokens are not listed on both; correct?

A.  I don't know.  I have not reviewed all of the listings of tokens for the global company as well as the U.S. company.

Q.  Are you aware that TORN was not listed on the U.S. Binance?

MR. MOSLEY:  Objection.

THE COURT:  I'll allow, if you know, sir.  If you don't, then say you don't know.

A.  I believe that I am -- I don't want to speculate and so, no, I cannot answer that question with confidence.

Q.  Okay.  So you don't know if TORN was listed on both or one or the other?

A.  No, I don't.  In this case, all I know is that Binance accepted TORN.

Q.  You don't know if that's Binance International or U.S.?

A.  Well, given that this account, Michael Vazhenin, I believe that this may be an international account.  But, again, I am not fully aware and I don't want to speculate.

Q.  So let's look at the account.  Let's go to what's been marked as 3006-2, and this is in evidence.

Okay.  And so the prosecutors provided you this Binance account of Mr. Vazhenin; correct?

A.  Yes, ma'am.

Q.  And this represents some of your work product in analyzing that account; correct?

A.  Yes, ma'am.

Q.  And you've said there were thousands of transactions in this account?

A.  Yes, ma'am.

Q.  And you sifted through all those transactions?

A.  I sifted through the transactions, yes, ma'am.

P7OVSTO1                       George - Cross

Q.   Okay.  And are these -- underneath each -- you have three different columns, right?

A.   Yes, ma'am.

Q.   And each one represents a different step in the transactions; is that right?

A.   These particular screenshots represent different orders requesting conversions, conversions from one cryptocurrency to another.

Q.   Okay.  And so is this an excerpt of your work or is this all of the cryptocurrency conversions?

A.   No, this is a very small snapshot of a portion of the work.

Q.   For each of the columns it's a snapshot?

A.   Yes, ma'am.

Q.   You did a lot more work?

A.   Yes, ma'am.

Q.   Were there transactions in this account that were not related to TORN?

A.   Yes, ma'am.

Q.   All right.  Let's go to the next one.  This has been marked as -- I'm not sure.  It must be 3006-3.

        Okay.  And you testified then that you traced DAI and USDT coming out of this Binance account on August 8th and 9th, 2022; correct?

A.   That is correct.

Q.   And did all of it go to this wallet 0x2828?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.    The cryptocurrency illustrated in the graph and the ones I traced, yes, they ended up in 0eef, ending in 0eef.

Q.    And wallets on the blockchain are pseudonymous, right? They don't have a name on them?

A.    That's correct.  They don't have a name other than their address itself.

Q.    Right.  And so you went to non-blockchain sources in order to try to attribute and figure out who was behind this activity; isn't that right?

A.    The non-blockchain sources that I believe you're referencing are the communications that I received from the prosecution.  And if that's what you're referencing, yes, that is correct.

Q.    Now, other than the Binance account, the sources that you used to trace these cryptocurrency transactions was Etherscan; correct?

A.    Yes, ma'am.

Q.    Which is publicly available, right?

A.    Yes, ma'am.

Q.    And the information from Binance you received pursuant to a law enforcement subpoena; correct?

        MR. MOSLEY:  Objection.

        THE COURT:  From whom did you receive the Binance materials, did you just receive it from the prosecution team?

        THE WITNESS:  I received it from the prosecution team.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7OVSTO1                        George - Cross

THE COURT:  You don't know where they got it from?

THE WITNESS:  No, ma'am.

THE COURT:  Thank you.

MR. REHN:  Your Honor, may we approach?

THE COURT:  Sidebar, please.

(At sidebar)

THE COURT:  Why are you speaking during his witness?

MR. REHN:  I apologize, your Honor.  I'm looking at the disclosure for Stephan George.  The spreadsheet that she is referring to, I don't know if it's the same one that I was referring to in the disclosure.  I'm not 100 percent confident. There's a spreadsheet of tracing relating to these finance records, but I'm not 100 percent sure it's the same one he was referring to.

THE COURT:  That's something you can clean up on redirect.

MR. REHN:  I had said that it was produced, and I'm --

THE COURT:  Oh, I see what you're saying.

MR. REHN:  And then I pulled up the disclosure and I saw five spreadsheets.  And I'm not actually 100 percent sure if the one I was thinking about is the same one you described, if that makes sense.

THE COURT:  I do understand that.  I'm not sure why we're having a sidebar.

You're saying when she confirms with you whether it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7OVSTO1                          George - Cross

was produced or not, it may be that the thing you said was produced was something other than the thing he's talking about, but we just don't know.

MR. REHN:  Because I said that to the Court, I wanted to immediately acknowledge that when I pulled up the disclosure of the spreadsheet I thought he was talking about may not be the one that it appears he was talking about.

THE COURT:  Ms. Axel now knows.  I now know.

MR. REHN:  I apologize, your Honor.  I wanted to get that immediately corrected.

THE COURT:  Let me ask a different question.

May I assume that every spreadsheet he produced to you was conveyed to the defense?

MR. REHN:  That was my impression.  His description did not -- the spreadsheet that is in the production is not exactly like his description with relation to these tracings. So we need to check and make sure.  There may be a missing spreadsheet, I'm not sure.

THE COURT:  That he didn't give to you or you didn't give to them?

MR. REHN:  It's possible.

THE COURT:  Great.

MR. REHN:  Based on the description he just gave.

THE COURT:  Okay.  Thank you.

While we're together, may I ask how much longer?

P7OVSTO1                    George - Cross

MS. AXEL:  I think it's probably 20 minutes still.

THE COURT:  Okay, which is double what you suggested yesterday, but that's fine.  All right.  That's fine.

And is there redirect?

MR. MOSLEY:  I don't have that answer right now.  If it's redirect, it's one question.

THE COURT:  Okay.  We'll go back then.

Thank you very much.

(Continued on next page)

(In open court)

MS. AXEL:  May I inquire?

THE COURT:  You may.  Thank you.

BY MS. AXEL:

Q.  Mr. George, in the course of your work as a law enforcement officer doing cryptocurrency investigations, you've seen Binance data before; correct?

A.  Yes, I have.

Q.  And other exchange records, such as records from Coinbase, for example?

A.  Yes, ma'am.

Q.  So looking at the tracing that you've done, all of the information is available publicly except for what you received from Binance; correct?

A.  What I've demonstrated on here on this graph, yes, that is correct.  All this information is publicly available except for the Binance activity.

Q.  And so the only piece of this tracing that a member of the public couldn't follow was when the cryptocurrency, the TORN, went to Binance, right?

A.  That's not true.  You'll be able to know when it went to Binance, but you won't be able to know what happened within the Binance environment.

Q.  So at that point, Binance would provide privacy for -- on the blockchain for somebody transferring cryptocurrency into

it?

A.   Yes, that's correct.

Q.   Let me show you what was marked as Exhibit 2055-T.

          MS. AXEL:  And, Mr. DeMarco, can we have page 36.  I think I may have marked on the screen -- I don't know if people can see that red mark.  That was not intentional.  Let me clear it.  There we go.

Q.   Mr. George, looking at the bottom message -- maybe I will try this.  I put an X on it.  Can you see it?  Oh, it doesn't work.  Okay.

          All right.  Looking at that message, when Mr. Semenov mentions getting busted there, I mean, do you know what he's referring to, people being able to see his transactions?

          MR. MOSLEY:  Objection.

          THE COURT:  Do you know what the term "getting busted" means in this context?  Don't speculate, sir.

          THE WITNESS:  I don't want to speculate.

Q.   So other than reading this message, you didn't do any other work to determine what this meant?

A.   No, I did not.

Q.   And it wasn't illegal to sell TORN, was it?

          MR. MOSLEY:  Objection.

          THE COURT:  I get to talk about the law here, but I'll let you answer that one question.

A.   Not that I'm a legal expert, but I am not aware of any

issue with selling TORN at this time.

MS. AXEL:  Okay.  We can take that down.

Q.  And there's also nothing illegal about holding an offshore account, is there?

MR. MOSLEY:  Objection.

THE COURT:  I'll allow.

A.  There is nothing illegal about having an offshore account, that is correct.

THE COURT:  Can we please meet at side bar?  The answer is yes.  Thank you.

(Continued on next page)

(At sidebar)

THE COURT:  You'll excuse me if I'm misremembering, but I thought we had weeks of motion practice where I said we should not be using the terms "legal/illegal," "lawful/unlawful," "legitimate/illegitimate," "licit/illicit" with the expert witnesses.  Why are you questioning on the legality of transactions?

MS. AXEL:  I was referring, your Honor, to specific texts that he read into the record concerning Mr. Storm saying we should open offshore accounts.

I'm prepared to move on.  I have one more question, and I will not use the word "legal."

THE COURT:  But am I mistaken?  Did I just misremember weeks of motion practice where I said not to use these terms?  I just want to know why you're using them.  Because have you just decided to -- I mean, did we somehow just forget that I decided these things or do you just not care?

MS. AXEL:  In this context, your Honor, I didn't apply the Court's word about "legitimate" and "illegitimate" to this question.  I'm sorry, I just didn't think that through.

THE COURT:  The whole point of this is to keep the expert witnesses talking about what they can meaningfully speak to and not having them opine on legal issues.  That's what I get to instruct the jury on.  So I'm just asking you to please remember and abide by my orders.

P7OVSTO1                      George - Cross

MS. AXEL:  Of course.  I'm sorry, your Honor.

THE COURT:  Move on.  Let's go.

(Continued on next page)

P7O1STO2                          George - Cross

                    (In open court)

                    THE COURT:  Counsel, you may inquire.

                    MS. AXEL:  Thank you.

BY MS. AXEL:

Q.  Mr. George, you are aware that Mr. Storm does own U.S. real estate, correct?

A.  I am aware that Mr. Storm does own U.S. real estate; that is correct.

Q.  Let's look back at 3006-3.

        And the final step in this transaction, Mr. George, that you testified to was the movement of the 2.6 million DAI on August 9, 2022; do you see that?

A.  Yes, ma'am.

Q.  And then we looked at certain text messages, correct, and you used those for attribution?

A.  Yes, ma'am.

Q.  And so you believe that 2.6 million here went to Mr. Storm on or about August 9th or 10th, 2022?

A.  The communications caused me to believe that, yes, one of these addresses Mr. Storm may have accessed to—or—oh, 0EEF, he has access to for sure.

Q.  And you're an IRS agent, correct?

A.  Yes, ma'am.

Q.  And did Mr. Storm pay his taxes on the 2.6 million?

                    MR. MOSLEY:  Objection.

P7O1STO2                      George - Cross

THE COURT:  I'll allow if he knows.

A.  I want to clarify.  I'm an IRS Special Agent; and number two, I don't know anything about his taxes or his ability—his activity with his taxes.

Q.  Okay.  All right.  Let me show you what you marked as 1281 and put in evidence.

And you testified this is a summary spreadsheet that you prepared concerning VPN addresses, correct, or IP addresses?

A.  This is a summary spreadsheet of IP addresses and activity, yes.

Q.  Okay.  And we looked at some GitHub records yesterday, correct?

A.  Yes, that's correct.

Q.  And you used certain GitHub records to determine an IP address associated with a Storm login to GitHub on June 22, 2022.

A.  That is correct.

Q.  Okay.  And showing you now what has been marked as 665, which I understand is also in evidence pursuant to the GitHub custodian of records declaration.

MS. AXEL:  Do you want to check?

Thank you.

Q.  Mr. George, did you review this page from GitHub which shows the site administration for Peppersec?

P7O1STO2                        George - Cross

A.   I did not.

Q.   Okay.  And do you see at the bottom there, it says Roman Storm, and he has a picture and a public identity?

A.   Yes, I do see that.

Q.   And you're aware that this is publicly available.

         MR. MOSLEY:  Objection.

         THE COURT:  I'll allow it.

A.   I'm not aware if this is publicly available.

Q.   All right.  And let's also look at one more page.

         Can I show you what's been marked as 667.

         And did you look at this GitHub record for Mr. Storm's GitHub account info file?

A.   I did not.

Q.   Okay.  Mr. George, are you aware that when Mr. Storm logged into GitHub, his profile is publicly available?

         MR. MOSLEY:  Objection.

         THE COURT:  I'll allow if you know.

A.   I am not aware of Mr. Storm's profile on GitHub in terms of whether it's public or what aspects of his profile are public.

Q.   Let's look back at 1281, which is your document.

         As an expert witness, Mr. George, do you have any reason to believe that Mr. Storm was intending to hide his identity when he logged into GitHub?

         MR. MOSLEY:  Objection.

         THE COURT:  Sustained.

P7O1STO2                         George - Cross

Q.  Special Agent George, as an agent of IRS-CI, if you log into your email, don't you have to use a VPN?

MR. MOSLEY:  Objection.

THE COURT:  Sustained.

MS. AXEL:  Okay.  Just a minute, your Honor, please.

Q.  All right.  Mr. George let's take a look back at 3006-4. Do you recall that?

A.  I do recall this.

Q.  Okay.  And this is another summary document that you prepared.

A.  Yes, that is correct.

Q.  Okay.  And you said that you began with this crypto.com transaction here on the left, correct?

A.  Yes, that is correct.

Q.  And you received this information from the prosecution team to focus on this crypto.com address?

A.  Focus on this particular transaction.

Q.  Focus on this transaction.  What is crypto.com?

A.  It appears to be a website that offers some kind of service to the general public.

Q.  Is it a crypto exchange?

A.  I have not looked into crypto.com and what it could be.

Q.  And this particular transaction in crypto.com, do you understand why you were asked to look into that particular transaction?

A.   The request that I had received was, can you follow this transaction and tell me if any of these funds—where they went. And so your question was specifically, was I given the context of this transaction.  The only aspect to the context was, these are victim funds.  That was the word that I got.

Q.   Okay.  Victims of a hack, right?

MR. MOSLEY:  Objection.

THE COURT:  I'll allow.  If you know, sir.

A.   The words I got were, these are victim funds.

Q.   Okay.  And you've told us you followed this LIFO method, correct?

A.   Yes, ma'am.

Q.   And you've also testified that you were not asked to attribute these wallets, to figure out who they belonged to.

A.   That is correct.

Q.   I believe that we also looked yesterday—let me—so wait. I think we were at about C2, approximately, on the chart.  What happens between E and F?

A.   Between addresses E and F, there are transactions that are sent from E to an address, I believe it's about four addresses, if I remember correctly, and it's the same amount of victim funds between each address, so I have grouped them together for visual ease.

Q.   So it's approximately four hops.

A.   From my recollection, yes, I believe that is correct.

Q.   Okay.  Let me show you what has been marked as Defense Exhibit 6001, which we looked at yesterday and is in evidence.

MS. AXEL:  I will represent to the Court——I'll get that in a minute to sort that out.

There we go.

And I will tell the Court, and I already let the prosecutor know, that we had pulled up yesterday the BlockTrace version of this rather than Mr. George's version of this, and they asked me to put that on the record.

THE COURT:  So now I know.  Thank you.

Q.   Okay.  Mr. George, looking at this tracing document, did you prepare this on or about July 20, 2025?

A.   Yes, that's correct.

Q.   So is that the date on which you did this work?

A.   No.  I've done this work for a number of days prior to that.

Q.   Approximately how many days?

A.   This is when you asked yesterday about when I had started working on this, and I had answered that near the end of June, early July is what I recall from when I started looking at this particular trace.

Q.   Okay.  And where on these columns or this spreadsheet does it——do we go from E to those intermediary hops?

A.   Well, my illustration there doesn't have addresses because it would add to the visual complexity of understanding what

occurred, so your question as to when it goes to E, I would have to put these side by side and, just as we did yesterday, I matched the time, the date stamp, and the amount, I would have to do the same in order to answer your question accurately.

Q.   Okay.  Well, we did that yesterday.  Let's take a look. Should be faster this time.

A.   In the effort to save time, there are some more columns I'm going to need than the ones that are presented here.  I can specify which columns if you'd like.

Q.   Sure.

A.   So if you unhide all of them.

So you can go ahead and hide column A and B, and C.  I apologize.  You can hide E and F.  You can hide column J.  And that should be good enough for now.  Thank you.

Your question, ma'am?

Q.   Okay.  My question is:  Where is the transaction that goes from E into this intermediary cluster that you have?

A.   So if we can zoom into the E, the transaction leaving E on the left side.  So I see here that the transaction leaving address E is dated 10/25 at 8:40 a.m. in the amount of 47,000 units of USDT.  When I look on the right-hand side, I believe there's row 9.  If you can highlight.  That is on 10/25, at 8:40.  It is utilizing USDT in the amount of 46,511, so for rounding and visualization, that's the 47 that you see there. Line—row 9 is your question—the answer to your question.

P7O1STO2                       George - Cross

Q.  Okay.  And after that, you indicated you had several hops

clustered under I, correct?

A.  I apologize.  Under intermediary addresses you said?

Q.  Yeah.

A.  Yes, ma'am.

Q.  So that would be from——

        MS. AXEL:  Mr. DeMarco, I think the highlight was row

9, the 8:40 transaction, down through row 13.

A.  Row 13 is the transaction in which the USDT was sent from

the intermediary cluster to the address F.

Q.  And as to these particular transactions, did you look at

any of these wallets to see if they had the attribution——I'm

sorry.  Let me try that question again.

        As to each of these particular hops, did you look at

the addresses to see if they had any indicia of being a crypto

exchange?

        MR. MOSLEY:  Objection.

        THE COURT:  I'll allow.

A.  I did look for that.

Q.  Okay.  And what did you find?

A.  It is my review of these addresses that none of these

addresses are associated with a cryptocurrency exchange

platform.

Q.  And do any of these addresses have a very high volume of

transactions?

P7O1STO2                         George - Cross

A.   Ma'am, over the course of my investigative experience, I've looked at many addresses that have significantly more transactional activity than the ones here.

Q.   Okay.  How much?

          MR. MOSLEY:  Objection.

Q.   I'll try a better question.

          Looking at the wallet addresses here, isn't there a wallet that has $750 million of transactions in and out?

A.   That's possible.  I apologize.  That is possible.

Q.   Did you observe that; do you recall?

A.   I recall——dollar amounts are——the amount of USD that you're mentioning isn't a factor when determining whether an address is associated with a cryptocurrency exchange platform.  You're looking for other factors, like the volume of actual transactions that occur, you're looking for the amounts of the transactions that occur, you're looking for any other associated characters about that address and the activity in there, but the dollar value of the transactions is not a factor in determining whether the addresses associated with a cryptocurrency exchange platform——no.

Q.   Okay.  So other than the dollar amounts, you didn't see an amount of activity that you would think that was consistent with an exchange platform.

A.   That is correct.

Q.   But you would agree that if you saw such activity, you

would believe that it was a change of ownership?

MR. MOSLEY:  Objection.

THE COURT:  I'll allow.

A.  Each cryptocurrency exchange platform goes about differently in how they manage their addresses and how they manage customer deposits and withdrawals.  I can't—to answer your question, I cannot give you an answer for that because I don't know which particular cryptocurrency exchange platform you're—you're talking about.

Q.  You wouldn't think it's more likely that if someone moved it into an exchange, then the next hop did not belong to the person who'd moved it in?

MR. MOSLEY:  Objection.

A.  I'd have to ask the exchange to know the answer.  Anything else would be speculation.

THE WITNESS:  I apologize if I shouldn't have answered.

THE COURT:  You should have let me speak first.

THE WITNESS:  I apologize.

THE COURT:  That's all right.  You've answered the question.  I'll let it stand.

MS. AXEL:  Let's take a look at what's been marked as 254 that you looked at yesterday.

Was it 253?

MR. MOSLEY:  253.

P7O1STO2                        George - Cross

MS. AXEL:  253.

THE COURT:  Are we at 253 then?

MS. AXEL:  We are.  Apparently this is the one in evidence, so——

THE COURT:  This is the one we talked about yesterday.

MS. AXEL:  Yes.

BY MS. AXEL:

Q.  So you were asked about the second page of this, 121354.

MS. AXEL:  Yes, thank you, Mr. DeMarco.

Q.  And the prosecution blew up this——it looks like a portion of a spreadsheet in the middle.  Do you see that?

A.  Yes, ma'am, I see it.

Q.  Mr. George, do you know who prepared this?

MR. MOSLEY:  Objection.

THE COURT:  I'll allow.

A.  I don't know.  I don't know who prepared this.

Q.  And it states here that the holder of——well, the holder of these assets in the amount of 148,828 is Tornado Cash at this address; isn't that correct?

A.  Can you restate the question.

MR. MOSLEY:  Objection.

Q.  Well, at the bottom it says, Holder Tornado.Cash, correct?

A.  At the bottom it says, Holder Tornado Cash; that is correct.  That's what it says.

Q.  And you were asked about the transaction hash.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MS. AXEL:  No, not that one.  The one above it.

Q.  Correct?  You identified you recognized that transaction hash.

A.  Yes, ma'am.

Q.  But you did not attribute $148,828 to that transaction, did you?

A.  What was attributed to that transaction specifically was not the 148,820 units of USDT.

MS. AXEL:  We can take that down.  Thank you.

May I confer for just a second, your Honor.

THE COURT:  Of course.

Q.  With respect to that last document, 254, the letter that we were looking at—

THE COURT:  253.

MS. AXEL:  Oh, thank you, your Honor.

THE COURT:  That's why I'm here.

Q.  253, do you know who prepared it?

MR. MOSLEY:  Objection.

THE COURT:  You asked that question.

MS. AXEL:  I did.  Okay.

THE COURT:  Yes.  Thank you.

Q.  Do you know if Ms. Lin hired anyone to try to do the type of investigation that you did?

MR. MOSLEY:  Objection.

THE COURT:  Sustained.

P7O1STO2                    O'Sullivan - Direct

MS. AXEL:  Then I have nothing further.

THE COURT:  All right.  Thank you so much.

MR. MOSLEY:  Nothing further, your Honor.

THE COURT:  Sir, you may step down.  Thank you very much.

(Witness excused)

THE COURT:  May I please have the government's next witness.

MR. ARAD:  The government calls Conor O'Sullivan, your Honor.

THE COURT:  All right.  Thank you so much. Mr. O'Sullivan may approach.

(Witness sworn)

THE DEPUTY CLERK:  Thank you.  Please be seated, and into the microphone, please state and spell your full name for the record.

THE COURT:  Take a moment to move over the chair, sir.

THE WITNESS:  Conor O'Sullivan.  C-O-N-O-R, O apostrophe S-U-L-L-I-V-A-N.

THE COURT:  Counsel, you may inquire.

CONOR O'SULLIVAN,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ARAD:

P7O1STO2                    O'Sullivan - Direct

Q.   Hello, Mr. O'Sullivan.  Please tell us about your professional background starting after college, sir.

A.   So I am——I'm a CPA, and I worked at public accounting firms for about 13 years, a few firms here in New York, and then I segued to becoming a Special Agent with the FBI, and I worked primarily fraud matters and money laundering, and I did that for about 23, 24 years, and now I'm a contract employee of the U.S. Attorney's Office for the Southern District of New York and my job title is litigation financial analyst.

Q.   In your job as a litigation financial analyst, do you sometimes create visual depictions of financial data?

A.   Yes.

Q.   What was your role in this case?

A.   Basically to review some financial records and a chart basically for accuracy and to be able to testify about it.

Q.   Did you create any of those records that you just referenced?

A.   No.

Q.   You just reviewed records that were created by others?

A.   Yes.  I traced all the numbers and checked the formulas and, you know, checked that it was accurate.

Q.   Let's look at some of that data.

        MR. ARAD:  Ms. Sebade, will you please display for the witness, the parties, and the Court only what's been marked as Government Exhibit 3602.

THE COURT:  May I ask the defense if there are objections to these exhibits coming in.

MS. AXEL:  No, your Honor.

THE COURT:  Okay.  So perhaps we can just then, just to short-circuit the process and allow them to be admitted, you'll tell me if there is an objection, but for now, this is Government Exhibit 3602.  It is admitted into evidence and it may be shown to the jury.  Thank you.

(Government's Exhibit 3602 received in evidence)

Q.  Mr. O'Sullivan, what is in this file?

A.  This is a price list of various cryptocurrencies.  What's on the screen, the first one, is for T-O-R-N, TORN, and if you look at the bottom of the screen, you'll see that there are other tabs that have other cryptocurrencies in it, so if you went to each one, you'd get the similar chart.

Q.  Do you see the headers at the top of the page here?

A.  Yes.

Q.  Let's just go through them.  What does Date Time mean here?

A.  It's the date that the—I guess the price was struck at, I guess, and the time, it's basically all 0s so, I don't know.

Q.  And pretty self-explanatory, but the Price column?

A.  The price on the date that we just talked about.

Q.  And these are the two data points for TORN that you focused on in your work for this case?

A.  Yes.

Q.  You weren't asked to do anything with the Circulating Supply for Total Volume?

A.  No.

Q.  Do the other tabs here contain the same data but for different cryptocurrencies?

A.  Yes.

Q.  All right.  We don't have to go through each one.

MR. ARAD:  Ms. Sebade, we can please take that down.

And I just want to make sure I'm understanding accurately from the defense, no objection to any of these exhibits, I can just put them up?

MS. AXEL:  I think we're not going to stipulate as to putting 3601 into evidence as opposed to using it, but I don't object to it being put up.

THE COURT:  Well, that one, I'll ask you to do the foundational questions for it and I'll make the decision.

MR. ARAD:  Sure.  Will do, your Honor.  That's not the one we're talking about now.

Ms. Sebade, can you please display for everybody Government Exhibit 3603.

THE COURT:  Government Exhibit 3603 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 3603 received in evidence)

BY MR. ARAD:

Q.  Do you see the two headings here in bold, Mr. O'Sullivan?

P7O1STO2                    O'Sullivan - Direct

A.   Excuse me?  I didn't hear what you said.

Q.   The two headings here in bold.

A.   Yes.

Q.   What are they?

A.   Price List and Change in Price Over Time.

Q.   And do you see a date range under the headings?

A.   Yes, it's February 1, 2022, to May 8, 2022.

Q.   So the same date range for both charts?

A.   Yes.

Q.   Is that the entire date range that was in the chart we just looked at?

A.   No, this is a subset.  I think the other range was over ten years.  This is just maybe three, four, five months.

Q.   But the data in this spreadsheet comes from the chart that we just looked at?

A.   Yes.

Q.   And it's an accurate representation of that data?

A.   Yes.

Q.   Do you see in the next set of headings Date List?

A.   Yes.

Q.   It's in both charts, right?

A.   Correct.

Q.   And so what does Date List mean?

A.   That's the—from the original chart, the price and date list.  Basically this is the dates that the prices on the—the

left were, you know, taken from the other chart.

Q.  Let's just focus on the chart on the left here for a moment.  What are the numbers under each of the TORN, ETH, etc., headings?

A.  Well, those numbers are the price on——like, for instance, the first one, on February 1, 2022, the price of TORN was 22.4154041, ETH was 2745.515, BTC was 38657.520.

THE COURT:  Slow down.

THE WITNESS:  Okay, sorry.

A.  UNI was 2.53725690, and COMP was 125.650.

Q.  And the headers that you just read——TORN, ETH, BTC, UNI, COMP——what are those?

A.  Those are cryptocurrencies.

Q.  These prices are expressed in dollars even though you don't see a dollar sign here?

A.  Correct.

Q.  Let's look at the next chart now, the Change in Price Over Time.

The dates here represent the same thing as on the chart on the left?

A.  Yes.

Q.  And what's represented by the numbers underneath each cryptocurrency here?

A.  So aside from the first line on 2/1/2022, which are all 0s, every other number is from a formula, and the formula is based

on the table on the left.

MR. ARAD:  Ms. Sebade, can you please click on cell K5.

Q.  And Mr. O'Sullivan, do you see the formula that you just referenced on this screen?

A.  Yes.  So on the first——on the first one, K5, it's just a 0.

MR. ARAD:  At the top left, Ms. Sebade, next to the fx equals, if we could expand that.  It might be tricky with the software we have.

All right.  We'll trust that everybody can see it.

Q.  And so can you explain what the numbers are meant to represent here.  For example, the February 2, 2022 line says .2047 and so on.  What does that number mean?

A.  Well, basically, you're comparing the——the price on February 2nd to the price on February 1st, so you're taking——I guess it's C6 divided by C5 times a hundred, and then once you get that product, you subtract a hundred, and that gives you .204717701, which means that the price change from the second versus the first was——it went up 2.04717701 percent.

Q.  And for each of these dates, is the comparison between the price on that date and the price on February 1, 2022?  And we'll talk about an example in a second.

A.  Yeah, so the constant is the 1st, 2/1/2022.  That's always going to be the denominator in the formula.  The date that we're looking at is always going to be the numerator.

Q.   So for example, on February 5th—

A.   Correct.

Q.   —that number represents the difference between the price on February 5th and the price on February 1st?

A.   It changed—percentage change in price, yes.

Q.   Percentage change in price.  And what percent would that be for February 5th?

A.   It went up 9.60880257 percent.

Q.   And just to be clear, it went up by that percentage between February 1st and February 5th.

A.   Correct.

Q.   Not between February 4th and February 5th.

A.   Correct.

        MR. ARAD:  Okay.  So Ms. Sebade, will you please display for everyone what's been premarked Government Exhibit 3601-1.

Q.   Do you see that, Mr. O'Sullivan?

A.   I do.

Q.   And do you see a binder of documents in front of you there?

A.   This one here?

Q.   Yes.

A.   Yes.

Q.   Could you just flip through that.

        THE COURT:  Counsel, if I may inquire.  Is this the exhibit as to which the parties have a different view or—

MR. ARAD:  Yes, your Honor.  I think the defense agrees this can come in as a demonstrative, but I will be moving to admit it as a summary chart, once I've laid the foundation for it.

THE COURT:  All right.  But right now it's being shown to the jury in its capacity as a demonstrative with the hopes that one day it grows up to be a summary chart?

MR. ARAD:  I suppose so, your Honor, and I can take it down.

THE COURT:  Let's take it down.  Thank you.

MR. ARAD:  Ms. Sebade, just for the witness, the parties and the Court.

BY MR. ARAD:

Q.  Have you taken a look at the documents in that binder, sir?

A.  Yes.

Q.  Do you recognize them?

A.  Yes.

Q.  What are they?

A.  This is the—well, at least the first one here is, the chart that we looked at, table 2, when you put it into graph form for the period here, this is what you would get.

Q.  So the percentage changes in price between February 1st and various dates, that's what's reflected here?

A.  Correct, but it's all based on the second table.

Q.  Got it.  And do you see here that only a certain date range

on the whole chart is actually plotted?

A.   Yes.

Q.   In the charts in the binder that you have in front of you, are the rest of the dates plotted?

A.   On certain documents, yes, they are.

Q.   Did you check to make sure that these charts accurately reflect the data in the tables that we just looked at?

A.   Yes.

MR. ARAD:  Your Honor, the government moves Government Exhibits 3601-1, 3601-2, 3601-3, 3601-4, and 3601-5 into evidence.

THE COURT:  The defense objects?

MS. AXEL:  Yes, your Honor.  Again, no objection to it being shown as a slide but we object to it being admitted.

THE COURT:  Thank you.

May I inquire, counsel?  Thank you.

Sir, these graphs, are they the graphical representation of the chart that we were seeing as 3602 and 3603, the charts we were seeing?

THE WITNESS:  I'm sorry.  I don't understand the question.

THE COURT:  Sure.  That's fine.  You saw some charts a moment ago; for example, 3603 was the Change in Price Over Time.  Remember that chart?

THE WITNESS:  The table.

THE COURT:  Yeah, the table with the 0s and——

THE WITNESS:  Yeah.  So that table generates these charts.

THE COURT:  Fair enough.  Is that table itself the product of other information?

THE WITNESS:  It's——that table is created from the table on the left, table——the first table with the price list.

THE COURT:  Fair enough.

All right.  I will admit these as summary charts. Government Exhibits 3601-1, 3601-2, 3601-3, 3601-4, 3601-5 are admitted into evidence.  Counsel, you may now show them to the jury.

(Government's Exhibits 3601-1, 3601-2, 3601-3, 3601-4, 3601-5 received in evidence)

BY MR. ARAD:

Q.  So Mr. O'Sullivan, I just want to make sure that we're clear about what this chart shows.  What's the date range that's plotted so far on this chart?

A.  From February 1, 2022, to February 14, 2022.

Q.  So for the February 14th dates, are those the very end of each line here?

A.  Yes.

Q.  Okay.  So do you see the blue line?

A.  The darker blue line or the——it's hard to tell with the COMP, what colors.

P7O1STO2                    O'Sullivan - Direct

Q.   The darker blue line.

A.   Yes.

Q.   And which cryptocurrency does that represent?

A.   COMP.

Q.   And you know that based on the table on the right, the key on the right?

A.   Yes.

Q.   So that blue line on February 14th, approximately where is it in terms of the numbers on the left?

A.   Well, that means that from the——in relation to the first, on the 14th, the cryptocurrency COMP was about the same price.

Q.   Because it means that the price change was about 0.

A.   Correct.

Q.   Okay.  Just using that as an example.

        MR. ARAD:  And again, before the next exhibit, I just want to make sure all of the exhibits that we produced to the defense, there's no objection, for this witness?  Or should I just go through them in an abundance of caution, your Honor?

        THE COURT:  The remaining exhibits, there's no objection?

        MS. AXEL:  I'm just not sure what they are.  I'm not blaming them.  I  just don't know.  I think we need to go through them one by one.

        THE COURT:  We'll go through them one by one.  Thank you.

MR. ARAD:  Ms. Sebade, will you please display what's been marked Government Exhibit 1376 for the witness, the parties, and the Court.

BY MR. ARAD:

Q.  Mr. O'Sullivan, do you recognize this?

A.  Yes.  This is——

MR. ARAD:  Ms. Sebade, if we can scroll down to the next page.

A.  This is some sort of a messaging, messaging——

Q.  You can take a moment to read the message, sir.

A.  Sure.  It says——

Q.  To yourself.

A.  It's a message from——from an app; I believe it's from Signal.

Q.  I'm sorry?

A.  Signal.  I believe it's a message from Signal, on a messaging app called Signal.

Q.  Have you seen the contents of this message before, sir?

A.  Yes.

Q.  And you testified that you believe it's from a messaging application?

A.  Yes.

MR. ARAD:  Okay.  Your Honor, the government moves to admit Government Exhibit 1376 into evidence pursuant to the Court's prior ruling.

MS. AXEL:  We have a standing objection on the Court's prior ruling.  I also don't think this witness has laid a foundation for the exhibit.

THE COURT:  I will allow Government Exhibit 1376 to be admitted into evidence, and it may be shown to the jury.

(Government's Exhibit 1376 received in evidence)

MR. ARAD:  Ms. Sebade, if you can please scroll up back to the first page.

BY MR. ARAD:

Q.  And Mr. O'Sullivan, do you see that there's a Thread Participants line at the top of this page?

A.  Yes.

Q.  Do you see there the name Alexey Pertsev?

MR. ARAD:  And Ms. Sebade, can you highlight these as we go.

A.  Yes.

Q.  Do you also see the name Poma?

A.  Yes.

Q.  And the name Roman Storm?

A.  Yes.

Q.  And the name Tom Schmidt?

A.  Yes.

Q.  Directly above the name Tom Schmidt and to the right, do you see the name Haseeb?

A.  Yes.

MR. ARAD:  Ms. Sebade, we can scroll down to the next page, please.

And expand the message, please.

Q.  Mr. O'Sullivan, what's the date of this message?

A.  February 14, 2022.

Q.  And is that the last date of data that's plotted on the chart we just looked at?

A.  Yes.

Q.  Who's the sender of this message?

A.  @tomhschmidt.

Q.  Do you see a name written above the date on this message?

A.  Oh, Roman Storm.  Sorry.

Q.  And will you please read the message now.

A.  Okay.  "@tomhschmidt, ping some torn holders to cast a vote on tc governance proposal."

MR. ARAD:  Ms. Sebade, if you can scroll to the next page and expand the next message, please.

Q.  Mr. O'Sullivan, do you see the date of this message?

A.  Yes.

Q.  What is it?

A.  2/14/2022.

Q.  Same date as the last message?

A.  Yes.

Q.  And who's the sender?

A.  Roman Storm.

Q.   Please read this message.

A.   "Sure.  Got it.  Since it's a different group, I'd suggest this type of post.

"Tornado Cash governance vote.

"The Tornado Cash proposal that everyone is waiting for is now being voted on.

"If you want a new utility for the TORN token and a decentralized relayer registry, vote now."

Q.   And just from the face of this communication, does it seem to be about something called a governance vote?

A.   Yes.

Q.   Having to do with something called a relayer registry?

A.   Yes.

MR. ARAD:  Ms. Sebade, if you could please display on the left side of the screen here Government Exhibit 3601-2.

Q.   Mr. O'Sullivan, what date is represented by the vertical line here?

A.   February 14, 2022.

Q.   The date of these messages on the left about this relayer proposal?

A.   Yes.

Q.   Let's plot some more price data on this chart.

MR. ARAD:  Ms. Sebade, will you please display Government Exhibit 3601-3.

And you can just expand the whole page for 3601-3.

Q.  Mr. O'Sullivan, do you see anything notable about the price of the orange line here?

A.  Yes.  The TORN cryptocurrency increased its percentage from February 1st significantly after the 14th.

Q.  And do you notice anything about the other cryptocurrencies represented by the other lines here?

A.  The other ones kind of take a similar path and they go up a little, down a little, and up a little, but they all kind of go together, like in a similar pattern.

Q.  So you mean a similar pattern to each other.

A.  Yes.

Q.  As distinct from TORN.

A.  Different than—very different than TORN.

Q.  Through what date is the data on this chart currently plotted?

A.  Through March 1, 2022.

MR. ARAD:  Ms. Sebade, please show the witness, the parties, and the Court Government Exhibit 1936.

Q.  Do you recognize this?

A.  Yes.

Q.  What does it appear to be?

A.  It's a tweet on X.

MR. ARAD:  Your Honor, the government moves to admit Government Exhibit 1936 pursuant to stipulation S3, which actually already has been read into the record.

MS. AXEL:  I'm sorry.  I thought that was a representation.  Yes, your Honor.

THE COURT:  All right.  Government Exhibit 1936 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1936 received in evidence)

BY MR. ARAD:

Q.  Mr. O'Sullivan, will you please read the account name for this post.

A.  Tornado Cash.

Q.  And can you please read the post itself.

A.  "Tornado Cash.  New decentralized relayers network.  Staking rewards for TORN token."

MR. ARAD:  Ms. Sebade, could you please expand right underneath the graphic.

Q.  It says from tornado-cash.medium.  Do you see that?

A.  Yes.

Q.  Could you read that, please.

A.  From tornado-cash.medium.com.

Q.  And what's the date?

A.  It is March 1, 2022.

Q.  Is that the same date as the last date that's plotted on the chart we just looked at?

A.  Yes.

MR. ARAD:  Ms. Sebade, please display Government Exhibit 1936-A for the witness, the parties, and the Court.

P7O1STO2                    O'Sullivan - Direct

Q.  Sir, do you recognize this?

A.  Yes.

Q.  What does it appear to be?

A.  It is a——I guess a link to a——

Q.  Have you seen this before, sir?

A.  I have.  It's a link, Medium, to a Tornado Cash New Decentralized Relayers Network.

MR. ARAD:  Your Honor, the government moves to admit Government Exhibit 1936 pursuant to stipulation S3, which has been read into the record.

THE COURT:  1936-A, sir?

MR. ARAD:  Correct, your Honor.

THE COURT:  Thank you.

MS. AXEL:  No objection.

THE COURT:  Thank you.  Government Exhibit 1936-A is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1936-A received in evidence)

MR. ARAD:  Ms. Sebade, can you please display 1936 on one side and 1936-A on the other side of the screen.

BY MR. ARAD:

Q.  Mr. O'Sullivan, can you please read the title of the Medium post on the left.

A.  "Tornado Cash New Decentralized Relayers Network."

Q.  And is that the same text that appears in the image in the tweet that we looked at earlier?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Yes.

Q.   And can you please note the date on the Medium post on the left.

A.   March 1, 2022.

Q.   And is that the same date as the Twitter post?

A.   Yes.

Q.   Or the X post, I should say.

And is that also the same date as the last date that's plotted on the chart we just looked at?

A.   Yes.

Q.   Would you please read the byline that starts with "A brand new."

MR. ARAD:   And Ms. Sebade, if you could please expand that.

A.   "With a brand new decentralized relayers network, Tornado Cash just added an awaited utility to its tool belt, pushing its decentralization one step further."

Q.   And, sir, does this also appear to be about something called a relayers network?

A.   Yes.

Q.   That has been just added?

A.   Yes.

MR. ARAD:   Ms. Sebade, if you could please keep the Medium post on the left side and display on the right side Government Exhibit 3601-4.

Q.  Mr. O'Sullivan, what's represented by the second vertical line here?

A.  When you say what is represented, the date?

Q.  What date is represented?

A.  Okay.  It's March 1, 2022.

MR. ARAD:  Ms. Sebade, if you could please display Government Exhibit 3601-5 instead of Government Exhibit 3601-4.

Q.  Mr. O'Sullivan, what, if anything, do you notice about the price of TORN after March 1, 2022?

A.  TORN cryptocurrency has another spike relative to February 1, 2022.

Q.  And what, if anything, do you notice about the other cryptocurrencies represented here?

A.  The other cryptocurrencies maintain a similar pattern. They're not exactly in line, but they all kind of go down a little, up a little, down a little.

Q.  And again, you mean a similar pattern to each other?

A.  To each other.  Sorry.

Q.  What's the total date range represented in this chart?

A.  February 1, 2022, to May 8, 2022.

Q.  And there are five different cryptocurrencies represented in this chart?

A.  Yes.

Q.  How many of them went up during that time?

A.  Just one.

Q.   Which one?

A.   TORN.

Q.   And how much did it go up by?

A.   123 percent from February 1, 2022.

Q.   Does that mean it more than doubled?

A.   Yes.

Q.   And what happened to the other ones?

A.   They all went down relative to February 1st, different percentages; like ETH went down 6 percent, BTC went down 10 percent, COMP went down 21 percent, and UNI went down 36 percent.

Q.   Mr. O'Sullivan, in your work on this case were you asked to analyze cause and effect price changes here?

A.   No.

Q.   Were you asked to learn about TORN or ETH or BTC or UNI or COMP aside from the data we've looked at?

A.   No.

          MR. ARAD:  No further questions.  Thank you very much.

          THE COURT:  Thank you.

          Cross-exam.

CROSS EXAMINATION

BY MS. AXEL:

Q.   Good morning, Mr. O'Sullivan.

A.   Good morning.

          MS. AXEL:  May I inquire, your Honor?

THE COURT:  Yes.  I just want to make sure I can hear you.

Yes.  We should be good.  Thank you.

MS. AXEL:  Mr. DeMarco, can I have on the screen what has been marked as——

THE COURT:  Oh, I'm so sorry.  The witness can't hear you.

MS. AXEL:  Mr. DeMarco, can I have on the screen what has been marked as 3602 that just came in evidence.

THE WITNESS:  I don't have anything on my screen.

THE COURT:  He's getting it.

MS. AXEL:  We'll get there.

THE COURT:  He's good, but he's not that fast.

MS. AXEL:  He hasn't switched to mind reader yet.

No, no, 3602.

THE COURT:  Oh, the actual——sorry.  He and I had the same thought.  So I'm sorry, sir.

BY MS. AXEL:

Q.  Mr. O'Sullivan, did you create this data?

A.  No.

Q.  Where did you get it?

A.  From the prosecutor.

Q.  Okay.  And so this is the raw data, you didn't manipulate it in any way?

A.  No.

Q.   And you understand it to be pricing data over a period of time for the different cryptocurrencies reflected at the bottom, right?

A.   Yes.

Q.   And what is the time period of this entire spreadsheet?

A.   Well, I'd have to go from the top to the bottom to tell you that.

Q.   Okay.  So the data begins on or about February 7, 2021, correct?

A.   Correct.

Q.   And Mr. DeMarco is scrolling.  Goes through 12/31/2024; is that right?

A.   Yes.

Q.   Okay.  So what did you then do with this data that you received?

A.   I then traced this data to table——the first table we saw to make sure that these numbers matched the data on that table.

Q.   Okay.  Let's look at that table.  Let's look at what you marked as 3603.

     Okay.  So did you prepare this spreadsheet?

A.   No.

Q.   You also received this spreadsheet from the prosecution.

A.   Yes.

Q.   And but the time period here is more limited; is that correct?

A.   This time period is limited compared to the other ones; a subset of the other ones.

Q.   A subset of the other ones.  Okay.  And does it draw data from the other spreadsheet?  Do they speak to each other?

A.   Do they speak to each other?  I don't think so.  I mean, could you copy and paste from one to the other?  You could, yes.

Q.   Okay.  And that's how this one was created.

A.   I'm not sure.  I physically checked each one from one.  I don't know.

Q.   I'm sorry.  Explain to me what you mean by that.  You physically checked what from what?

A.   I checked the chart we just saw to the price on this chart.

Q.   You corresponded then 3602 to——

A.   I traced from this chart to this chart.

Q.   To make sure they matched.

A.   Correct.

Q.   And so this one goes from——let's check this again—— February 1, 2022, through May 8, 2022; is that correct?

A.   Correct.

Q.   Did you select that time period?

A.   No.

Q.   Okay.  So you were asked to use that time period.

A.   The chart was made already.  I did not——I just checked the chart.

P7O1STO2                     O'Sullivan - Cross

Q.   I see.  Okay.  And so when you look across here, the prices of these various cryptocurrencies are very different from one another, correct?

A.   Correct.

Q.   So TORN is, for example, on February 1, 2022, $22, right?

A.   Correct.

Q.   While BTC is——is this in dollars?  Sorry.

A.   Yes, my understanding, it's in dollars, correct.

Q.   It's converted to dollars.  Okay.

And BTC, that was the dollar value at the time, was 800?

A.   Correct.

Q.   So let's now look at——you then took this and showed us 3601-1.

MS. AXEL:  I hope I have that right.  Yes.

Mr. DeMarco, can we have 3601-1.

Q.   Okay.  Mr. O'Sullivan, we just saw these different cryptocurrencies have very different values, right?

A.   Correct.

Q.   So BTC, for example, is worth $58,000 as of February 1, 2022.

A.   Correct.

Q.   How do you correspond them on the vertical axis here?

A.   Well, this is not showing you the change in price; it's showing the percentage change in price from February 1st.  They

P7O1STO2                          O'Sullivan - Cross

all start February 1st as the date, what the price was that date. So we're just going up the percentage of change in price from that date, not the—what the actual price was. It's the change in price.

Q. Okay. This is the change—I just want to make sure I understand. So these aren't the absolute prices, the dollar values of each of these things.

A. Correct.

Q. It's the change in price.

A. The percentage change in price.

Q. As of measured February 1, 2022.

A. Always against the first date.

Q. Okay. Did you look at any dates prior to February 1, 2022?

A. No.

Q. Did you look at any dates after May 8, 2022?

A. No.

Q. Okay. Let me show you what has been marked as 1376. And you remember this chat, sir?

A. Yes.

Q. That you thought took place on Signal, right?

A. I believe—I believe so.

Q. And do you know who Haseeb is?

A. No, I do not.

Q. Do you know who Tom Schmidt is?

A. I do not.

Q.  Does the name Dragonfly Capital mean anything to you, sir?

A.  No.

Q.  Okay.  And looking at page 3, the next page, you were asked about that message, right?

A.  Correct.

Q.  And you understood that to be from Mr. Storm to Tom H. Schmidt, correct?

A.  Correct.

Q.  And it says "ping some torn holders to cast a vote on tc governance proposal," right?

A.  Yes.

Q.  And what do you understand is going on with this chat?

A.  Mr. Storm is sending something to Mr. Schmidt to ask some TORN holders to cast a vote on some proposal.

Q.  He's lobbying for the proposal?

A.  I don't know.  I'm just reading what's on the thing. That's all I know.

Q.  Is he campaigning for the proposal?

A.  Don't know.

Q.  Okay.

MR. ARAD:  Objection.

Q.  And let's——

THE COURT:  Overruled.

That's fine.  I just wanted to respond to his objection.  Go ahead, counsel.

MS. AXEL:  Sorry, your Honor.

May I move to the next page.

Q.  You looked at the next message there.

Mr. O'Sullivan, do you know what it means when it says "a new utility for TORN"?

A.  No, I do not.

Q.  And what about a decentralized relayer registry, do you know what that means in this context?

A.  No, I do not.

Q.  All right.  And you also identified Government Exhibit 1936-A.

MS. AXEL:  Did I have that?  And this is in evidence also.

Q.  And Mr. O'Sullivan, have you read this document?

A.  I have.

Q.  And what were the conditions for becoming a decentralized relayer?

A.  I do not know.

Q.  Okay.  Can I show you page 5.

MS. AXEL:  Back one.  Yeah.  There we go.

Q.  Mr. O'Sullivan, there, do you see that it says anyone can be a relayer, the only condition to be included on the preferred list is to hold minimum 300 TORN and go through the newly realized decentralized relayers network UI?  Do you see that?

P7O1STO2                    O'Sullivan - Cross

A.  I see that.

Q.  And are you aware of any other conditions to become a relayer?

A.  I've never seen this document before, so no, I have not.

Q.  Okay.  All right.  Well, let's look at the final chart you put in, 3601-5.

            MS. AXEL:  Oh, no.  Sorry.  I'm sorry, Mr. DeMarco.  I have one more question on that one.  Could I go back to 196-A, page 3.

            No, that's not it.  Can we take that down.

            Okay.

            Scroll back up again a little bit.  Page 1.  Page 3.  There we go.

Q.  All right.  Mr. O'Sullivan, this indicates that Exhibit 1936-A was an article written by the Wu Tornado Team Ayesa (ph) and B211BA?  Do you see that?

A.  Yes.

Q.  Do you know who those individuals are?

A.  No.

Q.  Okay.  Now we will look at 3601-5.

            And so Mr. O'Sullivan, carrying out what you told us before, the entire point of reference for all these percentages is simply how they are measured as of February 1, 2022; is that right?

A.  Yes.

P7O1STO2

Q.   And you look at——you note that there——well, would you agree that the high is on or about March 3rd or 4th of 2022?

A.   It would be after the 4th, the 4th or 5th, somewhere in that range.

Q.   And after that there's a considerable drop in price——is that right——as well, somewhere around the 10th?

A.   Correct.

Q.   And after that point there's not a significant change in the percentage, is there?

A.   There are some dips and some, you know, crests, but it goes up and down and finishes, you know, kind of flat to——or in the middle of the——between 100 and 150.

Q.   So if we measured it from 3/10 to where it finishes, it would be more or less flat.

A.   Well, from 3/10, yeah, similar, yes.  As of May 8th, yes.

Q.   As of May 8th, yes, but you testified you didn't look past May 8th, right?

A.   No, I did not.

Q.   And you didn't look to see what the high was perhaps prior to February 1, 2022 either, did you?

A.   Did not.

        MS. AXEL:  No further questions, your Honor.

        THE COURT:  Thank you.

        MR. ARAD:  No redirect, your Honor.

        THE COURT:  All right.  Sir, thank you so much.  You

P7O1STO2

may step down.

(Witness excused)

THE COURT:  This seems like a good time to take our morning break.  So let us take our morning break and then I'll just talk to the parties for a moment.  Let's imagine it will be about ten minutes.  It might be a moment or two longer, but let's keep it as close to ten as possible.  I ask you please not to discuss this case with each other or with anyone else and to please keep an open mind until all of the evidence is received.  Thank you so much.

All rise.

(Continued on next page)

P7O1STO2

(Jury not present)

THE COURT:  Please be seated for a moment.  Thank you.

Mr. Rehn, maybe I'm unduly optimistic, but are we at the government's last witness?

MR. REHN:  That's correct, your Honor.

THE COURT:  All right.  In connection with or preliminary to that, are there stipulations you're going to be reading into the record, are there exhibits that are going to be coming in en masse, or something else?

MR. REHN:  So there will be the stipulation regarding the OFAC issue.

THE COURT:  That's what I was wondering.  Okay.

MR. REHN:  That will be the first thing we do.

THE COURT:  Good.

MR. REHN:  And then we have a number of exhibits. We've sent the list to the defense.  So they have raised some issues with some of them, which I don't know if the Court would prefer to address now or—

THE COURT:  I'll address them I think through the witness, to the extent that the questioning makes sense.  Well, perhaps I should know what they are.  If they are just retreads of my resolution of objections, then I suppose the objection is preserved.  Go ahead.

MR. REHN:  The only objection we've received specifically relates to a number of emails to the defendant

from victims.  I believe the Court already ruled that evidence of notice to the defendant of victims reporting hacks to him is admissible.

THE COURT:  It is, but with a limiting instruction, that it should not be considered for its truth.

MR. REHN:  Correct.

THE COURT:  So would the defense want me to give that with the first of these, Mr. Patton?

MR. PATTON:  Your Honor, before we get to a limiting instruction, I just want to be clear what these are.  By my count, there are quite a series of emails and then a few chats, from disparate people reaching out, claiming to be victims, but there is no——we don't have any underlying indication that——same thing we've gone through with Ms. Lin and some other topics: there is no connection that these folks actually had their money go to Tornado Cash.  So I think this is wholly different than what your Honor was ruling on before.  In the *in limine* briefing that we had on this, the government said, for instance, Ms. Lin's communication to this hello@tornado.cash email is relevant because we get to show that SUAs went to Tornado Cash in fact and that Mr. Storm was put on notice of that.  The fact that people may have reached out and thought that their funds went through Tornado Cash is of no relevance whatsoever.  I mean, there's just——

THE COURT:  Well, one moment, please, sir.

Mr. Rehn, with Ms. Lin and others, our witness from yesterday who I will just call Moz because it's easier for me, for those, ultimately the dots were connected—although the defense may dispute that as to Ms. Lin—with respect to them saying something about funds going through Tornado Cash and in fact there being some evidence, disputed though it may be, about funds going through Tornado Cash, but I could—well, I mean, let me not put myself in this.  Is there some suggestion that these individuals who have written to hello@tornado.cash actually—did Agent DeCapua or someone else find their money somewhere in this?

MR. REHN:  Your Honor, with respect to these complaints that were sent to the defendant, we aren't connecting them to any of the tracing that was done in the case, but this is a very common form of evidence for notice to a defendant in a money laundering case.

THE COURT:  I do enjoy you speaking to me as though I've never actually done a money laundering case before.

MR. REHN:  I realize that, your Honor, but notice of the nature of the activity that you've engaged in laundering is frequently in the form of reports he receives from other parties, and they're separate evidence.  But those reports don't tie necessarily to particular transactions.  It's the overall nature of the defendant's state of mind that's relevant here.

And we did brief this, your Honor.  We briefed with respect to the actual witnesses, that it would both be connected as an SUA and also that it was admissible as to notice.  We've separately argued to your Honor that victim complaints to the defendant are generally admissible as evidence of his state of mind.  Obviously the parties can argue about what, if any, inferences to draw from the fact that the defendant was repeatedly put on notice of criminal funds being placed into Tornado Cash, but that's central evidence to the nature of his state of mind about what the nature of the business was and what sort of funds were flowing into it.  It's very similar to a drug money laundering case, where somebody tells the defendant, hey, there's going to be a lot of drug money coming in.  That doesn't tie into a specific——

THE COURT:  I believe Mr. Patton's point is that for all he knows, these could be mistakes or trolls, as came up at trial, but not actual people who have lost money, but I do understand your point.

All right.  Mr. Patton, I'll hear from you on this further if there's anything else to add.  Otherwise——

MR. PATTON:  Just, I mean, I think your Honor understands the point, and it's not just on relevance grounds. It would also be *Crawford*.  These people weren't called as witnesses.  So we have a whole series of objections to these. And on 403 grounds.  The obvious implication, even with a

P7O1STO2

limiting instruction, is that people must have had some basis to associate their loss of funds with Tornado Cash and going through it.

THE COURT:  I'll allow, but I'm going to modify my limiting instruction of earlier.  Thank you.

Something else, Mr. Rehn?

MR. REHN:  That was the only objection the defense had raised with us.  I don't know if they will have any others to any of the other exhibits.

THE COURT:  Well, someone will have to perhaps give me a sign——or maybe I'll figure it out on my own——when I should be giving the limiting instruction to which the parties agreed and that which they sent me last evening.  Would that be with the first of the exhibits that were the subject of the dispute?

MR. REHN:  I expect so, your Honor.  I will——I don't know if you would like me to flag it for the Court when it comes up or——

THE COURT:  No.  Just give me the exhibit number, the first of the exhibits where it will come up where this matters.

MR. REHN:  I believe it will be 2036-T.

THE COURT:  All right.  Thank you.

Mr. Patton?

MR. PATTON:  There are a number of other exhibits that have been the subject generally of some of the litigation between the parties.  There are at least three exhibits I've

seen. And forgive me, your Honor. There are two large binders associated with this witness, so I'm not sure if they're all coming in or if a portion, but I've noticed at least three in connection with this *Bloomberg* reporter. Again, we have relevance objections to that, hearsay objections to that. There's Rho correspondence. And in addition to the litigation we had over the relevance, because there were no false statements made, there's discussion in the correspondence about compliance issues, and so this, once again, gets into the issues we've been talking about in terms of this not being an AML-KYC case, and so once again have objections on those grounds.

There are obviously continuing objections to all of the chats that come in from the Pertsev phone. I won't reiterate that. That will just be a standard continuing objection.

I will note that there is the one in there that we think is highly misleading, the Government Exhibit 2004-T that has the forward of a reporter's comment, and it is not at all clear where that forward is coming from.

I thought we had come to agreement on a rule of completeness issue on what's now marked as Government's 2248. I think it may have had some other designations at some point. That involves discussion of the Ronin hack. And there's a portion that's been excised in which Mr. Storm says—and pardon

P7O1STO2

my French——"glad those fuckers got caught."

THE COURT:  I'm not sure I admitted that.

MR. PATTON:  Sorry?

THE COURT:  I thought that was the subject of motion practice and I don't know that——if you've agreed to it, I'm not sure which exhibit that was.  I know Mr. Casey and I were having substantial discussions about exhibits, and I thought we had resolved all of them.

MR. CASEY:  May I speak to this issue, your Honor.

THE COURT:  Yes, sir.

MR. CASEY:  So to clarify, the government had marked previously a different exhibit reflecting the same chat conversation.  We had discussions with the government about completeness issues.  They indicated——

THE COURT:  I need you to speak up a little louder, sir.  Thank you.

MR. CASEY:  We had discussions with the government about completeness issues.

THE COURT:  Yes.  Sir, is this your exhibit 10 from your letter to me that we talked about yesterday and you said that you had reached it or was it a different exhibit?

MR. CASEY:  This is a different piece of it, your Honor.

THE COURT:  Okay.

MR. CASEY:  So the government previously marked——

P7O1STO2

MR. REHN:  Can we get an exhibit number, just so we can look.

MR. CASEY:  This is previously marked as 1374, and we had discussions about it, and the government agreed that they weren't going to use that exhibit once we raised that.

MR. REHN:  Yes.  It's not on the outline.

THE COURT:  It's not being admitted, sir.

MR. CASEY:  Correct.  And then they, last night, disclosed that they intended to use 2248, which is an identical copy of the same chat, so I raised the completeness issue again, and then just this morning I believe they confirmed that they're not seeking to use 2248.

MR. REHN:  That's correct.  2248 is not on the outline.

THE COURT:  So we're still okay.

MR. CASEY:  I believe so.

THE COURT:  He just said that's not coming in either.

MR. PATTON:  Well, then if I can clarify, because I have it under I believe yet a different——

THE COURT:  A third designation, sir?

MR. PATTON:  Yes.  That's 2004-T, which I had in the collection of this summary witness's materials.

MR. REHN:  What's the subject matter?

MR. PATTON:  I thought it was the same chat, but it's a portion of it and not the full——

P7O1STO2

MR. REHN:  That's a different chat than the one—I don't believe that has anything to do with the topic you've been—I think—I don't believe there will be any issues because I think we've worked it out, but if there are, I'm sure Mr. Patton will flag them if they arise.

THE COURT:  Except this.  We're flagging them now, and I would rather not have discussions like this with the jury present, so I'm assuming you've worked this out.  I'm telling myself now you've worked this out.  All right.

MR. REHN:  I don't see 2004-T on my list.

MR. PATTON:  Oh, I'm sorry.  My apologies.  I was referring to the reporter forwarding number.  It's 2248.  So if that's—

THE COURT:  That's off, according to them.

MR. PATTON:  Then we're good.

THE COURT:  Okay.  Any more complaints, Mr. Patton?

MR. PATTON:  Many, your Honor.

THE COURT:  Any more that I can address in this conversation?

MR. PATTON:  I don't think so.  Obviously we may raise individual objections as we go.  I think for the most part it will be continuing objections.

THE COURT:  Okay.  All right.  Ms. Axel?

MS. AXEL:  Your Honor, yes.  Based on Special Agent George's answer to my questions, your Honor, we would move to

strike the testimony concerning the tracing from crypto.com. We believe it has no relevance here. He's admitted he was not asked to make attributions. He can't say that the hacker in fact transferred proceeds to that ultimate Tornado Cash address. We also think there are 705 issues. We request the government double-check its production. We didn't receive anything——I mean, I said, we didn't receive a spreadsheet that he worked on, we didn't receive notes, and we did not receive any Chainalysis or TRM, and that would only amplify the reasons to strike, and we would ask for a corrected instruction as well.

(Continued on next page)

P7OVSTO3                    Cotto - Direct

THE COURT:  Okay.  Motion is denied because it's duplicative of all the reasons that were mentioned to me earlier, other than the disclosure issue — and I'm really hoping there wasn't a failure to disclose.  And I'll hear again if there is.  That's the one that you can renew.

Okay.  I'll see you in about ten minutes.  Thank you.

(Recess)

THE COURT:  Please be seated.  Thank you.

(Jury present)

THE COURT:  Government, please call your next witness or read a stipulation, whatever is next on the agenda.

Thank you.

MR. REHN:  Your Honor, we'll call the witness and then read the stipulation, if that's okay.

THE COURT:  Thank you so much.

MR. REHN:  The government calls Angelica Cotto.

ANGELICA COTTO,

   called as a witness by the Government,

   having been duly sworn, testified as follows:

THE COURT:  Counsel, you may inquire.

DIRECT EXAMINATION

BY MR. REHN:

Q.  Good morning, Ms. Cotto.

A.  Good morning.

Q.  Where do you work?

P7OVSTO3                          Cotto - Direct

A.   At the U.S. Attorney's Office.

Q.   For which district?

A.   Southern District of New York.

Q.   What's your job there?

A.   I'm a paralegal in the illicit finance and money laundering unit.

Q.   How long have you been working there?

A.   Two years.

Q.   Have you done any substantive work in connection with the Tornado Cash case?

A.   I have not.

Q.   Were you provided with a set of exhibits to review in advance of your testimony today?

A.   Yes.

          MR. REHN:  Before we proceed to the exhibits, your Honor, the government will now ask to read Government Exhibit S-6, titled "Stipulation Regarding OFAC."

          THE COURT:  You may, sir.

          MR. REHN:  We can bring that up as well for the jury. We won't read the initial part; we'll start at paragraph 1.

          From time to time, OFAC issues economic sanctions pursuant to the International Emergency Economic Powers Act IEEPA.  OFAC often notifies the public of new economic sanctions by announcing that certain individuals and entities have been placed on what is called the Specially Designated

Nationals or SDN list.

On September 13, 2019, OFAC announced that the Lazarus Group had been placed on the SDN list pursuant to a presidential executive order, and identified it as an agency instrumentality or controlled entity of the North Korean government.  These sanctions have been in effect continually since that date.

On April 14, 2022, OFAC publicly announced that it was updating its designation of the Lazarus Group as an SDN to include a cryptocurrency wallet address — and with the Court's permission, I won't read the entire address.

THE COURT:  Good.  Thank you.

MR. REHN:  — associated with the Lazarus Group.  These sanctions have been in effect continually since that date.

Paragraph 4.  Under certain circumstances, OFAC will issue a license for a U.S. person to engage in a transaction that otherwise would be prohibited.

Paragraph 5.  OFAC has run a license history check for the following names:  Roman Storm, Roman Ganchenko, Roman Semenov, Roman Vladislavovich Semenov, Alexey Olegovich Pertsev, Alexey Pertsev, Tornado Cash, Tornado Cash, tornado.cash, Peppersec, Inc., Peppersec, Inc., and Peppersec, and found no OFAC license has been issued to date to any of these parties.

And that's dated July 23rd, and signed by counsel for

P7OVSTO3                         Cotto - Direct

the parties.

THE COURT:  I'm understanding it is being moved to be an exhibit at this trial, Government Exhibit S-6; correct, sir?

MR. REHN:  Yes, your Honor.

THE COURT:  It is so admitted.  Thank you.

(Government's Exhibit S-6 received in evidence)

MR. REHN:  Your Honor, the government offers Government Exhibit 1915.

THE COURT:  All right.  May I see the document, please.

MR. REHN:  We have a stipulation regarding publicly available materials with respect to this.

THE COURT:  Is this something to which the defense objects, Mr. Patton?

MR. PATTON:  It is not, your Honor.

We do not object.

THE COURT:  You do not.  Thank you so much.

Then Government Exhibit 1915 may be shown to the jury.

Thank you.

(Government's Exhibit 1915 received in evidence)

BY MR. REHN:

Q.  Ms. Cotto, can you see what is on your screen and marked as Government Exhibit 1915?

A.  Yes.

Q.  If I could direct your attention to the upper left-hand

P7OVSTO3                        Cotto - Direct

part of this document.  Do you see that there's an address?

A.  Yes.

Q.  Could you please read that address.

A.  Dragonfly.xyz/#team.

          MR. REHN:  If we could bring that down.

Q.  Are there some names listed below that?

A.  There are.

Q.  And could I ask you to read the name on the left at the
bottom?

A.  Haseeb Qureshi.

Q.  What's his title?

A.  Managing partner.

Q.  And if we ask you to read the second name over.

A.  Bo Feng.

Q.  What's his title?

A.  Managing partner.

Q.  If I could ask you to read the third name.

A.  Tom Schmidt.

Q.  What's his title?

A.  General partner.

          MR. REHN:  We could bring that down.

          And if we could bring up for the witness and the
parties Government Exhibit 1303.

          And the government offers this document pursuant to
the certification pertaining to this document.

P7OVSTO3                         Cotto - Direct

MR. PATTON:  No objection.

THE COURT:  Government Exhibit 1303 may be admitted into evidence and shown to the jury.

(Government's Exhibit 1303 received in evidence)

Q.  Ms. Cotto, do you see Government Exhibit 1303 on the screen?

A.  Yes.

MR. REHN:  If we could, Ms. Sebade, expand the portion going from Peppersec, Inc. down through the first full paragraph.

Q.  Ms. Cotto, could you please read the title of this document.

A.  "Peppersec, Inc. Safe, Simple Agreement for Future Equity."

Q.  Could I ask you to read the first sentence underneath that.

A.  "This certifies that in exchange for the payment of $882,000, the purchase amount, by the undersigned investor, the investor, on or about August 18, 2020, to Peppersec, Inc., a Delaware corporation, the company, the company hereby grants to the investor the right to subscribe for certain shares of capital stock subject to the terms set forth below."

Q.  And could I ask you to --

MR. REHN:  Ms. Sebade, if you could highlight the words "payment of" and the amount.

Q.  What was the payment amount in connection with this agreement?

P7OVSTO3                         Cotto - Direct

A.   $882,000.

          MR. REHN:  If we could go to page 9 of this agreement.
And if we could expand the signature block for both parties.

Q.   Ms. Cotto, who signed this agreement on behalf of
Peppersec?

A.   Roman Storm.

Q.   And what's his title?

A.   Chief executive officer.

Q.   What's the email underneath his signature block?

A.   Roman@tornado.cash.

          MR. REHN:  We could bring that down.

          And if we could now bring up Government Exhibit 1304,
which the government offers, just for the witness and the
parties, please.

          MR. PATTON:  No objection.

          THE COURT:  Government Exhibit 1304 is admitted into
evidence and may be shown to the jury.

          (Government's Exhibit 1304 received in evidence)

          MR. REHN:  Ms. Sebade, if we could again bring up the
title and the first paragraph on the first page.

Q.   What is the date of this document, Ms. Cotto?

A.   August 18, 2020.

Q.   What's the title of this document?

A.   "Peppersec, Inc. Warrant."

Q.   And if I could ask you to read the first sentence.

A.   "This certifies that in consideration of $18,000, the purchase amount, paid on the date hereof to Peppersec, Inc., a Delaware corporation, the company, receipt of which is hereby acknowledged, the undersigned holder or its registered assigns, holder, is entitled, subject to the terms and conditions of this warrant, to purchase at the warrant price, as defined below, up to holder's portion, as defined below, of any network tokens, as defined below, upon delivery to the company of a duly executed exercise notice in the form attached hereto as Exhibit 1, the exercise notice, and simultaneous payment of an amount equal to the warrant price."

          MR. REHN:  And, Ms. Sebade, if I could ask you to highlight the portion "consideration of" and the amount.

Q.   What was the amount exchanged for the warrant?

A.   $18,000.

          MR. REHN:  And if I could, Ms. Sebade, ask you to highlight the portion that says "network tokens."

Q.   Do you see that, Ms. Cotto?

A.   Yes.

          MR. REHN:  If we could now go to page 7 of this document.  And if we could just expand the signature block again.

Q.   Who signed this document on behalf of Peppersec?

A.   Roman Storm.

Q.   Was it the same email we looked at earlier?

P7OVSTO3                        Cotto - Direct

A.   Yes.

          MR. REHN:  We can bring that down.  And we'd now like to show the witness and the parties government Exhibit 1345.

          The government offers government Exhibit 1345.

          MR. PATTON:  Your Honor, this is just part of the continuing objection from earlier.

          THE COURT:  The objection is overruled.

          Government Exhibit 1345 is admitted into evidence and may be shown to the jury.

          (Government's Exhibit 1345 received in evidence)

          MR. REHN:  Ms. Sebade, if I could ask you to expand the portion at the top.

Q.   Ms. Cotto, who are the thread participants?

A.   Haseeb and Roman Storm.

          MR. REHN:  We could bring that down.

          If we could expand the message at the bottom.

Q.   Who was the author of this message?

A.   Roman Storm.

Q.   And what was the date of this message?

A.   July 20, 2020.

Q.   Could I ask you to read this message.

A.   What do you think of valuation of 12.5 million for Tornado?

          MR. REHN:  We can bring that down.

          And if we can show the witness and the parties Government Exhibit 1346.

And the government offers this exhibit.

MR. PATTON:  Continuing objection, your Honor.

THE COURT:  And it is overruled.

Government Exhibit 1346 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1346 received in evidence)

MR. REHN:  Can we please expand the portion of this exhibit containing the messages.

Q.  Ms. Cotto, could I ask you to read the first message from Roman Storm, and then I will read the messages from Haseeb.

A.  "Like the shirt?"

Q.  "It's dope.  Seriously going to need some swag for our team after we close this investment."

A.  "Sure.  We will make some."

Q.  There's some form of symbol there.

MR. REHN:  If we could bring that down and bring up Government Exhibit 1347.

And the government offers Government Exhibit 1347.

MR. PATTON:  Continuing objection.

THE COURT:  Objection is overruled.

Government Exhibit 1347 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1347 received in evidence)

MR. REHN:  If we could expand the bottom two messages here.

Q.  Ms. Cotto, again, I will read the messages from Haseeb, and I would ask you to read the messages from Roman Storm.  Before we continue, could you tell me what the date of these messages are?

A.  August 14, 2020.

Q.  "Because it seems to me that, one, governing Tornado v2 is not actually possible due to the permissionless nature of the contracts, right?  So that can't be the utility anyway.  Two, your users can fill in the blanks once the token distribution begins."

A.  "One.  It is possible."

MR. REHN:  Please scroll to the next page.

Q.  And if I could ask you to read the messages on this page.

A.  "People can decide, for example, to deploy new Tornado Cash pool link 1,000 or ETH 1,000 pool, deploy new Tornado v3, a lot of stuff could be done with it.  Saw your email.  I'm in the middle of drafting the docs."

MR. REHN:  We could bring that down.

Could we bring up for the witness Government Exhibit 1348.  And the government offers this pursuant to the same certification.

MR. PATTON:  Same objection.

THE COURT:  Objection is overruled.

Government Exhibit 1348 is admitted into evidence and can be shown to the jury.

P7OVSTO3                        Cotto - Direct

(Government's Exhibit 1348 received in evidence)

Q.  Ms. Cotto, can we again proceed with the messages, with you reading the messages from Roman Storm, and I will read the messages from Haseeb.

A.  "Because Roman Semenov wants to make money, smiley face."

Q.  "LOL, we're all agreed there.  You don't want to spook the market though.  Future investors, since you guys will have to sell tokens OTC, will really want to see that you guys have skin in the name.  Either way, most of the money you'll make will be in the future when Tornado Cash is huge and successful."

A.  "Two years is too small?"

Q.  "Two years is on the small side these days for founder lockups.  You can look at comps.  Messari shows a lot of founder token vesting schedules."

A.  "Russian mentality is not ambitious.  We can have a chat with Roman Semenov to convince him."

Q.  "Okay.  I am down."

A.  "I just had a chat with him."

Q.  "What was his response with previous chat?"

A.  "Basically says he didn't see too many crypto projects with huge vesting schedule."

Q.  "Tell Roman that either way he'll have a one-year lockup.  And if Tornado is successful, he'll make a bunch of money after he gets to sell his tokens."

A.   "He agrees on that."

Q.   "So whether it's 25 percent after one year or 50 percent, the real question is how many long-term investors will want to buy TORN if they think Semenov will bounce after he's fully unlocked."

A.   "He is like, dude, I don't want to spend four years building this shit, smiley face."

Q.   "LOL.  That's not good."

A.   "It's okay."

Q.   "We really want him involved.  And so should you, I think."

A.   "You don't know Russian mentality.  Always short-term thinking.  We built Tornado as a hackathon project."

Q.   "I do know, haha, I know Ivan well enough to know how that goes."

A.   "Look where we are now, 1.1 years already."

Q.   "But Tornado can be something really big, the kind of thing that you work on four years and then retire if you do it right."

A.   "I think only because of me, don't wanna take credit, but I lived in SV for eight years.  We understand it because we have been in the valley."

Q.   "Definitely.  You're the CEO.  You're the one who is keeping the team together and moving forward."

A.   "They are not."

Q.   "I get that.  But it's also on you to pull the team with

you and inspire and motivate them.  Screw the Russian mentality.  If they want that, then they can leave after two years and leave half their tokens on the table IMO.  You don't get tokens for just showing up and having the idea.  That's not the hard part.  The hard part is doing the work for the next four years when liquidity mining is going crazy, tech is changing, layer twos are arriving now.  You are competing with all of the other privacy projects out there and the crosshairs are on your head."

A.   "True.  And the way it works with Roman S is to not scare him with five years of work, smiley face.  He likes small wins.  I just gotta keep providing it, that's how I can keep Roman for four to five years."

Q.   "I hear you.  You know him better than anyone, so will leave it to you what you think is the right way to convince him."

A.   "Anyway."

Q.   "I'm happy to back you up however is helpful."

A.   "Let me ask what Alexey thinks about it."

Q.   "Okay.  Sign emoji."

A.   "He will wake up in four to five hours.  Personally, I'm even fine with standard four years vesting, on the other I also understand it's crypto, everything changes here so quickly, we have no idea how it will look like in two years.  Some of it I understand where Roman comes from."

P7OVSTO3                          Cotto - Direct

MR. REHN:  Let's scroll down to the next page, in the interest of time, and go to the next page, and the next page, and the next page, and the next page and the next page.

Is that the end of it, Ms. Sebade?  There's one more page?

Q.  Okay.  If could I ask you to read the last three messages.

A.  "Alexey agrees with me three years sounds reasonable.  We will wait for Roman's morning and get a consensus on it.  He has no choice cause me and Alexey are down for longer vesting. Winky face.  Alexey is long-term founder."

MR. REHN:  We can bring that down and go to -- bring up Government Exhibit 1350.  And the government offers this exhibit.

THE COURT:  Yes, Mr. Patton, continuing objection?

MR. PATTON:  Your Honor, could we have a sidebar on this?

THE COURT:  Yes.

(Continued on next page)

(At sidebar)

MR. PATTON:  The issue, your Honor, is they are talking about something that is related to a regulatory concern about whether the TORN is a security.  And I think it's -- that concern is not relevant.  So I did reach out to the government about a number of other chats that were related to that issue.

THE COURT:  Yes.

MR. PATTON:  And they took them out, but this is one that --

THE COURT:  Did you approach them about this one?

MR. PATTON:  I did.  I think their understanding was that I was objecting to what surrounds this is discussion about the securities issue.  But this is still about it, but it's suggesting like that this chat could be about anything and could sound nefarious or related to compliance issues, when it's about this securities issue.  And I don't think it's a rule of completeness issue because we wouldn't want to add in the securities regulation issue on TORN being a security.

MR. REHN:  First off, this was what we had discussed, the exhibit, with Mr. Patton yesterday was my understanding.

But, second off, the issue here is just to establish the date and their discussions when the TORN tokens were released.  There's no suggestion of any issues relating to securities or anything like that; it's just that they're discussing the release of the TORN tokens.

P7OVSTO3                         Cotto - Direct

THE COURT:  So when you're speaking about amplifying on social media, it is the release of the TORN token that is being amplified?

MR. REHN:  This is the date they are releasing them. There's already a document in evidence to that effect.

MR. PATTON:  But they are talking about why they are not going to amplify it, and it's because of the securities issue.

THE COURT:  I'm confused.  You said this is a discussion about the release of the TORN tokens, and yet the context is that they are not going to amplify it.  How is that probative of any issue in your case?

MR. REHN:  It's just the fact that they are coordinating with their investors.  There's this issue that I don't know if the defense is still going with this, it's a not-for-profit DeFi app.  But the fact that they are coordinating the release of TORN tokens with their investors is directly responsive to that offense.

MR. PATTON:  First of all, we have all of the safe documents and the investment documents and all of the discussion about TORN and its pricing and all the rest.  So like this is a tiny part and it's just talking about the securities issues.

MR. REHN:  Your Honor, there was cross-examination this morning attempting to suggest that there needed to be some

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

sort of community process to release the TORN tokens.  The fact that they are discussing the release of the tokens without reference to that is directly responsive to that.

THE COURT:  The problem for me is it's not obvious to me that they are discussing releasing the TORN tokens.  There's more to this communication than this one page?

MR. PATTON:  There was, yes.

MR. REHN:  This connects to the government exhibit, I believe it's 1904, the actual Medium post where this was announced.  This is on the same day as that.

THE COURT:  What part of this exhibit are you planning to read into the record, the totality of the chat?

MR. REHN:  Can I take a look, your Honor?

THE COURT:  Well, I only have the one page.

MR. REHN:  It is just the page.

This, in connection with the announcement, makes it clear they are talking about the release of the TORN tokens, your Honor.  The timing lines up exactly as when that happens. And we took out a bunch of stuff that the defense requests.

THE COURT:  But why can't we start at "FYI, expected date for wire to hit is 12/21, awesome," and leave it at that, and just call that out and not have her read the rest of it and then just replace the exhibit.

MR. REHN:  Okay.

THE COURT:  Okay.  Good.  That's an answer.

P7OVSTO3                      Cotto - Direct

Thank you.

(In open court)

THE COURT:  Government Exhibit 1350 is admitted as modified by our discussions at sidebar.  Counsel, you may call out that last portion of the exhibit, thank you very much, and then show that to the jury.

(Government's Exhibit 1350 received in evidence)

MR. REHN:  Ms. Sebade, if you could first show to the witness Government Exhibit 1350.  If you could just expand the bottom two messages.  And if we could bring that up for the jury.

BY MR. REHN:

Q.  Ms. Cotto, what is the date of these messages?

A.  December 17, 2020.

Q.  And if I could ask you to read the message from Haseeb.

A.  "FYI, expected date for wire to hit is 12/21."

Q.  And could you read the response from Roman Storm.

A.  "Awesome."

MR. REHN:  We can bring that down.

And if we could show the witness and the parties Government Exhibit 1309.

We offer Government Exhibit 1309.

MR. PATTON:  No objection, your Honor.

THE COURT:  Government Exhibit 1309 is admitted into evidence and may be shown to the jury.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

(Government's Exhibit 1309 received in evidence)

MR. REHN:  Ms. Sebade, if we could just expand the top portion of this.

Q.  Ms. Cotto, if I could ask you to read the title of this document.

A.  "Exhibit 1, Exercise Notice."

Q.  And if you could read the portion underneath that.

A.  "To be completed and signed only upon each exercise of the warrant."

MR. REHN:  If we could go to page 3.  And if I could ask you to expand the signature block under holder.

Q.  Who signed this warrant exercise?

A.  Feng Bo.

Q.  Who is he signing on behalf of?

A.  Dragonfly International Holding Limited.

Q.  What was the date?

A.  December 11, 2020.

MR. REHN:  We can bring that down.

If we can show the witness and the parties Government Exhibit 1368.  And the government offers 1368.

MR. PATTON:  Part of our continuing objection, your Honor.

THE COURT:  The objection is overruled.

Government Exhibit 1368 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1368 received in evidence)

MR. REHN:  Ms. Sebade, if I could ask you to expand the portion at the top of this message, please.

And, Ms. Sebade, if I could ask you to highlight some names:  Alexey Pertsev, Haseeb, Poma, Roman Storm, and Tom Schmidt.

Q.  Do you see those names, Ms. Cotto?

A.  Yes.

MR. REHN:  If we could go down to where the messages begin, I believe it's on page 2.  We can bring that part down. Just one sec.  If we go to the next page, and the next page, and the next page.  Here we go.

Q.  If we could start at the messages here.  If I could ask you to read the message from Roman Storm.

First, tell us what the date was.

A.  December 16, 2021.

"Of course, my team is pissed because a lot of money going around and we are like top builders, in our view, and we still eating crypto ramen, sarcastically.  Crypto ramen means we still consider between economy flight tickets."

MR. REHN:  All right.  We can bring that down.

And if we could go to Government Exhibit 1369, again, for the witness and the parties.

And the government offers Exhibit 1369.

MR. PATTON:  Same objection.

THE COURT:  The objection is overruled.

Government Exhibit 1369 is admitted into evidence, may be shown to the jury.

(Government's Exhibit 1369 received in evidence)

Q.  Ms. Cotto, does this have the same participants as the last one we're looking at?

A.  Yes.

MR. REHN:  If we can go to page 2.  And if we could expand the message at the bottom.

Q.  And if I could ask you to read the date.

A.  February 2, 2022.

Q.  Who is the author of this message?

A.  Roman Storm.

Q.  Can you please read this message.

A.  "Question:  In our bank acc, the balance is about 380,000 left.  I think it can go for 10 to 12 months.  Need an advice what to do.  We have some stables around 280,000 and we need fiat to pay for crypto services, Infura eats like 5 to 8K per month plus salaries, 30 to 40K per month.  Should we just wait till burn?  Should we figure out how to get more?  Should we dissolve Peppersec, Inc. afterwards?  Lots of questions.  Or we can get TORN, sell it to stables, and move stables to bank. Please advice.  Basically how do we fund our bank acc, we would need to explain that TX where it came from and who funded it."

Q.  I'll read the messages from Tom Schmidt:  "Let's chat.  Are

P7OVSTO3                        Cotto - Direct

you free later this evening or tomorrow afternoon?"

A.  "Yes."

Q.  "How about 5 p.m. Pacific time?"

A.  "Sounds good."

MR. REHN:  Could we bring up Government Exhibit 1376 for the witness and the parties.  And the government offers this exhibit.

MR. PATTON:  Same objection, your Honor.

THE COURT:  Overruled.

Government Exhibit 1376 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1376 received in evidence)

BY MR. REHN:

Q.  Ms. Cotto, does this have the same participants as the other chats we've been looking at?

A.  Yes.

MR. REHN:  Can we go to the second page.  And if I could ask you to expand that message.

Q.  Could you please read this message.

A.  "@tomhschmidt ping some TORN holders to cast a vote on TC governance proposal."

Q.  And what was the author of this message?

A.  Roman Storm.

Q.  What was the date?

A.  February 14, 2022.

MR. REHN:  Could you bring that down.

I'd like to shift topics and bring up Government Exhibit 2031 and 2031-T, which the government offers pursuant to the Court's prior rulings.

MR. PATTON:  We maintain our objection.

THE COURT:  All right.  The objection is overruled.

Government Exhibits 2031 and 2031-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2031, 2031-T received in evidence)

MR. REHN:  If we could just bring up the messages side-by-side.  And I'll remind the Court of our stipulation that the exhibits with the "T" are true and accurate English translations of the Russian contents of the original exhibits.

THE COURT:  I am so reminded.

MR. REHN:  If we could bring up Government Exhibit 2031-T on the full screen.  If we could just go to page 4.  And if we could pull up the two messages at the top.

Q.  And if I could ask you, Ms. Cotto, to tell me who wrote these messages?

A.  Roman Storm.

Q.  And what was the date of these messages?

A.  September 24, 2020.

Q.  If I could just ask you to read these messages.

A.  "One.  Haseeb took me to task.  I made a report.  I said

P7OVSTO3                         Cotto - Direct

that everything is fine, that there is progress, that all of us are fucking working hard, that there are three audits underway, and everything is fucking great.  We discussed the situation with Amin.  Haseeb also thinks it's not worth interfering.

"Two.  Barry.  I fixed the situation.  I apologized, we talked, everything is fine.  He understood and forgave me.  Damage mitigated.

"I am working on UI myself.  Danik found a small bug.  I can explain later, but it's connected to Kovan.  But I don't think it fucking matters because it's testnet."

MR. REHN:  Okay.  We can bring that down.

If we could bring up now for the witness and the parties Government Exhibits 2014 and 2014-T.

THE COURT:  Mr. Patton, same objection?

MR. PATTON:  Yes, your Honor.  Sorry, I didn't think it was --

THE COURT:  I thought you had them in your binder, excuse me, sir.  I too am waiting to see them.

MR. REHN:  It may be easier, with the Court's permission, to just bring up the translations pursuant to the parties' stipulation.

THE COURT:  Thank you.

MR. REHN:  So if we can just bring up Government Exhibit 2014-T.

And the government offers Exhibits 2014 and 2014-T.

MR. PATTON:  Objection.

THE COURT:  Yes.  The objection is overruled.

Government Exhibits 2014 and 2014-T are admitted into evidence on the Court's understanding that 2014 is the pre-translation version of the conversation.

(Government's Exhibits 2014, 2014-T received in evidence)

MR. REHN:  Thank you, your Honor.

BY MR. REHN:

Q.  Ms. Cotto, if I could ask you to identify the participants in this particular Telegram chat.

A.  Roman Storm and Alexey Pertsev.

MR. REHN:  If we could go to page 2.  And if we can expand these three messages.

Q.  And, again, I will read the messages from Alexey Pertsev and ask you to read the messages from Roman Storm.

Could you first tell us what the date is of these messages.

A.  December 23, 2021.

"The guys broke UI Tornado again.  They fucking deployed a nonworking fix again."

Q.  "Did they fix it?"

MR. REHN:  Is that the end of that one?

A.  "They put the optimization with the trees into production and fucking broke everything.  They are testing the build."

Q.   "Fuck.  But they said that they were testing it."

A.   And did you at least do a code review?  The updates are so serious."

Q.   "No.  No one looked in on that for ages."

A.   "This is a serious update for tree-building.  Things like that can't not be audited.  For some reason, Roma wakes up at 4 a.m. and sees that the users are complaining.  Roma and Lesha are in a convenient time zone, but it doesn't fucking matter."

Q.   "But I've been on the road since yesterday.  I didn't look anywhere at all.  I agree, the front end was fucking lost. Can't be fucking trusted with anything at all."

A.   "So where are you going?"

          MR. REHN:  If we can now bring up Government Exhibit 2121-T just for the witness and the parties.

          And the government offers this exhibit.

          THE COURT:  2121?

          MR. REHN:  Yes.

          THE COURT:  Thank you very much.

          MR. PATTON:  Same objection.

          THE COURT:  Yes, the objection is overruled.

          Government Exhibits 2121 and 2121-T are admitted into evidence and may be shown to the jury.

          (Government's Exhibits 2121, 2121-T received in evidence)

          MR. REHN:  Could we read the title of this particular

chat.

A.   "Tornado take my muffin."

Q.   And if we could read the message on page 1, after you tell us who it is from.

A.   It's from Roman Storm.

Q.   What does he say?

A.   "Here is the general idea — two are in favor and one is against.  We can therefore offer 1,500 TORN."

          MR. REHN:  If we could go to page 4 and bring up the bottom two messages.

A.   "Hi."

Q.   First, before we get -- I will read the messages from this other person.  Could you read that person's name?

A.   Pavel Muntyan.

Q.   "Hi.  We are ready to accept the offer.  In addition to integrating the Tornado brand into an episode, we will do movie-style opening credits for you like we did for 1 inch. I'll show you now.

          "Message with an attachment.

          "Only one question remains.  The amount went down and it would be logical to receive the tokens and to send you TMM-tokens after the signing.  How possible is this?  As of today, 1500 TORN is 3,000 803 TM."

          MR. REHN:  Could we go to -- is this page 4 or 5?  We can bring that one down for now.

P7OVSTO3                        Cotto - Direct

Could we now go to Government Exhibit 2122-T and bring it up for the witness.

The government offers Government Exhibit 2122 and 2122-T.

MR. PATTON:  Same objection.

THE COURT:  Objections are overruled.

Government Exhibits 2122 and 2122-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2122, 2122-T received in evidence)

MR. REHN:  And if we could go to page 5, and if we could read the top two messages.

A.  "@zick0x, change the UI logic for the gas price in Tornado. Make it as it is in my crypto.  We are walking too close to the base fee."

Q.  Read the response.

A.  "All right.  I will do that tomorrow."

Q.  Go to page 10, and read --

MR. REHN:  Bring up the bottom message on page 10. Okay.  We can bring that down.

Could we go to Government Exhibit 2124-T and please bring it up for the witness.

And the government offers 2124 and 2124-T.

MR. PATTON:  Objection.

THE COURT:  Objection is overruled.

P7OVSTO3                          Cotto - Direct

Government Exhibits 2124 and 2124-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2124, 2124-T received in evidence)

Q.   Ms. Cotto, what is the title of this chat?

A.   "Peppersec Team."

Q.   Can we go to page 4 and can we read the top two messages.

A.   "@zick0x, did you remove note deletion from UI?  This needs to be done fucking urgently."

Q.   And who's the author of those messages?

A.   Roman Storm.

Q.   Can we go to page 5 and read the top message.

A.   "What's up with that one?"

MR. REHN:  We can bring that down and go to Government Exhibit 2127-T.  And the Government offers 2127 and 2127-T.

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.

Government Exhibits 2127 and 2127-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2127, 2127-T received in evidence)

BY MR. REHN:

Q.   Ms. Cotto, is this another portion of that Peppersec team chat?

A.   Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MR. REHN:  Bring that down and go to page 3.

And if we could expand that.

Q.  And if you could read -- who wrote the messages on this page?

A.  Roman Storm.

Q.  What was the date?

A.  October 27, 2021.

Q.  Okay.  If I could ask you to read the three messages here.

A.  "People are writing that Tornado is frozen.  On BSC.  In the group."

MR. REHN:  And could we go to page 10.

Q.  And read the bottom two messages of page 10, please, telling me who they are from first.

A.  Roman Storm.

"Please give me the latest build where it works on a cell phone.  V2.5."

MR. REHN:  Can we go to page 11.

Q.  And if I could ask you to read the top message from Nikita Dementev.

A.  "Deployed commit 1d0d991 of tornado.cash 2.5 UI," and then a link.

MR. REHN:  Okay.  And then if we could go to page 12, and if we could expand the four messages on this page.

Q.  And if I could ask you to read those.

A.  "Fuck.  It doesn't fucking work at all.  I messed up like a

P7OVSTO3                        Cotto - Direct

loser in front of the Binance guys right now.  Give me a build for a phone.  @zick0x, is there a build or not."

MR. REHN:  Can we go to page 13.  And if we could expand the messages on this page and read those.

Q.  So first off, on this first one, is this a reply from Nikita Dementev?

A.  Yes.

Q.  Read that please.

A.  "I uploaded it to the master; the latest build should be there right now."

Q.  And did Roman Storm respond to that message?

A.  Yes.

Q.  Can you read that.

A.  "Can you give me a build that would work on a cell phone?"

Q.  Read the next message.

A.  "I want to do a demo for the guys."

MR. REHN:  Okay.  If we can bring that down.

And if we could go to Government Exhibit 2262-T and bring that up just for the witness and the parties.

And the government offers this exhibit.

MR. PATTON:  Same objection.

THE COURT:  Objection is overruled.

Government Exhibits 2262 and 2262-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2262, 2262-T received in

evidence)

Q.  And looking at page 2 of this exhibit and the second name up from the bottom, do you see that, Ms. Cotto?

A.  Yes.

Q.  Who's in this chat?

A.  Roman Storm, among others.

MR. REHN:  Can we go to pages 3 and 4.  I guess go to page 3.

Q.  And if you could read the messages on page 3.

A.  "We can't go into production with this UX.  It's really shitty.  I can show this.  It's not a new Tornado but a fucking mess.  It feels like Windows 95 when there already was windows 7."

MR. REHN:  This was 2262; is that right?

Okay.  Could we bring up 2129, please; 2129-T for the witness.  And the government offers 2129 and 2129-T.

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.

Government Exhibits 2129 and 2129-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2129, 2129-T received in evidence)

BY MR. REHN:

Q.  Ms. Cotto, is this a portion of the Peppersec team chat we were looking at earlier?

A.   Yes.

MR. REHN:  Can we go to page 3.

Q.   And read the first message.  And who is this from?

A.   Roman Storm.

Q.   All right.  Could I ask you to read this message please.

A.   "@uhaubuhau894, @smartex, @dan1kov.  Priorities:  One, omni bridge PR, get it done.  Two, relayer registry, integration with contracts, classic UI integration of staking.  Three, nova bugs, max doesn't work properly, issue with refresh on tab. Four, multi sender refractor -- refactor.  Use much more optimized way to validate addresses proposed by @alexpertsev."

MR. REHN:  Okay.  Could we go to page 4 and read the first message.

Q.   Is this a reply to that message also from Roman Storm?

A.   Yes.

Q.   If I could ask you to read this reply.

A.   "How is the relayer registry doing?  I would like:  One, PR in Tornado-replayer repo; two, PR in Tornado classic UI; three, registry UI app.  Who is working on what, and how is it going there?"

Q.   What's the date on that message?

A.   February 10, 2022.

MR. REHN:  All right.  Can we go to page 9 of this exhibit.  And if we could expand the messages on this page.

Q.   And if I could ask you to identify who sent the message on

the top of this page?

A.   Roman Storm.

Q.   Do you see that it says "forwarded"?

A.   Yes.

Q.   What was the date that Roman Storm forwarded this?

A.   February 26, 2022.

Q.   Do you see the second line that says "additional sanctions against Russia may be imposed"?

A.   Yes.

          MR. REHN:  If we go down to the next two messages.

Q.   And if we could read those.

A.   "So your salaries will stop working, guys.  It's time to accept crypto."

          MR. REHN:  If we could go to page 5 -- I'm sorry, page 10.

Q.   And just read the messages on this page.

A.   "I still think that everything will be fine, but anything could happen.  It's necessary to set up a company in Dubai @semenovroman."

          MR. REHN:  Okay.  Can we now bring up for the witness Government Exhibit 2130.

Q.   Is this another portion of that Peppersec team chat?

A.   Yes.

          MR. REHN:  If we could go to page 4.

          THE COURT:  Are you seeking its admission, sir?

P7OVSTO3                        Cotto - Direct

MR. REHN:  I apologize, your Honor.

The government offers Government exhibits 2130 and 2130-T.

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.

Government Exhibits 2130 and 2130-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2130, 2130-T received in evidence)

MR. REHN:  If we go to page 4 and expand the third and fourth messages.

Q.  Who is the author of these messages?

A.  Roman Semenov.

Q.  Could I ask you to read the physical message there.

A.  "Let's quickly hard code a fix for the UI."

Q.  What's the date of that message?

A.  February 14, 2022.

MR. REHN:  Can we go to page 5 and read the bottom message.  Who's this message from?

A.  Roman Storm.

Q.  What's the date of this message?

A.  February 14, 2022.

Q.  And I won't ask you to read all those @ addresses, but if you could just read the message.

A.  "We need a fix fast."

MR. REHN:  Okay.  Could we go to Government Exhibit 2135-T and bring it up for the witness.

Q.  Is this a continuation of the Peppersec team chat?

A.  Yes.

MR. REHN:  The government offers Exhibits 2135 and 2135-T.

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.

Government Exhibits 2135 and 2135-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2135, 2135-T received in evidence)

MR. REHN:  If we go to page 3.  And if I could expand that and read the --

Q.  If I could ask you to tell me who wrote this message.

A.  Roman Storm.

Q.  What's the date on this message?

A.  February 21, 2022.

Q.  And do you see that he's forwarding a message?  Or, I'm sorry, replying to a message, I apologize.

A.  Yes, he's replying to a message.

Q.  And can you read the message he's replying to, again, just the text of the message.

A.  "WU Tornado they are asking me for a registry UI in order to start writing the documentation.  Shall I give them the

P7OVSTO3                        Cotto - Direct

build with the fork or just screenshots of the steps?"

Q.   Could I ask you to read what Roman Storm wrote in response to that message.

A.   "Well, when will the UI be ready?  We need to roll it out today already."

Q.   What's the date of this message?

A.   February 21, 2022.

        MR. REHN:  Okay.  Excuse me.  Could we go to page -- I'm sorry, could we go to Government Exhibit 2101.

Q.   What's the title of this message?

A.   "HR Peppersec."

        MR. REHN:  The government offers Exhibits 2101 and 2101-T.

        MR. PATTON:  Objection.

        THE COURT:  Objection is overruled.

        Government Exhibits 2101, 2101-T are admitted into evidence and may be shown to the jury.

        (Government's Exhibits 2101, 2101-T received in evidence)

        MR. REHN:  If we go to page 5 of this exhibit, please.

Q.   And if we could read the bottom message here -- actually, the bottom two messages here.

        MR. REHN:  If we could expand those.

Q.   Ms. Cotto, what are the dates on these messages?

A.   March 16, 2022.

Q.   Could I ask you to read the first message.

A.   "We need a UI/UX designer."

Q.   And if we go to the second message, I won't ask you to read the reply, what he's replying to, just the text of the message.

A.   "Requirement.  A dude who knows how to design UI/UX interfaces, who thinks of how to make it convenient and pretty. We use Figma, experience with crypto will be highly useful."

MR. REHN:  Okay.  We can bring that down.

All right.  Could we go to Government Exhibit 2261. And if we could show the witness 2261-T.

And the government offers 2261 and 2261-T.

MR. PATTON:  Objection, your Honor.

THE COURT:  Government Exhibits 2261 and 2161-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2261, 2261-T received in evidence)

MR. REHN:  Could we go to the message on page 3.

What's the date on this message?

A.   October 4, 2021.

Q.   And is this a message from Roman Storm?

A.   It is.

Q.   And is he replying to another message?

A.   Yes.

Q.   And if I could just ask you to read the reply that he wrote on that date.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7OVSTO3                    Cotto - Direct

A.   "Two.  Subsidization is certainly cool, but I think we need to get people used to paying for transactions.  We have capitalism rather than socialism, after all.  Basically, it's at your discretion, of course, but in my humble opinion, it's dangerous when free bread is taken away from hamsters later. It's better to take money from them right away.  We can do this right away so that your relayers would immediately receive compensation.  If this entails some risks, then I will understand the reason for the refusal to collect the commission."

(Continued on next page)

P7O1STO4                     Cotto - Direct

MR. REHN:  Okay.  We can bring that down and bring up Government Exhibit 2210 just for the witness.

And the government offers Government Exhibits 2210—

Is this in translation?  Just 2210, actually.  We have an original here.

THE COURT:  Objection, Mr. Patton?

MR. PATTON:  Yes, your Honor.

THE COURT:  Thank you.  The objection is overruled.  Government Exhibit 2210 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2210 received in evidence)

BY MR. REHN:

Q.  Ms. Cotto, what is the first name listed in this chat as the admin of this conversation?

A.  Roman Storm.

Q.  Could we go to page 2.  And if I could ask you to read page 2, please.

A.  "@ivor2 could you add this, please."

Q.  Could we go to page 3.

A.  "Overview:

"1.  Anyone can become a relayer by staking TORN into registry contract.

"2.  Minimum stake is governed by the governance.

"3.  Each Tornado pool has its own fee percent which is also set by the governance.

"4.  On every withdrawal via relayer, the relayer has to pay the Tornado pool fee in TORN.

"The fee is deducted from his staked balance.

"6.  All collected fees are stored into staking reward contract.

"7.  Any TORN holder can stake their TORN into governance contract like they were before, but earning fees proportionately to their stake.

"Caveats:

"Anyone can trigger price oracle update in order to adjust the calculation of how much TORN should be deducted.

"It uses Uniswap V3 TWAP oracle model."

MR. REHN:  Okay.  Are we on page 2 or 3?  Could we go to page 3.

Is this page 3?  This looks very similar to what we just read, so—oh, yeah, okay.  So if we could go back to page 2.

Q.  And Ms. Cotto, if I could ask you to look at that first message again.  What was the date on that message?

A.  November 2, 2021.

Q.  And who was that message addressed to?

A.  Ivor2.

MR. REHN:  Could we now bring up Government Exhibit 2037-T.  And the government offers Government Exhibits 2037 and 2037-T.

P7O1STO4                        Cotto - Direct

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.  Government Exhibits 2037 and 2037-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2037 and 2037-T received in evidence)

BY MR. REHN:

Q.  Ms. Cotto, do you see the name of this chat?

A.  Yes.

Q.  And what's the name of it?

A.  Bablo Peppersec.

Q.  And what's the group photo?

A.  It's a money bag.

MR. REHN:  Could we go to page 4 of this document.

I'm sorry.  Go up to page 3.  And if we could expand the message in the center of this page.

Q.  Who wrote this message?

A.  Alexey Pertsev.

Q.  And what was the date?

A.  November 18, 2021.

Q.  If I could ask you to read that message.

A.  "Ivor is fucking leaving!"

MR. REHN:  Okay.  Could we go to page 4.  And if we could expand the top three messages here.

Q.  Could I ask you to read these three messages.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   "He's mumbling something.  I can't understand a fucking thing."

     "Basically he's pissing his pants."

     "We need to calm him down somehow."

Q.   Could we go to the next message.

     Who's the author of this message?

A.   Roman Semenov.

Q.   And could I ask you to read this message.

A.   "As I understand, his relatives think that Tornado is about laundering dough and hackers."

     MR. REHN:  Could we go to the next message, the next page.

     And if we could actually go to the second message here.

Q.   Do you see a reply from Roman Storm?

A.   Yes.

Q.   And what message is he replying to?

A.   The "Ivor is fucking leaving" message.

Q.   And do you see a link there?

A.   Yes.

     MR. REHN:  If I could just ask you to, Ms. Sebade, to expand the text at the bottom underneath the link a little bit.

Q.   And Ms. Cotto, if I could ask you to read the headline and the first sentence of this.

A.   "Feds indict three more alleged employees of Silk Road's

Dread Pirate Roberts. Ross Ulbricht, the alleged Dread Pirate Roberts and administrator of the Silk Road drug website, may be spending Christmas in a jail cell in Brooklyn, New York."

MR. REHN: Bring that down.

Q. So who sent that message in response to the "Ivor is fucking leaving" message?

A. Roman Storm.

MR. REHN: Your Honor, we could continue. I'm not sure when the Court wants to break for lunch.

THE COURT: I don't have a sense of how much more your direct is, sir.

MR. REHN: I think we're about halfway through.

THE COURT: The issue, sir, would be if we broke for lunch and then what do you think, there's an hour and then there would be another――I don't know, because then there would be a break in the afternoon, a substantial break in the afternoon right after an hour lunch break, but you think you have an hour to go?

MR. REHN: I would think so, your Honor.

THE COURT: All right. And Mr. Patton, you have some cross, yes, sir?

MR. PATTON: I'm sorry?

THE COURT: You have cross, sir?

MR. PATTON: It will be very brief, if any.

THE COURT: If it's an hour, that's probably asking a

P7O1STO4

little too much, so we will break.  We'll do the break for lunch.  And I know, sir, that you'll be streamlining this during the lunch break.

So we will break for lunch.  That means we're probably going to break again this afternoon, and you'll understand why.  So we'll do a 45-minute lunch break and we'll see you in 45 minutes.  And I'll ask you not to discuss this case with each other or with anybody else and to keep an open mind until all the evidence is in.  Thank you very much.

All rise.

(Jury not present)

THE COURT:  We'll see you all in 45 minutes.  Thank you.

(Luncheon recess)

P7O1STO4

                         AFTERNOON SESSION

                            1:34 p.m.

            (Jury not present)

            THE COURT:  Counsel, I'm advised that there is an
issue.  What is the issue, please?

            MR. REHN:  Your Honor, I think we're going to withdraw
the exhibit.  I was just consulting with my team.  And so I
think we're going to not create another issue for the Court to
have to resolve, and I apologize.

            THE COURT:  You're so kind.  Okay.  And therefore
there's no issue.

            All right.  My deputy advises that our jurors took a
longer lunch than they might have been given today, although
some of my litigants did too.  We were told the four of them
that we needed were all in the security line, so they should be
here momentarily.

            All right.  We might as well remain here.  You're
welcome to sit down.

            Mr. Patton, you're alone.

            MR. PATTON:  I've been abandoned.  We are fine to
continue.  They'll be in.  We're trying to herd cats on
witnesses for this afternoon.

            THE COURT:  I see.  Okay.  But we're still good on not
having the 4:00 conference, correct, sir?  That's not
happening, the 4:00 conference?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

P7O1STO4                       Cotto - Direct

MR. PATTON:  I think that's correct.  That has not been in my——

THE COURT:  Your bailiwick?

MR. PATTON:  Correct.

THE COURT:  Okay.  I mean, I did adjourn it, so I'm hoping we're not having it.

MR. PATTON:  I have heard nothing to the contrary.

(Continued on next page)

(Jury present)

THE COURT:  Please be seated.  Thank you very much.

Ms. Cotto, I'll remind you that you remain under oath.

Mr. Rehn, you may continue.

MR. REHN:  Thank you, your Honor.

If we could bring up Government Exhibit 2211-T.

THE COURT:  For the witness and the parties?

MR. REHN:  Yes, your Honor.

THE COURT:  Thank you.

MR. REHN:  I'm sorry.  This is one of the ones that's originally in English, so just 2211.

THE COURT:  Thank you.  Thank you, Ms. Sebade.

MR. REHN:  Can we display that for the witness and the parties, please.

BY MR. REHN:

Q.  Ms. Cotto, do you see that this is a message where Roman Storm is the admin?

A.  Yes.

MR. REHN:  Government offers Government Exhibit 2211.

MR. PATTON:  Same objection.

THE COURT:  Government Exhibit 2211 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2211 received in evidence)

MR. REHN:  If we could bring this up and go to page 2.

BY MR. REHN:

Q.   And if we could read the first message from Alexey Pertsev.

A.   "Hi @ivor2.  Here is a feedback from one of the reputable solidity engineers that we got.

"We think the Tornado proxy should be a simple contract that only forwards calls to necessary instances.  It should not store any data and methods that manipulate instances itself.

"Move this logic to a completely separate contract: Tornado instances.sol."

Q.   Can you read who wrote this next message.

A.   Roman Storm.  "Tornado proxy is heavy now and it shouldn't know so many things about instances.  So, I agree with such feedback.  Separation of concerns."

        MR. REHN:  Okay.  Could we go to Government Exhibit 2120, please.

        And bring up 2120-T.

Q.   Ms. Cotto, is this another chat from that Peppersec team chat?

A.   Yes.

        MR. REHN:  Government offers 2120 and 2120-T.

        MR. PATTON:  Objection.

        THE COURT:  The objection is overruled.  Government Exhibits 2120 and 2120-T are admitted into evidence and they may be shown to the jury.

        (Government's Exhibits 2120 and 2120-T received in

evidence)

MR. REHN:  Ms. Sebade, if we could go to page 2.

The next page.

Yes.  If we could expand the message at the top.

BY MR. REHN:

Q.  What's the date on this message, Ms. Cotto?

A.  June 14, 2021.

Q.  And if I could ask you to identify the author of the message.

A.  Roman Storm.

Q.  Could you please read this message.

A.  "Priorities:

"1.  Tornado 2.5 UI.

"2.  RAI deployment with fee to governance.

"3.  Incentivized governance torn holders.

"4.  Relayer fee split to buy TORN.

"5.  Registry relayer with subscription model.

"6.  Governance leader board.

"7.  Job ads landing.

"Work in progress:"

Q.  I'll stop you there.  Thank you.

And if we could now go to Government Exhibit 2015. And 2015-T.

Ms. Cotto, is this a chat between Roman Storm and Alexey Pertsev?

P7O1STO4                        Cotto - Direct

A.   Yes.

MR. REHN:  The government offers 2015 and 2015-T.

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.  Government Exhibits 2015 and 2015-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2015 and 2015-T received in evidence)

MR. REHN:  Could we go to page 2 of this document, please.

BY MR. REHN:

Q.   And could we read the first message here.

A.   "I asked him to help us with Tornado."

MR. REHN:  Could we go to the next page of the document, please.

And if we could expand that top message Ms. Cotto.

Q.   Do you see that on January 31, 2022, Roman Storm sent an attachment?

A.   Yes.

MR. REHN:  Ms. Sebade, if I could ask you to bring up—or we would move to admit Government Exhibit 2015-1, which is the attachment to this message.

THE COURT:  Same objection?

MR. PATTON:  Yes.

THE COURT:  Yes.  Also overruled.  Government

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Exhibit 2015-1 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2015-1 received in evidence)

MR. REHN:  There's actually an audio file, your Honor, and we would just ask to play just a few seconds so we can hear what it sounds like.

THE COURT:  Yes.

(Audio played)

MR. REHN:  Your Honor, we would now offer Government Exhibit 2015-1-T pursuant to the parties' Russian translation stipulation.

MR. PATTON:  Objection.

THE COURT:  All right.  The objection is overruled. 2015-1-T is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2015-1-T received in evidence)

BY MR. REHN:

Q.  Ms. Cotto, if I could ask you to read the translation of that audio message.

A.  "I was also surprised, Lesha, that someone, I don't know whether it was you or someone else, created a task that, for some fucking reason, we need to calculate a new percen—or, to change the fee calculations for relayers in the, er, old Tornado UI.  I go, like, 'What the fuck?'  We don't need to change a fucking thing.  It should work the way it works, the

P7O1STO4                          Cotto - Direct

same way as it does now.  We don't need to do anything.  I mean we will have, er, a chain link model.  So, you guys are making money there, and the relayers will already do their own calculations of what to do in order to come out on top, that's all.  This should not be our responsibility now, to change the calculations at UI, to fucking change relayer software there so they would all be so nice and would come out on top.  They can fuck off.  Let them do their own calculations."

MR. REHN:  And we can bring that down.  And if we can bring up for the witness Government Exhibit 2016-T.

Your Honor, the government offers Government Exhibits 2016 and 2016-T.

MR. PATTON:  Objection.

THE COURT:  Objection is overruled.  Government Exhibits 2016 and 2016-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2016 and 2016-T received in evidence)

BY MR. REHN:

Q.  Ms. Cotto, is this a further part of that chat between Roman Storm and Alexey Pertsev?

A.  Yes.

Q.  Could we go to page 2, please.

And if we could read the top three messages here.

A.  "Nothing but problems."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7O1STO4                          Cotto - Direct

            "I spoke with Dragonfly."

            And then a link.

Q.   Does that appear to be an attachment?

A.   Sorry.  Yes.  An attachment.

            MR. REHN:  Your Honor, the government offers

Government Exhibit 2016-1, which is an audio file that was the

attachment to this message.

            MR. PATTON:  Objection.

            THE COURT:  Government Exhibit 2016-1 is admitted into

evidence.

            (Government's Exhibit 2016-1 received in evidence)

            THE COURT:  And is it being played for the jury, sir?

            MR. REHN:  I think it sounds very similar to the prior

one, so I would suggest we move to the translation, which is

Government Exhibit 2016-1-T.

            THE COURT:  And that is also admitted over the defense

objection.  Thank you.

            (Government's Exhibit 2016-1-T received in evidence)

            MR. REHN:  If we could bring up 2016-1-T, please.

BY MR. REHN:

Q.   And Ms. Cotto, is this the attachment to that message that

Roman Storm sent?

A.   It appears to be the transcript, yes.

Q.   If I could ask you to read this.

A.   "Basically, wh—what he suggested is:  He said, okay, he

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

said, 'You can make this protocol fee of yours but,' he said, actually——fuck!  I also figured out that he just suggested a fucking amazing idea.  To basically take, er——to basically take the protocol fee not in TORN, but, for instance, m-maybe a part——the relayers could have it in TORN and I also think we can make another protocol fee which will be fucking done right in Ethereum, well, right in the asset in which it is, and we can just send that fee to governance.  This way, governance will be accruing some dough, and we could submit that dough. We could just say, fucking give us some money, dudes.  Now that's a fucking——that's a——that's fucking amazing.  That's it. And so——and——why haven't we fucking figure that out right away, the cock suckers?  This is such a fucking amazing idea!"

MR. REHN:  Bring that down.

And if we could go back to Government Exhibit 2016-T. And if we could bring up that message where that attachment was sent.

Q.  What was the date of that audio message, Ms. Cotto?

A.  February 4, 2022.

MR. REHN:  All right.  If we could now go to Government Exhibit 2017-T.

Q.  And Ms. Cotto, do you recognize this as a further portion of the chat between Roman Storm and Alexey Pertsev?

A.  Yes.

MR. REHN:  The government offers Government

Exhibits 2017 and 2017-T.

MR. PATTON:  Objection, your Honor.

THE COURT:  Government Exhibits 2017 and 2017-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2017 and 2017-T received in evidence)

MR. REHN:  And if we could go to page 2 of this document.

And if you could expand the three messages on this page.

BY MR. REHN:

Q.  What's the date on these messages, Ms. Cotto?

A.  February 23, 2022.

Q.  All right.  If I could ask you to read the first two messages from Roman Storm.

A.  "We have a couple of relayers who are already in a fucking uproar that we fucking cheated them."

"They registered but they are not on the list——"

"——and they have nowhere to write for help."

MR. REHN:  Bring that down, please.  Is there another page to this one?

All right.  Let's expand this page as well.

Q.  And I can read the Alexey Pertsev message and you can read the Roman Storm message.

So Alexey starts writing on February 23, 2022, "Well,

they are fucking nuts, because why the fuck did they try to get in the contract manually?  Wait for the official release and instructions and then do it."

A.  "It's our mistake anyway, in my humble opinion."

Q.  "Yes, we generally don't talk to people properly."

MR. REHN:  All right.  If we could bring that down.

And we could move on to the next exhibit.

So let's see here.  Give me one second.

All right.  Could we now go to Government Exhibit 2010 and in particular 2010-T, Ms. Sebade.

Q.  Ms. Cotto, do you recognize this as another portion of the conversation between Roman Storm and Alexey Pertsev?

A.  Yes.

MR. REHN:  The government offers Exhibits 2010 and 2010-T.

THE COURT:  Same objection, sir?

MR. PATTON:  Yes, your Honor.

THE COURT:  Thank you.  It's overruled.  Government Exhibits 2010 and 2010-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2010 and 2010-T received in evidence)

MR. REHN:  If we could bring that up and go to page 2.

BY MR. REHN:

Q.  And if we could read the chat.  I'll ask you to read the

Roman Storm messages and I'll read the Alexey Pertsev messages.

A.   "Was Ether deposited to governance?"

Q.   "No fucking clue.  I didn't look."

"It probably still needs to be executed there."

A.   "Well?"

"Please take a look."

"Lesha, you are now in charge——of Tornado.  Deal with the issues."

Q.   What was the date of those messages?

A.   October 24, 2021.

MR. REHN:  All right.  We could now bring up, for the witness, Government Exhibit 2034-T.

Q.   Is this a portion of that chat with the money bag that we looked at before, Ms. Cotto?

A.   Yes.

MR. REHN:  Your Honor, the government offers Exhibits 2034 and 2034-T.

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.  Government Exhibits 2034 and 2034-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2034 and 2034-T received in evidence)

MR. REHN:  If we could go to page 5, please.

BY MR. REHN:

Q.  And if we could go at the bottom and read the message from Storm.  Oh, I'm sorry.  The top message from Storm.  Is this a reply to a message?

A.  Yes.

Q.  And if I could ask you to read the reply, please.

A.  "I also strongly believe that we should never, even in private chats, talk as if we own Tornado."

MR. REHN:  Okay.  Let's bring that down.

Could we go to Government Exhibit 2043-T, please.

Q.  And if we can, is this another portion of that money bag chat?

A.  Yes.

MR. REHN:  The government offers Exhibit 2043 and 2043-T.

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.  Government Exhibits 2043 and 2043-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2043 and 2043-T received in evidence)

BY MR. REHN:

Q.  So is this that same chat between Roman Storm, Alexey Pertsev, and Roman Semenov?

A.  Yes.

MR. REHN:  And if we could please go to page 17.  And

if we could expand the top message here.

Q. Do you see that there's a reply from Roman Storm?

A. Yes.

Q. What was the date of that?

A. March 15, 2022.

Q. Could I ask you to read this message, please.

A. "Why the fuck are you getting into a defense mode immediately?  I am fucking tired of that.  We're talking about fucking business here."

Q. Okay.  Could we go to page 18.

And read the top message.

A. "We devote more to time to various bloombergs."

Q. Could we go to page 20, to the bottom.

Do you see that there is a reply from Roman Storm to a message?

A. Yes.

Q. And who is that message that he's replying to from?

A. Roman Semenov.

Q. Could I ask you to just read the first paragraph of that message.

A. "The UK's National Crime Agency has called for the regulation of sophisticated mixing technology used by criminals to avoid detection when laundering money through cryptocurrencies."

Q. Okay.  So if we can scroll down to the part where Storm

replies to this message.

Could you read the reply at the bottom of the screen now.

A.   "It was stressed that they take a commission."

Q.   If we could now go to page 20.

And at the bottom, do you see that there's another reply from Roman Storm?

MR. REHN:   Is this page——oh, are we already at 20? I'm sorry.  Go to page 21.  That's what we just did.  Go to page 22, please.

And if you could expand the messages here.

Q.   And if I could ask you to read the message from Roman Storm and then I'll read the message from Roman Semenov.

A.   "For now they just got to Bitcoin mixers but soon they'll get to Tornado too and they'll start fucking messing with us."

Q.   "We need to think what else they can fucking accuse us of."

Could I ask you to read the message from Alexey Pertsev.

A.   "Just the UI, as usual."

Q.   Scroll down.  And if I could ask you to read the response from Roman Storm.

A.   "UI plus that we don't fucking block anything at the front."

Q.   Okay.  Could we scroll down a little bit further.

And I will read the message from Roman Semenov and

I'll ask you to read the message from Roman Storm.

"And for the access to ENS as well."

A.   "We would have looked to have 2-3 teams for UI."

Q.   If we go to the next page.

A.   "Yeah, it's a fucking mess."

Q.   You just read a message from who?

A.   Roman Storm.

Q.   And could you read the message that he's responding to from Roman Semenov.

A.   "And for the access to ENS as well."

Q.   And how did Roman Storm respond to that?

A.   "Yeah, it's a fucking mess."

MR. REHN:   What page are we on now?   This is 24?   Okay.   Could we now expand the bottom two messages on this page.

Q.   Could we read these two messages as well.

A.   "We should probably hand over the key to governance, keeping just the update access key."

Q.   And I'll read Semenov.   "But to approve releases through the multisig, 1. it has to be open source, and 2. it slows down releases."

And could we go to the next page.

Could I ask you to read the response from Roman Storm.

A.   "Yes, it would be fucking tough.   We need to hand over the primary access and then we can yell that the worker is not the

P7O1STO4                    Cotto - Direct

owner."

Q.  Okay.  Go a little further.

I'll read this part.  "Well, like we'll keep access to release UI with KYC."

And if I could ask you to read the Storm message.

A.  "We should fucking throw it away and move on to v3."

MR. REHN:  Okay.  Go down a little further.

Okay.  I think we can bring that down now.

All right.  We would now move on to Government Exhibit 2049-T, just for the witness.

The government——

Q.  Well, Ms. Cotto, do you recognize that this is part of that same chat?

A.  Yes.

MR. REHN:  The government offers Exhibits 2049 and 2049-T.

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.  Government Exhibits 2049 and 2049-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2049 and 2049-T received in evidence)

MR. REHN:  Okay.  For this one, could we start on page 4, please.

BY MR. REHN:

Q.   And the first message on page 4 is a reply; is that right?

A.   Yes.

Q.   And is it a reply by Alexey Pertsev to a message from Alexey Pertsev?

A.   Yes.

Q.   Could you read the original message from Pertsev.

A.   "I created a card in RHO and gave it to Sergey.  He's going to post ads in Facebook to look for candidates."

Q.   If you could then read what Alexey Pertsev wrote next.

A.   "I just wondered, is everything OK here from a legal point of view?  Maybe it's a dead giveaway if we pay for Tornado from the Peppersec account, although on the other hand everyone knows who's building it."

Q.   Okay.  Could we go to page 5 of this exhibit.

         And if we could read—do you see at the top there's a reply from Roman Semenov to that message?

A.   Yes.

Q.   If I could ask you to read that reply.

A.   "We are paying salaries from it anyway."

         MR. REHN:  Okay.  Could we now go to page 9.

         And if we could expand the message in the middle from Roman Storm.

Q.   And what's the date of this message?

A.   May 6, 2022.

Q.   Do you see at the top it says forwarded?

A.   Yes.

Q.   So what was the message that Roman Storm forwarded on May 6, 2022?

A.   "U.S. authorities sanction the blender.io mixer."

     "Sanctions were also imposed on addresses associated with the mixer.  Blender.io is allegedly linked to North Korean hackers."

     Pointing up emoji.  "It is the first time when the U.S. treasury has added a cryptocurrency mixer to its sanctions list."

Q.   Okay.  Could we go to page 10 now.

     And if we could read the message from Roman Storm in reply to that message.  The original——

     So we have the original message, and if I could ask you to read the reply.

A.   "U.S. authorities——"

Q.   No, I'm sorry.  You've already read I think the original message, so just the reply.

A.   "How about that?  That went through Tornado as well."

Q.   Okay.  Scroll down.

     Could I ask you to read the next message from Roman Storm.

A.   "The domain is blocked."

Q.   I will read the Pertsev message.  "Let's go and have a fucking chat."

P7O1STO4                    Cotto - Direct

"@semenovroman here?"

And then what's the——is there a response from Roman Storm?

A.   Yes.  He sends a Zoom link.

Q.   Okay.  What was the date of these messages?

A.   May 6, 2022.

MR. REHN:  All right.  If we could now go to Government Exhibit 2036-T.

Q.   Ms. Cotto, do you recognize this as another portion of this group chat?

A.   Yes.

MR. REHN:  The government offers Exhibit 2036 and 2036-T.

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.  Government Exhibits 2036 and 2036-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2036 and 2036-T received in evidence)

MR. REHN:  If we could start on page 4, and if we could expand the message at the bottom.

BY MR. REHN:

Q.   Do you see the date on this message?

A.   November 16, 2021.

Q.   And is this a forwarded message?

A.   Yes.

Q.   And so what does it look like Roman Storm forwarded here?

A.   A link to an NPMJS website.

Q.   If I could ask you to read the description of that website lower down in the message.

A.   "Node.JS module with the verifier SDK for PureFi decentralized AML protocol.  Providing wrappers for communicating with PureFi issuers."

Q.   Okay.  Scroll down.

Did Roman Storm forward another message?

A.   Yes.

Q.   What was the message that Roman Storm forwarded?

A.   "Maybe you should install it at your site?"

Q.   Okay.  Could we scroll down.

And is there another message he forwarded?

A.   Yes.

Q.   Could you read that.

A.   "This way, Crystal will not even be needed, I think."

Q.   Could you read the next message from Roman Storm that was forwarded.

A.   "Anonymity of clients is preserved, and you can set the risk score threshold to enter yourselves."

Q.   Okay.  And I will read the response from Roman Semenov, on November 16, 2021.

"Would you like to install KYC on Tornado?"

And could we go and read the next two messages from Storm.

A.   "Such suggestions, make me fucking scream with laughter."

MR. REHN:  You can bring that down.

THE COURT:  Before we move on, may I ask my friends at the defense table if they'd like me to read a limiting instruction at this time.

MR. PATTON:  Yes, your Honor.

THE COURT:  All right.  Members of the jury, please listen to this limiting instruction.

You have seen and you may see further evidence making reference to certain anti-money laundering, or AML, or Know Your Customer, sometimes called KYC features.  Mr. Storm is not being charged with, and I will not be instructing you, that either Mr. Storm or his alleged co-conspirators were required by any law or regulation to implement any particular anti-money laundering or Know Your Customer features.  Instead, I have permitted this evidence so that you may consider it in evaluating whether Mr. Storm had knowledge of such features and whether he had the ability to implement changes to Tornado Cash.  So think about that if you see other exhibits with KYC and AML, or written out, Know Your Customer or anti-money laundering.  Thank you very much.  Please follow my instruction.

Thank you, counsel.  Please continue.

P7O1STO4                     Cotto - Direct

MR. REHN:  Okay.  If we could now bring up on the screen Government Exhibit 1372 just for the witness.

BY MR. REHN:

Q.  Ms. Cotto, do you recall we looked at some messages involving Alexey Pertsev, Haseeb, Poma, Roman Storm, and Tom Schmidt?

A.  Yes.

Q.  And do you see that this is another portion of those messages?

A.  Yes.

MR. REHN:  The government offers Exhibit 1372.

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.  Government Exhibit 1372 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 1372 received in evidence)

MR. REHN:  Could we scroll down in this message, please.  And if we could expand the top four messages.

BY MR. REHN:

Q.  What's the date on these messages?

A.  It starts on May 2, 2022, and goes on for the next two days.

Q.  Okay.  Could I ask you to read the initial message on May 2nd of 2022.

A.  "Folks, we are brainstorming an idea.  Privacy for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7O1STO4                          Cotto - Direct

blockchain with full compliance.  We want your opinion and help us to see if this is something that market needs plus legality of such venture.  Hack MD link.  Has to be under new brand name basically fork of Tornado but with KYC/AML in it."

Q.  Okay.  I'll read the responses from Haseeb, and we'll just continue through this chat.

"I am not a fan of this tbh.  Legally it seems fine but I just don't know if anyone will actually want this. Market need seems quite thin."

A.  "We hear a lot of different opinions.  Do you personally use Tornado Cash or Dragonfly as a business?"

Q.  "Dragonfly doesn't.  Our auditors would kill us."

"I haven't used it personally beyond playing around with it."

A.  "See?  That's the use case."

"Right there."

Q.  "Well, the other thing is we use centralized exchanges all the time so that's our effective mixer."

A.  "You are quite limited there.  And not easy to use."

Q.  "I know what you mean, but TBH it would be unlikely that as a fund we'd use a 'compliant mixer.'  As a venture fund, we are relatively low velocity.  That may look different for hedge funds."

MR. REHN:  We can bring that down.

All right.  One moment.  Could we now move to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Government Exhibit 2059-T.

Q.  Do you see a conversation here between Alexey Pertsev,
Roman Storm, and Roman Semenov?

A.  Yes.

          MR. REHN:  The government offers Exhibits 2059 and
2059-T.

          MR. PATTON:  Objection.

          THE COURT:  The objection is overruled.  Exhibits 2059
and 2059-T are admitted into evidence and may be shown to the
jury.

          (Government's Exhibits 2059 and 2059-T received in
evidence)

          MR. REHN:  Okay.  If we could go to page 2 and if we
could expand these messages.

          Just one moment, your Honor.

BY MR. REHN:

Q.  All right.  Do you see on the screen, Ms. Cotto, that there
is a message from Roman Semenov?

A.  Yes.

Q.  And what's the date of this message?

A.  February 14, 2022.

Q.  Okay.  So do you see—what kind of a message is this?  Is
it an attachment?

A.  It is an attachment.

          MR. REHN:  So the government offers the attachment

P7O1STO4                          Cotto - Direct

here, which is 2059-1, and the translation of that, which is 2059-1-T.

MR. PATTON:  Objection.

THE COURT:  Government Exhibits 2059-1 and 2059-1-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2059-1 and 2059-1-T received in evidence)

MR. REHN:  If we could bring up 2059-1-T.

THE COURT:  Is this an audio file, sir, that you're not going to play for the jury?

MR. REHN:  Yes.

THE COURT:  I understand.  Thank you.

MR. REHN:  If we go to page 2.

BY MR. REHN:

Q.  And if we could read—if you could read, start reading, and I'll tell you when we can stop.

A.  "I thought a little more here about the protocol fee in the form that Roma suggested—so that, er, the proxy would, like, take commission from all the users and would send it somewhere into governance.  Er, on the one h-hand, if we do that, we will fuck with BlankWallet really well, because as it is, all their users will have to pay commission to Tornado too.  But on the other hand, this is a very questionable sort of precedent.  As it is, what do we have?  We have the Tornado immutable smart contract which doesn't have any commission, but we just up and

made a proxy that charges this commission on top of it.  And the protocol seems immutable, but everyone must use the proxy because if you bypass it, you could kind of lose anonymity because all of our u-users go through the proxy by default and if you bypass it, then, as it is, you, er, are kind of different from everyone.  Which means that we kind of took back power this way.  Which is questionable regarding the community—er, well—well, a simple example, right, how, how it could be questionable.  Because just like that, it could be said, OK, well, because, you have the, you now have the power over, er, how transactions are made, since you are now charging a commission for them, so, since you control the proxy, why don't you also make it possible for it to ban, say, hacked money, so that, like, the proxy wouldn't let hacked money into Tornado, OK?  Er, well, that is, I mean that this could, er, somehow highlight some level of the recentralization of the protocol that, er, there could be, er, be some control over it.  Therefore, the protocol fee could be a bit questionable here.  Plus, er, someone could, er, I—I mean that when it's actually the protocol because with the relayers, one could always say that it doesn't make sense to do a fork because if you want a custom relayer, you just enter one into custom and use it for free, but through our UI, OK.  With a protocol fee, this would no longer be possible and someone would have to make an alternate version in order to directly interact with the

contracts there in order to not pay the fee.  For, er, SushiSwap——"

Q.  That's enough.  Sorry.  It was a long passage.  But if we could scroll down a little bit further.

All right.  And we could say——if we could pick up again at the "as for why."  Do you see?  "But as for why it should be forked."  If we could highlight.

THE WITNESS:  Would you highlight it.  Thank you.

A.  "As for why should it be forked, it was 'so that it would be impossible to turn on any commission with us.'  Therefore, a similar reason could, like, appear for Tornado as well, er, OK.  So, um, I don't know.  I basically doubt that, hmm, such a commission is or is not OK, just because it is charged from all users, OK, and as it is, there is some level of control over the protocol.  Something along the lines of that we are already forcing——because with the relayers, it's kind of like an optional commission, but here it turns out that we are already kind of forcing it."

MR. REHN:  All right.  We could bring that down.  And if we could go back to 2059-T.

Q.  And do you see after that attachment there is a message from Alexey Pertsev?

A.  Yes.

Q.  And if I could ask you to read that message.

A.  "That's right, control.  Governance control."

Q.  If we could go down.

          And is there another attachment?

A.  Yes.

          MR. REHN:  All right.  The government offers

Government Exhibits 2059-2 and 2059-2-T.

          MR. PATTON:  Objection.

          THE COURT:  Objection is overruled.  Government

Exhibits 2059-2, 2059-2-T are admitted into evidence and may be

shown to or played for the jury.  Thank you.

          (Government's Exhibits 2059-2 and 2059-2-T received in

evidence)

          MR. REHN:  Again, I think we'll dispense with playing

the original Russian message, your Honor, and go directly to

the transcript.

          THE COURT:  Thank you.

          MR. REHN:  And if we could expand that.

BY MR. REHN:

Q.  And again, this was an attachment to a message that was

sent by Roman Semenov; is that correct?

A.  Yes.

Q.  Okay.  Could we please read the transcript of the audio of

that message.

A.  "That's right, we have someone to show the governance to

anyway.  So the token holders recognize——are responsible for

that.  Well, I mean, I don't know, someone will come to some

Dragonfly or just major holders and will tell them 'go on and fucking vote.'  Well, or, say——well, in——in DAO, there kind of haven't been any major precedents when, er, DAO participants have been, say, forced to do something, but nevertheless, it is theoretically possible there.  Like one could say, 'go on and fucking create a special multisig where the FBI could send some requests regarding any trouble or how fucking stolen funds are kept there and have this multisig be able to add to the proxy's block list there.'  Or some other fucking bullshit.  Well, I mean that, er, on the whole, many of these possibilities are kind of theoretical, but even when there is a theoretic possibility, the community doesn't fucking like this at all anymore.  Well, because the blockchain, it was originally about decentralization, so that it wouldn't even be theoretically possible to somehow influence the situation.  Like, so we say that we have immutable contracts and that's it, no one can stop it, no matter what you do there, but it turns out that no, it is possible to stop it, as long as the governance makes the right decision."

Q.  Could I just ask you to read that last portion again, beginning with the word "no."

          MR. REHN:  And if we could highlight that.

A.  No——

          MR. PATTON:  Objection, your Honor.

          THE COURT:  Sustained.

MR. REHN:  We could bring that down and bring back up Government Exhibit 2059-T.

And if we could expand the response from Alexey Pertsev.

BY MR. REHN:

Q.  How did Alexey Pertsev respond to this message?

A.  "I think you are being paranoid about FBI."

MR. REHN:  Okay.  Keep scrolling.  I think that's the last one we need to do here.

So let's go to 2060—or actually—I'm sorry, yes, 2060.

Q.  And is this another set of messages between Alexey Pertsev, Roman Storm, and Roman Semenov?

A.  Yes.

MR. REHN:  Okay.  And if we could offer this into evidence, your Honor, Government Exhibits 2060 and 2060-T.

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.  Government Exhibits 2060 and 2060-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2060 and 2060-T received in evidence)

MR. REHN:  All right.  So if we could expand the bottom two messages on the screen here.

BY MR. REHN:

Q.  First off, what's the date on these messages?

A.  February 14, 2022.

Q.  So is that the same date as the message that we were just looking at?

A.  Yes.

Q.  If I could ask you to read the two messages that Roman Storm sent later that day.

A.  "So show me a DeFi project which has true decentralization, Roma.  And let's take a look at how many projects have centralized potential points like ours.  Basically, the concerns are no doubt valid, but that's no reason not to do correct updates."

"Moreover, the protocol fee will be useful for everyone."

MR. REHN:  Okay.  I think that's the end of that one; is that right, Ms. Sebade?

Are there more?  Could we just take a look at those?

I don't think we need to read all the messages for this one.

All right.  Let's now shift gears a little bit.  If we could go to Government Exhibit 917.

I don't know if this is actually in or not.  It may have come in during an earlier witness.

Okay.  Your Honor, the government offers Government Exhibit 917 pursuant to the certification produced by Rho.

MR. PATTON:  Objection, your Honor.

THE COURT:  Government Exhibit 917 is admitted into evident and may be shown to the jury.

(Government's Exhibit 917 received in evidence)

MR. REHN:  Okay.  Could we expand the top email all the way down through the signature line.

BY MR. REHN:

Q.  All right.  What's the date on this message?

A.  April 19, 2022.

Q.  Okay.  And do you see there's an email from somebody described as Darko Pavlovic?

A.  Yes.

Q.  Could I ask you to read this email.

A.  "Hi Roman and Alexi,

"Rho Client Service Team here.  We hope this email finds you well.

"As a part of our standard audit, our compliance team has requested that you fill out our crypto questionnaire for the account Peppersec Inc.  You can find the link to our crypto questionnaire here.

"Please note that the questionnaire must be filled out within the next seven days.

"We appreciate your prompt response and cooperation through this process!

"Sincerely."

Q.   Okay.  And is that email from Darko Pavlovic?

A.   Yes.

Q.   What's the address listed underneath his signature heading?

A.   It's Rho at 100 Crosby Street, New York, New York 10012.

Q.   Okay.  Could we scroll down.

And do you see there's a message from Roman Storm via Client Service on April 19, 2022?

A.   Yes.

Q.   All right.  What does that message say?

A.   "Done," and then "[Quoted text hidden]."

MR. REHN:  Okay.  If we could now bring up, just for the witness and the parties, Government Exhibit 923.

And I apologize.  This is an Excel spreadsheet, but I think it's the only one we'll be doing in——

THE COURT:  This is why it's taking 10 minutes to load?  Okay.

MR. REHN:  Struggle with us, your Honor.

And the government offers Exhibit 923.  This is also part of the Rho certification.

MR. PATTON:  Objection.

THE COURT:  Government Exhibit 923 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 923 received in evidence)

BY MR. REHN:

Q.   Ms. Cotto, do you see on column A there's something that

says "Please add today's date"?

A.   Yes.

Q.   What was the date of this?

A.   April 19, 2022.

Q.   So is that the date of those emails we were just looking at?

A.   Yes.

Q.   All right.  Do you see where it says "Legal Entity Name"?

A.   Yes.

Q.   What does it say?

A.   Peppersec Inc.

Q.   And then it says, "Please add your name in column E."  What does that say?

A.   Roman Storm.

Q.   And then it says, "Please add your role within the company."  What does that say?

A.   CEO.

Q.   Okay.  So let's go to column M.  And I'm going to read the question and I'll ask you to read the answer.

         "How is your company directly or indirectly related to cryptocurrency?"

A.   "Donations, payments, expenses."

Q.   If we could go to column Q.

         "Does your company operate on a blockchain?"

A.   "No."

P7O1STO4                         Cotto - Direct

Q.  Go to the next column.

"Does the company accept deposits?"

A.  "No."

Q.  Go to the next one.

"Does your company offer services that allow its users/clients to buy, sell, trade, convert, digital currency or otherwise invest in companies that do the same, or that offer the same?"

A.  "No."

Q.  Go to column V.

"Does your company offer any products/services related to a digital wallet?"

A.  "No."

Q.  Okay.  Column W.  "Does/will your company receive or send international transactions in relation to any digital currency?"  What's the answer?

A.  "No."

Q.  Okay.  We can bring that down.

And then do you see at the bottom here there's a message from Darko Pavlovic on April 26, 2022?

A.  Yes.

Q.  I'll just ask you to read the line on the screen here.

A.  "Hi, Roman.  Thank you for filling out the crypto questionnaire!"

MR. REHN:  Okay.  We can bring that down.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

All right.  Shifting gears again, if we could go to and bring up Government Exhibit 237.

And your Honor, this is covered by the authenticity stip with respect to Google records.  And the government offers Government Exhibit 237.

MR. PATTON:  Objection.

THE COURT:  Counsel, at this time would you like me to read a limiting instruction?  If this is—

MR. PATTON:  Yes, your Honor.

THE COURT:  Members of the jury, again, we've talked about limiting instructions, and when I give you those, it means that you can only consider the evidence for a limited purpose and not for all purposes.

I believe that some of the exhibits you are about to see will be letters to or communications to Tornado Cash.  To the extent that there's information contained in that, that information is not being admitted for the truth of its contents but simply for the effect on the recipient of the information for the effect on the state of mind of the recipient of the information.  You may not consider the contents of these emails for their truth.

Thank you, counsel.

MR. REHN:  Okay.  If we could start with Government Exhibit 237 and if we could expand—

THE COURT:  Which I'm admitting.  I don't know if I

said this formally, but I am admitting that over the defense objection.  Thank you.

(Government's Exhibit 237 received in evidence)

MR. REHN:  Thank you, your Honor.

Could we expand this email, Ms. Sebade.

BY MR. REHN:

Q.  And Ms. Cotto, could I ask you to read the body of this email.  Actually, let's set the stage here a little bit.

Who is this email from?

A.  From m49039@mjib.gov.tw.

Q.  Who is it to?

A.  Hello@tornado.cash.

Q.  Okay.  If we could now see the date of the email.

A.  May 13, 2021.

Q.  And what's the subject?

A.  "Request assistance from the law enforcement unit in Taiwan."

Q.  Okay.  Could I ask you to please read the email.

A.  "Dear tornado.cash support team,

"This is Vincent Yu from Ministry of Justice Investigation Bureau, Taiwan (ROC).  We are investigating the Furucombo's proxy smart contract compromised event on 2021/2/28.  As the hacker used your service to send out the stolen funds, we need your help to provide the hacker's IP address or any information that hacker's identity that could be

P7O1STO4                         Cotto - Direct

identified.  An official request document shown as the attachment pdf file.  Kindly reply to this email."

Q.  Do you see there's a reference to an official request document?

A.  Yes.

Q.  And do you see there's an attachment to this email?  What's the attachment?

A.  It's official request form MJIB TW to tornado.cash.pdf.

Q.  Do you see the sender of the email says he's from the Ministry of Justice Investigation Bureau?

A.  Yes.

          (Continued on next page)

P7OVSTO5                          Cotto - Direct

MR. REHN:  We could now show the witness and the parties Government Exhibit 238.  And this is also offered, your Honor, pursuant to the stipulation regarding the authenticity.

THE COURT:  Also objected to by the defense.

And I'm overruling the objection and I'm allowing in Government Exhibit 238.

(Government's Exhibit 238 received in evidence)

THE COURT:  It may be shown to the parties -- to the jurors, thank you.

BY MR. REHN:

Q.  Ms. Cotto, do you see the second email on the page here, is that same email we were just reading?

A.  Yes.

Q.  Do you recall that email was sent to hello@tornado.cash?

A.  Yes.

Q.  Who responded to that email?

A.  Roman Storm.

MR. REHN:  We can take that down.

Government Exhibit 2320.  Is this in translation or only original?  Okay.  The government offers Exhibit 2320, your Honor.

MR. PATTON:  Objection.

THE COURT:  Government Exhibit 2320 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 2320 received in evidence)

P7OVSTO5                        Cotto - Direct

MR. REHN:  If we could just expand the front page of this.

Q.  Who are the participants in this chat?

A.  Roman Storm, Taeja, Alexey Pertsev, and then one I cannot read.

Q.  Okay.  If we go to page 2, do you see there are two messages from Roman Storm on this page?

A.  Yes.

Q.  All right.  Do you see on that top message there's like a paragraph of text and then there's a line underneath?

A.  Yes.

Q.  I would just ask you to read the line underneath and then the following message.

A.  "When someone asks about hacks, it's usually the best to provide that answer, if you want."

MR. REHN:  All right.  We can bring that down.

If we could bring up for the witness and the parties Government Exhibit 245.

And, your Honor, the government offers 245 pursuant to the same stipulation.

MR. PATTON:  Objection.

THE COURT:  I am admitting Government Exhibit 245. And it may be shown to the jury.

(Government's Exhibit 245 received in evidence)

THE COURT:  And I will remind them of my prior

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

limiting instruction, which may apply to a number of documents in this section.  Thank you.

MR. REHN:  If we could bring this up for the jury and expand the top part and the first two full paragraphs.

Q.  All right.  Do you see who this message is from?

A.  It's from Alan D. McCarthy.

Q.  And who is it to?

A.  Hello@tornado.cash.

Q.  What's the date of this message?

A.  November 23, 2021.

Q.  What's the subject?

A.  Criminal investigation.

Q.  Can I ask you to read these two paragraphs.

A.  "I am a detective Garda attached to the economic crime investigation unit in Angleses Street, Garda Station, Cork, Ireland.  And I am making this request under section 41B of the Data Protection Act 2018.  I wish to report that I am currently investigating the theft of 89.7 Ethereum to the value of 338,980 euros from Vishnuvardhan Reddy Pocha, on July 1st, 1993 of four posts -- "

Q.  We could skip to the next paragraph.  If you can just read the next paragraph starting with "The injured party."

A.  "The injured party reports that the hacker deposited stolen funds in the Tornado Cash portal."

Q.  And if you could read the next line.

P7OVSTO5                          Cotto - Direct

A.   "Hacker wallet address used to deposit funds in Tornado Cash."

Q.   What appears to be after that line?

A.   It's an address, an Etherscan website address.

Q.   Okay.

          MR. REHN:   Could we go to Government Exhibit 251 just for the witness and the parties.

          The government offers Exhibit 251 pursuant to the same stipulation.

          MR. PATTON:   Objection.

          THE COURT:   Government Exhibit 251 is admitted into evidence and may be shown to the jury.

          (Government's Exhibit 251 received in evidence)

          THE COURT:   I may be reminding the jurors of my prior limiting instruction.

          MR. REHN:   If we could expand the top portion of this document.

Q.   If I could ask you who this email is from?

A.   Vanessalenz@polizei.gv.at.

Q.   Who is it to?

A.   Hello@tornado.cash.

Q.   What was the date of this message?

A.   April 16, 2022.

Q.   If I could ask you to read this message.

A.   "Dear ladies and gentlemen, I work for the police in 8430

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Leibnitz, and I'm investigating an act of fraud in which an unknown perpetrator stole Bitcoins from the victim or illegally transferred them.  My question is therefore whether your company can provide information about a transaction with or without an order from the public prosecutor's office.  Reply requested."

MR. REHN:  Okay.  We could bring that down.

And if we could bring up just for the witness and the parties Government Exhibit 553.

And we would offer this pursuant to the stipulation regarding Twitter records or X records, your Honor.

MR. PATTON:  Objection.

THE COURT:  Government Exhibit 553 is admitted into evidence and it may be shown to the jury.

(Government's Exhibit 553 received in evidence)

MR. REHN:  Could we bring this up and read the --

Q.  I will read the messages in blue, and I'll ask you to read the messages in gray.

Can you start by telling us what the date is on the first message in gray.

A.  June 28, 2021.

Q.  Okay.  And if I could ask you to read that first message.

A.  "Hi Roman, my name is Marcelo Cronfeld.  I wrote to hello@peppersec.com about a case.  Please confirm if you receive it.  Thank you."

Q.  From rstormsf, July 2nd, 2021:  "Can you post it here, please."

And if I could ask you to read the next three messages.

A.  "Hi.  On May 24th I suffered from a MetaMask wallet hack in which all of my funds were lost.  Mainly I had the fund on DeFi pools.  Around USD 700,000 in different tokens were lost between the Ethereum and BSC blockchains.  The money went to Tornado.  You can check the logs on May 24th on the ethereumblockchain@, and then a link.  The BSC hack was around May 31st.  You can check the transaction at, another link.

"I'm not sure it was hacked with my seed phrase or with my computer.  Any help would be much appreciated.  I'm pretty desperate.  Thanks for your help, Marcelo.

"Basically, I need to try to be able to march the inputs and outputs of Tornado to see if they match with the funds stolen.  And then trace the funds."

MR. REHN:  We can bring that down.

And if we could pull up just for the witness and the parties Government Exhibit 556.  And the government offers this pursuant to the same stipulation regarding X records.

MR. PATTON:  Objection.

THE COURT:  Yes.  The objection is overruled.

Government Exhibit 556 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 556 received in evidence)

Q. All right. What is the date on these messages?

A. February 8, 2022.

Q. All right. And if we could -- I could ask you to read just the first two messages.

A. "Hi Roman. Let me present you a real-life use case for your product Tornado Cash. Two days ago, I woke up to see that my open sea had been hacked and all my NFTs stolen. No, I didn't share my seed phrase and didn't click on any discord links or air dropped NFT."

MR. REHN: If we could just expand the fourth message down.

Q. If I could ask you to read that message, just the fourth one.

MR. PATTON: Your Honor, can we approach? Could we approach, your Honor?

THE COURT: Yes.

(Continued on next page)

P7OVSTO5                         Cotto - Direct

(At sidebar)

MR. PATTON:  Just noticing in this one, I don't know if there are others, but in addition to our other objections about the victim correspondence, the emails and others, there's something in here about all the things he's suffered as a result of the loss which we weren't even permitting live witnesses to testify to.

THE COURT:  It is too late for you to tell me now, sir.  I wish you had told me that before these things were put up for the witnesses.

MR. PATTON:  Your Honor, we just ask that we not show it to the jury; we can redact it from whatever goes back to them.  It doesn't need to be shown or read to them.

THE COURT:  Once again, you are exceptionally late for this.

Mr. Rehn, how many more of these exhibits are there?

MR. REHN:  We have a few more, but I can limit it, your Honor.

THE COURT:  Limit it to just the losses and the identification and have Ms. Sebade call out those sections.

MR. REHN:  I was trying to do that, your Honor, as well as I could, but, yes, your Honor.

THE COURT:  All right.  Thank you.

MR. REHN:  I'll cut it down a little bit.

THE COURT:  The bigger question, sir, is that you have

P7OVSTO5                          Cotto - Direct

incredibly misunderestimated — which I appreciate is not a word — your direct.

MR. REHN:  That's correct.

THE COURT:  We're now finishing the second hour of a one-hour direct.

MR. REHN:  Yes, your Honor.

THE COURT:  How much more is there, sir?

MR. REHN:  This is, I think, the second-to-the-last section.  There's some chats at the end and I think it will be wrapping up.  Obviously, I read faster when I'm doing it in my office than we do in the courtroom.

THE COURT:  Sir, it's going to be two and a half times longer than you told counsel.  And counsel has been running like crazy to try and arrange for witnesses based on what you told us.  We all expected you to be done by lunch — in fact, you suggested you might be done before lunch, you didn't even want to commit to that.

So I'm telling you this because I'd like to understand if perhaps we should agree, now that we're together, that we're not going to begin the defense case today if, for example, we finish with your direct at 3 o'clock.  But I'll hear from both sides.  I just want it to be understood that it was an incredible imposition on the defense to give them a time frame that was just wildly off base.

MR. KLEIN:  Your Honor, can I add to that a little

P7OVSTO5                        Cotto - Direct

bit.

THE COURT:  Please.

MR. KLEIN:  We have one witness who we're going to call today.  It's the only day he goes.  He leaves for a foreign country tomorrow.  He's been here all day.  He's a 15-minute witness.  It's important testimony for us.

We'd ask to please have a stipulation or something about his testimony.  We are going to be really prejudiced by this.

THE COURT:  This is Mr. Van Loon.

MR. KLEIN:  It is Mr. Van Loon.

THE COURT:  All right.  I guess the question is -- there are things we can do.  I don't know how long -- the jury will stay till 4 o'clock.

THE DEPUTY CLERK:  Some of them raised an eyebrow.

THE COURT:  They'll live.

But the question is I don't know how long the Rule 29 is, because I don't know how long you want it to be.

I don't even know that we can do this, but would you want to begin the defense case and then do the Rule 29 afterwards with the understanding that if I grant it, then it's all moot anyway?

I'm just asking the government would you consent to that rather unorthodox procedure, whether we begin the defense case and then do the Rule 29, and not suggest that the defense

has compromised their abilities to move under Rule 29?

MR. REHN:  I think the defense could make a motion, the Court could schedule an argument on the motion for tomorrow morning, and we could proceed with the defense case.  We wouldn't object to that procedure, your Honor.

THE COURT:  I want the motion today.  The point is we would do it after the witness has left.

MR. REHN:  Yeah.

MR. KLEIN:  That's absolutely right, your Honor.  We just don't want to have any issue later that somehow we waived our Rule 29 by calling our witness.

MR. REHN:  We won't take that position.

THE COURT:  I understand that.  I think we're all agreeing that that's a thing you could do.

MR. KLEIN:  Okay.

THE COURT:  So what we'll do is he'll finish soon.

MR. REHN:  Yes.

THE COURT:  We'll give them the afternoon break -- well, do we need to give them the break now?  We have restless jurors.

THE DEPUTY CLERK:  If we're not taking the mid-trial motion break, then I would give them a break now.

THE COURT:  Okay.  We'll give them a break now.  You will finish.

I don't even want to ask you to estimate, sir, but 15

minutes?  Twenty minutes?

MR. REHN:  I think I can do it in 20.  I will do one more victim, and then I'll go to the chats sort of at the end. I don't know exactly how long this will take, but we'll cut it down.

THE COURT:  How many more victims do you have?  Or can you admit the documents and not read from them?

MR. REHN:  Sure.  So we'll move the admission of about five more victim emails, we won't read from them, and then we'll skip to some chats sort of at the conclusion of the time frame that we've been talking about.

THE COURT:  All right.

Should we still do the break, Ms. Noriega?

Okay, that's a yes.

She knows the jury better than we do.

MR. KLEIN:  Absolutely, your Honor.

THE COURT:  All right.

Do you still think you have a negligible cross-examination?

MR. PATTON:  Yes, your Honor.

THE COURT:  Okay.  All right.  Thank you.

So that's what we'll do.  Again, we are all agreeing — we are pinky swearing, as it were — that government rests, we'll then hear from -- well, we'll then switch to your witness, right.

P7OVSTO5                        Cotto - Direct

MR. KLEIN:  Can we quickly just somehow --

MR. PATTON:  Utter the magic Rule 29 words.

THE COURT:  I will say we will -- say, Your Honor, we would like to --

MR. KLEIN:  Do a sidebar, your Honor, real quick, just say it over here.

THE COURT:  All right.  And then I'd be also making the *Geaney* finding regarding co-conspirators statements also here at sidebar.  I don't know if anybody even does that anymore, but I'm old-school like that.

MR. KLEIN:  I don't know, your Honor.

THE COURT:  Sorry.  All right.  We'll do that.  We'll have hopefully just one more sidebar.

MR. KLEIN:  Thank you, your Honor, for accommodating us.

THE COURT:  No, it's not your fault that he can't estimate his direct.

Two and a half times, Mr. Rehn, two and a half times.

MR. REHN:  I apologize.  I did not anticipate it would take this long, but we will power through.

THE COURT:  Okay.

(Continued on next page)

(In open court)

THE COURT:  Members of the jury, we are coming near the close of the government's case, but I want to give them a chance — and if not even a gentle nudge — to streamline the very last part of their case and, therefore, we are going to take our afternoon break now.  It will be ten minutes.  Then we'll come back, we'll proceed from there.

I will ask you please not to discuss this case with each other or anyone else.  Keep an open mind until all the evidence is in.  We will see you in ten minutes.

Thank you very much.

(Jury not present)

THE COURT:  I'll give you your ten minutes, government, so you can hack away at the remainder of your direct examination.  Thank you.  See you then.

(Recess)

(Jury present)

THE COURT:  Please be seated.  Thank you.

Mr. Rehn, you may continue.

MR. REHN:  Thank you, your Honor.

In the interest of time, I'd like to move certain exhibits into evidence.  The parties have discussed -- I think we'll move the following exhibits:  Government Exhibit 234, 239, 243, 246, 247, 248, 249, and 256.

MR. PATTON:  Your Honor, we maintain our continuing

objection, but the parties also discussed the possibility that if there are any appropriate redactions or other things to take up with the Court, we may still do that with these exhibits.

THE COURT:  All right.  But you're still objecting to their admission, sir?

MR. PATTON:  I am, your Honor.  And but I also, in case we need some further discussion later, just wanted to give your Honor that awareness.

THE COURT:  All right.  I have been so notified.

I am admitting, over the defense objection, Government Exhibits 234, 239, 243, 246, 247, 248, 249, and 256.  They are admitted.

(Government's Exhibits 234, 239, 243, 246, 247, 248, 249, 256 received in evidence)

MR. REHN:  Thank you, your Honor.

Similarly, we would move into evidence Government Exhibit 2069 and 2069-T.

THE COURT:  The numbers again, please, sir.

MR. REHN:  2069 and 2069-T.

THE COURT:  2069 and 2069-T.

Go ahead, please, sir.

MR. REHN:  And 1367.

THE COURT:  No T with that, sir?

MR. REHN:  That's correct.

THE COURT:  All right.  Any others, please?

P7OVSTO5                        Cotto - Direct

MR. REHN:  2039 and 2039-T, 2040 and 2040-T, 2003 and 2003-T, 2004 and 2004-T, 2061 and 2061-T, 2062 and 2062-T, 2063 and 2063-T, 2006 and 2006-T, and 2052 and 2052-T, and 2295 and 2295-T.

THE COURT:  Same objection, sir?

MR. PATTON:  Same objection and same caveat, your Honor.

THE COURT:  All right.  I am admitting over defense objection the following exhibits:

Counsel, I'd ask you to be careful to ensure that I am admitting the correct ones:  2069, 2069-T, 1367, 2039, 2039-T, 2040, 2040-T, 2003, 2003-T, 2004, 2004-T, 2061, 2061-T, 2062, 2062-T, 2063, 2063-T, 2006, 2006-T, 2052, 2052-T, 2295, 2295-T.

Counsel, have I said those correctly?

MR. REHN:  I believe so, your Honor.

THE COURT:  They are all admitted into evidence.

(Government's Exhibits 2069, 2069-T, 1367, 2039, 2039-T, 2040, 2040-T, 2003, 2003-T, 2004, 2004-T, 2061, 2061-T, 2062, 2062-T, 2063, 2063-T, 2006, 2006-T, 2052, 2052-T, 2295, 2295-T received in evidence)

THE COURT:  Any other exhibits to admit, sir?

MR. REHN:  Not at this time, your Honor.

THE COURT:  Thank you.

MR. REHN:  If we could bring up now Government Exhibit 2033.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT:  Not yet in evidence, sir?

MR. REHN:  Not yet in evidence, your Honor.

THE COURT:  Thank you.

MR. REHN:  2033-T will be more convenient for us, and we would offer this into evidence as a further portion of the Bablo Peppersec chat.

THE COURT:  There's an objection from the defense, yes, I understand.  I'm overruling the objection and I am admitting Government Exhibits 2033 and 2033-T.  Thank you.

(Government's Exhibits 2033, 2033-T received in evidence)

MR. REHN:  All right.  Ms. Cotto, if we could go to -- or, Ms. Sebade, if we could go to page 4 of this exhibit.  And if we could expand the message at the top.

BY MR. REHN:

Q.  Ms. Cotto, do you see a message that's a reply from Roman Semenov to Alexey Pertsev?

A.  Yes.

Q.  And do you see a reference to TORN in the message from Alexey Pertsev?

A.  Yes.

Q.  I would ask you to read the first sentence of Roman Semenov's response.

A.  I thought about -- sorry.

"They are pumping the token price for us."

MR. REHN:  Okay.  Could we now go to Government Exhibit 2041, for the witness, 2041-T.

Q.  And is this another chat between Alexey Pertsev, Roman Storm, and Roman Semenov?

A.  Yes.

MR. REHN:  Government Exhibit 2041 and 2041-T.

MR. PATTON:  Objection.

THE COURT:  Objection is overruled.

Government Exhibits 2041 and 2041-T are admitted into evidence and may be shown to the jury.

(Government's Exhibits 2041, 2041-T received in evidence)

BY MR. REHN:

Q.  All right.  Could we go to page 4 and read message two.  If I could ask you to read this forwarded message by Roman Semenov.

A.  "For the last few days we've seen a jump in volume on Binance actually.  I think today might be the highest volume day ever on TORN/USDT."

MR. REHN:  Okay.  We could bring that down.

If we could now -- sorry, could we just bring that up real quick and go back to page 4.

Q.  What was the date on that message?

A.  February 17, 2022.

MR. REHN:  Okay.  If we could go to Government Exhibit

P7OVSTO5                        Cotto - Direct

2064, showing just for the witness.

Q.  Is this another portion of a chat we've been reviewing?

A.  Yes.

          MR. REHN:  Your Honor, we offer Government Exhibit
2064 and 2064-T.

          MR. PATTON:  Objection.

          THE COURT:  The objection is overruled.

          Government Exhibits 2064 and 2064-T are admitted into
evidence and may be shown to the jury.

          (Government's Exhibits 2064, 2064-T received in
evidence)

          MR. REHN:  You can bring up page 2 of this exhibit.
And if we could just expand the first two messages.

Q.  What are the dates on these messages, Ms. Cotto?

A.  November 25, 2021.

Q.  If I could just ask you to read the first one.

A.  "Are you aware that we pay each multi sig member 100 TORN
per month?"

          MR. REHN:  We could bring that down.  And we could go
to Government Exhibit 2067.

Q.  And is this another portion of a chat we've been reviewing?

A.  Yes.

          MR. REHN:  Government offers 2067 and 2067-T.

          THE COURT:  Defense objection?

          MR. PATTON:  Yes, your Honor.  Sorry.

                      SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

THE COURT:  No, that's fine.  Again, full service, sir.

I am overruling the objection and admitting Government Exhibits 2067 and 2067-T.  2067-T may be shown to the jury.

(Government's Exhibits 2067, 2067-T received in evidence)

MR. REHN:  All right.  If we could bring that up and go to page 2.  And if we could just expand the first two messages.

Q.  Is there a message from Roman Storm on March 25th, 2022?

A.  Yes.

Q.  If I could ask you to read that message.

A.  "How about we fucking sell it all and I retire, smiley face."

Q.  Is there a reply from Roman Semenov?

A.  Yes.

Q.  What is that message?

A.  Need to release v3.

Q.  What was the date on these messages?

A.  March 25, 2022.

Q.  All right.

MR. REHN:  Could we go to Government Exhibit 2050, please.

Q.  Is this a portion of one of the chats we've been reviewing?

A.  Yes.

P7OVSTO5                          Cotto - Direct

MR. REHN:  Your Honor, the government offers Government Exhibit 2050 and 2050-T.

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.

Government exhibits 2050 and 2050-T are admitted into evidence and they may be shown to the jury.

(Government's Exhibits 2050, 2050-T received in evidence)

Q.  Ms. Cotto, do you recognize the Bablo Peppersec name on the front of this message?

A.  Yes.

MR. REHN:  All right.  Could we go to page 29.  And if we could expand the four messages on this page.

Q.  What are the dates on these messages?

A.  June 13, 2022.

Q.  All right.  Let's go ahead and just read the four messages just on this page.  And I'll read the messages from Roman Semenov, and you can read the messages from Roman Storm.

"How about we just give away the entire remaining budget as bonuses and that's it, we can then leave and go home."

A.  "That's fucking shut everything down."

Q.  "I think that you don't give a fuck about the project anymore and that's why you don't give a shit about how appropriately the money is spent and how long all this will

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

last."

What was the date of those messages?

A.  June 13, 2022.

MR. REHN:  All right.  The government would now offer -- or if we could bring up Government Exhibit 209-22.

THE COURT:  Not in evidence, sir?

MR. REHN:  This is not yet in evidence, your Honor.

We would move this pursuant to the stipulation.

MR. PATTON:  Objection.

THE COURT:  The objection is overruled.

Government Exhibit 209-22 is admitted into evidence and may be shown to the jury.

(Government's Exhibit 209-22 received in evidence)

MR. REHN:  Could we just expand the central portion of this.

Q.  And starting at the bottom, Ms. Cotto, what did this account search for at 7:38 and 14 seconds a.m. on that date?

A.  Roman Storm.

Q.  What did this account search for a few seconds later?

A.  Roman Storm.

Q.  What did this account search for a few seconds later?

A.  "Are Tornado Cash criminals."

MR. REHN:  Let's go now to Government Exhibit 2053.

And if we could, your Honor, offer this chat as well.

THE COURT:  I believe the defense is going to object.

MR. PATTON:  Objection.

THE COURT:  Yes.  I'll overrule the objection and admit into evidence Government Exhibits 2053 and 2053-T.  It may be shown to the jury.

(Government's Exhibits 2053, 2053-T received in evidence)

Q.  All right.  And if we could go to -- do you recognize this as part of that same Bablo Peppersec chat, Ms. Cotto?

A.  Yes.

Q.  If we go to the bottom of page 2.  And is this a reply written by Roman Storm?

A.  Yes.

Q.  And if you could read this message, please.  The reply, not the full -- yeah.

A.  "@semenovroman, help is needed to push Tornado to raise some money."

MR. REHN:  Okay.  Could we go to the next page.

Q.  And if I could ask you to read that as well.

A.  "It's necessary to sell a sweet fantasy to the investors.  I'll jot down my thoughts now."

MR. REHN:  You can take that down.

Just one moment, your Honor.

(Counsel conferred)

MR. REHN:  Nothing further, your Honor.

THE COURT:  Thank you.

P7OVSTO5

MR. PATTON:  Very briefly, your Honor.

THE COURT:  Oh, all right.

CROSS-EXAMINATION

BY MR. PATTON:

Q.  Good afternoon.

A.  Good afternoon.

Q.  In the formatting of some of those chats we were reading, some of the messages noted that they were forwarded.  Do you remember that?

A.  Yes.

Q.  Is it fair to say that where there were forwarded messages that you read, you can't identify the original author of the person who wrote the message that was being forwarded?

A.  Yes.

MR. PATTON:  That's all, your Honor.

THE COURT:  Redirect?

MR. REHN:  No, your Honor.

THE COURT:  Thank you.

Ms. Cotto, thank you so much.  You may step down.

THE WITNESS:  Thank you, your Honor.

(Witness excused)

THE COURT:  Mr. Rehn, all your exhibits are in, all your stipulations are in?

MR. REHN:  Yes, your Honor.  The government rests.

THE COURT:  Great.  Thank you so much.

P7OVSTO5

May I please see the parties at sidebar momentarily.

Thank you.

(At sidebar)

THE COURT:  It is my understanding that the defense wants to make a Rule 29 motion mid trial; and that given the needs of your first witness, the parties have agreed that we can put this witness on, send the jury home, and allow you to make your Rule 29 motion without having prejudiced any rights that you may have had, to make it as though it were being made right now.

Do I have that understanding from the government?

MR. REHN:  Yes, your Honor.

THE COURT:  And is that your understanding as well, Mr. Klein?

MR. KLEIN:  Yes, your Honor.

THE COURT:  All right.  I will also make the *Geaney* finding.  I can make it now because I don't even know if anybody does it anymore, because I think the cases is from 1969.

But I am finding by a preponderance of the evidence that there is evidence sufficient to support each of the charged conspiracies in the case, and evidence sufficient to support by a preponderance of the evidence that Mr. Storm is a member of each of the charged conspiracies in the case; and, thus, that each of the statements that have been proffered as

P7OVSTO5

statements in furtherance of the conspiracy, I can make that finding by a preponderance of the evidence and, therefore, having admitted them subject to connection, I am making that connection here.

Thank you very much.

All right.  Shall we get your witness.

MR. KLEIN:  I was going to make the motion, your Honor.

THE COURT:  You're going to make a motion.

MR. PATTON:  Just as belts and suspenders.

THE COURT:  Absolutely.  Go ahead.

MR. KLEIN:  Mr. Storm moves for a judgment of acquittal as to all three counts pursuant to Federal Rule of Criminal Procedure Rule 29(a), both on the merits and on venue, for a variety of reasons which we'll elaborate on after the first defense witness.

THE COURT:  Understood.  We all understand that.

I'll hear from the government's response.  I presume the government opposes the Rule 29 motion.

MR. REHN:  The government opposes the motion, your Honor.

THE COURT:  Thank you.  I'll hear from you after this witness.

All right.  And I'm going -- friends?

MR. MOSLEY:  In the interest of saving time with the

P7OVSTO5

potential witness, your Honor, I just have one quick issue. And that is the defense and I -- we and the defense have conferred about this witness. And what we understand to be part of his proposed testimony is that he is going to testify about being at a conference called ETH Boston.

THE COURT:  This witness?

MR. KLEIN:  Yes, your Honor. We learned that he went to ETH Boston 2019. And because one of the other witnesses we may stipulate to may not be able to come here, we want to be able to put in evidence from a live witness who participated in it about the -- very brief, your Honor. He was there. And this is where the T-shirt we're talking about that we're going to put in, so it's directly relevant to our defense to refute what they are going to argue about GX-1.

THE COURT:  Yes.

MR. MOSLEY:  Though one of the issues with that is that the witness hasn't met Mr. Storm, there's no evidence — at least from the proffer that we got from the defense — that he interacted with Mr. Storm or had any sort of connection or contact with Mr. Storm at or during this conference.

THE COURT:  All right. And, therefore, what, sir? Do you think he should not be permitted to testify?

MR. MOSLEY:  We have a continuing objection to the relevance of this conference at all.

THE COURT:  One moment, please. And you're raising a

fair point.

Is your witness prepared to testify not merely that he went to this conference, but that he saw someone in the T-shirt in question at that conference?  I don't care if he went to the conference; he has to see somebody in a T-shirt for it to matter to me.

MR. KLEIN:  Your Honor, as far as I know, he did not see anybody in a T-shirt, and he did not interact with Mr. Storm at the conference or anybody who's alleged to be a co-conspirator.

But it is critical for us, your Honor, to establish what happened at this conference.  Because they are going to argue and close, they have talked about hackathons, and there was a hackathon at this conference.  The picture we're putting in and the blog post mentions a hackathon.

We don't want the jury to be under any misimpression what that terms means.  It goes to evidence they introduced this afternoon about hackathons.

So this witness is going to testify that he was at this conference, where it was, what it was like, and it was a hackathon.  And it's going to be very short, your Honor, it's five minutes.  And then we have another witness who's going to tie in the T-shirt to the hackathon.  And so this all comes together in one.  And it's part of the exhibits they put on, including GX-1, as well as exhibits discussing hackathons,

P7OVSTO5

which we think they will mischaracterize in the closing.

THE COURT: All right. I will --

MR. MOSLEY: Your Honor, just one -- I'm sorry.

THE COURT: I was going to allow it, but now you're going to tell me why I can't.

MR. MOSLEY: I was going to ask -- just say, your Honor, if you allow this testimony, we would request that it be limited to prevent any references to the reputable or other nature of the conference.

MR. KLEIN: He's just going to say what the conference was and where it was and he was there. I don't know what that means.

THE COURT: All right. He's apparently not couching his questions with the word "reputable" in them.

MR. KLEIN: I'm not using the word "reputable" in my questions.

THE COURT: I can stop him if he goes astray.

All right. Are you crossing, Mr. Mosley?

MR. MOSLEY: Yes, your Honor.

THE COURT: All right. Briefly, we hope.

Wait. It was my plan to tell the jury, because I suspect they'd love to leave, that though you have no obligation to put on a case, you have chosen -- your client has chosen to do so. And in the interests of scheduling, we're going to take one brief witness today and then let the jury go.

P7OVSTO5

MR. KLEIN:  Yes, your Honor.  That works for the defense.

MR. MOSLEY:  Yes, your Honor.

THE COURT:  Thank you.

(Continued on next page)

P7OVSTO5

(In open court)

THE COURT:  Members of the jury, let me talk to you a little bit about what is happening in this case.

As I mentioned, when the government rests, there are frequently motions that are made mid trial, and those motions have been made at the sidebar.

As I've also said to you, the defense is not required to put on a case.  They have no obligation to because the burden is always with the government.  I am advised that in this case Mr. Storm would like to put on a case, and, of course, he's permitted to do that.

For scheduling and other reasons, there is one brief witness who Mr. Storm and his team will put on today as the first defense witness.  And after that witness, it's my intention -- I contemplate letting you go for the day.  And I'll continue to work with the parties to get a sense of the scheduling going forward.

So with that, the government has rested.  The defense may call its first witness.

MR. KLEIN:  Yes, your Honor.

The defense calls Preston Van Loon.

PRESTON VAN LOON,

    called as a witness by the Defendant,

    having been duly sworn, testified as follows:

THE COURT:  Counsel, you may inquire.  Thank you.

P7OVSTO5                          Van Loon - Direct

MR. KLEIN:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. KLEIN:

Q.  Mr. Van Loon, where do you live?

A.  Nashville, Tennessee.

Q.  And what do you do for a living?

A.  I'm a software engineer and Ethereum core developer and software engineering manager.

Q.  What is an Ethereum core developer?

A.  Ethereum core developer is somebody building or researching the protocol of Ethereum itself.

Q.  And why did you get involved with crypto?  When did you first get involved with crypto?

A.  Are you asking when or why?

Q.  Both.

THE COURT:  We're starting with when, sir.

A.  I first discovered Ethereum in 2017, and started contributing meaningfully in 2018.

Q.  And why did you become interested in Ethereum?

A.  I found it to be an exciting and novel technology with a lot of promising use cases.

Q.  And how long have you been a core developer?

A.  Since January 2018.

Q.  And in connection with your testimony here, did the defense pay for your travel, hotel-related transportation?

P7OVSTO5                         Van Loon - Direct

A.   Yes, I've been promised reimbursement.

Q.   Anything else though?

A.   No, just the travel and lodging.

Q.   Okay.  Do you recall a conference in 2019 called ETH
Boston?

A.   Yes.

Q.   What do you recall about it?

A.   I recall attending the conference.

Q.   Do you remember where it was?

A.   I believe it was at Harvard University.

Q.   And can you talk a little bit about -- what you remember
happened at the conference?

A.   The conference was two or three days.  There were talks,
people presenting ideas related to Ethereum, and there was also
a hackathon as well.

Q.   What is a hackathon?

A.   A hackathon is where software developers come together,
usually with a time limit, say, 48 hours, to come with an idea
and build it from zero to complete the idea where they would
present it to judges.

Q.   And is it fair to describe that as a coding competition?

A.   Yes, exactly.

Q.   And approximately how many people do you recall being at
ETH Boston?

        THE COURT:  Excuse me.  At the conference or --

MR. KLEIN: Yes, sorry, at the conference ETH Boston.

A. At the conference, there were one or 200 people, I think.

Q. Are you familiar with something called Tornado Cash?

A. Yes.

Q. At a high level, what is Tornado Cash?

A. Tornado Cash is a privacy tool for Ethereum, where you can separate your account from the money. So like you can separate your identity from money on Ethereum. Basically, you -- let me rephrase. You can make a deposit. Several people make deposits. Then you can make a withdrawal. And there is no connection between the deposit and the withdrawal.

Q. And by that you mean when you withdraw, you have a new address?

A. Yes.

Q. Have you used Tornado Cash?

A. Yes.

Q. How many times have you used Tornado Cash?

A. I believe four times.

Q. And why did you use Tornado Cash?

A. I used Tornado Cash for privacy reasons. I wanted to separate my identity from the money that I have on the Ethereum blockchain.

Q. What were these privacy reasons?

A. It has to do with operational security and personal safety.

Q. Can you give examples of both, please.

A.   Operational security --

MR. MOSLEY:  Objection.

THE COURT:  The personal safety I'm not sure I'm going to let him testify to.  You mean his own issues -- well, let me hear about operational security, and then we'll see.

A.   Operational security is the idea where you try to limit the amount of information that potential adversaries may have to exploit or cause harm.

Q.   Was that sort of to protect yourself from hackers or people who were trying to take your Ether?

THE COURT:  Counsel, please don't testify.  Thank you.

You may answer the question.  And I'm sure the next one will be much less leading.

A.   Could you repeat that?  I'm sorry.

MR. KLEIN:  My screen is dead, your Honor, so it's actually hard for me to repeat it.

THE COURT:  I'll help.

Sir, who are the potential adversaries of which you just spoke?

THE WITNESS:  They are unknown.  Anybody in the world could be an adversary, I suppose.

THE COURT:  Okay.  Thank you.

Q.   Would that include hackers?

THE COURT:  I'll allow the one question, and then we really -- do you understand the question?

THE WITNESS:  Yes, it may include hackers.

THE COURT:  All right.  Move on.

Q.  And did you have -- you mentioned personal safety.

MR. MOSLEY:  Objection.

THE COURT:  I'll let him ask the question before I decide whether I let him answer it.

Thank you.  Go ahead.

Q.  Did you have concerns for your personal safety and is that one of the reasons you used Tornado Cash?

MR. MOSLEY:  Objection.

THE COURT:  I will allow.

Overruled.  Yes, no.

A.  It was one of the reasons --

THE COURT:  Yes or no, sir.

A.  Excuse me.  Yes.

THE COURT:  Thank you.

Q.  What were those concerns?

A.  The concern is if an adversary were to know the full scope of what I own or all of the assets, that I could become a target.

Q.  And by "adversary," do you mean like a criminal?  Or when you say "adversary," what are you referring to?

A.  It could be a criminal, in general, any bad actor, someone who wishes to do harm.

MR. KLEIN:  Your Honor, nothing further.

P7OVSTO5                         Van Loon - Cross

THE COURT:  Mr. Mosley, cross-examination.

CROSS-EXAMINATION

BY MR. MOSLEY:

Q.  Good afternoon, Mr. Van Loon.

THE COURT:  Are you able to hear him, sir?

THE WITNESS:  Yes.

THE COURT:  Thank you.

MR. MOSLEY:  May I inquire?

THE COURT:  You may, sir.

Q.  You haven't met Mr. Storm, right?

A.  No, I have not.

Q.  Haven't talked to him?

A.  No, not in person.

Q.  You don't know anything about his state of mind in operating Tornado Cash, right?

A.  No.

Q.  You hold crypto, right?

A.  Yes.

Q.  Do you have an account at a regular crypto exchange?

THE COURT:  I don't know what "regular crypto exchange" means.  Could you define the exchange.

Q.  A mainstream cryptocurrency exchange.  For example, an exchange similar to -- are you familiar with Coinbase?

A.  Yes, I'm familiar with Coinbase.

Q.  Do you have accounts at -- a cryptocurrency exchange

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7OVSTO5                          Van Loon - Cross

similar to Coinbase?

A.   Yes.

Q.   So you've made four deposits into Tornado Cash, right?

A.   I believe so, yes.

Q.   And how much did you deposit?

A.   I don't recall exactly.  I believe I made one deposit of 10 Ether, one deposit of one Ether, and two or three of .1 Ether.

Q.   When was that?

A.   I don't recall exactly.  I believe it was in the year 2019 or 2020.

Q.   And you took out one withdrawal?

A.   I took out one of those deposits, I don't recall which one.

Q.   And when you did this, you used the user interface?

A.   I may have.  I used the -- I did use the user interface, yes.

Q.   And you testified on direct, I believe, that you did this for privacy purposes.

A.   That was the intention, yes.

Q.   You only did -- but you only did those four transactions; correct?

A.   Yes.

Q.   And you haven't used any other mixers; correct?

A.   I have used another privacy tool similar to Tornado Cash, yes.

          THE COURT:  I believe his question, sir, was did you

P7OVSTO5                          Van Loon - Cross

use a mixer, and do you understand the term?

A.  I do not understand the term "mixer."

Q.  You didn't use any other method by which you could commingle your cryptocurrency with the cryptocurrency of other people in order to conceal the nature and source of the -- and ownership of that cryptocurrency?

A.  I have used another, yes.

Q.  What's it called?

A.  I believe it's called privacy pools.

Q.  Changing gears, back to the cryptocurrency exchange, and we're now talking about a cryptocurrency exchange similar to, say, Coinbase.  Generally speaking, those are platforms where users can buy, sell, and trade cryptocurrencies, right?

A.  Yes.

Q.  You'd agree with me that transactions made inside of a crypto exchange can't be viewed on the blockchain?

A.  That's correct.

Q.  And so if you used your Coinbase account to send money to someone else's Coinbase account, that would not be viewable on the blockchain, right?

A.  I don't know how that's possible.

Q.  You don't know how what's possible?

A.  I don't -- I haven't heard of anyone sending Coinbase funds from one account to another.  May be possible, but I don't know.

Q.   And if you sent cryptocurrency like from inside your exchange account outside of that account, that couldn't be linked to your identity either; correct?

A.   Are you asking if I withdraw from Coinbase?

Q.   Right.  If cryptocurrency went out from Coinbase, that would not be attributable to your identity; correct?

A.   That action alone, perhaps not.

Q.   You have a regular bank account too, right?

A.   Yes.

Q.   And you initiate and receive transactions using that account, right?

A.   Yes.

Q.   And bank account transactions are not viewable by the public, right?

A.   Yes.

Q.   Mr. Van Loon, did you meet with the defense?

A.   Yes.

Q.   About how many times?

A.   I don't recall the total number.  Maybe three, I think we had three meetings.

Q.   Do you recall anybody taking notes during those conversations?

A.   I don't recall.  Probably somebody was.

          MR. MOSLEY:  One moment, your Honor.

          (Counsel conferred)

MR. MOSLEY:  Nothing further, your Honor.

MR. KLEIN:  No redirect, your Honor.

THE COURT:  Okay.  Mr. Van Loon, thank you very much for your time.  You may step down.

(Witness excused)

THE COURT:  Do I understand from the parties that we have decided we're going to let the jurors go for the remainder of the day; we'll resume tomorrow for the shortened day?

MR. KLEIN:  Yes, your Honor.

MR. REHN:  Yes, your Honor.

THE COURT:  All right.  Then that's what we're going to do.

Thank you very much for your patience and attention today.  We will let you go home.  We'll see you tomorrow. Remember, it's a shortened day tomorrow.  We're not going to have lunch; we're going to leave at 1:30.

Please remember, even though we're on the defense case, my earlier rules apply:  Do not discuss this case with each other or with anyone else.  Keep an open mind until all of the evidence is received.

Thank you.  Have a great night.

(Jury not present)

THE COURT:  Please be seated.

Do the parties or the court reporter need a break before the Rule 29 motions?

MR. REHN:  The government is prepared to proceed, your Honor.

THE COURT:  Thank you.

MR. KLEIN:  If we can have five minutes, your Honor. Just a quick five.

THE COURT:  Quick five minutes.

I'll see you in five.  Thank you.

(Recess)

THE COURT:  Who's making the motion for the defense, please?

MR. KLEIN:  Your Honor, it's going to be Ms. Axel, Ms. James, and --

MS. AXEL:  And Ms. Andazola Marquez.

MR. KLEIN:  And Ms. Andazola Marquez.

THE COURT:  At long last, she gets to speak at this case.  All right.

MR. KLEIN:  We're going to have some witnesses that we were going to have her do.

THE COURT:  Great.  We'll be talking about that later, thank you, once I get your schedule.

Who is speaking first, please?  Ms. James?

MS. JAMES:  I'll speak first, your Honor.

THE COURT:  Thank you.

Is it easier for you to do it from there, from the podium?

P7OVSTO5

MS. JAMES:  I'll go to the podium.

THE COURT:  Whatever works for you.  Thank you.

And would you let me know the division of labor among the three of you.

MS. JAMES:  Yes.  I'm going to start and I'll address the Count One.

THE COURT:  Yes, please.

MS. JAMES:  And then Ms. Andazola Marquez will be addressing Count Two.  And Ms. Axel will be addressing Count Three.  And I will address venue.

THE COURT:  Okay.  Are you batting cleanup with venue or are you going to do that as part of this presentation?

MS. JAMES:  I'm sorry, say again.

THE COURT:  I'll say it better.  Thank you.

When you discuss venue, will it be part of your presentation now or will you wait till your colleagues finish, and end with venue?

MS. JAMES:  I'll wait till they're finished and come back to venue at the end, if that's okay with the Court.

THE COURT:  Thank you.  However works best for you.

Let me hear from you on Count One, please.  Thank you.

MS. JAMES:  Thank you, your Honor.

The government's case comes down to one of could-haves and should-haves.  The government's opening statement said it all.  Mr. Storm could have gotten out of the business or he

could have changed his business to make it unattractive to criminals.

The government's whole theory is that Mr. Storm failed to take action to prevent the improper use of Tornado Cash. This was the flawed premise of all three conspiracy counts.

There are two fundamental problems with the government's theory.

First, Mr. Storm's omission to implement measures to stop criminals from using Tornado Cash cannot be transmitted into a criminal act.  And there's a Second Circuit case, *United States v. Sabhnani.*

THE COURT:  I know the *Sabhnani* case.  I'm interested in how you think it applies, but go ahead.  All right.

MS. JAMES:  Well, to quote *Sabhnani*, it's a long-established principle that criminal law generally --

THE COURT:  Oh, stop, stop, stop, please.  Please excuse me.  I know you know this, but our courtroom is so cavernous, and we've already exhausted Madam Reporter.  So let's be louder and slower, also so I can take better notes.

Thank you.  Go ahead.

MS. JAMES:  Sure, your Honor.

It is a long-established principle that criminal law generally regulates action rather than omission.  And that for criminal liability to be based upon a failure to act, it must first be found that there is a duty to act, a legal duty, and

P7OVSTO5

not simply a moral duty.

And that's what's missing here, your Honor. The government has failed to establish any legal duty to act to prevent money laundering, the transmission of criminal funds, or sanctions evasion. In fact, the government has not sought to prove that Tornado Cash was subject to know your customer or AML measures.

THE COURT: Oh, God, we're bringing this up now? Okay. Go ahead.

MS. JAMES: Well, we know that's not an issue in this case and not subject to those measures. In the absence of such a duty, there can be no criminal liability for failing to act.

And the second major problem with the government's theory is kind of related to the first one, is that it really comes down to a negligence theory.

This is a case that requires a showing of willfulness. These are conspiracy counts that all require --

THE COURT: I'm going to ask you to slow down, please. I'm trying my best to take notes. Thank you.

MS. JAMES: All three conspiracy counts require the government to show that the defendant acted willfully — knowingly and willfully, not negligently. But when Mr. Storm was told of illicit uses, his failure to shut down Tornado Cash or implement belated safeguards, what he could have done is really a negligence theory at most. It's not a willful

promotion of the charged crimes.

*Elonis* from the United States Supreme Court makes clear that negligence is generally not sufficient, and it's certainly not sufficient here in a willfulness case.

Mr. Storm's conduct was not wrongful but, rather, the innocent conduct of someone making software available to the public.

Those are the general points, your Honor, that apply to all three counts.

THE COURT:  Just one moment, please, so I can finish taking that note.  Thank you.

Thank you.  Please continue.

MS. JAMES:  Turning to Count One, your Honor, the conspiracy to commit money laundering count.

First of all, there's just no evidence of a conspiratorial agreement.  Indisputably, there was no agreement between Mr. Storm or his co-founders and any hackers or scammers, that the government has acknowledged as much, has not attempted to prove that connection.

The conspiracy instead is supposed to be between Mr. Storm and his co-developers.  But they did not agree to do anything -- there's no evidence presented that they agreed to do anything to assist with money laundering.  The government must show that they acted in a joint enterprise with the awareness of the nature and extent of the unlawful purpose.

P7OVSTO5

And without that, there is no conspiracy.

Here, it was mere foreseeability that criminals might abuse an otherwise lawful product.  And that does not create a conspiracy.  And a failure to prevent a bad act is not the same as an agreement to assist it.

Second problem with the conspiracy count in Count One is that there was no ability to control the funds, or no control or ability to control the funds by Mr. Storm or his co-developers.

The law of money laundering requires that a co-conspirator conduct or agree to conduct the transaction with the illicit proceeds, which implies possession or control over the funds at some point.  As the evidence has shown, all the dirty cryptocurrency was moved in and out of Tornado Cash by the hackers or criminals themselves acting alone.  They were not -- it was not Mr. Storm or his co-developers that had ever took custody of those funds.  And I would just say the absence of any conspirator's control over those illicit funds is a fatal defect in the conspiracy count charged in Count One.

And then the next element is the knowledge element.  And the evidence has failed to show the requisite knowledge.  The government must — but has failed to — show that Mr. Storm was aware of the specific transactions that would constitute money laundering; that is, that he knew that the specific transactions, they involved proceeds from some unlawful

P7OVSTO5

activity, and he knew that those transactions were designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.  So he had to know two things:  He had to know that they were -- he had to know the transactions, and he had to know of their purpose.  And that is just straight from the statute.

And the knowledge that is required for the substantive offense of money laundering also applies to the conspiracy charge.  So if he had to know about those specific transactions which he did for the substantive charge, he had to have that same knowledge for the conspiracy count.  And we've provided some authority for that in our proposed jury instructions.

Mr. Storm must have had knowledge that the purpose — and not merely the effect — of the transaction was to conceal, disguise the nature, location, source, ownership, or control of the illegal proceeds.

Conspiracy requires more than evidence of a general cognizance of criminal activity, more than just suspicious circumstances and more than association with others engaged in criminal activity, though we don't even have that here, we don't even have any association with others in criminal activity.

At most, the government showed that Mr. Storm and his co-developers were generally aware that criminals sometimes use Tornado Cash to move their proceeds.  And that is not enough to

establish the requisite knowledge to be convicted of a conspiracy to commit money laundering.  The knowledge must be of specific transactions using Tornado Cash, and he must have had knowledge of those transactions in advance of the transactions so that he could actually conspire to do something to assist those transactions.  But there's no evidence of that in this case.  He did not -- at most, he got evidence -- he got information about hacks that already occurred and reports of proceeds being sent to Tornado Cash after the fact.  That's not sufficient.

Also, as to his intent, the government has failed to show that Mr. Storm had the necessary *mens rea* for the conspiracy charge here.  It's a specific intent crime.  The defendant must willfully join in the agreement intending to further its unlawful objective.  The evidence is insufficient to establish that Mr. Storm wanted to conceal criminal funds at all.

The government did not show that Mr. Storm's purpose in developing Tornado Cash was anything other than to allow people to protect their financial privacy, which was a lawful aim.  And nothing in the government's evidence proves that he ever deviated from that purpose to help criminals.

Intent cannot be presumed from inaction, and that's what the government is trying to do here.  But to presume intent would conflict with the overriding presumption of

P7OVSTO5

innocence.  If wrongdoing may presume from an action on the presumption of innocence is turned on its head.

As the Supreme Court has explained, the intent requirement is satisfied only when a person actively participates in a criminal venture, not when they are merely -- when they merely fail to act.  Willfulness also requires a free will or choice to do wrong.  Mr. Storm was powerless regarding the hackers' actions because Mr. Storm had no ability to intervene or exercise choice; he could not have deliberately chosen a criminal objective.

THE COURT:  Just on that last point, you're speaking, I presume, about when the contracts went immutable; correct?

MS. JAMES:  Yes.

THE COURT:  And yet there was testimony at the trial that suggested that's either first from the government's expert witnesses and as well, I believe, from some of the emails or Telegram chats I've seen this afternoon that the three co-founders believed that they could change the pools by sending a different proxy contract to them or by setting up a different pool.

MS. JAMES:  My understanding, your Honor, is not the specific transactions though.  I mean, they could not get in there and change specific transactions.  I may be wrong, but they could have made changes to the protocol as a whole.

THE COURT:  I'll let the government tell me their

P7OVSTO5

thoughts.  Thank you.

Okay.  Please continue.

MS. JAMES:  And I'll pass it off to Ms. Andazola Marquez at this point.

THE COURT:  Before we do that — and I hope she doesn't mind — I think it might be easier for me to have the government's response to Count One, and then just go in sequence.  Thank you.

Mr. Rehn, are you it?  I say that with no disrespect. Are you going to be responding to all of them or are you also sharing the love with other members of your team?

MR. REHN:  I think I will do my best to shoulder the load, your Honor.

THE COURT:  Okay.  Just give me a moment please.

Go ahead, sir.

MR. REHN:  I was just taking a quick look at the *Sabhnani* case.

So I think it's sort of the core problem with the defense argument is that there's been a basic failure -- there's been an assumption by the defense — really throughout the pendency of this case and, in particular, with this recent argument — that the government's case is premised on inaction. That's simply not what the government's case is premised on.

The government's case is premised on the defendant's affirmative conduct in actively operating Tornado Cash over a

period of two years, during which time he made multiple revisions and continued to facilitate and conduct transactions, knowing that they involved criminal proceeds.

THE COURT:  But, sir, just to that point, I don't know that -- I don't think I understood that the government argued that any of the revisions that were made to the Tornado Cash protocols or Tornado Cash service as a whole were designed to aid money launderers, hackers, fraudsters.  So I'd like to understand that more.

I believe what you're saying is this isn't a case about inaction because there was a lot of action.  I guess I'm asking whether the action on the part of the defendant and his putative co-conspirators actually aided the money laundering objective or could be seen as promoting the conspiracy you say they've joined.

MR. REHN:  Yes, your Honor.  We do contend that.

So, for instance, with reference to the December 2020 update which introduced anonymity mining, this is a point in time where the defendant has already been put on notice of specific criminal incidents, as well as a more general knowledge that criminals were using Tornado Cash in large numbers.  There were chat -- the KuCoin hack had occurred and doubled their business overnight.  KuCoin had reached out to them in the midst of that laundering activity and told them about it.

And shortly thereafter, there was another incident, I believe it's called The Compounder Finance Incident. In the midst of that incident, the victim reached out to them by email, told them that it was actively ongoing. And in the midst of all of that, they're designing what's called the anonymity mining program, which is a specific design to expand the pool within which the criminals can hide.

So it certainly would be permissible for the jury to draw the inference that a purpose of that, given the sudden increase in their business that was caused by the KuCoin hack, they recognized the need to pay other people to create pools big enough for the criminals to hide in.

THE COURT: So, wait. Are you asking me to intuit not merely that they wanted to expand their business so that they could expand their business, but that they wanted to expand their business to provide -- to make it even more palatable or even more favorable for folks who might be bad actors who might be using it?

MR. REHN: Yes, your Honor. I think that the evidence on the whole clearly demonstrates that the defendant understood that his core target market was people who wanted to engage in criminal money laundering. There's evidence of them discussing marketing opportunities arising from hacks, evidence of their knowledge of the high percentage of Tornado Cash deposits that came from these criminal incidents.

P7OVSTO5

The reason they continue to create features in the service that provided enhanced anonymity, and then essentially pay others to create these larger pools to facilitate concealment, they are basically paying some users to create a pool for their primary target market, which is the money launderers. And that's basically how the anonymity program worked.

But, your Honor, in addition to that, the defendant made multiple revisions to the website. He repeatedly rolled out new features; he paid to maintain that website; he took a number of affirmative actions; he paid for --

THE COURT: Slow down, please, sir. Thank you.

MR. REHN: He paid for the blockchain traffic. All of those communications to the blockchain that were discussed in this trial, the pipes on which that ran, as the Court heard, were maintained by Infura. And the defendant was paying thousands of dollars a month in order to maintain those pipes.

So there's a lot of affirmative conduct here that was knowingly engaged in moving criminal proceeds, and that's the core of --

THE COURT: Let me please understand this argument that you're making. You're suggesting that knowing that Tornado Cash is being used by malefactors, it was criminal for him to continue the operations of Tornado Cash? You're saying he's paid for the blockchain traffic, he was paying bills to

Infura.  I want to understand what you want me to deduce from that.

MR. REHN:  Your Honor, as we've always discussed in this case, I think the best way to think about this is as a, sort of, just a traditional money laundering case, like a restaurant or a car wash.  A business that is on notice that criminals are depositing funds into it in large numbers, that then continues to maintain the means by which those criminals do so, understanding that by doing so, the criminals are able to conceal their proceeds, is engaged in knowing money laundering.  That meets the elements of the statute.  And that's exactly what we have here.

THE COURT:  But Ms. James has told me — and I guess -- and I want to be sure I understood the evidence that was coming in today.  Ms. James told me that her client had no ability to control the Tornado Cash pools.

MR. REHN:  Your Honor, as the evidence has clearly demonstrated over the course of this case, there are many additional components to Tornado Cash beyond the pools.  Of course, the Court heard the evidence of the government's expert, Mr. Werlau, who described in detail the different components and how they operated together, and identified the portions of them that the defendant controlled, maintained, revised over time.

But, in addition, and powerfully, the Court heard

today these audio messages in which Roman Semenov and Roman Storm discussed the fact -- very clearly discussing very similar concepts to what Mr. Werlau had described in his expert testimony.

And also bear in mind, your Honor, those messages, those audio messages, in particular, that were read today, those are being done in February 2022, at the very moment that they are designing the relayer registry, which was implemented just about ten days after those audio messages.

THE COURT:  Are you suggesting that the relayer registry design was itself indicative of criminal conduct, either because it didn't include these patches or these other -- these ways in which perhaps they could stem the tide of bad actors using the service, or are you just arguing that the relayer registry went more to the issue of their decision to operate the business for a profit or both?

MR. REHN:  So it does go to both, your Honor.  So it goes to the intent of the defendant to profit from these money laundering transactions.  They roll out the relayer registry, which is a way to profit at a point in time where shortly before, there are these chats that were read into evidence, talking about how, for example, one of their developers quit because he believed Tornado Cash was all about money laundering.  And then Storm responded by referencing the *Silk Road* prosecution, which is a very similar case to the case at

issue here, where the defendant was operating a website, knowing that criminals were using it to engage in money laundering. I'm referring to just the money laundering charge in that case.

THE COURT: Thank you. Yes, there are other components that I don't think --

MR. REHN: Yes, there were additional charges in that case. But the money laundering charges were actually quite structurally similar to the charges here, in that the operator of the website was not alleged to be in specific conspiracy with the various criminals using it, but simply to knowingly be providing a service that was attractive to them and providing features that he knew were attractive to them, which is exactly what the defendants did in this case.

And it's actually remarkable how in those discussions in February 2022, the defendant and his co-conspirators are specifically talking about law enforcement scrutiny, about the fact that they could easily, as they're updating the service to make more profits, also implement features to block these criminal transactions. But they reject that proposal.

And so the money aspect of this connects to that, because the defendant at this time is sitting on a large supply of TORN tokens. And the TORN tokens' value is about to be connected to the volume of Tornado Cash transactions. And so he's consciously choosing to enable criminal transactions to

P7OVSTO5

increase that volume and to profit therefrom.  And so that is very much an affirmative act in furtherance of the money laundering.  It facilitates the use of the service by criminals, which the defendant is fully aware of at that point in time.  And it facilitates his ability to profit from those specific criminal transactions without putting in place the sort of things that a business — any business, like I said, a car wash or restaurant — that does not intend to conduct criminal proceed transactions would put in place.

A car wash that knows a bunch of drug dealers are coming in and depositing cash to pay for their car washes, you could say, Oh, they did nothing because they just directed their employees to conduct business as usual.  But that is doing something if you know that business as usual is now the act of money laundering.

You can't just conduct business as usual with knowledge that the transactions that you're participating in involve criminal proceeds.  That's exactly what the money laundering statute is designed to prevent.  It says to participate in a financial transaction with knowledge that it involves the proceeds of an unlawful activity.

And as to that, the evidence here is unusually strong for a money laundering case.  Because the defendant was repeatedly put on notice by victims, by members of law enforcement, there are multiple internal communications among

P7OVSTO5

the defendant and his co-conspirators.

Doing the thing that we usually see in money laundering cases, Oh, look at all this dirty money or whatever, those sorts of chats exist. But what's unusual here is the specificity of the chats in saying not just, Oh, wow, there's a lot of dirty money, haha, which the Second Circuit has said is enough for there to be sufficient evidence of knowledge of criminal proceeds, but actually discussing specific criminal incidents.

And I think perhaps the most noteworthy example and the one that's been discussed most at trial is the Ronin hack, where as soon as that hack happens, the defendant and his co-conspirators, before it even gets to Tornado Cash, are talking about the shit is really going to hit the fan. That's what Roman Semenov says as soon as it happens. They understand this money is coming to Tornado Cash by this point.

THE COURT: Slow down, counsel.

MR. REHN: Because by this point, they have seen it happen over and over again.

Then, on April 4, it starts. That very day they get notice from reporters reaching out to them, a *Wall Street Journal* reporter. There was an email read into evidence about this. Hey, look, here's a link to Etherscan. You can actually watch in real time as this money is flowing into Tornado Cash. And they watch it and they talk about it for six weeks, six

weeks during which that single incident makes up a majority of all of the Tornado Cash deposits. They discuss it. They implement a fix to it. But they say, when they do that, We need to tell people. We need to tell everyone. That's the defendant's message at that point in time. We need to tell everyone we're doing something about it. But, privately between us, we know this is easy to bypass.

And as the government's expert, Mr. Werlau, described, it was obviously easy to bypass. And due to the defendant's knowledge of how Tornado Cash worked, it would have been easily apparent to him both that it was easy to bypass and that there were other implementation measures that were easy and obvious that could have actually been more effective at blocking those transactions. And so you're in a situation where you can't do business as usual under those circumstances, and that does constitute money laundering.

THE COURT: I'm asking gently, and I'll ask less gently next time, please speak more slowly.

MR. REHN: Certainly, your Honor.

THE COURT: Thank you.

All right. Is there anything else you want me to know on Count One, sir?

(Counsel conferred)

MR. REHN: I think that's enough, your Honor, unless you have further questions for us.

P7OVSTO5

THE COURT:  I've asked the questions I have.  Thank you.

Ms. Andazola Marquez.

MS. ANDAZOLA MARQUEZ:  I hope you'll forgive my first-time jitters.

THE COURT:  No, don't worry.  We're all friends here. That's okay.

MS. ANDAZOLA MARQUEZ:  Sounds good.

So I'm here to address Count Two, conspiracy to operate an unlicensed money transmitting business.

Similar to Count One, the evidence has not shown that there is a criminal agreement between Mr. Storm and his co-developers to operate an unlicensed money transmitting business.  At most, there was an agreement to operate a privacy protocol, and none of the evidence is sufficient to show there was a criminal agreement to operate a money transmitting business that transmits criminally derived funds or promotes a criminal offense.

THE COURT:  Let me ask you this:  If in the beginning there had been an agreement to operate a privacy protocol, and then, some months in, everybody agreed to operate an unlicensed money transmitting business, that would still count.  Would that still suffice?  I mean, for example -- and let me ask a better question.

How it began doesn't matter.  How it ended up during

the charged time period is what matters; is that not correct?

MS. ANDAZOLA MARQUEZ:  Yes, your Honor.

THE COURT:  Okay.  But you're going to tell me it never changed.

MS. ANDAZOLA MARQUEZ:  Yes.  Well, it would have to be supported by evidence that the agreement became one that reflected criminal intent, and there was no evidence here showing that the agreement shifted to an intentionally criminal agreement.

We've already briefed the next point extensively, but the evidence does not show that Tornado Cash or its developers accepted or transmitted money for others, as contemplated by 1960, because they never had custody or control of the funds.

THE COURT:  Yes, that's your point on appeal for the motion to dismiss.  Thank you.

MS. ANDAZOLA MARQUEZ:  Just need to preserve it on the record, your Honor.

THE COURT:  It is so preserved, yes.

MS. ANDAZOLA MARQUEZ:  Can I continue on this point or would you like me to move on?

THE COURT:  If you're going to talk about the custody point, I think you can move on.

MS. ANDAZOLA MARQUEZ:  Okay.

Similarly, the evidence does not show that Tornado Cash is a business, as required under the statute, because it

does not charge its users any fees and the protocol does not generate any profits.

THE COURT:  But you'd agree -- see, I think you're still working under the *Velastegy* description about fees.  I still think *Banki* suggested it has to continue for a profit. *Banki* seemed to set less store by the concept of fees.  That may just be a point of disagreement between us.  But you still believe, even post *Banki* -- you still believe post *Banki* that fees are a necessary component of an unlicensed money transmitting business, yes?

MS. ANDAZOLA MARQUEZ:  I would need a conference with --

THE COURT:  Go ahead.

(Counsel conferred)

MS. ANDAZOLA MARQUEZ:  Yes, your Honor.

Our position is that if there is still a requirement of fees, but even that aside, there is no evidence of profits.

As the evidence showed -- well, I'll cite to a few examples.  Mr. Ahmed testified to the fact that he did not pay a fee to the Tornado Cash protocol.  Mr. Bram testified that there was no fee required to use the Tornado Cash protocol.

THE COURT:  I don't think there's any dispute that there were no fees per se.  I understood the government's arguments to be -- although maybe -- Mr. Rehn is giving me a strange face, so perhaps I'm wrong.

P7OVSTO5

I thought the point was that there was a portion -- that with the relayer registry came the staking of tokens and the possibility of the founders earning through that and, as well, through the appreciation of TORN and, as well, through the influx of cash from entities such as Dragonfly.  That's what I thought the profit -- the evidence of profits or an intention to make profits were.

MS. ANDAZOLA MARQUEZ:  We disagree with the government's theory of profits as to that evidence.  For instance, the TORN earnings reflect income rather than profits to the Tornado Cash protocol.  Those are Mr. Storm's personal income rather than profits of the protocol.

And the evidence also reflected that Mr. Storm expressed in emails that the protocol --

THE COURT:  May I just push you on that a little bit?  And by that, I just need to probe the issue a little bit more, please.

MS. ANDAZOLA MARQUEZ:  Sure.

THE COURT:  If I owned a business and I am paid solely in either securities, stock or stock options, or, in this case, in a cryptocurrency such as TORN, and my wish is, is it not, that that cryptocurrency appreciates in value.  So is that not -- is that not a consideration of profits?  You're suggesting it's income only.  But I thought the point was it's not that he's receiving a fee at currency, he's receiving TORN

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7OVSTO5

tokens that he hopes appreciates in value.  Is that not an interest in profits?

MS. ANDAZOLA MARQUEZ:  Well, I think that the profits have to go to Tornado Cash, not as to Mr. Storm.  If this is an unlicensed money -- unlicensed money transmitting business, the entity that needs to earn the profits is Tornado Cash.

THE COURT:  I see.  Thank you.

MS. ANDAZOLA MARQUEZ:  Next, I would like to talk about the requisite knowledge to be liable under 1960.

The government was required to show that Tornado Cash was a business -- sorry.  The government was required to show that Mr. Storm knew that Tornado Cash was a business engaged in money transmitting; and that the business transmitted funds derived or -- derived from or intended to promote a criminal offense.

There is no evidence showing that Mr. Storm knew that Tornado Cash was a business that was transmitting funds.  And the cite I have for that is *U.S. v. Elfgeeh,* 515 F.3d 100, from the Second Circuit, which says that there must be proof that the defendant knew that the business was engaged in money transmitting, and that the money transmitting business was unlicensed.

There's also no evidence that Mr. Storm knew specific transmissions of criminally derived funds, and that he also had contemporaneous knowledge of such transactions.  At most, he

generally knew that some users had used Tornado Cash for nefarious reasons.  That is not enough to impose criminal liability.  This is similar to what we argued for Count One. Mr. Storm must have known of the specific illegal transactions at issue at the time that they occurred, not after the fact.

Next, I would like to turn to the overt act requirement.

There's no evidence that any alleged co-conspirator committed an overt act in furtherance of the conspiracy.  For a conspiracy to violate Section 1960, an overt act must be proven.  Paying regular operation cost is not sufficient to prove an overt act because that is not the conspiracy.  It is not enough to show that the co-founders did something to facilitate the general operation of Tornado Cash because that's not the conspiracy.  The conspiracy is to conduct transactions knowing that they involve criminally derived proceeds.  And the government did not show evidence as to that.

THE COURT:  But I believe in your proposed charge for the overt act you suggest that often -- and the government offers the same charge, that an overt act itself doesn't have to be criminal; and sometimes, viewed in context, it can, though innocent in the abstract, indicate or demonstrate an act in furtherance of the charged conspiracy.  So you're not suggesting to me that the act itself has to be criminal, or are you?

P7OVSTO5

MS. ANDAZOLA MARQUEZ:  I'm saying that the act relayed here of paying regular operation cost was not sufficient.

THE COURT:  Is that the only -- well, I'll ask Mr. Rehn.  Is that the only overt act that's offered?  You know what?  That's not for you to -- you don't have to supply his overt acts.  He understands now that he has to supply his overt acts, so thank you.

MS. ANDAZOLA MARQUEZ:  Okay.  And then our next point is that subsection (b)(1)(C), the only alleged object only applies to businesses that are registered, which Tornado Cash was not.

THE COURT:  You're going back to FinCEN and 5330 and the stuff that I've totally thrown out already?

MS. ANDAZOLA MARQUEZ:  Well, your Honor, it's more about the otherwise clause in the statute.  It's a matter of statutory construction.  (b)(1)(C) has no purpose if it applies to conduct that's already covered by the other subsections of the statute.

THE COURT:  I've seen how this case was -- excuse me.  I've seen how this charge was given in cases like *Mizrahi* case and the *Romankolov* case in this district.  And there was no such attempt to tie it in the manner you suggest.  Maybe we're all just wrong, but I appreciate the argument.

MS. ANDAZOLA MARQUEZ:  Yes, your Honor, that is what we are suggesting.  We are suggesting that this has been

charged incorrectly and that (b)(1)(C) should only apply to businesses which are licensed, but are otherwise engaging in the criminal conduct that is detailed.

THE COURT: All right. That's, again, part of your motion to dismiss that I've rejected. Go ahead.

MS. ANDAZOLA MARQUEZ: And then I would like to conference Ms. James on the *Hoskins* point.

THE COURT: Oh, I think I know the *Hoskins* and the *Amen* points. You're suggesting that because *Hoskins*, which speaks to the FCPA, and *Amen* is a similarly specific statute, that because they have said that you must apply to each person, you're focusing on a distinct group of individuals, that it is not enough -- that you can't have a conspiratorial liability or liability under a conspiracy theory under *Hoskins*. I haven't seen *Hoskins* extended to unlicensed money transmitting anywhere, have you?

MS. ANDAZOLA MARQUEZ: I don't believe so, your Honor. But we are arguing it does apply here.

THE COURT: Okay. You don't need to caucus, because I do understand the argument, because it's been very well-made in your request to charge. I just, at the moment, don't agree with it. Thank you.

MS. ANDAZOLA MARQUEZ: And that is all on Count Two.

THE COURT: Thank you so much.

All right. Mr. Rehn.

P7OVSTO5

MR. REHN:  Yes, your Honor, briefly.

I think one of the --

THE COURT:  Really?  She said a lot.  You may want to say a lot, too.  Go ahead.

MR. REHN:  I'd be happy to address any of the issues.

I just want to say a few points up front, which are, the object of the conspiracy, unlike what the defense has just suggested, it is not a transaction-based object; it applies to a business.  The elements of the underlying offense, the 1960 offense, are that there was a business; and that the defendant knew the business involved the proceeds of criminal activity.  So any action aimed at maintaining that business is an overt act in furtherance of the object of the conspiracy.

THE COURT:  And, therefore, the monthly payments to Infura, the monthly payments to Alchemy, the monthly payments to Last Mile --

MR. REHN:  And Piñata was another one.

THE COURT:  Fine, Piñata.

Any payment for rent, any payment for electricity you believe is an overt act in furtherance of the conspiracy.

MR. REHN:  That is how 1960 charges work, your Honor; that the operation of the business, knowing that it involves criminal proceeds, is the offense.  That's how it works.  That's how it's instructed.

THE COURT:  So, once again, you heard me speak to your

adversary about it doesn't have to be a 1960 violation *ab initio*, right.  You're suggesting to me that they could have had the purest of motives in opening up Tornado Cash, but when they -- there came a point — and I'm not sure when that -- you're going to tell me that point came about, there came a point that they suddenly realized, Oh, wait, it's now an unlicensed money transmitting business.  Yes?

MR. REHN:  So, your Honor, what we have actually alleged in this case very carefully is that the money transmitting business conspiracy begins in February of 2022, when they roll out the new system with the relayer registry, with the fees flowing into the TORN holders.  So essentially there's a new business model that's rolled out involving the monetization of those TORN tokens.

And at that point in time, that's the initiation of the conspiracy.  And we allege from that point onwards they -- certainly in February of 2022, they are aware that the business involves the transmission of criminal proceeds.  And so we do allege that they knew from the outset of this conspiracy.

THE COURT:  All right.  But I thought I was sounding ridiculous, but you're now going to tell me I'm accurate.  Every payment of every invoice to keep the business afloat after February of 2022 could be — you will argue is — an overt act in furtherance of the conspiracy charged in Count Two.

MR. REHN:  Your Honor, that is what the law is, that

P7OVSTO5

the business -- the operation of the business is the element of the offense.  And so an act in furtherance of operating the business, there is no need to tie it to engaging in a particular transaction.  I don't think there's any case that has ever suggested that.  The element of the offense goes to the operation of the business.  So we do take that position.

But there's, you know, many, many, many business expenses that the defendant incurred, but also overt acts in furtherance of operating the business.

Among other things, he released the relayer registry, we've discussed that.  He repeatedly updated that .eth website, either the defendant or his co-conspirator Roman Semenov.  The blockchain records inclusively establish that.  He was paying for the .cash website.  It wasn't just that he was paying expenses, but he was contracting with these organizations that were necessary to make the business widely available.

Paying for that website itself is a part of the business.  And again, 1960 doesn't require complete ownership of the whole business.  It says ownership of all or part of a money transmitting business.  So it's actually a very broadly written statute that allows for the government to proceed on any particular part of that business.

And one reason that's important, your Honor, going back to the issue of the fees, is the defense has this oddly formalistic view, given their belief that everything is

decentralized, that there is something called Tornado Cash that can be clearly defined.  The jury is entitled to take into account how the overall parts of the business work together. As an example of that, I would point to the cases involving *Hualez*, which are disparate networks of people that work -- that may not even know each other.

THE COURT:  Sir, if you look at *Banki* and you look at who's the attorney on *Banki*, you'll see I'm familiar with the concept of *Hualez*.

MR. REHN:  Yes, your Honor.  I understand.

So the point is that the Tornado Cash enterprise, considered on the whole, certainly includes those relayers who were acting in concert with the defendant.  And, again, they don't all have to be members of the conspiracy; they just have to be parts of the business.

And there's no question that not only has the government proven that the defendant himself personally profited from linking those TORN tokens to those relayer payments, and subsequently unloading them for millions of dollars, but also that he designed a business that did, in fact, charge fees.  Whether or not the defendant himself was the fee taker isn't -- no case suggests that that's a requirement.  And, in fact, he did link up those fees to ultimate benefits to the TORN tokens.  But that's not even a requirement, that's just a fact of this case that makes it even

less of a close call.

And just to put a sort of finer point on it, there's this idea that has been put forward by the defense over the course of this case that because the relayer fees were optional, they are not fees.  The business is operating a service; and then it has a free, but not very valuable, option, you know.  But the service, which involves moving to new wallets with no transaction history, does require fees.  And so even if there were a few requirement — which *Banki* says there isn't — that would clearly be met on these facts.

THE COURT:  You might think that you're already ahead on two points, but go ahead and respond to the (b)(1)(C) point, that needing a license and, if you want, the *Hoskins* and *Amen* points.

MR. REHN:  On the point about (b)(1)(C), your Honor, there have been many, many cases charging both (b)(1)(B) and (b)(1)(C) violations.  As the Court is aware, the *Romankolov* case is a recent example in this district.  The defense has not cited any authority suggesting that the statute was written in such a way as to be, like, nonoverlapping parts.  And, in fact, it couldn't be; because if you look at (b)(1)(A) and (b)(1)(B), (b)(1)(A) charges operating a business without the state licensing, and (b)(1)(B) charges operating a business without the federal registration.  It is frequently the case that these informal money transmitting businesses fail to comply with

either of those regulations and are charged with violating both.

Similarly, it is frequently the case that unregistered money transmitting businesses both fail to comply with registration requirements and also knowingly move criminal proceeds and are charged with both. There is nothing novel about that. No case has ever suggested that somehow each of these provisions has its own sovereign sphere of authority, and if you're in one, you can't be in the other, which is what the defense seems to be suggesting.

THE COURT: Go ahead, please, sir.

MR. REHN: I think those would be the points I would make on that.

What was the next point, your Honor?

THE COURT: The *Hoskins/Amen* point. That's really been fleshed out in the jury charges; I know you were working on that. I don't know if you're prepared to speak to that now.

MR. REHN: If you could remind me what that point is, and I'll tell you if I'm prepared to address it.

THE COURT: Yeah.

*Hoskins* being the FCPA case, and the suggestion being that when you have a statute that is really designed to focus on a particular group of people, that the defendant must be in that group of people; it is not enough to conspire with somebody else who is.

I guess you're not going to talk about it now.

MR. REHN:  I didn't hear that raised just now by the defense, but perhaps I missed it.

THE COURT:  Well, when they were -- I believe your adversary was speaking about *Hoskins* and *Amen*.  But perhaps I was putting words in her mouth.

Counsel?  You were, right?

MS. ANDAZOLA MARQUEZ:  Yes, your Honor.

THE COURT:  Thank you.  All right.

MR. REHN:  I would have to review those cases, your Honor.  I'm not seeing the connection between the FCPA and 1960.

THE COURT:  Okay.  Anything else I should know, sir?

MR. REHN:  No, your Honor.

THE COURT:  Thank you.

Ms. Axel, Count Three.

MS. AXEL:  Thank you, your Honor.

As you know, I'm going to move to dismiss Count Three, the IEEPA count.

Your Honor, let me begin with the Furman amendment.  And, your Honor, obviously the informational materials exception to IEEPA provides that under that exemption, Tornado Cash's software and related ancillary tools all fall under IEEPA's broad exception for information.

THE COURT:  And this was exactly in your motion to

dismiss and it was rejected there, yes?

MS. AXEL:  Yes, your Honor.

THE COURT:  Okay.  So we're also not charging the jury on this either, just FYI.  Spoiler alert on that.

MS. AXEL:  Okay.  Obviously, your Honor, we believe the argument applies, and you're directing me to move on. We're preserving it.

THE COURT:  You have preserved it.  You ought to move on.

MS. AXEL:  Okay.  Thank you.

Your Honor, I would point out that actually the IEEPA charge, when the Court looks back at the indictment, is quite different than the other charges.  It's extremely narrow.  It begins from April 14th, 2022, on or about the date of the Ronin hack.  Your Honor, that puts it after the relayer registry, which was a focus of much of Mr. Rehn's argument.  Relayer registry was already in place.  And really there is nothing different that was really done between April 14th, 2022 and August 8th, 2022, making this an even more appropriate candidate for us to discuss what's really a negligence theory at the heart of the government's case.

First, your Honor, obviously we believe there's no evidence, as the Court should find, of a conspiratorial agreement.  The criminal purpose must be to violate the IEEPA, not to operate Tornado Cash.  And a failure to prevent the DPRK

P7OVSTO5

from using these software tools does not evidence a criminal agreement to violate IEEPA.

Secondly, your Honor, I'm going to discuss --

THE COURT:  May I ask you a background question, please.

IEEPA, by its terms, discusses the conduct of U.S. persons; correct?

MS. AXEL:  Yes, I was going to get to that.

THE COURT:  Thank you.

"U.S. persons" is defined -- I guess I'm not -- U.S. persons includes U.S. citizens, I think it includes permanent residents, I think it includes people within the United States and U.S. companies.  I'm not sure that I know -- Mr. Storm was here in the United States during the relevant time period.  Do I know where Mr. Pertsev and Mr. Semenov were?

MS. AXEL:  I believe the record does not establish that they were here or that they are U.S. persons.

So, yes, your Honor, I will discuss the objects in a bit more detail in a second.

But first, your Honor, there is no evidence of funds, goods, or services provided to the Lazarus Group, at a high level.  Again, Mr. Storm is creating intangible property in the form of software.  These are not services, and nor are they provided to the DPRK.  He wrote two pieces of software that anyone could use.  That's not a sanction transaction, it's not

P7OVSTO5

an export under the IEEPA.

And there's real problems with all four of the objects.  The government has real problems on all of them.

There is no co-conspirator control over any transactions that the DPRK engaged in or is alleged to have engaged in.  And there's no specific connection between any of the alleged co-conspirators with any transaction to the 0x0898b716 address, which is addressed in all four charged counts of the indictment.  There's no connection, there's no suggestion.

First of all, there is no evidence in this record that Mr. Storm or the co-conspirators touched any specific transaction at all.  And we believe that's a fundamental flaw.

(Continued on next page)

THE COURT:  I'll ask you to slow down as well.  I might as well.  I've asked everyone.  Thank you.

MS. AXEL:  Sure.  That's a fundamental thought both here and in the money laundering.  You can't have a satisfactory conspiracy without—money laundering conspiracy or IEEPA conspiracy without the defendant actually having some ability to control the transaction that was made.  It has to be specific.  I mean, again, turning back to the money laundering statute, I think it says so right in the very beginning, knowing that the object then being conducted.

It's the same for sanctions, your Honor.

And so there's no connection here at all with between Mr. Storm and any particular transaction.  And here, we have to have a particular transaction involving the oxo98 address.  And there's no evidence actually in this record at all that any transactions from that address went through the UI, which is the only piece that they've really emphasized that Mr. Storm had any ability to control.  Even then, the UI does not conduct transactions.  The evidence is already clear what Infura and Alchemy do is provide read information from the blockchain.  Mr. Werlau agrees that the UI does not conduct transactions.  The users wallet conducts the transactions.  So that is a core legal issue here, your Honor, again, both in money laundering and here in IEEPA.  The UI doesn't conduct the transactions.  So there's no link between the alleged co-conspirators and

these transactions, and we have no evidence that any money from the oxo89b716 address actually used that UI.  Even if it did, the UI didn't conduct transactions for it; it conducted transactions itself.

So if you go through all these objects, we've got problems with every single one because here, you know, neither Storm nor his co-founders could have caused the receipt of funds from that particular address when they didn't control the transactions with it, didn't even know when any particular ones occurred, and that's true as you go down each one.

Number two, they could not have agreed to provide a service to that specific address.

Number three is knowingly, willfully causing, and again——well, I'm going to get to U.S. persons in a minute——to transfer, pay, withdraw, and deal in property and addresses, in property of the Lazarus Group, namely, that address, without first obtaining control.  Again, there's no evidence that Storm or his co-founders agreed to cause other persons to do anything with respect to property coming from that address because they had no control over it.

Fourth object.  Similarly, your Honor, that one is willfully any causing other U.S. persons to engage in transactions to evade and avoid the requirements of U.S. law. I just don't see how this one goes to the jury.  There's nothing here about willfully causing——and again, it has to

PY01STO6

touch U.S. persons——to engage in transactions, specific transactions to evade and avoid requirements of U.S. law, with respect to that particular address.  There's just nothing in this record that would support that.

I will turn to the possession and control of U.S. persons issue, although I just touched on it.  We requested an instruction——I think the Court saw that——that prior to any alleged transfer, payment, export, withdrawal, or dealing with that address, the property had to come within the United States or the possession or control of a U.S. person.  That is plainly in the regulation and in the executive order.  The obligation to block property is not triggered until the property of the SDN enters into the control of the U.S. person.  And there is no evidence here that that ever happened.  There's no substantive count, of course, your Honor, so they're not alleging that Mr. Storm directly controlled this, but even if there was, if he's conspiring to conspire with himself, he did not control this property, it never came into his possession, and as the Court——

THE COURT:  But I thought the point of conspiracy is that the objectives don't have to be realized, every element of them has to be agreed to.

MS. AXEL:  This gets to the issue we discussed earlier, your Honor, right, as to whether this is an agreement to have something happen in the conspiracy as opposed to what I

PY01STO6

understand the charges here to be, that they already happened, but either way——

THE COURT:  Yes, I can't do your past tense agreement. It seems to me an agreement for something to happen.  But I appreciate that you think otherwise.  Go ahead.

MS. AXEL:  Okay, fine, your Honor.  Even under the Court's formulation of that, there still has to be——the person has to agree that some U.S. person is going to engage with that property.  Otherwise, the U.S. jurisdiction never kicks into place.  There's no U.S. jurisdictional hook.  And again, even Mr. Werlau admitted the user's wallet conducts the transaction. So wherever the DPRK is doing their transactions, they're not here, and none of the alleged co-conspirators, as we've said, touches those transactions.  So we don't have an obligation to block property that's kicked in.  Again——

So as we've also said, again, the smart contracts operate independently, autonomously, publicly on the internet. They were available.  The UI, which doesn't conduct transactions, was publicly available on the internet anywhere. So there is no place by which the U.S. jurisdiction actually attaches here.

THE COURT:  Okay.

MS. AXEL:  And finally, your Honor, *mens rea*.  We had a brief discussion about the *Bryan* standard, your Honor.  A willful IEEPA violation requires that the defendant knew his

conduct was unlawful and intentionally chose to break the law. There has not been any evidence of that here. Again, you know, the information is, again and again, he's allegedly on notice, he fails to act, he chose an effective remedy. I will note the evidence also shows that he implemented the Chainalysis oracle, which did in fact attach to the UI and did in fact block transactions with any addresses designated by OFAC, including but not limited to the oxo98b716 address. So for all of what they said about inadequate measures, ineffective measures, he did effect a measure on UI that actually would not allow somebody to engage. As soon as they put their wallet address in, if it was one of these wallet addresses, the UI did not operate. And that evidence is in this record. So he did in fact implement a measure. I don't see how we can get to a willfulness *mens rea* of defendant knowing his conduct was unlawful and intentionally choosing it to break it on this record. No one——no Court has ever held an IEEPA charge on such a tenuous *mens rea*. On the contrary, the standard is, as you know, in *Bryan*, a deliberate choice to violate the law with knowledge of the alleged illegal objective and with intent to further that unlawful purpose.

THE COURT:  Thank you.

MS. AXEL:  Thank you.

THE COURT:  Mr. Rehn?

MR. REHN:  Thank you, your Honor.

There's a lot there.  I think there's a sort of issue that is probably more appropriately addressed at the charge conference relating to this blocked property issue.  For purposes of——

THE COURT:  This is what worries me, because I'm really not interested in the four-hour charge conference.

MR. REHN:  We are intending to submit something in writing in short order on that issue, your Honor.  We've been working very diligently on it.

For purposes of this moment in the history of the case, I would like to focus on the portion of the indictment charging the defendant with providing services to a sanctioned entity, which I think is not covered in any way by this blocked property issue.  Because there's no question that the Lazarus Group and, as part of the designation of the Lazarus Group, this particular cryptocurrency wallet, are persons whose property is blocked such that it is illegal for U.S. persons to provide any services to this them, without getting into the question of whether there is particular property that's blocked that's being dealt in.

And so focusing on that issue, it's abundantly clear that the defendant and his co-conspirators made a decision to continue to provide money transmitting and money laundering services to an SDN, the Lazarus Group, and its cryptocurrency wallet.  They were fully aware that that SDN was making use of

their ongoing money transmitting business.  Actually, the evidence as to the willfulness with respect to the sanctions violations, again, is unusually clear in this case.

THE COURT:  But when you talk about providing services to a sanctioned entity, does that mean you're forgoing any of the four objectives that you have currently charged?

MR. REHN:  As I said, we plan to submit something regarding that issue.  I don't think we've made a decision.  I think for purposes of Rule 29, we're focusing on the providing services prong, and the evidence is——

THE COURT:  On the theory that if I find as to one, I have to let the count go forward.

MR. REHN:  That's correct, your Honor, and I think that's the focus, that is really the primary focus of this case, and so it may be we don't need to reach the blocked property issue because of the services to an SDN issue being much more straightforward.

THE COURT:  I won't worry my pretty little head about it then.  All right.  I understand.  I'm just saying, you have to realize that for months now I've been working——or weeks, at least, I've had a charge in which you're asking me to charge four objectives.  Now you're telling me maybe not.

MR. REHN:  Your Honor, we are evaluating in light of the arguments the defense put in their request to charge and the Court highlighted at the pretrial conference——

PY01STO6

THE COURT:  Okay.  But just anything that you submit—and look, it would be neat if you could agree with the defense.  I mean, the defense wants the whole count to go away, but if you could agree to limit the count, I do think that any submission you make to me ought to address the U.S. persons issue in light of the absence of evidence about Mr. Semenov or Mr. Pertsev being U.S. persons.

MR. REHN:  Yes, your Honor.  Well, Mr. Storm is certainly a U.S. person.

THE COURT:  For these purposes, yes.

MR. REHN:  Yes.  And Peppersec Inc. is a U.S. entity. And I think there's clear evidence that Peppersec Inc. is essentially, in essence, an alterego of Tornado Cash, and Tornado Cash itself is therefore a U.S. entity, and certainly the evidence is sufficient for a jury to draw that inference. As the Court saw today, the deal documents to set up the investment into Tornado Cash were under the auspices of Peppersec, the U.S. Delaware incorporated entity, and so essentially the U.S. entity is operating this business under its auspices, and so that's an important part of this proof. And all of those payroll records, all of that bank record evidence that came in that wasn't particularly hotly litigated in the course of the trial but is important to determining the status of Tornado Cash as a U.S. entity, is highly relevant to that because essentially they put the business, Tornado Cash,

in the name of Peppersec, the U.S. entity, and so Peppersec is providing the services that Tornado Cash is providing. The government does not contend that Semenov or Pertsev are U.S. persons. We don't believe they were regularly in the United States during this time period.

THE COURT: So the putative conspirators here are Mr. Storm, Tornado Cash, and Peppersec?

MR. REHN: Mr. Storm can still conspire with people outside the U.S. to cause a U.S. person to provide services to SDN.

THE COURT: I appreciate the clarification. Okay.

MR. REHN: And so again, that issue alone as to that, I think the evidence is clearly more than sufficient for the jury to find the defendant guilty. In particular, the defendant clearly knows about the sanctions. As soon as they're announced, he sends the announcement to his co-conspirators and clearly evinces his belief that if they continue to provide these services to the Lazarus Group, they are subject to criminal sanctions. So as to the knowledge of the sanctions and the willfulness with respect to them, that's actually an unusually clear case, we would submit. With respect to the——

THE COURT: Hold on a second. I want to see what you said a few moments ago. I think you said the same construction. Unusually strong. Yes, unusually strong,

PY01STO6

unusually clear.

MR. REHN:  We have an unusually strong case, your Honor.

THE COURT:  Well, yes.  I'm not sure I agree with you on that, but okay.  I'll just note that this too is unusual.  Go ahead, please, sir.

MR. REHN:  Your Honor, when I'm talking about——I guess what I'm talking about, we have the richness of defendant's——evidence of the defendant's state of mind from his statements, which really goes to his knowledge of a lot of these key points, knowledge of the criminal proceeds, knowledge of the sanctions, knowledge of the sanctioned transactions, which you don't usually see in these cases.  That's the general shorthand for how I'm referring to that issue.

THE COURT:  All right.

MR. REHN:  So with respect to this issue of the transactions, there's this idea that Ms. Axel suggested that Tornado Cash doesn't involve itself in the transactions, it's just software.  I think the evidence in this case——at least in government's case, we'll see what happens in the defense case——overwhelmingly refutes that conclusion.  A transaction on the Ethereum blockchain is simply a set of instructions delivered to the Ethereum blockchain, and those instructions were in fact conveyed by the user interface to the router, to a set of registries, all of which the defendant created,

implemented, and had the ability to control, change, and modify. There's abundant evidence of that. The suggestion that it's just the user's wallet doing it all by itself is just incorrect. The instructions go through a number of steps that were laid out in great detail by the government's expert Mr. Werlau, and those are all component parts of the transaction, and so certainly the Tornado Cash——the service was participating in that transaction and conducting it along its way on the Ethereum blockchain, and that is just very straightforward how the blockchain works. I think even Ms. Axel described the blockchain that way in her opening statement when she referred to instructions being sent to cause transfers of value. That's exactly what Tornado Cash was doing for the North Koreans during the pendency of this particular charged conspiracy. And so the evidence is certainly, at a minimum, sufficient for the jury to draw that inference.

As it goes to this issue of the——she suggested there's no specific transactions involving the sanctioned address. Again, Special Agent DeCapua identified over 1400 transactions in funds originating from that sanctioned address that were deposited into Tornado Cash, and those are services being provided to the sanctioned address. Again, there's no requirement that when you're helping an SDN violate sanctions, there can't be a middleman between you, it has to be direct, and so her suggestion that because it went through an

PY01STO6

intermediary wallet somehow it's not a sanctions violation, if you know that what you're doing is providing the service of helping that wallet launder the funds that are contained therein, that's just not how——there's no legal requirement of that sort of a direct connection.  The requirement is, are these transactions that provide a valuable service to that sanctioned entity, and certainly, the ability to move funds that were the subject of great worldwide attention and attempt to trace and stop from being hidden is the most valuable service that that sanctioned entity could have asked for at that moment in time.

I'm happy to address other issues if the Court has questions, but those are the——

THE COURT:  No.  But asking for a friend who might be the presiding judge in this case, when can I expect your letter on Count Three?

MR. REHN:  I expect it will be tonight, or——tonight or tomorrow.  There's a draft that I've had a chance to look at, but we're going to work on it and get it to you.

THE COURT:  All right.  Thank you.

Ms. James, the issue of venue?

MS. JAMES:  Yes, your Honor.  Just before I get to that, just to clarify one point——may I clarify one point on the merits?

THE COURT:  Of Count One?

PY01STO6

MS. JAMES:  Yes.

THE COURT:  Yes.  Thank you.

MS. JAMES:  Yes.  Just to be clear, the knowledge has to be of specific transactions, and the government's argument goes to a generalized knowledge of activity, not specific transactions, and we just want to be very clear about that point, that the knowledge and intent has to be directed at specific transactions, not just general knowledge of money laundering.

THE COURT:  All right.

MS. JAMES:  I also did want to just point out, in our motion to dismiss, we had made some constitutional arguments. We do preserve those arguments and would reassert them here, but I'm not going to argue them now.  I think the Court has already rejected those arguments.  So just preserving them for the record.

THE COURT:  All right.

MS. JAMES:  As to venue, in a conspiracy prosecution, venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the co-conspirators.  It must be either directly done by the co-conspirator——

THE COURT:  I don't think it must be an overt act. You mean it has to be in furtherance.

MS. JAMES:  *Svoboda* actually says an overt act in

PY01STO6

furtherance of the conspiracy.  It does use that terminology actually.

THE COURT:  But that would seem to undercut Count Two and Three, which don't have an overt act requirement.

MS. JAMES:  The law says you still look for an overt act for venue purposes.

THE COURT:  We'll see.

MS. JAMES:  An act in furtherance of a conspiracy.  But if it's not done directly by a co-conspirator, it must be caused by a co-conspirator.  And if the defendant himself is not the one doing the act or causing the act, in the district, then it must be foreseeable that such an act would occur in the district of venue.

THE COURT:  Just so that I understand what you're saying, it would either be by the defendant, by a co-conspirator, or reasonably foreseeable to the defendant.

MS. JAMES:  Right.  If it's not done by the defendant himself, it has to be foreseeable to him.

THE COURT:  Yes.  Thank you.

MS. JAMES:  And the case on that is *Tang Yuk*, I believe, which is 885 F.3d 57.  The same case requires some sense of venue having been freely chosen by the defendant, also from that case.

And when we look what the offense conduct is, we look at the essential conduct elements, and we're directed to

PY01STO6

distinguish those from circumstance elements, and essential conduct elements provide the basis for venue.

The act also cannot be merely preparatory to the offense as discussed in *Eisenberg* and discussed in the *Beech-Nut* case. And it's been a bit of a moving target as to what the government is claiming supports their venue, but it's obvious——I'll go through as best I can what I think their venue evidence is.

They put in conversations between Mr. Storm and others and Mr. Schmidt, from Dragonfly, when they established that Mr. Schmidt was in the Southern District of New York. But if you look at those discussions, there's nothing in those discussions that furthers the alleged conspiracies. They're talking generally about Tornado Cash, they're talking about other things altogether, but they're not talking about the conspiracies, they're not doing anything to further the conspiracies.

They put in evidence about a conversation on March 15th, and by the way, this is before he's ever even said that he's in New York, so there's no evidence that they knew he was in New York when they were having this conversation, but it has to do with whether they have any interest in chatting with www.sismo.io. They're interested in using Tornado's relayer network——

THE COURT: Please slow down. Thank you.

MS. JAMES:  They're interested in using Tornado's relayer network to put their attestations on chain.  But nothing about that comment has anything to do with furthering the illegal, you know, objectives of the conspiracy here.

Similarly, on March 18th, they put in a conversation about talking about—talk to board about very similar project. Again, nothing furthering the conspiracy about this message. And it wasn't until April 1st that Mr. Schmidt even said anything about being in New York.  And I would point out in that conversation, Mr. Storm asks if he's in San Francisco, and throws out some other cities where he might be, not New York, so it doesn't appear Mr. Storm had any reason to foresee that he was in New York at that time.  We're jumping ahead a little bit to the foreseeability question, but—and the only message that takes place on that day was about a different project altogether.  It wasn't even about Tornado Cash.  So it doesn't—he was helping to set up a DAO raise on another project.  So that's the only day that he could have even foreseen that Mr. —— that Mr. Schmidt was in New York or was in the Southern District.  Was in New York; doesn't even say he's in the Southern District.

Later conversation doesn't occur until April 6th, they're talking about pinging torn holders to vote, but there's no context to the message about, you know, to tell us what they're—how that's furthering the conspiracy.

PY01STO6

And then they put in the message completely——about two months later, June 9th, completely separated from the time when Mr. Schmidt had indicated he was in New York, asking about funds for Tornado Cash. And that one is probably the closest, you know, relationship to Tornado Cash, at least that we have, but that doesn't further the conspiracy. That just furthers operating Tornado Cash. And that's not the conspiracy here. The conspiracy is to do money laundering, to operate an unlicensed money transmitting business or——under (b)(1)(C), or to conduct——to engage in sanctions violation. And that is not——so there's nothing about funding Tornado Cash per se that furthers those illegal objectives.

So I guess you would just say, this is in contrast to other cases, in other cases where there have been——I mean, there have been other cases where phone calls, for example, have been sufficient. I haven't really seen cases involving messages. But assuming they're given the same treatment even, there has always been a much more direct connection to the illegal conduct. They're doing something to set up, you know——one case, they're setting up a robbery through a phone call; another case they're discussing the narcotics transaction. They're committing extortion or they're communicating with their victim of extortion. They're doing something that really is in furtherance of the illegal objective. They're not just running a business, as they're

PY01STO6

doing here.

And I guess I would also say, this is another example, also an example of, if anything, it's preparatory to the offense, because if anything, trying to just, you know, operate Tornado Cash may be arguably some kind of preparation for doing something illegal, but it's not the illegal act itself. At most it would be preparatory, and that's not enough.

Just returning quickly to the foreseeability point, there's only that one text, as I said, where Mr. Schmidt——and I guess just one other quick point on the funding issue. He was actually talking about funding Peppersec, not Tornado Cash, and we don't agree they're the same thing.

Foreseeability. There's only the one mention of being in New York. He doesn't——of course he doesn't mention where in New York, so that doesn't really establish the Southern District. And there was also evidence that he was in lots of other cities besides New York at that time, in that time frame. So there's no——it doesn't establish that he was necessarily in New York or it was foreseeable to Mr. Storm that he would be in the Southern District of New York during that whole time that they were——

THE COURT: But my memory of that witness's testimony was that there were many hits which to him was an indication of the presence of Mr. Schmidt in the New York area. I thought the other cities were the other phone.

MS. JAMES:  That could be correct, your Honor.  I'm not sure.  But he was not——but it was not clear that he was at all times in New York or that was foreseeable to Mr. Storm I guess is the point.

THE COURT:  I understand that point.  Thank you.

MS. JAMES:  As to the other——the use of Tornado Cash by Mr. Ahmed, who testified here, I think that's one of the other slivers that the government would like to rest on, because he did use Tornado Cash in the Southern District of New York.  But that was not the act of a co-conspirator, nor was it caused by any co-conspirator.  This was a third party using Tornado Cash.  All that the co-conspirators, or alleged co-conspirators in this case did was to make Tornado Cash available to the public in general.  They didn't do anything to cause Mr. Ahmed to use it in this way.

THE COURT:  I thought I understood the government's point from Mr. Ahmed's testimony to be that for Count Two, where the idea is the operation of a money transmitting business, an unlicensed money transmitting business, that operating Tornado Cash, it was reasonably foreseeable that someone in New York could and in fact did use the Tornado Cash service.  I think I've hinted to the government——maybe I'll hint again——that Mr. Ahmed's testimony, at most, goes to Count Two.  I don't think it goes to Count One and Three.  But perhaps Mr. Rehn will explain why I'm wrong.

MS. JAMES:  Well, I think that's certainly correct, your Honor, as to Counts One and Three.  As to Count Two, I would say that's just an overbroad theory because again, it comes back to, you know, making this software available to the public is not offering money transmitting, an unlicensed money transmitting business under (b)(1)(C).  So that just making it available to him is not enough to establish——

THE COURT:  Well, making it available to someone who ends up using it for improper purposes.  I appreciate your point, which is that he couldn't have known, but all right.

MS. JAMES:  Right.  They had no knowledge of this individual, they had no knowledge of this, you know——nothing to——nothing to tie them to this particular individual.  This is——it's just not——again, it's just not part of the charged conspiracies here.

I gather that the government has put in evidence to show they used an account that was in New York to pay for business expenses, but again, paying for business expenses is not in furtherance of a conspiracy.  It may be in furtherance of a business, but it's not an illegal activity, and it doesn't have to be illegal, but it's not in furtherance of an illegal conspiracy.

The same thing with questionnaire to Rho, assuming that's going to be a thread.  It has nothing to do with the conspiracy.  It was just the Peppersec business.  Nothing

illegal about the Peppersec business.  That is not part of the conspiracy.  Nothing, nothing that these acts did did anything to further the illegal conspiracies charged to commit money laundering, to commit——to operate an unlicensed money transmitting business, as that term is defined in (b)(1)(C), or sanctions violation under IEEPA.

And that's all I have for now, your Honor.  If there's any other questions, I'd be happy to answer.

THE COURT:  Thank you.  I've asked my questions.  Thank you.

Mr. Rehn?

MR. REHN:  Thank you, your Honor.

THE COURT:  Could you go count by count with your venue, please, sir.

MR. REHN:  Yes.  And I think Count One is the most straightforward and so we'll start with that one.  So first off——

THE COURT:  Please don't say it's unusually straightforward, sir.

MR. REHN:  I would not classify it that way, your Honor.

So the law, I think we agree, and the parties agree, that an act in furtherance of the conspiracy is required and that it is reasonably foreseeable to the defendant as to each of the counts.  But it need not be a criminal act itself.  If

there is a criminal conspiracy, any act that is in furtherance of that is sufficient for venue to be proper in the district. So that's an important distinction. The defense I think is trying to pick apart many of these acts and say, well, if you look at that act in isolation, it is not itself a criminal act to, for example, rally support for a TORN proposal or something. But if it's in furtherance of a preexisting conspiracy, then it is still an act that is sufficient for venue purposes. So I think that's one important thing to keep in mind as we go through these.

But we would cite a few things in the record, your Honor, as relevant to venue as to Count One.

So I think the first thing would be the testimony and the exhibits that were introduced through Joe Evans, the lawyer for BitMart, who said that he reported the BitMart hack to Storm via email from his New York apartment and that Storm responded and that he sent and received those messages, Evans did, while he was in his Manhattan apartment. The email that Evans sent to Storm had his New York office address in it, so it was certainly reasonably foreseeable to Storm that Evans would be in Manhattan when he sent that email to Evans. There were also Telegram messages sent I believe by Semenov to Evans at around the same time while Evans was in Manhattan, and those acts—again, it need not be a criminal act, but those acts are in fact criminal acts because there's an earlier message that

PY01STO6

was put into evidence today in the case saying that Storm had kind of come up with what he described as, like, the thing we send when we hear about hacks, here's our script, essentially, and then they're turning around shortly thereafter and using that script where a defendant—where a victim, in a very high-profile hacking incident, is attempting to get information about it, and basically the effect of sending that message is to throw them off the scent while the money laundering is still going on.  And so that is not just an act in furtherance, but it's actually, you know—a critical part of the money laundering is these false statements to victims about the purported inability of the defendant and his co-conspirators to do anything about it:  Don't bother us, we can't do anything about it.  Well, as the Court has heard a lot of evidence of in this case, that was false, and they knew it was false, and it served the effect of dissuading victims and law enforcement from continuing to pursue those stolen funds.

With respect to—so that's the Evans emails, and Telegram messages.  Another thing we would point out are the payments that were made——

THE COURT:  Please, sir, are you suggesting that part of the conspiracy to commit money laundering was blowing off inquiries from victims and law enforcement on behalf of victims?

MR. REHN:  I think ignoring the messages is not an act

in furtherance, but sending false information to victims who are in the midst of trying to find the money certainly helps to conceal the funds.

THE COURT:  I see.  So had he not answered, no; but having answered and you would argue——and I'm not agreeing, I'm just stating for you——having answered, in your estimation falsely, that's an overt act, and an act that gets you venue.

MR. REHN:  Yes, we certainly submit that as to the money laundering charge, your Honor.

The next thing we would point to are the payments that were made to Infura.  Infura's beneficiary bank account was a Chase Bank account located in Manhattan.  Government Exhibit 851 is an invoice sent to Storm identifying that Infura bank account and its Manhattan address.  And then Government Exhibit 924, Storm personally made 17 payments to that account from——to that Infura account from October 2nd of 2020 to February 2nd of 2022.  Those payments were in furtherance of the conspiracy and——

(Audio disruption)

(Discussion off the record)

THE COURT:  Okay.  Thank you.  Please continue, sir.

MR. REHN:  So the payments to Infura are, as we've discussed previously today, very essential because they facilitate the traffic on Tornado Cash.  They make the transactions accomplish successfully, and so making those

payments at moments in time where Storm is aware that the business is in fact moving criminal proceeds is clearly in furtherance of the ongoing money laundering that's going on.

Just one quick point on that. We just heard from defense counsel at the beginning the suggestion that there needs to be not just knowledge of the idea that there would be transactions but knowledge of particular transactions.

THE COURT: I have heard that several times, yes.

MR. REHN: That might be true for a substantive offense. It's certainly not true for the conspiracy charge we have here. In fact, there don't even need to be particular transactions. There just needs to be an agreement that such transactions would be conducted. And in a conspiracy charge, if you have people who are in agreement that they will facilitate criminal transactions and then engage in the act of doing so, they don't have to foresee any particular one of those criminal transactions to be in a conspiracy to——

THE COURT: But Ms. Axel's point to me has been frequently that this is that weird case where you charged conspiracy, but if anything, the substance of what could have happened, but you're not interested in telescoping that; you're extracting the charge to remain at the agreement level and to not focus on the fact that the objectives may or may not have been accomplished.

MR. REHN: For purposes of——the point of that was to

PY01STO6

illustrate that knowledge of particular transactions can't be a requirement because particular transactions are not even a requirement.  So the suggestion that in a conspiracy charge there would have to be evidence that the defendant had knowledge of any particular individual criminal transaction, I don't think there's any legal support for that.

THE COURT:  Okay.

MR. REHN:  So the next thing we would point to as venue—and this is venue for both Count One and Count Two—is the payments for maintenance of and operation of a proprietary website that was available to users in New York, and was in fact used by a user in New York in July 2022.  The Court heard testimony from Shakeeb Ahmed about that, his access to the defendant's proprietary website in July of 2022.  I would cite—

THE COURT:  So you do disagree with me in the sense that while I've been fixated on it as possibly supportive of venue for Count Two, you believe it goes to Count One as well.

MR. REHN:  We believe it does, your Honor, because the maintenance of the website and the foreseeability that it will be used—so, you know, part of the government's theory—and I think the jury can draw this inference from the evidence that's been presented—is this idea that all of the transactions on Tornado Cash facilitate the money laundering.  It's not only the criminal ones.  In fact, if it were only criminal

transactions, it wouldn't be an effective money laundering device.  You need to have at least a public perception that there are a lot of transactions, not all of which may necessarily be criminal, in order to facilitate the criminal's efforts to conceal their funds.  And so the maintenance of a publicly accessible website is a critical part of that because if they had closed down the website or if they had sort of changed it in some way, and you reduce the size of the pools, you also reduce the efficacy of the concealment.  And so I think the Court can consider the maintenance of a website that's broadly available to the public as an act in furtherance of all of the money laundering activity.

THE COURT:  But perhaps you could respond to Ms. James's point that having the website does not equal reasonable foreseeability that someone in New York would use it.

MR. REHN:  Well, your Honor, I believe the Second Circuit has held to the contrary in *United States v. Rowe,* at 414 F.3d 277.  That was a case involving child pornography charges, where basically the circuit held that it was irrelevant whether the defendant's website intentionally transacted business with any New Yorker because——this is at page 279——the defendant must have known or contemplated that the advertisement would be transmitted to anyone the whole world over, and so therefore it was foreseeable to him that a

PY01STO6

user in New York could well use the website.

Another case that the Court may well be familiar with is *United States v. Levis*, 488 F.App'x 481, 485 (2d Cir. 2012). That's a case involving the posting of a 10-K to the SEC's website, and the fact that somebody subsequently accessed that was sufficient for venue. The defendant in that case didn't specifically know who in New York might access the 10-K, but the fact that he made it publicly available on the web and that somebody in New York then did in fact access it was sufficient for venue.

So I actually think the law is pretty clear in this area that the maintenance of a website and the actual accessing of that information that's in furtherance of the crime by somebody in New York is in fact sufficient for venue purposes.

THE COURT: Count Three, sir.

MR. REHN: Yes. So before getting to Count Three, I just want to highlight another basis of venue, and this will also be the focus of the venue for Count Three, and that's the communications with Tom Schmidt that the Court heard evidence of.

So as the Court heard yesterday, there were multiple Telegram and Zoom communications between the defendant and one of the two kind of lead investors from Dragonfly in Tornado Cash, Tom Schmidt. They were discussing Tornado Cash business, they were discussing new features of the relay registry, they

were discussing a governance proposal and the need to get support for it to implement that. Those are clearly in furtherance of Tornado Cash's operations.

THE COURT: All on the day that he was in New York?

MR. REHN: All of the communications that I just referred to are on days he was in fact in New York. And——

THE COURT: All on the day that he said he was in New York, or just all on days he was in New York?

MR. REHN: Days he was in fact in New York. But as to the foreseeability point, your Honor, I think the jury could draw an inference that the defendant would have been aware that Schmidt was in New York. If the Court looks at the foreseeability cases in the Second Circuit, it's not a particularly onerous bar. So for example, in the *Kirk Tang Yuk* case, which defense counsel just cited, that was a government informant who actually called the defendant and said, I'm in New York. And it was not even clear. You know, it could have been——and the defendant I believe was in Florida in that case. And the Second Circuit held that's enough, that it was reasonably foreseeable to him that he was in fact in the Southern District. And not only that, but he had been when he had driven a drug load previously because that was the sort of actual act in furtherance. It wasn't the call, it was the previous delivery of the drugs. And so it's just an example of the degree to which foreseeability, it doesn't mean the

defendant is certainly aware; it doesn't mean the defendant even is aware that it's more likely than not.  It's just that it's foreseeable that the person would be in New York and in the Southern District.

And so with that in mind, the fact that the government put in Tom Schmidt's rental records showing he was a resident of New York, the fact that the government put in Tom Schmidt's cellphone records showing that he was in New York extremely regularly, almost all of his cellphone hit days, the vast majority of them, were in the Southern District of New York throughout that time period, and notably, the defense tried to suggest that he was regularly in Seattle or San Francisco, but as it turned out, that's a separate cellphone, so that was just incorrect.  And so those communications are themselves sufficient for venue as to the Counts One and Two.

Now with respect to Count Three, it's a slightly narrower time frame that that count is charged, and so it's from April 14th onwards, and so we wanted to just be very precise with communications regarding that.  The first thing we would point to, your Honor, is Government Exhibit 2246.  That's the chat that's been the subject of a fair amount of discussion in this courtroom, the chat regarding the compliant mixer. That chat, in which Tom Schmidt is a participant, he receives those messages, he's in New York on those days.  There was evidence to that effect presented.  I believe for those days it

PY01STO6

was the American Express records.  In those chats, remember, the timing here is critical.  April 14th, the sanctions come down.  April 15th, the defendant puts in place this easy-to-bypass patch so he can make a public announcement pretending it's not a problem.  Over the next four to five weeks, until May 19th, the Lazarus Group is the majority of the volume on Tornado Cash.  And so it's extremely relevant that that is the point in time when the defendant circles up with his investors, one of whom is in New York, and says, should we implement a change, should we have a compliant mixer, should we put in place some of these features, what do you guys think, would you use that?  The response:  We don't think there's any market demand.  Remember, if the defendant stops Tornado Cash now, he's sitting on hundreds of thousands of TORN tokens worth tens of millions of dollars.  He loses all of that if the TORN value collapses.  It's a critical moment where he's making a decision, do I keep operating a business that's criminal or do I step in and put in place controls that the Court has heard abundant evidence the defendant knows how to do and he's actually discussed specifically doing with his co-conspirators at this point in time.  In making that decision, he brings in his investors, he consults with them, they tell him not to do it, there's no money in it, and they don't do it.  They continue to operate the business, knowing full well that they're moving—most of the money they're moving at that point

in time is sanctions-violating North Korean transactions.  So we would submit, your Honor, that that particular chat in particular is an act in furtherance of those sanctions violations, and that would be the main thing we would point to from that critical period of time, and again, one of the people who's receiving those messages, Tom Schmidt, is in New York during those chats.

THE COURT:  Thank you.

Given the quality of the argument this afternoon, you'd think I'd have more to say, but I don't.  I'm reserving on the motion.  I'm letting this case go to the jury.

Let me please understand tomorrow's witness list.  Mr. Klein.

MR. KLEIN:  Yes, your Honor.

THE COURT:  Do you want to come to the podium.  Is that easier, so you're not pushing Ms. James around?

MR. KLEIN:  I like hovering over people.

THE COURT:  Who are we going to have?

MR. KLEIN:  Tomorrow we're going to have Dr. Edman.

THE COURT:  Okay.

MR. KLEIN:  Professor Malekan.

THE COURT:  I'm sorry?  Spell, please?

MR. KLEIN:  M-A-L-E-K-A-N.

THE COURT:  An expert witness, sir?

MR. KLEIN:  No.

THE COURT:  Ah, thank you.  Okay.  I was going to say, this is a report I don't recall reading.  Okay.

MR. KLEIN:  And if we need more time, because we're not sure how long that will go, we have a standby witness, because we want to let you know about those.  Dr. Stephanie Hurder.

THE COURT:  Yes.  That's the one I was expecting.

Okay.  You know, I thought I was doing us all a favor when I found out we weren't going to have the 4:00 conference, so now that I look at it, it's 5:16.  So much for that.

What is the situation with Chainalysis, sir?

MR. KLEIN:  We don't need the hearing, your Honor.  Past that?

THE COURT:  I'm sorry.  I'll be more precise.  I'm actually not sorry, but I'll be more precise.  We don't need the hearing.  You got the documents you want.  Am I going to hear from a Chainalysis witness tomorrow?

MR. KLEIN:  No, your Honor.

THE COURT:  Are we going to hear from a Chainalysis witness ever in this trial?

MR. KLEIN:  We are working on a stipulation, your Honor.  We have a Chainalysis custodian and percipient witness subpoenaed.  We may call them Monday, depending on what happens with our discussions on the stipulation and with Chainalysis, and the government.

PY01STO6

THE COURT:  The stipulation, are you negotiating that with Chainalysis and its counsel, sir?

MR. KLEIN:  I think we have a finalized stipulation with them that we're going to present to the government.  I'm not sure what Sullivan Cromwell is sharing or telling the government about this along the way.

THE COURT:  I couldn't say.

Let me just put my cards on the table.  We've had two days now where the jurors have had to wait in the morning because of unexpected pretrial matters.  I'm just trying to prevent that from happening tomorrow if I can.  So I just want to know if there's anything I need to know tonight.  I'm getting a letter from the government tonight or tomorrow.  I'm imagining that's on charge issues, sir; don't you worry.  So I'm going to imagine tomorrow I'm not going to stay up late to receive it, because I know they want to give me their very best.  But I just want to know, is there a fight that I need to resolve tonight?

MR. KLEIN:  I'm going to have to look at my team, your Honor, just to make sure.

THE COURT:  Of course.  All right.  And, oh, Mr. Gianforti is saying yes, okay, while you're looking at your team.  From your perspective, sir, you have no fights before the witness's testimony tomorrow, so neither a fight tonight nor a fight at 8:45 tomorrow.

MR. KLEIN:  I'll just bring up one point I want to follow up on.  We do want to know about the data that we were missing from Special Agent George, so I just don't want to lose track of that, your Honor.  I think the government was going to let us know if we got everything, because that remains an important issue for us.

THE COURT:  Yes, of course.  Because you might have to re-call him otherwise, or something else.

MR. KLEIN:  Well, we'd move to strike, and we would move under 705 or——let's see what we learn, I guess.

THE COURT:  We're both waiting for that then, sir. Okay.

All right.  And from your perspective——I'll ask the broadest question I can——is there anything else you want me to know before you sit down this evening?

MR. KLEIN:  Yes, your Honor.

THE COURT:  Okay.  What is it?

MR. KLEIN:  There was this that witness we mentioned earlier.  I've talked to the government, Mr. Arad this afternoon.  I think we're working out a stipulation for this witness.  It's the witness with the personal issue.

THE COURT:  Yes.

MR. KLEIN:  And the remote testimony.  I don't want to lose track of that, your Honor, because I understand I brought that up.  And it's something we learned just very recently.  So

PY01STO6

I believe we'll be able to work out something with the government. We're going to do our best. We have drafted a stip. We're going to show it to the witness's counsel, then we're going to show it to the government, but I think that would be teed up for an issue Monday if it's an issue, but I will keep you apprised, your Honor, but I don't think it's a tomorrow morning issue. How about that?

THE COURT: That's all I can ask for.

Okay. Just while I have you standing and before I turn to Mr. Gianforti, you've got tomorrow filled with witnesses, sir, yes?

MR. KLEIN: We believe so. We're going one or two breaks till 1:30, correct? That's our understanding.

THE COURT: Yes. One break, 1:30.

MR. KLEIN: One break, 1:30.

THE COURT: Do you have witnesses to fill Monday?

MR. KLEIN: I believe we do, your Honor, yes. I don't know, depending on how far we get tomorrow, and if Ms. Hurder spills over, we do have anticipated witnesses for Monday, and then of course—so I think we will be filling most of Monday. And then there's a question of whether Mr. Storm testifies, which is outstanding. But I do believe we'll fill most of Monday, if not all of Monday. But maybe we'll get to—we'll know more by tomorrow and I can give you a better sense. But Monday partial at least.

THE COURT:  The reason I'm asking, sir, is, you indicated you had two to three days of a defense case.  You only got 15 minutes today and you're getting a partial day tomorrow, so I didn't know whether I should be subtracting a half a day from this two to three days and that you were thinking of going through Tuesday or Wednesday, or even beyond that.

MR. KLEIN:  I think there's a very strong chance we'll be going through Monday, and I don't know that we'll need all of Tuesday, unless Mr. Storm testifies, is the way I would put it right now.

THE COURT:  And of course we don't know if there's a rebuttal case.  But——

MR. KLEIN:  Very short, your Honor.  That was the rumor on the street.

THE COURT:  That was the rumor before he saw your witness list, perhaps.  But I'm just asking because again, I have a new set of proposed charges from the defense, I'm getting something new from the government.  I want to be sure that perhaps by Monday I have a charge for you in case we have a charge conference Monday night.  We are just all cognizant of the fact that we have four days next week.

MR. KLEIN:  Yes, absolutely, your Honor.

THE COURT:  Because we are not going to the Bad Bunny Resort in Puerto Rico, unless you want to go.  Maybe you're

PY01STO6

joining her.  But one of our jurors, she's told us from the start——

MR. KLEIN:  I have a kid I want to take to camp, so I have my own issues next weekend.

THE COURT:  All right.  Thank you.

All right.  Mr. Gianforti, I dread asking if there's a problem.  Tell me, sir, what's up.

MR. GIANFORTI:  Your Honor, the government has concerns about one of the defense's witnesses that they're proposing to call tomorrow, Professor Malekan from Columbia Business School.

THE COURT:  Why?  Professor Malekan is not, I've been told, not an expert witness.  He's not been disclosed as one.  Was Professor Malekan on the list of witnesses that was provided to you earlier?

MR. GIANFORTI:  Yes, yes.

THE COURT:  And what is the purpose of——

MR. GIANFORTI:  I'll tell you my understanding, your Honor.

THE COURT:  No, no, that's okay.  Stay there.

MR. GIANFORTI:  All right.

THE COURT:  Mr. Klein, for what purpose is Professor Malekan testifying?

MR. KLEIN:  He's used Tornado Cash, your Honor.

THE COURT:  What, is he a five-minute witness who's

PY01STO6

used Tornado Cash?

MR. KLEIN:  Very similar to Mr. Van Loon, your Honor.

THE COURT:  I guess I'm trying to understand the purpose of witnesses who have used Tornado Cash who don't admit to being money launderers or fraudsters.  What I mean to say is, are you just going to put on people to say, I have used Tornado Cash, I am not involved in criminal activity, I like privacy, it's cool?

MR. KLEIN:  We have identified Professor Malekan and Tyler Almeida.  Those are the only two people we plan to put on who are Tornado Cash users.

THE COURT:  You've just put on someone who is a——

MR. KLEIN:  Sorry.  Mr. Van Loon.

THE COURT:  That's what I'm saying.

MR. KLEIN:  So three total.  Two additional ones. That's our plan.  They all offer different perspectives.  They all used it for different reasons.  We think it helps fill out the view.  They put on witnesses who misused it, one who didn't even misuse it, apparently afterwards.  So we feel like we have a——we feel it's necessary to our case to put on these users, yes.

THE COURT:  That in very, very short direct testimonies will just say they were users for some time period and used it however often they did.

MR. KLEIN:  Yes.

PY01STO6

THE COURT:  All right.  Let me hear your problem with it, Mr. Gianforti.

MR. GIANFORTI:  Your Honor, the defense has been extremely cagey about the timing of when Professor Malekan used Tornado Cash, so there's an article that we found that they didn't share with us that indicates that he used Tornado Cash maybe twice but after sanctions, and indeed, shortly after sanctions, as a form of protest.

THE COURT:  What sanctions, April or August?

MR. GIANFORTI:  August.

THE COURT:  Is that so, sir?  We don't want to open that up.

MR. KLEIN:  We're not asking him about——

THE COURT:  No, no, no, no, no.  You've got somebody using it after the company is sanctioned, I don't want to hear from them.

MR. KLEIN:  He also used it before, your Honor.

THE COURT:  Are you sure?

MR. KLEIN:  Absolutely.

THE COURT:  We're not going to talk about his use after then.

MR. KLEIN:  We submit we should be able to, your Honor, but he's not going to——

THE COURT:  You, sir, are the reason why we're not talking about August sanctions at all.  You wanted it out of

PY01STO6

the case.  So now you've got it out of the case.  I gave you what you wanted.  You can't be having people talk about this stuff.

MR. KLEIN:  In no way would he bring up the sanctions when he talks about his use of Tornado Cash.

MR. GIANFORTI:  That would be about key context, that he used Tornado Cash after sanctions as a form of protest against the sanctions.

THE COURT:  Really?  Oh, he's not talking about that.

MR. KLEIN:  He wouldn't be talking about that, your Honor.

THE COURT:  No, no, no.  He's not even talking about his uses during that time period.  He can only talk about his use before the sanctions, if his use after is some ridiculous form of protest.

MR. KLEIN:  Your Honor, he used it afterwards, and they're referring to tweets he played.  But he also used it after——

THE COURT:  Which I shouldn't believe?

MR. KLEIN:  Your Honor, I'm not the witness.  I'm not going to speak for him.  But he also used it afterwards.  He teaches a class on cryptocurrency at Columbia Business School.  And I believe his testimony would be——he wouldn't bring up sanctions, but he would talk about his use as a teaching tool for his class, and how he used it and how he taught his class

PY01STO6

about how to use these types of tools.

THE COURT:  As long as that's happening before August of 2022, he can talk about it, but not after.  The bed you made, sir, not me.

MR. GIANFORTI:  Thank you, your Honor.  So we'll accept that proffer from the defense that Professor Malekan may have used it before August of 2022.  But I just wanted to flag another concern, your Honor, with this witness.

THE COURT:  But wait, wait, sir.  Thank you.

MR. GIANFORTI:  Of course.

THE COURT:  Given that I'm cutting that off, you're not crossing him on his tweets about why he's using it in August.  If perchance he has a 2020 tweet about how great or awful or whatever it is, I'm not going to foreclose it, but if I'm keeping it out, I'm keeping it out on all sides, yes?

MR. GIANFORTI:  Yes.

THE COURT:  Don't be stupid and open it.

MR. GIANFORTI:  I'm not a stupid person.

THE COURT:  Okay.  I'll accept your proffer, sir.

MR. GIANFORTI:  Thank you.

THE COURT:  Go on.

MR. GIANFORTI:  Your Honor, the government's other concern about this particular witness is that he appears to be somebody with, shall we say, quite strong views on privacy and the blockchain and all the matters that are core to this case,

and the government has some concern that they're going to try to sort of bolster Dr. Green's proposed testimony through a nonexpert witness, Dr. Malekan. He's written on these subjects.

THE COURT: But if he is in fact using the service because of those expressed views, I think he gets to speak about them. I have the ability to stop if I think it's getting out of hand.

MR. GIANFORTI: I agree with your Honor. Just as long as he's not going to expound upon the, you know, so-called privacy rights at length, I think they can ask the question why he used it, but to turn him into "Dr. Green Version 2" I think would be inappropriate.

THE COURT: We'll see tomorrow. I have to see.

MR. GIANFORTI: Okay. Just flagging. Thank you.

THE COURT: I am so notified, sir.

Something else that you're upset about?

MR. GIANFORTI: Probably, but not right now.

THE COURT: Something else that you're upset about that you wish to communicate to me at this time?

MR. GIANFORTI: The government rests.

THE COURT: If only.

Anything else?

MR. KLEIN: Not from the defense, your Honor.

THE COURT: Thank you, all. And many thanks to our

PY01STO6

court reporters, who have been fantastic.  And again, my thanks to the paralegals who have been great as always, who have helped in making this go smoothly.

We're adjourned.  Thank you.

THE DEPUTY CLERK:  All rise.

(Adjourned to July 25, 2025, at 8:45 a.m.)

INDEX OF EXAMINATION

Examination of:                                        Page

 STEPHAN GEORGE

Cross By Ms. Axel  . . . . . . . . . . . . . .1364

 CONOR O'SULLIVAN

Direct By Mr. Arad . . . . . . . . . . . . . .1406

Cross By Ms. Axel  . . . . . . . . . . . . . .1427

 ANGELICA COTTO

Direct By Mr. Rehn . . . . . . . . . . . . . .1448

Cross By Mr. Patton  . . . . . . . . . . . . .1557

 PRESTON VAN LOON

Direct By Mr. Klein  . . . . . . . . . . . . .1565

Cross By Mr. Mosley  . . . . . . . . . . . . .1570

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 3601-1, 3601-2, 3601-3, 3601-4, 3601-5  . . .1416

 2031, 2031-T  . . . . . . . . . . . . . . . .1471

 2014, 2014-T  . . . . . . . . . . . . . . . .1473

 2121, 2121-T  . . . . . . . . . . . . . . . .1474

 2122, 2122-T  . . . . . . . . . . . . . . . .1476

 2124, 2124-T  . . . . . . . . . . . . . . . .1477

 2127, 2127-T  . . . . . . . . . . . . . . . .1477

 2262, 2262-T  . . . . . . . . . . . . . . . .1479

 2129, 2129-T  . . . . . . . . . . . . . . . .1480

 2130, 2130-T  . . . . . . . . . . . . . . . .1483

2135, 2135-T  . . . . . . . . . . . . . . . . . .1484

2101, 2101-T  . . . . . . . . . . . . . . . . .1485

2261, 2261-T  . . . . . . . . . . . . . . . . .1486

2037 and 2037-T  . . . . . . . . . . . . . . .1490

2120 and 2120-T  . . . . . . . . . . . . . . .1497

2015 and 2015-T  . . . . . . . . . . . . . . .1499

2016 and 2016-T  . . . . . . . . . . . . . . .1501

2017 and 2017-T  . . . . . . . . . . . . . . .1504

2010 and 2010-T  . . . . . . . . . . . . . . .1505

2034 and 2034-T  . . . . . . . . . . . . . . .1506

2043 and 2043-T  . . . . . . . . . . . . . . .1507

2049 and 2049-T  . . . . . . . . . . . . . . .1511

2036 and 2036-T  . . . . . . . . . . . . . . .1514

2059 and 2059-T  . . . . . . . . . . . . . . .1519

2059-1 and 2059-1-T  . . . . . . . . . . . . .1520

2059-2 and 2059-2-T  . . . . . . . . . . . . .1523

2060 and 2060-T  . . . . . . . . . . . . . . .1525

234, 239, 243, 246, 247, 248, 249, 256  . . .1548

2069, 2069-T, 1367, 2039, 2039-T, 2040, . . .1549
        2040-T, 2003, 2003-T, 2004,
        2004-T, 2061, 2061-T, 2062,
        2062-T, 2063, 2063-T, 2006,
        2006-T, 2052, 2052-T, 2295,
        2295-T

2033, 2033-T  . . . . . . . . . . . . . . . . .1550

2041, 2041-T . . . . . . . . . . . . . . . . .1551

2064, 2064-T . . . . . . . . . . . . . . . . .1552

2067, 2067-T . . . . . . . . . . . . . . . . .1553

2050, 2050-T . . . . . . . . . . . . . . . . .1554

2053, 2053-T . . . . . . . . . . . . . . . . .1556

S-6  . . . . . . . . . . . . . . . . . . . . .1451

209-22  . . . . . . . . . . . . . . . . . . .1555

237  . . . . . . . . . . . . . . . . . . . . .1532

238  . . . . . . . . . . . . . . . . . . . . .1534

245  . . . . . . . . . . . . . . . . . . . . .1535

251  . . . . . . . . . . . . . . . . . . . . .1537

553  . . . . . . . . . . . . . . . . . . . . .1538

556  . . . . . . . . . . . . . . . . . . . . .1540

917  . . . . . . . . . . . . . . . . . . . . .1527

923  . . . . . . . . . . . . . . . . . . . . .1528

1303  . . . . . . . . . . . . . . . . . . . .1453

1304  . . . . . . . . . . . . . . . . . . . .1454

1309  . . . . . . . . . . . . . . . . . . . .1467

1345  . . . . . . . . . . . . . . . . . . . .1456

1346  . . . . . . . . . . . . . . . . . . . .1457

1347  . . . . . . . . . . . . . . . . . . . .1457

1348  . . . . . . . . . . . . . . . . . . . .1459

1350  . . . . . . . . . . . . . . . . . . . .1466

1368  . . . . . . . . . . . . . . . . . . . .1468

1369  . . . . . . . . . . . . . . . . . . . .1469

1372 . . . . . . . . . . . . . . . . . . . . . .1517

1376 . . . . . . . . . . . . . . . . . . . . . .1419

1376 . . . . . . . . . . . . . . . . . . . . . .1470

1915 . . . . . . . . . . . . . . . . . . . . . .1451

1936 . . . . . . . . . . . . . . . . . . . . . .1423

1936-A . . . . . . . . . . . . . . . . . . . .1424

2015-1 . . . . . . . . . . . . . . . . . . . .1500

2015-1-T . . . . . . . . . . . . . . . . . . . .1500

2016-1 . . . . . . . . . . . . . . . . . . . .1502

2016-1-T . . . . . . . . . . . . . . . . . . . .1502

2210 . . . . . . . . . . . . . . . . . . . . . .1488

2211 . . . . . . . . . . . . . . . . . . . . . .1496

2320 . . . . . . . . . . . . . . . . . . . . . .1534

3602 . . . . . . . . . . . . . . . . . . . . . .1408

3603 . . . . . . . . . . . . . . . . . . . . . .1409