P7P1STOF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          23 Cr. 430 (KPF)

ROMAN STORM,

                Defendant.              Jury Trial
------------------------------x

                                        New York, N.Y.
                                        July 25, 2025
                                        9:06 a.m.


Before:

                HON. KATHERINE POLK FAILLA,

                                        District Judge


                        APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  NATHAN M. REHN, ESQ.
     BEN ARAD, ESQ.
     KEVIN G. MOSLEY, ESQ.
     TARA M. LA MORTE, ESQ.
     Assistant United States Attorneys

WAYMAKER LLP
     Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
     KERI CURTIS AXEL, ESQ.
     KEVIN M. CASEY, ESQ.
     VIVIANA ANDAZOLA MARQUEZ, ESQ.
     BECKY JAMES, ESQ.

     -and-

HECKER FINK LLP
     Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
     CHRISTOPHER MOREL, ESQ.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

(Trial resumed; jury not present)

THE COURT:  Counsel, you've gotten word from my law clerk and my deputy, and I'll just give you a little bit of the personal communications I've had with the jurors in question.

This morning we received a voicemail from Juror No. 6. We just call him Mr. K because he has a last name that's a little tough for me to pronounce.  And he indicated in that voicemail he was quite sick and did not believe he was going to be able to come in.  We left him messages; he didn't respond.

(Page 1662 SEALED by order of the Court)

THE COURT:  In the midst of all of that, we got a phone call from Ms. Nelson, our Juror No. 11, who has the mom who is turning 90.  The aide did not show up at 7:30, so she called at 8 and I spoke to her, and she said she would call as soon as the aide came.  At 8:20, she called and said the aide was 10 minutes away and that she would leave immediately and it would take her one hour to get here.  There's not been another call so I think she's somewhere on her way here.

I believe my deputy advised me we're missing one juror, Ms. Salto.  She's I'm sure going to be here momentarily.  But Mr. K is not here.

So you have all of the information I have.  Mr. K does not know if he's going to get better tomorrow or the next day.  He just is telling me it would not, it would be dangerous——I'll use that term——and uncomfortable for sure for him to sit today.

So have the parties spoken?  I mean, we have options.  We can go forward.  We have four alternates.  And that's why we have them.  I would also understand if the parties wanted to adjourn till Monday, but again, we don't know what he's going to be like on Monday.  I can't tell you because he doesn't know either.

So have the parties spoken with each other?

MR. KLEIN:  We started to, your Honor, and then——could we have a moment with them.

THE COURT:  Sure.  Can I remain here?

P7P1STOF

MR. KLEIN:  Yes, your Honor.

THE COURT:  Well, no, I don't want to mess up the vibe of your conversations if I stay here.  Go ahead.

(Counsel conferring)

THE COURT:  Counsel, just before you tell me your answers, may I just suggest that I seal that portion of the transcript where I give out the medical information about the juror.  I don't think he'd really want that out there in the public record.

MR. KLEIN:  No opposition from us.

THE COURT:  Madam Reporter, that paragraph that I'm now seeing on the screen is to be sealed, with the consent or nonopposition of the parties.  Thank you.

Is there a consensus view about what to do today?

MR. REHN:  We're waiting to hear back from the defense, your Honor.

THE COURT:  Okay.

Counsel.

MR. KLEIN:  Your Honor, one second.

MR. REHN:  It sounds like we are not in agreement, your Honor, so I could articulate the government's position.

THE COURT:  Sure.

MR. REHN:  So it's the government's position that we should proceed with alternate Juror No. 1 in light of the fact that we have not lost any jurors yet, we're much further along

P7P1STOF

in the trial than we were earlier when we had some juror issues, and we now I think have a lot more confidence. We're not likely to lose three additional ones before this trial concludes. The parties are here. The witnesses are here and ready to proceed. The jury, as we understand it, is shortly to be here, expecting to proceed with trial, and so it's our view that it would be appropriate to proceed.

THE COURT: Mr. Klein.

MR. PATTON: Your Honor, I'll——

THE COURT: Mr. Patton.

MR. PATTON: The reason why we were caucusing was because we were trying to sort out scheduling of witnesses and trying to make sure that if we were to push this, that we would be okay, and we do think we'd be okay.

The reason we'd like to wait on Juror No. 6 is, in part, we're getting a late start and having an early finish today.

THE COURT: We still would get four hours of trial time.

MR. PATTON: We would. We would. But we just think we'd like to stick with the 12 that we initially picked. And so we'd like to give it a chance, if this is a stomach bug, hopefully that's something that resolves well before Monday.

THE COURT: But are we agreeing, sir, that if he's not here Monday, we go forward?

P7P1STOF

MR. PATTON:  Yes.

THE COURT:  Now what happens if another juror has a stomach bug on Monday?

MR. PATTON:  I think that starts to tip the scales in favor of moving forward.

THE COURT:  Then why does this juror today not tip the scales and another juror does?

MR. PATTON:  Just purely because of the timing, your Honor; that we have moved pretty quickly, today wasn't going to be a full day, and honestly, we'd also appreciate the additional time.  But——

THE COURT:  To shorten your directs?

MR. PATTON:  Exactly.

THE COURT:  Well, you'll excuse my skepticism.

Mr. Rehn, you're not changing your position, I understand.

MR. REHN:  No, your Honor.  As we discussed, it's unpredictable what will happen on Monday.  It would be sort of——we're ready to proceed, and if we continue to lose time like this, we're going to run into a lot of the constraints that the Court and the parties are all aware of in terms of scheduling.

THE COURT:  Mr. Patton, you're aware we have a chance of finishing next week.  We largely lose that chance because we do not sit on Friday, and with that, you still want to wait

P7P1STOF

till Monday.

MR. PATTON:  Yes, your Honor.  I mean, I think there is still a chance we could finish it next week, but the big wild card in that, obviously, is whether or not Mr. Storm testifies.  If Mr. Storm testifies, then we would not finish next week.

THE COURT:  I think you need a full day for summations and I would need two hours to charge the jury, so I would need all of Thursday, and I don't think it happens.  But that's not dispositive of the issue.  But again, I'm hearing you say if Mr. K or any other juror is sick on Monday, we go forward, yes?

MR. PATTON:  Yes.

THE COURT:  Mr. Rehn?

MR. REHN:  Your Honor, we would still suggest that we do go forward today.  We think that, you know, one juror has already been inconvenienced to get to court.  The parties are ready.  And we do have serious concerns about this trial spilling into a fourth week in the event that we don't proceed today.

THE COURT:  I respect your concerns because it very much complicates my life, and yet that is in fact what I told the jury, that they should expect this trial to be four weeks, so I don't think that's the issue.  I have the commitment from the defense.  Is it a commitment from the government as well that if we have a juror who is out sick on Monday, we're going

P7P1STOF

forward?

MR. REHN:  We would expect so, your Honor.  I mean—

THE COURT:  Thank you for not committing.  Mr. Patton has committed.

All right.  Look, I appreciate it.  I would prefer to go forward, but I did speak with my deputy, who knows all things about people, and my concern is a little bit different than your concerns, which is, how angry will this jury be when I go into that room and tell them that we're not sitting today, and my very sagacious deputy has suggested that on this record, they would not be upset.  But do it again, they'll be livid.  And I do feel for Ms. Nelson, who moved heaven and earth to get here this morning, only to be told to turn around.  But today I will agree with the defense and we will adjourn for the day.  But I'm not making that decision on Monday.

MR. PATTON:  We wouldn't want to delay it on Monday.

THE COURT:  All right.  Your love for Juror No. 6 is noted on the record, sir.

I presume I have the parties' approval, or at least nonopposition, to go in and tell the jury a much shortened version of what I've told you and to indicate that we'll be meeting again on Monday.  We'll have a full day on Monday, and maybe we'll go a tiny bit later.  I mean, remember, they won't be happy to go later because of this because they all came down.  But all right.  I have your nonopposition, correct?

P7P1STOF

MR. REHN:  Yes, your Honor.

MR. PATTON:  Yes.

THE COURT:  All right.  I'm going to do that now because they should not be delayed any further.  And I wish I could call Ms. Nelson and tell her to turn around, but we'll see what we can do.

Should I speak to the jury and then come back and discuss legal matters with you all?

MR. KLEIN:  There are a few, your Honor, that are probably worth handling while we're here.

THE COURT:  Fine.  But you'll have to wait, because they go first.  So I'm going to talk to the jury now and then I'll come back in a few minutes.  Thank you.

THE DEPUTY CLERK:  All rise.

(Recess)

THE COURT:  Please be seated.  Thank you.

The jurors appreciated the information.  I conveyed your wishes for good weekends.

And so I understand that there are legal issues to raise.  Mr. Klein.

MR. KLEIN:  Yes, your Honor.  There's a couple on the defense side.  One is an issue that we discussed yesterday with Special Agent George's testimony—

THE COURT:  Yes.

MR. KLEIN:  —and the data.  So last night we received

P7P1STOF

from the government a workbook of Excel spreadsheets that contain ten different spreadsheets with about 75,000 lines of data, cells of data.  It relates to his testimony on Binance. And so the defense is moving——and this goes to Rule 705.  The defense is going to move to strike the portion of his testimony dealing with Binance.  And we've also requested that the government double-check his data for the Lin tracing since we didn't have this data.  They told us this morning they had——

THE COURT:  One moment, please.  This isn't related to the Lin tracing, this is the Binance tracing.

MR. KLEIN:  Yes, your Honor, it's the Binance tracing.

THE COURT:  I see.  And you've asked them to double-check on Lin.  Okay.  Thank you.

All right.  Perhaps we'll take these seriatim.  Who on the government's side wishes to explain why this material was produced so late?

MR. MOSLEY:  Yes, your Honor.  That material was produced to us like shortly before we produced it to the defense.  We had not received that data from Special Agent George prior to his initial disclosures.  My understanding of this was that he did some work to check his work prior to testimony and he did not reveal that to us, so we found out about it when everyone else did, and he produced it to us on request and we immediately produced it to the defense.

THE COURT:  Is it in fact ten spreadsheets of 75,000

P7P1STOF

lines of data?

MR. MOSLEY:  I believe that might be correct.  I think that's right.  Let me check one thing, your Honor.

MR. KLEIN:  Your Honor, I have the printout of the QuickBooks tab.

THE COURT:  All right.  I don't think that's the biggest issue.

MR. MOSLEY:  It is that long, your Honor.

THE COURT:  Mr. Mosley, I don't want to necessarily obtain communications or accounts of communications that I'm not entitled to, but I'm trying to understand still how it could be that you asked the agent for his work product in order to hand it over either as part of the expert disclosures or as 3500 material, and you didn't get this thing.  I mean, I presume you made a request that would have covered this set of spreadsheets, yes?

MR. MOSLEY:  We did, your Honor.

THE COURT:  Okay.

MR. MOSLEY:  He just did this work on his own and we didn't know about it.

THE COURT:  I understand that.  But did he do it the day before he testified?  Did he do it—give me the time period within which it was done.  It's one thing if, for example, he said, well, actually, I did it on the way home after testifying to make sure what I said was correct.  Then I wouldn't expect

P7P1STOF

you to have it.  If he did it the day before, I might understand how he may have forgotten to hand it over to you.  But if it was done contemporaneously with the materials you did produce, I'm not sure why.  Because it's Binance; it's not the Lin stuff he was asked to do late in the day.  Why wouldn't he have given it to you?  I don't understand how it happened.

MR. MOSLEY:  I can't make a representation about what he was necessarily thinking.  What I understand from Special Agent George is that I believe that he did this work in late June time frame and just decided to check his work one day and thinking about doing his preparation, his own sort of internal preparation for trial, and he didn't tell us that he'd done that.

THE COURT:  All right.  Mr. Klein, is there any more record to be made on this point?

Mr. Mosley, apparently there is?  One moment.

MR. MOSLEY:  Just one thing on the length of the spreadsheet, your Honor.  I think that the vast majority of that—the vast majority of that spreadsheet—one moment, your Honor.

THE COURT:  Be careful what you say.

MR. MOSLEY:  The vast majority of that spreadsheet is the same as what he—

THE COURT:  Sir, stop, stop.  Have you reviewed the spreadsheet in its entirety before making this representation

P7P1STOF

to me?

MR. MOSLEY:  I haven't looked at every single, like, cell in the spreadsheet.

THE COURT:  Okay.  My point, sir, is, you're about to say the vast majority of the spreadsheet is something, but unless you have firsthand knowledge of this, I'm a little bit skeptical of that.  So what is it you were about to tell me?

MR. MOSLEY:  My understanding from Special Agent George is that there is an additional tab or there's additional data that relates to the Binance trace that goes from the three initial wallets that were transferred into and there's an intermediate trace that was done between that and the Binance account.  The beginning of that trace and the end of that trace, which would have been represented on the——I believe the first slide that Special Agent George had in his demonstrative, are the same.  The middle is slightly different.  But there is nothing in terms of the underlying data, as I understand it, that is different from the first part of that trace and the end of that trace.  So striking his testimony with respect to either of those things I think would be improper, as it would for the Lin trace.  But to the extent that there is a question about the middle part of that, I think the proper remedy here would be to re-call him.

THE COURT:  You're saying the beginning and the end of his analysis——

P7P1STOF

MR. MOSLEY:  Of the——sorry.

THE COURT:  The beginning and end of his analysis are the same, and at most it's the middle portion of his analysis that is changed, or did it not change?  You just don't know?

MR. MOSLEY:  It did not change.  And to be clear, this is the first part of that trace.  There were four slides, and it's that first slide from the beginning of the creation of the TORN tokens that ends in a deposit into the Binance account.  The beginning of that and the end of that are the same.  And I think the middle is the same.  But the data, you know, was placed into that spreadsheet and was recently produced to the defense.

THE COURT:  All right.  Now, Mr. Klein.

MR. KLEIN:  Your Honor, he did this tracing we believe at the same time he did the tracing of the car and the house.  We got detailed spreadsheets for those, your Honor, to be very clear.

THE COURT:  But please excuse me.  Now I am confused.  I'm understanding the data that was produced to you yesterday to relate to the Binance tracing.  Am I still correct?

MR. KLEIN:  You are, your Honor, but originally he was disclosed to talk about a number of things, if you remember.

THE COURT:  Yes, I remember.

MR. KLEIN:  There was the house and the car——

THE COURT:  Yes, sir.

P7P1STOF

MR. KLEIN:  ——and it tied that to——and the Binance also.  We believe he did this at the same time he did those tracings, and those we got very detailed reports on, and that's what Ms. Axel was ready to do her cross on.  She spent a lot of time with this agent yesterday trying to do a cross with him about these Binance records, and we were missing, again, ten spreadsheets with 70,000 plus lines of data.  And so, you know, she asked him for it.  We only got it last night.  You know, they could have received this three weeks ago and given it to us, and we didn't get it, and so it's totally hampered the cross-examination of a key witness for us.

THE COURT:  I understand, sir.  Okay.  Thank you.

All right.  This is something that I will have to think about.

Mr. Klein, what is your second issue?

MS. AXEL:  Oh, it's my issue.

THE COURT:  Ms. Axel?

MS. AXEL:  Thank you, your Honor.

I think the issue was, your Honor, there was a discussion yesterday about the time period of the case, and I think that obviously there were cross-motions on the sanctions issue, and your Honor resolved that issue, concerning sanctions not being mentioned, but there was not a motion that said that all facts in the case needed to end as of 8/2022, and that's been sort of——

P7P1STOF

THE COURT:  You're seeking to reargue my decision yesterday about what your witness Professor Malekan can testify to.

MS. AXEL:  No.

THE COURT:  Good.  Good.  Because that's what I said to my law clerk.  I said I'm not going to reargue that motion. Tell me then what you're going to argue instead.

MS. AXEL:  So there are two narrow facts pertaining to the testimony of Dr. Hurder and Dr. Edman that do pertain to post-August 2022 facts, and those particular facts, narrow facts that we would like to elicit from these witnesses first pertain to the operation of the UI.  It has already come in evidence that the Alchemy and Infura contracts were terminated by those companies and therefore the UI did not have a means of accessing an RPC node, at least one that was paid for by somebody else, but in fact, in the post-August 2022 period in fact, you know, simply the community modified the UI and people were able to use their own RPC nodes or to use a free RPC node, and I think——

THE COURT:  Why does this matter, please?

MS. AXEL:  Your Honor, maybe can I go ahead to the second thing I'd like to get in and then——I think the relevance pertains to both, so I think that's the reason I would like to do that.

And the second point is that Dr. Edman produced the

P7P1STOF

data and a summary chart but Dr. Hurder would speak more about it, and it's that the DAO was an active community post——she's not going to distinguish between pre- and post-8/22.  She's just going to talk in general about it being an active community and continuing to be an active community, even more of an active community over time, as in recent time periods there have been hundreds of thousands of votes in the DAO for certain actions.  And I think, your Honor, these are relevant to several issues in the case.

The first is, you know, the claim that the remedy that was chosen would not be effective, why it is that Mr. Storm believed that it would not be effective, and that has to do with the active nature of this community, and the fact that the DAO already controlled, for example, the router contracts, and an active DAO like that, the experts will tell you, is made up of lots of people who are themselves developers.

THE COURT:  But why do we have to talk about whether it remained active after the Infura and Alchemy contracts were terminated?  Why do we have to talk about that?  The indictment charges conduct that ends in early August of 2022.  Why does it matter if the DAO is today active?

MS. AXEL:  Because it pertains to the belief that in fact if the community did not like what was being done, it would simply do its own thing, as it has, and I think there are several pieces of evidence that the government has put in

P7P1STOF

that's relevant to that.  For example, we just heard the Dragonfly evidence, where someone from Dragonfly said, you know, no one's going to build——no one's going to use this other thing if you build it.  That is a statement about the community and what the community is like and how they are active and knowledgeable and able to create their own solutions.  And the experts will tell you, that is exactly what happens in the DeFi community.  If someone doesn't like your UI, they pop up another UI, because you've open-sourced your code.  Anybody can use it.

And so it's also directly relevant to Mr. Werlau's proposal that the founders could have simply ignored the DAO, which controlled the router, and popped up some other router. With an active DAO like this, like, that's just not going to work.  The DAO is going to say, no, we control this router, and we're going to find a solution to continue the way we want to go.  So, you know, you can't just start to do something different when you have an active DAO.

THE COURT:  It sounds like what you're saying is, the return of charges in this case, the arrest of Mr. Storm, didn't impact Tornado Cash because there's the DAO that remains in place to govern it.

MS. AXEL:  I'm not going to put in that evidence, your Honor.  I'm putting in this very specific thing about the UI and the RPC nodes and the active DAO community, as relevant——

P7P1STOF

THE COURT:  Once again, the active DAO community, doesn't matter whether it's active after August of 2022.  I think you could say that during the time period in question, which is what we've been focused on, that it was an active community.

But, all right.  Let me please hear from the government.

MR. ARAD:  Your Honor, the proposed testimony opens up a host of factual questions over the course of a years-long time period that postdates the relevant period in this case, and looming over all of those issues of fact in various ways will be the fact that sanctions were imposed on August 8th and then lifted after the *Van Loon* decision.  It won't be possible to address these issues adequately with the jury without opening up that can of worms.  And I'll just get to a couple of examples, your Honor.

We just got these charts recently so I'm trying to interpret them now, but what I see is, in October of 2024, which is right after the *Van Loon* decision, there is what appears to be an enormous spike in the number of votes cast on proposals by the DAO and another one shortly thereafter.  I don't know how that could possibly be explained without showing that the DAO seems to have become more active after sanctions were lifted.  I don't see how this is really relevant to the case, but if it comes in, that explanation needs to come in

P7P1STOF

also.

I also just want to address sort of the fundamental I guess irrelevance of this evidence. My understanding is that the defense intends to argue to the jury that because at some point the founders gave control to the DAO, the DAO could have controlled portions of Tornado Cash at any point in time. That simply doesn't make sense. Even if it did, the only evidence of that is control that the DAO exercised after the imposition of sanctions, which, for all the reasons that I've already discussed, raise a host of problems in this case.

So I'll pause there, your Honor. I mean, there could be more to say about this because it's such a big can of worms, but I'll go wherever the Court would like.

THE COURT: No. I'm not allowing these two facts, these two narrow facts to come in. I don't want to hear evidence at this trial about stuff after August of 2022.

So let's please go to the next issue that the defense has. And there may be none, and that's great.

Ah, Mr. Patton. Wow. Everyone's taking one today. Go ahead, sir.

MR. PATTON: Your Honor, I just want to come back to the issue of Tom Schmidt, who was the Dragonfly executive. We've seen a lot of chats in the evidence that the government's put in involving Mr. Schmidt. There's also the venue issue with Mr. Schmidt. We would like to call him as a witness. His

P7P1STOF

attorney has told us that after conversations with the government, he is going to assert the Fifth. We don't think that there is a reasonable basis for that so we want to (A) alert the Court to that issue. We're going to have to determine whether or not there is a reasonable basis for him to assert the Fifth.

THE COURT: Well, let me understand that first part, because we were talking about the fact—and this was also in connection with Chainalysis, and I don't know if you have an analogous argument for the Chainalysis witness you may or may not be calling.

I would be interested, in broad terms, in understanding the government's communications with Mr. Schmidt and whether only recently he understood that he might have some Fifth Amendment exposure. I don't know that to be the case. But if you think he has no chance, he has a minimal likelihood of criminal exposure and his attorney thinks otherwise and he accepts his attorney's advice, I want to understand what it matters from your perspective. I mean, I had heard rumors that you were going to seek to have me force the government to grant him immunity.

MS. JAMES: That would be the second piece of this, yes.

THE COURT: Well, what's the first piece of it then?

MR. PATTON: The first piece is that he simply doesn't

P7P1STOF

have——

THE COURT:  And who tells him that?

MR. PATTON:  Your Honor would.

THE COURT:  I wouldn't presume.  How would I know?

MR. PATTON:  Your Honor, I think based on the timeline of events, we have someone who made an investment in Peppersec in August of 2020, so just about five years ago, who has been out there for the government to know about for many years now, certainly during the entire life of this case.  There's just no realistic possibility that he faces charges in connection with the events at issue in this case.

THE COURT:  But please understand, sir——and I'm not pushing back.  I really want to understand this.  Are you suggesting that, what, I issue an order?  I call up his attorney and say, hey, I disagree, I don't think he has a chance of criminal exposure?  I mean, this is what I want to know.  Part two is the compelled immunity order, which I've been doing my own research on.  But what does part one look like?

MR. PATTON:  Part one is just that he's required to testify.

THE COURT:  No.  And that I make a preliminary finding he has no likelihood of criminal exposure?

MR. PATTON:  Let's take a different example that's sort of clear-cut.

P7P1STOF

THE COURT:  Please.

MR. PATTON:  Let's say we subpoenaed a witness who had nothing to do with the underlying facts of this case at all and they just decide they don't really want to testify and they're going to assert the Fifth.

THE COURT:  Right.  Now that I do understand, but okay.

MR. PATTON:  So the Court is capable and empowered to make a decision about whether or not somebody has a reasonable basis for asserting the Fifth and declining, pursuant to a subpoena, to testify.  When we've called somebody as a witness, they are compelled to testify.  They need to make some showing that there actually is a basis for asserting the Fifth.

THE COURT:  Assuming the government disagrees with you, are they obligated to put on the record every detail that they believe supports it?  Would you allow me to have an *in camera* discussion with them about why—because I'm certainly not at this moment in a position to tell Mr. Schmidt he can, should, whatever testify.

Also, may I just know, just for informational purposes, is his counsel a New York counsel, someone in California, someone somewhere else?

MR. PATTON:  Based in California, your Honor.

THE COURT:  All right.

MR. PATTON:  But he is here in New York at the moment

P7P1STOF

because we have a second Dragonfly witness to go to just very basic facts about Dragonfly. We're hoping to work out a stipulation on that in lieu of that testimony with the government, and we've been—

THE COURT: Seems unlikely, but okay.

MR. PATTON: Actually, it may not be, your Honor. It would be a very straightforward stipulation that the government has said they are open to in theory. So we're hoping to work something out on that.

THE COURT: The fact we're having this conversation suggests you guys can't work that out. But okay. Would you agree with me, sir—and the answer may be no—that I am not in a position today, at this exact moment, to know whether Mr. Schmidt has exposure or not?

MR. PATTON: Absolutely, your Honor. I think it would require some amount of *prima facie* fact finding, so that was more the alert.

The second piece is requesting the immunity. We have asked the government to grant him immunity.

THE COURT: Just give me a moment on that, please. Thank you.

You're not arguing discriminatory use of grants because there have been no grants. You're arguing overreaching, sir?

MR. PATTON: That's right, your Honor.

THE COURT: I see. All right. Do we both know what the case law is in this area? I mean, do you want me to start quoting cases? I will because I can. *United States v. Turkish*, 623 F.2d 769 (2d Cir. 1980); *United States v. Guzman*, 332 F. App'x 665 (2d Cir. 2009); *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006); *Blisset v. Lefevre*, 924 F.3d 434.

I guess there are more. *United States v. Stewart*, 907 F.3d 677 (2d Cir. 2018); *United States v. Melendez*, 2022 WL 3640449 (2d Cir. Aug. 2022).

Those are the cases, obviously, I've been looking at, sir. I just want to understand the arguments factually. You're arguing government overreach.

MR. PATTON: Those are the line of arguments. And your Honor, I'm not texting while arguing.

THE COURT: I did not think you were, sir.

MR. PATTON: I am looking on my phone at the same rough line of cases you've been referencing.

THE COURT: Okay. So we have the same understanding of the legal framework in which I operate.

MR. PATTON: Yes, your Honor. Yes, your Honor.

THE COURT: Okay. And I can take away the discriminatory use because we're not arguing that. You're arguing government overreach. And I think you were starting to tell me that, sir, which is the investment was in 2020, government's known for many years. Let me understand if there

P7P1STOF

are additional factors that you believe go to the issue of government overreach.

MR. PATTON:  Yes, your Honor.  This is somebody who was at a fund that invested in Peppersec.  And the government has known about Dragonfly and the people particularly involved——Mr. Schmidt, others——and it's just not credible to think that if they were going to bring charges, that they wouldn't have already brought them and that they've never sent, to our knowledge, Mr. Schmidt any sort of target letter or subject letter or made any moves toward charging him in any way, and certainly Mr. Schmidt's counsel hadn't heard that until we began talking to him.  I can probably nail down the dates, but we're talking about in the past, say, two months or so, when we heard from his counsel that there were murmurings that maybe he is the subject and maybe he does have some exposure, and it seems to us that that was really occasioned by the fact that we might call him as a witness.

THE COURT:  Okay.  I don't want to cut you off if there are other things you want me to know.

MR. PATTON:  No, your Honor.

THE COURT:  Okay.  Just a couple of other thoughts, sir.  Have you found a case where government overreach was found?  You keep talking about it.  I don't know that I've seen one.  Doesn't mean I'm not going to look, but I just don't know that I've seen one.

P7P1STOF

MR. PATTON:  Not off the top of my head, your Honor, but we can certainly submit something.

THE COURT:  No, no, no.  We're capable of legal research too.  My question then is, on the informational front, I mean, the government will make whatever proffer it makes here in open court, but—and I'm asking this because I don't know the answer—do I get to have an *in camera* discussion with them so that I don't say something stupid and say he doesn't have exposure when he does?  Or you think I could not do that?  I genuinely don't know.

MR. PATTON:  I'm just trying to clarify.  An *in camera* discussion with the government to get their view?

THE COURT:  Exactly.  You know, you talked about the case where someone just didn't want to testify and made up a Fifth Amendment concern that didn't exist, and actually we probably both have seen those exact cases.  What I'm talking about is something a little bit different, which is, I'm interested in finding out the bona fides of the government's claims, but I'm also not interested in compromising an investigation if one exists.  So what I'm saying is, they'll say what they say on the record, but if there is something going on that would compromise the investigation, is it appropriate for me to learn about it *in camera* or is it appropriate for them to say to me, look, Failla, we have an ongoing investigation, we just can't tell you about it, and it

P7P1STOF

ends there?

MR. PATTON:  Your Honor, I have concerns about us not being able to test those assertions.

THE COURT:  Fine.  Okay.  So that says no to *in camera*.  If they say to me——I'm not saying they will, but if they say to me, look, we have an ongoing investigation that, thanks to your discussions with Mr. Patton, we're just not going to tell you about, then that may be where I am.

MR. PATTON:  Your Honor, of course wherever the Court lands, the Court lands.  We don't think that there is a realistic chance, given the amount of time here and the role of Mr. Schmidt in all of this, that that is in fact the case.

THE COURT:  Fair enough.

Okay.  Someone at the government table who's going to speak to that?  Thank you.

MR. REHN:  Yes, your Honor.

(Pages 1689-1691 SEALED by order of the Court)

THE COURT:  Something else, sir?

MR. REHN:  I don't think there's anything else I can say beyond what I've said.

THE COURT:  Mr. Patton.

MR. PATTON:  I don't have anything additional for the Court.  We're happy to submit something if the Court——

THE COURT:  No.  You have other things to work on. I'll look at this and see if there is something I should be doing about it.

All right.  Is there a fourth issue from the defense? I'm not asking you to make one up, Mr. Klein, I promise.  I just want to know so I know when I can actually get off the bench and do work.  Go on.

MR. KLEIN:  Just, we're hoping to work out a stip on the remote witness.  And there's no other issues today, your Honor, no.  Not that I'm aware of.

And our witness list for Monday, I'm sure you're going to ask us.

THE COURT:  I am.  Before we get there, I will ask that, but, all right.

Mr. Arad, a chance?

MR. ARAD:  We talked yesterday about a stip.  We raised the possibility, your Honor.  We've talked about a particular aspect of the stip that will be problematic for the government, and I understand from the defense, just this

P7P1STOF

morning, that it will be in the stip.  So——

THE COURT:  So there will be no stip.

MR. ARAD:  If it's in the stip, I think there is not likely to be one.

THE COURT:  Okay.

MR. ARAD:  So I just wanted to sort of give the Court an update on that.

THE COURT:  Just because this trial will eventually come to an end, let me understand this, please.  Let's imagine there is no stip——and you really do have to communicate better, both sides, so that you're not hearing things for the first time using me as the intermediary——is the government going to object to this witness appearing remotely?  I don't know what the issue is, and we're not going to put it on this record.  You can tell me at some point.  Because in my lifetime as a judge I have had remote trials during the pandemic.  I have had a remote witness in a criminal trial a couple of years ago.  It was the defense expert witness and it was because she contracted COVID the day before she was scheduled to testify, and she testified remotely as a result.  Is there an objection to this witness testifying remotely?

MR. ARAD:  There may be, your Honor.  Before the issue of remote testimony, there will be an objection as to the scope of this witness's testimony and its relevance, and that is the issue underlying why the stipulation may not come to pass.

P7P1STOF

There is a stipulation that the government is willing to sign, and there's a certain stipulation that it's not. And it depends on the amount of information that comes in and whether that comes in through stipulation or through testimony, live or remote, that's really the core issue here.

THE COURT: Okay. But it sounds like there is some core to which you're willing to agree and that would be done by stipulation, but if you can't stipulate, if you can't agree to a stipulation, you're not agreeing to this witness testifying, you're moving to challenge the scope of the testimony to the extent it exceeds what you're willing to stipulate to.

MR. ARAD: That's accurate.

THE COURT: You really do need to talk to each other and let me know.

MR. ARAD: And I just want to make clear for the Court, we have discussed this very issue. I don't think that anything about this is new to either of us.

THE COURT: No. It's only new to me. But I need to know because as you're all well familiar by now, if they don't have a witness, they have to rest. And so they need to know, so they need to know whether there's going to be motion practice.

Just let me ask this while I have your attention. Assuming I agree with the defense on scope. Are you then going to put up a roadblock to having the witness testify virtually?

P7P1STOF

MR. ARAD:  That's something we'll have to discuss, your Honor, because the effect of virtual testimony depends in part on the nature of the testimony, and so if——

THE COURT:  But this is a 10-minute witness, isn't this?

MR. KLEIN:  It's a very short witness, your Honor.

MR. ARAD:  It is a quick witness, your Honor.  And again, I'm not saying we necessarily will oppose.  It's just something I have to discuss with the team.

THE COURT:  As you might figure out, I'm not interested in creating reversible errors, so I'm trying to get the attorneys to agree wherever possible.  I am saying that with the consent of the parties, I have in fact had one witness in a trial with otherwise in-person testimony.  One witness on consent testified virtually.  The case, if you need it for your office, is *United States v. Cristobal*.  It was a drug distribution case, pill mill case, where the defense expert had COVID.

So what I'm saying is, you may not agree on the scope, and that's what I'm here for, but just consider, based on what's been intimated by the defense, allowing it remotely and letting me decide the scope issue.  But of course you'll do what you do.

MR. ARAD:  Got it.  Understood.

THE COURT:  Okay.  Thank you so much.

P7P1STOF

All right.  Mr. Klein, that's it on——don't sit down just yet, sir.  That's it on that witness, correct?

MR. KLEIN:  Yes, your Honor.

THE COURT:  Okay.  And I will ask you your witness list in a moment, but on the Chainalysis issue, have you worked out a stip with the custodian at Chainalysis?

MR. KLEIN:  We have, and I believe we sent it this morning to the government.

THE COURT:  Okay.  Well, this morning, of course, they've been here.  Okay.  So——

MR. KLEIN:  We just got it worked out late last night with the company and then we sent it to the government this morning.

THE COURT:  Okay.  That's on the issue of the custodian and certain records, and I'm sure I'll be hearing from the parties this weekend on that.

Is there an intention presently to call a Chainalysis person as a witness?

MR. KLEIN:  If we don't have a stip, your Honor, then yes.

THE COURT:  Fair.  And I should have asked a better question.  The Chainalysis records will be resolved either by stipulation or by a custodial witness; is that fair to say, sir?

MR. KLEIN:  There's actually two witnesses, your

P7P1STOF

Honor.

THE COURT:  I know.  It's the other one I want to talk about.  Is there a percipient witness you're planning on calling from Chainalysis?

MR. KLEIN:  It we don't have a stip, there is both a custodian and a percipient witness.  We are deciding to call one or both.  We kept them both under subject of the subpoena, so we haven't made that determination.  We are hoping to resolve it by a stip.

THE COURT:  Okay.  Why I'm asking, sir, is, the first time I heard about compelling immunity was in the context of the Chainalysis witness.  Or I think I heard about both, about Mr. Schmidt and about the Chainalysis witness.  Counsel Mr. DeFilippis I thought had made comments to you all.  So is that issue resolved?

MR. KLEIN:  No, your Honor, because Mr. DeFilippis only learned it the night before the morning I told you about it, so that was a new issue to us.

THE COURT:  Sure.  But we've had, what, 30 hours since then, so do we know now?  That's still a live issue.

MR. KLEIN:  It's a live issue, your Honor.  I don't think it's been resolved.  And again, it ties into the concern with what Mr. Patton was discussing, which was—

THE COURT:  Government overreach.

MR. KLEIN:  Yes.  Which is calling similar witnesses

P7P1STOF

and they're learning they could potentially be prosecuted the last minute.

THE COURT:  I won't speculate that they're only learning it at the last minute.  You're only learning it at the last minute.  But I can't subscribe to that without knowing more.

Your Monday witnesses, are they the same as your Friday witnesses, or have they changed?

MR. KLEIN:  The plan is to call Mr. Edman; the plan is to call Professor Malekan with the narrowing.

THE COURT:  Yes.

MR. KLEIN:  The plan is to call Dr. Stephanie Hurder.  The plan is—and I may be mispronouncing his name—Guy Wuollet.

THE COURT:  Spell it please, sir.

MR. KLEIN:  W-U-O-L-L-E-T.  He is another venture capitalist at a16z, your Honor.

THE COURT:  And he's testifying about?

MR. KLEIN:  They did not make an investment in Tornado, in Peppersec, but the reasons they didn't are relevant to the government's case, so they were—and I can explain, your Honor.

THE COURT:  Yes, because right now I'm thinking I don't see why these people are relevant, and I'm sure I'm going to get a motion from the government later today about this.  Go ahead.

P7P1STOF

MR. KLEIN:  They've known about him.  In fact they marked an email as an exhibit.  And it's an exhibit we had given to them that we wanted to put in.  Basically a16z did not invest in Peppersec, but one of the main reasons they didn't——and they did diligence——was that they did not have a relayer registry.  And the government has made a big issue about, just yesterday, with the Rule 29, about how this relayer registry is the start of the criminality and their theory, at least for some of it, of this case.  And so we think this is directly relevant to rebutting some of the government's positions in this case.

THE COURT:  Okay.  Short witness, though, it sounds like.

MR. KLEIN:  Short.

THE COURT:  Okay.  And anyone else contemplated for Monday, sir?

MR. KLEIN:  Yes, your Honor.  We had——

THE COURT:  Off the record.

(Discussion off the record)

MR. KLEIN:  We had not anticipated obviously not going today until this morning.

THE COURT:  So you made the choice.  We're doing this for you, sir, so go on.

MR. KLEIN:  I understand, your Honor, but until, like, early this morning when we got the email, we didn't know that

P7P1STOF

there was a possibility of not even going today.  So we had plotted out today and we had plotted out Monday.  And we weren't sure if Dr. Hurder would go all through the day, and we thought she would spill over into Monday, and so we were thinking about that.  So there are other witnesses for Monday.  Tyler Almeida.  I mentioned him the other day.

THE COURT:  You did.

MR. KLEIN:  It is possible we'll get to Dr. Green.  Again, I don't know how fast we're going to go.  That's a full day, your Honor.

THE COURT:  I agree.  No, no, no.  That's six witnesses.  God bless us if we get through all of that.  But we have done five in a day because everyone's crosses are so surgical.

Okay.  So I've now got six listed.  That's the plan, those six.

MR. KLEIN:  That's the plan, subject to——we have to talk to people about travel issues.

Oh, sorry, your Honor.  There was one person today, Andrew Thurman, we added last night because of a travel plan.  He's a reporter for CoinDesk.  He knows a lot about that discussion about forwarding and the one text.  He's the one who wrote that message.  The government and the defense just this morning are discussing at least the possibility of a stipulation, so I hesitate to say that, you know, but he would

P7P1STOF

be also a very quick witness.  In our basket of quick witnesses, your Honor, this is one of those.

THE COURT:  Okay.  All right.  And then would you imagine you'd be ending with Dr. Green as your last witness, unless your client testified, or is there someone else?  And I understand, sir, that's all subject to Mr. Schmidt and Mr. or Ms. Chainalysis.

MR. KLEIN:  Your Honor, it depends on the issue with Chainalysis, of course——

THE COURT:  Of course.

MR. KLEIN:  ——it depends on what you decide about Mr. Schmidt, and it also depends on——we are contemplating a witness to rebut the Lin tracing——an already disclosed expert, to be clear——and submitting an additional disclosure to the government today about this.

THE COURT:  I'm sure they're well aware.  Okay.

MR. KLEIN:  And again, we'll see how things go, but there may be one or two others, but they would be short.

THE COURT:  I have in from your team everything you want me to have regarding the charge?

Yes.  Ms. Axel says yes.  Okay.  Fine.

I'm getting a letter from the government today on the charge——in particular, Count Three.

Just so I know, right now, sir, do you contemplate any motions that you're sending my way?

P7P1STOF

MR. KLEIN:  There's no motion being drafted right now, your Honor.

THE COURT:  Exactly.  And I understand the things that are in play right now with respect to stipulations.

MR. KLEIN:  There's nothing in the works, but that could change.

THE COURT:  Things can change.  I understand.

Mr. Rehn?  You now have this witness list.  I'm assuming there's going to be some motion regarding scope.

MR. REHN:  Yes, your Honor.  We could address a couple of issues with respect to Mr. Wuollet now or we could raise them at some point before he takes the stand.  But in short, the time period in which he declined to make that investment is a year prior to the introduction of the relayer registry.  So there's no relevance to it with respect to the proffered basis that was just offered from the defense.

THE COURT:  I'm just thinking.  This is a hot take, if you will, sir.  If all he's going to say is:

"I'm a venture capitalist."

"Did there come a time when you looked at Peppersec?"

"Yes."

"Were you thinking about it as an investment?"

"Yes."

"Did you decide to invest in it?"

"We made a decision not to."

P7P1STOF

"Why not?"

"Because they didn't have a relayer registry."

"What's a relayer registry?"

"It's this."

And it ends:  "When was that?"  "2021."

I don't think I've written your direct, sir, but I'm hoping it's that length.  Mr. Patton.

MR. PATTON:  It's not far off.  It would be very similar to that.  I think there is a little more context that would be important.  And to the extent that the Court would like to look at specifically what we're talking about, this is Government Exhibit 3301 that was marked but not introduced. And I think you'll see from the face of it why it matters, why it's highly relevant to Mr. Storm's mental state and the government's theory of his mental state, and it's really—I can't imagine the direct would be longer than 10 minutes or 15 minutes, and it would be confined to the topics that are in this email.

THE COURT:  All right.  Mr. Rehn, you hold a different view.  I'll hear it now.  I'm not going to decide the issue right now because I don't think I have enough information, but I guess my inclination is that if it's that brief, it's coming in.  You're going to now tell me why I'm totally wrong.

MR. REHN:  Your Honor, I take the Court's point, and, you know, we think if anything, this is probative of the

P7P1STOF

defendant's subsequent motivation to add the monetization model that he then did a year later.

THE COURT:  Then great.  Then you want this guy.

MR. REHN:  If that's what they're going for, we may well not oppose it.

THE COURT:  Okay.  Well, I mean, again, it's just based on what you're telling me now.  I'm just going to write a note to myself.  Maybe not oppose it is really all I'm aiming for at this point.  So, okay.  Thank you.

Mr. Rehn, are there things that you oppose that we haven't yet talked about in our time together this morning?

MR. REHN:  There are some issues with the slides from their experts that were disclosed to us last night, but we're talking about it with the defense, and we'll be able to I think work out most of those now that we have the weekend to do so.

THE COURT:  Is there anything else I should know before I let you go?

MR. REHN:  Nothing from the government, your Honor.

MR. KLEIN:  Your Honor, I just have a question.

THE COURT:  Sir.

MR. KLEIN:  So if Mr. Storm doesn't testify, and let's say he would testify on Tuesday.  Just to understand the schedule, will we close like end of day Monday or early Tuesday?  Is the current plan to have the charge conference—just so we can think about this as we're planning,

P7P1STOF

do you have a sense of when we would do the charge conference?

THE COURT:  Again, I don't know the crosses.  Neither do you.  My thought was Monday evening or Tuesday evening, with the thought that you'd sum up on Wednesday and have the charge on Thursday and the jury deliberations on Thursday.  Although my deputy thinks——well, we thought, until this morning, that we would charge the jury on Wednesday.  So the answer is, I'm still waiting for something from the government, which I feel, correctly, I need in order to finalize the charge, because I would like it to come to you in as finalized a form as I can.  My thought is that's what I'm working on this weekend is finalizing the charge.

I guess since we don't have a witness to talk about, let me then understand summations.  My expectation was that summations would take up the better part of the day.  I'm thinking two hours or so for each of the main summations and 45 minutes to an hour for the rebuttal, but maybe I'm off.  Maybe you're going to do it in——oh, god, I hope you wouldn't do it longer, but I can't say.

Mr. Klein, am I totally off on this?

MR. KLEIN:  We hadn't anticipated that long of a time, your Honor, for closings.  I don't know, obviously, what the government's anticipating.

THE COURT:  We're sort of spitballing right now, sir, and I'm not trying to do this to waste anyone's time, but it

P7P1STOF

would be my preference that all the summations are on the same day.  So if you rest Tuesday morning, then I guess we're going to be doing summations Tuesday rest of the day.  If you rest Tuesday afternoon, I don't think that's the case.  Now of course you could be having a case until Wednesday.  We just don't know.  Anything can happen.

But may I know which of the team is summing up?  Is it you, sir, is it Mr. Patton?

MR. KLEIN:  We're discussing that still, your Honor.

THE COURT:  Okay.  Not Ms. Axel?

MR. KLEIN:  She did a great job on the opening, your Honor, so she's in the mix too, your Honor.

THE COURT:  Okay.  Now listen, my preferences don't get to pick this here.  So one of you is going to be summing up, and it will be on the order of about two hours, sir?

MR. KLEIN:  Your Honor, I think it's an hour and a half.

THE COURT:  Okay.  That's fine.  Because my charge is probably two hours.  As I look at the length of it, it's about two hours.  And you wouldn't want to do that at the end of the day.  I think the jury would kill me.  So I would probably do it in the morning.  But I'd have to see.  If we finished at noon, which is inconceivable, then I should charge them in the afternoon.

But Mr. Rehn, may I know the government's thoughts.

P7P1STOF

And if I'm allowed to know, who's doing main, who's doing rebuttal?

MR. REHN:  Your Honor, Mr. Gianforti will be doing closing for the government and I'll be rebutting.  I'm not in a position to provide a time estimate for the summation.

THE COURT:  Mr. Arad gets nothing?

MR. REHN:  If the Court is willing to give us a fourth jury address, your Honor, we'd be willing to——

THE COURT:  Cute.  That was actually the funniest thing you said today.  Okay.

Mr. Gianforti, who's not here because he's working on his summation.

MR. REHN:  I certainly hope so, your Honor.

THE COURT:  I thought you'd be working on the charge.  Okay.

MR. REHN:  We're also looking at that, your Honor.

THE COURT:  Thank you.

Okay.  Mr. Gianforti, two hours, we think?

MR. REHN:  I hesitate——it's in progress, and I just haven't looked at it myself and so——

THE COURT:  Of course.  Suggest to him that the consensus of those in this room is that two hours seems like an outside; it shouldn't go much longer than that.

MR. REHN:  We're going to try and make it as concise as possible.

P7P1STOF

THE COURT:  When I said 45 minutes for yours, does that sound in the ballpark?

MR. REHN:  I think that's not an unreasonable estimate, your Honor.

THE COURT:  Would you be ready for Tuesday if we come to that point?

MR. REHN:  Yes, your Honor.

THE COURT:  So this is again, because Mr. Klein was asking about scheduling.  Again, I can't promise, because remember, you told me this was going to be a five-week trial that became a four-week trial that is now a three-week trial, which may be a four-week trial again.  I'm aiming to finish the charge by Sunday night, and if I do, I will send it to you as soon as I'm done with it.

Okay.  Anything else I should know?  Or anything else you just want me to know?

MR. REHN:  Not from the government.

MR. KLEIN:  Nothing else from the defense, your Honor.

THE COURT:  All right.  So this wasn't a wasted morning then.  Thank you, all.  I know you have other things to do.  We'll be watching our inbox.

Thanks, everyone.  Have good weekends, to the extent you can.

THE DEPUTY CLERK:  All rise.

(Recess)

THE COURT:  Mr. Klein?

MR. KLEIN:  Your Honor, thank you for letting us get back on the record on this issue.  We really appreciate it.

This relates to the issue of Mr. O'Holleran, who is the CEO of SKALE, S-K-A-L-E.  He's the witness we've been discussing possible remote testimony for.  I've conferred with the government and Mr. Arad, and the real issue that would help us resolve everything else is deciding the scope of what your Honor would permit him to testify about.  I have handed your Honor a copy of a blog post that is on SKALE's website.  This relates to ETH Boston 2019, which is the conference your Honor's heard a lot about already.

So if your Honor turns—it's towards the back.  I believe it's page 7.  It's actually RS12.  You have a Bates-stamped copy, your Honor, I believe.

THE COURT:  I am looking at it now, sir.  Thank you.

MR. KLEIN:  If you start there and flip to the next page—and I apologize for this header, but what you'll see on those two pages is that's a photo of Mr. O'Holleran with Mr. Semenov.  Mr. Semenov is wearing the T-shirt at issue.  It references Mr. Storm below.

THE COURT:  You know that I can't see it from this copy of it.

MR. KLEIN:  I know it's hard to—

THE COURT:  But you're representing to me that in its

P7P1STOF

natural state, one can see this.

MR. ARAD:  I think if you zoom in on it, it's visible, yes, your Honor.

MR. KLEIN:  We've got a better version for the jury, your Honor, just to be clear.

And so at that conference, the Peppersec founders—well, Mr. Semenov and Mr. Storm were there.  There was a hackathon, which you heard about yesterday from Mr. — without specificity, but there were hackathons there.  One of them was sponsored by SKALE.  They were a sponsor of the conference.  And the Peppersec, the Mix ETH, the Tornado Cash actually won a hackathon prize.  And if you turn back to the other page, your Honor——

THE COURT:  Page 12, sir?

MR. KLEIN:  Yeah.  You'll see he discusses it, and you'll see what's very clear from the government's evidence a screenshot of the UI, and it actually says that below——

THE COURT:  Yes.

MR. KLEIN:  It says mixeth.tornado.cashui.  And there's a description of the product that won and why, and then it thanks the founders for winning.  And so if Mr. O'Holleran was allowed to testify——and it would be very limited——he would come in and say, I'm the CEO of SKALE, we were at ETH Boston, we had this hackathon, one of the awards we gave out was to these Peppersec co-founders and their product, this is a photo

P7P1STOF

of us, I'm in this photo——he is in this photo, your Honor——and this is a document on our website.  We keep it as part of our, you know——it's a business record for us.  This is something we have.  And he would describe why they won.  And we think that's all relevant to the jury, the photo in particular, because it shows the T-shirt at the conference.  It shows them winning a prize.

THE COURT:  But you said a moment ago, sir, describe what they won or why they won.

MR. KLEIN:  Well, if you look above, that they won a prize at the hackathon.

THE COURT:  Of course.  And is that the totality of the discussion of the prize?

MR. KLEIN:  Well, we're not going to ask, like, how much money they won.

THE COURT:  No.  I don't care about that.  I'm saying, are you trying to introduce slide 12, what is Bates stamped 12 and 13, or just the photograph?

MR. KLEIN:  The 12 and 13, your Honor.  The reason why it's important is because they need to understand what did they create there that allowed them to win a prize, why are they in the photo.  It's not a random photo of just two people who were in the photo during a conference.  There's a reason they were in the photo.

THE COURT:  I don't think Mr. Arad was

P7P1STOF

suggesting——well, maybe I need to hear from him.

MR. KLEIN:  They think that's irrelevant.  They think everything about but the photo is irrelevant.  I don't want to speak for him, but that's what I've been told.

THE COURT:  Mr. Arad.

MR. ARAD:  Your Honor, the proffered relevance of this evidence is to do with the T-shirt evidence that the government has introduced at this trial.  The government introduced metadata showing that there was activity surrounding these designs into 2020.  I believe the defense wants to introduce this photograph in order to show that the T-shirt was worn in 2019 at a conference.  The government has no issue with that, and is willing to stipulate that this photo was taken at a conference in 2019 where this T-shirt was worn.  The fact that the Tornado Cash team won an award for certain technology that's associated with Tornado Cash at this conference does nothing to explain the T-shirt, and so therefore it is not probative of any important issue in this case, but it is prejudicial because it could lead the jury to believe that this is an award-winning technology that is sanctioned, you know, by this legitimate conference that is respectable and reputable and all of the things that the defense has been finding ways to get in, but that really shouldn't be coming in.

THE COURT:  So all that you would consent to is the identification of the T-shirt.

MR. ARAD:  We would consent to the admission of the photograph and the date and the place where it was taken.  We could even say the participants.  This is the CEO of a company called such and such.  But the fact of the winning of the award is prejudicial and not very relevant.

THE COURT:  All right.  I will allow it, but Mr. Klein, I don't know how to underscore this.  You've given me a very limited proffer, and that should be the length of the questioning and the exact nature of the questioning.  I'll let in the photograph and I'll let in that they won for whatever.  I suppose this is page 12.  But be forewarned, if it goes beyond anything you suggested to me today, I'll just shut it down.

MR. KLEIN:  Yes, we were probably going to agree to—the government was redacting everything except page 12 and page 13, part.

THE COURT:  Right.  Well, we also don't want zero pool on page 13.

MR. KLEIN:  Exactly, your Honor, correct.

THE COURT:  You really only need page 12 and the thank-you, correct?

MR. KLEIN:  Yeah, page 12, yes, your Honor, and it stops at zero pool, and yes, redact that on.

THE COURT:  I'll allow that.

MR. ARAD:  May I just have one moment to confer with

P7P1STOF

defense counsel.

THE COURT:  Would you consider then expanding your stipulation to that?

MR. ARAD:  I was about to talk to defense counsel about that.

THE COURT:  I think you can and should.  Do you want me to wait here while you do?

MR. ARAD:  There is just one question I want to ask defense counsel.  It will take just one moment.

THE COURT:  Sure.

(Counsel conferring)

MR. ARAD:  We can continue our discussions over the weekend, your Honor.

THE COURT:  Seems like a stipulation can be worked out.  All right.  Thank you both.

Ms. Noriega, can I ask you please to give this back to Mr. Klein.  I don't think it's mine to keep.

Anything else?

MR. KLEIN:  I'm not going to stop your Honor again on the way to anything.

THE COURT:  All right.  All right.  Thanks, everybody.

MR. KLEIN:  Thank you, your Honor, though.  We really appreciate it.

MR. ARAD:  Thank you, your Honor.

(Recess)

P7P1STOF

(Proceedings resumed via Teams; jury not present)

(Case re-called)

MR. REHN:  Good afternoon, your Honor.  Thane Rehn, Ben Gianforti, Ben Arad, and Kevin Mosley for the United States.

THE COURT:  Good afternoon.  Thank you.

Representing Mr. Storm?

MR. KLEIN:  Good afternoon, your Honor.  Brian Klein. I'm not with the others so I'll let Ms. Axel let you know who else is there.

THE COURT:  Okay.  Thank you.

MS. AXEL:  Yes, this is Keri Axel.  I have Roman Storm here, as well as Kevin Casey, Viviana Andazola Marquez, and Chris Morel for the defense.

THE COURT:  Okay.  Thank you so much.  And Mr. Storm, may I just confirm you're on the call.

THE DEFENDANT:  Yes, I am on the call, your Honor.

THE COURT:  Sir, thank you very much.  And may I confirm, sir, that you're waiving an in-person appearance today?

THE DEFENDANT:  Yes, I am.

THE COURT:  Thank you.

Mr. Patton, we had spoken in court earlier today about the possibility of receiving something from you and your team on or before 2:00.  I just wanted to confirm that nothing was

P7P1STOF

sent?

MR. PATTON:  Yes, that's right, your Honor.  We did not file anything, and that was as we discussed.

THE COURT:  Absolutely.  And I thank you.  And therefore there is no response from the government.

From my notes from this morning, there are two open issues that I wanted to provide resolution for, and then I hope no other issues have arisen in the last few hours, but who's to say with this group.

On the issue of Federal Rule of Evidence 705 and Agent George's testimony and the late disclosure of notes, it is obvious, I hope, that I'm concerned about this.  I am accepting the account that Mr. Mosley has given me of the sequence of events and how it is that they obtained certain documents and not others.  And so I am not going to preclude Agent George's testimony, but I am going to permit the defense to re-call him for cross-examination if they wish to do so.  They must give the government 24 hours' notice to produce Agent George.  What I will say, though——and I'm directing this in particular to Mr. Mosley——is, Mr. Mosley, you and your team are on notice of the importance of a complete production of the work papers under both 705 and 3500.  You have 24 hours to ensure that everything, everything, that Agent George put together as possibly relevant to his testimony and that could possibly be subject to production is disclosed to the defense.  If, heaven

P7P1STOF

forbid, something gets produced Monday afternoon or Tuesday morning, I'm letting the defense renew their motion to strike because you're all now on notice.

On the issue of the Fifth Amendment issue raised by Mr. Patton——and I am focusing in particular on Mr. Schmidt at this time. I don't know that I have a comparable record for the individual from Chainalysis and I don't know where we are with that. But on the issue of Mr. Schmidt, having listened to Mr. Rehn and listened to the timeline in his statements, I have no basis to refute or to call into question what he has said to me, and therefore I have no basis to refute the government's explanation of these witnesses and in particular Mr. Schmidt's potential criminal exposure. There's no basis for me to conclude that he, Mr. Schmidt, has no criminal exposure, and therefore I wouldn't be telling him he did not. For similar reasons, though, and again, based on the representations made by Mr. Rehn, which better have been factually accurate, I do not find government overreach and I do not find a basis to compel the government to grant immunity to the witness under the cases that I listed earlier today.

So that's where we are right now on those two issues.

I don't really want to ask this question, but I have to end every call by so doing. Mr. Rehn, are there any other issues from the government? And when can I expect your submission on Count Three?

P7P1STOF

MR. REHN:  There are no other issues, and we will be filing a submission both on Count Three and on some of the other questions the Court asked us to sort of preview at the charge conference earlier this week.  It will be——we're aiming for soon; certainly in the early evening hours.

THE COURT:  Ah, soon does not mean five minutes; soon means early evening hours.  Okay.  I will take that note.  I will remain here in the office until it comes in.  Thank you.

Mr. Klein, for your team, is there anything else to bring to my attention?

MR. KLEIN:  Your Honor, I think we are going to file a series of defense jury instructions which I think was discussed at the conference.  I wasn't there.  So I wanted to let you know about that coming in.

THE COURT:  Yes.

MR. KLEIN:  And there is another short letter motion that we talked about this afternoon that we are considering filing, but I don't want to, like, say we're going to do something and we don't or——but it will be something brief.

THE COURT:  And that letter motion, sir, is with respect to which of the many issues we were discussing today?

MR. KLEIN:  It actually hasn't been brought up today, your Honor.  It's another issue.

THE COURT:  Oh, good grief.  Another issue.  Okay. But you don't know that you're filing it yet so you don't want

P7P1STOF

to spoil it for me.

MR. KLEIN:  Yeah, I know you'll be waiting for it.

THE COURT:  Yes.  Okay.  If I'm getting it, sir, am I getting it by——oh, I don't know——early evening hours of this evening or something later?

MR. KLEIN:  Not soon, your Honor, is what I would say. It's just the rule of completeness issue that we're contemplating.  I just want to preview it.  And we're contemplating it and we're working on it, but it will be sometime before Monday if we file it.  And we'll let the government know.

THE COURT:  By which you mean you'll copy them on any motion.

MR. KLEIN:  Absolutely, of course.

THE COURT:  Okay.  Well, I was figuring as much.  When you say you'll let the government know, I didn't know whether you were going to——which would be a nice thing——meet and confer before filing this.

MR. KLEIN:  It's something we've met and conferred on many times, your Honor, so I think the ship has sailed on that.

THE COURT:  Okay.  So I will remain in part ignorant until I see it.

MR. REHN:  Your Honor, if I may, this is Thane Rehn representing the United States.

THE COURT:  Yes, sir.

P7P1STOF

MR. REHN:  If Mr. Klein could identify the issue.  I'm not sure what he's referring to either.

MR. KLEIN:  Well, we're still working it through, your Honor, so——and I shouldn't have brought it up, frankly.

THE COURT:  No, you shouldn't have, but then again I have accused both of you of trial by ambush, and this is feeding right into that.

MR. KLEIN:  Yes, I am trying to avoid that accusation again, your Honor, and we've been very forthright with you before we're going to do something, so if it's something we think we could reach agreement on with the government, we'll reach out to them and we'll see if there's any agreement.

THE COURT:  Well, look, it would be neat if you would identify it, but apparently it's still in its gestational stages.  I do consider this a little bit of an ambush since you're not telling us what it is, but I want you to have the issue fully worked out.  If the government gets your submission and figures out it can be resolved without my having to spend a lot of energy on it, then it would be nice to know that.  But for now I'll give you the time you need so that you can figure out whether you absolutely need to make this motion or not.  But I will be by the computer for a large chunk of the weekend looking for it.

All right.  Mr. Klein, something else?

MR. KLEIN:  That was it, your Honor.

P7P1STOF

          THE COURT:  That's enough.  Thank you.

          All right, everyone.  I'll leave you to do all your good work.  Thank you.  And enjoy your weekends as much as you can.  Take care.

          ALL COUNSEL:  Thank you, your Honor.

          (Adjourned to July 28, 2025, at 8:45 a.m.)