P7S5sto1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                              23 Cr. 430 (KPF)

ROMAN STORM,

              Defendant.              Jury Trial
------------------------------x

                           New York, N.Y.
                           July 28, 2025
                           9:00 a.m.

Before:

                HON. KATHERINE POLK FAILLA,

                           District Judge

APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  NATHAN M. REHN, ESQ.
    BEN ARAD, ESQ.
    BENJAMIN A. GIANFORTI, ESQ.
    KEVIN G. MOSLEY, ESQ.
    TARA M. LA MORTE, ESQ.
    Assistant United States Attorneys

WAYMAKER LLP
    Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
    KERI CURTIS AXEL, ESQ.
    KEVIN M. CASEY, ESQ.
    VIVIANA ANDAZOLA MARQUEZ, ESQ.

    -and-

HECKER FINK LLP
    Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
    CHRISTOPHER MOREL, ESQ.

P7S5sto1

(Trial resumed)

THE COURT:  Mr. Rehn, are you the law guy today for the government?

MR. REHN:  With respect to the issue that I believe the Court wanted to tee up this morning regarding the Stephan George disclosures, yes.

THE COURT:  And now we have working microphones. Thank you.

On the second issue, let me just say this.  I know the defense won't listen.  It was surprising, given that we didn't sit on Friday, that that second motion didn't come in until after 10:00 at night.  But, I was awake and I was waiting for it.  I don't know how, Mr. Klein, I can convince you not to ambush me with motion practice after 10:00 at night.  And if you say to me, *But Failla, at least it wasn't after midnight.* That is not the win that you think it is.  I have it.  I'm disappointed.  But here we are.  I have it, I have read it, I'm ready.

Mr. Rehn, I'm not -- I'm offering the government the opportunity to write on the second issue if you want to, but I'm also telling you that if you have other things to do, then just have someone prepared to speak to it at the end of the trial day.

MR. REHN:  We will, your Honor.  Mr. Arad has been working on it since we received that filing late last night as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7S5sto1

well, and he will be prepared to address it.

THE COURT:  OK.  Then I'm not going to look for anything.

Perhaps, Mr. Rehn, you can explain to me why there was a second production on Saturday of Agent George's material and how it wasn't produced the first time and then respond, please, to the defense motion.

MR. REHN:  Certainly, your Honor.

So, what we did after Special Agent George was off the stand, as we inquired regarding the spreadsheet he had testified about on cross-examination, confirmed that he had done additional work in the weeks leading up to trial to basically verify his analysis and asked him for a copy of that work which he provided to us and we immediately produced to the defense last week.

Then, the defense filed their motion and we had the Court's ruling on that motion on Friday afternoon instructing us to basically go back to the well and make sure we had completely run it dry.

THE COURT:  Yes, but I would have thought you would have gone back to the well immediately following Agent George's testimony.  I mean, I'm happy that you listened to me but I don't understand why you didn't do that beforehand.  Having figured out that he hadn't produced all of his materials, I don't know why you didn't have the going back to well back

P7S5sto1

then.

          Go ahead.

          MR. REHN:  Your Honor, if the Court will recall, this came up on Thursday afternoon.  We immediately had a call with Stephan George that day and said give us the work product that you were testifying about on the stand and produce that promptly.  We fully intended to make sure we had any prior drafts of that work product and we had a call with him as soon as we reasonably could, which was after the conference with the Court on Friday afternoon, just to ensure that we had everything.  And I just want to make clear, the additional versions of that spreadsheet are really just drafts that are -- essentially they're all captured in the version that was produced prior to the conference with the Court and I can go through each one and explain how that -- how they got into the primary spreadsheet, but just to ensure that there was no question that we had gotten everything, produce every possible prior version of this even if the data is in the version you already gave us to make sure there is no question that we have everything that we have produced to the defense.

          THE COURT:  But the concern is the defense is now obligated to compare all of these draft versions with what you gave them, so saying that they are in the final version may be, to a degree, cold comfort because they still have to make sure that the numbers are the same.  I don't know if you were able

to say to the defense that what was produced is no different in terms of the content, not just the format, of what has been prepared.  Presumably these were drafts and they changed, did they not?

MR. REHN:  So, your Honor, there was an initial change -- hold on just one moment, your Honor?

THE COURT:  Thank you.

(Counsel conferring)

MR. REHN:  So, I'm not -- I have not had the opportunity to completely verify the degree to which the data in all of those versions is identical to itself but the spreadsheets can be compared, essentially, with automatic comparison tools and data underlying his analysis, which is really what the government is obligated to produce on a Rule 16, was the spreadsheet that we produced immediately following his testimony.  All of those other materials were not previously in the production of the prosecution team.  Now, we have taken every effort to make sure we have gotten everything from him and produced it and we have gone above and beyond what we think our disclosure requirements are to make sure that they have all the opportunity to examine his tracing with respect to the movement of those TORN tokens to that finance wallet.  The defense, I think, has every opportunity to carefully review that and to prepare, if they want, to recall him.

THE COURT:  And you wouldn't mind an instruction to

the jury from me that said, in substance, the government omitted, failed, neglected to disclose certain materials, those materials were disclosed after the government rested its case and I have made the determination that the fairest thing is to permit the defense to recall this agent because of the failure to disclose.

You are not going to object to that; correct?

MR. REHN:  That's correct, your Honor.  If the defense chooses to recall, I think it would not be a problem to inform the jury as to the reason why he is being recalled.

THE COURT:  May I ask who is speaking for -- Mr. Klein?  Thank you.

Mr. Klein, why isn't that curative instruction that I have outlined, enough?

MR. KLEIN:  A couple reasons, but I want to address one point first, your Honor.

After he testified on Thursday, that evening they did send us those Binance materials that were voluminous.  In addition, though, I emailed them that evening and said, please, double-check with George about the Binance stuff and the Lin tracing stuff.  So, that evening I asked them again to double-check on the Lin tracing.  I heard nothing.

THE COURT:  But I'm told they weren't able to have that call until after my discussions with them on Friday.

MR. KLEIN:  I don't know why Agent George wouldn't

have been available before then.

THE COURT:  It's not that he wasn't.  They were here with me and you working through things so I assume they didn't do it until after -- I presume they had the call afterwards.

MR. KLEIN:  I want to be clear, we did request it right away on Thursday.

THE COURT:  OK.

MR. KLEIN:  So I just want to put that in.  Obviously we don't know, and it is very burdensome, to go through and check additional records and see how they match up with ones we got and from what we know they produced, it is data underlying his testimony because they are spreadsheets that he created and produced including Etherscan screenshots of things he reviewed.

So, now we are in a really difficult position of being forced to go back in the middle of our case, we got this on Saturday evening, try to compare those things for a witness we never intended to call in our case.  Stephan George is not on our list, we never intended to call him, and Ms. Axel spent significant time examining that day on both of these issues and a lot of the things that were the problem were that we didn't have his data and we didn't have it to review so the questioning went one way.  I think it would be incredibly prejudicial for us, even with the instruction you are talking about, for us to have to recall him and basically redo our cross and then the government gets some extra benefit of trying

to resuscitate his testimony after we are done.

And I also think, and we talked about this, the burden should not be on us to put their agent on in our case.

THE COURT:  Sir, this isn't a burden.  I find the burden-shifting argument non-persuasive.  I am giving you the opportunity to call him and I am giving a curative instruction. If you don't want it, that's fine, but I'm not striking his testimony.  Thank you.

So the motion for reconsideration is, well it is resolved in the manner I have.  I will give the curative instruction, but again, you have to give me some notice that this man is going to show up, or at least -- do you want to put on the record now that they should have him ready in case you call him tomorrow?

MR. KLEIN:  Yes, your Honor.

THE COURT:  All right.  Friends, have him here.

May I also understand, Mr. Klein, that if you make a determination at some point tomorrow that you are not going to call him, you will then let them know as well?

MR. KLEIN:  Yes, your Honor.

THE COURT:  Thank you.

I can ask.  Who is the next defense witness, please?

MR. KLEIN:  The first person we are calling is Dr. Edman, your Honor.

THE COURT:  Thank you very much.

P7S5sto1

Are there other issues that need to be addressed now?

MR. KLEIN:  There is one issue, your Honor, it involves a witness from Chainalysis.  We brought this up the last few days.

THE COURT:  Yes.

MR. KLEIN:  To refresh the Court's memory --

THE COURT:  I don't need my memory refreshed.

MR. KLEIN:  OK.  So we weren't sure if this witness was taking the Fifth.

THE COURT:  Yes.

MR. KLEIN:  I spoke with this witness' lawyer on Saturday who informed me that she is.  It is the same issues at play with Mr. Schmidt except the timeline is very different, your Honor.

So, in this case, the government has been speaking with Chainalysis for what we presume is approximately two years.  They were never, as far as we know, on any notice that they were subject or in any way going to be wrapped up or had any criminal exposure here.  On Wednesday evening of last week, we understand there was a call between the government and Chainalysis counsel and that's the first we learned, after that call -- we weren't on the call -- where Chainalysis counsel told us there was this issue.

THE COURT:  Counsel, given the e-mails that I received over the weekend from Mr. Schmidt's counsel, is this something

P7S5sto1

that should be discussed at side bar?

MR. KLEIN:  I don't know what the government would say, your Honor.

MR. REHN:  Your Honor, if I could just make something for the record?

THE COURT:  Well, I think he should get to make his point first.

MR. REHN:  OK.

THE COURT:  Do you each understand the correspondence of which I speak that came in on Friday?

MR. KLEIN:  Yes, I do, your Honor.

THE COURT:  I wish not to have a repeat of that so if we are going to start talking about things that maybe ought not be said, or not appear in the public docket, then I would like to have the conversation at side bar.  So, Mr. Klein, make your arguments and then, Mr. Rehn, you will tell me if they can be resolved short of side bar conversation.

Go ahead, sir.

MR. KLEIN:  The government should immunize this witness, your Honor.  We asked them for the basis, we asked them for information in an e-mail.  They haven't responded. What we don't know what information they're relying on.  And so we would ask in similar request to Mr. Schmidt, I do think the timeline is very different, though, in the sense that we understand it is two years, and on Wednesday, the night before

P7S5sto1

they were resting --

THE COURT:  When you say two years, are you saying two years without them ever being told anything?

MR. KLEIN:  That's our understanding, your Honor.

THE COURT:  OK.

MR. KLEIN:  But, again, I don't know what -- they might have had a call, I don't know where, but from looking at the 3500 we see no indication they were told this before Wednesday evening, the night before they rested.

THE COURT:  Mr. Rehn, is this something that should be discussed at side bar?

MR. REHN:  Your Honor, if I could say something for the record before we ask to approach side bar?

THE COURT:  Yes.

MR. REHN:  Your Honor, you will recall on Friday, as referred to, we had a discussion regarding the defendant's motion to require the government to immunize a Dragonfly witness.

THE COURT:  Yes.

MR. REHN:  Following that conference, there has been inaccurate and misleading public reporting on the government's position concerning Dragonfly and certain of its executives. The government wants the record to be clear that it has not identified Dragonfly or any of its directors, officers, employees, or controlling investors as targets of its

P7S5sto1

investigation.

THE COURT:  All right.

MR. REHN:  In light of the misleading public reporting following Friday's discussion, we do believe that -- we would request that we would make any submissions in responses to the Court's questions under seal, and perhaps at side bar or some other forum.

THE COURT:  Are you prepared to make a proffer now with respect to the Chainalysis witness who is planning to take the Fifth?

MR. REHN:  We are prepared to explain the course of events, under seal, as we understand them.

THE COURT:  All right then.  We are meeting at side bar.

Thank you.

(Pages 1734-1740 SEALED by order of the Court)

P7S5sto1

(In open court)

THE COURT:  Can we have the witness brought in, please?

Counsel?

MR. PATTON:  With respect to Agent George and the possibility we may call him tomorrow, we would just ask that the government be instructed not to speak with him as though he is still on cross.

THE COURT:  Yes.

You are so instructed.  You will not discuss the substance of any cross-examination.

MR. REHN:  Yes.

THE COURT:  Yes.

MR. PATTON:  Thank you.

(Continued on next page)

P7S5sto1                          Edman - Direct

(Jury present)

THE COURT:  Good morning, everyone and welcome to our third week of trial.  We hope everyone is feeling better today and that we all stay healthy this week.

Will the defense call its next witness?  Thank you.

MS. AXEL:  Your Honor.  Defense calls Dr. Matt Edman.

THE COURT:  Thank you.

MATTHEW EDMAN,

    called as a witness by the Defendant,

    having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Into the microphone, please state and spell your full name for the record.

THE WITNESS:  Full name is Matthew Edman.

THE COURT:  Thank you.

Counsel, you may inquire.

DIRECT EXAMINATION

BY MS. AXEL:

Q.  Dr. Edman, are you currently employed?

A.  I am.

Q.  Where?

A.  I'm a co-founder and partner of a cybersecurity and blockchain investigations firm based here in New York called NAXO.

Q.  Were you retained as an expert in this case?

A.  I was.  Yes.

P7S5sto1                         Edman - Direct

Q.   Who retained you?

A.   I was retained by defense counsel for Mr. Roman Storm.

Q.   Are you being compensated for your work in this matter?

A.   I am.

Q.   Does your compensation depend in any way on the outcome of this case?

A.   No, it does not.

Q.   Have you prepared certain slides to help the jury follow along with your testimony this morning?

A.   I have, yes.

          MS. AXEL:  Permission, your Honor, to display Defendant's Exhibit 8785?

          THE COURT:  Yes.

          May I understand, is there objection to this exhibit?

          MR. REHN:  No, your Honor.

          THE COURT:  All right.  So 8785, is it being offered as demonstrative or exhibit?

          MS. AXEL:  Your Honor, it will be offered as a demonstrative except for the ultimate page once we get there. It will be offered as a summary chart.

          THE COURT:  Thank you.

          Demonstrative Exhibit 8785 may be presented and shown to the jury as a demonstrative aid.

BY MS. AXEL:

Q.   Did you prepare a slide to summarize your background and

P7S5sto1                        Edman - Direct

education?

A.   I did, yes.

Q.   Could you describe for us your educational background?

A.   So, my education includes a bachelor of science in computer science from Baylor University; master of science in computer science from Rensselaer Polytechnic Institute; and a Ph.D also in computer science, also from Rensselaer.

Q.   Did you study -- did your studies affect, inform your knowledge of blockchain technologies?

A.   They did.

     So, the focus of my graduate studies was primarily on generally security and applied cryptography but more specifically on anonymous communication systems on the internet.  And a lot of the sort of fundamental building blocks of anonymous communication systems applied to blockchain technologies as well.

     THE COURT:  Sir, I'm going to ask you to move little bit closer to the microphone, if you can.  Thank you.  We want to make sure we all can hear you in this cabin of a courtroom.

     Thank you, sir.

BY MS. AXEL:

Q.   You used the word cryptography.  What does that mean?

A.   Cryptography generally is the way -- generally refers to protecting information.

     MS. AXEL:  And Mr. Demarco, if we could have the next

P7S5sto1                        Edman - Direct

area of the slide, please?

Q.   Do you have any relevant certifications?

A.   I do.   I have a number of certifications from a blockchain investigation company called Chainalysis.   That includes certifications specific to Ethereum investigations.   I also have certification related to digital forensic investigations.

Q.   What do these Chainalysis certifications enable you to do?

A.   They enable me to conduct investigations that involve blockchain technology.   So, that may involve following transactions on blockchain, tracing assets as they're transferred from one address to another on a blockchain.

Q.   Have you summarized for us also, your professional experience?

A.   I have.

Q.   Is this a summary of your professional experience?

A.   It is.

Q.   What of this experience is relevant today to talking about blockchain technologies?

A.   I would say all of the experience is relevant.

Q.   With respect to -- can you tell us what you did at Mitre Corporation?

A.   Sure.   So, Mitre corporation is a federally-funded research and development center where I worked right after I finished grad school.   Mitre supports various parts of the federal government.   I primarily supported the FBI's remote operations

P7S5sto1                      Edman - Direct

units down in Quantico, Virginia, on investigations related to what are called dark net markets.

Q.   And in the course of your professional experience, have you been engaged as an expert in matters involving blockchain technology and digital assets?

A.   I have.

Q.   How many times?  If you recall.

A.   I believe I have testified probably, as an expert, I estimate four to six times.

Q.   Have you testified before in the Southern District of New York?

A.   I have.

Q.   In criminal cases?  Civil cases?

A.   I have testified in the Southern District both in a criminal case and a civil case.

Q.   Have you been retained by the government?

A.   I have.

Q.   And have you testified on behalf of the government?

A.   I have submitted written testimony on behalf of the government.  I don't believe that case involved courtroom testimony.

Q.   And what was the agency?

A.   That was -- I was retained by the prosecutors from the U.S. Attorney's office for the Northern District of California.

Q.   And have you also been retained for the Securities and

Exchange Commission?

A.  I have, yes.

Q.  Did you testify in that case?

A.  I did.

Q.  And have you also testified as a defense expert in a criminal case?

A.  I have.

Q.  How often?

A.  I think aside from this case I would say -- I can think of one off the top of my head.

Q.  So, one other occasion that you recall?

A.  Correct.

        MS. AXEL:  Your Honor, defense moves to qualify Dr. Edman as an expert on blockchain technology, transaction tracing, smart contracts, and internet applications.

        MR. REHN:  No objection.

        THE COURT:  He is so qualified.  Thank you.

BY MS. AXEL:

Q.  Dr. Edman, did you prepare a slide summarizing your -- the scope of what you were asked to analyze in this case?

A.  I did.

Q.  Can you describe for us what the scope of your analysis was with respect to the Tornado Cash protocol?

A.  Sure.

        So, my analysis kind of fell into two buckets.  The

P7S5sto1                      Edman - Direct

first bucket involved sort of the on-chain components of the Tornado Cash protocol.  Specifically, I was asked to review the Tornado Cash smart contracts to determine how the protocol operated on the Ethereum blockchain, and based on that analysis, determined the extent to which the Tornado Cash developers could alter how that protocol operated after it was deployed, as well as whether the developers could control the crypto assets that users of the protocol deposited into the Tornado Cash pools.

Q.   Moving to the next slide then, what would you describe as the second bucket of your testifying?

A.   So, the second bucket of my analysis related to analyzing the Tornado Cash UI and CLI software which interacted with the Tornado Cash protocol on the Ethereum blockchain and to evaluate, similar to the first bucket, the extent to which the Tornado Cash developers could control what users did with that software once they had downloaded it, and as well as review a history of changes that the developers had made to that software over time.

Q.   And what materials did you consider in your analysis?

A.   My analysis involved a variety of materials.  Of course I mentioned the Tornado Cash smart contracts, I reviewed the source code related to those.  I also reviewed blockchain data associated with creation of those smart contracts and interactions with those smart contracts that also involved

P7S5sto1                          Edman - Direct

reviewing source code repositories, collection of source code from a website called GitHub, as well as information from other public websites, for example the Tornado Cash Medium, sort of like a blog.  I have also been present during this trial and observed witness testimony and reviewed exhibits that certain other witnesses have used in the course of their testimony.

Q.   And in reviewing those materials and performing your analysis, did you come to certain opinions?

A.   I did.

Q.   And what are those opinions?

A.   With respect to the first bucket of analysis, the Tornado Cash protocol, after reviewing the smart contracts and blockchain data, determined that the Tornado Cash protocol is a non-custodial protocol, it relies on a network of nodes which are sort of servers on the Ethereum network which are responsible for validating, relaying, and recording deposits and withdrawals into and out of the Tornado Cash protocol.

The Tornado Cash ETH pools were made immutable, which means they couldn't be changed in May of 2020, and because of how they were implemented and deployed, they cannot be modified or removed from the Ethereum blockchain.  Related to that, the developers created a series of smart contracts and delegated sort of governance of the Tornado Cash protocol to what is called a DAO, in December of 2020.

Q.   Did you also reach certain opinions concerning the UI and

P7S5sto1                        Edman - Direct

the CLI, based on your analysis?

A.   I did.

Q.   And what are those?

A.   At a high level, the Tornado Cash UI, it is just -- it is software.  It is publicly available and hosted on a decentralized file storage network called IPFS, as opposed to centralized server hosted by, say, Google.

          The Tornado Cash UI and CLI software, it is downloaded to the user's device and it runs on the user's device as opposed to on a server somewhere, but relies on third-party software and services to create and interact with the Ethereum network to relay transactions to the Ethereum network.  The developers, after reviewing the history of changes that they have made to the software, determined that they had incorporated a number of features into the software to limit the use of that software by sanctioned entities.

          MS. AXEL:  And actually, I realize I want to go back for a slide one second, Mr. Demarco, can I go back?

Q.   I meant to ask you, Dr. Edman, what does "non-custodial" in the first bullet point here, mean?

A.   Non-custodial, as opposed to custodial, means that the developers cannot control the assets that are in the Tornado Cash protocol.  So once ETH, we will say, is deposited to one of the immutable pools, the developers have no ability to unilaterally transfer those assets out of the pool or

prevent the withdrawal.

Q.   And then we can move just to the title portion of page 7.

Dr. Edman, in some testimony here we have heard terms such as crypto assets, cryptocurrencies.  Could you explain the difference in those as it relates to your analysis?

A.   They're generally used to refer to the same thing, cryptocurrency or at asset or sometime crypto.  In general, crypto assets may be a broader term to include not just say ETH or USDT or similar tokens, but to include non-fungible tokens you might think of as digital artwork on the blockchain.

Q.   Is there a particular blockchain you were asked to analyze in this case?

A.   Yes.   The Ethereum blockchain?

Q.   Are there multiple blockchains?

A.   There are.   There are many.

Q.   How are crypto assets transferred on the Ethereum blockchain?

A.   So, cryptocurrency are transferred on the Ethereum blockchain using what is called a transaction, and that is a term I used a little bit earlier.  Transaction generally is the series of instructions that tells the Ethereum blockchain, for example, deducts a certain amount of ETH from my accounts and credits somebody else, the recipients, with that ETH from my account.  It can also be used to interact with smart contracts. So, for example, if a smart contract exposes certain

P7S5sto1                        Edman - Direct

functionality, depending on the nature of that functionality

you may need to create a transaction which tells the Ethereum

network what you want to do with that smart contract.

Q.   And that function is some kind of code?

A.   Correct.

Q.   What is the function of ETH as we have heard it referred to

or ether, on the Ethereum blockchain?

A.   ETH or ether is what's sometimes called a native

cryptocurrency on the Ethereum blockchain.  It exists, sort of

we will say, by default on the Ethereum blockchain even though

you can create additional tokens on top of Ethereum.  Its

purpose is, one, transfer of value between users, but you also

use ETH to pay transaction fees called gas fees for -- to the

Ethereum node operators for executing your transactions.

Q.   And you provided a technical definition of -- you provided

a technical explanation of how crypto assets were transferred

on the Ethereum blockchain.  Have you also prepared a slide to

try to simplify that explanation?

A.   I have.

         MS. AXEL:  So let's display page 7.

Q.   Dr. Edman, would you please walk us through the transaction

as depicted on this slide that you prepared?

A.   Sure.  So, in this example transaction here we have two

Ethereum users -- we have Alice on the left, Bob on the right.

Alice currently has 10 ETH in her account or associated with

P7S5sto1                           Edman - Direct

her wallet address.  Alice, she wants to send money to Bob who currently doesn't have any ETH at all, so she creates a transaction with a series of instructions to tell the Ethereum network I want to send one ETH from my account to Bob, and here is his wallet address, the 0x21f in this example.

So, she creates this transaction and cryptographically signs it, which is a digital signature using a private key. And then if you go to the next part here, so Alice sends this transaction to a node, a server in the Ethereum network.  That node will look at the transaction and it will verify that it is well formed, it has a valid signature, for example that Alice actually has ETH in her account, she is not trying to spend money that she doesn't have.  If it is valid, the Ethereum node operator will relay that transaction to other node operators and that transaction will kind of propagate through the network, each node verifying that it is a valid transaction. Periodically, special nodes in the network called miners or validators, will group those transactions together in what is called a block.

If you go to the next part?

So, the miners or validators group these valid transactions into a block and then distribute that block to the blockchain.  Now, each block includes a reference to the previous block and that is transforming a blockchain, such that if any previous block in the blockchain is modified, then users

and nodes in the Ethereum network can detect that transaction or some transaction or some block has been modified.  For example, let's say that Bob tried to tamper with the transaction to, instead of receive one ETH from Alice, tries to receive all 10.  The Ethereum network can detect that, that this transaction has been modified and knows to reject it.

So once this block has entered the blockchain, Bob's ledger -- in the bottom right here -- will be updated to reflect that he was credited with one ETH.  And then Alice's ledger on the left will be deducted that one ETH and so now she only has nine.

Importantly, no -- there is no physical ETH transferred, it is not like a file going from one computer to another.  You are really just updating entries on a ledger, sort of like in your check book.  Deduct one ETH from Alice, credit one to Bob.  Everybody has the same copy of the ledger so they can see at any time the history of transactions and the balance associated with any particular wallet.

Q.  And who operates these nodes as depicted by these little laptops on the Ethereum network?

A.  The nodes are operated by multiple independent operators. The software is freely available, you can download it, you can run it on your computer and contribute to relay transactions on the Ethereum network.

Q.  So people just opt to do this on their own?

P7S5sto1                        Edman - Direct

A.   Yes.

Q.   Do they get any benefit for doing that?

A.   So, if you are just relaying transactions you get the benefit of essentially a more secure, more diverse Ethereum network.  If you are participating in the network as one of the special nodes that I mentioned called a miner or a validator, then you receive a benefit for that as well or you can receive a benefit.  I mentioned that a block consists of a number of transactions and each of those transactions pays the transaction fee or a gas fee.  Now, whoever mines that block, they receive not just an allocation of new ETH as a reward for participating as a miner, but they also receive the transactions fees paid.  In this case Alice had to pay a transaction fee to send one ETH to Bob, and whoever mines the block that contains Alice's transaction would receive Alice's fee.

Q.   Do people set up the organizations that just run validator nodes in order to obtain those fees?

A.   They did.

Q.   Is it possible for Alice to transfer one ETH to Bob without going through this Network?

A.   No.  In order to transfer some -- some value, whether it is ETH or another token, that transaction has to be created, signed, distributed to the Ethereum network, included in a block, and the block has to be added to the blockchain in order

P7S5sto1                          Edman - Direct

for anybody's balance or ledger to be updated.

Q.  And, Dr. Edman, here we were looking at a transfer from a person to a person on this.  How does this operate when a person or user wants to interact with a smart contract on the Ethereum blockchain?

A.  It is similar.  It depends on the nature of the transaction.  If you want to, let's say, use something like a smart contract that implements a token for, say, an NFT marketplace or something like that, you still need to create, sign, and distribute a transaction that contains a series of instructions for interacting with that smart contract and that transaction, again, has to be distributed to the network and included in a block, and that that block added to the blockchain, otherwise nothing actually happens.

          MS. AXEL:  We can take it down for a second.

Q.  You mentioned the term cryptographic signature.  Can you explain why that is important?

A.  A cryptographic signature is part of how the other users and nodes in the Ethereum network or similar blockchains can detect when somebody is trying to cheat in the protocol.  It is sort of like, let's say, a signature on your check or an electronic signature on a document.  It verifies or allows the recipient to verify that this transaction, this date has not been modified, it hasn't been tampered with, and the originator, the sender of this particular transaction.

P7S5sto1                          Edman - Direct

Q.   What is a private key in the context of your analysis?

A.   A private key is what you need to create a cryptographic signature.  It is basically a really big, long, random number, known only to you, and hence the term private, and you use this private key to control your crypto assets.  It is kind of like a -- kind of like a password or a PIN for your crypto assets.

Q.   And how does a user create a private key?

A.   You typically would use something called a wallet.

Q.   And have you prepared a demonstrative to show how a crypto wallet relates to blockchain?

A.   I have.

            MS. AXEL:  OK, let's show you what's been -- yes.  Page 8.

Q.   Dr. Edman, first you have some non-custodial wallets on the left.  First, what does non-custodial versus custodial mean in this context?

A.   In this context non-custodial means that the user has control over their crypto assets.  The private keys that they use to create transactions on the blockchain, they reside in the possession of the user.  There are a number of different types of non-custodial wallets.  Very commonly users will use what is called a software wallet, it is like an application that runs on your computer or on your phone.  Sometimes it is an extension or a plug-in for, let's say, your Google Chrome web browsers and that software wallet is responsible for

P7S5sto1                         Edman - Direct

creating the private keys associated with your cryptocurrency and for creating, signing, and distributing transactions to the blockchain.

There are other types of non-custodial wallets called hardware wallets where your private keys are stored on sort of a separate physical device which often times looks like a little subdrive and those are -- they're important because private keys can be stolen.  Let's say your computer is hacked or somebody gains access to your computer or your phone.  If they get your private keys then they can essentially steal your cryptocurrency.  And so, hardware wallets basically take the private keys from the computer and put it on the special purpose hardware device.

Q.   And then with respect to custodial wallets, what are those?

A.   Custodial wallets essentially delegate control of private keys to some centralized entity.  Instead of running software on your computer or having a special hardware device, you sign up for sort of, let's say, KuCoin or BitMart or Coinbase, and they take responsibility for creating private keys on behalf of their users, securing those private keys, and when you ask them, creating transactions to, say, send cryptocurrency from your account to some other address on the blockchain.

Q.   Can I send or receive crypto assets without a private key?

A.   There needs to be a private key somewhere in the context of custodial wallets.  You don't, you as the user, don't

P7S5sto1                              Edman - Direct

necessarily have access to your private key.  It is created and
maintained by this centralized entity like an exchange like
KuCoin.

Q.  Can you relate, then, these wallet examples back to your
discussion of a cryptographic signature?

A.  Sure.  In this example, the non-custodial wallets on the
left, they're responsible for generating the private keys and
using those private keys to create a cryptographic signature on
a transaction so that it can be validated, verified by a
blockchain network.

Q.  So -- sorry.  Go ahead.

A.  On the right, again, you are relying on the centralized
exchange or centralized trusted entity to do that for you.  You
don't have access to your private keys.

Q.  So using the non-custodial wallet situation, in fact if a
user wanted to engage in a transaction, their wallet has to
cryptographically sign the transaction?

A.  That's correct.

Q.  And then, after it is cryptographically signed, how is the
transaction submitted to the blockchain?

A.  That would be submitted to the blockchain by the wallet
software.

Q.  Now, if someone else obtains a copy of my keys, can they
create transactions pretending to be me?

A.  Absolutely.  The private keys are for how you control your

P7S5sto1                       Edman - Direct

cryptocurrency and if somebody steals your private key, they can create transactions pretending to be you and essentially abscond with all of your cryptocurrency.

Q.   Is it easy to create a wallet?

A.   It is.

Q.   And have you prepared a slide to demonstrate how to create a wallet?

A.   Yes.

MS. AXEL:  Let's go to the next page.  This is not the right one, actually.  Let's do this one first.  No, let's go back, let's go ahead and do that one.

Q.   Dr. Edman, have you prepared this slide to demonstrate what wallets are?

A.   I have.

Q.   Would you describe for us what is on the left to begin with?

A.   So, on the left is a screenshot of the software wallets called MetaMask.  It is a software wallet that is commonly used in cryptocurrency.  You can see on the left there are a number of accounts associated with that wallet.  Each of those accounts has a unique address associated with it, a unique private key that was created by the wallet software.  You can think of those accounts as kind of like, say, cards in your wallet where the MetaMask software acts like your physical wallet, and then within that wallet you have multiple different

P7S5sto1                          Edman - Direct

accounts like you might have a credit card, an ATM card, things

like that, each of which is identified by a unique number.

Q.   Are these unique numbers then -- can you trace them

publicly?

A.   They can.  You can.  If there is a transaction involving

any one of these accounts, that information would be visible on

the blockchain.

Q.   And so, showing on the bottom right there where it says

Etherscan, what are you showing us there?

A.   On the right I am showing a screenshot from a block

explorer called Etherscan.  You can see that the address sort

of at the top there, it is a little small, matches the address

of the top account and call it account 1 in this example.  So

you can see the history of all transactions associated with

that particular account.

Q.   So by knowing that account information you can actually see

the history of the account?

A.   That's correct.

Q.   OK.  Link this up for me again, though, with the private

key discussion.  Are these the private keys or are they

something else?

A.   No.  The addresses are public information.  The private

keys are created by the wallet software on the left, in this

case MetaMask, and they are known only to the user.  They keep

them on their computer and protects anybody else from accessing

P7S5sto1                        Edman - Direct

them.

Q.  So, does the wallet store both this public account information and then also the private key used to access it?

A.  Yes.

Q.  So let's now look at the next one.  Is this the example you prepared of how to create a new wallet address?

A.  Yes.

Q.  And you mentioned MetaMask as a popular application but are there other applications, other wallet software applications?

A.  There are many.

Q.  So this is an example?

A.  This is an example.

Q.  Can you walk us through -- you prepared this; right?

A.  I did.

Q.  So, can you walk us through how you create a wallet on MetaMask?

A.  Sure.

So, in this example, this is a somewhat older version of MetaMask but you can see the UI associated with the MetaMask software on the left.  Right now we just have two accounts. You can give them names that are meaningful to you but you wouldn't necessarily see those names on the blockchain, they are local on the user's device.  If you wanted to create a new account you just click Create Account, give it a name, you can -- let's say that you are going to use it for trading NFTs

P7S5sto1                         Edman - Direct

or something, you put whatever name you want here, this is just local to the user's software blockchain.  You hit Create, and now the wallet has created a new private key, and from that private key you can see the public address as it would appear publicly on the blockchain.

Q.   And how fast is this process?

A.   A matter of seconds.

Q.   Do you have to give MetaMask personal information?

A.   No.

Q.   Are there ways to create wallets even faster than through MetaMask?

A.   Yes.

Q.   How fast, for example?

A.   I mean, if you could create many, many accounts within a second and it is just a matter of creating that really large number which represents your private key.

Q.   You mentioned earlier -- oh, before I leave this, what is the little fox symbol?  Is that associated with MetaMask?

A.   Yes, that is logo or mascot for MetaMask.

Q.   You mentioned earlier that you were retained to annualize the Tornado Cash smart contracts.  Have you also prepared a slide to show an example of a smart contract transaction?

A.   I have.

Q.   Let me show you what is the next page, 11.

         First of all, what is the cat on the lower right-hand

side?

A.   That is an example of an NFT.  I mentioned that NFTs, they can have a number of different purposes, but most frequently people associate them with sort of digital artwork or ownership of digital artwork on blockchain.  In this case, that artwork is my entity which is a cat wearing a tie.

Q.   So, in this smart contract example, why are you showing the NFT?

A.   For this example just consider Alice, who wants to purchase this really cool NFT from Bob over here.  So, one way you can envision this transaction occurring is Alice can send some amount of ETH to Bob, Bob receives that ETH, and then sends the NFT directly to Alice.  Of course there is problems with that in that, let's say that Alice sends her ETH to Bob and Bob never actually sends her the NFT.  Since there are no refunds or clawbacks in the context of a blockchain, Alice basically got swindled out of the ETH that she paid to Bob.  It can go the other way where Bob sends Alice the NFT and Alice just never pays him.  In that case, Bob is out of an NFT.

        So, instead, we can use a smart contract.  That smart contract is basically a series of conditions.  It is like a program that runs on the blockchain, and that smart contract can be programmed such that Alice can send ETH to that smart contract, Bob can send his NFT to that smart contract.  The code comprising that smart contract, the series of instructions

P7S5sto1                          Edman - Direct

can verify that Alice has deposited the appropriate amount of ETH -- Bob's asking price -- and that Bob has deposited the correct NFT.  Alice may think she is buying a cat in a top hat and instead he sends something else.  The smart contract can recognize that and understand that Bob has not held up his end of the bargain.

So once these conditions are met, the smart contracts executes, automatically, a swap.  It will send the NFT to Alice and then send the ETH to Bob.  So in this case neither Alice or Bob have to trust each other.  They can both look at the smart contract, they can see the conditions of the instructions within that smart contract, they can validate that, yes, the smart contract does what it wanted to do and then they can complete this transaction without having to rely on each other or, say, a human in the middle.  It is just a computer program on a blockchain.

(Continued on next page)

BY MS. AXEL:

Q.  So if I understand correctly, the NFT is just an example of an asset that could be transferred.

A.  Correct.

Q.  And the role of a smart contract here is to make sure that the contract conditions have been met before any transfer takes place.

A.  Correct.

Q.  And contract conditions are all built into the code; is that right?

A.  That is correct.

Q.  When a smart contract like this is deployed to a blockchain, can anybody see it?

A.  Yes.

Q.  And can anyone interact with it?

A.  Generally, yes.  It depends on how the contract is implemented.  But blockchains like Ethereum, they're generally considered what's called permissionless, which means an application that's distributed to the blockchain, anybody by default can interact with it.  You don't have to sign up or, you know, create an account or anything like that.

Q.  A moment ago you talked about cryptocurrencies users having private keys to transfer crypto assets.  Do smart contracts also have private keys?

A.  No, not really.  Smart contracts can have what's sometimes

P7S1STO2                        Edman - Direct

called an owner address, and that address, the owner address, you can think of it kind of like an administrator or somebody who created and owns the smart contract, and may be able to perform certain functions with that smart contract others can't.  That owner address would have a private key, and so anybody with access to that private key could execute or perform those sort of privileged instructions with the smart contract.

Q.  And you were here for the testimony of Special Agent DeCapua, correct?

A.  I was.

Q.  Did any of the incidents, the hacks that he testified, involve the theft of private keys?

A.  My understanding is yes, they did.  The Ronin hack, for example, my understanding was that certain hackers had gained access to developer machines, used that access to access what are called validators, or special nodes associated with the Ronin network, used private keys that were held on those validators to create transactions, special privileged transactions for the Ronin smart contracts on the Ethereum blockchain, and were able to use that to drain assets from the Ronin blockchain bridge.

Q.  You mentioned earlier that you reviewed the source code for the Tornado Cash smart contracts; is that correct?

A.  I did.

P7S1STO2                         Edman - Direct

Q.   And did you analyze the source code to determine how the protocol operates?

A.   Yes.

Q.   I think I'm going to skip one.  Let's go to slide 15.  I think we'll come back.

       Okay.  Just staying on the subject that we just were on, do the Tornado Cash smart developers, including Mr. Storm, still control private keys associated with the owner address that you just described as the Ethereum pool smart contracts?

A.   No.

Q.   And what is the basis for that opinion?

A.   The basis for that opinion is the Tornado Cash smart contracts for the ETH pools, when they were created, they had an owner address.  That owner address could do a couple of things that a normal user of the Tornado Cash protocol couldn't do.  One of those things was transferring ownership, transferring that owner address from one address to another. In May 18, 2020, the developers transferred ownership or transferred that owner address to what's sometimes called a null address.  It's an address consisting of all 0s.  Nobody has a private key associated with that particular address.  And so by transferring ownership to this address for which nobody has a private key and therefore nobody can create a valid transaction for that address, essentially those smart contracts were immutable.  Nobody can call those privileged functions

P7S1STO2                    Edman - Direct

anymore.

Q.   So what does "immutable" mean?

A.   It means that the smart contract can't be changed, its functionality can't be altered.

Q.   Are smart contracts always immutable?

A.   Generally, yes.  So the series of instructions comprising that smart contract, once that's deployed to a blockchain, since the blockchain itself is immutable, those series of instructions can't be changed.  Smart contracts sometimes have certain variables associated with them.  In this example, the Tornado Cash ETH pool smart contracts had a variable that identified the owner address.  And in some instances that variable can be changed, which alters which particular series of instructions runs when you call a smart contract.  But if the smart contract doesn't have that functionality from when it's created, then there's really no changes that could be made to that smart contract.

Q.   So what was the effect to taking the owner address to null?

A.   Essentially those smart contracts can no longer be changed, no information associated with them can be updated.

Q.   Can anyone access these smart contracts on the blockchain?

A.   Yes.

Q.   Anyone can use them?

A.   Correct.

Q.   So if the Tornado Cash developers, such as Mr. Storm, were

P7S1STO2                     Edman - Direct

hacked today, could the hacker use that access, as in the Ronin example, to steal funds from these pools?

A.   No, they could not.

Q.   Can Mr. Storm or any developer access any user's funds that have been put in these pools?

A.   No.

Q.   And you mentioned that you were present for the testimony of Special Agent DeCapua; is that correct?

A.   Correct.

Q.   Have you reviewed the timeline of criminal hacks that he analyzed and testified about?

A.   I did.

Q.   And if you recall, when did the first incident occur?

A.   I believe the first incident that he analyzed occurred in September of 2020.

Q.   Is that after these pools were made immutable?

A.   It is.

Q.   Okay.  And can these pools then ever be taken off of these addresses?

A.   No.

Q.   They're here forever.

A.   As long as the Ethereum blockchain exists, yes.

Q.   Okay.  And so Mr. Edman, were you asked primarily to focus on the Tornado Cash ETH pools in this example——Tornado Cash 1 ETH pool, 10 ETH pool, 100 ETH pool, .1 ETH pool?  Do you see

P7S1STO2                        Edman - Direct

those?

A.  Yes.  Yes, I was.

Q.  Okay.  And so going forward, when we refer to the Tornado Cash pools, can we agree we're referring to the ETH pools?

A.  Yes.

Q.  All right.  Let's then go back a second.

Have you also prepared a slide to demonstrate how one deposits to a Tornado Cash pool?

A.  I have.

Q.  Okay.  Going back to page 12.

MS. AXEL:  Mr. DeMarco, can I have that.  There we go.

A.  So in this example, we have a user on the left.  They have a wallet address; in this case we'll say it starts with 0x34d. This user has 10 ETH in their account right now, and they want to make a deposit to the Tornado Cash pool; in this case it's a 1 ETH pool.  So in order to make that deposit, first, they need to create what's called a secret note, and that secret note, again, is basically a large random number known only to the user and not shared directly with the Tornado Cash developers or the pool smart contract.  That secret is then run through what's called a hash, which is sort of like a one-way function. You can put data into the hash and get an output, but given that output, you can't go the other way and figure out what the input was.  So the secret is hashed, and then this hash called a commitment is sent to the Tornado Cash pool.  It's called a

P7S1STO2                    Edman - Direct

deposit message.

When that transaction is distributed to the Ethereum network, 1 ETH is deducted from the user's account——we'll call it Alice——and then the Tornado Cash pool is credited with 1 ETH.  So the balance for the overall pool at this point, if it was 100 ETH before, after this transaction, now it's 101 ETH.

Q.  And is the picture of blocks on the right, does that address correspond to one of the pools that we were just looking at listed as a smart contract address?

A.  Yes, that's the 1 ETH pool.

Q.  The 1 ETH pool.  And so can anyone other than the user access the cryptocurrency once it's been moved to this pool address?

A.  No.  You would still need the secret, the secret note that the user created, and that's only known to the user.

Q.  Okay.  Just to get our concept straight, is the secret note the same as private keys?

A.  Similar in concept but different in practice.  So a private key is what you use to create a transaction, on the Ethereum blockchain.  The deposit note or the secret note associated with the Tornado Cash deposit is a different random value.  The user can use the same private key, the same Ethereum wallet address to make multiple deposits to the Tornado Cash pool, but each of those deposits will have a different secret note.

Q.  Okay.  Can you also demonstrate for us what a withdrawal

from the pool looks like.

A.  Yes.

Q.  Please describe to us what's depicted here with respect to withdrawal.

A.  So for the withdrawals, the user here, they have their secret note; the original nonhashed value corresponds to a deposit that they previously made to a Tornado Cash pool.  Now they create what's called a zero knowledge proof.

MS. AXEL:  Can we have that one more time, Mr. DeMarco.  It went by really fast.

There we go.

A.  The user creates what's called a zero knowledge proof, and that's a way of essentially proving that you know what that secret is without actually disclosing that secret.  And that proof is what gets sent to the Tornado Cash pool, not the secret itself.

The Tornado Cash smart contracts verify that proof. They verify that this does validly demonstrate that the user knows a random value corresponding to some previous deposit. The smart contract doesn't know which previous deposit it corresponds to, just that there's some previous deposit to the pool that hasn't been spent yet that corresponds to this proof.

Q.  And can anyone create that zero knowledge proof?  Can someone create that zero knowledge proof if they didn't have the original secret note?

A.   No.

Q.   And how does the pool know that it's receiving this secret note through the zero knowledge proof?  Or I'm sorry if I've just misdescribed the technology.  How does the Tornado Cash pool validate that the person actually has the note?

A.   So there's another smart contract called a verifier that knows the math behind verifying that the zero knowledge proof is valid and can verify that it corresponds to a previous deposit.

As for how the user——if that was your question——how the user sort of transmits that zero knowledge proof to the pool, it's by calling a particular function, withdrawal function, on the smart contract.

Q.   And was all this functionality sort of baked into the code from the beginning?

A.   It was, yes.

Q.   Okay.  We can move on to then the next process of the withdrawal.

A.   So after the pool has——or the smart contract is verified that this is a valid zero knowledge proof, corresponds to a previous deposit, without knowing which deposit, and that that secret note hasn't already been used to make a withdrawal, along with that zero knowledge proof the user provides a withdrawal address and then the pool smart contract automatically sends, in this case, 1 ETH from the pool to the

withdrawal address.

Q. Okay. And Mr. Edman, is this a somewhat simplified version of a withdrawal transaction?

A. Yes. In this case we're not using a relayer, so the user is submitting the withdrawal request. Obviously they would need ETH already in their account in order to be able to pay the transaction fees associated with this withdrawal request.

Q. Now does the Tornado Cash pool charge the user in any way for the deposit or the withdrawal?

A. No. The transaction fees associated with the deposit or withdrawal, those would go to the nodes or node in the Ethereum network that mines or validated the block that includes that transaction.

Q. So the Tornado Cash pool itself doesn't charge any fees.

A. Correct.

Q. Okay. So moving to then the transaction fee that you were talking about. Whose transaction fee is that?

A. I'm sorry. Associated with the withdrawal transaction?

Q. Yes. Well, any transaction.

A. So those fees are paid by the user to the Ethereum network.

Q. And where does the fee go?

A. It goes to the miners or validators of the transaction.

Q. And is that required for any Ethereum transaction?

A. Yes.

Q. Okay. But this particular map here does not show that, the

P7S1STO2                        Edman - Direct

gas fees.

A.  Correct.

Q.  Sorry.  Would you call the transaction fees also gas fees?

A.  Correct.

Q.  Okay.  So in this particular simplified illustration, who would pay the gas fees on a withdrawal?

A.  It would be the user.

Q.  It would be the user.  On the withdrawal part of the transaction?  On the back end?

A.  Whichever account submits the withdrawal transaction has to pay the gas fees for that transaction.

Q.  And so in this case would it have to be paid from the 0x251 user address?

A.  Yes, but at least in this example, assuming it's the same user.

Q.  Yes, it's the same user, but in terms of the address, that's where it would come from.

A.  Correct.

Q.  Okay.  So let's look at a withdrawal with a relayer.

        Okay.  Now, Dr. Edman, what is the function of a relayer, before we look at the specifics here?

A.  The function of the relayer is essentially to pay the gas fees associated with submitting the withdrawal transaction to the Ethereum network.  The relayer receives this zero knowledge proof from the user and then sends that transaction to the

Tornado Cash pool smart contracts and, in doing so, pays the associated gas fees.

Q.  And then how does the relayer get its instructions?

A.  The instructions come from the user.  So the user would submit this withdrawal request to the relayer, including that proof, since the user is the only one who knows this, the secret note corresponding to a previous deposit.

Q.  Does the relayer see the secret note?

A.  The relayer sees the secret note, but since the relayer does not know the underlying—the secret associated with that note, they only see the—sort of the hash or the encoded version.  They don't know the underlying secret that would allow them to make the withdrawal themselves.

Q.  So in this case still, only the user is the one who actually knows the note, the contents of the note.

A.  Correct.

Q.  So was the ability to use a relayer built into the software also from the beginning?

A.  It was, yes.

Q.  Pre-immutability.

A.  Correct.

Q.  And what problem does it solve here?  What is the need for a relayer?  Why would a user want to use one?

A.  So a relayer is helpful and necessary because the new account on the right here needs to have gas fees in order to

make the withdrawal, and oftentimes you want to make a withdrawal to a new account that doesn't have any transaction history associated with it. And so the relayer will pay those gas fees and then the withdrawal will go to the new account, even though that account doesn't have any ETH before this transaction so it couldn't pay the gas fees.

Q. Okay. So in our prior example it was the user, we talked about 0x251, paying this fee, right?

A. Correct.

Q. There was a concern that that compromises the anonymity of that user.

A. Correct.

Q. So can we then look at how this particular transaction then works.

MS. AXEL: Mr. DeMarco, go ahead and show the animation.

A. Yeah, so from the withdrawal, a portion of the 1 ETH will be paid to the relayer as a fee and then the new account will receive the remainder.

MS. AXEL: Okay. I think there were other portions of the animation. Go ahead and finish that.

There we go.

Q. Okay. So those additional arrows describe the gas fee. Okay. So what is the transfer fee versus the gas fee, now that we can see this whole thing?

P7S1STO2                     Edman - Direct

A.  So there are two separate fees associated with the transaction.  The relayer is paying the gas fee to the Ethereum network so that the transaction can be processed and validated, and then a portion of that withdrawal gets paid to the relayer. That's the transfer fee.

Q.  Okay.  And just so we're clear, Dr. Edman, I think—the gas fee doesn't go to the pool, it goes to the network.

A.  Correct.

Q.  Okay.  So you said the network of miners for Ethereum actually take that fee.

A.  That is correct.

Q.  Again, there is no fee to the Tornado Cash pool itself.

A.  That is correct.

Q.  And that's why the balance here is just the user's Ethereum coming in, the user's Ethereum coming out, and no other fees associated with that.

A.  Correct.

        MS. AXEL:  Okay.  Can we show the transaction balance in the user's account now.

Q.  Okay.  And so the user put in 1 ETH and got back .8 ETH. Why was that?

A.  Because a portion of the previous deposit was paid to the relayer.  That was the transfer fee, in exchange for providing the service of being a relayer and paying the gas fees.

        MS. AXEL:  Okay.  We can take that down for a second.

Q.   Dr. Edman, were you present for the testimony of
Mr. Werlau?

A.   I was.

Q.   Okay.  And if, as you say, the pools were immutable, then
how would it have been possible for developers to have changed
the Tornado Cash smart contracts as he had described?

         MS. AXEL:  Can we actually have slide 15 back up.

A.   My recollection of Mr. Werlau's testimony was that he
recognized that the Tornado Cash ETH pools were immutable as of
May 2020.  Those were not changed as part of the December 2020
governance changes to the Tornado Cash protocol.  Instead, what
they did was created new smart contracts sort of around the
existing ETH pools, those ancillary contracts that did not
actually change how the underlying—the core functionality of
the Tornado Cash ETH pools operated.

Q.   And can anyone still accept these ETH pools directly
without ancillary contracts?

A.   Yes.

Q.   Okay.  Dr. Edman, have you heard the term DAO?

A.   I have.

Q.   What is a DAO?

A.   A DAO, it stands for decentralized autonomous organization.
It's a method commonly used by blockchain protocols to delegate
decision-making over that protocol and how it operates to the
users of that protocol.

Q.   And how is a DAO generally created?

A.   A DAO is created, again, using smart contracts.  You can kind of think of those smart contracts as encoding sort of the bylaws of the organization.  It defines what aspects of the protocol can be changed and through what process.

Q.   And how do people vote in a DAO, generally?

A.   Typically a DAO will have a particular cryptocurrency token called a governance token, and the governance token is what you use to essentially vote for or against proposed changes to the protocol.

Q.   Did the Tornado Cash project have a governance token?

A.   It did.  When the DAO was created, there was a governance token called TORN that was also created at the same time.

Q.   Okay.  Let me show you what's in evidence as GX 1904.  Have you seen this document?

A.   I have.

Q.   Okay.  And it's titled Tornado.Cash Governance Proposal. What do you understand it to be?

A.   I understand this to be a Medium post that the Tornado Cash developers created that describes the creation of the DAO, including the TORN token.

Q.   All right. And showing you page 2.  There at the bottom it says, "30 percent, 3 million TORN.  Founding developers and early supporters will be unlocked linearly over three years with one year cliff."  What do you understand as being proposed

here?

A.  My understanding what's being proposed is this post is describing the allocation of TORN tokens.  So when the TORN token was created, there was a certain amount of the tokens that are created, here it was 10 million, and this specifies 30 percent will go to the developers and early supporters. Initially the developers and early supporters don't have access to those TORN tokens when it's created.  So these were created in December 2020, and as it says, there's a one-year cliff.  It means that anyone receiving those TORN tokens can't actually access them for a year.  After one year, they can access a third of the tokens.  That's the one-year cliff.  And over the following two years, they can only access one over 36, every 30 days.

Q.  And let me show you——

        MS. AXEL:  Sorry these are really not paginated, Mr. DeMarco.  We looked at these before.  The address page? Page 12, maybe.

Q.  Okay.  And what are these addresses in the post?

A.  These addresses are addresses of the various ancillary contracts that were created in connection with establishing the Tornado Cash DAO.

Q.  And let's look at the next page.

        So are all these addresses available on the blockchain?

A.   They are.

Q.   And have you looked at contract 3 here listed as the 0x77
address?

A.   I have.

Q.   Let me show you what's been marked as DX 8786.

         What is this, Dr. Edman?

A.   This is a screen capture of an Etherscan page showing a
history of token transfers associated with that team three
vesting contract.

Q.   Okay.  And I didn't ask you this.  The TORN token, what
kind of a token is it?

A.   TORN token is what's called an ERC-20 token, and an ERC-20
token is sort of a standard way of creating a new
cryptocurrency on top of the Ethereum blockchain.  ERC-20
refers to basically the specification for how a new token on
Ethereum should operate.  It defines certain functionality that
must be implemented by a smart contract associated with that
token, like transferring it from one user to another, or
creating new tokens.  In this case TORN is an ERC-20 token so
it implements that standard functionality.

Q.   Can anyone create an ERC-20 token?

A.   Yes.

Q.   Are there lots of ERC-20 tokens?

A.   Yes, there's very many.

Q.   And does an ERC-20 token have any functionality then in

P7S1STO2                        Edman - Direct

making an Ethereum transaction, on the Ethereum blockchain?

A.  No, not really.  In order to transfer an ERC-20 token from one user to another, you still need to make a transaction and pay gas fees, not in the token but in Ether.

Q.  So you'd always have to pay the gas fees in Ether, the native token.

A.  Correct.

Q.  Okay.  And looking at this, at the very bottom is this essentially when this——

THE COURT:  Counsel, are you seeking the admission of this exhibit?

MS. AXEL:  Yes, your Honor, I would like to move 8786 into evidence.

MR. REHN:  Can I see a copy.  I don't know if this was——

MS. AXEL:  It was disclosed last week.

MR. REHN:  Just the one page?

MS. AXEL:  Just the one page.

MR. REHN:  No objection.

THE COURT:  All right.  Defense Exhibit 8786 is admitted into evidence and it may be shown to the jury.  Thank you.

MS. AXEL:  Thank you.

(Defendant's Exhibit 8786 received in evidence)

BY MS. AXEL:

P7S1STO2                      Edman - Direct

Q.  Dr. Edman, why does it start with Null at the bottom?

A.  That transaction at the bottom from the Null address to the team 3 vesting contract, that indicates when the token was created.  So when the TORN token was created, tokens were minted.  Minting is sort of creating some amount of this token kind of out of thin air.  And so this reflects creation of those tokens sort of from thin air to the team 3 vesting contract.

Q.  Okay.  And so the tokens, 822,407 are created on 12/18/2020; is that right?

A.  Correct.  As part of the larger TORN token allocation, this particular vesting contract received 822,407 TORN tokens.

Q.  So would the team member to whom these tokens had been allocated been able to access that 822,000 on this date?

A.  No.  The team 3 vesting contract is what implemented the vesting schedule referenced in the Medium post.  It enforces that one-year cliff and the sort of linear release of tokens over the remaining two years.

Q.  So tokens can only be taken from this contract according to that schedule; is that right?

A.  Correct.

Q.  And so subsequently then we see some transactions which would accord with tokens being able to be released from the vesting contract.

A.  That is correct.

P7S1STO2                     Edman - Direct

Q.  Showing you 3006-1 that was a demonstrative exhibit used by Special Agent George.  Have you seen this exhibit before, Dr. Edman?

A.  I believe so.

Q.  Okay.  So a couple things.  On the far left, with respect to 2.5 million TORN on December 18, 2020, were those TORN actually available to the founders on December 18, 2020?

A.  No.

Q.  And do they come from anything called Tornado?

A.  No.

Q.  Where do they come from?

A.  They're minted, which, again, is sort of creating.  When the token is created, the tokens are just sort of—you declare there are this many tokens available for circulation.

Q.  It came from the Null address that we saw.

A.  That is correct.

Q.  Okay.  And then it shows 822,407 TORN being moved to founders' TORN addresses.  Do you see that?

A.  I do.

Q.  Is that correct?

A.  No.  Those are the addresses of the vesting contracts.

Q.  Okay.  So if the founders did access those particular wallets, how would they do that?  Or, I'm sorry.  They're depicted as wallets.  So you said vesting contracts.  So let me try again with a new question.

P7S1STO2                    Edman - Direct

If the founders did or when they did access these vesting contracts, how would they do that?

A.   They could only access the TORN associated with these vesting contracts according to the vesting schedule implemented in the contracts.  So after a certain period of time, once, let's say, the one-year cliff has passed, you would have to create a transaction to release tokens from that vesting contract to some other address.  If you try to release tokens before they've actually vested, then that transaction will fall and the tokens remain within the vesting contract.

Q.   And it would take the full vesting period before 822,000 was available to any of those vesting contract addresses.

A.   That is correct.

Q.   Okay.  Let's go back to slide 15.

Now once the Tornado Cash DAO was created, was it able to modify these pools?

A.   No.  The pools were immutable as of May 18, 2020.

Q.   So what could the DAO do with respect to the Tornado Cash protocol?

A.   I mentioned that when the DAO was created, they created a number of ancillary contracts, so around these pools, and the DAO could, through a governance vote, control certain aspects of these ancillary contracts but they couldn't actually alter the underlying ETH pools.

Q.   And how could the DAO modify those smart contracts?

A.   The DAO could modify the ancillary smart contracts through the governance process, which largely consisted of, you know, a user would have to have a certain amount of TORN, they would lock their TORN into the governance contract, which means you basically can't transfer your TORN once it's locked.  If you locked a certain amount of TORN, then you can create a proposal and that proposal is essentially another smart contract that contains how you propose to change the protocol.  Other users can see this proposal, have time to review it, and they can vote on this proposal, either for or against.  And those votes are proportional to the amount of TORN that they also have locked into the governance contract.

       The proposals have I think it was five days for other users of the protocol to evaluate the proposal, comment, discuss on it.  And then during that time they will——and as long as at least 25,000 votes were cast over those five days, either for or against the proposal, and the proposal received a simple majority of votes in favor, then that proposal would be considered passed.

       Then a couple days after that proposal is passed, then anyone can execute a transaction that would cause that proposal to essentially take effect, and at that point the protocol would be modified according to whatever was specified in the proposal.

Q.   And are the proposals visible on the blockchain?

P7S1STO2                    Edman - Direct

A.   They are.

Q.   Did you review the blockchain data associated with the proposal?

A.   I did.

Q.   Are the users who voted on the proposals reported on the blockchain?

A.   Yes.

Q.   And have you prepared a summary of the proposals?

A.   I have.

        MS. AXEL:  And I'd like to show for the witness and counsel only what's been marked as Exhibit 8701.

        Do we have 8701?

Q.   Okay.  Dr. Edman, do you see Exhibit 8701?

A.   I do.

Q.   Is this a summary you prepared of the voting proposals having reviewed the blockchain data?

A.   I believe it is.  This——it doesn't look exactly like the one that was on the previous slide.

Q.   Okay.  I think I'll move on.  Maybe we'll address that at the break.  Let's go back to the slide.

        Okay.  This is a summary you prepared, correct?

A.   It is.

Q.   Okay.  And this would indicate whether the proposals are accepted or rejected, correct?

A.   Correct.

Q.   Okay.  Did you also review the source code——turning to another subject.  Did you also review the source code for the Tornado Cash user interface?

A.   I did.

Q.   Where did you find that source code?

A.   I got the source code from two places——one, certain copies of the source code were I believe produced by the government; and I also independently obtained copies of the source code from a website called GitHub.

Q.   Okay.  What is GitHub?

A.   GitHub is a public website.  It's commonly used by software developers to manage and share source code and to collaborate on development of that source code.

Q.   Can anyone in the public add onto GitHub?

A.   Yes.

Q.   How would you do that?

A.   So you can create an account with GitHub, which will let you create what's called a Git repository, and a Git repository is essentially a collection of source code as well as a historical record of changes made to that source code.

        MS. AXEL:  And page 17, Dr. Edman's slide deck.

Q.   Okay.  What is this, Dr. Edman?

A.   This is a screenshot of the GitHub website showing a number of repositories associated with the Tornado Cash project.

Q.   And what is a git Commit?

P7S1STO2                        Edman - Direct

A.   Git commit is a set of changes to the source code.  It includes not just what was changed within that source code, for example, adding, removing, or modifying files or lines in the source code, but also historical records about when that change was made and who made that change.

Q.   And can you just walk us through this slide as you prepared it in steps to see how GitHub looks.

A.   Sure.  So at the top you can kind of see the Tornado Cash organization there, and within the organization there are a number of different repositories.

Q.   This is all public, right, on the internet?

A.   This is all public on the internet.

     Anyone can access any one of these repositories.  You can browse the source code through the website; you can download a copy of the source code either as a zip file or by cloning, which is essentially basically a copy of all of the source code and all of the historical changes.

Q.   I'm showing you the next blocks there.

A.   And depending on how the particular project operates, since anybody can download the source code, they can make their own changes to that source code locally on their computer, they can also essentially contribute those changes back to the project. They can create what's called a pull request, which is summary of changes that you've made and that you're proposing be integrated into that source code on GitHub.

Q.  Okay.  What is a user interface, Dr. Edman?

A.  User interface is essentially how most of us interact with the computer.  It's an application that you see on your phone or your laptop that includes graphical elements, and usually you interact with it using a mouse and typing some stuff in.

Q.  Is the user interface different than the thing that you're accessing using it?

A.  I'm sorry.  Could you rephrase that question.

Q.  What does it mean to interface?  What is it interfacing with?

A.  You're interfacing with—in this case, it's the GitHub website, but you can use the same, you know, Google Chrome web browser to interact with, let's say, a Google search.  It's the same application, but you're interacting with different applications within that interface.

Q.  What is a command line interface?

A.  Command line interface is sort of more text based.  Instead of having a bunch of graphical elements, you essentially see just a bunch of text on the screen, and instead of clicking around on things, you mostly just type commands into that interface.

Q.  Okay.  And all these, are these alternatives to one another?

A.  Typically, yes.  You access the same information and can generally perform the same functions.  It's just one is a

graphical method and then one is sort of more text based.

Q.  Okay.  Have you prepared some examples to show us the difference between these types of interfaces?

A.  I have.

Q.  Okay.  And showing you page 18.  What are you depicting here?

A.  This is just accessing a website like all of us do, using user interface.  In this case the user interface is Google Chrome.  So you put an address into the——into the top of your web browser, hit enter, and your web browser is responsible for going out to Google servers and requesting certain information, receiving that response from Google, and then drawing it in, inside the application.

Q.  Okay.  And is this Google interface?

A.  Yes.

Q.  Is there another way then to access the same Google content or have we finished the slide?

A.  I think there's one other part of the animation, but——

        MS. AXEL:  Okay.  Go ahead, Mr. DeMarco.

        Oh, no.

        THE WITNESS:  That's not it.

Q.  Okay.  So is there another way that you can access Google to do the same kind of searching?

A.  Yes.  So in this example, we're using a CLI application. As you can see, there's no pretty user interface here.  It's

P7S1STO2                          Edman - Direct

just what's called a command prompt.  And here, we're using a text-based CLI tool called Lynx.  You type the address of the url that you want to access and then that software goes out to Google servers, requests the same content, but instead of showing you pretty pictures and everything, since it's a text-based interface, you just see the text from the website.

Q.  And I asked you before what an interface access is.  Here you just said it's Google servers, right?

A.  Right.

Q.  In addition to the two examples you showed us, are there other ways you could access Google to run these Google searches?

A.  Yes.

Q.  Such as, for example?

A.  So both the user interface and the CLI are essentially using the same series of commands to request information from Google servers.  Instead of using a UI or a CLI like in these examples, you could request that information from Google directly.

If you go to the next slide.

Guess not.

Q.  Actually, I think that one's not there.  So just describe.

A.  So you can basically connect directly to Google servers, issue the same commands that the UI and the CLI are issuing, and receive exactly the same response.  But instead of it being

rendered, you know, in——

Q. All right. Sorry. We did get off that slide.

MS. AXEL: Go back, yes. We hadn't moved on. We're still here.

Q. Sorry, Dr. Edman. You can continue.

A. So instead of rendering the return content in user interface, like Google Chrome or CLI, like here, using Lynx, you just see the raw data, so to speak, that's returned by the Google servers, and so you as the user would have to read through that and understand the responses. Not as user friendly, but you're receiving the exact same information; it's just presented to you differently.

Q. And people like you that know how to read code can do that.

A. Correct.

MS. AXEL: Your Honor, I'm informed that the screen for the audience isn't working and we should just check and make sure that everyone's, including the jurors, are working.

THE COURT: The jurors' screens are working. I'm getting nods.

Anyone, please raise hands if it's not working.

No hands are being raised. We'll call AV about the other. Thank you.

BY MS. AXEL:

Q. All right. And with respect to GitHub, can you also access it either through the internet or——I'm sorry——either through a

P7S1STO2                        Edman - Direct

browser or directly as you've just described?

A.   Yes.

Q.   Okay.  Showing you the next slide.  What does this show?

A.   So this is, again, just using Google Chrome web browser to access the public GitHub website.  Here, we can just run a search for Tornado Cash GitHub, see a list of results, and then click on the—click on the result that we want and go look at the source code on the GitHub website.

        Here, it's the same thing except instead of using a web browser, we're going to use a command line tool called Git, which requests information from GitHub and makes a copy or a clone of the source code associated with, you know, some repository; in this case we're picking the source code for the Tornado Cash UI, that source code.  As long as—as long as all previous changes to the source code are downloaded to the computer, you can look at that source code, you can look at the changes that have been made previously, inspect those changes, revert to previous versions, all from the—from the CLI.

Q.   And Dr. Edman, you mentioned the GitHub repository. Turning back to that subject.  Is that something you can keep on your own computer?

A.   Yes.  When you make a clone of the Git repository, you copy essentially everything down to your computer and you can keep it.

Q.   Is that common?

A.   Yes.  It's very common.

Q.   Why is it common?

A.   That's largely how Git was intended to function.  The various developers using Git have basically perfect copies of the source code and historical changes that they then work from and then can share those changes with other developers who have——who are working from the same sort of historical changes.

Q.   So anyone could access then, for example, the code for the pool smart contracts, if published in the repository.

A.   Yes.

Q.   Or for the UI or CLI.

A.   Correct.

Q.   And they can permanently maintain their own copies.

A.   Yes.

          THE COURT:  Counsel, when it comes to a convenient point for a break, please let me know.  I'd like to have our morning break.

          MS. AXEL:  Okay.  Just a few more questions?

          THE COURT:  Sure.

BY MS. AXEL:

Q.   Did you review the implementation of the Tornado Cash UI to determine how it interacted with the Ethereum blockchain?

A.   I did.

Q.   And how does it interact with the blockchain?

A.   The UI interacts with the blockchain through——it's two

P7S1STO2

ways.  One is reading information from the blockchain via what's called an RPC provider, or remote procedure call.  And it sends information to the blockchain via your wallet application, such as MetaMask.

Q.  Does the UI application itself write transactions to the blockchain?

A.  No.  That occurs through your wallet software.

MS. AXEL:  Okay.

THE COURT:  Thank you.  We're going to take our morning break, and I know you haven't heard this for three days so in case you've forgotten, please do not discuss this case with each other or with anyone else, and please keep an open mind until all of the evidence has been introduced and admitted.

We'll see you in about ten minutes.  Thank you very much.

THE DEPUTY CLERK:  All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Counsel, please be seated for a moment. The witness is welcome to step down if you'd like.  Thank you.

Just to advise you, a member of our jury administration group is meeting with the jurors this morning. She's in the room right now.  There are some forms they have to fill out, and I'm not aware of them, but it may take a minute or two longer than usual while they go through these forms, so just please keep that in mind.

Ms. Axel, may I have a sense the remainder of your direct.  Will it take us through lunch?

MS. AXEL:  Yes, I believe.

THE COURT:  Okay.  And then Mr. Rehn, perhaps I was presuming too much.  Are you doing the cross?

MR. REHN:  Yes, your Honor.

THE COURT:  Will that take the rest of the day?

MR. REHN:  I hope not, but we'll see how much more we get in the direct and that needs to be cross-examined on.

THE COURT:  And then our next witness will be?

MS. AXEL:  There were a couple of small witnesses. Who's next?

MR. KLEIN:  Your Honor, we had Mr. Wuollet, but because of his availability, he may not be here.  Maybe he'll testify after lunch.  We have Mr. Almeida, Professor Malekan, Mr. Thurman, and Dr. Hurder, for today.

P7S1STO2

THE COURT:  Okay.  Would it be your thought that we'll try and get the smaller witnesses done today?

MR. KLEIN:  Yes, your Honor.

THE COURT:  And should I ask the jurors if they can stay a little bit later to try and do that?

MR. KLEIN:  We're fine with that.  It just depends on——

MS. AXEL:  I doubt we'll have trouble getting the small ones on.  I think.

THE COURT:  Your lips to god's ear.

Okay.  We'll see.  I'll tell them maybe till closer to 4 or 4:15 because then we have Dr. Hurder tomorrow?

MR. KLEIN:  Yes.  Tomorrow we would have Dr. Hurder; there's a custodian of records for Chainalysis; we potentially have Mr. Sheridan; we have Dr. Green.  And our client, depending how we go in the day and what his decision is.

THE COURT:  Of course.  Then I'll see you in about 10 minutes.  Thank you very much.

THE LAW CLERK:  All rise.

(Recess)

(Continued on next page)

P7S5sto3                    Edman - Direct

(Jury present)

THE COURT:  Thank you.  You may be seated.

Counsel, you may continue.

BY MS. AXEL:

Q.  Dr. Edman, I'm going to show you your Ethereum transaction slide, page 7 on the screen.  You had described for the jury how Alice sent monies in this transaction; correct?

A.  Yes.

Q.  This is simplified and did not address the gas fee theory; right?

A.  I believe that's correct.

Q.  So, in this particular example, where would the gas fee or the Ethereum fee come up and who would pay it?

A.  So, in this example, Alice would be paying the transaction fee or gas fee in connection with the transaction for sending one ETH from her account to Bob.  Those gas fees would be paid to the miners or validators in the Ethereum network, whoever mined the particular block that included her transaction, that miner/validator would receive not just Alice's gas fees but gas fees for all of the other transactions within that block.

Q.  So are those miners the same thing as the computers that we see here or something different?

A.  They can be.

So, you can participate in the Ethereum network either as just a node relaying and storing transactions or as a miner

P7S5sto3                      Edman - Direct

or a validator.  It takes more resources to do the latter but anybody can participate in it.  So, you assume that some subset of these little laptops in the Ethereum network are a miner, one of them mines the particular block in the top right.  That miner would receive the gas fees.

Q.  And so, then looking at our simplified withdrawals from Tornado Cash on page 13 -- oh wait, before we -- before you leave this, though, then Alice's wallet would also be deducted not just the one ETH transfer but also the ETH that she paid?

A.  That is correct.

        MS. AXEL:  So now let's go to slide 13.

Q.  So, in this example, Dr. Edman, where would the Ethereum fee be paid?

A.  The gas fee would be paid, again, to the Ethereum network, not to the Tornado Cash pool.

Q.  So it's really outside the scope of this particular demonstrative, validator nodes that get that fee; right?

A.  Correct.

Q.  And so in this instance if we had put the gas fee, which ledger would it be deducted from?

A.  In this example it would be deducted from the user who created the deposit transaction or the withdrawal transaction.

Q.  It would be on the 0x34d ledger?

A.  For the deposit and for the withdrawal, whoever submitted the withdrawal transaction.

Q.   I see.   The deposit would be for the user on the 0x34d but the withdrawal would be 0x251 here?

A.   Correct.

Q.   And in no instance does the pool itself charge any fee?

A.   Correct.

Q.   So there is no transaction fee that would ever get deducted out here from the 0x47CE address?

A.   Correct.

Q.   And we also showed you an exhibit for you to authenticate, without yet the jurors, showing you DX 8701.  Do you recognize it now?

A.   I do, yes.

Q.   And what is it?

A.   This is a summary of data associated with governance proposals that were made to the Tornado Cash DAO and votes either for or against those proposals.

Q.   And what information did you review that you relied on to create this summary chart?

A.   The summary chart was created from blockchain data submitted with the governance, the Tornado Cash DAO governance smart contracts.

Q.   Is that your summary of the proposals in Column B?

A.   Column B, yes.

Q.   Yes.

And then it also shows when the votes happened and the

P7S5sto3                    Edman - Direct

total votes, etc.?

A.   Correct.

Q.   And then you showed a version of this on the slide that we also looked at?

A.   That is correct.

          MS. AXEL:  DX 8701, defense moves in evidence.

          MR. REHN:  Objection, your Honor; 802.

          THE COURT:  I will allow it.

          Defendant's Exhibit 8701 is admitted into evidence and may be shown to the jury.

          (Defendant's Exhibit 8701 received in evidence)

BY MS. AXEL:

Q.   Dr. Edman, so we can see this, how does this compare to the summary slide that we looked at concerning the proposals?

A.   It is essentially the same data.  There might be some additional columns in this particular exhibit that we just couldn't show on the slide.

Q.   And let's just quickly associate it with the slide before we move on, so that is 16.  You said this is a more summary version of the data that was in 8701?

A.   Correct.  I think the only difference is hiding the voting extended time which is mostly false.

Q.   So let's take that down for a second.

          You had mentioned earlier that you reviewed GitHub to review the source code in this case; correct?

P7S5sto3                        Edman - Direct

A.   Correct.

Q.   And you reviewed the Tornado Cash UI code?

A.   I did.

Q.   Was it minified code?

A.   I reviewed both the minified version and the full source code.

Q.   They were both available?

A.   Yes.

Q.   And can you define for the jury what minified code is?

A.   Minified code is sort of a compressed version of source code.  It removes a lot of additional detail that you don't really need to run the source code like developer comments, which are sort of notes to themselves.  It is a little more difficult to read but the functionality is the same.

Q.   And what would be common reasons for using or uploading minified code to GitHub?

A.   Web applications are commonly distributed as minified code just because it is significantly smaller and more efficient for sharing and downloading into a web browser.

Q.   And have you prepared a demonstrative exhibit here to show the jury how the Tornado Cash UI worked?

A.   I have.

          MS. AXEL:  And let's go to page 23.

Q.   Dr. Edman, what are we seeing on the first page here?

A.   So, in this first slide this is the work flow for creating

a deposit to Tornado Cash.  The Tornado Cash pool supports, in addition to ETH, a number of other tokens.  In this case we are just going to look at the example of making an ETH deposit. So, first you select which type of cryptocurrency you want to deposit into a Tornado Cash pool.

Q.  And what is the next step?

A.  Then you select the denomination.  Each pool has a similar amount and all the deposits to that particular pool have that same amount.  For example, if you are depositing 0.1 ETH, that deposit would go to one pool.  If you are depositing 1 ETH, that would go to a different pool.  Here, for example, we are creating a deposit of 1 ETH.

Q.  And what happens next?

A.  In order to actually complete the deposit you need to connect your wallet to the Tornado Cash UI and this is the software wallet example that we walked through earlier.  So, you can see the little MetaMask icon in the top here.  If you click that, you are connecting your wallet software that is running in your web browser to the Tornado Cash UI, you are basically letting the two talk to each other.

Q.  And could you connect a different kind of wallet?

A.  Yes.

Q.  So this is just for example here?

A.  Correct.  You are not limited to only using MetaMask but it is a fairly popular option.

P7S5sto3                         Edman - Direct

Q.   And what is the next step then, if you were using the UI?

A.   So, if you were using the UI, you would select the account that you want to use to make the deposit and then when you click deposits are you going to -- the UI is going to generate the secret note, this long random number, and then you need to save that secret note to your computer.  It provides you with sort of a warning that this exists only on your computer and you have to verify that you did, indeed, back up the note. After you click Send Deposit, the Tornado Cash UI asks your wallet software to send this particular deposit to the Tornado Cash pool.  After that deposit is submitted to the blockchain, you can view that particular transaction on any public block explorer like Etherscan.

Q.   And does the user's wallet conduct or send the transaction?

A.   Their wallet software does, yes.

Q.   The user's wallet software does?

A.   That is correct.

Q.   Have you checked the code to confirm that that is how it works?

A.   I have.

Q.   So when you talked before about a cryptographic signature, where is that in this process of the deposit?

A.   The cryptographic signature would be created by the wallet, so the user's wallet software is what creates the private keys and stores the private keys used to create the signature.

P7S5sto3                        Edman - Direct

Q.   Does the user have to have an RPC provider in order to send the transaction to the wallet, to the blockchain?

A.   No.  The UI used an RPC provider to obtain information from the blockchain.  In this example you can see sort of the estimated gas fees in a previous screenshot, you can see recent deposits.  All of that information is read from the blockchain, but in order to make the deposits or the transaction to the blockchain, that has to go through your wallet software.

Q.   And does the wallet software then write to the blockchain?

A.   Yes.  That's what is going to actually submit the blockchain, that while its software may use its own RPC provider but it is outside of the Tornado Cash UI.

Q.   And even for reading the blockchain information in the UI, can the user provide their own RPC provider?

A.   They can.  Yes.

Q.   That's an optionality that is built in here somewhere?

A.   Yes.  There are a number of free RPC providers and if you prefer to use one over the other, you can choose that as well.

Q.   OK.  Let's look at then your slides here concerning withdrawal transaction.  How does that work?

A.   So, we need to provide the UI with your, the deposit note that you saved previously since you're the one who has the deposit note.  If you are the only one who has it, you need to paste that into the UI software here and then specify where you want the withdrawal to go.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7S5sto3                        Edman - Direct

Now, the saved note that you are pasting in here does not actually get submitted to any server, it is just used by the UI software running in your web browser to create that deposit transaction that then gets submitted to the blockchain.

Q.   Does the UI software save the secret note?

A.   No.

Q.   What is the next step then?

A.   So, if you pick the recipient address and make sure that your wallet software is connected, then click withdraw.  Within the MetaMask software it receives this -- MetaMask software receives the withdrawal transaction but at this point it is not actually signed, so the MetaMask software will use the private key that it created and that it controls in order to sign that transaction and then submit that transaction to the blockchain.

Q.   Is this a transaction without a relayer?

A.   I believe so.  Yes.

Q.   So, is the relayer optional, sometimes you could do the withdrawal yourself; correct?

A.   Correct.

Q.   Did we finish this?  The connected wallet pops up?

A.   Then you click confirm to verify it as you do want to create the transaction, and then the software will submit the transaction to the blockchain for you.

Q.   So, when you hit confirm, it is your wallet software that submits your transaction?

P7S5sto3                        Edman - Direct

A.   Correct.

           MS. AXEL:  OK.  I think I'm not going to do this one
yet, Mr. Demarco, so let's pause here for a second.

Q.   How else could you create a transaction other than by using
the user interface -- the Tornado Cash user interface?

A.   There was a CLI software implementation available as well.

Q.   Are there other ways?

A.   You certainly could create the transaction yourself.  It is
fairly complex but there is no technical reason that you
couldn't.

Q.   And using the COI, how does that work?

A.   The CLI software, like the UI that you download to your
computer, could, for example, obtain the CLI software from the
GitHub which includes the source code, review it, and verify
that it does what you want it to do, and then you can just run
that on your computer to create either a deposit or withdrawal
transaction instead of using the UI.

           MS. AXEL:  I would like the witness and counsel and
the Court to see Exhibit 8788.

Q.   Doctor, I am showing you what is marked Defendant's Exhibit
8788.  Do you recognize it?

A.   I do.

Q.   What is it?

A.   It is one of the source code files from the Tornado Cash
CLI software.

P7S5sto3                        Edman - Direct

Q.  Did you obtain this document?

A.  I did.

Q.  How?

A.  I obtained it from a source code repository that I downloaded from GitHub.

MS. AXEL:  Can you flip through the pages, Mr. Demarco, so that counsel can see it?

Defense would move in evidence 8788.

MR. REHN:  No objection.

THE COURT:  Defendant's Exhibit 8788 may be admitted into evidence and shown to the jury.

(Government's Exhibit 8788 received in evidence)

BY MS. AXEL:

Q.  Dr. Edman, what is this exactly?

A.  So, this source code file from the Tornado Cash CLI software defines the addresses of the pool smart contracts that make up the Tornado Cash protocol.  It includes -- you can see at the top here for ETH the addresses of the ETH pools, their denomination, 0.1 ETH, 1 ETH, and 100, and the blocks after which those pools are available.

It also includes additional information like the address of a proxy or router contract that the CLI software can use to submit a deposit or withdrawal transaction.

Q.  And this looks like a bunch of numbers to me.  Is this something you can read?  You personally, Dr. Edman?

P7S5sto3                        Edman - Direct

A.   Yes.

Q.   And can you put this in your computer and run this?

A.   You need the other source code associated with this particular file so the rest of the source code for the Tornado Cash CLI but it is publicly available, you can download it, and you can run it.

Q.   Can you modify this code?

A.   Yes.  The source code is basically a text file so you could open this in Windows Notepad and make whatever changes you want, it is safe, and now you have a modified version of the source code.

Q.   So as a sophisticated user, you could easily modify this?

A.   Correct.

Q.   Would any user need permission from anyone to make these modifications and use this code?

A.   No.

Q.   Could the Tornado Cash developer such as Mr. Storm control what modifications were made to this code?

A.   No.  Generally once you download source code to your computer the developer -- the original developer of that source code can't technically control what you do with it.

Q.   So can people re-distribute source code?

A.   They can.

Q.   Can they modify it and re-distribute that source code?

A.   Yes.

P7S5sto3                    Edman - Direct

Q.   Is that also true for the UI code?

A.   Yes.

Q.   So that also can be modified and distributed freely?

A.   That is correct.

Q.   So someone -- could someone pop up their own user interface using the code?

A.   They could, yes.

Q.   Or simply run it on their own computer?

A.   Yes.

          MS. AXEL:  Let's go back to the slides and can I look at page 32?

Q.   Dr. Edman, you indicated that users could interact directly with the pools.  Can you walk us through this that you prepared and how they can do that?

A.   Sure.

          So, after December 2020, I mentioned there were some ancillary contracts that were created around the core ETH pools.  One of those ancillary contracts was the Tornado Cash router and so the user, using CLI or UI or some other method, can submit a deposit or withdrawal transaction to that route which then gets sent to one of the pools, in this example the 1 ETH pool.  The transaction, of course, like any other transaction, has to be distributed to nodes in the Ethereum network and verified and mined into a block before that deposit ever actually occurs or takes effect.

P7S5sto3                          Edman - Direct

Q.   And is there another way then?  Sorry?

A.   Of course.  Sue.

So, the software, the UI or the CLI software could be modified to instead f send the transaction to the Tornado Cash router, can just bypass the router and send that deposit transaction directly to one of the ETH pools, just that like happens before December 2020, before the router was ever created.

Q.   And have you seen examples on the blockchain of users going directly to the pools?

A.   I have, yes.

Q.   Let's switch gears for a second and we can take this down.

What is a decentralized application?

A.   A decentralized application is an application that is generally hosted by or distributed by multiple participants in any protocol as opposed to, let's say, a centralized location when we looked at Google before.  Google develops the source code, you access their website, they run servers behind that provide you the content that you see, but a decentralized application, everybody that is participating in this protocol can contribute resources to the operation of that protocol.

Q.   Is this something unique in the blockchain community?

A.   No.  There have been decentralized protocols, I would say, even before cryptocurrencies.

Q.   Can you provide an example for the jury?

A.  So, another example of a decentralized protocol, I don't remember exactly when it was created, but IPFS is one that is commonly used within cryptocurrency.  It is a decentralized file storage network.

Q.  That existed prior to cryptocurrency?

A.  I don't remember exactly when it was created.

Q.  Have you prepared a slide to help illustrate this subject matter?

A.  Yes.

MS. AXEL:  Let's look at page 31.  OK, that's correct, Mr. Demarco.

Q.  Dr. Edman, on the left what are you showing here?

A.  So, this is an example of the centralized application I was just talking about where you have your computer, you are running Google Chrome, you use your web browser to access content from Google, that content that is hosted on Google servers.  You send a request, if goes out over your internet service provider like Verizon or AT&T, and the Google servers receive that request, look up information to respond to that request and send it back to you through your ISP.  But, in this case Google is -- they're an example of a centralized service where they're the ones hosting and providing all of the data.

On the right --

Q.  OK.  By contrast.

A.  By contrast, on the right is just sort of a conceptual

P7S5sto3                        Edman - Direct

example of a decentralized application where each of the

participants in this protocol contributes whether it is

processing or band with or data storage to help serve requests

from other users who are also participating in that protocol.

Q.   OK.  So in this instance do these decentralized -- are

these also nodes?  What would you call these computers?

A.   You can call them nodes, servers, participants.

Q.   So these nodes all separately host data?

A.   Correct.  It depends on the protocol, but generally no

single node in the decentralized protocol is going to host all

of the data on the network.  They may host just subsets of it.

Q.   So, with respect to the UI, for example, can we just --

yes, thank you, read my mind -- was this hosted in a

decentralized manner?

A.   Correct.  It was hosted on IPFS.

Q.   Have you reviewed what is marked Government Exhibit 1611?

That is an exhibit that was used with Ben Gibbs.

A.   Yes.

          MS. AXEL:  Can we look at that?  I think we need to go

a few pages in or maybe to the last page to see the end of that

animation.

Q.   Do you understand the process that is being shown in this

chart 1611?

A.   Yes, I do.

Q.   Can you remind us what it is?

P7S5sto3                         Edman - Direct

A.   Sure.  So, in this example the user is accessing a website associated with an ENS website, and they're accessing that website through a service called ETH.limo.  So the user on their web browser on their computer they type in website.ETH.limo, and that request goes to an ETH.limo server. The ETH.limo server or service knows how to map the ENS name website.ETH to what is called a content identifier.  Instead of a URL that you can type into your web browser, a content identifier is how you locate content on a decentralized network like IPFS.

So, ETH.limo server goes to the Ethereum blockchain, looks up the ENS website name website.ETH, obtains the content identifier from the Ethereum blockchain, and then goes to the IPFS network and requests the content associated with that content identifier.

The nodes within the IPFS network will collaboratively respond to that request, provide the content back to the ETH.limo server, who will return it to Ethereum.

Q.   This is one way that the user can get the website content or the interface content.  Am I understanding you correctly?

A.   Correct.

Q.   With respect to the blockchain information, the first step of this, if the user is sophisticated and knows what they're doing, can they skip this ETH.limo process and directly get that information?

P7S5sto3                        Edman - Direct

A.  Correct.  You can go to the Ethereum blockchain and do the lookup for website.ETH yourself, find the content identifier, and then if you have access to the IPFS software, you can make the exact same request that ETH.limo would except you do that without relying on ETH.limo.

Q.  Are there other ways to get that IPFS identifier?

A.  Yeah.  It is basically a short string, so any way that you can share that content identifier you could use that later to look up content from IPFS.

Q.  All these little computers on the peer-to-peer network, IPFS, do they always host the same version of the content?

A.  No.  When the content changes, the content identifier will change as well and the nodes on the IPFS network can host multiple different versions of that same software which will have different CIDs.

Q.  What is the concept of pinning?

A.  Pinning is a way of making sure that the content that you want to make available to someone is actually available on the network.

     So, if you are hosting content on IPFS on your computer and somebody comes to the IPFS network and requests that content, that information could get faxed or stored on other nodes in this decentralized IPFS network.  Since no node can necessarily store all of the data for all requests for all time, periodically they'll clear out their cache or delete

P7S5sto3                          Edman - Direct

stuff people haven't requested in a while.  Now if they clear out their cache and your computer, let's say it is no longer online, you turn it off for the night and so you are not serving that content anymore, somebody who comes to the IPFS network and requests that CID, they wouldn't be able to obtain that data.

So a pinning service is basically a service that hosts the data that you want to be available on the IPFS network and their servers and make sure that is running all the time and that this data is available all of the time.

Q.   But do the servers in this network have to take the updated content?

A.   Could you rephrase that?

Q.   Do the IPFS nodes have to accept the updated content or can they continue to pin previous versions?

A.   You can pin -- as a participant in IPFS you can pin whatever content you want.  If you want to make sure all versions of a particular application are available at all times you can pin all of the different versions.

Q.   Can these nodes also download various versions of the CIDs?

A.   Yes.

Q.   So through this system you really can't make old content go away.

A.   No.

Q.   Did you see any evidence that older versions of the

P7S5sto3                        Edman - Direct

Tornado Cash user interface remained in use?

A.   Yes.

Q.   I want to take a look back at your summary opinion slide, page 6.  Dr. Edman, at the bottom there you said:  The developers incorporated multiple features into the software to limit use of the software by sanctioned entities; right?

A.   Correct.

Q.   What are you referring to it there?

A.   I am referring to changes that the developers made to the Tornado Cash software that would check certain information about a particular transaction like the IP address of the user who is accessing the website or the wallet address that is used to make a deposit or withdrawal to or from Tornado Cash, and then if it matches certain lists, then deny access to that user or refuse to create that transaction.

Q.   What was the Tornado Cash compliance tool?

A.   The Tornado Cash compliance tool was sort of in addition to the Tornado Cash UI that -- I believe it was added in June 2020 that lets you basically prove, given your secret note that you used to make a deposit/withdrawal, prove which deposit and which withdrawal corresponded to that particular secret note.

Q.   OK.  Can we stop for a second?

        Did you prepare another slide that illustrates that?

        MS. AXEL:  Can we see page 33?

A.   I did.

P7S5sto3                          Edman - Direct

Q.   And just before you go too deep into it, what is the
screenshot at the top?

A.   The screenshot at the top is the screenshot of the
Tornado Cash compliance tool.  In this example you paste your
secret note up at the top and it creates, basically, a report
that lets you show which deposit corresponded to which
withdrawal, if any, for that particular secret note.  So, if
you needed to show the origin of funds, you could do that with
this particular tool.

Q.   And so, if I took my Ethereum after it came out of the
Tornado Cash pools and I sent it to a centralized exchange,
would I provide this information to that exchange?

A.   You could.  They could ask you to prove the source of funds
to, for example, make sure that the funds deposited to your
account from Tornado Cash weren't connected to a deposit
associated with some criminal incident.

Q.   It would show where the funds came from prior to being
deposited in the pool?

A.   Correct.

Q.   Can only the user generate this particular compliance
report?

A.   Correct.  You need the secret note in order to generate the
compliance report.

Q.   And what did you put in the slide on the bottom left?

A.   The bottom left is a screenshot from a GitHub repository

P7S5sto3                         Edman - Direct

for the Tornado Cash UI.  This is a commit that was made to that repository, in this case by Mr. Storm on May 8, 2020, that incorporated certain changes related to development of the compliance tool.

Q.  And this was in the process of the development of the code for this pool; correct?

A.  Correct.

Q.  And you thought it went live in or about June 2020?

A.  I believe so.  At least that's when I believe it was announced publicly.

Q.  Is this a common feature of decentralized protocols, this compliance-type tool?

A.  Not really.

So Tornado Cash was fairly a novel protocol, especially back at this time, and so this is sort of a, kind of an innovating way to show the origin of funds via the Tornado Cash protocol.

Q.  And did the developers implement any measures to prevent sanctioned users from accessing the website or the UI?

A.  I did.

Q.  And what was that?

A.  It was a technique called geo-blocking, which basically prevents users from certain IP addresses from accessing a website.

Q.  Why is it called geo-blocking?

P7S5sto3                        Edman - Direct

A.   Geo-blocking because it generally refers to something sometimes called GUIP which is mapping an IP address, which is a phone number for a computer on a network, to an approximate geographic location.  So, given an IP address there are certain databases that you can use to match the IP address to, say, the country of the user or the computer associated with that IP address.  So, what this is doing is essentially looking at that IP address and mapping that IP address to a country code like Russia or Belarus and if that matches, then redirecting to the compliance page.

Q.   Did the geoblock also include blocking the DPRK?

A.   It did.  My understanding is that's -- what is identified by the KP country code.

Q.   So, was this -- what of the applications or ancillary tools that you have discussed was this tool applied to?

A.   This would have been applied to the website.

Q.   Would you include within that the user interface?

A.   Assuming the user interface was accessed via Tornado Cash. If you access the UI directly from IPFS, then this wouldn't apply.

Q.   If you access it from the website it would?

A.   Correct.

Q.   And was something like this put on the pools itself?

A.   Similar, but instead of looking at IP addresses of users, it was looking at wallet addresses.

P7S5sto3                       Edman - Direct

Q.   Could the developers block addresses from accessing the
pools directly, though, on any basis?

A.   No.

Q.   If they went to the pools directly that could not be
blocked?

A.   Correct.

Q.   And did the developers incorporate any other measures into
the user interface to present certain wallet addresses from
interacting with the Tornado Cash pools?

A.   Yes.

Q.   What other tool?

A.   It was a tool called the Chainalysis Sanctioned Oracle.

Q.   What is the Chainalysis Sanctions Oracle?

A.   So, the Chainalysis Sanctions Oracle is basically a smart
contract, and that smart contract has a list of addresses that
Chainalysis has added to it from various sources and these
addresses may be associated with sanctioned individuals or
actors.  You can give the Sanctioned Oracle an address and say,
hey, is this address on the list of sanctioned addresses and it
will say yes or no.  And so, the Tornado Cash UI software used
the Sanctions Oracle to ask for an address making a deposit
transaction:  Is this address on the list of sanctioned
addresses?  If it is, then it wouldn't actually create the
deposit transaction.  If it wasn't, then it would proceed --
would proceed as it normally would.

P7S5sto3                        Edman - Direct

Q.   How does this work?  Is it a smart contract?

A.   Sanctions Oracle is a smart contract.

Q.   So it is just code?

A.   Correct.

Q.   Is Chainalysis a reputable company?

          MR. REHN:  Objection.

          THE COURT:  Sustained.

Q.   What do you understand is the work of Chainalysis?  What does the company do?

A.   Chainalysis does a few things but primarily they're a blockchain data intelligence and software firm that make tools for investigating cryptocurrency transactions.

Q.   So it is their job to follow blockchain transactions?

          MR. REHN:  Objection.

          THE COURT:  Sustained.

BY MS. AXEL:

Q.   Did the Tornado Cash developers control which addresses were added to the Chainalysis Sanctions Oracle?

A.   No.

          MR. REHN:  Objection.

          THE COURT:  I will allow.

BY MS. AXEL:

Q.   Who did?

A.   That would have been Chainalysis.

Q.   And in your experience is incorporating a Sanctions Oracle

P7S5sto3                          Edman - Direct

a commonly used technique?

A.    No.   The Sanctions Oracle is fairly new at the time it was

incorporated into the Tornado Cash software.

(Continued on next page)

BY MS. AXEL:

Q.  When was the sanctions to oracle launched?

A.  I believe it was created in March of 2022.

Q.  And when did the Tornado Cash developers add it to the UI, the Tornado Cash UI developers add it to the UI?

A.  April 2022.

Q.  And can we just go back for a second.

So with respect to the geoblock, Dr. Edman, are there ways in which people could circumvent this particular compliance tool?

A.  Yes.  So people can use let's say VPNs to make their IP address look different.  Instead of, you know—if you're accessing the website from your home internet, you know, the website might see your home IP address, but if you're using a VPN, that website would see the IP address of your VPN service.

Q.  In that case then people could go around this particular tool.

A.  Correct.

Q.  Is it still common for websites to often include this as a measure of compliance?

A.  Yes.

Q.  Okay.  And then moving to the Chainalysis sanctions oracle, so just to make sure we understand, what exactly did it block?

A.  The Chainalysis sanctions oracle, it didn't really block anything.  It just provided a list of sanctioned addresses that

you could query, and then from your software, your——and then if an address was listed by the sanctions oracle, then prevents transactions involving that address.

Q. So then the UI software would block it.

A. Correct.

Q. Based on it hitting on the Chainalysis oracle, do I understand that correctly?

A. Correct.

Q. And could that also be circumvented?

A. Yes.

Q. How?

A. We saw earlier how easy it is to create a new wallet address, so you just create a new address that's not listed by the sanctions oracle, send your ETH to that address, and then make a deposit to——to Tornado Cash or just some other service from that new address.

Q. And you testified earlier that you were familiar with the Ronin hack; is that right?

A. In general, yes.

Q. And you understand that certain addresses then——were there certain addresses that were sanctioned by OFAC concerning the Ronin hack?

A. There were.

Q. Did you look at certain exhibits just to refresh your recollection and focus on what the addresses were associated

with the Ronin hack?

A.  I did.

Q.  Okay.  Showing you Exhibit DX 8787.

        MS. AXEL:  And not on the screen.  It's not in evidence.

Q.  Is this something you relied on to look for attribution of the address associated with the Ronin hack?

A.  Yes.

Q.  What is it, Dr. Edman?

A.  It is a post from the Ronin network about the compromise of their validators.

Q.  Okay.  And on page 3 at the bottom, do you see an address?

A.  I do.

Q.  And you understand that the Ronin network identified this as where the hacked proceeds had gone; am I right?

A.  Correct.

Q.  Okay.  And was this address then subsequently sanctioned by OFAC?

A.  I believe so.

        MS. AXEL:  Okay.  The exhibit is not in evidence.  I'd like the witness just to read the address into evidence.

        MR. REHN:  I think the address is in evidence, your Honor.

        THE COURT:  Can he read the address?

        MS. AXEL:  Well——

P7S1STO4                        Edman - Direct

MR. REHN:  No objection.

THE COURT:  There's no objection.  You may read the address in, sir.

A.   The address is 0x098b716b8aaf21512996dc57eb0615e2383e2f96.

Q.   Thank you.

MS. AXEL:  And I think we can display Government Exhibit S-6.

MR. REHN:  Yes, this is in evidence, S-6.

THE COURT:  Yes.

MS. AXEL:  Okay.

Q.   Okay.  And Mr. Edman, you'll see at the bottom—and this is in evidence—on April 14, 2022, OFAC publicly announced it was updating its designations—I'm skipping along—to include a cryptocurrency wallet address.  Do you see that?

A.   I do.

Q.   Now, Dr. Edman, have you checked to see if—

THE COURT:  This can be shown to the jury, yes?

MS. AXEL:  Yes, this one can be.  Sorry.

Q.   Now, Dr. Edman, have you reviewed the blockchain data that Mr. DeCapua, Special Agent DeCapua presented concerning, you know, hacks that he attributed had gone through Tornado Cash?

A.   I have.

Q.   Have you run this particular blockchain address through Mr. DeCapua's data?

A.   I have.

Q.   And were there any deposits from this address into Tornado
Cash?

A.   No.

Q.   Now when was this address——it says here, actually; on
April 14th.

     So this address was sanctioned on April 14, 2022.  Do
you know when it was added to the Chainalysis oracle?

A.   Based on blockchain data, this address was added to the
Chainalysis sanctions oracle a day later, on April 15, 2022.

Q.   And when was the oracle then added to the Tornado Cash user
interface?

A.   I believe it was about the same time, still in April 2022.

Q.   Can I go back to page 35.

     From April 15, 2022, to August 8, 2022, based on your
review, how many addresses were added to the Chainalysis
oracle?

A.   I don't recall the exact number.

Q.   More than one?

A.   I'm sorry.  Could you repeat the time range again.

Q.   Yes.  From April 15th, the time period of this announcement
here in the tweet, to August 8, 2022, how many addresses,
sanctioned addresses were included in the sanctions oracle?

A.   I don't remember the exact number.  It was certainly more
than one.

Q.   And did you compare all those addresses to DeCapua's data

to determine if any of the addresses that were sanctioned went through the pool?

A.  I did.

Q.  And were there any deposits from the sanctioned addresses into the pools?

A.  No.

Q.  Okay.  I'd like you to look at DeCapua slide 3002-49.

So given your testimony, Dr. Edman, how can this show that wallets associated with the Ronin hack went into Tornado Cash?

A.  The demonstrative shows that the funds from the Ronin hack went into Tornado Cash through multiple intermediary wallets.

Q.  And so in that case those wallets would not have been sanctioned themselves.

A.  No.

Q.  And how would one go about, if you were trying to do this in realtime, looking at the sanctioned wallets and then determining how assets were moving before they were put into the Tornado Cash pools?

A.  I believe Special Agent DeCapua described it as following a bouncing ball around the blockchain.  In this case you would have to sort of follow that bouncing ball from one hop to the next.

Q.  And each Ethereum is an individual identifier; there's not a serial number you can put in the system and it does it for

P7S1STO4                      Edman - Direct

you.

A.  Are you talking about the——

Q.  Yeah.  Each ETH, it doesn't have some sort of serial number, so you can't just do this in an automated way.

A.  Correct.

Q.  Are there companies that do active tracing of hops like this?

A.  There are, and Chainalysis would be one of them.

Q.  But Chainalysis didn't include any kind of realtime tagging like this in the oracle.

A.  No, not to my knowledge.

Q.  All right.  Let me show you what has been marked and is in evidence as Government Exhibit 2603.

        MS. AXEL:  And I'm looking at page 110, Mr. DeMarco.

        2063.  Maybe I misspoke.  Do you want a minute to confirm it's in evidence?

        Okay.  I'm looking at page 110, Mr. DeMarco.

        Oh, we need the T version of this.  Oh, there we go.  No, we still need the T version of this, though.

        Okay.  Is that it?  Ah, there we go.  Okay.

BY MS. AXEL:

Q.  Okay.  And Mr. Edman, you'll see there from Roman Storm, sharing an article that says that Sanctioned Crypto Wallet Keeps On Laundering.  Do you see that?

A.  I see that.

MS. AXEL:  And if you continue on.  We can just show the chain down.  I'm going to then move on to 111.  Okay.  We can stop there.

Okay.  Can we go to the next page.

Q.  And Roman Semenov says, "Ultimately Chainalysis oracle is to blame for everything because they are too slow at adding addresses."  Do you see that?

A.  I do.

MS. AXEL:  And if you continue going down.

I think that replies to something different.  Let's keep going.

Q.  And then Mr. Storm replies, "Not them but OFAC."  Do you see that?

A.  I do.

Q.  And then the next page.

"Chainalysis adds them quite fast."  Do you see that?

A.  I do.

Q.  So to your understanding here, though, is Chainalysis's tool adding only what OFAC has already designated?

A.  That is my understanding.

Q.  Yeah.  Chainalysis doesn't add their own hops on top of it.

A.  No, I don't believe so.

Q.  Okay.  And you understand then that by implementing this tool then the developer is relying on Chainalysis and OFAC to designate these addresses?

MR. REHN:  Objection.

THE COURT:  I'll allow.

A.  That is my understanding, yes.

Q.  How difficult would it be for a person to just constantly monitor all these hops?

A.  Fairly challenging.  I think, based on my recollection of Agent DeCapua's testimony, there were a lot of hops, a lot of intermediary addresses, and so following all of those transactions in realtime is—is a significant effort.

MS. AXEL:  Okay.  You can take that down.

Q.  Were you here for the testimony of Mr. Werlau?

A.  I was.

Q.  And have you had a chance to review his testimony and his exhibits used in support?

A.  I have.

Q.  Okay.  Let's look at what was marked as Government Exhibit 3005-14.

Do you recognize this as something that Mr. Werlau testified about?

A.  I do.

Q.  Okay.  And what do you understand the December 2020 router to be?

A.  The December 2020 router was deployed as part of the introduction of the number of additional or ancillary contracts to the Tornado Cash protocol in the establishment of the

Tornado Cash DAO.

Q.   Who created that router?

A.   The router was created by the developers of Tornado Cash.

Q.   And did they need anyone's approval to put it in place?

A.   No.

Q.   All right.  And looking at the next page, page 15, the February 2022 router, do you see that?

A.   I do.

Q.   How was that router put in place?

A.   That router was created following the approval of a governance proposal.

Q.   And was that governance proposal made on chain, on the blockchain?

A.   It was, yes.

Q.   And could this router have been implemented here without the community voting on chain for that?

A.   No.

Q.   And so is this router literally controlled on chain?

A.   Sorry.  Could you rephrase the question.

Q.   Can the developers, like Mr. Storm, just go change this on their own?

A.   No.  Any changes to the router would be subject to a vote of the governance, the DAO.

Q.   And so if the DAO didn't like any proposed changes, they could just vote against it.

P7S1STO4                    Edman - Direct

A.   Correct.

Q.   Does it also take some period of time to make changes through this process?

A.   It does.  There's a voting period, and then following the voting period, assuming a majority of voters are in favor of the proposal, there's also another couple of days of a time lag before the proposal can actually be executed.

Q.   Let's go to page 20.

Now there's a green bubble here listed as User Registry.  What did you understand that Mr. Werlau was proposing with respect to the user registry?

A.   My understanding——

MR. REHN:  Objection, your Honor.  This is outside the scope of the disclosure for this witness.

THE COURT:  I'll allow.

A.   My understanding of what Mr. Werlau was proposing with the user registry was the creation of a new smart contract that includes information about users who are permitted to interact with the Tornado Cash protocol.  That user registry would have, you know——it will say addresses, associated with that smart contract, but off chain there would be some database of identifying information of users associated with that smart contract, or with that registry.

Q.   Is there any way by smart contract to just collect all that user's information and process it?

P7S1STO4                      Edman - Direct

A.   No.

Q.   And is this a type of a smart contract you're familiar with?

A.   No.  This isn't something that, in my experience, is commonly used in decentralized protocols.

Q.   Would a login and password system, would that work as a user registry in a blockchain context?

A.   No.

Q.   What type of information does a login and password usually ask for, in your experience in cybersecurity matters?

A.   Are you talking about with respect to creating a new account?

Q.   Yes.

A.   So creating——it depends on the service, but they actually ask for like a user name or email address, a password, and maybe some identifying information about yourself, like, you know, your name or address.

Q.   And is that commonly used, again, in blockchain technology as a smart contract?

A.   No.  In blockchain protocols, users are typically identified by their wallet address and not by necessarily their real-world identity.

Q.   And even in the centralized application context, if you collect the login and password information alone, is that a successful method of screening out certain users?

A.   Certainly not in the blockchain context.

Q.   Okay.  Let's look at the next page.  Page 21.

          Mr. Edman, the relayer registry is right next to this hypothetical user registry.  How were they different, as you understand them?  Well, I mean, first I should say, you understand what the relayer registry is, right?

A.   I do.

Q.   That's something that actually exists.

A.   Correct.

Q.   Okay.  So how is that different than what you understood Mr. Werlau was proposing as this hypothetical user registry?

A.   Well, the relayer registry, for one, users who want to run a relayer, they can add themselves to the relayer registry, subject to certain conditions like having enough TORN tokens. The user registry, on the other hand, my understanding of Mr. Werlau's proposal was that the Tornado Cash developers would be responsible for adding users to the registry and verifying their identification——their identity information and then storing that somewhere if needed.  It requires a human in them, you know, whereas a relayer registry operates automatically.

Q.   And what are the conditions to be in the relayer registry?

A.   You needed to stake or have a certain number of TORN tokens associated with your account.

Q.   You didn't have to have a real name to be a relayer?

A.  No.

MS. AXEL:  All right.  Let's look at page 22.  And showing you page 22.

Oh, no.  Not this one.  I think it's the next one, maybe.  My paper is not numbered.  Yeah, 23.

No.  It was the previous one.  Maybe it's animated?

Okay.  Let's show 22.

Q.  Okay.  Were you here for Mr. Werlau's testimony concerning whether or not people accessed the router directly?

A.  I was.

Q.  And what did you understand him to say?

A.  My recollection of his testimony was that Mr. Werlau testified that after the introduction of the February '22 router, that the only deposits into and withdrawals from the Tornado Cash, the hundred ETH pool, went to the other router. There were no transactions directly with the hundred ETH pool.

Q.  And Dr. Edman, have you looked and have you seen whether there are transactions that go to the pools directly without going through the router?

A.  I have.

Q.  For which pools?

A.  For all the pools.

Q.  And have you seen particularly transactions from the 100 ETH pool going directly to the pools outside of the router?

MR. REHN:  Could we clarify a date range, your Honor.

P7S1STO4                        Edman - Direct

THE COURT:  Please.

MS. AXEL:  Can I just get the answer to this question and I will do that next.

Q.  It's just a yes or no.  Have you seen ones for the 100 ETH pool?

A.  Not post-February 2022.

Q.  Okay.  Have you seen them for——yeah.

A.  Sorry.

Q.  My next question.  Okay.  So for what period of time?

A.  From February 2022 to the end of what I understand to be the relevant time period, August 8, 2022.  I agree with Mr. Werlau's analysis that there were no transactions directly with the hundred ETH pool.

Q.  But prior to that period of time had you observed transactions directly to the hundred ETH pool?

A.  Yes.

Q.  And using Special Agent DeCapua's data that he associated with certain hacks, were you able to find transactions that actually associated with particular hacks that went directly into the 100 ETH pool without using any router?

A.  Yes.

Q.  For which hacks?

A.  This was the Alpha Homora hack I believe in 2021.

Q.  And I forgot one question before.  With respect to the hypothetical user registries, are there any security risks

P7S1STO4                        Edman - Direct

associated with collecting that kind of data?

MR. REHN:  Objection.

THE COURT:  I'll allow.

A.  Sure.  If you are collecting a lot of personally identifying information about users of the protocol, I could imagine that that would be a particular focus for hackers or somebody who would like to access and steal that information.

Q.  All right.  Let's look at page 24 of Mr. Werlau's slides deck.

And what do you understand this spreadsheet to show?

A.  I understand this spreadsheet shows changes to the content hash or the CID associated with the tornado.cash ENS name.

Q.  Are these different content identification information, are these 2020 blockchain?

A.  They are.

Q.  So does that mean anyone can access by looking at the blockchain?  Can they find the identifying information for the prior version?

A.  Yes.

Q.  All right.  Let me show you what's been marked as page 3005-40.

Are you familiar with Mr. Werlau's gas analysis?

A.  I am.

Q.  And is this a methodology that you had previously heard about outside of Mr. Werlau's disclosure?

A.   No.

Q.   You've never seen it before.

A.   No.   I've seen approaches—well, mostly Bitcoin—of trying to use certain heuristics to identify information about who created a transaction, but the gas limits, gas ratio analysis is not something that I've seen, seen used before.

Q.   Do you know if it has a known error rate?

A.   No.   And my understanding of Mr. Werlau's testimony is he doesn't know either.

Q.   Okay.   So looking at page 40 here, let's sort of take it by timeline here and see if you can help us understand this a little bit.

So starting on the left here where it indicates there are KuCoin and Compounder hacks, first of all, what do you understand the line to show?

A.   That line, my understanding is this is—it's not really a line, it's just a whole bunch of dots that are packed in densely together around the 1.2 million gas fee, and based on how the Tornado Cash UI software is implemented at the time, this software used a fixed gas limit of 1.2 million, and so Mr. Werlau clustered all transactions that had that gas limit as being made via the Tornado Cash UI.

Q.   And so he's suggesting that based on his methodology, the cluster would indicate that most people during this period, based on the gas, used the Tornado Cash user interface.

A.   Correct.

Q.   Okay.  So what are the purple dots that go all around?

A.   Those are, at least according to Mr. Werlau's analysis, unidentified; couldn't actually cluster those to either the UI or the CLI.

Q.   Okay.  And what does that tell you about how a user may have accessed the pools?

A.   It tells me that, you know, at a minimum, the error rate of this approach is certainly not zero, but it tells me that either the methodology is flawed or that there are other approaches, other means of accessing the Tornado Cash pools other than the Tornado Cash UI and CLI software that Mr. Werlau reviewed.

Q.   And what about the 2021 time period?  Looking at that, what are your observations concerning the data shown for roughly the 2021 period, which, if the jury can see, covers maybe the end of Furucombo up through before where it says Crypto?

A.   Yeah.  So the software was changed around this time to instead use a fixed gas limit to estimate the necessary gas limit or how much fees you'd have to pay to have your transaction processed by the Ethereum blockchain, and so any gas limits that fell within that particular range that Mr. Werlau identified, I assumed was created using the Tornado Cash UI.

Q.   What are your observations about some of the outlying dots

here, on 2021?

A.  So in 2021, if you follow the line that has the KuCoin arrows, to the right, you can see that there are still a number of dots that follow that exact same pattern, which suggests that either, again, there could be another method for——or another software implementation for interacting with the Tornado Cash pools that isn't accounted for with this analysis, or people were just using——continuing to use a previous version of the Tornado Cash UI software.

Q.  Okay.  And then for 2022, starting there, maybe where we left off in Crypto and moving——

        MS. AXEL:  Mr. DeMarco, can you move it to the right further.

Q.  Okay.  What are your observations then about what happened here in 2022 and what this analysis shows?

A.  So around this time the CLI software was also changed to use a variable gas limit, and the horizontal lines represent the balance that Mr. Werlau identified in his methodology.  The lines at the top are for the CLI, for the range of gas limit values used by the CLI, and then the lines at the bottom are the range of gas limit values that Mr. Werlau says were used by the Tornado Cash UI.

        MS. AXEL:  I'm sorry, your Honor.  There was another question about whether the jurors' screens work.

        THE COURT:  Oh, it just came up?

P7S1STO4                        Edman - Direct

JUROR:  Just came up.

THE COURT:  You will have to wave your arms if you're not seeing things.

MS. AXEL:  Yes.  Okay.  We will try to be efficient.

Q.  Okay.  Mr. Edman, unfortunately the jurors' screens did not work from 2020, so perhaps we can try to——

THE COURT:  Are you seeing it now?

JUROR:  We can see it, your Honor.

THE COURT:  Have you seen it the whole time?

JUROR:  No.

THE COURT:  Well, here we are.

MS. AXEL:  Okay.  Apologies, everyone.  All right.  So we took this in pieces, but we certainly can streamline a bit.

BY MS. AXEL:

Q.  So Dr. Edman, in order to efficiently cover what we saw when, unfortunately, the jury couldn't see——and this is really one you really need to see to follow along——looking at 2020, okay, first of all, describe for us what the solid black line is, and then would you just go ahead and say, in addition to that, what do you observe are not consistent with that line and what it might show based on the data and the analysis.

A.  So the solid black line at the bottom, which is actually just a whole bunch of dots clustered very closely together, represents transactions that, through Mr. Werlau's methodology, he argues were made using the Tornado Cash UI, but you can see

both above and below that line, there are a number of dots that are not attributed to any particular methodology, and that suggests that either this methodology does not account for other methods of interacting with the Tornado Cash pools, which may actually constitute some of the dots along the horizontal line around 1.2 million, or the methodology just inaccurately classifies transactions as being made with the UI.

Q.  Okay.  And with respect to the 2021 period——and again, now that the jury can see it, so we're leaving the KuCoin, Furucombo, the first line of Furucombo, moving to the second Furucombo and going up to where the crypto sign is, roughly 2021.

MS. AXEL:  Ah, that's very helpful, Mr. DeMarco. Thank you.

Q.  So Dr. Edman, what are your observations here then about what Mr. Werlau was depicting and then what the other outlying data shows?

A.  Sure.  So you can see kind of towards the bottom, in between the two horizontal bars, a number of dots that are clustered which Mr. Werlau indicates were transactions made using the UI.  But if you look up above again at the sort of 1.2 million horizontal line, you can see that there's still a number of transactions following exactly that line, which suggests again that either there was some other method of creating transactions, deposits into the Tornado Cash pools

that isn't accounted for with this methodology, or people just continued to use a previous version of the UI.

Q. Okay. And then moving to 2022, we have several other hacks that were plotted along this that now we have two bars of green at the top and then the red at the bottom. What do you understand this to show?

A. So I understand that the dots in between the two lines at the top indicate transactions created with the Tornado Cash CLI, according to Mr. Werlau's methodology, and then the dots clustered between the two lines, the two horizontal lines at the bottom are transactions created with the UI. However, you can see up above, just around the 1.4 million mark, there's another cluster of dots that aren't accounted for using this methodology.

Q. And to what do you attribute that?

A. I would attribute that either this methodology is flawed or there's some other, you know, some other wallet software, some other implementation used for creating deposit transactions to Tornado Cash that this methodology doesn't account for.

Q. Now with respect to the bottom bar there, so the increase from the UI to the CLI in 2022, do you understand Mr. Werlau suggested that that could be because the sanctions oracle was added to the UI?

A. I recall that.

Q. And Dr. Edman, if the sanctions oracle were added to the

P7S1STO4                      Edman - Direct

CLI, could someone have easily modified the CLI code to remove it?

A. It could, or you could just continue using a previous version of the CLI. If you look at the top, the dotted line along there, those are transactions that Mr. Werlau attributes to the CLI. And you can see, even though there was a change to how CLI computed the gas limits in early 2022, there's still dots along the 2 million mark up at the top, which indicates people continued to use that software.

Q. The same CLI software that was available from the beginning.

A. That is correct.

Q. And with respect to the green band here, again, for the CLI in 2022, do you see that?

A. I do.

Q. Could people in that have continued to use also the old version of the UI?

A. Yes.

MS. AXEL: Now let's see what we've entered in evidence as DX 8788.

Q. And Dr. Edman, this is your export of code from the CLI; is that correct?

A. Correct.

Q. So how could a user, if they wanted to change the CLI to remove, for example, reference to the sanctions oracle, how

could they do that?

A.   Well, the reference to the sanctions oracle was in a different source file as part of the CLI source code, but here, this is a configuration file where you specify which pools you want to use or which router contract, and you can change any one of these to instead use, let's say, a different version of the router or you could remove the router directly, just interact directly with the pools.

Q.   And again, the Chainalysis oracle is not in this particular example that you pulled, 8788.

A.   Correct.

Q.   It was not added to the CLI.

A.   Correct.

Q.   Okay.  But as an example, you're just using an example of something you could change in this programming language.

A.   Correct.

Q.   And looking at this page and the next page, is there something here that, you know, you could just easily change as a programmer yourself?

A.   It's all—you can pretty much change anything here very easily.  I think on the next page specifies the address, the router proxy contract here, you could alter that as well.

Q.   And that's an example of something you could simply change yourself.

A.   Correct.

Q.   Okay.  All right.  You mentioned you were also here for Agent DeCapua's testimony; is that right?

A.   I was, yes.

Q.   And you reviewed his analysis of different hacks?

A.   I did.

Q.   Did you review the analysis he did of deposits to the Tornado Cash pools that he tied to those hacks?

A.   Yes.

Q.   Okay.  Let's look at GX 3002, page 14.

       Okay.  And you understand that Agent DeCapua testified concerning the KuCoin hack and some analysis he did of the KuCoin hack; is that right?

A.   Correct.

Q.   And let's go back to page 13.

       Okay.  And this happened in——I'm sorry——September and October 2020.

       Can I show you what was marked as——can I show you page 25.

            MS. AXEL:  Is this 25?

            MR. REHN:  Your Honor, may we approach?

            THE COURT:  Sidebar, please.

            (Continued on next page)

(At the sidebar)

MR. REHN:  Your Honor, so first off, earlier testimony, these are registries.  He used the registry in February, and there was no reference to the responses.  So the Court allowed that testimony over our objection.  But we'll consider whether we need a rebuttal expert for that.

With respect to the DeCapua testimony, I don't believe there was any testimony with respect to that in the disclosure.  The Ronin hack he already testified to, but the DeCapua tracing he's discussing now wasn't disclosed.

THE COURT:  My reason for allowing the registry was that I understood from—and remember, I haven't read the disclosures.  My understanding was that one of the things he was going to testify to was things that Tornado Cash had put in place to prevent bad actors, basically, and I assume therefore that that testimony allowed him to comment on what Werlau said had been things that they could do.  That's why I allowed that.

MR. REHN:  Okay.

THE COURT:  As for this, with the tracing, he was qualified and asked to be qualified as an expert in tracing, so I'm not sure what the issue is.  You're saying the issue—

MR. REHN:  It just wasn't disclosed, anything beyond the Ronin trace.

THE COURT:  Counsel.

MS. AXEL:  I mean, a couple things.  I don't have the

full disclosure in front of me.  I would have to go pull them.
But I think he certainly indicated that he had reviewed and
would be prepared to respond to DeCapua's tracing analyses, and
we I think are allowed to respond.  Everything in their slide
charts, for example, wasn't disclosed to us until, you know,
two weeks before they were going to testify, so these pie
charts of the portion of hacks that were attributable,
particularly like a BitMart hack, no, he didn't.  His analysis
is actually pretty much what they disclosed was the 1.1 billion
traceable to these things.  Breaking it down in the ways that
they did was tracing it through and then going by like a
two-day period where they said this is how much they
essentially did this versus—and that's all he's going to
respond to is the data, which I think he did say that we have
this information and he said he reviewed and he's going to
respond to that data.  And then I disclosed the summary chart.
Last week he was going to testify that he takes all the DeCapua
data and shows the portion that DeCapua attributed to hacks.
That's all.  It's the final pie chart.

THE COURT:  I will allow him.  Neither one of you has
any moral high ground here on the adequacy of disclosures, but
I will allow it.

But I do think, in order to keep your jury from
rebelling more than they have already, you do need to finish.
And that would be very soon, before the lunch break?

P7S1STO4                          Edman - Direct

MS. AXEL:  Very soon, before the lunch break.

THE COURT:  Okay.

(In open court)

BY MS. AXEL:

Q. Okay. Dr. Edman, showing you what was displayed as 3002-17. Sorry. I think my page numbers were incorrect.

Okay. Did you see——were you here for Special Agent DeCapua's testimony concerning this period of time and the amount of proceeds that went into Tornado Cash attributable to the KuCoin versus other deposits?

A. I was, yes.

Q. And can I also show you what is marked as——is it 15? I can't read my own handwriting. 50. Yes. 50.

Okay. And you were present to see this one concerning the Ronin hack proceeds as compared to all other Tornado Cash deposits; is that right?

A. That's correct.

Q. And did you look at all of Special Agent DeCapua's data concerning transactions through Tornado Cash?

A. I did.

Q. And did in fact that data include not only his tracing of hacked deposits but all deposits?

A. It did, yes.

Q. And did you yourself prepare then a pie chart to show all of the deposits and how they compared to what DeCapua had identified?

A. Yes.

Q.   Okay.  Let me show you page 36 of the slide.

MS. AXEL:  And I would offer this in evidence, your Honor, as his summary chart.

MR. REHN:  No objection.

Q.   Okay.  Dr. Edman, what is this?

THE COURT:  Thanks.  You have to give me a moment to actually admit it.  You know, I do have a job up here.  I'm not a potted plant.

Page 36 of the slide is admitted as a summary chart.

MS. AXEL:  Sorry, your Honor.  Trying to get everybody out to lunch, and I'm a little rushed.

(Defendant's Exhibit 8785-36 received in evidence)

BY MS. AXEL:

Q.   Okay.  So Dr. Edman, what did you show here?

A.   So this chart shows, if you look at deposits to Tornado Cash ETH pools over the whole time period analyzed by Special Agent DeCapua instead of just select days around notable hacks, you see that 85 percent of the transactions are attributable to unidentified ETH deposits.

Q.   Meaning ones he did not attribute to hacks, particular hacks?

A.   Correct.

Q.   And using the method that he said of selecting hacks of a certain amount are greater and how many hacks, how does that break down into these two smaller portions of the pie?

A.  So my understanding from Mr. DeCapua's analysis was, he analyzed 31 different hacks but included 16 of them in his testimony, and those 16 accounted for 13 percent of the overall ETH deposits to Tornado Cash.  If you include all of the other 15, it only adds another 2 percent to the overall deposit volume.

Q.  So those were much smaller hacks.

A.  Correct.

Q.  He selected the biggest one.

A.  Correct.

Q.  Okay.  And so all together, the hacks that he studied and attributed were 15 percent of all ETH deposits to Tornado Cash.

A.  Correct.

Q.  One small housekeeping matter.  Let me show you what was marked as DX 8791.

        MS. AXEL:  This has not been admitted, but I understand there's no objection.  Displaying this to Mr. Edman.

Q.  Mr. Edman, what is this?

A.  This is a post from the Tornado Cash Twitter account referencing the Chainalysis sanctions oracle.

Q.  And this is what you put on your slide?

A.  Yes.

        MS. AXEL:  Okay.  And I'll move to admit that as 8791.

        THE COURT:  Defense Exhibit 8791 is admitted into evidence and may be shown to the jury.

(Defendant's Exhibit 8791 received in evidence)

Q.  And having admitted that, I think, and then the final exhibit, showing you what has been marked as GX 1008, which is in evidence.

And Dr. Edman, you're aware of this letter from Joe Evans on behalf of BitMart?

A.  I am.

Q.  And were you asked to look at the addresses here under No. 1 where it says Tornado Cash?

A.  I was, yes.

Q.  Where it says "A digital address we believe associated with Tornado Cash first address ending in 6967, I'll just summarize all of these.  There are several exhibits, there are several addresses there that he says he identified that Ethereum was in those addresses that was coming from the hack.  Do you see that?

A.  I do.

Q.  Have you checked all of those addresses to see what they are?

A.  I have.

Q.  And what are they?

A.  So the addresses that are attributed, this email, to Tornado Cash, the one starting with 0x722, those—that is the address of an earlier version of the Tornado Cash router or proxy.

Q.    And what happens when Ethereum enters the router?

A.    When Ethereum is sent to the router, then the router will essentially proxy or route that deposit to the appropriate ETH pool for whatever denomination it is, so in this case 100 ETH deposit transaction would be routed by the router to the hundred ETH pool.

Q.    And does that happen automatically?

A.    Yes.

Q.    So at the time that these addresses were then identified as having received hack proceeds, was there anything anyone could do to retrieve these proceeds?

A.    No.

Q.    They had already gone to the pools.

A.    That is correct.

Q.    And from the pools, neither Mr. Storm nor Mr. —— nor any developer could retrieve the proceeds, the hacked proceeds that had gone into pools.

A.    That is correct.

            MS. AXEL:  Let me just confer.

            No further questions.

            THE COURT:  All right.  Mr. Rehn, I believe there is cross-examination, correct?

            MR. REHN:  There will be, your Honor.

            THE COURT:  All right.  Let's take our lunch break now.  Thank you very much.  I will see you in 45 minutes.  And

P7S1STO4

during your lunch break, I'll ask you please not to discuss this case with each other or anyone else, and to keep an open mind until all of the evidence is in.

We'll see you in 45 minutes.  Thank you.

THE DEPUTY CLERK:  All rise.

(Continued on next page)

P7S1STO4

(Jury not present)

THE COURT:  Counsel, please be seated.

Friends, I've been advised by one of our jurors that she has obligations today and tomorrow at 4:00 so she needs to leave at 3:45 so we cannot stay late today or tomorrow. Judging by the progress of today's testimony, it suggests we might be hearing the defense case into Wednesday morning, but you'll know better than I.  For all I know, Mr. Rehn's cross is ten minutes.  But let me understand the afternoon's proceedings.  At 3:45, when the trial day closes, we'll take a quick break and then we'll hear argument on the motion, the Rule 106 motion that came in from the defense.  That is part of the plan, yes?

Okay.  Mr. Klein is getting up to say yes and he's nodding.

Mr. Arad, it is you I'm hearing from, sir?

MR. ARAD:  That's correct.

THE COURT:  You'll be ready by then, sir?

MR. ARAD:  Yes.

THE COURT:  Good answer.

Do we think it's a half an hour of argument?  You can say it depends on me.  Okay.  All right.  Do you have half an hour to talk to me, do you have 45 minutes, what do you——

MR. ARAD:  As much time as the Court needs.  I think I can make my arguments in probably 10 to 15 minutes.

THE COURT:  Okay.  And I'm sure the defense will want to be heard.  We're doing the charge conference today?

MR. REHN:  We would suggest waiting till tomorrow, your Honor, given that it's very unlikely that the defense will rest tomorrow.

THE COURT:  I'll do what the consensus of the parties is.  I'm ready, but, all right.  Tomorrow?  But let me please understand this.  The only reason I'm inclined to do that is because I want to take the time that this motion merits, but if I go home tonight and at 10:00 I'm getting another set of motions or, worse yet, one of you says to me, we have matters before the jury comes out, then we will have lost lots of time.  So where is Mr. Casey?  Are there contemplated motions you intend on sending to me at some ungodly hour, sir?

MR. CASEY:  No, your Honor.

THE COURT:  All right.  Right now there's nothing in the works, sir?  Remember, you're speaking to a judge.

MR. CASEY:  Not that I am aware of, your Honor.

THE COURT:  All right.

MR. KLEIN:  Your Honor, we are not working on any motions right now.

THE COURT:  That's all I can hope for.

Friends at the government's table?

MR. REHN:  We're probably going to file a letter asking for a particular jury instruction, so it will be

P7S1STO4

relevant to the charge conference, but just——

THE COURT:  With respect to what, please?

MR. REHN:  With respect to the issue of jury nullification and privacy rights.

THE COURT:  Hmm.  I don't know that.  I would have thought that my charge as a whole would not have admitted nullification.  I'm not sure it's necessary, but we'll see.

MR. REHN:  Very short letter just proposing additional language.

THE COURT:  Whether I grant it or not will be another issue.

Mr. Klein?

MR. KLEIN:  We have an additional jury instruction request that I believe was brought up at the pre-preconference, which goes to the defense theory, and we are submitting that.

THE COURT:  I'm still waiting for that, sir.

MR. KLEIN:  Yes, we're going to talk about that over lunch.

THE COURT:  Not to take away even more of your lunchtime.  Just a question for you.  There is a motion to dismiss with which you're very familiar.  I decided it as I did.  The arguments were then renewed as some of your motions *in limine*, and then they were rejected again.  They were renewed as part of your Rule 29 motion, and then they were rejected again.  They are included as part of your jury

P7S1STO4

charges, and they're being rejected again.  So I guess I'm asking you, I imagine you're doing this just to preserve appellate issues, and I understand it, but I was kind of hoping there wouldn't be too much pushback from the fact that, for example, I'm not including an extensive discussion about whether you have to have custody of things or things of that nature.  So I'm just saying that to whoever is going to be arguing for your team.  There are certain things that were submitted that are, again, echoing things that I've rejected repeatedly, and if it's being done just to preserve it, I get it; let's not spend a lot of time on it.

MR. KLEIN:  Your Honor, we were discussing this last night, and that is our plan.

THE COURT:  Okay.  Because I'm trying to figure out how long this charge conference is.  Who knows.  You know better than I.  But for example, a lot of the Count Three issues I would have thought have been obviated by the government's truncating of Count Three.

MR. KLEIN:  Your Honor, can we talk over lunch and——

THE COURT:  Of course.  But apparently we're not having the charge conference today anyway, because we have to wait for Mr. Rehn's letter.

MR. KLEIN:  Oh.

THE COURT:  I'll have the charge conference tomorrow.  But I'm asking you whether there are motions that I should be

looking out for tonight because that's how I'm basing when we're having the charge conference. It doesn't sound like you're finishing tomorrow and we're going into summations tomorrow.

MR. KLEIN: We could be finishing. It depends if Mr. Storm testifies. But we think——

THE COURT: Dr. Hurder and Mr. Green? They're not short witnesses.

MR. KLEIN: We've narrowed the scope of Dr. Green tremendously, due to your concern about not overlapping testimony on basic points. But you're right; Dr. Hurder could take a while, depending on the government's cross.

THE COURT: That's what I'm fearing. But I'm also fearing your four short witnesses are not happening today.

MR. KLEIN: We're hoping to get them on because of travel things. People have really made Herculean efforts to get here travelwise who are not based in New York.

THE COURT: All right. Understood.

Mr. Rehn, you're still renewing your request that the charge conference be tomorrow?

MR. REHN: I think it would be better and actually more efficient if we had it tomorrow so the parties could have more time to prepare for it.

THE COURT: Despite the fact that you've had the charge since before noon yesterday.

MR. REHN:  Yes, your Honor.

THE COURT:  Okay.  I'm going to hope for enormous efficiencies as a result.

MR. REHN:  I'm hoping for that as well, your Honor.

Just one other thing.

THE COURT:  Of course.  There's always one other thing, sir, yes.

MR. REHN:  Just because there had been no prior disclosure as to any testimony concerning user registries, we would ask, pursuant to Rule 705, for any facts or data that underlie those opinions from Dr. Edman.

THE COURT:  Oh, good grief.  I hope there isn't some cache of documents that hasn't been produced by defense.

MS. AXEL:  I will—not now, but I will confer with Mr. Edman after his testimony, but he obviously was responding to Mr. Werlau's testimony that he heard, and much of what we heard about the user registry we did not hear until the testimony.  So I think it's based on his training and experience, but at his completion of his testimony, I will inquire.

THE COURT:  And you've raised a really good point.

Mr. Rehn, would you permit the defense to speak to their expert on the limited issue of whether he has additional materials?  Because I don't want them talking about the substance of his testimony.  If not, then we're going to wait

P7S1STO4

till he's over.

MR. REHN:  I think just that limited question, we would appreciate.

THE COURT:  Will you be able to do that?

MS. AXEL:  Yes.

THE COURT:  And please do that, and we're all going to hope that the answer is no.  But if not, they've got a great motion they can copy from you.

Okay.  Mr. Klein, you did stand up, sir.  I just wanted to hear from Mr. Rehn first.  What would you like me to know?

MR. KLEIN:  Just to be clear, we're fine with the charge conference on Tuesday.

THE COURT:  Me personally, I'd prefer it today because, to use a term that's come up in this case, I'd like to become immutable.  However, I also wish to have their letter—not really, but I will take their letter, and I wish to have your defense theory charge, which I'm sure I'm going to get sometime today.  So that's fine.

Thank you.  See you in something less than 45 minutes.

THE DEPUTY CLERK:  All rise.

(Luncheon recess)

P7S5sto5                    Edman - Cross

A F T E R N O O N   S E S S I O N

1:45 p.m.

(Jury present)

THE COURT:  Please be seated, everyone.  Thank you.

Mr. Rehn, you may inquire.

CROSS-EXAMINATION

BY MR. REHN:

Q.  Good afternoon, Dr. Edman.

A.  Good afternoon.

Q.  You and I have never met before, have we?

A.  We have not.

Q.  But I understand you have been a paid consultant for at least 12 years; is that right?

A.  I guess so.  I think I got into consulting when I joined FTI, which was probably 2014, so.

Q.  11 or 12 years, something like that?

A.  I think that's fair.

Q.  And in your work you are typically paid to be a defense witness; is that correct?

A.  No.  We're independent technical experts so we have been retained both by plaintiffs or prosecutors, as well as by defense.

Q.  And you are being paid for your work for Mr. Storm today; right?

A.  I am.

Q.   And you are being paid at the rate of $750 per hour?  Do I have that right?

A.   That's correct.

Q.   And so far you have collected around $90,000 for your work on this case.  Do I have that right?

A.   My company has, yes.

Q.   And that's before the time you are billing for this trial?

A.   Correct.

Q.   You are billing for your testimony right now; is that right?

A.   I am.

Q.   And is that at that rate of $750 per hour?

A.   It is.

Q.   Did defense counsel send you their legal filings in this case?

A.   No.

Q.   Did defense counsel discuss the arguments they were trying to make in court with you?

A.   I mean, I think we discussed the sort of the substance of my testimony, but.  I don't know if that --

Q.   Fair to say you worked with the defense team?

A.   I worked with the defense team.

Q.   And you spoke with defense counsel about your testimony?

A.   Yes.

Q.   How many times would you say you spoke with them?

P7S5sto5                      Edman - Cross

A.   I'm not sure, exactly.  I would say probably at least a few times.

Q.   And that included talking about the questions you would be asked and the answers you would give?

A.   In general.  At least the general topics and sort of the points that I wanted to make sure that I hit.

Q.   Did any of the defense lawyers take notes during any of those meetings?

A.   Not that I'm aware of.

Q.   When you were rehearsing your testimony, how many defense lawyers were present?

A.   I suppose it would depend on which day you are talking about.  I would say somewhere between one and all of them.

Q.   How many is all of them?

A.   I'm not even sure, really.  Probably eight, at least in the room.

Q.   Now, during your testimony you talked about the Tornado Cash developers.  Do you recall that?

A.   I do.

Q.   When you used that term, you mean Roman Storm, Roman Semenov and Alexey Pertsev; correct?

A.   Yes.  They would be included in that but based on my analysis of the GitHub change history, it looked like there were a number of developers who contributed to the source code.

Q.   The owners of the GitHub repository were Roman Storm, Roman

P7S5sto5                         Edman - Cross

Semenov, and Alexey Pertsev; am I right?

A.   That's my understanding from the records of GitHub.

Q.   Have you ever spoken to Roman Storm?

A.   No.

Q.   Have you ever spoken to Roman Semenov?

A.   No.

Q.   Have you ever spoken to Alexey Pertsev?

A.   No.

Q.   So you didn't interview Roman Storm; correct?

A.   Correct.

Q.   Your testimony isn't based on something like that?

A.   No.  My testimony is based on the materials that I
described earlier.

Q.   So I want to be clear, you don't know what was in the
defendant's head when he and the other developers started
Tornado Cash; is that right?

A.   That is correct.

Q.   You weren't there with them when they created Tornado Cash?

A.   I was not.

Q.   You weren't there when they made changes to Tornado Cash
over time?

A.   No.

Q.   You didn't talk to them about their plans for Tornado Cash?

A.   No, I did not.

Q.   You didn't talk to the defendant about his plans to profit

P7S5sto5                        Edman - Cross

from Tornado Cash, did you?

A.   No.

Q.   So you don't know what the defendant was thinking at any of the key events in this case; is that fair to say?

A.   That's fair to say.

Q.   And you don't know, for example, what was in the defendant's head when he created the TORN tokens; do you?

A.   No.

Q.   Or when he promoted the relayer network?

A.   Again, I can't speak to the state of mind of the defendant.

Q.   And you don't know what was in the defendant's head when he cashed out $12 million worth of TORN tokens in August, do you?

A.   No.

Q.   Or when he decided to use a Binance account in someone else's name to do that cashout?

         MS. AXEL:  Objection, your Honor.

         THE COURT:  I will allow but I'm sure counsel is going to move -- we get the point.

         THE WITNESS:  I don't know what was in his head.

BY MR. REHN:

Q.   Now, Dr. Edman, we can agree that criminals use Tornado Cash; correct?

A.   Yes.

Q.   And we can agree that criminals used it to hide money they got from the crimes they committed.  Fair to say?

P7S5sto5                        Edman - Cross

A.   I think that's fair to say.

Q.   Take the Ronin hack.  You talked a lot about that in your direct testimony; is that right?

A.   I'm not sure I talked a lot about it but I did mention that hack; yes.

Q.   Those hackers used Tornado Cash; correct?

A.   It would appear that way, yes.

Q.   They deposited a lot of money into Tornado Cash; isn't that right?

A.   Yes.

Q.   And those hackers were attributed to a North Korean cybercrime group called the Lazarus Group.  Isn't that right?

A.   That's my understanding.

Q.   So that North Korean cybercrime group used Tornado Cash to hide crypto it earned from a hack; correct?

A.   Again, that's my understanding.

Q.   And you don't know whether the defendant thought that was a good thing or a bad thing for the value of his TORN tokens; do you?

A.   I don't.

Q.   But we can agree that he did not say shut down the Tornado Cash UI after he found out the North Koreans were using it to hide money from the hack; right?

A.   I can agree, I'm not aware of him making a statement like that.

P7S5sto5                        Edman - Cross

THE COURT:  Excuse me.  Go ahead.  Continue.

Q.  We can agree he and the other developers did not release a new router in response to these transactions; right?

A.  Correct.

Q.  And we can agree that there were many other hackers and criminals who used Tornado Cash; correct?

A.  Based on Agent DeCapua's analysis, I believe that would be correct.

Q.  And you didn't do your own independent analysis of Special Agent DeCapua's work, did you?

A.  Only the aspects of the work that I testified about today.

Q.  So you have no reason to question his attribution of all that money to all those hacks; do you?

A.  No.  Not as I sit here today.

Q.  And you started working on this case after the criminals used Tornado Cash to hide their cryptocurrency; is that right?

A.  Yes.

Q.  So you didn't talk to the defendant when he found out that those criminals were using Tornado Cash to hide the crypto, did you?

A.  No.

Q.  And you also did not engage in any of your own financial tracing analysis for your testimony today, did you?

A.  Do you mean specifically blockchain transactions or are you talking about --

Q.  A portion of the proceeds of any of these incidents, aside from looking at Special Agent DeCapua's work, you didn't do your own financial tracing; is that right?

A.  No, not of the incidents that Agent DeCapua analyzed.  I was just looking at his results.

Q.  OK.  Let's talk about what you did do.

MR. REHN:  If we could bring up the slide 5?  What is the exhibit number for the slide deck?  8785.  I will try to remember that.  If we can bring up slide 5 of Defendant's Exhibit 8785, which I think is being used for demonstrative purposes, and if we can show that to the witness and the jury, please?

Q.  Was this the summary of your opinions?

A.  Yes, that was one of the slides.

Q.  And I just want to be clear about the time frame we will be talking about.  We are talking about the time frame from September 2020 to August 2022 in this case; right?

A.  I believe that is the time frame for the hacks that Special Agent DeCapua analyzed but, of course, the Tornado Cash smart contracts that were relevant to those hacks were created before September 2020.

Q.  But when you have descriptions in your slides, you were looking at the time frame prior to August of 2020; is that right?

A.  Yes, since that's when the contracts were created.

Q.   So I want to look at the third point you have here.  Do you see where it says that control over the smart contracts was delegated in December of 2020?  Do you see that?

A.   I see that.

Q.   Now, one of the Tornado Cash smart contracts is the Tornado Cash router; is that right?

A.   That was something that was created in December 2020.

Q.   But there was another router created in February 2022; isn't that right?

A.   Yes.

Q.   And there was something called the relayer registries, that was another smart contract?

A.   Yes.

Q.   And that was created in February 2022; is that correct?

A.   That is correct.

Q.   So those were new smart contracts that the Tornado Cash founders created later than December 2020; weren't they?

A.   Yes.

Q.   And so this description here doesn't apply to all of the smart contracts you have discussed; does it?

A.   Which description specifically?

Q.   Where it says control was delegated in December 2020.  That's not fully accurate, is it?

A.   It is accurate.

Q.   Well, it is not accurate about the router for

P7S5sto5                        Edman - Cross

February 2022; is it?

A.   Yes.   That was created as part of a proposal that went through the Tornado Cash DAU.

Q.   Control over the router that was created in February 2022 was not delegated in December 2020, was it?   It didn't even exist yet.

A.   No, but the ability to create new contracts such as the router that was created in February 2022 was delegated to the DAU in December of 2020.

Q.   So it is your testimony that the DAU is what created the Tornado Cash router?   Is that your testimony?

A.   Pursuant to proposal that was passed by the DAU.

Q.   Wasn't it the Tornado Cash developers who actually created the code for that smart contract?

A.   Perhaps, but in order for that code to be deployed and the Tornado Cash protocol to be updated, that would have been, and was subject to the government's proposal.

Q.   We will come back to that.

          MR. REHN:   If we can bring that down?   Now, if we could show the witness what's been previously shown for demonstrative purposes, as Government Exhibit 3005-6?

Q.   Do you recognize what we see on the screen here, Dr. Edman?

A.   I do.

Q.   This was the user interface; is that right?

A.   Yes.

P7S5sto5                        Edman - Cross

Q.   Is another term for that the web application?  Is that fair to say?

A.   I think that's fair to say.

Q.   And the user interface was posted on Tornado Cash.ETH. That was the address for it, right?

A.   Well, the ENS address, TornadoCash.ETH contained a reference to content on the IPFS network that hosted the web app.  If you just put Tornado Cash.ETH into your web browser you are not going to get the Tornado Cash UI.

Q.   You would have to go through like a .limo or service or something like that; is that right?

A.   Correct.

Q.   But in order to access the contents that we see here, you would have to access that .ETH domain; is that fair to say?

A.   Yes, via the Ethereum blockchain you have to look up this particular ENS name to identify the CID where the contents hosted.

Q.   And if a user went to the TornadoCash.ETH domain, this is what they would see during that time period in question; is that right?

A.   Again, if you just put this in your web browser, you are not going to see anything but assuming you are using some sort of gate way, yes, you would see something like this.

Q.   And you saw that Roman Semenov was the owner of that ENS domain name during this time period; isn't that right?

P7S5sto5                    Edman - Cross

A.  Yes, I believe I recall that, and I also understand that from I think it was Mr. Werlau's testimony.

Q.  So it was Roman Semenov who could decide what a user could get on their computer if they went on that domain name.

        Is that fair to say?

A.  For a certain period of time.  I believe post-December 2020 certain changes to ENS content IDs were also part of the governance process.

Q.  The ENS ownership didn't change until August 8, 2022; isn't that right?

A.  I don't know off the top of my head.

Q.  The person listed as the owner of the ENS domain has the authority to control what is available on that domain; correct?

A.  Typically, yes.

Q.  And you would agree with me that --

        MR. REHN:  Actually, your Honor, we would admit Government Exhibit 3005-6 into evidence.

        MS. AXEL:  Objection.

        THE COURT:  Objection overruled.  Government Exhibit 3005-6 is admitted into evidence.

        (Government's Exhibit 3005-6 received in evidence)

        MR. REHN:  If we could bring up Government Exhibit 3005-18?

Q.  Do you recognize this, Dr. Edman?

A.  I do.

Q.  Was this the same user interface if you clicked on the Withdraw tab?

A.  Yes.

Q.  And was this also available at that TornadoCash.ETH domain name during this time period?

A.  I believe so, yes.

MR. REHN:  We would offer this into evidence as well, your Honor.

MS. AXEL:  Objection, your Honor.  This wasn't raised with us.

THE COURT:  All right.  I'm allowing it but --
Mr. Rehn, we are not going to be introducing now and admitting into evidence now through this witness, the demonstratives of the prior witness.

MR. REHN:  Yes, your Honor.

THE COURT:  These two given the amount of testimony we have had about them I will allow but I'm not expecting others.

(Government's Exhibit 3005-18 received in evidence)

MR. REHN:  If we can go back to 3005-6.

BY MR. REHN:

Q.  Dr. Edman, you would agree with me that most users used the user interface; correct?

A.  I would expect so.

Q.  And that's because it is a user-friendly experience.  Fair to say?

A.   Correct.

Q.   Compared to the CLI that you talked a lot about in your direct, this would be much easier for the average user; fair to say?

A.   Most likely, yes.

Q.   And because of that, whatever smart contract the user interface connected to would be the one that most users connected to; correct?

A.   Correct, although I think it's important to note that there were multiple versions of the UI and you could use any one of them.

Q.   In fact, the user interface was updated 250 times; is that right?

A.   I don't know how many times it was updated.  I would say that the source code was updated probably more than that, but as far as actually updating the CID associated with the TornadoCash.ETH ENS domain, I don't know exactly how many times that was updated.

Q.   But for the updates that actually hit the domain, that would be knowable from the blockchain data; is that right?

A.   Correct.

Q.   And did you review the blockchain data regarding that, that was admitted into evidence in this case?

A.   I believe I -- yes, but after Mr. Werlau's disclosures or testimony.

P7S5sto5                        Edman - Cross

Q.   And do you recall that, according to that blockchain data, while Roman Semenov owned that domain name the user interface available at that domain was updated 250 times.  Do you recall that?

MS. AXEL:  Objection, your Honor.

THE COURT:  I will allow.

A.   That's my understanding from Mr. Werlau's testimony.

Q.   And you don't have any reason to doubt that, do you?

A.   No.  I don't believe so.

Q.   You would also agree with me that one of the points of Tornado Cash is to blend in with the crowd; right?

A.   Correct.

MS. AXEL:  Objection, your Honor.

THE COURT:  I will allow.

Go ahead.

THE WITNESS:  Correct.  There is a saying in anonymous communications systems that anonymity loves company.

BY MR. REHN:

Q.   In other words, a user wants their deposits and withdrawals to look like everyone else's deposits and withdrawals; correct?

A.   Correct?

Q.   So if most people are using one smart contract as their point of entry, that means everyone else will have an incentive to use that same smart contract; correct?

A.   Not necessarily.

Q.   Well, you just said that everyone wants to blend in with each other; isn't that right?

A.   Yes, but that's what occurs within the pools.

Q.   Can you tell what router a deposit goes through from blockchain data?

A.   You can.

Q.   Can you tell what router a withdrawal goes through from blockchain data?

A.   Yes.

Q.   So, if you wanted to blend in with other deposit, you would need to use that same router that most other deposits were using; correct?

A.   Perhaps, but again, that anonymity comes from the pool so in your example I could consider a counter-example where say somebody --

Q.   My question is yes or no.  You will have a chance on redirect.

        THE COURT:  Counsel, you haven't said that before now. Are you asking me to direct that witness as I haven't for other witnesses to answer only yes or no.

        MR. REHN:  Yes, your Honor.

        THE COURT:  Sir, please just answer questions yes or no, thank you, or I can't answer that question.

BY MR. REHN:

Q.   Similarly, for a withdrawal to blend in with other

withdrawals you would need to use that same router as other withdrawals; correct?

A.   I can't answer that without providing additional context.

Q.   Would a withdrawal that used a different router than every other withdrawal look different on that blockchain?

A.   It would.

Q.   So it would not blend in with the crowd; correct?

A.   With the crowd of withdrawals.  But again --

         THE COURT:  No.  Stop.

Q.   Let's go back to your presentation and let's go to slide 12.

         MR. REHN:  Mr. Iannuzzelli, it is probably easier with the PDFs.

Q.   Dr. Edman, do you recall testifying about depositing to a Tornado Cash pool?

A.   I do.

Q.   Now, this slide shows that user going directly to the pool; is that right?

A.   It does.

Q.   But, in fact, almost all of the deposits went through that Tornado Cash router; correct?

         THE COURT:  Is there a time period, sir?

         MR. REHN:  Prior to August of 2022.

A.   Sorry.  Prior to August 2022 but after?

Q.   Between December 2020, when the first router was released,

and August 8, 2022, that overwhelming majority of deposits went through a Tornado Cash router; correct?

A.  I think I would agree with that.

Q.  Fair to say it was over 99 percent?

A.  I don't know that exact number.

Q.  Do you have any reason to doubt that it was over 99 percent?

THE COURT:  He just said he doesn't know, sir.

Q.  Dr. Edman, you analyzed that source code for that user interface; correct?

A.  Correct.

Q.  And you know that that user interface directed deposits to the router not directly to the pools; correct?

A.  Correct.

Q.  And you have seen that evidence regarding that 100 ETH pool deposits; correct?

A.  I'm sorry.  Could you be more specific?

Q.  You have seen that evidence regarding how that deposits for that 100 ETH pool were routed after that February 2022 router was released; right?

A.  I believe I understand what you are referring to.

Q.  Well, let's pull it up.

MR. REHN:  Can we pull up Government Exhibit 300 9 which is in evidence and if we could expand that?

Q.  Dr. Edman, after that router was released, what percentage

of deposits to the 100 ETH pool went through that router?

A.  A hundred percent.

Q.  After that February 2022 router was released, what percentage of withdrawals went through that router?

A.  100 percent.

Q.  Let's go back to your slide 12.  So you left that router out on this chart, didn't you?

A.  Yes.

Q.  You left out something that actually applied to 100 percent of deposits to the 100 ETH pool; correct?

A.  I did.

Q.  You decided to present a chart that left out that step; right?

A.  Yes.

        MR. REHN:  Let's go to slide 14.

Q.  Do you recall testifying about the withdrawals?

A.  I do.

Q.  And for this slide you didn't include that router either; correct?

A.  Correct.

Q.  So you just decided to leave out some steps in this process too?

A.  Yes.  Obviously it is a simplified diagram.

Q.  And if we look at this, you also have the gas fee going to the pool; correct?

P7S5sto5                          Edman - Cross

A.   No.

Q.   Well, there is an arrow with gas fee pointing to the pool; right?

A.   Correct, but that is intended to indicate the gas fee. Going, not to the pool but to the nodes operating that Ethereum blockchain.

Q.   So that's just a sort of inaccuracy in your graph?

A.   That chain is intended, with the blocks it is intended to indicate that blockchain.

Q.   This shows the relayer communicating directly with the pool, isn't it?

A.   Yes.

Q.   In fact, after February 2022, that relayer code was hard coded to go to the router; correct?

A.   Yes, I believe so.

Q.   It did not go directly to the pool, did it?

A.   No.

Q.   So you left out a step between these two points?

A.   Yes.  Again it is a simplified diagram.

Q.   And they needed that relayer to go to the router so they could calculate that commission that relayer paid in TORN tokens; correct?

A.   I believe that is part of it, yes.

Q.   Because that router would check that relayer registry; right?

P7S5sto5                    Edman - Cross

A.   I don't recall specifically.

Q.   The router would determine if the relayer would pay TORN tokens to that governance contract; correct?

A.   I don't necessarily recall that that's exactly correct.

Q.   Well, you analyzed that code; isn't that right?

A.   I did.

Q.   And you did see it was hard-coded to go to the router; correct?

A.   It being that relayer software?

Q.   Yes.

A.   Correct.

Q.   If a user wants to transfer ETH to a new address as listed here, they need to use a relayer; correct?

A.   Correct.

Q.   And that's because that new address doesn't have the money to pay that gas fee; right?

A.   That is correct.

Q.   Was that an important part of the value of Tornado Cash for its users?

A.   I don't know how to quantify that value but it seems like an important property from a privacy perspective.

Q.   And, in fact, at least 94 percent of withdrawals used a relayer; right?

A.   That sounds accurate.

Q.   And those withdrawals then paid the relayer fee to do that;

correct?

A.   Correct.

          MR. REHN:   Could we bring up slide 32?

Q.   You said in your direct testimony that users can use that router or interact directly with the pools; correct?

A.   I did?

Q.   Now, it is theoretically possible for a user to go directly to the pool; correct?

A.   I don't believe it is just theoretical, but yes.

Q.   Well, at least for that 100 ETH pool, between February and August of 2022, nobody actually did that; correct?

A.   Based on blockchain data, I believe that's correct.

Q.   So, with respect to those 100 ETH deposits during that time period it is entirely theoretical; isn't it?

A.   For the 100 ETH deposits, yes.

Q.   And when we were talking about those deposits from the Ronin hack, those were all 100 ETH deposits; correct?

A.   I don't recall if there were any non-100 ETH deposits.  I am sure that was at least that majority of them.

Q.   That overwhelming majority?

A.   Again, I don't recall exactly every deposit associated with the Ronin hack but I would wage that the majority were 100 ETH deposits.

Q.   So every one of those deposits had to go through that router according to the blockchain data; isn't that right?

A.   Didn't have to but apparently did, based on blockchain data; yes.

Q.   Every one of those deposits in fact did go through that router; isn't that right?

A.   I believe so, if I am recalling correctly.

        MR. REHN:   If we could bring up Government Exhibit 3005-22?

Q.   Do you recall looking at this during your direct testimony?

A.   I do.

Q.   And this shows all those 100 ETH deposits and withdrawals interacting with the router; correct?

A.   Yes.

Q.   And if we go to page 2 of this exhibit, this shows the actual numbers from that time period that we looked at in that summary chart; correct?

A.   It does.

Q.   And that's a big crowd to blend in with; isn't it?

A.   I suppose so.

Q.   If you are in a crowd of 7,000 people you are going to be hard to find; right?

A.   I would assume so.   I think there may be additional context.

Q.   And so, if you wanted to get that benefit of blending in with that crowd, you would need to go through that router to look the same; isn't that right?

P7S5sto5                        Edman - Cross

A.   Again, I don't believe I can answer that without additional context.

Q.   Well, you said earlier that deposits directly to the pool look different on the blockchain; isn't that right?

A.   That's correct.

Q.   And so, if you wanted to look the same as other deposits you would have to go through the router; correct?

A.   Yes.  But again, I think there is additional context I'm happy to provide.

Q.   Let's go to page 3 of this exhibit.

There were zero deposits directly to the pool during that time period; correct?

A.   Correct.

Q.   And there were zero withdrawals directly from the pool during that time period; correct?

A.   Correct.

Q.   And if there had been a single deposit and a single withdrawal, it would have been immediately apparent that that one was different from every other deposit and withdrawal; isn't that right?

A.   Yes.

Q.   That one would not have blended in with the crowd; correct?

A.   Again, I think there is additional context here that is important.

Q.   I'm asking if that one would blend in with the crowd based

P7S5sto5                        Edman - Cross

on the blockchain data.  Isn't it correct that it would not?

MS. AXEL:  Objection, your Honor.

THE COURT:  I will allow.

A.  The addresses are distinguishable so you could distinguish one deposit from another.

Q.  That deposit would stand out from the other deposits in terms of the method by which it went into Tornado Cash, correct?

A.  Method would stand out, yes.

MR. REHN:  We can bring that down.

Q.  Do you recall talking about the TORN token vesting during your direct testimony?

A.  I do.

Q.  And Roman Semenov was the one who wrote the code for those TORN tokens; isn't that right?

A.  I don't recall specifically who wrote the code.

Q.  Roman Semenov wrote the code for the vesting contracts, isn't that right?

A.  I don't recall specifically who wrote it.

Q.  You don't have any reason to think otherwise, do you?

A.  No.

MR. REHN:  If we could bring up Defendant's Exhibit 8786?

Q.  So you talked about this particular vesting contract during your direct testimony; correct?

P7S5sto5                    Edman - Cross

A.   Correct.

Q.   Now, there were three particular vesting contracts associated with three developers; right?

A.   That is my understanding.

Q.   There was one for Roman Storm?

A.   I believe so.

Q.   There was one for Roman Semenov?

A.   I believe so.

Q.   And there was one for Alexey Pertsev?

A.   I believe so.

Q.   And each developer's vesting contract received 800,000-plus TORN in December of 2020; correct?

A.   Correct.

Q.   Do you recall which developer this particular vesting contract was associated with?

A.   No.

Q.   So this is either Roman Storm, Roman Semenov, or Alexey Pertsev?

A.   Correct.

Q.   You are just not sure which one?

A.   Correct.

Q.   Now, that TORN that went to the founders couldn't be sold for a year; isn't that right?

A.   Correct.

Q.   It was locked up from December 2020 until December 2021;

P7S5sto5                        Edman - Cross

correct?

A.   Correct.  And in December 2021, only a third was unlocked.

Q.   And a third of 800,000 is around 374,000; correct?

A.   Correct.

Q.   So, just to be clear, if TORN prices were high in early 2021, the founders wouldn't be able to benefit from that; correct?

A.   Correct.  At least not from this TORN that they received.

Q.   They wouldn't be able to sell their founders TORN until December 2021; correct?

A.   Correct.

Q.   So if you were considering the founders' interest in the market price of TORN, you would focus on the period from December 2021 onwards; correct?

A.   I don't know.  I'm not an economist or financial analyst.

Q.   Now, if we look at this we read these from the bottom up, is that right, in terms of chronological order?

A.   Correct.

         MR. REHN:  So if we could expand the bottom two there? Just the bottom two.

Q.   Dr. Edman, the first transfers, that null transfer to this particular developer's vesting contract; correct?

A.   Correct.

Q.   And that was on December 18, 2020; correct?

A.   Yes.

P7S5sto5                         Edman - Cross

Q.   And so on that date, this founder whether it was Storm, Semenov or Pertsev, got 800,000 TORN into the vesting contract?

A.   The vesting contract received the TORN.

Q.   The vesting contract associated with one of those three founders?

A.   Correct.

Q.   This one is labeled no. 3; is that right?

A.   That is correct.

Q.   And so, founder no. 3, about a year later, received the ability to transfer a third of those TORN tokens; is that right?

A.   Correct.

Q.   And around that a year later that founder in fact transferred a third of those TORN tokens out of this vesting contract; correct?

A.   Correct.

Q.   And at that point those 274,000 TORN tokens were free for that person to sell; is that right?

A.   I believe so.

Q.   And so, at that point in time, whoever owns these 274,000 TORN tokens is going to have an interest in what the price of TORN is going forward; correct?

A.   I would assume so but, again, I'm not an economist.

          MR. REHN:  We can bring that down.

Q.   You talked a lot about open source code in your direct

testimony; is that right?

A.   I did.

Q.   You talked a lot about the GitHub repository for Tornado Cash?

A.   Yes.  There were many GitHub repositories for Tornado Cash.

Q.   And the Tornado Cash GitHub repository included a selection of code for the user interface; is that right?

A.   It did.

Q.   Now, the owner of a GitHub repository can decide whether to make the code available to the public or not; correct?

A.   Correct.

Q.   And they can decide whether to allow the public to propose changes to the code; is that right?

A.   I believe so, yes.

Q.   And if the owner of a collection of code makes it available to the public and the public can then make suggestions, that's called being open source; is that fair to say?

A.   I think there may be a more nuanced definition of open source but I think that's certainly -- that's an example of an open source project.

Q.   That is the essence of it when it comes to GitHub; correct?

A.   I would say in the essence when it comes to GitHub is making the source code freely available and redistributing it.

Q.   Even with open source software people can only propose changes to the code; isn't that right?

P7S5sto5                      Edman - Cross

A.   No.   Once you receive the source code you can make changes to it, if you would like.

Q.   People can make changes to their own copies but if they want to pose a change for the main branch, the owner gets to approve that; isn't that right?

A.   Assuming you are trying to incorporate your changes into the repository where you got the source code, yes, but you can also create a new repository that includes your changes.

Q.   But there is still, for purposes of the main branch an owner of the code who maintains an official version; is that right?

A.   With all due respect, I don't think your use of main branch is technically accurate but to the extent I understand your question, whoever owns that GitHub repository or organization, they can destroy or control whether changes are integrated into their version of the source code.

Q.   And that is what you call it the official version or main version?   What term would you refer to that version?

A.   Often times if you are making changes you would refer to it as upstream.

Q.   So the upstream version is the version that's officially available on the repository?

A.   Yes, the version that you would pull changes from.

Q.   And Roman storm was one of the owners of the Tornado Cash repository; right?

P7S5sto5                         Edman - Cross

A.   I believe he was owner of the GitHub organization which had many different repositories.

Q.   And the GitHub organization Tornado Cash had the user interface repository; correct?

A.   Yes.

Q.   So ultimately those owners of that organization could decide what the upstream version of Tornado Cash was?

A.   Correct.

Q.   And they could also decide what version was available at TornadoCash.ETH?

A.   Yes.

Q.   Now, you say in your direct testimony that the Tornado Cash UI repository is open source; correct?

A.   It is.

Q.   But, in fact, it was not made open source until July 2022; correct?

A.   No, I believe it was available in a minified version before that.

Q.   But a minified version is not the full source code, is it?

A.   It omits stuff that you don't actually need for the operation of the application but it is still functional, you can read it, albeit it is a little more challenging to read.

Q.   It makes it more difficult for people to make their own revisions to it; isn't that right?

A.   In general I would agree with that, yes.

P7S5sto5                          Edman - Cross

Q.   So, true open source is releasing the full source code; correct?

A.   Yeah, I'm not sure exactly what you mean by true open source, but typically code is made available with additional context or additional information.

Q.   And when the full source code is released, that's what you usually refer to when you mean open source; is that right?

A.   I think that's probably, yeah, the sort of generally -- the most common version of open source.

Q.   When people say open source, that's what you understand them to mean.  Fair to say?

A.   Yes.  I mean, I generally --

Q.   I am asking for yes or no questions again.

A.   Yes.

Q.   In fact, using that definition, the Tornado Cash user interface source code was not made open source until July 2022; correct?

A.   Using that definition, yes.

Q.   So when you said Tornado Cash was open source, you were only referring to one month out of this two-year time frame; is that right?

A.   Under that strict definition, yes.

Q.   So it would be more accurate to say that for the majority of the time, from September 2020 to August 2022, it was not open source.

A.  Sorry.  Are you speaking specifically about the UI?

Q.  Yes.

A.  Under that strict definition of open source, yes, I would agree with that.

Q.  So in your direct testimony you testified at length about it being open source; correct?

MS. AXEL:  Objection.

THE COURT:  I will allow.

A.  Yes.  The source code was available in other forms.  I mean, there was also the CLI which was available.

Q.  You didn't even mention that the UI source code wasn't made open source until July 2022, did you?

A.  No.

Q.  And it's the owner of the organization who decides whether to make that code available; correct?

A.  Yeah, I believe so.  On GitHub at least.

Q.  So in this case Roman Storm, Roman Semenov, and Alexey Pertsev decided to make that source code available only in July 2022; isn't that right?

A.  I can't say when they decided to make it available.

Q.  Well, made available in July 2022; correct?

A.  That's my recollection, yes.

Q.  And prior to that it was not made publicly available, the full source code for the UI; correct?

A.  Correct.

Q.   Let's talk about websites.

          MR. REHN:   Can we bring up slide 18?

Q.   So this is a slide you talked about in your direct exam; right?

A.   It is.

Q.   This is the Google website?

A.   Yes.

Q.   This is, I guess, what you would call a user interface; correct?

A.   Correct.

          MR. REHN:   Let's go to the next slide.

Q.   So, what was this?

A.   It is an application called Links.

Q.   And I guess this is a CLI?  Is that right?

A.   Correct.

          MR. REHN:   So let's go back to the prior slide.

Q.   Which of these would you say provides a better user experience?

A.   It depends on the context.

Q.   Well, for the average user which one would they be more likely to use?

A.   For the average user, absolutely the Google Chrome UI.

Q.   And if somebody wanted to make their website available to average users, they would provide a user interface; correct?

A.   Again, I think it depends on the context but, yes, I would

assume user interface is something that they would make available.

Q.  A user interface is necessary for broad public adoption; isn't it?

A.  No.

Q.  Would you say that most people who use the internet have been to the Google website?

A.  I don't have any statistics to back it up but I would assume the answer is yes.

Q.  And almost all of these people see something like what we see on the screen here; isn't that right?

A.  Most likely, yes.

MR. REHN:  If we can go to the next slide?

Q.  Do you actually think that any significant percent of people use this version?

A.  Today?  Probably not.  There is a previous time where, yes, it probably did.

MR. REHN:  You can bring that down.  Can we go to slide 31?

Q.  So, you talked a little bit about centralized versus decentralized applications.  Do you recall that?

A.  I do.

MR. REHN:  If we can bring up 1611 and go to the last page?  Government Exhibit 1611?

Q.  Do you remember looking at this during your direct

P7S5sto5                         Edman - Cross

examination?

A.   I do.

Q.   And just to be clear, it is the owner of that ENS name who decides what the user gets when they go to that domain; correct?

A.   I would say yes.

Q.   In other words, the owner of the ENS domain, in this case website.ETH, will provide a content identifier that tells the other parts of the system what to deliver to the user; correct?

A.   That is correct.

Q.   And the owner of the ENS domain can change that content identifier if they want to implement a new version of their website; isn't that right?

A.   That is correct.

          MR. REHN:   You can bring that down.

Q.   Do you recall being asked on your direct examination some questions about the gas ratio analysis?

A.   I do.

Q.   Do you recall that you looked at some of the charts that Mr. Werlau prepared showing the overwhelming majority of users using either the UI or the CLI?

A.   I understand that was the output of his analysis.

Q.   Do you recall that you, during your direct testimony, you pointed out there were a scattering of dots outside of the ranges that you had marked out; correct?

P7S5sto5                        Edman - Cross

A.   In some instances.  It was more concentrated than a scattering, but it's --

Q.   But you testified about dots that were outside of the range; correct?

A.   Correct.

          MR. REHN:  If we could bring up Government Exhibit 3005-39?

Q.   Dr. Edman, do you recall seeing this calculation that Mr. Werlau did?

A.   I do.

Q.   And this shows that 96 percent of all those deposits were within those ranges for the UI; isn't that correct?

A.   Assuming that his range is accurately identifying use of the UI.

Q.   And this also showed that about 2.8 percent were in the CLI range; isn't that right?

A.   Yes.  Again, assuming that the methodology is actually accurate.

Q.   And then it says that there is 1 percent of all the deposits that are unidentified.  Do you see that?

A.   I see that.

Q.   So, in your testimony you were focusing on the 1 percent of dots outside of those branches instead of the 99 percent of dots that were inside the ranges, weren't you?

A.   I was focusing on the 1 percent which suggests that the

P7S5sto5                          Edman - Cross

conclusions relating to the 96.2 percent and the 2.8 percent may not be accurate.

Q.   The ranges show that almost everybody was within the range that the UI would have been in; isn't that right?

A.   According to Mr. Werlau's definition of those ranges; yes.

Q.   And you didn't do your own analysis on what the ranges should have been, did you?

A.   No.

          MR. REHN:  You can bring that down.

Q.   Dr. Edman, you are familiar with the sort of size of the overall Ethereum community; correct?

A.   I'm not sure exactly what you are referring to as the community.

Q.   Well, is there people out there in the world who talk about and think about Ethereum?  You are sort of familiar with that space; is that fair to say?

A.   Generally, yes.

Q.   Is it fair to say there are tens of thousands of people involved in Ethereum in one way or another?

A.   I don't really have a basis to quantify how many people are involved in Ethereum.  That doesn't sound implausible, though.

Q.   Maybe even hundreds of thousands?

A.   I don't know.

Q.   So I would like to look at slide 16 of your presentation. You talked about some governance proposals in Tornado Cash;

P7S5sto5                        Edman - Cross

correct?

A.   Yes.

Q.   And I just want to make sure I understand.  So there are columns for votes and then there is columns for voters.  Do you see that?

A.   I do.

Q.   And the votes, that is the number of TORN tokens; correct?

A.   Correct.

Q.   And then the number of voters is how many actual people were behind those votes; correct?

A.   Correct.

Q.   So let's start with the votes.  Do you see the total votes column?

A.   I do.

Q.   Do you see that the total number of votes is almost always under 100,000 except for that very last one; correct?

A.   Yes.

Q.   In fact, many of these are more like 30,000 or maybe up to 40,000.  Fair to say?

A.   Yes.

Q.   So if a person had 230,000 TORN tokens they would have the ability to control any of these votes if they wanted to; correct?

A.   Yes, if they had that many tokens.  I believe so, yes.

Q.   And you testified earlier that each of the Tornado Cash

developers had that many tokens as of December 2021; isn't that right?

A. They at least had access to them. Whether they had released them from the vesting contract, I don't know for certain.

Q. They had the ability to spend those tokens out over time, fair to say?

A. Again, I don't know what they did with the tokens once they vested.

Q. Vested means the ability to control; isn't that right?

A. Yes.

Q. So, each individual founder, by himself, had the ability to vote to cast more votes than all of the votes for any of these proposals; isn't that right?

A. Assuming that they had had those TORN tokens at the time of the proposals, I believe so.

Q. And collectively, if you add up all three of their vested TORN tokens, it was over 800,000 during this team period, isn't that right?

A. I don't recall exactly. I mean, they didn't receive -- none of the TORN tokens would vest until December 2021, so for everything from proposal 9 and earlier I would disagree.

Q. For the 2022 proposal they had the ability to control those votes; isn't that right?

A. Yeah. I would believe so, assuming that they had had

P7S5sto5                         Edman - Cross

actually released those tokens from the vesting contract.

MR. REHN:  If we can unhighlight that and now look at the total voters?

Q.  So, if we look at the total voters for each proposal, is it fair to say that they typically got a lot fewer than 50 votes, with one or two exceptions?

A.  I would distinguish votes from voters, but for the most part there were fewer than 50 distinct voters.

Q.  That's fewer than 50 distinct individuals who were actually casting these votes; isn't that right?

A.  I don't know whether -- 50 distinct addresses, whether each address corresponds to a different individual or not I don't know for certain.

Q.  So it could be even fewer than the numbers here because somebody could have multiple addresses; isn't that right?

A.  Possible.

Q.  So if we look at relayer registered, no. 10; 44 different addresses voted on that; right?

A.  Correct, but there is also the ability to delegate folks, so you could delegate your TORN tokens to somebody else to vote.

Q.  Do you have any evidence that anybody di that in connection with this proposal?

A.  No, not as I sit here today.

Q.  So that is just theoretical; right?

P7S5sto5                         Edman - Cross

A.   Correct.

Q.   So, in comparison to that overall Ethereum community you talked about earlier, this isn't a very big community, is it?

A.   Relatively?  No.

Q.   There wasn't really much interest in governance in the broader Ethereum community, was there?

         MS. AXEL:  Objection, your Honor.

         THE COURT:  Sustained.

         Rephrase.

Q.   There was not a high degree of participation in Tornado Cash governance as compared to the overall Ethereum community; is that fair to say?

         MS. AXEL:  Objection.

         THE COURT:  Overruled.  You may answer.

         THE WITNESS:  I'm not sure I have a basis to answer that accurately.

         MR. REHN:  You can bring that down.

Q.   I want to ask you about this compliance tool.  Do you remember that testimony?

A.   I do.

Q.   You said that Tornado Cash tried to access the compliance tool?

A.   It did.

Q.   So, that was completely optional; right?

A.   I'm sorry?

P7S5sto5                        Edman - Cross

Q.   That was completely optional for Tornado Cash users;
correct?

A.   Correct.

Q.   There was no requirement that anyone used the compliance
tool?

A.   Not from the protocol's perspective.

Q.   And that could have been part of the design; correct?

A.   I'm sorry.  Could you be more specific?

Q.   Requiring use of that could have been part of the design if
they wanted to; correct?

A.   I'm not sure I fully understand your proposal.

Q.   It was a design choice to make the compliance tool
optional; isn't that right?

A.   I would agree with that.

Q.   And the defendant and co-founders are the ones who made
that design choice; correct?

A.   I would assume so.  I don't think I can say for certain.

Q.   And remember earlier when we talked about hackers and
criminals using Tornado Cash?  Do you recall that testimony?

A.   I do.

Q.   Tornado Cash didn't require those people to use the
compliance tool; did it?

A.   No.

Q.   That was a design choice?

A.   I suppose you could phrase it that way.

P7S5sto5                        Edman - Cross

Q.   Let's go on to geo-blocking.  Do you recall testimony about geo-blocking?

A.   I do.

Q.   And that's just identifying parts of the world where people can't visit your website from; is that fair to say?

A.   Yes.

Q.   And if we could bring up your slide 34, this was one of the only parts of computer code we looked at during your testimony; is that right?

A.   It wasn't the only part but --

Q.   There were one or two others but this is one of the main ones you testified about, fair so say?

A.   Sure.

Q.   This is a section of the source code for the user interface; correct?

A.   Correct.

Q.   And to be more specific, this is a pull request for that source code, for the user interface; is that right?

A.   I'm sorry.  Can you say that again?

Q.   This is what is known as a pull request for the source code for the user interface; is that correct?

A.   It is a commit.  It is a commit to a git repository. Whether there was a subsequent poll request on GitHub to integrate this particular commit I don't recall.

Q.   So a commit is when somebody proposes adding this to the

P7S5sto5                         Edman - Cross

source code; is that right?

A.   It is when somebody makes changes to the source code.

Q.   But a follow request is when it actually gets added into the main branch or upstream version?

A.   In general, yes.

Q.   Did you investigate whether commit was ever actually even added to the upstream version?

A.   I don't recall.  I thought it was but as I sit here I don't recall exactly which branches this commit was applied to.

Q.   So, as you sit here today you don't know if the code, as we see on the screen, was even added to the UI source code, do you?

A.   I believe it was but, again, I don't recall specifically.

Q.   Well, did you go into the source code for the user interface and identify this yourself or did someone else do it for you?

A.   I did.

Q.   And you didn't check the subsequent history of this command to see if it was pulled into the upstream version?

A.   I did, but as I sit here today, I don't recall.

Q.   You don't know if this was changed before it was added to the upstream version, do you?

A.   I recall there were changes to the country list over time.

Q.   Do you recall that Roman Storm made those changes to the country list over time.

P7S5sto5                          Edman - Cross

A.    I don't recall exactly who made those changes.

Q.    So, what you showed us isn't how it is exactly committed to the source code, is it?

A.    It is committed to the source code.

Q.    But the actual version changed some of these countries, didn't it?

A.    I don't know what you mean by actual version, but there were changes to the source code over time.

            (Continued on next page)

P7S1STO6                    Edman - Cross

BY MR. REHN:

Q.  When this was pulled into the official version, the upstream version, before that happened, the countries changed, didn't they?

A.  I don't recall.  I remember the countries changed, but I don't recall exactly when.

Q.  And the person who made those changes was Roman Storm, wasn't it?

A.  I don't recall.

Q.  So this code commit is a configuration file for Netlify, correct?

A.  Correct.

Q.  And Netlify is a web-hosting service; is that right?

A.  Yes.

Q.  And so this code commit only works if you're hosting your website on Netlify, correct?

A.  Correct.

Q.  But the user interface wasn't hosted on Netlify, was it?

A.  No.  The user interface runs locally in the user's browser.

Q.  It's hosted on IPFS, isn't it?

A.  Correct.

Q.  So if the user interface was hosted on IPFS, this Netlify configuration tool wouldn't even work, would it?

A.  No, 'cause IPFS is just data storage.  It's not a website router.

Q.   So in your testimony you showed us one part of the user interface code to focus on, but it's one that didn't even work with the user interface as it was hosted; isn't that right?

A.   My recollection is it worked with the website, but the user interface, again, it runs in your browser.

Q.   This is the source code for the user interface, Dr. Edman, isn't it?

A.   It's from that repository, yes.

Q.   Not the source code for the tornado.cash website, is it?

A.   This, no.

Q.   So the website is irrelevant to this source code, isn't it?

A.   I'm not sure that it's irrelevant.

Q.   This source code doesn't have anything to do with the tornado.cash website, does it?

A.   I don't necessarily recall.  I——

Q.   Well, it's the source code for the user interface, isn't it?

A.   It's from that repository, yes.

Q.   And so this source code is about the user interface that was hosted on IPFS, correct?

A.   It could also be hosted other places.

Q.   As far as you know, the place they hosted the user interface was an IPFS, isn't it?

A.   Correct.

Q.   And so you showed us a piece of code that would have had no

P7S1STO6                          Edman - Cross

effect on any geoblocking for the user interface, didn't you?

A.  On IPFS, correct.

THE COURT:  Counsel, may I please have a sense of how much more redirect you have.

MR. REHN:  Maybe 20 minutes?

THE COURT:  Hmm.  All right.  Let's take our afternoon break now then.

I'll ask you, as always, not to discuss this case with each other or anyone else.  Please keep an open mind until all of the evidence is in.  And we'll see you in 10 minutes.  Thank you.

All rise.

(Jury not present)

THE COURT:  All right.  I'll see you in 10 minutes.

Mr. Rehn, cut it down.  Thank you.

(Recess)

(Jury present)

THE COURT:  Please be seated.  Thank you very much.

Mr. Rehn, you nay may continue.

BY MR. REHN:

Q.  Dr. Edman, do you recall testifying about some of the tracing analysis that Special Agent DeCapua did?

A.  I do.

Q.  And you didn't disagree with Special Agent DeCapua's analysis that Tornado Cash laundered more than $1 billion in

P7S1STO6                    Edman - Cross

criminal proceeds, did you?

A. I certainly did not use those terms or quantify the dollar value of deposits to Tornado Cash.

Q. You didn't do any analysis to disagree with his conclusions in that regard, did you?

A. No.

Q. What you did do is make your own pie chart; is that right?

A. I did.

Q. And that was just taking his data and making a different pie chart, correct?

A. Correct.

Q. And in his pie charts and in your pie charts there's a big piece of the pie for criminal proceeds; is that right?

A. There's a big piece of the pie for criminal proceeds in his pie charts and a smaller piece of the pie in my pie chart.

Q. And then there's another part of the pie for other or unidentified; is that right?

A. Correct.

Q. For those other deposits, you didn't analyze those other transactions, correct?

A. No.

Q. You didn't make any effort to do any attributions regarding those transactions, correct?

A. Correct.

Q. You can't say anything about who the people making those

other deposits are, or what purpose they used Tornado Cash for?

A.  Correct.

Q.  So far as you know, the majority of those other transactions could also be criminal proceeds, correct?

A.  They may, they may not.

Q.  You have no way of knowing.

A.  Correct.

Q.  There's no way to look at the pie chart and say that they weren't criminal proceeds, is there?

A.  No.

Q.  In fact, you have not independently identified a single Tornado Cash deposit that wasn't criminal, have you?

A.  It certainly wasn't in the scope of my analysis.

Q.  I'd like to talk about the sanctions oracle.  Do you recall testifying about that?

A.  I do.

Q.  Now that was implemented by the developers on April 15th, correct?

A.  Correct.

Q.  Of 2022.

A.  Correct.

Q.  That was only implemented in the user interface; is that right?

A.  That is correct.

Q.  The developers didn't make any changes to the CLI, did

they?

A.   No.

Q.   They didn't release a new router or make any changes to the existing router, did they?

A.   No.

Q.   And based on your testimony, you would agree that putting that oracle at the user interface level was easy to bypass, correct?

A.   Yes.

Q.   Let's go on and talk about the February 2022 router.  So do you recall testifying about that February 2022 router during your direct testimony?

A.   I do.

Q.   And I think you said in direct that the developers needed to get a governance vote to release a new router.  Do you recall that?

A.   I recall that.

Q.   Let's take a look at that February 2022 router.

          MR. REHN:  Could we first pull up Defense Exhibit 8788.  And if we go to page 3.

Q.   Do you recall that this was some of the code that identified the address for the router?

A.   I do.

          MR. REHN:  And if we could highlight that section called Proxy, the top of the screen.

Q.   So that's the address for the February 2022 router, correct?

A.   I believe so, but I don't recall the address of every Tornado Cash contract.

Q.   You testified on direct that this part of the code, this is where it listed what the router was during that time period. Do you recall that?

A.   I do.

Q.   And so this was the February 2022 router.

A.   I believe so, but again, I don't recall the address of every version of the router.

Q.   Okay.  Is it possible to use data from Etherscan to identify when a particular address was created?

A.   To identify the first transaction involving an address.

Q.   And for a smart contract, it will identify that the smart contract was created when that transaction happened, correct?

A.   Yes.

        MR. REHN:  If we could show the witness what's been marked for identification purposes as Government Exhibit 4027.

Q.   Dr. Edman, do you recognize this as a page from Etherscan?

A.   I do.

Q.   And do you see that in the lower half it says Created and it has that address for the February 2022 router we were looking at just now?

A.   I see that.

P7S1STO6                        Edman - Cross

MR. REHN:  Government offers Exhibit 4027.

MS. AXEL:  Objection, your Honor.

THE COURT:  On what basis is this being offered, sir?

MR. REHN:  This is the Etherscan data, the publicly available Etherscan data for this router contract, that he just testified was in the code.

THE COURT:  I'll allow.

MS. AXEL:  May I be heard?

THE COURT:  No.

(Government's Exhibit 4027 received in evidence)

MR. REHN:  If we could bring that up, please.

BY MR. REHN:

Q.  Dr. Edman, this is the Etherscan data showing the transaction hash for the creation of that router contract, correct?

A.  It appears so, but this is the first I'm seeing this particular exhibit.

Q.  And do you see there's a time stamp in the middle of the page?

A.  I see that.

Q.  What was the date that the router was created?

A.  Accepting your representation of this, the date is February 9, 2022.

MR. REHN:  If we can bring that down.

Q.  And let's look at slide 16 from your presentation.

P7S1STO6                    Edman - Cross

Dr. Edman, was there a vote on February 9, 2022?

A.   Doesn't appear so.

Q.   So there was no governance vote to authorize the creation of that router, was there?

A.   There was not, but that also doesn't mean that that contract was integrated into the Tornado Cash protocol.

MR. REHN:   Let's go back to Defense Exhibit 8788, page 3.   And if we could expand.

Q.   Do you see where it says Proxy?

A.   I do.

Q.   That's the address we were just looking at ending in 31b, isn't it?

A.   It is.

Q.   So it was integrated into Tornado Cash, wasn't it?

A.   Based on this exhibit, I don't know when that line of code was changed, and just because you create a contract on a particular date, doesn't mean that it's integrated into the protocol as of that date.

Q.   Dr. Edman, it was possible for the developers to create a new smart contract without anybody voting to approve it; isn't that right?

A.   That is correct.

Q.   And it was possible for the Tornado Cash developers to put that address into the code for the UI and the CLI without anybody approving it; isn't that right?

A.   That is correct too.

Q.   So the founders could create a new router and put it in the UI, without any governance vote; don't you agree?

A.   They could.

Q.   Dr. Edman——we can bring that down——you have experience conducting cryptocurrency investigations, correct?

A.   I do.

Q.   And you have investigated cryptocurrency scams, frauds, and hacks, correct?

A.   Yes.

Q.   And based on that experience, would you say that mixers are often associated with illicit activity?

A.   Yes, I would say that.

Q.   And would you say that in your experience, when individuals engage in illicit activity, they will attempt to launder funds through mixers?

         MS. AXEL:  Objection.

         THE COURT:  I'd like you to be a little bit more precise because not all proceeds can be laundered through mixers, sir, so maybe be a little bit more specific.

         MR. REHN:  I'm asking if he would say that, your Honor.

         THE COURT:  Okay.

Q.   Would you say that in your experience, when individuals engage in illicit activity, they will attempt to launder funds

through mixers?

A.  I think I have said that before, but I'm not an expert on money laundering.

Q.  You have said that before, haven't you?

A.  I believe so.  I believe that——I believe I know the case you're referring to.

Q.  You testified in a case called *United States v. Chastain*, didn't you?

A.  Yes.

Q.  And that was here in the Southern District of New York, correct?

A.  It was.

Q.  That was in 2023, correct?

A.  Yes.

Q.  And you were an expert witness for another defendant in that case, correct?

A.  Correct.

Q.  And that defendant was paying you $750 per hour, right?

A.  Correct.

Q.  In that case, did you say that when individuals engage in illicit activity, they will attempt to launder funds through mixers?

A.  I believe that was part of my written disclosure.  I don't believe that was part of my courtroom testimony.

Q.  You signed a document representing that that was your view;

isn't that right?

A.   Correct.

Q.   Dr. Edman, I'd like to show you an exhibit that is in evidence in this case, government Exhibit 2055-T.

MR. REHN:   And if we go to page 13.   And if we could expand the top three messages.   Not the top two, the top three, if possible.

Q.   Do you see these three messages from Roman Storm?

MS. AXEL:   Objection.

THE COURT:   I'm going to let you ask the question. I'm not sure I'm going to let him answer it though.

Q.   Do you see these three messages from Roman Storm?

A.   I do.

Q.   Dr. Edman, based on your experience conducting cyber investigations, individuals engaging in illicit activity will try to obfuscate their network location using a VPN; wouldn't you say that?

THE COURT:   I'll allow it.

A.   I'd say that is one possible technique, yes.

Q.   And that's what you said in the *Chastain* case, isn't it?

A.   Again, I believe that was my written disclosure, yes.

MR. REHN:   Nothing further, your Honor.

THE COURT:   Okay.   Redirect?

MS. AXEL:   Yes, your Honor.

REDIRECT EXAMINATION

BY MS. AXEL:

Q.  Dr. Edman, you were asked about prior testimony.  Were you engaged recently by the Securities and Exchange Commission?

A.  I was.

Q.  In what kind of a case?

A.  This was a civil case involving the blockchain called the Terraform blockchain.

Q.  And is the Securities and Exchange Commission an agency of the United States?

A.  They are.

Q.  Were you paid for that testimony?

A.  I was.

Q.  Was that a significant engagement?

A.  Yes, it was.

Q.  And what was your most recent engagement, Dr. Edman?

A.  I'm sorry.  Most recent expert engagement?

Q.  Yes.

A.  That would have been the case with the U.S. Attorney's Office for the Northern District of California.

Q.  And so you were engaged by the government there.

A.  Correct.

Q.  And were you paid also for that engagement?

A.  I was.

Q.  You were asked about minified source code, sir.  Why do

P7S1STO6                    Edman - Redirect

people minify source code?

A.   Typically for efficiency reasons.  It's smaller and faster and easier to download.

Q.   And was the minified source code of the Tornado Cash UI available prior to July 2022?

A.   Yes.

Q.   And that was open sourced.

A.   Yes, it was.  You could download it, you could run it, you could modify it.

Q.   And it would work.

A.   Yes.

Q.   And with respect to the CLI, was the CLI code always open sourced?

A.   It was, yes.

Q.   Were you ever aware of any alternative UIs to the Tornado Cash UI?

A.   I believe there were a few, at least.

Q.   Now let me show you what we looked at previously as 3002-49.  This is an Agent DeCapua document.

     And we discussed Agent DeCapua's tracing of the Ronin hack, right?

A.   Correct.

Q.   And how is tracing done here on the blockchain?  How does somebody do it, generally?

A.   Generally, you will use, you know, a combination of

publicly available tools like block explorers like Etherscan and also incorporates, or at least we often incorporate, data from commercial tools, from like Chainalysis and Elliptic are some examples, and you will typically use those tools to, again, to use Agent DeCapua's analogy, follow the bouncing ball and try to attribute those addresses to particular services or entities.

Q.   And you're able to do this because this is publicly available data.

A.   That is correct.

Q.   And you were able to track one address to the next address; is that right?

A.   That is correct.

Q.   Where does the moment of privacy occur?

A.   That occurs within the Tornado Cash pools themselves.

Q.   Okay.  Let's look at the depiction that you showed the jury.

          MS. AXEL:  Let's see page 12 of our Exhibit 8785, I believe it is.

Q.   Okay.  And looking at this document, is the step where we're looking at the user, is that one public?

A.   I'm sorry.  Could you say that again.

Q.   Yes.  Again, which part of this is public and where does it become private?

A.   So the user——

MR. REHN:  Objection, your Honor.

THE COURT:  I'll allow.

A.  Apologies.  The user making the deposit, that address is public.  The transaction creating that deposit is also public.  But once the funds are within the Tornado Cash pool, then that's essentially where the private aspect comes from.

Q.  And you were asked about the router.  Why didn't you show the router in this example?

A.  Again, this is a simplified diagram showing the deposits to a Tornado Cash pool.

Q.  And would it matter for privacy purposes that you would show it going into the router before it goes into the Tornado Cash pool?

A.  No.

Q.  You were asked about the necessity of blending in.  Is it important to blend in prior to the pool?

A.  No, 'cause again, those transactions are publicly viewable.  You can distinguish one deposit from—transaction from another deposit transaction regardless of whether you're using the router or going directly to the pool.

Q.  Okay.  Let's look at the withdrawal transaction.

MS. AXEL:  Let's go to the relayer one on 14.

Q.  And you were also asked about the router with respect to the relayer function, correct?

A.  Correct.

Q.   Now first, is a relayer optional?

A.   It is optional.

          MS. AXEL:  No, I mean his slide deck at 14.

Q.   And can a user select their own relayer?

A.   They can.

Q.   So are they required to use the relayer registry router at all?

A.   No.

Q.   All right.  But if they did, where would that router appear then in this example that you provided?

A.   I'm sorry.  Which router specifically?

Q.   You were asked about the relayer on the back end, on the withdrawal part of the process.

A.   Okay.  That would be from the—the transaction from the relayer to the pool.

Q.   To the relayer to the pool.  And would that affect then when the Ethereum goes to the new account?

A.   I—it would not.

Q.   So identify for us again the moment of privacy here for the user who used the pool.  Where is that?

A.   That occurs within the pool itself.

Q.   And so does the location of the router or the choice of router there have anything to do with the user obtaining privacy?

A.   No, because the pool is what sort of breaks the link

P7S1STO6                      Edman - Redirect

between a deposit and subsequent withdrawal.

Q.  And you asked to be able to provide some context to the question regarding the need to blend in.  Can you provide that context now.

A.  Well, the context, if I'm recalling the right question from Mr. Rehn, was just that the transactions either depositing assets into Tornado Cash pool or withdrawing transactions from the Tornado Cash pool, those are distinguishable.  They're public; they're identifiable.  It's the correlation between the deposits and the withdrawals that gives the protocol its privacy aspects, and that occurs within the pool itself, not—not the router.

Q.  Okay.  And showing you page 16.  And you testified that you created this and pulled this data concerning the DAO activity; isn't that right?

A.  That is correct.

Q.  Do you consider yourself an expert on DAO governance matters?

A.  No.  I'm familiar with the general constructs, but not an expert on, yeah, necessarily the community aspects of it.

Q.  All right.  But with respect to the blockchain data here, that's what you were capable of looking at.

A.  That's correct.

Q.  And looking at the blockchain data here, you did look at the dates at which the founders' tokens were released from the

P7S1STO6                      Edman - Redirect

cliff, correct?

A.   I did, yes.

Q.   And so you testified that was after proposal 9.

A.   Correct.

Q.   Prior to that they would have been locked.

A.   That is correct.

Q.   And is it possible on the blockchain then to trace the founders' TORN and find out if they voted or not?

A.   It is.

Q.   Yeah.  That's something that one could do.

A.   Yes.

Q.   Okay.  Let's look at slide—my deck is falling apart—34. And you were asked about this particular excerpt of code concerning geoblocking.  Do you see that?

A.   I do.

Q.   Why did you pick this particular excerpt of code?

A.   Particular—picked this particular excerpt of code because it shows basically a measure that was implemented to prevent access from countries associated with sanctions.

Q.   And was that measure in fact implemented on the website?

A.   I believe so, yes.

Q.   Can you employ geoblocking on IPFS?

A.   Not really.  If you were to apply geoblocking, it would have to be—the individual operators of nodes within the IPFS network would have to do it.

Q.  So was the UI always on the decentralized IPFS network?

A.  I don't recall specifically.  I believe it was always available at IPFS.  I don't recall over the period of time it was available.  It's sort of a traditional server, but——

Q.  Okay.  You don't know.

Looking at then the sanctions oracle.

MS. AXEL:  Can we go then back a page.  Yeah.  There we go.

And you were also——no, actually, it's not that one.  I want to go to the compliance tool, page 33.

Okay.  And——back again.  There we go.

Q.  Okay.  And Dr. Edman, you were asked about it being a design choice how the compliance tool was implemented.  Do you recall that?

A.  I do.

Q.  What other design choices would there have been for this?

A.  If I recall from Mr. Werlau's testimony, a design choice that they could have made was to send the secret notes that users generate to——to the Tornado Cash developers for every deposit.  That could be a design choice, albeit not a good one.

Q.  Why would that not be a good design choice?

A.  Well, you——the secret node is what lets you control or withdraw funds that you've deposited to Tornado Cash, and anybody who has your secret note can withdraw your funds, and so by sending all the secret notes to the Tornado Cash

developers, essentially you are taking this decentralized, noncustodial protocol and turning it into a centralized custodial protocol where they would have secret notes and be able to withdraw funds or, if their computers were hacked, then somebody would be able to steal those secret notes and withdraw all the user funds.

Q.  They would have to have a massive registry of all the secret notes.  Would that provide a privacy?

        MR. REHN:  Objection.

A.  No.

        THE COURT:  I'll allow it, but counsel, I'd prefer you not testify.

A.  No, that would not provide privacy to users of the protocol.

Q.  Okay.  And let's take a quick look at what they marked as Government Exhibit 4027 and identified as an Etherscan document concerning the router.

        And Dr. Edman, is there a difference between a proxy being deployed and then integrated?

A.  Yes.

Q.  Okay.  What is that difference?

A.  So—sorry.  Is there supposed to be an exhibit up?

Q.  We didn't receive it before the testimony.

        MR. REHN:  We could bring it up for you.  4027?

        MS. AXEL:  4027.

Q.   Okay.  And remind me where you found the date on this
document.

A.   It was in the—sort of in the middle, where it says Time
Stamp.

Q.   Okay.  Time Stamp.  I see that.  Okay.  So what does this
time stamp reflect?

A.   This time stamp shows, based on this screenshot, a contract
being created on February 9, 2022.

Q.   And you indicated there was a difference with integration.
What does that mean?

A.   Correct.  So the source code for the Tornado Cash smart
contracts was publicly available.  Anybody can download it and
create a contract using that source code.  But in order to
integrate that smart contract into the protocol, that's what I
mean in terms of integration.  Having the other smart contracts
as part of that protocol reference this new smart contract.

Q.   And how would it be integrated?

A.   That would have been part of the DAO, the governance
process.

Q.   Let's take a look at page—back to our pages—the page of
your presentation, 18.

        Okay.  And you were asked about this on
cross-examination, were you not?

A.   I believe I was.

Q.   Okay.  And in contrasting this page with the next page on

P7S1STO6                          Edman - Redirect

19, Dr. Edman, what type of user would use this first page, page 18?

A.  I can't see the page numbers, but assuming this is the Google Chrome interface, I would say most users would use this particular interface.

Q.  And so it would lead to broad adoption.

A.  Correct.

Q.  And with respect to page 19, what type of user could use this type of a website?

A.  I would say sort of a more advanced technical user would use something like this.  There are also certain times where you don't actually have access to a UI like you would see on your—on your computer.  You might be connected to a remote machine and you don't have a graphical interface that lets you view things like Google Chrome, and so you would use a text-based tool like this to view and interact with certain websites.

Q.  And you heard testimony concerning the Ronin hack, and you were asked about that on cross-examination, weren't you?

A.  I was.

Q.  And that involved a compromise of private keys?

A.  That is my understanding, yes.

Q.  What is a bridge?

A.  A bridge.

          MR. REHN:  Objection.

P7S1STO6                    Edman - Redirect

Q.  Isn't it the——

        MR. REHN:  Beyond the scope, your Honor.

        THE COURT:  Sustained.

Q.  Was it a sophisticated user that was needed to conduct the Ronin hack?

        MR. REHN:  Objection.

        THE COURT:  I don't know what a sophisticated user is. Rephrase the question.

Q.  Understanding what you testified on direct and what you were asked about on cross-examination concerning the Ronin Bridge, is it your opinion that the hackers were sophisticated?

        MR. REHN:  Objection, your Honor.

        THE COURT:  I'll allow that.

A.  I believe so, yes.

Q.  One more.  Let's take a look at the sanctions oracle page. Should be 20——my pages have come off——35.

        Now the sanctions oracle was implemented by the Tornado Cash developers on which interface?

A.  It was integrated into the Tornado Cash UI.

Q.  And you were cross-examined that most users use the UI, correct?

A.  Correct.

Q.  Did you review the CLI repositories to determine if the developers had considered or were in the process of adding the oracle to the CLI?

MR. REHN:  Objection.

THE COURT:  I'll allow.

A.  I don't recall——yeah, I don't recall something like that from the CLI repository.

Q.  And would it be easy to remove if it were added to the CLI?

A.  Yes.

Q.  You were asked whether it was easy to circumvent the sanctions oracle, and you testified yes; is that right?

A.  That is correct.

Q.  How was it easy to circumvent?

A.  Well, if your address is on the list maintained by the sanctions oracle, then you can just create a new wallet address, send your funds to that address, and then use that to make a deposit to Tornado Cash in this instance.

MS. AXEL:  No further questions.

THE COURT:  Thank you.  Sir, you may step down.

(Witness excused)

THE COURT:  Next defense witness, please.

MR. KLEIN:  Yes, your Honor.  The defense calls Tyler Almeida.

(Witness sworn)

THE DEPUTY CLERK:  Please be seated and into the microphone, please state and spell your full name.

THE WITNESS:  Tyler Almeida.  T-Y-L-E-R, A-L-M-E-I-D-A.

THE COURT:  You may inquire, sir.

MR. KLEIN:  Yes, your Honor.

TYLER ALMEIDA,

     called as a witness by the Defendant,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. KLEIN:

Q.  Good afternoon, Mr. Almeida.

A.  Hello.

Q.  Where do you live?

A.  California.

Q.  And what do you do for a living?

A.  I work in cybersecurity, in offensive security at Coinbase, a large crypto exchange.

Q.  And I'm sorry.  And how long have you worked at Coinbase?

A.  Just over four years now.

Q.  And before Coinbase what did you do?

A.  I was a cybersecurity and privacy consultant for about five years.

Q.  Can you just explain to the jury what cybersecurity is, briefly.

A.  Sure.  It's just keeping the bad guys out, but really most of the time it's just working with corporations, helping to poke holes in their assumptions and their understanding of their security, and then figure out how we can patch the

P7S1STO6                       Almeida - Direct

security and make it stronger the next day.

Q.  Are you familiar with Tornado Cash?

A.  Yes.

Q.  At a high level, what is Tornado Cash?

A.  At a very high level, it's a—to my understanding, just an implementation of existing privacy technology on the blockchain.

Q.  Do you recall which blockchain?

A.  Yeah, the Ethereum blockchain.

Q.  And have you used Tornado Cash?

A.  Yes.

Q.  How many times have you used Tornado Cash?

A.  Once.

Q.  Why did you use Tornado Cash?

A.  For, I mean, a myriad of reasons.  As kind of a technologist, was fascinated by the technology, the implementation of the technology—

        THE COURT:  I'm so sorry.  I'm going to ask you to slow down for court reporter and judge.

        Give me your myriad reasons again, please.

A.  Sure.  There are a myriad of reasons.  In summary, to use the technology, because I was fascinated by it; and then secondly, for privacy reasons, because I wanted to donate using the—using crypto, and there's no privacy option in Ethereum.

Q.  And so what were you donating to?

P7S1STO6                    Almeida - Direct

A.   I was donating to the Ukrainian War Fund.

          MR. MOSLEY:  Objection.

          THE COURT:  I'll allow it, but counsel, that's not what this case is about, so let's please move on.

Q.   Why was privacy important to you in that instance?

A.   I was—for a couple of reasons.  One was because of the nature of using blockchain to donate.  It was both an immediate way that they could receive the funds.  However, like as mentioned, there's no privacy by default on the Ethereum blockchain, so I had to use Tornado Cash or some kind of privacy protocol to maintain that privacy or to break the chain between my identity, which is on my wallets in Ethereum and how I wanted to donate.

Q.   Were you concerned about anything in particular?

A.   Yes.  I mean, I was—

          MR. MOSLEY:  Objection.

          THE COURT:  I'll hear it, but I might strike it.

          Go ahead.  Give your answer, sir.

A.   Sure.  I mean, I was concerned for my privacy from bad actors who might—

          THE COURT:  That's it.  Thank you.

Q.   Okay.  Do you know Roman Storm?

A.   No.

Q.   And did the defense pay for your airfare, hotel, and transportation?

P7S1STO6                    Almeida - Cross

A.   Defense?

Q.   Us.

          THE COURT:  That table, yes.

A.   Nobody's paid for it yet, but——

          THE COURT:  Do you expect to be reimbursed?

          THE WITNESS:  Yes, yes.

          THE COURT:  Thank you.  That's now on the record of
this trial.  Thank you, sir.

Q.   And nothing else, though.

A.   No, no, nothing.

          MR. KLEIN:  Nothing further, your Honor.

          THE COURT:  Thank you.  Cross-examination?

          MR. MOSLEY:  Yes, your Honor.

          THE COURT:  You may inquire, sir.

          MR. MOSLEY:  Thank you, your Honor.

CROSS EXAMINATION

BY MR. MOSLEY:

Q.   Good afternoon, Mr. Almeida.

A.   Good afternoon.

Q.   You just made the one deposit and one withdrawal, correct?

A.   Yes.

Q.   And you work for Coinbase; is that correct?

A.   Correct.

Q.   And Coinbase is a cryptocurrency exchange.

A.   Among other things, but primarily, yes.

P7S1STO6                     Almeida - Cross

Q.   And you have an account at Coinbase; is that correct?

A.   Yes.

Q.   And you have cryptocurrency accounts at other exchanges, correct?

A.   Yes.

Q.   So I don't get you in trouble, but your company prefers that you use Coinbase if you use an exchange; is that correct?

A.   Yes, for like trade surveillance purposes.

Q.   You would agree with me then that as far as what can be viewed on the blockchain is concerned, the public cannot associate transactions you make using Coinbase with your identity; is that correct?

A.   If—correct.  If the question is about my public persona, then yes.

Q.   And again, as far as what is readable on the blockchain is concerned, transactions leaving Coinbase can't be associated with your identity either, right?

A.   Correct.

Q.   And you hold a regular bank account; is that correct?

A.   Yes.

Q.   And you initiate and receive transactions using that account, correct?

A.   Yes.

Q.   And those bank account transactions are not viewable by the public either, are they?

A.  They're not viewable by the public, but they're viewable by people, and there's logs of those, so yes.

MR. MOSLEY:  One moment, your Honor.

Q.  Mr. Almeida, have you ever made a donation?  You haven't made any donation using Coinbase, have you?

A.  Could you repeat the question.  I didn't hear.

Q.  That's a bad question.  Let me ask another one.

Have you ever made any donations using Coinbase, sir?

A.  Using Coinbase as a platform or—

Q.  Yes.

A.  No.

MR. MOSLEY:  Nothing further, your Honor.

THE COURT:  Okay.

MR. KLEIN:  Real quick, your Honor.

THE COURT:  Real quick.

REDIRECT EXAMINATION

BY MR. KLEIN:

Q.  When you use Coinbase, do you have to provide your personal information?

A.  Yes, a lot of it.

Q.  Why didn't you use Coinbase for this transaction?

A.  Because all of my information is on Coinbase, and if any of that information were either to be leaked, hacked, or provided to the government willingly by the company due to a subpoena, that's no longer public—or no longer private.  Apologies.

MR. KLEIN:  Nothing further, your Honor.

THE COURT:  All right.  Sir, thank you very much.  You may step down.

(Witness excused)

THE COURT:  Mr. Axel, do you have a witness of comparative brevity?  If not, then we'll break for the day, but I—

MR. KLEIN:  We don't have a witness of comparative brevity.

THE COURT:  All right.

MR. KLEIN:  Well, there's—your Honor, how late are we going, your Honor?

THE COURT:  I believe we have about five minutes, sir.

MR. KLEIN:  It will be longer than five minutes, your Honor, the next witness.

THE COURT:  Will it be longer than ten minutes?

MR. KLEIN:  I believe so.  We have a stipulation we could read right now that would fill some of this time if your Honor—

THE COURT:  I don't want the jury to think that their time is being filled, but yes, please read the stipulation into the record and we'll end with that.  Thank you.

Does the stipulation have a designation, sir?

MR. MOREL:  Yes.  It is marked as Exhibit S-8.

THE COURT:  S-8.  And are you going to be asking to

admit it into evidence, sir?

MR. MOREL:  Yes, your Honor.

THE COURT:  Thank you so much.  Go ahead.

MR. MOREL:  Stipulation is entitled Stipulation Regarding Testimony of Custodian of Records for Dragonfly.

It is hereby stipulated and agreed by and between the United States of America, by Jay Clayton, United States Attorney for the Southern District of New York, by the undersigned counsel, and Roman Storm, the defendant, by and with the consent of his attorneys, that, if called to testify as a witness at trial, a custodian of records for Dragonfly would testify as follows:

1.  Dragonfly is a venture capital firm whose mission is to identify and invest in crypto-based companies.  The firm invests in seed-stage, early-stage, and later-stage companies operating in the cryptocurrency and blockchain sectors, with the goal of earning a profitable return on these investments.

2.  Dragonfly has two managing partners overseeing investment activities, plus two other general partners and several other partners who all have an active role in identifying, making, and managing investments.  In addition to those individuals, Dragonfly has approximately 50 employees.

3.  In August 2020, Dragonfly and Peppersec, Inc. ("Peppersec") entered into an agreement that gave Dragonfly the option to purchase network tokens related to Tornado Cash at a

P7S1STO6

set price.  This agreement is GX 1309.  That same August, Dragonfly entered into a related agreement with Peppersec, giving Dragonfly the right to obtain shares of Peppersec if Peppersec underwent an equity financing in the future.  This agreement is GX 1304.  The total amount of Dragonfly's investment in August 2020 was $900,000.

4.  The money Dragonfly used for that $900,000 investment came from a $100 million venture capital fund it had raised from various investors that invested in approximately 100 other companies.

5.  In December of 2020, Dragonfly exercised its option to purchase network tokens related to Tornado Cash and was granted 5 percent of the TORN tokens issued that month.  In August of 2022, Dragonfly sold a portion of its TORN holdings for cryptocurrency worth over $4 million.

This stipulation is dated July 28, 2025, and is signed by counsel for both parties.

THE COURT:  And you're seeking the admission of stipulation S-8, correct, sir?

MR. MOREL:  That's correct, your Honor.

THE COURT:  Stipulation S-8 is admitted into evidence.  Thank you very much.

(Government's Exhibit S-8 received in evidence)

MR. MOREL:  Thank you.

(Continued on next page)

P7S5sto7

THE COURT:  All right.  Well, this seems to be an appropriate time to break for that day and so we will do that.  We will be back tomorrow.  I will ask you to get here as close to 8:45 as possible so that we can begin timely, and certainly I will let you know, as things go on, where we are in the continuum of this trial.

Please, do not discuss this case with each other or with anyone else.  Have a wonderful evening and keep an open mind until all of the evidence is received.

Take care.

THE DEPUTY CLERK:  All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Counsel, please be seated.

Maybe if someone wants to give Mr. Arad a seat at that table?  I am asking both tables, do we need a break or can we go to the motion right now?

MR. PATTON:  Happy to proceed.

THE COURT:  Thank you.  We will proceed.

Mr., Arad.  You have received that submission dated, it is docket entry 217, sir?

MR. ARAD:  Yes, your Honor.

THE COURT:  Do you agree?

MR. ARAD:  No.

THE COURT:  With any of it?

MR. ARAD:  No, we do not agree with any of it, your Honor.

The defense sent us a number of exhibits that it wanted admitted, I believe, yesterday morning.  We did agree to at least one so it is not here in the filing, but we disagree with respect to these submissions.

THE COURT:  Am I correct that some of these submissions were things that were part of the Rule 106 practice of last week?

MR. ARAD:  I believe that some of them may have been, your Honor.  I can tell the Court that some of these were previously cut as proposed government's exhibits, others were

P7S5sto7

never cut as proposed government's exhibits.

THE COURT:  Some of them were cut because I said if you, the government, put in one piece, I was going to allow in the remaining piece; correct?

Don't think so?  All right, we will see.  Far for me to --

MR. ARAD:  None come to mind at the moment, your Honor, but --

THE COURT:  In particular I thought the first exhibit I thought I had seen previously.  And, indeed, the fifth exhibit I thought I had seen previously, although perhaps in a different context.

Mr. Arad, let's do it this way, please.  Is it easier for you to respond exhibit by exhibit or give me a more global response?

MR. ARAD:  I can go either way, your Honor.

Globally speaking, your Honor?

THE COURT:  Go ahead.  Globally speaking.

MR. ARAD:  Globally speaking, the defense is trying to admit a number of exhibits now pursuant to Rules 106 and 803. These exhibits are made up of statements of the defendant and his co-conspirators that are clearly self-serving and unreliable hearsay.  Most of these statements are backward-looking, they're untethered from anything that would require their admission for added context, and in addition,

P7S5sto7

they would have little probative value and many would be prejudicial to the government.

There is just no basis to admit these under 106 or 803 and I would add, at the final pretrial conference the defense represented to the Court that it was going to be making potentially some rule of completeness objections and perhaps, in the alternative, making Rule 803 objections or requests for admission as well but one of these exhibits, the last one the defendant proposed here, the government never proposed to admit as an exhibit in the first place, and so it couldn't have been the subject of a Rule 106 application at any point.

THE COURT:  Let's then go through the exhibits.

Exhibit 1, let me just give you some hot takes from my perspective, sir.  The conversations between Mr. Qureshi and Mr. Storm on the first page, basically I don't see -- well, let me say this.  I don't see -- and I am saying this to the defense as well -- I don't see rule of completeness for this at all.  I am asking as to the last attribution why that isn't indicative to state of mind.

MR. ARAD:  It is backward-looking for one thing, your Honor.  This message is dated June 30, 2022, and the defendant is referring to hackers that have already used the Tornado Cash service.  At this point, for months, the defendant and his co-conspirators have been allowing criminals to use Tornado Cash and it is just a little too convenient that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7S5sto7

defendant takes this opportunity to make a statement that he doesn't like it.

If this were to come in, your Honor, it would open the door to pretty much any defendant, ex post, saying I didn't do this, I'm innocent of this, coming in as a present sense impression.

THE COURT:  But the last statement just seems to -- I mean, putting to the side the expletive, just seems to me a statement of how he feels.  Right now, today, I'm OK that these guys have been detected.  Why is that not -- again, the rest of it I agree, a long discussion about why the hackers got caught and what they could have done better I don't see as either rule of completeness or state of mind.  I'm asking about the very last attribution, unless you tell me that it can't come in extracted from the conversation because no one knows what it means.

MR. ARAD:  Extracted from the conversation, your Honor, it would be divorced from context and the other two statements are hearsay statements that don't fall under any other hearsay exception.

We do see this as an attempt by the defense to essentially bootstrap using Rule 803 in order to get in other hearsay statements that are not subject to any other exception.

THE COURT:  I'm making clear, the only thing in Exhibit 1, the only thing I would possibly admit is the last

attribution so I want you to focus on why I shouldn't.  It is not a rule of completeness issue and it is not state of mind.

MR. ARAD:  Right.

THE COURT:  Based on my read of state of mind and my read of the case law on state of mind, I am asking about the last attribution.

MR. ARAD:  I understand that, your Honor.

On its own, your Honor, this statement would be pretty difficult to understand.  He says:  On the other hand, I'm glad those -- I will say individuals -- are detected.

THE COURT:  You can curse in front of me, sir.  I just can't curse in front of you.

MR. ARAD:  Which individuals is he talking about, your Honor?  Without the other messages, the jury would be left to wonder and this statement would be completely devoid of meaning.

It is a 403 problem, your Honor, because the jury would simply be confused about what this means, in addition to the fact that, as I mentioned earlier, it is a backward-looking statement.  He is talking about, conveniently, his feelings now about events that he participated in actively as they transpired and which at the time that he has made this statement, are behind him.

I will say, your Honor, that there is a number of cases in the district where Courts have excluded similar kinds

of statements.  I will point to *United States v. Robert Adams*, that's 20 CR 494.  That case was about a different set of facts than we have here.  There, an MCC corrections officer was on trial for accepting a bribe in the form of demanding sex from a visitor to the MDC who had tried to bring in contraband, in order for the guard not to report that bringing in of contraband.  He tried to admit certain text messages with the victim post-dating the bribe, and Judge Gardephe didn't let that in because even though it was intended to show the prison guard's state of mind with respect to the victim by showing that they had an ongoing relationship that was not coercive, the fact that it post-dated the criminal conduct made it backward-looking and not forward-looking.  And that's what we have here, too.

The defendant participated in these transactions and then after they were done he conveniently said, actually, I'm glad these guys got caught.

THE COURT:  Sir, just because I want to show you I do read what was submitted to me, last week in Mr. Casey's submission it was, I believe, their exhibit 1374 is where -- has a broader communication that included this as well but let's -- we will move on.  The fact that I remember it means nothing to no one.  I am letting you know some of this stuff I feel like I have seen already in the context of 106.  Please speak to Exhibit 2, sir.

P7S5sto7

MR. ARAD:  So, Exhibit 2, your Honor, surprised me to see in the defense's submission.

THE COURT:  You mean because of FinCEN.

MR. ARAD:  Yes.

THE COURT:  I thought the FinCEN was a curious inclusion.  Go ahead.

MR. ARAD:  The Court sees where I am going with this.

THE COURT:  Go ahead.  I will let you go there.  Go ahead.

MR. ARAD:  I'm sorry.

THE COURT:  I will let you tell me why you were surprised about it.

MR. ARAD:  There was a lot of litigation in this case about whether there could be almost any mention at all of regulations of FinCEN, and ultimately the government was precluded from putting in large swaths of evidence that referenced FinCEN, that referenced regulations.  There was a lot of it.

THE COURT:  Precluded in part because you changed your theory of the case and proceeded under a different prong of Section 1960.

MR. ARAD:  That's fair, your Honor.

THE COURT:  So, it is not just me being mean.  You did, in fact, change your theory of the case.

MR. ARAD:  That is totally fair, your Honor.

THE COURT:  And in part you did so because you did not want the FinCEN information to come in.  No, sir?

MR. ARAD:  Well, what I would say, your Honor, is I think by the time we got to the point of litigating whether the FinCEN materials would come in, it was the defense's position that they shouldn't and there were -- there was litigation as recently as just a few days ago about whether certain documents that merely mentioned AML and KYC in their colloquial sense could come in and the government prevailed on that particular motion.

I think where this is different is that there is no way to mention FinCEN and the CFTC in a colloquial sense.  The defendant says:  According to FinCEN, we are not breaking any law so far.  There is just no way to interpret that colloquially, it is not something that people say in everyday speech.  So, it would be an indication to the jury, offered for its truth, that Tornado Cash was legal.  And it's for that very reason that the government was not able to talk about Tornado Cash not doing things that would comply with regulations.  It is simply not relevant to this case and could confuse the jury and so it should be excluded on Rule 403 grounds for that reason.

THE COURT:  Well, do you believe it completes any prior communication that the government has admitted at this trial?

MR. ARAD:  No, your Honor.  I struggle to see how it does.  In fact, I think the defense merely referred to other chats with individuals from Dragonfly --

THE COURT:  Right.

MR. ARAD:  -- as what needs to be completed, but those chats are completely separate and apart from this one here, both in timing and in substance.

On this, your Honor, I would point the Court to *United States v. Glover*, the case no. is 24 CR 370, this is a 2025 case, and I can point to the transcript cite as well.  This was a case before Judge Broderick involving drug alteration and misbranding conspiracy.  The government introduced the bottom e-mail of a chain and the defendant sought to introduce a higher up e-mail in the same chain, I believe it was about five hours after the e-mail that the government had sent, and there the defendant was talking about his prior understanding of certain pharmacy policies that applied in that case, and Judge Broderick did not let that in either under Rule 803(3) or under Rule 106.  Not under Rule 106 because a communication that came in later in time about a different subject, did nothing to explain the earlier-in-time communication, and not under Rule 803 because this, again, was backward-looking.

And so, your Honor, to answer the Court's question, just directly, no, I don't see how this adds any context to any other exhibit that the government has put in evidence.

THE COURT:  Let me hear, please, on Exhibit 3, which is the BitMart information.

MR. ARAD:  Yes.

So Exhibit 3, your Honor, is a classic self-serving hearsay statement and I will note the defendant made this statement knowing full well that his suggestions to BitMart to use Chainalysis were not going to be helpful at all, which leaves us with the only conclusion to draw being that the defendant made these statements in order to make himself look good.

THE COURT:  How do I know that he knew at that time, at the time of this conversation, that referral to Chainalysis would be futile?

MR. ARAD:  Well, your Honor, the defendant had designed Tornado Cash specifically so that it would be impossible to trace transactions coming out of the protocol.

THE COURT:  Let me be more specific, sir.

Perhaps I am forgetting a portion of this conversation but I didn't see in this conversation a suggestion from Mr. Storm to any of his putative co-conspirators that by sending them to Chainalysis, it was a fool's errand.

MR. ARAD:  He didn't have to say it out loud, your Honor, it is the quiet part, but it was the part that everybody knew.

THE COURT:  How did everybody know by then?

MR. ARAD:  At this point Tornado Cash had been designed specifically with the purpose of making it so that companies like Chainalysis would not be able to trace the funds coming out of it.

THE COURT:  And that's the government's theory and the defense theory is, no, it was designed the way it was designed for privacy, and to the extent there were these other issues, they had no ability to change things and other things.

You have the view that this is self-serving.  I expect they're going to tell me that this is indicative that he actually was trying to be helpful within the limits of what they technologically could do at Tornado Cash.  For example, sir, to send someone -- to send someone a website, is that actually even a statement offered for its truth?  If Mr. Storm says, Try this, and sends the Chainalysis website, is that a statement offered for its truth?  You may tell me it is divorced again like the last thing I'm trying to extract from a conversation that it doesn't make sense otherwise, but is that -- I don't even know that that is a statement being offered for its truth.

MR. ARAD:  The import of the statement, your Honor, is that Chainalysis may be able to help.  That is the truth that is offered through the defendant's sending this link to BitMart and it is what the defense wants the jury to take away from this message.

P7S5sto7

There is also -- this is a long exchange and the defense is trying to have admitted and there is plenty of other hearsay --

THE COURT:  The long exchange isn't coming in.  I am seeing whether there is any portion of it that could come in --

MR. ARAD:  I see.

THE COURT:  -- as state of mind, although I don't see this although, let's be clear, I haven't heard reply from defense counsel and they may be able to persuade me that this is 106 but I don't see it as such.

MR. ARAD:  It would be hard to understand the sending of the Chainalysis link without the context of the back and forth with BitMart which includes a lot of hearsay.  And so, to the extent that the Court were wanting to let in the Chainalysis message, it would be opening the door to a lot of hearsay coming in sort of through the back door.  And none of this hearsay is really relevant to the core issues in the case.

THE COURT:  I'm not worried about whether it is relevant or relevant to the core issues in the case.  I am trying to figure out whether it is legitimate state of mind evidence or not.  You are saying to me it is not and I will hear from your adversary suggesting that it is.

MR. ARAD:  I would add one more point, your Honor.

THE COURT:  Please.

MR. ARAD:  It is when telling me a lawyer from BitMart

contacted the defendant and his co-conspirators just days before this interaction, not one of them suggested that Chainalysis or any other service provider that Tornado Cash was using might be able to help.  All they said was we can do nothing.

A few days later they decided to make a self-serving statement directly to BitMart and BitMart reached out to them, but there is just no indication that they believed that Chainalysis could do anything.  In fact, the record is already full of evidence that by this time the defendant was aware of numerous hacks where victims had been unable to trace their funds.  That, alone, shows us that he knew full well Chainalysis was not going to help.

THE COURT:  Exhibit 4, sir?  I noted today that in one of the slides in the demonstrative sort of the completion of the quote from Tornado Cash made its way, although I don't believe it was admitted as an exhibit.  Let me understand your position because, right, the sentence that I saw was:  However, it should not come at the cost of non-compliance.  That made its way into today's slide deck and I am sure you saw it, but let me understand your opposition to Exhibit 4.

MR. ARAD:  We did, your Honor.

Our opposition to Exhibit 4 is rather similar to our opposition to Exhibit 2, at least in one sense, which is that this post is just -- it's replete with the kind of self-serving

P7S5sto7

hearsay that the hearsay rule is expressly meant to exclude.

I mean, this post contains statements like privacy should not come at the cost of violating laws and we would like to stay respectful of U.S. laws while announcing a completely voluntary, and therefore ineffectual and pretextual tool called, conveniently, the compliance tool.

The notion that, you know, this represents anybody's actual state of mind on June 3, 2020 simply doesn't square with the facts in this case.  It also, your Honor, invites a collateral trial on the question of what exactly was the intention behind this compliance tool at this time and also who was expressing it.  I mean, this was published by Tornado Cash but was it the defendant himself?  Was it one of his co-conspirators?  To the extent it was anybody's actual state of mind it must have been one of theirs but it is not possible to know whose.

This simply opens up sort of a can of worms that would be a distraction for the jury and likely quite confusing.

THE COURT:  Anything else with respect to Exhibit 4, sir?

MR. ARAD:  No, your Honor.

THE COURT:  Exhibit 5, please.

MR. ARAD:  Exhibit 5 is the exhibit which I mentioned earlier, your Honor, which the government never even proposed to offer into evidence so I struggle to see how there could be

any kind of rule of completeness argument about this particular exhibit.

In here the defendant seeks to admit a bunch of self-serving hearsay statements by him and his co-conspirators in which they basically lament possible reputational harm from the use of Tornado Cash by criminals and discuss ways to burnish their reputation.

These are simply not present sense impressions, they are present statements of fact, albeit incorrect fact. *We can't forbid scammers. What can be done to make the site legitimate is to attract more legitimate users.* Those things may be true and they may be false. They're hearsay, and they simply don't convey the present sense impression of the declarants.

If these were admitted, your Honor, these are the kinds of exculpatory statements any defendant could make in the midst of any long crime and have admitted under Rule 803(3). The rule would simply collapse on itself if these sorts of statements were to come in.

THE COURT:  I'm not laughing at you, sir, understand, it is just you are trying out all of the greatest hits.  I'm waiting for:  A trial within a trial.  I have already got the opening of the door, I've got this is bad precedent, but, yes, I understand.

MR. ARAD:  I will say, your Honor --

THE COURT:  I know those are your arguments but I would like something more than the things I have heard many times before.

MR. ARAD:  That's fair, your Honor.

I will say that looking at the recent cases, the recent cases do tend to go through pretty much all of the same greatest hits because you see the same thing happen over and over again which is the defendant tries to get in a self-serving statement under Rule 803(3) and it often fails for sort of all of these reasons.

I will add one more case that I would point the Court's attention to, your Honor, which is not a greatest hit. I think it applies especially to this particular exhibit.  This is an Eastern District case, *United States v. Mohamed Tahlil Mohamed*, 18 CR 603.  In this case the defendant was charged with hostage-taking, terrorism, and other offenses for the kidnapping of an American journalist who was held in the captivity of pirates.  The defendant there sought to admit out-of-court statements that he was against piracy, broadly speaking.  He didn't think that piracy was a good thing.  Judge Ross held that those statements were too broad and self-serving to come in under 803(3).  This is very similar.

The defendant and his co-conspirators were making statements about being unhappy, generally, that hackers and criminals are using Tornado Cash.  Well, that's a very broad

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

statement that would give them cover for all of the criminal activity that they have been engaged in for an extended period of time, and so I think that for similar reasons that animated Judge Ross' decision, these should not come in.

THE COURT:  Thank you.

From the defense side, who is speaking?  Mr. Patton?

MR. PATTON:  I will, your Honor.

THE COURT:  If you can go exhibit by exhibit please, sir.

MR. PATTON:  I will do that.

With respect to the first exhibit, the only thing I will say, your Honor, we do think that last chat does need some amount of context.  We think the whole thing should come in but if the Court is disinclined to do that, at least the very first chat in that exchange has, is sending a link that gives it context.  So, it is not even a statement of the speaker but it is at least a non-statement that gives the last statement some context about what it is about.

So, we think the whole thing is important but if the Court disagrees, we would at least ask for the very first and the very last chat.

On the second exhibit, this is really occasioned by the government's insistence, even after we had had a lot of pretrial discussion about this, to bring in chats and conversations by Mr. Storm that involved compliance in KYC and

AML.  I know that they were trying to slice this pretty thinly between the colloquial and the non, but we think this is extremely important, not to mention all the other chats that they've put in involving Dragonfly that we think is very significant in terms of rule of completeness issues.

On Exhibit 3, I don't know whether Mr. Arad misspoke or I misheard him.  He was saying that this was an exchange that came after the correspondence from Mr. Evans.  That's not so and that is part of why this is so vital to come in.  This came a few days before Mr. Evans reached out.  It is hard to imagine something more important to the context.  They're criticizing how Mr. Storm and his co-founders responded to Mr. Evans and yet there have already been discussions with BitMart on this very topic.  It is hard to imagine something that -- it would be more misleading and leave that out and then criticize how they responded to Mr. Evans.

On Exhibit 4, this is the Medium post.  They have put in a number of other posts and they're saying this was something that was intentionally in effective and useless and yet they want to just have a very cut off title from their own Exhibit 1901, and leave out not just the part that says we think compliance is important but also explaining their rationale, which very much is their --

THE COURT:  Which kind of sounds like hearsay.

MR. PATTON:  It is, your Honor, except that there is

an exception for this under 803 and in terms of rule of completeness.

THE COURT:  Please, I wish you would stop saying rule of completeness.  None of these, sir, it is your weakest argument.  You can keep making it but if you do, make it better than you have because everything you have made so far has been ineffectual.

MR. PATTON:  Your Honor, the reason I raise it is because Government Exhibit 1904 is in evidence and the last page of it has just sort of a screenshot of just a small portion of the post and of this cut off line here that we refer to.  So, I won't press the issue but I do think it is a legitimate rule of completeness issue.  This is already in evidence in a very partial form.

Exhibit 5, I won't belabor it, but I disagree that this is sort of a general statement in the way that Mr. Arad compared it to like being against piracy, generally.  This is very specific to Tornado Cash and so I think that is an apples and oranges comparison.

THE COURT:  Thank you.

Mr. Arad, please talk a little bit more about Government Exhibit 1904.  They are correct, are they not, the defense, that the first line is included?  Now, I don't -- you didn't make any effort, I think, to exclude or to black out or redact that particular -- this particular Medium post, or did

P7S5sto7

you?  I want to understand what you have done with the Medium post that is the attachment to 1904.

MR. ARAD:  All it is, your Honor, and I am looking at it now -- or I will be -- there we go -- is a few links at the end of a block post.  So I understand the defense's argument to be that what they want admitted here is linked in other places --

THE COURT:  Correct.

MR. ARAD:  -- right, but I haven't heard anything from the defense about the substantive content of the locations where this article is linked and I think that the reason for that is that there isn't any.  There is actually a link on this exhibit that says see all from Tornado Cash, which would link to every single post that touches Tornado Cash.

THE COURT:  May I please, can I ask, Mr. Iannuzzelli, to bring up Government Exhibit 1901 at page 10 and 1904 at page 14 and you can do them seriatim, sir?  Thank you.

MR. ARAD:  So, your Honor, you can see that there is a subheading here that says more from Tornado Cash.

THE COURT:  I do see that.  Can I ask you, please, to isolate what is on the lower corner of each?

MR. ARAD:  Yes.

THE COURT:  I see Tornado Cash compliance, maintaining -- but, see, maintaining financial privacy is essential to preserving our financial freedom.  However -- and

P7S5sto7

then it ends and that was the sentence --

MR. ARAD:  Sorry.  Unless we are looking at different parts of the document, which is entirely possible, your Honor --

THE COURT:  We are not.  Are you looking on the screen?

MR. ARAD:  Yes.

THE COURT:  Are we both looking at what has been called out?

MR. ARAD:  We are both looking onto the screen where I see two different --

THE COURT:  Two different callouts.

MR. ARAD:  Correct.

THE COURT:  Do they not end with the words:  However, however, I...

MR. ARAD:  Oh, at the bottom.  I am sorry.  I am looking at the top.

THE COURT:  I am looking at the bottom.

MR. ARAD:  Where that sentence continues.

THE COURT:  Where?

MR. ARAD:  Maintaining financial privacy that is essential to preserving our freedom.

THE COURT:  There it is.

MR. ARAD:  However it should not come at the cost of non-compliance.

P7S5sto7

THE COURT:  I see.  The entirety is in the -- sorry. I am being lost in this trial.  I see.  All right.

So, I had understood that these were being cut off but no, they are not, they are in -- I see where they are know. OK.

MR. ARAD:  That's correct, your Honor.

THE COURT:  I see.  OK.  Thank you.

Let me please take a few minutes break and I will come back as soon as I can.  If you need to stretch your legs, please do.  If you need five or 10 minutes time, fine by me.

(Recess)

THE COURT:  I mentioned earlier that I did not think this is a 106 issue and I still don't.  I have been focusing on Federal Rule of Evidence 803(3) and the cases I have been looking at include the following, *United States v. Kadir*, 718 F.3d 115, a Second Circuit decision from I think 2013, maybe -- sorry, that part got cut off; *United States v. Blake*, again of course it is -- excuse me while I fight with my computer. I will try that again.

*Kadir* is 718 F.3d 115, the pinpoint cite is 124 (2d Cir. 2013); *United States v. Blake*, 195 F.Supp. 3d 605, the pinpoint is 610 to 611, a Southern District decision from 2016; quoting *United States v. DeMaria*, 727 F.2d 265, a Second Circuit decision from 1984.  In addition, *United States v. Netschi*, 511 F. App'x 58, the pinpoint is 61, Second Circuit

decision from 2013; and *United States v. Cardascia*, 951 F.2d 474, pinpoint 487, Second Circuit decision from 1991.

All right. So those are the cases I have been looking at. Let me go through these individually. As I said, a number of these are rule of completeness, the only question is whether they are state of mind.

With respect to Exhibit 1, I do believe the last attribution is indicative of Mr. Storm's state of mind under 803(3). I will therefore allow that last attribution, as well as Mr. Qureshi's first attribution which is not being offered for its truth, it is simply a link and the link does seem to explain or cause -- ultimately cause Mr. Storm a few minutes later to make the statement that he does. So, the first and last attributions in Exhibit 1 are admitted.

In Exhibit 2, that is not admitted. Not only is there a lot larger discussion of FinCEN which I do not want, it is not indicative of anyone's state of mind, it is a series of discussions and ruminations about compliance and legality. It is out.

For Exhibit 3, once again, there is nothing about state of mind so it is not being admitted.

For Exhibit 4, I initially thought that was the rule of completeness issue but thank you for putting the exhibits on the screen with enough of a callout that I could read them. There is nothing that has been left out in the government's

P7S5sto7

presentation and I'm not allowing in the compliance manifesto because I'm not sure whose state of mind it is illuminative of, if anyone's, and I think it is extremely self-serving.

And then, Exhibit 5, I really thought I had seen this previously but I guess I hadn't.  No, absolutely not, it is a gripe session, it is a lot of spitballing, it is a lamenting being misunderstood and wondering what one can do to better one's reputation.  It is a discussion of things that the participants in the conversation could do but not sufficiently fully formed to actually be a plan or intent or anything.  So, no, it is not state of mind.

So, Exhibit 1 and not the others.  You now have resolution.  Let me please understand the witnesses for tomorrow

Mr. Klein?

MR. KLEIN:  Yes, your Honor.  Professor Malekan.

THE COURT:  Yes.

MR. KLEIN:  Andrew Thurman; Guy Wuollet; a custodian from Chainalysis.

THE COURT:  Sir, there is no analogous stipulation that could be reached as was reached regarding the Dragonfly stip?  It is fine if there isn't, but I just wanted to know.

MR. KLEIN:  We tried but we weren't able to work it out.  The government has changed their mind.

THE COURT:  I'm not making you do anything.  I just

P7S5sto7

wanted to know.

MR. KLEIN:  We did try, your Honor.

THE COURT:  That's all I can ask.

And the Chainalysis person has a name?

MR. KLEIN:  Yes, your Honor and I forget it off the top of my head, it is someone I have never --

THE COURT:  That's fine, Chainalysis custodian.

Not that my opinion matters but it did seem to me that the custodial stip from Dragonfly was more descriptive -- it was more of a testimonial stip, I thought, than a custodial stip but what do I know.  Tomorrow's custodian will perhaps say something perhaps different.

Then after that would it be Professor Hurder?

MR. KLEIN:  Yes, Dr. Hurder.

THE COURT:  Dr. Hurder.

MR. KLEIN:  And it is Professor Green or Dr. Green.

THE COURT:  You say potato, I say potato.

Dr. Green.  It would be great if we could get that far that we would be into Dr. Green.  I have no idea how long Dr. Hurder's direct is.  I didn't know how much time today's witness would take.  Perhaps you didn't either.

And then, of course, there is still the question about your client and you will let me know when you let me know.

MR. KLEIN:  Yes, your Honor.

THE COURT:  Which is probably tomorrow.

P7S5sto7

MR. KLEIN:  Probably tomorrow, your Honor.

Mr. Casey?

MR. CASEY:  Yes, your Honor.

THE COURT:  No more motions tonight?

MR. CASEY:  As far as I know, other than the supplement.

THE COURT:  Which is the theory of defense instruction, your Honor?

MR. CASEY:  Yes, your Honor.  Other than that, I am not aware of any motions to be filed tonight.

THE COURT:  You will let me know if that changes.

MR. CASEY:  Absolutely, your Honor.

THE COURT:  As soon as it changes, even if it is before you send it.

MR. CASEY:  Yes, your Honor.

THE COURT:  Thank you, sir.

Mr. Klein, something else?  Is there another issue to raise?

MR. KLEIN:  I don't think so, your Honor.  I am just checking.

(Counsel conferring)

MR. KLEIN:  Your Honor, there is a quick issue of judicial notice that Mr. Morel talked to the government about earlier today.

THE COURT:  And there was agreement?

P7S5sto7

MR. MOREL:  There was not.

THE COURT:  OK.  Mr. Morel.  Please.

MR. MOREL:  Your Honor, this concerns Government Exhibit no. 1.  We ask that the Court take judicial notice of the fact that the CITGO sign that appears in Government Exhibit no. 1 is located in Boston.

It might be easy if Mr. Demarco can display Government Exhibit no. 1.

It is the picture of the Peppersec founders taken on what I understand is the Harvard side of the Charles River facing towards downtown Boston.  As I am sure your Honor is aware, Rule 201 of the Federal Rules of Evidence allows the Court to take judicial notice of a fact that is not subject to reasonable dispute and that is capable of accurate and ready determination, where resort to sources with accuracy cannot reasonably be questioned.

I think here -- and thanks, Mr. Demarco, for blowing it up, the Court is capable of readily determining that the CITGO sign in GX 1 is located in Boston.  It is a well-known landmark in Boston.  Numerous public sources confirm that the CITGO sign is located in Boston.  It is on the city government website for Boston.  It appears in publications or articles published on the website for Boston University.  If you are watching a baseball came, it is on the MLB's website.  If you watch a game from Fenway you can see the CITGO sign.  There is

numerous reputable online sources that confirm that this CITGO sign is located in Boston.

THE COURT:  Why does it matter, sir?

MR. MOREL:  What was that?  I'm sorry.

THE COURT:  Why does it matter?

MR. MOREL:  We have taken the position in this case that Mr. Storm wore the t-shirt that is displayed here in Government Exhibit 1 at the ETH conference in 2019 in Boston. And we have heard testimony from Van Loon, we have a stipulation with the government that I believe will be read into the record tomorrow that concerns individuals' involvement at this conference in 2019 in Boston, and we believe it is important for the jury to be able to get the fact -- it is important to be able to get the fact before the jury that GX 1, this photo, was taken in Boston.

THE COURT:  Mr. Gianforti?

MR. GIANFORTI:  Your Honor, this is may be the proudest moment of my legal career that I am about to share with you and that is that when the defense --

THE COURT:  It frightens me, sir.  Go ahead.

MR. GIANFORTI:  When the defense identified this as a picture taken in Boston, with my keen legal eye, I also noticed the CITGO sign and tried to convince my colleagues that this was, indeed, Boston.

THE COURT:  Is it?

P7S5sto7

MR. GIANFORTI:  They weren't so sure.

We are willing to agree that is Boston.

THE COURT:  So, Mr. Morel has persuaded you?

MR. GIANFORTI:  No, I persuaded myself.

THE COURT:  Hang on.  OK, for those of us who are trying to get their memories of Boston out of their minds since law school, are you agreeing with this then?

MR. GIANFORTI:  I'm not sure that we can say that that is Harvard but I'm willing to agree that that is Boston.

THE COURT:  That the picture was taken in the Boston area.

MR. GIANFORTI:  Absolutely.

THE COURT:  The Boston metropolitan area.

MR. GIANFORTI:  Yes.

THE COURT:  Why are we having this discussion?  Why don't you tell me you agree to this?

MR. GIANFORTI:  I just found out about the disagreement.

THE COURT: Are you asking me who, actually, again it clearly must be PTSD, I vaguely kind of sort of remember this sign but I couldn't tell you they're in Boston.  Am I being asked to tell the jury that this is Boston?  Or how is this coming in?  I would rather not because I'm the one who --

MR. GIANFORTI:  I think we can do a stipulation.

THE COURT:  Great.  Stip sounds better than judicial

P7S5sto7

notice.  OK.

Mr. Morel, you win.

MR. MOREL:  Thank you.

THE COURT:  Take that victory, savor it for a long time.

What else would you like me to know, sir?

MR. MOREL:  Nothing else for the defense, your Honor.

THE COURT:  For the entire defense?  Or are you guys going to take turns and stand up and tell me other things.

MR. PATTON:  We are done, your Honor.

MR. KLEIN:  We are.

THE COURT:  Friends at the government table, also done?

MR. ARAD:  Also done, your Honor.

THE COURT:  Am I going to, other than something regarding the nullification issue, nullification charge, which I have heard about from Mr. Rehn, it is going to come to me at a decent hour this evening, by which I mean by 8:00.  Yes, by 8:00.  Get cracking, you have three hours to send it to me. Then there is nothing else to raise?

MR. ARAD:  Nothing else.

THE COURT:  You are now aware of the defense list of witnesses.

MR. ARAD:  Yes.

THE COURT:  You have gotten all the exhibits that

P7S5sto7

they're going to introduce.

MR. ARAD:  I don't know about that.  We will probably get some more later tonight is my assumption but I don't think that's for us to know for sure.

THE COURT:  Have they gotten all of their exhibits, Mr. Morel?

MR. KLEIN:  I believe so, your Honor but we will double check when we go back to the office.

THE COURT:  Please do.

MR. REHN:  If I may, your Honor?

One thing I know we haven't gotten is the purported Chainalysis exhibits.  One of the reasons we haven't been able to reach stipulation is we don't know what these are or whether there is a witness who can authenticate them.

THE COURT:  I see.  So you're -- OK.

Mr. Klein, you haven't given them the Chainalysis exhibits that your witness is proposing to authenticate?

MR. KLEIN:  Your Honor, I had spoken to Mr. Rehn at a break.  I indicated that one of the exhibits we are going to rely on related to Chainalysis is a government exhibit that's in evidence.

THE COURT:  That is in evidence.

MR. KLEIN:  Is in evidence.

THE COURT:  OK.

MR. KLEIN:  But the other exhibit, and there may be

one or two others in addition, are the logs that Chainalysis --
the relayer logs that Chainalysis produced to the government
and to us with certifications from custodians.

THE COURT:  I really hate to open up this pandora's
box but are these the logs that were produced after things went
down and people got investigated?  I thought I heard Mr. Rehn
talk to me about Chainalysis presenting information in
connection with the government's investigation.

Am I making all of that up, Mr. Rehn?

MR. REHN:  Your Honor, these are logs that Chainalysis
did produce pursuant to a 2703(d) order but we have not gotten
a clear answer as to what they represent from Chainalysis.

THE COURT:  As to what they represent from
Chainalysis?

MR. REHN:  Yes.

THE COURT:  What do these logs represent?

MR. KLEIN:  They're the logs of the relayer.

THE COURT:  OK.

MR. REHN:  I don't believe there is a witness with
firsthand knowledge of that who can explain that.

THE COURT:  But I don't think he is going to, or she.
The custodian is going to say we keep these records in the
ordinary course of business, they're maintained at or about the
time the events reflected in there.  They just go through the
business records.  I don't know what they look like but I don't

P7S5sto7

think they're akin to -- and you will tell me if I am wrong -- I don't think they're akin to, for example, the Cellebrite logs where we have another layer of hearsay that we are dealing with that it is just --

MR. KLEIN:  Data.

THE COURT:  -- machine-generated data.

MR. REHN:  Your Honor, I think that the problem is that there is real questions about the completeness of this, exactly what the context in which it was collected was.

THE COURT:  I do need you to be closer to the microphone, sir.

MR. REHN:  There are questions we have that have not been answered to our satisfaction about is this complete data, how was it collected.  The fact that Chainalysis has maintained these logs since they were collected does not entirely answer questions about the provenance of them but we will see what the witness says.  We are also not sure if any of it is relevant, but.

MR. KLEIN:  Your Honor, they were produced with a certificate of business record certificate to the government, so they've been relying on those to introduce evidence left and right in this case.

THE COURT:  Not from Chainalysis.

MR. KLEIN:  I agree.  Other --

THE COURT:  Apparently they're not doing well with

P7S5sto7

Chainalysis based on everything else.

MR. KLEIN:  Just to be very clear, they have the same business record certificate from Chainalysis for these records that they've offered lots of evidence in of similar type in this case, so I'm not sure what he means by we are not sure what they are or whether they got them.

They have a certificate of -- we can offer them probably without even calling the witness and just put them in through that.  So I don't understand this, like, oh, we are not sure we got everything, we are not sure of this.  They have a signed certificate from the company.

THE COURT:  And the relevance is what, sir, that Chainalysis was a relayer and therefore what?

MR. KLEIN:  Yes, your Honor; Chainalysis was a relayer.

THE COURT:  And therefore what?

MR. KLEIN:  It goes to a couple concepts.  One is they've alleged a conspiracy with the relayers.  They've alleged the relayer registry launched all their charges.  We should and be able to put into evidence who some of the relayers are.  We have identified one relayer, it is Chainalysis.  Chainalysis ran a relayer during this time period, they earned fees, they were running this relayer.  It is completely relevant to show how the process worked, to show the independent parties and in this case a business that every

P7S5sto7

single government agent in this case used, as it turns out, to do their analysis for tracing was being used in this case.

THE COURT:  All right.  That will be fun.  But the word -- we are just hoping you are going to avoid the word "reputable" because apparently the government gets very upset when you use that term.

There it is.  OK.  Anything else, Mr. Rehn?

MR. REHN:  Nothing further, your Honor.

THE COURT:  Anyone else at the government table?  All right.

Thank you.  I will see you tomorrow morning.  8:45.

(Adjourned to July 29, 2025, at  8:45 a.m.)

INDEX OF EXAMINATION

Examination of:                                          Page

MATTHEW EDMAN

Direct By Ms. Axel . . . . . . . . . . . . . . .1742

Cross By Mr. Rehn  . . . . . . . . . . . . . .1868

Redirect By Ms. Axel . . . . . . . . . . . . .1926

 TYLER ALMEIDA

Direct By Mr. Klein  . . . . . . . . . . . . .1939

Cross By Mr. Mosley  . . . . . . . . . . . . .1942

Redirect By Mr. Klein  . . . . . . . . . . . .1944

                      GOVERNMENT EXHIBITS

Exhibit No.                                      Received

 S-8   . . . . . . . . . . . . . . . . . . . .1947

 3005-6    . . . . . . . . . . . . . . . . . .1879

 3005-18   . . . . . . . . . . . . . . . . . .1880

 4027    . . . . . . . . . . . . . . . . . . .1921

 8788    . . . . . . . . . . . . . . . . . . .1811

                      DEFENDANT EXHIBITS

Exhibit No.                                      Received

 8701    . . . . . . . . . . . . . . . . . . .1804

 8785-36   . . . . . . . . . . . . . . . . . .1856

 8786    . . . . . . . . . . . . . . . . . . .1784

 8791    . . . . . . . . . . . . . . . . . . .1858