P7T1STO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                    23 Cr. 430 (KPF)

ROMAN STORM,

              Defendant.          Jury Trial
------------------------------x

                               New York, N.Y.
                               July 29, 2025
                               8:55 a.m.

Before:

                HON. KATHERINE POLK FAILLA,

                               District Judge

                       APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  NATHAN M. REHN, ESQ.
    BEN ARAD, ESQ.
    BENJAMIN A. GIANFORTI, ESQ.
    KEVIN G. MOSLEY, ESQ.
    TARA M. LA MORTE, ESQ.
    Assistant United States Attorneys

WAYMAKER LLP
    Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
    KERI CURTIS AXEL, ESQ.
    KEVIN M. CASEY, ESQ.
    VIVIANA ANDAZOLA MARQUEZ, ESQ.

    -and-

HECKER FINK LLP
    Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
    CHRISTOPHER MOREL, ESQ.

P7T1STO1

(Trial resumed; jury not present)

THE COURT:  Good morning.  Please be seated.

Mr. Rehn, I understand that there are some matters you wish to discuss with me before the jury comes out?

MR. REHN:  Yes, your Honor.

THE COURT:  Mr. Rehn, when I asked you and Mr. Casey yesterday about submissions, I didn't understand that to mean that you would not send me something in writing so that you could give me something first thing in the morning.  So why was I not made aware of this before now?

MR. REHN:  Well, your Honor, this relates to the issues that were raised by defense counsel at the end of the day yesterday and also some subsequent discussions we've had with defense counsel about this issue regarding Chainalysis.  And I just wanted to sort of tee up directly for the Court the government's position on why evidence of Chainalysis operating a relayer should not be admitted at trial, based on the proffer that the defense gave yesterday in particular.

So first, since yesterday, we've talked to the defense, we've talked to Chainalysis.  We've agreed that if the Court determines that the identity of Chainalysis as a relay operator is relevant, we will stipulate to the authenticity of the logs that they produced pertaining to that relayer.

So the issue, though, is, as we understand it from the defense, what they have proffered is that they want to

P7T1STO1

introduce evidence that Chainalysis was a relayer——

THE COURT:  I need you to be closer to the microphone, please.  Thank you so much.

MR. REHN:  ——because it was, quote, a reputable company with government contracts.  That's what defense counsel said yesterday.  And we think that——

THE COURT:  Well, he and I were tussling over whether reputable is going to come in at all.  I believe what he was going to suggest to me was that Chainalysis is being used by the government's witnesses and therefore how bad can it be, you know, there must be some reason the government feels comfortable using it.  But all right.  So. . .

MR. REHN:  Again, your Honor, that argument would be an impermissible attempt to suggest that because some other actor has some reputation or relationship, it couldn't have possibly been involved in criminal activity, which I don't think is a permissible inference to draw, and as we all know, there are many reputable companies with government contracts that have been involved in criminal behavior, and the suggestion that some third party's state of mind as to which there will be no evidence, purpose for operating this relayer, as to which there will be no evidence, is somehow indicative of anything relevant to what the defendant did and what his state of mind was just is an impermissible argument that shouldn't be presented to the jury.  And then that would be true full stop,

P7T1STO1

but it's——

THE COURT:  But wait, there's more?  Okay.

MR. REHN:  ——layered on top of a whole 'nother layer of irrelevance, which is, the defendant did not know Chainalysis was operating a relayer.  There's no evidence he had any knowledge whatsoever that Chainalysis was operating a relayer.  It was not disclosed to him.  And so the suggestion that somehow facts unknown to the defendant at the time could somehow be used to spin out some sort of inference about his conduct and his state of mind, even if the argument could arguably be relevant if he'd known about it, certainly isn't relevant under the facts of this case.  So we don't think it should be admitted.

And then the second thing the defense has said about this evidence, your Honor——

THE COURT:  This is the second layer?  Okay.  No, no, that was the second layer.  Is there a third layer?

MR. REHN:  There's a second sort of purported reason to introduce this, which is just to introduce facts to the jury about relayer fees, staking of TORN tokens and the like.  All of that evidence is not premised on the relayer logs.  That's premised on blockchain data that is already in evidence.  The government has put in the transactional data for every single withdrawal from Tornado Cash during the relevant time period, which allows a witness——the defense, by the way, has not

P7T1STO1

disclosed any analysis based on this to the government yet. But if the defense wants to introduce a witness to make arguments about any particular relayer earning fees, all of the relayers collectively earning fees, any particular relayer staking TORN tokens, all of the relayers collectively staking TORN tokens, or anything along those lines, that can be determined from blockchain data that is in evidence in this case. And the identity of any one of those relayers is unnecessary for arguments based on the fact that these relayers existed, staked TORN tokens, and earned relayer fees from Tornado Cash withdrawals. So to the extent that evidence is relevant—which, again, we're not clear why it would be, necessarily, but—it can fully be mooted before the jury without any reference to any particular identity of any relayer. And so for those reasons——

THE COURT: Are you able to discern from the blockchain data that a particular, if unidentified, relayer earned a particular quantity of fees?

MR. REHN: Yes, your Honor. And what defense counsel told us yesterday is that's what this summary witness, which apparently will testify at some point in the next day or two, did, is he went to that data, and you can see which relayer was applied for each transaction and what the relayer fee was for that transaction. So it's simply aggregating those numbers, essentially. Again, you could do it collectively, you could do

it relayer by relayer.  There's many things that could be done with the data, but it's all based on on-chain data.  The relayer logs from Chainalysis actually don't really enter into that analysis.  They don't need to.  They're not necessary in any way to saying, well, there's this relayer here, it earned so many fees because it processed so many transactions.  That's all already in evidence, and the parties can make arguments based on that evidence.

And so we just think that introducing this Chainalysis concept is clearly an attempt to distract the jury, confuse the jury, suggest improperly that because a company is well known or has previously had dealings with the government, it couldn't possibly—like nothing connected to it could possibly have any criminal intent or purpose, none of which would be permissible certainly on the facts that we have before us, where the defendant didn't even know that that company was involved in operating a relayer.

THE COURT:  Before you sit down, sir, a couple of follow-up questions.

We have had I believe now two defense witnesses who've testified that they have used Tornado Cash, and I don't know that you've objected to their testimony, have you?

MR. REHN:  We have not objected to that fact being put into evidence, your Honor.

THE COURT:  You've not objected to the defense

P7T1STO1

introducing Tornado Cash users who do not admit to being money launderers or operatives for North Korea, correct?

MR. REHN:  That's correct, your Honor.

THE COURT:  What is the difference between them and Chainalysis evidence that the defense seeks to introduce on the relayer level as distinguished from the user level?

MR. REHN:  Your Honor, there is no evidence about why Chainalysis did this, what its intent was, so if a witness comes to the stand and explains their conduct——

THE COURT:  I see, yes.

MR. REHN:  ——that is a different matter than, well, some FBI agent said he looked at Chainalysis data once, and, look, Chainalysis also had a relayer, and so you, members of the jury, should draw a set of inferences from that.  That's a completely different matter than saying that a witness who testifies about their particular interactions, there's some leeway to that, although we have tried to object and keep it limited.  I think the Court has sustained some of those objections.  But again, this issue——and I'm reminded we did actually motion *in limine* on that and I think we were overruled.  So we have tried to keep that out as well.  But this is a different issue because this relates to——

THE COURT:  This is coming in through a custodial witness and not a percipient witness is what you're saying.

MR. REHN:  In large part.  And in any event, because

P7T1STO1

it's not known to the defendant and because it introduces a set of impermissible inferences about whether Chainalysis is or is not criminal, reputable, legitimate, whatever words you want to use, it basically invites a whole side trial on that question.

THE COURT:  Oh, don't go down that road.  Don't go down that road.  I don't want to be threatened with trials within trials.  That doesn't move me.

Let me hear from someone on the defense side.

Mr. Klein.  Thank you.  Good morning.

MR. KLEIN:  Good morning, your Honor.

First, the government has put the issue of relayers on this trial.  They've talked about them.  They've said the start of the relayer registry is the start of one of the charging periods.  They put in expert testimony about relayers.  They've talked—

THE COURT:  Sure.  So you could have a relayer testify, but you're not.

MR. KLEIN:  Well, your Honor, so I think they put the issue in play.

THE COURT:  Okay.

MR. KLEIN:  I think it is important.  They put in what they said are the blockchain data to show relayers earning fees.  We're going to put a face on that.  And we should be allowed to put a face on what a relayer looks like.

THE COURT:  But you're not.  You're putting a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

custodian on.  You're not putting a face on the relayer.

MR. KLEIN:  Your Honor, if the Court permits this to come in, we have a stipulation that says, Chainalysis was a relayer, they ran it from this time period, and they processed transactions.  And I think that is important evidence to show the disparate parts of how this worked because the government is right in a sense, which is, this was a decentralized protocol.  Different people were working separately from each other.  That is key evidence for us, your Honor, to talk about, and they are trying to say it's all one giant thing, working together, that our clients control.  That's not true.  And so the fact that someone's running a relayer as a separate entity is actually critical evidence for us to establish the disparate parts of this and the decentralization.  And so if you keep out evidence of that, you're not allowing us to respond to the government arguments that they're going to make in close.

THE COURT:  I did not understand, sir, that they were going to argue that——I didn't think they were walking away, for example, from the decentralized nature of Tornado Cash, nor did I think that they were ever arguing that all of the relayers were either working somehow in concert with the founders or that they even knew who they were.  I'll certainly listen to you, but you're saying that you're doing this to rebut government arguments, but I want to understand the arguments you're seeking to rebut.

P7T1STO1

MR. KLEIN:  So they're going to say—

THE COURT:  Also, if I may ask, do you have a copy of the stipulation, the proposed stipulation?

MR. KLEIN:  Yes, your Honor.

THE COURT:  Can I ask you to hand it, please, to my law clerk and for him to hand it back to me.  And I want to hear from you before I read it, but I do want to see it as well.

MR. KLEIN:  And there was, depending on what you rule, there's one suggestion—we've got a witness who we'd asked the government to talk about outside.

THE COURT:  Please continue, sir.

MR. KLEIN:  Part of this also is, your Honor, and I'll just note the Fifth Amendment issue that we were overruled on.  But one of the witnesses we wanted to call has asserted the Fifth, so the company person we're able to call is the custodian.  The logs do show that Chainalysis ran a relayer, that they would be admissible.  They're business records.  We actually want to put in the logs that the government received with a certification from the company.  So what's referenced there in that DX number on the stip, your Honor, are logs that were produced to the government with a certified custodian of records stip.  So we'd want to put those in too.  And I think this is critical evidence.  They're going to say the relayers—they've said it in their charging stuff—are

P7T1STO1

co-conspirators.  And in filings.  And they're going to talk about the relayers in close.  They're going to talk about the relayer registry being the start of the criminal conspiracy on certain counts.  And so to say, hey, Chainalysis ran a relayer is totally appropriate, and to put——

THE COURT:  But it sounds like you're putting the Chainalysis in as a character witness through your custodial stip.

Please stop shaking your head, Ms. Axel.  I'll criticize both sides if they are unwilling to retain a poker face during this.

Mr. Klein, you want to put in Chainalysis records because then you're going to argue, you've heard Chainalysis throughout this trial, the government is using Chainalysis products, how bad can they be?  How disreputable can they be?  What's the point, if all you're going to argue is, yes, the government talked about relayers, one relayer is Chainalysis, full stop?  That's not what you're going to do, right?  You're going to argue that I and the jury should intuit from the fact that Chainalysis's name has come up as often as it has, and the fact that the government uses it, that they must be a legitimate entity and therefore——or what?

MR. KLEIN:  Your Honor, one second on that.

THE COURT:  Please.

Ms. Noriega, please advise our jurors that we're

dealing with legal issues.  And Mr. Rehn, is there a second issue to raise?

MR. REHN:  There is, although it could probably wait till the lunch break because it's not pertaining to the evidence likely to come in this morning.

THE COURT:  And this is?

MR. REHN:  We're not sure, but we wanted to tee this up quickly, and it was sort of raised at the end of the day yesterday.

THE COURT:  Okay.

MR. KLEIN:  Your Honor, two points on this.

One is, Chainalysis is a separate business, a for-profit business that is operating as a relayer during relevant time periods.  And to be clear, it's during relevant time periods.  Your Honor can see that from the stipulation.  So I think that is a critical point to show how this is decentralized, how this is separate, that there's a separate for-profit business doing something separately on there.  I also don't think the government should get to decide what we can argue based on the evidence they put in.  I think we should be permitted to put—

THE COURT:  I appreciate you thinking the government's doing my job for me, but I'm actually making the decision about what evidence is coming in.  So tell me.  All right.  So your argument is, government shouldn't decide.  Okay.  Fine.  Please

P7T1STO1

have a better argument than that.

MR. KLEIN: Your Honor, what they're saying is they put in sufficient records for us to make the argument that they think we should be making. Mr. Rehn said that. They put in this blockchain data. The blockchain data references this, that they put in this relayer; it actually includes information that ties back to this relayer. So they put that into evidence. So we should be permitted to put in evidence about who wanted those relayers that they put in evidence for. That's how you can tie these together.

THE COURT: But, sir, it comes in, it seems, disembodied. You get to say that it was a relayer, but I don't know why, and apparently I can know for how long they were a relayer. I don't know why, I don't know what they did, I don't know why I care.

MR. KLEIN: Your Honor, the stipulation gives dates. It says what they did. And I think it is important in critical evidence to talk about that there was a for-profit business separately running their relayer at the time they're alleging our clients were fully in charge of this service, and this under——

THE COURT: Sir, please understand, I'm not saying that you couldn't put in that witness, but I'm having difficulty thinking that it comes in through a custodian of records. And I understand we've had many discussions about why

P7T1STO1

you don't have a percipient witness from Chainalysis, but I'm not sure it comes in this way.

MR. KLEIN:  So, your Honor, these facts in the stip are what the custodian, if they put in the record, would be able to say.  That's why we did the stip, just to streamline this.  Because if these data logs come in, they show these facts.  So these facts that are in the stip, these dates, and that they assisted with withdrawals, those are all in those data logs that are referenced as DX 8605.  This is a way to streamline this process, not call a witness, and just put this in quickly.  So——

THE COURT:  Sure.  But if I said no, you'll call in the custodian, who won't be able to speak to this, or will they?

MR. KLEIN:  I'll be able to——they'll get up on the stand and I'll say, Did you produce these records?

THE COURT:  But——

MR. KLEIN:  And they're data logs, and we would just argue the same points.  This is just a way to streamline it.  And they would say what Chainalysis is.  When I put them on the stand, I'll say, What is Chainalysis?  They will say what Chainalysis is, correct, they will say that.  And I can pull up the data logs or not.  But this stip is just a way to streamline these things, and it's coming in through these data logs.  So if you allow the custodian to come up, this same

exact information is coming in.

THE COURT: All right. Mr. Rehn, you want to say something.

MR. REHN: Your Honor, the only information that could be relevant here would be the information about the fact that this particular relayer earned fees, staked TORN to get entered into the relay registry. You don't need the data logs for that. That's on the blockchain. The data logs don't add anything except identifying that it's Chainalysis behind the relayer, and that's the exact issue that we think has only been offered for an improper purpose. There's been no suggestion that it's anything other than an attempt, as the Court just suggested, to essentially try to introduce sort of indirect character evidence in support of the defendant, even though he didn't know about this at the time.

THE COURT: But if I allow a live witness, is Mr. Klein not correct that this information is coming in? Are you going to object to the custodian coming in?

MR. REHN: We would object, your Honor, because we think that the only relevance would be to identify Chainalysis as the entity behind a relayer as to which all the relevant data is already in evidence. And so that's really the focus of our objection is that the identity of this particular relayer, without any witness with any knowledge of why or how it was operated, just a custodian of records to say, here's some logs,

P7T1STO1

is simply a way to try to get something in that they can use to make improper argumentation. To the extent that the relayer's ability to buy TORN tokens and then independently set up a relayer, that's clear from the record. That's already in evidence. The blockchain data and the witness testimony established that. The parties can make arguments based on that and what those facts mean, but the suggestion that—and this particular one was run by this company and, oh, by the way, look how reputable they are, should be something the jury should consider. Just, it's irrelevant and it's prejudicial, and that's what they're trying to do with this evidence. They haven't—that's clearly what they said they're going to try to do with this evidence. And it's an attempt to try to bolster the defendant's character, bolster the legitimacy of his business, by reference to something he didn't even know about at the time. And so I think that would be impermissible, and that's why we're saying they can put in the blockchain evidence about the relayer, that gives them all the relayer fee independence arguments they want to make, but identifying it as connected to Chainalysis is where we think the Court should draw the line.

THE COURT: One moment, please. Thank you.

I am not letting this information in through a custodial witness. I'm not letting it in through a stipulation. If there's a percipient witness at Chainalysis

P7T1STO1

that wants to speak to what it did as a relayer and why it did, I will allow it in, but not through the custodian. No. So I agree with the government.

Mr. Klein.

MR. KLEIN: Your Honor, our concern is, in close, the government is going to say that these are people in some basement somewhere, some individual, and we're very concerned that they're going to have a misleading portrait of who relayers are when they know that's not the case. And so allowing us to put a face to one of the relayers is critical for us because otherwise, the jury is going to be misled to thinking it's some guy in a basement in the middle of nowhere running the relayer, because that's how they obtained the registry.

THE COURT: I'm getting a commitment now they're not going to be arguing that people in mom's basement are the relayers in this case.

MR. REHN: Yes, your Honor. Mother's basements will not appear in the closing. Nothing along those lines. We're not going to get into anything about who the relayers are other than how they become relayers, by buying the TORN and so forth.

THE COURT: That's fine. I'm not letting the custodian be the manner in which this evidence is coming in.

Mr. Rehn, what other issue do you have?

Mr. Arad, what other issue do you have?

MR. ARAD:  Your Honor, the other issue the government has has to do with the slides the defense intends to use with Dr. Green later today.  These slides contain various forms of hearsay news articles, social media posts, an academic article, and these forms of hearsay should not be put in front of the jury, whether in evidence or in a demonstrative.

I have a copy of the slides here if the Court would like to take a look.

THE COURT:  Cannot expert witnesses use hearsay?

MR. ARAD:  They certainly can, your Honor, but they have to analyze the hearsay they hear outside.  Courtroom——

THE COURT:  And not merely convey it.

MR. ARAD:  Exactly.  In fact, I have some case law here making that point, but I think your Honor is familiar with it.

THE COURT:  I feel like we've addressed this in the motions *in limine* but maybe from the opposite perspective.  Why am I only hearing about this this morning?  When did you get these slides of Dr. Green?

MR. ARAD:  We first got a copy of these slides over the weekend, your Honor.

THE COURT:  I'll ask again, why am I only hearing about it on Tuesday morning?

MR. ARAD:  In preparing for cross-examination, your Honor, we noticed this issue, and we raised it with the defense

P7T1STO1

yesterday evening.

THE COURT: You can't keep doing this. Eventually, I'm not going to be prepared to answer something.

I'll take the slide deck and I'll look at it this morning. Have you already annotated the ones you think are inappropriate?

MR. ARAD: I have.

THE COURT: All right. May I please hear from someone on defense side regarding Dr. Green?

Yes.

MR. KLEIN: Me again, your Honor.

When you look at the slides——it will be easier if you have them in front of you.

THE COURT: Well, if someone would give me a set.

MR. KLEIN: I have a set but it's my copy.

THE COURT: If they'd been sent to us, you'll excuse me. I was not told that this was going to be an issue until two minutes ago. All right.

MR. KLEIN: I apologize if they weren't sent to you, your Honor. I thought they were.

If you turn to page 3, your Honor, that's the first slide they object to.

THE COURT: I see it --

MR. KLEIN: So he's going to discuss these issues, he's going to talk about hacks and breaches. Then if you turn

P7T1STO1

to slide I believe——and Mr. Arad can correct me.  I think it's 6, 9, 10, and 11; is that right, Mr. Arad?

MR. ARAD:   9——8, 9, and 11.

THE COURT:  8, 9, and 10.  Oh, wait.  Excuse me.  11. Excuse me.

MR. KLEIN:  So these are instances he's going to discuss.  We didn't put in salacious headlines.  It's common for experts to rely on hearsay, as your Honor indicated.  He's not bringing this in itself.  We're not putting the article in and trying to get it into evidence.  It's a demonstrative so the jury can follow along.  And we put nonsalacious——we didn't put the instances your Honor was worried about, about violence or other things.

THE COURT:  No, but there's kidnapping discussion.

MR. KLEIN:  So, your Honor, that is a real concern, and we will need to talk about the threat to physical safety, without going into salacious details, but that is a legitimate concern about why people need privacy tools, and your Honor has heard that from a number of witnesses already.

So again, we're not planning to offer these slides into evidence.  I also want to be clear about that.  These are demonstratives.  They're going to show up on the screen that Dr. Green is going to walk through as part of his testimony. He's going to discuss these things.  So I think it's completely appropriate.  And they're just the top of the headlines.

THE COURT:  I understand.

Mr. Arad, I appreciate your concerns, but I do believe these come in.  Thank you.

And, I mean, I can't ask you guys to give me things in a timely fashion.  Apparently that's just never going to work. I'll hold this.  I'll hold this because you don't need it.  And if I change my mind, I'll let you know, but I really doubt it. Thank you.

Are there other issues?

MR. ARAD:  Not from the government, your Honor.

THE COURT:  Mr. Klein?

MR. KLEIN:  Your Honor, there was a stipulation we entered into yesterday where there was a scrivener error.  We wanted to——I don't think we need to read it.

THE COURT:  We'll just switch it out, sir?

MR. KLEIN:  We talked to the government about this. The exhibit numbers were slightly wrong.  And it was the Dragonfly stipulation we had at the end of the day.  So we have a copy of that.  I forget if I've given it to the government yet to sign, but they're fine with it.  How would you like us to put that——just give it to your clerk, change it out?

THE COURT:  Please send it to my clerk, but your respective legal assistants are gathering together all of the exhibits ultimately when this trial is over, so we'll just make sure to have the right one in there.

P7T1STO1

We do have all of our jurors.  Does anyone need a break before we begin?

I have a yes.  So, okay.  Let's take five minutes, and then we will begin.  Thank you very much.

THE DEPUTY CLERK:  All rise.

(Recess)

(Continued on next page)

P7T1STO1                          Wuollet - Direct

(Jury present)

THE COURT:  Good morning.  Please be seated.

My thanks to our jurors this morning for your patience.  We had some legal issues, as sometimes happens, and we've resolved them.  Thank you.

Mr. Patton, please call your witness.  Thank you.

MR. PATTON:  Thank you, your Honor.  The defense calls Guy Wuollet.

(Witness sworn)

THE DEPUTY CLERK:  Please be seated and into the mic, please state and spell your full name for the record.

THE WITNESS:  David Wuollet Jr.  Do you want me to spell the whole thing?

THE COURT:  The last name, sir, please.

THE WITNESS:  W-O-U-L-L-E-T.

THE COURT:  Thank you.

Counsel, you may inquire.

And sir, I'm just going to ask you, just because of the acoustics in the courtroom, you'll want to speak up loudly and bring the microphone as close to you as you can.

THE WITNESS:  Yes.  Good?

THE COURT:  Thank you.

Mr. Patton.

P7T1STO1                    Wuollet - Direct

DAVID WUOLLET JR.,

        called as a witness by the Defendant,

        having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. PATTON:

Q.  Good morning, Mr. Wuollet.  What do you do for a living?

A.  I work as a venture capital investor at Andreessen
Horowitz.

Q.  And tell me about what the company does, generally.  What
does that mean?

A.  Yes.  We invest in early-stage tech companies.  I
specifically work on our crypto team, which we usually call
a16z crypto, so we invest in crypto startups.

        THE COURT:  Little louder.  Thank you.

Q.  Sorry.  Just because I'm not sure everyone heard that, did
you say you work for a unit called a16z?

A.  Yes, I work for an investment firm called Andreessen
Horowitz, which is often abbreviated or shortened into a16z,
crypto, and that's the team I work for.

Q.  And give us just a general sense of your daily work.  What
is it that you do?

A.  My job is to find, evaluate, talk to founders of tech
companies, hopefully get the opportunity to invest in them and
then support them in their journey and goal towards building a
successful company.

P7T1STO1                        Wuollet - Direct

Q.  And what sorts of things do you do when you're trying to decide whether to invest in a company?

A.  We spend a lot of time talking with the founders of the company, trying to understand how their product works, both technically and at a business or sort of a user-facing level, evaluate whether or not the business that they're building will be successful or profitable, spend a lot of time reviewing the technical documentation or description of how their company and their product will work, we do references, talking with people that the founders have worked with previously, talk to customers of the company if that's relevant.  Is that helpful?

Q.  That's fine.  And again, just as a general matter, give us a sense of how big your company is by whatever metrics might help us see that.

MR. GIANFORTI:  Objection.

THE COURT:  I'll allow the one question.

A.  We're a big company.

THE COURT:  Okay.  Well, that's your answer.

Q.  Were you basically doing the same job that you've been describing in 2021?

A.  Yes.

Q.  Are you familiar with something called Tornado Cash?

A.  Yes.

Q.  And in 2021 did you have interactions with Roman Storm in connection with his company Peppersec related to Tornado Cash?

P7T1STO1                    Wuollet - Direct

THE COURT:  Perhaps lead a little less, counsel. Thank you.

A.  Yes.

Q.  And what were those interactions about?

A.  I and other people on our team got introduced to Roman and Roman, Storm and Semenov, the two founders of Tornado Cash; we talked with them about the protocol they were building, evaluated investing in it, decided not to invest in it.

Q.  And did you end up writing Roman Storm an email explaining your decision not to invest?

A.  Yes.

MR. PATTON:  Could we pull up just for the witness only Defense Exhibit 9851.

And if we could just——yeah, there we go.  Thank you.

Q.  Do you recognize this as that email?

A.  Yes.

Q.  And is this email something you wrote and maintained in the course of your work at a16z?

A.  Yes.

MR. PATTON:  Your Honor, we offer Defense Exhibit 9851.

MR. GIANFORTI:  No objection.

THE COURT:  Defense Exhibit 9851 is admitted into evidence and it may be shown to the jury.

(Defendant's Exhibit 9851 received in evidence)

BY MR. PATTON:

Q. And Mr. Wuollet, I'm just going to ask you to read from the beginning of this, starting with "Hi, Roman," and just the first paragraph.

A. Sure.

"Hi Roman,

"Great chatting earlier this week!  We really appreciated your vision for Tornado Cash and were impressed by the strength of privacy you provide.  We're excited about the next iteration of the protocol, and believe private transfers and continuously sized entry into the private pool are big improvements."

Q. When you said here that you were impressed by the strength of the privacy and were excited about the next iteration, this may seem like an odd question, but did you mean what you said?

A. Yes.

Q. You weren't just being polite as you were declining the investment?

MR. GIANFORTI:  Objection.

THE COURT:  Sustained.

Q. If you could go ahead and read the next paragraph.

A. "We're going to pass on the investment opportunity.  We're uncertain of the value capture model for TORN, and whether the community will accept the addition of a protocol level fee.  I believe the model of using TORN to pay relayer fees could help

TORN capture value, but would like to see this design implemented and gaining traction before forming full conviction.  I know this is nuanced and that we addressed it together.  This is simply where we've landed this time around."

Q.  So could you sort of try to summarize for us the reasons you were giving here.

A.  Yes.  The simplest way of framing it is that we were uncertain that Tornado Cash, the protocol which was being used and seemed useful, would be profitable and a good investment and would make money, and so that's why we didn't invest.

Q.  And was that in fact the reason you did not invest?

A.  Yes.

Q.  And then if you could continue on and read the last paragraph.

A.  Yup.

"We will continue to be fans of Tornado Cash and to track its adoption on chain.  We'd love to stay in touch as you continue to grow out the team and iterate on the protocol. Please let us know if there's something we can do to help informally or if you want someone to bounce ideas off."

Q.  And were you in fact fans of Tornado Cash and interested in continuing to follow it?

A.  Yes.

           MR. PATTON:  No further questions, your Honor.

           THE COURT:  Cross-exam?

CROSS EXAMINATION

BY MR. GIANFORTI:

Q.  Good morning, Mr. Wuollet.

        MR. GIANFORTI:  Mr. Iannuzzelli, if you have it, could you please pull up Defense Exhibit 9851 again.  And could you blow it up.

Q.  And Mr. Wuollet, focusing on that second paragraph there, could you read that sentence that starts with "I believe."

A.  "I believe the model of using TORN to pay relayer fees could help TORN capture value, but would like to see this design implemented and gaining traction before forming full conviction."

Q.  So what you were communicating to Mr. Storm was that if TORN——TORN is a proprietary token of the Tornado Cash ecosystem; is that right?

A.  Yes.

Q.  And what you were communicating here was that if Tornado Cash were to use TORN to pay relayer fees, that would essentially make Tornado Cash profitable, right?

A.  Not necessarily.  But that sounded like a good idea in theory, and we were interested in seeing that play out before, you know, potentially revisiting or changing our decision to not invest.

Q.  But it was a potential path of profitability; you would agree?

P7T1STO1                    Wuollet - Cross

A.   Yes.

MR. GIANFORTI:  All right.  You can take that down.
Thank you.

Q.   All right.  And just stepping back for a minute, fair to
say that a16z only invests in companies that it thinks will
ultimately become profitable?

A.   Yes.

Q.   That's the hope, anyway?

A.   Yes.

Q.   Okay.  Because you're trying to make money for your
investors, right?

A.   Yes.

Q.   All right.  And you said that you're sort of in a
specialized cryptocurrency unit of a16z, right?

A.   Yes.  We don't focus just on cryptocurrencies, but we focus
on investing in startups that are related to blockchains or
to—to crypto.

Q.   Okay.  And fair to say that when you're considering an
investment in a company, you'll do research into that project?

A.   Yes.

Q.   Fair to say that you know a fair amount about
cryptocurrency?

A.   Yes.

Q.   And fair to say you know a fair amount about blockchains,
just sort of generally?

P7T1STO1                          Wuollet - Cross

A.   Yes.

Q.   And in connection with your work, you keep an eye on the cryptocurrency industry generally as a rule?

A.   Yes, that's——that's my job.

Q.   Yeah.  So you follow developments in the news related to crypto?

A.   Yes.

Q.   Do you read crypto press?

A.   Yes.

Q.   You follow cryptocurrency social media?

A.   Yes.

Q.   People in crypto are pretty active on social media; is that fair to say?

A.   Depends on the people, but yes.

Q.   Okay.  All right.  And you'd agree with me that crypto is used in criminal activity?

A.   That's a——I'm not quite sure I understand the question.

Q.   Well, you just testified that you follow the cryptocurrency industry, right?

A.   Yes.

Q.   And you're on crypto——crypto Twitter, for lack of a better phrase?

A.   Yes.

Q.   And sometimes they discuss major hacks in the cryptocurrency space, don't they?

A.   Yes.

Q.   So crypto is used in crime.

A.   I——I guess the way I would use crypto——I wouldn't say that's crypto being used in a crime.  That's someone committing crime on a blockchain.  Just the same way, you know, if someone robbed a store, I wouldn't say the store is used in crime.

          MR. GIANFORTI:  Okay.  No further questions.

          THE COURT:  Thank you.

          Redirect?

          MR. PATTON:  No, your Honor.

          THE COURT:  Oh, okay.

          Sir, thank you very much.  You may step down.

          THE WITNESS:  Thank you, your Honor.

          (Witness excused)

          THE COURT:  May I please have the next defense witness.

          MR. KLEIN:  Yes, your Honor.  The defense is calling Omid Malekan, M-A-L-E-K-A-N.  First name Omid, O-M-I-D.

          (Witness sworn)

          THE DEPUTY CLERK:  Please be seated and into the microphone, please state and spell your full name for the record.

          THE WITNESS:  My name is Omid Malekan.  O-M-I-D, M-A-L-E-K-A-N.

          THE COURT:  Thank you.

Counsel, you may inquire.

OMID MALEKAN,

called as a witness by the Defendant,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. KLEIN:

Q.   Good morning.  Where do you live?

A.   I live on Long Island, New York.

Q.   What do you do for a living?

A.   I am an adjunct professor at Columbia Business School, and I also do consulting work.

Q.   What do you teach at Columbia?

A.   I teach blockchain and cryptocurrency.

Q.   And what kind of consulting do you do?

A.   Also related to blockchain and cryptocurrency.

Q.   How long have you been doing those things, teaching about crypto and consulting about it?

A.   It will be six years this September, since I started teaching at Colombia; and the consulting started a little bit before that, so around seven years.

Q.   Have you heard of a cryptocurrency called Ether?

A.   Yes.

Q.   What is it?

A.   Ether is what we call the native coin of the Ethereum blockchain, so it is a currency but it's also what makes that

decentralized platform work.  People invest in it, and other people use it to pay fees to use the Ethereum blockchain.

Q.  And do you teach about Ether?

A.  I do, actually.  How it works is a core part of my class.

Q.  And why did you become interested in cryptocurrency?

A.  I worked on Wall Street before I ever learned anything about crypto, and I sort of stumbled into it, and what fascinated me about it was all the ways it was different from how things like banking work, and I actually was quite and still am quite optimistic that cryptocurrencies could solve some of the problems of what we call the traditional financial system.  Everything from the more catastrophic—

          MR. GIANFORTI:  Objection, your Honor.

          THE COURT:  Yes, stop right there.  Thank you.

          Counsel, I hope you can remember our prior discussions.  Thank you.

          MR. KLEIN:  Yes, your Honor.

Q.  Are you familiar with Tornado Cash?

A.  Yes.

Q.  At a high level, what is Tornado Cash?

A.  Tornado Cash is a decentralized protocol for privacy on the Ethereum blockchain.

Q.  And did you conduct a transaction using Tornado Cash?

A.  I did.

Q.  Can you describe what you did.

A.   I used Tornado Cash when I was purchasing something called an ENS name.  ENS is the Ethereum Name Service.  It's sort of a blockchain equivalent of a domain name, so just like I own omidmalekan.com.

MR. GIANFORTI:  Objection.

THE COURT:  I'm sure this is coming to an end soon.

MR. KLEIN:  Yes, it is, your Honor.

THE COURT:  Finish your answer, sir.

A.   Purchasing my ENS name required me to pay for it with Ether, coming out of a wallet address where I keep my investments, and I wanted to keep that private so I used Tornado Cash.

Q.   Did you use anything else when you conducted that purchase?

A.   I used Tornado Cash, and then I also used the cryptocurrency exchange Coinbase for the same reason.

Q.   And do those two provide different experiences, Coinbase and Tornado Cash?

A.   They do.  They actually provide very different experiences.

Q.   Can you explain.

A.   Tornado Cash allows you to send cryptocurrency from one wallet to the other without them being linked.  That's why I used it.  I didn't want the public to know where my investments are.

MR. GIANFORTI:  Objection.

THE COURT:  I'll allow.

P7T1STO1                    Malekan - Direct

A.   May I——I didn't want to put a bull's-eye on my back for——

THE COURT:  Okay.

MR. GIANFORTI:  Objection.

THE COURT:  The jury will disregard that last answer.

Counsel, if you cannot control your witness, he will come right off the stand.  Thank you.

Answer the questions asked, sir.

THE WITNESS:  Yes, ma'am.

THE COURT:  Ask more bite-sized questions.

MR. KLEIN:  I will, your Honor.

BY MR. KLEIN:

Q.   Can you explain the difference——can you talk about Coinbase for a moment.

A.   Coinbase is a cryptocurrency exchange that can be used to buy and sell cryptocurrencies.

Q.   And why did you use Coinbase as part of this transaction?

A.   Just to have added protection for reasons of privacy.

Q.   And are their layers of protection different?

A.   Yes.

Q.   How are they different?

A.   Coinbase collects data on all of their customers, which I'm fine with, but exchanges like Coinbase are often targeted by hackers to try to steal customers' data.

Q.   Did the defense provide any funds for you to travel here or be here today?

A.   No.

Q.   Do you know Roman Storm?

A.   No.

          MR. KLEIN:  Nothing further, your Honor.

          THE COURT:  Thank you.

          Cross-examination?

CROSS EXAMINATION

BY MR. GIANFORTI:

Q.   Good morning, Professor.

A.   Good morning.

Q.   So, Professor Malekan, you said you've never met Roman
Storm; is that right?

A.   That's correct.

Q.   You've never spoken with him?

A.   Not to my knowledge, no.

Q.   Never communicated with him electronically?

A.   Not to my knowledge, no.

Q.   Fair to say you can't read his mind?

A.   Yes.

Q.   Fair to say you don't know what he was thinking while he
was working on Tornado Cash?

A.   Correct.

Q.   And you said you used Tornado Cash to buy an ENS domain.
Do you remember that?

A.   Yeah.  You mean which one?

P7T1STO1

THE COURT:  No, no.  Just, he's asking you do you remember giving that testimony a few moments ago, sir.

A.  I do.

Q.  Okay.  When was that?

A.  That was in February of 2021.

Q.  How much ETH did you put through Tornado Cash?

A.  I don't remember exactly.  I believe it was several hundred dollars' worth at the time.

Q.  Just one moment.

And Professor Malekan, have you spoken to the defense before you took the stand today?

A.  I have.

Q.  How many times?

A.  Four or five times, I would guess.

Q.  How many times have you spoken with me?

A.  I have not spoken with you before.

Q.  But you were willing to talk to the defense.

MR. KLEIN:  Objection, your Honor.

THE COURT:  Counsel.

MR. GIANFORTI:  No further questions.

THE COURT:  Obviously the objection was sustained.

All right.  Redirect?

MR. KLEIN:  No, your Honor.

THE COURT:  Thank you very much.  You're excused.

(Witness excused)

P7T1STO1

THE COURT:  Next witness, please, sir?  Or——

MR. KLEIN:  Your Honor, we're going to read a stipulation into the record, with the Court's permission.

THE COURT:  Thank you.

Mr. Morel, go ahead.  Just give me, please, the identifying number of the stipulation, whether it is to be admitted into evidence.

MR. MOREL:  Yes, this will be S-7, and we will ask that it be admitted into evidence.

THE COURT:  Thank you.  Sir, you are welcome, if you want to, to skip that paragraph with which we're all familiar.

MR. MOREL:  Very well.

THE COURT:  Okay.  Thank you.

MR. MOREL:  Stipulation is titled Stipulation Regarding Testimony of IRS-CI Special Agent Peter Dickerman.

Paragraph 1.  On July 7, 2025, IRS-CI Special Agent Peter Dickerman participated in a phone interview with law enforcement officials.  A law enforcement official took notes memorializing the substance of the interview.  Special Agent Dickerman did not review the notes.

2.  According to the notes, Special Agent Dickerman stated, in substance and in relevant part, the following:  (1) Special Agent Dickerman observed Remko Lindeman, a Dutch official, take control of the computer and initiate the parsing process; and (2) after the parsing process was complete,

Special Agent Dickerman took over and ran searches of the extraction relating to Roman Storm.

This stipulation is dated July 25, 2025, and it is signed by counsel for both parties.

THE COURT:  Thank you so much, sir.

The next witness, please?

MS. AXEL:  The defense calls Dr. Stephanie Hurder.

THE COURT:  Thank you very much.

(Witness sworn)

THE DEPUTY CLERK:  Please be seated and into the microphone, please state and spell your full name for the record.

THE WITNESS:  My name is Stephanie Hurder.  It's spelled S-T-E-P-H-A-N-I-E; Hurder, H-U-R-D as in David, E-R.

THE COURT:  Thank you.

Counsel, you may inquire.

MS. AXEL:  Thank you.

 STEPHANIE HURDER,

    called as a witness by the Defendant,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. AXEL:

Q.  Good morning, Dr. Hurder.

A.  Good morning.

Q.  Are you currently employed?

A.  I am.

Q.  Where do you work?

A.  I am a partner and founding economist at Prysm Group.

Q.  And what is Prysm Group?

A.  Prysm Group is an economics advisory firm focused on blockchain and cryptocurrency projects and other emerging technologies.

Q.  Were you retained as an expert in this case?

A.  I was.

Q.  Who retained you?

A.  Mr. Storm's counsel and Mr. Storm.

Q.  Are you being compensated?

A.  I am.

Q.  Does your compensation depend on the outcome of this case?

A.  It does not.

Q.  Did you prepare certain slides to help the jury follow along with your testimony?

A.  I did.

Q.  Did you receive any assistance in preparing your slides?

A.  I did.  I received assistance from Mr. Storm's counsel as well as an outside graphic design firm.

        MS. AXEL:  Permission to display DX 9050.

        THE COURT:  As a demonstrative aid?

        MS. AXEL:  Yes.  Your Honor, I will be seeking at the end to submit summary charts but that won't come up for a

P7T1STO1                        Hurder - Direct

while.

THE COURT:  May I know from the government whether there will be objections to those slides?

MR. ARAD:  If they are as we've seen them before, no objection.

THE COURT:  Okay.  We'll see if they are as you've seen them before.  Thank you, counsel.

BY MS. AXEL:

Q.  Okay.  Dr. Hurder, can you describe for the jury your educational background.

A.  Sure.  I have a PhD in business economics, a master's degree in economics, and a bachelor's degree in mathematics and economics, *magna cum laude* and Phi Beta Kappa, all from Harvard University.

Q.  As part of your educational background, does that include statistics?

A.  It does.

Q.  How?

A.  In addition to standard graduate-level training in statistics and econometrics, I also completed PhD-level qualifying exams in frequentist and Bayesian econometrics.

Q.  Oh, I think we may have to spell that later.

A.  Okay.

Q.  And would you describe for us your professional history, in brief.

A.   For the past——since 2018, I've co-founded and been with Prysm Group.  Prior to that I was a consultant and project leader at the Boston Consulting Group.  Prior to that I was a postdoctoral research associate at the Massachusetts Institute of Technology.

Q.   And did some of this particular professional experience relate to cryptocurrency and blockchain technologies?

A.   I would say the experiences that are most relevant were, I was an advisor to the World Economic Forum's blockchain and digital currency group.  And I've also been affiliated with the Center for Cyber-Physical Systems and the Internet of Things at the University of Southern California.

THE COURT:  Counsel, hold on, please.  Thank you.

Can I ask you to just slow down a little bit.  Thank you so much.  The jury has heard this so many times.  It's not you, it's this courtroom.  Thank you.

Q.   And how does your work as an economist at Prysm relate to blockchain technology specifically?

A.   Oh, we work with blockchain and cryptocurrency-based projects to help them design economic systems, so things like designing the economics of tokens, how incentives work, how marketplaces function, and governance.

Q.   And what do you mean by governance?

A.   Governance is typically a collective decision-making within a blockchain project.

Q.   And how many blockchain projects have you provided such economic advisory services to?

A.   Several dozen.

Q.   Does your work involve the use of any publicly available blockchain tools?

A.   It does.

Q.   Such as?

A.   We use tools like CoinMarketCap and CoinGecko for data; we use Etherscan when necessary; we will use public code repositories such as DUNE.

Q.   And have you published in any areas relevant to also this cryptocurrency and economics work that you do?

A.   I have.

Q.   Can you provide some examples.

A.   I am a co-author of a book chapter published by Palgrave Macmillan on cryptoeconomics and blockchain governance; I've also co-authored game theory papers on blockchain governance that have been presented at universities like Stanford and Berkeley.

Q.   And do you speak on these topics?

A.   I do.

Q.   Can you provide some examples for us.

A.   I've been a guest lecturer in courses at Stanford, the University of Chicago, the University of California Los Angeles; I've spoken at major crypto conferences such as South

x Southwest and Consensus; and I also give plenary talks at different major conferences.

Q.   Have you testified as an expert before?

A.   I have not.

Q.   Have you previously been engaged as an expert in litigation matters?

A.   I have.

Q.   How many times?

A.   Three, including this one.

          MS. AXEL:  The defense moves to qualify Dr. Hurder as an expert on economics of blockchain and blockchain projects, including cryptocurrency design.

          MR. ARAD:  No objection.

          THE COURT:  She is so qualified.  Thank you.

Q.   Have you reviewed various materials to prepare for your testimony today?

A.   I have.

Q.   And showing you slide 2, would you summarize for the jury the key materials that you've considered.

A.   Sure.  I reviewed documentation related to the Tornado Cash project.  This included Medium posts, project documentation, and the governance website.

          I reviewed token price data for various tokens.

          I reviewed data from Etherscan.

          I reviewed selected academic literature that was

related to tokens and cryptocurrency governance.

I reviewed, investigated Peppersec corporate records.

I reviewed selected government expert disclosures and selective trial materials.

Q. And does that include some exhibits introduced at trial and some testimony that took place here in this trial already?

A. I believe, yes.

Q. And have you then come to certain opinions that you'll testify about today?

A. I have.

Q. Okay. Would you tell the jury what opinions you've reached.

A. In my opinion, the TORN token was created as a governance token to facilitate the operation of what's called the Tornado Cash DAO.

In my opinion, upon reviewing it, the Tornado Cash DAO was well designed, it was active, and had significant power.

The founders of TORN allocated a significant number of TORN tokens to the community in order to bootstrap and support the DAO.

I found that the price of the TORN token generally rose and fell with the overall crypto market movements.

And that the Ronin hack did not benefit the price of the TORN token.

Q. So let's turn to a few background definitions to get to

P7T1STO1                         Hurder - Direct

your opinions here.

Would you describe for the jury what "tokenomics" means.

A.   Tokenomics is the economic design and analysis of blockchain-based tokens.  It uses tools like economic theory, research, and data analysis.

Q.   Are there any synonymous terms?  Are there other things you say instead of tokenomics?

A.   It's sometimes called cryptonomics.

Q.   What is a decentralized application, or dApp for short?

A.   A dApp, or decentralized application, is built on top of a blockchain protocol.  DApps can do all kinds of different things.  They'll frequently have their own token that's different than the native token of the blockchain protocol.

Q.   And the word "decentralization," on its own, how would you define that?

A.   Something is decentralized when it's not controlled by a single entity or individual, so there's a collective group that together controls the project or the item or whatever you're talking about.

Q.   How is that different than a traditional corporate structure?

A.   So corporate structures vary, but we typically think of corporate structures as being one or a couple of legal entities that are frequently hierarchical.  Decentralized projects don't

necessarily have that structure.

Q.   And another term we may encounter here is "protocol fee." How would you define the term "protocol fee"?

A.   In this context, a protocol fee is a fee that a blockchain project charges to users that the project then collects for itself.  So protocol fees can be used for things like funding research and development, you know, paying for hosting, doing other types of ongoing maintenance.

Q.   And is it then the software protocol itself that would charge this fee?

A.   Yes, it's typically programmed into a smart contract.

Q.   And how does it direct it in that instance?

A.   The smart contract will direct the fee to, for example, the project treasury, if that's where it's supposed to go.

Q.   And we didn't have it on here, but what is the role of tokens in tokenomics?

A.   I mean, a token is a digital asset.  It's a digital representation on a blockchain.  The role of tokenomics is to figure out how to create tokens that have use and value.

Q.   So in your experience have you worked with a lot of blockchain startups?

A.   I have.

Q.   And who typically launches a blockchain-based project?

A.   It can be a person; it could be a group of people; they could be affiliated with a small startup; they could have no

legal entity at all; they could be part of a big company.  It's typically just a founder or founding team.

Q.  And is decentralization something that happens at the beginning or over time?

A.  Projects frequently are launched by the founding team, and then many founding teams will choose to decentralize part or all of a project over time.

Q.  Okay.  Have you prepared a slide to just talk about startup funding?

A.  I have.

Q.  Okay.  And Dr. Hurder, is this based on your experience with blockchain, or startups in general?

A.  It is.

Q.  Okay.  So what are the types of costs that you often see?  And if you could particularize it to blockchain startups as you're describing that, that would be helpful.

A.  So blockchain startups experience many of the same startup costs that you'd think of for any type of software project, right?  They typically need technical talent to be able to develop the project.  They may need legal advice.  They need marketing.  In the time period that we're talking about, it was particularly important to attend conferences, especially in the blockchain space, to meet other people and tell them what you were working on.  And some projects would engage experts and things like security audits to check for bugs in their code.

Q.   And so what are the types of funding sources that you've often seen to fund these types of startup costs?

A.   There's a variety.  Some blockchain-based projects will sell equity, like any startup would; some will engage in token sales; many protocols will offer grants to projects that choose to build on them, so that's a common source of funding; and some projects will have early revenue from operations that they can use to pay for costs.

Q.   And when you're referring to funding sales here, do you mean that a founding entity might just simply sell tokens for cash?

A.   Could you repeat the question, please?

Q.   Yes.  When you're talking about a funding source here for a startup entity, do you mean some projects might just take the tokens and sell them for cash?

A.   Yes.

          (Continued on next page)

P7T5sto2                          Hurder - Direct

BY MS. AXEL:   (Continuing)

Q.   What are the ongoing costs then, that you would say, after a startup has gotten off the ground?

A.   Similar to any software project there is going to be ongoing maintenance, there is going to be research and development.  There may just be ongoing fees like any business, right, they might need Zoom, or GitHub, or many of these services.

Q.   If an entity were to ultimately decentralize over time, who would pay these types of costs?

A.   Figuring out funding sources to pay for ongoing costs is a key part of a decentralization plan.  Some projects will allocate a pool of tokens to something like a treasury so they can be sold over time for funding.  Other projects will have ongoing revenues so, for example, from a protocol fee.

Q.   And what is the role, then, of the founding entity as the project goes forward towards decentralization, or does that vary?

A.   It varies by project.  Many founding teams in the blockchain space have the goal that the project is eventually independent of the founding team that it can basically run without the founding team controlling it.

Q.   Have you looked at the entity Peppersec, Inc.?

A.   I have.

Q.   And what is Peppersec, Inc.?

P7T5sto2                          Hurder - Direct

A.   Peppersec, Inc. is a Delaware corporation.

Q.   And are you familiar with Peppersec's funding for Tornado Cash development and startup costs?

A.   I have reviewed some of their funding documents, yes.

Q.   Starting at the top, what is one source of their funding?

A.   Peppersec engaged in what is called crowdfunding.  They received a grant from a platform called Gitcoin.

Q.   And what is Gitcoin?

A.   Gitcoin is an online platform where developers can propose projects and the community can contribute funds.  I believe the platform also has a matching program to match contributions from the community.

Q.   And have you looked at the GitHub -- sorry, not GitHub -- have you looked at the Gitcoin website concerning the crowdfunding that Peppersec did there?

A.   I have seen snapshots from the Wayback Machine.

Q.   Showing you what has been marked just for the counsel and the witness as DX 9051, do you recognize this document?

A.   I do.

Q.   And what is it?

A.   This is a snapshot of the fundraising page for Tornado Cash on Gitcoin.

        MS. AXEL:  We would offer it in evidence, your Honor.

        MR. ARAD:  Objection, your Honor.

        THE COURT:  I will see the parties at side bar,

P7T5sto2                          Hurder - Direct

please.

        (Continued next page)

P7T5sto2                          Hurder - Direct

(At side bar)

THE COURT:  Was this an exhibit that was shared with you?

MR. ARAD:  It was.

THE COURT:  I see.  So when you were telling me earlier that you didn't think you had objections, you were referring to the slides in the deck that counsel is proposing to go admit later on, not this document.

MR. ARAD:  That's correct.  That's right.

THE COURT:  You are concerned about this document that it is hearsay?

MR. ARAD:  Correct; and also from before the relevant time period, your Honor.

THE COURT:  All right.  I do want to understand, is that what the rest of this day is going to be, a bunch of objections to any hearsay introduced through expert witnesses?

MR. ARAD:  That's not the intention, your Honor; no.

THE COURT:  It may be the effect, but OK.

MR. ARAD:  In this case the reason that it matters that this document precedes the charged time period is that it goes to the defendant's intent at a time that is simply not relevant to the charges here.

THE COURT:  OK.  Counsel?

MS. AXEL:  Your Honor, we have two of them, to be clear; two.

THE COURT:  OK.

MS. AXEL:  This one also is from 2020, 401, and this 2020 time period, this is 2019.  There has been some testimony about 2019.  The Court, of course, knows that we have a stipulation from Scale concerning the ETH Boston conference.  And, in general, I think this is foundational for her talking about where the startup monies come from.  They put on Agent Reyes who went through the bank accounts of Rho Bank and talked about how the money was received and what they used it for.  And so, I think we are just laying the foundation that essentially this is the money they raised and then and they've talked about ultimately what they did with it, that's all in the pie chart, so I think this is also relevant.

MR. ARAD:  A couple of -- sorry, your Honor.  I didn't mean to jump the track.

THE COURT:  Go ahead.

MR. ARAD:  A couple of thoughts on that, your Honor.

First, as to other evidence that was admitted before the charged time period, the government vigorously objected to the admission of that evidence.  I think this evidence is even less relevant to the extent this evidence is coming in in order to show the defendant's state of mind which does appear to be its purpose.  It is hard it see how the fact that Tornado Cash was crowdfunded goes to his state of mind and what his intentions were with the company before the charged time

period.

And I will also add, your Honor, that to the extent the government introduced Rho Bank records about the funding and uses of funding by Peppersec, all of those were during the charged time period so I don't think that is an apt comparison.

THE COURT:  I will allow it as foundational to this witness' testimony and I presume there will be very little questioning on it.  Thank you.

The objection is overruled.

(In open court)

MS. AXEL:  May I continue, your Honor?

THE COURT:  The exhibit is admitted over the government's objection and it may be shown to the jury.

(Defendant's Exhibit 9051 received in evidence)

BY MS. AXEL:

Q.  Dr. Hurder, tell us again, now that we can see it, where this document came from?

A.  This is from a crowdfunding site called Gitcoin.  This is a snapshot from the Wayback Machine of a page from a project -- a website called Gitcoin.

Q.  And what is the date of this document?

A.  The date of the snapshot is -- go back to the top, please so I can see the date?

It is 12/18/2019 is the snapshot date.

Q.  Let me show you, have you pulled another way back screenshot?

A.  I have.

Q.  Let me show you what is marked as 9052.

THE COURT:  Government is objecting to the introduction?

MR. ARAD:  Yes, your Honor.

THE COURT:  Thank you.  The objection is overruled and Defendant's Exhibit 9052 is also admitted into evidence and may be shown to the jury.

(Defendant's Exhibit 9052 received in evidence)

BY MS. AXEL:

Q.   Dr. Hurder, what is the date of this snapshot?

A.   This snapshot is dated April 1, 2020.

Q.   Were you able to determine from the Gitcoin public records approximately how much was raised?

A.   The Wayback Machine records were not complete.  According to this page they had, as of this date, raised about 5,500 DAI which is approximately $5,500.

Q.   But at this point the materials were no longer complete, you said?

A.   Right.

Q.   What is another source of funding -- turning back to slide 6 -- what is another source of funding that you were able to review in the corporate records?

A.   There is a $50,000 investment from a group called The LAO.

Q.   And do you know what The LAO is?

A.   The LAO is a -- they call themselves an investment group run like a DAO, they're sort of a dApp that invests in startups.

Q.   What type of funding did the LAO provide?

A.   They signed a convertible note.

Q.   And what is another source of funding then that you reviewed?

A.   I reviewed a SAFE and a warrant with Dragonfly.

P7T5sto2                     Hurder - Direct

Q.   And what did you understand Dragonfly to be?

A.   Dragonfly is a venture capital firm that I believe specializes in blockchain and crypto projects.

Q.   What type of funding did Dragonfly provide?

A.   Dragonfly signed, agreed to what is called a SAFE with a warrant.  A SAFE is a Simple Agreement for Future Equity.

Q.   Showing you what is in evidence as GX 1303, is that the SAFE?

A.   That is the SAFE.

Q.   And recognizing that you are not a lawyer, can you describe, generally, what you understand, in your experience, a SAFE to be?

A.   A SAFE is an agreement that is commonly used with early-stage startups.  It allows the investor to acquire equity at a future date.

Q.   And so what entity did Dragonfly get equity in?

A.   This is an agreement with Peppersec, Inc.

Q.   And in addition to the SAFE, was there another agreement between Dragonfly and Peppersec?

A.   Yes.  There was a warrant.

Q.   And showing you exhibit GX 1304, is that the warrant?

A.   I'm now looking at the warrant; yes.

Q.   Again, just generally, what do you understand the warrant to provide for?

A.   The warrant, in general, states that if Peppersec is

involved in the issuance of one or more network tokens, that the investor has the option to acquire some of those tokens.

Q.  So, does this warrant specifically say that Tornado Cash tokens, TORN tokens are issued, that Dragonfly would have an option for those?

A.  I believe it gives Dragonfly the right to any network token.

Q.  Any network token that Peppersec was involved in?

A.  Yes.

Q.  How much funding did Dragonfly provide to Peppersec in total?

MS. AXEL:  Can we go back to slide 5 now, Mr. Demarco?

A.  All together, approximately $900,000.

Q.  Are you familiar with how Peppersec used this funding?

A.  I reviewed selected financial statements.

Q.  And so, how did they use it?

A.  They used it in a way that I found very similar for a typical startup.  There were payroll expenses, there were expenses for things like GitHub.  There were registered agent fees, just typical startup expenses.

Q.  And, did Peppersec earn any fees or revenues through Tornado Cash to fund these ongoing costs?

A.  They did not.

Q.  Now let's go back a page to page 5.  How did Peppersec's funding then compare to your startup costs up here?

A.   Could you repeat the question?

Q.   How, after your review of Peppersec's financial records, how did their expenditures compare to your example costs?

A.   I saw expenses for development and I saw expenses for technical infrastructure.

Q.   On the funding sources side, how did Peppersec's funding sources compare?  For example, were there token sales?

A.   There was the warrant that gave the option of token sales, yes.

Q.   The warrant to Dragonfly?

A.   Yes.

Q.   But Peppersec didn't issue its own token directly and get revenue directly for that?

A.   No.

Q.   So how did that warrant work then?  What did it get from Dragonfly?

A.   The warrant was for $18,000.

Q.   And what did Peppersec then do for that $18,000?

A.   Peppersec gave Dragonfly the option to pay a fee to acquire some tokens in the future.

Q.   Did you ever see any operating revenue?

A.   I did not.

Q.   Have you also reviewed Peppersec's bank accounts?

A.   Selected, yes.

Q.   Did you see anything different there or is it as you have

already testified?

A.   It is as I have already said.

MS. AXEL:   Let's go to page 7.

Q.   Now, you talked a little bit before about decentralization. So, what are common goals that blockchain projects have when seeking decentralization?

A.   So, projects seem to become decentralized for a number of reasons.  One of the main ones is the community ethos, just blockchain as a community that values decentralization and community involvement.  Sometimes they become decentralized in order to distribute work among the community and sometimes to comply with securities laws.

Q.   And how did these types of concerns then affect your token design?

A.   Some projects want to ensure that --

MR. ARAD:   Objection.

THE COURT:   Would you please reask the question? Thank you.

Q.   How do the concerns that you have outlined impact your design of tokens?

THE COURT:   This is what is confusing to me.  Are you saying your token design?

Q.   Dr. Hurder, in the process of working with blockchain projects, do you engage in, do you assist in DAO design?

A.   I do.

P7T5sto2                          Hurder - Direct

Q.   As part of DAO design, do you consider perhaps how tokens are distributed in the community or to founders?

A.   Yes.

Q.   So returning to the question of reasons for your decentralization, do those reasons come into mind when you are out designing, helping design a DAO or token project?

A.   Some projects we work with I do want to ensure that token allocations are sufficiently decentralized for securities laws reasons.

          MR. ARAD:  Objection.

          THE COURT:  I'm not sure why we are talking about the securities laws here.  I will allow that question.  I am sure we are going to move on.

BY MS. AXEL:

Q.   And when you are working with a project on these DAO and token design aspects, who is deciding these matters at the outset?

A.   Typically it is the founding team that has a vision for what they want their project in the community to look like in the future.

Q.   Is the goal that you have described as decentralization in conflict at all with founders wanting to have profits?

A.   There are sometimes tradeoffs between seeking decentralization and founder profits.  For example, projects that are aiming to be decentralized may take a significant

fraction of their tokens and distribute them to the community rather than keeping them with the founding team.

Q.   And why do they do that, in your experience?

A.   They can use the tokens in various ways to incentivize community members to actively participate.

Q.   How does the goal of decentralization affect profits a founder may receive from their own intellectual property?

          MR. ARAD:  Objection.

          THE COURT:  I will allow.

A.   It depends on the project.  Many blockchain projects employ open source technology, and so to the extent they have revenues it would not be from licensing that technology specifically.

Q.   And why do you think decentralization is often a goal in blockchain projects?  What is unique about this community?

A.   Blockchain, itself, is a technology that is a ledger that is communally maintained by multiple entities.  Right?  The entire point is there is not a single locus of control and I think that type of technology attracts people who are interested in that type of project.

Q.   And you mentioned governance before.  What are the goals of a decentralized governance system?

A.   A decentralized governance system typically, the goal is to enable the community, whether of users or of other people, to have meaningful control over the ongoing operations and direction of a project.

Q.   And what is the role of a DAO in that?

A.   A DAO was particularly, in this time period, a very popular form of decentralized governance for blockchain projects.

Q.   Are tokens required to create a DAO?

A.   A DAO almost always has a token affiliated with it, yes.

Q.   And what is the role of the token and the DAO?

A.   In general, the token is typically required in order to participate in the DAO.  It depends exactly on how the DAO is designed, but the general idea is that people who want to vote or submit proposals or whatever need to have some skin in the game, and so having the token enables them to do that.

          MS. AXEL:  Can I have the next slide?

Q.   Dr. Hurder, would you describe for us what, sort of, pictorally, is depicted here?

A.   Right.  So this is a picture representation of a DAO, Decentralized Autonomous Organization.  Around the outside you have pictures of individuals or users and they each have some of the, what is called the governance token of the DAO.  In the center is meant to depict the smart contract or smart contracts that run the DAO.

Q.   And that is what is depicted in the center with the computer?

A.   With the computer, yes.

Q.   And in your professional experience, how do you think about designing a well-functioning DAO?

MS. AXEL:  We can move to the next slide.

A.  So, DAO design is actually quite difficult.  If you think about any committee or community decision process that you have ever been a part of, there is a lot of pieces that need to be in place for it to work effectively so you need to think about things like what are the types of topics that the DAO is going to have decision-making authority over.  How do members of the community submit proposals for changes or upgrades or whatever the group might decide to do.  You have to decide who can participate.  You have to have a way to vote and -- collect and aggregate votes.  And you need to find a way to make sure that whatever the community decides is actually implemented.

Q.  And when a strong DAO, what can token holders do?

A.  Typically, a well functioning DAO, users can submit proposals for change they want to see to the project and they can vote on proposals submitted by other people or by themselves.

Q.  So was there a DAO for the Tornado Cash community?

A.  Yes, there was.

Q.  And how was that created?

A.  There was a Medium post in December of 2020 that outlined both the plan for the TORN token, the plan for governance which turned into the Tornado Cash DAO.

MS. AXEL:  And can we look at that Medium post which is in evidence as GX 1904?

Q.   Dr. Hurder, is this the proposal you were referring to?

A.   It is.

Q.   And looking at page 2 -- first of all, is it common to publish these types of proposals on Medium?

A.   Medium is a common place for blockchain projects to lay out their plans, yes.

Q.   So turning to page 2, looking at the structure of the proposed TORN token allocation here, how were the tokens to be allocated?

A.   So, there will be 10 million TORN tokens created, 5 percent of them or 500,000 are going to be used for airdrops to early users of Tornado Cash ETH pools.  10 percent or 1 million TORN are going to be used for something called anonymity mining awards.  55 percent or 5.5 million TORN are going to be given to the treasury of the DAO.  And, 30 percent or 3 million TORN are going to be given to the founding team and investors.

Q.   And based on your professional experience designing these projects and looking at allotments, what are your observations on this breakdown?

A.   One thing that stands out to me is that the allocation to the DAO treasury is more than half of the tokens, so this allocation is going to be given to the DAO and the DAO users can vote on how it will be used.  And, allocating 55 percent of tokens to the DAO for the community to allocate is quite big.

Q.   Was this document publicly available?

P7T5sto2                         Hurder - Direct

A.   It was.

Q.   So looking at then, we will take it at the top, the airdrop, what do you understand that is?

A.   An airdrop is a distribution of tokens to a set of people where they don't pay for them, they just receive them.

Q.   Is that common?

A.   This is extremely common.

Q.   And what would be the purpose, in your experience, of airdropping to people based on early users?

A.   Depending on the project, airdrops are used either for marketing or to encourage the recipients of the airdrops to engage with the project that the token is affiliated with.

Q.   And then, looking at anonymity mining, do you have an understanding of what that is?

A.   Yes.  My understanding is that these were rewards for users who made deposits into the Tornado Cash ETH pools.

Q.   And is this a common concept in blockchain projects?

A.   Mining is a common concept.  There is a concept in decentralized exchanges called liquidity mining where decentralized exchanges will frequently give rewards to users who deposit their tokens into the decentralized exchanges.  The reason is that this increased liquidity makes the exchanges function better.  So, in this case, these mining rewards had a very similar feel to them.

Q.   And then looking at the founding team, founding developers

and early supporters, so it indicates that the tokens would be unlocked linearly over three years with a one-year cliff. Are those types of provisions common with respect to allotment to founders?

A. Yes. This was very common type of vesting schedule at this time.

Q. So what is a cliff?

A. A cliff is a period of time in which the founders, in this case the founders will receive no tokens that they can access so they have to wait a year before they can trade, sell, access, give away any of their founders tokens.

Q. And was a one-year cliff common at this time?

A. Yes.

Q. And why would founders provide this sort of delay and then vesting?

A. One reason for vesting is to provide long-term incentives for participation, so very similar to how founders in regular startups, if you are an employee at a company you may get vesting of stock or options over time, it is meant to encourage you to invest in the long term development of the project and this has a similar intent.

Q. And with respect to the cliff, are founders able to vote these tokens prior to the cliff?

A. It depends on the design of the contract.

Q. As to this one, could founders vote prior to the cliff?

P7T5sto2                          Hurder - Direct

A.   I believe they could not.

Q.   And looking at the next page, page 2, what do you understand this chart to be?

A.   This is a chart, so the horizontal axis is the number of months since the launch of the tokens so you will see it goes from zero to 60, so that is about five years, and this is meant to represent the release of TORN tokens into what is called the circulating supply.

So, when tokens -- frequently when tokens are created, they create a whole bunch of them at once but they release them over time, so this is basically showing how many tokens will be circulating at a given period of time and the different colors correspond to the different sections of the pie chart.

Q.   So, for example, the airdrop tokens are available right away?

A.   That's correct.

Q.   And what do you understand it to show -- it is just a little confusing.  So, did a team and investors have any tokens available prior to the 12 month mark?

A.   My understanding is they do not.

Q.   And so, is this common to depict it this way with the red line on top of the yellow line?

A.   Yes.  Well, this is a stacked area chart.  I think what might be a bit confusing is that the slope upstarts a little bit before 12.  I think that is just a choice that the graph

maker made whether they made this graph.

Q. But it doesn't mean that they vested prior to the one-year mark?

A. That's right.

Q. Did the governance proposal include a way to enable the TORN token?

A. It did.

Q. And what was that?

A. At the end of the Medium post --

MS. AXEL: If we can go to page 10?

A. -- there is the section called Governance Initiation and it outlines a website where the community can go and complete, I believe it was 62 tasks, that would enable the TORN token and the governance.

Q. And is this a common way to start a DAO or do voting to start a DAO?

A. I would say that this -- some projects will just launch the DAO. I would say this is unusual in already including the community.

Q. Why not just have a vote on-chain at this point?

A. At this point there is no on-chain voting system, you need to launch it, which is what this does.

Q. So, with respect to these 62 tasks, just what kinds of tasks were they?

A. Things like allocating tokens, creating and launching smart

P7T5sto2                         Hurder - Direct

contracts.

Q.   Were the 62 tasks completed?

A.   They were.

        MS. AXEL:   OK.  I think we can turn to page 11 --
sorry, slide 11 we can go back to.  There we go.

Q.   Do you know when they were completed?

A.   I believe they were completed within a day.

Q.   When did the DAO launch?

A.   So the smart contracts for the DAO would have been launched
on December 18 of 2020.

Q.   So when the proposal was adopted, did that create TORN?

A.   Could you repeat the question?

Q.   When the proposal then was adopted, is that what created
the TORN?

A.   The completion of these tasks, yes.

Q.   What is the TORN token?

        MS. AXEL:   You can go to page 12.

A.   So, the TORN token is what I would consider to be a
governance token because its primary purpose upon launch was to
be used within the governance system.

Q.   Did users of the Tornado Cash pools need to buy and use
TORN to use those pools?

A.   No.   The Tornado Cash pools existed and operated before the
TORN token was ever created and it was not -- TORN was not
needed afterwards to use the pools.

P7T5sto2                        Hurder - Direct

Q.   So at the time of launch here, December 2020, what could the TORN token be used for?

A.   The TORN token could be used to, in theory, to integrate with the DAO.  There was a proposal in early March of 2021 that needed to pass in order for it to be traded.

Q.   So it couldn't be traded at all until March 2021?

A.   Forgive me.  February 2021.

Q.   And you previously discussed there was a vesting schedule for the founders; correct?

A.   That's correct.

Q.   And have you also prepared a slide demonstrating how that vesting schedule worked?

A.   Yes.

        MS. AXEL:  Can we go to page 13?

Q.   Is this the vesting schedule you created?

A.   It is.

Q.   Describe the text bubble that you put there and what that means.

A.   The one referring to the cliff period ending?  So, the vesting schedule for the founders allocated approximately 22,845 tokens to each founder per month.  However, because of this so-called cliff, for the first year each founder was not able to actually access those tokens, they couldn't sell them, trade them, give them away.  So, when the cliff period ends and we designate this by the bars from going from gray to green,

that's when the founders are able to access the tokens that have been accruing over time.  So, on the 13th of December of 2021, each founder has access to approximately 274,000 of the tokens they were allocated.

Q.  So at the periods of gray the amounts are accruing but not accessible?

A.  That's correct.

Q.  Did you review any evidence concerning any sales by the founders from the vesting contracts?

A.  I did.

Q.  Did any of those sales go to Peppersec, Inc., the company?

A.  They did not.

Q.  Where did they go?

A.  The founders sold tokens for themselves.

Q.  So when the TORN token was launched, did that create the Tornado Cash DAO?

A.  It did.

          MS. AXEL:  Let's turn to slide 14.

          Sorry, your Honor.  Before I exit, I would like to offer page 13 in evidence as a summary sheet created.

          THE COURT:  Mr. Arad?

          MR. ARAD:  No objection, your Honor.

          THE COURT:  Slide 13 is admitted into evidence.  What are we then calling it please?  9050-13?

          MS. AXEL:  It is.

P7T5sto2                          Hurder - Direct

THE COURT:  Thank you.  Defendant's Exhibit 9050-13 is now admitted into evidence as an Exhibit.  Thank you.

(Defendant's Exhibit 9050-13 received in evidence)

BY MS. AXEL:

Q.  Showing you 14, what could members of the Tornado Cash do then?

A.  Once the DAO was created, Tornado TORN holders could primarily do two things.  So, both of them involved what is called staking TORN.  So, when you stake TORN or any token, you acquire the token and then you lock it up in a smart contract and it is inaccessible for a period of time.  So, TORN token holders who staked a sufficient amount of TORN into the governance contract could make proposals, so they could say here is a proposal I think the community should vote on, or they could vote on proposals proposed by themselves or by others.

Q.  How many votes did each TORN token holder have?

A.  So, a TORN token holder received one vote for each TORN token that they staked.

Q.  What are the types of things they could vote on?

A.  The topics that the Tornado Cash DAO addressed were quite varied, so some of them had to do with the allocation of the DAO treasury, that big group of tokens that the DAO allocated that there were votes about, how to spend and handle that. There were votes around the governance process itself so the

DAO could propose to change that, and there were proposals to address certain ancillary smart contracts.

Q.  How does the voting process work?  How does the proposal process work?

Let me ask a different question.  How does the proposal process work?

A.  Yes.  With the caveat that I'm not a technical expert, the proposal process worked where if a user had staked a sufficient number of tokens, they could submit a proposal to the DAO.  The proposal had to be accompanied by what is called executable code.  So, there are some DAOs that are not this one where you could submit a suggestion to vote on.  Here you actually had to submit the code that you wanted implemented.  Once the proposal was proposed there was a period of voting, I believe it was five days, where members of the community could vote for or against the proposal.

Q.  Did you review then the voting history of the Tornado Cash DAO?

A.  I did.

Q.  And showing you slide 15, is that something that you have prepared?

A.  It is.

Q.  Would you explain for us what the columns are here and what they show?

A.  Right.  So, this shows the first 13 proposals that were

submitted to the Tornado Cash DAO.  The Proposal column is a
brief description of the topic of the proposal.  The Start Date
is the start date of the voting period, so the voting period
would have been approximately five days.  The Total Votes is
the total number of TORN tokens that voted either for or
against the proposal.  Total Voters is the total number, I
believe, of addresses that participated.  And the State is
whether the proposal was either executed or defeated.

Q.  And I would say, did you also rely on certain data from
Dr. Edman to compute the votes in total voter columns?

A.  Yes.  That's correct.

Q.  Based on your review of the DAO activity, did you reach any
opinions about the Tornado Cash DAO?

A.  I did.  In my opinion, the Tornado Cash DAO was well
designed, it was active, and it had significant power over
various systems.

Q.  And why did you believe it was well designed?

A.  As I said, there is a lot of design that goes into making a
well-designed decision-making system and some of the things
that stood out to me were just the fact that the process by
which individuals or users could participate in the DAO was
very well laid out, the instructions were very clear.  The fact
that proposals had to be accompanied by code is something that
was not always true but in this case it wasn't just you could
make a casual suggestion, it is that you had to submit the code

you wanted implemented so people could review it.

The voting period was very clear.

And, the designers also made it so that once a proposal was approved by the DAO, there is a period of time where anyone in the community could then implement that code.

Q.   Why did you believe it was an active DAO?

A.   So, if we look here, the very first proposal is the proposal that allows TORN to be transferred from one account to another and we are looking at a period of about 16 months, give or take, and you see that there are a number of different proposals, they're on different types of topics and you see, you know, total -- you see total votes and total voters.

Q.   Is there anything particularly significant about the first vote?

A.   So the first vote I thought was quite interesting.

So, at the time of the first vote users were not able to go buy tokens.  Right?  They could receive them from airdrops and they could receive them, I believe, from anonymity mining, but you couldn't go buy them.  So, to me, it is very impressive that you have a brand-new DAO with a token that hasn't been around very long and you have 111 different addresses participating in this vote.

Q.   What was the scope of the DAO's decision making authority?

A.   In general, from what I reviewed, the DAO was able to address issues around the DAO governance processes.  It was

able to address issues around token allocation, particularly around the DAO treasury, and it was able to address certain technical issues.  For example, proposal 4 has to do with, I believe, with the Merkle trees related to anonymity.

THE COURT:  M-E-R-K-L-E?

THE WITNESS:  Yes.

MR. ARAD:  Objection.

THE COURT:  To my spelling?  I have an objection to that.  Sorry.

There was an application to admit this slide?  Is that correct?  I am trying to figure out what you are not objecting to, sir.

MR. ARAD:  My apologies, your Honor.

THE COURT:  That's fine.  Got it.

MR. ARAD:  I thought the Court was cuing me.

BY MS. AXEL:

Q.  Did the DAO have the authority to change the pool smart contracts?

A.  No.

Q.  And if there were technical -- let me see.

MS. AXEL:  Let me show you what has been marked as Defendant's Exhibit 9053, just for counsel and the witness.

Q.  Dr. Hurder, do you recognize this document?

A.  This is the summary of the governance process from the Tornado Cash GitHub.

Q.  Did you pull this excerpt from the GitHub?

A.  I did.

Q.  Is it something you relied on in your testimony?

A.  I did.

          MS. AXEL:  Defense would offer Exhibit 9053.

          MR. ARAD:  Objection, your Honor; 802.

          THE COURT:  I will allow, given that she is an expert using it in her testimony.

          Defendant's Exhibit 9053 is admitted into evidence and may be shown to the jury.

          (Defendant's Exhibit 9053 received in evidence)

BY MS. AXEL:

Q.  Dr. Hurder, what is this, exactly?  What does it tell you?

A.  This is a set of what I would call instructions to the community of how to use the governance system.

Q.  And what is the support for your statement that the lawn of -- person launching a proposal would have to provide the code?

A.  If you could scroll down further?  Please continue?  Please continue scrolling?

          So, if you go to the previous page, the pagination might make this a little bit difficult to understand but this is an example of a proposal.  And so, this is a mockup and you can see here that as part of the proposal, there is a proposal address which is the link to, I believe, the Etherscan page

that contains the code.  And you can see on the bottom it says:

Look for the contract address on Etherscan and make sure that

the source code is verified and readable.

Q.   Is that an address then you could follow over to Etherscan

and look at the actual code?

A.   That's correct.

            MS. AXEL:  Can we go back to page 15 of 9050, please?

Q.   Dr. Hurder, have you looked at proposal no. 10, Relayer

Registry?

A.   I have.

Q.   Can you provide a basic description of the relayer registry

proposal?

A.   The relayer registry proposal proposes to allow users who

would like to serve as relayers to stake a certain number of

TORN tokens and then be included in the registry.  And then, a

user of the UI who would like to engage a relayer would be

assigned a relayer as a function of an algorithm.

Q.   What was decentralized about the relayer registry proposal?

A.   The relayer registry proposed that the relayers would be

assigned via an algorithm and that in order to qualify as a

relayer, a relayer simply had to acquire and stake the

appropriate amount of TORN.  There was no single person or

entity who had to give signoff that you could be in the

registry.

Q.   And how does that affect decentralization or relate to

P7T5sto2                        Hurder - Direct

decentralization?

A.   It eliminates the single point of control.  So, in previous Medium posts prior to relayer registry, my understanding is the founders would be asked who are the reliable relayers, and so in this case relayers can make themselves available by interacting with the code and by staking TORN.

Q.   And so then was the entire process achieved through code?

A.   That's my understanding, yes.

Q.   And what is staking?

A.   Staking is taking a token and depositing it in a smart contract where it is held and you can't access it for a period of time.

Q.   How was the relayer registry proposed?

          Sorry.  Let me do this a different way.  Given what you have testified with regard to Defendant's Exhibit 9053 and the process for proposing proposals, how was the relayer registry proposed?

A.   Well, whoever proposed the relayer registry would need to stake, I believe it is 1,000 TORN, and submit the proposal.

          MS. AXEL:  Let's look at 9053 again.

Q.   Dr. Hurder, in this manner would they propose the code and would that exist on Etherscan?

A.   Yes.  That's my understanding.

Q.   Did you review relayer registry proposal 10 and look at why it was posted on Etherscan?

P7T5sto2                        Hurder - Direct

A.   I did.

          MS. AXEL:   Showing you Government Exhibit 4027.

Q.   Dr. Hurder, this is a transaction on February 9, 2022.   Do you recognize it?

A.   With the caveat that I have not memorized every string of letters affiliated with this project, I believe this is the transaction hash for the creation of relay registry smart contracts.

Q.   Understood.

          And with that caveat, though, you did, yourself, go to Etherscan and look at the fact that there was code posted for this proposal, did you not?

A.   I did.

Q.   Turning back to your Exhibit 9050-15, so was the relayer registry start date February 14, 2022?

A.   I believe that's the day voting started; yes.

Q.   So what is the difference between voting starting and then actually implementation?

A.   So, based on my review of those governance instructions that you showed earlier, typically the community would have five days to vote on a proposal and then the proposal, if it met quorum, if enough people voted either for or against, the side that was victorious would win.   And if a proposal was passed, there was a latency period which I believe was two days and then there was a three-day period where anyone in the

community could execute the code that had been proposed.

Q. And so the actual implementation would occur after this vote, after this start date?

A. That's correct; yes.

Q. To your knowledge, did the founders vote their founders' TORN on Proposal 10?

A. Based on my review of Mr. Werlau's testimony, they did not.

Q. Could the founders have voted on proposals 1 through 9?

A. Not with their founders' TORN. They could have voted if they got airdrops or bought some TORN on an exchange, but not with their founders' TORN.

Q. And in your review of documents and items, is there other evidence that the founders didn't control all the voting process?

A. Yes. Proposal 13.

Q. Showing you Defendant's Exhibit 9050-16, the next page, did you prepare this summary slide, Dr. Hurder?

A. I did.

Q. And what does it show?

A. Well, this is a depiction of a DAO and it shows proposals -- the title of Proposal 13, treasury diversification proposal.

Q. Was there anything unique about this proposal?

A. So, this proposal was interesting because my understanding is that the founders were in favor of this proposal. However,

the proposal failed.

Q.   And how did that vote go down?

A.   If we can wait for the animation?  If we were to go back to that chart you would see that this, at this time period, this was a relatively large number of total votes and what was particularly interesting about this is that there was an address -- so the voting records for all of these proposals are public, they're available on websites.  There was an address that was affiliated with 73,000 -- approximately 73,000 votes against this proposal.

          MS. AXEL:  Let's go to page 17.

          THE COURT:  Counsel, when you come to a convenient breaking point in the next few minutes, we will take our morning break.

          MS. AXEL:  Thank you.

Q.   Were proposals that were passed by the DAO, implemented?

A.   Yes.  My understanding is that all of the proposals that were passed by the DAO were executed, that means they were implemented.

          MS. AXEL:  I would move this page, 17, in evidence.

          MR. ARAD:  Is it the one currently on the screen or the other one?

          THE COURT:  The one currently on the screen, the proposals.

          MR. ARAD:  No objection.

P7T5sto2                        Hurder - Direct

THE COURT:  Defendant's Exhibit 9050-17 is admitted into evidence.

(Defendant's Exhibit 9050-17 received in evidence)

MS. AXEL:  This would be a good time for a break.

THE COURT:  Let's take our morning break.  We will get back together in about 10 minutes.  I will ask you please not to discuss this case with each other or with anyone else.  Keep an open mind until all the evidence is received.

Thanks, everyone.  Please rise.

(Continued on next page)

P7T5sto2                        Hurder - Direct

(Jury not present)

THE COURT:  The witness can step down.

Very quickly, counsel.  Ms. Axel, do you believe your direct will take us through lunch?

MS. AXEL:  I doubt it.  According to my outline I would be three quarters done and I think it may move a little faster in this part, so I guess half an hour.

THE COURT:  That's fine.

And Mr. Arad, you are doing the cross, I imagine, so but your cross will extend beyond lunch?

MR. ARAD:  That is likely, your Honor.

THE COURT:  Thank you.

You are welcome to step out.  We are talking about a couple of logistical issues, out the front door of the courtroom.

(Witness steps down)

THE COURT:  Thank you so much.

Then there are two witnesses who remain or more or perhaps three?

MR. KLEIN:  Your Honor there is Dr. Green.

THE COURT:  Yes; is it Mr. Thurman?  Have I got the name wrong?

MR. KLEIN:  We are considering and we will talk about it over lunch whether we will be calling him.

THE COURT:  OK.

MR. KLEIN:  And he was a short witness, your Honor, 10, 15 minutes.

THE COURT:  That's fine.  Go ahead please, sir.

MR. KLEIN:  There are a few other things; obviously Mr. Storm possibly testifying and there is also, we have some stipulations that we would put in.  We may have a summary witness of three exhibits.  We sent it to the government last night so there is that.

That would be it.

THE COURT:  Is there a way to stipulate to the admission of three exhibits?  You want the summary witness anyway?

MR. KLEIN:  Yes, we want the summary witness.

THE COURT:  Who will not make this a summation based on all of our prior discussions.

MR. KLEIN:  It is three very, very short exhibits, including the one you let in yesterday, your Honor, that the jury hasn't seen.

THE COURT:  Yes.  I was wondering how is your summary witness going to get that in?  Through the government's -- authentication through the government's prior custodial stip regarding -- I am wondering how you are authenticating it.

MR. KLEIN:  We have an agreement with the government that if it is something that they are getting in as authentic it would come in for us, too.

P7T5sto2                         Hurder - Direct

THE COURT:  Sure.  Oh no.  I just think it undermines your complaints about their using custodial stipulations, which is fine by me, because I found that it was OK.

Is there a chance, sir, obviously you know where I am going with all of this.  Is there a chance you rest today?

MR. KLEIN:  Yes, your Honor.

THE COURT:  OK.  Is there a rebuttal case, of which I should be aware?

MR. REHN:  Just a moment, your Honor?

THE COURT:  I figured, Mr. Klein, you would want to know as well.

MR. KLEIN:  Absolutely, your Honor.

MR. REHN:  As of now, based on the witnesses that have been described, we would not intend to present a rebuttal case.

THE COURT:  OK.  Someone has to tell me.  When you make your final decision about your client or that will be a game time decision?  You will tell me at the end of the day today.

MR. KLEIN:  We are going to talk about it over lunch, your Honor.

THE COURT:  The reason I am asking is, and I know you want your break and I promise I will give it to you, but I would like -- if we are finishing with testimony today or if we finish tomorrow morning, I would like to explain to the jury what happens next, meaning that tomorrow they can anticipate

summations.  I want them to know today because I want them to understand that once the case is given to them, they choose how long they wish to stay.  If they wish to stay past 3:45, they can.  But I want them to know that today in case they have child care or employment obligations they need to work out. So, understand that I am very likely to be talking to them about that later on today.

I don't mean to sound like I don't know what I am doing here, but I really would like to know if we are coming near the end of the defense case, I would like to know.  If there is a rebuttal case, I would like to know.  So just, please, keep that in mind.

I will see you in 10 minutes.  Thank you very much.

(Recess)

(Jury present)

THE COURT:  Please be seated.  Thank you.

Counsel, you may continue.

MS. AXEL:  Thank you, your Honor.

Mr. DeMarco, if I could have back 9050.

BY MS. AXEL:

Q.  Dr. Hurder, did you form any opinions as to the TORN token's value based on its uses in governance?

A.  Yes.  One of the things that stood out to me about the data on voting in the DAO was the value of the TORN that users were willing to lock up in order to participate in voting.

So the chart that we have in front of us here looks very similar to the one we've been seeing before, but it has a couple of new columns.  It shows the total votes for each proposal, and it also has the price of TORN at the time that the proposal started, like the voting period started.  And so you can see, on the right-hand side, the column, what I call the value of voting TORN.  So in order for a user to participate in voting in the DAO, they had to do what—they had to do what's called staking their TORN, and once they staked their TORN, their TORN was unavailable to them for over a week.  So if they locked it up in staking and the price crashed and they wanted to sell it, there was nothing they could do about it.  And so what struck me was that, you know, if you look at proposal 5, that's almost $5.7 million worth of TORN that users

have staked in order to participate in voting.  And so what this indicates to me is that the user base was willing to put substantial capital, even in the short term, towards being able to participate in the DAO.

Q.  And Dr. Hurder, is it common for voting rights to be valuable?

A.  It is.  This is also a topic that is related to voting rights in equities as well.

Q.  What is the concept of opportunity cost?

A.  An opportunity cost is basically the cost of what you forgo when you choose what to do with the resource.

Q.  And how does that relate to this chart?

A.  So this chart itself does not display an opportunity cost, but the participants in voting are incurring an opportunity cost, right?  They are taking their TORN that they have paid valuable money to receive and they've chosen to use it by locking it up for a week in the Tornado Cash DAO.  That means they can't do things like stake it somewhere else in a rewards, they can't sell it, they can't give it away.

MS. AXEL:  First of all, I would offer this page, page 18, in evidence.

MR. ARAD:  No objection.

THE COURT:  Defense Exhibit 9050-18 is admitted into evidence.

(Defendant's Exhibit 9050-18 received in evidence)

BY MS. AXEL:

Q.   Are there certain tokens that you're aware of that have only the governance use case and have sustained value?

A.   There are many.  Especially during this period, governance tokens were a very popular form of token.

Q.   Okay.  Let me show you what is in evidence as 3603.

          MS. AXEL:  3603?

Q.   Dr. Hurder, do you recognize 3603?

A.   I do.

Q.   What is it?

A.   This is a spreadsheet of the prices of five different blockchain-based tokens, as well as computations on these prices.

Q.   And do you understand that the government put this in evidence based on data you had provided?

A.   That's correct.

Q.   And so Dr. Hurder, why did you provide data on what is listed there as UNI and COMP?

A.   So UNI and COMP are short for——UNI is the governance token of Uniswap, which is a decentralized exchange; and COMP is the governance token of a project called Compound Finance.  So these are two well-known governance tokens.

Q.   And have those tokens sustained value over time?

A.   They have.

Q.   What was the value as of this period of time, February

2022?

A.  You can see here that at the start of the time period, if you look on the left-hand side, there's the price list.  Column F is UNI, and column G is COMP.  And you can see, as of February 1, 2022, UNI is trading at $11.25 per token, and COMP is trading at $125.65 per token.

Q.  Okay.  And let's go back to our page 18.

And before we leave this, can you describe, what makes someone a DAO voter?

A.  What makes someone a DAO voter?

Q.  Yes.  How does one vote?

A.  In order to vote, one needs to acquire a certain amount of TORN, in this case, whatever the governance token is for the DAO; they need to stake the token, in this case the TORN; and then they need to participate.  They need to look at the proposal and hopefully read it and decide to vote for or against it.

Q.  And how does this relate, if at all, to users of the Tornado Cash pools?  Are those the same thing?

A.  No.  Those are different.

Q.  From your perspective, what influences the price of a blockchain-based token?

A.  Blockchain-based tokens' prices are driven by supply and demand.  Demand for tokens can be driven by many things.  You know, blockchain-based tokens are a relatively new asset class

P7T1STO3                        Hurder - Direct

compared to things like equities and bonds.  The types of things that can impact them are their uses, it can be general crypto market sentiment, it can be momentum, it can be social media activity, a variety of different things.

Q.  And what is a token use case?

A.  A use case is a purpose of a token, so it's the purpose of a token within a project.

Q.  What causes the most variation in the prices of token?

A.  In my experience and according to some research, a significant portion of token price variation is due to crypto market sentiment.

Q.  And did TORN have a use case when it was first implemented?

A.  Yes.  TORN was a governance token.  It was launched with the governance system in mind.

Q.  Was there ever any other use case?

A.  Yes, when the relayer registry was introduced.

Q.  How was that a use case?

A.  In order for a potential relayer to be listed in the registry, one of the things the relayer had to do was I believe acquire 300 TORN and stake 300 TORN.

Q.  Are there certain cryptocurrency tokens that you use as a baseline to measure market sentiment?

A.  Yes.  The classic that you probably hear about if you follow financial news is Bitcoin.  Bitcoin's price is frequently used as a proxy for the condition of the general

market.  ETH, Ethereum is also frequently used, especially when you're talking about projects that are built on Ethereum.

Q.  Okay.  And I'll show you page 19.  Did you prepare this chart?

A.  I did.

Q.  And what does it show?

A.  So this is a graph of the prices of ETH and Bitcoin over a relevant period of time, from June '21 through August of '22.  The orange line is Bitcoin and the blue line is ETH.  And what you can see from this overlay is that while their prices don't move exactly in tandem, there's a lot of similarity in how the prices move together, right?  So if you start on the left-hand side, they're kind of flat, and then they go down into this sort of W shape, and then they go up for a while, and then they come down and they sort of peak near the middle of the graph, then they come down and they're sort of in the middle for a while, they go up, and then they go down again.  So there's substantial co-movement in the prices.

Q.  What does it mean for movements to be correlated?

A.  It means that the—a change in one variable is associated with a change in the other variable.

Q.  Does one cause the other one to move?

A.  Not necessarily.

Q.  And what methods do you use to determine that BTC and ETH are correlated with one another?

A.   There are different forms of statistical analysis.
Correlation analysis is a common form.

Q.   What are some of the factors that might cause these to move
together?

A.   Crypto market sentiment, just generally similar to, you
know, if you invest in tech stocks, general tech sentiment is a
thing.  There's crypto market sentiments.

Q.   Have you also compared the price of TORN to these other
indexes?

A.   I did.

Q.   And showing you page 20, is that your comparison?

A.   It is.

Q.   What does it suggest about TORN?

A.   So looking at this picture, the blue and orange lines are
the same ones that we saw on the previous graph, so those are
the prices of Bitcoin and ETH, and you can see they're
following the same pattern that I described before.  The green
line is the price of TORN, and what you can see if you go
through the graph is that while TORN is not as closely
correlated with Bitcoin and ETH, as Bitcoin and ETH are with
each other, there are periods of substantial co-movement,
right?

         So all the way to the left, you can see that the price
of TORN goes up temporarily.  That's right around the time that
TORN is listed on Binance, which is a very, very well-known

exchange.  Then you can see that TORN sort of rejoins, it goes down a little bit, it follows up, goes across, and then there's a period in the middle where Bitcoin and Ethereum keep going up but TORN starts going down, but you can see that they're moving downwards sort of in parallel.

Then you get around to February of '22, TORN goes up a little bit, they meet up together, and then you can see at the end they kind of fall and move together before raising slightly at the end.

Q.  Did you use statistical analysis to determine whether over this period TORN was highly correlated with BTC and ETH?

A.  Yes, I found that TORN——the price movements of TORN were highly correlated with the price movements of Bitcoin and ETH. This was particularly true in sort of the latter third of this time period.

Q.  Late 2022, or mid-2022.

A.  Mid-2022.

Q.  Did you also look at specific Tornado Cash events on the price of TORN?

A.  I did.

Q.  Showing you page 21, what events did you note in your analysis?

A.  I looked at two events.  One of them was the introduction of the relayer registry, and the other was the announcement of the Ronin hack and its relationship to Tornado Cash.

P7T1STO3                      Hurder - Direct

Q.   And what did you observe about those events?

A.   So my analysis around when the Ronin hack was announced
was, there was a period afterwards where there was constant
news about the Ronin hack and the amount and its affiliation
with Tornado Cash, and I found that in the two-week period
after that news became public, the price of the TORN token fell
19 percent, and this was a greater decrease than was seen by
Bitcoin and Ethereum at the same time.

Q.   And what did you conclude about the relayer registry's
impact on the price and the value of TORN?

A.   I did not find evidence that the relayer registry
positively impacted the price of TORN.

Q.   Did you conduct any statistical analysis there?

A.   I compared the price movements of TORN after the launch of
the relayer registry to the price movements of Bitcoin and
Ethereum over the same time.

Q.   And what did you find?

A.   I found that after the launch of the relayer registry, the
price of TORN fell approximately 50 percent between the launch
period and the end of this graphical period, which was a
greater decrease than was exhibited by either Bitcoin or
Ethereum's price.

Q.   Showing you page 22.  Can you walk us through that
analysis.

A.   Yes.  So the green line, again, is the price of TORN.  And

P7T1STO3                          Hurder - Direct

on the 1st——the 1st of March of 2022 is the day that there is a Medium post that announces that the relay registry has passed and that it is up.  It has been announced.

Shortly after that, there is a price spike where it reaches——TORN reaches a local high of almost $60.  That's labeled on the left.  But from then on, the price of TORN remains relatively flat.

And by the time we reach the end of this period, on August 7th of 2022, the price of TORN has fallen 50 percent.

Q.   And why did you pick this two-week period?

A.   Could you repeat the question, please.

Q.   I'm sorry.  It's not two weeks.

Why did you pick this period for your analysis?

A.   This was——I wanted to be able to look at the——the full period where the relayer registry was in full force.

Q.   And you understand the relayer registry is active throughout this period.

A.   Yes.

Q.   Have you reviewed Government Exhibit 3601-5, which is in evidence?

MS. AXEL:  You may put it on the screen.

A.   I have.

Q.   What do you understand it to show?

A.   So this is a graph of looking at price changes of five different blockchain-based tokens.  So you can see on the right

they've labeled the colors.  Orange is TORN; light blue is ETH, green is Bitcoin; the purply-brown color is UNI; and the other blue is COMP.

And what this graph shows is it starts on February 1st.  It takes February 1st as its start date.  And it plots the changes in the prices of the token compared to each token's price on the 1st of February.

Q.  So these are absolute prices.

A.  No.  These are relative changes compared to a specific start date.

Q.  Okay.  And what is the most significant factor in this type of analysis?

A.  This type of analysis relies crucially on the choice of the start date.

Q.  And what is significant about the start date that the government chose?

A.  If we can move back to the graph of the three prices.

MS. AXEL:  And that's the next one, Mr. DeMarco, 23.

A.  So this is, again, the graph of the prices of the three tokens we've been talking about.  This is ETH, Bitcoin, and TORN.  The green line is TORN.

And if you look at the start date chosen in that graph, it's February 1st of '22, which isn't labeled on here, but it's right about that bottom point, around 2/7, you see where the token price in the green reaches its lowest.  It's

right around there.

Q.  And so that's fair to say that's near the bottom of the price on this entire period?

A.  It's among the lowest prices in this entire period, yes.

Q.  So looking back at the other date on 3601-5, do you think this is accurate to show the registry's effect on the TORN price?

A.  I think that this is a very advantageous choice of start date.  You can see from the picture that the price of TORN at this start date is relatively low.  So if it's going to go up, it's going to exhibit or, you know, be depicted as having this big increase.  I think if a different start date had been chosen, the graph might look quite different.

Q.  Can you rule out that the announcement in the tweet and the article caused an increase in the price?

A.  Could you clarify, please.

Q.  Can you rule out that the announcement, which is depicted as the March 1st event, caused the rise in the price?

A.  It's possible that there was a reaction.

Q.  But why do you focus on a longer period of time, going back to your chart, which is at page 22?

        MS. AXEL:  One more back.

        THE WITNESS:  Different one.

        MS. AXEL:  Yeah.

A.  I think there's a couple of reasons.  If we could actually

P7T1STO3                         Hurder - Direct

go back to the government's exhibit.

Q.  Okay.

A.  I think first, you know, the government has highlighted this two-week period between the teal and the purple.  I think one thing to note there is that even though the relayer registry was proposed on February 14th, it wasn't approved until voting was over on the 19th, right?  So there wouldn't have been news that the relay registry was approved until halfway through this period.

And I also think that, you know, it's entirely possible that the market for TORN anticipated the launch of the relayer registry, but if the relayer registry had a fundamental effect on the demand of TORN, I would also expect to see price movements after the relayer registry had launched.  And as we've shown on the previous graphs, once the relayer registry launched, the price stayed flat and then fell to a greater degree than the market comparables.

Q.  Going back to your chart 22, do you believe proposal 10 had the effect of driving up the price of TORN?

A.  I don't see conclusive evidence that it did.

Q.  Is there another event you looked at to analyze the value and price of TORN?

A.  I looked at the announcement of the Ronin hack.

Q.  What did you understand was the Ronin hack?

A.  The Ronin hack was a hack, I believe it was conduct──it

turned out to be conducted by the Lazarus Group, but it was a hack of several hundred million dollars' worth of stolen coins.

Q.  And what did you——well, let me show you.  Let's look at what you prepared as page 24.

What did you conclude was the effect of the Ronin hack on TORN's price?

A.  So in this instance, I was interested in looking at whether news that Tornado Cash was——the Tornado Cash pools was affiliated with this enormous hack had on the token price, and what I found was that the token price decreased 19 percent in the two weeks after the announcement of this relationship, which was greater than the relative price decrease of the comparables.  And what this indicates to me is that the TORN price is not benefiting from news of alleged association with this hack activity.

Q.  And why did you pick this period of two weeks for your analysis?

A.  So I felt that two weeks was sufficient for, you know, news to travel and potentially be incorporated into the price.

In addition, in any analysis like this, events happening over and over and over again, right, so lots of stuff is happening, and it can be difficult to sort out all the different confounding factors, so I felt that this was a time period that was sufficiently long but there weren't other affiliated events that could potentially also have effects of

their own.

Q.   And are there any other reasons—before I leave this one, are there any other reasons to suggest that the Ronin hack would not benefit the price of TORN?

A.   Yes.  I also looked at the alleged deposits of Ronin hack proceeds into the Tornado Cash smart contracts.  This was data provided by Agent DeCapua.

Q.   And what did you conclude by looking at that?

A.   There was no correlation between the volume of these alleged Ronin hack proceed deposits and changes in the price of TORN.

Q.   Anything else you relied on that I'm forgetting?

A.   No.  I conducted a variety of statistical analyses.

Q.   And looking at page 25.  You indicated before that—well, let me ask you, the highest TORN price on this particular time period was when?

A.   The highest TORN price during this time period was the 1st of September of 2021, where it was approximately $79 a token.

Q.   And what does that event correlate with?

A.   This was just a post-price high.  The time period I'm looking at here is the time period during which TORN is listed on an exchange called Binance.  So this is when the token is going to have plenty of liquidity, plenty of exposure, and is not going to suffer from sort of, you know, un—arbitrary jumps in price due to mechanical problems.

Q.   And do you attribute the June 11th peak in that period to the Binance listing?

A.   It could be related, yes.

Q.   How?

A.   Frequently when tokens are listed on prestigious exchanges, there is a short-term bump in their price due to things like increased liquidity and the marketing exposure from the listing.

Q.   And this period that you've shown here is only June 2021 through August 2022.  Is this the highest price that TORN ever sold for?

A.   No.  During the very initial launch, when there was very little TORN in circulation, there was maybe less liquidity, I believe TORN reached a price of over $400 a token.

          MS. AXEL:  No further questions, your Honor.

          THE COURT:  Cross-examination.

CROSS EXAMINATION

BY MR. ARAD:

Q.   Hello, Dr. Hurder.

A.   Good morning.

Q.   We have not met before, correct?

A.   I believe we have not.

Q.   I'm Ben Arad.  I'm one of the members of the prosecution team.

A.   Good to meet you.

Q.  You as well.

Let's start with the scope of your testimony here today.

I want to be clear.  You don't know what was in the defendant's head when he and his co-founders started Tornado Cash, right?

A.  Are you referring to the pools?

Q.  Any part of Tornado Cash.

A.  No, I don't.

Q.  You weren't there with him at the time, right?

A.  No.

Q.  And you didn't talk to him about his intentions at the time, right?

A.  No.

Q.  About the pools?

A.  No.

Q.  About any part of Tornado Cash?

A.  No.

Q.  You weren't there when the defendant promoted the relayer network, were you?

A.  I was not.

Q.  And so you don't know what he was thinking when he promoted the relayer network, do you?

A.  I don't.

Q.  You don't know what his motivations were.

A.   I don't.

Q.   And can we agree that Tornado Cash hid criminal proceeds?

A.   I'm sorry.  You're going to have to be more specific.

Q.   At some point in time are you aware that criminals used Tornado Cash to hide their money?

A.   According to, among other things, the data provided by the prosecution, I would have to say yes, based on that.

Q.   So we agree, criminals used Tornado Cash to hide their money.

A.   Based on the available information, yes.

Q.   Do we agree that North Korean hackers used Tornado Cash to hide their money?

A.   According to—give me one second.

     Based on what I've reviewed, if we affiliate the Ronin hack proceeds with North Korean hackers and rely on the data from Agent DeCapua, then yes.

Q.   And you don't know, do you, whether the defendant thought that was a good thing?

A.   I don't.

Q.   You didn't discuss it with him.

A.   I've never met the defendant.

Q.   Let's talk about that.  In fact, you started working on this case after the defendant was indicted, right?

A.   That's correct.

Q.   When exactly did you start working on this case?

A.   I would need to check my engagement letter, but I believe it was October of last year.

Q.   And you work at a paid consulting firm called Prysm Group, right?

A.   That's correct.

Q.   You're a founding economist there?

A.   I am.

Q.   Clients pay you and your firm to do work for them.

A.   They do.

Q.   Clients like the defendant?

A.   Blockchain-based projects.

Q.   How about the defendant?

A.   To my knowledge the defendant has never engaged Prysm Group.

Q.   Or you?

A.   No.

Q.   And the defense team?

A.   I'm sorry?

Q.   Did the defense team engage you or Prysm Group?

A.   The defense team has engaged me as an individual in one prior case as an expert.

Q.   So Prysm Group is not engaged——

A.   No.  In this case I am an individual.  I'm engaged as an individual expert.

Q.   You're making a lot of money to work on this case, right?

A.   I'm being compensated.

Q.   I can rephrase.  Your billing rate is $500 per hour, correct?

A.   That's correct.

Q.   And so far the defense has paid at least $120,000 for your work on this case, correct?

A.   I believe that's correct.

Q.   Is there an outstanding balance that you're owed for your work on this case?

A.   I have been paid all of the invoices I've submitted.

Q.   And have you been paid $120,000 or more than that?

A.   That's approximately the sum total of the invoices I've submitted and been paid.

Q.   Now part of the time that you spent working on this case has been spent meeting with the defense, right?

A.   That's correct.

Q.   How many times did you meet with the defense?

        THE COURT:  You mean in person, telephonically, by Zoom, or any communications?

        MR. ARAD:  That was going to be my next question.

        THE COURT:  Excuse me.  Then I won't ask it.

        MR. ARAD:  I mean in any form.

A.   Let me think about it for a second.  It's been several months.

Q.   Sure.

A.   Without being able to consult my calendar, I'm going to say it's approximately 10.

Q.   And did you see some of their legal filings in this case.

Dr. Hurder, didn't you testify earlier that you saw some of their legal filings in this case?

A.   I did.

Q.   Did you speak with the defense about the positions that it was taking in this case?

A.   To a limited extent.  I'm not—not in detail about the—

Q.   Just answer the questions yes or no, please.

A.   Okay.

Q.   Did you speak with the defense about the positions that it was taking in this case?

A.   Some of them related to the topics I was analyzing.

Q.   I'll ask you to answer yes or no, please.

A.   Yes.

Q.   So you got a sense of some of the arguments they were making?

A.   Yes.

Q.   Some of the positions they were taking?

A.   Yes.

Q.   Let's talk more about your meetings with the defense.

Were these in-person or remote meetings?

A.   The bulk of them were remote.

Q.   And during any of these meetings did you notice whether

anybody on the defense team was taking notes?

A.   They were mostly audio only, so no.

Q.   On any video calls or any in-person meetings, you didn't see anybody taking notes?

A.   I don't recollect what—witnessing someone taking notes.

Q.   And there were times you sent emails to the defense about your anticipated testimony, right?

A.   That is correct.

Q.   Since the time you began working on this case, approximately how many emails?

A.   Again, without being able to access my email, I would say one—maybe one to two dozen, if that many.

Q.   And how about other written communications, texts or chat messages?

A.   I have a logistical chat with one member of the team so I know what room to go to.

Q.   Nothing substantive there?

A.   No.

Q.   Now you prepared slides in anticipation of today's testimony, I think you testified, along with a design group and with the defense team, right?

A.   That's correct.

Q.   So you prepared some of the slides?

A.   I provided the data for many of the slides.

Q.   And who actually made the slides?

A.   The graphic design team and counsel.

Q.   Counsel meaning defense counsel?

A.   Yes.

Q.   When were these slides prepared?

A.   Over the course of several weeks.

Q.   And are there drafts of those slides that the defense did not show the jury?

A.   Yes.

Q.   Are there other charts and slides that you and your team prepared that were not shown to the jury?

A.   Could you clarify, please.

Q.   Are there any other charts or slides that you prepared in preparation for your testimony here that were not shown to the jury?

A.   I made a couple of draft text slides.

          THE COURT:  I believe the question he's asking is, might there have been slides that you were considering talking about but then ultimately didn't make it into the final cut?

          THE WITNESS:  Yes, that is true.

          THE COURT:  Okay.

Q.   Now were all the charts or slides that you prepared disclosed to the government?

          THE COURT:  I don't know how she would know.

A.   I don't know the answer to that question.

Q.   All right.  Let's switch gears.  Let's talk about TORN.

P7T1STO3                       Hurder - Cross

A.   Okay.

Q.   We can agree that TORN was the way the defendant and his co-founders intended to profit from Tornado Cash, right?

A.   I think you'll have to be more specific.

Q.   TORN was part of the plan to make a profit off Tornado Cash; isn't that right?

A.   I think if you're referring to the Tornado Cash smart contracts, that's not necessarily the case.

Q.   I'm referring to Tornado Cash overall.  TORN was part of the plan to make money off Tornado Cash overall, correct?

A.   Tornado Cash has different parts.  There's the smart contracts, there's the UI, there's the CLI, there's the DAO.

Q.   I'd appreciate it if you'd answer my questions yes or no, please.

     Tornado Cash as a whole.  Was TORN part of the plan to profit from Tornado Cash as a whole?

     MS. AXEL:  Objection.

     THE COURT:  I'll allow.

A.   I think that the founders hoped that the asset would be profitable.

Q.   What about their investors?

A.   I think investors generally hope that their investments are profitable.

Q.   And here, one way that investors planned to profit off Tornado Cash was through TORN, right?

A.   Yes, the——

          THE COURT:  I'm sorry.  I just need to know this.  Do you want yes or no answers, do you not want yes or no answers?

          MR. ARAD:  Yes or no answers, please.

          THE COURT:  All right.  I'm going to ask you to respond yes or no, and the defense counsel may ask you questions on redirect for more information.  Thank you so much.

A.   Could you repeat your question, please.

Q.   One way the investors planned to profit off of Tornado Cash was through TORN, correct?

A.   Yes.

Q.   They gave the defendant real money to invest in Tornado Cash, correct?

A.   They gave the defendant real money to invest in the TORN token.

Q.   And they stood to profit from that token that they paid real money for, correct?

A.   Yes.

Q.   They invested about $900,000 in Tornado Cash, right?

A.   The token grant was for $18,000.

Q.   The investors invested about $900,000 in Tornado Cash, correct?  And I'll ask you to answer yes or no.

A.   That's not correct.

          MS. AXEL:  Objection.

Q.   Did Dragonfly Capital not invest approximately $900,000 in

Peppersec?

A.   They invested it in Peppersec.

         THE COURT:  Yes or no, please.

A.   Okay.  Then could you repeat the question.

Q.   Did Dragonfly invest $900,000 in Peppersec?

A.   Yes.

Q.   And in return for that investment, one of the things that it got was TORN tokens, right?

A.   That's correct.

Q.   And TORN was a way to profit off Tornado Cash, as a whole, right?  That was your testimony?

         MS. AXEL:  Objection.

         THE COURT:  Overruled.  You may answer.

A.   It was a way to profit from——

         THE COURT:  No, no.  Please, yes or no.  Or yes, no, or I don't know.  Those are your choices.

A.   Yes.

Q.   Now when the defendant started Tornado Cash, he set it up so that he would get a bunch of TORN up front and he couldn't use it for a while, right?

A.   That's correct.

Q.   But eventually he would be able to use it.

A.   That's correct.

Q.   And he would get more over time, correct?

A.   Yes.

Q.   And if that TORN ended up being worthless, he wouldn't make money on it, right?

A.   That's correct, if the token wasn't worth anything.

Q.   But if the TORN ended up being really valuable, he could make a profit, right?

A.   That's correct.

Q.   So we can agree that the more valuable TORN became, the bigger the profit the defendant would have made, right?

A.   That's correct.

Q.   And ordinary folks out in the world, they could also buy TORN, right?

A.   They could.

Q.   One thing they could do with that TORN is they could hold it to see if it went up in value, right?

A.   Correct.

Q.   So let's talk now about the value of TORN.

        We can agree that one important part of the value of TORN is the supply of TORN, right?

A.   That's correct.

Q.   And another important part of the value of TORN is the demand, right?

A.   Correct.

Q.   And the supply is how much TORN is out there, right?

A.   Correct.

Q.   And the demand is how much people want TORN, right?

P7T1STO3                          Hurder - Cross

A.   Correct.

Q.   All else equal, if the supply of TORN stays the same and more people want it, the value goes up, right?

A.   Yes.

Q.   You testified that one reason TORN is valuable is because people who hold TORN can vote on things that Tornado Cash does, right?

A.   On topics related to the DAO, yes.

Q.   And you call those governance rights, correct?

A.   Yes.

Q.   We can agree that governance rights are not the only reason that TORN is valuable, right?

A.   I would agree with that.

Q.   I'm sorry?

A.   Yes.

Q.   Okay.  So we can agree that more than one thing drove the value of TORN, correct?

A.   Yes.

Q.   One way governance rights can be valuable is that people think it's fun or useful to vote on governance matters, correct?

A.   That's correct.

Q.   And if a lot of people want to participate, demand goes up, correct?

A.   That's correct.

Q.   And all else equal, the price goes up, right?

A.   If the increase in demand is sufficiently large, yes.

Q.   Now another way that governance rights can be valuable is if they give people authority over how TORN can be used, right?

A.   That's correct.

Q.   And whether it can be sold?

A.   That's correct.

Q.   So let's look at the DAO proposal slide that you just testified about.

MR. ARAD:  Mr. Iannuzzelli, can you please put up slide 17.

Q.   Now you tallied the number of voters for each of these proposals, right?

A.   That's correct.

Q.   And when you say voters, by the way, do you mean individual people?

A.   I believe it's counting the number of addresses.

Q.   But you think that that's a good proxy for individual people, right?

A.   Sure.

Q.   And I think you testified that proposal No. 1 here got more votes—sorry—had more voters than any other proposal; isn't that right?

A.   From this chart, that's true.

Q.   And by a lot, right?

A.   That's true.

Q.   I mean, the next highest proposal is proposal 4 with 61 votes, right?

A.   That's correct.

Q.   So let's talk about this proposal that a lot of people voted on, proposal 1.

A.   Yes.

Q.   You described it as a proposal to enable TORN transfers, right?

A.   That's right.

Q.   And earlier you testified that this proposal was necessary because holders of TORN couldn't transfer it before the proposal, right?

A.   That's correct.

Q.   That also means they couldn't sell it, right?

A.   I believe that's correct.

Q.   And so this proposal allowed TORN holders to sell TORN, right?

A.   Yes.

Q.   And if somebody wants to profit off of TORN, they have to sell it, right?

A.   Yes.  Or they need a very fancy alternative contract.

Q.   I'll ask you to answer yes or no, please.

A.   Yes.

Q.   So one reason governance rights are valuable is that they

gave people the ability to vote on measures that would affect their ability to profit off of Tornado Cash, right?

A.   Yes.

Q.   And in fact, this particular proposal had more voters than any other proposal, right?

A.   Yes.

MR. ARAD:   We can take this down, Mr. Iannuzzelli.

Q.   I want to switch now to talk about the relayer registry. You're familiar with that, correct?

A.   I am.

Q.   You testified about it in your direct examination?

A.   I did.

Q.   We can agree that TORN token holders voted to adopt the relayer registry, right?

A.   That's correct.

Q.   And that relayer registry made people pay TORN to the DAO if they wanted to be a relayer, right?

A.   They were required to stake DAO.

Q.   Let's walk through an example.

Someone wants to register as a relayer.

A.   Mm-hmm.

Q.   That person needs——

THE COURT:   Please excuse me.   Can I just ask you to answer yes or no, please.   It's easier for the court reporter.

THE WITNESS:   Okay, sure.

Q.   That person needs to go out and get TORN, right?

A.   Yes.

Q.   So all else equal, that increases the demand for TORN, right?

A.   It can.

Q.   It can or it does, all else equal?

A.   It does.

Q.   And then the relayer needs to stake that TORN, stake, right?

A.   That's correct.

Q.   In order to register.

A.   Yes.

Q.   And then they also need to stake more TORN to increase their odds of being chosen as the relayer, right?

A.   That's correct.

Q.   And so all else equal, demand for TORN goes up again, right?

A.   That's correct.

Q.   Now the relayer registry also made Tornado Cash even more effective at concealing money, right?

A.   I'm sorry.  You'll have to clarify.

Q.   The relayer registry—actually, let's start more basic than that.

        Tornado Cash conceals money, right, the source of funds?

THE COURT:  Do you want to ask the question differently, sir.

MR. ARAD:  Sure.

Q.  Earlier, you testified that Tornado Cash has been used by criminals to conceal the source of funds, did you not?

A.  According to the evidence that's put in, yes.

Q.  Yes, according to the evidence.  And so one of the things that Tornado Cash does, the main thing, is hide the source of funds, right?

A.  It can.

Q.  Now the relayer registry made it even better at that, right?

A.  You'll have to explain further.

Q.  You studied the relayer registry, right?

A.  I did.

Q.  You know generally how it works, right?

A.  Mm-hmm.  Yes.

Q.  So you know that it enables a customer to withdraw funds into a completely new wallet, right?

A.  Yes.

Q.  Clean wallet?

A.  Yes.

Q.  And that that address would be untraceable to the user on the blockchain, right?

A.  Yes.

Q.  And so I'll ask again.  Does the relayer network make Tornado Cash more effective at concealing funds?

A.  I would say the answer is no.  Relayers were already——

THE COURT:  All right.  I think he just wanted a yes or no answer.

MR. ARAD:  I did just want a yes or no answer.

Q.  Without a relayer, could a user of Tornado Cash withdraw money into a new clean wallet?

A.  No.

Q.  So a relayer was necessary to withdraw money into a new clean wallet, right?

A.  That's correct.

Q.  That would be untraceable, right?

A.  That's correct.

Q.  Is your answer still no, that the relayer network did not help Tornado Cash conceal money?

A.  I——I stay with the same answer.

Q.  Let's talk about motivations again.

The voters who voted on the relayer network proposal, you didn't poll them, did you?

A.  No, I did not.

Q.  So you didn't ask them what their intentions were?

A.  No.

Q.  You didn't ask them if they were voting because they thought it was fun to participate in governance or because they

wanted to make a profit off of TORN, did you?

A.   No.

Q.   So you don't know what their motivations were, do you?

A.   I don't.

Q.   But you do know that the relayer registry governance vote caused a huge spike in the price of TORN, don't you?

THE COURT:   Time period, sir?

MR. ARAD:   Right after the relayer registry governance vote, February 2022.

THE COURT:   All right.  Thank you.

A.   Would it be possible to be more specific about the time period?

Q.   Sure.  Let's look at the data.

MR. ARAD:   Mr. Iannuzzelli, could you please put up Government Exhibit 3601-5, which is in evidence.

Q.   This time period, where TORN goes up.

A.   The vote is taking place during part of that period.

Q.   And after that period do you see that the price of TORN goes up?

A.   It does.

Q.   And what happens to the prices of all of the other coins on this chart?

A.   They have remained relatively steady compared to the price of those tokens on the 1st of February.

Q.   Let's get straight to the point, and I'll ask you to answer

this one yes or no.  Do they go down?

A.  Some of them do, some of them don't.  It varies over the time period.

Q.  You testified earlier that the meaning of the data in this chart is that every day's price is compared to the price on February 1st, right?

A.  That's correct.

Q.  And so do you see that TORN ends 123 percent higher than it was on February 1st?

A.  Yes, that's right.

Q.  And do you see that every other coin here ends lower than it was on February 1st?

A.  On that end date, yes.

Q.  So I'll ask the question one more time.  Did the prices of the other coins decrease during this period?

MS. AXEL:  Objection, your Honor.

THE COURT:  I will allow.

A.  Yes.

Q.  Now, Dr. Hurder, would you say that the price increases here are notable?

A.  Are—could you repeat, please?

Q.  Would you say that the price increases in TORN here are notable?

A.  Yes.

Q.  What's notable about them?

A.   I mean, a price increase of 123 percent is large.

Q.   More than a doubling, right?

A.   That's correct.

Q.   And you testified earlier that in general, TORN was correlated with Bitcoin and ETH, right?

A.   Yes.

          (Continued on next page)

BY MR. ARAD:

Q.   Is it correlated during this time period?

A.   If you look at the period from --

Q.   Yes or no, please.

        MS. AXEL:  Objection, your Honor.

        THE COURT:  No.  I will allow.

A.   It actually is for part of the period.

Q.   For the entire period, which was my question, is the price of TORN correlated with the price of BitCoin and ETH?

A.   Without having run the correlation for this specific time period I would say it still is.

Q.   So your testimony is that for this time period, when TORN went up by 123 percent and Bitcoin went down by 10 percent and ETH went down by negative 6 percent, they were all correlated to each other?

A.   Correlation is a number that comes in a range.

Q.   Yes or no, please.

A.   Yes.

        MR. ARAD:  We can take this down.  Mr. Iannuzzelli, can you please pull up slide 18 of Dr. Hurder's slides?

Q.   Dr. Hurder, it was your testimony that governance rights were valuable because people staked valuable TORN in order to vote; right?

A.   That's correct.

Q.   And you pointed to Proposal 5 on this slide; right?

A.   That's correct.

Q.   And you pointed to the fact that people staked about $5.69 million worth of TORN in order to vote on that proposal; right?

A.   That's correct.

Q.   Did they lose $5.69 million worth of TORN?

A.   No.

Q.   Did they get it back?

A.   They did.  Well, they --

Q.   After how many days?

A.   They received the same tokens back.

Q.   After how many days did they get the TORN back?

A.   It is approximately 8.25, I believe.

Q.   So they had to give up about $5.6 million worth of TORN for approximately 8.25 days?

A.   That's correct.

Q.   And what do you think that's worth?

A.   It -- the price of TORN was extremely volatile during this period.  It's potential that the price of those tokens could have fallen significantly during that week-long period.

Q.   So you don't know what it is worth that people gave up $5.6 million worth of TORN for 8.25 days?

A.   I haven't run the specific calculation, no.

Q.   That would be the opportunity cost, wouldn't it?

A.   That would be the opportunity cost.

Q.   And you testified earlier about the opportunity cost, didn't you?

A.   I did.

Q.   You said that the opportunity cost is what you give up for not doing the next best thing to whatever you do; right?

A.   That's correct.

Q.   And your whole point here is that people were giving up a lot in order to do this; right?

A.   They were incurring an opportunity cost; yes.

Q.   Is your point here that people were giving up a lot in order to vote on governance proposals?

A.   Yes.

Q.   But you don't know what the opportunity cost was, do you? That was your testimony a moment ago, wasn't it?

A.   I would need to run the numbers for the specific proposals.

Q.   So you didn't run the numbers?

A.   Not for all the specific proposals.

Q.   So you don't know?

        MS. AXEL:  Objection, your Honor.

        THE COURT:  No, I will allow.

A.   I don't know the specific numbers.

Q.   Let's keep talking about the value of TORN?

        MR. ARAD:  We can take this down, Mr. Iannuzzelli.

Q.   You analyzed how the price of TORN changed after the Ronin hack; right?

P7T5sto4                        Hurder - Cross

A.   After the announcement of the Ronin hack, yes.

Q.   Important distinction and we will get to that in a minute.

     The Ronin hack was when North Koreans hacked the Ronin network; right?

     MS. AXEL:  Objection, your Honor.

     THE COURT:  I'm not sure she knows.

     Do you have knowledge of what the Ronin hack is?  And if you don't, that's fine?

     THE WITNESS:  Basic knowledge.

     THE COURT:  Counsel, ask very specific questions.

     MR. ARAD:  Sure.

BY MR. ARAD:

Q.   The hackers who used the Ronin hack used Tornado Cash to hide their funds; correct?  You testified to that earlier?

A.   According to the evidence provided by the prosecution, yes.

Q.   And you concluded that the Ronin Hack was not good for the price of TORN; right?

A.   That's correct.

Q.   In fact, what you are getting at is it was bad for the price of TORN; right?

A.   Yes.

     MR. ARAD:  But I want to get into the specifics of your analysis so can we please pull up slide 24?

Q.   Now, you testified that news of the Ronin hack went public on March 29; right?

A.   That's correct.

Q.   And earlier, when I asked you if you analyzed the price of the effect of the Ronin Hack on the price of TORN, you said -- you corrected that you focused on when the news was announced; right?

A.   That's correct.

Q.   You made that distinction; right?

A.   Yes.

Q.   Because March 29 was an important input to your analysis; right?

A.   It was the date of the first news of the Ronin hack.

Q.   That's right.

     And it wasn't the date that the Ronin hackers first deposited funds into Tornado Cash; right?

A.   That's correct.

Q.   That date was April 4; right?

A.   Correct.

Q.   So, let's look at how the price of TORN changed beginning on April 4 when the hackers started actually using Tornado Cash.  Did you analyze that?

A.   I did.

Q.   OK, let's do it together?

     MR. ARAD:  Mr. Iannuzzelli, can you please display Government Exhibit 3602, which is in evidence?

Q.   Dr. Hurder, this is the pricing data that you relied on for

P7T5sto4                        Hurder - Cross

your analysis; right?

A.   That's correct.

Q.   You pulled this data yourself; right?

A.   Yes.

Q.   Do you see that the spreadsheet shows the prices of TORN, Bitcoin and ETH in tabs on the bottom?

A.   That's correct.

Q.   And a few other cryptocurrencies too?

A.   Yes.

Q.   Let's focus on the first three.  We can start with the price of TORN on April 4, which is the date that hackers from the Ronin hack started using Tornado Cash.

        MR. ARAD:  Mr. Iannuzzelli, could you please scroll down to cell B 423?

Q.   Do you see the price there?

A.   Yes.

Q.   What is it?

A.   $45.76.

Q.   And what is the date?

A.   That is the 4th of April of 2022.

Q.   So, let's check out the price on May 19 when Tornado Cash finished mixing the Ronin hackers' funds, that is cell B 468.

        MS. AXEL:  Objection, your Honor.

        THE COURT:  I will allow.

A.   $37.49.

Q.   So that's gone down; right?

A.   Yep.

Q.   About 18 percent?

A.   That's about right.

Q.   So now let's compare the price drops in Bitcoin and in ETH.

MR. ARAD:   Mr. Iannuzzelli, if you could please go to the Bitcoin tab and go to cell B 4286.

Q.   What is the date there?

A.   That is the 4th of April of 2022.

Q.   And the price?

A.   $46,014.87.

MR. ARAD:   Mr. Iannuzzelli can you please go to cell B 4331?

A.   $29,579.09.

Q.   And so that went down; right?

A.   It did.

Q.   About 35 percent?

A.   It did.

MR. ARAD:   So for ETH now, Mr. Iannuzzelli, if you could please go to the ETH tab?  Let's compare cell B 2437.

Q.   What is the date there?

A.   That is the 4th of April of 2022.

Q.   And what is the price?

A.   $34,077.68.

MR. ARAD:   And Mr. Iannuzzelli, if you can go to cell

B 2482?

A.   That's $1969.92.

Q.   And that went down; right?

A.   It did.

Q.   About 43 percent?

A.   I'll take your word for the percentage.

Q.   So let's recap.   TORN went down 18 percent; right?

A.   OK.

Q.   Bitcoin went down 35 percent; right?

A.   OK.

Q.   And ETH went down 43 percent; right?

A.   Yes.

Q.   Fair to say that during the time period when the Ronin hackers were depositing funds into Tornado Cash, TORN performed notably better than Bitcoin and ETH?

A.   There were also others.

Q.   Yes or no, please.

A.   Yes.

         MR. ARAD:   Mr. Iannuzzelli, could you please go to the last slide in Dr. Hurder's deck?   I am actually looking for the slide with the 50 percent drop in the price of TORN.   Sorry if it is not the last one.   There we go.

Q.   Dr. Hurder, earlier you used the words "advantageous choice of start date" to describe one of the government's charts; right?

A.   Yes.

Q.   And you thought it was advantageous because the government started at a low point; right?

A.   Yes.

Q.   Where is the price of TORN highest on this chart?

A.   The 3rd of March.

Q.   Is that where you started your analysis?

A.   That's correct.

Q.   Is that how it got to 50 percent down?

A.   That is the numerical calculation.

Q.   I want to switch topics now from advantageous start dates to control.

        MR. ARAD:  We can take this down, Mr. Iannuzzelli.

Q.   You testified earlier that DAOs decentralized control; right?

A.   That's correct.

Q.   That just means basically that decisions about the entity or the project involved are made by a group of people that may or may not know one another; right?

A.   Yes.

Q.   We can agree that not all DAOs are built the same way; right?

A.   That's correct.

Q.   And they exist on a spectrum; right?

A.   Yes.

Q.   Some DAOs are more decentralized than others; right?

A.   Yes.

Q.   And DAOs that have tokens, some people who have tokens can vote on pretty much everything and other DAOs that have tokens, people can vote on just a few things; right?

A.   Right.

Q.   And how much power the DAO has depends on how the project is set up; right?

A.   That's correct.

Q.   We can also agree that how powerful a DAO is depends on how many votes the founders have compared to everybody else; right?

A.   Let me think about that for a second?

Q.   Sure.

A.   Yes.

Q.   So let's walk through an example.  Suppose a DAO has issued a thousand tokens, each with one vote; OK?

A.   Yes.

Q.   Imagine the founder has 900 tokens?

A.   Yes.

Q.   Imagine 100 other investors have one token each.

A.   OK.

Q.   And imagine that majority vote wins.  Can we agree that everybody can vote but really the founder has the power to decide any one of those votes?

A.   If he chooses to exercise his votes.

Q.  The question was whether the founder has the power, not whether he chooses to exercise it.

A.  Yes.

Q.  And I will ask you to please answer the questions yes or no.

So, let's turn to talk about Tornado Cash.  Roman Storm and his co-founders had about 2.5 million TORN, right?  A little bit under that?

A.  I'm multiplying.  Hold on.  Approximately.

Q.  I admire your mental math.

And about 800,000 of TORN that they had vested in December of 2021; right?

A.  Across the three of them you mean?

Q.  Yes.

A.  That's correct.

Q.  Now, the total number of votes on a particular proposal reflected the amount of TORN that was staked for that vote; right?

A.  Yes.

MR. ARAD:  Mr. Iannuzzelli, could you please put up slide 15 of Dr. Hurder's deck?

Q.  Looking at the total votes column, the highest number of votes cast on any of these proposals was 173,829; right?

A.  That's correct.

Q.  That's the one on the bottom?

A.   Yes.

Q.   And the founders collectively had about 800,000 vested TORN by that time; right?

A.   That's correct.

Q.   And so, each one of them had -- and you are better at mental math than I am -- but well over 200,000 TORN; right?

A.   That's correct.

Q.   So any one of those could have potentially decided this election, right, and together they definitely could have?

A.   Yes.

Q.   And that was also true of Proposal 12; right?

A.   Yes.

Q.   And it was also true for Proposal 11; right?

A.   Yes.

Q.   And it was also true for Proposal 10; right?

A.   Yes.

Q.   But it wasn't true of Proposals 1 through 9; was it?

A.   I can't fully answer that with a yes or no.

Q.   Let's break it down.  The founders had 800,000 TORN that vested in December of 2021; right?

A.   Yes.

Q.   And you testified earlier that the fact that their TORN hadn't vested until then meant that they couldn't use it to vote on governance proposals; right?

A.   That's right.

Q.   So the founders were not able to use their TORN to vote on Proposals 1 through 9; right?

A.   That's correct.

Q.   But the way that they designed the system, their TORN vested in December 2021; right?

A.   Yes.

Q.   And all of a sudden they had all of this power to decide every proposal; right?

A.   They did.

Q.   So Tornado Cash became less decentralized over time, not more; isn't that right?

A.   The distribution of tokens became less decentralized.

Q.   Please answer yes or no.

A.   Yes.

Q.   Dr. Hurder, I want to shift back to TORN.  We have talked a lot about it and you testified that TORN is a governance token; right?

A.   That's correct.

Q.   But at the end of the day, Dr. Hurder, Roman Storm and his co-founders created TORN; right?

A.   No.

Q.   Roman Storm and his co-founders designed TORN and turned it into a proposal; right?

A.   Yes.

Q.   So Roman Storm and his co-founders designed the TORN token;

right?

A.   I believe that's true.

Q.   And they got a bunch of it; right?

A.   Yes.

Q.   And they sold it for millions of dollars; right?

A.   Based on the sales data I have been --

Q.   Please answer yes or no.

A.   Yes.

Q.   They sold it for millions of dollars; right?

A.   They did.

         MR. ARAD:   No further questions.

         THE COURT:   Redirect.

REDIRECT EXAMINATION

BY MS. AXEL:

Q.   Dr. Hurder, can we look at your slide deck 9050-1 and can we look at, for example, page 2?

         Dr. Hurder what was your role in preparing this slide deck?

A.   I provided the information on the slides.

Q.   And does this relate to the disclosure that you provided to us and to the government?

A.   Yes.

Q.   So you have extensively reviewed this document?

A.   Many, many, many times.

Q.   Does it appropriately capture your conclusions and

opinions?

A.   It does.

Q.   Have you made personal edits to it?

A.   Many, many, many times.

Q.   For example, page 5 of this document, Dr. Hurder, where did this come from?

A.   That is taken from a slide that I made and sent to you.

Q.   And the data underlying all of the charts, where did that data come from?

A.   I downloaded it.

Q.   And with respect to the pricing, let's take a look at page 19.  How were these charts derived, Dr. Hurder?

A.   I provided the data that counsel had shown on that spreadsheet and a graphic designer graph of it.

Q.   Is this a summary chart of the data that you gathered?

A.   Yes.

Q.   And have you reviewed it?  I mean is it prepared automatically, essentially, through software?

A.   Yes.

Q.   Yes.

     And so, have you reviewed this and does this summarize the data that you provided and the conclusions that you had?

A.   Yes.

Q.   Let me go back, actually, let's just start with page 15, and you testified about this and it is in evidence.

A.   That's correct.

Q.   Dr. Hurder, what evidence did you see that the founders did not in fact control the voting here?

A.   There were two pieces.  First, Mr. Werlau testified that the founders did not vote their founding TORN on Proposal 10, which as was just asked, this was during the period when their founders TORN had vested but they did not vote it, according to Mr. Werlau.

Q.   And what other evidence?

A.   Proposal 13, which is the proposal that I discussed earlier where it failed, I have seen founders chats where the founders discussed that they really wanted this proposal to pass but it nonetheless failed.

Q.   And have you seen other evidence that it was an active community?

A.   I have.

Q.   You were asked about ownership of TORN.  Did Peppersec ever own any TORN?

A.   Not to my knowledge.

Q.   And so, when you were referring to the founders TORN, who owned that TORN?

A.   That was TORN that was owned by the three individuals.

Q.   And you can, in fact, trace on the blockchain whether or not the founders voted their TORN; is that right?

A.   It can be done.  It is not my area of expertise but, yes,

it can be done.

Q.   Which is why you relied on Mr. Werlau for that point?

A.   Yes.

Q.   And you were asked a question about decentralization.  What was your observation about decentralization at the time of the relayer registry?  What aspects of Tornado Cash were decentralized?

A.   I think -- I mean there is, again, as we have talked about, there are multiple participants in the DAO.  The relayer registry, in my opinion, increased decentralization because rather than having to rely on recommendations from founders or single Medium posts, the available set of relayers was determined by the individual choices of the relayers and the code.

Q.   You were asked a question about what participants in the relayer registry had to do in order to participate in it.  Do you recall that?

A.   Yes.

Q.   And what did they have to do?

A.   So, participants who wanted to be listed in the relayer registry had to acquire somehow some TORN, I believe it was at least 300 TORN, and then they had to stake it, and then I believe they had to specify some information like whether they were going to charge a fee and how much it would be.

Q.   And you were asked whether that created demand for TORN?

A.    That's correct.

Q.    So, have you looked at whether or not you thought that that need for TORN would in fact increase the price of TORN?

A.    I thought it wasn't obvious that it necessarily would.

Q.    Why is that?

A.    So, at the time that the relayer registry was introduced, there were millions of TORN in circulation and a relayer was required to stake 300.  So, in order for demand for TORN from the relayer registry to meaningfully impact the price, you would need quite a bit of TORN to be staked.

Q.    And given the circulating supply, what was your conclusion?

A.    That it's not obvious that people staking 300 tokens is going to meaningfully change the price when the circulating supply is millions.

Q.    Mr. Arad also asked you whether the relayer registry helped to conceal money.  Do you remember that?

A.    I did.

Q.    Why?

A.    In my opinion, I mean, relayers were already available.  So it is true that the relayer registries may have made it easier for some people to find a relayer but relayers were already in use beforehand and even during the relayer registry period you could get a relayer without using the registry.

Q.    Let's take a look at your chart 9050-22.

          So why did you focus your analysis at this period of

time, starting on 3/3/22?

A.   I included 3/3/22 to take into account what might have been considered the announcement price spike, the anticipatory price spike.

Q.   And how do you separate out that anticipatory price spike from your analysis about whether or not the relayer registry increased the price?  How does it factor into your analysis?

A.   I think it's possible that there was an anticipatory price spike but, as I said, I would anticipate that if the relayer registry were generating meaningful changes and demand, that you would see changes in improvements in price for more than -- I mean to be generous -- two days.

Q.   So, as Mr. Arad said, people needed more TORN in order to participate in a relayer registry.  You would expect that effect to continue over time?

A.   Yes.

Q.   And in fact to increase?

A.   Yes.

Q.   OK.  Let's look at your page 23.  Did you prepare this based on -- or was this prepared using software based on the data that you have and have you checked it?

A.   I have, yes.

Q.   You were asked about comparing certain prices of Bitcoin, Ethereum, and TORN from April through May 19.  Do you recall that?

A.   Yes.   That's correct.

Q.   And, to your knowledge, was it a public matter exactly when the Ronin hackers were putting proceeds through Tornado Cash?

A.   To my knowledge those -- the timing of those deposits was not public.

Q.   And so, what was the public issue that you focused on?

A.   I focused on when relevant news sources were covering the association between the hack and Tornado, the pools.

Q.   And what date was that?

A.   That first announcement came out on the 29th of March and continued to be in the news for weeks.

Q.   And you were asked about a particular period of time -- that particular period of time from April through mid-may and the differences between Bitcoin and the TORN price; correct?

A.   Yes.

Q.   I believe that you also began a question that you weren't allowed to finish.  So, what other factors do you think were not considered when with Mr. Arad walked you through those numbers for that period of time?

A.   I mean, one piece that was an event in that time period was the introduction of, I believe, the Chainalysis sanctions tool was introduced in mid-April, and that's another, as I mentioned, one of the challenges of time series data, is that lots of things happen and it is hard to disentangle what causes what, and introducing that sanctions tool might have been

important as well.

Q.  So the sanctions tool might have in fact increased the value of TORN as compared to ETH and BTC?

A.  That's right.

Q.  Your overall conclusion that during this period of time TORN remained highly correlated with BTC and ETH?

A.  Yes.

Q.  Was that based on statistical analysis that you ran?

A.  Yes, it was.

Q.  You have training and experience as an economist to run that statistical analysis?

A.  I do.

MS. AXEL:  One second?

(Counsel conferring)

MS. AXEL:  Your Honor, I said at the outset that I was going to move into evidence the last five pages.

THE COURT:  Oh.  I thought you had moved in things -- I thought you were speaking of individual pages that we had admitted in.

MS. AXEL:  I mentioned those because I had not flagged them to begin with.  I had flagged the last five pages and I do think at the end I forgot to mention pages 19 through 25 were the summary charts that I intended to admit.

THE COURT:  Mr. Arad?

MR. ARAD:  Could I just see exactly which ones they

are?

MS. AXEL:  Sure.

(Counsel confer)

MS. AXEL:  There are duplicates, so let's clarify. 19, 20, 21, 22 -- this is the same -- 19 through 22 and 24.

(Counsel conferring)

MS. AXEL:  Through 19 through 22 and 24.

MR. ARAD:  No objection.

THE COURT:  Thank you.

Defendant's Exhibit 9050-19, 9050-20, 9050-21, 9050-22, and 9050-24 are admitted into evidence.

(Defendant's Exhibits 9050-19, 9050-20, 9050-21, 9050-22, 9050-24 received in evidence)

MS. AXEL:  No further questions.

THE COURT:  Thank you.

Dr. Hurder, you may step down.  Thank you very much.

MR. KLEIN:  Your Honor?

THE COURT:  Yes, Mr. Klein?  Thank you.  Are there things you would like to read into the record or do you want to be seen at side bar?

MR. KLEIN:  Sorry, your Honor.  I'm not sure I understand the question.

THE COURT:  You will excuse me, sir.

Our choice is now we have about 10 minutes until lunch.  If there is a small witness or small stipulations or

things like that that can be got in, I would love to do it.  If not, then perhaps we are taking an earlier lunch.

MR. KLEIN:  I think an earlier lunch, your Honor.  We had planned to call Dr. Green.

THE COURT:  That is your next witness is Dr. Green?

MR. KLEIN:  Yes.

THE COURT:  OK.  I will, understanding that Dr. Green will be the first order of business after lunch, that's fine.

We are going to break for lunch.  We are going to break for 45 minutes, and so I will see you at 20 minutes after 1:00.  Please, do not discuss this case with each other or anyone else, keep an open mind until all of the evidence is in, and thank you very much.

THE DEPUTY CLERK:  All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Counsel, please be seated for the moment.
Thank you.  Everyone else may go to lunch.

Mr. Klein, in the afternoon we have -- it is
Dr. Green, sir?  I don't want to misattribute.

MR. KLEIN:  Dr. Green, Professor Green.  I will ask
him over the break what he prefers.

THE COURT:  Yes, let's not offend him; right.  Then
after that, sir?

MR. KLEIN:  After that, your Honor, assuming we don't
call our client, later we are going to have -- there is a
couple stipulations and exhibits we are going to admit in.
There is a video we wanted to play that we are offering into
evidence.

THE COURT:  I'm sorry.  A video?

MR. KLEIN:  Short video.

THE COURT:  The government has consented to?

MR. KLEIN:  We provided them as a defense exhibit.  We
haven't heard anything in objection.

MR. ARAD:  We have not consented, your Honor, and
object to the admission of the video.

THE COURT:  What is the video, please?

MR. ARAD:  The government's understanding is it is a
video of the 2019 ETHBoston conference where the t-shirt was
worn.

THE COURT:  Again we are talking about this?

MR. ARAD:  We didn't bring it up, your Honor.

THE COURT:  OK.

MR. KLEIN:  Our client is in the video, your Honor.

THE COURT:  I don't care.

MR. KLEIN:  He is not speaking.

THE COURT:  Why is it coming in?

MR. KLEIN:  Your Honor, it comes in --

THE COURT:  You have already got the picture, you have got the CITGO sign stipulation.  Why is this video coming in?

MR. KLEIN:  It is an important piece of evidence, your Honor, because what it does with the stipulation and the blog post, it actually shows the hackathon that was happening.  Our client is in the video, he is not speaking, as well as the other defendants.  And it puts them into context, as well so the jury can see what it looked like.  It literally is a short, two-minute video of what was happening.

THE COURT:  How is it getting in, sir?

MR. KLEIN:  We have a certified custodian record for it.

THE COURT:  Under what?  Wouldn't it implicate the hearsay rules?

MR. KLEIN:  There is nothing said in this, your Honor, and it was a business record.  It was produced by the company.

THE COURT:  The video is a business record?

MR. KLEIN:  Absolutely, your Honor.

THE COURT:  It was produced by the company that was one of the sponsors.  They hosted it on YouTube.

We contacted the company, they provided it to us, we have certified business record served for it, which the government has been using to put its evidence in.  We provided both of those the two government.  It is a short, two-minute video.

THE COURT:  What is its -- you have gotten -- once again, you have gotten in testimony about this conference that predates the indictment.  You have gotten a stipulation, unless Mr. Gianforti changed his mind about this.  I don't understand why we are again going back to a conference that has, it is now clear, tangential relevance to this case.

MR. KLEIN:  It doesn't, your Honor.  First of all GX 1 is their first exhibit, the t-shirt.

THE COURT:  Yes.

MR. KLEIN:  The t-shirt worn by our client in the video which is not in the picture of a blog post, OK, so it puts the context of this t-shirt, it shows what it looked like at this event and this is one of the origins of the product so it is a key part of how this project came together and why our client would have a state of mind that he had throughout this project.  And so, we think it is a critical piece of evidence. It is two minutes also, your Honor.

THE COURT:  I don't care -- sir, I care not about its length, I care about how it comes in under the rules of evidence.

MR. KLEIN:  It is a certified business record.  We can present the Court with the certificate, if your Honor would like.  We have it here.  It is marked as an exhibit.  It is exactly how the government was putting in exhibits.

THE COURT:  I don't think -- there is a certification but the videos came in because they were statements of party opponents.  You are putting in your own person, the video of your person.

MR. KLEIN:  No.  It is a video taken by another company who is a sponsor at the conference.  It is not our video.

THE COURT:  I'm not going to make the government's arguments for it.  Let me hear why you oppose it.

MR. ARAD:  Let me say a little bit more about the video, your Honor.  It is a two-minute video without audio that just pans over participants in this ETHBoston conference.  The only possible relevance that it could have is that it would show the defendant operating in an atmosphere that seems legitimate around the time that he wore the t-shirt.

THE COURT:  Are you suggesting the ETHBoston conference wasn't legitimate?  Because that would be a new argument to be made.

MR. ARAD:  No, your Honor, but what I am suggesting is that that is simply not an appropriate inference for the defendant to ask the jury to draw from that conference, and there is already plenty in evidence to the extent the defendant is permitted to make that argument, that he can base that argument on.  There is the stipulation, there is the CITGO stipulation, there is already enough in the record for the defendant to say this was a conference in Boston, near Cambridge, where this t-shirt was worn.  There is just no reason for this video to come in and it is classic hearsay.

In addition to that, your Honor, I fail to see how --

THE COURT:  Let me make sure I understand your hearsay arguments.  What?  Because showing a video of people doing things as communicating, it is a non-verbal act or it is communication, that this is a conference and all of these people are in attendance at the conference?

I want to understand the hearsay argument.

MR. ARAD:  That's right, your Honor.  The video is edited in order to send a particular message.  This is the conference that apparently our company participated in.

I don't see how this video could possibly be a business record given that it is available on YouTube.  I think that when the defense sent it to us that's where we saw it.  So this would be, I guess, a YouTube record but with a certification from the company that the company keeps it on

YouTube in the normal course of its business?  It is a confusing set of facts to square.

THE COURT:  The defense tells me that it is being offered for non-hearsay purpose, specifically Mr. Storm's state of mind.  Did I misunderstand that, Mr. Klein?

MR. KLEIN:  No, you do not.  I think it is critical, your Honor, for that reason.

THE COURT:  Sir, whether something -- even the government had the same idea that if you tell me something is really, really important it is actually going to influence my decision.  It really doesn't.

MR. ARAD:  The way -- I'm sorry.  The way I am understanding that, your Honor, is that this video of a conference that the defendant attended in 2019 before the charged time period where apparently the defendant shows up in just a few moments is somehow supposed to be probative of his state of mind with respect to the offenses in this case?  It just seems highly attenuated, your Honor.

THE COURT:  Once again with the adverbs.  Adverbs and adjectives on both sides.

MR. ARAD:  Sorry.  It seems attenuated, your Honor.

THE COURT:  Thank you.

Mr. Klein, thank you.

MR. KLEIN:  I'm not going to use any adverbs, your Honor.

P7T5sto4                          Hurder - Redirect

THE COURT:  Thank you, sir.

MR. KLEIN:  He is, in the video, he is mingling with lot of other people, it is a crowded room where people are doing the hackathon.  It is short --

The video shows him mingling with other people wearing this t-shirt.  It is the only image we have of him at the conference with the shirt on which is a critical piece of evidence they're going to try to hammer him on in close and they brought it in on opening.  It was Government Exhibit 1 and this is actually our guy wearing the t-shirt.

THE COURT:  But it is not the -- is there not another photograph, the one with the CITGO sign also has your client wearing the t-shirt?

MR. KLEIN:  But he is not mixed in with other people at the conference.

THE COURT:  He is in Boston.  You can make the argument -- sir, it is not coming in.  It is not coming in.  It is irrelevant.  It is not -- it does not indicate state of mind at all and I'm keeping it out under 403 so it is not coming in.

So, there is still stipulations and other exhibits, there is not a video.  Mr. Klein, what else is coming in, please, this afternoon?  Or do you think Dr. Green will take the whole of the afternoon?

MR. KLEIN:  I don't think he will take the whole of the afternoon.

THE COURT:  I guess -- I don't know what the cross is so we will both see that.

MR. KLEIN:  The direct is not the whole afternoon.

THE COURT:  Fair enough, sir.

You will let us know now or you will let us know when we resume whether your client is testifying today or not.

MR. KLEIN:  When we resume, your Honor.  We are going to talk to him over lunch.

THE COURT:  If I may ask, because my law clerk reminded me because sometimes I am inconsiderate, has the defense made a decision with respect to Agent George?  Is he here?  Should he be kept here?

MR. ARAD:  He is here, your Honor.  He came up from Florida.

THE COURT:  Thank you.  If you want to tell me -- perhaps you will tell me after lunch, but if he is not going to be used I did want to send him back.

MR. KLEIN:  After lunch, your Honor.

THE COURT:  I will know both of these things after lunch.  OK.

Are there other issues people want to raise.

MR. KLEIN:  You asked about the other witnesses.  I just want to say there is a summary witness similar to the paralegal the government used, with three exhibits.  We are going to make sure about that over lunch.

THE COURT:  Right.  Is there an objection to the three exhibits?  Do you know what they are, Mr. Arad?

MR. ARAD:  No, your Honor, there is not objection.

THE COURT:  Thank God.  OK.

Mr. Klein, are you ending with a summary witness unless your client testifies?

MR. KLEIN:  Either the summary or the stipulation from Skale.  So we are not sure about that, we are going to talk about that.

THE COURT:  Got it.  OK.  Thank you.

MR. ARAD:  There is one more matter, your Honor.

THE COURT:  Of course, there is.  Go ahead, Mr. Arad.

MR. ARAD:  Dr. Hurder described and pointed to e-mails and said that she revised the slides many, many times.

THE COURT:  And that there were slides that were not included in the deck that was shown to the jury.

MR. ARAD:  That's right.

THE COURT:  Yes.  No, I heard it.  I assumed that there was going to be an, if you will, an Agent George-like motion for production of notes.

MR. ARAD:  That's the motion I am making, your Honor.

THE COURT:  Ms. Axel?

MS. AXEL:  We have been all through our notes, your Honor.  We went through e-mails, we produced to them the ones that are 26.2.  E-mails concerning like what time we are going

to meet or stuff are not statements.

THE COURT:  I don't think they want the logistical chat that she was discussing but she did mention slides being prepared that were not -- that were discarded for today's presentation.

MS. AXEL:  She testified that there were tech slides that were not used.

THE COURT:  Yes.  They were produced.

MS. AXEL:  Produce and removed.  There was an XRP slide at the end that we produced.  Maybe we have given it to your Honor and did not use it.  I am not sure what she is referring to.  Obviously these were just simply changed in real-time until we get to the deck that is the deck, and I don't believe there are images there other than what we have given them.  We can go back through.

THE COURT:  Of course.  Ms. Axel, to the extent that there were -- that Dr. Hurder would e-mail to your team a slide with edits on it, you would have produced that?

MS. AXEL:  We did not work flow that way, but.

THE COURT:  Oh, because I thought I heard her say that she made edits.  Was it done by calling and then -- to the extent I may know -- she is suggesting that there are drafts somewhere of these slides.  I want to know how they existed.

MS. AXEL:  Typically they're just revised in real-time until you get to one and we don't keep copies of them.  When we

had copies at the end we provided them.  I think last night she made a few changes.  When I send over the ones I didn't send her handwritten notes but we said a few typos were corrected -- those were her typos that were corrected.  So, we disclosed the prior one and then the one that was corrected.

THE COURT:  Sure, but let me ask this.  Let's imagine the situation -- Mr. Arad, you can sit down.

Let's imagine the situation where a slide deck was sent to Dr. Hurder and there was thereafter a telephone call or Zoom call or some discussion about the content of those slides and one of the slides was then edited, as you say, I think you made the expression in real-time but while the conversation is taking place.  you would have saved the original set, the original deck that was sent to her for her review, correct?

MS. AXEL:  If we had sent to them in that manner, yes, your Honor we looked for that.

THE COURT:  But if there are changes made did you save the slides that were edited even if they were edited on the fly?  What I mean to say is to the extent there were discussions, I presume there was a before-call and after-call version of the deck; yes?

MS. AXEL:  I don't know that they were saved in that manner, your Honor.  I mean, I just don't recall.

THE COURT:  Because I will be really sad if, for example, you overwrote things in the course of a call but

didn't save what the original was because that would have been, I think, something subject to production.

Perhaps I am misunderstanding how this was put together, but to the extent that there was a deck and it was edited, I would think the prior versions would have to be produced because I assume that's what the government did with some notable exceptions with Agent George with respect to the manner in which their slides were put together.

Mr. Arad, now you can stand up.

MR. ARAD:  Yes, your Honor.  That was our practice.

THE COURT:  So every time a change was made you saved an original and then produced the slide that had been changed?

MR. ARAD:  Yes, your Honor.

THE COURT:  That's what I am assuming you are doing as well, Ms. Axel.  I don't want to know that you made -- because by simply overwriting things, then you have actually deprived the government of the prior draft so I am sure that's not what happened but please tell me what did.

MS. AXEL:  I will go back and look and see if there are other drafts exactly put together that way, your Honor.  I mean, again, it starts with work product, so like there is something that we create, as she testified to, and then she changes it.  When it is hers, then we disclose it.

THE COURT:  All right, but what she is changing is hers, it is not your work product anymore.

MS. AXEL:  Understood.  Yes.

THE COURT:  The way you are describing it, I am fearing a situation where someone says, sure, we will make this change.  You can both be, for example, sharing a document in a Zoom conference -- I'm not saying that's what happened -- and then just agree to change the slide but you would have to show what slide got changed, that would have to be produced as 26.2 material.

But, yes, you will speak with your witness and you will let the government know and I really am not looking forward to a motion to strike the testimony or motion to recall.

Yes, Mr. Arad, something else?

MR. ARAD:  It is about this topic, your Honor.  I don't mean to drag it out.

THE COURT:  And yet you are.  Go ahead.

MR. ARAD:  But not for the sole purpose of dragging it out, I assure the Court.

I just wanted to highlight something, which is that when the witness was asked whether she had any text messages with the defense, she went out of her way to explain that she did but it was purely logistical.

THE COURT:  Yes.

MR. ARAD:  When she was asked if she had e-mails with the defense, she said somewhere between one or two dozen and

did not go out of her way to make any sort of caveat like that.

THE COURT:  I heard as well.

MR. ARAD:  The government has received, I believe two or three e-mails, at least one of them was substantive from the defense, and has concerns that there may be substantive discussions in the other e-mails.

So I wanted to raise that and ask for the e-mail communications with Dr. Hurder, and I also wanted to raise, your Honor, that this gives us concerns that perhaps not everything has been disclosed with respect to Dr. Green's testimony, and because it is coming up --

THE COURT:  I don't even know, we haven't heard word one from Dr. Green.

MR. ARAD:  Right.  That's why I raise it now.

THE COURT:  I understand that.

Again, I may have said previously I'm not sure the government is operating from the moral high ground here but, Ms. Axel, I did hear one to two dozen e-mails.  I, of course, have no idea what the production was.  Did you produce one to two dozen e-mails?

MS. AXEL:  No.

THE COURT:  Is she just wrong?

MS. AXEL:  As I said, we produced e-mails.  We looked at the e-mails and we produced to them the ones that were her statements.  So, we went through that process, we pulled all

our e-mails, we looked at them.  We also sent a letter because we, out of an abundance of caution, we went through notes and had an associate who had certain notes, we produced those by letter.  And so, we believe we have done a thorough search of the e-mails and notes.

THE COURT:  If she sent you an e-mail including an update or a suggested edit, that would have been produced?

MS. AXEL:  Yes.

THE COURT:  Or were it just a transmittal e-mail that attached something that was edited.  That would be produced?

MS. AXEL:  Yes.

THE COURT:  To the extent I can, can I please have a sense of what the remaining -- the remainder of the one to two dozens e-mails that were not subject to production?

MS. AXEL:  I don't remember one to two dozen e-mails, I would have to go back and check.  She is throwing out a number on the top of her head.  So, again, I'm not guessing but I'm assuming we are talking mostly about logistical e-mails, you know, *We are going to have a WebEx at 3:00*, or something like along those lines.

THE COURT:  Let's hope that that is all it is.

Who is putting up Dr. Green Mr. Klein?

MR. KLEIN:  I am, your Honor.

THE COURT:  Just so that I don't have this at the end of the day, can I ask you to check in with him and make sure

you have everything you are supposed to have or have you done that already?

MR. KLEIN:  I will, your Honor.

THE COURT:  Mr. Arad, now what?

Something else, Mr. Klein?

MR. KLEIN:  I do want to talk to our client about his testimony.

THE COURT:  Oh, me too.  I want you to as well so I know.  Yes, I mean, I'm not thinking about lunch, I am thinking about the stuff that you guys are going to be doing during the lunch break.

Mr. Arad, can they go or is there something else you wish to raise?

MR. ARAD:  Nothing else, your Honor.

THE COURT:  Give me 30 seconds to issue the rare compliment to the trial teams -- and you are thinking, no way, she won't do that -- I have interns.  This is their last week. I wanted them to see good work.  When I heard we had an expert witness being put up by Ms. Axel and cross-examined by Mr. Arad, I said this is the witness they should come see. They're here, they did, they learned.

Thank you, both.  Great job.  Thank you.

MS. AXEL:  Thank you.

THE COURT:  See you in something less than 45 minutes. Should we make it 1:30?  Shall I tell the jury 1:30?

MR. KLEIN:  That would be appreciated, your Honor.

THE COURT:  OK.

(Luncheon recess)

(Continued on next page)

P7T1ST05

AFTERNOON SESSION

1:34 p.m.

(Jury not present)

THE COURT:  Sir, what are we doing this afternoon?

MR. KLEIN:  Two updates, your Honor.  We are not going to call Special Agent George.  We talked about it over lunch.

THE COURT:  Okay.  And you've told the government so that they can——

MR. KLEIN:  I just walked in.  I'm telling——

THE COURT:  I beg your pardon?

MR. ARAD:  Yes, we know.  That was all I was going to——

THE COURT:  Okay.  Thank you.

Yes, sir.

MR. KLEIN:  Second thing.  We talked to our client.  He is not choosing to invoke his right to testify.  I don't know if you want to do that colloquy here now or——

THE COURT:  I believe we did this at an earlier point when I made him aware of his rights, but I can do that right now, if that's acceptable to the government.

All right.  And may I address your client directly?

MR. KLEIN:  Of course, your Honor.

THE COURT:  Thank you.

Mr. Storm, you're welcome to remain seated, sir.  I'd just ask you to bring the microphone close to you.

Sir, we've had this conversation before, but you are aware under the Fifth Amendment that you have the right to testify if you wish to do so, and you have the right not to testify. You're aware of both of those, sir?

THE DEFENDANT: Yes, I am aware, your Honor.

Yes, I am aware.

THE COURT: Thank you.

And sir, having discussed the issues with your counsel and fully aware of these rights, you have chosen not to testify at this trial, yes, sir?

THE DEFENDANT: Yes. Yes, your Honor.

THE COURT: All right. And I will instruct the jury accordingly that they can take no inferences from that. Thank you for letting me know.

THE DEFENDANT: Thank you.

THE COURT: Yes, Mr. Klein? Something else to add?

MR. KLEIN: No, just we're ready with Dr. Green. I didn't know if you wanted us to bring him in now.

THE COURT: That would be great. I believe Ms. Noriega is getting our jurors to line up, so we'll go with that.

MR. KLEIN: Your Honor, I have a quick question.

THE COURT: Please, sir.

MR. KLEIN: Do you give the jury a copy of the jury instructions?

THE COURT:  I do, sir.  I do that because I've found that for some jurors, they prefer to read as I am reading it to them, so everyone does get a copy of it that they are allowed to bring with them into the jury room.  They can't take it home with them.  And you'd be surprised——or maybe you wouldn't be——a predecessor judge here I believe instructed the jury that they should take home the charge and the indictment so they could think about it.

MR. KLEIN:  I'm sure they spent a lot of time doing that, your Honor.

THE COURT:  Made for a fantastic appellate issue, sir.

But yes, that would be my expectation to show them. The same thing that I gave to you, I would be giving to them.

MR. KLEIN:  And then is the same true with the superseding indictment?  Do you give them a copy of that or not?

THE COURT:  I do give them a copy.  Not copies for everybody, but I'm just thinking about——

Hi.  Dr. Green, correct?  Thank you, sir.  I need one moment.  Thank you.

I was just thinking about Mr. Arad instructing just to answer yes or no.  I want to give a little bit of context to my answer.  But in other cases that I have had, it is often the case that the parties agree on a redacted form of indictment that goes to the jury, as, for example, if the government

P7T1STO5

elects not to pursue a charge or if it's a speaking indictment and they don't want all of the speaking stuff to go to the jury. It sounds like the parties haven't discussed that. In the absence of an agreed-upon redacted form of the indictment, I would be giving them the indictment that I have, which is the S1. But I'm fine——although I don't know when you guys are going to do it——if the parties wanted to agree to cut out the things that are not being pursued anymore.

MR. KLEIN: We like to do a lot of things at midnight, as you know, your Honor, but we will look at it. That was in jest, obviously.

THE COURT: No, no, no. Gallows humor. I understand.

MR. KLEIN: Yes. We will look at it, and we will confer with the government. We had suggested redactions. I suspect we might, but I haven't looked at it recently. So we will confer with the government.

THE COURT: Sure. And if you have one, I tend to get it with like an R in the designation. I don't explain to the jury what that is. They don't need to know. But that would be my preference. But I only give one or two copies of that, and let's say they probably get three or four copies of the verdict sheet, just in case something goes awry, but everybody gets a copy of the charge.

MR. KLEIN: And then lastly, we have a request, your Honor. I think we will finish up today. I don't think

P7T1STO5

Dr. Green, at least on direct, will be more than an hour.

THE COURT: Okay. Now he knows. Okay. Yes.

MR. KLEIN: And I would say, your Honor, if we're closing tomorrow, we would ask, if we can, that we give the instructions in the afternoon. And here's why, your Honor, because Thursday is——

THE COURT: I missed the very last thing you said, please.

MR. KLEIN: I wasn't clear when your Honor would instruct the jury, if it would be after close.

THE COURT: Absolutely. It would be my present intention to instruct them tomorrow. And the reason——well, perhaps you and I are thinking the same things. But I have a slightly different cast, if I may. It is often the case for my juries that their reaction to being charged is to have a state of catatonia, where they just need some time to decompress after having been spoken to for 75 minutes to, you know, two hours. So I plan on telling the jury that once the case is in your hands, they set the time. But perhaps I can tell them that tomorrow, given the expectation——you're going to rest today, sir?

MR. KLEIN: Well, if we get through Mr. Green and our summary witness, which is very short, we think we will be able to, so yes.

THE COURT: And at the moment, friends at the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7T1STO5

government's table, no rebuttal case, so you'll be—that's it?

MR. REHN:  Correct.

THE COURT:  Okay.  Then I think I'll tell them they ought to plan to stay maybe a little bit late tomorrow because I really would like to charge them and not take the two hours of Thursday.  That's your concern, sir?  My concern is that plus the fact that I know that they are exhausted after the charge and there won't be productive deliberations for the first hour or so while they get all of that in their head.  But I don't think the government is going to object if we go half an hour long so that I can instruct them.  No.  No objections.

MR. ARAD:  No, your Honor.

THE COURT:  Great answer.  Okay.  Mr. Arad, you're in pole position again.  Does this mean you are crossing this witness as well?

MR. ARAD:  Yes.

THE COURT:  They don't give you a jury but they let you cross everybody, sir?  I know.  Thank you very much.

Anything else, Mr. Klein?

MR. KLEIN:  Nothing from the defense, your Honor.

THE COURT:  Much appreciated.  Sir, thank you very much.

(Continued on next page)

P7T1STO5                          Green - Direct

(Jury present)

THE COURT:  Thank you, and please be seated.

And my thanks to the jury for your patience a few moments ago.  We, as is often the case, had some legal and logistical issues to address.

Mr. Klein, please call your next witness.

MR. KLEIN:  Yes, your Honor.  The defense calls Dr. Matthew Green.

(Witness sworn)

THE DEPUTY CLERK:  Thank you.  Please be seated and into the microphone, state and spell your full name for the record.

THE WITNESS:  Matthew D. Green.  M-A-T-T-H-E-W, D, G-R-E-E-N.

MR. KLEIN:  And your Honor, we have some demonstrative slides.  Can I pull up the first slide to—

THE COURT:  You may.

May I know, is there any objection to the demonstrative slides?

MR. ARAD:  Prior objection, your Honor.

THE COURT:  Okay.  That's been overruled, so thank you.

MR. KLEIN:  Mr. DeMarco, would you please pull up DX 8951, the first slide.

P7T1STO5                        Green - Direct

MATTHEW D. GREEN,

    called as a witness by the Defendant,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. KLEIN:

Q.  Dr. Green, where do you work?

A.  I'm a professor of computer science at Johns Hopkins University.

Q.  And what do you do there?

A.  Well, I teach students, undergraduate students and graduate students, and I do research as well with my graduate students.

Q.  And what topics do you teach?

A.  I mostly teach the field of cryptography, computer security, and I work specifically on privacy topics as well.

Q.  Can you talk a little bit your educational background.

A.  Well, I have an undergraduate degree in computer science; I have, after that, a master's degree in computer science; and I received my PhD in computer science focused on cryptography and privacy topics, also at Johns Hopkins University.

Q.  And have you received grants in connection with your work?

A.  Yes.

Q.  Can you talk about the DARPA grant.

A.  Well, I've worked on more than one DARPA grant, but one DARPA grant, which is on the slide, is called Securing Information for Encrypted Verification and Evaluation, and it

P7T1STO5                          Green - Direct

is a way to basically compute on data that's encrypted so we can do the computation without having anyone see the data that you are actually computing on.

Q.   What is DARPA?

A.   Oh, sorry.  DARPA is the Defense Advanced Research Projects Agency.  It's an agency of the U.S. government that does research for the Defense Department.

Q.   Have you written papers on various academic topics?

A.   Yes.

Q.   Please describe in general the topics you've written academic papers on.

A.   I've written papers on many different topics, but most of them deal with the field of cryptography, which is a way to protect information mathematically; computer security; privacy; cryptocurrency; blockchains; and probably missing some, but those are some of the topics.

Q.   And have you in fact created a cryptocurrency or helped to create one?

A.   I helped to design a cryptocurrency, which is called Zcash. It was about a decade ago.

Q.   And do you have professional experience with online security and privacy?

A.   Yes.  I also, some time ago, in the 2000s, co-founded a company which did security evaluation, and we were looking at real companies' security products, trying to find bugs in them

P7T1STO5                         Green - Direct

and fix those bugs.

Q.  And have you given speeches about the topics of your research?

A.  Yes.

THE COURT:  Can you just move the microphone a little closer to you.

THE WITNESS:  Oh, yes.  I will.

THE COURT:  Thank you very much.

Thank you, counsel.

MR. KLEIN:  Yes, your Honor.

BY MR. KLEIN:

Q.  Have you given speeches about similar topics?

A.  Yes.  I've given talks, I've given some small talks and large talks about all of these topics.

Q.  At conferences?

A.  Yes.

Q.  Have you testified before Congress?

A.  Yes.

Q.  What did you testify about?

A.  I testified about encryption and law enforcement access and the relation between those two problems.

Q.  Do you have patents?

A.  I do.

Q.  Generally speaking, what do your patents cover?

A.  Oh, I have some patents dealing with different ways of

P7T1STO5                        Green - Direct

securing data with encryption and some older patents that deal with video.  I used to work for AT&T Labs, and we worked on video there.

Q.  In connection with your work have you received honors and awards?

A.  I have.

Q.  Could you talk for a moment about the Test of Time Award.

A.  So I worked on cryptocurrency back in 2000——2014.  We published a paper, which was about how to build private cryptocurrencies, and about 10 years later, the conference that published that paper has a thing called the Test of Time Award, where they go back 10 years and they say, which of these papers were relevant to the real world, and if they think your paper is relevant, they give you this Test of Time Award, and we received that last year, I think.

Q.  And what organization is that?

A.  That is——I'm sorry.  That's the IEEE.  The IEEE stands for——and I'm sorry about this, I'm always missing a word——the International Electrical and Electronic Engineers.  I think that's it.  That is what it is.  Okay.  I'm sorry.  I'm probably missing a word there.

Q.  That's okay.  And what does that organization do, generally?

A.  They're kind of a big organization of people who do technology.  They started just with electrical engineers, but

they also focus on computer science, and they have conferences

on computer security topics, and this happened to be one of

those conferences.

Q.   Are you a member of any organizations related to the topics

of your studies?

A.   Yes.  I'm also a member of the International Association of

Cryptologic Engineers——sorry——International Association of

Cryptologic Researchers, which is the IACR, and they are

another organization of researchers that work on cryptography.

Q.   And have you testified before as an expert?

A.   I have testified, yes.

        MR. KLEIN:  Your Honor, I move to qualify Dr. Green as

an expert in cryptocurrency, cryptography, online information

security and privacy.

        MR. ARAD:  No objection.

        THE COURT:  He is so qualified.  Thank you.

Q.   Dr. Green, in connection with this case, have you reviewed

certain things?

A.   Yes.

Q.   Can you give the jury a general sense of the things you've

reviewed.

A.   Well, I reviewed a lot of documents.  Some of them were

public articles in places like Medium.  We've seen some of

those here.

        I reviewed academic papers about cryptography and

cryptocurrency.  I have read many of those over the years, so those were kind of included.

I reviewed the source code for Tornado Cash.

I reviewed GitHub repositories for Peppersec.

I reviewed a lot of blockchain data from places like Etherscan.

And I think that's the majority of it.  There may be some other things I've looked at in the past.

Q.  And you've been present here for some of the testimony?

A.  Some of it, yes.

Q.  For example, Mr. Werlau?

A.  Yes.

Q.  Are you being paid for your time?

A.  No.

Q.  Is your travel and lodging being reimbursed?

A.  I hope so.

Q.  The answer is yes.

A.  Yes.

MR. KLEIN:  Can we move to the next slide, please, Mr. DeMarco.

Q.  I want to talk to you for a moment about tools for online privacy.

Are there technologies that help people protect their private information online?

A.  Yes.

P7T1STO5                          Green - Direct

Q.   I'd like you to talk about a few of those.

     What is encryption?

A.   Well, every time you make a connection using an app or you go visit a website, the data you send is encrypted, and the reason it's encrypted is, especially if you're using WiFi, but any time you communicate over the internet, people can listen in on the data you're sending, so whether it's typing your password into a website or typing your credit card into a website, we have to make sure that data is protected, or at least website designers want to make sure that information is protected.  Encryption is one of the biggest tools for doing that.

     And another place we care about encryption is if you use an app like WhatsApp or iMessage, which are encrypted communication apps, those apps will encrypt your messages so that only the person you're talking with receives the actual data, the actual content of what you're saying.  Anyone who's trying to listen in, even the companies that operate those services, can't read your messages.

Q.   Does that include the government too?

A.   That would include the government.

Q.   Let's talk for a moment about web browsing.  How is that encrypted and what companies engage in that type of encryption?

A.   Just about every web browser.  So that would include Google's Chrome, it would include Apple Safari, it would

include Firefox, if you use that.

THE COURT:  Just slow down for court reporter and judge.  Thank you.

THE WITNESS:  Okay.

THE COURT:  Repeat.  Thank you.

A.   That would include just about every web browser——Google Chrome, Apple Safari, and Mozilla Firefox as well.

Q.   And do companies promote the fact that they have encrypted technology built into the web browsing?

A.   Yes.

Q.   And also the messaging apps, do they promote that encryption too?

A.   Yes.

Q.   Let's talk for a moment about VPNs.  What is a VPN?

A.   VPN stands for virtual private networking, or network. It's a way to——that does really two things.  One of the things it does is it sends your web browsing through another computer somewhere else, and it encrypts that communication.  So the first thing it does is encrypts that communication.  The second thing that it does is it hides your source IP address so people who are on the other end of that connection can't see the IP address of your computer, which is where you're coming from, and so it gives you some added privacy when you're communicating with websites, and doing anything on the web.

Q.   Who uses VPNs?

P7T1STO5                         Green - Direct

A.  A lot of people.  Governments use VPNs, corporations use VPNs, but you can also buy access to a commercial VPN for a few dollars a month.

        This——on the slide, I have an ad for a company called NordVPN, which is one of the many VPNs that advertise their services that normal consumers can use.

Q.  Let's talk for a moment now about tokenization.  What does that term mean in the context of online privacy?

A.  So this refers to a technology where, if you're using credit cards, you can replace your credit card with another credit card number.  Most consumers don't do this, but the systems that actually handle the credit cards do this.  When you use something like Apple Pay, which is where you tap your phone to pay, sometimes what's happening there is your actual permanent credit card number is not being given to the store.  Apple Pay will derive a one-time temporary credit card number, and that's the number that goes to the merchant you're paying.  And the reason they do that is credit card numbers are stolen very frequently.  So if somebody hacks into the merchant, this case, instead of getting your actual credit card number, they'll get this temporary credit card number, not the real thing, and then they won't be able to use that for fraud, hopefully.

Q.  Do a lot of online payment companies offer this?

A.  At least Apple Pay does use this, and I think Google Pay

does as well.

Q.   Have you heard of Tor?

A.   Yes.

Q.   What is Tor?

A.   Tor stands for The Onion Router, and it's sort of like a VPN but it gives you extra privacy.  So instead of sending your communications through one server, it sends them through multiple servers, and the idea is it gives you extra privacy, particularly in cases where the person controlling the network that you're communicating with might not be trustworthy.

Q.   And who originally launched or created Tor?

A.   Tor was originally—the research that led to Tor was funded by the Naval—the U.S. Navy under the Naval Research Laboratories.

Q.   And has the State Department recommended Tor?

A.   Yes.

          MR. ARAD:  Objection.

          THE COURT:  Move on.

          MR. KLEIN:  Let's move on to the next slide, please, Mr. DeMarco.

Q.   I want to focus in on online financial security.

          What are the security concerns with conducting financial transactions online?

A.   Well, first off, if we're talking about the sort of traditional banking and credit card services, to start with,

there are some pretty well-known security concerns, one of which is that if the bank you're using or one of the credit card agencies is subject to a data breach, your data can be stolen, and that can lead to credit cards being stolen; it can, in the worst case, lead to actual funds being stolen, but it can also lead to your personally identifiable information being stolen, and that can lead to other bad consequences.

Q.  Can you talk for a moment about hacks; focus on that.

A.  Well, there have been many, many hacks where criminals break into servers, they break into servers that are run by banks or credit card companies or credit reporting agencies, and they steal entire databases' worth of data, and that data then can be used for identity theft, it can be used to actually defraud you or to find different ways to steal money from you.

Q.  Now a moment ago you talked about some online privacy tools.  How are those tools helpful with preventing these kind of things you're talking about now?

A.  Well, so the—those tools that I mentioned do help you from some attackers, people who are listening to your network communications, for example.  Tokenization can protect you if somebody hacks into a store and steals credit card numbers. But in other cases, they may not always help you.  If you have to use your real name and actual information about yourself to establish a credit account and then somebody hacks into the credit provider or credit reporting agency, that information

P7T1STO5                        Green - Direct

will be available, and so they're helpful in some ways, not helpful in others.

Q.   And let me ask you——one second.

        MR. KLEIN:   Let's go to the next slide.

Q.   What are the two major cryptocurrencies?

A.   I think the two largest by market cap cryptocurrencies are Bitcoin and Ethereum.

Q.   And do those currencies provide privacy to the users of them who participate in them?

A.   Not necessarily.  One of the big problems with Ethereum and Bitcoin is that they're run by many different computers, and one of the design choices in building those cryptocurrencies is that every computer on the network has to look at every single transaction, and that's a good thing because it means that everybody is checking to make sure that those transactions are valid.  The downside of that approach is that everybody has to see those transactions.  And transactions contain information like the source account ID, the destination account ID of a transaction, and the amount that's being paid.  And so that information becomes public.

Q.   And you were talking about——are you talking about the addresses?

A.   Sorry.  Yes.  Addresses, sometimes accounts, yes, addresses.

Q.   And are those sort of like bank account numbers?

A.  Yeah.  They're long numbers, and you've heard someone read them in here.  They're long numbers that uniquely reference your account.

Q.  Let's move on to the next slide.

What is a blockchain explorer?

A.  So while I just said that that transaction information goes to many computers, that doesn't mean that everybody wants to run their own computer, if they want to see that transaction data.  And there's sometimes interest in seeing it, so some people run websites where you can go and you can look at all the transactions on, in this case Ethereum, and these blockchain explorers is what you type in an address or a transaction identifier and you can see that information.  You can even move around and see related transactions.  And all of that information gets presented on a nice website for you to read.

Q.  Are those websites publicly available?

A.  Yes.

Q.  And when you go and let's say you type in an address and you find it, can you also trace back to all the other transactions that address had been involved in?  How far back can you go?

A.  You will see all of the transactions that are associated with that particular address.  You can click on them, and they go back, as far as I know on Etherscan, since the founding of

P7T1STO5                          Green - Direct

Ethereum, which is in 2015.

Q.  Let's talk for a moment about some examples.

MR. KLEIN:  Can you turn to slide 6, please, Mr. DeMarco.

Q.  Let's focus back in 2017, '18, '19, '20.  Are there well-known examples of people tracking people's movement of funds along the Ethereum network?

A.  Yes.

Q.  Can you give us some examples.

A.  Well, for many years—there are so many examples, but one that's on this slide is the—one of the founders, the author of the Ethereum paper is Vitalik Buterin, and he has some Ethereum that he owns, and so he will occasionally move or spend some Ethereum from one account, send it to another.  Since that's available on the blockchain, everybody can know about that instantly, and there are people who watch his wallet and determine whether that's happening, and that results in tweets, as you can see here, it results in news stories.  Almost instantaneously, that information is public.

Q.  So when people who have been identified—sorry.  Let me step back and rephrase that.

In your experience are there lots of stories about public figures moving funds along the Ethereum network?

A.  Yes.

MR. KLEIN:  Let's move forward to the next slide,

please.

Q.   What are some of the dangers of using a cryptocurrency like Ethereum, or ETH?

A.   Well, every time you pay somebody, or move money on Ethereum, you are revealing information about yourself.  So for example, if I make a payment to buy a cup of coffee, the person who receives that money will know my wallet address, and then they can go on Etherscan or a blockchain explorer and they can see how much money I have in my account and they can see any other people I've interacted with.  They can see my entire history as far back as the wallets existed.  And so there's some risk to that.  If you happen to have cryptocurrency, that means that people can potentially do things.  You know, knowing that you have money, they can use that information in ways that will harm you.

Q.   What are some of the examples of things people can do?

A.   So one of the least bad things they can do to you is that once they know you have a wallet with funds in it, a lot of money, they can try to hack into your computer remotely or they can try to send you phishing emails to trick you into stealing your money.  But there are worse things they can do.

Q.   Is that common, those kind of attacks?

A.   Extremely common.

Q.   And you were going to go on to something else?

A.   Another thing that people do——and this is sort of in the

same category——is they will try to target people for fraud. There are situations where people try to break into people's cryptocurrency accounts at exchanges.  They'll do other things to people to try to trick them.  That's——these are all things that can happen.

And then there's a worse category where people who have a great deal of cryptocurrency can be physically in danger and at risk, where somebody could come and they could target them for physical extortion, based on that information.

MR. KLEIN:  Let's move to the next slide, please, Mr. DeMarco.

Q.  And has this been a pretty common phenomenon, these dangerous hacking fraud, physical danger?

A.  Yes.  It's been something that's been happening over the years, and it's certainly been accelerating.

Q.  And has it been widely reported in newspapers like *The New York Times*?

A.  Yes.  So for example, this is an article from February of 2018 that talks about a whole series of different physical attacks and where physical attacks means people actually tried to hurt other people, or threaten to hurt other people for their cryptocurrency.

MR. KLEIN:  Let's move forward, please, Mr. DeMarco, to the next slide.

Q.  I want to talk for a moment about how you got involved in

cryptocurrency.

When did you first get interested or start to work with cryptocurrency?

A.  So I first heard about Bitcoin from a colleague in 2011.  I was really interested in the system.  I didn't believe that it worked.  I spent about two to three weeks installing it, trying it out, trying to find problems with it, and for the most part, in terms of the actual functionality of using Bitcoin to send money to people, I found that it worked pretty well.  I was pretty surprised by that.

The thing that I thought was a huge bug in the system was this fact that there was no privacy whatsoever, that every time you spent money, you were revealing public information the whole world could see.  And I thought that this was interesting, but if cryptocurrency was ever going to be a big thing, if it was ever going to be important to the real world, this would have to be fixed before that could happen.  There would have to be some kind of new technology that could hide that information in the same way that when you use a bank, you don't tell the whole world about every transaction you make.  And so I spent some time with my graduate students and we looked into a way to fix this problem.  We came up with a system that uses a technology called zero knowledge proofs, and we wrote a paper about that.

Q.  And when did you write that paper?

A.  I think we wrote it in 2012 and we published it in 2013.

Q.  Was this in connection with that same symposium we talked about, the IEEE?

A.  Yes.

Q.  Okay.  And you talked about some of the problems, but let's talk about what you might have perceived as some of the benefits.  What did you perceive as some of the benefits for cryptocurrency?

A.  Well, at the time cryptocurrency wasn't being used very much, so it was—this is in 2011—more of, to me, a toy than anything real, and it was not something I thought people would be using.  But some of the benefits of cryptocurrency were that you controlled your own money, so if you are a person who—this was after the financial crisis, just to be clear—didn't trust banks, if you were a person who couldn't get access to a bank, or if you just liked the idea of holding onto your own money, this was a way to do it, where all you had to do was generate a wallet and you could hold that money.  This could also potentially be—and many people said this—a way to hedge against inflation, since there was a limited supply of these coins, so this was a way to control your funds without having somebody else—

         MR. ARAD:  Objection, your Honor.

         THE COURT:  I'll allow it.  But I know it's coming to an end.  Thank you.

MR. KLEIN:  Yes, it is, your Honor.

THE COURT:  Without having somebody else?  Just finish the sentence, please, sir.

THE WITNESS:  Sorry.  This was a way that you could control your own funds directly without entrusting them to a third party.

THE COURT:  Thank you.

BY MR. KLEIN:

Q.  Turning back to your paper and zero knowledge proofs, can you give the jury—I know it's very technical.  Can you give the jury a very high-level sense of what that means, what a zero knowledge proof is.

A.  Okay.  Oh, boy.  All right.  So, zero knowledge proofs. They are a way that you can prove a mathematical statement to somebody, like, I know some numbers that satisfy this equation, and you can prove that to somebody so that they are convinced of that fact mathematically but without knowing the numbers, without knowing the secret numbers that you're trying to prove, and that's it.  It's a technology that's been around since the 1980s, and it allows you in some cases to prove statements like, I know a number that allows me to spend some cryptocurrency.

Q.  That went over my head.

I want to turn to the next slide.

Talking about zero knowledge proofs, are there

P7T1STO5                          Green - Direct

cryptocurrencies that started to incorporate this technology?

A.  Yes.

Q.  Can you talk about some of them.

A.  Well, this slide shows a few of them.  It's not a complete slide.  But over on the left, you can see there is a cryptocurrency called Monero, which has been around since 2014, uses zero knowledge proofs to achieve privacy for cryptocurrency transactions.

Zcash is a cryptocurrency I was one of the scientific advisors to.  That started in 2016.

Aztec is a cryptocurrency or a protocol that was launched on Ethereum.  That launched in 2017.

Iron Fish is a more recent cryptocurrency on Ethereum.

And an even more recent one is Aleo, in 2024.

Q.  And do all those allow for private transactions?

A.  Yes.

Q.  And what do you mean by that?

A.  So a private transaction, as we've seen in this case, is a transaction where I can make a transaction on the blockchain but where somebody looking at the blockchain does not know the past history or the current history of my wallet and where that money came from and everything about me, the way they normally would in a traditional cryptocurrency.

Q.  And you mentioned Zcash.  You were involved in that?

A.  Yes.

P7T1STO5                        Green - Direct

Q.  And did you seek venture capital funding for that?

A.  Yes.

          MR. KLEIN:  Okay.  Let's move on to the next slide, please.

Q.  You mentioned Vitalik Buterin earlier.  Has he spoken about the issue of privacy in Ethereum?

A.  Yes.

Q.  And what has he said about that?

          MR. ARAD:  Objection as to hearsay, your Honor.

          THE COURT:  Exactly.  He's not been qualified to speak for Mr. Buterin.  Find a better question, sir.  Thank you.

Q.  Was there a discussion back in 2018 and '19 in the Ethereum community about the need for privacy on the Ethereum network?

          THE COURT:  I will allow a yes or no answer to that.

A.  Yes.

          THE COURT:  Were you involved in that discussion, sir?

          THE WITNESS:  I don't recall.  I don't think so.

          THE COURT:  Okay.  Thank you.

          MR. KLEIN:  Let's move on to the next slide.

Q.  Are you familiar with Tornado Cash?

A.  Yes.

Q.  At a high level, how does it work?

A.  So Tornado Cash creates a series of pools, and these pools basically have Ethereum in them, and the idea is that anyone can deposit their funds in a particular size—for example, 10

Ethereum at a time——into these pools, and then there is a way that they can withdraw their money from those pools. The important thing is that instead of just saying, hey, I'm the same person who deposited, the withdrawal portion of the Tornado Cash system allows you to use a zero knowledge proof to prove that you own the money that's in there, but because it's a zero knowledge proof, you don't have to say which piece of that money it is and you don't have to link it to a previous transaction.

Q. And so Tornado Cash incorporates your zero knowledge proof idea?

A. Yes.

Q. And is that integral to how it works——

A. Yes.

Q. ——and how the pools work?

What is a setup ceremony?

A. So one of the details about using the particular zero knowledge proofs that Tornado uses is that they require some special numbers called parameters that have to be generated, and here is the tricky thing about them. If the parameters are generated by someone you don't trust, then they can hold——they can end up holding a back door that would allow them to fake zero knowledge proofs that aren't true, and in the worst case, that could allow them to steal money from the Tornado pools, in this case. And so in order to make sure those numbers aren't

vulnerable, that there's no back door, Tornado used a technology where a whole set of people all contributed to generating those numbers, and I believe there were over 1100 different people, and the way this worked was that as long as one of those people was honest and didn't hold onto that back door, then the resulting numbers would be honest and nobody would have the power to back-door the Tornado Cash system.

Q.  So you only needed one out of let's say the 1100 people to be honest?

A.  That's correct.

Q.  Who invented this idea of a setup ceremony?

A.  My colleagues and I wrote the first paper about it back in 2015.

Q.  So as a result of this ceremony, what happened, or what can happen?

A.  So after the ceremony happens, these numbers were generated in such a way that no party would have the control or the ability to back-door the system.  Those numbers were then uploaded into the Tornado Cash pool smart contracts, and then the smart contracts were given a final instruction which made sure that nobody else would be able to change those numbers or make any further changes to the content of the pools that would allow them to control the pools, and this was on May 18th, I believe, 2020.

Q.  Have you heard the term "immutable" before?

P7T1STO5                         Green - Direct

A.   Yes.

Q.   What does that mean to you?

A.   In computer science, it means can't be changed.

Q.   And are there immutable features to the Tornado Cash pools?
Are they immutable?

A.   Yes.

Q.   And what does that mean?

A.   Well, the code itself, the software, can't be changed
because that's part of the Ethereum network.  The software, for
a period before May 2020, allowed you to change those special
numbers, the parameters, but that was closed in May of 2020
when the final numbers were set after the trusted setup
ceremony, and then finally, the ability to change the numbers
was closed off in May of 2020.

Q.   Tornado Cash runs on the Ethereum network?

A.   That's correct.

Q.   And what does that mean, just so we understand?

A.   So the Ethereum network is a cryptocurrency that can also
run programs, and you can upload a program to the Ethereum
network, and the computers that run the Ethereum network will
remember the program, and then you can send a command that says
run the program on this data, and those computers will do that.

Q.   So the Ethereum network is sort of a layer 1 to the Tornado
Cash, is that——

A.   Yes.  It's a general platform that can run many different

P7T1STO5                          Green - Direct

programs, and sometimes people call that a layer 1 cryptocurrency, and the Tornado smart contracts are some of the programs, but there are many others running on Ethereum.

Q.   And the people who process the Ethereum network, are they processing the Tornado Cash system through it?  I mean, that's a very layman's way of putting it.

A.   I'm sorry.

Q.   Are the node operators on Ethereum participating or helping run the Tornado Cash network?

A.   Yes.

Q.   Can you explain how.

A.   Well, each node operator in Ethereum sees every transaction, and they can check the transactions, run those programs themselves on the inputs to make sure that the transaction is correct.  And a subset of those nodes are really particularly responsible for picking out the transactions, including them in blocks, and making sure that they become part of the permanent record of the Ethereum network.  So many nodes on the Ethereum network check every program.

Q.   I want to turn back to immutability for a moment.  What are the benefits of immutability with Tornado Cash?

A.   Well, one of the things that's important here is that there's a lot of money at stake, and the amounts can be in the millions and——not for Tornado Cash but for some cryptocurrencies——in the billions of dollars.  And that's a lot

of money to try to secure yourself if you're a small company or a person, whereas if you write a smart contract and the smart contract itself controls the money, then as long as you don't have a bug in the smart contract and other people look at the smart contract and make sure that there are no bugs, then there isn't really anything that any criminal could do to steal the money.  The money will be controlled by the rules of your program.  And even if somebody comes to you and hacks into your own personal computer, they can't make the smart contract do anything it's not programmed to do.

Q.  So that prevents the people who created the smart contract from accessing the funds that are deposited in it?

A.  Yes.

Q.  It would also keep out hackers?

A.  Yes.

Q.  What about fraudsters you talked about?

A.  Absolutely.  Yes.

Q.  And the other thing you mentioned, the physical threats, does it help mitigate that?

A.  Yes.  Even if somebody comes to you and physically threatens you, you can't make the smart contract give them money, and that might be bad for you, but that's the way the system works.

Q.  And what is a secret note?

A.  When you make a deposit into the Tornado pool, your

P7T1STO5                    Green - Direct

wallets, the wallet, the front end, the UI, gives you a note, a secret note, and this is a big piece of data that you are supposed to store yourself, and think of it like a receipt, where if you put something in a coat check, you get a receipt, you can go back and you can take that thing back.  And that's what the secret note does.  It is your receipt that allows you to take that money that you deposited back out at a later point.

MR. KLEIN:  Judge, may I have one second.

THE COURT:  You may.

Q.  I want to turn from this pool for a moment and talk about what's been called the UI.  Did you look at the UI, the Peppersec UI?

A.  Yes.

Q.  And where was that code hosted or where was the repository?

A.  Oh, so there are a lot of different places you can find it. There is——one of the repositories is on a site called GitHub, and it is——for example, in the Tornado Cash repositories, there is a variant of the UI.

Q.  What is minified code?

A.  So when you write normal code, like JavaScript code, you write it for other human beings to read, so you add comments, you name your functions, you name them things useful——useful things.  For example, if you want to write a piece of code that adds to numbers, you might name it Add To Numbers.  But then

the problem is, the code gets a little bit big because it's written for humans to consume, not computers.  So there are special tools that will take that code and they will shrink it down by renaming things.  So for example, Add To Numbers might get renamed to A1, and it's a lot smaller to have all your functions be named A1 than Add To Numbers, but, you know, which is great when you're downloading things over the internet or using mobile networks, but at the same time it's very, very hard to read, or much harder to read, and so that's what minification does.

Q.  Could you still read minified code?

A.  You can read it; it's just more difficult.

Q.  Okay.  And does minified code help, for example, UI perform better and move faster?

A.  Yes.

Q.  And why does it do that?

A.  Well, the code gets smaller and so the code can be downloaded quickly.

Q.  And did you look at the UI, whether it was geoblocking?

A.  I——the UI code that I looked at does have some files that are designed to assist in geoblocking.

Q.  And was there a point when it wasn't able to geoblock anymore?

A.  So again, it's hard to notice from the code, but my understanding is that depending on where the code was hosted,

P7T1STO5                          Green - Direct

that would determine whether the geoblocking happens.

Q.  And if it ended up being hosted at IPFS, would that make it
so it couldn't geoblock?

A.  That's my understanding.

Q.  Was it always hosted on IPFS?

A.  No.  I believe there was a point where it was hosted on a
U.S. web hosting provider.

Q.  And do web hosting providers typically do some geoblocking
themselves?

A.  Some do.

Q.  I want to talk to you now for a minute about the difference
between something like Tornado Cash and how it operates and a
centralized exchange like Coinbase.  What are the differences
between the two?

A.  So a centralized exchange is a company kind of like a bank.
It's traditional.  It has computers.  There are people who have
control of those computers.  You know, it presents a website
most of the time.  And so the idea there is that when you
deposit money into one of these centralized exchanges, the
people who run the centralized exchange now have control of
that money.  You don't have the control of that money anymore
with your keys.  And most of the time that's fine.  We do that
all the time with banks.

        With centralized exchanges, however, in the
cryptocurrency world, some of them have not been quite as

P7T1STO5                    Green - Direct

reliable as, like, U.S. banks, and the result is that those people, the people running the exchange, can leave with your money, they can get hacked and they can lose your money, and there isn't really much you can do about that.

Q.  And do centralized exchanges or banks sometimes sell your personal information too?

A.  Yes.

MR. ARAD:  Objection.

THE COURT:  I would prefer you lead less.  Are we coming to the end of this topic?

MR. KLEIN:  We are, your Honor.

THE COURT:  All right.  I'll allow this one question. Yes or no, sir.

A.  Yes.

Q.  Were you here when Mr. Werlau testified?  I think you said you were.

A.  I was.

Q.  Do you recall him testifying about a hypothetical user registry for Tornado Cash?

A.  I do.

MR. ARAD:  Objection.

THE COURT:  I'll see you at sidebar.

(Continued on next page)

(At the sidebar)

MR. ARAD:  This is not in his expert witness disclosure, your Honor.  It's simply outside the scope.

THE COURT:  The concern that I have—well, I'll let you speak for yourself.  Go ahead.

MR. KLEIN:  Your Honor, in his disclosure, which was before their witnesses testified, obviously, he said he'd talk about how Tornado Cash operated, how it was implemented, the way it works, various things like that, so when he's talking about this hypothetical user registry, which is a way Mr. Werlau said it could work, he's going to explain why that wouldn't have worked.  So this witness got up—he's simply going to rebut that and explain why the hypothetical user registry wouldn't have worked.  It's a very narrow line of questioning.  It goes directly to something Mr. Werlau testified about which, frankly, in itself wasn't in their disclosure.

MR. ARAD:  They—sorry.

MR. KLEIN:  They had a much broader disclosure with KYC, AML, and they whittled it way, way down, and so Dr. Green was never going to do it.  You know, we had Mr. Carter on notice for that.  So when they changed it away from the KYC and AML aspect to a more technological aspect, the user login, we needed Dr. Green to be able to talk about it.  Very brief testimony.  It goes right to Mr. Werlau's testimony, which was

only a few days ago.

MR. ARAD:  Your Honor, Dr. Edman was already allowed to testify on this topic specifically because Mr. Werlau testified on it in the first place.

And just going back in time to when we made our actual disclosures, this was in Mr. Werlau's disclosure, and the defense never produced an updated disclosure, either for Dr. Edman or for this witness, that includes this subject matter.  I don't think they should have had the first bite at the apple but they certainly shouldn't have the second.

THE COURT:  All right.  I will allow it.  I will allow it.

(Continued on next page)

P7T1STO5                         Green - Direct

                (In open court)

BY MR. KLEIN:

Q.  Do you recall Mr. Werlau testifying about a hypothetical user registry?

A.  Yes.

Q.  What are your thoughts on that?

            MR. ARAD:  Objection.

            MR. KLEIN:  I can make it more honed, your Honor.

            THE COURT:  Please.

Q.  In terms of Tornado Cash and how that would work on Tornado Cash, how do you think that would work?

            MR. ARAD:  Objection.

            THE COURT:  Are you asking about feasibility?

            MR. KLEIN:  Feasibility, your Honor.

            THE COURT:  I'll overrule the objection.

            Do you understand the question?  Would it be feasible? Do you understand the question?

            THE WITNESS:  Yes.

            THE COURT:  Can you answer it?

            THE WITNESS:  Does it have to be a yes or no or can I give——

            THE COURT:  For me, right now, it's a yes/no.

            THE WITNESS:  Can we define "work."

            THE COURT:  Counsel, move on.  If he can't answer the question, we really should——no, no, no.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P7T1STO5                        Green - Direct

MR. KLEIN:  I have a better one.

BY MR. KLEIN:

Q.  What are the problems with the user registry for Tornado Cash?

MR. ARAD:  Objection.

THE COURT:  Sustained.

Q.  In terms of Tornado Cash, would there be problems with collecting personal information?

MR. ARAD:  Objection.

THE COURT:  Now you're just going to feed him the answer, sir.  I asked him the simplest question and he couldn't answer that.  If he can't answer at the highest level, I'm not going to let him answer at your level.  Please move on.

MR. KLEIN:  One second, your Honor.

THE COURT:  All right.  Cross-examination?

MR. KLEIN:  I said one second, your Honor.

THE COURT:  I beg your pardon.  I misheard.  Sorry. Cavernous courtroom.

MR. KLEIN:  Your Honor?

THE COURT:  Sir.

MR. KLEIN:  If we can have another brief sidebar?  May we have another brief sidebar?

THE COURT:  Yes.

(Continued on next page)

(At the sidebar)

THE COURT:  Sir?

MR. KLEIN:  I just really——I know we had the back-and-forth, your Honor, but I think he didn't actually understand the question.  He does have the foundation to talk about whether that feature would have worked, so I think if I could ask him, do you know if this feature would have worked in terms of stopping the bad actors from using this service.

THE COURT:  Sir, I asked him, and we framed it in terms of feasibility, and when I asked him about feasibility, he look at me and said, I can't answer the question.  Then he said, it's not a yes or no.  All he had to say was whether it was feasible or not.  He can't answer that high-level question, he can't answer the more granular one.  Thank you.

MR. KLEIN:  Okay.

(Continued on next page)

(In open court)

THE COURT:  You may continue, sir.  Thank you.

MR. KLEIN:  Nothing further, your Honor.

THE COURT:  Okay.  Thank you.

I jumped the gun a little bit, Mr. Arad.  Is there cross?

MR. ARAD:  There is.

CROSS EXAMINATION

BY MR. ARAD:

Q.  Hello, Dr. Green.

A.  Hello.

Q.  Have we met before?

A.  No.

Q.  I'm Ben Arad.  I'm part of the prosecution team.  I just have a few questions for you.

You talked about a setup ceremony, right?  Would it be accurate to describe that setup ceremony as essentially throwing away the key to the pools?

A.  A setup ceremony is not throwing away the key.  The setup ceremony is just building secure parameters so nobody can have a back door.  But once the pools become immutable, they're locked down so nobody can change them.  Okay.  That's a metaphor I could live with.

Q.  I'll put the question a little differently.  You said that the setup ceremony made the pools immutable, right?

P7T1STO5                          Green - Cross

A.  It was part of it, yes.

Q.  I'll ask you to answer my questions yes or no, please.

A.  Yes.

Q.  And it is the case, isn't it, that after that ceremony, nobody could modify the pools?

A.  Yes.

Q.  But it's not the case, is it, that after that ceremony, the Tornado Cash website became immutable?

A.  That's correct.

Q.  Not the case, right?

A.  Not the case.

Q.  The website was changeable.

A.  Yes.

Q.  Same question for the user interface.  Still changeable after the ceremony, right?

A.  There are multiple copies of the user interface that couldn't be changed, but the main website could be.

Q.  I'll ask you to answer my questions yes or no, please.

        The main user interface could be changed, right?

A.  Yes.

Q.  The relayer registry could be changed, right?

A.  Relayer registry I don't believe existed at that time.

Q.  Very good point.  But it was created after the ceremony, right?

A.  Yes.

P7T1STO5                          Green - Cross

Q.   And it could be changed after it was created, right?

A.   Yes.

          MR. ARAD:  No further questions.

          (Continued on next page)

P7T5sto6                          Green - Cross

THE COURT:  Redirect?

MR. KLEIN:  No, your Honor.

THE COURT:  OK.

Sir, you may step down.  Thank you very much.

(Witness excused)

MR. KLEIN:  Your Honor, we are going to get our next witness who is --

THE COURT:  In the security line?

MR. KLEIN:  No, not -- upstairs, it is Ms. Andazola Marquez.  She just got stuck upstairs.  I apologize.  Their cross went a lot faster than we anticipated.

THE COURT:  It happens, yes.

Are there other things we can do in the interim, sir?

MR. KLEIN:  That's the last bit, your Honor.

THE COURT:  OK.  Do we believe she will be here in a few minutes?

MR. KLEIN:  Yes, your Honor, a few minutes.  She is just a few floors up.  She will be here any minute.

Your Honor, can we have a five-minute break -- oh, here she is.

THE COURT:  Do you want us to take the break a few minutes earlier than usual?

MR. KLEIN:  Yes, your Honor.

THE COURT:  So she can get set up.

MR. KLEIN:  Yes, your Honor.

P7T5sto6                          Green - Cross

THE COURT:  Then that's what we are going to do.

We are going to take our afternoon break now, a little bit earlier than usual but that's OK.  Don't discuss this case with each other or anyone else.  Keep an open mind until all of the evidence is in.

We will see you in 10 minutes.  Thank you.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

(Jury not present)

THE COURT:  Counsel, please be seated for a moment.

What is the game plan?  Ms. Andazola Marquez, are you the witness?  Are you the questioner.

MS. ANDAZOLA MARQUEZ:  Well, I will be first reading a stipulation into the record, then I will be doing the direct of the summary witness.

THE COURT:  Great.  And our summary witness is in the courtroom?  Somewhere nearby?

MS. ANDAZOLA MARQUEZ:  Yes.

THE COURT:  Right there?  Terrific.  Has a name?

MS. ANDAZOLA MARQUEZ:  Yes.  Mariah Mizbani.

THE COURT:  Terrific.  And then?

MR. KLEIN:  Then the defense is going to rest.

THE COURT:  OK.

And then no rebuttal case?

MR. REHN:  Still no rebuttal.

THE COURT:  Good.  Just want to make sure.  OK.

Then I will see you in 10 minutes.  Thank you very much.

(Recess)

THE COURT:  Mr. Klein, I am advised there is a 15-second issue.

MR. KLEIN:  When do you want us to renew our Rule 29? I didn't want to do it in front of the jury.

P7T5sto6                          Green - Cross

THE COURT:  Fair.  Do you want to do it immediately prior to the charge conference?

MR. KLEIN:  That's fine with us.

THE COURT:  Fine with the government.

MR. ARAD:  Fine with the government, your Honor.

THE COURT:  Oh, this is so much less involved an issue that it was going to be.  Ok.

MR. KLEIN:  15 seconds, your Honor.

THE COURT:  Well, yes, it can be 15 seconds and super contentious.  But OK.  Fine.

So, Ms. Andazola Marquez is ready?

MR. KLEIN:  Thank you for that accommodation, your Honor.

THE COURT:  Of course.

(Continued on next page)

P7T5sto6                         Green - Cross

(Jury present)

THE COURT:  Please, be seated.  Thank you.

Ms. Andazola Marquez, when you are ready.  Thank you.

MS. ANDAZOLA MARQUEZ:  Thank you.

Your Honor, I would like to offer into evidence a stipulation signed by the parties which has been marked as S-10.

Mr. Demarco, can you please show, for the parties and the Court, S-10?

THE COURT:  And you are going to ask, ultimately, that this be admitted into evidence?

MS. ANDAZOLA MARQUEZ:  That's correct, your Honor.

THE COURT:  Thank you.  I will admit it into evidence now and it may be shown to the jury.  You may read from it. Thank you.

MS. ANDAZOLA MARQUEZ:  May I read the stipulation, on the record, side by side with reference exhibit?

THE COURT:  You may.

MS. ANDAZOLA MARQUEZ:  Mr. Demarco, will you please display GX 1?  Can we display it for the jury?

This is a stipulation regarding GX 1:

1.  GX 1 is a picture that was taken in Boston, Massachusetts.  Signed July 29, 2025.

THE COURT:  Thank you very much.  S-10 is admitted into evidence and both exhibits may be taken down.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

(Defendant's Exhibit S-10 received in evidence)

MS. ANDAZOLA MARQUEZ:  I would also like to offer into evidence another stipulation signed by the parties that has been marked as S-9.

THE COURT:  Again, asking for its admission as an exhibit?

MS. ANDAZOLA MARQUEZ:  Yes, your Honor.

THE COURT:  Thank you very much.  S-9 is admitted into evidence and for now you may show it to the jury and read from it, as appropriate.

(Defendant's Exhibit S-9 received in evidence)

MS. ANDAZOLA MARQUEZ:  We would also like to admit the exhibits it references, DX 8852 and DX 8852-A.

THE COURT:  Defendant's Exhibits 8852 and 8852-A are admitted into evidence, pursuant to the stipulation.

(Defendant's Exhibits 8852 and 8852-A received in evidence)

MS. ANDAZOLA MARQUEZ:  I will first read the stipulation.

This is a stipulation regarding the testimony of John O'Holleran:

1.  Mr. O'Holleran is a co-founder and the CEO of Skale Labs.  Skale Labs developed an Ethereum-based scaling solution.  Skale Labs is headquartered in San Francisco, California, and was founded in 2008.

P7T5sto6                         Green - Cross

2.   In September 2019, Mr. O'Holleran, as CEO of Skale Labs, attended ETHBoston 2019, a public cryptocurrency conference.  ETH Boston 2019 was held at Harvard University and Skale Labs was one of the conference's sponsor.

3.   As a sponsor, Skale Labs awarded prizes to the best applications whose developers participated in what is called a "hackathon."  A hackathon is an event in which software developers work on software projects that are later judged, with prizes being awarded.

4.   The document identified as DX 8852 is a true and correct copy of a portion of a blog entitled "Anon hero uses full Skale stack and wins ETHBoston" that Skale Labs placed on it website on September 12, 2019 ("the blog post").  The photograph depicted in the blog post and in the document identified as DX 8852-A, is a true and accurate photograph of Mr. O'Holleran standing with Roman Semenov and others at the ETHBoston 2019 conference.  Below the photo is a hyperlink after the "see their code" that takes the user to a GitHub repository for Peppersec.  "MixETH" was one of the six winners of Skale Labs' hackathon.

Signed July 28, 2025.

Your Honor, may I display and read into the record what has been marked as DX 8852-A, the blog post?

THE COURT:  I will let you read some of it.  Let me see how long it is; yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7T5sto6                         Green - Cross

MS. ANDAZOLA MARQUEZ:  Mr. Demarco, can you please display 8852?

May I proceed?

THE COURT:  You may.

MS. ANDAZOLA MARQUEZ:  MixETH allows ETH to be moved between addresses in an untraceable manner by first mixing together the coins of different users.  This can help keep one's transaction history private, and privacy is a necessary component of fungibility, which in turn is an essential property of the currency.  MixETH uses ZK-Snark's verification, Skale's decentralized storage, and other web3 technologies.  It is already deployed on the Kovan Test Network.

If we can skip to the bottom sentence?

Thank you Roman Storm, Arsenii Pechenkin, Roman Semenov and Alex Lebed for coming up with a working privacy solution for Ethereum.

Mr. Demarco, can we also please display DX 8852-A?

That is all.  I would next like to call our summary witness.  Mariah Mizbani.

THE COURT:  Please, come forward.

MARIA MIZBANI,

     called as a witness by the Defendant,

     having been duly sworn, testified as follows:

THE WITNESS:  Mariah Mizbani.  M-A-R-I-A-H, M-I-Z-B-A-N-I.

THE COURT:  Thank you.

Counsel, you may inquire.

MS. ANDAZOLA MARQUEZ:  Thank you.

DIRECT EXAMINATION

BY MS. ANDAZOLA MARQUEZ:

Q.  Good afternoon, Ms. Mizbani.

A.  Good afternoon.

Q.  Where do you work?

A.  I work at Hecker Fink LLP.

Q.  And what is your job there?

A.  I'm a case manager.

Q.  How long have you been working there?

A.  I worked at the firm for just over two years.  I left and I have been there since March of this year.

Q.  Have you done any substantive work in connection with this case?

A.  No.

Q.  Were you provided with a set of exhibits to review in advance of your testimony today?

A.  I was.

Q.  Do you have true and correct copies in front of you?

A.  I do.

MS. ANDAZOLA MARQUEZ:  Mr. Demarco, can we please display what has been marked and admitted as GX 1367?

Q.  Ms. Mizbani, can you see what is displayed on the screen as

P7T5sto6                        Mizbani - Direct

Government Exhibit 1367?

A.  Yes.

Q.  I direct your attention to the upper page of page 1 listing the thread participants.

A.  Yes.

Q.  Who are the participants in this exhibit?

A.  Haseeb and Poma, among others.

Q.  Can I please direct your attention to the messages shown on page 2?

A.  Yes.

Q.  For purposes of this exhibit, can you please read the bubbles in blue and I will read the bubbles in gray after a few preliminary questions?

A.  Yes.

Q.  Can you please read who these chats were sent by?

A.  Haseeb and Poma.

Q.  Can you please read the date of the first message that appears?

A.  December 12, 2021.

Q.  Can you please read the first two blue texts?

A.  From Haseeb:  *Hey, do you guys track IPs who interact with Tornado or work with whitehat/hack remediation?*

        From Haseeb:  *One of our portfolio companies (Gelato) is currently dealing with a live hack situation and the blackhat used Tornado for source of funds.*

Q.    From Poma:  *We don't even host the UI.*

           From Poma:  *It is on IPFS.*

           From Poma:  *Other services like Infura could have it.*

A.    From Haseeb:  *Got it.  I figured.*

           MS. ANDAZOLA MARQUEZ:  Mr. Demarco, can you now
display what has been marked and entered into evidence as
GX 2047-T?

Q.    Ms. Mizbani, can you see what is on your screen as
DX 2047-T?

A.    Yes.

Q.    In showing you this evidence, who are the participants in
GX 2047-T?

A.    Roman Storm and Roman Semenov.

Q.    Can I direct your attention to the first messages shown on
page 2?

A.    Yes.

Q.    Can you please read the date of the first message
displayed?

A.    April 14, 2022.

Q.    Can you please read each message, one by one?

A.    From Roman Storm, with an attached link titled Twitter:
Web3 is going just great.  FBI links Axie Infinity hack to
North Korean Lazarus hacking group, April 14, 2022.  And says:
*Guys, we are fucking done for.*

           From Roman Storm --

P7T5sto6                    Mizbani - Direct

THE COURT:  I did not mean to interrupt.  I wanted to ensure that these actually have been admitted as exhibits.  You are reading from exhibits that have been admitted rather than exhibits you seek to admit.  That was my question.

MS. ANDAZOLA MARQUEZ:  Yes, your Honor this exhibit has been admitted and entered into evidence as GX 2047-T.

THE COURT:  Mr. Arad.

MR. ARAD:  I believe this exhibit has already been read into evidence, your Honor.

THE COURT:  OK.  My question is are these exhibits previously admitted into evidence.  The answer is yes.

MR. ARAD:  Yes.

THE COURT:  Thank you.

You may continue.

BY MS. ANDAZOLA MARQUEZ:

Q.  Ms. Mizbani, can we start from the top?

A.  Yes.

From Roman Storm, it includes an embedded link titled *Twitter, Web3 is going just great.  FBI links Axie Infinity hack to North Korean Lazarus hacking group,* April 14, 2022 and says:  *Guys, we are fucking done for.*

From Roman Storm:  *We urgently need to embed the OFAC sanctions list.*

From Roman Storm:  *Guys, basically, I think this is serious and we need to act very fast.*

P7T5sto6                      Mizbani - Direct

From Roman Storm:  *The address has already been added to the OFAC list.  These hackers are using Tornado.  We urgently need to tell everyone that we do not let such individuals to the front.*

Q.   Ms. Mizbani, I will now direct you to the next page, and for purposes of this page, I will read the messages from Roman Semenov and you can read the messages by Roman Storm.  Can you please start with the first message?

A.   From Roman Storm:  *But this is a very good thing for positioning.*

From Roman Storm:  *Well, even doing it onchain is fine since it is easy to bypass, while smart contracts do not deposit into us.*

Q.   And reply from Roman Semenov:  *I agree.*

From Roman Semenov:  *Then we will also need to do the open source right away?*

MS. ANDAZOLA MARQUEZ:  Mr. Demarco, can we show the next page?

Q.   Ms. Mizbani, can you start with the first chat?

A.   From Roman Storm, with an embedded link titled:  Time: U.S. links North Korean hacker group to record crypto heist. North Korean hacking group Lazarus was found tied to the theft of more than 600 million in cryptocurrencies.

Forwarded from Roman Storm:  *To block addresses.*

Forwarded from Roman Storm:  *This is very serious.*

MS. ANDAZOLA MARQUEZ:  Can we display the next page, Mr. Demarco?

Q.  Ms. Mizbani, can you start with the first message displayed on this page?

A.  Forwarded from Roman Storm:  *Let's do an on-chain proposal fast.*

From Roman Storm:  *Guys, this is not a joke.*

From Roman Storm:  *We need to do it urgently.*

From Roman Storm:  *Very fast, and it doesn't fucking matter whether it's at the open source or in any other way.*

MS. ANDAZOLA MARQUEZ:  Mr. Demarco, please continue to the next page.

Q.  Ms. Mizbani, can you start with the first message on this page?

A.  From Roman Storm:  *Or at UI plus onchain.*

From Roman Storm:  *A guy got five years of prison for sanctions.*

From Roman Storm, with an attached Twitter link, from Twitter, Dirty Bubble Media @tornado.cash laundered 26,300 ETH, $712.9 million for the North Korean government over the last two weeks.  Every holder of $TORN is an accomplice to violating sanctions.  All ether held in or withdrawn from @tornado.cash wallets is sanctionable.

From Roman Storm:  *Shit!*

MS. ANDAZOLA MARQUEZ:  Mr. Demarco, the next page?

Q.   For the purposes of the next page, I will read the messages from Roman Semenov and you can read the messages from Mr. Storm.

Can you start with the first message?

A.   From Roman Storm:  *Where are you guys?*

Q.   From Semenov:  *Send a Zoom.*

A.   From Roman Storm:  *Hold on.*

From Roman Storm:  With an embedded Zoom video link.

MS. ANDAZOLA MARQUEZ:  Next page, Mr. Demarco?

Q.   Please proceed with the first message on this page.

A.   From Roman Storm, in reply to the Zoom video link @Alex Pertsev.

Q.   From Roman Semenov:  Tornado Cash uses @Chainalysis Oracle contract to block sanctioned addresses from accessing the dApp. Maintaining financial privacy is essential to preserving our freedom, however it should not come at the cost of non-compliance.

Embedded link to Etherscan IO address and I will not be reading the address.

Ms. Mizbani, can you proceed with the next chat on the next page?

A.   From Roman Storm:  *Tornado Cash uses @chainalysis Oracle contract to block OFAC sanctioned addresses from accessing the dApp.  Maintaining financial privacy is essential to preserving our freedom, however, it should not come at the cost of*

*non-compliance.*  With an attached link to an Etherscan.io website.

Q.  From Roman Semenov:  *We just need to make sure that all the link and other fucking crap got updated before we tweet.*

From Roman Semenov:  *Add a bad address to the frame and try to log in and do some testing.*

MS. ANDAZOLA MARQUEZ:  Next page?  Can you proceed with the first message on the next page?

A.  From Roman Storm in reply:  *Yes, I'll test it.*

From Roman Storm:  *The .limo went through.*

From Roman Storm:  *The .link didn't, not yet.*

Q.  Can we proceed with the message on the next page?

A.  Forwarded from Roman Storm:  *What do you think, Admins?*  With an attached image.

From Roman Storm:  *The fucking .link won't go through.*

Q.  From Roman Semenov:  *I'm here, if needed.*

MS. ANDAZOLA MARQUEZ:  That's it for GX 2047-T.

Next we would like to move into evidence what has been marked as Defendant's Exhibit 8790.

Mr. Demarco, could you please display for the parties and the Court what has been marked 8790?  This is subject to the Court's prior ruling from yesterday.

THE COURT:  Can you go forward a few pages so that I can see it?  I am just seeing the first page.

It is admitted into evidence, subject to my ruling of

yesterday.  It may be shown to the jury.

(Defendant's Exhibit 8790 received in evidence)

MS. ANDAZOLA MARQUEZ:  Mr. Demarco, can you please display page 2 and 3 side by side?

Q.  Ms. Mizbani, can I direct you to read both messages that are shown?

A.  Yes.

From Haseeb, with an embedded link to a website from Hub.elliptic.co/analysis/The 100 million horizon hack following the trail to Tornado Cash to North Korea.

From Roman Storm:  *On the other hand, I am glad those fuckers are detected.*

MS. ANDAZOLA MARQUEZ:  That is all, your Honor.

THE COURT:  I didn't think there would be cross examination of this witness but I should ask Mr. Arad.

MR. ARAD:  There is not.

THE COURT:  You may step down.  Thank you very much.

(Witness excused)

THE COURT:  Other stipulations or exhibits, Ms. Marquez?

MS. ANDAZOLA MARQUEZ:  That is all from me, your Honor.

THE COURT:  Thank you very much.

Mr. Klein?

MR. KLEIN:  Nothing further from the defense.  We

P7T5sto6                          Mizbani - Direct

rest.

THE COURT:  All right.  Let me speak to the jury for just a moment.

As you just heard, the defense has rested.  As I mentioned to you at the beginning, they did not have an obligation to put on a case but they have put on a case and they have now rested.  In this circumstance the government has the ability, if it wants to, to put on rebuttal case.

Is there rebuttal case, Mr. Arad?

MR. ARAD:  There is not.

THE COURT:  Therefore, that is the end -- that is all of the evidence in this case that we are going to get so your question, naturally, *Well, what does that mean for us?*  So, let me speak to the jury specifically.

The evidence is in.  That does not mean you can be talking about the case just yet.  The next phase in the case is that of summations and I compliment you for your attentiveness and your timeliness and I compliment the parties who have done what I thought they would do when we were talking about jury selection and have very significantly cut down their cases to make them as streamlined as possible for you.

We had talked about four weeks and here we are on the second day of the third week with two days where we didn't sit, so we have actually made tremendous progress and all involved in this case are to be complimented.

Tomorrow morning we will begin with summations.  The government will go first and then the defense and then the government has the opportunity for rebuttal summation.

Given what I know about the progress of summations, it would be my expectation that when those are done there would be enough time in the day for me to charge you, and my charge will take probably about, let's say 90 minutes.  And then, depending on where we are in the day, you would then get the case for your deliberations.

What I want to underscore is a couple of things right now.  First of all, once the case is in your hands, you determine how late you wish to stay.  For example, if you get the case tomorrow -- well, let me use a ridiculous example.  Let's say you get the case tomorrow at 9:00 a.m. -- no, you are not going home at 9:30 so don't be thinking like that.  But, if it is 4:00 in the afternoon or 3:00 in the afternoon and you believe that you would be better, fresher resuming on Thursday, that's fine.  You let us know.  I'm telling you this tonight because if you have child care or employment or other obligations and you want to give yourself maximum flexibility for tomorrow, Thursday, and beyond, now would be the time to do that.  So it is you will tell us when you are done for the day and we will await hearing from you on that.

Secondly, I am just going to remind you of something I said long ago back when we started, and that is to the extent

there is any press coverage of this or any other cases in this space, you are only -- you should not read such coverage. You should not do any independent research on this case or its subject matter or any of us who has anything to do with the case or anyone you may have seen as a witness because you are only allowed to consider the evidence that has come in to court in this courtroom for this case.

Now, even though the evidence is in, you still can't talk to each other or anyone else about the case because you haven't been charged.

So, I am going to look to the parties and if there is anything else that I should be addressing to the jurors, Mr. Arad.

MR. ARAD:  Nothing from the government.

THE COURT:  Mr. Klein?

MR. KLEIN:  Nothing from the defense.

THE COURT:  All right, then we are going to let you go a little bit early today. We do thank you, as always for your attentiveness and patience. We will see you tomorrow. Please get here at 8:45 so we can beginning at the crack of 9:00 with summations. Do not discuss this case with each other or anyone else. I thank you very much.

All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Counsel, I am ready to proceed unless anyone needs a break.

MR. KLEIN:  Your Honor, I think some people on our side would like a few minutes to stretch and do more things.

THE COURT:  All right.  I will see you in 10 minutes and you can stretch and rearrange things.

MR. KLEIN:  Do you want me to renew?

THE COURT:  Yes, you are renewing your Rule 29 motion and I am continuing to reserve on it.

MR. KLEIN:  The defense renews its motion.

THE COURT:  Yes.

MR. KLEIN:  Under Rule 29.

THE COURT:  It is done.  Yes?

MR. ARAD:  Government opposes the motion.

THE COURT:  OK.  Thank you.  I will see you in 10 minutes.  Thank you.

Counsel, one more thing -- I'm sorry it is a little jack-in-the-box-like.  I don't mean it.

I was planning on telling the jury everything that I planned on telling the jury a few moments ago.  In the course of this afternoon I did -- I thought I received something -- no, never mind.

MR. PATTON:  Your Honor, my apologies.  I'm not going to be here for the charge conference.

P7T5sto6                      Mizbani - Direct

THE COURT:  Because you are working on your summation.

MR. PATTON:  Correct.

THE COURT:  OK.

MR. PATTON:  Related to the summation, I raised this with the government.  In most normal courtrooms you have the monitor at the podium so you can see what the jurors are looking at.

THE COURT:  Yes.

MR. PATTON:  And here we don't because it is this permanent one here.

THE COURT:  Yes.

MR. PATTON:  So we were wondering if there is a way to get a monitor that we can see while we are doing our addresses what the jury sees.

THE COURT:  Sometimes the government allows, gives one of theirs over to be used for summations.  Would there be a problem doing that?  The answer should be no.

MR. ARAD:  No, no problem with that, your Honor.

THE COURT:  Mr. Patton, can we turn one of those around so you can see?

MR. PATTON:  If that is possible to do, that's great. I didn't know whether there was a way to set up an independent one but that's fine.

THE COURT:  I'm not aware.  I will ask Ms. Noriega.  I think in the past what we have done is we have turned one of

those around.

MR. PATTON:  That will work.

THE COURT:  Thank you.  And government would be using the same as well while it is speaking because we have the -- it is the podium over there.

Off the record.

(Discussion off record)

THE COURT:  Thank you very much.  I will see you in 10 minutes.

(Recess)

THE COURT:  Thank you very much.  Please, be seated.

Hi, Mr. Klein.  What's up?

MR. KLEIN:  Your Honor, with apologies.  There is one matter related to the under seal letter that you received while we were all in court and I would like to talk to your Honor at side bar, under seal, about it.

THE COURT:  Yes.

MR. KLEIN:  I have talked to the government, they're fine with us at least talking under seal about it.

THE COURT:  I shall meet you all at side bar.

Thank you very much.

(Pages 2220-2222 SEALED by order of the Court)

(Continued next page)

(In open court)

THE COURT:  Counsel, in anticipation of the charge conference, I circulated on Sunday afternoon a draft that was dated July 27, 2025, and also said For Charge Conference.  I have received since then letters from the government and from the defense that are dated July 28, 2025, and we can talk about those momentarily.

I never know what is the best way to proceed in this setting.  I will let you know that my general mind-set about this is that I welcome any typographical error you have identified because I get very embarrassed when the jury sees them, and certainly I want you to tell me if what I'm doing is reversible error, but wordsmithing I am less interested in.

Ms. James, are you the point person for your side?

MS. JAMES:  Yes, your Honor.

THE COURT:  I beg your pardon?

MS. JAMES:  Ms. Axel and I will be arguing.

THE COURT:  Of course.  Of course.  Where is the first page on which you have a comment?

MS. JAMES:  I believe it would be on page 8, your Honor.

THE COURT:  Page 8.

Does the government have something before page 8?

MR. REHN:  No, your Honor.

THE COURT:  Ms. James, I'll hear from you on page 8.

MS. JAMES:  On page 8 on the "beyond a reasonable doubt" instruction.

THE COURT:  Yes.

MS. JAMES:  We did propose in our instructions that the Court use the term "firmly convinced."

THE COURT:  Yes, which I——oh, please, finish your thought.

MS. JAMES:  Sorry?

THE COURT:  Is your thought simply that you still want me to do that?

MS. JAMES:  I would just assert that we would ask the Court to include the language "firmly convinced" on page 8, as our proposed charge.

THE COURT:  The request is denied.  I did some looking through what we have.  We have a repository of charges that go back many years from many judges, and I haven't seen any of my colleagues use the "firmly convinced" in, well, in the entirety of the database that I have, which I won't say it's every judge in every case.  But I did see your request and I will note your objection to its noninclusion.  Thank you.

All right.  The next page.

MS. JAMES:  The same page, or I'm not sure where the Court would want to put it, but I did note that we had proposed an instruction on the testimony of experts and the Court has not included that, so——

THE COURT:  You'll excuse me.  I may have deleted it unwittingly, which it appears that I did.  There was at one point in its existence an expert witness charge.  I will put it in.  I tend to put it in before the preparation of witnesses. It's a pretty anodyne charge.  I'll circulate it this evening. Excuse me.  And thank you for catching that I did not have it. Thank you.  That I will add.

All right.  Anything else on that page?

MS. JAMES:  No, your Honor.

THE COURT:  All right.  The next page on which you have an edit, please?

MS. JAMES:  It would be on page 17, your Honor.

THE COURT:  Does the government have any before page 17?

MR. REHN:  No, your Honor.

THE COURT:  All right.  I am on page 17.  Thank you, Ms. James.

MS. JAMES:  This is the instruction F, which says, "Witnesses testifying pursuant to cooperation agreements or nonprosecution agreements."  In the first line, the Court has "who testified that they themselves engaged in criminal conduct" for the end of that first sentence.  But I believe that Mr. Bram did not testify that he engaged in criminal conduct.  In fact, he testified I think that he believed he had not.  But sort of as a precaution, he entered into the

P7T1STO7

nonprosecution agreement.

THE COURT:  It was a little bit confusing because he said he didn't think he had done anything wrong and yet on advice of counsel, he entered into a nonprosecution agreement, which would suggest at least some concern that he had engaged. What are you proposing?  Do you propose just going directly to testifying?  "You've heard testimony from several witnesses who testified," the three names, "who testified pursuant to"?  "You heard testimony from several witnesses," and then the three names, and then pick up with the next sentence?

MS. JAMES:  Right.  You could do that or say, "who testified pursuant to agreements with the government."

THE COURT:  Well, I'd like to distinguish between the two.

Mr. Rehn, am I directing these to you or someone else at your table?

MR. REHN:  To me, your Honor.

THE COURT:  All right.  That is the issue with Mr. Bram.  I suppose I could say, "You've heard testimony from several witnesses, including Andre Llacuna and Shakeeb Ahmed, who testified that they engaged in criminal conduct, and from Justin Bram," to combine those two.  I'm not sure it's essential that we have them testifying that they themselves engaged in criminal conduct.  So if it's acceptable to you, I would delete that clause and combine the two sentences.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MR. REHN:  That seems fine to us, your Honor.

THE COURT:  All right.  And Ms. James, as you know, this particular instruction is usually designed to aid the defendant by allowing him to distinguish himself from others. As I mentioned in our pre-charge conference, this is the unusual case where I have folks engaging in criminal conduct though not with the person against whom they're testifying. Are there other comments in this section, Ms. James?

MS. JAMES:  No.  The rest of the instruction we're fine with, your Honor.

THE COURT:  All right.  Is it acceptable, yes, Mr. Rehn, for you, sir?

MR. REHN:  I just noticed it's missing a "to," "Mr. Bram testified pursuant to a nonprosecution agreement," in the interest of typographical errors.

THE COURT:  No, that's exactly what I want.  Thank you very much.  I will add it.  Not sure where that "to" went, but it is not there; you're correct.  Thank you.

Ms. James, the next page on which you have edits?

MS. JAMES:  Page 28.

MR. REHN:  We have a 23, your Honor.

THE COURT:  One moment.  We are in agreement that I am deleting instruction K, testimony from Mr. Storm.  And I'm removing the "if applicable" from what is currently instruction L, instruction L, and will become—well, it will probably stay

at L because K will end up being the expert witness charge.  So that's acceptable to the parties?

MS. JAMES:  That's acceptable, your Honor.

THE COURT:  Of course.  Thank you.  I didn't think otherwise.

Mr. Rehn, you have something on 23?

MR. REHN:  Yeah.  Well, this is the issue that the Court was—and is it okay if we sit for the charge conference or would you prefer if we stand?

THE COURT:  No, that's fine.  I want to hear you and I want you to be able to consult your documents.  Go ahead.

MR. REHN:  Thank you, your Honor.

We are perfectly willing to have the indictment sent back to the jury room.  We do think that given that there are objects of both Counts Two and Three that aren't being presented to the jury, we should use a redacted version of the indictment.  And so we're happy to prepare one and give it to the defense this evening so they can review, and then we can give it to the Court in the morning.

THE COURT:  That would be my hope.

Ms. James, Ms. Axel, is that something that can be—you understand the concept.  Are you philosophically opposed to the concept of redacting the indictment to remove that which the government has not pursued?

MS. AXEL:  No, your Honor.

THE COURT:  Yes.

MR. REHN:  And typically what we would do, we would also remove the forfeiture allegations.  But typically we would just take the Word document and remove that.  So it's not like a document with white patches or black patches.

THE COURT:  Sometimes you're able to work it out to keep the signature page, which I understand, but I do think the forfeiture allegation should be removed if the defense has no objection to that.

MS. AXEL:  No objection.

THE COURT:  Okay.  Thank you.  So I will know that the parties will provide a redacted indictment.

Go ahead, Mr. Rehn.  Something before page 28?

MR. REHN:  On page 25.

THE COURT:  Sir, yes.

MR. REHN:  At the bottom of that, it says, "The question of whether a person acted knowingly or willfully is a question of fact for you to determine, like any other fact question."  I believe the word "unlawfully" should be added there, given the definitions on that page, all of which apply, I think, to the charges.  So we believe it should say, "The question of whether a person acted knowingly, willfully, or unlawfully is a question of fact for you to determine."

THE COURT:  Ms. James, agree, or at least not oppose?

MS. JAMES:  No opposition, your Honor.

THE COURT:  Okay.  That might also come later on at the end.

MR. REHN:  It's on the next page, your Honor.

THE COURT:  On the next page in the last sentence, or last paragraph.

MR. REHN:  Same edit there.  Knowingly, willfully, or unlawfully.

THE COURT:  Let's say unlawfully, knowingly, or willfully, because that's how I present it to them, but yes, okay, understood.  Thank you.

And then are we at 28?  Okay.  Ms. James, page 28? I'm at 28 with you.

MS. JAMES:  Yes, your Honor.  On the first element of the agreement, we would ask that the Court give our proposed instruction 14 on page 18 of our revised proposed jury instructions, and in particular, we would ask that the Court——

THE COURT:  I'm sorry.  I printed out your original one and I, candidly, paid less attention——I hope you take that in the right way——to the revised because it was focused on Count Three.  But is the revision in here?  It's in here too?

MS. JAMES:  No, there's no difference on that one.

THE COURT:  So please tell me the instruction again.

MS. JAMES:  Just the beginning part of instruction No. 14, and there's some specific language that we want to include, which is that it be with the specific intent to commit

the offense that is the object of a conspiracy.  And that comes from the *Garcia* case, which we did cite in our proposed instructions, 587 F.3d 509, 515.

THE COURT:  Let me hear from the government, please.

MR. REHN:  Your Honor, we would oppose the addition of that language because I think it's fairly captured by the other language in the charge regarding the requirement to prove that he knowingly and willfully became a member of the charged conspiracy, which I think is the more standard charge in the district and it's been affirmed repeatedly.

THE COURT:  Mr. Rehn, just putting aside what is common in this district and what is less common, is this language incorrect?

MR. REHN:  Actually, I would have to look at the *Garcia* case.  I haven't typically seen it described as a specific intent offense in this way, so——

THE COURT:  My concern, candidly, Ms. James, is that when I see specific intent, I start thinking about things like *Cheek* and *Ratzlaf* and where you have to know what the offense is.  So I found that language in tension with other language. I mean, "knowingly and willfully became a member of the charged conspiracy" I would have thought would have encompassed it.  I myself got hung up on the specific intent.  But I'll look at *Garcia* and I either will or will not include it, and you'll either have your objection or not.  All right.  Thank you.

All right. Then next? That's page 28. Is there anything else on page 28 for either side?

No? Thank you. Tell me please the next page on which you have an edit, Ms. James.

MS. JAMES: Page 30, your Honor.

THE COURT: Page 30. All right. Yes, I'm here. Oh, and excuse me, please.

Mr. Rehn, anything before page 30?

MR. REHN: No, your Honor.

THE COURT: Thank you.

All right. I'm on page 30, Ms. James.

MS. JAMES: We would like to add some language that we had in our proposed instruction No. 14A on page 19, and that is specifically language toward the bottom of that instruction that says, "Mere discussions about crimes or mere knowledge of crimes without an agreement to commit them is not a conspiracy. Further, agreement to achieve a lawful goal is not the same as a criminal conspiracy. Two or more individuals must have agreed to commit the crime of conducting financial transactions, knowing that they involved the proceeds of specified unlawful activity and knowing that the transactions were designed in whole or in part to conceal or disguise the ownership or control of the proceeds of specified unlawful activity. "

THE COURT: Okay. I did see that. I deliberately did

not include it.  I thought it was encompassed by other aspects of the charge, including the section on inferences and then the section later on on conscious avoidance and then the section on good faith.  So your objection is noted.  Thank you.

The next page on which you have an edit?

MS. JAMES:  Page 31, your Honor.

THE COURT:  31.  Okay.  I am there.

MS. JAMES:  This is perhaps not a major point, but we think that the end of that first paragraph that says, "As I mentioned a few moments ago," and to the end of that paragraph just seem unnecessary, may be confusing here, because the Court is just addressing Count One at this point in the instructions, so referring to Count Two and Three may be a little confusing at that point.

THE COURT:  I see.  You're talking about the very top, the top paragraph on the page.

MS. JAMES:  The top paragraph.

THE COURT:  You know, I've gone back and forth on this.  As you know, this was the genesis of our "pre-charge" conference" charge conference, because I was inverting these two.  I don't think it's confusing, but I also am quite agnostic about it.  This is not one I think the government should go to the mat on.  All right.  You want the rest of the—

MR. REHN:  Your Honor?

THE COURT:  Go ahead, sir.

MR. REHN:  I'm not going to go to the mat on this, but we had spent some time wrestling with the same issues that the Court has indicated with the conspiracy, substantively sort of how to explain it all in a digestible way, and I think the way the Court has done it makes sense, but it seems that the way the Court has done it is to really provide this general overview of conspiracy law up front, which is why I assume the Court added this language here on——

THE COURT:  That is correct.

MR. REHN:  ——31, so I do wonder if it will be somewhat confusing to the jury if they don't hear these instructions again, if this helps to connect some of this language to the subsequent offenses.

THE COURT:  That was its purpose.

MR. REHN:  So just for purposes of clarity, it made sense to us.

THE COURT:  All right.  You found it clarifying, the defense found it confusing.  Great.

Well, I will keep it.  Thank you.

All right.  The next?  Is there something else on page 31, Ms. James?

MS. JAMES:  Yes, the bottom of 31 to the top of 32. There's some language stating, "It is not necessary for the government to show."

THE COURT:  Yes.  This, you've asked me to delete it, the government has asked me to retain it.

Mr. Rehn, you want this stuff in why?

MR. REHN:  Yes, your Honor.  Well, we outlined this in the letter we filed I think on Friday.

THE COURT:  And you just want to stand on that.

MR. REHN:  I can explain further if the Court would like, but I think that the letter essentially explains the basic point, which is, this is a conspiracy that extends, as alleged, at least with respect to Count One, over a span of almost two years.  It's certainly possible the jury could conclude that the defendant was only a sort of member of the conspiracy for some portion of that time, and may not have had full visibility into all aspects of, you know, the conspiracy.  For example, there are messages where Semenov and Pertsev are discussing something.  I don't know what arguments the defense might make, but I think this is a pretty standard instruction to make sure the jury understands there's been a lot of evidence of the conspiracy, and the defendant doesn't have to have been read into all aspects of it, necessarily, in order to be guilty of it.

THE COURT:  What about the last paragraph?  Is there any suggestion of withdrawal?

MR. REHN:  The last paragraph on page?

THE COURT:  33.  Because, Ms. James, I presume you

wanted that out as well, or maybe not?

MS. JAMES:  33, your Honor, I think that's unnecessary as well, yes.  The last reference on page 33; is that what you're looking at?

THE COURT:  No one seems to be arguing that there was withdrawal.

MR. REHN:  I think that would be——I think there would be less we would point to in the record that would support a concern that the jury might find withdrawal, so——

THE COURT:  I don't think the defense is going to argue withdrawal.  The defense is going to argue there was never a conspiracy, or at least not one that their client joined.

MR. REHN:  I think that's likely correct, your Honor.

THE COURT:  All right.  Is there a reason that we need it?  One could argue, Ms. James might argue, that it's confusing to include that language.

MR. REHN:  I'm not going to go to the mat on that one either, your Honor.

THE COURT:  All right.  Then, Ms. James, we'll take out the last paragraph of that section.  Thank you.

MS. JAMES:  That's fine, your Honor. And just to be clear, but you are keeping the language on 31 to 32?

THE COURT:  I am, with notice of your objection, yes. Thank you.

All right.  Ms. James, your next edit, please, proposed edit?

MS. JAMES:  Okay.  Starting on page 33 and then going over to 34, we would ask that the Court give our proposed instruction 14B on pages 20-21.

THE COURT:  Okay.  No is the short answer.  You actually want there to have been a transaction conducted.

MS. JAMES:  Well, I think that's the way we structured our instruction.

THE COURT:  It is.  And that's exactly why I'm rejecting it.

MS. JAMES:  And we—

THE COURT:  Thank you for not talking over me.  But tell me if there's something else that—

MS. JAMES:  Yes, your Honor.  There are some specific points.

On the first element, we would like to say first that a person who is part of a conspiracy would—we could say would conduct a financial transaction.  I think it's important to have in there that the person who's part of a conspiracy be the one who's going to be conducting the transaction, and I think that's missing in the instruction.

THE COURT:  Yes.  Except what I say is that Mr. Storm agreed with one or more people to conduct a financial transaction, which presupposes that one of them, one member of

that agreement is going to be the conductor of the transaction. So, okay.  Keep going.

MR. REHN:  We actually had one on 33 and 34 as well, your Honor.

THE COURT:  Okay.  Let Ms. James finish her points and then I'll hear yours.

MS. JAMES:  Third and fourth elements listed on page 34, we would like an instruction that—again, I guess it's the same objection, just to be clear, that it would be a person who's a part of the conspiracy.  And also, though, that those elements require that Mr. Storm have the requisite knowledge, not just that one of the co-conspirators have the knowledge but that Mr. Storm have the knowledge.

THE COURT:  By the time we actually get to the third element, unless the government's backing away from its own proposed instruction, the government is agreeing that, I believe, that—we have a ways to go till we get there.  I thought they were saying that—hold on, please.

Page 43, that Mr. Storm knew that the property involved in the financial transaction was the proceeds of some form of unlawful activity.  That's their proposed instruction, so I took it.  My own view is that the conspiracy, it has to be that someone did, that he agreed.  By saying he agreed with one or more people to engage in a financial transaction with knowledge, I think that covers it.  Okay.  So I'm not going to

change the listing on page 34 based on your proposed

instruction on pages 20 and 21.

Mr. Rehn, what is the government's edit in this area?

MR. REHN:  So on the portion that runs from

pages 33-34——

THE COURT:  Yes.

MR. REHN:  ——the sort of overview of what

Section 1956(a)(1)(B)(i) prohibits.

THE COURT:  Yes.

MR. REHN:  It omits the knowledge, the knowledge that

the transaction represents the proceeds of some form of illegal

activity.  I don't know if it's necessary because then it's

picked up in the third numbered paragraph underneath that.

THE COURT:  I see.  So what you're saying is, the last

line of page 33, the knowing isn't merely that the transaction

was designed to conceal but knowing that the transaction

involves the proceeds of a specified unlawful activity.

MR. REHN:  Well, that it involves the proceeds of some

form of unlawful activity.

THE COURT:  Some form.

MR. REHN:  So we would add that language sort of at

the top of page 34, I think, sort of at the end of that

sentence.

THE COURT:  Ms. James, I imagine you would not object

to that.

MS. JAMES:  I'm sorry.  I'm just a little unclear on where that would be.

THE COURT:  We're at the bottom of page 33, carrying over onto page 34, and the omission, my omission is that I say that it is illegal to participate in a financial transaction that involves the proceeds of a specified unlawful activity, and then I say knowing that the transaction was designed to conceal or disguise, and I omitted the knowing that the proceeds were of some form of unlawful activity.  So I will add that clarifier.  And then separately, knowing that the transaction was designed to conceal or disguise.  So yes, I elided an element there.  So.

MS. JAMES:  No objection.

THE COURT:  No objection.  Thank you.  Okay.

MR. REHN:  And then lower down on page 34, you have the word "specified" in the knowledge paragraph, the third paragraph, which should be taken out, because the defendant doesn't have to have knowledge that it's at a specified unlawful activity.

THE COURT:  On third?

MR. REHN:  Yes.

THE COURT:  Yes, my mistake.  So third would be some form of unlawful activity.  Okay.

Yes.  Ms. James, your next?  Is it on 34 or 35?

MS. JAMES:  I think I had a 36.

P7T1STO7

THE COURT:  Oh, great.  I say that in jest, of course.

Mr. Rehn, something on 34, 35?

MR. REHN:  No, your Honor.

THE COURT:  Thank god.  Okay.  Page 36, yes.

MS. JAMES:  Okay.  Several things on page 36.

On the first paragraph, again, I think the Court's already expressed its view, but just for the record, we would want to say Mr. Storm conspired with one or more people that a member of the conspiracy would conduct a financial transaction.

THE COURT:  Yes.  And I believe that is clear from the sentence.  Thank you.  I understand.

Okay.  Others?

MS. JAMES:  We have some additional language we would like to add to the end of that paragraph, your Honor, and that's given what we think the government may argue.  And that would be to say, "I instruct you that the TORN tokens sold and distributed by Mr. Storm and the two other Peppersec co-founders are not the subject of the charge of conspiracy to commit money laundering."  And that's because we have a concern that the jury might become confused, with so much emphasis on the sale of the TORN tokens and the distribution of those tokens, that that is the proceeds or those are the proceeds that would be at issue, and that's not the proceeds that the government has charged.

MR. REHN:  Your Honor, I don't think any of our

arguments would suggest that, and I don't think it's necessary to add that. I just don't think there's a risk of jury confusion. I think the jury is pretty well aware of the money laundering being directed at the operation of Tornado Cash. That's been the entire focus of the case, and the evidence of the cashout of the TORN tokens has gone to the defendant's intent and his profits from the Tornado Cash, but we certainly don't intend to suggest those transactions are the charged money laundering in this case.

THE COURT: Given that, what is the opposition to an instruction that clarifies for the jury that that's not what you're talking about?

MR. REHN: Well, I just think it sort of adds sort of a confusing—you know, correcting a misimpression that nobody's likely to have could sometimes create more confusion than it solves. I just don't think there's any basis to have the concern that the defense is suggesting, and so it almost calls attention to something to dispel a notion that we haven't argued, we haven't suggested, and unnecessarily complicates the charge.

THE COURT: Ms. James?

MS. JAMES: Yes, your Honor. We would just ask for that clarification, your Honor. Just because you never know, you know, how the jury might get confused, and we do think that even if it's not going to be overtly argued by the government,

that that language be——

THE COURT:  But here's the thing, Ms. James.  Very soon they're going to learn that the specified unlawful activities are computer fraud and abuse and wire fraud, and there's not going to be any suggestion that any of the TORN sales are in any way involved with the computer fraud and abuse, which I understand to be the hacks, and the wire fraud, which I understand to be Ms. Lin.

MR. REHN:  And Mr. Llacuna, your Honor.

THE COURT:  And Mr. Llacuna.  Please excuse me.  Yes.  So I don't see how they're going to be confused.  So I'm not going to include it.  Thank you.

Other things on that page, Ms. James?

MS. JAMES:  Yes, I do.  The bottom of page 36.

THE COURT:  Yes.

MS. JAMES:  The government——or excuse me——the Court's instruction has two possibilities, either that the financial transaction in fact involved the proceeds of one of these specified unlawful activities——

THE COURT:  I'll just ask you to slow down for court reporter and judge.  Thank you.

MS. JAMES:  Or two, that Mr. Storm believed that the financial transaction involved the proceeds of one of these crimes.  And it's the second part that we have an objection to, the belief part.  This was the subject of the government's——one

of the subjects of the government's letter.  They cited Hassan.

THE COURT:  Yes.

MS. JAMES:  But this case is different from *Hassan*. *Hassan* offers no real analysis of the issue.  The government sort of seized on this word "belief" in that case, but it was a very different situation in that case, where there was not evidence that the drugs at issue actually contained a controlled substance, so the issue of the defendant's belief was in issue in that case.  That isn't really the case here. It's really not going to be any question that there was SUA, frankly, so the only issue is going to be whether the defendant knew about that, and our concern with the belief instruction is that it may undercut the knowledge requirement that Mr. Storm know that the proceeds were from some unlawful activity.

THE COURT:  Mr. Rehn, we talked about this last time, and I'm going to renew it again.  To me——and apologies for, you know, dragging out the former appellate lawyer that I was, but——I don't know why you're buying the appellate issue here if, if, you're lucky enough to obtain a conviction.  I cannot believe that the jury here is going to believe that you did not prove that the financial transaction in fact involved the proceeds of one of the specified unlawful activities.  I think this is one you should give up.

MR. REHN:  Your Honor, I'm less concerned about the appellate issue given how clear *Hassan* is, but I do think that

the way the evidence has come in, there's been less sort of dispute about the SUAs than we expected, and so I think, you know, barring some surprising arguments in the defense closing that would necessitate this sort of an instruction, we don't disagree with you that there's no need to include it, I don't think.

THE COURT:  Okay.

MR. REHN:  I mean, if we hear——

THE COURT:  No, no.  I'm sorry.  Excuse me.  My pause was because Mr. Casey is filing something now that I have to address at the same time I'm trying to do the charge conference.  So I'm being double-teamed or tag-teamed by the defense team.

All right.  So, okay.  So I think what that means, Ms. James——let's work through this, please.

On page 36, the paragraph that begins, "In addition, for a financial transaction to involve the proceeds of a specified unlawful activity, the government must prove that the financial transaction in fact involved the proceeds of one of these specified unlawful activities."  And then the rest of the paragraph is deleted.  Correct?

MS. JAMES:  That's correct, your Honor.

THE COURT:  All right.  Mr. Rehn, you agree?  Or at least you're not opposing?

MR. REHN:  We don't oppose, your Honor.  I do have a

concern that if defense closing is all about, do you really even know if these hacks occurred, you know, it would reopen this issue.  So, you know, I just want to flag that issue.

THE COURT:  Goodness.  Ms. James, you're not going to suggest that the Ronin hack actually didn't occur, are you?

MS. JAMES:  No, your Honor.  I don't see that being an argument.

THE COURT:  Okay.  Well, you and I and Ms. Axel are now on notice that if you argue something that like the SUAs didn't actually happen, then the government may renew, and I'll just be frantically recopying the charge, but okay.  For now, okay.

But what does that mean for——I think that means as well the next paragraph is deleted, because it's talking about his knowledge, and then we talk about his knowledge in the next section.  But I want you both to agree before I delete the paragraph.  Because we then talk about his knowledge on page 43.

Ms. James, from your perspective, is that paragraph being deleted?

MS. JAMES:  That's fine with us, your Honor.

THE COURT:  Mr. Rehn?

MR. REHN:  I've typically seen an instruction like this to just clarify that he doesn't have to know the specifics about the unlawful activity.  I'm just wondering if the

instruction on 43 sort of covers the concept adequately.

THE COURT:  Well, look at page 43, sir.

MR. REHN:  Yeah.

THE COURT:  I can put in the language——I don't think the defense is going to argue that Mr. Storm had to participate in committing it.

MR. REHN:  Well, they did argue that in their opening, your Honor.  They said, you know, you're not going to hear——

THE COURT:  Oh, that's right.  Okay.

MR. REHN:  So I think that language is actually very important.

THE COURT:  Okay.

MR. REHN:  So we certainly don't want to lose that language.

And probably, really, if we took this paragraph and sort of put it into the paragraph that runs from 43-44.

THE COURT:  Yes.  Or part of it.

MR. REHN:  Yeah.  I mean, they've actually tried to make a lot of arguments in this area, so——

THE COURT:  Okay.  I understand.  That paragraph is coming out of 37, and some piece of it will end up at page 43, in particular the participating argument.

Okay.  I'm now with the SUAs.  Are there edits to the SUAs?

MS. JAMES:  Not from the defense, your Honor.

THE COURT:  Okay.  Mr. Rehn, edits to the SUAs?

MR. REHN:  No, your Honor.  I—no.

THE COURT:  No.  Well, then I'm at 43.  Unless you have something before then.  And again, I'll take typos.

MS. JAMES:  Yes, your Honor.  I might have misspoken. I do have one on page 43, the very last paragraph of that I guess is the SUA instruction.

With regard to the two specified unlawful activities, this is about the victims.  We would propose striking that paragraph.  We haven't suggested and we're not going to argue that victims were negligent or gullible, so we don't think that that instruction is necessary.

THE COURT:  Mr. Rehn, if they're not going to argue gullibility of the victims?

MR. REHN:  I think that's okay.  I mean, I've heard sort of suggestions in the ether that that was an argument, but I don't know if they directly put it into the trial.

THE COURT:  They were going to be arguing that, and in fact the defense reserved—Ms. James, if I'm not mistaken, you did reserve your right not to argue that individuals were gullible but that entities could have done something different; am I correct?  That was your point from the supplemented MILs?

MS. JAMES:  That's correct, your Honor.

THE COURT:  But now you're not making that argument; you pinkie swear it?

MS. JAMES:  If I could have a moment.

MR. REHN:  If I could just note, I don't know what the purpose of Ms. Axel's cross of Andy Ho, the CTO of the Ronin network was, other than to suggest that there was some flaw in the Ronin network's security that allowed for the compromise. The Court may remember there was a fair amount of cross on that.  So even if they don't firmly argue it in closing, I do have some concern that they've attempted to sort of suggest in the minds of the jury somehow that there's some network security problem that's the real issue here.

THE COURT:  All right.  I'll look at the Ho cross then.  But otherwise, if it doesn't say it, then it may come out.  Okay.  Thank you.

I'm now on the third element of the money laundering object.

MR. REHN:  On that, your Honor, we just note the heading says Specified Unlawful Activity.  It should just say Unlawful Activity, or Some Form of Unlawful Activity.

THE COURT:  My efforts at consistency ended up being incorrect, yes.

All right.  Anything for the fourth element?

MR. REHN:  Just one moment, your Honor.

MS. JAMES:  We have one, your Honor.

THE COURT:  Thank you.  Are we on page 44?

MS. JAMES:  44.

THE COURT:  Thank you.

MS. JAMES:  The first paragraph, we just have, "knowing that the transaction would be designed," we had like for that to say, "and Mr. Storm knew that the transaction would be designed in whole or in part."  We think it has to be Mr. Storm's knowledge.

THE COURT:  I don't know that that's right.

All right.  Mr. Rehn?

MR. REHN:  As the Court has suggested, it's not obvious that's right in a conspiracy charge; but secondly, I think the sentence taken as a whole clearly indicates that the object of the conspiracy has to be a, you know, knowing conducting of a financial transaction.

THE COURT:  But to Ms. James's point, Mr. Rehn, the remainder of the charge, which is what the government has proposed, but of course that's not the end of the story because you're proposing what I proposed in *Wade*, so I'm seeing my own charges put back at me, but then in the next paragraph you speak of Mr. Storm and not of other members of the conspiracy.

MR. REHN:  You're talking about the——

THE COURT:  The paragraph that begins, "In other words."

MR. REHN:  So, and I have to recollect what the *Wade* instruction was.  We were modeling ourselves on *Wade*, and I forget if in *Wade* you also used "the defendant" and that's why

P7T1STO7

we did it here, but——

THE COURT:  Well, in *Wade*, sir, there was a substantive money laundering charge, so of course I was focused on Ms. Wade.  That's what I'm saying.

So Ms. James, to the extent that Mr. Storm has to know it, I think that's clear from the remainder of this section.  I'm not convinced, by the way, that he has to know as distinguished from a co-conspirator, but this is the instructions that both sides have proposed, so I'm letting you take on the burden that you're taking on.  So I'm going to keep it as is.  Thank you.

All right.  I'm in Count Two.

MR. REHN:  We still have some issues on this one, your Honor.

THE COURT:  Oh, and what might that be, sir?

MR. REHN:  So we found it a little confusing, the language that he thought the transaction was to further an innocent transaction at the bottom of that paragraph.  For one thing, it's not clear if that's sort of entirely correct as a matter of law in that as long as the transaction is designed in whole or in part to conceal or disguise the true origin of criminal proceeds, it doesn't matter if it was intended to further an innocent transaction or not.  Like, so I think that that——

THE COURT:  Well, then wouldn't be intended entirely.

P7T1STO7

That's the "in whole or in part," sir.

MR. REHN:  So but again, but an innocent transaction, I'm not sure exactly what that concept even means.  That's not a concept I've encountered previously in the case law that I recall.  We would suggest——

THE COURT:  I'm pretty sure I had this in *Wade*, but okay.  Let me hear your suggestion, and then I'll hear the defense suggestion.

MR. REHN:  So our suggestion would be, at the beginning——first sentence in this paragraph, where it says, "In other words, the purpose and not merely the effect of the transaction must be," we would then suggest adding "in whole or in part" there.

THE COURT:  That's true.

MR. REHN:  And then if we go down to this sentence --

THE COURT:  So you're saying it must be in whole or in part.

MR. REHN:  Yes.  And——

THE COURT:  That is correct.

MR. REHN:  And then for the "However" sentence——

THE COURT:  Yes.

MR. REHN:  ——we would suggest, "if you find that Mr. Storm knew of the transaction but did not know that it would be designed——"

THE COURT:  In whole or in part.

MR. REHN:  "——in whole or in part," or perhaps "at least in part," or something like that.  We would suggest striking the "or that he thought it was intended to further an innocent transaction," but if you are inclined to keep that, it should say something like "entirely or wholly," to make it clear that if any part of a transaction is designed to conceal, it's sort of——if it's mixed in, which is exactly what this case is, it's mixed in, so all of the transactions could arguably be designed to have dual purposes, and so I think this language is potentially confusing to the jury, without clarity.

THE COURT:  All right.  Ms. James?

MS. JAMES:  I object to those changes.  I think the way the Court's instruction reads is appropriate.  The law is that the purpose has to be to conceal or disguise the proceeds, nature, etc., and to add in "in whole or in part" I think adds an element of confusion that isn't really necessary here.  The I think "in whole or in part" may create some notion that the transaction could be pulled apart in pieces or something like that that I think would be inappropriate.

And I do think on a dual intent, which——we're sort of jumping ahead to the dual intent issue, I think, which we would object to as well.  I don't think it's appropriate to instruct about——to sort of minimize or take away from the purpose of the transaction to conceal or disguise the proceeds, nature, location, source, ownership, or control.

THE COURT:  But in fact the law is that it can be in whole or in part.  That is the law, correct?

MS. JAMES:  Your Honor, I'm not sure about that.

THE COURT:  Okay.  Then I'll——

MR. REHN:  Your Honor, that's the language of Section 1953.

THE COURT:  Exactly.  So, okay.  Thank you.  I'm rejecting that particular set of arguments.  Thank you.

I'm now into Count Two, or are we still back in Count One?

MR. REHN:  Nothing further from us on Count One.

THE COURT:  Nothing further on Count One.  Okay. Thank you.

Count Two, page 45.

MS. JAMES:  Yes, your Honor.  We would ask, on 3D2, where it says——the first element, at the end of it, it says, "is the operation of an unlicensed money transmitting business."  I would suggest that we take out the operation and replace it with "to conduct, control, manage, supervise, direct, or own," and that just tracks the statutory language.

THE COURT:  But you have it two pages later.  I explain what is——I don't say, for example, that the object of the conspiracy for Count One is money laundering, or the conduct of a financial transaction knowing it to be——you're asking me to summarize the elements in there, which I will not

P7T1STO7

do.  So thank you.

Other things on page 45?

All right.  Hearing none, page 46.

47.

MS. JAMES:  Your Honor, I have something on 46.

THE COURT:  Oh, okay.

MS. JAMES:  Oh, yes.  It's the same——well, same issue on No. 4, the first sentence, but I've heard the Court's ruling on that, on the operating versus conducting.

THE COURT:  Right.  We're going to get to that.  It's just a few lines away.  You'll get all of that.  So no.

MS. JAMES:  All right.  Moving on from that one.

But the last line, "first, that an unlicensed money transmitting business existed," we think that should read that Tornado Cash was an unlicensed money transmitting business, and that's because they have specifically alleged in the indictment that Tornado Cash——or they called it the Tornado Cash Service——was a money transmitting business, and if they're just allowed to find any money transmitting business, we're a little concerned that that might broaden the charge and cause a problem.

THE COURT:  But I didn't think there was anything else that was going to be argued.  My concern is each of you at times was basically asking me to make your summations for you, and each time I very much resisted that.  I don't think the

P7T1STO7

government is going to argue that the unlicensed money transmitting business was anything other than the Tornado Cash ecosystem.

So Mr. Rehn, please respond.

MR. REHN:  Yes, your Honor.  I mean, obviously it is not an element of this statute that Tornado Cash was an unlicensed money transmitting business, and we have to prove the existence of a business.  There has been dispute over the scope of the business and what counts as Tornado Cash, and I think the jury should be properly instructed as to the element of the statute, and then the parties can make arguments about whether the facts prove and meet that element.  But the Court should not be inserting facts of this case into the elements of the statute.

THE COURT:  All right.  Thank you.  It's rejected.

The next edit, Ms. James.

MS. JAMES:  Page 47, your Honor.

THE COURT:  Page 47?  Okay.  One moment, please.

Yes, I'm there.

MS. JAMES:  The very top of the page, we would just ask that the Court strike "or a co-conspirator."  This is the argument based on *Hoskins* and *Ahmed*.

THE COURT:  Yes, which I have rejected.

But Mr. Rehn, once again, in the vein of staving off a possible appellate issue at some point in the future, are you

really going to be arguing——is there a jury who's going to find that Mr. Storm, if they're going to find for the government, that they're going to find that he did not control, conduct, manage, supervise, direct, or own, and that somebody else did?

MR. REHN:  Well, to just take one example, your Honor, the evidence is that Semenov owned the tornadocash.eth domain, which is a critical part of the business, and so we do think we should be entitled to argue that, as the law permits us to, we can prove this by proving that a co-conspirator owned part of the business.

THE COURT:  All right.  You've potentially brought yourself the appellate issue.  I will keep it.  Thank you.

Other edits on page 47, Ms. James?

MS. JAMES:  No, your Honor.

THE COURT:  Thank you.

Government, 47?

MR. REHN:  Nothing on 47, your Honor.

THE COURT:  Okay.  48.

Ooh, all right.  None on 48.

49?

MS. JAMES:  Sorry.  48, your Honor.

THE COURT:  Oh.  I sounded like I was at a deli counter and I was just trying to move on to the next number.

Go ahead, Ms. James.

MS. JAMES:  Sorry.  Just one small edit on the first

P7T1STO7

full paragraph, where it says the money transmitting business must also be unlicensed. "Under Section 1960, one way in which the money transmitting business." We would just propose striking the "one way in which" language because there's not any other way that's being charged here, there's only one, one way, and we don't want the jury speculating about if there's some other way that the money transmitting could be unlicensed, could be——yes, money transmitting business could be unlicensed.

MR. REHN: We would agree with that, your Honor. And I would also cut the word "is" then at the beginning of the next line.

THE COURT: Wait. So then the sentence reads, "Under Section 1960, a money transmitting business is unlicensed——" oh, yes, thank you for the typo. And I'll take out "is," right, because I had an extra "is" on both sides. So I get one of those is's. Thank you.

Yes, Ms. James? Agreed?

MS. JAMES: Agreed.

THE COURT: Others on that page?

MS. JAMES: Yes, your Honor. We do think that the instruction needs to include and does not include an element that the defendant knew that the alleged business was a money transmitting business, and that comes from *United States v. Elfgeeh*, 515 F.3d 100, 133. And it's in our instruction 15B2 on page 32.

P7T1STO7

THE COURT:  Mr. Rehn?

MR. REHN:  I'm sorry.  What is the request?

THE COURT:  Using *Elfgeeh*.  I looked at this case.  I didn't think it required his knowledge.  So that is rejected.  Thank you.

The next one, next edit on the page, Ms. James?

MS. JAMES:  Just one moment, your Honor.

THE COURT:  Of course.

MS. JAMES:  Yes.  We had some language in our instruction 15B4, also on page 34 of our instructions, that the defendant——it should be made clear, it's not enough for the government to prove that Mr. Storm must have known or anticipated——

THE COURT:  Please slow down for court reporter and judge.  Thank you.

MS. JAMES:  Yes.  We had some language making clear that it is not enough for the government to prove that Mr. Storm must have known or anticipated that some users might use Tornado Cash to transmit criminal funds.  He has to know the specific transactions at the time they occurred.  And we have some authority cited in our instructions, including *Falcone*, *Lopac*, and *Direct Sales*, and we would ask that that language from our B4 be included.

THE COURT:  Mr. Rehn?

MR. REHN:  I don't think that's correct with respect

P7T1STO7

to a conspiracy to operate.  We've talked about this in the context of the money laundering charge.  Without having those cases in front of me, my understanding of the law is that if you are conspiring to operate a business with knowledge that it involves the transmission of criminal proceeds, there isn't a requirement that it even does involve the actual transmission of criminal proceeds, much less that you know the specific transactions involved, similar to the way the money laundering statute works.

THE COURT:  I have this charge from the *Mizrahi* case of Judge Oetken and the *Rahmankulov* case of Judge Abrams.  It didn't have that language.  I'm not going to include it.  Thank you.

I'm now in the second element.  Defense is renewing the objection to not making it specific to Mr. Storm?

MS. JAMES:  Yes, your Honor.

THE COURT:  Okay.  And that will again be rejected.

Government, any edits on 48?

MR. REHN:  No, your Honor.

THE COURT:  49?

MR. REHN:  Nothing from the government.

THE COURT:  All right.  50.  I'm fine if there's nothing, but go ahead, Mr. Rehn.

MR. REHN:  50-51 was I think——and this will be sort of throughout this section.  Count Three actually isn't charged

under Section 371.

THE COURT:  You didn't?  Oh, excuse me.  I must have been working from another draft.  Okay.

MR. REHN:  You may have been looking at an instruction in another case.  It's sometimes charged as a 371, but in this case we charged it under 50 U.S.C. § 1705, which prohibits conspiracy to violate the IEEPA.  It's actually part of IEEPA.

THE COURT:  The section again, please, sir?

MR. REHN:  50 U.S.C. § 1705.

THE COURT:  Okay.  My mistake.

MR. REHN:  That doesn't have an overt act requirement. And so that, you know, applies in this section generally. Beginning on the top of 51 where you cite——

THE COURT:  So I have to take out 371 because it is not under 371, but otherwise, it's correct.  The charge is not incorrect.  I've given it the wrong statutory attribution.

MR. REHN:  That's generally correct.  I think there was a reference to overt act at some point.

THE COURT:  Yes, and what I say is, this is what the defense is suggesting, that like Count One and unlike Count Two, there is no requirement of an overt act.

MR. REHN:  Correct, your Honor.

THE COURT:  So that's what I have.  And we have the unusual situation where I've got one of three conspiracies requires an overt act.  So that's why I was trying——and I may

have failed, but I was trying to be clear there.  Okay.

MR. REHN:  You have that correct here; you just have the wrong statute cited.

THE COURT:  I see that.  Yes.  Okay.  I will make that correction.  Thank you.

Other things, Mr. Rehn, on page 51?

MR. REHN:  No, your Honor.

THE COURT:  Ms. James, the next page on which you have an edit.

MS. JAMES:  I'm going to defer to Ms. Axel on this section.

THE COURT:  Oh, thank you.  Okay.

MS. AXEL:  I have 52, your Honor.

THE COURT:  Yes.

MS. AXEL:  So a couple of things.  While I appreciate this is the most streamlined set of IEEPA instructions I have seen, your Honor, I think in this particular paragraph here, given your Honor's work on it and the deletion of the additional objectives, this has been substantially shortened here, where it now says "to provide or cause other U.S. persons to provide goods or services to, by, or for the benefit of the Lazarus Group."  The indictment, however, was limited to the specific address, 0x098b716 address.

THE COURT:  One moment.  One moment, please.  I just want to turn to the indictment.

MR. REHN:  I don't believe that's correct, your Honor.  I believe it identifies the Lazarus Group pretty clearly.

THE COURT:  I'm looking at what I think is paragraph—are you on page 5 of 7, paragraph 13?

MS. AXEL:  Yes, I am.

THE COURT:  So I see it.  "Roman Storm would and did knowingly and willfully provide and cause others to provide funds, goods, and services to, by, and for the benefit of the Lazarus Group, a sanctioned entity."

MS. AXEL:  "To wit."

THE COURT:  I see the "to wit."

MS. AXEL:  Which narrows the allegation to this particular allegation, which is transfers, payments, money transmitting services, and money laundering in this address.

MR. REHN:  Your Honor, the "to wit" clause does not limit the allegation in the indictment.  That's I think pretty well-recognized law in the Second Circuit.

MS. AXEL:  We believe it does, your Honor, and we believe the broadening the theory that was permitted, that was submitted to the grand jury, even though we haven't seen the grand jury transcripts, but we believe it's clear there that the theory—all of these objectives were limited to this address and that was their theory.  I understand they put in other evidence, but I did not believe that to be leveled at or aimed at the sanctions charge here, the IEEPA charge, because

all of these were cabined by the address.  And so we think that in the jury instruction, where it says "to, by, or for the benefit of the Lazarus Group," it should be "to, by, or for the benefit of" the 0x098b716 address, and that that same change should be made in the third element.

THE COURT:  All right.  Let me look at the "to wit" clause, the degree to which the government is bound by its "to wit" clause, and I'll make that determination.

MS. AXEL:  One more thing on that page, your Honor.

THE COURT:  Let me please write down the comment you've just given me.  Thank you.

Yes, please.

MS. AXEL:  Yes.  So the record is clear, it's 0x, not Ox.

Second, your Honor, I don't think we've entirely avoided the blocking issue here.  This language, "to provide funds, goods, or services," if I'm looking at the Executive Order—and this language is both in the Executive Order and in the regulations—is in Section 6, which is a definitional paragraph, your Honor.  The actual prohibition is set forth in Section 2(a) of the Executive Order 13722.  And so the prohibition Section 6 defines the prohibition in Sections 1 and 2, to include—says, "includes but are not limited to," and then subsection (a) says "provisions of funds, goods, or services by, to, or for the benefit of any person whose

property and interest in property are blocked pursuant to this order."  And the importance of that being a subsection, your Honor, is that Section 2(a) is the part that sets forth that property is not blocked until it comes within the possession or control of a U.S. person, or comes on U.S. soil; either one of those two things.  So again, jurisdiction doesn't kick in under 2(a) until the property literally comes within the possession or control of any U.S., United States person or comes within the United States, and so we think that the jury still needs to be instructed, as we had recommended, that prior to any alleged transfer, payment, export, withdrawal, or dealing—and the language I am reading does come from 2(a), statutorily.  Again, I think they're actually charging 2(a), and then 6(a) is the subset definitional paragraph of that.  So since they're charging that, we still believe that it's appropriate that the jury be instructed that prior to any alleged transfer, payment, export, withdrawal, or dealing in any property or interest in property of a sanctioned entity, such property came within the United States or within the possession or control of a U.S. person.  And that language is in our proposed instruction.

MR. REHN:  Your Honor, I think that's a misreading of IEEPA.  The statute prohibits providing services to an entity whose interests in property are blocked, and also prohibits dealing in blocked property of that entity.

So just to take an example, if a U.S. citizen travels

to North Korea and provides services to the North Korean government, that is a sanctions violation even if no property of the North Korean government enters into the United States jurisdiction.  That's the *Virgil Griffith* case.  This is the way—this providing services to a specially designated national is—is it instructive?  It is the correct application of the law.  The Lazarus Group is an entity whose interests in property are blocked regardless of whether there's evidence of any particular property that has entered the United States.  That's just the definition of what sanctioned entity is.  And people are frequently charged with providing services to or goods to a sanctioned, specially designated national without proof that any property of that SDN has entered the United States or the control of the United States person.

(Continued on next page)

P7T5sto8

THE COURT:  I understand the parties' views.  I will look again at the executive order.  I have a different one with me now so let me look at that.

Ms. Axel, you believe that would result in changes to other portions of this instruction?

MS. AXEL:  No, your Honor.

THE COURT:  OK.  It is just to this section.  OK.

I'm then on page 54, conscious avoidance.

MS. AXEL:  That's also me, your Honor.

THE COURT:  Thank you.

I suppose if there is something on pages 53 or the top of 54 you should tell me now.  I am hearing nothing.

MR. REHN:  One moment, your Honor?

THE COURT:  Sir.

MR. REHN:  To read my notes?

So on 53 and 54, your Honor --

THE COURT:  Yes?

MR. REHN:  -- it actually wasn't clear to us that the jury was clearly instructed on what was prohibited, and so we would ask for a further statement at the end of this section sort of at the top of 54 that says:  I further instruct you that under these regulations U.S. persons may not provide or cause others to provide funds, goods, or services, to the Lazarus Group or the 0x098B716 wallet.

THE COURT:  Where are you getting this from, please?

MR. REHN:  What was that?

THE COURT:  Where is this prohibition?

MR. REHN:  This is what's in the executive order, your Honor.

So there is nothing in here that actually says what the prohibition is.  The charged executive order prohibits exactly what I am reading now so it is an important thing to have in here.  I don't think it is actually -- I don't think it expressly says what the prohibition is in the instructions.

THE COURT:  The prohibition is limited to the wallet.

MR. REHN:  Well, they argue we only allege the wallet in the to wit clause, I think, and then separately something about the block property which, again, if you look at the executive order it says -- the executive order combined with the designation mean that the prohibition is U.S. persons may not provide, or cause others to provide, funds, goods, or services to The Lazarus Group or the wallet address, without authorization from the U.S. government.

THE COURT:  Let me hear your objection to it.  Thank you.

MR. REHN:  So, this is at the end of, again, right above conscious avoidance.

THE COURT:  Yes.

MR. REHN:  I further instruct you that, under these regulations, U.S. persons may not provide or cause others to

P7T5sto8

provide funds, goods, or services, to The Lazarus Group, or --

THE COURT:  No, no.  Slow down.  Thank you.  And then I will hear from the defense.

MR. REHN:  Or the 0X098 -- I don't know how many digits we need to get into on that part but enough to designate which wallet we are talking about, wallet address -- without authorization from the U.S. government.

THE COURT:  I further instruct you that under these regulations, U.S. persons may not provide or cause others to provide funds, goods, or services to The Lazarus Group or the wallet address, without authorization from the United States government.

Yes, that is your proposed language?

MR. REHN:  Yes, your Honor.

THE COURT:  And defense, you will tell me what yours is.

MS. AXEL:  Yes, your Honor.  I think that's inviting legal error.  The funds, goods, and services language, as I previously explained, is in 6(a).  6(a) is a definitional provision that refers back to and says the prohibitions in Sections 1 and 2 include, but are not limited to.  The prohibitions are set forth in Section 1 and 2 and those prohibitions, as I read before, are that all property and interests in property that are in the United States and that hereafter come within the United States, or that are

P7T5sto8

hereafter -- or that are or hereafter come within the possession and control of any United States person of the following persons, are blocked and may not be transferred, paid, exported.

So I think they like to take this language about funds, goods, and services out of context and I think it implies confusion where you are talking about conduct of foreign actors on foreign soil.

I did represent Virgil Griffith, your Honor, that was a very different case. First of all it is an appellate issue, of course, he pled, and he was actually in North Korea so I don't think there was any issue there at all that there was actually a proximity where the interaction between him and a North Korean actor caused property to come within his possession and control. So I just don't think that is a relevant citation.

And there is otherwise no case law, you haven't heard any. They indicted the case with language that we believe to be legally wrong and they're still not really citing the statute here. So, I don't think that language is appropriate, I think it has to be tied to have the jurisdictional basis first and to mirror the executive order and the regulations as they are written.

THE COURT: Mr. Rehn?

MR. REHN: Your Honor, under that logic it would be

legal for a U.S. person to go to North Korea and provide any services they wanted to the North Korean government, as long as they didn't obtain property from the North Korean government in return.  That is just not what the law is.

Section 6 of the executive order prohibits the making of a contribution or provision of funds, goods or services to -- by, to, or for the benefit of any person whose property and interests in property are blocked.  It doesn't prohibit dealing in the blocked property itself.  By virtue of being added to the SDN, list The Lazarus Group's interests in property are blocked regardless of whether in a particular case you identify blocked property that's at issue because this separate prohibition prohibits providing services to them. That's just how the sanctions regime works and this is -- I mean, this is a very novel theory we are hearing from the defense.

THE COURT:  Each of you thinks that the other's is a novel theory.

I appreciate each side's arguments.

MS. AXEL:  Your Honor, I don't think engaging in hypotheticals here is -- we would actually have to have a lot -- there are OFAC lawyers who entirely engaged in much more remote hypotheticals than Mr. Rehn pointed where there are countries out there who, of course, do deal with sanctioned countries, not U.S. persons, but those situations you would

have much more interesting hypotheticals than just someone going to North Korea.  What about somebody who is working in a French oil company?  I mean, we could spend --

THE COURT:  You can spitball all day.  I would rather not, thank you.

MS. AXEL:  We have no case law.

THE COURT:  I will agree with one of you.  I am going to look back at the executive order.

I am in conscious avoidance.  Objections to conscious avoidance?

MS. AXEL:  We object to it your Honor.

THE COURT:  You object to it in its entirety?

MS. AXEL:  Yes, your Honor.

THE COURT:  OK.  That is fine.

MS. AXEL:  Can I be heard on it?

THE COURT:  Sure.

MS. AXEL:  Well, I think, your Honor, I think it is very clear here that the government's theory of knowledge is actual knowledge.  I mean, their view of knowledge is that generalized hearing about hacks in the media, knowing that those exist, perhaps knowing that they occurred after the fact, is not sufficient to meet the actual knowledge element.  We obviously contend it is not, that is sort of indirect or imputed knowledge, it is not knowledge that specific things on the blockchain are going to Tornado Cash at any particular

P7T5sto8

time.

So, as to their theory, they don't need this.  It is not really a conscious avoidance case, and I would say it is highly inappropriate here because this really isn't a case about whether there is active steps to avoid learning or whether there is purposeful contrivance.  I am sure the Court is aware of that language in other cases.

To the extent here, in fact, quite to the contrary, your Honor, their theory is that Mr. Storm was required to do some sort of real-time tracing on the blockchain to know exactly when it was going in to the UI, or alternatively, was supposed to do something to the UI in order to block it. Neither of those is conscious avoidance.  Both of those is like, instead, some active things that they said he should have done, monitoring the blockchain or changing the UI.  None of those is purposeful contrivance or active steps to avoid. Instead, it is something he was required to do.  I think that's the theory they're going to express so this is not -- the factual predicate is not here for a conscious avoidance charge.

THE COURT:  Mr. Rehn?

MR. REHN:  Your Honor, there is evidence that the defendant avoided learning more about these transactions upon receiving notice that they were occurring.  The issue is that he was repeatedly put on notice of these criminal transactions. There has been dispute among the parties about the degree to

which that proves his knowledge, but certainly in the alternative the jury can find that by continuing to engage in these transactions without investigating further he was deliberately blinding himself to what his business was actually engaging in, and so the conscious avoidance instruction, I think, is appropriate on these facts and we think it should be submitted to the jury.

This separate issue of, you know, whether he should have done something is not about conscious avoidance so that's sort of confusing the issues. And again, the government's theory is not inaction, it is his active participation in the transactions through his operation of the Tornado Cash service.

THE COURT: I will allow the conscious avoidance charge.

Good faith? No comment? Mr. Rehn, you wanted to add something to the good faith charge. I understand the point and we will talk about that, this dual intent issue. I will just say this: I'm not putting it in the good faith section, because I think it then blunts the good faith. I am considering putting it in the unlawfully, knowingly and willfully section but I think it is very strange to have a section that's all about good faith and that is very pro-defense theory and then just sort of undercut it by saying, by the way, the government doesn't need to prove it. I'm not going to undercut the good faith instruction by putting your

P7T5sto8

language in it.  Whether it belongs somewhere else we will have to see.

So, I am assuming the defense is not opposed to it, having a good faith instruction.

MS. JAMES:  No objection, and no objection to the Court's instruction.

THE COURT:  Thank you.

Defense theory of the case, I am inclined to include it as submitted to me and there is no objection to that. Great.

I am now in venue.  Objections to venue?

MS. JAMES:  Yes, I do have one, your Honor.

THE COURT:  Go ahead, please.

MS. JAMES:  On page 58.

THE COURT:  Yes, I'm there.

MS. JAMES:  The second paragraph at the end where it says:  Or was otherwise reasonably foreseeable to them, we would ask that that be stricken out and instead written:  And it was otherwise reasonably foreseeable to him that such an act would occur in the Southern District of New York.

The authority for that your Honor is the *Tang Yuk* case, among others, but *Tang Yuk* I think that makes it very clear that it is an "and," that act needs to have been done by or caused by a co-conspirator -- defendant or co-conspirator -- and that the knowledge has to be -- the reasonable

foreseeability, excuse me, also has to be shown and it has to be as to the particular defendant.  For example, the *Tang Yuk* case says that on 71 and 72 and then, in fact, goes through a pretty painstaking analysis of each defendant's reasonable foreseeability as to the act committed within the Southern District of New York.  And that's the last point, your Honor, that the foreseeability has to be that such an act would have occurred in the Southern District of New York.

THE COURT:  But I say that in the preceding sentence.

MS. JAMES:  Well, but foreseeability means that it would have been committed in the Southern District of New York.

THE COURT:  I see.  So reasonably foreseeable that such an act would occur in the Southern District of New York.

MS. JAMES:  Right.  So we would say:  And it was otherwise reasonably foreseeable to him that such an act would occur in the Southern District of New York.

THE COURT:  Mr. Rehn?  There is two pieces there.  The second one I'm more inclined to do.  The first one I don't know.

So, the first part is we say that the act in furtherance of the charged conspiracy may not be taken by Mr. Storm or a co-conspirator as long as the act was caused by the conduct of Mr. Storm and then, bracket, or co-conspirator, or was otherwise reasonably foreseeable to them that it would take place in the Southern District of New York.

P7T5sto8

MR. REHN:  So, this language does look different from what we typically do and I think -- we agree that it has to be reasonably foreseen to the defendant.  On that part, we agree.

THE COURT:  Reasonably foreseeable, not really the act, but that the act would be in the Southern District of New York.

MR. REHN:  That it would be foreseeable to the defendant that it would be in the Southern District of New York.  I don't disagree with that, your Honor.

THE COURT:  And not a co-conspirator.  As long as the act was caused by the conduct of Mr. Storm or a co-conspirator or it was otherwise reasonably foreseeable to Mr. Storm that such an act would occur in the Southern District of New York.

Ms. James?  That?

MS. JAMES:  Yes, but also we would say it is "and" instead of "or."  But as to the last part of the sentence, yes, to Mr. Storm, foreseeable to Mr. Storm that the act would occur in the Southern District of New York.

MR. REHN:  I am now looking at our proposed instruction.  I think the issue here is the reasonably foreseeable here is the foreseeability of the act.

THE COURT:  Yes.

MR. REHN:  Not the causation.  So, the act doesn't have to be caused by the conduct of a co-conspirator as long as it is foreseeable to them and it is in furtherance.  And so, I

P7T5sto8

think that's --

THE COURT:  Where is your proposed language?

MR. REHN:  It is on page 48 of our instruction.  It is similar to this.

THE COURT:  This is very common language in this district and I am using it so let's break this down.  We area all in agreement that it doesn't have to be -- the act doesn't have to be taken by Mr. Storm or a co-conspirator.  We are in agreement on that.

MS. JAMES:  Well, as long it was caused by, I would say it has to have been caused by defendant or co-conspirator.

THE COURT:  I understand that but my point remains he doesn't have to do it.  You are saying as long as the act was caused by the conduct of Mr. Storm or a co-conspirator, and then you say, "and" it was otherwise.

MS. JAMES:  "And" it was reasonably foreseeable, your Honor; yes.

THE COURT:  I think it is "or."

MS. JAMES:  The way I read *Tang Yuk*, your Honor, it is both, and in particular on page 72 they specifically say it is not enough to show the act occurred, you also have to show that it was reasonably foreseeable so that suggests it is an "and," not an "or" and on 71 as well.

THE COURT:  But you are now adding -- there are several points here.  One is that the act was caused and it was

reasonably foreseeable, and that the act -- what was reasonably foreseeable was not merely the act but the act occurring in the Southern District of New York.

MS. JAMES:  Right.  I think the foreseeability has to be that the act occurred in the Southern District of New York and that's, again, if you look at the analysis in *Tang Yuk*, that's what they looked at, was it foreseeable that this co-defendant would -- co-conspirator would be in the Southern District of New York.

MR. REHN:  Your Honor, if I may?

If you look at our instruction on page 48, we actually break out the foreseeability in two separate places which I think is the way I have typically seen it and I think is the -- so, I think there is a missing sentence at the beginning of this.  So, if you will see, at the beginning of our proposal on page 48, it says:  You must consider whether an act in furtherance occurred within the Southern District of New York and it was reasonably foreseeable to the defendant that the act will take place in the Southern District of New York.

THE COURT:  Where are you reading from, sir?

MR. REHN:  At the top of page 48 of our request to charge, your Honor.

THE COURT:  Ms. James, that does seem to be better for you.

MS. JAMES:  The "and" is in here and, yes, we would

prefer that language, your Honor.  It is just that it is missing the cause or done or caused by co-conspirator.

MR. REHN:  On the third paragraph.

THE COURT:  Third paragraph.

MR. REHN:  This is a separate concept which is --

THE COURT:  Yes.

MR. REHN:  -- whether the act was foreseeable to the defendant.  It didn't need to be caused by him as long as it was foreseeable to him and it was furtherance.

THE COURT:  Yes, and that's where you two differ.

MR. REHN:  Yes, but this is -- the instruction is as I have seen it given many times in the district, the one that we have proposed to your Honor.

THE COURT:  I have actually seen the one that I gave, which I have given repeatedly, but I understand that in this case that may not suffice.  So all right, I understand.

Variance on dates.  I am hoping now we have fewer comments.

MS. JAMES:  No objection to that one, your Honor.

THE COURT:  What is your next edit, Ms. James?

MS. JAMES:  We do have something on 3(k) which is the particular investigative techniques not required.

THE COURT:  Yes.

MS. JAMES:  I just don't think that instruction is really necessary here.  We haven't really and won't be making a

P7T5sto8

claim that there were not particular investigative techniques that should have been used but I do think that it might undercut some of our cross-examination and our arguments regarding expert witnesses, some of whom were government agents.  So, we do think we should be able to challenge their techniques and we wouldn't want this instruction to suggest that that is somehow improper.

THE COURT:  I don't think they're going to have that confusion.

Mr. Rehn?

MR. REHN:  If they're going to make suggestions about problems with the techniques, that's exactly why the instruction is appropriate.

THE COURT:  Well, what she is saying is they're not going to contest the investigative techniques, they're talking about your experts.  To the extent you used law enforcement officers as experts, it would be challenging their methodologies.

Ms. James, do I understand your point?

MS. JAMES:  Yes.

MR. REHN:  I don't think that is implicated by this but there was clear attempt to impugn the investigative techniques, for example, with respect to the Dutch cellphone.

THE COURT:  Yes.  I think this stays because of the questioning of Agent Dickerman and I don't think it undercuts.

P7T5sto8

So, that is fine.

Pages 60 forward?

MS. JAMES:  That's all I have, your Honor.

THE COURT:  God bless.

Ms. Axel, you still have something?

MS. AXEL:  I just have one thing, your Honor.  Could I briefly address the Ho cross-examination since I did it?

THE COURT:  You can, but I'm going to be rereading it anyway.  I am still at the charge.

MS. AXEL:  OK.  One thing.

MR. REHN:  I --

THE COURT:  Yes.

MR. REHN:  Before we go there, I wanted to give the Court a citation on the to wit clause issues which my very helpful colleague has pulled up for me.  *United States v. D'Amelio* 683 F.3d 412 (2d Cir. 201).

THE COURT:  One moment.  I'm sorry.  I need to go back many pages.

*D'Amelio*, go ahead.  I might have familiarity with that case.  Go ahead.  The cite again, please?

MR. REHN:  It is 683 F.3d 412 (2d Cir. 2012), and a more recent citation, your Honor, is *United States v. Samuels*, 2024 WL 1777720 at *4.

THE COURT:  All right.  I will look.  Thank you.

Mr. Rehn, other edits to the last section of the

P7T5sto8

charge?

MR. REHN:  No, your Honor.

THE COURT:  And then, yes, Ms. Axel, something on Mr. Ho or something else?

MS. AXEL:  Just on Mr. Ho, very briefly, your Honor.

I think I was very nice to Mr. Ho.  The line of cross-examination concerning how the hack occurred, I think the thing that I would add that you wouldn't get from reading Mr. Ho is I think I looped that in and made it clear, the connection, in the direct testimony of Dr. Edman, because it was simply about that if you -- if somebody hacks your private keys, your entire protocol can get hacked and that relates to why the Tornado Cash protocols were made immutable, for security reasons.  And he connected those two dots.  We didn't rake Mr. Ho over the coals or anything like that.

THE COURT:  I will have to look at that.  All right.

MS. AXEL:  Thank you.

THE COURT:  Something else?

MR. REHN:  Nothing on the charge, your Honor, or any other matters.

THE COURT:  Yes.  It would appear that I have a lot to do this evening so I will get going on that.  I will send you something.

May I see the parties at side bar, please?  Thank you.

(Pages 2284-2288 SEALED by order of the Court)

P7T5sto8

(In open court)

THE COURT:  Thank you very much for your patience at the side bar.  I think I obtained clarification on one of the issues raised by defense.  With that, I have some things to do with respect to the charge.

Let me please hear from the parties.  Mr. Rehn, anything else from your team now?

MR. REHN:  No, your Honor.

THE COURT:  Is there anything I should expect this evening in the vein of a motion?

MR. REHN:  I don't believe so, your Honor.

THE COURT:  Ms. Axel and Ms. James?

MS. AXEL:  I would like to say "no" but apparently I'm not always in the loop.

THE COURT:  I will ask the question differently.  To the best of your understanding, is Mr. Casey working on another motion right now?

MS. AXEL:  Not to the best of my understanding.

THE COURT:  That's all I can ask for.

MS. AXEL:  Thank you.

THE COURT:  Thank you, all, for staying as long as you have and being as careful and thoughtful as you have been.  I will let you go.

We are adjourned.

(Adjourned to July 30, 2025, at  8:45 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 DAVID WUOLLET JR.

Direct By Mr. Patton . . . . . . . . . . . . . .2008

Cross By Mr. Gianforti . . . . . . . . . . . .2013

 OMID MALEKAN

Direct By Mr. Klein  . . . . . . . . . . . . .2017

Cross By Mr. Gianforti . . . . . . . . . . . .2021

 STEPHANIE HURDER

Direct By Ms. Axel . . . . . . . . . . . . . .2024

Cross By Mr. Arad  . . . . . . . . . . . . . .2090

Redirect By Ms. Axel . . . . . . . . . . . . .2125

 MATTHEW D. GREEN

Direct By Mr. Klein  . . . . . . . . . . . . .2159

Cross By Mr. Arad  . . . . . . . . . . . . . .2194

MARIA MIZBANI

Direct By Ms. Andazola Marquez . . . . . . . .2205

DEFENDANT EXHIBITS

Exhibit No.                                              Received

  9050-19, 9050-20, 9050-21, 9050-22, . . . . .2133

           9050-24

  8852 and 8852-A  . . . . . . . . . . . . . . .2202

  8790    . . . . . . . . . . . . . . . . . . .2213

  9050-13   . . . . . . . . . . . . . . . . . .2059

  9050-17   . . . . . . . . . . . . . . . . . .2070

  9050-18   . . . . . . . . . . . . . . . . . .2076

  9051    . . . . . . . . . . . . . . . . . . .2041

  9052    . . . . . . . . . . . . . . . . . . .2042

  9053    . . . . . . . . . . . . . . . . . . .2064

  9851    . . . . . . . . . . . . . . . . . . .2010

  S-10    . . . . . . . . . . . . . . . . . . .2202

  S-9   . . . . . . . . . . . . . . . . . . . .2202