P7U5sto1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                          23 Cr. 430 (KPF)

ROMAN STORM,

             Defendant.              Jury Trial
------------------------------x

                         New York, N.Y.
                         July 30, 2025
                         8:55 a.m.

Before:

             HON. KATHERINE POLK FAILLA,

                       District Judge

                APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  NATHAN M. REHN, ESQ.
    BEN ARAD, ESQ.
    BENJAMIN A. GIANFORTI, ESQ.
    KEVIN G. MOSLEY, ESQ.
    TARA M. LA MORTE, ESQ.
    Assistant United States Attorneys

WAYMAKER LLP
    Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
    KERI CURTIS AXEL, ESQ.
    KEVIN M. CASEY, ESQ.
    VIVIANA ANDAZOLA MARQUEZ, ESQ.

    -and-

HECKER FINK LLP
    Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
    CHRISTOPHER MOREL, ESQ.

P7U5sto1

(Trial resumed; jury not present)

THE COURT:  I did want to put a couple things on the record regarding the jury charge I sent last evening but I understand from my deputy that there are some matters that folks want to bring to my attention.  So, who wishes to start?  Ms. Axel, thank you.  Yes?

MS. AXEL:  Good morning, your Honor.

I think there is one matter Mr. Klein wanted to raise following up on the under-seal matter but I think he just stepped out.

We also just wanted to make a record on a few things we saw in the jury charge.  Ms. James has prepared a quick, short list, like four things, if the Court would hear us out.

THE COURT:  I will ask you, Ms. James, I am going to ask you to follow me.  I am going to explain why I did it and then you will tell me why you think I'm wrong.

So, let me do this.  After our discussions yesterday, there were certain topics that I said to the folks at the charge conference that I would give additional thought to and I did.

On the issue of what Ms. James referred to as the specific intent because of the *Garcia* case, you will see that I did include that in the charge in light of the -- I will just give the names of the cases.  If you need me to, I have the cites.  But, *Mangano*, Second Circuit and also *Zemlyansky*, on

P7U5sto1

the IEEPA issue I resolved in the favor of Mr. Rehn.

On the to wit issue, I believe based on the *D'Amelio* case that there has not been a constructive amendment of the indictment and the government is not bound somehow by the to wit clause.

And then in light of my review of Mr. Ho's testimony, including its cross, I kept in the charge about gullible victims.

Venue took some time.  I have done my best to harmonize *Svoboda* and the cases that followed it.  The most recent one I saw was a summary order, *United States v. Bimbow*.

So, this morning I came in and again read the charge. I found a couple of conforming errors, you know, if I had a semicolon and the word "and" in a list, I put that back in or things of that nature.  I have made no substantive changes to the charge.

Thank you, Ms. James, for letting me put that on the record.  You will tell me your issues.

MS. JAMES:  Yes, your Honor.  And like I said at the outset, we preserve all our prior objections to the Court's charge but just a few points I would like to make in particular to the revised charge.

I did notice, and I had not, I apologize I did not catch this before, but on page 19 in the cooperating witness instruction, there is actually a reference to an accomplice

P7U5sto1

witness that I think might have been left in there inadvertently at the bottom of page 19.  I think it should be changed to "a cooperating witness."

THE COURT:  I really wish you had told me that before I printed out 30 copies of the charge.

MS. JAMES:  Sorry, your Honor.  I didn't see it before.

THE COURT:  I will see if I can fix it.

Go ahead, please.

MS. JAMES:  On page 27, the Court has added the dual intent instruction.

THE COURT:  Yes.

MS. JAMES:  We objected to that in the good faith instruction.  I would object to its placement here as well.  We don't think that the dual instruction belongs in this case as a conspiracy case, I think it is distinguishable from the cases cited by the government.  I do think it undercuts the willfulness that is required and the criminal objective that is required for conspiracy charge.  So, we would object to the inclusion of that dual intent language that starts with:  Let me add... on page 27.

THE COURT:  OK.  Anything else?

MS. JAMES:  Yes.

On page 52, this is in the IEEPA instructions, we would request that the Court include our willfulness

P7U5sto1

instruction that was on page 45 of our revised instructions to decline willfully here. It is a new willfully element of the substantive offense as well as the conspiracy charge so we would ask that the Court redefine willfully there.

THE COURT: This was something that you should have told me yesterday.

MS. JAMES: Yes, we should have, your Honor.

THE COURT: And you didn't, so here we are. OK.

MS. JAMES: And another one we should have mentioned yesterday but we neglected to was on page 53, we had requested in our revised instruction a reference to the Berman amendment. The Court did not accept that.

THE COURT: Did not.

MS. JAMES: So we are just stating for the record we would like that language added.

And on page 54 --

THE COURT: Ms. James, we had a two-hour charge conference and I sent you something last evening and you couldn't tell me at some point before now that you now have these issues?

MS. JAMES: Sorry, your Honor.

THE COURT: No. It is really not acceptable. Please continue, but I don't appreciate, again, the trial by ambush. I am being ambushed with these things after, long after, the charge conference.

Go ahead.  Tell me your next issue.

MS. JAMES:  One more, your Honor, on page 54.

I think we did raise this one but, to be clear, we did object to the language:  I further instruct you that... we think it is redundant, on page 54 the language that begins:  I further instruct you that...

THE COURT:  Yes.

MS. JAMES:  That was Mr. Rehn's language and we did object to that but we want to make the record clear that we object to the inclusion of that language.

THE COURT:  OK.  Thank you.

Mr. Rehn, I am not letting you speak this morning.  I should have done that.  Would you like to say something in response?

MR. REHN:  I think we have either filed letters or addressed the Court with respect to these issues, so unless the Court has questions, we would rest on our prior.

THE COURT:  Thank you.

Mr. Klein, is there something you wanted to bring to my attention?

MR. KLEIN:  Yes, your Honor.

THE COURT:  Is it something at side bar, sir?

MR. KLEIN:  Yes, it is, your Honor.

THE COURT:  Just one moment, please.  I will meet the parties at side bar.

P7U5sto1

(Pages 2299-2303 SEALED by order of the Court)

P7U5sto1

(At side bar)

THE COURT:  I was advised one of our jurors is late because he missed his train.  It is juror 6.  Of course it is juror 6.  He called me to tell me he'll be about 30 minutes late, just wanted me to know.

MR. KLEIN:  Nice that he has your number, your Honor.

THE COURT:  Yes, it is nice, that I answer my phone.

So I just wanted you all to be aware of that, not to -- so, Mr. Gianforti I suppose you have a few more minutes to consider your summation.

Mr. Patton, something you wanted to add, sir?

MR. PATTON:  Just a request, that after Mr. Gianforti finishes that we take a break.  We are going to try to set up our laptop at the edge of the government's table.  They've graciously offered their cables so that not only I can see a screen but also because of the distance, the clicker would not work from this distance.

THE COURT:  Madam reporter, may we begin the unsealed portion with Mr. Patton's discussion with me or perhaps -- we can begin the unsealed portion with Juror 6.  That is always a crowd pleaser.

Mr. Gianforti, 90 minutes?  Two hours?  One hour?

MR. GIANFORTI:  I think it is somewhere between 90 and two hours.

THE COURT:  OK.

P7U5sto1

Mr. Patton?

MR. PATTON:  Probably an hour and a half, give or take.

THE COURT:  So we will take the break between the two of them.  Then I think we are doing the lunch break.  I don't think we can ask them -- unless you tell me you have a 15-minute rebuttal Mr. Rehn.

MR. REHN:  Unlikely.

MR. PATTON:  The only thing I would ask, your Honor, if we get too close to the lunch hour such that the lunch hour would break up my closing --

THE COURT:  Oh no --

MR. PATTON:  -- we would ask that we maybe take an early glunch and I start after early lunch.

THE COURT:  I would rather do the later lunch and have you finish.

If we are starting at 9:30 and he finishes at 11:00, and you start --

MR. PATTON:  Right, if he finishes at 11:00.

THE COURT:  If he finishes at 11:30 --

MR. PATTON:  My concern is if we get closer to 12.

THE COURT:  I understand.  OK.  Well, we will, if you will, we will burn that bridge when we get to it.

Thank you.

P7U5sto1

(In open court)

THE COURT:  Friends I'm going in the back to find out what is going on with the jurors and you will be setting up for summations.

Thank you.

(Recess)

(Continued on next page)

P7U5sto1                    Summation - Mr. Gianforti

(Jury present)

THE COURT:  Please, be seated.  Thank you.

Members of the jury, good morning again.  As I mentioned to you at the close of yesterday's day, we now will have the oral arguments, the summation arguments of the parties.

We begin with the government.  Mr. Gianforti, whenever you are ready, sir.

MR. GIANFORTI:  Thank you, your Honor.

Good morning.

THE JURY:  Good morning.

MR. GIANFORTI:  Members of the jury:  Over the past three weeks you have had a front row seat to the dark underbelly of the world of global financial crime.  In this world, sanctioned North Korean hackers can steal hundreds of millions of dollars in the blink of an eye.  Ruthless fraudsters in all manner of criminals prey on regular people who get tricked into losing their hard-earned savings.  And what do these criminals need to get away with their crimes?  A way to make all that dirty money look clean.  And that is what the defendant helped them do.  He knew what he was doing and he got rich doing it.  He made millions of dollars.

You have seen that the defendant wanted to get rich off of Tornado Cash no matter the consequences because he came to realize that the real money wasn't in so-called privacy for

normal people, it was in hiding dirty money for criminals. It was in making it harder for them to get caught. You have seen through the evidence in this trial that the defendant knew for years that he was helping criminals hide their dirty money. And you heard when he said when he got caught, when he learned that the FBI had figured out that he was letting North Korean hackers hide hundreds of millions of dollars in stolen crypto through Tornado Cash. Here is what he said: *Guys, we are fucking done for.*

He was caught red-handed committing a crime. He was caught running a business that hides dirty money. We call that a money laundering business. It is illegal and that is why we are here today.

The defendant ran Tornado Cash as a money laundering business, a business that was designed to turn piles of dirty money into clean, untraceable funds. This summation is the government's opportunity to walk you through how you know that the defendant committed the crimes he is charged with beyond a reasonable doubt. It is our opportunity to walk you through the evidence you have seen and heard over the last three weeks.

Now, I'm not going to try to go over everything. You heard the witnesses testify, you saw the exhibits. What I hope to show you is how all the evidence fits together and how it clearly proves the defendant's guilt beyond a reasonable doubt.

And I think you will find that despite all the

P7U5sto1                        Summation - Mr. Gianforti

technical evidence, this is actually a pretty simple story. Here is what it boils down to.  This is a case about a money laundering business that the defendant created, operated, controlled, and profited handsomely from.  Maybe you have seen movies or TV shows where criminals push their dirty money through a business that operates out in the open like a restaurant or a car wash or a laundromat.  The restaurant actually serves food, the car wash actually washes cars, the laundromat actually does laundry, but the real point of the businesses is to make the dirty money harder to find by mixing it together with clean money so no one can tell them apart. The defendant's business operated the same way.  Tornado Cash mixed dirty money and clean money and made it impossible to distinguish the two.  This was attractive for criminals because it made it much harder for them to get caught.

And remember, ladies and gentlemen, it was the defendant who compared Tornado Cash to a washing machine. There it is, right on the defendant's t-shirt.  Can you think of a more literal advertising for a money laundering business than a t-shirt with a Tornado Cash-branded washing machine on it?

Now, I expect the defense may say it was just a joke. But is there anything funny about money laundering?  Is there anything funny about hundreds of millions of dollars disappearing?  Is there anything funny about innocent victims

seeing their hard-earned money be stolen from them like that? Of course there isn't.

The t-shirt portrays how the defendant understood that Tornado Cash, the so-called privacy tool, could easily be corrupted and used as a tool for washing money for criminals. Which it was. And by the way, notice that that t-shirt talks about anonymity. But isn't anonymity just another word for concealment? Hiding money is what Tornado Cash did.

Members of the jury, what the t-shirt tells you is that the defendant understood from the very outset that Tornado Cash was little more than a fancy online laundromat that would make your dirty money clean in exchange for a fee and that's exactly what happened, as the evidence shows, overwhelmingly.

Remember, this is a simple story. In fact, it is a tale as old as time. It is a story about greed. It is a story about making bags and bags of money by helping criminals hide their stolen money. And that's the image that Tornado Cash founders used for their private chat -- not some image to convey their passion for privacy -- a literal money bag.

Members of the jury, there are four key points that I am going to ask you to keep in mind as you begin your deliberations. First, the Tornado Cash service laundered dirty money and lots of it. That one is easy. Think about what you learned from Special Agent DeCapua from the FBI. He showed you

P7U5sto1                    Summation - Mr. Gianforti

that, conservatively, over a billion dollars in dirty money was laundered through Tornado Cash.  In other words, over a billion dollars in dirty crypto became impossible for anyone to find, thanks to Tornado Cash.

Second, the defendant knew that the Tornado Cash service was laundering lots of dirty money including money from sanctioned North Korean hackers.  This one is easy, too.  You saw many, many examples of chats, e-mails where the defendant was told that his business was laundering dirty funds.

Third, the defendant knew what he was doing was wrong. Why else did he say he was done for when he learned that the FBI found out that the sanctioned North Korean hackers were laundering stolen crypto through Tornado Cash?  Because he knew it was wrong and he was about to get caught.

Fourth, and finally, the evidence shows that the defendant ran the Tornado Cash service as a for-profit money laundering business and made millions of dollars from it. Another easy one.  There is overwhelming evidence in the record that the defendant ran Tornado Cash as a business with investors, employees, expenses, and marketing, just like that t-shirt.  And the evidence showed you that the defendant used Tornado Cash to generate millions of dollars in profits, money that he pocketed and split up with his partners in crime in the summer of 2022.

Before we start walking through the evidence in

P7U5sto1                    Summation - Mr. Gianforti

detail, let me just spend a few minutes on the charges in this case.  Judge Failla will instruct you on the elements of each of these charges.  For you to convict, the government must prove each of these elements beyond a reasonable doubt.  Remember that Judge Failla is the ultimate and only authority on the law in this courtroom and you should follow her instructions.

So, what are the charges?  The defendant is charged with three different crimes, each of which is reflected in a separate count in the indictment.  The defendant stands accused of conspiracy to commit money laundering.  That's Count One.  Conspiracy to operate an unlicensed money transmitting business, that's Count Two.  And conspiracy to violate the International Emergency Economic Powers Act, or IEEPA; that's Count Three.  I will give you a high level overview of what each of these crimes are in a minute.  I expect, though, that Judge Failla will instruct you that a conspiracy is just an agreement with an unlawful purpose between two or more people.  As you can see here, the defendant is charged with conspiring with his co-founders to commit three different crimes.

Let's pause here so I can address exactly who the defendant was conspiring with.  I expect you may hear from the defense that he wasn't doing anything wrong because he wasn't working directly with the hackers, the fraudsters, or the Lazarus Group -- those are the North Korean hackers.  That is

what the defense wants you to focus on but it is a distraction. Don't let them fool you.  The government is not saying that the defendant is a hacker or a fraudster.  The government is not even saying that the defendant agreed with hackers or fraudsters to launder their dirty money.  That is because we don't have to prove that he did.  What the government is saying and what the evidence at trial showed is that the defendant agreed with his Tornado Cash co-founders, Roman Semenov and Alexey Pertsev, to commit the charged crimes.  That is sufficient.

So the defense can talk to you all day about how the defendant didn't conspire with any hackers or any North Koreans or any other criminals who used Tornado Cash but it amounts to exactly nothing.  That is not what the government is alleging and it is not what we have to prove.  The conspiracies you should focus on are the ones that the government is actually alleging, the defendant's conspiracies with the Tornado Cash co-founders.

So now I would like to give you the high-level summary of the crimes the defendant is charged with.  Again, you are going to get detailed instructions from Judge Failla on each of these crimes and you should follow her instructions.  For now I am going to give you a basic overview to keep in mind as we walk through the evidence.

The first charge is conspiracy to commit money

P7U5sto1                    Summation - Mr. Gianforti

laundering.  The essence of money laundering is doing financial transactions to conceal money that came from criminal activity. This is a conspiracy charge so the defendant has to prove that the defendant agreed with the two Tornado Cash founders, two other Tornado Cash founders, to conduct those transactions.  In other words, Count One is about hiding dirty money.  If the defendant agreed with his co-conspirators to do that, he is guilty.

The second charge is conspiracy to operate an unlicensed money transmitting business.  The essence of this charge is that the defendant agreed with the other two Tornado Cash founders to operate a money transmitting business and the defendant knew that the business -- Tornado Cash -- was moving dirty money.  That's a crime.

The third charge is conspiracy to commit sanctions violations.  The essence of this charge is about proving -- I'm sorry.  The essence of this charge is about providing services to the Lazarus Group, again the North Korean hackers.  The United States issued sanctions on the Lazarus Group and on the wallet that was used in connection with the Ronin hack you heard so much about.  That means it was illegal for Americans and American businesses to do business with the Lazarus Group. If the defendant aggrieved with the two other Tornado Cash founders to violate those sanctions, that is a crime.

So, let's dive into the evidence and let's start with

P7U5sto1                        Summation - Mr. Gianforti

just a couple basic time lines to orient you here.  So, in this slide we see the period of August 2020 to August of 2022, which is the relevant period here, and there is just a few highlights I want to touch on.

So you see here that in August of 2020, that's when the defendant gets the infusion of $900,000 from Dragonfly that is a venture capital firm, that was their primary investor.

Then you see just a month later there is the KuCoin hack that Special Agent DeCapua told you about, $21 million of stolen crypto deposited in Tornado Cash over the next month or so.

A couple months later, in December of 2020, that's when the TORN token is released.  Remember, that's the proprietary cryptocurrency that was native to the Tornado Cash ecosystem.

So, we are going to fast forward about a year and then we hit the BitMart hack in December of 2021 and that results in $122 million in stolen crypto being deposited in Tornado Cash. A few months after that, the defendant and his co-conspirators rolled out the relayer registry, and at a high level what that was, was effectively the way the Tornado Cash figured out how to monetize the Tornado Cash service.  This is an important moment in the life of the service.  And, then just about a month after that, the Ronin hack.  $600 million gone in the blink of an eye, and something like $450 million gets put into

P7U5sto1                     Summation - Mr. Gianforti

Tornado Cash.

Then we go to June and August of 2022 and that's when we see the defendant cashing out.  We saw him cashing out a little bit of TORN in June of 2022 and then a couple months later we see him cashing out millions and millions of dollars worth of TORN, splitting it up and giving it to his two co-conspirators.

So that is a timeline of everything that's happened in this case, at a high level.

So this is a more specific timeline that has to do with the Ronin hack.  So, we see March 29, 2022, this is when the media begins reporting on the Ronin hack.  Just five days later -- actually, sorry March has 31 days, six days later, I think -- Tornado Cash begins processing the proceeds of that hack.  The defendant gets an e-mail, actually gets a couple of e-mails in which he finds out that this money is starting to get deposited into Tornado Cash but he doesn't know who did it yet.  Fast forward 10 days, OFAC designates the Lazarus Group wallet I was talking about that is the focus of Count Three, and the defendant finds out more or less in real-time and he panics.  And then, over the next month or so -- keep in mind this is after sanctions -- over the next month or so, the Lazarus Group continues to pump something like $350 million worth of stolen crypto into Tornado Cash despite the sanctions and despite the window dressing that he put on the front end

P7U5sto1                    Summation - Mr. Gianforti

and I will get to that in a moment.

So, with those time lines in mind let's start with the first key point you should take away from the summation.  The Tornado Cash laundered dirty money by making it impossible to find.  This isn't really in dispute.  The evidence is overwhelming that over a billion dollars in hacked funds and other crime proceeds went through Tornado Cash never to be seen again.

Now, let me just repeat myself:  Special Agent DeCapua told you that he traced over $1 billion in stolen money to Tornado Cash from 16 gigantic hacks and he told you that was a conservative estimate because he only focused on big money hacks and he didn't focus at all on other crimes like the smaller scale frauds you heard about from Ms. Lin, that's the Court translator who lost $250,000 to a fraudulent investment scheme, and Andre Llacuna, that's the young man who told you about the part he played in the Frosties NFT scam, not included in this chart.

So, let me just talk for a moment about the Ronin hack.  Special Agent DeCapua told you that the sanctioned North Korean hackers stole about $600 million from the Ronin gaming network.  The North Koreans hid something like $450 million of that money by depositing it in Tornado Cash.  Imagine someone laundering that much in cash.  How would you even do that? With Tornado Cash, washing that volume of dirty money was easy.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

That was the whole point.  And because it was so easy, hackers went to Tornado Cash to hide their stolen crypto again and again and again.  You know this because Special Agent DeCapua is an expert in cryptocurrency tracing.  He has been doing it for years and he has traced cryptocurrency in countless criminal investigations.  He told you about the tools and techniques he uses to identify hacks and track the proceeds from those hacks and he told you that he used all of those techniques in tracing 16 gigantic hacks that resulted in over a billion dollars in stolen crypto being deposited in the defendant's business.

First, Special Agent DeCapua talked about the KuCoin hack in September 2020.  That is what is highlighted on the screen now.  Now, KuCoin is a cryptocurrency exchange.  Special Agent DeCapua told you that in September of 2020 a hacker infiltrated KuCoin's technology and stole over $150 million in crypto.  He told you that over the next few months the hacker deposited over $21 million of that stolen crypto into the Tornado Cash service in order to conceal where it came from.

Here is an important thing to note.  Special Agent DeCapua showed you that for an approximately 11-day period in October of 2020, dirty money from the KuCoin hack made up 61 percent of the ETH deposits in the defendant's mixer.  Think about that for a second.  For this 11-day period, six out of every 10 ETH in Tornado Cash was traceable to a single hack.

Next, Special Agent DeCapua walked you through the BitMart hack. That is what is highlighted on the screen now. He told you that in December 2021 a hacker stole tens of millions of dollars of crypto from BitMart. He also told you that over the course of approximately two days, the hacker deposited approximately $121 million of that stolen crypto into the Tornado Cash service. And again, here is an important point. Special Agent DeCapua also showed you that over those two days in December 2021, dirty money from the BitMart hack made up 54 percent of the total ETH deposits in the defendant's business.

So, let's talk about the Ronin hack. That is what is highlighted on the screen right now. That was a pivotal moment in the life of the Tornado Cash service, as I am sure you have come to realize. When it became apparent that sanctioned North Korean hackers had become North Korea's [sic] latest customers, things got very real very fast for the defendant. While all the hacks that Special Agent DeCapua traced are important, this two-month slice of 2022, basically April and May, that is the period when the Lazarus Group was concealing nearly $450 million in stolen crypto in Tornado Cash. That two-month slice tells you everything you need to know about why Tornado Cash was, at the end of the day, a money laundering business. Nothing more than a fancy online laundromat It also tells you everything you need to know about the sanctions

charge in this case, that's Count Three.

What this slide tells you is that Tornado Cash transmitted over $350 million in stolen crypto from the sanctioned North Korean wallet after OFAC announced sanctions on that wallet.  Each of these deposits was a service that the defendant's business provided to the North Koreans.

Members of the jury, these are just the facts.  There is no reasonable dispute that these transactions happened. There is no reasonable dispute that this money was deposited into Tornado Cash and there is no reasonable dispute that it originated in that sanctioned wallet used by the North Korean hackers.

And here we see that during the approximately four-week period that Tornado Cash was laundering money for the Lazarus Group after sanctions, the dirty money from the Ronin hack made up 55 percent of the total ETH deposits in the defendant's business.  Think about that.  For a month, more than half the ETH in Tornado Cash was traceable to the Ronin hack and each of these deposits is evidence of the defendant committing all of the crimes he is charged with.

This is a critical point.  Special Agent DeCapua showed you that Tornado Cash did its highest volumes of business only in the wake of large-scale hacks.  In this chart we see that during the period that Tornado Cash was laundering money for the Lazarus Group, that is on the right-hand side, it

P7U5sto1                    Summation - Mr. Gianforti

was hitting some of its highest ETH deposits ever, and there is KuCoin and BitMart on the other side and a bunch of other hacks. These extreme peaks you are seeing aren't regular users trying to preserve their privacy, they're bigtime hackers trying to hide their stolen loot. The hackers drove the business, not regular people.

So let's just take stock for a second. There were multiple periods of time where more than half of the ETH being deposited into Tornado Cash was from just a single hack. We saw that with KuCoin, we saw that with BitMart, we saw that with Ronin.

And look at this chart which covers a full three-month period near the end of the relevant period. Over that three-month period, Special Agent DeCapua determined that fully half of all the money in Tornado Cash was dirty. And I remind you that other 50 percent isn't necessarily clean. That other 50 percent encompasses smaller dollar hacks and other crimes like the fraud on Ms. Lin who lost $250,000 to a bogus investment scheme; like Mr. Llacuna's Frosties scam where he pulled the rug out from under the people who thought they were buying NFTs. Special Agent DeCapua didn't focus on these crimes because he couldn't focus on every single dollar of dirty money that flowed into Tornado Cash.

When you put all of that together, there can simply be no dispute that, one, Tornado Cash processed criminal money;

two, the money involved was huge; and three, it represented for extended periods of time, more than half the money going through Tornado Cash.  Even the defense expert admitted that he could not say anything about all those unidentified deposits.

Ladies and gentlemen, I ask you to use your common sense here.  For the big money transactions on Tornado Cash, the 100 ETH transactions, each one of those deposits is worth hundreds of thousands of dollars.  The 100 ETH pool is what the sanctioned North Korean hackers were using, not regular people.  You know from your own experience that somebody does a transaction like that of that size maybe once or twice in a lifetime like when they buy a house.  Who needs to be able to hide hundreds of millions of dollars in stolen crypto?  Criminals.  Your common sense confirms what the evidence tells you.  Tornado Cash was especially suited to protecting criminals' privacy, not the privacy of normal people like the defense claims.

So, that was an overview of the evidence that shows you that the Tornado Cash service was laundering money for criminals at least as early as September 2020 and well into 2022.  Again, the amount of dirty money it laundered over this nearly two-year period was north of a billion dollars.  But you didn't just hear about gigantic hacks like the Ronin hack, you also heard from perpetrators who committed smaller scale crimes.

You heard from Andre Llacuna, who was involved in the Frosties NFT scam.  You might remember him, he is the guy whose mom wouldn't let him by crypto until he was an adult. Basically what he told you is he hyped up these NFT characters that people could buy, they were called Frosties, took peoples' money, didn't deliver the NFTs, kept the money. Straightforward crime.  And here are the Frosties characters on the screen and the ad for the private sale.

Here is what else Mr. Llacuna told you.  After he and his co-conspirators got the money which was right around a million dollars, they decided that Tornado Cash was the best place to hide the money they stole.  Here is his testimony:

"Q  And after learning about Tornado Cash, did you and the other members of the Frosties team make a decision whether to use it?

"A  Yes, we decided to use it.

"Q  Why did you decide to use it?

"A  We decided to use it because it seemed like the best option for us to hide the money and get away with it.

"Q  What about it was valuable to you for that purpose?

"A  It was valuable because then people would be unable to trace back the original -- I guess the original way we got the cryptocurrency."

That wasn't all he said.  Remember that we showed you some text messages between Mr. Llacuna and his girlfriend.

P7U5sto1                          Summation - Mr. Gianforti

Here they are on the screen.  Earlier in this thread Mr. Llacuna told his girlfriend that he was going to use Tornado Cash to hide the Frosties money, in other words he was going to use Tornado Cash to, quote, wash it.  His girlfriend responds:  *Washy washy*, with two emojis of a bar of scope.

Doesn't get more literal than that, folks.  And he explained what he meant about this:.

"Q  And when you said "wash wash," what were you referring to?

"A  I was referring to us cleaning the money.

"Q  How did you clean the money?

"A  By using Tornado Cash."

Mr. Llacuna told you that he and his co-conspirators cleared about a million dollars from the Frosties rug pull. Again, does that pale in comparison to about a half billion dollars of hack proceeds?  Yes, but it highlights how Tornado Cash was used to hide the proceeds of crimes, both big and small.  It is how you know that Special Agent DeCapua's estimates of how much dirty money was deposited into Tornado Cash was very much an underestimate.

You also heard from Shakeeb Ahmed.  He was the guy who got busted for perpetrating a couple of hacks on some cryptocurrency exchanges.  He told you that he used Tornado Cash to kick off one of these hacks.  Basically, he put some ETH through Tornado Cash that he then used to pay the transaction fees that he needed to pay for him to initiate one

P7U5sto1                          Summation - Mr. Gianforti

of his hacks.  Here is how he explained it:

"Q  How did you use Tornado Cash to pull off the Crema hack?

"A  So, whenever you interact with one of these programs like Crema, you have to pay what's called a transaction fee, or a gas fee.  And that has to come from -- that's in the form of cryptocurrency that you own.  So, I needed to pay these tokens to kick off this hack and I didn't want to use cryptocurrency that was directly linked to me, so I put it through Tornado Cash first."

          Mr. Ahmed also told you how he found out about Tornado Cash in the first place.  Now, before I read this testimony, I just want to remind you of Judge Failla's instruction:  You cannot consider this testimony for its truth but only for its affect on Mr. Ahmed.  In other words, you may consider it as evidence of why Mr. Ahmed went to Tornado Cash but you cannot use this testimony as evidence that the incidents he mentioned in fact happened:

"Q  so let's talk more about Tornado Cash.  How did you first learn about it?

"A  I heard it at least -- heard about it at least three years ago when it was being used in various hacks that were purported to have been carried out by nation-state attackers like Lazarus.

"Q  Did you gain confidence in Tornado Cash based on what you just described?

"A   Yes, I did.

"Q   Can you explain why?

"A   Yeah.   So, if high profile attackers are using it, then I figured there was something to it.   And also the fact that there was a lot of money contained within its pools."

        Ladies and gentlemen, this is a little bit like when an athlete endorses a sneaker.   Right?   Michael Jordan is wearing that sneaker, maybe I can play basketball like Michael Jordan.   That is basically what Mr. Ahmed is saying, *Hey, the Lazarus Group used Tornado Cash.   That's good enough for me, I'm much smaller scale, should be great.*

        Ladies and gentlemen, Mr. Ahmed put an even finer point on why he used Tornado Cash to kick off the Crema hack:

"Q   Did you have to log in to Tornado Cash with a user name and password?

"A   No.

"Q   If they had required these things, would you have used them?

"A   No.

"Q   Why not?

"A   'Cause it's like leaving your calling card at the scene of the crime."

        Think about everything we just went over, members of the jury.   Two criminals told you exactly why they went to Tornado Cash to commit their crimes.   They thought it would

reduce their chances of getting caught.  They went to Tornado Cash because it didn't collect any user information because if it did that, it would be as good as leaving the calling card at the scene of the crime.

Privacy for criminals, ladies and gentlemen.  And what does that mean?  Hiding their stolen money.  That's why we are here.

So let's turn now to the evidence relating to the second key point, that the defendant knew that his business was hiding stolen money for criminals.  The evidence here is overwhelming.  Here are three reasons you know that Roman Storm knew that he was laundering criminal money.

First, Storm was told repeatedly about dirty money being laundered through Tornado Cash.

Second, Storm admitted that he knew dirty money was being laundered through Tornado Cash.

And third, storm talked about criminals laundering dirty money through Tornado Cash all the time.  So let's start with that first point because it is so obvious.

You know from sitting through this trial that the defendant was told over and over and over again that the proceeds of hacks and other crimes were being deposited into Tornado Cash.  Let me show you a few examples.

Let's go back to the KuCoin hack in September of 2022. You will recall that in October of 2022 the defendant -- I'm

P7U5sto1                    Summation - Mr. Gianforti

sorry, in September of 2020.  You will recall that in October 2020 the defendant got this e-mail from an employee of KuCoin.  It reads:  *This is Amber from KuCoin Exchange.  We found that the hacker of KuCoin transferred the ETH to your platform.  Please help us block these tokens.*

This is KuCoin explicitly telling Tornado Cash that it received stolen money and they even tell them exactly which wallets the money is coming from.

Remember, information likes this is exactly the kind of thing that Special Agent DeCapua uses in his investigations of crypto crimes.  This is the kind of information that the defendant could have used to design his business to be less hospitable to hackers, or at least keep tabs on how much dirty money was flowing into Tornado Cash.  But of course he didn't do that.  He just kept that washing machine running.  And also remember that the KuCoin was the first peak that we saw on the graph we were looking at earlier from Special Agent DeCapua.

Have you ever gone to a business like a laundromat and they have the first $20 bill they ever earned taped up behind the cash register?  The KuCoin is that but for Tornado Cash.  High watermark.

And here is the next one, BitMart.  You know the defendant found out about the BitMart hack because you saw the letter that BitMart's lawyer sent to them on Telegram.  Here it is on the screen:  *Our investigation, to date, reveals that*

*certain assets were transferred to Tornado Cash and that a significant portion of those assets remain at Tornado Cash.*

The letter went on:  *Based on our investigation, it appears that Tornado Cash is it in possession of stolen assets.*

And how do you know for sure that the defendant got the BitMart letter?  Because he responded to the e-mail BitMart's lawyer sent him.  The defendant didn't ignore this message, he didn't overlook it.  He read it and responded.

Let's pause here for just a moment because I don't want you to get lost in the sheer scale of these hacks.  As you know, the losses are staggering but, as you know, Tornado Cash was used to hide the proceeds of much more human-sized crimes, too.  For example, I have already mentioned Ms. Lin a couple times.  She is the court translator, she was our very first witness.  You learned how she lost $250,000 to fraudsters who built up her trust and got her to invest in a bogus investment scheme.  You saw this in Ms. Lin's chats with the scammer who lulled Ms. Lin into feeling she could trust that person.  Then, slowly but surely, the scammer lured her in and eventually brought up the topic of an investment opportunity and as so often happens, Ms. Lin trusted the person and fell for the fraud, hook, line and sinker.  Poof.  $250,000 gone.  And you learned that some of that stolen money was deposited into Tornado Cash, never to be seen again.

Now, does $250,000 pale in comparison to half a

billion?  Of course.  But not for Ms. Lin.  That was a major loss for her.  And you learned that in April of 2022 she tried to do something about it.  She sent an email about what had happened to her to hello@Tornado.cash but no response.  No nothing.

Here is what is significant about that e-mail address. It is the same one that the defendant used to run the business. Here is how you know that.  This is an invoice from Infura from March 2022, just a month before Ms. Lin emailed that hello@Tornado.cash account.  Remember that Infura essentially helped Tornado Cash manage its blockchain traffic.  You heard from E.G. Galano at Infura about this.  He told you about how the Tornado Cash account grew over time, how its blockchain ETH steadily increased and steadily became more expensive.  He told you how if the defendant had stopped paying that bill, Tornado Cash basically would have stopped working.  But he kept paying the bill.

And what you can see from this invoice, ladies and gentlemen, is that the defendant used that hello@tornado.cash account in connection with his account at Infura.  That was his e-mail account.  E-mails to that account came to him.  E-mails from crime victims and law enforcement officers came to him over and over.  And there are many, many more examples of crime victims, law enforcement, and journalists reaching out to the defendant and either being ignored or fed this script full of

P7U5sto1                        Summation - Mr. Gianforti

lies that we will talk about a little bit later.

So take a look at these exhibits that I have listed here on the screen. Take a few notes, maybe note a few down, you can look at them later. We have GX 233, 234, 235, 238, 243, 246, 247, 248, 249, 256, 279, 553, 556, 562. You will have all of these exhibits during your deliberations. I encourage you to take a look at a few. They're all in evidence.

Again and again and again the defendant was put on notice of stolen funds being deposited in his business. E-mails to his inbox, direct messages to his Twitter account, and candid conversations in his various Telegram chats. He knew exactly what was going on. Did he shut the business down? No. He kept the laundromat running. He kept his eye on the prize, the big payday.

Now let's turn to the second reason you know that the defendant was well aware that Tornado Cash was laundering criminal money, because the defendant admitted it to his business partners and co-conspirators. Take a look at what the defendant said in September of 2021 when he was negotiating a promotional video for Tornado Cash. This is the defendant's main concern about the video: "The only thing I am personally worried about is the script. On the one hand, no limits should be set in order for it to be funny. On the other hand, it would be nice to have some sort of a positive message in the

P7U5sto1                    Summation - Mr. Gianforti

end that we are not entirely a project that helps bad guys, although I clearly understand roughly what the jibes would be and in what mode this will occur."

Not entirely a project that helps bad guys?  Wow.  I think you will find that Judge Failla will not instruct you that the only way you can find the defendant guilty of the charged offenses is if Tornado Cash was entirely about helping bad guys.

The defendant knew back in 2021 what you know now after seeing the evidence in this case.  Tornado Cash was overwhelmingly a project that helped bad guys, to the point that even the defendant was worried that his own ad campaign might reference that.

And let's turn back to Ronin again.  The Ronin hack is where all the threads of the case come together to show, in detail, that the defendant is guilty of the charged offenses because he knew Tornado Cash was transmitting dirty money.  So, let's spend a little more time on it.

First, here is the March 29, 2022 message where Semenov alerts the defendant and Pertsev to the Ronin hack: "Did you already see the $600 million hack today?  Shit might seriously hit the fucking fan now."

You should ask yourself, what does Semenov mean here? Why might shit seriously hit the fucking fan?  You know why. They all knew that a huge hack meant one thing, the stolen

P7U5sto1                    Summation - Mr. Gianforti

money was probably going to come to Tornado Cash.  So it is not just that they knew hacked funds found their way to Tornado Cash, they expected it.  They saw this gigantic hack and immediately thought that's coming our way.

(Continued on next page)

MR. GIANFORTI:  And they were right.

So what happened next?

Here we see Semenov making it clear that the $600 million hack was the Ronin hack.  He sends around a tweet from the Ronin network's official Twitter account that read: There has been a security breach on the Ronin network.  The Ronin Bridge has been exploited for 173,600 Ethereum and 25.5 million USDC.

Let me remind you about the testimony you heard from Andy Ho.  He's the co-founder and chief technology officer of Sky Mavis, which is the company that created the Axie Infinity game and ran the Ronin network.  Mr. Ho flew all the way here from Vietnam to tell you what happened with the Ronin hack.

This is the landing page for the Axie Infinity game up on the screen now.  Mr. Ho told you that Axie Infinity is run on the Ronin network, which is its own blockchain.  Players can buy these little characters you see on the screen, and they can buy them using cryptocurrency.  And to do that, players would take cryptocurrency like ETH and USDC and they would essentially lock it into this thing called the Ronin Bridge.  And the Ronin Bridge was just its own smart contract that held onto players' crypto and then issued them essentially an equivalent amount of the crypto that was used within the Ronin network, and that was what people used to buy these characters, upgrade them, etc.

Mr. Ho told you that in late March 2022, he got a message from one of his co-founders that one of their customers was having difficulty withdrawing about 5,000 ETH from the Ronin Bridge. So Mr. Ho went on the blockchain to see what was going on. And he confirmed that the customer's difficulty withdrawing that 5,000 ETH had to do with the fact that there was no longer 5,000 ETH in the Ronin Bridge to withdraw. In fact, he told you that the Ronin Bridge had no ETH in it at all. It had been drained completely, along with $25 million worth of USDC. And in all, he told you that about 170,000 ETH, worth about $600 million, was drained from the Ronin Bridge. He told you that all that money went up in smoke in just two transactions. Poof. Gone.

He also told you about his participation in the company's investigation of the hack. Basically he told you that the Ronin network fell victim to what is known as a phishing attack. A hacker reached out to one of Mr. Ho's employees on LinkedIn posing as a job recruiter. That's this message that we see up on the screen now. So the fake job recruiter gave this employee a homework assignment to do, which involved downloading a program onto their computer, and when that employee opened up that program, it allowed the hackers to gain access to that employee's computers and indeed to essentially take over the Ronin network. And once they had control of that, they were able to create what I think Mr. Ho

called a false authorization to withdraw all those funds from the Ronin Bridge. That's how they drained it.

So that's how the Ronin hack happened. How did the defendant and his co-conspirators respond?

Well, Semenov's initial instinct was to make a joke: "$600 million hack. A regular Tuesday in crypto." In other words, just another day in the office here in the money laundering biz. Just another day in cryptoland, where gigantic hacks are just a fact of life, like the weather.

And you saw that that was also the defendant's attitude. In that same chat, the defendant responds: "So what the fuck. If it's solen it's stolen." He's completely unbothered by the idea that $600 million has been stolen. Again, it's just a regular Tuesday in crypto.

But Semenov, he saw the writing on the wall and asked the defendant: "What will you do if it's loaded to us?" Because he knew, everyone knew, that Tornado Cash was the place to go to hide stolen funds. And I think you'll find that the defendant had no response to this question.

A few days letter, starting on April 4th of 2022, that's exactly what happened. The Ronin hackers started making ETH deposits into Tornado Cash. And the defendant knew about it more or less in realtime. That same day, as soon as the Ronin hack money started coming to Tornado Cash, a Manhattan-based *Wall Street Journal* reporter reached out to the

defendant and asked him about it.  The reporter could not have been more clear.  "These hackers are trying to use tornado.cash to launder stolen funds."  Let's focus on another part of that email.  Here is what he said to the defendant:  "You say here that 'maintaining privacy and preserving financial freedom should never come at the expense of noncompliance.'  Do you see this sort of activity in conflict with that statement at all?"

Ladies and gentlemen, I couldn't have put it better myself.  Of course those two things are in conflict.  The only privacy the defendant really valued was the privacy of criminals.  Those were his best customers.  The kind of privacy criminals need is a place to hide their stolen money.  This reporter hit the nail on the head.

So what happened next?

Well, basically for the next two months the Lazarus Group continuously pumped stolen money through the Tornado Cash service to conceal where it came from, as you can see from this slide that Special Agent DeCapua showed you.

But let's focus on the ten days that elapsed between April 4, 2022, when the defendant learned that the Ronin hack money was being deposited into Tornado Cash, and April 14, 2022, when OFAC sanctioned the Lazarus Group wallet that received the stolen funds.  Did the defendant and his co-conspirators take this opportunity to reconfigure the Tornado Cash service to make it less hospitable to hackers and

other criminals?  No.  They just kept on running the business as usual.  They kept on paying Tornado Cash's employees, they kept on paying Tornado Cash's bills, they kept the Tornado Cash laundromat running 24/7.

As you've seen, the evidence is clear that the defendant knew exactly what was going on.  There is just no reasonable dispute that the defendant knew that his business was helping criminals hide stolen money.

Now let's turn to the third reason you know the defendant was well aware that this was happening.  Because he and his co-conspirators talked about it all the time.  What do I mean by that?  Let me just give you a few examples.

Even from the earliest days of Tornado Cash, it was being used by hackers and other criminals so frequently that the defendant and his co-conspirators came up with a script to use every time someone asked about dirty money being deposited in Tornado Cash.

Take a look at this chat from March 2021.  The defendant instructs one of his employees, "when someone asks about hacks, it's usually the best to provide that answer, if you want."  That answer being the script he and his co-founders cooked up to respond to crime victims, law enforcement, and journalists who came to them to ask about stolen crypto.  It's in that top message you see on the screen.

Ladies and gentlemen, this is devastating evidence of

just how common these incidents were. They had a stock response. Oh, we're hiding dirty money again? Good thing we had a script for that.

And as you know from Mr. Werlau's testimony, the script wasn't even true. It denied that the founders had any control over Tornado Cash, but as you've come to learn, they absolutely did have control over it.

And here's another example from July of 2022, well after the Ronin debacle. The defendant was talking to a guy named Sergej who told the defendant that yet another hacker was laundering stolen money through the defendant's business. Sergej called this "free advertising again for Tornado Cash." The defendant's response? "We have a fuckload and more of advertising like this."

This is a simply astonishing admission from the defendant. He's admitting that he knows his customers include a fuckload of hackers who are giving him free advertising by taking their dirty money to Tornado Cash for their concealment needs.

And why is Tornado Cash their destination of choice, you might ask? Because "hackers will drive the money into best privacy at that time." That's what Roman Semenov, the defendant's business partner, had to say in response to Sergej's message about the chat. He followed that up by saying, "There should be 10x more regular users and then

everything will be fine."  What's Semenov really saying?  I mean, it's kind of a humblebrag, isn't it?  They've got the best so-called privacy solution, so of course hackers would use it.  That tells you everything about how these guys understood who really needed a "privacy solution."  It's not regular, legitimate users; it's criminals.

What else is Semenov saying here?  Again, this is late July 2022, months after the Ronin hack.  And Semenov is still saying, in effect, Tornado Cash would need at least ten times more regular users to drown out the fact that their most loyal customers are in fact criminals.

Another shocking admission.  What the defendant's co-conspirator is saying here, essentially, is that even in July of 2022, they understood that their main customers were hackers and that they barely had any regular users.  And that makes sense, doesn't it?

The evidence you saw during this trial shows definitively that the defendant and his co-conspirators knew hackers and other criminals turned to the Tornado Cash service for their money laundering needs again and again and again.  Remember, it was hackers who sent Tornado Cash's deposits soaring over its short existence, not regular users.  That's what we see on this chart here.  Semenov knew it, and so did the defendant.

So ladies and gentlemen, I'd like to just—could we

just take that down for one moment.

So now I'd like to shift gears for just a moment.

So I've already done this a bit.  I'll do it more going forward.  I'm going to be commenting on some of the arguments you've heard from the defense and that I expect you'll hear during their summation.  I want to remind you that the burden to prove the defendant guilty is always on the government.  We embrace that burden.  It's our job.  But if the defendant chooses to make arguments or put on evidence, as the defendant did here, you can and should scrutinize it like all the other arguments and evidence you've heard.

So I'd like to touch on one such argument right now.  And that argument is that you shouldn't find the defendant guilty because he built Tornado Cash with privacy in mind, not money laundering or the other crimes we just discussed.

Members of the jury, this is a distraction.  Even if the defendant got into the Tornado Cash project because he wanted to create a privacy solution for the blockchain, that doesn't matter.  Because you heard evidence that the defendant was on notice that criminals were using Tornado Cash to hide their dirty money no later than September of 2020.  You also heard overwhelming evidence that the defendant was reminded of this repeatedly over the next two years or so.  And each time the defendant was put on notice, he faced a choice——keep running the business or try to do something about that dirty

P7U1STO2                    Summation - Mr. Gianforti

money.  And you know the choice he made every time, to keep running the business; to keep adding new features; to keep making it more and more attractive to criminals; to keep pushing towards that big payday.

By at least September 2020, privacy became the cover story for Tornado Cash, not the goal.  At some point the defendant began profiting from other people's misery under the guise of standing up for their privacy.  So when the defense starts talking about privacy, which they will, remember that privacy was the cover story.  The real money wasn't in providing privacy for regular folks; it was in providing privacy for big-time crypto criminals who needed a place to hide hundreds of millions of dollars.  It was chasing that version of privacy that ultimately drove the defendant, because hackers were his best customers.  Hackers drove up Tornado Cash's popularity, not regular people, and it was hackers' usage of Tornado Cash that allowed the defendant to cash out for millions of dollars in August of 2022.

I said it before.  This is a simple story about greed; a story about the defendant continuing to profit as his business became a haven for criminals, because that was his only path to a big payout.  Remember, when the defense says privacy, what that really means is hiding money for criminals, not providing privacy to regular people.

Now the defendant didn't just know that criminals were

hiding their stolen money with Tornado Cash.  The evidence you saw during this trial also clearly established that the defendant was well aware that what he was doing was wrong, and that he didn't want to get caught.  That's key point No. 3.

All right.  Here's an easy example to start us off. In June of 2022, well after the Ronin hack, the defendant Googled his own name twice and then "are Tornado Cash criminals."  In my business, we call this evidence of consciousness of guilt.  In other words, doing something that only a person guilty of a crime would do.  Do innocent people Google if they're criminals?  Of course they don't.

The defendant and his co-conspirators also privately voiced concerns about being arrested for money laundering. Here's an example from November of 2021, where Pertsev tells the defendant and Semenov that Ivor, one of the Tornado Cash's developers, was "fucking leaving" and "basically pissing his pants."  Semenov knew exactly why Ivor was leaving.  Ivor's "relatives think that Tornado Cash is about laundering dough and hackers."

And here's how the defendant responded to the news about Ivor.  He circulated a link to a *Forbes* article about a criminal prosecution of a similar mixer that was providing similar concealment services to criminals.  Talk about knowing you've done something wrong.

By the way, does this Ivor thing remind you of anyone

else's testimony?  You heard from Justin Bram during the government's case.  He's the guy that put together a tutorial video for Tornado Cash that the defendant endorsed.  He also became a signatory on the Tornado Cash multisignature or multisig crypto wallet which the business used to pay expenses.  Here's what Mr. Bram had to say:

"Q.  Were you concerned about any potential liability you may have for participating in Tornado Cash?"

"A.  Yes."

"Q.  And when you say the climate was heating up in the U.S., what are you referring to?"

"A.  Over the six months that I was there a lot of hacks were happening and those were going into the Tornado Cash protocol and it just seemed like a bad look."

Ivor and Mr. Bram saw the writing on the wall.  Tornado Cash was a money laundering business for criminals, and they wanted no part of it.

And here's another message from the founders' chat from February of 2022, where Semenov voices a concern about being blamed that "we have deployed contracts through which bad dough can pass."

And then he circulated a few audio messages where he expressed concern about the FBI approaching them, if the FBI were to find out that the founders actually had control over Tornado Cash despite what they'd been saying publicly.  Here's

what he said:  "Like one could say 'go on and fucking create a special multisig where the FBI could send some requests regarding any trouble or how fucking stolen funds are kept there and have this multisig be able to add to the proxy's blocklist there.'"  In other words, ladies and gentlemen, even before the Ronin hack, they were worried about law enforcement learning that they controlled the business that was laundering bad dough.

Here's another example of how you know the defendant understood what he was doing was wrong.  It's a questionnaire from the company Rho that the defendant filled out on April 19th of 2022.  That's two weeks after the defendant learned the Ronin hack money was being deposited in Tornado Cash.  It's five days after the Lazarus Group wallet was sanctioned, which, as we've discussed, the defendant learned about in more or less realtime.  Now this questionnaire asked a bunch of crypto-related questions, and the defendant lied in response to basically all of them, claiming that Peppersec had a essentially nothing to do with crypto.  This is Government Exhibit 923.  As you've seen, Peppersec was just the formal entity for Tornado Cash.  Tornado Cash doesn't appear once in this questionnaire, even though that's the only reason the defendant opened an account at Rho.  He paid their business expenses out of this account.  And again, look at how he answered no to essentially every crypto-related question, even

P7U1STO2                    Summation - Mr. Gianforti

though that's all he was doing all the time.  Why did he lie to Rho?  Again, use your common sense.  People lie about what they're doing when they know what they're doing is wrong.  The defendant knew he was committing crimes, and he also knew the writing was on the wall.  How did he know that?

This is from June 2022, a couple months after the Ronin hack.  Here he says, "Well, guys, my personal bank account has been closed without an explanation, with all my credit cards.  I was a client there for five years.  They've started tightening the screws.  I'm thinking whether I should get the fuck out of the country or something."

Why was he thinking about getting out of the country?  Because he knew what he was doing was wrong and he was about to get caught.

But these weren't the only lies that the defendant told to keep the heat off Tornado Cash.  Let's revisit that script the defendant cooked up to respond to crime victims, law enforcement, and journalists when they reached out to Tornado Cash about a hack or some other crime.  They used the script over and over and over again.

Here it is again, on the top of the screen.  The defendant's telling one of his employees, "It's usually best to provide this answer if there's a hack."  If there's a hack.  But the script was full of lies.  Here's one thing it said: "Our company does not have any ability to effect any change or

P7U1STO2                    Summation - Mr. Gianforti

take any action with respect to the Tornado Cash protocol." That's simply not true.  Mr. Werlau told you that the defendant and his co-conspirators controlled and regularly changed every component of the Tornado Cash service except the pools.  They modified the web application 250 times.  And they rolled out new router smart contracts whenever they wanted to add new features to Tornado Cash.  They were running the show.

And here's another thing that the script said about Tornado Cash, that it is a decentralized software protocol no one entity or actor can control.  That's false for the same reasons I just gave you.  There were central points of control. And the defendant and his co-conspirators made sure they were in charge of those.  The script is what he told the public. But in his secret chats, he admitted the truth.

Here we see the defendant chiding Semenov about there being no such thing as "true decentralization," because Tornado Cash had centralized points.  And the defendant used those control points to run the business.

Ladies and gentlemen, for Tornado Cash, decentralization was the big lie.  It was the lie the defendant told so he could pretend he wasn't responsible for hiding all that dirty money, even though he knew that he was.  It's why he kept using that false script about how they didn't have any control.  He did that to keep the attention off of him.  Even the defense's expert Dr. Hurder admitted that Tornado Cash

P7U1STO2                    Summation - Mr. Gianforti

became more centralized over time, not less.  But do you see the defendant admitting to that publicly?  No.

Now you may be asking yourself, why lie about this? Well, I'd submit to you there are two reasons why the defendant was constantly lying about his business.  First, he couldn't be transparent about the fact that he actually had control over Tornado Cash because that would mean he was in control of a money laundering business, a business where criminals could hide their stolen money; hence why we're here.  Second, it would be bad for business if he was transparent about the fact that he controlled Tornado Cash.  If it became broadly known in the hacker community that the defendant and his co-conspirators actually had control over Tornado Cash, their customers, which, again, were mainly hackers and fraudsters, would stop using Tornado Cash for fear that the defendant would make changes to the service that would make it more likely that they could get caught.  That's not going to happen.  In fact, I think Haseeb Qureshi, who was the major investor from Dragonfly, the venture capital firm, I think he puts it best.  "Who would want a compliant mixer?"  That's what Qureshi said to the defendant when the defendant suggested creating a new mixer, under a new brand name, of course, with KYC/AML in it——in other words, with features that would help Tornado Cash know who its customers were——that's KYC——and combat money laundering——that's AML.

Now let me just remind you here, Judge Failla

instructed you that the defendant is not charged with violating any laws or regulations regarding the implementation of any particular AML policies or procedures or any particular KYC features.  Instead, where you see those terms in the evidence, you're permitted to consider them in evaluating whether the defendant had knowledge of such features and whether he had the ability to implement such features at Tornado Cash.

So let's get back to this chat with Qureshi.  He wasn't a fan of the defendant's idea for a compliant mixer.  Why?  Because he saw the market need for a compliant mixer as being quite thin.  Why was the market for a compliant mixer thin?  You know why.  Because so many of Tornado Cash's customers were hackers and other criminals who needed a place to hide hundreds of millions of dollars of stolen money.  Remember, privacy for criminals, not for regular people.

So that's why the defendant lied, because he knew what he was doing was wrong, and he wanted to keep his criminal customers coming back for more.

Ladies and gentlemen, I now want to spend a little more time specifically on the sanctions violations that are alleged in this case, because you can really see exactly how the defendant tried to pull off a coverup in realtime, that he knew about these sanctions and that he was doing something wrong, and that he didn't stop doing it.

The sanction violations began on April 14, 2022, when

the defendant sent his business partners a link to a report that the FBI had attributed the Ronin hack to the sanctioned North Korean hacking outfit known as the Lazarus Group.  The report also noted OFAC sanctions on the Lazarus Group wallet that received the stolen funds.  You know how the defendant reacted.  Exactly how someone guilty of a crime would react. "Guys, we're fucking done for."

That's when the defendant knew, without question, that the Ronin hack funds were being transmitted by Tornado Cash and that those funds were from sanctioned North Korean hackers.

Why were they done for?  Because the defendant and his business partners had known for over a week that the stolen Ronin money was moving through their service, and just like all the other hacks, they just kept right on running the business as usual.  As long as you were paying your relayer fees, the defendant was happy to let you use Tornado Cash.

But now the defendant knew the situation was more serious.  He knew that the Ronin hack had been perpetrated by sanctioned North Korean hackers, which would bring even more law enforcement scrutiny.  So when the FBI linked the Ronin hack to North Korea, the defendant panicked.  And rightly so. Here we see him telling his co-conspirators, "We urgently need to embed the OFAC sanctions list.  Guys, basically, I think this is serious and we need to act very fast."

He keeps going:  "The address has already been added

to the OFAC list—-these hackers are using Tornado.  We urgently need to tell everyone that we do not let such individuals to the front."

Just as a reminder, folks, "the front" means the front end of Tornado Cash.  That's the user interface or the web application.

And let's just pause here for a moment.  This message is extremely revealing.  Pay attention to what the defendant says and what he doesn't say.  What he says is:  We need to tell everyone that we don't let sanctioned hackers use Tornado Cash.  What he doesn't say is that they should actually stop letting hackers use Tornado Cash.  The defendant is concerned about public messaging here.  He doesn't care at all about stopping the North Korean hackers from using Tornado Cash.  All he cares about is keeping up the public facade that Tornado Cash isn't entirely used by bad guys.

This next message confirms that all he cares about is pretending to be doing something.  What does he say?  "This is a very good thing for positioning.  But even doing it onchain would be easy to bypass."  Let's break that down.

Why was this good?  Why was this a good thing for positioning?  Because they wanted to make some big PR announcement that they don't allow sanctioned entities like the Lazarus Group to use Tornado Cash.  But again, does the defendant actually care whether that's true?  Is he making a

real effort to keep criminals off Tornado Cash?  No.  Of course not.  He immediately assures his co-conspirators that these changes will be easy to bypass.  Don't worry, guys.  The money is going to keep rolling in.  The defendant knew that this was all window dressing.  It was a cover story that he hoped would keep him out of jail.

And how do we know that?  Because he said it as plainly as one possibly could:  "A guy got five years of prison for sanctions."

Ladies and gentlemen, I'm going to repeat something I said at the beginning.  This is what someone says when they've been caught red-handed committing a crime.  The defendant knew that Tornado Cash was a money laundering business.  He knew that his customers were not only criminals but sanctioned criminals, funding the North Korean regime.  And he was terrified about going to jail.  That's what someone says when they've been running a business that hides criminals' dirty money and their days are numbered.  That's what someone says when they know they've done something wrong and are about to get caught.

Now later that day, the defendant and his co-conspirators rolled out the cover story.  To be specific, they installed this thing called the Chainalysis oracle tool in the user interface, which, again, was just the web application.  They put out a tweet from the official Tornado Cash Twitter

P7U1STO2                     Summation - Mr. Gianforti

announcing they'd done this.  And but of course, as you know already, the defendant knew full well that this change was "easy to bypass."  Those are his words.

And here's where it gets interesting.  Here's what Roman Semenov said:  "Regarding Telegram chats, we also have to bear in mind that law enforcement is reading them too and can use them against us later."

Here's how the defendant responded:  "Cleaned it up."

But of course your common sense tells you that you only had to clean something up if you've made a mess, right?  And keep in mind that this message comes from Pertsev's phone, not the defendant's.  So maybe the defendant did clean it up by deleting a whole bunch of incriminating text messages, but Pertsev wasn't that smart.  He kept the incriminating text messages.

Ladies and gentlemen, these chats are devastating evidence of the defendant's knowledge that he was breaking the law.  Here you have the defendant admitting that he cleaned something up because he was worried about law enforcement seeing it.  He was worried about you seeing it.  He knew he was committing a crime, and he knew that if his secret communications with his co-conspirators ever came to light, that would prove that he was guilty.

And just as the defendant said it would be, the oracle was in fact easy to bypass——so easy that the Lazarus Group

bypassed it almost immediately.

But before we get to that, let me tell you briefly how the North Koreans didn't evade the oracle by depositing directly into the Tornado Cash pools.  You heard the defense talk about this in their opening and in some of their questioning of the witnesses.  But you heard it here first: That argument is a red herring of the highest order.  When you look at how Tornado Cash actually worked, it makes no sense. Here's the long and short of it.  Virtually no one went to the pools directly because that would have made them stick out like a sore thumb on the blockchain.  Even the defendant's expert, Dr. Edman, admitted that.  That's exactly what criminals go to mixers not to do.

So now if you'll permit me, I want to take you on a short technical detour, but it's worth the trip, because it will make you see how the defendant's argument makes no sense here.

You'll recall from Mr. Werlau's testimony that the router or proxy was one of the components of the Tornado Cash service that the defendant and his co-conspirators had complete control over.  For instance, on this slide we see how Mr. Werlau represented graphically how deposits into the Tornado Cash service worked.  As he described to you, the customer would select the amount they wanted to deposit on the Tornado Cash UI.  Let's say it was a hundred ETH.  The user

interface would send the deposit request to the Tornado Cash router, the router would then communicate with the Tornado Cash instance registry to make sure that that pool was online.  If it was, the router would transmit the deposit data to the 100 ETH pool, which announced to the Ethereum blockchain that that 100 ETH had been transferred to the router and then onto the pool.  Deposits using the Tornado Cash CLI basically worked the same way.  The router was still involved.

And this slide reflects graphically how withdrawals happened from the Tornado Cash service.  And this is after the introduction of that new relayer system that we talked about in February of 2022.

Now we don't have to get too into the weeds here.  The important thing is that, once again, there's the Tornado Cash router directing traffic so that the withdrawal could be made successfully from that 100 ETH pool.

Here's why this matters.  Mr. Werlau told you that if you look at any particular deposit or withdrawal from the Tornado Cash service, if you were to really drill down into the data associated with that transaction, you'd be able to see every little detail of how that particular transaction moved through the Tornado Cash service.  For example, you would see that the transaction request went through the Tornado Cash router.  Part of what made Tornado Cash effective as a mixing service, a place to hide your money, was that transactions with

P7U1STO2                    Summation - Mr. Gianforti

the service looked completely identical, and were effectively indistinguishable from one another, from the uniform amounts of ETH, the uniform increments of ETH for the pools, all the way down to the particular details of each withdrawal request.  If any one of those details from your transaction were different from all the other transactions, that would effectively make you stick out from the crowd.  Your crypto wouldn't be mixed anymore.  To use an example you heard at the beginning of this case, it would be like if that suspect in the black baseball cap and the green hoodie runs into the crowd of people wearing exactly the same thing, it would be like if that person swapped out that black hat for a red one.  The cops would be able to find that person immediately.

And here's how Mr. Werlau represented this graphically.  This shows you what it would look like in effect on the blockchain if someone were to go directly into the Tornado Cash pools and try to bypass the Tornado Cash router.  Again, you would just stick out like a sore thumb.  That would defeat the entire purpose of running your crypto through a mixer to obscure where it came from.  And again, even the defendant's expert admitted this.

And this, ladies and gentlemen, is why what I expect you will hear from the defense about the stolen crypto being able to go around the parts of Tornado Cash that the defendant controlled and deposit directly into the Tornado Cash pools

makes absolutely no sense, because for all intents and purposes, that stolen crypto would suddenly look completely different from all the other crypto in the pool. It wouldn't be mixed anymore. Each of those ETH tokens would suddenly be wearing a red hat.

Take Mr. Ahmed. That's the hacker who testified at this trial. He executed two multimillion-dollar hacks on two different cryptocurrency exchanges. And how did he wash the ETH that he used to kick off one of his hacks? He went through the Tornado Cash user interface. He didn't deposit straight to the pools, he didn't withdraw straight from the pools. He went in through the front door just like everyone else, like 96 percent of everyone else, because that's what kept the money hidden for everyone. In fact, you heard that no deposits or withdrawals went directly to the 100 ETH pool after the defendant deployed the new router in February of 2022.

Here's what Mr. Werlau said:

"Q. After that, the February 2022 router was released?"

"A. Yes. Correct."

"Q. And so were you able to identify how many of those deposits and withdrawals involved the router and how many went directly to the pool?"

"A. I was."

"Q. What were you able to identify?"

"A.  For the 100 ETH denomination during this time period, 100 percent of both deposits and withdrawals went through the router."

"Q.  So did anybody come up with that idea of depositing directly to the pools during this time period?"

"A.  No."

So again, let's focus on this early 2022 time period when the Ronin hack starts flowing into Tornado Cash.  How many direct interactions with the pools were there after that period?  Zero.

Ladies and gentlemen, make no mistake, this destroys any defense argument about criminals theoretically accessing the Tornado Cash pools directly.

Here's what Semenov said about the defendant and Pertsev in February of 2022:  "And the protocol seems immutable but everyone must use the proxy because if you bypass it, you could kind of lose anonymity because all of our users go through the proxy by default, and if you bypass it, then as it is, you, er, are kind of different from everyone."  Semenov knew it.  It would be like putting on a red hat.

Now let's get back to the Ronin hack.

Here we see that the defendant circulated a CoinDesk article entitled "Sanctioned crypto wallet linked to North Korean hackers keeps laundering."  And then there's the subtitle:  "It's a game of wallet whack-a-mole despite Tornado

Cash's efforts.  For now, the hackers appear to be winning."

The article noted that "Making a brief pit stop at a fresh, unsanctioned wallet, its crypto quickly flew through the popular coin mixer Tornado Cash, where the trail went cold."

Let's break that down a little bit.

As we've discussed, OFAC sanctioned a particular wallet associated with the Lazarus Group hack of the Ronin network.  The oracle blocked that particular wallet from transacting through the Tornado Cash user interface.  I should note it didn't block anything on the Tornado Cash CLI, or command line interface.  But as you know from listening to Special Agent DeCapua, hackers are very adept at creating new wallets and moving crypto around on the blockchain in all kinds of circuitous ways to try to avoid detection by law enforcement.  Here, the North Koreans didn't even have to do that.  They just had to create a single clean wallet that wasn't the subject of sanctions, send the stolen crypto there, and then send it to Tornado Cash.  Easy to bypass indeed.

And then about a week later, someone further confirmed for the defendant that the Lazarus Group had found a way around the oracle and had kept laundering the Ronin funds through Tornado Cash.  Here's what this tweet said that was shared: "Ronin network exploiters already transferred about 300 ETH into Tornado Cash through this new address.  It seems the hackers find a way to bypass sanctions oracle by transferring

to a new address before labeled as an address that included a sanctions designation."  Exactly what I just told you.

The guy who circulated that tweet then says:  "People are starting to figure out that front end block is a meme."  In other words, he was saying that the front end block that the defendant and his co-conspirators had put into place, the oracle, was basically a joke.  Of course the defendant had known that from the very beginning.  But he also knew that he had to say something if law enforcement came for him, so he put in something that was easy to bypass, so as not to disrupt business too much.

And then about a week later, Semenov realized they still weren't out of the woods with respect to law enforcement. Here he is complaining to the defendant about somebody writing a "bunch of fucking bullshit about us."  What was that bullshit?  It was this tweet from a company called Nansen, which said, "15% of deposits are from the Ronin exploiter." You can see other hacks you heard about from Special Agent DeCapua are on this list:  Beanstalk, for instance, at 7.17 percent.  Keep in mind, these percentages reflect hundreds of millions of dollars in stolen crypto.  Not exactly pocket change.

But was Semenov mad that this person had said there was dirty money in Tornado Cash?  No.  How could he be mad about that?  It was obvious to everyone.  No, Semenov was mad

P7U1STO2                    Summation - Mr. Gianforti

because he thought the tweet overstated how much dirty money was in Tornado Cash.  "They looked at the router that was deployed three months ago.  Obviously Ronin makes up a big percentage there."

Remember, we just talked about the Tornado Cash router.  I won't let it detain us again now.  Just remember that the router was something that the defendant and his co-conspirators had complete control over.  It was a part of the system that could have been easily changed to make Tornado Cash less hospitable to hackers.  And did they do that?  No.  Why would they try to block their best customers?  Does a laundromat send you away if you give them too much dirty laundry?  Of course not.  They roll out the welcome mat.

Now let's get back to Semenov's complaining:  "The percentage of criminal ones should be considered in relation to everything.  At this rate, it's possible to create the stats on the day of the Ronin hack and say that 99 percent of the dough is from hacking activity."

So what he's complaining about basically boils down to cherry-picking statistics.  But what is crystal clear is that the participants in this chat, including the defendant, knew full well that Tornado Cash was accepting dough from hacker activity, and that indeed on some days, this was basically the entirety of their business.  They knew that criminals using Tornado Cash was a critical aspect of their business model.

Privacy for criminals, not privacy for regular people.

So we just saw Semenov complaining about how to calculate the percentage of dirty money. You've heard the defense make some of those same complaints during this trial. But members of the jury, it's irrelevant. It's illegal to provide services to a sanctioned entity, full stop. Listen to Judge Failla's instructions. I expect she will not tell you that it's okay to break the law if it's only 15 percent of your business.

What the communications we were just looking at tell you is that the defendant knew he was doing business with North Korea and he knew it was illegal. It was illegal to do 1 cent of business with the Lazarus Group, let alone hundreds of millions of dollars.

Here's another way you know the defendant knew he was doing something wrong. He cashed out his TORN in a way that shows he was trying to hide the profits from the business and was worried about getting caught. Here's a chat from June 2022, when the defendant tells Semenov and Pertsev that he cashed out a little bit more than 8300 TORN for about $160,000 worth of USDT. That's essentially $163,000 that are pegged to each other. He reassures them that he did "everything from the Russian Binance, no problem at all, and even from a Russian IP (VPN)." It's not on this slide, but a little bit after this he confirms that he did it with "Mischa's account." So Binance,

P7U1STO2                    Summation - Mr. Gianforti

ladies and gentlemen, is just a very large cryptocurrency exchange. And you heard during the trial that a VPN is a way that you can make it look like your computer is in a totally different place than where you actually are. So basically what the defendant is saying here is, I made it look like I was in Russia when I did these transactions.

You'll recall that Special Agent George from the IRS walked you through how you know that the defendant in fact did cash out TORN in June 2022 through a Russian Binance account in the name of Michael Vazhenin. That's the Mischa the defendant was referring to. If the defendant thought he wasn't breaking the law, why go through all that trouble? Why use a VPN? Why use an account in someone else's name? It's obvious. The defendant knew he was breaking the law, and he was afraid of getting arrested and having his assets seized.

You'll recall a little after this Semenov says, "Yup. I will also send a little TORN a bit later, to avoid getting busted now."

Why would Semenov be afraid of getting busted? You know why. Because the defendant and Semenov knew that TORN was money that they had earned through their operation of a money laundering business, and they were afraid they were all going to get busted by law enforcement.

But this cashout in June 2022 was just the dry run for the big cashout in August of 2022. Special Agent George walked

you through that too.  The defendant ran the exact same playbook, swapping TORN for stablecoins in that Russian Binance account, then moving the money out of Binance where it would be hard to track.  Each of the co-founders cleared about $2.6 million out of the 12 million in total that the defendant cashed out.

And here it is reflected graphically.  You see the founders' TORN coming into the Russian Binance account.  That's the big green dot on the left side of the screen.  Then you see a whole bunch of swapping for USDT and then for DAI, which is another stablecoin, over a few days.  Then you see it all move off Binance in the middle, and then you see the money split into three equal parts.  $2.6 million for each of the three founders.  And just like that, the defendant cashed out of the Tornado Cash business.

And here we see the defendant confirming to Pertsev and Semenov that he cashed out $8 million, and he sent each of them $2.6 million, asking them to thank him since he'd been doing it all day.  He spent an entire day cashing out because at that point he had gotten extremely worried about the North Korean hackers and other criminals who brought all that attention on Tornado Cash.  He was afraid of getting caught.

MR. PATTON:  Your Honor, may we approach?

THE COURT:  Not in the midst of this, no.  Thank you.

MR. PATTON:  I'd just like to lodge an objection for

the record.

THE COURT:  Your objection is noted.

MR. GIANFORTI:  And then defendant gave Semenov and Pertsev a little advice about how to keep their profits out of the hands of law enforcement.  "Create new wallets and new seed phrases.  Transfer money to new addresses."  Ladies and gentlemen, that's how you cash out from a money laundering business, in a way that makes you and your money difficult to trace, in a way that keeps law enforcement from catching up with you.

That leads me to key point No. 4, which is the big why.  Why did the defendant operate a money laundering business, a fancy online laundromat, and all but openly court criminals to be his customers?  Why did he lie to people about the nature of his business for years?  Why did he try to hide his profits from the business?  You know why.  Because this is a simple story about greed.  It's a simple story about a money laundering business that the defendant hoped would make him rich, and it did.

But how do you know the defendant and his co-conspirators ran Tornado Cash as a for-profit business?  Well, because it had all the classic hallmarks of a business.

On this slide, I've summarized the evidence that the defendant ran Tornado Cash as a business—a business that concealed money for criminals.  And as you can see, there's a

P7U1STO2                        Summation - Mr. Gianforti

lot of evidence on this point.

First, the defendant and his co-conspirators referred to Tornado Cash as a business.  Here's an excerpt from an October 2021 chat where the defendant says the following: "Subsidization is certainly cool, but I think we need to get people used to paying for transactions.  We have capitalism rather than socialism, after all."  "It's dangerous when free bread is taken away from hamsters later.  It's better to take money from them right away.  If we can do this right away so that relayers would immediately receive compensation, it will entail some risks, then I will understand the reason for the refusal to collect the commission."

That's what the Tornado Cash service is all about, getting people to pay for transactions.  After all, this is capitalism, isn't it?  This is a business, right?  Of course it is.  It's the defendant's business.

Also note that the defendant seemed aware here that relayers taking fee may entail some risks.  What kind of risk? The risk from taking a cut of all that dirty money being deposited in Tornado Cash.

And here's an excerpt from the founders' private chat from November of 2021.  Pertsev asked the defendant about how they should set fees from a "business standpoint."  Again, why would they be talking about fees if Tornado Cash wasn't a business?

Here's yet another example from the founders' chat from March 2022, where the defendant and Semenov were arguing about Tornado Cash.  What does the defendant say?  "We're talking about fucking business here."

You also know Tornado Cash was a business because it had customers.  Here's the defendant complaining to Mr. Galano about a service outage on November 11th of 2020 that affected the defendant's "customers."  Don't forget, this is just a couple of weeks after the KuCoin hacker began laundering millions of dollars in dirty crypto through the Tornado Cash service, which the defendant was aware of, as we saw earlier, so you know exactly which customers he was referring to here. Hackers.

Another way you know Tornado Cash was a business is that the defendant was the CEO.  That means the chief executive officer.  The boss.  Here's an example from 2020 where the defendant's main investor——that's Haseeb Qureshi from Dragonfly——referred to the defendant as the CEO of Tornado Cash, with no pushback from the defendant.  Ask yourself this: Why would the Tornado Cash pools, these smart contracts standing alone, which is what the defense wants you to focus on, why would these pools need a CEO?  They wouldn't.  A business needs a CEO.

You also know Tornado Cash was a business because it had employees and a significant payroll.  You can see from this

P7U1STO2                    Summation - Mr. Gianforti

slide that a significant chunk of the $900,000 that the defendant got from Dragonfly went towards payroll.  And you know this list isn't comprehensive because you don't see the employee who left the business because of money laundering concerns in November 2021.  That was Ivor.  We talked about that a little while ago.  And don't forget, that's exactly why Justin Bram got out of Tornado Cash too.  He wasn't even anywhere close to the code in the way that this actual developer was.  The developer, Ivor, was someone who knew how Tornado Cash ran under the hood, as they say.  And what did he do?  He bailed because he was worried about going to prison.  And the defendant knew that.

And incidentally, some of these employees at least were willing to be paid in TORN, as you can see here.  That tells you everything you need to know about TORN.  Everyone thought it would explode in value.  This guy thought it was worth forgoing a regular salary on the hope that TORN would end up being worth way more than that.

So if Tornado Cash was just some autonomous pools living on the blockchain, why did the defendant have a team of developers being paid tens of thousands of dollars a month to work on it?  You know why.  Because Tornado Cash was a business.  And it needed people to keep it running and to keep improving its performance for its customers.  And again, who are the defendant's best customers?  Hackers and other

P7U1STO2                    Summation - Mr. Gianforti

criminals.

Another reason you know that the defendant ran the Tornado Cash service as a business is because it had significant monthly expenses beyond payroll. Ms. Reyes, the forensic accountant from the FBI, told you about the thousands of dollars the defendant was paying to service providers each month, and you heard from some of these service providers directly, including Infura, Alchemy, and GitHub.

For example, you heard from Mr. Galano from Infura. Here's what he said about Infura's services: "The Team tier is meant for once a project reaches a level of maturity where you have multiple people working on it, maybe you have your first version of an application out there and your early users are starting to use it; and then the Growth tier are like orders of magnitude more traffic required, so you're actually starting to get traffic users on your application, and that's when you typically graduate to that Growth tier."

Now we're looking at a couple of receipts from Infura from July 2020 and February of 2022. The one from July 2020 on the left shows that Tornado Cash was at that Team tier, paying about $225 a month for blockchain traffic. And you fast-forward to February of 2022, on the right, and that shows that Tornado Cash was now with the Growth tier and was spending over a thousand dollars per month on blockchain traffic. So just from the documents, you can clearly see the explosion in

P7U1STO2                     Summation - Mr. Gianforti

Tornado Cash's popularity, which, again, was driven by what? Hackers and other criminals. Privacy for criminals, not for regular people.

Here's another important reason you know the defendant ran Tornado Cash as a business. It had venture capital——or VC——investors. That was Dragonfly. They gave the defendant almost a million dollars to get the Tornado Cash service off the ground. Are venture capitalists in the nonprofit business? Of course not. And you heard from the defense's own witness from Andreessen Horowitz. That's another VC firm. VC firms invest in projects they think are going to make them money.

And finally, you know that the defendant and his co-conspirators ran Tornado Cash as a business because it invested in marketing, just like you would a regular business. You remember the T-shirts, right?

Let me ask you again. Can you think of a more literal advertisement for a money laundering business than a T-shirt with a washing machine with a corporate logo on it?

And here's another version of the T-shirt that Semenov wore to ETH Boston in 2019. It reads, "I keep my Ether clean with Tornado Cash," and again features an image of a washing machine with the Tornado Cash logo, just in case anyone didn't get exactly what they were going for.

So as we just discussed, you know that Tornado Cash was a business because the defendant treated it like a

P7U1STO2                        Summation - Mr. Gianforti

business.

So how do you know the defendant controlled the business? Well, for one thing, he was the CEO of Tornado Cash. CEOs tend to control their businesses, don't they? For another thing—and this is critical—the defendant had control over every aspect of Tornado Cash except for the pools. You heard that there were over 250 changes made to the UI during the relevant period. You heard that the defendant and his co-conspirators made upgrades to the CLI. You heard that they introduced new features like the relayer registry, which is what turned Tornado Cash into a money-making enterprise. You heard that they made changes to the Tornado Cash router, which directed deposits and withdrawals. They did that from time to time. And what all these things add up to, ladies and gentlemen, control, control, control.

And how do you know that the Tornado Cash business was for profit? Well, as you know, from Werlau, the defendant and his co-conspirators figured out how to monetize the Tornado Cash service and turn it into a profitable enterprise. And that's what ultimately netted them those millions of dollars. I want to put it very simply. They figured out a way to create a constant demand for those TORN tokens by integrating them into that new relayer system. This drove up the price for TORN when it was first released. That demand created a lift of a price.

This is a very important slide.  Make a note of it. It shows you that TORN did indeed explode in value when the new relayer system was rolled out.  It shows you that its value went up 123 percent over this three-month period in 2022.  And while its value came down a bit by the time the defendant cashed out, he still cashed out over $12 million worth of TORN. And don't forget that, as Mr. Werlau told you, creating a cryptocurrency costs essentially nothing.  TORN was all upside for the defendant and his partners in crime.  And make no mistake, making bags and bags of money was always the goal here.

Here's a key 2020 chat with Haseeb Qureshi from Dragonfly.  The defendant says, "Roman Semenov wants to make money," following that with a smiley face as in, wink, wink, we both know that I want to make money too.

And Qureshi of course agrees with that sentiment.  He works with a VC firm, after all, and assures the defendant that "most of the money you'll make will be in the future when Tornado Cash is huge and successful."

How huge and successful, you ask?  Well, according to Qureshi, so huge and successful that in four years the defendant and his co-conspirators could retire based on what they earned from Tornado Cash.  That's some promise.  That's not, you might make a million or two off of this, although that's a lot of money, that's, you'll make multiple millions

P7U1STO2                    Summation - Mr. Gianforti

off of this business, enough money so you can live off of it for the rest of your life.  It's no wonder the defendant was so fixated on making Tornado Cash a business success.

Given the founders' interest and Dragonfly's interest in Tornado Cash and its proprietary cryptocurrency token or cryptocurrency TORN, is it any wonder that the defendant and his partners were laser focused on the value of TORN?  You see it again and again in the chats.  There's just no way to reasonably dispute that.

Here's an excerpt from the founders' chat from February of 2021, where Semenov explains to Pertsev that the reason he was thinking about giving a company called 1inch a bunch of TORN was because 1inch was "pumping the token price for us."  In other words, 1inch was taking action to increase the value of TORN.  Semenov goes on to explain that, "We profit if the token price is even 1 percent higher because of these actions."  Why is that the case?  Because the defendant and his partners created TORN out of thin air.  It was all upside.

Here's another example of how focused the defendant was on making a profit from operating Tornado Cash.  This is from February 2022.  Remember, this is after the defendant had cracked how to monetize the Tornado Cash service.  Here, the defendant can't believe that Semenov is suggesting that they permit people to create another version of Tornado Cash without a protocol fee.  He replies, "The protocol fee is for the

benefit of token holders," and chides Semenov for not seeing the positives.  And who was a token holder?  The defendant, and his co-conspirators.  And he wanted to make sure that all those fees kept rolling in so that he could profit from the business.

Members of the jury, we spent a little time on the charges at the beginning of this summation, and now I'd like to spend a bit more time on them so we can talk about how the evidence shows that the defendant committed these crimes beyond a reasonable doubt.

But I'm going to take things out of order.  I'm going to start with Count Two, the evidence that the defendant is guilty of Count Two, and that's that the conspiracy to operate an unlicensed money transmitting business is clear and overwhelming.  The defense isn't even fighting that the defendant had an agreement with Semenov and Pertsev.  I expect they're just going to argue that the object of the agreement wasn't criminal.

But here's how you know that's wrong with respect to Count Two.  As I told you at the beginning, Count Two charges that the defendant agreed with Semenov and Pertsev to move money they knew to be derived from crime.  It's called unlicensed money transmission.  But I expect Judge Failla is not going to instruct you that the defendant or Tornado Cash needed a license of some kind to deal in dirty money and didn't get one.  There is no such license.

You saw overwhelming evidence that all three of the Tornado Cash founders, and especially the defendant, knew dirty money was moving through Tornado Cash. The defendant was approached repeatedly by crime victims and law enforcement begging for help to track down the funds lost to hacks and frauds. He was approached repeatedly by journalists who wanted to talk about the same thing. The defendant and his co-conspirators were constantly talking about hacked funds being deposited in Tornado Cash.

There's also overwhelming evidence in the record that the defendant and his co-conspirators ran Tornado Cash as a for-profit business, which is an element of Count Two. To name a few: the defendant was the CEO of Tornado Cash; they had VC investors; they had full-time employees; they had significant overhead; and the goal of the enterprise was to make bags and bags of money. That's a business.

You have the agreement, you have the knowing transmission of criminal proceeds, you have the for-profit business. This is all the evidence you need to convict on Count Two.

Now Count One is the money laundering conspiracy. Again, there's no real dispute on there being an agreement. The defendant was working together with his business partners, Semenov and Pertsev. As I told you earlier, money laundering requires the money to have been derived from something that's

known as a specified unlawful activity.  Judge Failla will instruct you that specified unlawful activity includes computer fraud, which is basically hacks, and wire fraud.

The evidence of specified unlawful activity is clear here.  For wire fraud, you need look no further than Ms. Lin.  Again, that's the court translator who lost $250,000 to a scammer.  You can also look to Mr. Llacuna, the Frosty scammer.  The tragic incident with Ms. Lin meets all the elements of a wire fraud.  The scammer drew Ms. Lin in with false promises, got her to invest in a bogus investment opportunity, then ran away with the money.  The luring happened over a messaging app, as you might recall.  That's the wire you need for a wire fraud.  The Frosty scam also meets all the elements of wire fraud.  Mr. Llacuna and his co-conspirators coaxed people into buying bogus NFTs, then pulled the rug out from under them, stealing over $1 million in the process.  The coaxing was done online.  There's your wire.  Computer fraud is even easier.

We've covered the big-money hacks that Special Agent DeCapua told you about, and you heard from Mr. Ho, the CTO of Sky Mavis, who was one of the many victims of the Ronin hack.  The evidence of hacks is overwhelming.  I don't really expect any of this will be contested, that dirty money was transmitted through Tornado Cash and that it came from computer fraud and wire fraud.

Now another element of money laundering is that the

defendant has to have known that the money came from some form of unlawful activity.  Again, we've already discussed this. Obviously the defendant knew that Tornado Cash was moving dirty money because he was told this over and over again and discussed it with his business partners.

I expect you'll also be told that to be convicted of money laundering, the defendant must have known the transactions were designed, at least in part, to conceal the source or ownership of the money.  In other words, he must have known that the purpose of sending the money through Tornado Cash was to hide the money.  And the evidence of that is overwhelming too.  After all, the whole point of Tornado Cash was anonymity on the blockchain, right?  Isn't that just another word for concealment?

Wasn't the whole point making sure that no one could track where the dirty money came from and who it belonged to? Why else would hackers have sent over a billion dollars in dirty money to Tornado Cash?  Tornado Cash was about providing so-called privacy to criminals by helping them hide their money.  It wasn't about providing privacy for regular people.

The evidence supporting Count Three is also overwhelming.  Again, no question about the agreement.  Three Tornado Cash founders worked closely together to run the Tornado Cash business.

To convict on Count Three, the government must prove

P7U1STO2                     Summation - Mr. Gianforti

to you that there were sanctions issued pursuant to that law I mentioned earlier, IEEPA. That's covered by stipulation S-6. The sanctions we're focused on are the April 14, 2022, sanctions on the Lazarus Group wallet that was used in connection with the Ronin hack. The stipulation explains this in more detail and satisfies this element of the offense.

Put very simply, when someone or something is sanctioned by OFAC, what that means is that U.S. persons and U.S. businesses can't transact with or provide services to those sanctioned entities unless OFAC issues them a license to do so. So the evidence here shows that after the OFAC sanctions, the defendant's business kept transacting in stolen funds from the sanctioned Lazarus Group wallet. Or put differently, the defendant kept providing services to this wallet. You know what kind of services——concealment services.

That was the whole point of Tornado Cash.

You also know from stipulation S-6 that no one associated with Tornado Cash got a license to transact with or provide services to that sanctioned Lazarus Group wallet, so that's an easy thing for you to find too.

Finally, the government must prove that the defendant and his co-conspirators willfully violated sanctions——that is, they violated them knowing about the law they were violating. There's no question that the defendant and his co-conspirators knew about the OFAC sanctions on the Lazarus Group wallet.

They talked about it in their private chat. That's the chat where the defendant said, "We're fucking done for." And their response to these sanctions was to keep running the business as usual. They threw on the sanctions article so they had something to say if law enforcement came knocking, but as you know, the defendant knew right from the get-go that it was easy to bypass.

And as you also know, he was right about that too. The Lazarus Group wallet kept depositing hundreds of millions of dollars of stolen crypto into Tornado Cash after the oracle was put in place. And when it was confirmed for him that the Lazarus Group had indeed found the oracle easy to bypass, what did he do? He just kept on running the business. He kept on running the business as another $350 million in stolen crypto was deposited into Tornado Cash after the sanctions. Each of those deposits represents an instance where the defendant, a U.S. person, provided services, concealment services, to the North Koreans. He could have done something about it, but he chose not to. That's because his best customers were hackers, and he was looking forward to that payday, which would come a few months later.

In addition to the elements I've just discussed, you'll also be asked to consider whether venue is appropriate here in the Southern District of New York. For that, I expect Judge Failla will instruct you that an act in furtherance of

each conspiracy must have occurred here in the Southern District of New York.  The Southern District of New York includes Manhattan, and an act in furtherance is where the defendant either did something or caused someone to do something here in this district.  Unlike the elements of the offenses that Judge Failla will instruct you on, the government need only prove that venue is appropriate in this district to a preponderance of the evidence.  In other words, you have to find that it is more likely than not that an act in furtherance of each conspiracy occurred here in this district.

Here's how you know it did.  There are many reasons.

First, you heard Joe Evans, the attorney from BitMart, testify that he was in his apartment in Manhattan when he emailed the defendant about the BitMart hack in late 2021.  And also, when the defendant emailed him back and lied about how Tornado Cash worked.  That's Government Exhibit 1011, and that's venue for Count One, the money laundering conspiracy.

You also know that the defendant paid monthly Infura invoices to a bank account in Manhattan over a period of many months.  A couple of examples of that are Government Exhibits 851 and 924.  That's also venue for Count One.

You also saw the defendant was getting business advice from Tom Schmidt—that's the guy from Dragonfly—over and over again while Schmidt was right here in Manhattan.  You saw that through the chats, you saw that through Special Agent Lopez's

P7U1STO2                         Summation - Mr. Gianforti

cell site analysis of Tom Schmidt's phone, and Schmidt's

American Express records, which show that he was making

purchases in Manhattan in the relevant period.

             (Continued on next page)

MR. GIANFORTI:  Critically, Schmidt received the messages about whether there was any market interest in a "compliant mixer," while he was in Manhattan.  This happened right in the middle of the sanctions violations in May 2022 and that exchange is in furtherance of the conspiracy to violate sanctions.  That's Government Exhibit 1372.

And finally, you know that the defendant paid for the website, the Tornado Cash website, and it was available here in this district.  And the reason you know that is because Mr. Ahmed, the hacker that we put on the stand, was sitting in his apartment in Manhattan when he used the Tornado Cash website to set up the hack that he committed in July 2022.

Members of the jury, I'm about to sit down but before I do I want to end where I began.  This is a simple story about a money laundering business that the defendant operated in hopes that it would make him rich.  Tornado Cash was nothing more than a fancy online laundromat for turning dirty money into clean money.  No different than the car washes or restaurants or, indeed, the actual laundromats you have seen used to clean dirty money for criminals in the movies and on TV.

Tornado Cash laundered hundreds of millions of dollars in dirty cryptocurrency and the defendant knew it.  That's what his business was doing, a business that he controlled and operated for a profit and he knew that what he was doing was

P7U5sto3

wrong.  The business was privacy for criminals.

This is, at its heart, a simple case where your common sense will be your greatest asset so I urge you to use that common sense.  If you do, you will reach the only verdict that is consistent with the law and the evidence, that Roman Storm is guilty.

THE COURT:  Thank you.

Before we hear the defense summation, I think it is a good time to take our morning break so we will take a break for 10 minutes and come back and hear from Mr. Patton.

I will remind you not to discuss this case with each other or anyone else because you haven't been instructed. Thank you.

All rise.

(Continued on next page)

P7U5sto3

(Jury not present)

THE COURT:  Counsel, please be seated.

Mr. Patton, given the timing of the completion, I think it's OK to go forward with yours and not take the early lunch.  My deputy will tell the jurors that if they want a little extra breakfast they can have it, and that we might be a little bit delayed with lunch.  It doesn't make sense to break now, it is too early.

MR. PATTON:  That's fine, your Honor.

I suppose --

THE COURT:  Yes, you did want to -- go ahead, please.

MR. PATTON:  If we are going, if it feels like I am going past 1:00, I think I would prefer breaking my summation rather than standing between them and lunch, if it is possible.

THE COURT:  Well, you had said to me, sir, that your summation was about 90 minutes long so we are fine.  I know.

MR. PATTON:  I have a lot to respond to so I don't know if it will be exactly 90 minutes.

THE COURT:  We will see, sir.  Thank you.

You wanted to put something else on the record?

MR. PATTON:  I did, your Honor.

The government, in two respects, I think very much crossed the line.  One, they said that Mr. Storm and the co-founders cashed out because they knew they were guilty of money laundering and this was a sign that they were getting out

because they were going to be caught for money laundering, whereas we all know it was because of the sanctions. This happened on August 8 which we are not permitted to respond to and which was not supposed to be part of this trial. I think that's a really serious crossing of the line. I would ask for a mistrial, and in the alternative, a curative instruction.

THE COURT: Both are denied.

MR. PATTON: The other thing that was just over the line was characterizing the chat, I believe it was from Semenov, about risk related to taking relayer fees when that was in fact related to the whole FinCEN issue that, again, is not at issue in this trial and, once again, I think that that crossed the line and move for a mistrial and/or curative instruction.

THE COURT: Actually, I should allow Mr. Gianforti -- I'm not inclined to do that but, Mr. Gianforti, you should be permitted to respond.

MR. GIANFORTI: So you have already denied the first motion for mistrial. With respect to the second one, I would have to look at the context of the chat. That is not my recollection that they were specifically talking about FinCEN risk here or needing to get licensed as a money transmitting business. I think that the chat says what it says and we are free to argue and draw inferences from what it says.

THE COURT: Thank you.

P7U5sto3

See you in just under 10 minutes.  As it is clear, the motion is denied.

(Recess)

THE COURT:  Thanks everyone.  Please, be seated.

The jurors are lining up.  I don't think it was clear, as I was running off the bench, that I was denying the second part of Mr. Patton's motion.

Mr. Patton, with respect to your actual summations, sir, my thought is this.  My deputy talked to the jury about their availability today.  They're willing to stay until 5:00 which is awfully nice of them.  We told them that they might be -- lunch might be a little bit later so they should eat whatever is in the room.

My thought, sir, at 1:00, I know have you got many things going on, but if somehow you just notice the 1:00 hour coming and if you have 15, 20 minutes, we will power through.  If you have got 40 minutes, we won't.

Can I ask you, I don't know if there is someone who is going to be --

MR. PATTON:  I am happy to police that.

THE COURT:  I appreciate that.

But, they're fine.  They're willing to stay.  And I think if we -- I think, candidly, most particularly for our alternates, I would like to charge so that we can release them, if we can.  If we can't, for all we know, let me speak this not

P7U5sto3

into existence, for all I know Mr. Rehn's rebuttal is thee hours long.

MR. PATTON:  I might have another objection.

THE COURT:  Oh, we might both be using the hook to get him away from the podium but I am sure he will take the subtle hints that I am giving him.

Mr. Kenny, let's see if our Jurors are lined up. Thank you.

LAW CLERK:  Yes, Judge.

All rise.  Jury entering.

(Continued on next page)

P7U5sto3                        Summation - Mr. Patton

(Jury present)

THE COURT:  Please be seated.  Thank you.

Mr. Patton, you may begin.

MR. PATTON:  Good morning.

THE JURY:  Good morning.

MR. PATTON:  The government has this completely, utterly wrong.  Roman did not agree with anyone, not his co-founders -- no one -- to help hackers and scammers and North Koreans.  He didn't want them to use Tornado Cash, he did not have a financial interest in them using Tornado Cash -- quite the opposite -- and it ended up destroying the project he spent three years working on and helping develop.

I will admit I'm not used to being surprised by closing arguments.  That closing argument utterly turned the facts and the law in this case upside down and we are going to spend some time talking about that.

Tornado Cash was a project that had its beginnings in the runup to a 2019 conference at Harvard where Roman and some of his friends entered a competition at this software engineering conference involving the technology and the project that would become Tornado Cash and they won a prize for it. And the following year an investment company reviewed it, thought it was fantastic, and invested nearly a million dollars in it.  A year after that, another even bigger investment company took a look at it, said this is fantastic, but your no

P7U5sto3                      Summation - Mr. Patton

fee model doesn't quite work for us, we will keep in touch, and continue to be a fan.

This was a project that was developed out in the open, open sourced, minified or otherwise, on GitHub, for a very legitimate purpose:  To ensure people who were engaging in financial transactions on the blockchain that they could have some privacy, some financial privacy where otherwise everything is wide open to the world.  And not only that, but to assure them that no one would steal their money or steal their personal data, or sell it, or God knows what else with their personal information.

The whole point of Tornado Cash was you don't have to trust us as the developers.  We don't have access to your money.  We don't have access to your personal data.  We don't know what it is.  You don't have to worry that you are going to send that stuff off to some corporation and just hope and pray that they treat it responsibly.  That was the entire point of the project.  They didn't maintain that information.  That wasn't a bug, that was the whole point, it was the future.

Now, did that also make it very useful to criminals? Of course it did.  You bet it did.  Just like all sorts of products in our everyday lives that are very useful to us that are also very useful to criminals, even when the people who make those products know that criminals will find them very useful.  Probably the most obvious example is something you

P7U5sto3                    Summation - Mr. Patton

check in here at this court house every day -- your cellphone. Full of all sorts of features that we all find very useful. And so do criminals. One piece of it that we heard a lot about during the trial is encrypted messaging. The whole point of WhatsApp and iMessage is that only the sender and the receiver can read the message. Even the folks at WhatsApp and Apple don't have access to the message. That's the whole point of it. Do criminals like that? Of course they do.

This is why the law is crystal clear in this area. In order to be guilty of the crimes that have been charged here it is not enough to just know that criminals use a product you make. You have to act intentionally, willfully, to engage in a criminal conspiracy with the purpose, with the goal that the underlying crimes be committed.

You have to intentionally -- the object here has to be to assist criminals in laundering money in violating sanctions, the goal of entering into an agreement to further an unlicensed money transmission business. Roman's intent was just the opposite and the chats and so many other aspects of the evidence show that very clearly.

From the government's closing, you would think knowledge is all that's needed. Now, fortunately you don't need to take my word for it on the law, you don't need to take the government's word for it on the law. Very shortly you are going to get the law from Judge Failla. I feel very confident

P7U5sto3                       Summation - Mr. Patton

you are going to find that I am describing it accurately. But that's going to be for you to decide.

It is very important to keep in mind that this is not a civil negligence case where the question is did somebody fail to do something they should have done. That's not the question here. We don't convict people of these serious crimes based on negligence or even recklessness. There has to be this willful intent for very good reasons. And it seems like maybe they are changing course on the theory they had throughout most of this trial. I barely heard about Mr. Werlau in that closing who talked about his idea for how else Tornado Cash should have been built or could have been built. So maybe they're abandoning that but their theory all along had been you should find that Roman acted intentionally to help scammers and hackers because he could have built a different product and the fact that he could have, tells you that he intended to help them. It is a very convoluted argument which is maybe why we are not hearing it now.

It is important to understand at the outset there is nothing unlawful about the software he built. There is nothing wrong with anonymizing software that breaks the chain between depositors and withdrawers. That's not an illegal thing. What is illegal is the acting intentionally and willfully and with certain purpose as I have been talking about. The software is not illegal. And the evidence here shows that Roman very much

P7U5sto3                        Summation - Mr. Patton

did not want hackers and scammers to use Tornado Cash.  The chats are quite telling in this respect.  Under the government's theory you would expect rather than freaking out when they're seeing reports out there that Tornado Cash is being used for money laundering, which is how they react, with a lot of F-bombs and other words, you would think they'd be high-fiving, they would be celebrating.  *Hey, had a banner day. We had a great day today.*  There is none of that.  Instead, they are freaking out.  Exactly what you would expect from folks who do not want this to happen.  They seem to want to have it both ways that it was good advertising for them to have it be seen as a place for hackers but at the same time they were trying to have PR that suggested it was not a place for hackers.  They can't have it both ways and the texts clearly show that they did not want it to be known as a place for hackers and scammers.

Before we start going through the evidence, which I am about to do now, I want to just say a brief word about what this trial is not about.  This is not about what the law should be.  This is not a public policy exercise.  That's not what criminal trials are all about.  Criminal trials are about very real human beings and whether they broke actual laws as they are on the books.

I am sure we all have different thoughts about cryptocurrency and what the laws should be surrounding

P7U5sto3                    Summation - Mr. Patton

cryptocurrency and reasonable minds can disagree on all of that.  And maybe you have different thoughts on the value of privacy and what tradeoffs we should make when it comes to privacy.  All perfectly legitimate.  But that's not the question before you.  The question before you is what are the laws and did Roman intentionally break them.  And I think you will find as we go through this, if you haven't already seen it for yourselves, that he did not intend that and that he is not guilty.  So, let's start going through the evidence.

How did this get started?  You have heard about it. This is, on the left, a photograph with Roman in Boston with a number of his friends, it is the 2019 --

JUROR:  It is not up.

THE COURT:  Thank you, my attentive jurors, for letting us know right away.

JUROR:  It's up.

MR. PATTON:  This all began at that conference at Harvard in 2019 when Roman and his friends won this prize, this competition at the software engineering conference.  We see them here with the team and there is a blog post congratulating them.  Mix ETH allows ETH to be moved between addresses in an untraceable manner by first mixing together the coins of different user.  This can help keep one's transaction history private, and privacy is a necessary component of fungibility, which in turn is an essential property of currency.  Mix ETH

P7U5sto3                    Summation - Mr. Patton

uses zx-SNARKs verification, Skale's decentralized storage and other web3 technologies.  It is already deployed on the Kovan Test Network.

They were being celebrated for precisely what we are all here talking about.

And the government, as you know, marked as Government Exhibit 1, the t-shirts that they are wearing and says this is evidence of a crime, of their intention, that at a conference of software engineers out in the open with hundreds of people they're confessing to a crime.  They said I suspect you will hear from the defense that it was a joke.  Well, they were right because it is.  I mean, I don't have to go through the litany of irreverent jokey t-shirts that exist in the world for advertising.  I was, just the other day, seeing an ad for a gin that was touting it as great for Molotov cocktails.  There is a TV snickers ad where these bank robbers are robbing a bank and one of them is getting cranky and suggests the other one eat a snickers so in essence he can be a better bank robber.  Are they seriously promoting criminal conduct?  No.  Are they catchy?  Maybe funny?  I don't know.  This is what passed for tech humor but it is not evidence of a crime.

So, what did they actually develop?  Tornado Cash, as you well know by now, is a non-custodial software that allows people to send and receive cryptocurrency and preserve their privacy.  The whole point is that they didn't take control of

P7U5sto3                    Summation - Mr. Patton

people's money or data and here is some of the key features that you have heard a fair amount:  You would deposit and withdraw from a pool and only the person with the secret note could withdraw from the pool, not even the developers themselves could withdraw.  All of the experts agreed on that, the government experts, our experts.  Only the holder.  That was a key component of this.  There was no fee.  Now, did they want to make money?  The government spent a lot of time well, of course they wanted to make money.  Yes, they wanted to make money.  It wasn't through fees, it was through the TORN token and we will talk about that.

The pools could not be altered.  Again, the experts agree on that.  They say other things about the user interface and routers could be changed and that's all well and true and undisputed, but the pools themselves were immutable.  And again, that was a feature, that meant nobody could go in there, including Roman and the other co-founders, to touch people's money.

It was always accessible, this is known as permissionless.  There was a little less discussion of this during the trial but there was some, about how once these are deployed, once these smart contracts are out there which is what the pools are, they're known as a smart contract, they can be accessed by anyone.  You don't need permission to go in and use them.  This was the discussion about there being different

P7U5sto3                          Summation - Mr. Patton

ways to access the pools.  Yes, you can use a UI and that is how most people accessed it.  You could use the command line interface, that was that different version of Google you saw.  That's another way that a more sophisticated user could access these pools.  And there is a third way where you could just go directly, if you were more sophisticated still, and access the pools directly without even going through a router.

And none of the use required divulging personal information.  Again, that was a feature, not a bug.  That's why this was developed.  And after they developed it, there was quite a bit of excitement within the Ethereum community about what they had developed.  We heard this both from the government witnesses, the gentleman from Infura that the government called, said he loved Tornado Cash, found it interesting because privacy is seen as like a missing piece of what brings mainstream adoption to cryptocurrency and blockchain, that without having privacy be a part of that, a lot of people would hesitate to use it.  I'm not going to go through all of these but we heard from many, many people that they thought this was a great thing, including from government witnesses.  So, contrary to how they are framing it as just this money laundering machine that was built for criminals, it is just so obviously not true.

What was the timeline?  They develop it at this conference at ETHBoston in 2019.  By May 2020 the smart

P7U5sto3                      Summation - Mr. Patton

contracts are immutable.  Right?  We heard from the blog post it was in this test phase earlier.  Now the smart contracts are immutable by May 2020.  In June 2020 they issue two compliance features, one is a compliance tool that is optional for users. And you might think, well, what good is this?  So, the way it worked was if you withdrew from the Tornado Cash pool you could request proof of the tracing of the funds, in other words you could show somebody, if you chose to, this is where the funds came from.  You could unconceal the transaction and show where the deposited money had come from so somebody could do a full tracing.  And you might think, well, that's optional, so like that's not going to stop the bad guys.  No, but it is something that is important if you are looking for mainstream adoption because exchanges -- legitimate exchanges, legitimate purchasers or holders of your crypto might want to see that and they might say, without that, we are not talking cryptocurrency that's been withdrawn from Tornado Cash because of concerns about the inability to trace it.  And so, this was designed in order to have more mainstream adoption.

The geo-blocking, which they say, OK, well that can easily be circumvented.  Geo-blocking, right, is where you could prevent people from certain countries from accessing Tornado Cash.  And it can be easily circumvented through VPNs which you heard about which sort of disguise where something is coming from, disguised as an IP address.  OK.  None of these

are foolproof but they are attempting to do things to make it palatable for mainstream adoption in a world that is still very new online, decentralized finance on the blockchain, and you saw a lot of the comments about why privacy was needed in order to expand mainstream adoption on the blockchain and this was part of it.

And then they get that Dragonfly investment in 2020, a large investment firm that had a $100 million fund and gave $900,000 to Peppersec, which was the company that Roman was actually the CEO of.  And you know that Peppersec had a lot of projects.  You saw their GitHub page.  Tornado Cash wasn't the only thing.  But the investment from Dragonfly was focused on their Tornado Cash project but the investment was in Peppersec and we will talk more about why that distinction matters.

And then in December 2020, after the investment, that's when the DAO was created and the TORN tokens are minted. Before this, there wasn't such a thing as a TORN token.  Part of the investment from Dragonfly is they would have the right to certain TORN tokens if they were created.  Here they are created and you have the DAO, the Decentralized Autonomous Organization, which at various times during the trial the government criticized the founders for not voting their overwhelming numbers of TORN when they could have after they had vested.  I'm sure if they had voted them they would say, see, it is not really decentralized, they're exercising all

their power to muscle through whatever they want.  But they didn't.  That was a good thing.  They believed in decentralization and they weren't being heavy-handed with the TORN tokens that they held when they vested.  This was a legitimate aspect of the ethos of the blockchain, was to move things towards decentralization.  It was all part of this ethos of no one centralized corporation or person is holding your material or making decisions about how data is used or money is held.  That was part of the ethos of this.

You heard from Dr. Green about the reasons why defi was interesting to people who found problems in the traditional banking system, whether it was fees or exclusionary practices or whatever it was, that was the promise of defi on the blockchain and this was helping to try to move towards that reality of mainstream adoption.

This was the e-mail I went over with Mr. Wuollet, just yesterday, the guy from Andreessen Horowitz, as he described it, a big investment firm.  No, they did not end up investing because they didn't yet see the financial proposition, the financial value of how Tornado Cash was being run.  It didn't have revenue, it didn't have fees.  All there was was the TORN token.

I think this is interesting for a couple reasons.  One is whether we are talking about did Roman Storm intentionally engage in a criminal conspiracy, was he out there with the

P7U5sto3                        Summation - Mr. Patton

purpose and intent of promoting money laundering and an unlicensed money transmission business and sanctions violations?  Think about the feedback he is getting from very legitimate people who are saying we are excited, we are impressed with what you are building here.  He has got one actually investing, he has another saying we are big fans and we look forward to following you.

These are not the signs of -- this is not happening in some back alley somewhere.  They're not developing this under a rock.  They're out in the open going to legitimate places saying this is what we do and they obviously are telling them what they do because you are seeing it here in the e-mail. They understand perfectly what they do.

The other thing that is really interesting is the government has spent a lot of time saying that one of the markers of the criminal conduct was the relayer registry that was launched in 2022 and that this was meant to really turbocharge hackers and scammers using the system and so you should look at that and see that as real evidence of his intent.

Look at who is talking about some sort of value capture for TORN involving the relayers.  Mr. Wuollet himself, a year earlier.  And they start working this out and ultimately the DAO, through one of those voting mechanisms, it is proposed and adopted a year later.  That was not some grand criminal

scheme.

I want to talk now a little bit about Mr. Werlau, even though the government didn't do much of it in its closing. Maybe we will hear more in their rebuttal, they get to go again.

There was a time when the government seemed to be saying, ah-ha, you know Roman is guilty because there was another way to do this and the fact that he didn't do it gives you insight into his intent, that is, his intent was to help hackers and scammers because he didn't do it the way Mr. Werlau said he should do it.  And Mr. Werlau's big addition, if you remember this slide that he created, all the stuff in black was Tornado Cash, as is, the green is what his suggestion was:  To implement a user registry.  And I want us to look at exactly what Mr. Werlau's idea was.  And forgive me for going through some transcript here but I think it is important to get it right.  I think it is important to get these facts right.

This is on direct when the government was questioning Mr. Werlau:

"Q  When you were evaluating some potential changes, what were the design objectives that you were considering?

"A  The primary design objective was to prevent bad actors from depositing and withdrawing from the network."

OK.  We will come back to that as a primary design objective.

"Q   And did you identify any changes that could have achieved those objectives?

"A   Yes, I did.

"Q   Based on your years of experience in web development, would the changes you identified have been apparent to a typical web developer in 2022?

"A   I believe they would.

"Q   Could you describe the changes that you identified?

"A   Yes.  So, at a high level, the changes would involve establishing two new registries for user registry.  In addition, they would involve maintaining an offchain database maintaining the connection between deposits and withdrawals."

        Let that last highlighted portion sink in just a little bit and see if you see anything odd about that.  He is basically saying you should do something that is not Tornado Cash at all.  That is not in fact a privacy solution, that is like all the other stuff that is online and not on the blockchain.  You should keep an offchain database maintaining the connection between deposits and withdrawals.

        Well.  OK.  That's not what Tornado Cash was about. And if you have any doubt about what he is talking about here, let's go to some more discussion about this:

"Q   Mr. Werlau, could you explain how the user registry would work on the withdrawal side?

"A   Right.  So, much like deposits, a user would log in to

their account on the user interface, associate a new wallet that they want to make a withdrawal to.  This would be recorded in an offchain database and then that address would be submitted to the user registry to approve withdrawals from that address.

"Q  Mr. Werlau, are web applications with user names and passwords a widely known concept in web development?

"A  Yes.  It is a very common design pattern.

"Q  Could you give us an example?

"A  Most social media:  Gmail, Spotify.  These all have username/password systems.

"Q  And is keeping records of user activity a common feature in web development?

"A  Yes, very common.

"Q  Give us an example of that sort of a tracking user activity concept.

"A  Sure.  So going off the example of Spotify earlier, Spotify keeps tracks of things like user and listener behavior and, for example, at the end of the year, can give you a summary of your listening behavior across the year.  So that information is drawn from tracking data throughout the year."

          This is his idea for a privacy protocol?  Tracking? Using your personal data?  I mean, look.  Again, back to the idea that this is not a policy exercise.  Maybe some of you are fine with the tradeoffs that come, you know, you do a Google

search, and then a day later you go to some website and suddenly there are advertisements there related to what you did the Google search on because you are being tracked.  There are pros and cons of that.  We are not here to litigate that but that's not what Tornado Cash was about.  It was about not doling that.  It was about not taking your data and not taking custody of your money.

Another one.  He was asked:

"Q  Could the web application have been designed to keep a copy of the secret note?

"A  Yes.

"Q  So was the decision not to retain a copy a design choice?

"A  That's correct."

The decision by the developers not to keep the secret note, in other words access to your money in the pools, was that a design choice?  Well, I suppose that's one way of putting it.  Another way of putting it is that was the whole point.  It was the design choice of Tornado Cash entirely.

I want to talk about the chats now.  And I guess one other thing before I move on to the chats.  Mr. Werlau had a lot of suggestions, like this user registry and other things. Some of the hacks that we learned about, like the phishing hack that got into Ronin, a lot of the hacks we learned about, they came about because things were in centralized places so that an employee could be phished and have information to give that a

hacker could take and then steal.  So, this isn't just about the developers not using somebody's information and data, it is about securing it as well.  It makes it less subject to hacking and Mr. Werlau admitted that on cross-examination.

Let's talk about the hacks now.  We will get to the hacks in a minute.  Some of the chats about the hacks.

If the government was right that they're having these chats that they never thought would see the light of day, it was on Pertsev's phone.  Right?  Would you not expect them to say:  Nice day today.  BitMart, huh?  We are kind of rolling in it with the Ronin hacks.  How can we get word out about this? They act as though they were getting a commission on the proceeds going through Tornado Cash.  They weren't.  The value proposition for them was the value of TORN.  They weren't getting a cut of the money that came through Tornado Cash. That was part of the whole point of it.  They weren't taking a cut, they weren't charging a fee.  So their only incentive would be if they thought, by hackers and scammers using this, the price of TORN would do better.  Well, we are going to, a little bit later, talk about how the opposite was true and they were aware that the opposite was true.

The chats show they were upset about hackers and scammers using Tornado Cash.  They were upset about it as a matter of fact and they were upset about people talking about it and the bad black eye that they were getting from people

talking about it.  And there are examples of Roman and the others brainstorming ideas about how to deal with this.

So, here is an example of that, this is Government Exhibit 2044-T.  It begins with Roman forwarding this idea for a cool idea on how to stop hackers and the chats go on for a while sort of talking about the pros and cons of the technology that would be involved with it and whether it was feasible to do or not.  They didn't do it but this is not the discussion of people who are like, let's get more hackers to use Tornado Cash.

This is one where Roman is responding to a report of money being laundered through Tornado Cash.  Pardon me, it is hard to go through these chats without dropping the F-bomb quite a bit:  *Fuck, that's just really fucking crazy.  It's upsetting, of course.*

This is the whole flurry of chats in response to the Ronin hack and the reports of Lazarus Group and North Korea. There is a whole string where Roman is trying to get the other co-founders' attention and he is saying:  *We urgently need to embed the OFAC sanctions list.  Guys, basically, I think this is serious.  We need to act fast.  Guys, this is not a joke, we need to do it urgently.*  They're saying this is all for PR. Well, surely it was, in part, because they didn't want to be known as a place for hackers and scammers.  This is that weird thing where they're trying to have it both ways.  On the one

hand they're saying they want it to be known as a destination for hackers and scammers but on the other hand they were interested in the opposite PR.  You can't have it both ways and the chats show the actual way which is they didn't want this and the very next day adopt this Chainalysis Oracle that had the address that was listed for the Lazarus Group that was sanctioned, the wallet address that was sanctioned the very next day.  And that sanctioned wallet never once deposited anything into Tornado Cash.  That seems like a pretty big deal for a sanctions violation count.

(Continued on next page)

MR. PATTON:  Not a dime.  It all came through that whack-a-mole disparate wallets thing that we went through with Mr. Werlau, with Agent Werlau and his tracing, and he showed how they just hop around from wallet to wallet.  And so I'm sure they're going to say, and have said, well, this was window dressing.  If you just block one wallet, you're not going to solve this whack-a-mole problem.  That's true.  You can't solve the whack-a-mole problem.  A gazillion wallets can be created in very short order.  Agent DeCapua talked about how there are proceeds of some of these huge hacks still just sitting in wallets today.  They can't access them.  And every now and then they get shifted to other wallets.

We heard from any number——through witnesses, through the experts, how there are loads of ways to conceal money on the blockchain.  Mr. Ahmed talked about some of the other protocols he used about bridging between different blockchains.  Yes, nothing they were doing was a panacea, was a total solution for hackers and scammers not using Tornado Cash.  If you're going to have a privacy protocol, that's part of it.

But a Werlau suggestion like maintain and track data and track information, user information, is basically the equivalent of going to Apple or WhatsApp and saying, you know, the encrypted messaging services you have are fantastic, but we think instead of how you're doing it, you should keep the copies of the messages that are sent.  Well, okay.  That's

P7U1STO4                     Summation - Mr. Patton

called unencrypted text messaging.  Do criminals use encrypted messaging service and benefit in the fact that Apple and WhatsApp can't give away those messages either to other companies or even to law enforcement?  They have no ability to. They don't have access to it.  Yes, that's a tradeoff.  And again, we could talk for hours about the policy tradeoffs.  So no, there was not some panacea.  But they did something.  They did what they could do with the oracle.

This was, you know——they talked a lot about this consciousness of guilt, that the way that Roman and the founders are responding in the wake of the Ronin hack and reports of Lazarus——this was something Agent DeCapua talked about.  There's this tweet from something called Dirty Bubble Media, calling every holder of TORN an accomplice in crime. And Roman responds, "Shit."  Now of course he's not happy and freaked out——and there are many messages like this——that people are out there calling them criminals.  But responding by saying "oh, shit" or "we're in a lot of trouble" doesn't mean you intended that.  It means it's really obvious that a lot of people are saying Tornado Cash is in the crosshairs.  Of course you would be concerned.  That's not the response of a hardened criminal who's like decided that this is what he wants to do.

I can't possibly go through all the chats.  There are just too many.  You will have access to them, and I'm just going to ask you to do a few things when it comes to these

chats.

First of all, read the entire chat exchange. A lot of what has been going on over the past couple weeks is taking things out of context. And it happened again just in closing with one of the chat exchanges that I had gone over with Agent DeCapua. This guy Sergej from something called 1inch had messaged them and said something like, "great advertising," right, like, you're getting all this great marketing, and sent along a link to a report of Tornado Cash being used by criminals. And they were clearly not happy about that, and pushing back on it. And then it gets towards the end of that chat that they introduced——see if I can find the actual Government Exhibit for you to take away. I think it's 2007-T. And Roman says something like, "that's funny," or I forget his exact words, but it sounds like he's like affirmatively adopting. And what they don't show you is that it's four days later and related to something else.

So there are a lot of chats like this where I'm going to ask you to read the entire exchange. Read them in context. See if somebody is needling them, giving them a hard time rather than actually saying, this is a good thing, or how they're responding to it. Are they saying it's a good thing or are they upset that this is being said about them?

Also, there are a lot of very confusing messages in there because you'll see that someone has forwarded a message,

but you can't tell who the original author of the message was, and there have been a number of things that have been put before you that makes it sound like the co-founders were saying something when in fact they were forwarding something.  There's a very good example of this where there's a chat that's something along the lines of, How do you launder $600 million? And it's actually from a reporter.  But you can't tell that. All it says is it's forwarded.  So there are a lot of examples like that.  You will have access to these things, and I hope you will take a complete look at them.

There are discussions of compliance, and here, I want to reiterate an instruction the government was referring to. There are emails where Roman is talking about things, abbreviations for compliance things like KYC, know your customer, or AML/anti-money laundering.  Judge Failla told you that Mr. Storm is not being charged with and I will not be instructing you that either Mr. Storm or his alleged co-conspirators were required by any law or regulation to implement any particular anti-money laundering or Know Your Customer features.  That's significant.

Again, this software protocol was not unlawful in itself.  What the government is relying on on those emails about compliance is they're saying the fact that he could have built a different product and done different things along the lines of what Mr. Werlau suggested means you should take the

leap to say he intended for criminals to use it.  The truth is exactly the opposite.  It was in fact about a privacy protocol and not maintaining tracking like Spotify, so that you would have widespread adoption, so that you would have a place on the blockchain that made sense for financial transactions more akin to the sort of privacy you can get in other ways but without the downsides of breaching your data or being tracked.  That was the goal.

Let's talk about the financial incentives.

Oh, sorry.  Before I do that, the Google searches.  They've talked about the Google searches.

I'm not going to say a whole lot about this because hopefully it's obvious.  When you are Googling something, usually it's because you don't know about the thing you are Googling.  You are trying to find out about the thing you are Googling.  That just tells you he was taking reports that he was getting seriously and looking into it.

And they also said, oh, he would Google Tornado Cash and then there would be a link related to some hack, and that that's evidence of something.  We have no idea how many times he would Google Tornado Cash.  I don't know.  Some folks Google their own names and see if there's anything out there, or companies they work for, or other things of interest to them.  And so yes, sometimes news of hacking that was out there and being reported would come up.  That's evidence of nothing.

And the one that really takes the cake is something like, is Tornado Cash a criminal, or are Tornado Cash criminals, something like that.  Is that the Google search of a criminal?  That's somebody who's worried about the reports that are out there and is thinking, I didn't think I was doing anything criminal.  That's the opposite of bad intent or purpose.  That's looking into, oh, my god, am I in trouble.  Somebody who's actually a criminal is not Googling, am I a criminal.  It is the exact opposite of how they have framed it.

Let's talk about the financial incentives.  And the government showed you this extraordinarily narrow chart of the TORN price, just right around the relayer registry.  And you remember Dr. Hurder sort of criticizing that.  Well, they just sort of chose a date at a low point in the price and then what they were measuring was percentage change from that place, but when you actually look at it, there's a brief spike and then a leveling out and then actually a drop, if we look from the 3/1 relayer registry announced point.  I want to make a few points about this.

One is——I'm going to toggle back and forth——if you will recall Agent DeCapua's line graph chart showing like the biggest hacks, by far the biggest one was this BitMart on December 5, 2021.  And then of course we've heard a lot about the Ronin hacks that are further to the right in the summer of 2022.  Right?  So those are the massive hacks.

Of the billion dollars——it's worth noting, too, by the way, of the billion dollars that they emphasize as proceeds of hacks, well more than half of it is from those two hacks, BitMart and Ronin.  Two hacks, the proceeds of.  But so let's look at those.

The high watermark of BitMart, BitMart and the Ronin hacks, and if we go back to the prices, what do you notice about the price of TORN?  Are they popping champagne and saying, great, we're killing it with the TORN price because of these really high-profile, big hacks?  It's exactly the opposite.  It's going down both before and after the BitMart hack, and it goes down significantly after the Ronin hack.

And they talk about how Roman and the others cashed out their TORN and, you know, this was a money grab.  Well, yes, they wanted to make money.  They put a lot into this. Please recall there was no revenue from this.  TORN was it. They weren't taking fees.  There wasn't like money coming in from this.  What you saw from Peppersec, from the Peppersec accounts, was just the investors' money that came in back in 2020.  Here we are two years later.

So yes, when their tokens vested, they sold some of them.  If you'll notice when they sold, towards the end of this chart, they sold for a lot less than they could have earlier on.  Those hacks and scams were not helping the one source of income from all of this, and they knew that.

Here are some chats.  March 30, 2022.  Semenov.  "Torn went down again June of 2022.  Folks, TC is running low on funds.  Any ideas?  We have 1-3 months funding to keep running.  Governance is planning to launch a sale of torn."

"There is torn streaming to keep development but the price keeps dropping."

"What should we do to stay afloat?"

Are they like—are these the good times of the Ronin hack proceeds?  It's the opposite.

Let's talk a little bit, to put some of this in context, about the privacy protocol and to touch on what we talked about earlier about how these hacking proceeds actually move around.

I'm not going to belabor this because we have talked about it a lot, but the point is like this is one of the charts that Agent DeCapua showed on the KuCoin hack, right, where it's going from a wallet and then to multiple intermediary wallets and then to a second wallet, and here they marked the wallet address of that second wallet which, if you'll recall from the testimony, was sent to Tornado Cash on October 26, the last day of the deposits.  This was a different aspect of the KuCoin hack, where everything going into Tornado Cash is coming from multiple intermediary wallets.

This is the whack-a-mole game again.  And there's no wallet number on here because there wasn't any wallet number

given to Tornado Cash.  And it wouldn't have mattered 'cause five minutes after you give them a wallet number, they have a different wallet number.

The BitMart hack, again, I'm not going to walk through all this, but notice that all of this happens in the course of two days, and this is where, nine days later, the attorney for BitMart, Joe Evans, who came in and testified, sent that letter, and the Telegram chat where Semenov responds——I think it's Semenov, it was either Semenov or Pertsev——responds with a standard response that they've given everyone, which is, you know, basically we can't help you.  We don't have control, and we can't help you.  They are conflating two very different things when they——they call that standard response a lie.  They keep saying, oh, they were lying, they were lying to people with this standard response.  Think about the context of who that's being sent to.  It's being sent to lawyers like Mr. Evans or other victims of hacks, saying, help us get our money back.  They can't do that.  They don't have access to people's money.  That's the whole point.  It wasn't a lie. Yes, they can come up with various rationales about, well, they have control over the UI and the router and other things.  The control over those things can't get people's money back. Everybody agreed on that.  Mr. Werlau agreed on that, our experts agreed on it.  Once they're in the pools, that's the whole point.  If you don't have the secret note, you don't have

access.  That was perfectly true.  And Mr. Evans, who is a very experienced lawyer in the crypto space, as he described, said he had no reason to think that there was anything untrue about what they said to him.  You think they were like pulling the wool over Joe Evans's eyes?

I just want to say a word about this.  This was the IRS agent George tracing for Ms. Lin's funds.  The government spent a fair amount of time talking about Ms. Lin.  I get it. She's a very sympathetic person.  We all feel bad that she was scammed.  Months after the fact she sent an email to the hello@tornado.cash and didn't get a response.  And of course they are trying to suggest that you should be very angry at Roman and the folks at Tornado Cash because of them not responding to this very sympathetic victim of a scam.  This tracing by Agent George is really nuts.  First of all, you should ask yourself, why didn't they have DeCapua, who did all the other proceeds tracing, do this one?  Remember, they only had Agent George, a CPA, an accountant, do this after we questioned DeCapua about the fact that they had not asked him to do this tracing.  And so he comes in and explains that he used these accounting principles called LIFO——last in, first out——to trace money through wallets that have thousands of transactions in and out of them.  Just enormous sums in and out.  And he claims that you can use that accounting principle to ultimately find that some of Ms. Lin's money ended up in

Tornado Cash.  But one of the very first questions on cross:

"Agent George, this doesn't prove that in fact the hacker moved the money into Tornado Cash, does it?"

"A.  No, not at all."

You have no idea who has ownership of that last wallet that put money into Tornado Cash.  People might have made all sorts of legitimate purchases or exchanges along the way.  The lengths that they are going to to stretch things so that they can tell a sympathetic story—and it is a sympathetic story about Ms. Lin—and try to lay it at the feet of Roman is really disturbing and should tell you something about this case.

There was a fair amount of selective cherry-picking of data and information.  I talked about it with respect to the chats.

There was also these pie charts where, again, you remember the line graphs with the spikes?  And Agent DeCapua did these pie charts that are basically like right on top of those spikes, to say, aha, look at the percentages that are going into Tornado Cash, isn't it shocking that more than half can be—well, no, it's not shocking that on, like, the day or two that he's looking at, of the single biggest hack, that this is the case.  We had to put in that this is the overall figure.  And the government will say, yes, this 85 percent, that doesn't come from those hacks that the agent was looking at, but we don't know; maybe some of that's hacker and scammer money too.

Well, that's true.  But what do we know about the 13 percent and the 2 percent?  The 13 percent is the 16 that Agent DeCapua looked at that met this $5 million threshold, and the 2 percent goes on up to I believe it's 31, or 32.  So in other words, the next roughly 15 or 16.  Do you see some diminishing numbers there?  Can you imagine that if you go beyond 31 or 32 in your tracing, you're going to have much more of a slice of this as you go?

The vast majority here—and it was certainly the goal—was legitimate use, and at the very least, there's no suggestion otherwise.  There's a good suggestion that it was, when you look at the diminishing percentage once you go beyond those 16.

Your Honor, I am going to have a bit more, so—

THE COURT:  Okay.  Members of the jury, I had discussed with defense counsel, given that we started later than expected this morning, that we might have to break in the middle of his summation.  Neither he nor I nor anyone wants to do that, but we also don't want stomachs to be rumbling during his summation or to have anyone distracted, so we're going to take a break.  We're going to take the lunch break right now, and I will see you in 45 minutes.  We will then continue with Mr. Patton's summation, then the government's rebuttal, and then, depending on time of day, my charge.

So I'm going to ask you not to discuss this case with

each other or anyone else, and to enjoy your lunch, to be back in 45 minutes.  Thank you very much.

THE DEPUTY CLERK:  All rise.

(Jury not present)

THE COURT:  I'll just speak into existence that Mr. Patton and Mr. Rehn are going to be working to streamline their addresses.

I'll see you in 45 minutes.  Thank you.

(Luncheon recess)

AFTERNOON SESSION

1:50 p.m.

(Jury present)

THE COURT:  Please be seated.  Thank you.

You may continue.

MR. PATTON:  Thank you, your Honor.

Good afternoon.

I want to talk to you now about the count and the law that I think you're going to be instructed on as you'll hear it from Judge Failla.

I was struck by the government's conversation about the law in their closing.  It was really as though it's as simple as Mr. Storm knew that criminals were using Tornado Cash and therefore, because he didn't make changes to it or shut down the front end of it, he's guilty.  And that's not the law.  And I think you're going to see that and you'll hear that from Judge Failla.

As I've said a couple times now, there's nothing unlawful about the software protocol, and there was no legal requirement that he engage in any particular compliance activity.  He will not be charged on that.  He hasn't been charged on that.  So all the government's discussion about what he could have done on the front end is in service of their argument that that shows you he intended to engage in this conspiracy, that he intended to further the goals of money

laundering and unlicensed money transmitting business, and sanctions violations. And that's just, as we've talked about at length, not the case.

So here's what I think you're going to learn. Obviously you do not want to be instructed on the law three times, so none of us are going over this in excruciating detail. You're going do get the full charge from Judge Failla. But I think this is a fair summary for the conspiracy to commit money laundering.

Are your screens up?

THE JURORS: Yes.

MR. PATTON: Okay. The government has to prove beyond a reasonable doubt, first, that at least two co-conspirators agreed to violate the law. So there has to be an affirmative agreement. You'll learn that doesn't have to take on any particular formality. People don't have to sign contracts or like swear on things or shake hands. They can show a criminal conspiracy just through other means. It's mostly about intent. Did people, like, intend to actually agree, did they in fact agree to violate the law. So you'll hear it doesn't have to take any particular form, but it does have this intent requirement.

And that the object or the goal of the conspiratorial agreement included all of the elements of the substantive law—in this case, of money laundering. But you're going to

see this same language for all three counts.

The first three that I have here, you can just substitute the substantive law at issue for each one of them.

So you have to have an object or a goal, the intent to further money laundering.

And finally, that Mr. Storm willfully participated in the conspiracy in order to promote that unlawful objective. And here, again, it's money laundering.  That's a lot different than just knowledge of criminals using Tornado Cash.

And then the bullet point under 3 gets to the substance of the crime of money laundering.  This is what you have to intend to further: to conduct a financial transaction that involved the proceeds of a specified unlawful activity, knowing that the transaction involved funds derived from some form of unlawful activity.

I'll say here, I think it is very clear that Roman is not guilty because he didn't have the intent above in 1, 2, and 3.  He just didn't have that kind of willfulness or intent or the purpose.

But even beyond that, he didn't have the knowledge of transactions, that the transaction involved funds derived from some form of unlawful activity.  He can be aware generally that there are credible reports of criminals.  He didn't do the block tracing that Agent DeCapua did.  But I think you could find you'll get this instruction called conscious avoidance,

which is one way of finding knowledge. That is, the law says you can't just like stick your head in the sand if you pretty much know something. It's not a defense to say, well, I didn't absolutely 100 percent know it, if you avoided knowing it. And I think it's fair to say that based on the number of credible reports that Roman was getting, that he had knowledge that in general, criminals were using Tornado Cash, but even if you look at DeCapua's spikes on that graph, where the pie charts are like, you know, a little more than half on those specified times, or had proceeds, you don't know which deposits are coming from where. You don't necessarily know who's legitimate and who's not. And the law does require that sort of knowledge.

MR. REHN: Objection.

THE COURT: I will be charging the jury on the law. They know that.

MR. PATTON: So I don't think you need to get to that point in your decision-making because it falls so far short on the intent and the purpose and the objective that I've talked about, but that's yet another reason that he is not guilty of conspiracy to commit money laundering.

One thing I'll say on this generally about state of mind. Obviously you don't have to, you know—it's hard to ever have a hundred percent certainty about what someone's state of mind is. But we have an awful lot of evidence here suggesting

that he did not have this criminal state of mind. The government examined, if you'll recall, quite a number of our expert witnesses and they did some questioning that was something along the lines of: Well, you can't read Mr. Storm's mind, right? You weren't there. You didn't crawl inside his head and know what he was thinking with Tornado Cash. Well, the same holds true for them, and yet they are making leap after leap in ways that are often cherry-picked to make their case about what his state of mind is.

Count Two. Again, the first three here will look very familiar. It's the same requirement of intending to further the goal of the conspiracy. Willfully engaging in an agreement, with this intent, with the goal to further the unlawful objective. But here, it's to operate an unlicensed money transmitting business, and that is defined as to operate an unlicensed money transmitting business that involves the transportation or transmission of funds that are known to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

So for many of the reasons we talked about with money laundering, the same applies here, in terms of his knowledge, and his intent.

There are yet additional reasons why he is not guilty of Count Two, and I'm going to go through these. And believe me, as I do this, I am well aware, this is a very technical

statute, and I am well aware that in parsing through this, it's not the most exciting stuff in the world, and this is probably why people hate lawyers, but it's important to go through.  It is what the law is, and it requires us to parse out these terms.

So again, I don't know that you need to do a whole lot of parsing, because the intent is, the purpose isn't there, but if you get to this point, there are a number of things that are important to keep in mind.

The term "money transmitting" includes transferring funds on behalf of the public.  But Tornado Cash is noncustodial and permissionless.  You heard from the experts——there's no disagreement about this——that Tornado Cash isn't doing the transferring.  It is the user themselves.  It's their wallet that is sending the instructions.  The transfer is entirely in the control of the user.

Again, I know this is a technical point, but it's an important one.  Tornado Cash is also not a money transmitting business.  And here, emphasis on business.  And again, I know, some of you are going to think that this is slicing things thinly, but the business was Peppersec.  Peppersec was the company that Dragonfly invested in.  Peppersec was the company that Roman was the CEO of.  There was, again, no revenue, no profit.  And here, maybe it's easier to think about this in terms of a more traditional business.  So let's take Ford Motor

Company.  Ford, or any other company, they have revenue, they have expenses, and you subtract the expenses from the revenue and you get the profits.  They also have stock, right?  And an employee of Ford may have Ford stock.  And they may sell that stock and make money.  Maybe if they've held it long enough or Ford has had a good year, maybe they make a lot of money, but that's their individual profit.  That is not the profit of the company.  And here, Roman and the other co-founders individually held TORN.  That was their financial incentive, as we've talked about.  This wasn't a fee-based model.  There wasn't revenue.  The whole idea was to try to make money from wide adoption that people would think, this is a great product and it's around for the long run.  Of course the hacks and scams actually derailed that.  But that was the idea.

(Continued on next page)

MR. PATTON:  So those are important distinctions to keep in mind, that Tornado Cash is not a money transmitting business.

And Roman did not conduct, control, manage, supervise or direct an unlicensed money transmitting business.  Again, he was the CEO of Peppersec.

Sanctions violations.  Again, I will sound like a broken record, but the first three are very similar to the first three in all the others.  He has to have had the intention to further the goal of sanctions violations and here you will notice that even the substantive violation has more than knowledge.  The unlawful objective is to willfully provide funds, goods, or services to, by, or for the benefit of the Lazarus Group.  There is just no evidence that he intended for this.  Yes, he was aware of the reports.  Yes, he freaked out, that's the whole series of chats there.  But there is a lot that we have talked about.  We didn't even talk about the one chat that we put in on our last day where Roman says to Haseeb who sends him a link about the North Korean connection, where Roman says: *I'm glad the fuckers are detected.*  He didn't, in any way, willfully intend to further the Lazarus Group or to violate sanctions on North Korea and the one sanctioned wallet never actually deposited anything into Tornado Cash, it came over a period of time from a whole disparate Whac-A-Mole number of wallets.

And again, I have touched on the Chainalysis Oracle. They did, the very next day from those chats that we were looking at, they implement this Oracle. Is it terribly effective? No. But you bet, you can imagine in some alternate universe where they don't implement it, the prosecutors will say, ah, they could have implemented the Chainalysis Oracle and they didn't and that is evidence of intent. I mean, yes, they knew it was likely not to be terribly effective. These are the most sophisticated hackers in the world. They had all sorts of ways of concealing their money but they took a step. That's not the step you take if your goal is to willfully assist them in violating sanctions.

I want to say a few words, the government pointed to Rho Bank and they claim that the bank where Peppersec had an account shows that Roman and the others made false statements and that is evidence of a guilty conscience, that they were lying to the bank what they did, and basically the gist of their argument is that they were hiding that they were in the cryptocurrency world. And they showed you a chart and over lunch I took a look at the chart, this is Government Exhibit 923. The one they show you on the screen doesn't include a column where the answer is, yes, there were investments received in form of cryptocurrency. Seems like a fairly striking omission. That's Government Exhibit 923.

There are other government's exhibits that show that

they in fact disclosed their connection to cryptocurrency. Please, take a look at Government Exhibit 919 when the bank asks him about his donations, payments, and expenses and he responds that he received funds from Gitcoin, a crypto crowdfunding source.  Exhibit 9051 and 9052 that show his Gitcoin grant page which clearly says that the Peppersec founders were working on Tornado Cash.  This is just crazy that they are saying he was lying to Rho Bank.  He was not, they were not.

I also want to address this issue of venue.  It may seem like an odd thing to be having a debate about but it is very important that people are charged in a proper place.  You can't just charge somebody anywhere if there is not a connection to the location and the crime.

As you know, Mr. Storm lives in Seattle.  You were probably wondering when we were going through those cellphone records like why are we going through this?  What is the point of these cellphone records for this Tom Schmidt at Dragonfly? Well, the point was they were attempting to show venue in New York and they listed four bases for why they believe they have venue in New York; one was Tom Schmidt and they pointed to chats with Roman from Tom, and they traced that Tom Schmidt was in New York -- remember the cellphone map -- around the times of those chats.

The law on venue is that Roman has to have caused an

act in furtherance of the conspiracy in the Southern District of New York.

MR. REHN:  Objection.

THE COURT:  I will be instructing the jury on venue. They'll listen to me more than they'll listen to you.

Go ahead, sir.

MR. PATTON:  I hope you do.

And that it had to be reasonably foreseeable that that conduct was happening in the Southern District of New York. And the only chat where Mr. Schmidt says, you remember there was one exchange where he says I'm in New York and they were all talking about they were in different locations?  That chat didn't have to do with Tornado Cash.  It had nothing to do with it.  And you will recall from the agent who testified about that, he said Mr. Schmidt only pinged in the Southern District about half the time for that summer, that period that he was looking at.  So, there is just no evidence that Roman knew that he was in New York or that anything in furtherance of the conspiracy that didn't exist was happening in New York.

They point to Shakeeb Ahmed, the hacker who testified that he seeded a wallet from New York.  Keep in mind what that means.  He put money into Tornado Cash that was perfectly legitimate money, it was his own ETH.  Right?  This was in preparation for him committing the hack.  So there wasn't any dirty money going into Tornado Cash from Mr. Ahmed.  Certainly

the same foreseeable issues apply here.  He never had any contact with Roman, they never knew each other whatsoever.

The BitMart lawyer who they respond to, again, to Mr. Evans' knowledge, he has no reason to think they responded falsely in any way when they said, sorry, we can't get your client's money back.  They're saying that's in furtherance of the conspiracy because Mr. Evans was a lawyer in New York.

And lastly, they point to the Infura payments which Infura, if you want to think about it, is kind of the blockchain equivalent of an internet service provider of sorts and that because they were using Infura that you furthered the conspiracy and that it was reasonably foreseeable that acts were happening in New York.  None of those things, they're really grasping at straws for any connection to New York.  This case has nothing to do with New York.

One thing on venue is that there is a lower standard of burden -- sorry.  There is a lower standard of proof.  They only have to show venue by a preponderance of the evidence, which means more likely than not, you think it is more likely than not that they proved it.  And I bring that up because it contrasts with the standard of proof for these charges which, as you all know from watching any television or being in the courtroom at all, is proof beyond a reasonable doubt.  And I bring that up because it is an extremely high burden of proof. Reasonable doubt is defined as something that would cause you

to hesitate in a matter of importance in your own life.  I hope that you see that there are all sorts of reasons to hesitate about Roman's intent here and purpose because the evidence leans so far in the other direction.  And the reason we have such a high burden of proof is because this is the way we try to assure that mistakes don't happen, that innocent people are not wrongfully convicted.  That's why it is so high, that's why we have to be so sure.

I am going to sit down.  You know, I will bring back up the photo from ETHBoston.  It is easy for the prosecution and Mr. Werlau and others to Monday morning quarterback, to say to Roman, you know, this incredibly innovative thing you came up with and that everybody in the community was excited about and that perfectly legitimate investors were saying this is a great tool, well, you should have done something different.  We think you should have made it more like Google or Spotify, a centralized system where you collected more data or, in this case, their money.

The software was not illegal.  He wasn't required to shut it down or change the front end in the ways that he talked about.  He obviously couldn't shut it down entirely, we talked about the immutability of the pools themselves but they talk about the UI and the router.  There was no legal obligation to do that.  They say that the fact that he didn't shows that he intended with a goal of furthering these crimes.  It is such a

leap.  I will say again, this case isn't about whether you love or hate crypto or what the law should or should not be.  It is also not about whether three guys running a startup dropped too many F-bombs or could have done things differently.

At the risk of stating the obvious, there is a lot at stake here.  I will tell you that I am worried that in a case that involves such dense technical issues that I have failed to address something you wanted addressed or I have not fully explained things either about the technology or the law.  And that concern is only exacerbated because I don't get to talk to you again, the prosecution does, they get to stand up now and speak to you again and that will be it and then you will get charged.  I promise you that there is nothing that they can say that doesn't have a response but I can't get back up and give you that response so I am asking you to think about what that response is because everything can be responded to here.

Roman didn't do this.  There is a very good reason why they've fallen so short of that high burden.  They couldn't possibly meet that high burden about his intentions here because he didn't do it.  He is not guilty and I hope you will find him so.

THE COURT:  Mr. Rehn.  Thank you.

MR. REHN:  Just getting the tech set up.

THE COURT:  Of course.

MR. REHN:  Good afternoon.

Ladies and gentlemen, what we have just heard from Mr. Patton is a very different picture of Roman Storm than what you saw in the actual evidence at this trial. Mr. Patton is trying to sell you on this story, the cover story that Roman Storm designed way back in 2020, that he built and ran Tornado Cash because he wanted to provide a privacy solution for crypto. He even tried to sell you on the idea that the defendant didn't like it when hackers used Tornado Cash. And the way he tried to sell you on that idea was claiming that messages were taken out of context.

Here is the problem with that story. You have seen the evidence in this case. You have seen the defendant's secret chats with his co-founders, with his partners in crime. Chats that you know they told each other they wanted to keep law enforcement from seeing. So you know that the cover story we have just heard from Mr. Patton is contrary to what Roman Storm was saying at the time.

Let's talk a little bit about context. Let's bring up Government Exhibit 2007-T. We heard a lot about this from the defense in the closing.

This is all one message. Storm is sending a link to a story about a hacker using Tornado Cash and then he says: *We have a fuckload and more of advertising like this.* There is no missing context here. Storm is trumpeting the fact that hackers are using Tornado Cash and that this is good

advertising for Tornado Cash.  That's the context.  And I encourage you, this whole chat is in evidence.  There are many messages in this chat about multiple hacks in real-time that the defendant is following and talking about the fact that, hey, this is great marketing for us.  This is what people will see is the real use case for Tornado Cash.  And the idea that these chats are taken out of context doesn't line up with the chats themselves.  Here you are, Storm, saying look at this hacker he is using Tornado Cash, we have a fuckload of advertising like this.  There is a whole fuckload of hackers using our service.  That is what the defendant thought when hackers used his service.  It is a marketing opportunity for Tornado Cash.  He knew this was the target market.

Let's look at another example, Government Exhibit 2008-T.  Here you have Roman Semenov sending a message to Storm about a hack and how does Storm respond?  *It is a good idea.  You take an ancient hack and promote it again.*

Again, these are how Storm is talking about the hacks in real-time when the hackers are using Tornado Cash.  It is good marketing, it is a good idea.

Look at Government Exhibit 2004-T.  This is when the defendant first finds out about the Ronin hack, it is one of the biggest hacks that has ever happened in crypto.  What does he say?  Is he concerned?  Is he worried about this?  No.  *What the fuck.  If it's stolen, it's stolen.*

This is what the defendant thought about hacks. Who cares. They're a good idea. And they're great marketing for Tornado Cash because when the defendant faced choices in this case, when he had to decide whether to do something about all the hackers he was laundering money for or to keep on taking their money, driving up his profits, you know what he chose. Again and again he chose to take money from criminals, to help them hide the stolen money, knowing full well that by doing so he was concealing that money, he was laundering it, he was making it harder for the victims to find and harder for law enforcement to find and that is money laundering.

Early in the defense summation defense counsel made a very interesting statement. He was talking about the compliance tool which you may recall. The compliance tool was a way for Tornado Cash's customers to unconceal their transactions. That's the term that defense counsel used. He said that a customer could go in and unconceal, they could reveal the link between the deposit and withdrawal. And here is what is important about that. What defense counsel told you is that that was a tool they put in because they were going for the mainstream market because the mainstream market wanted Tornado Cash to be able to unconceal transactions, if necessary. That was what regular users wanted, they wanted to be able to unconceal those transactions to reveal the true source of funds, if necessary. And so Tornado Cash provided a

Case 1:23-cr-00430-KPF  Document 267  Filed 12/18/25  Page 142 of 242  2438
P7U5sto5                    Rebuttal - Mr. Rehn

way to do that.  That's what normal users wanted, that is what they needed for the mainstream.  But here is what's important about that.  That's not what Tornado Cash was.  That's what defense counsel told you.  Tornado Cash didn't make that required for all customers.  It specifically made it so hackers didn't have to use that part of the service.  What Tornado Cash was designed for was to make there be a way for people to conceal the transactions with no unconcealing.  And the reason they did that is because the real target market, the people really using the service in large volume were the criminals and they knew that.  They weren't focused on the mainstream, they were focused on the criminals and defense counsel essentially admitted that to you in their closing statement.  That is what the Tornado Cash's target market was, they knew that if they had a way to unconceal all the transactions, they would lose the volume.  We have seen what drove the volume on Tornado Cash, it is the criminal users.  They can't let that happen.  If they lose the volume, they lose the ability to monetize the business so they have to make it so criminals get to use the service without unconcealing the transactions. Criminals get to use the service to conceal their dirty money, to hide it, to keep that money away from the eyes of victims and law enforcement.  And the defendant did that again and again and again and he made choices about how to do that.  So let's talk about some of those choices because what we heard

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

from defense counsel was this idea that the government is engaged in Monday morning quarterbacking and he talked about the testimony of Mr. Werlau.

So, Mr. Werlau explained to you all the ways -- some of the ways -- he said there is a lot of options here but he explained to you some of the ways that Tornado Cash could have easily been designed to do what normal users wanted -- to have the ability to unconceal transactions, if necessary.  You still get the ability to send money anonymously but you have a way to track it if it becomes necessary and he explained that to you. And you could block bad actors from using the service that way. That is not Monday morning quarterbacking because you know, you have seen the evidence, that the defendant and his co-conspirators talked about exactly that idea while they were committing these crimes.  They talked about it, they knew they could do it, and they decided not to do it.  Let's take a look at that.

So, remember, a key moment in time is February of 2022 when they implement the relayer registry.  We are going to make some big money here from Tornado Cash, we are going to monetize the service.  And the way they're going do that is roll out this new router.  Sometimes it is called a proxy, sometimes a router, and they're going to link that up, the relayer fees to the TORN tokens.  So that's that revenue model that we have talked about a lot that defense counsel wants you to forget

about, the key driver for pumping up the value of the TORN tokens, making the relayer buy the TORN tokens.  When they talk about doing that, they make it clear that when they release that new router they have every option in the world for how they're going to make the service work.

So, let's bring up Government Exhibit 2059-1-T.

You remember these, these are the audio messages.  So when they really want to talk about sensitive issues they don't only use Telegram, they actually record the audio messages.  This is when they really want to get into the real sensitive issues about how they know how Tornado Cash works.

What Roman Semenov says is he says that the protocol seems immutable but everyone must use the proxy because if you bypass it, you could kind of loose anonymity because all of our users go through the proxy by default, and if you bypass it, then you are kind of different from everyone, which means that we kind of took back power this way.  So he is acknowledging when we put that new router in place, we have got the power.  Everybody has to use the router so we have the power, we get to decide how this works.

They're going do this to make money.  Remember, it is February 2022.  They've known for a year and a half that the hackers are the ones driving up the volume ever since that KuCoin hack which doubled their business back in September of 2020.  They know, this is where a lot of our volume comes from,

these hackers.  And here what Roman Semenov is saying, and this is a message to the defendant, he is saying when we put the new proxy in place, everyone is going to have to use it.  That's the concept we talked about before.  You can't go straight to the pools, you have to go through the router to blend in with the crowd and because of that, we are taking back power, we can decide how this thing is going to work.

So, let's go a little bit lower down in this message.

THE COURT:  Counsel, I just ask you please, for court reporter and Judge, just slow down, please.  Thank you.

MR. REHN:  So a little lower down in the message what does Roman Semenov say?  Since you are now charging a commission for them -- that's those Tornado Cash deposits and withdrawals -- since you control the proxy, why don't you also make it possible for it to ban, say, hacked money, so that, like, the proxy wouldn't let hacked money into Tornado.  OK?

This isn't Monday morning quarterbacking, members of the jury.  This is what the defendant and his co-conspirators are talking about when they're implementing these changes.  At the moment in time when they're deciding how are we going to run this business?  How are we going to make money from this business?  They know we could block hacked money, we could do it.  We took back control with this new router.  We have the option to block hacked money and Semenov is saying, you know, that's an option we have.

And so, he then -- Semenov sent another message later that same day, February 14 of 2022 and that's Government Exhibit 2059-2-T.  What does he say there?  Like, so we say that we have immutable contracts -- remember that's the cover story.  That is what defense counsel is still trying to tell you even now.  Oh, it is all immutable.  That's the cover story and that's it, no one can stop it.  We just heard that from defense counsel, no matter what you do there.  But here is what Semenov says:  But it turns out that, no, it is possible to stop it, as long as the governance makes the right division.

Here is the key point.  The defendant and his co-conspirators knew how to block that criminal money.  They talked about it.  They were making a decision about how to run the business at a moment in time where they know it is a money laundering business.  They've known about all these huge hacks, all the biggest days in Tornado Cash's history, and now they're trying to decide how to monetize the business.  Are we going to monetize it with the dirty money or are we going to block the dirty money?  And you know what they chose.  They chose to do nothing to block the dirty money because the dirty money was where the volume was, that was where their opportunity to make profits was.  They made a choice and they memorialized that choice in secret audio messages that they hoped you would never see so they could sell you on the cover story.  But the cover story is just false.

So after the defendant got these messages, what did he say?  Well, that's in Government Exhibit 2060-T and if we can bring that up?

This is in direct response to those audio messages we were just looking at, same day, shortly thereafter, Roman Storm's messages:  Show me a defi project which has true decentralization, Roma, and let's take a look at how many projects have centralized potential points like ours.  Basically, the concerns are no doubt valid but that's no reason not to do correct updates.  Moreover, the protocol fee will be useful for everyone.

So think about that.  We just heard the defense tell you, oh, they believed in decentralization.  That's what Tornado Cash was all about, decentralization.  What does Roman Storm say in the secret chats?  There is no defi project which has true decentralization.  That's a myth.  There are centralized points of control.  They have the ability to take control.  Semenov says it, Storm says it.  They know what they are doing, they know how to operate this business to make money and they are deciding, should we do what Semenov is suggesting?  Should we put in a control to block the hacked money?  Is that what Storm suggests they do?  Of course not.  What is the update he wants to make?  Protocol fees.  That's those relayer fees to TORN token concept we learned a lot about in this trial.  It is about the money, money, money.  We have to do the

P7U5sto5                          Rebuttal - Mr. Rehn

update so we can make the money.  We are not going to block the hackers, we are not going to do anything about addressing what is going on in Tornado Cash.  We are making a decision about how to run this business and the decision we are making is how can we make money from these criminal proceeds.

That is a conspiracy to commit money laundering, it is in black and white in the defendant's messages, and the defense is trying to get you to ignore them and it is critical evidence that shows you that the defendant knew what he was doing at the time.  There is nothing Monday morning quarterbacking about this.  This is what they were talking about in real-time.

And again, the defense essentially admits this in their closing argument because they brought up another message about whether we should stop the hackers.  You may remember defense counsel talking about that.  Oh, they talked about stopping the hackers.  I don't know why the defense counsel is highlighting this.  They talk about stopping the hackers.  Do they do it?  Of course not.  Why is the defense counsel showing you a chat that basically said, well, should we stop committing these crimes?  Should we stop laundering money for these hackers?  No, no, no, let's keep doing it.  That's where the money is.  That's what those chats tell you.  That's what these chats tell you.  That's what the chats that defense counsel is telling you, is showing you to tell you:  They are making choices about how to run the business and the choices they're

making are let's make money by hiding criminals' money.  That's our business model.

And it becomes even more clear when we talk about the Lazarus Group chat.  So, again, remember defense counsel talks about context a lot, we need to look at the context.  And I don't know if you saw during his closing, he put up a slide that had like five or six little snippets from April 14 and 15, some of them had like two words and they were all pieced together to try to tell you they were trying to stop the Lazarus Group from using Tornado Cash.  Here is the things that he left out of that chat.  The whole thing is it in evidence, I encourage you to look at it, it is Government Exhibit 2047-T, and Mr. Gianforti walked you through it in detail during his closing, he showed you the whole thing.

What did the defendant actually say when he found out the Lazarus Group was putting this illegal money into Tornado Cash?  Did he say we should stop it?  Of course not. What he said was:  *We need to tell everyone* -- his words -- *we need to tell everyone that we don't let this money in.*  Defense counsel left that out because it gives away the lie.  It was a cover story.

Next message:  *This is good for our positioning.* Again, the cover story is hey, we are doing something to stop this but what is he telling his co-conspirators?  Don't worry, it is easy to bypass, there is an easy way the Lazarus Group

will be able to go in and make these deposits.

And this is why, if you consider the whole context, the context of what is going on with Tornado Cash, this is a key point in time for the defendant because, remember, it is April 2022.  The defendant has just rolled out the relay registry in February and, remember, TORN tokens go way up because the relayers want to buy the TORN tokens to process the withdrawals but you need to have a lot of money going through Tornado Cash for that business model to work.  The defendant is sitting on millions of dollars worth of TORN.  The last thing he wants to do is cut his business volume in half by stopping the North Koreans.  He knows he could do it but he is not going to do it because he knows that if he does that, he will lose that value of those TORN tokens.  He is making a decision to willfully do business with those North Koreans, right there. We need to tell people we don't let them in but it will be easy to bypass.  We can't lose a half of our volume.

Special Agent DeCapua showed you that that whole April and May time period, more than half of the money going into Tornado Cash is the Lazarus Group money, more than half of all their money is that criminal money and he stands to gain a lot of profit from it so he is trying to have it both ways.  He wants to roll out this public announcement, we need to tell everyone we are not doing this, but he still wants to take the dirty money.  That's just good business.  So he deliberately

designs something that will look like they're doing something but will be easy to bypass.  And you heard in the chats we just saw from Mr. Semenov and Mr. Storm, and also from the testimony you heard in this case from Mr. Werlau, that there were easy and obvious fixes that would have actually blocked that North Korean money that would have prevented them from using Tornado Cash to use the service.

And I want to talk a little bit about that because what we heard from defense counsel made it seem like there is some problem here because the money goes from one wallet to another wallet to another wallet and then into Tornado Cash. Again, that is irrelevant in terms of the sanctions violations because the crime here is providing those services to the Lazarus Group and to that blocked wallet that the Lazarus Group owns, and by taking the money from the Lazarus Group from that wallet into Tornado Cash, you are violating the sanctions.  It doesn't matter if it goes through other wallets in the interim, there is no requirement that it comes directly from the wallet. The point is the defendant knows -- he knows -- in March of 20222, in April of 2022 he is talking about it with his co-conspirators long after the announcement of those sanctions, hey, just as we expected, our screen that we put in place was bypassed an the Lazarus Group is still putting money into Tornado Cash.  And he continues to allow that to happen and that is a sanctions violation.  But another key point about

this is the method that Semenov describes in his audio messages and the method that Mr. Werlau described for you, it doesn't require complicated following of hops and things like that.  It is just a simple tracking which users are associated with which wallets.  It is a list of which users are allowed into the system.  So, moving through a different wallet doesn't allow you around that screen.  It wouldn't work, the whole concept is you have a list of who is allowed in, the user registry concept, and that way there wouldn't be any ability for the North Koreans to get around that.  There has been no testimony to the contrary in this case and the reason for that is because the defendant and his co-conspirator admit they know how tow do it, they talk about it, and so you know they have the ability to do it and they didn't do it and they're violating the law.

I want to talk a little bit about this concept of normal users or people who weren't using Tornado Cash for criminal purposes.  We heard a lot about that from the defense in their opening statement and through this trial, but the problem they have is there is really no evidence in support of that argument.  You did hear from a few customers in this case that they used Tornado Cash in the defense case but none of them used it more than once or twice and none of them used it to move more than a couple hundred bucks.  That's basically 0.1 ETH.  That was the smallest amount you could deposit into Tornado Cash.  And again, this is one of those areas where you

can use your common sense.  Normal, ordinary people do not need to move millions of dollars anonymously.  They don't need to make these hundred ETH deposits of hundreds of thousands of dollars in a single bound.  The people that the service is actually useful for are criminals.  The sort of people that steal millions of dollars and need to hide it in a hurry.  And that's what the market was.  When you look at those big money deposits and withdrawals driving the volume of Tornado Cash, that's the criminal money.

And there is another important point on this.  We already heard that what the mainstream, normal users wanted was to be able to connect, to unconceal the transactions but they didn't require that in Tornado Cash because they knew the criminals didn't want that and they actually talked about ideas like this in real-time while these sanctions violations are going on.  That's Government Exhibit 1372, that's that critical chat in May of 2022 where the defendant asks his investors at Dragonfly -- remember, this is right in the middle of the sanctions violations, right when the Lazarus Group is moving that dirty money through Tornado Cash -- and the defendant says, hey, should we have KYC or AML?  What do you think?  How do his investors respond?  Nobody says, oh no that's impossible.  You couldn't do that.  Of course not.  They knew how do it, they obviously knew how do it.  The response is market need seems quite thin.  That's exactly what you saw with

the customers that the defense called in this case.  Nobody actually used this on a regular basis for normal purposes.  The people that used this in high volume were the criminals.  So, if you took steps to keep the criminals off, you lose your market.  Market need is thin, nobody would use it.  And so they choose not to make those changes, they choose to continue to operate the business knowing that by doing it that way, they're moving money for the sanctioned North Korean hackers, and by doing that they're committing a crime.

Remember, we don't have to show you any particular features they could have implemented.  The point of this is what is the intent that the defendant had in mind at the time.  What was he thinking when he was operating Tornado Cash and that is what makes these chats so important.  The defendant is thinking, Should we do this?  I know we could do this but should we?  And what does he decide with Semenov and Pertsev?  Let's not do it, let's focus on making money.  What does he decide with his investors?  We are not going to do it, we are going to focus on making money, we are going to go where the market is.  The market is the criminals, that's what Tornado Cash is.  They know it, they make changes to the service to take advantage of it and to make money from it.  And by doing that they engage in money laundering, money transmitting of criminal proceeds, and also those sanctions violations.  It always all in that one moment with that

North Korean money.

This ties into another point we just heard from defense counsel that I think, again, it is not consistent with the evidence we heard in this case.  This isn't a case about negligence.  This isn't a case about something that could have been done but wasn't done.  What this is a case about is the actual operation of Tornado Cash.  It was a business that the defendant made choices to operate on a day-to-day basis.  You heard about that, he was paying for all that blockchain traffic.  That was necessary for those criminal deposits and withdrawals.  Without the blockchain traffic payments to Infura Tornado Cash doesn't work.  That's what E.G. Galano told you, from Infura.  He paid for and maintained the website.  He and his co-conspirators paid for and maintained the web application.  They updated it 250 times and they rolled out new features and specifically new features that helped make it more easy for criminals to use.

Again, things like the relayer registry that allowed for a broader collection of relayers to help conceal that money, to help move it to those clean wallets which even the defense expert witnesses admitted to you on cross-examination.  Those are choices he made to continue to take criminal money and to continue to hide it.  It is nothing about negligence, it is nothing about inaction.  It is the defendant's active choices.  His operation of a business that was engaged in money

laundering and that's what this case is all about.  And I think because it is so clear that that's what the defendant did, what we have seen with the defense arguments is an attempt to distract you with a lot of things that aren't relevant to this case.

So, defense counsel started by saying, oh, I don't want to have a policy argument about privacy but then he started asking about things like WhatsApp or cellphones.  He is trying to get you to think about issues that aren't at issue in this case.  He is trying to get you to think about things that you are not going to be asked to decide because he knows if you focus on the evidence in the case, if you focus on what the defendant actually did, you will convict the defendant.  So he is distracting you hey, look at this thing, think about WhatsApp, think about all the other things.  Focus on the defendant's conduct and focus on the laws that are at issue in this case.

Again, nobody is alleging that the defendant had some particular feature he had to roll out.  What he did have an obligation to do was follow the law.  The law forbids a conspiracy to participate in transactions knowing that they involve criminal activity.  He clearly did that.  He clearly knew these transactions involved criminal activity.  He is told about it over and over and over again.  And he agrees with his conspirators to participate in those transactions.  He has an

obligation to follow the law, he violated that obligation, he engaged in those money laundering transactions, and he is guilty of the crime.

I want to touch briefly on this issue of privacy. So, there is a couple of things to keep in mind. First off, the time period we are focused on here is in 2020 to 2022 and so the defense's arguments about what the defendant may have thought in 2019 when he set this up aren't really all that relevant. But what is important to remember is that in 2020, October 2020, the KuCoin hack, the defendant knows what's the first big bump in business for Tornado Cash when they roll this thing out? It is the hack. It is 60 percent of their volume, it doubles their volume overnight. They immediately know where the real market for this is and from that point forward as hack after hack after hack happens and as the defendant knows about each and every one of these in real-time, hearing about the hacks, being pointed to particular transactions on the blockchain where criminal money is coming into Tornado Cash, conducting those transactions, he continues to engage in those criminal transactions, he does so knowing he is doing criminal transactions with criminal proceeds, and by doing that he is engaged in money laundering.

Another thing I want you to keep in mind is that -- two quick points on privacy. So, first, I expect you will hear from Judge Failla that there is no requirement to prove that

criminal intent was the defendant's only intent.  The defendant is guilty if you find that he had the intent to commit the charged crimes even if you think that he was also motivated at some level by some other interest as well.  So here, for example, you know full well from what we have just been looking at that the defendant intended to take that North Korean money.  He knew it about it, he knew it was happening, he talked about stopping taking that money and then he did it anyway.  Because of that, he knowingly participated in that conspiracy to violate sanctions, regardless if he had other intentions in his mind at the time.  As long as you find he had that intention with respect to those transactions, he is guilty of that crime and it is the same thing for all those other hacking transactions that he was engaged in.

And the second point is all of these arguments about privacy really collapsed yesterday when they called Dr. Green to the stand.  And I know you guys all listened very carefully to Dr. Green and he described a bunch of other privacy solutions that existed.  He said there was something called Monero, that's been around since 2014.  He mentioned something called Aztec.  He had a whole slide of these privacy solutions.  In fact, he told you he invented one 10 years ago called Zcash.

The defense has tried to tell you in this case that Tornado Cash was some necessary privacy solution for the blockchain but the evidence in the case proves that to be

wrong.  What was different about Tornado Cash is all the things you have learned about in this trial, all the ways it was particularly designed to be very useful for criminals and not very useful for ordinary people.  And not just that it was designed that way but that the defendant then knew that was how it was actually being used and he continued to operate it that way, he actually made it even more suited to that purpose over time.  And because of that, Tornado Cash wasn't all about privacy, the cover story, it was about those criminals.

You heard from actual criminals like Andre Llacuna, the guy who did the Frosties scam; or Shakeeb Ahmed, the guy that did the hacking of the Crema.  What they told you was Tornado Cash was really great because you could move a lot of money really quickly with the easy-to-use website.  They didn't ask for any information, no user name, no login, so they felt comfortable they weren't leaving behind evidence of their criminal activity.  That is what was unique about Tornado Cash, it was unlike these other privacy solutions because it was designed for criminals.  The defendant knew that.

MR. PATTON:  Objection.

THE COURT:  I will remind, I will tell the jury that the statements of counsel in summations are not themselves evidence and on the issues of the law, I will be instructing you.

Thank you, counsel.  And please slow down.

P7U5sto5                    Rebuttal - Mr. Rehn

MR. REHN:  Just one other point in response to another context issue.  The defendant mentioned the Rho Bank questionnaire.  Again, it is in evidence, take a look at it.  The Rho Bank questionnaire says we don't operate on a blockchain.  That's literally what he told Rho Bank.  If there is one thing we know from this case it is that Tornado Cash was operating on a blockchain.  These are false statements and, again, Mr. Gianforti walked you through not just that one but a whole lot of other false statements that the defendant made over the course of his participation in this conspiracy.

There is simply no question that the defendant was covering up what he was doing.  You saw it.  We are worried about law enforcement reading it.  You saw the lies.  You saw all the things he did to hide what he was doing.  The Russian Binance account.  Why is he liquidating his interest in Tornado Cash through a Russian Binance account?  It is all about concealment of what he is doing because he knows he is committing a crime.  That's what people do when they're committing a crime.

And I think most importantly on this whole privacy point is privacy is not a license to commit crimes.  You will be asked to consider the elements of the charges.  You will hear detailed instructions on them.  The evidence clearly shows that the defendant committed these crimes and that is what you should focus on in this case, the evidence in the case.  Don't

let defense counsel distract you with a bunch of issues that aren't at issue in this case that have nothing to do with this case.

We heard a lot about the law from the defense counsel at the very end of his summation.  Again, I would encourage you to listen carefully to Judge Failla's instructions.  One thing in particular with respect to Count Two, this money transmitting business account, you heard defense counsel give you a bunch of terminology that he said shows it is not a money transmitting business.  You are not going to hear that terminology in the jury instructions.  There is nothing about non-custodial, nothing about permissionless.  Defense counsel said, Oh, I'm making technical points.  But those points aren't technical to what the elements of this crime are and they're also just wrong.  You know how Tornado Cash works, you have listened to the evidence.  Focus on how Tornado Cash actually works.  Does Tornado Cash transfer funds for people?  Of course it does.  That's the whole point.  That's what it is.  You go there so you can move money.  And so the suggestion that there is some permissionless or non-custodial part of this, it is just an attempt to confuse and distract you.  Don't take the bait.

Is Tornado Cash a business?  He actually tried to tell you it is not a business.  Again, look at the evidence in the case.  Tornado Cash is clearly operating as a for-profit

enterprise.  It has all of these pieces that work together and it is a for-profit enterprise and that is just what you are going to be asked to include.  It is not some technical thing of whether it is a Delaware corporation or anything like that. Again, don't get distracted, focus on the evidence.  This is a for-profit enterprise run by the defendant that is offering money transferring services for the people who use it and therefore Count Two is obvious.

One other just final point on Count Two is he mentioned that Shakeeb Ahmed, when he used the Tornado Cash service, he was putting in money before he committed the crime and he acted like that was some big problem for this.  The look at the language of Count Two in particular, the money transmitting business count, it includes both the proceeds from a criminal activity -- that means the money you get when you commitment the crime, afterwards -- but it also includes money to promote that criminal activity.  And so, that evidence of Shakeeb Ahmed sitting in his apartment in Manhattan using the website that the defendant controls to put money through that he could then use in the hack, is exactly in furtherance of that money transmitting to promote criminal activity.

So, again, it is another attempt by the defense to try to confuse you by suggesting there is some problem there when if you actually listen to the law and you look carefully at the charges in this case, it is just not true.

Just very briefly on venue.  You heard about a lot of evidence of acts that the defendant took that were in New York, that he sent e-mails to New York, he made payments to New York, he had chats with his investor while the investor was in New York, and he operated a website and it was certainly foreseeable to him that people would be using that website in New York.  And so all of those things, there is ample connections between New York and this case and that's not what you need to find.  You just need to find a single act in furtherance of each of the charged crimes and there is many, many such acts which you have heard a lot of evidence about in this case.

So, what have we learned in this case?  We have learned that the defendant built and operated Tornado Cash and he had a plan to make big money from it.  He executed that plan for a period of two years, from September 2020 to August 2022.  During that time he knew and he was specifically told again and again and again that he was hiding money for criminals.  That was part of the plan.  He was making money from doing that.  It was pumping up his business and he made choices to make even more money and to help those criminals move their money, even when he found out it was sanctioned North Korean actors.  It was all part of the plan.

And then at the end you heard, in June 2022, he started cashing out, he took that money he made from doing this

dirty business and he started to run, covering his tracks, using the Russian Binance, but he started to cash out starting in June and continuing into August.  But there is a lot of things he didn't plan for.  He didn't plan that the IRS would be able to track down his profits from Tornado Cash to that Russian Binance account and show you exactly how he secretly cashed out his profits from Tornado Cash.  He didn't plan for FBI agents to trace more than $1 billion in dirty money from large criminal exploits into his business.  He didn't plan for agents to find his e-mails, his chats, his Google searches showing that he knew about each and every one of these hacking incidents that you have heard evidence about in this case right when they happened.  And he knew that those hackers were using Tornado Cash.  You can remember Government Exhibit 3002-2 which is in evidence, it listed all the hacks that Special Agent DeCapua told you about and all the documents that showed the defendant knew about these hacks when they were happening.  He didn't plan on you finding out about that.  He certainly didn't plan on having his secret communications with his co-conspirators shown in open court, communications that leave no reasonable doubt that the defendant knew he was committing a crime and he continued to engage in it over and over again.

If we could bring up Government Exhibit 2062-T?

The defendant was trying to cover this up.  He was trying to keep you from seeing his messages because he knew

that when you saw the evidence in this case, you would know that he was guilty of these crimes.  And now he is trying to have it two ways, both ways.  You know from the evidence in the case that he built Tornado Cash as a money laundering business, he profited from that money laundering, and now he wants to go back to the cover story.  Oh, forget all of that stuff I said in the private chats, forget my jokes about the hackers being good marketing, forget my discussion about how we could easily block the hackers but we are choosing not to do so.  Forget that.  Let's just pretend it was a decentralized privacy protocol.  But we have seen the evidence in that case.  We know that cover story doesn't line up with the truth.  You know the truth.  You have seen the evidence and you know exactly what happened in this case.  You know the defendant committed these crimes and the time has come to hold him accountable.

When you go into that jury room to deliberate, follow the evidence, listen to the instructions on the law and use your common sense and when you do that, you will find the defendant guilty.

THE COURT:  Thank you to all of our oralists this afternoon.  We are going to take our afternoon break now and then when we come back, I will read the charge to you.

For my friends who are in the gallery, you are welcome to stay, but if you stay you are not leaving during the charge, so make the decision now how exciting this is for you.

P7U5sto5

For my jurors, do not discuss this case with each other or anyone else until you begin to deliberate, which will be after I give you the charge.

All rise, please.

(Jury not present)

THE COURT:  I will see you in 10 minutes.  Thank you.

(Recess)

(Continued next page)

(Jury present)

THE COURT:  Thank you.  Please be seated.

Members of the jury, as I indicated to you, it is now time for you to receive the charge in this case.  I've placed a copy of the charge on your seats, on each of your seats.  You're not obligated to read the charge along with me.  You can simply listen to me speak it to you.  But for some people, they understand things better when they're both hearing and reading, so you have that option if you want.

Just a couple of points to keep in mind before I begin.

The first is that I'm probably not going to look at you very often as I read from this because it is critically important that I read what is on this page and not riff on something and sort of think that I remember it and not.

The second thing is that somewhere in this document I'm sure is a typographical or grammatical error caused by me.  I'll see it.  If you see me wince, that's what it is, so you'll excuse me.  But be forgiving and understand.

And third, just given the length of the charge, because I think it is about a 90-minute, might be a slightly longer charge to read, at some point my back will give out and I will have to get up and do like a seventh inning stretch, and you're welcome to join me if you feel that as well.

So with all these instructions preliminary to the

instructions, I'm going to begin with the charge.

Members of the jury, you have now heard all of the evidence in the case, as well as the final arguments of the parties.  We have reached the point where you are about to undertake your final function as jurors.  You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict in this case.

My duty at this point is to instruct you as to the law.  It is your duty to accept these instructions of law and to apply them to the facts as you find them, just as it has been my duty to preside over the trial and to decide what testimony and evidence was proper under the law for your consideration.  On these legal matters, you must take the law as I give it to you.  If any attorney or witness has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

The indictment in this case charges the defendant, Roman Storm, in three counts with conspiring (or agreeing with others) to commit money laundering; conspiring to operate an unlicensed money transmitting business; and conspiring to violate the International Economic Emergency Powers Act (the IEEPA).  I want to emphasize that you must consider each count separately and render a verdict on each count.

My instructions to you today are in several parts.

First, I will instruct you about the trial process, including the burden of proof.  Second, I will give you instructions concerning evaluation of the evidence.  Third, I will describe the law to be applied to the facts that you find to be established by the evidence.  Fourth and finally, I will instruct you regarding your deliberations.

Because my instructions cover many points, I have given you a copy of them so that you may follow along.  In addition, you may take your copy of the instructions with you for reference during your deliberations.  You should not single out any instruction as alone stating the law; instead, you should consider my instructions as a whole when you retire to deliberate in the jury room.

As members of the jury, you are the sole and exclusive judges of the facts.  You evaluate the evidence.  You determine the credibility of the witnesses.  You resolve any conflicts in the testimony.  You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

In reaching your verdict, you must remember that all parties stand equal before a jury in the courts of the United States.  The fact that the prosecution is brought in the name of the United States does not entitle the government or its witnesses to any greater, or lesser, consideration than that accorded to any other party.  The government and Mr. Storm

stand on equal footing before you.

It would likewise be improper for you to consider, in reaching your decision as to whether the government has sustained its burden of proof as to any count in the indictment, any personal feelings you may have about Mr. Storm's race, ethnicity, national origin, sex, age, or other personal characteristic. All persons are entitled to the same presumption of innocence and the government has the same burden of proof with respect to all persons. Your verdict must be based solely on the evidence developed at trial.

Under your oath as jurors you are not to be swayed by sympathy or prejudice. You are to be guided solely by the evidence in this case, and the crucial question that you must ask yourselves as you review the evidence is: Has the prosecution proved Mr. Storm's guilt of each charge in the indictment beyond a reasonable doubt? It is for you and you alone to answer this question, and you must do so based solely on the evidence at trial, or the lack of evidence, and subject to the law as I have instructed you.

You will recall my prior instructions on unconscious or implicit biases. It must be clear to you that once you let fear, prejudice, bias, or sympathy interfere with your thinking, there is a risk that you will not arrive at a true and just verdict. If you find that the government has met its burden of proving Mr. Storm's guilt on a particular charge in

the indictment beyond a reasonable doubt, then you should not hesitate because of sympathy or any other reason to render a verdict of guilty on that count.  If, on the other hand, you have a reasonable doubt as to Mr. Storm's guilt of that charge, then you must render a verdict of not guilty on that count.

I also caution you that, under your oath as jurors, you cannot allow a consideration of any punishment that may be imposed upon Mr. Storm if he were to be convicted of one or more counts in the indictment to enter into your deliberations. The duty of imposing a sentence in the event of conviction rests exclusively upon the Court and the issue of punishment may not affect your deliberations as to whether the government has proven Mr. Storm's guilt of a particular count beyond a reasonable doubt.

Similarly, it would be improper for you to allow any feelings you might have about the nature of the crimes charged to interfere with your decision-making process.  Your verdict must be based exclusively upon the evidence, or the lack of evidence, in this case.

You should draw no inference or conclusion for or against any party by reason of lawyers making objections or my rulings on such objections.  Counsel have not only the right, but the duty, to make legal objections when they think that such objections are appropriate.

Nothing that I say is evidence.  If I commented on the

evidence at any time, do not accept my statements in place of your recollection or your interpretation. It is your recollection and interpretation that govern.

Also, do not draw any inferences from any of my rulings. The rulings I made during trial are no indication of any view on my part. You should not seek to find any such view or opinion on my part, nor should you otherwise speculate as to what I may think.

Further, do not concern yourself with what was said at any sidebar conferences or during my discussions with counsel outside of your presence. Those discussions related to rulings of law.

At times I may have admonished a witness or directed a witness to be responsive to questions, to keep his or her voice up, or to slow down. At times I may have asked a question myself. Any questions that I asked, or instructions that I gave, were intended only to clarify the presentation of evidence and to bring out something that I thought might be unclear. You should draw no inference or conclusion of any kind, favorable or unfavorable, with respect to any witness or any party in the case, by reason of any comment, question, or instruction of mine. Nor should you infer that I have any views as to the credibility of any witness, as to the weight of the evidence, or as to how you should decide any issue that is before you. That is entirely your role.

Finally, the personalities and the conduct of counsel are not in any way in issue. If you formed opinions of any kind about any of the lawyers in the case, favorable or unfavorable, those opinions should not enter into your deliberations.

You may not draw any inference, favorable or unfavorable, from the fact that no person other than Mr. Storm is on trial here. You also may not speculate as to the reasons why other persons are not on trial. Those matters are wholly outside your concern and have no bearing on your function as jurors.

Similarly, you are being asked to decide whether the government has proven Mr. Storm's guilt of each count in the indictment beyond a reasonable doubt. You are not being asked whether any other person has been proven guilty. Your verdict should be based solely upon the evidence, or lack of evidence, as to Mr. Storm, in accordance with my instructions and without regard to whether the guilt of any other person has, or has not, been proven.

I will now instruct you on the presumption of innocence and the government's burden of proof in this case. Mr. Storm has pleaded not guilty to the charges in the indictment. In so doing, he has denied every allegation charged against him. As a result of Mr. Storm's plea of not guilty, the burden is on the prosecution to prove his guilt of

each charge in the indictment beyond a reasonable doubt.  This burden never shifts to Mr. Storm for the simple reason that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

The law presumes Mr. Storm to be innocent of the charges against him.  I therefore instruct you that he is to be presumed by you to be innocent throughout your deliberations.

Mr. Storm began the trial here with a clean slate. This presumption of innocence alone is sufficient to acquit him unless you as jurors are unanimously convinced beyond a reasonable doubt of his guilt of a particular charge, after a careful and impartial consideration of all the evidence in this case.  If the prosecution fails to sustain its burden as to a particular charge in the indictment, then you must find Mr. Storm not guilty of that charge.  This presumption of innocence was with Mr. Storm when the trial began; it remains with him even now as I speak to you; and it will continue with him during your deliberations unless and until you are convinced that the prosecution has proven him guilty of that particular charge beyond a reasonable doubt.

Now the next question naturally is, what is reasonable doubt?  The words almost define themselves.  It is a doubt that a reasonable person has after carefully weighing all of the evidence.  It is a doubt that would cause a reasonable person

to hesitate to act in a matter of importance in his or her personal life.  Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs.  A reasonable doubt is not caprice or whim.  It is not speculation or suspicion.  It is not an excuse to avoid the performance of an unpleasant duty.  And it is not sympathy.

In a criminal case, the burden is at all times on the prosecution to prove guilt beyond a reasonable doubt.  That said, the law does not require that the prosecution prove guilt beyond all possible doubt; rather, proof beyond a reasonable doubt is sufficient to convict.  The burden never shifts to Mr. Storm.  Even if a defendant has presented evidence in his or her defense, it is not his or her burden to prove themselves not guilty.  It is always the prosecution's burden to prove each of the elements of the crime with which a defendant has been charged beyond a reasonable doubt.

If, after fair and impartial consideration of all the evidence, you are convinced of Mr. Storm's guilt of a particular charge in the indictment beyond a reasonable doubt, then you must convict him of that charge.  On the other hand, if, after fair and impartial consideration of all the evidence, you have a reasonable doubt as to Mr. Storm's guilt of that charge, then you must acquit him of that charge.

In determining the facts, you must rely upon your own recollection of the evidence.  What is evidence?  Evidence consists of the testimony of witnesses, the exhibits that have been received, and the stipulations of the parties.  A stipulation is simply an agreement between the parties.  At trial, the parties introduced two types of stipulations.  First, you have seen evidence in the form of stipulations of testimony.  A stipulation of testimony is an agreement between the parties that, if called as a witness, the person would have given certain testimony.  You must accept as true the fact that the witness would have given that testimony.  However, it is for you to determine the weight, if any, to be given that testimony.  Second, you have seen stipulations that contained facts that the parties agreed were true.  You must accept as true the facts contained in these stipulations.  Again, however, it is for you to determine the weight, if any, to be given those facts.

Let me now give you some instructions about exhibits.  The only exhibits that are evidence in this case are those that were received in evidence.  Exhibits marked for identification but not admitted are not evidence, nor are materials that were used only to refresh a witness's recollection.

During the course of the trial, we have seen, among the exhibits received in evidence, materials that have been redacted.  "Redacted" means that part of the item was taken

out.  You are to concern yourself only with the part of the item that has been admitted into evidence.  You should not speculate as to any reason why any other portions have been redacted.

Some evidence has been admitted for a limited purpose only.  If I have instructed you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other purpose.

And let me remind you of certain things that are not evidence.  The statements and arguments made by the lawyers are not evidence.  Their arguments are intended to convince you of what conclusions you should draw from the evidence or lack of evidence in this case.  Now those arguments are important.  You should weigh and evaluate them carefully.  But you must not confuse them with the evidence.  As to what the evidence was at this trial, it is your recollection that governs, not the statements of the lawyers.

You should also bear in mind that a question put to a witness is never evidence.  It is the answer to the question that is evidence.  One exception to this is that you may not consider any answer that I directed you to disregard or that I ordered to be stricken from the record.  You are not to consider such answers.

There are two types of evidence that you may properly use in deciding whether the government has proven beyond a

P7U1STO6                          Charge

reasonable doubt that Mr. Storm is guilty of a particular crime with which he has been charged.

One type of evidence is called direct evidence. Direct evidence of a fact in issue is presented when a witness testifies to that fact based on what he or she personally saw, heard, or observed. In other words, when a witness testifies about a fact in issue on the basis of that witness's own knowledge—-by virtue of what he or she sees, feels, touches, or hears——that is direct evidence of that fact.

The second type of evidence is circumstantial evidence. Circumstantial evidence is evidence that tends to prove a disputed fact indirectly by proof of other facts. There is a simple example of circumstantial evidence that is frequently used in this courthouse.

Assume that when you came into the courthouse this morning, the sun was shining and it was a nice day outdoors. Assume that the courtroom windows were covered over and you could not look outside. Assume further that as you were sitting here, someone walked in with an umbrella that was dripping wet and then, a few moments later, somebody else walked in with a raincoat that was also dripping wet.

Now because you could not look outside the courtroom and you could not see whether it was raining, you would have no direct evidence of that fact. But, on the combination of facts that I have asked you to assume, it would be reasonable and

logical for you to conclude that it was raining.

That is all there is to circumstantial evidence.  You infer on the basis of your reason, experience, and common sense from one established fact the existence or the nonexistence of some other fact.

Many facts, such as a person's state of mind, can only rarely be proven by direct evidence.  Circumstantial evidence is of no less value than direct evidence.  It is a general rule that the law makes no distinction between direct and circumstantial evidence, but simply requires that in order to convict a defendant, the jury must be convinced of that defendant's guilt beyond a reasonable doubt from the evidence in the case.

The matter of drawing inferences from facts in evidence is not a matter of guesswork or speculation.  An inference is a deduction or conclusion that you, the jury, are permitted to draw—but are not required to draw—from the facts that have been established by either direct or circumstantial evidence.

You do not leave your common sense, good judgment, or life experiences behind you when you walk into the courtroom. You carry that background into the jury room during your deliberations.  While you are considering the evidence presented to you, you are permitted to draw, from the facts that you find to be proven, the reasonable inferences that

would be justified in light of your experience.  Please remember, however, that you may not use your experience and common sense to fill in or create evidence that does not exist. You use them only to draw reasonable inferences from proven facts or to weigh and evaluate the evidence provided during the trial.

There are times when different inferences may be drawn from facts, whether proved by direct or circumstantial evidence.  The government may ask you to draw one set of inferences, while Mr. Storm may ask you to draw another.  Some inferences, however, are impermissible.  For example, you may not infer that a defendant is guilty of participating in criminal conduct if you find merely that he or she was present at the time the crime was being committed and had knowledge that it was being committed.  Likewise, you may not infer that a defendant is guilty of participating in criminal conduct merely from the fact that he or she may have associated with other people who were guilty of wrongdoing, or merely because he or she may have had knowledge of the wrongdoing of others. Nor may you use evidence that I have instructed you was admitted for a limited purpose for any inference beyond that limited purpose.

Here again, let me remind you that, whether based upon direct or circumstantial evidence, or upon the logical, reasonable inferences drawn from such evidence, you must be

satisfied that the government has met its burden of proving Mr. Storm's guilt of a particular charge in the indictment beyond a reasonable doubt before you may convict him of that charge.

Ultimately, it is for you, and you alone, to decide what inferences you will draw.

During the trial, certain summary charts were admitted into evidence as exhibits in order to save time and avoid unnecessary inconvenience.  All of these exhibits will be provided for you in electronic form during your deliberations.

In addition, during the trial, including during the arguments of counsel, the parties have used other charts and summaries as demonstrative aids in order to make other evidence more meaningful and to aid you in considering the evidence. Those demonstrative aids were not admitted in evidence and therefore you cannot ask for them in the course of your deliberations.  They are no better than the testimony and the documents upon which they are based, and therefore, you are to give them no greater and no lesser consideration than you would give to the evidence upon which they are based.  It is for you to decide whether these demonstrative aids correctly presented the information contained in the testimony and in the exhibits on which they were based.  You are entitled to consider these demonstrative aids if you find that they are of assistance to you in analyzing and understanding the evidence.

P7U1STO6                    Charge

You have heard testimony about, and have seen introduced as exhibits, certain evidence obtained by law enforcement officers.  This evidence includes items seized in connection with certain searches conducted by law enforcement officers; and information (including documents, electronic records, and recordings) obtained from banks, cellphone service providers, internet service providers, and social media platforms pursuant to subpoena or court order.  I instruct you that the evidence in each of these categories was obtained lawfully and that it may be considered by you during your deliberations.

In addition, English translations of Russian-language recordings and communications were admitted into evidence.  The English-language translation of any Russian-language conversation is evidence.  Even if you may know the Russian language, it is important that all jurors consider the same evidence.  Therefore, you must accept the evidence presented in the English translations.

I am now going to give you a few general instructions as to how you may determine whether witnesses are credible and reliable; whether the witnesses told the truth at this trial; and whether they knew what they were talking about.  How do you determine that?  It is really just a matter of using your common sense, your good judgment, and your experience.

First, consider how well the witness was able to

observe or hear what he or she testified about.  The witness may be honest, but mistaken.  How did the witness's testimony impress you?  Did the witness appear to be testifying honestly or candidly?  Were the witness's answers direct or were they evasive?  Consider the witness's demeanor, manner of testifying, and the strength and accuracy of the witness's recollection.  Consider whether any outside factors might have affected the witness's ability to perceive events.

Consider also the substance of the testimony.  How does the witness's testimony compare with other proof in the case?  Does it seem implausible or otherwise unworthy of belief?  Is it corroborated or is it contradicted by other evidence?  If there is a conflict, does any version appear reliable, and if so, which version seems more reliable?

In addition, you should specifically note any evidence of hostility or affection that the witness may have had for or against the government or Mr. Storm.  Likewise, you should consider evidence of any interest or motive that the witness may have had in cooperating with or helping either party.  It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony.  If you find that a witness is biased or interested, you should view his or her testimony with caution, weigh it with care, and subject it to close and searching scrutiny.

Of course, the mere fact that a witness has an

interest in this case does not mean the witness has not told the truth.  It is for you to decide from your observations, applying your common sense and experience, and all the other considerations mentioned, whether an interest has intentionally or otherwise colored or distorted the witness's testimony.  You are not required to believe or disbelieve a biased or an interested witness; you may accept as much of the testimony as you deem reliable and reject as much as you deem unworthy of belief.

If a witness made statements in the past that are inconsistent with his or her trial testimony concerning facts that are at issue here, you may consider that fact in deciding how much of the witness's testimony, if any, to believe.  In making this determination, you may consider whether the witness purposely made a false statement, or whether it was an innocent mistake.  You may also consider whether the inconsistency concerns an important fact or merely a small detail, as well as whether the witness had an explanation for the inconsistency, and if so, whether that explanation appealed to your common sense.

If you find that a witness has testified falsely as to any material fact, or if you find that a witness has been previously untruthful when testifying under oath or otherwise, you may reject that witness's testimony in its entirety or you may accept only those parts that you believe to be truthful or

P7U1STO6                      Charge

that are corroborated by other independent evidence in the case.

You have heard testimony from several witnesses, including Justin Bram, Andre Llacuna, and Shakeeb Ahmed, who testified pursuant to agreements with the government. Mr. Llacuna and Mr. Ahmed testified pursuant to cooperation agreements with the government, and Mr. Bram testified pursuant to a nonprosecution agreement with the government. The law allows the use of testimony from witnesses who testify pursuant to cooperation or nonprosecution agreements. Indeed, it is the law in federal courts that the testimony of such a witness may be enough in itself for conviction, if the jury finds that the testimony establishes guilt beyond a reasonable doubt. But it is also the case that testimony from individuals who testify pursuant to cooperation or nonprosecution agreements must be scrutinized with great care and viewed with particular caution. The fact that a witness is testifying pursuant to a cooperation or nonprosecution agreement can be considered by you as bearing upon the witness's credibility. It does not follow, however, that simply because a person has admitted to participating in a crime, that person is incapable of giving a truthful account of what happened.

Like the testimony of any other interested witness, testimony from a witness who is testifying pursuant to a cooperation or nonprosecution agreement should be given such

P7U1STO6                          Charge

weight as it deserves in light of the facts and circumstances before you, taking into account the witness's demeanor, candor, the strength and accuracy of the witness's recollection, the witness's background, and the extent to which the witness's testimony is or is not corroborated by other evidence in the case. You may also consider whether the witness has an interest in the outcome of the case, and if so, whether it has affected the witness's testimony. For instance, you may consider whether the witness believes the government has provided him or her with any benefits or promises, and whether that belief provides the witness with a motive to testify either falsely or truthfully at this trial. Let me emphasize that you must scrutinize the testimony of these witnesses with great care. If you believe the testimony to be true, and determine to accept it, you may give it such weight, if any, as you believe it deserves.

You are to draw no conclusions or inferences of any kind about the guilt of Mr. Storm from the fact that a witness pleaded guilty to charges arising out of or related to their use of Tornado Cash. The decision of a witness to plead guilty is a personal decision that witness made about his or her own guilt. It may not be used by you in any way as evidence against or unfavorable to Mr. Storm.

Finally, you have heard testimony about written agreements between the government and these witnesses. Your

P7U1STO6                        Charge

concern is whether each of these witnesses has given truthful testimony in this courtroom.  In addition to using all of the other considerations that I have described to evaluate testimony, in evaluating the testimony of a witness who has signed a cooperation or a nonprosecution agreement, you should also consider what effect, if any, the agreement has had on the witness's motive to tell the truth.

As with all witnesses, you may accept or reject the testimony of these witnesses in whole or in part.

You have heard testimony from law enforcement officers.  The fact that a witness may be employed by a federal, state, or city government as a law enforcement officer does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

It is your decision, after reviewing all the evidence, whether to accept the testimony of each law enforcement officer and to give to that testimony the weight you find it deserves.

You have heard testimony from what we call expert witnesses, someone who by education or experience has acquired learning or expertise in a science or a specialized area of knowledge.  Such a witness is permitted to give his or her opinions as to relevant matters in which he or she professes to be expert and give his or her reasons for those opinions. Expert testimony is presented to you on the theory that someone

who is experienced in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

Now, your role in judging credibility applies to experts as well as to other witnesses. You should consider the expert opinions that were received in evidence in this case and give them as much or as little weight as you think they deserve. If you should decide that the opinion of a particular expert witness was not based on sufficient education or experience or on sufficient data, or if you should conclude that the trustworthiness or credibility of the expert is questionable for any reason, or if the opinion of the expert was outweighed, in your judgment, by other evidence in the case, then you may disregard the opinion of the expert in whole or in part.

On the other hand, if you find that the opinion of a particular expert witness is based on sufficient data, education, and experience, and the other evidence does not give you reason to doubt the expert's conclusions, then you may accept that testimony.

You heard evidence during the trial that one or more witnesses may have discussed the facts of the case and their testimony with the attorneys for the parties before the witnesses appeared in court. Although you may consider that fact when you are evaluating a witness's credibility, I should

tell you that there is nothing unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects about which he or she will be questioned, focus on those subjects, and have the opportunity to review relevant exhibits before being questioned about them.  Such consultation helps conserve your time and the Court's time.

Again, the weight you give to the fact or the nature of the witness's preparation for his or her testimony, and what inferences you draw from such preparation, are matters completely within your discretion.

The number of witnesses testifying concerning any particular dispute is not controlling.  You may decide that the testimony of a smaller number of witnesses concerning any fact in dispute is more believable than the testimony of a larger number of witnesses to the contrary.  By the same token, you do not have to accept the testimony of any witness who has not been contradicted or impeached, if you find the witness not to be credible.  You also have to decide which witnesses to believe and which facts are true.  To do this, you must look at all the evidence, drawing upon your own common sense and personal experience.

I have already instructed you on the criteria for evaluating the credibility of witnesses.  You should keep in mind that the burden of proof is always on the government, and

that Mr. Storm is not required to call any witnesses or offer any evidence, since he is presumed to be innocent.

There are people whose names you heard during the course of this trial, but who did not appear here to testify. I instruct you that all parties have an equal opportunity, or lack of opportunity, to call any of these witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called. Their absence should not affect your judgment in any way.

You should remember my instruction, however, that the law does not impose on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. It is the government's burden to prove beyond a reasonable doubt each and every element of the crime charged in the indictment.

Mr. Storm did not testify in this case. Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the government's burden to prove a defendant guilty beyond a reasonable doubt. That burden remains with the government throughout the entire trial and never shifts to the defendant. A defendant is never required to prove that he or she is innocent.

You may not attach any significance to the fact that Mr. Storm did not testify. No adverse inference against him

P7U1STO6                          Charge

may be drawn by you because he did not take the witness stand. You may not consider this against Mr. Storm in any way in your deliberations in the jury room.

Mr. Storm has been formally charged in an indictment. The indictment in this case contains three counts, each of which constitutes a separate crime or offense. You must consider each count of the indictment separately, and you must return a separate verdict on each count.

As I instructed you at the outset of this case, the indictment is a charge or accusation. It is not evidence. You will have a copy of the indictment with you in the jury room and you can read each count in its entirety. I am going to provide only a brief summary now.

Count One of the indictment charges that Mr. Storm conspired, or agreed, with others to commit money laundering from at least in or about September 2020, up to and including on or about August 8, 2022.

Count Two of the indictment charges that Mr. Storm conspired with others to operate an unlicensed money transmitting business from at least in or about February 2022, up to and including on or about August 8, 2022.

Count Three of the indictment charges that Mr. Storm conspired with others to violate the International Emergency Economic Powers Act, which I have previously referred to as the IEEPA, from at least on or about April 14, 2022, up to and

including on or about August 8, 2022.

Mr. Storm denies that he is guilty of these three charges. Mr. Storm is not charged with committing any crime other than the three offenses alleged in the indictment. You are here only to determine whether the government has proven Mr. Storm guilty beyond a reasonable doubt of one or more of the three specific charges in the indictment.

All three charges against Mr. Storm are conspiracy charges. I will instruct you as to the elements of each charge in just a moment, but before I do, I want to explain the difference between conspiracy charges and substantive charges.

A conspiracy charge, generally speaking, alleges that two or more persons agreed together to accomplish an unlawful objective. The focus of a conspiracy count, therefore, is on whether there was an unlawful agreement. There can be no conspiracy unless at least two people reached such an agreement, whether express or implied, to commit another crime. A substantive charge, by contrast, alleges that one or more persons actually committed an offense.

A conspiracy to commit a crime is an entirely separate and different offense from a substantive crime, even if that substantive crime is the object of the conspiracy. And because the essence of the crime of conspiracy is an agreement or understanding to commit a crime, it does not matter if the crime that was the object of the conspiracy was ever committed.

In other words, if a conspiracy exists and certain other requirements are met, it is punishable as a crime even if its purpose is not accomplished.  Consequently, a conspiracy charge does not require proof that the crime that was the object of the conspiracy was actually committed.

Let me also instruct you on three terms that will come up repeatedly throughout these instructions, particularly when you are evaluating Mr. Storm's state of mind: unlawfully, knowingly, and willfully.

The term "unlawfully" simply means contrary to law.  A defendant need not have known that he or she was breaking any particular law, but he or she must have been aware of the generally unlawful nature of his or her acts.

A person acts "knowingly" when they act voluntarily and deliberately rather than mistakenly or inadvertently.  In other words, a person acts knowingly if he acts intentionally and voluntarily and not because of ignorance, mistake, accident, or carelessness.

To act "willfully" means to act knowingly and with a wrongful purpose to either disobey or disregard the law.  A defendant need not have known that he or she was breaking a specific law or a specific statute—he or she need only have been aware of the generally unlawful nature of their act, and must act with the intent to do something the law forbids.

The question of whether a person acted unlawfully,

knowingly, or willfully is a question of fact for you to determine, like any other fact question.  This question involves one's state of mind.  Direct proof of knowledge is almost never available.  It would be a rare case where it could be shown that a person wrote or stated that as of a given time in the past they committed an act with the requisite state of mind.  Such direct proof is not required.  The ultimate facts of knowledge and criminal intent, though subjective, may be established by circumstantial evidence, based upon a person's outward manifestations, their words, their conduct, their acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn therefrom.

What is referred to as drawing inferences from circumstantial evidence is no different from what people normally mean when they say, "use your common sense."  Using your common sense means that, when you come to decide whether Mr. Storm possessed or lacked a certain state of mind, you do not limit yourself to what he said, but you also look at what he did and what others did in relation to him and, more generally, everything that occurred.  As I have previously instructed you, circumstantial evidence, if believed, is of no less value than direct evidence.  But in any case, the essential elements of the particular crime charged against Mr. Storm must be proven by the government beyond a reasonable

doubt.

Related to the question of whether a person acted unlawfully, knowingly, or willfully are the concepts of "conscious avoidance" and "good faith."  I will instruct you further on those concepts later in this charge.  Let me add that the government need not prove that a criminal intent was a defendant's only intent.  A defendant may have the required criminal intent even if the defendant was motivated by other lawful purposes as well.  The government must prove beyond a reasonable doubt, however, that Mr. Storm acted with the requisite intent.

Count One charges Mr. Storm with participating in a conspiracy to commit money laundering between in or around September 2020 and on or about August 8, 2022, in violation of Title 18, United States Code, Section 1956(h).  The relevant portion of the money laundering statute, Title 18, United States Code, Section 1956(a)(1)(B)(i), states that:

Whoever, knowing that the property involved in the financial transaction represents the proceeds of some form of unlawful activity, conducts, or attempts to conduct such a financial transaction which in fact involves the proceeds of a specified unlawful activity . . ., knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, [commits a

P7U1STO6                        Charge

crime].   Section 1956(h) of the statute further provides in relevant part that any person who conspires to commit any offense defined in this section . . . [commits a crime].

(Continued on next page)

THE COURT:  In order to satisfy its burden of proof on Count One, the government must prove the following two elements beyond a reasonable doubt:

First, that the conspiracy charged in Count One of the indictment existed, that is, that there was an agreement or understanding between two or more people to commit the crime of money laundering; and

Second, that Mr. Storm knowingly and willfully became a member of the charged conspiracy with the intent to further its illegal purpose, that is, with the intent to achieve the object of the charged conspiracy.

I will now instruct you separately on each of these elements.

To begin, the government must prove beyond a reasonable doubt that there was an agreement between at least two people to accomplish the money laundering offense that was charged as the object of the Count One conspiracy.

To show that there was such an agreement, the government is not required to provide evidence that two or more people sat around a table and entered into a solemn pact orally or in writing, stating that they had formed a conspiracy to violate the law and spelling out all the details.  It would be quite extraordinary if there were such a formal document or specific oral agreement in most conspiracy.

Common sense will tell you that when people in fact

undertake or agree to enter into a criminal conspiracy.  Much is left to the unexpressed understanding.

Conspirators do not usually reduce their agreements to writing.  They do not typically publicly broadcast their plans. By its very nature, a conspiracy is almost always secret in its origin and execution.  Thus, it is rare that a conspiracy can be proven by direct evidence of an explicit agreement.

Similarly, express language or specific words are not required to indicate assent or agreement to form the conspiracy.  Instead, it is enough if two or more people, in some way or manner, explicitly or implicitly, came to an understanding to violate the law.

In determining whether there was an agreement as charged in Count One, you may infer the existence of the conspiracy from the circumstances of the case and the conduct of the parties involved if you find that the evidence justifies such an inference.

For the crime of conspiracy, actions often speak louder than words.  In this regard you may, in determining whether an agreement existed, consider the actions and statements of each alleged co-conspirator as proof of whether a common design existed to act together to accomplish an unlawful purpose.  This is because when people enter into a conspiracy, they become agents or partners of one another in carrying out this crime.  Therefore, as I just said, in determining the

factual issues before you, you may take into account any acts done or any statements made by any of the alleged co-conspirators during the course of the conspiracy, even if such acts or statements were made outside of Mr. Storm's presence or without his knowledge.

However, before you may consider the statements or acts of an alleged co-conspirator in deciding the issue of Mr. Storm's guilt of Count One, you must first determine that the acts were done and the statements were made during the existence, and in furtherance of, the charged conspiracy. If the acts were done, or the statements made, by someone whom you do not find to have been a member of the conspiracy, or if any such acts or statements were not done or said in furtherance of the conspiracy, then you may not consider them as evidence against Mr. Storm as to the charged conspiracy.

It is sufficient to establish the existence of the conspiracy if, after considering all of the relevant evidence, you find beyond a reasonable doubt that the minds of at least two alleged conspirators met in an understanding way, and that they agreed, as I have explained, to work together to accomplish the money laundering object charged in Count One. In short, the government must prove beyond a reasonable doubt that at least two alleged conspirators came to a mutual understanding, either spoken or unspoken, to violate the law.

The second part of the first element relates to the

P7U5sto7                          Charge

object or goal of the conspiracy.  As I noted earlier, you may find a defendant guilty of the crime of conspiracy even if you find that the substantive crime that was the object of the conspiracy was not actually committed.  The government must prove beyond a reasonable doubt, however, that the conduct on which the conspirators agreed, included all of the elements of the substantive crime, even if the substantive crime did not actually occur.

The object of the conspiracy charged in Count One is money laundering.  As I mentioned a few moments ago, the object of the conspiracy charged in Count Two is operating an unlawful money transmitting business.  The object of the conspiracy charged in Count Three is the violation of the IEEPA.  I will explain the law regarding each of these objects later in my instructions.

If you conclude that the government has proven beyond a reasonable doubt that the conspiracy charged in Count One of the indictment existed and that the conspiracy had, as its object, the money laundering offense charged in the indictment (which I will address shortly), then you must determine the second question:  Whether Mr. Storm participated in the conspiracy with knowledge of its unlawful purpose and with the intent of furthering its objective.

The government must prove beyond a reasonable doubt that Mr. Storm unlawfully, knowingly, and willfully entered

P7U5sto7                         Charge

into the conspiracy charged in Count One and that he agreed to take part in the conspiracy to promote and cooperate in its unlawful objective.  I have defined these terms for you previously.

It is not necessary for the government to show that a defendant was fully informed as to all the details of the conspiracy in order for you to infer knowledge on his or her part.  To have guilty knowledge, a defendant need not have known the full extent of the conspiracy or all of the activities of all of its participants.  It is not even necessary for a defendant to know every other member of the conspiracy.

The duration and extent of a defendant's participation has no bearing on the issue of his or her guilt.  He or she need not have joined the conspiracy at the outset.  The defendant may have joined it for any purpose at any time in its progress and he or she will be held responsible for all that was done before he or she joined and all that was done during the conspiracy's existence while he or she was a member.

Each member of a conspiracy may perform separate and distinct acts and may perform them at different times.  Some conspirators may play major roles while others play minor roles in a scheme.  An equal role or an important role is not what the law requires.  In fact, even a single act can be sufficient to make a defendant a participant in an illegal conspiracy.

P7U5sto7                            Charge

However, I want to caution you that a person's mere association with a member of a conspiracy does not make that person a member of the conspiracy, even when that association is coupled with knowledge that a conspiracy is taking place. Mere presence at the scene of a crime, even coupled with knowledge that a crime is taking place, is not sufficient to support a conviction.

In other words, knowledge without agreement and participation is not sufficient. What is necessary is that Mr. Storm joined in the conspiracy with knowledge of its unlawful purpose and with an intent to aid in the accomplishment of that purpose.

In sum, the prosecution must prove beyond a reasonable doubt that Mr. Storm -- with an understanding of the unlawful character of the conspiracy -- knowingly and willfully engaged, advised, or assisted in the conspiracy for the purpose of committing money laundering. He thereby became a knowing and willing participant in the unlawful agreement, that is to say, a conspirator.

Count One charges Mr. Storm with conspiring to violate Title 18, United States Code, Section 1956(a)(1)(B)(1). That statute makes it illegal to participate in a final transaction that involves the proceeds of a specified unlawful activity -- here (a) computer fraud and abuse; and (b) wire fraud; knowing that the transaction involves the proceeds of some form of

unlawful activity, and knowing that the transaction was designed to conceal or disguise the nature, location, source, ownership or control of those proceeds.  This type of money laundering is known as concealment money laundering.

In order to prove the existence of the conspiracy to commit money laundering charged in Count One, the government must establish beyond a reasonable doubt that Mr. Storm agreed with one or more people:

First, to conduct a financial transaction that in some way or degree affected interstate or foreign commerce;

Second, to conduct the financial transaction with property or funds that involved the proceeds of a specified unlawful activity;

Third, to engage in the financial transaction with knowledge that the transaction involved the proceeds of some form of unlawful activity; and

Fourth, to engage in the financial transaction knowing that the transaction was designed, in whole or in part, either to conceal or to disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity.

The government must first prove beyond a reasonable doubt that Mr. Storm conspired with one or more people to conduct a financial transaction.

To conduct includes initiating, concluding or

participating in initiating or concluding a transaction.

The term "financial transaction" means a transaction that involves the movement of funds by wire or other means and in any way or degree affects interstate or foreign commerce.

The term "funds" includes any currency, money, or other medium of exchange that can be used to pay for goods and services, including digital or cryptocurrency.

The term "interstate or foreign commerce" means commerce between any combination of states, territories, or possessions of the United States, or between the United States and a foreign country.  In determining whether a defendant is engaged in or whether his or her actions -- activities affected interstate or foreign commerce, the involvement in interstate or foreign commerce can be minimal.  Any involvement at all will satisfy this element.  In addition, you do not have to decide whether the effect of a transaction on interstate or foreign commerce was harmful or beneficial to a particular business or to commerce in general.  The government satisfies its burden of proving an effect on interstate or foreign commerce if it proves any effect, whether it was harmful or not.

In addition, it is not necessary for the government to show that the conspirators actually intended or anticipated an effect on interstate or foreign commerce by their actions, or that commerce was actually affected.  All that is necessary is

that the natural and probable consequences of their acts would affect interstate or foreign commerce.

The government must next prove beyond a reasonable doubt that Mr. Storm conspires with one or more people to conduct a financial transaction that involved the proceeds of a specified unlawful activity.

The term "proceeds" means any property derived, directly or indirectly, from some form of unlawful activity including the gross receipts of such activity.  Proceeds can be any kind of property, not just money.  Proceeds can be in the form of funds, which as I defined for you earlier, includes digital or cryptocurrency.

The term "specified unlawful activity" means any one of a variety of offenses defined by the money laundering statute.  In this case, the government has alleged that the funds in question stemmed from certain cybercrimes including hacking and internet fraud schemes and were the proceeds of computer fraud and abuse and wire fraud.  I instruct you as a matter of law that both computer fraud and abuse, and wire fraud, fall within the definition of a specified unlawful activity.  However, it is for you to determine whether the funds at issue here were the proceeds of computer fraud and abuse or wire fraud.  The government must prove that the financial transaction in fact involved the proceeds of one or both of these specified unlawful activities.

If the government proves that the proceeds of a specified unlawful activity were mixed or co-mingled in the Tornado Cash pools with other funds that did not derive from criminal activity and that the mixing or co-mingling of these funds facilitated the concealment of the criminal proceeds, then any financial transaction involving the Tornado Cash pools while they contained mixed or co-mingled criminal proceeds is a transaction involving the proceeds of a specified unlawful activity.

I will now instruct you on the elements of computer fraud and abuse, which is the first specified unlawful activity alleged in Count One.  The elements of computer fraud and abuse are:

First, that a person knowingly accessed a protected computer without authorization;

Second, that the person did so with the intent to defraud; and

Third, that in furtherance of the scheme, the person obtained something of value.

The first element of computer fraud and abuse is that the person knowingly accessed a protected computer without authorization.  I have defined the term "knowingly" for you previously and you should use that definition here.  "Computer" means an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical

P7U5sto7                          Charge

arithmetic or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

The computer accessed must be a protected computer. A protected computer means any computer that is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States. I have previously defined "interstate or foreign commerce" and you should apply that definition here. This definition of protected computer includes any computer that is connected to the internet.

Accessing a computer includes both obtaining information from a computer and making use of a computer and its capabilities.

A person acts without authorization under this element where he or she accesses a computer without any right or permission to do so.

The second element of computer fraud and abuse is that the person accessed the protected computer with the intent to defraud. To act with the intent to defraud means to act willfully, a term I have previously defined, and with the intent to deceive, for the purpose of causing some loss of money or property to another.

The third element of computer fraud and abuse is that

the person used the computer to further the fraud, and as a result, obtained something of value.

I instruct you, however, that if all the person obtained was the use of the computer and that the value of such use is not more than $5,000 in any one-year period, the government has not proven that the person committed computer fraud and abuse.

I will next instruct you on the elements of wire fraud which is the second specified unlawful activity alleged in Count One.

The elements of wire fraud are as follows:

First, that there was a scheme or artifice to defraud or to obtain money or property by materially false or fraudulent pretenses, representations, or promises;

Second, that one or more persons knowingly and willfully participated in this scheme or artifice with knowledge of its fraudulent nature and with the specific intent to defraud; and

Third, that in the execution of that scheme, the person or persons involved in the scheme used or caused others to use interstate or foreign wire communications.

The first element of wire fraud is the existence of a scheme or artifice to defraud others of money or property by means of false or fraudulent pretenses, representations, or promises.  A "scheme or artifice to defraud" is any plan,

device, or course of action to obtain money or property by means of false or fraudulent pretenses, representations, or promises.

"Fraud" is a general term.  It is a term that includes all the possible means by which a person seeks to gain some unfair advantage over another person by intentional misrepresentations, false suggestion, or false pretenses.  The unfair advantage sought must involve money or property, that is, the government must prove that the alleged scheme contemplated depriving another of money or property.  Thus, a scheme to defraud is merely a plan to deprive another of money or property by trick, deceit, deception, or swindle.  The scheme to defraud here is alleged to have been carried out by making false or fraudulent statements, representations, and promises.

A statement, representation, or promise is false if it was untrue when made and was then known to be untrue by the person making it or causing it to be made.  A representation or statement is fraudulent if it was falsely made with the intention to deceive.  Deceitful statements or representations of half truths may also constitute false or fraudulent statements under the statute.  The false representations and pretenses must be material.

We use the word "material" to distinguish between the kinds of statements we care about and those that are of no real

importance.  A material fact is one that reasonably would be expected to be of concern to a reasonable and prudent person relying on the representation or statement in making a statement.  That means if you find a particular statement of fact to have been untruthful, before you can find that statement to be material you must also find that the statement was one that would have mattered to a reasonable person in making such a decision.

It is not necessary, however, for the government to establish that any particular person actually relied on or actually suffered damages as a consequence of any false statement or omission of any material fact.  That is, it is not necessary for the government to establish that the scheme actually succeeded, that persons realized any gain from the scheme, or that the intended victim suffered any losses.  You must concentrate on whether there was such a scheme, not on the consequences of the scheme.

A scheme to defraud need not be shown by direct evidence but may be established by all the circumstances and facts in the case.

The second element of wire fraud requires the government to prove that the person or persons involved in the fraud knowingly and willfully devised or participated in the scheme or artifice to defraud with a specific intent to defraud others of money or property.  To devise a scheme to defraud is

to concoct or plan it.  To participate in a scheme to defraud means to associate oneself with it with a view and intent toward making it succeed.  I have previously defined the terms knowingly, willfully, and intent to defraud earlier in this charge and you should apply those definitions equally here.

The third element of wire fraud requires the government to prove the use of interstate or foreign wire communications.  Wires include telephones, faxes, e-mail, internet communication, radios and television.  A wire communication also includes a wire transfer of funds between banks in different states.  "Interstate" just means that a wire communication passes between two or more states.  And "foreign" just means that a wire communication passes between the United States and somewhere outside the United States.  That is, a foreign wire communication still has a domestic connection to the United States.

The use of the wire need not itself be fraudulent. Stated another way, the wire communication need not contain any fraudulent representation or even any request for money.  It is sufficient if a wire is used to further or assist in carrying out the scheme to defraud.

With regard to the two specified unlawful activities charged in Count One, I instruct you that it is unimportant whether a victim might have discovered the fraud had he or she probed further.  If you find that a scheme or artifice to

defraud existed, it is irrelevant whether you believe that a victim was careless, gullible, or even negligent.  Negligence, carelessness or gullibility on the part of victims is no defense to a charge of such fraud.

The third element of the money laundering offense that is the object of the conspiracy charged in Count One is that Mr. Storm knew that the property involved in the financial transaction was the proceeds of some form of unlawful activity. That is, Mr. Storm must have known that the property involved in the transaction represented proceeds from some form of activity that constitutes a felony under state, federal, or foreign law.

To satisfy this element, the government does not need to prove that Mr. Storm participated in committing the unlawful activity.  In addition, the government does not need to prove that Mr. Storm specifically knew that the property involved in the transaction represented the proceeds of computer fraud and abuse, wire fraud, or any other specific offense.  The government only has to prove that Mr. Storm knew that it represented the proceeds of some illegal activity that was a felony.  I instruct you as a matter of law that computer fraud and abuse and wire fraud are felonies under federal law.

Finally, the government must prove beyond a reasonable doubt that Mr. Storm conspired with one or more people to conduct the financial transaction at issue, knowing that the

P7U5sto7                        Charge

transaction would be designed, in whole or in part, to either conceal or disguise a specific attribute of the funds such as their nature, location, source, ownership, or control.

In other words, the purpose, and not merely the effect of the transaction, must be in whole or in part, to conceal or disguise the proceeds' nature, location, source, ownership or control.  Thus, if Mr. Storm knew that the transaction was designed, at least in part either to conceal or to disguise the true nature, location, source, ownership, or control of the property in question, this element is satisfied.  However, if you find that Mr. Storm knew of the transaction but did not know that it was designed, in whole or in part, to conceal or disguise the true origin of the property in question, then this element has not been satisfied.

Here, too, Mr. Storm need not know which specific unlawful activity -- specified unlawful activity he was agreeing to help conceal.  He need only know that a purpose of the financial transaction was concealing the nature, location, source, ownership, or control of the funds.

Count Two charges Mr. Storm with conspiring to operate an unlicensed money transmitting business in violation of Title 18, United States Code, Section 371, which makes it unlawful to conspire to violate Title 18, United States Code, Section 1960(a).  That latter section reads:

Whoever knowingly conducts, controls, manages,

supervised, directs, or owns all or part of an unlicensed money transmitting business, commits a crime.

In order to sustain its burden of proof with respect to the conspiracy charged in Count Two, the government must prove each of the following three elements beyond a reasonable doubt:

First, that the charged conspiracy existed, that is, there was an agreement or understanding between two or more people to commit the object of the conspiracy, which, for Count Two, is the operation of an unlicensed money transmitting business;

Second, that Mr. Storm knowingly and willfully became a member of the conspiracy with the intent to further its illegal purpose; and

Third, that any member of the conspiracy knowingly committed at least one overt act in furtherance of the conspiracy.

I previously instructed you in connection with Count One on the law relevant to determining whether a conspiracy existed and whether a defendant became a member of such a conspiracy. You should apply those instructions in considering the first two elements of the conspiracy charged in Count Two as well.

The object of the conspiracy charged in Count Two is operating an unlicensed money transmitting business in

violation of Title 18, United States Code Section 1960.  Thus, in order to prove that Mr. Storm is guilty of the conspiracy offense charged in Count Two, the government must establish beyond a reasonable doubt that Mr. Storm agreed with one or more people to operate an unlicensed money transmitting business.  I remind you that the government must prove beyond a reasonable doubt that the conduct on which the conspirators agreed included all of the elements of the substantive crime, even if the substantive crime did not actually occur.

The crime of operating an unlicensed money transmitting business has three elements:

First, that an unlicensed money transmitting business existed;

Second, that Mr. Storm or a co-conspirator controlled, conducted, managed, supervised, directed, or owned all or part of that business with knowledge that it was used as a money transmitting business; and

Third, that operation of the money transmitting business affected interstate or foreign commerce.

I will now explain each of these elements.

The first element of the object of the conspiracy charged in Count Two is that the business in question was an unlicensed money transmitting business.  The term "money transmitting" includes transferring money on behalf of the public, by any and all means, including but not limited to,

transfers within the United States or to locations abroad, by wire, check, draft, facsimile or courier.

As I instructed you earlier, the term "funds" includes any currency, money, or other medium of exchange that can be used to pay for goods and services including digital or cryptocurrency.

A "business" is an enterprise that is carried on for profit or financial gain.  Thus, a single isolated transmission of money is not a business under this definition.  However, a business need not have a physical storefront, be formally incorporated, or otherwise operate in a conventional manner in order to be a money transmitting business.  There is also no requirement under the law that the business exist solely for the purpose of engaging in money transmitting.

The money transmitting business must also be unlicensed.  Under Section 1960, a money transmitting business is unlicensed if the business involves the transportation or transmission of funds that are known to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

The government has the burden to prove that Mr. Storm knew that the business involved the transportation or transmission of funds that were derived from a criminal offense or intended to be used to promote or support unlawful activity.

The second element of the object of the conspiracy

charged in Count Two is that Mr. Storm agreed with others to operate such an unlicensed money transmitting business.  In this context, to "operate" an unlicensed money transmitting business means to conduct, control, manage, supervise, direct, or own part or all of an unlicensed money transmitting business.

The government need not prove that Mr. Storm in fact actually operated an unlicensed money transmitting business, only that he knowingly and willfully joined a conspiracy knowing that the object of the conspiracy was to conduct, control, manage, supervise, direct, or own all or part of an unlicensed money transmitting business.

The third and final element of the object of the conspiracy charged in Count Two is that the operation of the unlicensed money transmitting business had some effect on interstate or foreign commerce.  I have previously instructed you on the meaning of "interstate or foreign commerce" and you should apply that instruction here.

If you conclude that the government has proven beyond a reasonable doubt that the conspiracy to operate an unlicensed money transmitting business charged in Count Two of the indictment existed, and that Mr. Storm knowingly and willfully joined the conspiracy with knowledge of its unlawful purpose and in furtherance of its unlawful objective, then you must consider the third element of the conspiracy charged in Count

Two:  Whether the government has proven beyond a reasonable doubt that at least one of the conspirators committed at least one overt act in furtherance of the conspiracy.

The overt act element is a requirement that the agreement went beyond the mere talking stage, that one or more actual steps was taken in furtherance of the conspiracy's illegal object.  You need not find that each and every member of the conspiracy committed or participated in the overt act, or that Mr. Storm personally did so.  It is enough to find that at least one overt act was committed by at least one member of the conspiracy.

For the government to satisfy the overt act requirement it is not necessary for the government to prove all of the overt acts alleged in the indictment, or even any of the overt acts contained in the indictment.  Indeed, you may find that overt acts were committed that were not alleged at all in the indictment.  It is sufficient for the government to show that Mr. Storm, or one of his alleged co-conspirators, knowingly committed an overt act, whether specifically charged in the indictment or not, in furtherance of the conspiracy. You also need not be unanimous as to which particular overt act was committed in furtherance of the conspiracy.  However, you need to be unanimous that at least one overt act was so committed.

The overt act must have been knowingly done by at

least one conspirator in furtherance of some unlawful object of the conspiracy. In considering this element, you should bear in mind that an overt act, standing alone, may be an innocent lawful act. Frequently, however, an apparently innocent act sheds its harmless character if it is a step in carrying out, promoting, aiding, or assisting the conspiratorial scheme. You are therefore instructed that the overt act does not have to be an act that, in and of itself, is criminal or constitutes an object of the conspiracy.

Count Three of the indictment charges Mr. Storm with conspiring to violate the International Emergency Economic Powers Act, which I have previously referred to as the IEEPA. This charge is brought under Title 50, United States Code, Section 1705 which prohibits conspiracies to violate the IEEPA.

There are two elements to the conspiracy charged in Count Three:

First, the government must prove beyond a reasonable doubt that the conspiracy charged in Count Three existed; and

Second, the government must prove beyond a reasonable doubt that Mr. Storm knowingly and willingly became a member of the conspiracy with the intent to further its illegal purpose.

I instruct you that, like Count One and unlike Count Two, there is no requirement that the government prove that any co-conspirator committed an overt act in furtherance of the conspiracy charged in Count Three.

Once again, I remind you that the government must prove beyond a reasonable doubt that the conduct on which the conspirators agreed included all of the elements of the substantive crime, even if the substantive crime did not actually occur.

I have previously instructed you in connection with Count One on the law relevant to determining whether a conspiracy existed and whether a defendant became a member of such a conspiracy. You should apply those instructions in considering the first two elements of the conspiracy charged in Count Three as well.

As noted, the object of the conspiracy charged in Count Three is to violate the IEEPA.

As charged in the indictment, the government must prove beyond a reasonable doubt that Mr. Storm conspired with one or more people to provide, or to cause other U.S. persons to provide funds, goods, or services to, by, or for the benefit of the Lazarus Group. U.S. persons in this setting includes any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States including foreign branches, and any person in the United States.

This object, in turn, has the following elements:

First, the violation of any license, order, regulation or prohibition issued pursuant to the IEEPA;

P7U5sto7                          Charge

Second, that the violation was committed willfully; and

Third, that during the period alleged in the indictment, Mr. Storm and his co-conspirators had not obtained authorization from the U.S. government to provide services to the Lazarus Group.

The object of the conspiracy charged in Count Three is alleged to have involved a violation of a regulation or prohibition issued pursuant to the IEEPA.  I am now going to describe for you the regulations and prohibitions that are relevant in this case, particularly to the first and third elements of the object of the conspiracy.

You have heard a stipulation of facts between the parties that bears on Count Three.  I instruct you that at all times relevant to the conspiracy charged in Count Three, regulations issued pursuant to the IEEPA provided certain restrictions on U.S. persons in dealing with persons that the Secretary of the Treasury had determined to be an agency, instrumentality, or controlled entity of the government of North Korea, in part by placing certain individuals and entities on what is known as a Specially Designated National, or "SDN," list.  I further instruct you that at all times relevant to the conspiracy charged in Count Three, the Secretary of the Treasury's Office of Foreign Assets Control, or "OFAC," had designated the Lazarus Group as an agency,

P7U5sto7                            Charge

instrumentality, or controlled entity of the government of North Korea and placed it on the SDN list.

On April 14, 2022, OFAC publicly announced that it was updating its designation of the Lazarus Group as an SDN to include a cryptocurrency wallet address beginning with the characters 0X098B716 (the 0X098B716 address).  Finally, the parties have stipulated that at all times relevant to the conspiracy charged in Count Three, OFAC had not issued a license to Roman Storm, Roman Ganchenko, Roman Semenov, Alexey Pertsev, Tornado Cash, or Peppersec, that would allow the recipient of the license to engage in transactions that would otherwise be prohibited under the IEEPA.

I further instruct you that, under the regulations, U.S. persons may not provide or cause others to provide funds, goods, or services to the Lazarus Group or to the 0X098B716 address without authorization from the U.S. government.

At various points in this charge I have instructed you that the government was required to prove beyond a reasonable doubt that Mr. Storm acted knowingly.  In determining whether he acted knowingly, you may consider whether Mr. Storm deliberately closed his eyes to what otherwise would have been obvious.

For example, if you find that Mr. Storm was aware of a high probability that the object of the particular conspiracy he joined was to commit money laundering (for Count One), or to

operate an unlicensed money transmitting business (for Count Two), or to violate the IEEPA (for Count Three), but that he acted with deliberate disregard of that fact, you may find that Mr. Storm acted knowingly.  The law calls this conscious avoidance.  However, if you find that Mr. Storm actually believed that he and his co-conspirators were acting in a lawful manner, he may not be convicted of the particular conspiracy charge you are considering.

A person cannot look at all sorts of things that make it obvious to any reasonable person what is going on and then claim in court that because he or she deliberately avoided learning explicitly what was obvious anyway, he or she did not actually know the incriminating fact.

I want to be very clear about what this means and does not mean.  For starters, there is a difference between knowingly participating in the conspiracy and knowing the objects of the conspiracy.  Conscious avoidance, as I have described it, cannot be used as a basis for finding that Mr. Storm knowingly joined the conspiracy.  It is logically impossible for a person to join a conspiracy unless he or she knows the fact that the conspiracy exists.  However, if you find beyond a reasonable doubt that Mr. Storm chose to participate in a joint undertaking, you may consider whether he deliberately avoided confirming an otherwise obvious fact or facts.

If you find beyond a reasonable doubt that Mr. Storm was aware that there was a high probability that the objective of his alleged co-conspirators was to commit money laundering (when you are considering Count One), or to operate an unlicensed money transmitting business (when you are considering Count Two), or to violate the IEEPA (when you are considering Count Three), but that he deliberately avoided confirming this fact, you may treat this deliberate avoidance of positive knowledge as the equivalent of knowledge of the object of the charged conspiracy, unless you find that Mr. Storm actually believed that he and his co-conspirators were acting in a lawful manner.

Again, this last point is important.  The necessary knowledge on the part of Mr. Storm regarding the object of the conspiracy cannot be established by showing that he was merely careless or negligent or stupid or foolish, or that he should have known what was going on.  If Mr. Storm actually believed that what the government has charged as a conspiracy was something else entirely -- or if he was merely foolish, careless, or even reckless about the risk that he was wrong -- then you cannot find him guilty.  Conscious avoidance can only be established where a defendant deliberately decided not to confirm a key fact when it was obvious or highly probable that that fact was true.  One may not willfully and intentionally remain ignorant of important facts in order to escape the

consequences of the criminal laws.

If you find that Mr. Storm was aware of a high probability that the object of his conduct and that of his co-conspirators was to violate a federal law, and that he acted with deliberate disregard of these facts, then you may find that he acted knowingly.  However, if you find that Mr. Storm actually believed that the object of his conduct and that of his co-conspirators was lawful, then he may not be convicted. It is entirely up to you whether you find that Mr. Storm deliberately closed his eyes based on any inferences to be drawn from the evidence.

Conversely, because the government must prove that Mr. Storm acted willfully in order to establish his guilt of each count in the indictment, his good faith is a complete defense to each count.  Good faith means having a state of mind that is honest and object of criminal intent.  I say it as a defense but I want to make it clear that a defendant has no burden of establishing his or her good faith.  The burden remains on the government to prove beyond a reasonable doubt that a defendant acted willfully and, consequently, that he or she lacked good faith.

A person who acts or causes another person to act based on a belief that the intended action complies with the law cannot be punished under the statutes relevant to this case merely because that belief turns out to be inaccurate,

incorrect, or wrong.  If a defendant believed in good faith that he or she was acting lawfully, even if he or she was mistaken in that belief, and even if others were harmed by his conduct -- his or her conduct -- there has been no crime. Again, the burden of proving good faith does not rest with Mr. Storm because he does not have an obligation to prove anything in this case.

Whether a person acted in good faith, like whether he acted knowingly or willfully, is a question of fact for you to determine like any other question of fact.

Mr. Storm has pleaded not guilty to all three charges. Mr. Storm contends that he did not agree with anyone to violate the law.  Instead, Mr. Storm contends that he agreed with the Peppersec co-founders to develop privacy software for lawful purposes, and that he never willfully engaged in a conspiracy with anyone with the goal of furthering money laundering, operating an unlicensed money transmitting business, or evading international sanctions.

This is a good time for me to take my 7th inning stretch so I'm going to get up for a moment.  You are welcome to as well.  (Pause)  We resume.

In addition to all of the elements I have just described, you must consider the issue of venue, namely whether any act in furtherance of the charged offenses occurred within the Southern District of New York.  The Southern District of

New York includes Manhattan, the Bronx, and Westchester, Rockland, Putnam, Sullivan and Dutchess Counties.

Venue must be examined separately for each count in the indictment.  Venue on one count does not establish venue on another count, although if applicable, you may rely on the same evidence to establish venue on multiple counts.

With respect to the conspiracy offenses charged in Counts One through Three, it is sufficient to establish venue if the government proves that any act in furtherance of the charged conspiracy you are considering occurred in the Southern District of New York and that it was reasonably foreseeable to Mr. Storm that the act could occur in this district.  The act in furtherance of the charged conspiracy need not be taken by Mr. Storm or a co-conspirator, so long as the act was caused by the conduct of Mr. Storm or a co-conspirator.

I should note that on this issue, and this issue alone, the government's burden is not proof beyond a reasonable doubt but only proof by a preponderance of the evidence.  A preponderance of the evidence means the greater weight of the evidence.  To establish a fact by a preponderance of the evidence means to prove that a fact is more likely true than not true.  If you find that the government has failed to prove venue by a preponderance of the evidence as to any count, you must return a verdict of not guilty as to that count.

For each in the indictment, various date ranges are

alleged.  Specifically, the indictment alleges that the conspiracy charged in Count One existed between in or about September 2020 and in or about August 2022; that the conspiracy charged in Count Two existed between in or about February 2022 and in or about August 2022; and that the conspiracy charged in Count Three existed between in or about April 2022 and in or about August 2022.  It is not essential that the government prove that the conspiracies alleged started and ended within the specific time periods identified in the indictment.  However, you must find with regard to each count, that a conspiracy was formed, and that it existed for some time within the relevant period set forth in the indictment.

This is also a good opportunity to instruct you that it does not matter if a specific event or transaction is alleged to have occurred on or about a certain date and the evidence indicates that it, in fact, it occurred on another date.  The law only requires a substantial similarity between the dates alleged in the indictment and the dates established by the evidence at trial.

You have heard references to certain investigative techniques that were used or not used by the law enforcement authorities in this case.  There is no legal requirement that the government prove its case through any particular means.  While you are to consider carefully the evidence presented by the government, you need not speculate as to why certain

techniques were used or why others were not used.

Your concern is to determine whether, based on the evidence or lack of evidence, the government has proven the guilt of Mr. Storm of a particular charge in the indictment beyond a reasonable doubt.

You are about to go into the jury room and begin your deliberations.  Lists of the witnesses who testified at trial and of the exhibits introduced into evidence will be sent to you in the jury room, along with hard copies of the indictment and electronic copies of all of the exhibits that have been admitted.  In addition, you may take with you your copy of these instructions on the law.

If you want any of the testimony read to you, or given to you in hard copy, that can be done.  But please remember that it is not always easy to locate what you might want, so be as specific as you possibly can in requesting portions of testimony.

Your requests for testimony, in fact any communications with the Court, should be made to me in writing, signed by your foreperson, and given to one of the marshals.  I will respond to any questions or requests you have as promptly as possible, either in writing or by having you return to the courtroom so that I can speak with you in person.  In any communication, please do not tell me or anyone else how the jury stands on the issue of Mr. Storm's guilt, until after a

unanimous verdict is reached.

Juror no. 1, Mr. Lopez, will be the foreperson of the jury unless for any reason he prefers not to act in that capacity.  In that event, your first order of business will be to send me a note, signed and dated, identifying the new foreperson.  The foreperson will send out any notes, and when the jury has reached a verdict, he or she will notify the Marshal that the jury has reached a verdict.  And when you come into open court, the foreperson will be asked to state what the verdict is.

Again, notes should be signed and should include the date and time they were sent.  They should also be as clear and precise as possible.  Any notes from the jury will become part of the record in this case so please be as clear and specific as you can in any notes you send.

Some of you have taken notes during parts of the trial.  Please recall my earlier instruction regarding note-taking.  Notes can be useful to focus a note-taker's attention, and may aid the recollection of the note-taker. Note-taking may, however, distract a note-taker from hearing or seeing other important evidence.  Notes should be used solely to refresh the note-taker's recollection of the testimony and they are not a substitute for the transcript of the testimony which has been taken down verbatim by the court reporters. Just because one juror has taken notes does not mean the notes

are any more accurate than any other juror's recollection.  And please remember that if notes were taken during the lawyers' arguments, lawyers' argument are not evidence.

We have prepared a verdict form for you to use in recording your decision.  After you have reached a verdict, the foreperson should fill in the verdict sheet and note the date and time.  Each of you should then sign the verdict sheet.  The foreperson should then give a note to the Marshal outside your door stating simply that you have reached a verdict.  Do not specify what the verdict is in your note and do not give the verdict sheet to the Marshal.  Instead, the foreperson should retain the verdict sheet and hand it to us in open court when you are all called in.

I will stress again that each of you must be in agreement with the verdict that is announced in court.  Once your verdict is announced by your foreperson in open court, and officially recorded, it cannot ordinarily be revoked.

The most important part of this case, members of the jury, is the part that you as jurors are now about to play as you deliberate on the issues of fact.  It is for you, and you alone, to decide whether the government has proven beyond a reasonable doubt each of the essential elements of each crime with which Mr. Storm is charged.  If the government has succeeded, it is your duty to find Mr. Storm guilty of that charge; if the government has failed, it is your duty to find

Mr. Storm not guilty of that charge.

I know that you will try the issues that have been presented to you according to the oath that you have taken as jurors.  In that oath, you promised that you would well and truly try the issues joined in this case and a true verdict render.  Your function is to weigh the evidence, or the lack of evidence in the case, and determine whether Mr. Storm is guilty or not guilty of each charge in the indictment solely upon the basis of such evidence.

As you deliberate, please listen to the opinions of your fellow jurors and ask for an opportunity to express your own views.  Every juror should be heard.  No one juror should hold center stage in the jury room and no one juror should control or monopolize the deliberations.  If, after listening to your fellow jurors, and if, after stating your own view, you become convinced that your view is wrong, do not hesitate, because of stubbornness or pride, to change your view.  On the other hand, do not surrender your honest convictions and beliefs solely because of the opinions of your fellow jurors or because you are outnumbered.  Your final vote must reflect your conscientious belief as to how the issues should be decided.  Your verdict must be unanimous.  If at any time you are not in agreement, you are instructed that you are not to reveal the standing of the jurors, that is, the split of the vote, to anyone, including the Court, at any time during your

P7U5sto7                          Charge

deliberations.

Finally, I say this not because I think it is necessary, but because it is the custom in this court house to say this:  You should treat each other with courtesy and respect during your deliberations.

All litigants stand equal in this room.  All litigants stand equal before the bar of justice.  All litigants stand equal before you.  Your duty is to decide the issues before you fairly and impartially, and to see that justice is done.

Before you retire into the jury room, I must excuse our alternate jurors with the thanks of the Court.  You have been very attentive and very patient.  I am sorry that you will miss the experience of deliberating with the jury but the law provides for a jury of 12 persons in this case.  So, before the rest of the jury retires into the jury room, if you have any clothing or items there, you are asked to pick them up and to withdraw before any deliberations start.  For the next few days, please refrain from discussing the case with anyone or conducting any research on any anything you have heard about at this trial.  In the event that one of the jurors is unable to complete the deliberation process, you may be called back.

Members of the jury, I ask your patience for a few moments longer.  It is necessary for me to spend a few moments with counsel and the reporter at the side bar.  I will ask you to remain patiently in the jury box without speaking to each

P7U5sto7                        Charge

other, and we will return in just a moment to submit the case to you.

          Thank you.

               (Continued on next page)

(At the sidebar)

THE COURT:  You saw I believe on page 28 that I caught a typo.  I believe that should be "specified unlawful activity," so I said that.

There were a few occasions when I added "his or her."  You saw that throughout.  I didn't think that was objectionable.

I think there might be a mistake.

MR. MOSLEY:  There was one.

THE COURT:  Page 34.  If you rely on the representation, in making a decision.  I don't think it's making a statement.  So I said the word "statement," but I'd like to correct that and say "decision."

MR. REHN:  I had caught that as well, yes.

MR. KLEIN:  That's fine.

THE COURT:  Okay.  And then are there other things that you saw?

MR. REHN:  That was the only thing I noticed.  I didn't know if the Court wanted to remind them about the recharge part.

THE COURT:  I will, I will.  But we have bigger fish to fry.  During the charge, during the administration of the charge, the CSO did not allow certain people into the courtroom, misunderstanding what I had said earlier.  You know when I got up to leave, I said, go, stay, but please don't

leave.  I believe you heard me say that.  I don't want you to leave in the middle of charge because it's very distracting to the jury.  The CSO completely misunderstood it and kept some people out.  So Ms. Noriega tells me that for some period of time the CSO kept folks out of this room.  When Ms. Noriega saw him doing that, she immediately went to him and it stopped.  I cannot say how long it lasted.  A couple minutes?

THE DEPUTY CLERK:  I would say maybe three minutes by the time I got to the back and spoke to him and got them to come inside.

THE COURT:  It's a courtroom closure issue, but I wanted you to know about it, but I wanted to you to know that as soon as she saw it, it was remedied after a few minutes. Anyone want to put anything on the record about it?

MR. KLEIN:  Not from the defense, your Honor.

MR. REHN:  Nothing from the government.

THE COURT:  Okay.  So I'm going to make this change to page 41.  I'll tell them about it.

I'm going to tell them to not look at any media reports.

I'm going to tell them that they can go directly to the jury room tomorrow; however, they cannot begin deliberating until the 12 of them are there.

And I think there was one other issue.

I imagine we're not going to have deliberations right

P7U1STO8                         Charge

now.

THE DEPUTY CLERK:  I was going to say you mentioned letting them leave at any time they want and starting whatever time they want.

THE COURT:  Well, I'd like them to start at 9, but they can leave when they want.

MR. KLEIN:  Will we know that in the morning when they come?

THE COURT:  The Marshals will let us know.

Oh, there was one other thing I wanted to tell them. Your firm tomorrow, I have a guilty plea at 11:30.  No?  12. 12.  I want them to understand that I have a criminal conference tomorrow and that if I am delayed in responding to them——if you prefer I not say a criminal conference, I can say I have a conference tomorrow I cannot move, and it needs to happen, but if I am delayed in responding, it is because of that conference.  Would you prefer I not to——

MR. KLEIN:  I would prefer conference.

MR. REHN:  That's fine with the government.

THE COURT:  It's a guilty plea, and I'm not going interrupt a guilty plea, even to take a verdict.  I'm sorry.

Okay.  So those are the three things I plan to tell them.

And then Ms. Noriega, they'll go back to the jury room and probably just leave from there?  They can stay later.

P7U1STO8                         Charge

THE DEPUTY CLERK:  I was going to ask if you want to dismiss them from the jury room and then I just come back in and tell everybody that I have gone for the day, or if you want to bring them back in and dismiss them for the night.

THE COURT:  I guess I'd like to know if our foreperson is going to be our foreperson, so I think I'd like one note from our foreperson, whoever that may, telling us either that they decided to stay or they've decided to go.  If they decide to go, do I have your permission to go and dismiss them from their room?

MR. KLEIN:  Yes, your Honor.

MR. REHN:  Yes.

MR. KLEIN:  Your Honor, can I look at the statement. I'm sure you're fine.  I just——thank you.

THE COURT:  Of course.  It makes more sense if you read the whole paragraph.

MR. KLEIN:  Yes, your Honor.  Yes.

THE COURT:  Okay.  Thank you.  And I'm sorry that the many of us didn't catch that before.

Okay.  Let's go then and we'll instruct the jury.

(In open court)

THE COURT:  Okay.  Members of the jury, I'm going to ask you to turn to page 41 of the charge that you've seen, because a couple of you saw me make a few changes, adding a "his or her," just to be inclusive.  But there is an actual

P7U1STO8                              Charge

error on page 41, and if you get there, it's the paragraph that begins, "The false representations."  I'm going to read the third sentence, and the last word of it is incorrect, so I'm going to read it with the correct word.

A material fact is one that reasonably would be expected to be of concern to a reasonable and prudent person relying on the representation or statement in making a decision, not in making a statement.  So that's one.  And I was grateful to the parties, we caught that error.

So now you've been properly instructed.  So let's talk about deliberations.

We're going to release you in a moment to begin to deliberate.  Of course our friends who are the alternates will take their time, and you can say your good-byes to them, they can remove their things.  Also, I too can see the time of day, and I will understand if the foreperson——Mr. Lopez or someone else if he wishes not to be——writes me a note very shortly saying, we are done, we would prefer to resume deliberations tomorrow.  You also have the right, if you want to, to continue to stay tonight.  As I said to you before, you decide.  But we're going to wait for your note in some period of time to let us know whether you're going forward or whether you're done for the day.  And either answer is correct.

Let me just give you a few other points about deliberating.

Given where we are in the trial right now——we're in deliberations——I'm going to emphasize again that you should not look at any media or press coverage of this case, if there is any.  And just to be safe, if you see any articles or news clips about cryptocurrency issues, just don't look at them for now.  Let's get this case over with.  Because there's no reason for you to.  You have all the evidence you need right here.

Let me also say that tomorrow morning you can resume deliberating when the 12 of you are in the jury room.  But if there's 11 of you or some number less than 12, you're just that number of people talking.  You cannot deliberate until all 12 of you are in the room.  So if one of you needs to absent yourself to make a phone call or use the bathroom or do something, you stop, and you resume again when there are 12 of you.

One other thing just for you to know.  Shockingly, I have other cases.  I have a conference tomorrow at 12 noon. That doesn't affect you in any way.  I'm just telling you.  And it might even move.  The time might move.  What I'm saying is, if I am delayed in responding to you, it may be because I have another matter that I just can't get myself out of.  So I'm going to ask for your patience on that front.

Looking at the parties and seeing no other instructions to give, Ms. Noriega, is it time to swear in the Marshal?

P7U1STO8                        Charge

THE DEPUTY CLERK:  Yes, your Honor.

Will the Marshal please step forward.

(Marshal sworn)

THE DEPUTY CLERK:  Thank you.  Please step forward.
All rise.

THE COURT:  Members of the jury, I give you slightly different instructions this evening.  You do have all of the evidence you need, but you're still not to discuss this case with anyone other than your fellow jurors, and even then, only when you're deliberating.

Have a good evening, and thank you.

(At 5:14 p.m., the jury retired to deliberate)

THE COURT:  Counsel, is there anything to discuss this evening?

Okay.  Get some rest.  Thanks, everyone.  We'll see you tomorrow morning.

MR. REHN:  Should we wait for the note?

THE COURT:  Oh, yeah, we should wait for the note.
Well, get some rest here.

MR. REHN:  As much as I'd love to——

THE COURT:  All right.  I'll be right back there.
You're correct.

(Recess)

THE COURT:  Thank you very much, and please be seated.

I quickly received a note, signed by Mr. Lopez.  The

P7U1STO8                    Charge

note reads as follows:

"We will retire for tonight and will resume tomorrow at 9 a.m."  It is dated and timed July 30, 2025, at 5:17 p.m.

Ms. Noriega, have we given this a Court Exhibit No.? Should it be 1 or——I think it's going to end up being——you'll excuse us.  I think we have to mark the charge, the verdict form, and things like that.  So Court Exhibit to be determined, number to be determined later, but everyone has seen it.

So with your consent, I will let them go for the night, and then I will let you go for the night.  And we'll resume at 9 a.m. tomorrow.  Sleep well, everyone.  Thank you.

Something to add, Mr. Klein?

MR. KLEIN:  No.  We just talked to Ms. Noriega about giving her our phone numbers.

THE COURT:  Oh, thank you very much.  Please do that.

THE DEPUTY CLERK:  All rise.

(Adjourned to July 31, 2025, at 9:00 a.m.)