UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 23 Cr. 430 (KPF)

ROMAN STORM,

Defendant. Jury Trial
------------------------------x

New York, N.Y.
August 6, 2025
8:45 a.m.

Before:

HON. KATHERINE POLK FAILLA,

U.S. District Judge

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
BY: NATHAN M. REHN, ESQ.
BEN ARAD, ESQ.
BENJAMIN A. GIANFORTI, ESQ.
KEVIN G. MOSLEY, ESQ.
TARA M. LA MORTE, ESQ.
Assistant United States Attorneys

WAYMAKER LLP
Attorneys for Defendant
BY: BRIAN E. KLEIN, ESQ.
KERI CURTIS AXEL, ESQ.
KEVIN M. CASEY, ESQ.
VIVIANA ANDAZOLA MARQUEZ, ESQ.

-and-

HECKER FINK LLP
Attorneys for Defendant
BY: DAVID E. PATTON, ESQ.
CHRISTOPHER MOREL, ESQ.

(Trial resumed; jury not present)

THE COURT: Good morning, everyone. Thank you very much. Please, be seated.

We received a note, it's timed 9:17 this morning. I am marking it as Court Exhibit 26 because I believe that is the next number in sequence, and it reads:

Dear Judge, While we made progress yesterday, we are deadlocked on some of the counts. We do not believe that after four days of deliberations that a unanimous agreement is possible. Please advise.

And it is signed by the foreperson.

Mr. Arad?

MR. ARAD: Your Honor, the government's view is that given the amount of time the jury has been deliberating and even recognizing that the four days weren't four full days, the jury has been at it for quite some time and at this point an Allen charge would be appropriate.

THE COURT: I am not disagreeing with you just yet but they did say that after -- I just wonder, is there a significance to the fact that they say that after four days of deliberations -- I suppose in fairness, Wednesday was not five minutes; Thursday was a full day; Monday was a full day, yesterday was a half day so it is not quite four days of deliberations.

MR. ARAD: Right. We have counted something in the

neighborhood of about 14 hours of deliberations, your Honor.

THE COURT: All right. And on that, why do you believe the Allen charge is appropriate?

MR. ARAD: We believe it is appropriate because the note seems to convey that they're having trouble continuing to explore each other's views in a way that might lead them to a unanimous outcome and at this point some guidance from the Court would possibly lead them there.

THE COURT: Mr. Patton or Mr. Klein?

MR. KLEIN: Your Honor, we oppose an Allen charge.

THE COURT: Why?

MR. KLEIN: The note makes very clear that they have spent significant time deliberating. We know they've asked for a lot of exhibits, they've asked for a lot of transcripts. They've been back there however many hours total but they've been at it for four days, starting last Thursday, so they've had plenty of time to think through these issues. The note makes it very clear that they have considered things carefully and that they don't believe a unanimous agreement is possible. It says that. So, we think no Allen charge should be given.

THE COURT: And then what, sir? That I take the partial?

MR. KLEIN: Yes, your Honor.

THE COURT: Interesting. Interesting.

Mr. Arad, I'm planning ahead. What if they come back

after your supposed Allen charge and say, no, we can't do this? Then take the partial?

MR. ARAD: I think the government would prefer to cross that bridge when we get there, your Honor. We may have a further indication from the jury about where they are depending on what their note says at that point, so I wouldn't want to commit to anything at this stage. But, looking at the situation as it currently stands, it does seem like the very first indication from the jury that it is having trouble reaching a verdict as to certain counts, wouldn't merit simply essentially giving up at this point and an Allen charge would be appropriate.

THE COURT: OK. Please give me a moment.

(Pause)

THE COURT: I am going to give the Allen charge. I know there are several versions of it but I have what I think is the easiest and cleanest. Let me show it to the parties and you will tell me -- I know there is a longer version of this. I actually don't know that we want to give them more. I am having my deputy print out the longer version to show you. My inclination is to give you the one I am holding in my hands right now. I will have my law clerk show it to both sides. I will step off the bench so you can talk about it. It should not shock you, is very similar to Sand's charge. My deputy will show you the other one. Again, I think the one I have

handed you is the one I think we ought to use.

I will step off the bench while you guys can talk unless you want me to stay here. I can stay here.

MR. KLEIN: Whatever your preference is, your Honor.

MR. ARAD: Up to the Court.

THE COURT: I'm not sure you guys are going come to consensus if I leave so it is a question of how much time do you need to review it.

MR. KLEIN: Minutes.

THE COURT: Yes. OK.

This is the longer form that my colleagues -- that is the response to the request that has been made in another case.

If anyone on the team of the government is aware, did Judge Subramanian give one in the Combs case.

MR. ARAD: I'm not certain whether he did, your Honor.

MR. REHN: I don't believe he did.

MR. KLEIN: I don't believe he did, your Honor.

THE COURT: OK. You guys followed that case more closely than I did.

MR. KLEIN: Everyone did.

THE COURT: Exactly. Again, the one I showed you, the first one is the easiest.

As the parties are aware, the concern is that is one of coercion. I don't think the things that I am circulating are in any way coercive.

MR. REHN: And you said this is the version from Sand's more or less, the shorter version?

THE COURT: Yes. I can show you Sand if you want. I have it in my hands. If the parties want to see the Sand charge.

MR. REHN: Yes.

THE COURT: Mr. Kenny, would you show it to them as well? Thank you.

MR. KLEIN: Thank you.

(Counsel confer)

THE COURT: Counsel?

MR. KLEIN: We are almost ready, your Honor.

MR. ARAD: Same here.

THE COURT: Sorry.

MR. KLEIN: I thought you were asking if we were ready.

THE COURT: I was asking what is going on.

MR. KLEIN: A few minutes, your Honor?

MR. ARAD: We are also almost there.

THE COURT: OK.

(Counsel confer)

MR. KLEIN: Your Honor, the defense is ready.

THE COURT: OK. I am just advising the parties as you are talking, not to rush you, but that the more we are researching this on the fly, the more we are realizing that

longer may not be better. There is some Second Circuit concern about increasingly lengthy and complex Allen charges but let me hear from the parties.

Mr. Klein, you spoke first, sir.

MR. KLEIN: Yes, your Honor. We continue to oppose an Allen charge.

THE COURT: OK.

MR. KLEIN: But if you are going to give one, the shorter version, but I think it is really critical that you add a section dealing with a partial verdict which also is in Sand's, 9.08. In the longer one you will see there is bracketed language at the end, the longer version you handed out to the parties.

THE COURT: Yes.

MR. KLEIN: And the bracketed language is: I also want to instruct you that you may render a partial verdict, that is, a verdict on some counts but, again, your verdict must be unanimous as to those counts.

THE COURT: So if I am going to give an Allen charge, which you don't want me to do, you want me to include that language?

MR. KLEIN: Yes.

THE COURT: All right.

Mr. Arad?

MR. ARAD: Your Honor, we also ultimately come out

thinking that the shorter charge is better than the longer one. We thought it was a close call but we do think the shorter one is better. What we did not think was a close call is whether the partial verdict version instruction should be given, we think it should not.

THE COURT: Why not?

MR. ARAD: The purpose of the Allen charge is to encourage the jury continue to deliberate toward a complete verdict, and combining it with a partial verdict charge gives the jury -- well, it takes a lot of the force out of the Allen charge and what it is meant to accomplish. If the jury comes back sometime later and says we are still deadlocked, the Court always has the option of giving the partial verdict instruction and, indeed, at some point the government would agree that it is appropriate but this wouldn't be the time for it. It would undermine the purpose of the Allen charge.

THE COURT: All right. I agree. Let's bring them out.

May I have back the shorter version of the Allen charge?

Mr. Klein?

MR. KLEIN: If they're still deadlocked, are you giving them a second Allen charge plus partial verdict?

THE COURT: We will talk, but I think at that point it is just a partial. I have to see what they say back. If they

tell me again -- this one is suggesting that there is unanimity as to one or more counts.

Mr. Arad, I'm not sure, after the days that they've spent, that we are going to get a different answer.

MR. ARAD: We will have to see.

THE COURT: Yes. I think I understand from the defense that if a note similar to the one we just received comes out an hour, two hours, whenever, you are then asking for the partial to be taken, sir; yes?

MR. KLEIN: We are asking you to take the verdict at that time, your Honor.

THE COURT: Yes, sir. I understand.

MR. KLEIN: We would oppose any additional instruction.

THE COURT: Other than the instruction on the partial verdict.

MR. KLEIN: We would just ask you to take -- if they're still deadlocked we would ask you to take the verdict at that time.

THE COURT: I understand.

Mr. Arad, be prepared for that eventuality.

MR. ARAD: OK.

THE DEPUTY CLERK: All rise. Jury entering.

(Jury present)

THE COURT: Please, be seated. Thank you.

Ladies and gentlemen of the jury, I realize this is the first time we are seeing you in the jury box without your alternate jurors so a little smaller group but that is fine.

I received your note this morning and you asked at the end of it for advice and I am therefore going to give you an instruction that I believe applies in this circumstance and I want you to listen very carefully.

This case is important for the government and for Mr. Storm. It is desirable if a verdict can be reached that this be done, both from the viewpoint of the government and of Mr. Storm. But, as I stated in my instructions to you, your verdict must represent the conscientious judgment of each juror and under no circumstances must any juror yield his or her conscientious judgment.

It is normal for jurors to have differences. This is quite common. While you may have honest differences of opinion with your fellow jurors during the deliberations, each of you should seriously consider the arguments and opinions of the other jurors. Do not hesitate to change your opinion if after discussion of the issues and consideration of the facts and evidence in this case, you are persuaded that a change of your original opinion is justified. If, after fully exhausting your deliberations you still cannot agree, then it is your right not to agree. Again, I emphasize that no juror should vote for a verdict unless it represents his or her conscientious judgment.

What I have just said is not meant to rush or pressure you to reach a verdict. Take as much time as you need.

We will let you go back and deliberate and we will hear from you when you are ready to speak to us again. Thank you.

All rise.

(Jury not present)

THE COURT: Please be seated.

It would not surprise me if we hear from them within the hour, so while I don't want to waste your time. I'm about to cancel my morning calendar and I suggest you might want to do that as well.

Mr. Klein, I'm going to find that partial verdict charge because I do think I have to at least invite -- we have to see what the next note looks like but Mr. Arad and team, that's where I think you need to be focusing your energies.

MR. ARAD: Understood.

THE COURT: Thank you, all.

THE DEPUTY CLERK: All rise.

(Recess pending verdict)

THE COURT: We have received another note. It is timed 10:35 a.m. It is marked Court Exhibit 28:

Dear Judge, We have made our best effort to continue deliberating and come to a unanimous decision, however there are jurors who are set in stone with their decision, even after

we put a good faith effort to consider all arguments and we are deadlocked.

Based on the last two notes I have received from the jury -- you may recall that the first one suggested that they were deadlocked on some of the counts and the second one suggests they are deadlocked -- well, it just suggests that they haven't moved from that position. I think the step is to take a partial verdict. I know the defense -- I heard from my deputy there might be some objection to using Sand's. It might be to the part that says wait until the end of your deliberations. In all candor and knowing what I know about this jury, there is no more deliberating that they can do. I think we can offer them the option of taking the partial verdict. But, let me please hear from the parties, either party.

MR. KLEIN: Your Honor, the defense agrees with that. I just think we should tell them how to do it. It is not clear what they would fill out on the verdict form so maybe you would want to instruct them.

THE COURT: Would it be to answer the question for those counts as to which this they have unanimity and to not answer the counts for which they do not have unanimity?

MR. KLEIN: That could be it or you could say write "no agreement" below so it is clear.

THE COURT: I see. So it is not guilty, guilty, or no

agreement?

MR. KLEIN: That way it is career.

THE COURT: OK.

Mr. Arad?

MR. ARAD: Your Honor, the government thinks there are three ways forward here. One of them, in theory, would be to continue deliberating as the Court just said. It doesn't seem like that is likely to happen.

THE COURT: No.

MR. ARAD: That is not as to the whole case. Another way is to return a partial verdict. Another way is to return a partial verdict as to certain counts and continue deliberating as to others.

The government's view is that the jury should be informed of all of the options that it has in a neutral way, not encouraging that it take any particular path, at least so that it know that all of those three possibilities exist. That is consistent with the Sand instruction that the Court put out that we looked at just before your Honor came out and there is precedent for that in the district. I am happy to point to a case.

THE COURT: *United States v. Morris* before Judge Furman.

MR. ARAD: I am actually looking at a different one, *United States v. Richard Brega* before Judge Karas. In that

case Judge Karas gave a jury instruction that laid bear all three options in a very clear way I have it in front of me if the Court would like to hear it.

THE COURT: Judge Furman's charge does offer the three options.

Mr. Klein, just engage with me for a little bit, sir.

Perhaps your issue with the Sand verdict is that it presupposes additional deliberations.

MR. KLEIN: Yes, your Honor. That is right, your Honor.

THE COURT: Of course.

Judge Furman's, I think, suggests the three options and let me just -- I have to play with it a little bit because it was done in a context where there were questions with the counts, I suspect for drug quantity, but what it says is -- and I will show it to you in just a second. You may return a verdict on any count on which you all agree and then continue deliberating. You may wait until all deliberations are concluded to return a verdict, or return a verdict on any count on which you agree and inform me that you are deadlocked on the unresolved counts.

I think that is the best way --

MR. KLEIN: They've already indicated they're deadlocked, your Honor now, twice. I mean, they've had an initial note this morning and now they've sent a -- couldn't be

clearer note, after less than an hour, about an hour saying they're absolutely deadlocked and there are jurors who are deadlocked so I don't think that would be appropriate.

THE COURT: So you are suggesting that I modify Sand to simply say if you have reached unanimous agreement on some of the charges you may return a verdict on those charges?

MR. KLEIN: Yes. And then let them know how to note where they haven't reached agreement.

So we would ask that the instruction be very short and simple and just say to the effect that you have reached agreement, mark that. If you haven't reached agreement, let us know by writing "no agreement" next to the count.

THE COURT: OK.

Mr. Arad, you disagree?

MR. ARAD: Yes, your Honor.

The government sees no prejudice that could result from the jury being informed of its options in a neutral way. It would be one thing to instruct the jury you have to do it this way, but the jury may well be operating under the assumption that if it is deadlocked as to a count it is deadlocked as to all counts and that is just not the reality of the situation.

If the jury comes back and says, OK, thanks for letting us know that those are our options. We have come to agreement on these counts, we are deadlocked as to thee counts

and we do not believe that we should continue deliberating on them then that will be the end of the matter but I truly see no reason whatsoever to keep them in the dark about all three options.

THE COURT: All right. Just one moment, please. I am trying to look at language.

I received a similar transcript cite from Judge Engelmayer. Each of the ones I have seen gives them the option of deliberating further. I understand what Mr. Klein is saying, that they are very unlikely to do that, but I believe I will give them that option, knowing that they are very unlikely to take it. I'm going to work on modifying Judge Furman's instruction that he sent to me. I am going to ask for your patience while I do so. Please, be seated. I do understand that the defense objects -- yes, Mr. Klein?

MR. KLEIN: I think you need to give them the option -- your Honor, we object to that, but if you are going to do it that way, that they can come back soon with the way we have talked about so they're not thinking they have to go back -- it should be you can choose to go back and do it this way, which is mark the form and come back here. Because that needs to be clear to them no matter what because, again, any suggestion that they need to keep deliberating when they have sent two notes now saying they're deadlocked and people aren't moving, we think, would be inappropriate.

THE COURT: I understand, sir.

Mr. Arad?

MR. ARAD: I think what the Court is already contemplating doing makes it very clear that the jury has three options and can choose from among them. Nowhere in the Court's proposed instruction, based on Sand or in the instructions the government has seen, is there any suggestion that one of the options is available only after a certain period of further deliberations. That is certainly not what the government is suggesting here and I don't see any risk that the jury would interpret that when it is not in the instruction.

THE COURT: Thank you. I am going to ask for your patience.

(Pause)

THE COURT: I'm going to step off the bench for a moment and will get this to you.

Thank you.

(Recess pending verdict)

THE COURT: Please excuse me while I do my edits.

(Pause)

THE COURT: My deputy is submitting the proposed charge to you now.

(Counsel confer)

THE COURT: Mr. Arad?

MR. ARAD: The government sees no issue with the

instruction, your Honor.

THE COURT: Mr. Klein?

MR. KLEIN: Your Honor, we continue to object to anything beyond just asking them to return the verdict.

THE COURT: OK.

MR. KLEIN: But if you are going to go with this tact, your Honor --

THE COURT: Yes.

MR. KLEIN: We think you should strike the last line that says: "And continue your deliberations." It seems at odds with the tenor of giving them three choices and we also think if you are going to do this you should move no. 3 in the middle paragraph to 1; no. 1 to 2; and no. 2 to 3.

THE COURT: OK. I'm not doing that. I understand those are your proposed edits.

MR. KLEIN: Yes, your Honor.

THE COURT: I'm taking neither of them. Thank you.

Ms. Noriega, let's get the jury.

MR. KLEIN: Your Honor, can they be given this form in addition to being read it?

THE COURT: I would want to take out the partial verdict instruction language on it.

MR. KLEIN: Redact the top -- redact the top and just give them the --

THE COURT: Does the government have an objection to

that.

MR. ARAD: We don't see that it is necessary, your Honor.

THE COURT: Sure, but it's -- is there opposition?

MR. ARAD: No, your Honor.

THE COURT: OK. I will think about it. It doesn't seem long enough to me to merit going back with them but I'm thinking -- let me first read it to them. If it appears that they're following what I am instructing them.

(Jury present)

THE COURT: Members of the jury: From your notes I understand that you may have reached a unanimous verdict as to one or more counts in the indictment. If you have reached a unanimous verdict only as to some of the counts in the verdict form, you may, but are not required, to return a verdict on those counts on which you all agree. If you do that, your verdict on those counts will be final and cannot be changed or revisited in any way.

To summarize, you may, (1) return a verdict on any count on which you all agree and then continue deliberating on other unresolved counts; (2) wait until all deliberations are concluded to return a verdict on all counts or tell me you are deadlocked on all counts; or (3) return a verdict as to any count on which you all agree and inform me that you are deadlocked on the unresolved counts.

To return a verdict as to any count as to which you all agree, please indicate what the verdict is for that particular count. For any count as to which you are not in agreement, please write not unanimous next to that count.

Remember, any verdict you return must be unanimous. No juror should vote for any verdict unless, after full discussion and consideration and exchange of views, it represents his or her considered judgment and conscientiously held belief.

Finally, I want to remind you again to consider all of my instructions as a whole and that the government bears the burden of proving each element on every charge beyond a reasonable doubt.

Please retire and continue deliberations. And, given what I have just said to you, I'm going to hand to your foreperson a copy of the instruction I have just read to you in case anything I have said is unclear and you want to see it on paper. In fact, we have printed out multiple copies in case those want to share with others. You may have it and will retire and we will hear from you when we hear from you.

Thank you.

All rise, please.

(Jury not present)

THE COURT: Stay local, we may hear something.

(Recess pending verdict)

A F T E R N O O N S E S S I O N

12:25 p.m.

THE COURT: I received a note from the jury. It has been marked as Court Exhibit 30, and again, apologies if I have to re-number all of these. It says:

Dear Judge, we have reached a verdict.

From my perspective, it is either a full verdict in which case deliberations are over or a partial verdict, in which case deliberations are over.

Does anyone disagree with that? Mr. Arad?

MR. ARAD: No, your Honor.

THE COURT: Mr. Klein?

MR. KLEIN: No, your Honor.

THE COURT: While I have you here, let me just have some logistical issues. My deputy will go back and get the jury now. I am going to ask, if I have to I will instruct, that there please be no emotion shown -- including by my friends in the gallery -- when the verdict is read. These people have given us days of their lives and they deserve to have us accepting the verdict as it is.

If the verdict is such that post-trial motions are warranted, may I please ask the parties to meet and confer and propose a schedule for me in the next week? I know not what the verdict is but if we need, I don't want to have you setting schedule right after this.

Mr. Klein, agree?

MR. KLEIN: Yes, your Honor.

THE COURT: Mr. Arad, agreed?

MR. ARAD: Agreed.

THE COURT: Thank you.

It is my practice to speak with the jury to thank them personally after the verdict. Does either side wish to speak with the jury or do you want to hear what the verdict is beforehand?

MR. ARAD: Hear beforehand, your Honor.

THE COURT: All right.

Mr. Klein, same, sir?

MR. KLEIN: One second.

THE COURT: OK.

MR. KLEIN: Let's wait to hear, your Honor.

THE COURT: I will meet representatives from each side at side bar. I'm going to take the verdict. I will ask if you want polling, I guess that may depend on what the verdict is as well.

I will give them sort of the administration issues, check is in the mail, you can talk to people, thank you, and then I will meet you at side bar and you will tell me whether you want to speak with them. I will give them that option when I speak with them and if they want to, we will send back word saying at some point they'll be ready for you and if they don't

want to, as sometimes happens, I will just let you know.

Before we get the verdict, thank you, everyone. Very hard fought case, great lawyering on both sides, and thank you. And now we see what it is.

THE DEPUTY CLERK: All rise. Jury entering.

(Jury present)

THE COURT: Please be seated. Thank you.

Mr. Foreperson, can I ask you please to stand, sir? I have been advised, I have received a note from the jury, I believe it is written by you, sir. It says: Dear Judge, we have reached a verdict.

Is that correct, sir?

THE FOREPERSON: That is correct, your Honor.

THE COURT: Thank you.

I'm going to ask you to hand to my deputy, Ms. Noriega, the verdict form in this case, please. Thank you. Please, excuse me.

Ms. Noriega, can I ask you please to hand this back to Mr. Lopez? And Ms. Noriega, would you please take the verdict?

THE DEPUTY CLERK: Yes, your Honor.

Mr. Foreperson, can you please stand?

For Count Number One, conspiracy to commit money laundering, how do you find the defendant, Roman Storm, with respect to Count One? Not guilty or guilty?

THE FOREPERSON: Not unanimous.

THE DEPUTY CLERK: For Count Number Two, conspiracy to operate an unlicensed money transmitting business, how do you find the defendant, Roman Storm, with respect to Count Two? Not guilty or guilty?

THE FOREPERSON: Guilty.

THE DEPUTY CLERK: Count Three, conspiracy to violate the IEEPA, how do you find the defendant, Roman Storm, with respect to Count Three? Not guilty or guilty?

THE FOREPERSON: Not unanimous.

THE DEPUTY CLERK: Thank you.

Your Honor, that is the verdict of the jury.

THE COURT: Thank you.

Mr. Arad, do you want the jury polled?

MR. ARAD: No, your Honor.

THE COURT: Mr. Klein, do you want the jury polled?

MR. KLEIN: Yes, your Honor.

THE COURT: Thank you.

Ms. Noriega, please poll the jury.

THE DEPUTY CLERK: Juror no. 1, is this your verdict?

JUROR: Yes, it is.

THE DEPUTY CLERK: Juror no. 2, is this your verdict?

JUROR: Yes.

THE DEPUTY CLERK: Juror no. 3, is this your verdict?

JUROR: Yes.

THE DEPUTY CLERK: Juror no. 4, is this your verdict?

JUROR: Yes.

THE DEPUTY CLERK: Juror no. 5, is this your verdict?

JUROR: Yes.

THE DEPUTY CLERK: Juror no. 6, is this your verdict?

JUROR: Yes.

THE DEPUTY CLERK: Juror no. 7, is this your verdict?

JUROR: Yes.

THE DEPUTY CLERK: Juror no. 7, is this your verdict?

THE COURT: I'm sorry. That is juror no. 8.

THE DEPUTY CLERK: Excuse me.

Juror no. 8, is this your verdict?

JUROR: Yes.

THE DEPUTY CLERK: Juror no. 9, is this your verdict?

JUROR: Yes.

THE DEPUTY CLERK: Juror no. 10, is this your verdict?

JUROR: Yes.

THE DEPUTY CLERK: Juror no. 11, is this your verdict?

JUROR: Yes.

THE DEPUTY CLERK: Juror no. 12, is this your verdict?

JUROR: Yes.

THE DEPUTY CLERK: Your Honor, they have been polled. The verdict is unanimous.

THE COURT: Thank you very much.

Members of the jury, I want to begin, these are the last instructions I want to give to you and I want to begin by

thanking you, and as my deputy has heard me say many times before, there was a very great Judge in this district who believed that you should never thank a jury, and that the satisfaction that they obtained from doing their civic duty was thanks enough. And that may well be for them, but I have been with you on this journey and I know how hard you worked and how many days you came here and the amount of time that you spent very carefully reviewing the evidence in this case and my instructions and I thank you for that. And I hope that what you feel, because it is what I feel when I see juries like you, is that if you were in a similar situation as a litigant, you would want to have a jury as careful as you were reviewing this.

So, I hope that this shows you how important the jury system is and how it functions and I'm glad to see that you took so much care for this case.

In terms of other administrative issues, you will, in the coming weeks, receive a certificate of your completion of jury service and some check that does not begin to cover what you have given up over the past couple of weeks, but you will receive that.

I will very soon be discharging you and that does mean that you can speak about the case. If I may, I lose the ability to control you, to instruct you once you leave in a couple of minutes, but I'm going to ask you to think about

something. You can now speak to your family and your friends and, if you want, to the attorneys in this case. What I would ask you to do is just be mindful of the fact that it is one thing to talk about what you felt and what you did but I'm not sure that you would want to be -- I'm not sure all of your fellow jurors want you to talk about what they felt and what they did. So, I just ask you to be thoughtful as you speak about the case and to treat it with the seriousness that it deserves.

I'm going to discharge you in a moment -- you keep thinking I keep threatening to do that, right? I will do that very soon. I would ask you, if you could, to remain in the jury room for a few moments so that I can speak to you privately and give me thanks to you privately.

I'm going to ask the parties in a moment if they wish to speak to you and then I will convey their wishes, if they do.

Ms. Noriega, have I reviewed everything with them? I don't want to forget anything administratively.

(Court and Deputy confer)

THE COURT: I am going to meet the parties at side bar and see if there is anything we need to address.

Please, excuse me.

(Continued next page)

(At side bar)

THE COURT: Yes, counsel.

Mr. Arad, does the government wish to meet with the jury?

MR. ARAD: It does not.

THE COURT: Thank you.

Mr. Klein, does the defense wish to meet with the jury?

MR. KLEIN: Yes, we do, your Honor, and at this time we are going to move for a mistrial also.

THE COURT: OK. Any particular grounds?

MR. KLEIN: On the multiple times the Judge sent back notes to keep them deliberating.

THE COURT: I see. OK. The Judge being me?

MR. KLEIN: Yes. Sorry, your Honor. I'm just --

THE COURT: That's fine. All right. That's fine.

That motion is denied. Thank you. You can write something, I will listen to it if you want to write something else out and show me why what I did was wrong, and then if the government wants to respond to it, but I presume there is a Rule 29 and a Rule 33 in the offing and I will just ask you to coordinate with the government on a schedule. I'm not going to require you to submit it all in one week.

MR. KLEIN: Yes, your Honor. We appreciate that.

THE COURT: Thank you.

Anything else, counsel? No. Then I will discharge them, speak with them, and I will let you know if they wish to speak.

Thank you very much.

(In open court)

THE COURT: Members of the jury, at this time I discharge you as jurors in this case and I will ask you again to go to your jury room and I will meet with you in just a moment. We are going to stand one last time as a measure of our respect for you for your work on this case.

All rise.

(Jury discharged)

THE COURT: Please be seated for a moment.

My law clerk is just showing you the verdict form in this case, and of course we can scan it and send it to you. We will scan it and send to you at a later point today. I don't think there is anything else for us to address.

Mr. Arad?

MR. ARAD: No, your Honor.

THE COURT: Mr. Klein?

MR. KLEIN: No.

THE COURT: Thank you. All right.

MR. ARAD: Sorry, your Honor.

THE COURT: Please.

MR. ARAD: There is nothing left to address with respect to the verdict form but there is the matter of bail presentencing. There is, as the Court knows, a presumption of detention after a guilty verdict is reached.

THE COURT: Yes.

MR. ARAD: And in this case the government's view is that the defendant cannot come close to meeting his burden to show, by clear and convincing evidence, that he does not present a flight risk. I am happy to explain why.

THE COURT: Yes.

Ms. Noriega, tell the jury I may be a moment.

You are moving for his remand?

MR. ARAD: Yes, your Honor.

THE COURT: What basis, sir?

MR. ARAD: We could, of course, do this after the jury is dismissed, your Honor. There is no insistence for the government that it happen now.

THE COURT: I hear you, sir. Does it have to be today?

MR. ARAD: Yes, your Honor.

THE COURT: OK, because they may take my -- I don't know. Sometimes they ask me questions and I can be back there for half an hour, 45 minutes, so if you are making the motion, make it now.

MR. ARAD: We are making the motion, your Honor.

THE COURT: Go ahead.

MR. ARAD: The defendant presents a flight risk for a number of reasons. First, he has multiple foreign ties, he is a naturalized American citizen but he is originally from Russia. He also has significant means and has, himself,

resettled before. Not only that, your Honor, he has shown a propensity to flee. As the Court knows from the evidence presented in this case, in June of 2022 the defendant sent a communication to his co-conspirators in which he said: *I'm thinking whether I should get the fuck out of the country or something.* And this is after a few of his bank accounts were cancelled before he was ever charged, let alone convicted of any offense.

In addition to that, your Honor, there is a number of communications that the government has in which the defendant appears to have advised people on how to cheat the immigration system. Now, in this case we are talking about the U.S. Immigration system and obviously the concern is that he would flee from the United States, but his willingness to lie in this fashion, and I will get into the details in just a moment, demonstrates his propensity to flee and his lack of trustworthiness.

THE COURT: Mr. Arad, what are the current conditions of bail?

MR. ARAD: The defendant is on a bond and surrendered his travel documents, your Honor. I don't have the specifics in front of me.

THE COURT: Because I believe that was before my time. I don't believe the bail conditions were changed while I have had the case, although I may be incorrect.

MR. ARAD: That may be, your Honor.

THE COURT: Ms. Axel, thank you.

MS. AXEL: Yes, your Honor.

We did have a follow-on hearing before this Court when we first initially appeared here.

THE COURT: Thank you.

MS. AXEL: The Court did revisit the conditions and changed them in some respect.

THE COURT: What are they currently, Ms. Axel?

MS. AXEL: Obviously he has travel restrictions and surrendered his passport.

THE COURT: What is the amount of bond.

MS. AXEL: It is $2 million, secured by his house.

THE COURT: And the passport was surrendered?

MS. AXEL: Yes, it was.

THE COURT: Thank you.

Thank you, Mr. Arad.

MR. ARAD: So, your Honor, I want to delve into a little bit of detail on the conversations where the defendant is advising people on how to cheat the immigration system.

He says, for example, in one instance: *I would do a fake document where it says that you have German roots and I would apply as a German. As far as I know, with good preparation, everything goes smoothly. There are also a ton of options with political asylum.*

I will give the Court another example.

*Nonstandard immigration options always worked better than doing everything directly and honestly. The main thing is to do it cleanly. That already depends on your level of risk/fear to fucking cheat the system.*

There are several other examples, your Honor. I have printouts here and I am happy to walk through them. I also want to talk about the defendant's significant means to flee, should he choose to do so.

At the moment, the government believes the defendant has, at his disposal, over $10 million worth of cryptocurrency that he could easily liquidate in order to resettle. There are $4.5 million worth of TORN tokens sitting in the wallet that received TORN directly from the vesting contract that the defendant used.

In addition to that, there is about $12 million of ETH that is located in the wallet that was used to call the TORN from the vesting contract and so that puts us at over $16 million worth of cryptocurrency right there. That's the defendant's cryptocurrency.

His co-conspirators also continue to have significant cryptocurrency at their disposal, including Roman Semenov, who has about $10.4 million worth of cryptocurrency in the wallet where the defendant sent $2.6 million worth of TORN in August of 2022. And I will remind the Court that Roman Semenov is --

has made it impossible for law enforcement to find him and detain him.

In addition to all of that, your Honor, the defendant has support of a broad cryptocurrency community that has been donating funds to his defense. This community includes certain high-profile individuals who have significant other resources and so there are multiple places where the defendant could obtain the resources that he needs, including in his own personal reserves of cryptocurrency, to resettle.

So, for these reasons, your Honor, the defendant has shown a propensity to flee, a willingness to lie, particularly with reference to immigration matters, he has tremendous means, and he has the support of others including one of his co-conspirators who, himself, has fled justice. How the defendant could meet the burden to show by clear and convincing evidence that he doesn't present a flight risk is hard to see.

THE COURT: One moment, please.

(Pause)

THE COURT: Mr. Klein, someone from your team? Ms. Axel, thank you.

MS. AXEL: Your Honor, I think actually the burden is very easy to meet here. I think we have a substantial history of Mr. Storm being out on bond.

THE COURT: I do need you closer to the microphone. Thank you.

MS. AXEL: I will get the microphone closer to me.

Even prior to the bond period, your Honor, he has obviously known of government enforcement action -- potential government enforcement action since the sanctions were imposed in August of 2022. He was aware of potential criminal investigation as early as the fall then of 2022. He came to New York, at that point he voluntarily proffered, he sat down with the government and gave information knowing there was an investigation in December of 2022.

THE COURT: Yes, although the government said that that was incomplete information designed, really, to stimie their investigation, but yes.

MS. AXEL: I don't know that exactly they go that far, your Honor. I don't think they've attacked the truthfulness of what he did. There were certain, perhaps, attorney objections interposed as to things that he didn't speak about but I don't think they've accused him of being misleading.

THE COURT: I said incomplete.

MS. AXEL: He then was indicted in August of 2023 and has been on bond successfully since then. That has involved, of course, travel restrictions. He has properly obtained approval from his probation officer -- pretrial services officer to come either to Los Angeles to meet with us, to come to New York. There have been no issues with that.

He also is under restrictions concerning his

cryptocurrency and the transfer of cryptocurrency and there have been no issues with that either, and we can demonstrate the correspondence where he has asked for permission --

THE COURT: Please slow down, thank you.

MS. AXEL: -- where he has asked for permission and needed permission even, for example, to pay his federal taxes. So we actually had to get probation approval to do that.

In terms of accessing any cryptocurrency, he has not done that without Court permission and so I think we have demonstrated that he is not going to -- he is going to obey the Court orders and do so very faithfully, your Honor, and I don't think there is anything to fear from the fact he has other assets.

His house in Washington, of course, is tied up with the $2 million bond and I think that significantly mitigates any potential flight risk.

We haven't also mentioned he has a 5-year-old daughter in Seattle of which he has joint custody. Obviously you know she was there at the time of the initial arrest. And so that is a significant reason to be here.

He also has family and friends and a community all here in the United States. He was here in the United States during the period of the conduct, he has always been here, as opposed to the other alleged co-conspirators who were never here; they are not U.S. citizens, they were never here. He has

been here the whole time and remains here.

He has a sister in Sacramento who has three children and she was here, she was here last week, she stayed an extra day to see if there was a verdict there. She was here as a support person for him, she has 3 children also here as well. His parents are green card holders and they come both here and to Russia but they were here recently as well. So, he has a strong support system here. He has a girlfriend here, he has friends here. All of these are ties, these are people that have been in court.

As to the broader cryptocurrency community that has supported him as well, your Honor, these also are U.S. ties. These are reasons to stay, not reasons to leave. These are people who have, yes, committed money to his defense and will, we certainly hope, continue to commit money to his defense because they believe it presents important issues of first impression and I think those -- those are actually more reasons to stay than they are reasons to leave.

I think with respect to the immigration statements, your Honor, those don't have anything to do with flight risk, and the context of that was a number of people, obviously Russian friends and immigrants, freaking out in the light of the Ukrainian war and the sanctions that were happening, and so there was talk about how -- those were people, again, who wanted to be here, hence the talk about how they could

potentially qualify for status in the United States here. That is really the topic of those conversations, and so they don't have anything to do with flight risk or danger whatsoever.

THE COURT: Mr. Arad?

MR. ARAD: Thank you, your Honor.

What was notably absent from the defense's argument just now is that the defendant's interests and incentives have massively shifted from the moment before he was convicted of a criminal offense to the moment after he was convicted of a criminal offense, and that is one of the primary reasons that the burden shifts to the defendant in this context in a bail argument.

With respect to the defendant's ties to the United States, your Honor, the government recognizes that the defendant has a young daughter here but also sees the significant means at the defendant's disposal to resettle with his family, to support his family's travel to visit him wherever he may try to resettle, and the other ties to the United States that the defendant has are not unlike ties that pretty much every other defendant to come before the Court usually has; other family in the United States, friends in the United States, other communities in the United States. But the point here is that the defendant has been convicted of a crime and that sets a tremendous incentive for him to flee.

As for these immigration conversations, your Honor, I

think they're clearly relevant because they show that the defendant is very willing to lie, particularly in the context of trying to resettle from one country to another. And while, as I stated earlier, the government recognizes those conversations where in the context of people trying to come to the United States, is that has no bearing on whether the defendant would be willing to similarly lie in order to leave the United States.

I want to also just point the Court to one more of those communications which speaks for itself: *The system is essentially completely based on a check mark in every document where you promise to tell the truth and it's prison for lying. Not everyone takes risks like that but understanding the system allows its abuse. Americans are generally too lazy to verify anything. This applies to the way many things work here. It is easier for them to get your signature, to believe, to document, and to file it away.*

This is precisely the kind of context where the defendant's understanding of how the system would work, given his other conduct and his other statements, would lead him to check the box and ask that the system simply file it away. And his incentive now is different than it was at every other stage in this proceeding.

The government's strongly held view is that the Court should not take the risk that this defendant would flee. Under

these facts he comes nowhere near showing, by clear and convincing evidence, that he does not pose a flight risk.

THE COURT: Sir, I am understanding that your arguments are made under risk of flight prong, not the danger to community prong; am I mistaken?

MR. REHN: That's correct, your Honor.

THE COURT: Please excuse me.

MS. AXEL: One more thing, your Honor?

THE COURT: Ms. Axel, desperate to have the last word.

MS. AXEL: I'm sorry, your Honor. I failed to point out that there is a five-year cap on the statute of which we received a guilty verdict this morning, so your Honor that is not a significant amount of exposure which the Court should also take into account, and I did also not point out that we obviously have novel and significant legal issues that we obviously intend to pursue in this case, the Court is well aware of them, and we think those also militate towards allowing him to remain out on bond.

THE COURT: Ms. Axel, actually your last point was the point that was my first point.

Mr. Arad, understanding Section 3143 -- and you are welcome to sit down, sir -- of Title 18 of the United States Code and understanding clear and convincing standard, I do think it is met here. I don't believe at this stage of the game that Mr. Storm poses a risk of flight because only one of

the three counts was a count of conviction, the jury could not reach unanimity on the other two. There is an interesting question about whether you will be pursuing those counts but I think the stability of the verdict is very much in play, if not before me, then before a reviewing Court. I think these are, of all of the counts of conviction, I think the 1960 is perhaps the most interesting of the legal issues that it raises, and so I think Mr. Storm has every incentive to stay here and fight than to flee. Now, that may change at a later date depending on resolution of motions at a later date, but I do think that he has met the clear and convincing standard that he will not be a risk of flight, that he does not pose a risk of flight because of his ties to the U.S., because of his daughter, because of the size of the bond. And though you said the -- Mr. Rehn, please stop -- though you say, sir, that the incentives have shifted, I appreciate, I just read the verdict, they have shifted, but not tremendously, sir. There is a lot of fighting left in this case before sentencing and I believe that Mr. Storm is going to remain here for that fight and so I am going to deny the motion to remand at this time.

Is there anything else that we should be addressing? Do I need to say on the record that I am granting a mistrial as to Counts One and Three? I guess the parties kind of figured -- the jury didn't reach a decision on that so I don't know whether I have to formally say it or not. I will let you

guys let me know that and you will have to let me know, sir, what you are going to do with those two counts.

MR. ARAD: We will get back to the Court on that.

THE COURT: Thank you.

Mr. Klein, something else?

MR. KLEIN: Nothing. We will get back to the Court on that.

THE COURT: Thank you very much. I will speak to the jury and will come out, as need be. Thank you.

o0o