

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*Jakob K. Javitz Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

April 7, 2026

**BY ECF AND EMAIL**

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

     **Re:**    *United States v. Roman Storm*, **S1 23 Cr. 430 (KPF)**

Dear Judge Failla:

     The Government respectfully writes in response to the defendant's April 2, 2026 letter, (Dkt. 282), regarding the Supreme Court's recent decision in *Cox Commc'ns, Inc. v. Sony Music Ent.*, No. 24-171, 2026 WL 815823 (U.S. Mar. 25, 2026). *Cox* is inapposite for two reasons. *First*, it concerns contributory civil liability for copyright infringement, which is far afield from the legal issues here: criminal liability for money laundering, unlicensed money transmitting, and sanctions evasion conspiracies. *Second*, even if *Cox* articulated legal principles that somehow applied here (it does not), the defendant's conduct bears no resemblance to the conduct at issue in *Cox*.

     In *Cox*, the Supreme Court held that Cox Communications, Inc. ("Cox"), an internet service provider, was not contributorily liable for copyright infringement on its users' accounts. *Id.* at *7. As the Court explained, contributory liability requires that the defendant either "induced the infringement" or "provided [a] service [that] is tailored to [] infringement." *Id.* at *6.[1] "A provider induces infringement if it actively encourages infringement through specific acts." *Id.* "A service is tailored to infringement if it is not capable of substantial or commercially significant non-infringing uses." *Id.* The legal question at issue in *Cox* is inapposite here for multiple reasons, including that the Supreme Court was considering the scope of a specific, judicially crafted civil doctrine of contributory liability under the Copyright Act that—the Supreme Court held—needed to be construed narrowly. *Id.* at *5. That inquiry is beside the point on the question of the defendant's guilt pursuant to the criminal statutes at issue in this case.

     Even if *Cox* had some applicability here, its reasoning offers no help to the defendant given the strikingly different facts at issue. In concluding that Cox had not affirmatively induced infringement, the Court underscored that "Cox repeatedly discouraged copyright infringement by

---

[1] Quotations omit all internal quotation marks, citations, and previous alterations.

sending warnings, suspending services, and terminating accounts." *Id.* at \*7. Cox also contractually prohibited its users from engaging in infringement and presented evidence that its responses to infringement notices "ended 98% of identified infringement." *Id.* at \*5, \*7. "As for providing a service tailored to infringement," the Court held that Cox "was clearly capable of substantial or commercially significant noninfringing uses" because it "simply provided internet access, which is used for many purposes other than copyright infringement." *Id.* at \*7.

The defendant and the Tornado Cash service are a far cry from Cox.

As set forth in detail in the Government's response to the defendant's Rule 29 motion— and in contrast to Cox's robust system for responding to infringement—the defendant intentionally implemented mere half-measures that he said were "easy to bypass" to counter criminal use of the Tornado Cash service, and his purpose in doing so was to distract law enforcement. (*See* Dkt. 241 at 11 (quoting GX 2047-T)). Moreover, he actively lied in response to inquiries from victims, telling them he had little control over the protocol when in fact he and his co-conspirators implemented over 250 changes to Tornado Cash infrastructure during the charged time period and explicitly discussed—but forwent—feasible measures to curb criminality on their platform. (*See id.* at 5-6 (citing Tr. 1063-64, 1078-79), 22 (citing GX 2059-2-T (Roman Semenov's message to Alexey Pertsev and the defendant: "[S]o we say that we have immutable contracts and that's it, no one can stop it, no matter what you do there, but it turns out that no, it is possible to stop it as long as the governance makes the right decision"[2])))).

The defendant's specific intent to launder the proceeds of particular hacks is also evident from his continued operation of the Tornado Cash service even when he knew, in real time, that stolen funds made up the lion's share of cryptocurrency flowing through the service. For example, the defendant knew about the Ronin hack the day it was announced, expected that the Tornado Cash service would launder the funds even before the laundering began, and knew about the laundering through Tornado Cash from the day it commenced onward. (*See id.* at 10). This amounted to $449 million of stolen funds laundered in 1,751 transactions—all with the defendant's knowledge. (*See id.* (citing Tr. 647-48, 1183-84; GX 3002-45)).

In short, the defendant's reaction to criminal use of his company was window dressing at best and outright misdirection at worst. It was nothing like Cox's robust and 98% effective mechanism for dealing with known infringement. Indeed, there is no evidence that the limited screening mechanism the defendant put in place here was effective at all, and there is ample evidence that he both knew it would be ineffective when he implemented it and knew it was in fact ineffective after he implemented it.

Moreover, there is no evidence that Tornado Cash was "capable of substantial or commercially significant" noncriminal uses. *First*, Congress has criminalized the operation of a

---

[2] While Semenov described the anti-crime measure as a matter for "governance," the defense's own economics expert testified that the defendant and his co-conspirators at crucial times had more than enough votes to dictate the outcome of any governance vote. (*See id.* at 35 (citing Tr. 2141)). And in fact, the defendant and his co-conspirators controlled the user interface without input from governance and routinely updated it without a governance vote.

money transmitting business that involves the transportation of funds known to the defendant to have been derived from a criminal offense or intended to be used to promote a criminal offense. Operation of such a business is criminal, full stop. The law does not require any particular threshold percentage of criminal proceeds to render the entire business criminal. *Second*, even if the existence of some noncriminal users of Tornado Cash were relevant, the evidence showed that throughout the time period alleged in Count Two, large volumes—at least 37% of the entirety of the funds being transmitted by the Tornado Cash service—were attributable to large-scale criminal incidents of which Storm was specifically aware. (*See id.* at 9 (citing GX 3002-60; GX 3002-2 and exhibits referenced therein)). For several weeks during the Ronin Hack, that figure jumped to more than 50% solely from that criminal incident. (*See id.* at 13 (citing Tr. 661 and GX 3002-50)). No such proportions of infringing activity were at issue in *Cox*. Indeed, the evidence at trial indicated a nearly complete absence of legitimate uses, as the few noncriminal users who testified indicated that they had engaged in isolated transactions in the smallest Tornado Cash pools, and the defendant and his co-conspirators discussed the fact that their volume was driven by criminal users. (*See, e.g.*, Tr. 1940:12-13 (testimony by Tornado Cash user that he used the service only "[o]nce"); 1567:17-18, 1571:6-7 (testimony by Tornado Cash user that he used the service "I believe four times" to make "I believe . . . one deposit of 10 Ether, one deposit of one Ether, and two or three of .1 Ether"); GX 2001-T (discussing report of $15 million "being laundered right now through Tornado Cash"); GX 2048-1 (discussing report that "15 percent of Tornado deposits are from the Ronin" hack); GX 2007-1 (message to defendant and other cofounders regarding the laundering of stolen funds through the Tornado Cash protocol: "None of this would have happened without you")).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

3

The defendant's conduct simply is not comparable to the conduct at issue in *Cox*. In any event, a civil copyright case has no relevance here in the first place.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____
Ben Arad
Thane Rehn
Assistant United States Attorneys
(212) 637-6521
(212) 637-2354

Kevin Mosley
Special Assistant United States Attorney

cc:    Brian Edward Klein, Esq.
       Keri Curtis Axel, Esq.
       Kevin Michael Casey, Esq.
       Viviana Andazola Marquez, Esq.
       Ashley Martabano, Esq.
       Becky S. James, Esq.
       Emily Stierwalt, Esq.
       David E. Patton, Esq.