UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 23 Cr. 430 (KPF)

ROMAN STORM,

Defendant.

------------------------------x

New York, N.Y.
April 9, 2026
10:00 a.m.

Before:

HON. KATHERINE POLK FAILLA,

District Judge

APPEARANCES

JAY CLAYTON,
United States Attorney for the
Southern District of New York
BY: BEN ARAD
NATHAN M. REHN
KEVIN G. MOSLEY
Assistant United States Attorneys

COOLEY LLP
Attorneys for Defendant
BY: BRIAN E. KLEIN
VIVIANA A. MARQUEZ
-and-
WAYMAKER LLP
BY: KERI C. AXEL
-and-
HECKER FINK LLP
BY: DAVID E. PATTON

(Case called)

MR. ARAD: Good morning, your Honor. AUSAs Ben Arad and Thane Rehn for the government, Special AUSA Kevin Mosley also for the government.

THE COURT: Thank you and good morning.

MR. KLEIN: Good morning, your Honor. Brian Klein. With me at counsel table is Mr. Storm is here, Keri Curtis Axel, Viviana Andazola Marquez, Mr. Patton.

THE COURT: Thank you very much. Good morning to each of you. Thank you.

It is my understanding that Mr. Arad and Mr. Klein are taking the lead this morning with respect to oral argument; is that correct?

MR. ARAD: Yes, your Honor.

MR. KLEIN: Yes, your Honor. I'm actually splitting it a little bit with Ms. Axel, who will handle money laundering and sanctions, but I will be handling venue and 1960. Sorry if that wasn't clear when your clerk came out.

THE COURT: It was not.

I'm not sure I need the seating chart of who you are. I know who you this many months into things. Let me begin, as I always should, by thanking you for the work on the motions. These were anything but perfunctory. There was enormous care and attention paid to them. I've sat with them for a while and I've reread the trial transcript and looked at a lot of

exhibits. It may not look like it, but I've tried very hard to pare down my questions. I think I have fewer questions, but they might be rather long for me to get them out. I would ask you to focus on the question that I'm asking and not the one you wish I would ask. I might ask a few questions that are replicating questions I've asked in the past with respect to the motions to dismiss. That is in part because, perhaps as a result of the trial testimony or exhibits, I might have new thoughts on these, but I am asking you. And I know it's so hard to do this, don't read too much into my questions. I have issues, you'll see what my issues are, but if I didn't need assistance from you, I wouldn't be having this oral argument. If my mind was made up one way or the other, I wouldn't drag you all in. I'm not doing this for fun — let's put it that way.

There are certain decisions that I don't intend to revisit today, and I will just tell you what they are so that you can not pose arguments on them. They include the significance, or not, of Tornado Cash's failure to register; the need for Tornado Cash to have had physical custody of the assets; the claim that Tornado Cash comprises only pools that were made immutable as distinguished from the DUI, the COI, and other ancillary components; the applicability, or not, of the IEEPA informational materials exception; IEEPA arguments based on blocked property; the tool service dichotomy set forth in

the *Van Loon* decision that does not today bind me; and there are arguments that were based on *United States v. Hoskins*, 902 F.3d 69, and *United States v. Amen*, 831 F.2d 373 that I'm not discussing. And generally speaking, I'm not revisiting most of the constitutional arguments. I'm also not especially moved by the briefing or the Supreme Court's decision in *Cox Commc'ns, Inc. v. Sony Music Ent.* It doesn't, I believe, help my analysis, so I didn't intend on discussing it today.

Now, here's the slightly strange thing, Mr. Klein. I have questions for you, for better or worse, I have more questions for your adversaries, but it's your motion, so I'm going with you. I think what's going to happen is that after you hear me question the government, you will want to follow up with your own thoughts. What I mean to say is I'm not going to re-ask the questions of the government to you, but as you're listening to me discuss certain issues with them, I'm confident that there's something you're going to want to follow up on, and I will give you an opportunity in reply to give me that information because the questions I have, they're not directed to you for some of these issues, but I'm sure you want to be heard on them.

Let me begin, please, with venue. If you're ready to begin, sir, I'm ready to begin with you. So, sir, it does seem to me that some of the arguments you're making ask me to draw different or unfavorable inferences for the government, and I

don't think I can do that at this procedural posture of the case. Certainly, if there are inferences that are completely inappropriate or that no one could reasonably draw, I get that, but it does seem at times that you're saying you're suggesting that there's another way of looking at evidence. I understand that there is, and it's in fact a way that you've suggested to the jury that they ought to look at it, but they did not agree with you. I'm just not sure that that is Rule 29 worthy.

Separately, sometimes you're suggesting to me a burden here with venue that I think is higher than preponderance, so I'm just going to ask you to keep that in mind when I'm asking these questions.

You argue, sir, for substantial contacts test. This is multifactor analysis that is sometimes used where the defendant's contacts with the district are minimal, and I do understand that, but one of the cases on which you rely, which is *United States v. Kirk Tang Yuk*, 885 F.3d 57 specifically says, in a section that you've elected not to quote to me, that when an overt act in furtherance of a criminal conspiracy has been committed in this district, this supplemental inquiry has no relevance. The court goes on to say that a defendant participating in a conspiracy that is being conducted in part in the district of prosecution necessarily has sufficient substantial contacts to justify a finding of venue that is otherwise proper. So this would suggest, sir, that if I find a

covenant of good faith and fair dealing overt act, and we'll talk about what that might be, then venue is satisfied and I don't have to go to the substantial contacts theory. Conversely, if I don't find a qualifying overt act, I don't have to proceed to the substantial contacts test because we've already failed at the first step. Is my read of this case correct?

MR. KLEIN: Your Honor, I would just want to clarify the substantial contacts test. We applied that for the Infura payments. So I want to make sure that's been cabined in that area. So I just want to make that clear at the outset. We haven't argued that test for the other three bases the government alleges established venue under the preponderance test, so I want to make that part clear at the outset.

THE COURT: Okay.

MR. KLEIN: I think there, there isn't an overt act. So that's why we argued it there.

THE COURT: What I'm saying, and perhaps I wasn't clear a moment ago, if I don't find an overt act, I don't have to get to substantial contacts because I haven't found an overt act; is that correct?

MR. KLEIN: We don't disagree with you on that, your Honor, and that's why we focused it on the Infura payments.

THE COURT: That's why I'm wondering why do I have to focus on substantial contacts at all. What I'm saying, again,

is if I find a qualifying overt act, I don't have to do the substantial contacts analysis according to the *Kirk Tang Yuk* case, that's what it says. If I don't find a qualifying overt act, then I never have to get to the substantial contacts test because I don't have a qualifying overt act. That's what that case says. I'm trying to harmonize because I'm trying to understand what it means in this context, because it seems strange to append it as a separate level of inquiry when finding an overt act in the district seems to viciate its applicability.

MR. KLEIN: Well, what I think we say is, your Honor, the way we read that case and the way we read when you apply substantial contacts is if there's a question and sort of an equitable question about the weakness of the case and you could rely on it as a secondary test, and where we focus that test is in the Infura payments, and so that's where we think, in particular, that test applies. So, again, I just want to be clear about that part. So I don't necessarily disagree with your Honor, but I'm saying I think the tenor of that decision, the tenor of when to apply it is if there's a real sense that their argument is weaker and then you can apply it there. That's why we used it in the Infura payment section.

THE COURT: When you're speaking about weaker argument, you mean with respect to a particular overt act qualifying or not qualifying?

MR. KLEIN: Yes, your Honor.

THE COURT: So in ascertaining whether a particular overt act qualifies, I could then use this test?

I'll try that again, this time coherently, sir.

I read the language from the decision a moment ago.

MR. KLEIN: Yes, you did.

THE COURT: And it says if there is an overt act, I don't need to use this test. That's what it says.

MR. KLEIN: You don't need to, but you still could use it, your Honor.

THE COURT: No, actually, I'm being too nice. When an overt act has been committed in this district, the supplemental inquiry has no relevance. I'm trying to figure out when to use it then. That's the problem that I'm having, sir.

MR. KLEIN: I think you should use it for the Infura payments, your Honor, where there is no overt act where you could look at both tests and you could use it there. That's why we directed your attention to it in the Infura payments area. You haven't relied on that test in any other basis.

THE COURT: Okay. And we're in agreement, the qualifying overt act has to be committed by a member of the conspiracy and has to be reasonably foreseeable to your client?

MR. KLEIN: And material, your Honor.

THE COURT: I'm headed there next, sir, yes.

MR. KLEIN: Okay. Since then.

THE COURT: Okay. The materially further band to the conspiracy, that's from the *Royer* case, and I understand that. I've only seen it in two Second Circuit cases. When I saw it, the sentence that it's included in says — I'm quoting from *Royer* — this includes not just acts by coconspirators, but also acts that the conspirators caused others to take that materially further the ends of the conspiracy. Now, you and I could have long discussions about that, and which, and whether something is limiting or a positive, yes, I still remember how to diagram sentences, the nuns were very explicit in that regard, sir. But I want to understand, I took the materially furthering language to apply to acts that coconspirators caused others to take. You're suggesting that this materially furthering standard includes, as well, acts taken by coconspirators?

MR. KLEIN: Yes, your Honor. And I had underlined the same thing, your Honor. So I think we're on the same page here, literally, yes, your Honor. We think it applies to any act has to be materially in furtherance of the conspiracy.

THE COURT: I understand it has to be in furtherance of the conspiracy. It's this material furtherance that I'm not sure about because it only shows up, as I saw it, in the *Royer* case and then repeated in *United States v. Lange*, 834 F.3d 58. I don't see it showing up in other discussions of overt acts.

MR. KLEIN: Well, I think it may not because it's so

obvious it's material it's not an issue. But where it is immaterial or *de minimus*, then they discuss it, and I think that's the point of the *Royer* case. So I think we read that same sentence broader than your Honor appears to be reading it. We think any act in furtherance must be material.

THE COURT: Again, I don't know how to read it.

MR. KLEIN: Oh, sorry.

THE COURT: That's why we're having the discussion, again. But I appreciate that you're asking me to read it in a manner that the "material furtherance" language applies both to acts taken by coconspirators or the defendant, him or herself, and acts that coconspirators caused others to take.

MR. KLEIN: Yes, your Honor.

THE COURT: Let me please put to the side the communications with the BitMart attorney. I think the government has more problems with that than you do, and that's why not I'm not asking you questions about it, but I do want to talk about some of the other arguments.

With respect to the Infura payments, and I guess perhaps you'll bring in the substantial contacts test here, I'm understanding or the government was arguing that those payments were designed to keep Tornado Cash afloat. We can talk about whether there is sufficient evidence whether they went to a Manhattan-based bank account. I understand your view is that they don't. I'm trying to understand whether you are arguing,

as a baseline matter, that keeping Tornado Cash operational could not or was not an overt act for any account in this case.

MR. KLEIN: Yes, your Honor. What Infura was doing was not in furtherance of the conspiracy. So --

THE COURT: So Infura was allowing Tornado Cash to run, correct? The services that Infura provided allowed for the operation of Tornado Cash some component of the Tornado Cash protocol, did it not?

MR. KLEIN: A component, maybe, but not Tornado Cash overall. So I want to be specific there.

THE COURT: Okay. No, I appreciate you're very concerned about that, yes. I'm saying and the government's arguing that the services provided by Infura allowed Tornado Cash, as a protocol, and I know you guys disagree about what I should be looking at and how narrowly I should be looking at that, but it allowed it to operate.

MR. KLEIN: Those were for the UI, your Honor.

THE COURT: Yes, sir.

MR. KLEIN: And so not for Tornado Cash operating, to be very clear. So that's why I want to draw that distinction.

THE COURT: Fair enough. But was not the UI the principal way by which Tornado Cash was accessed? The people didn't access the pools directly because that messed up the anonymity issue.

MR. KLEIN: No, they could access it directly --

THE COURT: They could, but they elected not to in the main.

MR. KLEIN: Most people did. The evidence trial did establish that most people did access the pools through the UI, but the UI was not an essential component, it didn't transfer any funds. We're not going to do what all that, necessarily, past that.

THE COURT: Thank you.

MR. KLEIN: So the UI was one tool that someone could use to interface with the Tornado Cash protocol.

THE COURT: Correct.

MR. KLEIN: So it's not part of the protocol, your Honor, that's where I'm going to draw the distinction. It's a tool that allows to you access the smart contract pools.

THE COURT: I think the government will tell me that you're slicing the salami too thinly, and I understand that. We'll see. I appreciate that that's your argument, that's always been your argument, that I should look more narrowly than the government wants me to as to what constitutes Tornado Cash. But the point is, if, under my construction of things, the services Infura provided allowed users to access Tornado Cash, you're saying that's not an overt act?

MR. KLEIN: Yes, your Honor.

THE COURT: Because why? Because it wasn't undertaken with a criminal purpose, because all it did was keep afloat a

business that was not itself or per se illegal or something else?

MR. KLEIN: For many reasons, your Honor, the UI is a non-essential tool --

THE COURT: Did it have to be essential to be an overt act, sir? Well, I guess you would say yes under the material.

MR. KLEIN: Yes.

THE COURT: The material furtherance that I'm not sure I agree with. All right.

MR. KLEIN: It's a non-essential tool, your Honor, it's a neutral tool. So it's not a tool designed specifically to engage in money laundering. You could, legitimate users could and did use it --

THE COURT: I saw the neutral tool argument made throughout your briefing. It wasn't obvious to me that that's something that courts looking at sufficiency of the evidence challenges or looking at overt acts are looking for this neutral versus not neutral tool. It's just something I've not seen in the case law.

MR. KLEIN: I think that has arisen in this case, your Honor, obviously, and it's a major component of this case, and there's a lot of, I think we can all agree, unique components to this case that there are interceptions of lots of different areas of the law. So I think we'd emphasize that point because I think it is important for many of the charges here, in fact

all of them. So, it is a non-essential neutral tool. I think that's an important part.

These payments, I mean, I would just start stepping back even. Even if your Honor found that, there's still no connection to New York.

THE COURT: Found what, please, sir?

MR. KLEIN: Found that the UI was material to the furtherance of the conspiracy. There's still, as we all know in this test, whether it was a connection to this district.

THE COURT: Yes.

MR. KLEIN: And that's woefully -- there's no existence of that evidence. So it's only pure speculation by the government. So I think that's the starting point, is like, is there any connection to any of this, Infura, to this district? And there is none. It's only speculation by the government about those payments and what you could, like, kind of payment after March, did it have an invoice, did it mention New York. Somehow that means, if you remember, your Honor, and I'm sure you do, the payments starting in March were all cryptocurrency. They were not sent to New York. There's no evidence, the government didn't argue that. What the evidence does show is there was an invoice sent for those cryptocurrency payments that reference New York, but that was for a bank account in New York that our client didn't use, he paid in cryptocurrency. So the only bank account that possibly could

have been used is when they were paying in fiat before March, so February or earlier. There is no evidence that those payments went to a bank account in New York. It's pure speculation that a March invoice referring to a bank account in New York actually is a bank account when they paid in fiat in February and earlier. So there is no tie to New York for this Infura payments. And that's a key starting point here, and I don't want that to get lost in the discussion.

THE COURT: I understand. I know the government disagrees with you. They suggest that if I look at the bank records in their totality, I'm going to see payments, fiat payments to New York.

MR. KLEIN: The only thing they latch onto is, I think, your Honor, is there is a Peppersec record, bank record, there was some reference to New York, which has only been highlighted here. At this late stage, I don't think this was ever brought up with the jury, but even that isn't enough, your Honor. We talk about how a ministerial payment to a third party is not enough. And so the payment wasn't directly to Infura, obviously it went to a bank account. And the sliver of possible evidence, which we disagree with, it doesn't meet the preponderance standard set, or in speculation, is that those payments went to a New York bank before February and earlier.

THE COURT: A lot of your arguments are predicated on the premise that Tornado Cash began its life as a non-criminal

enterprise. There's no evidence, for example, that it was developed in order to facilitate the commission of crimes, there's no evidence that people sat in a room and said let us build a better mousetrap specifically for criminals. And, of course, the government suggests that, over time and as a result of information or certain actions that were taken, things became criminal, and I know you disagree with that. But are you suggesting that because Tornado Cash at its inception was not criminal, or at least the government hasn't argued otherwise, that anything done to keep Tornado Cash afloat could not be an overt act and could not support a conviction?

MR. KLEIN: Your Honor, what we said, and to be clear, and I'll start off with this point, which needs to be very clear, a cryptocurrency mixer is legal, the government's agreed with that. We filed a motion in limine asking not to argue against that and you ruled it was moot. So, starting the cryptocurrency mixer — perfectly legal. Just that abstract idea, and that's what started here.

So, maintaining your cryptocurrency mixer and continuing in this universe of helping that code or do things, that would also be legal, because if -- a cryptocurrency mixer itself is legal, right. So we need to have that in mind when we look at all this evidence. The government can't argue and isn't going to argue that running a cryptocurrency mixer itself is illegal. And so I think that's an important starting point

here and that's where we would start when you think about this, that that is very clear. So it's legal to have a cryptocurrency mixer, it's legal to operate one, full stop.

The government's arguments, and again, I spent a lot of time on this, as you know, talking about how it's all backwards-looking. It's well, you built this thing, you learn bad people were misusing it to some degree, and you didn't take steps to stop them or fix it, right. That's the nutshell of what they've argued, is the evidence that shows -- that they claim shows there was a bad agreement at the start. The problem with that, your Honor, is of course that's just really a negligence case, which we've said repeatedly. I don't want to beat that drum a lot, of course, but that's what we're saying, is all their evidence is negligence evidence. And if they're committed to use --

THE COURT: Let's pause there, please, because at times you argue this is a case of inaction. The government's made very clear, and you may disagree with it, but they made very clear that they're not holding your client liable for your client's inaction, but for affirmative conduct in which he engaged. So I'm understanding the pivot to be that this affirmative conduct is, at most, negligence and not willful conduct warranting the imposition of criminal penalties. If you're going to talk to me about inaction, I'm probably not going to listen to you because I don't think that's what the

government is -- you just say it in your briefing.

MR. KLEIN: I'm not -- in responding to your question, I'm not saying that, but your theory is broader. But yes, for answering your question, your Honor, and taking your supposition that they're arguing that the affirmative steps they took when they were running it, like the Chainalysis oracle, adding features, that those were half measures or those were window dressings.

THE COURT: Yes.

MR. KLEIN: And those affirmative steps show somehow that back at the beginning, this was a criminal conspiracy and throughout it was.

THE COURT: But my point, sir, is I may ultimately agree with you that the affirmative conduct posited by the government does not suffice. I'm asking you not to argue to me today that your client's being prosecuted for his inaction. That's what I'm saying.

MR. KLEIN: We maintain that argument. I won't argue it to your Honor. But we do think he is being prosecuted for not taking certain steps. And I'll give you an example, which is clearly they brought up Mr. Werlau, this expert, to talk about they should have had a user registry.

THE COURT: Yes.

MR. KLEIN: And so they didn't do that, right. So it's not just things he did that -- they actually put in

affirmative evidence that said, hey, here's something you could have done. And now stepping back, we have a lot of problems with Mr. Werlau's registry because I will tell you now, your Honor, I think it's so obvious and common sense tells us if they had actually done the user registry, which only asks for a name and email address, the government would have been pounding this table throughout the trial about how that was window dressing and a half measure. Common sense tells us and our expert even told the jury that wouldn't have been effective at stopping people from misusing it because, of course, a North Korean hacker could enter in a fake name and enter in a fake email address and then just still use it, the UI. So this is where we're getting in this issue of both of what they claim are affirmative actions, which show intent, which we disagree with, but also inaction. That's why I want to be specific there.

THE COURT: I appreciate the clarification. I understand.

Let's switch to the existence and the ability to access the Tornado Cash website. The government has argued maintenance of a website can itself be an overt act. Why isn't it one here?

MR. KLEIN: Well, first of all, the website did nothing to further the misuse. The website is a neutral website just like it had information. It didn't say, come in

hackers, welcome all money launderers.

THE COURT: It would have been surprising for them to do that though.

MR. KLEIN: You'd be surprised what people put on websites, your Honor.

THE COURT: All right.

MR. KLEIN: A lot of the cases we looked at and they tried to cite to are literally message boards and websites for child pornographers, right, that actually do do those things. So I want to be clear about that. There are cases where people do do that. So having a neutral informational website, it doesn't specifically -- it's neutral. It's not saying anything to anybody about using money laundering. There's no evidence of that. We put that in. You can look at it. There's no way to read it that way. And so maintaining a website like that is not in furtherance of the conspiracy.

THE COURT: With respect to Mr. Ahmed's depositive assets, you suggested that doesn't suffice to constitute an overt act because it was too brief and it was too insubstantial to further the conspiracy. I thought the point was, there's the overt act, was the fact that Mr. Storm and his colleagues maintained a website that could be accessed by customers like Mr. Ahmed and where deposits could be made.

MR. KLEIN: Well, there's a lot of problems with Mr. -- that's one point we raised. There's a lot of problems

with that evidence as a basis for venue.

First of all, he didn't actually use Tornado Cash for his hack, right. When he got up and testified, he said, I went there to see the later wallet that I used, right.

THE COURT: Yes.

MR. KLEIN: So when he used Tornado Cash was not to launder money, not to violate sanctions. So let's just start there, right, Counts One and Three. He used it, what he claimed was, for this discrete purpose. He doesn't recall -- he testified that -- I think he saw it or used it, but he didn't actually recognize the website when he was asked about it. And his -- that's not as a basis for venue, your Honor. I mean, he happened to be in New York, but he used a neutral tool before he even committed the crime.

THE COURT: You keep talking about neutral tool. My memory of the charge for an overt act is that it has to be in furtherance of the conspiracy. The act itself does not have to be illegal, it just has to be in furtherance of the conspiracy. And by the way, my charge nowhere has the words "materially further." So I'm just not sure. The neutral tool construct that you're giving me, it may just be because of the nature of this case, but I just don't remember charging the jury that that's what it -- I don't remember you asking me to charge the jury that the overt act had to be itself non-neutral.

MR. KLEIN: That was a while ago and I don't remember,

so I don't want to go back and guess what we objected to. I know we put our objections on the record.

But, your Honor, what he was doing was not in furtherance of the conspiracy they charged Mr. Storm of committing, which was money laundering, violating sanctions and operating an unlicensed money transferring business. What he was doing was just moving funds through Tornado Cash and then later committing the crime.

THE COURT: Turning now to the counts of conviction, I realize I have a whole lot here about action. Just noting at the government's opposition at pages 3 and 8 and 14 and 87, there are — and I will be discussing this with government at some length — what the government considers to be the affirmative conduct in this case. But later on you say, okay, maybe there was affirmative conduct, but there's no proof that it was taken -- I believe your words were that it was taken or done for the criminal purpose of assisting bad actors. Now, maybe, but it sounds to me as though the government argued to the contrary, everybody argued this at length, and the jury disagreed. Why is it that I should be -- this isn't a Rule 33. There's no suggestion yet that I instructed the jury incorrectly. If they were presented with the same evidence that we're talking about today, they made a contrary decision. Why should I invade and overturn that decision?

MR. KLEIN: So I think the portion you're talking

about is in the money laundering or sanctions provision.

THE COURT: It's money laundering, yes.

MR. KLEIN: So I'm happy to hand this off to Ms. Axel. She did a fantastic job with that and seems very ready to address it.

MS. AXEL: Yes, your Honor. And I apologize, I'm fighting a cold here.

THE COURT: Sorry hear that.

MS. AXEL: So you may hear me, I feel a little bit like I'm speaking through a tunnel.

I think, your Honor, we view the consistent use of the word "affirmative conduct" to actually be insincere, I think. There really is not affirmative conduct that they point to, other than continuing to support the protocol, push out upgrades to the protocol, continue to support the UI. That's the only alleged affirmative conduct. None of the so-called affirmative conduct has any nexus to an unlawful purpose.

THE COURT: It seems to me, as well, the government is arguing that the affirmative conduct includes acts of concealment — and I will talk to government about this, as well, so they can be forewarned — regarding either the centralization or not of governance and the monetization or the money that Mr. Storm could or could not derive from it. So those things, as well, consilient of that information, also seems to be part of the affirmative conduct they're outlining.

You may think it's not sufficient, but I think it includes that, as well.

MS. AXEL: Is your Honor referring to what they call kind of consciousness of guilt evidence?

THE COURT: No. What I'm saying is the government's opposition at page 3 where they're talking about the conduct that was taken, it includes concealment of criminal proceeds and the movement of funds. At page 87 of the government's opposition, when they're talking about the IEEPA account in Lazarus Group, they say, as well, that conduct included lying to the public about the effect of purported screening mechanisms he had implemented to profit handsomely from the Lazarus Group's payment of relayer fees. What I'm saying is you say it's just maintaining Tornado Cash and improving Tornado Cash. As an initial matter, your adversaries say those improvements, and the way in which they were reached and the discussions that were had, suggest that Mr. Storm and his colleagues deliberately refrained from making improvements that would tamp down on criminal activity. They believe that amounts to criminal conduct. You may disagree and we'll talk about it.

Separately, they're saying that actions taken by your client to conceal information about the ability to control components of the protocol and about the money that he could and was making from Tornado Cash is also part of the

affirmative conduct. That's at least what I'm understanding. So please engage on that.

MS. AXEL: Your Honor, first of all, before you stopped me, the formulation the Court gave me, again, was one of inaction, a failure to take some sort of remedy. So, again, I think it's very clear, we'll just start with this, the Court already addressed inaction in the discussion with Mr. Klein. I think it's very clear from the authorities we have that an inaction is not sufficient to reach a criminal agreement, to reach willful participation, neither of those things.

THE COURT: I think the difficulty I was having with Mr. Klein, and he was very helpful at clarifying it, is that sometimes it's like two sides of a coin, what you're saying is inaction and the government is disclaiming as inaction. The government would then say, well, actually, it was choosing to do something else. When you choose to do something else, your action sort of includes with it inaction in another context. And so I'll walk back a little bit my concerns about your arguments about predicating things on inaction. I'm just noting that I think what the government is talking about is your client making decisions to do one thing over another.

MS. AXEL: What they have said multiple times, and, again, we reference closing argument, your Honor, simply to kind of attempt to parse out what their argument actually was. I think they simply doubled down on this in their papers. The

founders agreed to maintain the business and it continue its operations. And, again, we already talked about it with Mr. Klein, there was an agreement here that there's no evidence that this was illegal from the outset or had an unlawful purpose from the outset. So, and then agreed to maintain it, including upgrading software and finding a way to monetize it, even after they knew it had become a haven for hackers, money launderers, and sanctions evaders.

So, again, we have this idea that because there's general public knowledge that this product, the protocol, the software itself can be misused, they continue to upgrade it and ultimately seek to monetize it. That is the heart of their argument and that is one that's based on -- it's inadequate as a matter of criminal purpose. There's no direct evidence, not even circumstantial evidence that they wanted to facilitate money laundering or sanctions evasion. There's zero of it. No evidence of a desire to break the law. We've given the Court --

THE COURT: There's a fair amount of internal communications that one could read to suggest that Mr. Storm and his colleagues had concerns that they were allowing criminal conduct to take place under Tornado Cash and that they themselves could be liable for it. There is. We can't deny that there is. Now, whether their concerns actually bear out to criminal liability may be a different issue. They weren't

unaware of the possibility of liability for what was going on in Tornado Cash.

MS. AXEL: Well, again, you're referring to consciousness of guilt evidence. Again, I think the case law, it is very clear, you can't rely on consciousness of guilt evidence to come in and satisfy its intent. It's insufficient. We cited case law that said that. It actually is very weak evidence. I actually think, too, your Honor, when you look at the evidence itself, it's very weak. "The guys were effed" comment comes in the context of discussing -- comes right before discussing the sanctions oracle, which they did implement. So the consciousness there is we need to do something at which point they did something. So I think a lot of that evidence is very -- it's cabined within the context. The other statement about law enforcement is in that same chat, all of which is, you know, Mr. Storm weighing against his colleagues to implement the Chainalysis oracle, which they did. So I think you can't take that evidence out of that context and suggest that it provides some other broader thing.

Again, we have no evidence here of a desire to break the law. Again, so consciousness of guilt here is like the knowledge that somebody else might investigate. It is hardly really surprising after OFAC issues a specific order affecting this particular wallet. And this happens really, really, late, your Honor, in the alleged conspiracy.

So I think the evidence they point to is knowledge of illicit use coupled with continued promotion of the platform. That doesn't get you there. Consciousness of guilt and even, again, lies to victims. What are the lies to victims? About the effectiveness of a remedy? I mean we reject that those are lies anyway.

THE COURT: Well, yes, right, that's a problem. The problem is that, again, you have a fundamental disagreement over whether they could make changes to Tornado Cash that would or would not have this effect or be effective. But, as well, right, the government's arguing that when they told victims that there was nothing they could do, that in fact there was something they could do.

MS. AXEL: Again, your Honor, you're characterizing the statements much as the government does.

THE COURT: Well, I have to because that's where we are. I have to give the best inferences because that is what the jury found. I'm not doing it in my capacity as me, I'm doing it because, at this stage, I must give the government's best inferences for this evidence. Not unrealistic ones, but --

MS. AXEL: Well, it's not realistic, and I guess that's what I was going to say about the alleged light. So, for example, the statement to BitMart or to any of the victims. What the victims asked was, can you get my money back, you

know, can you trace this, what can you do about it. They haven't pointed to a single alleged lie where anyone came in and said, you know, can you make changes to the protocol to prevent this kind of action in the future. No one asked that. What they asked was, my money was stolen, can you trace it? No, they can't. That's the question. That's the BitMart question. And it didn't lull anybody. It wasn't intended to lull anybody. The BitMart attorney testified that after he received that communication, he then did in fact inform law enforcement and take that next step. There's no lulling there to try to get somebody not to inform law enforcement. And again, this is against the backdrop of this being a totally public project with which Mr. Storm was affiliated.

So, getting back to the Court's concealment question, I don't think there is evidence of concealment here. That is not evidence of concealment, to provide a lawful answer. And the Court can actually look at the exhibit itself and see if it is capable of the inference that the government is urging.

Keep in mind on money laundering and sanctions evasion, we don't have a jury verdict here. Even if we did, the Court can look at the exhibit itself and say is it capable of that inference that they're urging from it, which is somehow that it deceived victims about what changes could be made. It's not about that. And the Court can actually look at that.

So, you know, what they have, your Honor, on the

conduct is a grab bag of stuff that's actually very weak. I quoted from their argument on the bottom of page 71 and 72 when they get to trying to summarize evidence, they point to the sheer volume of laundered funds, communications received about Tornado Cash concealing dirty money, founders internal knowledge about laundering — those are all one thing. Those three things are all one thing. That's what they point to continually. You're on notice, you received information, you learned about hacks, you knew Tornado Cash was being misused. Four, consciousness of guilt, which I just addressed. And five, millions of dollars of Torn ultimately sold at the end. And none of that, your Honor, amounts to an agreement to an unlawful purpose.

On the inaction front, I would remind the Court that there's a series of cases here that I think are critical, including *Morissette*, you can't presume intent. You must actively participate in a criminal venture with full knowledge. That's *Rosemond*. And then, your Honor, I think, very critically, *Falcone*, the Second Circuit case that was recently cited in the *Smith & Wesson* case, and I think, your Honor, that's very similar here. This is a prohibitionary case where the defendant sold sugar and knew that one of the places he sold sugar to was a still that was using it to make prohibited liquor. The court there said that it's not enough that the defendant does not forego a lawful activity. He must in some

sense promote the venture himself. And the Supreme Court recently cited this in *Smith & Wesson*. Also, in *Falcone* and in *Twitter*, the Supreme Court cited the *Direct Sales* case, inference of knowledge, and another old Supreme Court case, inference of knowledge of a conspiracy can't be drawn merely from knowledge the buyer will use the goods illegally. I think those all go to the inaction problem here. You can have the affirmative conduct of continuing to run a business, you can even know that someone is going to misuse your product as in the *Falcone* case, but the question is whether you joined how to common-goal in that venture, and that's ultimately where *Direct Sales* comes up. *Direct Sales* says, well, ultimately, the seller -- sorry. The seller, based on extensive pattern of knowledge, does join in a common goal with the buyer, but until you get to that common goal with the actual unlawful actor, you don't have a criminal conspiracy. And I guess, if this is a good opportunity, but I can wait and answer the Court's questions, as well.

THE COURT: Go ahead, because my next question, and I don't have many more on this substance, goes to the 1960 claim. So go ahead.

MS. AXEL: Okay. Great. So this is a good segue, your Honor, for me to address the argument that we've, I think, very fully developed in these papers, but I would like to reorient the Court because I think I cited the cases in the

wrong order.

THE COURT: Okay.

MS. AXEL: I would like to --

THE COURT: I'm troubled by your suggestion I need to be reoriented.

MS. AXEL: Because of the way we presented the issue, your Honor.

THE COURT: Okay. Go ahead.

MS. AXEL: I think the Court will appreciate this.

So, your Honor, we've argued to the Court — and I think it's crystal clear, actually — that a coconspirator has to conduct the money laundering transaction. You have to agree that as part of the criminal agreement, the defendant must agree that a coconspirator will conduct the actual transaction. And this is an argument we made at jury instructions and at the close of the case, and I think --

THE COURT: But this was also part of, I think, your motion to dismiss that I rejected, no?

MS. AXEL: I think your Honor focused there on knowledge and intent and not the fact that the conduct of the specific money laundering transaction, the agreement to conduct, it has to be a coconspirator that's going to conduct the transaction. I don't think that was fully developed in the motion to dismiss, I think maybe by the time of the motion for reconsideration, but not in the motion to dismiss.

And here's why I think we're absolutely right and we had a lot more time I think to dig into the research here. I think, your Honor, starting with *Twitter*, the most recent Supreme Court case, it says that a significant limiting principle of conspiracy liability is an agreement with the primary wrongdoer to commit the wrongful act.

And then I think there's really two other Supreme Court cases that I would ask the Court to read because I think they're completely clear on this point. One is *Ocasio v. United States* — these are recent cases — and *Salinas v. United States*. In *Ocasio*, it says a defendant must reach an agreement with the specific intent that the underlying crime be committed by some member of the conspiracy. In other words, each conspirator must have specifically intended that some conspirator commit each element of the substantive offense. That's the problem, and we've been trying to focus on that from the motion to dismiss when the Court and I had the mob boss dialogue and from that point forward, but I think this case law really hits the nail on the head. *Salinas*, a person may be convicted of conspiracy so long as he agrees with another person that they or one or more of them will engage in the conduct that constitutes the crime. And *Salinas*, I think, relevantly, cites the model penal code for the underlying principles of conspiracy. *Salinas* is a RICO case. But, also, RICO was passed in the '70s, similar to 1956(h). And what the

Supreme Court says is you look to the common law at the time to see what Congress intended for this particular statute. And this is the model penal code. And the model penal code says a coconspirator has to be the one that's going to commit the substantive act. And that's always been the problem, is the problem here, your Honor, for conducting, and it's a problem on knowledge. And they're related sort of reciprocal. But you can't have a money laundering case, a conspiracy to money launder. You can't say that the defendant intended to commit the object, he can't agree to object of the crime unless he agrees to the elements of that, and that includes agreeing that some coconspirator will conduct the actual money laundering act. We obviously don't have that here. And without that, your Honor, they've extended, they've attempted to extend conspiracy liability beyond the breaking point far beyond where it was ever meant to go. And I think, again, then you return back when you read *Twitter* and you read *Smith & Wesson* and you say, this is what the Supreme Court would say in this case, this is beyond the scope of criminal conspiracy to say I developed something that's misused by bad actors that the government admits are third parties and are not part of the same conspiracy.

And I would also then draw the Court back to *Direct Sales*, because *Direct Sales* says that, at the end of the day, it's one conspiracy or *Blumenthal*, another prohibition era

case. In *Blumenthal*, the Court says you can have downstream coconspirators. It's also a whiskey case involving whiskey sales and you've got pubs down at the far end. These people don't have to know each other, but when somebody agrees to the conspiracy, they have to understand that this is a common goal, that the whole conspiracy only makes the end users responsible for what happened at the beginning. And the whole conspiracy, like relevant conduct, your Honor, if they're in -- I'm sorry, your Honor. I know you can follow me, so I tend to speed up. You can only hold those downstream coconspirators liable for the whole thing if we're in the same conspiracy together.

THE COURT: You're still not listening to my hand signals. Please slow down.

MS. AXEL: I'm sorry.

And so here where we have clear government theory, the government says things like it's never been our theory that the bad actors are in the conspiracy and we say, yes, that's the problem with your theory.

THE COURT: Yes.

MS. AXEL: And so they've actually admitted they do not have a viable money laundering theory under *Twitter*, *Ocasio*, *Salinas*, *Falcone*.

THE COURT: Let me return to Mr. Klein. Thank you.

MS. AXEL: Thank you.

THE COURT: Mr. Klein, you argue in your papers that

Mr. Storm needed advance knowledge of the criminal nature of the transactions, and I wanted to be sure that I understood the timeframe there. You're making that argument on a transaction-by-transaction basis that he had to know *ex ante* that a transaction was going to be processed through Tornado Cash that was itself illegal in some way?

MR. KLEIN: Yes, your Honor.

THE COURT: But with respect, for example, to the Ronin hack, if it was obvious — and it seemed to be obvious to your client and his colleagues — that the Lazarus Group was laundering the proceeds of this hack through Tornado Cash, at some point, wasn't it enough to know that that was what they were doing, that they were attuned to it? I'm not sure how he could have known before the transaction was effectuated that it was effectuated, but he did know that for six weeks they were laundering the proceeds of the hack through Tornado Cash.

MR. KLEIN: Your Honor, I don't think that's what the evidence actually shows and what he knew. So, to be clear, there was reporting about the Ronin hack, there was reporting — and this is third-party reporting — that those proceeds were going to potentially go through Tornado Cash, the smart contract pools. And I know we all know this, but I think it's worth emphasizing, he had no contact with the hackers. They didn't come and ever tell him we're about to send the proceeds through.

THE COURT: Of course.

MR. KLEIN: That's, I think, important because that does happen in cases, right. Often, money launderers do know those things. Often, people running unlicensed transmitting businesses that violate subsection C do know those things, that's how they're proving it. So that they are engaged — and this ties into Ms. Axel's point — with the people committing the crimes and they have full awareness of the specific funds that are being processed are from an illegal source.

And so there was -- the evidence does show there was concern, and they did discuss about it because of this third-party reporting. And they took some steps, including the Chainalysis oracle, but they didn't know the specific funds and when, how, where. And that's really important, your Honor, because the government put on an FBI agent, as you remember, who talked, Mr. DeCapua, talked a lot about how all these funds moved. And what we learned from that and what the jurors looked toward and every inference points to, the hackers just didn't take it from the hack in none of the exhibits they had and just moved it directly into Tornado Cash. It was constantly moving around and doing different laps in different wallets and generating new wallets to tons of intermediary wallets. And then, at some point, some funds might have gone through Tornado Cash. But the actual, knowing those specific funds were coming through, when, where, how, or even if they

went through — no. And what we do know is that sometimes after he did learn that, people did come in and say, hey, my funds are in a smart contract pool — again, a third party telling him that, but that's after when he couldn't do anything. Because we all can agree, and this is undisputed by the government, what's in the smart contract pool, only the user with the secret note has access. Our client never had access, never could do anything.

And so I think we stand by that argument, we stand by that application of the law, we stand by what the facts indisputably showed here.

THE COURT: Thank you.

I would like to turn now to the government. Mr. Arad, I actually want to move backwards, and that's because, as I think is evidenced from the briefing and from the questions and discussion had this morning, there's just a fundamental dispute about whether the trial evidence demonstrated inaction or culpable inaction, or negligent conduct, or willful misconduct. So I think I have to go back and make sure I understand the government's theory of the case so that I didn't miscite arguments when I was having my discussions with Mr. Klein and Ms. Axel.

So, starting at step 1, the government's not arguing that Mr. Storm and his colleagues committed a crime in developing and launching Tornado Cash, correct?

MR. ARAD: Correct.

THE COURT: The government is not arguing that Mr. Storm and his colleagues committed a crime in not shutting down Tornado Cash upon learning that bad actors were using it to launder criminal proceeds, correct?

MR. ARAD: That is one way in which the defendant and his coconspirators could have avoided committing a crime, could have stopped committing a crime. There were several ways in which they could have stopped committing crimes. One of them would have been to shut down the service, another would have been to simply withdraw.

THE COURT: If all that the evidence showed was that, and we can perhaps have a smaller timeframe, if Mr. Storm learned that someone was using Tornado Cash to launder proceeds, are you suggesting that his failure to shut down Tornado Cash exposed him to criminal liability or, if you will, is a basis on which I can uphold his conviction in this case?

MR. ARAD: No, your Honor. But I want to be very clear about a few things in that answer.

THE COURT: Okay.

MR. ARAD: I was listening very carefully to the Court's question.

THE COURT: Thank you.

MR. ARAD: The question was whether that knowledge that someone had misused Tornado Cash would require him to take

a step like shutting it down, and the answer to that very narrow question is no. But the evidence at trial showed a lot more than that. He didn't just learn that someone had misused Tornado Cash in the past. He learned over a period of years that multiple criminal actors were regularly using Tornado Cash at huge volumes. And I want to take this to the Ronin hack because this sort of represents the whole case in a nutshell.

With respect to the Ronin hack, the defendant not only learned that these sanctioned North Korean cyber criminals — so not just someone — were laundering money through Tornado Cash, he learned they were doing it to the scale of hundreds of millions of dollars --

THE COURT: Please stop. I might even agree with you. Are you saying that Mr. Storm's failure to shut down Tornado Cash upon learning of the Lazarus Group's use of Tornado Cash to launder the proceeds of the Ronin hack in and of itself exposed him to criminal liability?

MR. ARAD: It's his continuing to operate Tornado Cash, which is not the same thing.

THE COURT: Are you sure? I need to understand, because I feel like I just said that. I just said failing to shut it down, you said continuing to operate. Are they not two sides of the same coin?

MR. ARAD: I am sure. I think the nuances do matter here, your Honor. He could have, for example, withdrawn. He

didn't have to shut down Tornado Cash, he didn't have to say Tornado Cash is no longer a going concern, we're not going to pay for the website, we're not going to do this, we're not going to do that. All he had to say is, I am stepping back, I am not going to participate in this anymore because I know that everything that I do to participate in the Tornado Cash enterprise in its current state is promoting these criminal activities.

THE COURT: This is what confuses me. I thought what you were going to be arguing to me based on many, many discussions we've had in the past is not that operating Tornado Cash is a basis for a criminal conviction and not that continuing to operate with knowledge that there are some bad actors using it, I thought what you were saying was that the conscious decision to implement improvements to or developments of the Tornado Cash software with knowledge that the system was then being used by bad actors and the decision to do that while monetizing or trying to implement a relay or register tied to the Torn token that ended up resulting in some monetary benefits to Mr. Storm, that that's what got the conduct.

So I want to understand perhaps, and maybe I should have asked the question this way, at what point factually did criminal liability inhere?

MR. ARAD: Once the defendant knew that his service was in large part serving criminal actors and would continue to

do so. Every step he took that was in furtherance of that service was a criminal act. There are multiple categories of conduct that fall under that umbrella, which I will call operating Tornado Cash. The Court drew an important distinction between what I might call the humdrum daily operations of Tornado Cash and certain acts that the defendant undertook to improve Tornado Cash to make it more effective in ways that would serve these criminals.

THE COURT: But please pause because, and this was the basis for these questions in the first instance, I wanted to be sure you weren't saying that merely developing and launching Tornado Cash and finding out it was being misused was itself a basis for criminal liability, and you're not saying that, but you seem to suggest that the decision to continue operations upon learning that a substantial portion of clients were using it for bad ends subjected him to criminal liability, and that's what concerns me. Maybe I was misunderstanding the government's theory of the case, and that's embarrassing if it's true, but I thought the point was that knowledge plus improvements, not just maintenance, but improvements plus monetization was what the government was predicating criminal liability on. But if what you're saying is that merely keeping the business afloat while knowing that it was being used for bad purposes, that that's enough for criminal liability, then tell me, but I'm concerned if that's your theory. And I don't

think that's what the jury convicted on, but we'll see.

MR. ARAD: The theory that your Honor understood the government to be pursuing is the full package. That was the full set of evidence that the government presented to the jury and asked the jury to conclude guilt from. And I believe that that is what the jury did.

But the government's theory is broader than that. The government's theory is that at some point when this business became obviously to the defendant in large part serving only criminal actors — and this next point is key — and even the legitimate transactions that went through Tornado Cash became illegitimate because they also facilitated the criminal ends of the money transmitting of the money laundering and of the sanctions evasion --

THE COURT: Because they kept the pools afloat? You're saying legitimate transactions in Tornado Cash, folks who were concerned about privacy and not committing bad acts.

MR. ARAD: Right.

THE COURT: But putting their money in there, they were allowing what? They were keeping pools afloat that allowed bad actors to use them for bad means?

MR. ARAD: They were helping in a number of ways. And by the way, I'm not suggesting that they --

THE COURT: They clearly had no knowledge of that.

MR. ARAD: I was just about to say, I'm not suggesting

that they had knowledge of that, but I'm saying that once the money was mixed, the presence there of what otherwise might be considered money from clean transactions dirtied that money and dirtied those transactions, not from the perspective of the innocent depositors of which there were a few, but from the perspective of the defendant and his coconspirators.

And there were a number of ways in which this was true, your Honor. One is the anonymity set. The size of the pools mattered to making Tornado Cash an effective tool of concealing money. And so the innocent funds that were in there helped to hide the criminal funds.

With respect to sanctions evasion --

THE COURT: And therefore what? Therefore what? Therefore, Mr. Storm is criminally liable because even the non-criminal users were aiding the criminal users and he's somehow -- I mean, my concern, as I hope you know, is we have a standard of willfulness here. You're suggesting that maintaining this knowing that there are bad actors and that there are good actors who are perhaps hiding the bad actors unwittingly is willful conduct on the part of Mr. Storm?

MR. ARAD: Once the extent of criminal activity rises to the level that it did for the time period that it did on Tornado Cash, yes, your Honor. We focused a lot on the Court's instruction on willfulness, which was that to act willfully means to act knowingly and with a wrongful purpose, either to

disobey or disregard a law.

THE COURT: Yes.

MR. ARAD: Every morning that the defendant went to work on Tornado Cash, once he knew that hundreds of millions of dollars of criminal proceeds were passing through his system and would continue to pass through his system, and in the example of the Lazarus Group, knew exactly which criminal group was making those deposits and had information about the primary wallet from which those deposits were coming, yes. At that point, every time the defendant went to work, he knew that every act he took in furtherance of Tornado Cash was in furtherance of those transactions and more would come later.

THE COURT: But you're not asking me to sustain the jury's conviction or to allow the other claims to go forward to a retrial based merely on the Ronin hack, because the Ronin hack was at the tail end of this conspiracy. You're suggesting to me that just learning that a percentage, and I think, was it at the trial, was it Agent DeCapua who did a conservative estimate at 37 percent or something along those lines?

MR. ARAD: That was during an earlier hack. During the Ronin hack, it was around 55 percent.

THE COURT: Okay. Fine, it's not 100 percent. 37 percent or 55 percent, once they knew that, they had an obligation to stop or to withdraw. My concern, sir, and it's interesting because I might argue that you were doing better

before you started talking, but you're suggesting -- I was fine, I understood your argument that it was one thing to let Tornado Cash lie and remain operational, it was something else to try and improve on it. It was something else to improve on it in a manner that made it more appetizing for folks who were using it for criminal conduct and to refrain from implementing measures that you argue and the defense contests would do something to tamp down on the criminal conduct, but now you are saying that letting the pools remain operational in the face of knowledge that a substantial percentage of the transactions were being used for criminal conduct is itself a sufficient basis for liability. Why are you taking that on?

MR. ARAD: I'm not, your Honor.

THE COURT: But you just did.

MR. ARAD: It's not that letting the pools remain was a sufficient basis for criminal liability.

THE COURT: Okay.

MR. ARAD: It was taking active steps to maintain and improve them.

And I just want to be clear about one thing. I was trying to listen very carefully to your Honor's question, which is what is the government's theory of the case, what is the most expansive theory of the case the government has what is outside the bounds of the government's theory of the case, which is a different question from, on a Rule 29 motion, did

the government present enough evidence for the jury to reasonably convict. And there, I just want it to be clear that I was trying to answer your Honor's question as directly as I could.

THE COURT: I understand that, but I guess what you're suggesting is that the construction that I offered earlier in this conversation about what I understood the government's theory to be was in fact what was argued to the jury and what you believe they in fact convicted on, but you're letting me know so that I don't get worried about such things, that there was an even more expansive basis on which I could sustain the jury's conviction.

MR. ARAD: Yes.

THE COURT: I just don't know why you're biting that off as an appellate issue. I mean, you are and you did, I'm not sure why, but that's fine, that's what you did.

Let me understand something different. Ms. Axel and I had a substantial discussion about the two sides of the action coin, inaction versus action that excludes other actions. What is the conduct of Mr. Storm that subjects him to criminal liability in this case?

MR. ARAD: His conduct was, your Honor, multifold. At every turn, Mr. Storm took steps to enhance the Tornado Cash protocol in ways that would make it more effective, yes, for all of its users, including its criminal users who were a

substantial portion. He enhanced the protocol in order to make it profitable for himself. He did that in a way that, in turn, made it more effective for criminals to use because the presence of relayers was the icing on the cake that made every transaction that went through Tornado Cash truly secret on the Blockchain.

THE COURT: It may be that I can't formulate an adequate hypothetical here, but it seems to me that if you are making improvements to your website, Windows makes improvements to improve functionality, to perhaps change the screen so I can have it look more to my liking, and I, as noncriminal, may find these developments to be beneficial and in fact useful, and some criminal may like to choose his background colors, as well. It can't be that an improvement to a website on that level that benefits good and bad actors equally matters. I'd like to understand, maybe you are arguing that the particular improvements that Mr. Storm and his colleagues implemented to Tornado Cash were particularly focused on aiding those who were engaged in criminal activity by design, not by effect.

MR. ARAD: That's correct, your Honor. Many of the improvements that the defendant undertook did aid criminals in their activity.

There is an interesting issue in this case, which is that the fundamental business that Tornado Cash was in was concealing money. Now, there can be legitimate uses for it. I

think it's worth raising that only two witnesses at trial who testified that they used Tornado Cash for lawful purposes, testified that they used it a total of about five times in small denominations, but in theory there were lawful uses for Tornado Cash. But the scale of unlawful uses for Tornado Cash is what tipped the balance. When the defendant undertook steps like implementing the relayer network, he was doing that and the consequence was to make the service more effective for criminal actors.

Now, part of the reason for presenting that evidence, your Honor, was to show that, at every step, the defendant faced a choice — he could withdraw from committing these crimes, he could alter the Tornado Cash protocol so that it would be less hospitable to criminal actors, he could have done any number of those things, and yet, at every turn, he chose not to.

And coming back to the Court's definition of "willfulness" that it gave to the jury. He knew that he was acting unlawfully, and we know that because once things started looking dark around the time of the Ronin hack is when all of the consciousness of guilt evidence comes up. And so the defense is presenting a theory that it wants the Court to uphold over the jury's verdict that at no point in implementing all of these improvements to Tornado Cash and foregoing any change that he well knew how to make that would have made the

platform less hospitable to criminal actors, at no point did the defendant understand himself to be participating in unlawful activity, but the jury didn't reach that conclusion and there was ample evidence from which it could draw that very reasonable inference.

THE COURT: Let me go back a moment, please. You talked about the relayered network, and what you said is that the consequence of the relayer network was to make Tornado Cash more effective for bad actors; do I understand that correctly?

MR. ARAD: Yes.

THE COURT: But I don't think I understood the documentary evidence that was introduced to suggest that that's what they were talking about as they were implementing the relayer network. So you used the word "consequence" rather than, for example, "design" or "purpose." That's interesting to me because it's one thing, as I suggested earlier, and I'm sorry my Windows analogy wasn't sufficiently transferable to this case, but it's one thing to implement something that everybody likes that's beneficial to everybody and that also has the consequence, has the effect of aiding bad actors, but I'm not sure I saw, with respect to the relayer registry as distinguished from the Chainalysis oracle, conversations suggesting that they knew and they wanted the relayer registry to aid bad actors in their use of Tornado Cash. Is there such evidence?

MR. ARAD: Not in the form of communications specifically about the relayer network, but in their broader conduct, there absolutely is such evidence, your Honor. For example, in the defendant's statements, his outright lies that there was nothing that he and his coconspirators could do to change the Tornado Cash protocol. They started making those statements at least as early as December of 2021, and they crafted that premeditated response at least as early as March of 2021, nine months before that statement was ever made to Mr. Evans regarding the BitMart hack. That's just one example of the way in which the defendant did have on his mind that criminals were using Tornado Cash and that he wanted to distance himself from that as a matter of perception as much as possible.

For example, your Honor is right to bring up the Chainalysis oracle in part because it does actually apply here. The defendant there said, before its implementation, we need to tell everybody that we're not doing this kind of thing. That demonstrates his willfulness because he's not concerned with actually doing something that will be effective. He's concerned with creating air cover for himself. The jury could reasonably draw the inference, and it did, from that kind of evidence that the defendant willfully acted with an unlawful purpose. And the parsing of those communications, the way that Ms. Axel was doing moments ago, is a fine exercise, but it's an

exercise for the jury, it's not an exercise for the Court after a verdict has been delivered.

THE COURT: One moment, please, sir. I'm realizing that I'm actually getting ahead of myself, and that is because I really do have some questions about venue. I thought it was obvious during the trial that I was interested, I won't say concerned, but I will say interested in the government's evidence of venue. So let me go to that and then I'll go back to these substantive issues.

I should note, just as a last matter of housekeeping, there was appended to perhaps the defendant's reply brief a technological facts appendix. Did you see that, sir? It's the last couple of pages, I believe, of the reply brief.

MR. ARAD: I don't have it in front of me, your Honor.

THE COURT: Okay. My point is, and maybe this is something you can tell me about after we switch sides again, whether you agree with the factual statements that are contained in the technological facts appendix, whether you believe that they somehow impact your arguments for sufficiency or the defense arguments to the contrary. Or maybe, just more broadly, how, if at all, should I consider the statements? Because you will recall or have refreshed that there are just statements about what this technology could and could not do and how, if at all, it matters. So I do want to know whether you think I can consider this, whether you think it's actually

an effort to revise what was actually shown to the jury and sort of a revision as to history or something like that. So your colleagues will keep in mind that that's something that you're going to discuss at break.

Let's please move to venue. I know, too, that venue is a preponderance standard, but sometimes it matters. And I saw in the last year that Judge Subramanian vacated a conviction in *United States v. Eisenberg* on venue grounds. And so I don't think that you're challenging my views as to the substantial contacts analysis, although I can hear from you if you want, but could you engage, please, on the material furtherance line of cases and whether I have misunderstood or how I should perhaps properly understand the language from the decisions I mentioned earlier.

MR. ARAD: Yes, your Honor.

I want to start with the *Royer* case, which the defense raised. The *Royer* case was about a website that had about 300 subscribers, and venue was found proper where only seven of them were in the district in question, which is the Eastern District of New York. There wasn't even evidence presented in that case that any of those individuals actually traded on the information that was published on the website, but the court determined that it was reasonable for the jury to find venue on two separate theories, one of them being some trades must have taken place by those seven subscribers or, together or in the

alternative, some of those seven subscribers had to disseminate that information further within that district and trades had to be made on that further dissemination, too. The materiality language in *Royer* was not there to, in any way, say that overt act was required in order for the crime to be committed. And I think actually that the materiality language focuses more on the act in furtherance than it does on the consequences that follow from it.

So, for example, the basis on which we rely, one of the bases on which we rely, which has to do with making the UI accessible in the Southern District of New York, is the overt act. It's not Mr. Ahmed's use that is the overt act, and this is something that the defense conflated in its briefing, I think the Court picked up on it, so I don't need to speak about that further, but the question is whether the overt act is material. Whether the overt act is material is largely a function of its capacity to further the charged crime. So making this website public in the EDNY in the *Royer* case had tremendous capacity to further the objectives of the offense. That's essentially the conclusion the court reached there. It was the materiality of the overt act itself, which was publishing it there that mattered.

I can say more about it, your Honor, but --

THE COURT: No. I guess the point is I'm surprised that you took the bait, the *Royer* bait because, again, this

material furtherance language I see in *Royer*, I see in *Lang*, I don't know that I'm seeing it in other Second Circuit cases.

MR. ARAD: That's right.

THE COURT: But yet, you didn't say, hey, Failla, it's very limited to two cases, don't worry your pretty little head about it, you actually do engage with it without suggesting it doesn't apply. I'm trying to figure out when and where it applies you seem to suggest it does.

MR. ARAD: I should have started with that, your Honor. I went straight to addressing the fact that it does exist somewhere, but that is not the main point. The main point is that the case law does not require that the overt act materially furthered the offense. In the cases where the word comes up, if we have to assign some meaning to it, I think that the way that I described might be the limited nature in which we do that.

THE COURT: I see. I appreciate the clarification.

I think I'm still having problems understanding the venue arguments that are predicated on the conversations with the BitMart attorney, and I think this is something we discussed during the trial, even accepting that the statements made to the BitMart attorney were false, I'm not sure how those responses really furthered any of the charged conspiracies. You say it disincentivized victims from coming forward and approaching law enforcement, okay, I'm not sure, but once

again, I think I may have to step back a few paces.

As I understood it, you were not suggesting that Mr. Storm had an obligation to respond to the BitMart attorney at all; is that correct?

MR. ARAD: That's correct.

THE COURT: And I don't think you were arguing — this is from my notes from the trial — that failing to respond to inquiries from victims or failing to respond to law enforcement notices would itself suffice as an overt act.

MR. ARAD: I don't believe that it would, your Honor, but that's not the case that we have here.

THE COURT: Okay. Here, what you're saying is that responding falsely does amount to an overt act, correct?

MR. ARAD: Yes.

THE COURT: So he didn't have a duty to speak, but if he spoke, he shouldn't speak falsely?

MR. ARAD: I think that's right, your Honor, yes.

THE COURT: How does speaking falsely become an overt act?

MR. ARAD: The reason is that the most reasonable inference to draw about his intention in making that lie was that he was trying to create distance between or the perception of distance between himself and his coconspirators on one hand and the criminal activity on the other hand, and that is exactly what he did. On cross-examination, Mr. Evans said that

he had no reason to disbelieve the statement. Well, there you go, the ruse worked, and it worked for a long time.

THE COURT: But how is that an overt act in furtherance of any of the charged conspiracies? Is the argument that the false statement keeps Tornado Cash functioning and thereby keeps open a viable means for money laundering, or for operating an unlicensed money transmitting business, or for committing IEEPA sanctions? It seems a bit attenuated for me to say that disincentivizing victims from speaking up furthers the conspiracies. I need help connecting the dots.

MR. ARAD: It is disincentivizing the victims from speaking up. But, more broadly than that, your Honor, it's a key component of getting away with any crime, which is concealing your involvement in the offense. That's what the lie was doing. The defendant was not just answering the question, he actually, he went too far. We might be having a different conversation if he simply said, I can't get your money back. It's immaterial that he wasn't asked whether there's anything else that he could do to control the protocol. The fact that he wasn't asked that and nevertheless came forth with this lie is evidence that he was pursuing a purpose other than merely answering the question. The only reasonable inference to draw is that that purpose was to conceal his involvement in criminal activity.

THE COURT: But you heard me speaking with Ms. Axel, she believes what he said was factually accurate, that they couldn't control it.

MR. ARAD: That's true, your Honor. I only hesitate because I was taking the Court's signal earlier that perhaps you didn't want to delve into the question of whether it was just the pools or all of the different ancillary parts.

THE COURT: I don't, but I do.

MR. ARAD: That is this question, unfortunately, so I think we have to go there.

The defendant didn't control the pools after the trusted key ceremony, that's true, that was undisputed at trial, but the central dispute of this whole case is whether the defendant exercised meaningful control over the Tornado Cash protocol as a whole.

THE COURT: Does that mean, sir, that the viability of any of the counts of conviction distills to whether in fact Mr. Storm and his colleagues could, could affect the Tornado Cash protocol writ large?

MR. ARAD: Well, in a hypothetical world where his statement to the BitMart lawyer was true where there was nothing that they could do to affect the protocol, it would be a lot harder to make an argument that they were taking steps in furtherance of these offenses. The affirmative steps were in exercising their control over the protocol.

THE COURT: The 250 changes.

MR. ARAD: Exactly. And that's the power of the defendant's lie to Mr. Evans. He's saying, I don't have control over this, anything it does is not on me.

THE COURT: Okay, but hang on a second. At the time he said that, he in fact did not have the ability to do anything to retrieve those funds.

MR. ARAD: That's not what he said, though, your Honor. He said a lot more than that.

THE COURT: And so if he had just said, sorry, friend, I can't get your money back, you and I wouldn't be having this conversation?

MR. ARAD: We wouldn't have that piece of evidence.

THE COURT: All right. Keep going on this if there's something else to add. I may have derailed you.

MR. HAMMOND: No, I don't think so, your Honor. I think I've made the point.

THE COURT: Let's talk, please, about the Infura payments.

MR. ARAD: Yes.

THE COURT: Why are they venue? Why are they overt acts? Did I correctly remember that your argument, if I look at the bank records in their totality, I will see payments made to a Manhattan bank account?

MR. ARAD: You'll see payments made with a notation in

NY, and also a notation for a 347 area code.

THE COURT: Yes, but 347 to me touches on the tiniest bit of Manhattan as distinguished from other areas of New York.

MR. ARAD: Those were the touchstones from which the defendant could foresee that there was a chance that his payments were going to New York.

THE COURT: I see.

MR. ARAD: And I do want to fixate for a moment on the levels of conviction that everybody has to have in the locust of the acts and the likelihood that they would take place. The jury had to find by a preponderance, more than 50 percent, that this was foreseeable to defendant, but the degree of foreseeability does not have to be by a preponderance. For example, there are cases where mere knowledge that a coconspirator sometimes travels to New York and New Jersey without anything more specific that would delineate the SDNY are sufficient to know that a phone call with that person in furtherance of the conspiracy may be going into New York. And so the area code and the fact that there's an NY notation, and the fact that the part of New York that is known to be the financial capital of the United States, and arguably of the world, is Manhattan in the SDNY. All of that is enough for the defendant to have foreseen that these payments would be going to a Manhattan account.

THE COURT: I believe Mr. Storm is arguing, though,

that payments went from an account with which he had no involvement. Maybe I misunderstood that.

MR. ARAD: I don't believe that's right, your Honor.

THE COURT: Where was the location or where did the crypto payments go? Are you not seeking to predicate venue on those?

MR. ARAD: We are not seeking to predicate venue on those.

THE COURT: So it's just the fiat payments?

MR. ARAD: Yes.

THE COURT: One of which seems to slightly predate the relayer registry, but you tell me that's okay because the relayer registry was in contemplation at that time?

MR. ARAD: More than in contemplation. There was work being done to bring it to life.

THE COURT: Let me please understand, as well, how the communications with Mr. Schmidt suffices overt acts for the conspiracy charged in Count Three. You say that they concerned Tornado Cash's operations and profitability. Even if those were obviously or recently foreseeably taking place in the Southern District of New York, how does that further the IEEPA conspiracy charged in Count Three?

MR. ARAD: Well, actually, your Honor, I would say more than just that one of those conversations was about the profitability of Tornado Cash, it was about keeping

Tornado Cash, quote-unquote, afloat. Tornado Cash was under a real threat at that time of not having enough funding to continue to operate, and the obvious consequence of that is that criminals wouldn't be able to use it anymore. And so the defendant was having a conversation with one of his investors about finding somewhere an injection of capital that could allow Tornado Cash to continue to engage in these kinds of transactions.

THE COURT: Of course. But there's really no suggestion that someone said to Mr. Schmidt or that your defendant, Mr. Storm, said to Mr. Schmidt, we really need to keep this thing afloat because we have so many hackers that are dependent on us.

MR. ARAD: No, but that's not required to meet the requirements of an overt act in furtherance of the conspiracy. It was the defendant's purpose to keep Tornado Cash afloat so that --

THE COURT: So that they could, so that hackers could use it?

MR. ARAD: Regardless of whether he said that to Mr. Schmidt or not.

THE COURT: Well, no, but is that your argument? Your argument is not that Mr. Storm was sad that one of his ventures was coming to a possible failure, you're suggesting that, aware that it was being used for criminal conduct, he wanted to

perpetuate or to keep it afloat for that purpose and that's why he was seeking capital infusions?

MR. ARAD: In part. And there's no issue with that. That's the reason the Court gave a dual intent instruction to the jury. The government nowhere argues that Mr. Storm had no intent to service noncriminal actors. That's not what's required in order to sustain this conviction, but it was among his intentions. It was a significant intention of his. At that point, your Honor, it was obviously a huge part of the business. I mean, the defendant knew that before the media and the broader world got wind of it, but by June of 2022, it was widely known in the crypto community that Tornado Cash was being used at an enormous scale to facilitate one of the largest thefts of cryptocurrency ever committed.

THE COURT: The hack had already happened at the time he was having the discussions with Mr. Schmidt?

MR. ARAD: Yes.

THE COURT: This wasn't the one in check, this was the Ronin hack that happened?

MR. ARAD: That was the Ronin hack, your Honor, but the conspiracy was still ongoing because the defendant was continuing to take steps — and this goes back to affirmative conduct — that tied back to the conspiracy. Like, for example, liquidating his and his coconspirators' Torn in a secretive manner using somebody else's name on a Russian Binance account.

All of these activities are linked.

THE COURT: But couldn't that liquidation, I mean, it could be for any number of reasons, including personal expenses that he had, but the use of the -- I'm understanding in this space that anonymity is at a premium. So using somebody else's Binance account might not necessarily be for criminal purposes, but might just be a concern that if potential investors in Tornado Cash were to see that one of the developers was himself cashing out, they might be less willing to infuse capital into it.

MR. ARAD: Perhaps one could see it that way, your Honor, yes, but that kind of analysis is for the jury to do. The government presented mountains of evidence that the defendant at this point in time, based on his communications with his coconspirators, was panicking about what was going to happen to Tornado Cash and panicking about the possibility of criminal liability, Googling "are Tornado Cash criminals," sending around articles showing that people got, quote, five years for sanctions. The jury was well within the realm of reasonability to take all of that into account in assessing what his state of mind was around this time and as context for why he was liquidating funds in that secretive manner.

So the defense could and did make that argument to the jury, that maybe there's some other reason that he is doing this for privacy and it's not that he's trying to get away with

a crime, but the government presented evidence to the contrary from which the jury could reasonably conclude that he was trying to get away with a crime.

THE COURT: I was planning on returning back to substantive discussions about the counts of conviction. Mr. Arad, there's discussion from the defense, including in their reply brief, about testimony from their expert witness and others that the UI could not have transferred the funds. This is when you make the responsive argument that, indeed, it was the wallet could be used as a conduit for a deposit, I believe, and there was a different question about withdrawals. Perhaps you're going to tell me that this is just a variation on the custody argument that I've already rejected, but I guess I might look at it as a more persuasive argument than the arguments that were presented to me and that I rejected previously. Could you please engage with the discussion of sort of the reading and writing aspects of deposits and withdrawals through Tornado Cash, and whether it really is enough for a 1960 purposes for Mr. Storm to have known that these transactions could have been effectuated using a particular user's wallet.

MR. ARAD: Yes, your Honor, happy to. At the outset, I do think this is a way of repackaging the control argument, but I will put that aside now that I've said it.

I actually think that a useful way to analyze this

issue is through an analogy that the defense offered in its reply brief, which was to somebody who sends an email, I think it was to a banker with instructions to send a particular wire, somehow saying that that would not be conducting a transaction. But imagine this, somebody starts a business, a criminal business that transfers money from one place to another for criminals. What he says is, I have a bank account at whatever bank, send me the money to that account, and I will have it sent somewhere else. Then he instructs his banker to send the money forward and he takes a fee for this service. Is he not engaging in unlicensed money transmitting? Of course he is. He's transferring money from one place to another. The days where one person alone could take every action that was required in order to effectuate a transfer without the involvement of anybody else or any other tools were the days when somebody could take a bag of cash and hand it over to somebody, but that's not the world that we live in anymore.

And so what the Tornado Cash protocol did was a lot more than just writing an email. On the deposit side, it gave instructions to the depositor's wallet. The wallet wasn't just a conduit, it was an instrumentality of Tornado Cash in creating that transfer. And on the withdrawal side, it's even clearer that Tornado Cash is the one making the transfer because, there, it's the relayer itself that writes to Blockchain. Not only that, it's not as if some third-party

relayer individual is on his own without any input from Tornado Cash doing this. The relayers used infrastructure that they downloaded from Tornado Cash which is itself what was doing the writing. So it was Tornado Cash infrastructure with a Tornado Cash relayer, which is part of the cohort operating Tornado Cash for the purpose of transferring money from one place to another for a profit that was conducting these withdrawals. So, even by the defense's analogy to an email, it's obvious that Tornado Cash was conducting these transactions.

THE COURT: Let me change topics, please.

I discussed previously these arguments regarding governance, centralization, and the simulacrum of centralization at Tornado Cash. It's showing up, for example, at pages 6 to 9 of your opposition and later at page 36. I am trying to understand what you're arguing. For example, I think I do understand the arguments that you're making regarding the relayer registry and the push to use Torn, and the monetization or appreciation of value of Mr. Storm's assets, but what you then say is that there is a false decentralization narrative that aimed to forestall attention from law enforcement and others, thus furthering the conspiracy. And you say later that the purpose of certain governance proposals or efforts to get votes for those proposals was to create the false impression that Mr. Storm or his colleagues had less control over

Tornado Cash than in fact they did.

Did I understand those correctly to be your arguments?

MR. ARAD: Yes.

THE COURT: What is the legal significance of those arguments? Are those conversations or efforts themselves overt acts? Are they bases for venue? Are they part of the tapestry of evidence from which I can discern something about Mr. Storm's intent? Do they fulfill some other element of the offense?

MR. ARAD: All of those purposes, your Honor. From the beginning of this case, the defendant has been telling the court of public opinion and this court of law that he does not control the Tornado Cash protocol, and we saw at trial that that's not true. So the question becomes, well, why did he do that? And the answer is so that he wouldn't be held responsible for Tornado Cash. I mean, that's essentially the answer to your Honor's question in a nutshell. It's hard to think of another explanation of why the defendant would stick to that story so obviously untrue, other than because he was trying to pull the wool over someone's eyes. The jury was asked by us to draw that conclusion and reasonably did because why else? And even if there were some other reason that one could come up with in theory, it was for the jury to decide whether that purpose behind the defendant's concealment was actually his purpose. That's not what the jury decided.

I'm happy to speak, your Honor, and I want to make sure that I'm addressing your Honor's concerns. So if there's a particular example that you'd like me to talk through, I'd be very happy to do that.

THE COURT: Well, it's this idea of a false decentralization narrative you repeated several times in your opposition. I wanted to understand in what sections of my analysis I should be including that evidence, and you're suggesting at various points.

MR. ARAD: Yes. As to venue and as to each substantive count, that's correct, your Honor.

THE COURT: You also talk about a conspiracy to implement the relayer registry and to connect the fees earned by Tornado Cash to the value of the Torn tokens. Which conspiracy might that be? Or is that just another conspiracy, but not one that's charged in this case? Is it ancillary to one of the ones that is charged? Again, how are you asking me to view what you consider to be the design and implementation of the relayer registry and its correlation to the Torn token?

MR. ARAD: So the relayer registry is relevant also to every substantive count and in a certain sense to venue, as well. The reason is the relayer registry had two consequences, accomplished two things that are relevant to the elements of the offenses charged in this case. One of them was it enhanced the anonymity that the protocol provided, the other is that it

made it a profitable business. The second, I think, is the focus of your Honor's question, so that's where I'll go.

Every step the defendant took in undertaking the project of bringing about the relayer, and perhaps with respect to the relayer, it would have been less confusing to use the word "project" or "undertaking" than "conspiracy." But every step that he and his coconspirators — and there I am using the term "conspiracy" deliberately — took, in order to implement the relayer registry, showed that their motivation was profit because every design decision that they made was designed to enhance demand for the Torn token. Obviously, the purpose of enhancing demand for any commodity is to raise its price. The fact that relayers had to stake Torn created demand for it. The fact they lost some of their staked Torn every time they executed a transaction created demand for it. The fact that anonymity mining was paid in Torn created demand for it. The fact that, in theory, it was a governance token created demand for it, in theory. All of those things gave value to the Torn token, all of them were connected to Tornado Cash. And so it's just impossible to say that making money was not an objective of Tornado Cash. The jury can't reasonably have been expected to conclude that the defendant undertook a two-, two-and-a-half-year effort that resulted in millions and millions of dollars in gains for him and his coconspirators and that all happened by accident.

THE COURT: At page 50 of your opposition, you don't need to turn to it, you simultaneously argue that Mr. Storm was not legally obligated to adopt a user registry, but that his decision not to adopt one in the face of his knowledge of criminal conduct involving Tornado Cash could be considered evidence of his criminal intent. Indeed I believe you're arguing to me that I could consider that in determining whether the government has demonstrated willfulness as required by these statutes. Is there not a tension in that argument beginning by saying that Mr. Storm had no obligation to do something, but then saying his failure to do so could support a criminal conviction? I am concerned that that allows the jury to convict Mr. Storm for not doing what he was not legally required to do. Perhaps what you'll say is, no, Failla, it's not just that it's all of these other things. But please help me understand what I think is the tension by beginning a sentence saying he doesn't have to do this, and yet it can support willfulness. Are you saying it can support willfulness on its own?

MR. ARAD: On its own, no. That alone --

THE COURT: Okay.

MR. ARAD: That alone would not be enough. Combined with other evidence that the government presented of the defendant's willfulness, it plays a role, or it can play a role.

Now, I want to just unpack that a little bit.

So, why is it that the fact that he had an option to do something, but forewent that option, goes to his willfulness.

THE COURT: Yes, because one might say that that's inaction.

MR. ARAD: If the only way that he could stop facilitating, engaging in, completing these criminal transactions would have been to withdraw or to shut down Tornado Cash, perhaps there would have been some argument that he wasn't willfully engaging in criminal activity, he just didn't want to give up this thing that he had developed that arguably had other legitimate uses. But the fact that he could have done this, he could have done what Mr. Werlau suggested, and knew he could have done it for two reasons, one of them, the relayer registry was built basically the same way using the same kind of architecture — and this argument was made to the jury and evidence was presented on it — and two, and more importantly, his coconspirator Roman Semenov told him that this was possible.

So the defendant knew he could do this. He had essentially done the same kind of thing before. There can't be an argument here that, actually, all he really wanted were the legitimate transactions, because if that's all he wanted, he could have had it, but he chose not to. He chose to have the

criminal ones, too.

THE COURT: You're suggesting that knowledge requires conduct at some point or at least when there are options available -- well, no, that knowledge requires him to have done something, or if he did something, that that something may end up impacting the willfulness analysis, because I think we said earlier if all he had done was operate Tornado Cash and just left it there or kept operating it, I think you'd have perhaps a harder argument on willfulness. You're suggesting it was his decision to improve, build upon it, and make it even better for folks who would seek to use it for bad purposes is what brings us here.

MR. ARAD: That's correct, and his choice to marshal resources toward the ends of making it more effective and more profitable that show those were his priorities. In other words, that was his intention. And to use the defendant's words, so what if it's stolen. He wanted all of that money. He didn't want to take only the funds of innocent users, because if that had been his intention, there were other courses of action that he could have taken, some more drastic than others, and he decided not to. That is what reveals his priorities and his intentions.

THE COURT: Before trial when we talked about the feasibility of implementing these measures, and it is my failing, I used the expression "any idiot," which I'd rather

people not keep throwing back at me, but the point was, was something readily available and could be done? Is it your argument that between Semenov's statements about this being practicable, the fact that, later on, they did do a registry that was substantively identical to the idea that Mr. Werlau was suggesting, and Mr. Werlau's testimony that a jury could find that, contemporaneously, Mr. Storm had the knowledge that this was a thing he could do, it might not be perfect, right, I don't think you were suggesting it was a cure-all?

MR. ARAD: Correct.

THE COURT: But it was something. And he chose not to do it. And knowing that it was there, knowing it could be done and choosing not to do it, that allows for the count of conviction?

MR. ARAD: Yes.

THE COURT: And that allows the other two counts to go forward to a retrial?

MR. ARAD: Correct.

Now, I'm not saying that that necessarily would have been required for the jury to conclude that the defendant, in taking active steps for Tornado Cash, was committing these offenses, it was just one piece of evidence that went to his criminal intent.

THE COURT: It would seem to me in the absence of evidence in the record of an alternative that could be used to

tamp down on the use of Tornado Cash by criminal actors or bad actors, I think it would be much harder to demonstrate willfulness or to demonstrate Mr. Storm's criminal liability. Your argument, as I understood, to the jury was not merely that he saw bad things happening, but he saw them, there was something he could do to stop them or limit them and he chose not to, and that's why we're here, correct?

MR. ARAD: That's right, your Honor. That's right.

THE COURT: Then what is your most recent point to me, that even in the absence of measures that could be taken to tamp down on criminal conduct, he could still be liable simply by keeping it operational or seeking to monetize it?

MR. ARAD: And continuing to take steps to improve it in ways to make it even more effective for criminal actors.

THE COURT: I see. You're looking from both ends of the spectrum. Not merely efforts to tamp down criminal activity, but efforts to enhance criminals' ability to an experience with the Tornado Cash protocols?

MR. ARAD: That's right. My point with respect to the possibility of implementing a system like Mr. Werlau described is that that was evidence that the jury could reasonably conclude from the defendant had a willful state of mind. There was other evidence, also. And I don't believe that the proposal Mr. Werlau put forth was necessary for the conviction. The jury could have reasonably inferred that the defendant had

a criminal state of mind from his lies, from his design of the Torn token and the relayer registry, from his internal communications with his codefendants, et cetera. And so this was just one brick in the wall of the defendant's criminal intent.

THE COURT: Ms. Axel has suggested several things. She says, first of all, it would change the character of Tornado Cash entirely. I sense that's not something that moves you because your view was it was criminal and that's okay to change that character. But on the issue of the utility of measures akin to those described by Mr. Werlau, I believe what she's saying is it wasn't going to work, it could be avoided, and the government would have said, aha, this is another half measure. Why is she wrong?

MR. ARAD: That would be a silver bullet that would defeat any theory that is based on the possibility of preventing criminal actors from using the protocol.

THE COURT: Right.

MR. ARAD: And that's because it imagines a world where some perfect solution could be devised. No perfect solution could be devised. But the solution that Mr. Werlau presented and the jury heard is similar to other measures that other financial institutions take in order to prevent criminals from using their services. When Mr. Ahmed testified, he testified that he wouldn't use a service that required a

username and password or any information from him, which was part of Mr. Werlau's proposal. I mean, the jury heard testimony from an actual criminal who actually used Tornado Cash to further his criminal purpose that, if Mr. Werlau's proposal had been implemented, he would not have used Tornado Cash. So certainly the jury can reasonably infer from that testimony that this actually would be effective. The defense wants the Court to focus on the possibility that this would be largely ineffective, but there was no evidence at trial that this would be largely ineffective. Sure, it wouldn't be perfect, but there was evidence that it would be effective.

The other thing is, your Honor, the defendant never rejected this idea because it might be ineffective. He rejected it because he would make less money with it. We know that because the fact that something's ineffective didn't stop the defendant in other contexts.

THE COURT: Right. This was the no market for it, correct, there was discussion about the market?

MR. ARAD: Yes, that's right, your Honor. It's the compliance mixer discussion.

THE COURT: Let me turn to another area where I see attention in the government's arguments. In the context of Count One, the money laundering conspiracy, you argue that because the charge is conspiracy, that no transaction need in

fact occur, but you're simultaneously arguing, I think, that the transactions needed to occur in order for Mr. Storm to have developed the requisite knowledge, and therefore the requisite willfulness. He didn't know until people were using Tornado Cash to launder money that Tornado Cash could be used to launder money. What I'm saying is, you did not argue, I don't think, that, from the start, the development and the launch of Tornado Cash was designed, was a money laundering conspiracy, you're saying it became one over time, correct?

MR. ARAD: Correct.

THE COURT: You say that no transaction needs to in fact occur because it's a conspiracy, which I get, and yet it kind of does because it's only the conduct of these transactions through Tornado Cash that gives you the ability to argue knowledge and willfulness; is that not correct?

MR. ARAD: That's right, your Honor. That's where this case actually provides more than the law requires. The law doesn't require that an actual transaction have taken place, but in this case, many actual transactions took place.

THE COURT: I think you're misunderstanding my argument. Had no transactions taken place at the time of the launch and at the time that you brought these charges, I don't think you'd be able to argue that the mere fact that one could use Tornado Cash for bad purposes was enough to bring criminal liability upon Mr. Storm, agreed?

MR. ARAD: Agreed.

THE COURT: And therefore, yes, you're right, it's a conspiracy charge. You don't actually need the transactions, but you also wouldn't have had any basis to bring charges. Here, it sounds like you did need the transactions to occur in order to bring about the requisite knowledge. So saying this is more than you need, well, yes and no, because without these transactions, you wouldn't be able to argue — and we'll talk about whether that's successful or not later on — that there was a basis for knowledge or willfulness, correct?

MR. ARAD: That's right, your Honor. But the reason that we focused on the legal requirement in our briefing and the fact that the law does not require a transaction is that the defense is making a legal argument here. It's saying the law requires that the defendant know in advance all of the details of a particular transaction before it happens, and that can't be true if the law doesn't require a transaction to happen in the first place.

And so, as a legal matter, a conviction is sound even in the absence of knowledge of a particular transaction. It has to be if it's also the case that a conviction would be sound in the absence of any transaction. That's the argument. It's a legal argument more than a factual one. I think the tension --

THE COURT: The tension is because I am perceiving it

as an argument about the evidence in the case and you're arguing it as a response to their argument. But you're actually leading into my next question, which is, and you heard me discuss with defense counsel, the argument that Mr. Storm needed knowledge in advance of each transaction in order to be liable under Count Two. You heard those discussions, yes?

MR. ARAD: Yes.

THE COURT: Could you respond to them, please.

MR. ARAD: I did not hear one authority for that proposition that he had to know of a particular transaction before it took place.

THE COURT: Well, I believe what he says is it's the statutory language itself that suggests that they must know at the time of the transmission.

MR. ARAD: That's correct, your Honor, but the statutory language itself doesn't say "engages in a particular transaction that transfers money from one place to another."

THE COURT: All right. So you just simply disagree with their construction of the statute.

MR. ARAD: It's more than that. We disagree with their construction of the statute. In the very well developed body of the case law on section 1960, there is no support for that very narrow construction of the statute, and with good reason. The purpose of 1960 is to curb the use of money transmitting businesses by criminals in an evolving world.

Requiring knowledge of a specific transaction before it happens would obviously curb 1960's ability to meet that goal, and that probably explains why no court has held that that is a requirement.

I do want to also say something about the Ronin hack with respect to this issue, your Honor.

THE COURT: Okay.

MR. ARAD: In the Ronin hack, the defendant knew, again, over a period of weeks, that large amounts of money were flowing through the Tornado Cash service. He had been sent Blockchain records and links to Blockchain records that would show this, including links to Etherscan. We know he knew how to use Etherscan because he sent Etherscan links to confirm payments he made of cryptocurrency to Infura. So we know that if the defendant just looked at that data that a lot of people were sending him, he would have seen the finite set of wallets that this money was coming from.

THE COURT: Could he have stopped them?

MR. ARAD: Yes, he could have. The way that the Chainalysis oracle worked is that it identified certain addresses that money might come from and it blocked them. And so if he identified those additional addresses simply by looking at the Blockchain — and this is the analysis that Mr. DeCapua did on the stand — he would have been able to block them, but he didn't do it.

Now, I guess that begs the question to the defense, well, how much of a transaction does he need to know about in advance, who's doing it, where it's coming from, that it's coming soon, that it's going to come to the 100 Evepool instead of other pools. What else? All of that information was at his fingertips.

THE COURT: Let me please change topics, and this is the last for now, unless there's something you feel compelled to tell me.

In the reply brief, the defense notes that in the constitutional section, that the prior challenges were facial and these are as applied. I believe that's what it said.

MR. ARAD: It's just not accurate.

THE COURT: Let me make sure I did not misunderstood that. Looking at page 55, the government misconstrues this Court's prior rulings on due process, they were based on facial challenges, has not previously ruled on whether the statute was unconstitutional as applied.

MR. ARAD: I don't believe that's accurate, though. Meaning, I didn't mean to suggest --

THE COURT: I didn't misread, you're saying that their point is -- okay.

MR. ARAD: Exactly. That is what I was saying at the start, your Honor.

THE COURT: I do appreciate that. Thank you.

MR. ARAD: I have in front of me your Honor's oral ruling. For example, on vagueness, just as an example. Moving on, Mr. Storm also argues that the statutes are void for vagueness --

THE COURT: Slow down, counsel.

MR. ARAD: Moving on. Mr. Storm also argues that the statutes are void for vagueness both facially and as applied to his conduct. That's at page 40. Page 38. Mr. Storm contends that the application of these statutes to his conduct is a content-based restriction on his freedom of speech.

THE COURT: And therefore you believe I've decided this, but you're also sticking with the arguments in your opposition?

MR. ARAD: Correct.

THE COURT: Those were the questions that I had for you, sir. If there's something else you want to tell me that you believe I did not appreciate based on the questions I've asked you or your adversary or something else, please tell me now and then we'll take a break and then I'll hear in reply from your adversaries.

MR. ARAD: I don't believe so. Thank you, your Honor.

THE COURT: Let's take a break. I'm going to make sure that I've asked all the questions I intended to ask, and when we get back, Mr. Klein, Ms. Axel, if there are things that you were writing down as I was hearing from Mr. Arad that you

want to make sure I have in my head as I'm deciding this, I would welcome that from you. I'll see you in 10 minutes, please. Thank you.

(Pause)

Mr. Arad, did you have an opportunity to speak with your colleagues about technological appendix?

MR. ARAD: We did discuss it, your Honor. The government would respectfully request the opportunity to review that in detail and write the Court about it.

THE COURT: A very brief letter, please.

MR. ARAD: Brief letter.

THE COURT: All right. Thank you.

Mr. Klein, would you or Ms. Axel like to be heard to comment on some of the discussions I've been having with the government?

MR. KLEIN: Yes, your Honor.

THE COURT: Thank you.

MR. ARAD: So.

MR. KLEIN: Your Honor, I want to start off with the initial line of questioning you had for Mr. Arad about how things transpired, what my client could have done or not done. I'm quoting what I wrote down. What he said was once the defendant knew in large part he was serving criminal actors and they continued to do so, that was the crime. There is no basis in law for that, your Honor. There is no basis in law for what

is a large part. This is a whole cloth invention to this case. It goes right to the heart of our argument the whole time, this is a negligence case. So you pushed Mr. Arad on, like, well, does that mean he had to stop? Would that have ended the criminal liability? Could he have walked away? Mr. Arad said he could have stopped, he could have walked away. The question is when, what was the date he could have walked away? When did it become a large part? Those questions aren't known, the answers aren't known. You'd have to wait for this trial to happen or there's no way my client could have known. This is the real core problem here, your Honor, and I think, your Honor, when you were talking about this, you said, well, I thought you were going to get up and talk about knowledge, plus improvements, plus monetization --

THE COURT: That is what I said.

MR. KLEIN: -- equals the crime.

THE COURT: Yes. Well, and I believe what Mr. Arad said was that was what was presented to the jury, that's what the jury voted to convict on, but they could have done less — "they" being the government.

MR. KLEIN: Your Honor, that goes back to the conversation we had two years ago when we talked about the motion to dismiss, when you asked about WhatsApp. All those things are present in all these other technologies we use every day that are misused in large part, I don't know what that

means, but definitely some percentage. I don't know if "large part" is 3 percent, 5 percent, 15, 20, you get it.

THE COURT: Of course. Yes, I do, sir.

MR. KLEIN: That's the core problem here. And to be clear, they've misrepresented the record the jury heard about the percent that was in place because he talked about 37 percent or 50. These are narrow windows, your Honor, and those exhibits -- the exhibit with the 37 percent is Government Exhibit 3002-60. That's the 37 percent from this window of February 25th through August 8th, 2022. The defense put in an exhibit that covered the whole time period because the government did not do that of the alleged conspiracy, which dates from September 1st, 2022, to August 8th, 2022. That's defense exhibit 8785-36, and this is based on the government's analysis. So this is at best for them. That number, your Honor, is, at most, 15 percent.

THE COURT: One-five, sir?

MR. KLEIN: 15.

THE COURT: Yes.

MR. KLEIN: So what does "in large part" mean? Nobody knows. When should he have walked away? Nobody knows. And so that's a core issue here, your Honor, that we have to address. And I think Mr. Arad danced around whether he could have stopped. But I think it bears pointing out, tornado Cash is still running, the UI is still running because it is immutable

and it can't stop running. And so it is still running. So we had this discussion of whether he could have controlled and whether he could have stopped it, he can't, it's still running today, both the UI and the protocol, the smart contract pools.

I want to talk about a few other issues quickly because I think we're all ready for lunch. The relayers. Your Honor, it's important to remember, the relayers existed from the start of Tornado Cash. They basically just sprang to life with the relayer registry that Mr. Arad was talking about, perhaps there was already a relayer registry before even that one. This relayer registry he was talking about was an improvement on it through a smart contract that decentralized it so that no one was in control of the registry before people were in control of the registry, and then it got pushed off and so that was decentralized and run by a smart contract, and that's an important point to keep in mind.

Another thing to keep in mind is the relayers were never alleged to be coconspirators, they're independent third actors. Mr. Storm never earned any fees, none of the founders earned any fees as relayers, there's no evidence of that.

Let's talk for a moment about BitMart, the December 2021, the alleged lie about "I don't control" and I'm paraphrasing "the protocol." The inquiry from Mr. Evans was, and your Honor has these exhibits, can you give us information about specific transactions, like identify them, and can you

get us the money. We understand you have these funds. We know from the government's own expert, Werlau, that information wasn't available to my client, nor could he have given them back the funds. The funds had already been in the smart contract pools. That was a truthful response.

Talk about Infura for a moment, your Honor, the venue basis. This 347 area code plus a notation of NY — your Honor, the only reasonable inference to draw from that is it's not in Manhattan, actually, as your Honor identified. 347, it's a tiny sliver of the Southern District. The rest of it is not the Southern District. This is, again, the thinnest, weakest evidence of venue, it does not meet the preponderance standard in any way. And to be clear, the government only offered a bank record of Peppersec, they didn't offer the checks or wires showing that, it's just a bank record from Peppersec.

The communications with Mr. Schmidt at dragonfly, I don't want to get lost in the shuffle on this one. The only reference to anything in this district, there is none, obviously, but the only reference even to argue there is NY, New York, in one chat from April 1st, not about Tornado Cash. That should not be lost in the shuffle here.

THE COURT: I'm sorry you think I would, sir.

MR. KLEIN: I'm not. The discussion was not about that, so I wanted to steer back into that.

THE COURT: All right.

MR. KLEIN: There was discussion about the user interface, your Honor, which I think is an important thing to think about and talk about. Again, with deposits, as Mr. Arad acknowledged, it didn't write to the Blockchain, it didn't transfer the funds, to be very clear, on deposits. There's no evidence of that under any definition of "transfer."

As for withdrawals, at most, all it did was provide information to a relayer. It didn't itself transfer the funds, and that is undisputed in the evidence that it didn't transfer the funds.

When we talked about control of Tornado Cash and why was that -- you asked Mr. Arad why was that statement -- why was he talking about that, why was Mr. Storm saying he didn't control it. And he said the only reason is because it was a way to throw people off the scent. But what has been ignored is the evidence that was heard at trial. And we heard that -- I'm surprised we got criticized for only calling two witnesses on this point. I guess if we had a retrial, we'd have to call 20. But if you remember the coin --

THE COURT: Threaten me with a good time, sir, yes. Go ahead.

MR. KLEIN: Well, Mr. Arad was the one criticizing us for that. I don't think your Honor would want that either.

But remember the man from Coinbase who came in, the security researcher, his testimony is critical here. He

explained is the reason why you don't want someone to control something like a crypto mixer — which is perfectly legal, not theoretically legal, to be clear, actually legal, Mr. Arad said theoretically — is because you need to know the funds are safe and there's no backdoor key to get them, and if someone controls it and someone runs it and has access, then the whole thing collapses because no one's ever going to put their funds in.

And what's interesting to me, your Honor, is there was a lot of discussion, well, Mr. Storm, the founders, they needed this clean money to hide the bad money. That makes no sense logically because you need a lot of funds in there so that it's anonymous. We can see that, at most, the mix was 85/15. So it's like you wouldn't build a car to just rob a bank, which is what they're basically arguing. You build a car, and that's what they built. And so the fact that some people might rob a bank with it is different. But the clean money, the people using it for legitimate reasons was very high. And they want that, too. That's the thing that's missing here. They want other people for legitimate reasons using it, too. If I'm a legitimate user, I don't want everyone else to be an illegitimate user because I might get thrown in the mix there, people might be suspicious of me. The point of this tool is to allow lots of people to use it so that it's useful for anonymizing and giving them privacy, and the biggest pool of

people is legitimate users. And so if this project was ever going to be successful and ever actually make Mr. Storm money, it needed to capture a huge market. Just like if you look at WhatsApp, you know, Meta didn't build WhatsApp to help criminals, we know they use WhatsApp all the time, but they built it for everybody.

With that, I'm going to hand off the last of the discussion to Ms. Axel.

THE COURT: Thank you so much.

MS. AXEL: Thank you, your Honor. Just a few points from me, and I think principally related to the IEEPA theories, which we didn't really discuss in the opening argument, but I think there's some things that bubbled to the surface, I think, in your discussions with Mr. Arad.

So, first of all, your Honor, the whole conversation you had about what the government's theory is, and is it knowledge plus improvements or is it knowledge plus improvements plus these other things, I think the IEEPA conspiracy argument really highlights that because the period of the alleged conspiracy does not begin until the OFAC designation happens in April of 2022. And so at that point, your Honor, the relayer registry proposal had already happened, that had already happened and been implemented, voted on by the community. And so the only continued action was maintaining the UI. That's the only thing really left. And I think that's

why Mr. Arad had to concede that, at the end of the day, their case really is knowledge of misuse plus continued operation, because that's all we had happening at that point.

Their consciousness of guilt evidence, again, this is why they focused on that, also is around that time. It's concerning the Ronin hack. And again, I would submit to you, most of that evidence, all of it I can think of at the moment, has to do with awareness of that and a discussion about whether something was required to be done and they did the Chainalysis oracle.

The relayer registry, your Honor, was very public. There's no concealment involved in that. It was done very publicly. And again, the idea going back to knowledge plus improvements or knowledge plus continued operation, I think, again, I'd like to submit that the idea that there are improvements that somehow are assisting criminals, I think that's a red herring. There are no improvements here that it's just criminals. We actually discussed this in prep and we looked at the citations, there are no citations for that. The relayer registry, as I think the Court already mentioned in comments, was not tailored to particularly help criminals. Obviously monetization was a purpose, also decentralizing the relayer registry making it so that that was a smart contract, it happened autonomously, that was all part of that proposal. None of that assisted criminals. As Mr. Klein already said,

relayers already existed. There was already a list for that. So that, the use of relayers did not change with the relayer registry proposal. But again, in the context of IEEPA, this was already done at the time the Ronin hack happens and the sanctions.

So their case really comes down to knowledge plus continued operation, and we're back, your Honor, to the line of cases that I mentioned before, and that a failure to take action can't suffice for willfulness or agreement, *Falcone*, *Direct Sales*, the Supreme Court *Morissette* case.

Further on willfulness. So, because we're in the zone of knowledge plus continued operation, then they really are talking about was the remedy good enough. They're pointing to a failure to implement a better remedy, a remedy other than the Chainalysis oracle because, again, our point in time begins April 14th. So the only thing they did at that point was implement the Chainalysis oracle. There's no evidence he considered Mr. Werlau's user registry at all. I heard reference to that, but there's no evidence that that idea was considered. And as Mr. Klein said, the idea that somehow a login and a password was going to somehow block DPRK is crazy without a full KYC component to that, which they say, and no one has said there's a legal duty to implement KYC with respect to the user registry, it was left unclear what, if anything, it would have done. But, in any event, there's no evidence that

that idea was particularly put to Mr. Storm. We're conflating things when we talk about the compliance mixer, because a compliant mixer is not the user registry. Werlau just made that up. It's totally separate. A compliant mixer, as was talked about, was a whole different kind of mixer, your Honor, and would not have solved the Ronin hack problem because Ronin was using the existing mixer. So we're just mixing apples and oranges and we're really just sort of inventing things and conflating them. And then it ignores the evidence that did exist, that DeCapua said it was a game of Whac-A-Mole.

Oh, I also meant to tell the Court, on the subject of the user registry proposal, I would and -- substantive components and how it is different from the relayer registry technically is, the relayer registry is decentralized. I know the Court has heard this word thrown around a lot, but it actually is an autonomous thing. Someone stakes a certain amount of Torn, they don't have to give a login and a password, they don't have to give a name, and based on their address on the Blockchain and the amount of Torn that they have, they become listed on the registry by virtue of that smart contract. So it is not a login and a password, it is not a KYC, there's no human component. Simply through the algorithm, through the programming language, you stake the amount of Torn, it computes that it's staked, it puts your address on the list. That's it. There's no component to that.

So we covered that in TFA No. 7, your Honor, and I would refer the Court to that.

With respect to this idea now that Mr. Storm could simply have spun up some Blockchain explorer or daily thing where he tracked wallets going through, I would refer the Court to DeCapua's testimony that the hackers can make up hundreds of addresses in a second. And that we covered in TFA No. 4.

And the intent of what we call TFAs, the Technology Facts Appendix, we were speaking of an undisputed fact section as akin to a summary judgment motion, your Honor, where we would submit to you what we believe were undisputed or indisputed facts, indisputable facts. And we did exercise some discretion not to put things in there that we thought were hotly debated.

THE COURT: Yes. Although, again, you put it in your reply brief so the government didn't really have a chance to respond to it.

MS. AXEL: Well, your Honor, we did put facts in the opening brief, as well. So I do think that they were responded to. So this was an effort to look at the facts that they put in their opposition and the facts that we put in our opening. Again, you would do this in a reply brief, you know, it's a different motion, it's a different process in summary judgment, but you would have a chance to somebody saying what they thought was disputed and summarize it. And so on that, since

we went to our facts that we put in before and their facts they put in before and we tried to create a summary judgment. So I would refer the Court to that on TFA 4.

And on the Blockchain explorer, the idea that they're saying that he could just go to Chainalysis and consistently in real time, there's no evidence that anybody could possibly do that. It's inconsistent with DeCapua's testimony --

THE COURT: Slow down, please.

MS. AXEL: Of course.

If you want to ask who was in the best position to do this, you would say Chainalysis. And do they have a product? They do. It's called the oracle, and that's the product that they used, the company that was in the best position to provide that real time data, and that's the company whose product was rolled out on the UI.

And we have in TFA 3 that in fact it did block 100 percent of transactions from the sanctioned wallet. Again, they can Whac-A-Mole, they can move hundreds of wallets in a second and move them. But it did work as it was intended to work and they relied on Chainalysis to update it appropriately. There's no evidence that that was a bad choice, even though that's not a sufficient legal base to impose an additional duty.

Before I leave the TFA, your Honor, and I'm almost done, before I leave the TFA, I will say I also want to

highlight No. 1 and No. 2. The words "decentralized" are thrown around a lot. In this community, they can mean different things. Decentralization is sometimes a governance issue, who can make changes to a protocol, who has the power, who do we defer to, but they also are often referred to as a technical thing. And in that sense, the word "decentralized" really means non-custodial and permissionless. And so we tried to tease those apart because, from a technical standpoint, your Honor, Tornado Cash was permissionless and noncustodial. And those are very important when you get to concepts like transfer. It has to do with whether or not the person really controls the crypto or somebody else does. It's obviously kind of a central reason for being in the Blockchain world, that someone controls their own crypto and has the ability to do so. And that's why everything in the architecture, that's why the software architecture is built the way it is from beginning to end, so that at all times, the user had control, otherwise you're just running a totally different type of a system. And so sometimes the word "decentralization" is used for that. And I think those facts are undisputed, which is why we put them in here.

There is disputes around governance and what kinds of things could be done governance to affect the other elements, as we say, the accessory, the auxiliary or accessory tools around Tornado Cash. And for that reason, we did not put in a

TFA on that, your Honor.

But, nevertheless, I think, just before I close, I mean, it is important on the relayer registry to point out that the evidence did show that governance is much like democracy. The president might be able to overthrow the vote, but when we say that everybody's vote matters, it's because people adhere to the system. And with respect to the relayer registry vote, Mr. Werlau's testimony is that the system was adhered to, meaning the founders did not control that vote. Mr. Werlau put that evidence in. So that was, in that sense, a decentralized proposal adopted by the community according to Mr. Werlau' own testimony. And, in fact, the proposal for it, again, was very public. There was no concealment of that whatsoever. There's a medium post, there's a proposal by the founders, and we saw in trial the actual Ethereum page where the proposal is, where the smart contract address is, where it's deployed once the vote takes place on chain, and all of that came in in evidence. That decision is made by the community and was a decentralized one.

THE COURT: All right. This is a lot. I will sit with this. I'm sure you're getting the transcript of this, perhaps in an expedited fashion.

Mr. Arad, you seem to want to talk to me about something.

MR. ARAD: I do, your Honor, very briefly. There are

just three points I would like to make.

THE COURT: Yes, and I'll give Mr. Klein the very, very last word because it is his motion.

MR. ARAD: Thank you, your Honor.

With respect to the BitMart communications, I neglected to say one other thing that they accomplished for the defendant, which is that not only did they conceal his involvement in the money laundering, they also enhanced the money laundering. They made it less likely that the criminals would get caught, less likely that law enforcement would try even to trace the funds and get back to them. And so those two purposes that the defendant had in telling that lie were reasonable bases from which the jury could infer his willful intent.

With respect to the relayer registry, I also wanted to just emphasize that one of the key purposes of the relayer registry, one of those two that I mentioned was to enhance the anonymity, which was very helpful to the criminal actors that used Tornado Cash, and that's because relayers were required to make it impossible to trace to the owner of the wallet that the money went to after it left Tornado Cash. And so the implementation of the relayer registry was very much an implementation of a feature of Tornado Cash that made it more useful to criminals.

So those are two points I wanted to make on specific

pieces of evidence. My third point is broader.

We've discussed a lot today particular pieces of evidence and whether a particular piece of evidence could be taken as sufficient on its own to prove willfulness, for example. The Court's task here, though, is to take all of the evidence as a whole, which is how the jury considered the evidence, and then ask from that tapestry of evidence, was it reasonable for the jury to draw inferences that led it to convict or, for the other two counts, would it have been reasonable to arrive at that kind of conclusion from, again, the overall tapestry of evidence that was presented. And so even if no one piece of evidence or no hypothetical version of a piece of evidence would have been sufficient on its own, put together, the evidence that the government presented was sufficient.

Thank you.

THE COURT: Thank you.

MR. KLEIN: Two last very brief points, your Honor, just to respond to Mr. Arad.

Again, crypto mixing was legal, it was allowed. And so making it better at enhancing anonymity or privacy cannot be a crime because it's allowed to do that. Just building a better crypto mixer is fine. And that would be useful for everybody who uses it, all the legitimate users, too. So it definitely does not indicate criminality.

Lastly, which I failed to mention briefly, what we're talking about in the user registry is like some sort of *de facto* duty to do something that my client would have never known about. We only learned about the user registry when Mr. Werlau -- his expert testimony was disclosed to us and when he testified.

So, again, that's where I would end. Thank you, your Honor.

THE COURT: Thank you.

Friends, again, my understanding is that you are going to get a transcript of these proceedings. The issue is that the government had asked me to set a trial date on the theory that the government is pursuing the earlier counts on which the jury hung.

So, we have problems, as always. I have obligations through July into August. I was thinking we'd do November before Thanksgiving, but I'm told there's a conflict. I think I had heard from the parties, as well, September into October. But perhaps --

Mr. Arad, yes.

MR. ARAD: The government has no conflict with a November date before Thanksgiving. The dates that we suggested in our letter, which I believe were October 5th and 12th as start dates, were the only dates that both sides could agree on. But the government does have broader availability than

that.

THE COURT: I can't do those dates in October for the preservation of my marriage. So I'm out the week, I think it would probably begin Friday the 16th. So I probably could begin the 26th of October just to ensure that we're done by Thanksgiving. But perhaps I could hear from the defense.

MS. AXEL: I have a November conflict, your Honor.

THE COURT: That's the problem. Okay.

MS. AXEL: Yes. I can look at the specific dates. I mean, that's why if we started earlier in October, I was hoping to be done --

THE COURT: Right. Which I can't do.

MS. AXEL: And then I think there's an early 2027 conflict.

THE COURT: I want this to be done before then. I think something that ends before Thanksgiving, well before Thanksgiving would keep my jury happier. You have a conflict on the 26th of October?

MS. AXEL: No, I have a conflict. It's most of November.

THE COURT: Oh, most of November.

MS. AXEL: It's a state court trial, so it's scheduled on particular dates.

THE COURT: Yes. And for sure it's happening?

MS. AXEL: I can never say for sure.

THE COURT: Of course. Same here. If you have a conflict in November, then we can't do this in November.

MS. AXEL: If we have to do it in November, your Honor, I guess I would like maybe a moment to see what I can do on that, if the Court --

THE COURT: If you could. If you could. I currently do not have a trial -- oh, I have a trial in November with a *pro se* criminal defendant beginning on the 26th of October, but I'll try and move it up and see if I can do it September into October. After that, though, that trial will go right into Thanksgiving, so that doesn't make sense for us to begin. My December is reasonably clean. I have an obligation, a judicial conference obligation, but that's two days, and if the jury isn't sitting for two days, they'll probably thank us. So I could start the 30th of November. So perhaps, Ms. Axel, I won't put anything down just yet. You're welcome to caucus with your team and with the government and let me know. Those are the dates available to me. And then my January is totally free. I just hadn't thought we were going out that far.

MS. AXEL: So the options would be October 26th, November 30th, or January 2027?

THE COURT: Correct.

MS. AXEL: Could we have until the end of the week?

THE COURT: Today's Thursday, you can have until the beginning of next week because I need you to see how viable

these are. But yes. Talk amongst yourselves and get back to me and I will be working on this.

Mr. Arad, anything I have neglected to do that I should be doing now?

MR. ARAD: No, your Honor.

THE COURT: Thank you so much for your time, sir, and your preparation.

Mr. Klein, anything else we should be doing now?

MR. KLEIN: No, but we're still hoping we don't have to come back for a retrial.

THE COURT: I understand, sir, but I can't make my decision based solely on that wish.

MR. KLEIN: I understand, your Honor.

THE COURT: I will be taking everything that you've said today very seriously.

Thank you, everyone. We're adjourned.

* * *